Ramzi Abadou (SBN 222567)
**KAHN SWICK & FOTI, LLP**
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 459-6900
Facsimile: (504) 455-1498
ramzi.abadou@ksfcounsel.com

*Lead Counsel and Counsel for Lead Plaintiffs,*
*Diane Smith & William P. Smith*

*[Additional counsel on signature page]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| MEYSAM MORADPOUR, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> VELODYNE LIDAR, INC., ANAND GOPALAN, ANDREW HAMER, JAMES A. GRAF, MICHAEL DEE, and JOSEPH B. CULKIN <br> Defendants. | Case No. 3:21-CV-01486-SI <br><br> **CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>**CLASS ACTION**</u> <br><br> JURY TRIAL DEMANDED |

# **TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ............................................................................1

II.   SUMMARY OF THE ACTION ........................................................................3

III.  JURISDICTION AND VENUE .......................................................................13

IV.   PARTIES .......................................................................................................13

 A.    Lead Plaintiff ......................................................................................13

 B.    Corporate Defendant Velodyne Lidar, Inc......................................13

 C.    Defendant Anand Gopalan ...............................................................14

 D.    Defendant Andrew Hamer ................................................................15

 E.    Defendant James A. Graf ..................................................................16

 F.    Defendant Michael Dee .....................................................................17

 G.    Defendant Joseph B. Culkin .............................................................18

V.    SUBSTANTIVE ALLEGATIONS ................................................................21

 A.    Background on SPACs .......................................................................21

 B.    Graf Industrial Fails to Acquire a Company Within Its Originally Scheduled Timetable ............................................................................23

 C.    Defendants Graf and Dee Target Mr. Hall's Velodyne ..................29

 D.    Summary of Class Period Allegations ..............................................32

  1.    Defendants' Scheme to Remove David Hall from Velodyne...................33

  2.    Defendant's Financial Outlook and Guidance Trajectory Misrepresentations ....................................................................42

  3.    Defendants' Class Period Ford Misrepresentations ...................51

  4.    Defendants' Internal Control and Corporate Governance Misrepresentations ....................................................................55

 E.    Post-Class Period Developments .......................................................58

VI.   DEFENDANTS' MATERIALLY FALSE AND MISLEADING PRE-REVERSE MERGER STATEMENTS AND OMISSIONS...........................................61

A.    July 2, 2020 Statements ..................................................................61

B.    July 15, 2020 Statements ................................................................69

C.    July 20, 2020 Statements ................................................................74

D.    August 21, 2020 Statements ...........................................................76

E.    August 27, 2020 Statements ...........................................................82

F.    August 31, 2020 & September 1, 2020 Statements .........................84

G.    September 8, 2020 Statements ........................................................87

H.    September 14, 2020 Statements ......................................................93

I.    September 22, 2020 Statements ......................................................99

VII.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING POST-REVERSE MERGER STATEMENTS AND OMISSIONS.................................................102

A.    October 1, 2020 Statements .........................................................102

B.    October 19, 2020 Statements .......................................................106

C.    October 30, 2020 Allegations .......................................................110

D.    November 4, 2020 Statements ......................................................114

E.    November 5, 2020 Statements ......................................................115

F.    November 9, 2020 Statements ......................................................124

G.    January 7, 2021 Statements..........................................................127

H.    January 12, 2021 Statements .......................................................130

VIII.    ADDITIONAL CLASS PERIOD ALLEGATIONS ....................................131

IX.    ADDITIONAL SCIENTER ALLEGATIONS AND POST-CLASS PERIOD DEVELOPMENTS.................................................................................136

X.    LOSS CAUSATION..............................................................................150

A.    January 7, 2021 Disclosure ..........................................................152

B.    February 12, 2021 Disclosure ......................................................152

C.    February 22, 2021 Disclosure ......................................................153

D.    March 17, 2021 Disclosure ..................................................................154

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE ........................................................................155

XII.    NO SAFE HARBOR .........................................................................157

XIII.    CLASS ACTION ALLEGATIONS ...................................................158

XIV.    COUNT I ...........................................................................................159

XV.    COUNT II ..........................................................................................160

XVI.    COUNT III.........................................................................................161

XVII.    PRAYER FOR RELIEF .....................................................................161

XVIII.    JURY DEMAND ................................................................................162

## I.    PRELIMINARY STATEMENT

1.    Lead Plaintiffs Diane and William P. Smith ("Lead Plaintiffs" or "Plaintiffs") allege the following based upon personal knowledge with respect to themselves and, with respect to all other matters, the investigation of Lead Counsel.

2.    Lead Counsel's investigation included a review and analysis of, *inter alia*: (i) United States Securities and Exchange Commission ("SEC") filings by Velodyne Lidar, Inc. ("Velodyne") *f/k/a* Graf Industrial Corp. ("Graf Industrial") (together with Velodyne, "Velodyne" or the "Company"); (ii) press releases, media statements and marketing and investor presentations that Defendants prepared, issued and publicly-disseminated; (iii) Defendants' statements to analysts and the Company's investors during earnings conference calls, investor conferences and in media reports; (iv) analyst and industry reports concerning Velodyne; (v) court filings by and concerning Velodyne before the Judicial Arbitration and Mediation Services ("JAMS"), Santa Clara, California Superior Court and the United States District Court for the District of Delaware; and (vi) other industry-specific and regulatory information concerning Velodyne. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

3.    This is a putative class action for violations of the federal securities laws. Plaintiffs bring this federal securities action on behalf of all persons who purchased Velodyne securities between July 2, 2020 and March 17, 2021, inclusive (the "Class Period") and were damaged by the conduct asserted herein (the "Class").

4.    Plaintiffs assert claims pursuant to §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, against: (i) Velodyne: (ii) *former* Velodyne Chief Executive Officer ("CEO") Anand Gopalan; (iii) Velodyne Chief Financial Officer ("CFO") Andrew Hamer; (iv) *former* President and CFO of Graf Industrial, and current Chairman of Velodyne's Board of Directors ("Board") Michael Dee; (v) *former* CEO of Graf Industrial and Velodyne director James A. Graf; and (vi) *former* Velodyne Chairman of the Board and a current director of the Board Joseph B. Culkin (together, "Defendants").

5.      Lead Plaintiffs' claims arise out of a fraudulent or deliberately reckless course of business conduct whereby, throughout the Class Period, Defendants either knew or recklessly disregarded that their: (i) statements and omissions as alleged herein were materially false and misleading when made; (ii) material misstatements and omissions would adversely affect the integrity of the market for Velodyne securities and deceive investors into purchasing Velodyne securities at artificially inflated prices during the Class Period.

6.      Specifically, throughout the Class Period, Defendants made materially false and misleading statements and/or failed to disclose that: (i) since July 2, 2020, Defendants and now former Velodyne CEO and Executive Board Chairman, David Hall, were actively engaged in an undisclosed and highly damaging dispute over control of Velodyne which, unbeknownst to investors, was harming the Company's business operations and prospects;[1] (ii) by no later than December 9, 2020, the Company's Audit Committee had already taken steps to retain outside counsel at Keker Van Nest & Peters, LLP ("Keker Van Nest") to commence a formal outside independent investigation to oust Mr. Hall from the Company's leadership; (iii) Velodyne was losing major customers and investors, including one of its most highly touted customers and investors – Ford Motor Co. ("Ford"); (iv) Velodyne was not on track to achieve its stated guidance due to a loss of customers, an increase in research and development ("R&D") costs and sales and marketing expenses, which were necessary to compete with lidar competitors Hesai Technology and Argo AI; (v) Velodyne's internal controls over financial reporting suffered from multiple undisclosed material weaknesses, including its processes and controls over tracking and reporting whistleblower complaints and litigation matters; and (vi) as a result of the foregoing, Defendants' statements about Velodyne's business, operations, and prospects were materially misleading when made.

---

[1]      Mr. Hall is not named as a defendant herein but is a named defendant in a federal derivative action filed in Delaware federal court captioned *In re Velodyne Derivative Litig.*, et al., Case No. 1:21-cv-00369-TMH (D. Del. Mar. 12, 2021).

7.    As the full truth regarding Defendants' material misrepresentations and omissions were revealed in a series of disclosures as alleged in more detail in ¶¶ 384-400, *infra*, the price of the Company's securities declined dramatically, thereby damaging investors.

## II.    SUMMARY OF THE ACTION

8.    Prior to the Class Period, Graf Industrial was a special purpose acquisition company ("SPAC") formed by Defendants Graf and Dee in June 2018 for the sole purpose of raising capital through an initial public offering ("IPO") to target a private company to merge with and take public. Under the terms of its original articles of incorporation, Graf Industrial was required to complete such a business combination no later than April 18, 2020. If it failed to do so, Graf Industrial and Defendants Dee and Graf would have to refund Graf Industrial's investors over $200 million, which it had raised during its IPO. At the same time, Defendants Graf and Dee's own founders shares and warrants would expire worthless such that they were highly motivated to quickly consummate a business combination.

9.    When it became apparent that Graf Industrial would fail to meet its April 18, 2020 deadline after a business combination that it publicly announced failed to materialize, Graf Industrial amended its articles of incorporation twice—first extending its deadline to consummate the combination to July 31, 2020, and later to October 31, 2020. Ultimately, Graf Industrial targeted privately held Velodyne, which specializes in lidar technology. Lidar is a method for measuring distances using laser light, commonly used to make high-resolution maps and is a key feature in developing certain autonomous vehicle technologies.

10.    Velodyne was founded by Mr. Hall in 2015 and, at all relevant times prior to his ouster as the Company's Chairman of the Board by Defendants on February 22, 2021, Graf Industrial publicly acknowledged his critical importance to the Company's prospects, stating that: "Velodyne is highly dependent on David Hall [and] **[t]he loss of Mr. Hall would adversely affect Velodyne's business** . . . ."[2] In order to limit Mr. Hall's ability to withdraw from the Merger, Defendants Graf and Dee imposed a provision whereby "Velodyne must pay Graf Industrial a termination fee of

---

[2]    All emphasis added throughout herein unless otherwise noted.

"$58,867,000" if the July 2, 2020 merger agreement between Graf Industrial and Velodyne was terminated by Velodyne (*i.e.*, Mr. Hall) prior to the close of the business combination on September 29, 2020.[3] On July 2, 2020, the first day of the Class Period, Graf Industrial filed a press release with the SEC on Form 8-K announcing its merger agreement with Velodyne ("Merger"). On September 29, 2020, the combined Company's common stock and warrants began trading on Nasdaq after the reverse merger closed ("Reverse Merger").

**Class Period Allegations**

11.    At all relevant times during the Class Period, Defendants knew that the Merger and Reverse Merger could and would not be consummated and approved by shareholders unless Defendants, *inter alia*, made four categories of materially false and misleading statements and/or omissions: (i) touting Mr. Hall's continued involvement as a director and employee of the Company after the Merger and subsequent Reverse Merger; (ii) trumpeting the Company's purported massive financial guidance and prospects; (iii) highlighting Ford's continuous investment in and as a critical customer of the Company after the Reverse Merger; and (iv) promoting the quality of the Company's internal control over financial reporting.

12.    As Defendants' undisclosed scheme unraveled during the Class Period, it devolved into public accusations of securities fraud by and amongst the Company's highest ranking executive officers and directors. Indeed, both during and after the Class Period, Mr. Hall specifically accused Defendant Gopalan (who ultimately resigned from Velodyne) of having "***manipulated the truth to***

---

[3]    To the same end, Defendants Graf and Dee entered into an agreement ("Support Agreement") with David Hall that prevented Mr. Hall from disrupting the Reverse Merger by restricting his ability to vote against it. The Support Agreement "provid[ed] . . . that at any meeting of the Velodyne stockholders and in connection with any written consent of the Velodyne stockholders, Mr. Hall will vote all of the outstanding shares of Velodyne common stock held by Mr. Hall or with respect to which Mr. Hall has the right to vote by proxy (or will execute and deliver a written consent with respect to such shares) in favor of the Merger and the adoption of the Merger Agreement, regardless of whether the Merger is no longer recommended by the Velodyne board of directors in accordance with the Merger Agreement." *See* Graf Industrial's July 6, 2020 Form-8K, which was signed by Defendant Graf.

*customers and investors alike.*"[4] And, for their part, Defendants have variously accused Mr. Hall of: (i) "behav[ing] inappropriately"; (ii) "fail[ing] to operate with honesty, integrity, and candor"; and (iii) of publicly making "*false assertions*" during the Class Period. As the accusations of corporate wrongdoing intensified and began negatively impacting the Company's operations, shareholders suffered significant damages as alleged herein.

13.     *First*, *Defendants falsely assured the market about Mr. Hall's continued leadership of Velodyne in an effort to successfully promote the Merger and gain shareholder approval for the Reverse Merger.* This action involves an undisclosed, manipulative scheme by Defendants Dee and Graf to oust the Company's founder and now former CEO and Executive Chairman, Mr. Hall. Velodyne's (and its predecessor, Graf Industrial's) Class Period press releases, investor presentations and SEC filings repeatedly highlighted its "founder and industry icon" Mr. Hall's continued involvement in the Company following the July 2, 2020 Merger and subsequent Reverse Merger with Graf Industrial on September 29, 2020.

14.     Starting on July 2, 2020 – the first day of the Class Period – and continuing until February 22, 2021, Defendants repeatedly highlighted Mr. Hall's continued leadership role at Velodyne as a (if not *the*) primary reason to support the Merger and subsequent Reverse Merger representing, *inter alia*, that: (i) "David Hall *will continue to play a critical role as executive chairman of Velodyne*;" and that (ii) Mr. Hall "*remains deeply involved in all aspects of Velodyne's business* . . . ." While Defendants Graf and Dee already had concerns with Mr. Hall's controlling equity stake of Velodyne at the time of the Merger, and had already begun to marginalize him internally, the Company's Class Period SEC filings repeatedly recognized Mr. Hall's fundamental importance to Velodyne's operations and reputation while assuring investors that he would continue to lead the Company well after the business combination. At the same time, however, Defendants concealed the fact that they were actively engaged in a scheme to remove Mr. Hall from the Company.

---

[4]     As alleged in ¶¶ 42, 165-167, 372-375 *infra*, Defendant Gopalan announced his sudden resignation as Velodyne's CEO on July 19, 2021. As of the date of this filing, the Company does not have a CEO.

15.     Then, for the first time since the Merger and subsequent Reverse Merger, the Company unexpectedly disclosed in a press release filed with the SEC on Form 8-K on February 22, 2021 that Mr. Hall had been terminated as Velodyne's Chairman, and that a previously undisclosed outside investigation by Keker Van Nest that commenced on December 9, 2020 had concluded (without any factual support) that Mr. Hall had purportedly "failed to operate with respect, honesty, integrity, and candor in their dealings with Company officer and directors."[5] To this day, Defendants still have yet to provide any details supporting their investigation's boilerplate findings. A February 22, 2021 article by Mat Grossman of *Dow Jones Institutional News* detailed these developments in a report called "Velodyne Lidar Names New Chairman Following Board Investigation." There, Mr. Hall, who was interviewed for the report, revealed that his ouster was: "a ***well-played-out plan to hijack the corporation by the SPAC guys***." Mrs. Hall elaborated that "she and Mr. Hall had been misled into believing that aspects of the merger's structure were boilerplate and could be corrected later." In response to these damaging developments, the price of Velodyne stock and warrants fell 15% and 20% in a single day, respectively, on unusually heavy trading volume.

16.     Since being ousted as Velodyne's Executive Chairman, Mr. Hall has accused the Company's now former CEO (Defendant Gopalan) and various members of the Board, including Defendants Dee, Graf and Culkin, of misleading shareholders with their statements about his continued leadership role in the Company during the Class Period. At various times between March and June 2021, Mr. Hall has publicly stated, *inter alia*, that Defendants had: (i) "***manipulated the truth*** to customers and investors alike" about the Company's operations, financial condition and prospects; (ii) "***breached stockholders' confidence***"; (iii) "prioritized [their] own self-interests over stockholders and has overseen the destruction of significant stockholder value"; (iv) "rubberstamp[ed] an increased compensation package for [Defendant] Gopalan despite the Company releasing weak Q4 2020

---

[5]     Prior to her termination and censure by the Company's Board on February 19, 2021, Mrs. Hall served as Velodyne's Chief Marketing Officer. The Company later rehired Keker Van Nest to bring a temporary restraining order against Mr. Hall for purported trade secret theft in Santa Clara Superior Court. *See Velodyne Lidar, Inc. v. Hall*, No. 21CV383938 (Cal. Sup. Ct. July 2, 2021).

earnings and missing year end forecasts"; and (v) making those financial forecast and earnings guidance statements "*knowing the company would miss its 2020 projections*.'"

17.     According to Mr. Hall, unbeknownst to investors, the Company had begun scheming to limit his control of the Company and remove him from Velodyne altogether since the time of the Merger on July 2, 2020. On June 3, 2021, Mr. Hall revealed that: "perhaps the greatest offense has been that this Board has allowed [Defendant] Gopalan's actions to go *unchecked* as Chief Executive Officer while he has *manipulated the truth to customers and investors alike*."

18.     Indeed, although the Board's Audit Committee (*see* ¶¶ 50, 366-367, 367 n.44, *infra*) had already commenced an internal investigation into Mr. Hall by the time it hired Keker Van Nest on December 9, 2020, Defendants failed to disclose that very investigation when they unexpectedly pre-announced Velodyne's preliminary fourth quarter and full year 2020 financial results on January 7, 2021. To the contrary, instead, the Company falsely represented that same day "*that there is no change in our fundamental outlook for the future*" despite the fact that virtually all of the Company's previous SEC filings assured investors that "*the loss of Mr. Hall would adversely affect Velodyne's business* . . . ."

19.     Relatedly, Defendants also knew at all relevant times that, in their words, "[n]egative public perception of, or negative news related to, Mr. Hall . . . may adversely affect Velodyne's brand, *relationship with customers* or standing in the industry." Defendants therefore on the one hand misleadingly reassured investors that the Company's "fundamental outlook" remained unchanged as of January 7, 2021 while contemporaneously knowing that Mr. Hall – as of *January 7, 2021* – was *already* under investigation and had *already* "informed the Board of Directors of the Company that he has voluntarily transitioned from serving as an employee and executive officer of the Company to a non-executive role, effective immediately" due to the undisclosed fight for control over the Company.[6]

20.     *Second, Defendants misrepresented that the Company was experiencing tremendous growth and was on track to achieve a massive revenue trajectory to promote the Merger and Reverse Merger*. Between July 2020 and January 7, 2021, Defendants repeatedly touted the Company's

---

[6]     Velodyne's January 13, 2021 press release filed with the SEC on Form 8-K.

1    financial outlook and prospects based on Velodyne's purportedly already "existing" customer

2    contracts. Starting with the Company's July 2, 2020 press release on Form 8-K, Defendant Graf falsely

3    claimed that "[e]stimated revenues under ***existing customer contracts*** are expected to exceed $800

4    million from 2020 to 2024. Velodyne is expected to generate revenues of approximately $100 million

5    in 2020, increasing to approximately $680 million in 2024 with ***existing contracts*** expected to drive

6    just under 50% of the estimated 2024 revenues."

7         21.    On August 31, 2020, Defendants again reiterated in a press release signed by Defendant

8    Graf that "Velodyne's 2020 revenue guidance and outlook through 2024 are ***reaffirmed***" and that

9    "Velodyne's customer agreements represent approximately $970mm in expected revenue through

10   2024, a $130mm increase from time of initial transaction announcement on July 2, 2020." On

11   September 2, 2020, the Company again reaffirmed its projections stating "Velodyne's 2020 revenue

12   guidance and outlook through 2024 are ***reaffirmed***" and that "Velodyne's customer agreements

13   represent approximately $970mm in expected revenue through 2024, a $130mm increase from time

14   of initial transaction announcement on July 2, 2020.

15        22.    Then, on January 7, 2021, after having successfully lured investors to approve the

16   Reverse Merger and invest in the Company's public securities, Defendants not only disclosed that they

17   had radically misstated Velodyne's 2020 guidance but added that: "at this time 2021 ***guidance***

18   ***withdrawn*** due to reduced near-term visibility." On this news, the price of Velodyne stock and

19   warrants fell 7% and 13%, respectively, on massive trading volume. Hoping to justify the Company's

20   profoundly missed guidance and withdrawn outlook, Defendants misleadingly sought to blame the

21   COVID-19 pandemic, stating in a press release on Form 8-K filed with the SEC on January 7, 2020

22   that: "[l]argely as a result of these COVID-19 related disruptions, management now estimates fourth

23   quarter revenue 2020 in a range of $15.5 million to $16.0 million and full-year 2020 revenue of

24   approximately $94 million versus $101 million as previously provided as guidance for the full year.

25   Without these unexpected end-of-year disruptions, Velodyne believes it would have met prior revenue

26   guidance for 2020."

27

28

23.     Subsequently, on May 25, 2021, Mr. Hall described Defendants' COVID-19 excuse for the Company's large quarterly earnings miss and withdrawn 2021 guidance as a "*convenient scapegoat*," adding that the miss was in "reality" due to "the Company's plunging product sales, departure of key R&D personnel [and] significant loss of market share to competitors . . . ." None of these negative developments were ever disclosed to investors by Defendants at any point during the Class Period. In the same letter, Mr. Hall added: "[s]adly, the Board and *management appear content blaming their own failings on the COVID-19 pandemic*." Further, after suddenly announcing withdrawn 2021 guidance, Defendants thereafter flatly refused to provide any explanation for the stark reversal in Velodyne's prospects during the Company's February 25, 2021 earnings conference call. There, in a response to an analyst question about the Company's repeated prior guidance misrepresentations through 2024, Defendant Hamer stated without elaborating that: "*we aren't providing any guidance* that far out at this point." Defendant Hamer's refusal to respond was yet another stark instance of Defendants' glaring bait-and-switch scheme to take Velodyne public *via* the SPAC process.

24.     Further, as a high-raking insider and controlling Company shareholder with deep firsthand knowledge of the Company's operations and financial condition, Mr. Hall also squarely accused Defendants of making materially false and misleading statements and omissions during the Class Period about Velodyne's missed fourth quarter and full year 2020 guidance and withdrawn financial outlook. Specifically, on May 25, 2021, Mr. Hall explained that Defendants' materially misleading Class Period statements concerning the Company's financial performance were, in fact, misleading because they failed to contemporaneously disclose the "*Company's plunging product sales [and] departure of key R&D personnel* . . . ." In other words, Defendants either knowingly or recklessly failed to disclose either of these negative material developments to investors during the Class Period because, as Mr. Hall later revealed on March 10, 2021, Defendants made their projections statements while simultaneously "*knowing that the company would miss its 2020 projections*."

25.     On May 26, 2021, analyst Michael Filatov of Berenberg Capital Markets commented on these developments in a note called "An update on VLDR's power struggle[,]" which highlighted

1    that: "Mr. Hall appears to corroborate some of the views expressed in our downgrade note that the

2    company is experiencing a 'significant loss of market share to competitors.'" Again, at no point during

3    the Class Period, did Defendants ever disclose these material, adverse developments concerning

4    Velodyne's acute competitive challenges, which they either knew or recklessly disregarded had by

5    then negatively impacted the Company's operations, financial condition and prospects.

6         26.    ***Third***, ***Defendants misleadingly touted Ford's continued investment in and as a key***

7    ***customer of Velodyne to promote the Merger and gain shareholder approval for the Reverse***

8    ***Merger***. In a Definitive Proxy filed with the SEC on Form 14A dated September 14, 2020 to promote

9    the September 29, 2020 Reverse Merger to investors, for instance, the Company assured investors that

10   "***Ford is expected to hold greater than 5% of the Company's outstanding common stock after the***

11   ***Business Combination***." At the time this statement was made, Defendants either knew or recklessly

12   disregarded that, no later than October 2020, Ford intended to sell its entire 7.6% stake in Velodyne

13   because it had negotiated a "Letter Agreement" with Velodyne whereby "Velodyne agreed that any

14   shares of common stock issued to Ford Motor Company in the Business Combination will not be

15   subject to a lock-up or market stand-off agreement."

16        27.    Then, on February 12, 2021, ***Ford*** (*i.e.*, not Defendants) unexpectedly disclosed in

17   Schedule 13G/A filed with the SEC that same day that it had sold its entire 7.6% stake in Velodyne ***as***

18   ***of December 31, 2020***. On this news, the price of Velodyne stock and warrants fell 8% and 12%,

19   respectively, on unusually high trading volume. At no point between October 2020 and February 2021

20   did Defendants ever inform investors that Ford – one of its longtime, most significant investors and

21   customers – had sold its entire position in the Company's shares. A market analyst from Berenberg

22   Capital later disclosed that Velodyne had also lost Ford as a customer to Argo AI due to the Company's

23   increasingly obsolete product offerings. And when asked by an analyst during the Company's

24   February 25, 2021 earnings call with investors about "Ford's decision to sell down their Velodyne

25   stake," Defendant Hamer admitted, contrary to Defendants' prior statements about Ford's long term

26   investment in Velodyne, that: "***they don't like to stick around as a financial investor***. ***That's not their***

27   ***nature. They'd rather reallocate that capital to other investment***."

28

28.    ***Fourth*, *and finally, Defendants materially misrepresented the quality of Velodyne's corporate governance and internal controls to mislead investors about the quality of the harried business combination***. Throughout the Class Period, Velodyne's SEC filings, including its September 14, 2020 Proxy to promote the Reverse Merger with Graf Industrial, represented that Velodyne had "in place the governance, financial systems and controls required in the public markets . . . , as well as corporate governance, financial systems and controls in place to operate as a public company." Those representations were also profoundly materially false and misleading when made as the Company's corporate governance and internal controls were breathtakingly dysfunctional during the Class Period.

29.    In a filing on Schedule 13D with the SEC dated March 2, 2021, for instance, Mr. Hall revealed that he had previously raised "concerns with [Velodyne's] corporate governance" as early as July 2, 2020. On March 10, 2020, Mr. Hall revealed that Defendants had "manipulate[d] the Company's corporate machinery" and "fostered an anti-stockholder culture and that ***Velodyne Lidar's corporate governance is broken***. Perhaps most unsettling was the Board's decision to rubberstamp an increased compensation package for Mr. Gopalan despite the Company releasing weak Q4 2020 earnings and missing year end forecasts."

30.    Then, on March 17, 2021, Defendants were forced to finally admit in an Annual Report filed with the SEC on Form 10-K, that: "[w]e have identified material weaknesses in our internal control over financial reporting, and the failure to achieve and maintain effective internal control over financial reporting could harm our business and negatively impact the market price of our common stock." The same day, the Company revealed in a press release filed with the SEC on Form 8-K that its Chief Operating Officer ("COO") Thomas Tewell had suddenly and unexpectedly resigned, tersely stating that: "[o]n March 14, 2021, Mr. Tewell resigned from the Company, effective immediately." In response to this news, the value of the Company stock fell by 5.4%, while the trading price of Velodyne stock warrants similarly fell by 7.8% in a single day.

31.    The fallout from Defendants' Class Period misconduct is still continuing to negatively impact the Company's operations and prospects to this day. On August 6, 2021, an article by Rebecca

Bellan of *TechCrunch.com* titled "The cost of Velodyne's internal drama is starting to add up" highlighted, for instance, how Velodyne was "***spending more to find new customers for its products while grappling with an increasingly expensive internal drama***." The same article added that Defendants' Class Period recklessness had become a "debacle," stating: "[e]arlier in the year, founder David Hall was removed as chairman of the board and his wife, Marta Thoma Hall, lost her role of chief marketing officer following an investigation by the board into the couple for 'inappropriate behavior.' ***The legal fees involved in this debacle set the company back $1.4 million this quarter, and $3.7 million for the first half of 2021***, according to Velodyne CFO Drew Hamer." The same article further noted the Company "reported its second quarter earnings Thursday [August 5, 2021], results that show a company spending more to find new customers for its products while grappling with an increasingly expensive internal drama" and corroborated that the Company "has lost some customers more recently. . . . For instance, ***Ford, which had originally backed Velodyne, divested its stake in the company and placed its bets on Argo AI*** . . . ."

32.    Ultimately, as alleged throughout herein, Defendants' materially misleading statements about, and simultaneous failure to disclose the negative material developments impacting the Company's operations during the Class Period caused the Company's share price to decline ***over 50%*** since the commencement of the Class Period on July 2, 2020. While the Company's insiders pocketed massive amounts of money in the process, the Company's public shareholders were not as fortunate as alleged throughout herein. Indeed, as Mr. Hall himself noted on August 23, 2021, "Velodyne Lidar's stock price declined from $30 in September 2020 to $6.17 on August 20, 2021" due to, *inter alia*, Defendant Dee's misconduct, adding for good measure that: "Mr. Dee is facing serious accusations of misleading investors and fraud."[7]

---

[7]    https://www.businesswire.com/news/home/20210823005386/en/David-Hall-Founder-of-Velodyne-Lidar-Calls-for-Chairman-Michael-Dee-and-Director-Hamid-Zarringhalam-to-Resign-from-the-Board.

III.     **JURISDICTION AND VENUE**

33.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5. This Court has jurisdiction over the subject matter of this action under § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States of America.

34.     Venue is proper in this District under § 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b)-(d). The Company maintains its principal executive offices in this District, and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

35.     In connection with the acts alleged in this Complaint, Defendants directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the U.S. mail, interstate telephone and other electronic communications, and the facilities of the Nasdaq Stock Market LLC ("Nasdaq"), a national securities exchange.

IV.     **PARTIES**

A.     **Lead Plaintiff**

36.     Lead Plaintiffs purchased Velodyne securities during the Class Period as set forth in the certification previously filed with the Court on May 3, 2021, and as incorporated by reference herein, and have been damaged thereby. *See* ECF Nos. 45-2 (certification) and 45-3 (loss chart).

B.     **Corporate Defendant Velodyne Lidar, Inc.**

37.     Defendant Velodyne was formed as a publicly traded company through the Merger and subsequent Reverse Merger between Velodyne and Graf Industrial. Prior to the Reverse Merger, Graf Industrial's stock, warrants, and ownership units traded under the symbols "GRAF," "GRAFW" and "GRAFU," respectively. The Company is headquartered in San Jose, California. Velodyne develops and markets lidar solutions for autonomous vehicles, driver assistance, delivery, robotics, navigation, mapping, and other uses. Velodyne common stock and warrants trade on the Nasdaq under ticker symbols "VLDR" and "VLDRW," respectively.

38.    The Company is liable for the acts of the Individual Defendants (defined in ¶ 54, *infra*) and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

**C.    Defendant Anand Gopalan**

39.    Defendant Anand Gopalan ("Gopalan") is the former President and CEO of Velodyne. Defendant Gopalan began serving as the Company's President and CEO in January 2020 and as a Company director in July 2019. Previously, he served as Velodyne's Chief Technology Officer ("CTO") beginning in June 2016. According to the Company's current report filed on Form 8-K with the SEC on October 5, 2020 (the "October 2020 8-K"), as of September 29, 2020, Defendant Gopalan beneficially owned 1,482,646 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 29, 2020 was $24.75, Defendant Gopalan owned approximately $36.7 million worth of Velodyne stock. Moreover, Defendant Gopalan personally benefitted from the Reverse Merger, as his total reported compensation rose over ***nine times*** from approximately $2.898 million for the fiscal year ended December 31, 2019 (before the Merger) to $26.135 million for the post-Merger fiscal year ended December 31, 2020.

40.    During the Class Period, Defendant Gopalan signed and/or had ultimate authority over the Company's: (i) Merger Agreement; (ii) October 19, 2020 Registration Statement on Form S-1 ("October Registration Statement"); (iii) Amendment No. 1 to the Registration Statement on Form S-1, filed on October 30, 2020 ("October 2020 Amended Registration Statement");[8] (iv) quarterly report for the third quarter of 2020 filed with the SEC on Form 10-Q on November 9, 2020 ("3Q20 10-Q"); and (v) 2020 Annual Report filed with the SEC on Form 10-K on March 17, 2021 ("2020 Annual Report"). As the Company's CEO, Defendant Gopalan also executed Certifications filed pursuant to the Sarbanes Oxley Act of 2002 during the Class Period falsely attesting to the quality of the Company's internal controls as alleged herein.

---

[8]    Defendant Gopalan further signed the October 30, 2020 Amended Registration Statement, in his representative capacity, on behalf of Defendants Hamer, Graf, Dee, and Culkin.

41.     Defendant Gopalan also participated in and made statements during all the Company's Class Period earnings conference calls. Because of his senior position with the Company, Defendant Gopalan possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Velodyne made with the SEC during the Class Period.

42.     According to a July 19, 2021 Form 8-K ("July 2021 8-K") filed by Velodyne, Mr. Gopalan tendered his resignation on July 16, 2021, effective July 30, 2021. In connection with his departure, which provided him $8 million, Velodyne announced in the July 2021 8-K that:

> [Velodyne] and Dr. Gopalan have indicated their intent to enter into a consulting agreement, pursuant to which Dr. Gopalan would provide transition services following his departure. Dr. Gopalan will also receive severance benefits in connection with his resignation pursuant to his amended and restated employment agreement.

### D.     Defendant Andrew Hamer

43.     Defendant Andrew Hamer ("Hamer") is the CFO of Velodyne. Defendant Hamer has served as the Company's CFO and Treasurer since July 2019. Previously, he served as the Company's interim CFO and Treasurer from April 2019 until July 2019. According to the October 2020 8-K, as of September 29, 2020, Defendant Hamer beneficially owned 91,806 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 29, 2020 was $24.75, Defendant Hamer owned approximately $2.3 million worth of Velodyne stock.

44.     During the Class Period, Defendant Hamer signed and/or had ultimate authority over the Company's: (i) October Registration Statement; (ii) October 30, 2020 Amended Registration Statement (which he authorized Defendant Gopalan to sign on his behalf); (iii) November 5, 2020 8-K; (iv) 3Q20 10-Q; (v) January 7, 2021 8-K; (vi) February 25, 2021 8-K; and (vii) 2020 Annual Report. Defendant Hamer participated in and made statements during all the Company's Class Period earnings conference calls with investors. As the Company's CFO, Defendant Hamer also executed Certifications filed pursuant to the Sarbanes Oxley Act of 2002 during the Class Period falsely attesting to the quality of the Company's internal controls as alleged herein.

45.     Because of his senior position with the Company, Defendant Hamer possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Velodyne made with the SEC during the Class Period.

**E.     Defendant James A. Graf**

46.     Defendant James A. Graf ("Graf") served as the CEO of Graf Industrial from its inception in 2018 and remained in that role through the Reverse Merger. He was also the managing member of the Sponsor entity, Graf Acquisition LLC—his fifth SPAC venture as of February 5, 2020. After the Reverse Merger, he served as a director of Velodyne from September 2020 until mid-February 2021, also serving as a member of the Compensation Committee. As reported by *Bloomberg* on February 11, 2021, Defendant Graf had organized SPACs called Graf Acquisition Corp. II, III and IV, intending to raise $150 million, $225 million and $300 million, respectively. On February 15, 2021—just four days after *Bloomberg* reported his formation and fundraising efforts for three new SPACs, Graf suddenly and unexpectedly announced his resignation from Velodyne, effective immediately. Velodyne announced his resignation from the Board of Directors in a Form 8-K filed with the SEC dated February 18, 2021.

47.     According to Velodyne's current report on Form 8-K filed with the SEC on October 5, 2020, as of September 29, 2020, Defendant Graf beneficially owned 1,957,000 shares of Velodyne's common stock, representing 1.1% of the total outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on September 29, 2020 was $24.75, Defendant Graf owned approximately $48.4 million worth of Velodyne's stock.

48.     During the Class Period, Defendant Graf signed and/or had ultimate authority over the Company's: (i) July 2, 2020 8-K; (ii) Merger Agreement; (iii) July 20, 2020 8-K; (vi) August 27, 2020 Registration Statement; (v) September 1, 2020 8-K; (vi) September 2, 2020 8-K; (vii) September 22, 2020 Amendment to the August 27, 2020 Registration Statement; (viii) October Registration Statement; and (ix) October 30, 2020 Amended Registration Statement (*via* Defendant Gopalan, as power of attorney). Because of his senior position with the Company, Defendant Graf possessed the

1    power and authority to control the contents of the Company's press releases, investor and media

2    presentations, and all filings Velodyne made with the SEC during the Class Period.

3        **F.    Defendant Michael Dee**

4        49.    Defendant Michael Dee ("Dee") is the former President and CFO of Graf Industrial

5    and the current Chairman of the Board. Defendant Dee has served as a Company director since

6    September 2020. He also serves as the Chairperson of the Nominating and Governance Committee.

7    According to the October 2020 8-K, as of September 29, 2020, Defendant Dee beneficially owned

8    170,318 shares of the Company's common stock. Given that the price per share of the Company's

9    common stock at the close of trading on September 29, 2020 was $24.75, Defendant Dee owned

10   approximately $4.2 million worth of Velodyne stock.

11       50.    According to the Prospectus filed on or around October 1, 2020, upon completion of

12   the Reverse Merger between Graf Industrial and Velodyne Lidar, Inc., Defendant Dee began service

13   as a member of the Audit Committee alongside Christopher Thomas (its chair) and fellow director

14   Barbara Samardzich. As further detailed below, Dee, Thomas, and Samardzich served on the Audit

15   Committee during and beyond December 2020 (when the Audit Committee retained Keker Van Nest

16   to investigate purported misconduct by Mr. Hall and Marta Thoma Hall). Defendant Dee remains a

17   member of the Audit Committee to this day and is also currently the Company's Executive Chairman

18   of the Board – having replaced Defendant Culkin and Mr. Hall in that role.

19       51.    During the Class Period, Defendant Dee signed and/or had ultimate authority over the

20   Company's: (i) August 27, 2020 Registration Statement; (ii) September 14, 2020 Proxy Statement;

21   (iii) September 22, 2020 Amendment to the August 27, 2020 Registration Statement (*via* Defendant

22   Graf, as power of attorney; (iv) October Registration Statement; (v) October 30, 2020 Amended

23   Registration Statement (*via* Defendant Gopalan, as power of attorney); and (vi) 2020 Annual Report

24   (*via* Defendants Gopalan and Hamer, as power of attorney). Because of his senior position with the

25   Company, Defendant Dee possessed the power and authority to control the contents of the Company's

26   press releases, investor and media presentations, and all filings Velodyne made with the SEC during

27   the Class Period.

28

### G.    Defendant Joseph B. Culkin

52.    Defendant Joseph B. Culkin ("Culkin") is the former Chairman of the Board and currently serves as a Company director. Defendant Culkin has served as a Company director since September 2016. Defendant Culkin co-founded Velodyne's predecessor company, Velodyne Acoustics with Mr. Hall. According to the October 2020 8-K, as of September 29, 2020, Defendant Culkin beneficially owned 13,559,196 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on September 29, 2020 was $24.75, Defendant Culkin owned approximately $335,590,101 million worth of Velodyne stock.

53.    During the Class Period, Defendant Culkin signed and/or had ultimate authority over the Company's: (i) October Registration Statement; (ii) October 30, 2020 Amended Registration Statement (*via* Defendant Gopalan, as power of attorney); and (iii) 2020 Annual Report (*via* Defendants Gopalan and Hamer, as power of attorney). Because of his senior position with the Company, Defendant Culkin possessed the power and authority to control the contents of the Company's press releases, investor and media presentations, and all filings Velodyne made with the SEC during the Class Period.

54.    Defendants Gopalan, Hamer, Graf, Dee and Culkin are collectively referred to herein as the "Individual Defendants." Because of the Individual Defendants' executive positions, they each had access to the undisclosed adverse information about Velodyne's business, operations, services, acquisition plans, and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof.

55.    The scienter of the Individual Defendants and other employees and agents of Velodyne as alleged herein is imputed to Velodyne under *respondeat superior* and common law agency principles.

56.    Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, acquisition

plans, and present and future business prospects, as alleged herein. In addition, the Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

57.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and trade on the Nasdaq, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business, services, markets, competition, acquisition plans, and present and future business prospects. In addition, the Individual Defendants each had a duty to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded common shares and warrants would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

58.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

59.     Each Defendant is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Velodyne securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived

the investing public regarding Velodyne's business, operations, services, and present and future business prospects; (ii) enabled Velodyne to complete an initial business combination, thereby triggering lucrative incentive payouts for certain Company insiders, as detailed herein, during the Class Period; and (iii) caused plaintiffs and the Class to purchase Velodyne publicly traded securities at artificially inflated prices.

60.    Each Defendant was prohibited from using the instrumentalities of interstate commerce or the mails to: (i) employ any device, scheme, or artifice to defraud; (ii) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engage in any act, practice, or course of business which operates or would operate as a fraud upon any person. The Defendants' conduct violated the Exchange Act and SEC regulations promulgated thereunder in connection with the purchase or sale of the Velodyne securities.

61.    Defendants' scheme deceived the investing public regarding Velodyne's operations and the intrinsic value of Velodyne's securities and caused Plaintiffs and other members of the class to be damaged as a result of their purchases of Velodyne securities at artificially inflated prices.

62.    Each of the Individual Defendants is liable under the Exchange Act as a participant in a fraudulent scheme and course of business whose primary purpose and effect was to operate as a fraud and deceit on purchases of Velodyne securities by disseminating materially false and misleading statements and/or concealing material adverse facts about Velodyne's operations. The Individual Defendants' scheme deceived the investing public regarding Velodyne's operations and the intrinsic value of Velodyne's common stock, and damaged Plaintiffs and other members of the Class as a result of their purchases of Velodyne common stock at artificially inflated prices.

63.    The Company's press releases, and SEC filings were group-published documents, representing the collective actions of the Company management. The Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein under the Exchange Act and were aware, or recklessly disregarded, with respect to the statements at issue herein, that false and misleading statements were being issued

1    regarding the Company. The Individual Defendants also approved or ratified these statements in

2    violation of the Exchange Act.

3    **V.    SUBSTANTIVE ALLEGATIONS**

4          **A.    Background on SPACs**

5          64.    SPACs are entities formed to raise capital in an IPO with the purpose of using the

proceeds to acquire one or more unspecified business or assets to be identified after the IPO. A SPAC

will go through the typical IPO process of filing a registration statement with the SEC, clearing SEC

comments, and undertaking a road show followed by a firm commitment underwriting. The IPO

proceeds are held in a trust account until released to fund the business combination or used to redeem

shares sold in the IPO.

          65.    Offering expenses, including the up-front portion of the underwriting discount, and a

modest amount of working capital will be funded by the entity or management team that forms the

SPAC ("Sponsor"). A SPAC does not initially have any operations or business of its own. Rather,

SPACs raise money from investors in an IPO and then uses the proceeds from the offering to acquire

a business or operational assets, usually from a private company that does not publicly report financial

or operating results. After an IPO, SPACs pursue an acquisition opportunity and negotiate a merger

or purchase agreement to acquire a business or assets in a business combination.

          66.    Following the announcement of a merger agreement, a SPAC will undertake a

mandatory shareholder vote or tender offer process, in either case offering public investors the right

to return their public shares to the SPAC in exchange for an amount of cash roughly equal to the IPO

price paid. If the business combination is approved by the shareholders (if required) and the financing

and other conditions specified in the acquisition agreement are satisfied, the business combination will

be consummated (a "de-SPAC transaction" or reverse merger), and the SPAC and the target business

will combine into a publicly traded operating company. The reverse merger process is similar to a

public company merger, except that the buyer (the SPAC) is typically required to obtain shareholder

approval, which must be obtained in accordance with SEC proxy rules.

          67.    According to the SEC, SPACs are defined and operate as follows:

A SPAC is a shell company with no operations. It proceeds in two stages. In the first stage, it registers the offer and sale of redeemable securities for cash through a conventional underwriting, sells them primarily to hedge funds and other institutions, and places the proceeds in a trust for a future acquisition of a private operating company. Initial investors also commonly obtain warrants to buy additional stock as at a fixed price, and sponsors of the SPAC obtain a 'promote' – greater equity than their cash contribution or commitment would otherwise imply – and their promote is at risk. If the SPAC fails to find and acquire a target within a period of two years, the promote is forfeited and the SPAC liquidates. About ten percent of SPACs have liquidated between 2009 and now.

But most SPACs since 2009 have gone on to identify acquisition candidates. In their second stage, SPACs complete a business combination transaction, in which the SPAC, the target (i.e., the private company to be acquired), or a new shell 'holdco' issues equity to target owners, and sometimes to other investors. SPAC shareholders typically have a vote on the so-called 'de-SPAC' transaction, and many investors who purchased securities in the first stage SPAC either sell on the secondary market or have their shares redeemed before or shortly after the de-SPAC. After the de-SPAC, the entity carries on its operations as a public company. In this way, SPACs offer private companies an alternative pathway to 'go public' and obtain a stock exchange listing, a broader shareholder base, status as a public company with Exchange Act registered securities, and a liquid market for its shares.

68.     SPACs are also frequently referred to as "blank check companies" because, while the SPAC founders sometimes will have an acquisition target in mind, the target is not often identified in the IPO process. Accordingly, investors in the SPAC will likely not have any idea what company they will ultimately be investing in—essentially writing a "blank check" to the founders with their initial investment in the SPAC. Investors in SPACs must therefore rely on the skill, transparency, and honesty of the blank check company's sponsor to spend the offering proceeds to acquire a fundamentally sound target company that offers attractive risk-adjusted returns for investors.

69.     While SPACs have been promoted as a way to take a company public with less regulatory oversight, early assumptions that they are somehow shielded from securities laws that apply to public offerings is incorrect. In a public statement by the SEC's then Acting Director, Division of Corporation Finance John Coates on April 8, 2021, Mr. Coates wrote that:

Over the past six months, the U.S. securities markets have seen an unprecedented surge in the use and popularity of Special Purpose Acquisition Companies (or SPACs). Shareholder advocates – as well as business journalists and legal and banking practitioners, and even SPAC enthusiasts themselves – are *sounding alarms about the surge*. Concerns include risks from fees, conflicts, and sponsor compensation, from

celebrity sponsorship and the potential for retail participation drawn by **baseless hype**, and the sheer amount of capital pouring into the SPACs, each of which is designed to hunt for a private target to take public.

Any simple claim about reduced liability exposure for SPAC participants is overstated at best, and potentially seriously misleading at worst. **Indeed, in some ways, liability risks for those involved are higher, not lower, than in conventional IPOs**, due in particular to the potential conflicts of interest in the SPAC structure.[9]

### B.    Graf Industrial Fails to Acquire a Company Within Its Originally Scheduled Timetable

70.    Graf Industrial, which would later become the publicly traded iteration of Velodyne, was organized as a SPAC. Its 424B3 Prospectus dated October 18, 2018 ("October 2018 Prospectus"), states that Graf Industrial is a "blank check company." Accordingly, Graf Industrial's sole purpose was to complete a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses within the permissible time frame—originally set at 18 months following its IPO.

71.    The initial investment into Graf Industrial was made through a private placement, resulting in "founders' shares" (defined in the October 2018 Prospectus as "shares of our common stock initially purchased by our sponsor in a private placement prior to this offering") being issued to Defendants in exchange for a relatively minor investment of just $25,000.00. The Sponsor entity (called Graf Acquisition LLC) initially received 8,625,000 founder shares but returned 2,156,250 founder shares to Graf Industrial at no charge on September 13, 2018. An additional 50,000 shares were split into two 25,000 blocks, with one block given to each of two director nominees – Keith Abell and Sabrina McKee.[10]

---

[9]    John Coates, Acting Director, Division of Corporation Finance, *SPACs, IPOs and Liability Risk under the Securities Laws*, SEC.gov (Apr. 8, 2021) https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (last accessed Aug. 2, 2021). Mr. Coates is currently the SEC's General Counsel.

[10]    According to the October Prospectus, "Graf Acquisition LLC [is] a Delaware limited liability company, which is controlled by James A. Graf and owned by Mr. Graf, Michael Dee, Owl Creek and certain other investors with longstanding relationships with Mr. Graf." The Prospectus did state, however, that Defendant Dee "disclaim[ed] any beneficial ownership of any shares held by the

72.    According to an article published on *Private Funds CFO*, there are three main structural distinctions between a "founder share" and a publicly traded share, which reduces the fair value of the former relative to the latter. They are:

(a)    Founder shares are subject to a lock-up period that prohibits the sale of the shares as the SPAC is searching for an acquisition (a period of up to two years, typically) and for a period after an acquisition (or a "de-SPAC") is completed. Typically, such lock-ups last 12 months.

(b)    Founder shares do not feature the de facto put option enjoyed by holders of public shares whereby, upon announcement of a deal, the SPAC is obligated to allow shareholders to vote on the acquisition and public shareholders can tender their shares back to the SPAC in exchange for an amount of cash roughly equal to the price they paid at the IPO. Founder shares in most cases actually expire worthless if an expire acquisition is not completed.

(c)    Usually, a larger percentage of founders' shares will be forfeited by the sponsor if they do not participate in the acquisition.[11]

73.    Such was the case here. According to Graf Industrial's October 25, 2018 Prospectus, the founder's shares would not participate in any liquidating distribution, should Graf Industrial fail to acquire a suitable target company within 18 months:

> Our sponsor, officers and directors have entered into a letter agreement with us, pursuant to which they have waived their rights to liquidating distributions from the trust account with respect to any founder shares held by them if we fail to complete our initial business combination within 18 months from the closing of this offering.[12]

74.    In addition to their founder's shares being excluded from any liquidating distributions from the $225 million trust account, Defendants Graf and Dee also stood to lose between $6.7 million and $7.4 million on an investment in private placement warrants if the initial business combination failed. The Prospectus further provides:

> ***The founder shares will be worthless if we do not complete an initial business combination***. In addition, our sponsor has agreed to purchase an aggregate of

---

sponsor." Defendant Graf, however, remained a beneficial owner of some 6,418,750 shares at the time of the October Prospectus' publication.

[11]    Ryan MacLean and Charles Paraboschi, *SPAC Shares are not created equally, so don't value them equally*, PrivateFundsCFO.com, (Jan. 12, 2021) https://www.privatefundscfo.com/spac-shares-are-not-created-equal-so-dont-value-them-equally/ (last accessed July 30, 2021).

[12]    Graf Industrial's October 15, 2018 Prospectus filed with the SEC on Form 424B4 at 78; *see also* the "Summary" at 27 (same).

13,400,000 (or 14,750,000 if the underwriters' over-allotment option is exercised in full) private placement warrants *for a purchase price of $6,700,000 (or $7,375,000 if the underwriters' over-allotment option is exercised in full), or $0.50 per warrant, that will also be worthless if we do not complete an initial business combination*.[13]

75.     On or about October 16, 2018, Graf Industrial completed its initial public offering, selling 24.4 million ownership units (including a partial over-allotment) to investors for gross proceeds of $244 million (the "IPO"). Each unit consisted of one share of common stock and one redeemable warrant. The IPO was sponsored by Graf Acquisition, a strategic advisory firm owned and controlled by, among others, Defendants Graf and Dee.

76.     While Graf Industrial did not identify any target companies at the time of the IPO, its IPO offering materials stated that Graf Industrial planned to pursue an acquisition focused in the diversified industrials sector. Graf Industrial's IPO offering materials claimed that Defendants Graf and Dee would "bring a unique rigor to the process of identifying and consummating an initial business combination that will be well-received in the public markets, and to create value over time for our stockholders following an initial business combination."

77.     Pursuant to its IPO prospectus, Graf Industrial was required to acquire a target business with an aggregate fair market value of at least 80% of the net assets held in trust from the IPO proceeds, and to do so within 18 months of the October 2018 IPO. Accordingly, Graf Industrial had a deadline to complete its intended acquisition by April 18, 2020.

78.     In the event Graf Industrial failed to complete an initial business combination, it would be obligated to redeem 100% of its outstanding public shares equal to the aggregate trust proceeds plus interest. As noted above, the founders' shares would not be eligible to participate in any liquidating distribution. Moreover, shareholders could redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction. If enough shareholders redeemed their shares, a deal would not be economically feasible.

79.     Defendants Graf and Dee in particular stood to lose substantial sums it they failed to acquire a suitable target within the allotted time frame. *Forbes* succinctly tied the soundness of a SPAC

---

[13]     Prospectus on Form 424B4 (Oct. 25, 2018) at 48.

investment to the reputation of its founders, writing that—without the typical financial statements accompanying an existing entity—researching who is behind the SPAC is a necessity:

> Investing in a SPAC IPO **amounts to a bet on the sponsors**, their reputation and whether a successful deal will happen within two years. Rather than researching a company's financials, as you should when investing in an individual stock, **you'll need to instead research who is behind the SPAC** and what industry they may be targeting for an acquisition.[14]

Accordingly, at all pertinent times, the Defendants were acutely aware that they needed to obtain a suitable target company before the deadline elapsed and they were forced to refund over $200 million to their investors.

80.    However, if Graf Industrial successfully completed an initial business combination within the allotted time frame, Defendants Graf and Dee and various Company insiders would be richly rewarded. Specifically, the Graf Industrial founders' shares that it had issued to Graf Acquisition in connection with the IPO equal to approximately 20% of the Company's outstanding common shares after the IPO, which Graf Acquisition held for the benefit of Defendants Graf and Dee. Note 5 to the Prospectus provides that the number of founder shares would be adjusted up or down, such that the Sponsor was guaranteed a 20% interest following any business combination:

> The Founder Shares include an aggregate of up to 843,750 shares subject to forfeiture by the Sponsor to the extent that the underwriters' over-allotment is not exercised in full or in part, so that the Sponsor will own, on an as-converted basis, 20% of the Company's issued and outstanding shares after the Proposed Public Offering (assuming the Sponsor does not purchase any Public Shares in the Proposed Public Offering and excluding the Private Placement Warrants). If the Company increases or decreases the size of the Proposed Public Offering, the Company will effect a stock dividend or shares contribution back to capital, as applicable, immediately prior to the consummation of the Proposed Public Offering in such amount as to maintain the Founder Share ownership of the Company's Sponsor prior to the Proposed Public Offering at 20.0% of the Company's issued and outstanding common stock upon the consummation of the Proposed Public Offering.

81.    These founder shares were worth approximately **$72 million by September 2020** but would expire worthless if the Company failed to complete an initial business combination.

---

[14]    Anna-Louise Jackson, Benjamin Curry, "Special Purpose Acquisition Company: What is a SPAC?", FORBES (Mar. 9, 2021) https://www.forbes.com/advisor/investing/spac-special-purpose-aquisition-company/ (last accessed August 13, 2021).

Consequently—and in tandem with the funds already expended to acquire warrants which would also expire worthless absent a combination—Defendants Graf and Dee were highly incentivized to complete an initial business combination and to convince shareholders to approve the Reverse Merger.

82.     As alleged herein, Graf Industrial was required to acquire a target business with an aggregate fair market value of at least 80% of the net assets held in trust within 18 months of October 2018. In the event that Graf Industrial did not complete an initial business combination, it was obligated to redeem 100% of its outstanding public shares equal to the aggregate trust proceeds plus interest. None of the founders' shares would be eligible to participate in such a liquidating distribution, *and would expire worthless*. Moreover, shareholders could redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction. If enough shareholders redeemed their shares, a deal would not be economically feasible.

83.     On April 8, 2020, as Graf Industrial's deadline to complete an initial business combination approached, the Company announced in a Form 8-K that it was in negotiations to acquire a then unnamed polypropylene recycling company.

84.     As stated in its Preliminary Proxy, Graf Industrial's "drop dead date" was initially 18 months from the closing of its IPO, or April 18, 2020. Despite this deadline, and Graf Industrial's management and Board reviewing "more than 200 acquisition opportunities and enter[ing] into discussions with more than 30 potential target businesses[,]" including drafting no less than 18 term sheets, Graf Industrial was unable to meet the April 18, 2020 deadline. Consequently, on April 16, 2020—just two days before the original April 18, 2020 deadline to complete Graf Industrial's initial business combination—Graf Industrial filed a Form 8-K with the SEC stating that it had updated and amended its articles of incorporation to extend its deadline to consummate combination until July 31, 2020, stating:

> On April 16, 2020, Graf Industrial . . . filed with the Secretary of State of the State of Delaware, an amendment (the 'Extension Amendment') to [Graf Industrial's] second amended and restated certificate of incorporation to extend the date by which [Graf Industrial] has to consummate a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses from April 18, 2020 to July 31, 2020 (the 'Extension'). [Graf Industrial's] stockholders

1    approved the Extension Amendment at a special meeting in lieu of the 2020 annual

2    meeting of stockholders of Graf Industrial (the "Special Meeting") on April 16, 2020.[15]

3        85.     Subsequently, on April 23, 2020, Graf Industrial filed another Form 8-K stating in

4    pertinent part, "[i]n response to media and investor inquiries, [Graf Industrial] confirms that the name

5    of the Target referred to in the press release is PureCycle Technologies, LLC." Ultimately, the

6    PureCycle combination failed to materialize—PureCycle would later go public through a merger with

7    an entirely different SPAC called Roth CH Acquisition I. As alleged in ¶ 111, *supra*, Defendant Dee

8    is currently embroiled in litigation at PureCycle Technologies, Inc., relating to his role as CFO

9    following its merger with a SPAC.[16]

10       86.     Following this extension, Defendants Graf and Dee were determined to effectuate any

11   strategic alternative.[17] The Company would later acknowledge that it was not until May 9, 2020 that

12   the Velodyne investment opportunity surfaced. According to the Proxy Statement filed with the SEC

13   on September 14, 2020, it was not until May 9, 2020 that Graf even considered acquiring private

14   Velodyne and taking it public:

15

16   [15]    Graf Industrial's April 16, 2020 Form 8-K.

17   [16]    The PureCycle litigation centers around that company's transition to a public company *via* an
18   SPAC. The complaint alleges that "[m]ultiple former employees of the earlier failed companies
     associated with PureCylce's executive team stated that PureCycle's excutives [which included
19   Defendant Dee as CFO] based their financial projections on '*wild ass guessing*,' brought companies
     public far too early, and had deceived investors." *See Tennenbaum v. Purecycle Technologies, Inc., et
20   al.*, No. 6:21-cv-00818, ECF No. 1, ¶¶ 18, 43. (M.D. Fla. 2021). According to the complaint, the truth
     was revealed to the market when Hindenburg Research published a report titled "PureCycle: The
21   Latest Zero-Revenue ESG SPAC Charade, Sponsored by the Worst of Wall Street" which concluded
     that "PureCycle represents 'the worst qualities of the SPAC boom; another quintessential example of
22   how executives and SPAC sponsors enrich themselves while hoisting unproven technology and
     *ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate
23   consequences*.'" *Id. at* ¶¶ 7, 44.

24   [17]    In connection with approval of the April 16, 2020 extension, certain of Graf Industrial's current
     stockholders elected to redeem their shares. As such, "an aggregate of 12,921,275 shares of [the
25   Company's] common stock were redeemed, and approximately $132.1 million was withdrawn from
     the Trust Account to pay for such redemptions." *See* Graf Industrial's July 15, 2020 Preliminary Proxy
26   at 26. Graf Industrial's Trust Account was left with $117,294,619.33 as of June 30, 2020, or roughly
     forty-seven percent (47%) of its March 31, 2020 balance (*i.e.*, $249,560,868). *See id.* at 26, F-17. This
27   significant loss of capital further incentivized Graf Industrial's hunt for a target company.

28

On May 9, 2020, representatives of Bank of America Corporation ("BofA"), financial advisors to Velodyne, called James A. Graf to describe, in general terms and on a no-names basis, a possible transaction opportunity for Graf. Mr. Graf then discussed the proposed transaction with Michael Dee (together with Mr. Graf, the "Graf Management"), and both concurred to proceed to learn more.

On May 11, 2020, Graf signed a non-disclosure agreement, after which BofA disclosed to Graf that Velodyne was the potential target and sent an overview presentation on Velodyne; Velodyne countersigned the non-disclosure agreement.

87.    Velodyne became the only end-goal acceptable to Defendants, at whatever cost, despite a return of initial investment to Graf Industrial's public stockholders possibly being a superior return than owning less than 20% of the surviving entity.[18] Against this framework, Graf Industrial set its sights, on Velodyne, a privately held corporation, and its founder and then-Executive Chairman of the Board, Mr. Hall. The personal issues Defendants Graf and Dee developed leading up to the Merger and Reverse Merger with Mr. Hall were therefore set aside and concealed from investors until Defendants Graf and Dee completed the Reverse Merger.

**C.    Defendants Graf and Dee Target Mr. Hall's Velodyne**

88.    As a private company, Velodyne was the brainchild of Mr. Hall, who had founded an audio company called Velodyne Acoustics in 1983. In 2005, Velodyne Acoustics began developing its lidar technology. By 2006, Mr. Hall patented his lidar technology, later making it commercially available in 2010. When it hit the market, Mr. Hall was catapulted to the forefront of a technological arms race for driverless vehicles. According to a 2017 piece published by *Forbes.com,* Mr. Hall's technology was nothing short of "revolutionary":

About a decade ahead of his time. In 2006, Hall patented one of his inventions--a multi-beam spinning LiDAR sensor--that put Velodyne, albeit almost accidentally, at the center of a revolution that's disrupting the auto and tech industries. Hall built the LiDAR sensor on a whim. Velodyne, which he had founded in 1983, was a successful business known for specialized audio equipment. But always itching to keep inventing,

---

[18]    Prior to engaging in merger discussions with Graf Industrial, private Velodyne "confidentially filed an S-1 for its possible public initial public offering[.]" *See* Definitive Proxy at 134. This solidified Velodyne as the only acceptable end goal because it lessened the risk that Defendants Graf and Dee would not successfully meet the deadline to finalize an initial business combination and as a result, lessened the risk of their founder shares expiring worthless. *See id*. at 134-35 ("Given Graf's deadline of July 31, 2020, the fact that Velodyne had financial statements and disclosure developed with a view to compliance with SEC requirements was an important consideration.").

in the early aughts Hall became obsessed with a seemingly fantastical contest: a Defense Department-sponsored race for autonomous vehicles. It promised to be both fun and an excellent proving ground for his engineering chops. Over a couple of years, Hall refined a roof-mounted LiDAR (for 'light distance and ranging') unit consisting of 64 lasers spun by a small electric motor; the device became a favorite of the race's winning teams. 'It was revolutionary,' says William 'Red' Whittaker, a roboticist at Carnegie Mellon University and a father of the autonomous-vehicle movement.

Alan Ohnsman, "How A 34-Year-Old Audio Equipment Company Is Leading the Self-Driving Car Revolution," *Forbes.com* (Aug. 8, 2017).[19] The Forbes piece added that:

Today Velodyne is the top supplier of advanced automotive LiDAR and sells its sensors to virtually every auto and tech company that's building or testing autonomous vehicles. GM, Ford, Uber and China's Baidu are big buyers, and even Caterpillar uses Velodyne's tech for gargantuan robotic mining trucks. Google has been a major customer for years, though it's also making its own sensors. No company other than Velodyne produces comparable units in sufficient quantities to meet the growing demand.

*Id.*

89.     To this day, Velodyne claims to be a global leader in lidar technology and a provider of real-time 3D vision for autonomous systems, often referred to within the Company as "smart vision." Smart vision uses eye-safe lasers that measure precise distances to advance the development of automated systems by enabling machines to see their surroundings. Velodyne's proprietary lidar technology is designed to improve roadway safety, as it is used to control and navigate autonomous vehicles. Additionally, the Company's smart vision technology is used in, among other things, autonomous mobile robots, unmanned aerial vehicles, precision agriculture, and advanced security systems. Lidar is a method for measuring distances using laser light. It is commonly used to make high-resolution maps and is a key feature in developing certain autonomous car technologies.

90.     In December 2015, private Velodyne incorporated as a new spin-off from Velodyne Acoustics which assigned all its lidar-related assets and operations to Velodyne. Mr. Hall served as a director of private Velodyne from December 2015 and continuing through the Reverse Merger. He remained in this capacity until he was forced out of the Company altogether by March 2021.

---

[19]     https://www.forbes.com/sites/alanohnsman/2017/08/08/how-a-34-year-old-audio-equipment-company-is-leading-the-self-driving-car-revolution/?sh=57be07e55d40 (last accessed July 30, 2021).

91.    On August 16, 2016, the Company announced it had raised approximately $150 million from Ford and Baidu, Inc., a Chinese multinational technology company. Ford invested in the Company (and Mr. Hall) with "[t]he aim . . . to quickly mass-produce a more affordable automotive LiDAR sensor" and in furtherance of its "intention to deliver high-volume, fully autonomous vehicle for ride sharing in 2021." Velodyne's then-CEO, Mr. Hall, claimed that the "investment [would] accelerate the cost reduction and scaling of Velodyne's industry-leading LIDAR sensors, making them widely accessible and enabling mass deployment of fully autonomous vehicles." In October 2016, just two months after Ford's investment, Barbara Samardzich, former chief operating officer of Ford Europe and 26-year employee of Ford, joined Velodyne's board of directors.[20]

92.    According to a Schedule 13D filed with the SEC on February 12, 2021, as of February 12, 2021, Mr. Hall beneficially owned 98,545,299 shares of the Company's common stock, which represented 58.4% of the Company's outstanding shares of common stock making him a controlling shareholder. Given that the price per share of the Company's common stock at the close of trading on February 12, 2021 was $23.22, Mr. Hall owned over $2.4 billion worth of Velodyne stock. Mr. Hall is married to Marta Hall who, prior to the Reverse Merger, was involved in the operations of Velodyne and remained in that capacity—however briefly—after the Reverse Merger. After the Reverse Merger, Ms. Hall served as Velodyne's Chief Marketing Officer through February 19, 2021. According to a Form 8-K filed on February 22, 2021, on February 19, 2021, Velodyne's Board of Directors terminated Ms. Hall as Chief Marketing Officer, effective immediately.

93.    On June 26, 2020, several media outlets reported that Graf Industrial was in talks to acquire Velodyne. Despite the issues and concerns that Defendants Graf and Dee had at the time regarding Mr. Hall, they decided to nevertheless press forward and acquire Velodyne on July 1, 2020 given the time constraints for closing the business combination. According to its later-filed September

---

[20]    As alleged in ¶¶ 153, 375, *supra*, Ms. Samardzich informed the Board that she would not stand for re-election as a director of the Company on January 18, 2021 – just weeks before Ford revealed that it liquidated its entire position in Veldoyne and after Mr. Hall was forced out as the Company's Board Chairman.

14, 2020 Definitive Proxy, Graf Industrial assured the market that Defendants Graf and Dee had purportedly performed due diligence on Velodyne, stating:

> Before reaching its decision on July 1, 2020, our Board of Directors reviewed the results of Graf Management's due diligence, which included:
>
> - Public research on the lidar industry and its prospects, review of Velodyne's *historical financial performance and forecasts including revenues*, operating costs, EBITDA (a non-GAAP financial measure), capital expenditures, cash flow and other relevant financial and operating metrics;
>
> - *extensive conference call meetings with Velodyne's Management* and representatives regarding operations, company services, intellectual property, major suppliers, partners and customers, growth prospects, both organic and through possible acquisitions, among other customary due diligence matters;
>
> - *review of Velodyne's material business contracts* and certain other legal and environmental due diligence;
>
> - *Financial and accounting due diligence*; and
>
> - creation of an *independent financial model*, which was generally consistent with the financial model prepared by Velodyne.

**D.    Summary of Class Period Allegations**

94.    Graf Industrial issued a press release filed with the SEC on Form 8-K on July 2, 2020 announcing that it had entered into a merger agreement with Velodyne to be funded by cash and new stock issuances valuing the combined company at $1.8 billion. As a result of dilution, Graf Industrial's existing stockholders would own only an estimated 6.5% of the combined post-Merger company. The Merger Agreement also included a provision whereby "Velodyne must pay Graf Industrial a termination fee of $58,867,000" if the July 2, 2020 Merger Agreement was terminated by Velodyne.

95.    Graf Industrial's July 2, 2020 press release described private Velodyne as a "pioneer" in the lidar field and highlighted the continued leadership of its "founder and industry icon," Mr. Hall, as well as the large equity stake that would purportedly continue to be held by Ford following the Reverse Merger. The release represented that Velodyne was experiencing tremendous growth and on track to achieve $100 million in revenues in 2020 and $680 million in revenues by 2024.

96.     On July 23, 2020, Graf Industrial shareholders once again voted to extend the deadline, from July 31, 2020 to October 31, 2020, in order to provide sufficient time to consummate the Reverse Merger. On August 31, 2020, Graf Industrial issued a release reaffirming Velodyne's revenue trajectory, stating it would achieve $101 million in revenues in 2020 and that its long-term contracted revenues had increased by 8% since the deal was first announced.

97.     On September 14, 2020, Defendants issued the final Definitive Proxy Statement for the Merger, which urged shareholders to vote in favor of the deal and (as detailed below) contained numerous materially false and misleading statements and omissions (the "Proxy" or "Definitive Proxy"). Specifically, the defective Proxy misrepresented Velodyne's business, financials and prospects, claiming, *inter alia*, that: (i) Mr. Hall would maintain leadership of Velodyne which was critical to the Company's success; (ii) Ford would maintain a significant equity stake; (iii) Velodyne was on track to achieve considerable revenue growth and on track to achieve over $100 million in 2020 revenues; and (iv) this growth rate was firm because of the high percentage of revenues already awarded under existing contracts.

98.     Relying on the defective Proxy, shareholders voted to approve the Reverse Merger at a special shareholders meeting on September 29, 2020. Following the consummation of the Reverse Merger, Graf Industrial became publicly traded Velodyne. An article appearing on *Bloomberg Wealth* dated June 22, 2021 titled "The SPAC Man Method: Inside the Billionaire Rush for Riches" reported that "[a]s insiders have raced to push businesses into the public's hands, they've employed a range of maneuvers to boost their fortunes. . . . ***As insiders have rushed businesses into the public's hands, they've employed a range of maneuvers – some of them downright astonishing to the uninitiated –*** ***to win even when investors lose***." This action represents such an instance.

1.      **Defendants' Scheme to Remove David Hall from Velodyne**

99.     While Defendants Graf and Dee already had concerns with Mr. Hall's controlling equity stake of Velodyne at the time of the Merger and had already begun to marginalize him internally, the Company's Class Period SEC filings repeatedly recognized Mr. Hall's fundamental importance to Velodyne's operations and reputation while assuring investors that he would continue

to lead the Company well after the Reverse Merger. At the same time, however, Defendants concealed the fact that they were actively engaged in a scheme to remove Mr. Hall from the Company.

100.    Specifically, starting on July 2, 2020, the Company issued a press release filed with the SEC on Form 8-K signed by Defendant Graf stating *inter alia* that "***David Hall will continue to play a critical role as executive chairman of Velodyne***. Chief Executive Officer Dr. Anand Gopalan and Chief Financial Officer Drew Hamer will lead and manage the business along with Mr. Hall. Chief Marketing Officer Marta Hall will continue to support and elevate the brand." Mr. Graf added that "[w]e are tremendously excited by the opportunity to partner with David Hall and Velodyne." Defendants continued to make such representations throughout the Class Period.

101.    Then, on February 22, 2021, prior to market opening, the Company made an unexpected announcement that it had removed Mr. Hall as the Company's Chairman and replaced his wife, Marta Hall as the Company's Chief Marketing Officer following a previously undisclosed internal Audit Committee investigation and subsequent "independent" investigation by Keker Van Nest that commenced on or around December 9, 2020. It ultimately vaguely accused him, without any supporting facts, of "dishonesty." The February 22, 2021 release disclosed that an internal investigation concluded that the couple had "each behaved inappropriately with regard to Board and Company processes, and failed to operate with respect, honesty, integrity, and candor in their dealings with Company officers and directors." The Board also formally censured the couple and directed them to receive "appropriate remedial training."

102.    Mr. Hall responded to the Company's actions by describing them in public statements as an "***ambush***" and "power grab" designed by Velodyne executives to remove them from the Company's leadership since the time of the Merger. At no point prior to Defendants' disclosure did any of the Defendants reveal *any* issues with the Halls or the investigation itself. To the contrary, Defendants repeatedly touted Mr. Hall and his absolute critical importance to the Company's continued operations and success – including with customer relationships at the Company.

103.    On this news, the price of the Company's stock dropped from $21.11 per share at the close of trading on February 19, 2021, to $17.97 at the close of the next trading day, on February 22,

2021, a drop of $3.14 per share, or approximately 15%, on heavy trading volume. Moreover, the price of the Company's warrants dropped from $7.37 per warrant at the close of trading on February 19, 2021, to $5.90 at the close of trading on February 22, 2021, a drop of $1.47 per warrant, or approximately 20%.

104.    A February 22, 2021 *Reuters* article titled "Sensor maker Velodyne removes founder from chairman post, wife claims 'ambush,'" by Ayanti Bera, the Halls provided additional details surrounding their ousters: "Marta Hall described the brief Friday board meeting at which she and her husband lost their jobs as a surprise, and added the blank-check firm, or special-purpose acquisition company (SPAC), that took Velodyne public through a reverse merger last fall was trying to cut the Halls out of the decision-making process at Velodyne. 'It was like an ambush,' she told *Reuters* in an interview. '***We had no chance to defend ourselves***.'"

105.    On February 24, 2021, Mr. Hall issued a press release *via Business Wire* titled "David Hall, Founder of Velodyne Lidar, Addresses Company's Low-Road Smear Campaign." Therein, after reiterating that they collectively controlled 58.4% of the outstanding common stock of Velodyne, responded to Velodyne's February 22, 2021 censure by stating:

> As Board members and large stockholders, Marta and I have acted ethically and tirelessly to advance the best interests of Velodyne Lidar. We presided over years of growth and success that ultimately laid the groundwork for Velodyne Lidar to go public via a reverse merger in 2020. Since Anand Gopalan assumed the Chief Executive Officer role early last year, I have stepped back from day-to-day management and offered strategic perspectives when appropriate. I ultimately relinquished my Executive Chairman position in favor of simply serving as Chairman once it became clear this winter that Mr. Gopalan and others preferred to continuously ignore my input in favor of implementing their own agenda.

> Marta and I firmly believe that the ***boardroom ambush*** that took place on February 19, 2021 is an affront to stockholders that undermines corporate democracy. The Board's rash decision to censure us based on an opaque, ***secret investigation*** into baseless, unfounded claims simply reveals that the Company's governance is broken. Moreover, stripping us of our respective positions – without justification – after many years of success appears more like an ***internal power grab*** than a pro-stockholder action. We are committed to righting these wrongs in the weeks ahead and plan to communicate substantive updates in the near-term.

106.    According to a March 4, 2021 current report on Form 8-K signed by the Company's General Counsel Michael Vella, Mr. Hall had informed the Company on March 2, 2021 "of his

voluntary decision to resign as a Class III director" from the Board, effective immediately. The Form 8-K further noted—in a true understatement—that the Halls "disagreed with the conclusions of the investigation and the actions of the Board based on the investigation."

107.    Further, on March 4, 2021, Mr. Hall publicly filed with the SEC a Schedule 13D, revealing, *inter alia*, that the Halls' leadership roles in the Company, contrary to Defendants' claims, had been stymied from day one, writing:[21]

> ***Since the consummation of the Merger*** [on July 2, 2020], the Reporting Persons have tried to work cooperatively with the Board to express their concerns with the Issuer's corporate governance, strategy and financial performance but have felt disregarded. In attempting to enhance the Board, the Reporting Persons tried to recommend highly qualified directors to join the Board and took every effort to avoid a public nomination of Mr. Hall's nominee, Eric Singer. Shortly thereafter, the Issuer chose to remove the Reporting Persons from their roles at the Issuer – Mr. Hall as Chairman and Mrs. Hall as Chief Marketing Officer, on February 19, 2021 and took the ***highly unusual step to publicly censure the Reporting Persons*** as directors, presenting few facts to support the censure. Recently, the Board further sought to manipulate the corporate machinery in moving director Chris Thomas to a new class to avoid having to face re-election at the upcoming annual meeting of stockholders. ***Since the Reporting Persons were removed from their roles at the Issuer, the Issuer's stock has declined over 30%.***

> Although Mr. Hall controls approximately 58% of the outstanding Shares, Mr. Hall has felt marginalized in the boardroom and does not believe his input has been respected by the other members of the Board. For these reasons, on March 2, 2021, Mr. Hall notified the Board of his decision to resign as a director of the Issuer, effective immediately.

108.    On March 10, 2021, Mr. Hall sent the Company's Board another letter over *Business Wire* to "directly refute[] statements made in Velodyne Lidar's recent Form 8-K filing [dated February 22, 2021]." There, Mr. Hall stated, *inter alia*, that:

> I am writing to you today to directly refute the statements regarding my resignation from the Board included in Velodyne Lidar's (the "Company") recent Form 8-K filing. These statements do not accurately depict why I resigned and instead focus on the Company's decision to publicly censure Marta Hall and I based on unfounded claims which we strongly refute.

> To be completely clear: I chose to resign from the Board because ***I had numerous concerns about the strategic direction and current leadership of Velodyne Lidar***.

---

[21]    The 13D defines Merger as follows: "In connection with the merger described in that certain Agreement and Plan of Merger, dated as of July 2, 2020 (the "Merger") . . . ."

Despite serving as the Executive Chairman of the Board following Velodyne Lidar's successful SPAC merger, it became quickly apparent to me that ***Jim Graf and Michael Dee – joint founders of the SPAC – wanted to curtail my involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward.*** These actions, in my view, emboldened Chief Executive Officer Anand Gopalan to disregard my views.

I firmly believe that the Board has fostered an ***anti-stockholder culture and that Velodyne Lidar's corporate governance is broken***. Perhaps most unsettling was the Board's decision to rubberstamp an increased compensation package for Mr. Gopalan despite the Company releasing weak Q4 2020 earnings and missing year end forecasts.

The Board also recently attempted to ***manipulate the Company's corporate machinery*** by transitioning Christopher Thomas from a Class I director to a Class II director in an apparent move to avoid having him stand for re-election against my nomination of Eric Singer, a highly-qualified director candidate with significant public board experience.

As a whole, I believe the status quo in Velodyne Lidar's boardroom is unacceptable. The Board lacks prior public company experience, ***seems to prioritize its own self-interests over stockholders*** and has overseen the destruction of significant stockholder value.

109.    On May 25, 2021, Mr. Hall again directly contradicted Defendants over *Business Wire* for attempting to blame the COVID-19 pandemic for Velodyne's poor financial performance and missed projections. There, Mr. Hall revealed that the Board had enriched insiders at shareholders' expense, stating:

Taken together, these decisions are an affront to stockholders. It appears that Dr. Gopalan and his boardroom allies are more focused on advancing their own self-serving agenda than delivering stockholder value. . . . ***We voiced our grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors***, the serious risk of theft of IP in China and the Company's overall poor financial performance.

110.    In the same letter, Mr. Hall also highlighted how:

Sadly, the Board and management ***appear content blaming their own failings on the COVID-19 pandemic***. While a convenient scapegoat, the reality is that similar lidar companies have been thriving during the pandemic. Luminar Technologies reported that its revenues for the first quarter of 2021 increased 37% over the first quarter of 2020, and Ouster reported a revenue increase of 187% over the first quarter of 2020 . . . . But rather than increasing focus on the addition of new research and development personnel to keep pace with innovation, the current Board instead opted to increase G&A expenses significantly. ***G&A expenses increased by 59% for the three months ended March 31, 2021*** from the comparable period of 2020. This is in the face of

Velodyne Lidar's 35% decline in product revenues for the comparable periods of March 31, 2020 to March 31, 2021.

111.    Finally, given the foregoing, Mr. Hall publicly called for the resignation of, *inter alia*, Defendant Dee, stating:

> It is our view that our fellow stockholders would benefit from the immediate replacement of directors Michael Dee and Christopher Thomas. ***Mr. Dee not only lacks relevant skillsets to serve on the Board but is now deeply embroiled in litigation at PureCycle Technologies, Inc., relating to his role as Chief Financial Officer following its merger with a SPAC with disastrous results***. We suspect that Mr. Thomas and the rest of the Board orchestrated the resignation of Mr. Graf and appointment of Mr. Thomas to place Mr. Thomas into a new class of directors whose term would not expire until 2022, because he otherwise faced a possible contested election that could have resulted in him being voted off the Board by stockholders at the 2021 Annual Meeting. This manipulation of the Company's governance structure to entrench a director for another year is the ***epitome of poor corporate governance*** and warrants his immediate resignation.

112.    For its part, on May 26, 2021, the Company responded in a press release carried on the Company's website (also published *via Business Wire*) regarding "the Halls' false assertions" and, without providing any details, the "Baseless Assertions from David Hall, Marta Thoma Hall and Eric Singer." Defendants' press release was not filed on Form 8-K with the SEC.

113.    Then, following the Class Period, on June 3, 2021 Mr. Hall sent another open letter to the Board which was published over *Business Wire* accusing Defendants Gopalan, Culkin and Dee of misleading investors about the Company's current financial condition and prospects during the Class Period. There, he wrote in pertinent part that:

> I believe that each of these individuals has ***breached stockholders' confidence*** and destroyed significant value in the Company.
>
> In my view, the only way to turn around Velodyne Lidar is to purge the Board of its seemingly self-interested and underqualified members. The Board should know it is not lost on stockholders that the Company's stock price has plummeted almost 50% since I was unjustifiably stripped of my role as Chairman in February. Pushing aligned and experienced directors off the Board has clearly been a recipe for disaster. At this point, the Company's failed directors should do the right thing and resign.
>
> From my vantage point, perhaps the greatest offense has been that this Board has allowed Dr. Gopalan's actions to go unchecked as Chief Executive Officer while he has ***manipulated the truth to customers and investors alike***.

In addition, I am calling on Mr. Culkin to step down because I believe that he has also *taken several liberties with the truth* and has acted as a rubberstamp on Dr. Gopalan's actions, including by approving a robust, metric-free Chief Executive Officer compensation package.

I fear that if Messrs. Culkin, Gopalan and their fellow SPAC-appointed directors are left at the helm, significant value destruction will only compound for stockholders. Velodyne Lidar's customers, employees and stockholders deserve a better Board rather than one that *lacks a firm grasp of the truth* and a coherent strategic plan. I intend to continue to speak my mind, and to take other actions to return strategic product development and shareholder value to Velodyne Lidar.

114.    In a press release carried on *Business Wire* dated June 11, 2021, Mr. Hall commented on the Company's preliminary results of the Company's 2021 annual shareholder meeting, including the election of Eric Singer to the Board, writing:

[Singer] can bring sorely-needed accountability to the Board, *which has demonstrated a fundamental disregard for stockholders' interests in recent months*. Eric is a highly-qualified director with significant experience helping broken tech companies improve their governance, operations and performance. He is an expert when it comes to corporate governance, capital allocation, operations optimization and strategic planning. While much more work is needed to fix the Company's anti-stockholder culture, I believe Velodyne Lidar has the potential to return to its position at the forefront of lidar technology invention and innovation. Electing Eric is a step in the right direction.

115.    On June 16, 2021, the *Financial Times* published an article that it interviewed Mr. Hall for an article titled "Brothers-in-law at war: family feud at Velodyne Illuminates Spac Pitfalls" by Miles Kruppa. There, the *Financial Times*, reported that:

[A]fter a Spac deal and a boardroom bust-up at their company, Velodyne Lidar, they are now, in the words of Hall, locked in a "fight to the death".

Hall, who founded the 3D sensor business, was ousted as chair earlier this year but remains the largest shareholder and is now determined to strike back against Culkin, who took over as chair, and anyone else on the board who helped remove him.

Last week, Hall wielded his majority voting power to install Eric Singer, an activist investor, on to the board. 'He's going to drive those cockroaches out of there,' said Hall, in an interview with the Financial Times. 'I want them gone and to never hear from them again for the rest of my life, and my children's lives as well.'

The developments at Velodyne are *another example of the pitfalls of special-purpose acquisition companies*, which have provided a quicker route to public markets compared to traditional listings, but which have also been used by high-risk, founder-

controlled businesses. *The company's share price has fallen more than 50 per cent this year during the public dispute*.

A spokesperson said the company continues to execute 'a strategy designed to drive long-term growth for the company [ . . . ] with the highest standards of corporate governance'.

**Falling revenues**

Velodyne is the leading US manufacturer of lidar systems, the rotating laser devices used by self-driving vehicles to "see" roads and obstacles. Ahead of its arrival on the public markets, through a $1.6bn deal with a Spac called Graf, regulatory filings described it as a "fast growing business with strong momentum".

But the company's troubles stretch back for years, according to regulatory filings and people familiar with the company.

Hall set up Velodyne in 2016, raising an initial $150m from Ford and China's Baidu. The investors also became important customers, buying millions of dollars worth of products.

Velodyne made more than $180m in revenues in 2017, according to filings, largely from one-off sales to research teams at companies such as Uber that were developing self-driving cars. That year, Velodyne's lidar sensors sold for a weighted average price of nearly $18,000. But as rivals flooded the market, the price of lidar sensors fell sharply.

Velodyne said it had proactively cut its prices to increase the adoption of the technology, but by 2019 its revenues had fallen by more than 40 per cent.

In 2018, the company accused Hesai, a Chinese rival that also received funding from Baidu, of reverse engineering its spinning lidar sensors. Last year, it settled the dispute with Hesai and with another Chinese company, in exchange for licensing and royalty fees.

But Hall said the alleged theft of Velodyne's designs had "ruined" the market for lidar.

\*      \*      \*

*An investor presentation predicted Velodyne's revenues would begin growing again and reach more than $680m in 2024*, with more than half of business coming from new multiyear agreements, software sales and subscriptions. In 2020, the company had revenues of $94m.

The deal was announced in July, and in the weeks leading up to Velodyne's listing in September, the vehicle's share price briefly reached $32. Culkin, who co-founded with Hall an audio company from which Velodyne was spun out, emerged with millions of shares and a seat on the board.

Ford, meanwhile, negotiated an exemption to lock-up agreements that typically restrict insiders from early trading, and sold its entire stake in Velodyne in the fourth quarter. Ford, which is still using Velodyne's technology, has said the sales were "consistent with our efforts to make the best, highest use of capital".

In the months after going public, Hall pushed for changes to the board that would have allowed him to appoint six out of eight directors and fire the chief executive, according to Velodyne.

The board's audit committee began investigating Hall and his wife, claiming in February that they 'behaved inappropriately with regard to board and company processes'. ***Velodyne removed Hall as chair without publicly providing specifics of the investigation's findings***.

\*      \*      \*

Following his removal, Hall accused Culkin of taking 'several liberties with the truth' and acting as a 'rubber stamp'. Culkin did not respond to requests for comment.

One day after the annual shareholder meeting last week, Velodyne announced it had begun arbitration proceedings against Hall, alleging breach of contract and the theft of trade secrets.

In a separate statement, the company said Hall had copied "hundreds of thousands" of Velodyne documents on to at least one external hard drive before returning his company laptop. Through a spokesperson, Hall declined to comment on the arbitration.

Hall said he had been misled by lawyers and Spac executives during the merger process, which he believed would allow him to retain control over the company. Graf and Gunderson Dettmer, the law firm that represented Velodyne during the Spac discussions, declined to comment.

116.    Defendants' scheme to assure investors about Mr. Hall's continued involvement in the Company's operations – which they knew was necessary to complete the Reverse Merger – while simultaneously secretly curtailing his participation and control of the Company were ultimately successful. On August 11, 2021, Veldoyne filed its quarterly report for the period ending June 30, 2021 with the SEC on Form 10-Q ("2Q21 10-Q"), wherein the Company reported it was no longer a "controlled company[,]" stating in relevant part:

Prior to the filing of this Quarterly Report on Form 10-Q, David Hall controlled the votes of the majority of our common stock. As a result, we were a "controlled company" for purposes of the Nasdaq corporate governance rules . . . . We are no longer a "controlled company" under the corporate governance rules of Nasdaq.

*David Hall will have control over key decision making because he holds voting rights with respect to a significant amount of our voting stock.* David Hall, our former chairman and CEO, holds voting rights with respect to an aggregate of approximately 87.6 million shares of common stock, which represented approximately 44.9% of the voting power of our outstanding capital stock as of June 30, 2021. In addition to the approximately 59.5 million shares of common stock currently held by Mr. Hall, which represented approximately 30.5% of the voting power of our capital stock as of June 30, 2021, stockholders holding approximately 28.2 million shares of common stock, including Joseph Culkin, a member of our Board, Marta Hall, a member of our Board, and certain other family members of Mr. Hall, have entered into agreements granting Mr. Hall an irrevocable proxy to vote such stockholders' shares at Mr. Hall's discretion on all matters to be voted upon by stockholders. As a stockholder, Mr. Hall is entitled to vote his shares in his own interests, *which may not always be in the interests of our stockholders generally and could adversely affect the market price of our common stock*.

### 2.    Defendant's Financial Outlook and Guidance Trajectory Misrepresentations

117.   Next, the Company's July 2, 2020 press release on Form 8-K represented that: "[e]stimated revenues under existing customer contracts are expected to exceed $800 million from 2020 to 2024. Velodyne is expected to generate revenues of approximately $100 million in 2020, increasing to approximately *$680 million in 2024 with existing contracts* expected to drive just under 50% of the estimated 2024 revenues."

118.   Similarly, the Company's August 31, 2020 press release represented that "Velodyne's 2020 revenue guidance and outlook through 2024 are reaffirmed" and that "*Velodyne's customer agreements represent approximately $970mm in expected revenue through 2024, a $130mm increase from time of initial transaction announcement on July 2, 2020*." On September 2, 2020, the Company again reaffirmed its projections stating "Velodyne's 2020 revenue guidance and outlook through 2024 are reaffirmed" and that "Velodyne's customer agreements represent approximately $970mm in expected revenue through 2024, *a $130mm increase from time of initial transaction announcement on July 2, 2020*."

119.   Defendants' same press release went even further, highlighting that "Velodyne *reaffirmed* its $101mm 2020 revenue guidance and multi-year revenue outlook through 2024. The proportion of the future revenue outlook supported by customer agreements has increased as the number of multi-year agreements entered into by Velodyne has increased to 18 (+2) since the

announcement of the proposed business combination on July 2, 2020 (the "announcement"), with approximately 56% (+8% since the announcement ) of the 2024 revenue outlook now represented by customer agreements. Customer agreements *now represent a total of approximately $970mm of revenue through 2024, an increase of approximately $130mm since the announcement*."

120.    Then, on August 31, 2020, Defendants issued a press release over *PRNewswire* representing that: (i) "*Velodyne's 2020 revenue guidance and outlook through 2024 are reaffirmed*," (ii) "Velodyne's customer agreements represent approximately $970mm in expected revenue through 2024, a *$130mm increase from time of initial transaction announcement on July 2, 2020*," and (iii) "Velodyne reaffirmed its $101mm 2020 revenue guidance *and multi-year revenue outlook through 2024*. The proportion of the future revenue outlook supported by customer agreements has increased as the number of multi-year agreements entered into by Velodyne has increased to 18 (+2) since the announcement of the proposed business combination on July 2, 2020 (the "announcement"), with approximately 56% (+8% since the announcement) of the 2024 revenue outlook now represented by customer agreements. Customer agreements now represent a total of approximately $970mm of revenue through 2024, *an increase of approximately $130mm since the announcement*."

121.    At the same time, the Company made repeated reassurances that its financial projections had already accounted for potential problems due to the ongoing COVID-19 pandemic. Along with the August 31, 2020 press release, Graf Industrial filed an investor presentation dated September 1, 2020 ("September 2020 Investor Presentation") as Exhibit 99.2 to the Form 8-K. Defendants Graf, Gopalan and Hamer presented the September 2020 Investor Presentation in a webinar with *SPAC Insider* on September 1, 2020 ("September 1, 2020 Webinar"). The September 1, 2020 Investor Presentation also represented that the *"[e]xpected future cumulative revenue from existing production agreements increased by order $130mm to ~$970mm*" and further stated that "[d]espite COVID-19 impact, Velodyne maintains 2020 revenue guidance and *reaffirms revenue outlook to 2024*[.]"[22]

---

[22]    Emphasis in original.

122.    On October 1, 2020, the Company filed a prospectus announcing the resale of up to 15,000,000 shares of stock held by the Company's PIPE investors. The October 1, 2020 prospectus represented that: "[a]s a result of COVID-19, we experienced some production delays in the second quarter and early in the third quarter of 2020 due to travel restrictions to Thailand, the location of one of our key manufacturing partners. We were also manufacturing at approximately 50% capacity for much of the second quarter of 2020. ***Today, we believe those production delays have been eliminated under the current work conditions, with our internal manufacturing and production capacity back to 100%***." The prospectus also acknowledged that: "[w]e believe that demand for our products remains strong, but COVID-19 will result in some transactions we expected to occur earlier in 2020 being delayed until late 2020 or early 2021. ***When preparing the 2020 and 2021 projected financial information included in this prospectus, we considered these potential delays***."

123.    By November 5, 2020, Defendants began to quietly narrow their financial outlook statements through 2024, while still simultaneously falsely affirming Velodyne's full year 2020 outlook, stating that: "[f]or the full year 2020, we expect total revenue of approximately $101 million, ***as previously forecasted***." In the report Defendant Gopalan stated, "[d]espite the continued impacts of Covid-19, we see growing interest in lidar applications across multiple industries, as evidenced by our accelerating commercial success across all of our focused markets. In this environment, Velodyne continues to demonstrate its leadership as the only at-scale lidar player, through ***strong technical and business execution***."

124.    Similarly, on November 5, 2020, Defendant Gopalan was featured in an episode of the podcast *SAE Tomorrow Today*, titled "How Velodyne Became a Leader in LiDAR with Anand Gopalan."[23] During the interview with host Grayson Brulte, Gopalan explained Velodyne's ability to manage its supply chain in the midst of a global COVID-19 pandemic, stating in relevant part:

---

[23]    Grayson Brulte and Anand Gopalan, "How Velodyne Became a Leader in LiDAR with Anand Gopalan" SAE TOMORROW TODAY (Nov. 5, 2020) https://open.spotify.com/episode/6EUrPRl3sYm9G886F5v985 (last accessed Aug. 31, 2021); "SAE Podcast Interviews Anand Gopalan on Velodyne's Mission to Democratize Lidar" VELODYNE LIDAR (Nov. 18, 2020), https://velodynelidar.com/blog/sae-podcast-interviews-anand-gopalan/ (last accessed July 21, 2021). "SAE" is an acronym for the Society of Automotive Engineers.

**Grayson Brulte**: And now you're clearly focused on scale, we're in the middle of a global pandemic, you're hearing a lot on business papers and CNBC and Bloomberg, a lot on supply chain. How are you managing the supply chain to ensure that your customers are getting the LiDAR that they need during this uncertain time?

**Anand Gopalan**: Yeah, I mean, this is something that we have been aware of as a risk and working on for many years at this point. The first thing that we did really was to create a much more globally diverse supply chain, we have really looked very carefully at supply concentration over geography for specific suppliers for specific types of components and tried to solve for that over the past three or four years. And then of course, creating manufacturing centers that are not in one, only in one geography so we have Nikon who is in Japan, we have our own manufacturing facility in San Jose, we have a manufacturing facility in Thailand so creating the kind of diversity of manufacturing base. ***I think those things have really helped us and we were able to manage through the pandemic without really significant losses from a supplier perspective because of this ability to have multiple suppliers and diverse supply chains*** and of course, as the leader in this space, you know, we have these deep supplier relationships as well and often the suppliers are seeking us out and saying hey, here is a new technology that I can bring to the table, here is new cost optimization that I can bring to the table and that's now a significant advantage because we're able to have these conversations ahead of everyone else and really be able to set the products up for success and manage through this. ***So I think our supply chain has really endured very well though this challenging Covid pandemic.***

125.    Then, only a short time later on January 7, 2021, Defendants disclosed profoundly missed 4Q20 revenue, abruptly withdrew Velodyne's full year 2021 guidance and subsequently refused to answer any questions about these developments during an earnings conference call – all after having had just recently affirmed and reaffirmed those projections to promote the Reverse Merger on November 5, 2020.

126.    Contradicting their earlier statements, Defendants stated on January 7, 2021 that: "[l]argely as a result of these COVID-19 related disruptions, management now estimates fourth quarter revenue 2020 in a range of $15.5 million to $16.0 million and full-year 2020 revenue of approximately ***$94 million versus $101 million*** as previously provided as guidance for the full year. Without these unexpected end-of-year disruptions, Velodyne believes it would have met prior revenue guidance for 2020." Further, the Company anticipated that costs associated with the delay would be largely offset in 1Q21, saying, "[a] substantial portion of these deliveries are expected to be fulfilled by the company in the first quarter of 2021 . . . ." The Company pointed to "reduced production capabilities" which allegedly "impaired the company's ability to fulfill certain of its customers' orders in December."

1    However, the Company did not elaborate as to what made these circumstances unlike the "potential

2    delays" its earlier financial projections purportedly "considered."

3        127.    The same day, Velodyne issued a release providing preliminary fourth quarter and full

4    year 2020 financial results. The January 7, 2021 release stated that the Company had only achieved

5    between $15.5 million and $16 million in revenues during the fourth quarter and that full-year revenues

6    only totaled $94 million, or approximately **30% less for the fourth quarter than represented in the**

7    **Proxy**. The Company also withdrew any future guidance, notwithstanding Defendants' earlier

8    representations about long-term committed revenues through 2024. On this news, the price of

9    Velodyne stock and warrants fell 7% and 13%, respectively. Given the Company's assurances

10   regarding Velodyne's ability to manage its supply chain during the pandemic, the Company's

11   materially false and misleading Class Period statements and omissions about the Company's ability to

12   meet its revenue projections were made either knowingly or with deliberate recklessness as to the

13   truth.

14       128.    Further, the COVID-19 disruption was foreseeable given that the Company assured

15   investors that its projections previously accounted for such an event as alleged in ¶¶ 121-124, *supra*.

16   The Company's efforts to blame its $15 million 2020 earnings shortfall on vague, COVID-19 related

17   "reduced production capabilities" were also materially false and misleading when made. As Mr. Hall

18   himself corroborated, Defendants' COVID-19 explanation was a "convenient scapegoat" and that the

19   miss was in "reality" due to "the Company's plunging product sales, departure of key R&D personnel

20   [and] significant loss of market share to competitors."

21       129.    By February 25, 2021, the Company began to alter its story, stating instead that: "[a]s

22   of February 19, 2021, Velodyne **estimates that it could have the opportunity** for over $1.0 billion of

23   revenue from signed and awarded projects from 2021 through 2025 . . . ." The Company added that

24   for 4Q20, "[t]otal revenue of $17.8 million compared to $19.0 million in the fourth quarter of 2019.

25   Product revenue was $14.4 million compared to $18.2 million in the fourth quarter of 2019. The

26   company reduced production capabilities at its manufacturing sites late in the fourth quarter of 2020

27   due to COVID-19, which impaired the company's ability to fulfill certain customers' orders in

28

December, impacting product revenue. Velodyne continues to focus on accelerating the adoption of sensors by lowering ASPs and driving higher volumes. As such, product units sold was higher year-over-year while revenue was impacted."

130.     During the accompanying earnings call announcing its February 25, 2021 4Q20 results, Defendant Gopalan stated for the first time that the Company had lost multiple contracts to its competitors, with analysts later identifying Ford as likely one of those contracts. Similarly, Defendant Hamer revealed that the weighted average price for Velodyne products had plummeted by one third during the year. Confirming that Defendants knew of these adverse trends during the Class Period, when asked by an analyst whether anything had changed given the significant difference between the Company's prior outlook and latest disclosures, Defendant Gopalan stated: "we have always had a clear and clear-eyed understanding of where the end cost of the technology needs to get to for all of these different applications to enable mass market adoption. . . . *So, no, nothing has really changed in terms of outlook*."

131.     Notably, during the same call, Defendant Gopalan represented that COVID-19 had not impacted its overall performance, saying "*[d]espite Covid, we have not slowed down*. We continue to set production records and are making significant progress on our growth plans." There, Defendant Hamer also stated, *inter alia*, that: "Total revenue was $17.8 million for Q4 2020 compared to $19 million in Q4 2019. Product revenue was $14.4 million in the quarter compared to $18.2 million in Q4 2019. As we disclosed in January, we reduced production capabilities at our manufacturing sites late in the fourth quarter of 2020 due to COVID-19, which impaired our ability to fulfill certain customers' orders in December and negatively impacting product revenue."

132.     During the question-and-answer portion of the same earnings call, analysts were incredulous. For instance, Itay Michaeli, an analyst with Citigroup Inc., Research Division asked:

> Let me just ask a second quick question just on the financials. Thank you for the update on the forward business outlook through 2025. *I think back in September, you'd mentioned that, I think maybe roughly like 56% of your prior 2024 revenue outlook was signed and awarded*. I don't know if you could be in a position to update that today or can you talk about roughly kind of where you are relative to that for 2024? I believe the number was maybe like $380 million at the time that was signed and awarded back in September?

133.    In response, Defendant Hamer stated: "Yes. So *we aren't providing any guidance that far out at this point*." Similarly, analyst Ruben Roy from The Benchmark Company, LLC asked:

> And I guess as a follow-up, I know you guys aren't providing any explicit guidance here and your visibility should start to improve in the second half. But based on what you just said about ASPs, based on when you typically get purchase orders, which I think you have some lead time and backlog visibility, is it realistic at this point to expect that you're going to grow revenue in '21 versus '20?

134.    In response, Defendant Hamer stated: "Again, *I can't provide guidance*. It's really going to be about the unit volumes and the orders that come in from the customers about being able to grow revenue in '21 versus '20. And until we get a better sense of people coming back into the workplace, *there's not much I can say about that right now*." This directly contradicted his prior statements about Velodyne's guidance based the Company's purported "existing customer contracts."

135.    In response, on March 12, 2021, Berenberg Capital Markets downgraded the Company to "Hold," confirming that Velodyne's earnings misses reflected that it was losing market share to competitors in a note called "Channel checks gives us pause, move to Hold." There, Berenberg analyst Michael Filatov remarked that:

> New developments and channel checks with a dozen OEMs, tier 1s, and autonomous driving (AD) startups since our launch leave us more cautious on VLDR's market share potential: We continue to gain new insights that suggest to us that *VLDR is losing share in spinning lidar, while facing stiff competition in directional lidar. Management commentary suggests that revenue could be flat or down in 2021 versus prior guidance of +50% yoy, which we believe is more indicative of competitive challenges than pandemic-related disruptions*. We could potentially consider being buyers again once we have more visibility to the Velarray being used in series production with an OEM (likely Hyundai). We believe the end of the legacy shareholder lockup later this month could put added pressure on the share price and present more enticing upside potential. We downgrade our rating to Hold (from Buy) with a $16 price target (from $28) as we move purely to a DCF valuation method with lower market share assumptions and a higher discount rate.
>
> The Ugly: Channel checks with OEM and tier 1 customers suggest that the Velarray 'just isn't there yet.' Given reliability and form factor concerns with spinning lidars, directional beam steering lidars are the most resilient solution for consumer vehicles. While VLDR is in a strong position to enter series production with Hyundai, the commentary from customers who have tested the Velarray *leaves us less confident that it has any unique advantage over competing products*.

136.    The same Berenberg Capital report cast further doubt as to whether the Company's missed 2020 guidance was actually caused by pandemic related production delays, saying, "[t]his expectation of a weak Q1 is surprising given that COVID-19 pandemic related shutdowns at VLDR's manufacturing facilities at the end of Q4 *were expected to push some revenue into the beginning of 2021*." It went on to discuss that Velodyne's missed earnings were likely due to other factors, saying "we continue to gain new insights that suggest to us *that VLDR is losing share in spinning lidar, while facing stiff competition in directional lidar.*"

137.    Then, on March 17, 2021, Velodyne issued a release announcing that it had hired a new COO, James Barnhart, effective immediately. He replaced former Velodyne COO Thomas "Rick" Tewell. On March 30, 2021, analysts with Craig-Hallum Capital Group LLC issued a research note, downgrading its price target from $20 to $13, and highlighting Velodyne's diminished performance as compared to that of its competitors, saying,

> We have concerns about VLDR's opportunity at several of its large customers: Baidu, Hyundai, and Ford. *At Baidu, VLDR's sales have declined from the high single-digit millions in 2017/18 to <$1M in both 2019/20*. Meanwhile, Hesai's sales to Baidu have grown: $0.2M in 2018, $3.6M in 2019, and $1.6M in 2020. Our concerns with Ford (canceled project with VNE for legacy VLDR tech) and Hyundai (using Valeo for 2022 program, still evaluating VLDR for later projects) are laid out more fully in our previous note on Feb 9th, *but each suggests VLDR has yet to prove out its new Velarray tech*. While VLDR's overall pipeline has increased since year's end, we don't have much visibility into these other projects.

138.    On May 10, 2021, the Company held an earnings conference call for 1Q21 after the Class Period where Aileen Elizabeth Smith of BofA asked:

> First question. When we look at the 2021 revenue outlook, *it's a pretty notable shortfall versus what I think was $150 million plus that you outlined upon going public in September of last year*. But it's also the lowest annual revenue that you've reported since 2016. I think we can all appreciate that there's some near-term headwinds associated with semiconductor shortages and supply chain disruption. But 2021 looks like it could be more of a structural air gap as you try to make the shift from R&D project-based lidar to commercial multiyear contract lidar. So why are we not -- would that be a fair characterization for 2021? And what gives you confidence that some of the out-year financial targets you've outlined are still valid?

139.    In response, Defendant Hamer deflected, pointing towards changing customer "conversations" and basing optimistic outlooks as a post-pandemic world "starts to accelerate again":

Yes. So the key thing for us, Aileen, is the fact that we are still having deep conversations with customers across a broad base of contracts. There about these discussions where they are actively interested in looking forward and moving forward with these different production agreements that we're talking to them about. And they provide a baseline. As the world starts to accelerate again hopefully here in the second half of the year, we'll be able to see that pick up, and we'll be able to get back on pace for the expectations of the forecast for 2022. So it's really -- if there's anything in the air gap, we really feel it's *more kind of a macro headwind*. And that it really should start to take shape here in the second half of the year as the vaccinations and other things start to take hold and the market start to come back.

140.    Notably absent from Defendants' May 10, 2021 earnings call was any explanation as to why the alleged COVID-19 related slowdowns at the end of 4Q20 push increased revenue into 1Q21, as investors already expected would happen to make up for a delay. Rather, as Mr. Hall would later make clear, the Company was using the pandemic as a "convenient scapegoat," concealing the truth that its customers' were abandoning Velodyne's expensive products and taking their business to Hesai, Argo AI and others.

141.    On May 11, 2021, BofA Securities issued a report on Velodyne highlighting that its 2021 financial outlook was "much lighter" than "targets outlined by the company upon going public last September . . . ." The report was also skeptical of the Company's spurious COVID explanation, saying "we still struggle with bridging the lower outlook for revenue and gross margin versus targets outlined in September *and are concerned it may reflect challenges in the company's shift from R&D, project-based LIDAR towards commercial, multi-year contract LIDAR* (particularly considering still 65% of 1Q:21 unit shipments were spot buys rather than under multi-year contract agreements)."

142.    On May 26, 2021, Berenberg Capital Markets issued another report about Velodyne, noting that:

The Founder and former Chairman of the Board *echoes our view that VLDR has been losing share* and presents other concerns. We've continued to highlight our view that *VLDR is ceding share in spinning lidar* to private Chinese lidar competitor Hesai and may be behind the curve in terms of bringing a high-performance solid-state lidar to series production (according to channel checks). . .

We've expressed our skepticism about the reduced guidance ($150m of revenue in 2021 to $86m and 47% gross margins to 20%) and *believe it is heavily attributable to the competitive pressure VLDR is facing*.

The Company's stock price reflected the market's skepticism, sliding to a closing price of $11.38 on May 10, 2021. As of this filing, the Company's share price trades at or near an all-time low of approximately **$6.50 per share**.

### 3. Defendants' Class Period Ford Misrepresentations

143. Beginning on July 2, 2020 and continuing virtually throughout the entire Class Period, Defendants repeatedly emphasized Ford's significance to Velodyne as both an investor and a customer, representing, *inter alia*, that: (i) the Company was "***backed by*** industry leading strategic investors, including ***Ford***"; (ii) Velodyne sells products and services directly and indirectly to Ford through third party distributors; (iii) the Company's "[s]trategic partnerships and ***strong relationships***" included "autonomous team leaders and engineers from . . . Ford[.]" Defendants knew that Ford provided the Company's circus-like SPAC process much needed credibility and legitimacy.

144. In a further effort to boost investor confidence about the Reverse Merger, Defendants touted Ford and other strategic investors' ownership position in the post-combination company, stating in relevant part that: (i) "[c]urrent Velodyne shareholders, including David Hall and strategic investors Ford, Baidu, Inc., Nikon Corporation and Hyundai Mobis, will retain an equity interest of more than 80% in the combined company"; (ii) "[t]he existing owners of Velodyne, mostly company management and Velodyne ***strategic shareholders***, will be rolling over all of their equity into this transaction. This will be subject to a six month lockup post-closing. The existing shareholders, led by Executive Chairman David Hall, will represent approximately 83% of the pro-ownership of the transaction, with the PIPE representing just under 9%, public shareholders just under 7%, and the sponsors just over 1%"; and (c) "***Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination***."

145. Nevertheless, in July 2020, however, Defendants entered into an agreement with Ford ("Ford Letter Agreement"), which at the time held more than 5% of Velodyne's outstanding capital stock. Pursuant to the Ford Letter Agreement, Ford was "grant[ed] . . . the right to have any shares of common stock issued to it in the [b]usiness [c]ombination included in the registration statement filed for purposes of registering the shares issuable upon exercise of the public warrants." Notwithstanding,

Defendants' representations that its existing owners would be subject to a lock up agreement, Defendants agreed "that any shares of common stock issued to Ford Motor Company in the [b]usiness [c]ombination [would] *not be subject to a lock-up or market stand-off agreement*."

146.    Approximately one month before it entered into the Ford Letter Agreement, however, Ford had completed transaction with Volkswagen AG ("VW") wherein Ford split its ownership stake in Argo AI – a self- driving technology platform developing its own LiDAR sensors – with VW.[24] Pursuant to this transaction, VW agreed to invest $1 billion dollars in Argo AI in addition to purchasing $500 million in shares from Ford over the course of three years and providing its Autonomous Intelligent Driving subsidiary to Argo AI as its European headquarters. While Ford would invest the remaining $600 million from its previously announced $1 billon cash commitment to Argo AI.

147.    Though Defendants knew that Ford intended to divest from Velodyne after the Reverse Merger and terminate its existing contracts with the Company in favor of Argo AI, Defendants nevertheless touted its purportedly strong business relationship with Ford throughout the Class Period, which was designed to instill investor confidence in the post-combination Company's legitimacy and prospects.

148.    On August 21, 2020, Defendants filed a Preliminary Proxy Statement with the SEC on a Schedule 14-A wherein the Company represented that only certain stockholders would be bound by a six-month lock-up period, stating in relevant part: "*Velodyne . . . agreed to cause* each holder of Velodyne common stock or Velodyne preferred stock that is a party to the IRA (as defined in the Merger Agreement), by and among Velodyne and *certain of its stockholders to be bound by a*

---

[24]    On February 10, 2017, six months after it invested in Velodyne, Ford announced its plans to invest $1 billion in Argo AI over the course of five years. *Ford Invests in Argo AI, a New Artificial Intelligence Company, in Drive for Autonomous Vehicle Leadership"*, Ford (Feb. 10, 2017), https://media.ford.com/content/fordmedia/fna/us/en/news/2017/02/10/ford-invests-in-argo-ai-new-artificial-intelligence-company.html (last accessed September 1, 2021). Just eight months later, Argo AI acquired Princeton Lightwave – a company developing Giger-mode LiDAR sensors – with the purpose of "creat[ing] LiDAR sensors that not only meet the demanding performance required for high volume production, but also are affordable." Bryan Salesky (Argo AI CEO), *How Acquiring a Team of LiDAR Experts Strengthens our Self-Driving Future*, Argo AI (Oct. 27, 2017), https://medium.com/self-driven/how-acquiring-a-team-of-lidar-experts-strengthens-our-self-driving-future-8ef340603563 (last accessed September 1, 2021).

*customary "lockup" restricting the transfer, sale and conveyance of the shares of common stock to be issued in connection with the Merger Agreement for a period of six (6) months following the Closing*, all in a form reasonably acceptable to Graf."

149.    The Preliminary Proxy further represented that Defendants had entered into an agreement with Ford wherein Ford would not be subject to a lock-up agreement. It, nevertheless, represented immediately after that disclosure that Ford was "expected" to maintain its ownership stake in the Company:

> In the letter agreement, [GRAF] and Velodyne agreed that any shares of common stock issued to Ford Motor Company in the Business Combination will not be subject to a lock-up or market stand-off agreement. ***Ford is expected to hold greater than 5% of [GRAF's] outstanding common stock after the Business Combination.***

150.    On October 5, 2020, six days after the Reverse Merger closed, Ford filed a Form SC 13G with the SEC, revealing its 7.6% ownership position in Velodyne (*i.e.*, 13,065,444 shares of common stock). Upon the release of this news, Velodyne's share price increased 7% from a closing price of $16.23 on October 5, 2020 to a closing price of $17.40 on October 6, 2020.

151.    Just two weeks later on October 19, 2020, the Company filed a Registration Statement with the SEC on Form S-1 to, *inter alia*, resell "up to 13,507,192 shares of our common stock" upon the expiration of lock-up agreements by the selling stockholders. Such a statement implied that the selling stockholder's shares would not become available for sale until after the expiration of a lock-up period; however, the selling stockholders only included former Velodyne CFO Qing Lu and Ford, and Ford was not subject to a lock-up agreement. Furthermore, the Registration Statement did not readily identify who the selling stockholders were but, rather, buried that information on page 118 of the Registration Statement to obscure that Ford's full ownership stake had been registered for sale.

152.    Notwithstanding the fact that Velodyne registered Ford's entire stake in Velodyne for sale, the October 19, 2020 Registration Statement again prominently represented that "***Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination***." The October 19, 2020 Registration Statement became effective on November 4, 2020.

153.    Between November 4, 2020 and December 31, 2020, Ford ***sold its entire stake in Velodyne***. On January 18, 2021, Defendant Samardzich, a Velodyne audit committee and board

member and former 26-year-long employee of Ford, informed the Board that she would not stand for re-election as a Class I director at the Company's 2021 annual meeting of stockholders. The Company reported that Defendant Samardzich's "decision not to stand for re-election was not a result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices." Nevertheless, and unbeknownst to investors, Defendant Samardzich's former employer (Ford) *had already divested its entire ownership stake in Velodyne*.

154.    Then, on February 12, 2021, notwithstanding Defendants' repeated Class Period representations that Ford would maintain its long-term equity ownership in the Company, Ford revealed that it had sold its entire 7.6% stake in the combined Company as of ***December 31, 2020***, causing the Company's common stock to fall 8% and warrants 12% on unusually heavy trading volume, respectively.

155.    As *Forbes* reported in a February 15, 2021 article titled "Ford Sells Velodyne Stake, Likely to Use Argo Lidar for 2022 Automated Vehicle," an unidentified Ford spokesperson explained Ford's divestment, tersely stating that: "[t]his was *part of our long term capital investment strategy* we invested in Velodyne, we made money off of the investment, and we sold the stock." In a further blow to Velodyne, that spokesperson stated, "[w]e're still using the Velodyne lidar on all of the testing vehicles that we had on the road today *but when it comes to future product or technology we don't comment on that.*" At no point during the Class Period did Defendants inform investors about Ford's long-term investment strategy to sell its stake in Velodyne while simultaneously assuring investors that Ford was "expected" to remain a long-term investor in the Company.

156.    During the Company's February 25, 2021 earnings conference call announcing its 4Q2020 results, Aileen Elizabeth Smith, an analyst with BofA Securities, asked Defendants about Ford's actions, which Defendant Hamer responded to:

> And then to ask a question on another headline recently being Ford's decision to sell down their Velodyne stake. Can you talk about what this means, if anything, from a customer relationship with Ford and Argo AI and even potentially relatedly with Volkswagen? And separately, many automakers, including GM and others over the past few years have acquired their own lidar technology that they're working to commercialize. How has that impacted your discussions with existing and potentially new customers?

**Andrew Dunn Hamer Velodyne Lidar, Inc. - CFO & Treasurer**

Yes. So we're finding like, in the case of Ford, this is a relationship we've really benefited greatly from. They are in the business of making strategic investments in critical suppliers, when they need to stand them up and ensure that they'll be financially secure to deliver these components that they need, in our case, lidar. ***When those particular companies that they've invested in are capable of standing on their 2 feet, so to speak, then they don't like to stick around as a financial investor. That's not their nature. They'd rather reallocate that capital to other investment.***

So we benefited greatly from this relationship with Ford, both in terms of what they've done for Velodyne Lidar in helping it to develop its products as a partner and becoming that critical supplier for them. And then also from their investment. . . . ***We continue to work with them very closely on both current products that are being used as well as the development of new technologies, and we'd expect that to continue for a long time to come.***

157.    Contrary to Defendant Hamer's representations, Ford terminated its contract with Velodyne as Ford's performance and pricing needs were not being met as alleged in ¶¶ 343, 371, *infra*. Given these performance shortcomings, including the Company's poor Velarray sensor as alleged in ¶¶ 135-136, 155 *supra*, Ford cancelled its contract with Velodyne in favor of lidar sensors developed by Argo AI's 2017 acquisition Princeton Lightwave. As a result, Defendant Hamer's statements in ¶ 156, *supra* were materially false and misleading when made because Ford was not expected to continue working with Velodyne for "a long to come" as Ford had just terminated a major contract with Velodyne and had liquidated its entire stake in the Company as of December 31, 2020.

### 4.    Defendants' Internal Control and Corporate Governance Misrepresentations

158.    Throughout the Class Period, Defendants engaged in yet another bait-and-switch by touting the Company's internal controls and the high quality of its corporate governance as befitting of a publicly traded company only to subsequently reveal the Company's utterly dysfunctional internal controls and corporate governance. On November 5, 2020, for instance, Defendant Gopalan was featured in an episode of the podcast *SAE Tomorrow Today*, titled "How Velodyne Became a Leader

in LiDAR with Anand Gopalan."[25] During the interview, in furtherance of his hands-on management style and Velodyne's standing as a public company, Defendant Gopalan trumpeted the Company's internal controls, stating in relevant part:

> **Defendant Gopalan**: The demand that David [Hall] always had for perfection in the product and really best in class performance and quality hasn't changed. So those things are really fundamental to the business. ***What of course we have also been able to do is put in place processes and people and methods that create the discipline that is needed to basically to be a public company to say what you're going to do then do it predictably*** so I think there's been an evolution that's started in fact before I took over where we had these talks about preparing ourselves to be a public company and ***we've been working for more than a year at this point, putting in place many of these processes, methodologies, and even people, controls to really create that predictability around the commercial and business side of things.*** So I would say it's a mixed bag somethings have evolved and gotten more disciplined and then you know it's really in our best interest to keep some of the core DNA intact and untouched.

> **Grayson Brulte**: As someone who invests in the public markets, I'll say ***thank you because that's what you want to hear from a publicly traded CEO, you want honestly and candor*** but you also want to focus on delivering value for shareholders so as a public markets investor, thank you for that. And so staying on the public markets thing, you have your first earnings call coming up on Nov. 5th, are you actively preparing for that - is there kind of butterflies in your stomach. Is there excitement because what you just said, you're clearly prepared to lead a public traded company and you're clearly prepared to grow a publicly traded company, so let's hear your thoughts on how you're preparing.

> **Anand Gopalan**: Yeah, obviously it's Velodyne's first earnings call so we are incredibly excited as sort of a thrill and excitement that's running through all parts of the business as we get ready for this but at the same time, I think, ***I feel very confident and comfortable that we have done so much work in putting these processes that I talked about in place and we've taken such a disciplined approach to gathering the data, the information that's needed to be able to communicate with the public investment community that that piece of it is almost muscle memory and we're able to - those, those processes are working, the data is coming together, and we're able to get things the together for the call*** . . . .

---

[25]    Grayson Brulte and Anand Gopalan, "How Velodyne Became a Leader in LiDAR with Anand Gopalan" SAE TOMORROW TODAY (Nov. 5, 2020), https://open.spotify.com/episode/6EUrPRl3sYm9G886F5v985 (last accessed August 31, 2021); "SAE Podcast Interviews Anand Gopalan on Velodyne's Mission to Democratize Lidar" VELODYNE LIDAR (Nov. 18, 2020), https://velodynelidar.com/blog/sae-podcast-interviews-anand-gopalan/ (last accessed July 21, 2021).

159.    Given his hands-on management style assurances regarding Velodyne's internal controls, Defendant Gopalan's materially false and misleading Class Period statements and omissions were made either knowingly or with deliberate recklessness as to the truth.

160.    Then, on March 17, 2021, the last day of the Class Period, the Company disclosed that it had identified various material weaknesses in the Company's internal controls. Despite Defendants Gopalan and Hamer's sworn certifications of the Company's internal control over financial reporting pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") during the Class Period, Velodyne's March 17, 2021 annual report on Form 10-K revealed that the Company was suffering from multiple material weaknesses in its internal controls over financial reporting, including weaknesses related to: (i) Velodyne's processes and controls over tracking and reporting whistleblower complaints and litigation matters; and (ii) Velodyne's failure to adequately review revenue schedules associated with non-standard revenue arrangements, which resulted in misstatements of revenue and deferred revenue for the three months ended December 31, 2020.

161.    On March 17, 2021, Velodyne also filed a current report with the SEC on Form 8-K, revealing that the Company's former COO, Thomas Tewell, had suddenly and unexpectedly resigned on March 14, 2021 after almost two and half years in that role. In response to this news, the value of the Company stock fell by 5.4%, while the trading price of Velodyne stock warrants similarly fell by 7.8% in a single day. A March 17, 2021 *Silicon Valley Business Journal* article written by Allison Levitsky titled "Velodyne Lidar reveals financial reporting mishaps, names new leaders," summarized many of the allegations as set forth herein, reporting that:

> Since it went public last fall, Velodyne Lidar Inc. has been struggling with a ***messy leadership battle that's resulted in the ouster of its founder***.
>
> ***Now you can add problems with its financial statements and internal controls to its list of troubles***.
>
> Due to 'material weakness' in its controls - the system of checks and balances in corporations that ensures proper accounting and protects against fraud - the company misstated its revenue and deferred revenue in the fourth quarter, it said in its annual report, which it filed with the Securities and Exchange Commission on Wednesday. The company found a similar 'material weakness' in how it handles whistleblower complaints and litigation, it said in the filing. Velodyne fixed the problem with its

whistleblower process by the end of the year and corrected its financial misstatement, it said.

'We are working to remediate the remaining material weakness' underlying that misreporting of its revenue, Velodyne said in its annual report. But, it continued, 'we cannot assure you that the measures we have taken to date will be sufficient to remediate the remaining material weakness we identified or prevent additional material weaknesses in the future.'

***Velodyne did not offer details on how much it misstated its revenue and deferred revenue***.

Velodyne spokesman Jim Golden declined to offer more details about the weaknesses the company found in its financial reporting and didn't offer a timeline for when the company expected to correct the one related to its revenue recognition.

\*       \*       \*

Earlier in the week, Velodyne announced it had named Jim Barnhart as its new chief operating officer. In the same filing mentioning Hersman's board appointment, Velodyne gave some more context to the hiring of Barnhart.

Barhart is replacing Thomas 'Rick' Tewell, the company's previous chief operating officer. Velodyne 'determined to transition' Tewell from his position on Thursday, it said in the filing. It appointed Barnhart to the role the same day, a hiring that took effect Monday. Tewell resigned Sunday, it said.

[Velodyne spokesperson] ***Golden didn't know what the company meant by the phrase 'determined to transition***.'

### E.   Post-Class Period Developments

162.   Following the Class Period, analysts, sophisticated market participants and Mr. Hall himself accused Defendants of a bait-and-switch during the Class Period whereby the Company lured investors to approve the Reverse Merger and purchase the Company's shares only to later disclose the Company's true state of affairs. On March 30, 2021, analysts with Craig-Hallum Capital Group LLC issued a research note called "***Cat Out of the Bag***, But With No Catalysts In Near-Term, Board Drama, Limited Financial Visibility & Lockup Expiration, ***Downgrading To HOLD*** And Lowering Price Target To $13 Until Catalysts Emerge" noting that:

2021 hasn't been the stellar year VLDR (or we) had hoped for – ***from withdrawn guidance to public mentions of lost customers to a public Board spat***. With worries about SPACs in general, a rising interest rate environment that hits high-multiple stocks hardest and a looming lockup expiration, and still no visibility, it is increasingly

difficult to have a positive rating on this stock. While we had multiple opportunities to get clients out of the way on this (Jan 7th when VLDR withdrew guidance and Feb 9th when we identified a few customer issues), *we are clearly late and the cat is certainly out of the bag, with the stock down ~50% since the peak early this year*.

163.    Then, on May 25, 2021, Mr. Hall sent a letter to Velodyne's shareholders publicly over *Business Wire* squarely contradicting the Company's blaming the Covid-19 pandemic for its poor financial performance and projections and highlighting the Company's "Anti-Stockholder Culture" and "Troubling Underperformance." There, Mr. Hall, revealed that the Board had enriched insiders at the Company's expense, stating:

> Taken together, these decisions are an affront to stockholders. It appears that Dr. Gopalan and his boardroom allies are more focused on advancing their own self-serving agenda than delivering stockholder value. . . . *We voiced our grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors*, the serious risk of theft of IP in China and the Company's overall poor financial performance.
>
> *        *        *
>
> *Sadly, the Board and management appear content blaming their own failings on the COVID-19 pandemic. While a convenient scapegoat*, the reality is that similar lidar companies have been thriving during the pandemic. Luminar Technologies reported that its revenues for the first quarter of 2021 increased 37% over the first quarter of 2020, and Ouster reported a revenue increase of 187% over the first quarter of 2020. . . . But rather than increasing focus on the addition of new research and development personnel to keep pace with innovation, the current Board instead opted to increase G&A expenses significantly. G&A expenses increased by 59% for the three months ended March 31, 2021 from the comparable period of 2020. This is in the face of Velodyne Lidar's 35% decline in product revenues for the comparable periods of March 31, 2020 to March 31, 2021.

164.    In an article appearing on *The Verge* by Andrew J. Hawkins dated May 25, 2021, titled "The founder of lidar maker Velodyne is going to war with his own SPAC," Mr. Hall accused the Board of "padding Velodyne CEO Anand Gopalan's compensation 'despite knowing the company would miss its 2020 projections.'" Mr. Hall added that his termination by the Board was a "seemingly retaliatory move [that] followed our attempt to hold Dr. Gopalan more accountable for the company's weak performance and reconstitute the board with more experienced and highly-qualified public company directors." Mr. Hall also characterized his ouster as "*based on an opaque, secret investigation into frivolous claims*."

165.    On July 19, 2021, and only after over a year as the Company's CEO, the Company announced that ***Defendant Gopalan had suddenly resigned as Velodyne's CEO***, effective July 30, 2021. The Company was unable to name a successor as CEO, suggesting that Defendant Gopalan's departure was sudden and unexpected. Instead, the Company announced that it created an "Office of the Chief Executive" comprised of several individuals, including Defendant Hamer, as CEO.

166.    In a research note dated July 19, 2021, Baird analyst Tristan Gerra wrote that Gopalan's departure "casts further uncertainty in the company's outlook after earlier-year design win losses and a high profile board/founder fight." On the news, Baird downgraded Velodyne from Outperform to Neutral with a $10 price target. The same day, *Reuters* reported in an article called "Velodyne Lidar CEO to step down, shares drop" that "Velodyne Lidar Inc (VLDR.O) said on Monday Chief Executive Officer Anand Gopalan would step down at the end of July, ***a little over a year after taking the role***, sending its shares down nearly 6%. San Jose, California-based Velodyne will be led by a team consisting of several members of the senior leadership while it searches for a successor, it said. ***The company did not give a reason for Gopalan's departure . . . . Velodyne did not immediately respond to a request seeking details on Gopalan's exit***."

167.    The same day, on July 19, 2021, *TechCrunch* published an article by Kristen Korosec titled "Velodyne Lidar CEO resigns in latest internal drama" noting that "Gopalan's resignation comes after months of internal drama and business setbacks for a company that has been considered the leading supplier of lidar, the light detection and ranging radar sensor that is considered a critical component to commercially deploy autonomous vehicles. ***The resignation is the latest in a series of issues that have cropped up since Velodyne Lidar struck a deal to merge with special purpose acquisition company Graf Industrial Corp***."

168.    Then, on August 2, 2021, Velodyne announced that Defendant Culkin was stepping down from his position as Chairman of the Board, citing health reasons. The Company subsequently appointed Defendant Dee to serve as Chairman of the Board. The same day, Velodyne also announced that Deborah Hersman – who had only been appointed to the Board in March 2021 - was also stepping down from the Board.

169.    While the Company's highest-ranking insiders profited from this unseemly SPAC transaction, investors were not as fortunate and suffered significant damages. Indeed, from a Class Period trading high of $32.50 per share on September 10, 2020, the Company's share price closed at $14.01 on March 17, 2021, the last day of the Class Period. Currently, the Company's shares are trading at approximately $6.50 per share.

## VI.    DEFENDANTS' MATERIALLY FALSE AND MISLEADING PRE-REVERSE MERGER STATEMENTS AND OMISSIONS

### A.    July 2, 2020 Statements

170.    On July 2, 2020, Graf Industrial and Velodyne issued a joint press release ("Merger Release"), filed with the SEC on Form 8-K, announcing that they reached the Merger. The Form 8-K to which the Merger Release was attached was signed by Defendant Graf.

171.    The Merger Release represented how Velodyne was on track "***to generate revenues of approximately $100 million in 2020, increasing to approximately $680 million in 2024 with existing contracts*** expected to drive just under 50% of the estimated 2024 revenues." The Merger Release also stated that "[e]stimated revenues ***under existing customer contracts are expected to exceed $800 million from 2020 to 2024***." The Merger Release further emphasized Velodyne's existing investor relationships in an effort to build investor confidence in Velodyne's business prospects. In doing so, Graf Industrial and Velodyne represented that "***[c]urrent Velodyne shareholders, including David Hall and strategic investors Ford, Baidu, Inc., Nikon Corporation and Hyundai Mobis, will retain an equity interest of more than 80% in the combined company***."

172.    The highlighted statements in ¶ 171, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(ii)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(iii)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(iv)** Defendants knew of or recklessly disregarded Mr. Hall's "grave concerns regarding the

Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance"; **(v)** as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, **(vi)** as a result of (i)-(v) above, Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

173.   In addition, the Merger Release further emphasized Hall's continued involvement with Velodyne, stating in relevant part that: "***David Hall will continue to play a critical role as executive chairman of Velodyne***."

174.   The highlighted statement in ¶ 173, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless disregard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business given Velodyne's dependence on him; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; **(v)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation"; **(vi)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(vii)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(viii)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(ix)** Defendants knew of or recklessly disregarded Mr. Hall's "grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the

Company's overall poor financial performance"; **(x)** as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, **(xi)** as a result of (i)-(x) above, Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

175.    Graf Industrial also filed an "Investor Presentation" ("July 2, 2020 Investor Presentation") as an Exhibit to the Merger Release, which represented that Velodyne had ***more than $680 million in projected revenue through 2024, and that 50% of this projected value was "contracted" based on volume and price agreements as of June 1, 2020***.[26] The July 2, 2020 Investor Presentation also highlighted that the Company had ***sixteen "signed and awarded contracts"*** and further represented in footnoted small print that the "agreed terms and conditions of supply, but do not reflect firm orders unless and until purchase orders are received" and that "[o]ne customer accounts for $316.3m in cumulative projected revenue between 2020 and 2024."

176.    The highlighted statements in ¶ 175, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business given Velodyne's dependence on him; **(ii)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(iii)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(iv)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(v)** Defendants knew of or recklessly disregarded Mr. Hall's "grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share

---

[26]    The July 2, 2020 Investor Presentation was also filed with the SEC on Form 14A that same day. Defendants Dee and Hamer "maintained a one-on-one dialogue" for purposes of, *inter alia*, "preparing the investor presentation." *See* Graf Industrial's September 14, 2020 Definitive Proxy Statement, p. 135.

to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance"; (**vi**) as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, (**vii**) as a result of (i)-(vi) above, Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

177.    That same day, on July 2, 2020, Defendants held a joint conference call to discuss the announcement of the business combination.[27] During the call, Defendant Gopalan touted Velodyne's customer base and "strategic' investment partners, stating in relevant part: "[w]e have a broad based set of customers. Virtually every major OEM [original equipment manufacturer] and tech company is a Velodyne customer. We have global sales presence and ability to actually deliver this technology with mass manufacturing capabilities across all of these different end markets beyond not just automotive. ***And finally, we are backed by industry leading strategic investors, including Ford***, Baidu, Nikon and Hyundai Mobis. That really makes us uniquely positioned to be able to capture this inflection point. . . . And of course, throughout this history, ***we have been supported by the strong base of strategic investors and partners, as this slide shows***. And so all of this has led to not just a really exciting technology study, but a real business."

178.    Defendant Dee also emphasized the importance of Ford's investment in Velodyne during the July 2, 2020 conference call, explaining that existing owners of Velodyne, such as Ford and Baidu, would be "rolling . . . their equity" as part of the Merger, stating in relevant part that the: "existing owners of Velodyne, mostly company management and Velodyne strategic shareholders, will be rolling over all of their equity into this transaction. This will be subject to a six month lockup post-closing. The existing shareholders, led by Executive Chairman David Hall, will represent approximately 83% of the pro-ownership of the transaction, with the PIPE representing just under 9%, public shareholders just under 7%, and the sponsors just over 1%."

---

[27]    Graf Industrial Corp., "Velodyne Lidar and Graf Industrial Corp. Announce Business Combination to Form Leading Publicly-Traded Lidar Technology Company" (Ex. 99.1 to Form 8-K) (July 2, 2020), https://www.sec.gov/Archives/edgar/data/0001745317/000110465920080274/tm2024030d1_ex99-1.htm; Graf Industrial Corp. and Velodyne, "July 2020 Investor Presentation" (Ex. 99.2 to Form 8-K), https://www.sec.gov/Archives/edgar/data/0001745317/000110465920080274/tm2024030d1_ex99-2.htm.

179.    To further promote the Merger, Defendant Gopalan touted "*projected 2024 revenue to be over $680 million, of which roughly half is contracted today through 16 signed and awarded multiyear agreements*." Defendant Graf reiterated these projections, representing that: "as we look out to 2024 *about 50% of the 2024 revenues is from contracts already in hand*. This gives us conviction and confidence in pricing off the 2024 projections." Defendant Hamer also emphasized the Company's financial prospects and outlook during the call, stating "*we have approximately $837 million in signed and awarded contracts going out through 2024*." Defendant Hamer continued, highlighting the significance of the signed and awarded contracts:

> [S]ignificant *because we're expecting as we go forward that contract pipeline will only continue to grow and give us greater visibility, predictability* and eventually stickiness with our customers in the revenues because we're going to seek additional contracts that will lead to signed and awarded deals. *Now, another part that's really important about this slide is the evolution of the signed and awarded contracts*. As you can see here on this slide at the beginning of January 2019 we had 1, the beginning of January 2020 we had 3 and as of June 1st of this year we had 16. Again, significant improvement. When we're looking at these numbers you start to see this ramp go, [sic] it's becomes reasonable to suggest that by the end of 2021, we should have as many as 50 signed and awarded contracts. So our pipeline will continue to grow from June 1st. The number of contracts that move to signed and awarded will continue to grow as we go past June 1st. *And that will give us further visibility and confidence in these numbers as we go forward to hitting our projected revenue targets*. Now, the other key thing for me when I'm looking at this, because people should be wondering, well, why should you be confident these numbers in the out years? *First of all, coming from multiple contracts in each year. So even if a contract moves in or out, there will be other new contracts that are going to be coming out of that pipeline. For example, in 2024, we have approximately $1.7 billion as of June 1st that is just the pipeline. And I'm looking to fill the void between $326 million and $684 million*. It's entirely *reasonable to suggest we'd get $360 million dollars out of a $1.7 billion dollar pipeline that's as of June 1st, 2020*. And then therefore our expectation is this pipeline grows and we go forward and we could anticipate that that will also gain momentum and get some more traction and we'll have lots of different contracts. So we have delevered the model or derisked it because of the very, very different customers are going be in there. *So, again, this has $837 million dollars of contracts out through 2024 and what that does is it leads to us being able to take a look at our revenues and gain greater confidence*.

180.    The highlighted statements in ¶¶ 177, 179, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove

him from the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business given Velodyne's dependence on him; **(ii)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(iii)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(iv)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(v)** Defendants knew of or recklessly disregarded Mr. Hall's "grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance"; **(vi)** as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, **(vii)** as a result of (i)-(vi) above, Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

181.    Defendants Dee and Hamer knew or were reckless in not knowing that Velodyne's financial guidance was unachievable because they "maintained a one-on-one dialogue" with each other "regarding clarifying issues including; the status of shareholder approval, ***confirming awarded contract status***, providing investor feedback, organizing the task lists, ***preparing the investor presentation***, ***reviewing the financial model***, discussing business updates as they transpired, ***ensuring White & Case reviewed all the contracts and tied the contracted volumes to the revenue projections***, and anticipating next steps to efficiently organize resources."

182.    During the July 2, 2020 conference call, Defendant Hamer also emphasized that the Company's general and administrative expenses ("G&A") were "designed to be SEC-ready," saying "we've hired all the people with the technical skills," "put in place all the systems that we need" and that "***we'll see the G&A expense come down to about 7 percent by 2024***." Defendant Gopalan also downplayed the risks to Velodyne associated with the Covid-19 pandemic during the July 2, 2020 conference call, stating "[w]e fully transitioned one of our high volume products to Fabrinet in Thailand, ***even in the midst of the challenging COVID pandemic . . . .***" Gopalan and Hamer's

statements on July 2, 2020 were consistent with the contemporaneous due diligence procedures which were touted to voting investors *via* the September proxy to investors, which contended that Graf Industrial had, *inter alia*, reviewed revenue contracts, performed accounting and financial due diligence, and created its own independent financial modeling to yield results which were reasonably consistent with Velodyne's own. *See* ¶ 93, *supra*.

183.    The highlighted statements in ¶ 182, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Velodyne's internal controls over financial reporting suffered from multiple material weaknesses, including material weakness related to the Company's tracking and reporting of whistleblower complaints, revenue recognition, and reporting practices; **(ii)** Defendants surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company would foreseeably result in increased G&A expenses associated with litigation, which Defendants knew (or were reckless in not knowing); **(iii)** Veldoyne's G&A expenses increased by 59% as a result of the Company's removal of Mr. Hall; **(iv)** Defendants were aware of "concerns with [Velodyne's] corporate governance" no later than July 2, 2020 because Mr. Hall raised such concerns with the Board; **(v)** "Velodyne Lidar's corporate governance [was] broken" as evidenced by Defendants' "decision to rubberstamp an increased compensation package for Mr. Gopalan despite the Company releasing weak Q4 2020 earnings and missing year end forecasts[,]" which Defendants knew or recklessly disregarded because Mr. Hall raised such concerns; **(vi)** Defendants had "manipulate[d] the Company's corporate machinery" by transitioning board members to lengthen the re-election time period and maintain control over board seats; **(vii)** the Board, including Defendants, "prioritize[d] their "own self-interests over stockholders"; **(viii)** "the Board and management appear[ed] content blaming their own failings on the COVID-19 pandemic" and while it was "a convenient scapegoat, the reality [was] that similar lidar companies have been thriving during the pandemic"; **(ix)** Defendants had "fostered an anti-stockholder culture"; **(x)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(xi)** Defendant Gopalan had "manipulated the truth to customers and investors alike" about the Company's operations and prospects; **(xii)** Defendant Culkin

took "several liberties with the truth and has acted as a rubberstamp on Dr. Gopalan's actions, including by approving a robust, metric-free Chief Executive Officer compensation package"; and finally, **(xiii)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

184.    Furthermore, Defendants Gopalan and Hamer knew or were reckless in not knowing that Velodyne's internal controls were ineffective given: **(i)** Defendant Gopalan's purported "confidence" in the Company's year-long efforts to create and implement processes and controls "needed to basically to be a public company" and to "create that predictability around the commercial and business side of thing" (*see* ¶ 158, *supra*); and **(ii)** their respective roles, which afforded them access to the undisclosed adverse information about Velodyne's business, operations, and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof.

185.    During the same call, Defendant Gopalan highlighted Mr. Hall's continued involvement in Velodyne following the Merger, stating in relevant part:

> David Hall is the Company's visionary founder, serial inventor, who has pretty much created the industry of autonomy. He's transitioned to an executive chairman role, but **will remain very involved in the engineering and technology vision of the Company**. While he's handed over day to day operations to myself, to me and really his vision is to see lidar technology proliferate across the world in all of these different applications making autonomy safer. The combination with Graf Industrial and the addition of Jim Graf and Michael Dee really will add a depth of operational expertise by these really industry veterans, and that will ensure Velodyne will continue to execute on its vision, continue to innovate, and remain the industry leader that it is today.

186.    Finally, in concluding the call, Defendant Dee further stated that "Jim Graf and I could not properly conclude today's presentation without a nod to the leadership of Velodyne, and in particular to its visionary founder, David Hall. David's technological and manufacturing genius is really reflected in the ***extremely high quality of management and engineering talent that he has and will continue to assemble***. ***We are profoundly honored to be his partner in taking Velodyne to the next level as a public company***."

187.    The highlighted statements in ¶¶ 185-186, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** Defendants knew of or recklessly disregarded Mr. Hall's "grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance"; **(v)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; and **(vi)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation."

**B.    July 15, 2020 Statements**

188.    On July 15, 2020, Defendants filed a Preliminary Proxy Statement with the SEC *via* Schedule 14. The July 2020 Preliminary Proxy further stated that the Board recommended that shareholders vote to approve the Reverse Merger, with one of the purported reasons for support being Velodyne's and Mr. Hall's "***Committed and Capable Management Team*" "*whose interests are aligned with those of [Graf Industrial's] stockholders and [who] can clearly and confidently articulate the business plan and market opportunities to public market investors*."

189.    The July 2020 Preliminary Proxy continued touting Mr. Hall's importance to the Company, representing that "Founder and Executive Chairman David Hall is an industry icon having invented real-time 3D lidar in 2005" and further stating that:

> Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles ("AVs") organized by the Defense Advanced Research Projects Agency (DARPA). . . .
>
> David Hall led Velodyne as it grew into the leading lidar provider, with early customers such as Google, Caterpillar, and Nokia. As the company progressed, we have built a

strong team, adding leaders in sales, engineering, automotive validation, manufacturing, operations, legal and finance, bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon. *Today we work together as a dynamic team, planning the company growth strategy to take advantage of market opportunities and drive sales.*

190.　The July 2020 Preliminary Proxy further emphasized Mr. Hall's continued leadership of Velodyne after the Merger, stating:

> *Visionary and proven management team with deep industry experience*. Innovation runs deep in our corporate culture. *Our founder and executive chairman, David Hall,* and our chief executive officer, Dr. Anand Gopalan, along with our executive management team, *drive our vision and corporate strategy*. . . . Our experienced leadership team is committed to deploying safe, autonomous systems across multiple end markets. As the company developed, *Mr. and Ms. Hall built a strong team*, adding leaders in sales, engineering, automotive validation manufacturing, operations, legal and finance bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon.

191.　It also highlighted that "Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management" and further represented his active involvement in and continued leadership of the Company following the Merger:

> Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and *he remains deeply involved in all aspects of Velodyne's business, including product development*. *The loss of Mr. Hall would adversely affect Velodyne's business* because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's R&D activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. *Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry*.

192.　It further represented that Mr. Hall would maintain his leaders role at Velodyne well after the business combination, stating: "Upon the consummation of the Business Combination, *Mr. Hall will serve as the post-combination company's executive chairman*. . . . In his role as executive chairman, *Mr. Hall will remain actively involved in the post-combination company's product and technology development strategy*."

193.    The highlighted statements in ¶¶ 188-192, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; **(v)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation"**; (vi)** Defendants were aware of "concerns with [Velodyne's] corporate governance" no later than July 2, 2020 because Mr. Hall raised such concerns with the Board; **(vii)** the Board, including Defendants, "prioritize[d] their "own self-interests over stockholders"; **(viii)** Defendants knew of or recklessly disregarded Mr. Hall's "grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance"; **(ix)** Defendants had "fostered an anti-stockholder culture"; **(x)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(xi)** Defendant Gopalan had "manipulated the truth to customers and investors alike" about the Company's operations and prospects; and finally, **(xii)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

194.    The July 2020 Preliminary Proxy also recommended that shareholders vote to approve the Merger for the purported reason Velodyne had "***Stable Free Cash Flow, Prudent Debt and Financial Visibility***." The July 2020 Preliminary Proxy further represented that Velodyne had "***in place . . . the governance, financial systems and controls required in the public markets . . . , as well as corporate governance, financial systems and controls in place to operate as a public company***" and expounded on the controls in place, stating in relevant part:

> **Internal Controls**. ***The Company maintains a system of internal accounting controls designed to provide reasonable assurance that***: (a) transactions are executed in

accordance with management's general or specific authorizations; (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

195.     The highlighted statements in ¶ 194, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Velodyne's internal controls over financial reporting suffered from multiple material weaknesses, including material weakness related to the Company's tracking and reporting of whistleblower complaints, revenue recognition, and reporting practices; **(ii)** Defendants were aware of "concerns with [Velodyne's] corporate governance" no later than July 2, 2020 because Mr. Hall raised such concerns with the Board; **(iii)** "Velodyne Lidar's corporate governance [was] broken" as evidenced by Defendants' "decision to rubberstamp an increased compensation package for Mr. Gopalan despite the Company releasing weak Q4 2020 earnings and missing year end forecasts[,]" which Defendants knew or recklessly disregarded because Mr. Hall raised such concerns; **(iv)** Defendants had "manipulate[d] the Company's corporate machinery" by transitioning board members to lengthen the re-election time period and maintain control over board seats; **(v)** the Board, including Defendants, "prioritize[d] their "own self-interests over stockholders"; **(vi)** Defendants had "fostered an anti-stockholder culture"; **(viii)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(ix)** Defendant Gopalan had "manipulated the truth to customers and investors alike"; **(x)** Defendant Culkin took "several liberties with the truth and has acted as a rubberstamp on Dr. Gopalan's actions, including by approving a robust, metric-free Chief Executive Officer compensation package"; and finally, **(xi)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

196.     Furthermore, Defendants knew or were reckless in not knowing that Velodyne's internal controls were ineffective given: **(i)** Defendant Gopalan's purported "confidence" in the Company's year-long efforts to create and implement processes and controls "needed to basically to be a public company" and to "create that predictability around the commercial and business side of

thing" (*see* ¶ 158, *supra*); and **(ii)** their respective roles, which afforded them access to the undisclosed adverse information about Velodyne's business, operations, and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof.

197.    Graf Industrial also filed a copy of the Merger Agreement as Annex A to the July 2020 Preliminary Proxy.[28] The Merger Agreement stated that "Velodyne had one multi-year customer contract in early 2019, three multi-year customer contracts in early 2020 and *16 multi-year customer contracts awarded or signed as of June 1, 2020. These contracts account for 71% and 48% of projected 2023 and 2024 fiscal year revenues, respectively"* and that Velodyne had "*projected 2024 revenues of $684 million*." The Merger Agreement also provided that "*Velodyne Management estimates that Velodyne's revenue will have a compound annual growth rate from 2020 to 2024 of 61%*" and that "[a]pproximately *48% of projected 2024 revenues are under existing awarded multi-year contracts*." Graf also included a table of projected earnings by year:

| ($ in millions) Year | Revenues | EBITDA | Free Cash Flow |
|---|---|---|---|
| 2020 | $ 101.2 | $ (59.3) | $ (59.6) |
| 2021 | $ 152.0 | $ (7.5) | $ (4.1) |
| 2022 | $ 249.4 | $ 15.5 | $ 6.6 |
| 2023 | $ 412.1 | $ 56.7 | $ 29.9 |
| 2024 | $ 684.1 | $ 148.8 | $ 103.7 |

198.    The highlighted statements and the graph in ¶ 197, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business given Velodyne's dependence on him; **(ii)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while customers rejected its Velarray sensors; **(iii)** Velodyne was losing

---

[28]    Defendants Graf and Gopalan signed the Merger Agreement.

major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(iv)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(v)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(vi)** as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, **(vii)** as a result of (i)-(vi) above, Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

199. Furthermore, Defendants Dee and Hamer knew or were reckless in not knowing that Velodyne's financial guidance was unachievable because they "maintained a one-on-one dialogue" with each other "regarding clarifying issues including; the status of shareholder approval, ***confirming awarded contract status***, providing investor feedback, organizing the task lists, preparing the investor presentation, ***reviewing the financial model***, discussing business updates as they transpired, ***ensuring White & Case reviewed all the contracts and tied the contracted volumes to the revenue projections***, and anticipating next steps to efficiently organize resources."

## C.    July 20, 2020 Statements

200. On July 20, 2020, Graf Industrial filed a Form 8-K with the SEC, which was signed by Defendant Graf. Therein, it advised stockholders and potential investors "to read the preliminary proxy statement relating to the Business Combination and, when available, any amendments thereto and the definitive proxy statement and documents incorporated by reference therein filed in connection the Business Combination as well as the definitive proxy statement relating to the Extension, as these materials will contain important information about the Extension, Velodyne, the Company and the

1   Business Combination."[29] Graf Industrial further attached an investor presentation, titled "Analyst

2   Day" and dated July 20, 2020 ("July Investor Presentation") as Exhibit 99.1 to the Form 8-K.

3   201.    The July Investor Presentation represented that Velodyne had ***more than $680 million***

4   ***in projected revenue through 2024, and that 50% of this projected value was "contracted" based on***

5   ***volume and price agreements as of June 1, 2020***.[30] The July 2, 2020 Investor Presentation also

6   highlighted that the Company had ***sixteen "signed and awarded contracts***[.]*"*

7   202.    The highlighted statements in ¶ 201, *supra* were materially false and misleading when

8   made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants

9   were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from

10  the Company, which they knew (or were reckless in not knowing) would adversely affect the

11  Company's business; **(ii)** Velodyne was incurring increased R&D and sales and marketing expenses

12  in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor

13  was being rejected by customers; **(iii)** Velodyne was losing major customer contracts to competitors

14  Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues

15  during the Class Period; **(iv)** Ford planned to terminate a major contract with Velodyne and sell its

16  stake in Velodyne shortly after the Reverse Merger; **(v)** after the consummation of the Merger, Mr.

17  Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key

18  R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China

19  and the Company's overall poor financial performance[,]" which Defendants knew or recklessly

20  disregarded; **(vi)** as a result, Velodyne was not on track to achieve its revenue projections and in fact

21  was suffering from year-over-year revenue declines; and that, **(vii)** as a result of (i)-(vi) above,

22  Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

23  203.    Furthermore, Defendants Dee and Hamer knew or were reckless in not knowing that

24  Velodyne's financial guidance was unachievable because they "maintained a one-on-one dialogue"

25  with each other "regarding clarifying issues including; the status of shareholder approval, ***confirming***

---

26  [29]    Emphasis removed.

27  [30]    The July 20, 2020 Investor Presentation was also filed with the SEC on Form 14A.

28

*awarded contract status*, providing investor feedback, organizing the task lists, **preparing the investor presentation**, **reviewing the financial model**, discussing business updates as they transpired, **ensuring White & Case reviewed all the contracts and tied the contracted volumes to the revenue projections**, and anticipating next steps to efficiently organize resources."

### D. August 21, 2020 Statements

204. On August 21, 2020, Graf Industrial and Velodyne filed a Preliminary Proxy Statement with the SEC *via* Schedule 14-A. The August Preliminary Proxy stated that the Board recommended that shareholders vote to approve the Reverse Merger, with one of the purported reasons for support being Velodyne's and Mr. Hall's "**Committed and Capable Management Team**" "**whose interests are aligned with those of [Graf Industrial's] stockholders and [who] can clearly and confidently articulate the business plan and market opportunities to public market investors**."

205. The August 2020 Preliminary Proxy continued touting Mr. Hall's importance to the Company, representing that "Founder and Executive Chairman David Hall is an industry icon having invented real-time 3D lidar in 2005" and further stating that:

> Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles ("AVs") organized by the Defense Advanced Research Projects Agency (DARPA) . . . .
>
> David Hall led Velodyne as it grew into the leading lidar provider, with early customers such as Google, Caterpillar, and Nokia. As the company progressed, we have built a strong team, adding leaders in sales, engineering, automotive validation, manufacturing, operations, legal and finance, bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon. **Today we work together as a dynamic team, planning the company growth strategy to take advantage of market opportunities and drive sales.**

206. The August 2020 Preliminary Proxy further emphasized Mr. Hall's continued leadership of Velodyne following the Reverse Merger, stating:

> **Visionary and proven management team with deep industry experience**. Innovation runs deep in our corporate culture. **Our founder and executive chairman, David Hall,** and our chief executive officer, Dr. Anand Gopalan, along with our executive management team, **drive our vision and corporate strategy**. . . . Our experienced leadership team is committed to deploying safe, autonomous systems across multiple end markets. As the company developed, **Mr. and Ms. Hall built a strong team**, adding leaders in sales,

engineering, automotive validation manufacturing, operations, legal and finance bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon.

207.    It also highlighted that "Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management" and further represented his active involvement with the Company:

> Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and *he remains deeply involved in all aspects of Velodyne's business, including product development*. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's R&D activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. *Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry*.

208.    It further represented that Mr. Hall would maintain his leadership role at Velodyne well after the business combination, stating: "Upon the consummation of the Business Combination, *Mr. Hall will serve as the post-combination company's executive chairman*. . . . In his role as executive chairman, *Mr. Hall will remain actively involved in the post-combination company's product and technology development strategy*."

209.    The highlighted statements in ¶¶ 204-208, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; **(v)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation"; **(vi)** Defendants were aware of

"concerns with [Velodyne's] corporate governance" no later than July 2, 2020 because Mr. Hall raised such concerns with the Board; **(vii)** Defendants "prioritize[d] their "own self-interests over stockholders"; **(viii)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(ix)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(x)** Defendant Gopalan had "manipulated the truth to customers and investors alike" about the Company's operations and prospects; and finally, **(xi)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

210.    The August 2020 Preliminary Proxy also recommended that shareholders vote to approve the Reverse Merger for the purported reason Velodyne had "***Stable Free Cash Flow, Prudent Debt and Financial Visibility***." The Preliminary Proxy further represented that Velodyne had "***in place the governance, financial systems and controls required in the public markets . . . , as well as corporate governance, financial systems and controls in place to operate as a public company***" and expounded on the controls in place, stating in relevant part:

> **Internal Controls**. ***The Company maintains a system of internal accounting controls designed to provide reasonable assurance*** that: (a) transactions are executed in accordance with management's general or specific authorizations; (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

211.    The highlighted statements in ¶ 210, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Velodyne's internal controls over financial reporting suffered from multiple material weaknesses, including material weakness related to the Company's tracking and reporting of whistleblower complaints, revenue recognition, and reporting practices; **(ii)** Defendants knew of or recklessly disregarded "concerns with [Velodyne's] corporate governance" no later than July 2, 2020 because Mr. Hall raised

such concerns with the Board; **(iii)** "Velodyne Lidar's corporate governance [was] broken" as evidenced by Defendants' "decision to rubberstamp an increased compensation package for Mr. Gopalan despite the Company releasing weak Q4 2020 earnings and missing year end forecasts[,]" which Defendants knew or recklessly disregarded because Mr. Hall raised such concerns; **(iv)** Defendants had "manipulate[d] the Company's corporate machinery" by transitioning board members to lengthen the re-election time period and maintain control over board seats; **(v)** Defendants "prioritize[d] their "own self-interests over stockholders"; **(vi)** Defendants had "fostered an anti-stockholder culture"; **(vii)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(viii)** Defendant Gopalan had "manipulated the truth to customers and investors alike"; **(ix)** Defendant Culkin took "several liberties with the truth and has acted as a rubberstamp on Dr. Gopalan's actions, including by approving a robust, metric-free Chief Executive Officer compensation package"; and finally, **(x)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

212.    The August Preliminary Proxy stated that "***Velodyne . . . agreed to cause*** each holder of Velodyne common stock or Velodyne preferred stock that is a party to the IRA (as defined in the Merger Agreement), by and among Velodyne and ***certain of its stockholders to be bound by a customary 'lockup' restricting the transfer, sale and conveyance of the shares of common stock to be issued in connection with the Merger Agreement for a period of six (6) months following the Closing***, all in a form reasonably acceptable to Graf." It further represented that Graf Industrial and Velodyne had entered into an agreement with Ford wherein Ford would not be subject to a lock-up agreement. It, nevertheless, represented immediately after that disclosure that Ford was expected to maintain its ownership stake in the Company:

> In the letter agreement, GRAF and Velodyne agreed that any shares of common stock issued to Ford Motor Company in the Business Combination will not be subject to a lock-up or market stand-off agreement. ***Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination.***

213.    The highlighted statements in ¶ 212, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** in July 2020, Graf Industrial and Velodyne agreed to terms that would allow Ford to liquidate its entire ownership

stake in the Company; **(ii)** Ford planned to terminate a major contract with Velodyne and sell its stake in the Company shortly after the Reverse Merger, which Defendants knew or were reckless in not knowing given the aforementioned agreement; **(iii)** Velodyne was losing major customer contracts and market share to competitors Hesai and Argo AI while its Velarray sensor was being rejected by customers; and **(iv)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, [and] the serious risk of theft of IP in China[,]" which Defendants knew or recklessly disregarded.

214. The August Preliminary Proxy further touted that Velodyne had **"over $100 million in expected cash flow in 2024," "16 multi-year customer contracts awarded or signed as of June 1, 2020,"** that **"[t]hese contracts account for 71% and 48% of projected 2023 and 2024 fiscal year revenues, respectively**." It further stated that it estimated that "**Velodyne's revenue will have a compound annual growth rate from 2020 to 2024 of 61%**." Graf Industrial also included the same table of projected earnings by year:

| ($ in millions) Year | Revenues | EBITDA | Free Cash Flow |
|---|---|---|---|
| 2020 | $ 101.2 | $ (59.3) | $ (59.6) |
| 2021 | $ 152.0 | $ (7.5) | $ (4.1) |
| 2022 | $ 249.4 | $ 15.5 | $ 6.6 |
| 2023 | $ 412.1 | $ 56.7 | $ 29.9 |
| 2024 | $ 684.1 | $ 148.8 | $ 103.7 |

215. The Company also disclosed in the August Preliminary Proxy that its G&A expenses had increased to $16.4 million (152% of 2019 G&A expenses compared to the same time period the year before), but attributed this to "an increase of $6.6 million in legal and professional services, an increase of $2.4 million in legal proceedings accrual for employment-related matters, an increase of $1.9 million in personnel-related costs and an increase of $0.2 million in bad debt expenses." G&A accounted for about 30% of Velodyne's total operating expenses. The Preliminary Proxy nevertheless claimed that any potentially disparate interests than public shareholders "would be mitigated" because "these interests were disclosed in the initial public offering prospectus."

216.    The highlighted statements and graph in ¶ 214, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business given Velodyne's dependence on Mr. Hall **(ii)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(iii)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(iv)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(v)** after the consummation of the merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(vi)** as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, **(vii)** as a result of (i)-(vi) above, Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

217.    Furthermore, Defendants Dee and Hamer knew or were reckless in not knowing that Velodyne's financial guidance was unachievable because they "maintained a one-on-one dialogue" with each other "regarding clarifying issues including; the status of shareholder approval, ***confirming awarded contract status***, providing investor feedback, organizing the task lists, preparing the investor presentation, ***reviewing the financial model***, discussing business updates as they transpired, ***ensuring White & Case reviewed all the contracts and tied the contracted volumes to the revenue projections***, and anticipating next steps to efficiently organize resources."

218.    In response to Defendants representations as alleged in ¶¶ 204-208, 210, 212, 214, *supra*, on August 21, 2020, the price of Graf Industrial's share price rose by $1.69 per share to close

at $19.23 on August 24, 2020 (the next trading day), a rise of 9.64%, on unusually heavy volume of 1.874 million shares traded.

**E.    August 27, 2020 Statements**

219.    On August 27, 2020, Graf Industrial filed its Registration Statement dated August 26, 2020 on Form S-1 with the SEC, which Defendants Graf and Dee, *inter alia*, signed. The August 2020 Registration Statement instructed stockholders and investors to "rely only on the information contained in this prospectus."

220.    The August 2020 Registration Statement touted Mr. Hall's importance to the Company, stating that:

> Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles ("AVs") organized by the Defense Advanced Research Projects Agency (DARPA) . . . .
>
> David Hall led Velodyne as it grew into the leading lidar provider, with early customers such as Google, Caterpillar, and Nokia. As the company progressed, we have built a strong team, adding leaders in sales, engineering, automotive validation, manufacturing, operations, legal and finance, bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon. **_Today we work together as a dynamic team, planning the company growth strategy to take advantage of market opportunities and drive sales._**

221.    It also emphasized David Hall and Marta Hall's leadership, stating:

> **_Visionary and proven management team with deep industry experience_**. Innovation runs deep in our corporate culture. **_Our founder and executive chairman, David Hall,_** and our chief executive officer, Dr. Anand Gopalan, along with our executive management team, **_drive our vision and corporate strategy_**. . . . Our experienced leadership team is committed to deploying safe, autonomous systems across multiple end markets. As the company developed, **_Mr. and Ms. Hall built a strong team_**, adding leaders in sales, engineering, automotive validation manufacturing, operations, legal and finance bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon.

222.    The August 2020 Registration Statement further highlighted that "Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management" and further represented his active involvement with the Company:

Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and *he remains deeply involved in all aspects of Velodyne's business, including product development*. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's R&D activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. *Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry.*

223.    The August 2020 Registration Statement further represented that Mr. Hall would maintain his leadership role at Velodyne after the business combination, stating: "Upon the consummation of the Business Combination, *Mr. Hall will serve as the post-combination company's executive chairman*. . . . In his role as executive chairman, *Mr. Hall will remain actively involved in the post-combination company's product and technology development strategy*."

224.    The highlighted statements in ¶¶ 220-223, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(v)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; and **(vi)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation."

225.    The same public filing also stated that Graf Industrial and Velodyne entered into an agreement with Ford wherein Ford would not be subject to a lock-up agreement. It, nevertheless, represented immediately after that disclosure that Ford was expected to maintain its ownership stake in the Company:

> In the letter agreement, GRAF and Velodyne agreed that any shares of common stock issued to Ford Motor Company in the Business Combination will not be subject to a lock-up or market stand-off agreement. **Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination.**

226.    The highlighted statements in ¶ 225, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: (**i**) in July 2020, Graf Industrial and Velodyne agreed to terms that would allow Ford to liquidate its entire ownership stake in the Company; (**ii**) Ford planned to terminate a major contract with Velodyne and sell its stake in the Company shortly after the Reverse Merger, which Defendants knew or were reckless in not knowing given the aforementioned agreement; (**iii**) Velodyne was losing major customer contracts and market share to competitors Hesai and Argo AI while its Velarray sensor was being rejected by customers; and (**iv**) after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, [and] the serious risk of theft of IP in China[,]" which Defendants knew or recklessly disregarded.

227.    In response to the statements in ¶¶ 220-223, 225, *supra*, the price of Graf Industrial common stock climbed by $1.54 per share to close at $19.70 on August 28, 2020, representing a one-day increase of 8.48%, on a heavy trading volume of 1.429 million shares.

**F.    August 31, 2020 & September 1, 2020 Statements**

228.    On August 31, 2020, Graf Industrial issued an update on the Merger Agreement filed with the SEC as Exhibit 99.1 to a Form 8-K, which was signed by Defendant Graf. It represented that Velodyne's "2020 revenue guidance and outlook through 2024 are reaffirmed" and also stated that the amount of revenues under contract for Velodyne had substantially increased since the Merger was announced, stating:

*Velodyne's customer agreements represent approximately $970mm in expected revenue through 2024, a $130mm increase from time of initial transaction announcement on July 2, 2020."*

The release continued in pertinent part as follows:

*Velodyne reaffirmed its $101mm 2020 revenue guidance and multi-year revenue outlook through 2024.* The proportion of the future revenue outlook supported by customer agreements has increased as the number of multi-year agreements entered into by Velodyne has increased to 18 (+2) since the announcement of the proposed business combination on July 2, 2020 (the "announcement"), with approximately 56% (+8% since the announcement) of the 2024 revenue outlook now represented by customer agreements. Customer agreements *now represent a total of approximately $970mm of revenue through 2024, an increase of approximately $130mm since the announcement*.

229. In support of Velodyne's purported increase in customer agreements, Defendant Gopalan stated: "As we continue to execute on our business model and build our product and customer pipeline, I am excited about our customers' continued commitment to their lidar-enabled product roadmaps. Velodyne remains the leading provider of lidar and offers both rotational and solid-state lidar solutions. We help our customers deliver advanced and autonomous mobility solutions across multiple industries."

230. Along with the August Press Release, Graf Industrial filed an investor presentation, titled "Investor Presentation" and dated September 1, 2020 ("September 1, 2020 Investor Presentation") as Exhibit 99.2 to the Form 8-K. Defendants Graf, Gopalan and Hamer presented the September 1, 2020 Investor Presentation in a webinar with SPAC Insider on September 1, 2020 ("September 1, 2020 webinar"). The September 1, 2020 Investor Presentation represented that Velodyne had *more than $680 million in projected revenue through 2024, and that 56% of this projected value was "contracted" based on volume and price agreements as of August 1, 2020*.[31] It also highlighted that the Company had *eighteen "signed and awarded contracts"* and represented that the *"[e]xpected future cumulative revenue from existing production agreements increased by order $130mm to ~$970mm."* The September 1, 2020 Investor Presentation further stated that "[d]espite

---

[31] The September 1, 2020 Investor Presentation was also filed with the SEC on Form 14A.

COVID-19 impact, Velodyne maintains 2020 revenue guidance and *reaffirms revenue outlook to 2024*[.]"[32]

231.    During the September 2020 webinar, Defendant Graf reiterated these points, stating:

[D]espite ongoing COVID 19 impact, we are maintaining our 2020 revenue guidance of $101 million, and *we're re-affirming our 2024 revenue outlook as well at $684 million. The total number of multi-year agreements has increased by 2 from 16 to 18, and the projects in the pipeline have also expanded from 165 to 174. These two additional agreements in hand have increased our expected future revenues by over $130 million to $970 million, and that represents, in 2024, 56% of our revenue outlook*.[33]

232.    To further bolster the Company's revenue guidance and competitive standing, Defendant Gopalan relied on Veldoyne's signed and awarded contracts as a distinguishing factor from its competitors, stating in relevant part:

Lewis Silberman: Maybe we'll just go right to Anand and ask him to compare and contrast Velodyne with Luminar, and maybe talk about other companies in the lidar industry that they could come across.

Defendant Gopalan: Yes. Of course, we are quite familiar with Luminar and with a lot of the other players in the space. . . . We're quite familiar with all the different technologies and it's clear we're trying the same different experiments. . . . The commercial traction answers the question better than anything else. *We are sitting at 18 signed and awarded contracts and a real business that's $100+ million of revenue. I think, again, that sets us apart, by far, from the rest of the space.*

233.    In response to these statements, the price of Graf Industrial common stock rose dramatically. For example, between August 31, 2020 and September 1, 2020, the closing price of the Company's shares rose by $2.49 per share, representing a one-day increase of 12.47%, on unusually heavy trading of 1.973 million shares. As the market continued to absorb Defendants misrepresentations, between September 1, 2020 to September 2, 2020, the closing price of Graf Industrial stock rose an additional $2.02 per share, representing a one-day increase of 9.0%, on heavy trading volume of 3.725 million shares traded.

---

[32]    Emphasis in original.

[33]    The transcript from this webinar was attached to a current report on Form 8-K, signed by Defendant Graf, and filed with the SEC on September 2, 2020. It was also submitted to the SEC *via* Schedule 14-A on the same date.

234.    The highlighted statements in ¶¶ 228-232, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business; **(ii)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(iii)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(iv)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(v)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(vi)** as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, **(vii)** as a result of (i)-(vi) above, Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

235.    Furthermore, Defendants Graf and Gopalan knew or were reckless in not knowing that Velodyne's financial guidance was unachievable because, of their respective roles, they had access to the undisclosed adverse information about Velodyne's business, operations, and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof.

### G.    September 8, 2020 Statements

236.    On September 8, 2020, Graf Industrial and Velodyne filed an amended Preliminary Proxy Statement with the SEC *via* Schedule 14-A. The September 8, 2020 Preliminary Proxy stated that the Board recommended that shareholders vote to approve the Reverse Merger, with one of the

purported reasons for support being Velodyne's "***Committed and Capable Management Team***" "***whose interests are aligned with those of [Graf Industrial's] stockholders and [who] can clearly and confidently articulate the business plan and market opportunities to public market investors***." The September 8, 2020 Preliminary Proxy explicitly noted that David Hall was a part of that "***Committed and Capable Management Team.***"

237.    The September Preliminary Proxy continued touting Mr. Hall's importance to the lidar industry and the Company, representing that "Founder and Executive Chairman David Hall is an industry icon having invented real-time 3D lidar in 2005" and further stating that:

> Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles ("AVs") organized by the Defense Advanced Research Projects Agency (DARPA). . . .
>
> David Hall led Velodyne as it grew into the leading lidar provider, with early customers such as Google, Caterpillar, and Nokia. As the company progressed, we have built a strong team, adding leaders in sales, engineering, automotive validation, manufacturing, operations, legal and finance, bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon. ***Today we work together as a dynamic team, planning the company growth strategy to take advantage of market opportunities and drive sales.***

238.    It further emphasized Mr. Hall's continued leadership of Velodyne following the Reverse Merger, stating:

> ***Visionary and proven management team with deep industry experience***. Innovation runs deep in our corporate culture. ***Our founder and executive chairman, David Hall,*** and our chief executive officer, Dr. Anand Gopalan, along with our executive management team, ***drive our vision and corporate strategy*** . . . . Our experienced leadership team is committed to deploying safe, autonomous systems across multiple end markets. As the company developed, ***Mr. and Ms. Hall built a strong team***, adding leaders in sales, engineering, automotive validation manufacturing, operations, legal and finance bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon.

239.    The Preliminary Proxy highlighted that "Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management" and further represented his active involvement with the Company:

> Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and ***he remains deeply involved in all***

***aspects of Velodyne's business, including product development***. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's R&D activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. ***Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry***.

240.    The September 8, 2020 Preliminary Proxy further represented that Mr. Hall would maintain his leadership role at Velodyne well after the business combination, stating: "Upon the consummation of the Business Combination, ***Mr. Hall will serve as the post-combination company's executive chairman***. . . . In his role as executive chairman, ***Mr. Hall will remain actively involved in the post-combination company's product and technology development strategy***."

241.    The highlighted statements in ¶¶ 236-240, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; **(v)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation"; **(vii)** Defendants were aware of "concerns with [Velodyne's] corporate governance" no later than July 2, 2020 because Mr. Hall raised such concerns to the Board; **(viii)** the Board, including Defendants, "prioritize[d] their "own self-interests over stockholders"; **(ix)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded;

**(x)** Defendants had "fostered an anti-stockholder culture"; **(xi)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(xii)** Defendant Gopalan had "manipulated the truth to customers and investors alike" about the Company's operations and prospects; and finally, **(xiii)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

242.    The September 2020 Preliminary Proxy also recommended that shareholders vote to approve the Merger for the purported reason Velodyne had ***"Stable Free Cash Flow, Prudent Debt and Financial Visibility."*** The September 8, 2020 Preliminary Proxy further represented that Velodyne had "***in place the governance, financial systems and controls required in the public markets . . . , as well as corporate governance, financial systems and controls in place to operate as a public company***" and expounded on the controls in place, stating in relevant part:

> <u>**Internal Controls**</u>. ***The Company maintains a system of internal accounting controls designed to provide reasonable assurance*** that: (a) transactions are executed in accordance with management's general or specific authorizations; (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

243.    The highlighted statements in ¶ 242, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Velodyne's internal controls over financial reporting suffered from multiple material weaknesses, including material weakness related to the Company's tracking and reporting of whistleblower complaints, revenue recognition, and reporting practices; **(ii)** Defendants knew of or recklessly disregarded "concerns with [Velodyne's] corporate governance" no later than July 2, 2020 because Mr. Hall raised such concerns to the Board; **(iii)** "Velodyne Lidar's corporate governance [was] broken" as evidenced by Defendants' "decision to rubberstamp an increased compensation package for Mr. Gopalan despite the Company releasing weak Q4 2020 earnings and missing year end forecasts[,]" which Defendants knew or recklessly disregarded because Mr. Hall raised such concerns; **(iv)** Defendants had "manipulate[d] the Company's corporate machinery" by transitioning board members to lengthen the

re-election time period and maintain control over board seats; **(v)** the Board, including Defendants, "prioritize[d] their "own self-interests over stockholders""; **(vi)** "Defendants had "fostered an anti-stockholder culture"; **(vii)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(viii)** Defendant Gopalan had "manipulated the truth to customers and investors alike"; **(ix)** Defendant Culkin took "several liberties with the truth and has acted as a rubberstamp on Dr. Gopalan's actions, including by approving a robust, metric-free Chief Executive Officer compensation package"; and finally, **(x)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

244. Furthermore, Defendants knew or were reckless in not knowing that Velodyne's internal controls were ineffective given: (i) Defendant Gopalan's purported "confidence" in the Company's year-long efforts to create and implement processes and controls "needed to basically to be a public company" and to "create that predictability around the commercial and business side of thing" (*see* ¶ 158, *supra*); and (ii) their respective roles, which afforded them access to the undisclosed adverse information about Velodyne's business, operations, and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof.

245. The September Preliminary Proxy represented that "***Velodyne . . . agreed to cause*** each holder of Velodyne common stock or Velodyne preferred stock that is a party to the IRA (as defined in the Merger Agreement), by and among Velodyne and ***certain of its stockholders to be bound by a customary "lockup" restricting the transfer, sale and conveyance of the shares of common stock to be issued in connection with the Merger Agreement for a period of six (6) months following the Closing***, all in a form reasonably acceptable to Graf." It further stated that Graf Industrial and Velodyne entered into an agreement with Ford wherein Ford would not be subject to a lock-up agreement. It, nevertheless, represented immediately after that disclosure that Ford was expected to maintain its ownership stake in the Company:

> In the letter agreement, GRAF and Velodyne agreed that any shares of common stock issued to Ford Motor Company in the Business Combination will not be subject to a lock-up or market stand-off agreement. ***Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination.***

246.    The highlighted statements in ¶ 245, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** in July 2020, Graf Industrial and Velodyne agreed to terms that would allow Ford to liquidate its entire ownership stake in the Company; **(ii)** Ford planned to terminate a major contract with Velodyne and sell its stake in the Company shortly after the Reverse Merger, which Defendants knew or were reckless in not knowing given the aforementioned agreement; **(iii)** Velodyne was losing major customer contracts and market share to competitors Hesai and Argo AI while its Velarray sensor was being rejected by customers; and **(iv)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, [and] the serious risk of theft of IP in China[,]" which Defendants knew or recklessly disregarded.

247.    That same day, Graf Industrial filed an investor presentation, titled "Investor Presentation" and dated September 8, 2020 ("September 8, 2020 Investor Presentation") as Exhibit 99.1 to a Form 8-K, which was signed by Defendant Graf.

248.    The September 8, 2020 Investor Presentation represented that Velodyne had ***more than $680 million in projected revenue through 2024, and that 56% of this projected value was "contracted" based on volume and price agreements as of August 1, 2020***.[34] It also highlighted that the Company had ***eighteen "signed and awarded contracts"*** and represented that the ***"[e]xpected future cumulative revenue from existing production agreements increased by order $130mm to ~$970mm***[.]" The September 8, 2020 Investor Presentation further stated that "[d]espite COVID-19 impact, Velodyne maintains 2020 revenue guidance and ***reaffirms revenue outlook to 2024***[.]"[35]

249.    The highlighted statements in ¶ 248, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company, which they knew (or were reckless in not knowing) would adversely affect the

---

[34]    The September 8, 2020 Investor Presentation was also filed with the SEC on Form 14A.

[35]    Emphasis in original.

Company's business; **(ii)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(iii)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(iv)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(v)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(vi)** as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, **(vii)** as a result of (i)-(vi) above, Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

250.    Furthermore, Defendants Dee and Hamer knew or were reckless in not knowing that Velodyne's financial guidance was unachievable because they "maintained a one-on-one dialogue" with each other "regarding clarifying issues including; the status of shareholder approval, ***confirming awarded contract status***, providing investor feedback, organizing the task lists, ***preparing the investor presentation***, ***reviewing the financial model***, discussing business updates as they transpired, ***ensuring White & Case reviewed all the contracts and tied the contracted volumes to the revenue projections***, and anticipating next steps to efficiently organize resources."

251.    On September 8, 2020, in response to Defendants materially false and misleading statements as alleged in ¶¶ 236-240, 242, 245, 248, *supra*, the price of Graf Industrial's stock rose to a closing price of $29.75—an increase of $3.97 (or 15.40%) over the previous day's close of $25.78, on a heavy trading volume of 1.888 million. Then, between September 8, 2020 and September 9, 2020, the stock climbed an additional $0.68 per share, representing a further single-day 2.29% increase.

**H.    September 14, 2020 Statements**

252.    On September 14, 2020, Graf Industrial filed a Definitive Proxy with the SEC on Form 14A for the Merger, which was signed by Defendant Dee. The Definitive Proxy stated that the Board

recommended that shareholders vote to approve the Reverse Merger, with one of the purported reasons for support being Velodyne's and Mr. Hall's "***Committed and Capable Management Team" "whose interests are aligned with those of [Graf Industrial's] stockholders and [who] can clearly and confidently articulate the business plan and market opportunities to public market investors***."

253.    The Definitive Proxy continued touting Mr. Hall's importance to the lidar industry and the Company, representing that "Founder and Executive Chairman David Hall is an industry icon having invented real-time 3D lidar in 2005" and further stating that:

> Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles ("AVs") organized by the Defense Advanced Research Projects Agency (DARPA) . . .

> David Hall led Velodyne as it grew into the leading lidar provider, with early customers such as Google, Caterpillar, and Nokia. As the company progressed, we have built a strong team, adding leaders in sales, engineering, automotive validation, manufacturing, operations, legal and finance, bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon. ***Today we work together as a dynamic team, planning the company growth strategy to take advantage of market opportunities and drive sales.***

254.    It further emphasized Mr. Hall's continued leadership of Velodyne following the Reverse Merger, stating:

> ***Visionary and proven management team with deep industry experience***. Innovation runs deep in our corporate culture. ***Our founder and executive chairman, David Hall,*** and our chief executive officer, Dr. Anand Gopalan, along with our executive management team, ***drive our vision and corporate strategy*** . . . . Our experienced leadership team is committed to deploying safe, autonomous systems across multiple end markets. As the company developed, ***Mr. and Ms. Hall built a strong team***, adding leaders in sales, engineering, automotive validation manufacturing, operations, legal and finance bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon.

255.    The Definitive Proxy also highlighted that "Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management" and further represented his continued active involvement with the Company following the Reverse Merger:

> Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and ***he remains deeply involved in all***

*aspects of Velodyne's business, including product development*. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's R&D activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry.

256.     Defendants also represented there that Mr. Hall would maintain his leadership role at Velodyne well after the business combination, stating: "[u]pon the consummation of the Business Combination, *Mr. Hall will serve as the post-combination company's executive chairman*. . . . In his role as executive chairman, *Mr. Hall will remain actively involved in the post-combination company's product and technology development strategy*."

257.     The highlighted statements in ¶¶ 252-256, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; **(v)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation"**; (vi)** Defendants knew of or recklessly disregarded "concerns with [Velodyne's] corporate governance" no later than July 2, 2020 because Mr. Hall raised such concerns to the Board; **(vii)** the Board, including Defendants, "prioritize[d] its own self-interests over stockholders"; **(viii)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly

disregarded; **(ix)** Defendants had "fostered an anti-stockholder culture"; **(x)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(xi)** Defendant Gopalan had "manipulated the truth to customers and investors alike" about the Company's operations and prospects; and finally, **(xii)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

258.    In the same Proxy, Defendants also affirmed that Velodyne was on track to achieve over $101 million in revenues in 2020, which would grow to over $680 million in revenues by 2024. The Proxy stated that this growth rate was secure in part because 48% of projected 2024 revenues were already under existing awarded multi-year contracts. The Proxy stated in pertinent part as follows:

> Velodyne Management estimates that Velodyne's revenue will have a compound ***annual growth rate from 2020 to 2024 of 61%*** and that Velodyne will have an adjusted EBITDA margin of more than 20% in 2024, prior to incorporating the impact of any acquisitions. . . .
>
> ***Approximately 48% of projected 2024 revenues are under existing awarded multi-year contracts***.

259.    The highlighted statements in ¶ 258, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business; **(ii)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI, while its Velarray sensors were being rejected by customers; **(iii)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(iv)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(v)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly

disregarded; (**vi**) as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, (**vii**) as a result of (i)-(vi) above, Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

260.    The Definitive Proxy also recommended that shareholders vote to approve the Merger for the purported reason Velodyne had ***"Stable Free Cash Flow, Prudent Debt and Financial Visibility*.**" It further represented that Velodyne had "***in place the governance, financial systems and controls required in the public markets . . . , as well as corporate governance, financial systems and controls in place to operate as a public company***" and expounded on the controls in place, stating in relevant part:

> <u>**Internal Controls**</u>. ***The Company maintains a system of internal accounting controls designed to provide reasonable assurance*** that: (a) transactions are executed in accordance with management's general or specific authorizations; (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

261.    The highlighted statements in ¶ 260, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: (**i**) Velodyne's internal controls over financial reporting suffered from multiple material weaknesses, including material weakness related to the Company's tracking and reporting of whistleblower complaints, revenue recognition, and reporting practices; (**ii**) Defendants knew of or recklessly disregarded "concerns with [Velodyne's] corporate governance" no later than July 2, 2020 because Mr. Hall raised such concerns to the Board; (**iii**) "Velodyne Lidar's corporate governance [was] broken" as evidenced by Defendants' "decision to rubberstamp an increased compensation package for Mr. Gopalan despite the Company releasing weak Q4 2020 earnings and missing year end forecasts[,]" which Defendants knew or recklessly disregarded because Mr. Hall raised such concerns; (**iv**) Defendants had "manipulate[d] the Company's corporate machinery" by transitioning board members to lengthen the re-election time period and maintain control over board seats; (**v**) the Board, including Defendants, "prioritize[d] its own self-interests over stockholders"; (**vi**) "Defendants had "fostered an anti-

stockholder culture"; **(vii)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(viii)** Defendant Gopalan had "manipulated the truth to customers and investors alike" about the Company's operations and prospects; **(ix)** Defendant Culkin took "several liberties with the truth and has acted as a rubberstamp on Dr. Gopalan's actions, including by approving a robust, metric-free Chief Executive Officer compensation package"; and finally, **(x)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

262.    It further added that Ford was expected to hold as significant equity interest after the business combination, representing that Ford would hold 12,602,202 shares of Velodyne's common stock or just over 7% ownership interest after the business combination. The September 14, 2020 Definitive Proxy further stated that "***Velodyne . . . agreed to cause*** each holder of Velodyne common stock or Velodyne preferred stock that is a party to the IRA (as defined in the Merger Agreement), by and among Velodyne and ***certain of its stockholders to be bound by a customary 'lockup' restricting the transfer, sale and conveyance of the shares of common stock to be issued in connection with the Merger Agreement for a period of six (6) months following the Closing***, all in a form reasonably acceptable to Graf."

263.    Defendants also stated there that Graf Industrial and Velodyne entered into an agreement with Ford wherein Ford would not be subject to a lock-up agreement. It, nevertheless, represented immediately after that disclosure that Ford was expected to maintain its ownership stake in the Company:

> In the letter agreement, GRAF and Velodyne agreed that any shares of common stock issued to Ford Motor Company in the Business Combination will not be subject to a lock-up or market stand-off agreement. ***Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination.***

264.    The highlighted statements in ¶¶ 262-263, supra were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** in July 2020, Graf Industrial and Velodyne agreed to terms that would allow Ford to liquidate its entire ownership stake in the Company; **(ii)** Ford planned to terminate a major contract with Velodyne and sell its stake in the Company shortly after the Reverse Merger, which Defendants knew or were

reckless in not knowing given the aforementioned agreement; (**iii**) Velodyne was losing major customer contracts and market share to competitors Hesai and Argo AI while its Velarray sensor was being rejected by customers; and (**iv**) after the consummation of the Merger, Mr. Hall "raised . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, [and] the serious risk of theft of IP in China[,]" which Defendants knew or recklessly disregarded.

### I.    September 22, 2020 Statements

265.    On September 22, 2020, Graf Industrial filed Amendment No. 1 to its Registration Statement on Form S-1 with the SEC ("September 2020 Registration Statement"), which Defendants Graf and Dee, *inter alia*, signed. The September 2020 Registration Statement instructed stockholders and investors to "rely only on the information contained in this prospectus."

266.    The September 2020 Registration Statement touted Mr. Hall's importance to the lidar industry and the Company, stating that:

> Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles ("AVs") organized by the Defense Advanced Research Projects Agency (DARPA). . . .
>
> David Hall led Velodyne as it grew into the leading lidar provider, with early customers such as Google, Caterpillar, and Nokia. As the company progressed, we have built a strong team, adding leaders in sales, engineering, automotive validation, manufacturing, operations, legal and finance, bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon. ***Today we work together as a dynamic team, planning the company growth strategy to take advantage of market opportunities and drive sales.***

267.    It also emphasized Mr. Hall's continued leadership of Velodyne following the Reverse Merger, stating:

> ***Visionary and proven management team with deep industry experience.*** Innovation runs deep in our corporate culture. ***Our founder and executive chairman, David Hall,*** and our chief executive officer, Dr. Anand Gopalan, along with our executive management team, ***drive our vision and corporate strategy*** . . . . Our experienced leadership team is committed to deploying safe, autonomous systems across multiple end markets. As the company developed, ***Mr. and Ms. Hall built a strong team***, adding leaders in sales, engineering, automotive validation manufacturing, operations, legal and finance

bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon.

268.    It further highlighted that "Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management" and further represented his active involvement with the Company going forward:

> Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and *he remains deeply involved in all aspects of Velodyne's business, including product development*. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's R&D activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. *Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry*.

269.    The September 2020 Registration Statement further represented that Mr. Hall would maintain his leadership role at Velodyne well after the business combination, stating: "[u]pon the consummation of the Business Combination, *Mr. Hall will serve as the post-combination company's executive chairman*. . . . In his role as executive chairman, *Mr. Hall will remain actively involved in the post-combination company's product and technology development strategy*."

270.    The highlighted statements in ¶¶ 266-269, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; **(v)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation"; **(vi)** Defendants knew of or recklessly

disregarded "concerns with [Velodyne's] corporate governance" no later than July 2, 2020 because Mr. Hall raised such concerns to the Board; **(vii)** the Board, including Defendants, "prioritize[d] its own self-interests over stockholders"; **(viii)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(ix)** Defendants had "fostered an anti-stockholder culture"; **(x)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(xi)** Defendant Gopalan had "manipulated the truth to customers and investors alike" about the Company's operations and prospects; and finally, **(xii)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

271.     The September 2020 Registration Statement also stated that Graf Industrial and Velodyne entered into an agreement with Ford wherein Ford would not be subject to a lock-up agreement. It, nevertheless, represented immediately after that disclosure that Ford was expected to maintain its ownership stake in the Company:

> In the letter agreement, GRAF and Velodyne agreed that any shares of common stock issued to Ford Motor Company in the Business Combination will not be subject to a lock-up or market stand-off agreement. ***Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination.***

272.     The highlighted statements in ¶ 271, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** in July 2020, Graf Industrial and Velodyne agreed to terms that would allow Ford to liquidate its entire ownership stake in the Company; **(ii)** Ford planned to terminate a major contract with Velodyne and sell its stake in the Company shortly after the Reverse Merger, which Defendants knew or were reckless in not knowing given the aforementioned agreement; **(iii)** Velodyne was losing major customer contracts and market share to competitors Hesai and Argo AI while its Velarray sensor was being rejected by customers; and **(iv)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of

market share to competitors, [and] the serious risk of theft of IP in China[,]" which Defendants knew or recklessly disregarded.

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING POST-REVERSE MERGER STATEMENTS AND OMISSIONS

273.    On September 29, 2020, Defendants completed the Reserve Merger. That same day, the combined Company's common stock and warrants began trading on the NASDAQ under the ticker symbols "VLDR" and "VLDRW," respectively. On the same date, the Company dismissed WithumSmith + Brown, PC (the public accounting firm which served as its auditor for the fiscal years ended December 31, 2018 and December 31 2019), and replaced it with KPMG, LLP as the Company's new auditor.

### A.    October 1, 2020 Statements

274.    On October 1, 2020, Veldoyne filed a Prospectus with the SEC on Form 424B3, which related to the resale of up to 15,000,000 shares of common stock (*i.e.*, the "PIPE" shares). The October 2020 Prospectus instructed stockholders and investors to "rely only on the information contained in this prospectus." The Prospectus touted Mr. Hall's importance to the lidar industry and the Company, stating that:

> Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles ("AVs") organized by the Defense Advanced Research Projects Agency (DARPA) . . .
>
> David Hall led Velodyne as it grew into the leading lidar provider, with early customers such as Google, Caterpillar, and Nokia. As the company progressed, we have built a strong team, adding leaders in sales, engineering, automotive validation, manufacturing, operations, legal and finance, bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon. ***Today we work together as a dynamic team, planning the company growth strategy to take advantage of market opportunities and drive sales.***

275.    The Prospectus further emphasized Mr. Hall's continued leadership over the Company, stating:

> ***Visionary and proven management team with deep industry experience***. Innovation runs deep in our corporate culture. ***Our founder and executive chairman, David Hall,*** and our chief executive officer, Dr. Anand Gopalan, along with our executive management team, ***drive our vision and corporate strategy***. We believe Mr. Hall's invention of the

3D real-time lidar has directly contributed to significant developments in autonomous technology and many other applications requiring precise 3D perception data in real time. Mr. Hall was named inventor of the year in 2018 by Intellectual Property Owners Education Foundation in recognition of his significant contributions to lidar technology. Our experienced leadership team is committed to deploying safe, autonomous systems across multiple end markets. As the company developed, ***Mr. and Ms. Hall built a strong team***, adding leaders in sales, engineering, automotive validation manufacturing, operations, legal and finance bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon.

276.    It also highlighted that "Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management" and further represented his active involvement with the Company:

Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and ***he remains deeply involved in all aspects of Velodyne's business, including product development***. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's research and development activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry.

There, Defendants further represented that Mr. Hall would maintain his leadership role at Velodyne well after the business combination, stating: "Upon the consummation of the Business Combination, ***Mr. Hall will serve as the post-combination company's executive chairman***. . . . In his role as executive chairman, ***Mr. Hall will remain actively involved in the post-combination company's product and technology development strategy***."

277.    The highlighted statements in ¶¶ 274-276, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the

quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(v)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; and as a result, **(vi)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation."

278.     Defendants also stated there that Graf Industrial and Velodyne entered into an agreement with Ford wherein Ford would not be subject to a lock-up agreement. It, nevertheless, represented immediately after that disclosure that Ford was expected to maintain its ownership stake in the Company:

> In the letter agreement, GRAF and Velodyne agreed that any shares of common stock issued to Ford Motor Company in the Business Combination will not be subject to a lock-up or market stand-off agreement. ***Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination.***

279.     The highlighted statements in ¶ 278, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** in July 2020, Graf Industrial and Velodyne agreed to terms that would allow Ford to liquidate its entire ownership stake in the Company; **(ii)** Ford planned to terminate a major contract with Velodyne and sell its stake in the Company shortly after the Reverse Merger, which Defendants knew or were reckless in not knowing given the aforementioned agreement; **(iii)** Velodyne was losing major customer contracts and market share to competitors Hesai and Argo AI while its Velarray sensor was being rejected by customers; and **(iv)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, [and] the serious risk of theft of IP in China[,]" which Defendants knew or recklessly disregarded.

280.     In addition, Defendants further stated there that "[a]s a result of COVID-19, we experienced some production delays in the second quarter and early in the third quarter of 2020 due

to travel restrictions to Thailand, the location of one of our key manufacturing partners. We were also manufacturing at approximately 50% capacity for much of the second quarter of 2020. ***Today, we believe those production delays have been eliminated under the current work conditions, with our internal manufacturing and production capacity back to 100%***." The October 1, 2020 Prospectus went on to say, '[w]e believe that demand for our products remains strong, but COVID-19 will result in some transactions we expected to occur earlier in 2020 being delayed until late 2020 or early 2021. ***When preparing the 2020 and 2021 projected financial information included in this prospectus, we considered these potential delays***." While the Company did not provide detailed projections in this October 1, 202 filing, it did refer investors to its S-1, saying, "We have filed a registration statement on Form S-1, including exhibits, under the Securities Act of 1933, as amended, with respect to the common stock offered by this prospectus. This prospectus does not contain all of the information included in the registration statement. ***For further information pertaining to us and our securities, you should refer to the registration statement and our exhibits***." One of the exhibits to the S-1, was the July 2, 2020 Merger Agreement, which included the following table of projections:

| ($ in millions)<br>Year | Revenues | EBITDA | Free<br>Cash Flow |
|---|---|---|---|
| 2020 | $ 101.2 | $ (59.3) | $ (59.6) |
| 2021 | $ 152.0 | $ (7.5) | $ (4.1) |
| 2022 | $ 249.4 | $ 15.5 | $ 6.6 |
| 2023 | $ 412.1 | $ 56.7 | $ 29.9 |
| 2024 | $ 684.1 | $ 148.8 | $ 103.7 |

281.    The highlighted statements and graph in ¶ 280, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business; **(ii)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(iii)** Velodyne was losing major customer contracts to competitors like Hesai and Argo AI, including contracts that Defendants had used to highlight

"awarded" revenues during the Class Period; **(iv)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(v)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(vi)** as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, **(vii)** as a result of (i)-(vi) above, Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

282.    Between October 1, 2020 and October 2 2020, the price of the newly-christened Velodyne Lidar Inc. stock rose to close at $17.08 per share, a $0.31 increase (1.85%) over the previous day's close, on heavy trading of 3.867 million shares.

**B.    October 19, 2020 Statements**

283.    On October 5, 2020, 6 days after the Reverse Merger closed, Ford filed a Form SC 13G with the SEC, revealing its 7.6% ownership position in Velodyne (*i.e.*, 13,065,444 shares of common stock). Upon the release of this news, Velodyne's share price increased 7% from a closing price of $16.23 on October 5, 2020 to a closing price of $17.40 on October 6, 2020.

284.    On October 19, 2020, Velodyne filed a Registration Statement with the SEC on Form S-1 for the purposes of offering up to 18,282,384 shares of Velodyne's common stock related to the exercise of the Velodyne's publicly-traded warrants and up to 375,000 shares of the Velodyne's common stock related to Graf Acquisition's working capital warrants.[36] The October 19, 2020 Registration Statement also related to the resale of up to 13,507,192 shares of our common stock upon the expiration of lock-up agreements by the selling stockholders.

285.    This statement misleadingly implied that the selling stockholder's shares would not become available for sale until after the expiration of a lock-up period; however, the selling

---

[36]    The October 19, 2020 Registration Statement was signed by Defendants Gopalan, Hamer, Graf, Dee, and Culkin.

stockholders only included former Velodyne CFO Qing Lu and Ford and Ford was not subject to a lock-up agreement. Furthermore, the October 19, 2020 Registration Statement did not readily identify who the selling stockholders were but rather buried the information on page 118 of the October 19, 2020 Registration Statement in an effort to obscure that Ford's full ownership stake was registered for sale.

286.    The Registration Statement further stated that Defendants entered into the Ford Letter Agreement in July 2020 wherein Graf Industrial and Velodyne agreed "that any shares of common stock issued to Ford Motor Company in the [b]usiness [c]ombination [would] not be subject to a lock-up or market stand-off agreement." Notwithstanding the fact that the October 19, 2020 Registration Statement registered Ford's entire stake in Velodyne for sale, the October 19, 2020 Registration Statement represented, immediately after its disclosure of the lock-up agreement, that "***Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination***."

287.    The highlighted statements in ¶ 286, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** in July 2020, Graf Industrial and Velodyne agreed to terms that would allow Ford to liquidate its entire ownership stake in the Company; **(ii)** Ford planned to terminate a major contract with Velodyne and sell its stake in the Company shortly after the Reverse Merger, which Defendants knew or were reckless in not knowing given the aforementioned agreement; **(iii)** Velodyne was losing major customer contracts and market share to competitors Hesai and Argo AI while its Velarray sensor was being rejected by customers; and **(iv)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, [and] the serious risk of theft of IP in China[,]" which Defendants knew or recklessly disregarded.

288.    The October Registration Statement touted Mr. Hall's importance to the lidar industry and the Company, stating that:

> Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the

Grand Challenges for autonomous vehicles ("AVs") organized by the Defense Advanced Research Projects Agency (DARPA). . . .

David Hall led Velodyne as it grew into the leading lidar provider, with early customers such as Google, Caterpillar, and Nokia. As the company progressed, we have built a strong team, adding leaders in sales, engineering, automotive validation, manufacturing, operations, legal and finance, bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon. **_Today we work together as a dynamic team, planning the company growth strategy to take advantage of market opportunities and drive sales._**

289.    It emphasized Mr. Hall's continued leadership of Velodyne after the Reverse Merger, stating:

**_Visionary and proven management team with deep industry experience_**. Innovation runs deep in our corporate culture. **_Our founder and executive chairman, David Hall,_** and our chief executive officer, Dr. Anand Gopalan, along with our executive management team, **_drive our vision and corporate strategy_**. . . . As the company developed, Mr. and Ms. Hall built a strong team, adding leaders in sales, engineering, automotive validation manufacturing, operations, legal and finance bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon.

290.    It also highlighted that "Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management" and further represented his active involvement with the Company:

Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and **_he remains deeply involved in all aspects of Velodyne's business, including product development_**. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's research and development activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. **_Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry_**.

291.    The October Registration Statement further stated that Mr. Hall would maintain his leadership role at Velodyne well after the business combination, stating: "**_Mr. Hall serves as our executive chairman_**. . . . In his role as executive chairman, **_Mr. Hall will remain actively involved in our product and technology development strategy_**."

292.    The highlighted statements in ¶¶ 288-291, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** after the consummation of the Merger, Mr. Hall "raised . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(v)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; and as a result, **(vi)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation."

293.    The October Registration Statement disclosed the following regarding the Company's projections and the ongoing COVID-19 pandemic:

> Demand for our products in the quarter ended June 30, 2020 was less than that in the corresponding period of 2019. ***We believe that this decline in customer demand was, in part, the result of customers impacted by COVID-19 and delayed purchasing decisions***. While we continue to engage with current and potential customers, we believe some customers may delay purchases from us because their development programs may also be delayed as a result of COVID-19. We believe that demand for our products remains strong, but COVID-19 will result in some transactions we expected to occur earlier in 2020 being delayed until late 2020 or early 2021. ***When preparing the 2020 and 2021 projected financial information included in this prospectus, we considered these potential delays***.

294.    The October 19, 2020 Registration Statement included the July 2, 2020 Merger Agreement as an exhibit, which included the following table of projections:

| ($ in millions) Year | Revenues | EBITDA | Free Cash Flow |
|---|---|---|---|
| 2020 | $ 101.2 | $ (59.3) | $ (59.6) |
| 2021 | $ 152.0 | $ (7.5) | $ (4.1) |
| 2022 | $ 249.4 | $ 15.5 | $ 6.6 |
| 2023 | $ 412.1 | $ 56.7 | $ 29.9 |
| 2024 | $ 684.1 | $ 148.8 | $ 103.7 |

295.    The highlighted statements and graph in ¶¶ 293-294, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business; **(ii)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(iii)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(iv)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(v)** after the consummation of the Merger, Mr. Hall "raised . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(vi)** as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, **(viii)** as a result of (i)-(vi) above, Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact.

### C.    October 30, 2020 Allegations

296.    On October 28, 2020, the SEC issued a letter to Velodyne stating that "we have not reviewed and will not review your registration statement[,]" and advising the Company to "refer to Rule 461 regarding requests for acceleration." The letter further stated, "[w]e remind you that ***the company and its management are responsible for the accuracy and adequacy of their disclosures***,

notwithstanding any review, comments, action or absence of action by the staff." Rule 461 provides that the SEC "may refuse to accelerate the effective date" where, *inter alia*, "the form of preliminary prospectus, which has been distributed by the issuer or underwriter, is found to be inaccurate or inadequate in any material respect . . ." or "there have been transactions in securities of the registrant by persons connected with or proposed to be connected with the offering which may have artificially affected or may artificially affect the market price of the security being offered." 17 C.F.R. § 230.461(b).

297.    Just two days later, on October 30, 2020, Velodyne filed Amendment No. 1 to the S-1 filed on October 19, 2020. Velodyne stated that: "[t]he sole purpose of this Amendment No. 1 to the Registration Statement on Form S-1 (File No. 333-249551) is to file Exhibit 4.2, as indicated in Item 16 of Part II of this amendment." This Exhibit included an Investor Rights Agreement, ***dated October 25, 2019*** ("2019 IRA"), which referred to the September 4, 2018 Amended and Restated Investors' Rights Agreement dated September 4, 2018, as a "Prior Agreement."

298.    Pursuant to the 2019 IRA, Velodyne Private entered into an agreement with, *inter alia*, Ford Motor Company, Baidu (Hong Kong) Limited, Nikon Corporation, Baidu Holdings Limited, Hyundai Mobis Co., Ltd., Caster Holding Limited (identified as "investors") governing the registration of their securities in the event of an initial public offering. However, the 2019 IRA was only signed by representative from Baidu, Nikon Corporation, Hyundai Mobis, and Castor Holding LLC, and further only stated that it was being made "by and among" Ford Motor Company, Baidu, Nikon and Caster Holding Limited. The 2019 IRA provided certain of the investors with "observer rights." For Ford, it provided the following:

> As long as Ford Motor Company and its Affiliates ("Ford") owns at least twenty-five (25)% of the shares of Series A Preferred Stock (or an equivalent amount of Common Stock issued upon conversion thereof) purchased by Ford pursuant to the Series A Agreement (as adjusted for stock splits, stock dividends, combinations, recapitalizations or the like), ***the Company shall invite a representative of Ford, who shall not be an employee or a consultant of or otherwise affiliated with any Investor Competitor (as defined below), who shall initially be Colm Boran***, to attend all meetings of its Board in a nonvoting observer capacity and, in this respect, ***shall give such representative copies of all notices, minutes, consents and other materials that it provides to its directors at the same time and in the same manner as provided to such directors***; provided, however, that such representative shall agree to hold all

information so provided in confidence subject to the confidentiality provision set forth in Section 3.6 of this Agreement.

299.     The 2019 IRA's "observer rights" provision permitted Colm Boran, Ford's Senior Manager of Autonomous Vehicle Systems Engineering, to observe Velodyne's board meetings, including, on information and belief, five pre-Reverse Merger Velodyne Board meetings and seven post-Reverse Merger Velodyne board meetings in 2020. The 2019 IRA also contained a "market stand-off" agreement wherein the investors were prohibited from selling, transferring, disposing, etc. any common stock that they held after such a public offering from the time a final IPO prospectus was filed until a certain specified time (not to exceed 180 days). This "market stand-off" agreement, however, was only effective "if all officers, directors and greater than one percent (1%) stockholders of the Company enter[ed] into similar agreements[,]" and stated that:

> Each Holder hereby agrees that it will not, without the prior written consent of the managing underwriter, during the period commencing on the date of the final prospectus relating to the Initial Offering and ending on the date specified by the Company and the managing underwriter (such period not to exceed one hundred eighty (180) days) (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock . . . .

> The foregoing provisions of this Section 2.12 shall apply only to the Initial Offering, shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement, and **_shall only be applicable to the Holders if all officers, directors and greater than one percent (1%) stockholders of the Company enter into similar agreements._** The underwriters in connection with the Initial Offering are intended third-party beneficiaries of this Section 2.12 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto.

> Each Holder further agrees to execute such agreements as may be reasonably requested by the underwriters in the Initial Offering that are consistent with this Section 2.12 or that are necessary to give further effect thereto. **_Any discretionary waiver or termination of the restrictions of any or all of such agreements by the Company or the underwriters shall apply to all Holders subject to such agreements pro rata based on the number of shares subject to such agreements_**.

300.     Pursuant to the "market stand-off" agreement, and in light of Graf Industrial and Velodyne's agreement with Ford whereby Ford was not subject to a lock up agreement in connection with the Reverse Merger, the remaining investors subject to the 2019 IRA would have also been

released from the "market stand-off" agreement. However, Velodyne amended the agreement and eliminated the clause requiring each investor to participate in the market stand-off for it to be effective. Such a revision specifically allowed Velodyne to release Ford from compliance with any lock-up or market stand-off agreement while preventing the remaining IRA investors from being relieved of their lock-up obligations.

301.    This amendment was buried deep in the October 2020 Amended Registration Statement on page 45 of 47 as an undated document titled, "Exhibit E Amendment to Amended and Restated IRA" ("Amended IRA"). The Amended IRA could not have been an original part of the 2019 IRA as it includes references to the July 2, 2020 Merger Agreement. Specifically, the Amended IRA provided that Section 1(m) of the Amended and Restated IRA (*i.e.*, 2019 IRA) shall be "amended and restated" as follows:

> The term 'Registrable Securities' means (i) the Common Stock issuable or issued upon conversion of the Preferred Stock and the shares of Acquiror Common Stock issued to a Holder in the merger among the Company, Graf Industrial Corp. (to be renamed Velodyne Lidar, Inc.) ('Acquiror') and VL Merger Sub Inc., a Delaware corporation and a wholly owned subsidiary of
>
> Acquiror (the 'Merger Sub') pursuant to that certain Agreement and Plan of Merger, dated as of
>
> July 2, 2020, by and among the Company, the Acquiror and the Merger Sub (the 'Merger'), (ii) the shares of Acquiror Common Stock issued to the Common Holders in the Merger; provided, however, that such shares of Common Stock shall not be deemed Registrable Securities for the purposes of Sections 2.1, 2.3, 2.11, 3.1, 3.2, 3.6 and 4.7 and (iii) any Common Stock of the Company or any shares of Acquiror Common Stock issued as (or issuable upon the conversion or exercise of any warrant, right or other security that is issued as) a dividend or other distribution with respect to, or in exchange for, or in replacement of, the shares referenced in (i) and (ii) above, excluding in all cases, however, any Registrable Securities sold by a Person in a transaction in which his rights under Section 2 of this Agreement are not assigned.

302.    The Amended IRA to the Amended Registration Statement also provided that the Market Standoff Agreement is "amended and restated" as follows:

> Each Holder hereby agrees that it will not, without the prior written consent of the Acquiror during the period commencing on the date of the closing of the Merger (the 'Closing Date') and ending on the date that is six months from the Closing Date (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase,

or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock (whether such shares or any such securities are then owned by the Holder or are thereafter acquired) held immediately prior to the effectiveness of the Registration Statement for such offering, or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Common Stock, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Common Stock or other securities, in cash or otherwise. Any discretionary waiver or termination of the restrictions herein by the Company shall apply to all Holders subject to such agreements pro rata based on the number of shares subject to such agreements; provided, however, that such pro rata release shall not be required in the event that a waiver or termination is granted in connection with the registration or public offering of securities pursuant to a registration statement on Form S-1 filed with the U.S. Securities and Exchange Commission. Each Holder further agrees that it will not during the period commencing on the Closing Date and ending on the date that is six months from the Closing Date exercise any registration rights with respect to any shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock.

303.    Based on information and belief, the Amended IRA was added ex-post facto to the 2019 IRA to allow Ford to liquidate its position in the combined organization without triggering the 2019 IRA Market Stand-off Agreement's application to Baidu, Nikon and Hyundai. Until October 30, 2020, when the SEC forced the Company to publicly disclose the 2019 IRA, only the parties to it would have been aware of the agreement. Based on information and belief, the Amended IRA was added to 2019 IRA once it became clear that the 2019 IRA would need to be publicly disclosed.

304.    Following publication of these statements on October 30, 2020 the value of Velodyne common stock rose by $0.03 per share, to close at $12.26, representing a 0.25% increase over the preceding day's closing.

**D.    November 4, 2020 Statements**

305.    On November 4, 2020, Velodyne filed a Prospectus with the SEC on Form 424B2 relating to Velodyne's issuance of up to 18,282,384 shares of the Company's common stock related to the exercise of Velodyne's publicly-traded warrants and up to 375,000 shares of the Velodyne's common stock related to Graf Acquisition's working capital warrants. The November 4, 2020 Prospectus also related to the resale of up to 13,507,192 shares of our common stock upon the expiration of lock-up agreements by the selling stockholders, which included Ford and former

1    Velodyne CFO Qing Lu. The prospectus instructed investors to rely on it, stating: "You should rely

2    only on the information contained in this prospectus."

3           306.    The Prospectus stated that Graf Industrial and Velodyne entered into the Ford Letter

4    Agreement in July 2020 wherein Ford was "grant[ed] . . . the right to have any shares of common

5    stock issued to it in the [b]usiness [c]ombination included in the registration statement filed for

6    purposes of registering the shares issuable upon exercise of the public warrants." Graf Industrial and

7    Velodyne also agreed "that any shares of common stock issued to Ford Motor Company in the

8    [b]usiness [c]ombination [would] not be subject to a lock-up or market stand-off agreement."

9    Notwithstanding, preliminary prospectus represented that "***Ford is expected to hold greater than 5%***

10   ***of GRAF's outstanding common stock after the Business Combination***."

11          307.    In response to Defendants' statements on November 4, 2020 the price of Velodyne

12   common stock rose $2.08 per share to close at $14.94 per share (representing an increase of 16.17%)

13   on November 5, 2020, on heavy trading volume of 3.07 million shares.

14          308.    The highlighted statement in ¶ 306, supra were materially false and misleading when

15   made by Defendants, either knowingly or with reckless regard for the truth, because: (i) in July 2020,

16   Graf Industrial and Velodyne agreed to terms that would allow Ford to liquidate its entire ownership

17   stake in the Company; (ii) Ford planned to terminate a major contract with Velodyne and sell its stake

18   in the Company shortly after the Reverse Merger, which Defendants knew or were reckless in not

19   knowing given the aforementioned agreement; (iii) Velodyne was losing major customer contracts

20   and market share to competitors Hesai and Argo AI while its Velarray sensor was being rejected by

21   customers; and (iv) after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns

22   regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of

23   market share to competitors, [and] the serious risk of theft of IP in China[,]" which Defendants knew

24   or recklessly disregarded.

25          E.      **November 5, 2020 Statements**

26          309.    On November 5, 2020, Graf Industrial, which had been renamed Velodyne following

27   the September 2020 Merger close, issued a release announcing its third quarter 2020 financial results

("3Q20 Release"). The release stated that Velodyne had grown revenues 137% year-over-year to $32.1 million and continued to grow its contracted revenues, *signing 6 "multiyear agreements during the quarter," which increased the total to 24 long-term contracts*. The 3Q20 Release also reaffirmed the Company's purported revenue trends, stating: "Velodyne is pleased to reiterate the guidance shared in early September, as part of our business combination with Graf Industrial Corp. *For the full year 2020, we expect total revenue of approximately $101 million, as previously forecasted."*

310.    In the 3Q20 Release, Defendant Gopalan represented that the Company was experiencing "continued strength . . . in the overall lidar markets." He continued: "*Despite the continued impacts of Covid-19*, we see growing interest in lidar applications across multiple industries, as evidenced by our accelerating commercial success across all of our focused markets. In this environment, *Velodyne continues to demonstrate its leadership as the only at-scale lidar player, through strong technical and business execution*."

311.    That same day, Velodyne held a conference call with analysts and investors to discuss the Company's third quarter 2020 financial results. The call was hosted by Defendants Gopalan and Hamer. In his prepared remarks, Defendant Gopalan claimed that Velodyne was running ahead of target, stating in pertinent part as follows:

> Our strong performance in Q3, met or exceeded our target. Revenue in the third quarter grew 137% year-over-year to $32.1 million. We added six new agreements across all three of our broad markets in the third quarter, *bringing our total multi-year agreements to 24. At the end of a quarter, we were tracking 175 projects in our pipeline, which represents a 34% increase over the 131 projects at end of 2019 and further illustrates the demand for Lidar and Velodyne's ability to match Lidar solutions to very different applications in price points*.

312.    Defendant Hamer further represented that Velodyne was continuing to experience sustained customer engagement and revenue growth, stating in pertinent part as follows:

> Importantly the company continues to see healthy levels of customer engagement as evidenced by an increase in long-term contracts. Third quarter revenue of $32.1 million represents a 137% increase versus the comparable quarter last year. Sensors are the company's focused revenue stream. This quarter, we sold a record number of Alpha Prime units predominantly to the automotive sector. Another important area for the company is multi-year agreements with customers that are putting their supply chain in place for solutions that include lidar.

\*        \*        \*

***And finally I'd like to turn now to guidance, which remains the same as we publicly disclosed in early September***. As Anand mentioned, we are seeing increased interest and acceleration of last-mile delivery plans as a result of the pandemic while other industries are cautious about capital spending. ***With these dynamics in mind, for the fourth quarter and full year 2020, revenue is estimated to be approximately $101 million*** based on our pipeline and production contracts and the reduction of ASPs offset by volume. We expect higher sensor volumes in Q4. We expect the full year GAAP gross margin, including around $7.5 million of stock-based compensation expense to be around 22.6% to 25.6%, and the non- GAAP gross margin to be approximately 30% to 33%.

313.    The highlighted statements in ¶¶ 309-312, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business; **(ii)** by this time, Defendants had already taken steps to commence an investigation of the Halls, which Defendants knew (or were reckless in not knowing) would foreseeably result in increased G&A expenses associated with the investigation and any subsequent litigation; **(iii)** Velodyne's G&A expenses increased by 59% as a result of the Company's removal of Mr. Hall**; (iv)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(v)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(vi)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(vii)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(viii)** as a result, Velodyne was not on track to achieve its revenue projections and in fact was suffering from year-over-year revenue declines; and that, **(ix)** as a result of (i)-(viii) above,

1    Defendants' 2020 and long-term guidance was not achievable and lacked any reasonable basis in fact

2    and the Company's "business execution" was not "strong."

3         314.     During the same call, Defendant Gopalan also highlighted the Company's relationship

4    with Ford, stating that "***Velodyne is partnered with leading companies like Ford***," and claimed that

5    the Company had "inherently reduced the risk in our model by serving multiple customers in multiple

6    industries[.]" Defendant Gopalan touted this relationship even though the Company's October 2019

7    Registration Statement, which registered Ford's entire ownership position in Velodyne, had become

8    effective the day prior.

9         315.     The highlighted statements in ¶ 314, *supra* were materially false and misleading when

10    made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Velodyne

11    registered Ford's shares in the Company for sale and said registration became effective the previous

12    day, allowing Ford to liquidate its entire ownership stake in the Company; **(ii)** Ford planned to

13    terminate a major contract with Velodyne and sell its stake in the Company shortly after the Reverse

14    Merger, which Defendants knew or were reckless in not knowing given the aforementioned

15    registration; **(iii)** Velodyne was losing major customer contracts and market share to competitors Hesai

16    and Argo AI while its Velarray sensor was being rejected by customers; and **(iv)** after the

17    consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging

18    product sales, departure of key R&D personnel, significant loss of market share to competitors, [and]

19    the serious risk of theft of IP in China[,]" which Defendants knew or recklessly disregarded.

20         316.     Defendant Gopalan further highlighted Mr. Hall's import to Velodyne, representing

21    that Defendants were "***grateful for the pioneering work of our founder David Hall . . . . David's***

22    ***vision and expertise have fueled Velodyne's commercial success,*** as evidenced by our shipment of

23    47,500 sensors today for cumulative revenue of over $615 million." By this time, the Company's Audit

24    Committee had already taken steps to commence an internal investigation of Mr. Hall.

25         317.     The highlighted statements in ¶ 316, *supra* were materially false and misleading when

26    made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants

27    were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from

28

the Company; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(v)** Velodyne's Audit Committee had already begun investigating David and Marta Hall for 'inappropriate behavior', which they did not disclose until February 22, 2021; **(vi)** Defendants' investigation into the Halls was pretextual and "an opaque, secret investigation into frivolous claims" in a "seemingly retaliatory move" following the Halls' "attempt to hold Dr. Gopalan more accountable for the Company's weak performance"; **(vii)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; and as a result, **(viii)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation."

318. Defendant Gopalan was featured in an episode of the podcast SAE Tomorrow Today, titled "How Velodyne Became a Leader in LiDAR with Anand Gopalan" that same day.[37] During the interview with host Grayson Brulte, Defendant Gopalan highlighted Mr. Hall's importance to the Company and in maintaining its customer relationships, stating in relevant part:

> **Defendant Gopalan**: Yeah, you know, it's been such an incredible journey and to some extent when I think back on it, it really does feel like, you know the sort of quintessential origin story that so many silicon valley companies have*. I actually started with two other guys* in the founder David Hall's boat yard up in Alameda where he builds boats and it was the three of us with a dirt floor and no air conditioning and on the outside they were grinding this tugboat and this was the environment that we started in - it was so industrial, it was so quintessentially silicon valley - maybe silicon valley's not got so many such stories any more but this was sort of the founding of the

---

[37] Grayson Brulte and Anand Gopalan, "How Velodyne Became a Leader in LiDAR with Anand Gopalan" SAE TOMORROW TODAY (Nov. 5, 2020), https://open.spotify.com/episode/6EUrPRl3sYm9G886F5v985 (last accessed August 31, 2021); "SAE Podcast Interviews Anand Gopalan on Velodyne's Mission to Democratize Lidar" VELODYNE LIDAR (Nov. 18, 2020), https://velodynelidar.com/blog/sae-podcast-interviews-anand-gopalan/ (last accessed July 21, 2021).

1   place and we've grown - it's been growth on so many levels . . . It's been this
2   really incredible journey and really working alongside ***David Hall who is this prolific***
3   ***inventor thinking about product strategy, thinking about the business strategy*** and
    all of that was happening through this period of four, four and half years and so to some
4   extent when all - you know being through that journey and then when David finally
    asked me to take over the day to day runnings of the business late last year, it seemed
5   like a natural enough transition. Of course, no transition is perfect. There's always some
    new learning but it felt like we had worked on the strategy together, we had come so
6   far together building up this incredible company that it was something that felt natural
    and good.[38]

7   **Grayson Brulte**: It's important to point out for those who don't know, David Hall is
8   this incredible visionary who is always ahead of the curve and Velodyne he started
    making these incredible speakers early on and he was ahead of that whole curve. . . . In
9   those early days in '16, when you were working with David, was he still tinkering on
    speakers or was it more focused still to LiDAR?
10

11  **Defendant Gopalan**: Yeah, at that point, it was very focused, it was much more
    focused on LiDAR. Yes, for people who don't know David [Hall], he's - ***he has this***
12  ***incredible almost intuitive ability to look around the corner and see trends as they***
    ***become real and really his ability to almost, this brave and unyielding ability to look***
13  ***for perfection in products*** and so you know in 2016, when I joined, he was - he had
    already turned his attention to almost completely to LiDAR and that was a time when
14  we were really having conversations with - he had been the sole supplier to the industry,
    to the av industry and we were having some really interesting conversations around
15  how is this going to scale and what needs to happen for these applications to scale and
    for LiDAR to scale. And you know, fast forward five years, I think you're seeing the
16  results of that. It was really at time of incredible vision both from an application and
17

18
    _____
19  [38]    David Hall would later refute Defendant Gopalan's telling of Velodyne's "quintessential origin
    story[,]" stating in relevant part:
20
        The reality is that Velodyne Lidar did not begin with 'two guys' in a boat yard, but was
21      founded in 1983 and took decades to achieve such high-growth and significant
        technological advancement. In 2016, the year Dr. Gopalan first joined the Company,
22      Velodyne Lidar was profitable, earning its highest revenue to date, and producing and
        shipping all lidar products from a 60,000 sq. ft. building in Morgan Hill, CA with over
23      100 engineers. In stark contrast, since Dr. Gopalan has emerged as CEO, the
        Company's revenue has steadily declined. Dr. Gopalan was one of 50 engineers who
24      contributed to important projects and was not central to solving the main challenge
        facing Velodyne Lidar – achieving technical, cost-effective solutions to product
25      delivery. I believe the Company would be stronger if Dr. Gopalan left and was replaced
        by a capable successor.
26

27  David Hall, June 3, 2021 *Business Wire*, "David Hall, Founder of Velodyne Lidar, Reiterates Call for
    Chairman Brad Culkin and CEO Anand Gopalan to Step Down."
28

technology point of view but also from a product road map point of view. And we spent a lot time those days, talking about those things.

\*      \*      \*

**Grayson Brulte**: In the early days of self-driving, how was Velodyne able to build and maintain those relationships with these companies, starting with two or three guys in a garage and to became a multi-billion dollar corporations, one consistent trend was that Velodyne was there from day one to big corporate day, how were you able to maintain those relationships over the years as these companies grew.

**Defendant Gopalan**: Yeah I know, I think it started with actually David [Hall] himself when he invented this technology in the original DARPA challenge. The DARPA challenge was a group of people who were working on all of these systems and David was able to demonstrate and sell his LiDAR sensors to the DARPA participants as its famously known in 2007, five out of the six teams who finished had David's LiDAR on it and these people have really gone forth and proliferated these industry of autonomy so all of these people are still leaders in all these major OEM and tech companies working on a common solution so that's where those relationships started and as we have - you know we talk about, ***within Velodyne we talk about the Velodyne way which is the sort of [] inventorship that David brings to the table*** - looking constantly for solutions and then sharing this technology with these key leaders who have continued to be in this world of autonomy

319.    While Defendant Gopalan emphasized Mr. Hall's importance to Velodyne publicly, unbeknownst to investors, Defendants were then engaged in a surreptitious effort to limit his control of Velodyne and remove him from Velodyne altogether.  During the podcast, Defendant Gopalan also explained Velodyne's ability to manage its supply chain in the midst of a global pandemic, stating in relevant part:

**Grayson Brulte**: And now you're clearly focused on scale, we're in the middle of a global pandemic, you're hearing a lot on business papers and CNBC and Bloomberg, a lot on supply chain. How are you managing the supply chain to ensure that your customers are getting the LiDAR that they need during this uncertain time?

**Anand Gopalan**: Yeah, I mean, this is something that we have been aware of as a risk and working on for many years at this point. The first thing that we did really was to create a much more globally diverse supply chain, we have really looked very carefully at supply concentration over geography for specific suppliers for specific types of components and tried to solve for that over the past three or four years. And then of course, creating manufacturing centers that are not in one, only in one geography so we have Nikon who is in Japan, we have our own manufacturing facility in San Jose, we have a manufacturing facility in Thailand so creating the kind of diversity of manufacturing base. ***I think those things have really helped us and we were able to manage through the pandemic without really significant losses from a supplier***

*perspective because of this ability to have multiple suppliers and diverse supply chains* and of course, as the leader in this space, you know, we have these deep supplier relationships as well and often the suppliers are seeking us out and saying hey, here is a new technology that I can bring to the table, here is new cost optimization that I can bring to the table and that's now a significant advantage because we're able to have these conversations ahead of everyone else and really be able to set the products up for success and manage through this. *So I think our supply chain has really endured very well though this challenging Covid pandemic.*

320. Describing his hands on management style and Velodyne's standing as a public Company, Defendant Gopalan touted the Company's internal controls, stating in relevant part:

**Defendant Gopalan**: The demand that David always had for perfection in the product and really best in class performance and quality hasn't changed. So those things are really fundamental to the business. *What of course we have also been able to do is put in place processes and people and methods that create the discipline that is needed to basically to be a public company to say what you're going to do then do it predictably* so I think there's been an evolution that's started in fact before I took over where we had these talks about preparing ourselves to be a public company and *we've been working for more than a year at this point, putting in place many of these processes, methodologies, and even people, controls to really create that predictability around the commercial and business side of things.* So I would say it's a mixed bag somethings have evolved and gotten more disciplined and then you know it's really in our best interest to keep some of the core DNA intact and untouched.

**Grayson Brulte**: As someone who invests in the public markets, I'll say thank you because that's what you want to hear from a publicly traded CEO, you want honestly and candor but you also want to focus on delivering value for shareholders so as a public markets investor, thank you for that. And so staying on the public markets thing, you have your first earnings call coming up on Nov. 5th, are you actively preparing for that - is there kind of butterflies in your stomach. Is there excitement because what you just said, you're clearly prepared to lead a public traded company and you're clearly prepared to grow a publicly traded company, so let's hear your thoughts on how you're preparing.

**Anand Gopalan**: Yeah, obviously it's Velodyne's first earnings call so we are incredibly excited as sort of a thrill and excitement that's running through all parts of the business as we get ready for this but at the same time, I think, *I feel very confident and comfortable that we have done so much work in putting these processes that I talked about in place and we've taken such a disciplined approach to gathering the data, the information that's needed to be able to communicate with the public investment community that that piece of it is almost muscle memory and we're able to - those, those processes are working, the data is coming together, and we're able to get things the together for the call* . . . .

321.    The highlighted statements in ¶ 320, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Velodyne's internal controls over financial reporting suffered from multiple material weaknesses, including material weakness related to the Company's tracking and reporting of whistleblower complaints, revenue recognition, and reporting practices; **(ii)** Defendants knew of or recklessly disregarded "concerns with [Velodyne's] corporate governance" no later than July 2, 2020 because Mr. Hall raised such concerns to the Board; **(iii)** "Velodyne Lidar's corporate governance [was] broken" as evidenced by Defendants' "decision to rubberstamp an increased compensation package for Mr. Gopalan despite the Company releasing weak Q4 2020 earnings and missing year end forecasts[,]" which Defendants knew or recklessly disregarded because Mr. Hall raised such concerns; **(iv)** Defendants had "manipulate[d] the Company's corporate machinery" by transitioning board members to lengthen the re-election time period and maintain control over board seats; **(v)** the Board, including Defendants, "prioritize[d] their "own self-interests over stockholders"; **(vi)** "Defendants had "fostered an anti-stockholder culture"; **(vii)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(viii)** Defendant Gopalan had "manipulated the truth to customers and investors alike"; **(ix)** Defendant Culkin took "several liberties with the truth and has acted as a rubberstamp on Dr. Gopalan's actions, including by approving a robust, metric-free Chief Executive Officer compensation package"; and finally, **(x)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

322.    Furthermore, Defendant Gopalan knew or was reckless in not knowing that Velodyne's internal controls were ineffective given: (i) his statements reflecting his purported "confidence" in the Company's year-long efforts to create and implement processes and controls "needed to basically to be a public company" and to "create that predictability around the commercial and business side of thing" (*see* ¶ 158, *supra*); and (ii) his role as President and CEO, which afforded him access to the undisclosed adverse information about Velodyne's business, operations, and present and future business prospects *via* internal corporate documents, conversations and connections with other

corporate officers and employees, and attendance at management and Board meetings and committees thereof.

**F.    November 9, 2020 Statements**

323.    On November 9, 2020, Velodyne filed with the SEC a quarterly report for the third quarter of 2020 on Form 10-Q ("3Q2020 10-Q"), which was signed by Defendants Gopalan and Hamer. The 3Q2020 10-Q highlighted Mr. Hall's material importance to the lidar industry and Velodyne's operations, stating in relevant part:

> ***Our visionary founder and executive chairman, David Hall***, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles organized by the Defense Advanced Research Projects Agency (DARPA). In a historic engineering milestone, Mr. Hall invented a lidar sensor that could see and measure the vehicle's surroundings with unprecedented precision, enabling the vehicle to navigate the course autonomously.

324.    The 3Q2020 10-Q also included a risk factor concerning Mr. Hall, representing that "Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management" and further represented his active involvement with the Company:

> Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and ***he remains deeply involved in all aspects of Velodyne's business, including product development***. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's research and development activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. ***Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry.***

325.    The highlighted statements in ¶ 324, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company; **(ii)** as of July 2, 2020, Mr. Hall was being excluded from decision-making at Velodyne and was locked in a power struggle for control of the Company with Defendants; **(iii)** with the Merger

consummated, Defendants Graf and Dee sought to "curtail [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward"; **(iv)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(v)** Velodyne's Audit Committee had already begun investigating David and Marta Hall for 'inappropriate behavior', which they did not disclose until February 22, 2021; **(vi)** Defendants' investigation into the Halls was pretextual and "an opaque, secret investigation into frivolous claims" in a "seemingly retaliatory move" following the Halls' "attempt to hold Dr. Gopalan more accountable for the Company's weak performance"; **(vii)** Defendants Graf and Dee were executing a "power grab" designed to cut the Halls out of the Company; and **(viii)** Defendants Graf and Dee were implementing "a well-played-out plan [*i.e.*, a scheme] to hijack the corporation."

326.    Having raised the risk factor, and touted Mr. Hall's significance to Velodyne's success and prospects, Defendants had a duty to correct and/or update their earlier statements by disclosing that the investigation was underway, because the risk of any adverse action concerning Mr. Hall had now begun to manifest. They failed to do so until February 22, 2021.

327.    Defendants Gopalan and Hamer both signed the 3Q2020 10-Q. Additionally, Defendants Gopalan and Hamer each signed SOX certifications attesting, *inter alia,* that:

1.    I have reviewed this Quarterly Report on Form 10-Q of Velodyne Lidar, Inc.;

2.    Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.    Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, *to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*;

b) evaluated the effectiveness of the registrant's disclosure controls and procedures and *presented in this report our conclusions about the effectiveness of the disclosure controls and procedures*, as of the end of the period covered by this report based on such evaluation; and

c) disclosed in this report *any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting*; and

5.    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.[39]

328.    Defendant Gopalan's and Hamer's SOX certifications were materially false and misleading because they failed to disclose that Velodyne was then suffering from several systemic internal control weaknesses related to its processes and controls for tracking and reporting whistleblower complaints and litigation matters, and also that Velodyne's internal controls were so materially weak that the Company had failed to adequately review revenue schedules associated with non-standard revenue arrangements, later prompting it to—*inter alia*—hire more employees as a remedial measure.

---

[39]    The SOX certifications were included at Exhibits 31.1 and 31.2 to the 3Q20 Form 10-Q.

329.    Defendant Gopalan's and Hamer's SOX certifications were also materially false and misleading for the added reasons that: **(i)** Defendants knew of or recklessly disregarded "concerns with [Velodyne's] corporate governance" because Mr. Hall raised such concerns no later than July 2, 2020; **(ii)** "Velodyne Lidar's corporate governance [was] broken" as evidenced by Defendants' "decision to rubberstamp an increased compensation package for Mr. Gopalan despite the Company releasing weak Q4 2020 earnings and missing year end forecasts[,]" which Defendants knew or recklessly disregarded because Mr. Hall raised such concerns; **(iii)** the Board, including Defendants, "prioritize[d] its own self-interests over stockholders"; **(iv)** Defendants had "fostered an anti-stockholder culture"; **(v)** Defendants Culkin, Dee and Gopalan "breached stockholders' confidence" and had "not been acting in the best interest of stockholders"; **(vi)** Defendant Gopalan had "manipulated the truth to customers and investors alike"; **(vii)** Defendant Culkin took "several liberties with the truth and has acted as a rubberstamp on Dr. Gopalan's actions, including by approving a robust, metric-free Chief Executive Officer compensation package"; and finally, **(viii)** the Board had "demonstrated a fundamental disregard for stockholders' interests in recent months."

330.    Furthermore, Defendants Gopalan and Hamer knew or were reckless in not knowing that Velodyne's internal controls were ineffective given: (i) Defendant Gopalan's purported "confidence" in the Company's year-long efforts to create and implement processes and controls "needed to basically to be a public company" and to "create that predictability around the commercial and business side of thing" (*see* ¶ 158, *supra*); and (ii) their respective roles, which afforded them access to the undisclosed adverse information about Velodyne's business, operations, and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof.

### G.    January 7, 2021 Statements

331.    On January 7, 2021, Velodyne issued a press release, titled "Velodyne Lidar Announces Fourth Quarter and Annual 2020 Preliminary Support" ("FY2020 Release"), which was filed with the SEC on Form 8-K on January 8, 2021 and signed by Defendant Hamer. The FY2020

Release stated that Velodyne had only achieved approximately $94 million in annual 2020 revenues, 7% below the Company's previous annual revenue guidance and 30% below its fourth quarter revenue guidance. The FY2020 Release withdrew all future guidance, notwithstanding Defendants' repeated prior representations regarding the strong proportion of Company revenues purportedly under contract and favorable business trends *through 2024*, stating in relevant part:

> *Largely as a result of these COVID-19 related disruptions*, management now estimates fourth quarter revenue 2020 in a range of $15.5 million to $16.0 million and full-year 2020 revenue of approximately $94 million versus $101 million as previously provided as guidance for the full year. *Without these unexpected end-of-year disruptions, Velodyne believes it would have met prior revenue guidance for 2020*. Demonstrating the company's efficient business model, the company expects to meet or exceed guidance on other important financial metrics provided for the year, including non-GAAP gross margin percentage and operating loss.
>
> *        *        *
>
> The company's active engagement with its diverse customer base reinforces its positive future outlook. Given the uncertainty around COVID-19 worldwide and its downstream impacts, and customer implementation timelines that are *outside the company's control,* the company has less visibility on the timing of expected purchase orders and other projects in the pipeline. Velodyne is monitoring the situation daily to understand COVID-19's impact on signed and awarded business, and other developments in customer plans affecting the new business funnel, bookings, the company's manufacturing capacity, and ultimately, revenue. *With this reduced visibility and out of an abundance of caution, the company withdraws any previous financial guidance for 2021 at this time.*

332.    Notwithstanding the withdrawn guidance, Defendant Gopalan represented that "*there is no change in our fundamental outlook for the future*[,]" stating in relevant part:

> Commenting on the business and financial update, Velodyne CEO Dr. Anand Gopalan stated, 'Despite the impact of COVID-19 in the past few months and on our near-term visibility, *there is no change in our fundamental outlook for the future*. We are encouraged by the expanding adoption of lidar across a wide variety of industries, some of which are accelerating in a post-COVID world. As a result, we believe our pipeline is the most robust in the industry and we are manufacturing and shipping more lidar units than all our competitors have reported.'

333.    In response to this news, the value of the Company stock fell by 7.28%, while the trading price of Velodyne stock warrants similarly fell by 13.30% in a single day on massive volume.

334.    That same day, unbeknownst to investors, Mr. Hall had "transitioned from serving as an employee and executive officer of the Company to a non-executive role, effective immediately." Nevertheless, and despite months of representing Mr. Hall's import to the Company and the adverse impacts that would follow if the Company lost him, Defendant Gopalan falsely and misleadingly represented, knowingly or with reckless disregard for the truth, that "there is no change in our fundamental outlook for the future[.]" Defendants failure to disclose Mr. Hall's transition and the impending adverse impacts that were likely to follow – particularly in light of the undisclosed on-going investigation into the Halls - rendered Defendant Gopalan's statement materially false and misleading.

335.    The highlighted statements in ¶¶ 331-332, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business; **(ii)** by this time, Defendants had begun investigating the Halls and retained outside counsel, which Defendants knew (or were reckless in not knowing) would foreseeably result in increased G&A expenses associated with the investigation and any subsequent litigation; **(iii)** Veldoyne's G&A expenses increased by 59% as a result of the Company's removal of Mr. Hall; **(iv)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(v)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(vi)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(vii)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(viii)** as a result of (i)–(vii), Velodyne was not on track to achieve its revenue projections and in fact

was suffering from year-over-year revenue declines; and **(ix)** "the Board and management appear[ed] content blaming their own failings on the COVID-19 pandemic" and while it was "a convenient scapegoat, the reality [was] that similar lidar companies have been thriving during the pandemic."

336.    Furthermore, Defendant Gopalan knew or was reckless in not knowing that Velodyne was using COVID-19 as "a convenient scapegoat" for withdrawing guidance given his: **(i)** repeated assurances that COVID-19 was not impacting the Company's overall performance (*see* ¶ 124, *supra*); **(ii)** representation that the Company was "able to manage through the pandemic without really significant losses from a supplier perspective because of this ability to have multiple suppliers and diverse supply chains" (*see* ¶ 124, *supra*); and **(iii)** his role as President and CEO, which afforded him access to the undisclosed adverse information about Velodyne's business, operations, and present and future business prospects *via* internal corporate documents, conversations and connections with other corporate officers and employees, and attendance at management and Board meetings and committees thereof.

### H.    January 12, 2021 Statements

337.    On January 12, 2021, Defendants Hamer and Gopalan presented on Velodyne at the 19th Annual J.P. Morgan Tech/Auto Forum. During his opening remarks, Defendant Gopalan highlighted the Company's "real tangible visible financial growth," stating in pertinent part as follows:

> All of this leads to a company which has real tangible visible financial growth. Well, as I said before, huge momentum in our own sales pipeline, going from 130 projects at the beginning of 2020, to 183 projects and converting those projects into multiple signed and awarded agreements going from six to 25 as we stand today. ***All of this coming together to create tangible revenue today, and we guided to – in our latest announcement to $94 million in revenue***.

338.    In response to this news, the trading price of Velodyne common stock climbed on January 13, 2021 to a closing price of 23.91, representing an increase of $0.65 per share (2.79%) increase over the preceding day.

339.    The highlighted statements in ¶ 337, *supra* were materially false and misleading when made by Defendants, either knowingly or with reckless regard for the truth, because: **(i)** Defendants were engaged in a surreptitious effort to limit Mr. Hall's control of Velodyne and remove him from

the Company, which they knew (or were reckless in not knowing) would adversely affect the Company's business; **(ii)** by this time, Defendants had begun investigating the Halls and retained outside counsel, which Defendants knew (or were reckless in not knowing) would foreseeably result in increased G&A expenses associated with the investigation and any subsequent litigation; **(iii)** Veldoyne's G&A expenses increased by 59% as a result of the Company's removal of Mr. Hall; **(iv)** Velodyne was incurring increased R&D and sales and marketing expenses in an effort to keep pace with competing lidar companies Hesai and Argo AI while its Velarray sensor was being rejected by customers; **(v)** Velodyne was losing major customer contracts to competitors Hesai and Argo AI, including contracts that Defendants had used to highlight "awarded" revenues during the Class Period; **(vi)** Ford planned to terminate a major contract with Velodyne and sell its stake in Velodyne shortly after the Reverse Merger; **(vii)** after the consummation of the Merger, Mr. Hall "voiced . . . grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance[,]" which Defendants knew or recklessly disregarded; **(viii)** as a result of (i)–(vii), Velodyne was not on track to achieve "tangible financial growth" and in fact was suffering from year-over-year revenue declines; and **(ix)** "the Board and management appear[ed] content blaming their own failings on the COVID-19 pandemic" and while it was "a convenient scapegoat, the reality [was] that similar lidar companies have been thriving during the pandemic."

## VIII.    ADDITIONAL CLASS PERIOD ALLEGATIONS

340.    On February 15, 2021, Defendant Graf resigned from the Board, effective immediately. In a Form 8-K filed with the SEC on February 18, 2021, the Company reported that Defendant Graf's "decision to resign was not a result of any disagreement with the Company." Mr. Hall later publicly claimed, however, that Defendant Graf's decision to resign was "orchestrated" in an effort to maintain control over the Board:

> We suspect that Mr. Thomas and the rest of the Board orchestrated the resignation of
> Mr. Graf and appointment of Mr. Thomas to place Mr. Thomas into a new class of
> directors whose term would not expire until 2022, because he otherwise faced a

possible contested election that could have resulted in him being voted off the Board by stockholders at the 2021 Annual Meeting.

341.    On February 25, 2021, Velodyne issued a release providing the Company's final fourth quarter and full year 2020 financial results. The release stated that Velodyne had generated only $17.8 million in revenue during the fourth quarter, a 6% year-over-year decline rather than the 30% increase projected by Defendants during the Class Period. That same day, Velodyne held a conference call with analysts and investors to discuss the Company's fourth quarter and full year 2020 financial results. The call was hosted by Defendants Gopalan and Hamer. During his prepared remarks, Defendant Gopalan acknowledged that Velodyne had recently lost customer contracts, including one customer that "made a choice to use a different technology for their next generation platform" and another that selected "an older technology for their first generation rollout."

342.    On February 26, 2021, analysts at Craig-Hallum Capital Group LLC noted that:

It hasn't been a banner year for VLDR, at least looking from the outside in: Removing 2021 sales guidance on 'lower visibility', public info emerging on lost deals with key customers (incl. one we think was Ford), Ford selling its shares, and now a very public spat with a co-founder. ***VLDR didn't do a lot to assuage investor concerns about these specific issues***, and cited autonomy timeline pushouts from OEMs as the culprit for the Hyundai issue in particular. While this may be the case, it's not encouraging that VLDR has moved from highlighting existing projects to touting potential wins - like much of the rest of the LiDAR space – as it highlighted a potential $4.4B pipeline vs its $1B in awarded deals. It wasn't all bad news, though, as its pipeline increased to 194 from 183 and it signed an additional contract, and it continued to make progress with SW engagements.

We hesitate to place too much emphasis on two potential deals that slipped that were also mentioned in the public, while we do not have perspective on new contracts and engagements, which continue to increase. ***However, combined with Board drama, it's hard to not to worry and wonder what's really going on underneath***. But we still go back to the volumes VLDR is currently selling (nearly $100M) that all other LiDAR makers do not make in aggregate and the exposure to non-Auto markets that provides diversification (which few other LiDAR makers have).

343.    On March 12, 2021, Berenberg Capital Markets analyst Michael Filatov issued a research note on Veldodyne called "Channel check give us pause, Move to Hold" which downgraded the Company after speaking with the Company's customers. The note highlighted that, contrary to the Company's efforts to blame COVID-19 for its poor financial performance:

We continue to gain new insights that suggest to us that VLDR is losing share in spinning lidar, while facing stiff competition in directional lidar. Management commentary suggests that revenue could be flat or down in 2021 versus prior guidance of +50% yoy, which we believe is more indicative of competitive challenges than pandemic-related disruptions. . . . Since entering the market in 2017, Hesai has been growing share while VLDR's share in the autonomous vehicle market has fallen to 'about 25%.' We don't just take this at face value. Since our launch we have spoken to over a dozen customers, many of whom are planning to switch to Hesai for better performance at a lower cost.

344.    Later in the same report, Mr. Filatov also stated that:

Removal of 2021 guidance and new signed & awarded revenue pipeline is likely indicative of these competitive pressures.

At our Indy Tech conference last week, management reiterated that the reason guidance was pulled was due to pandemic-induced delays and uncertainty around customer purchasing plans. Some investors pushed back as to why this lack of visibility is now a problem, while the company had been providing guidance to $150m of revenue in 2021 (+50% yoy) throughout the SPAC merger process and into the new year. Management has not provided any updated guidance, but revenue is expected to see more pressure in H121 and could be flat or down for the full year depending on the speed of the recovery in the back half. This expectation of a weak Q1 is surprising given that COVID-19 pandemic related shutdowns at VLDR's manufacturing facilities at the end of Q4 were expected to push some revenue into the beginning of 2021.

While the pandemic has clearly created more challenges for customers in their autonomous driving R&D work, ***we believe that the competitive challenges we outlined earlier play a big role in the removal of guidance***. Another under the radar indicator of share/business losses is the updated signed & awarded revenue pipeline. In the Q420 release, the company stated that it estimates that it could generate over $1bn of cumulative revenue from signed & awarded contracts between 2021 and 2025. If we compare this to prior projections for revenue under signed & awarded contracts (in the SPAC merger presentations), the company had been expecting a similar level (~$1bn) of revenue from signed & awarded contracts between 2020 and 2024. This suggests that prior out-year revenue projections from the SPAC merger presentation may have been meaningfully reduced. We believe this is attributed to lost signed & awarded business with Hyundai (G90) and Veoneer (Ford – VLS-128), amongst others.

345.    On March 15, 2021, Velodyne issued a release announcing that it had hired a new COO, James Barnhart, effective immediately. On March 17, 2021, Velodyne filed its annual report with the SEC on Form 10-K. In the annual report's "Summary of Risk Factors," Velodyne revealed: "We have identified material weaknesses in our internal control over financial reporting, and the failure to

achieve and maintain effective internal control over financial reporting could harm our business and negatively impact the market price of our common stock."

346.    The annual report elaborated:

**We have identified material weaknesses in our internal control over financial reporting, and the failure to achieve and maintain effective internal control over financial reporting could harm our business and negatively impact the market price of our common stock.**

Our management determined that, as of December 31, 2020, we did not maintain effective internal control over financial reporting. During the year, management identified a material weakness related to our process and controls *over tracking and reporting whistleblower complaints and litigation matters* that was remediated in the fourth quarter. *In addition, management identified a material weakness in connection with our failure to adequately review revenue schedules associated with non-standard revenue arrangements, which resulted in misstatements of revenue and deferred revenue for the three months ended December 31, 2020*. These misstatements have been corrected as of year-end.

We are working to remediate the remaining material weakness and have taken and continue to take steps that we believe will address the underlying causes, including the following:

- We have enhanced the review process surrounding the quarterly and annual assessment of the ongoing status of standard and non-standard agreements and schedules.

- We have designed new controls and procedures associated with non-standard agreements and schedules, which requires incremental levels of accounting review, and

- We intend to hire additional resources with the relevant experience to strengthen our contract review processes.

While we have made progress to enhance our internal control over financial reporting, additional time is required to complete implementation and to assess and ensure the sustainability of these procedures. We will continue to devote time and attention to these remedial efforts. *However, the remaining material weakness cannot be considered remediated until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively*.

347.    In a section titled "Management's Report on Internal Control Over Financial Reporting," the Annual Report reiterated the material weakness in the internal controls, repeating the remedial actions described above, and further stating:

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2020. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013). Based on this assessment, our management concluded that our internal control over financial reporting was not effective as of December 31, 2020 because of the material weakness identified in connection with ***our failure to adequately review revenue schedules associated with non-standard revenue arrangements, which resulted in misstatements of revenue and deferred revenue for the three months ended December 31, 2020***, which have been corrected as of year-end.

348.    The Company's disclosures regarding the weaknesses in its internal controls relative to: (i) whistleblower reporting; (ii) litigation matters; and (iii) review of revenue schedules associated with non-standard revenue arrangements stood in stark contrast to the 3Q 2020 10-Q's SOX certifications by Defendants Gopalan and Hamer, all of which were silent as to these issues. This silence continued throughout the fourth quarter of the 2020 fiscal year and was not revealed to investors until nearly three months had passed since the year-end.

349.    Given the diligence which Graf Industrial performed prior to the Merger, which purportedly included a review of revenue forecasts, extensive conference calls regarding growth prospects, a review of material business contracts, financial and accounting due diligence, and the creation of an independent financial model (*see, generally*, ¶ 93, *supra*), the Defendants knew or deliberately disregarded that loss contingencies (*i.e.*, whistleblower lawsuits and litigation) were not being tracked, and that adequate review of non-standard revenue contracts were not being sufficiently reviewed.

350.    For its part, the auditors' report, included in the Form 10-K, asserted that KPMG performed no independent analysis of the effectiveness (or lack thereof) of the Company's internal controls, stating:

The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audits, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. ***Accordingly, we express no such opinion***.

351.   Also on March 17, 2021, Velodyne filed a current report with the SEC on Form 8-K. The Form 8-K revealed that the Company's former COO, Thomas Tewell, had resigned on March 14, 2021.

## IX.   ADDITIONAL SCIENTER ALLEGATIONS AND POST-CLASS PERIOD DEVELOPMENTS

352.   As alleged throughout herein, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. Defendants, by virtue of their receipt of information reflecting the true facts regarding Velodyne's management, competitive landscape, their control over, and/or receipt and/or modification of Velodyne's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Velodyne, participated in the fraudulent scheme alleged herein.

353.   The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants. Given their executive-level positions with Velodyne, the Individual Defendants controlled the contents of Velodyne's public statements during the Class Period. The Individual Defendants were each provided with or had access to the information alleged herein to be false and/or misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected. Because of their positions and access to material non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.

354.   Plaintiffs also allege that scienter of the Individual Defendants (who, as executive officers or Board Members of the Company, knew or recklessly ignored facts related to the core operations of Velodyne) can be imputed to Velodyne.

355.    Further evidencing their scienter, Defendants had the motive and opportunity to commit fraud. The Reverse Merger allowed Defendants Graf and Dee to secure tens of millions of dollars in equity in the combined Company that they would not otherwise receive and for the officers and directors of Velodyne to receive desirable positions in a publicly traded company, Velodyne. It also allowed the Individual Defendants to receive lucrative payouts, compensation and incentive awards in connection with their positions as officers and directors of Velodyne following the Reverse Merger.

356.    For example, according to the Velodyne Proxy Statement dated May 4, 2021, Defendant Gopalan's total compensation package skyrocketed following the Reverse Merger. Before the Reverse Merger, in the fiscal year ended December 31, 2019, Gopalan's total compensation package with Velodyne was worth approximately $2.898 million. For the fiscal year ended December 31, 2020, Gopalan's total compensation package—inflated by, *inter alia*, massive stock and option awards, and non-equity incentive awards of $425,000 (in 2019, it was $281,106)—had swelled to an astonishing ***$26.135 million***. Gopalan's total compensation package for the fiscal year ended December 31, 2020 was ***greater than nine times what it had been in 2019***—a virtual impossibility but for the Reverse Merger between Graf Industrial and private Velodyne.

357.    The October 19, 2020 Registration Statement provided that private Velodyne shareholders "will be issued restricted securities" in connection with the Reverse Merger, and then outlined two different lockup provisions for existing Velodyne stockholders versus the Founder Shares:

**Lock-Up Agreements**

In connection with the Business Combination, Velodyne stockholders will be issued restricted securities. The Velodyne Stockholders have agreed not to sell any shares of our common stock issued to them in the Business Combination for a period of six months following the closing of the Business Combination.

The Sponsor agreed that it will not Transfer any of its Founder Shares until the earlier of (i) one (1) year after the Closing and (ii) subsequent to the Closing, if the price of our common stock exceeds $12.00 per share (provided that the applicable thirty (30) trading day period commences at least 150 days after the Closing).

358.    Accordingly, Company insiders who acquired Velodyne public's common stock pursuant to the Reverse Merger were supposed to be subject to a six-month lock-up period, commencing on September 29, 2020, and ending on March 30, 2021.

359.    However, certain Defendants were able to skirt the lock-up agreement's terminal date of March 30, 2021 by exercising restricted stock units ("RSUs") which they had received in connection with the Reverse Merger, which had fully vested before the lockup period expired.

360.    More specifically, just before the Class Period ended, Defendant Gopalan filed on March 10, 2021 a Form 4 which alerted investors to his March 8, 2021 acquisition of 1,395,431 shares of Velodyne common stock, resulting from the exercise of fully-vested RSUs. According to the Form 4, Gopalan received the RSUs in connection with the Reverse Merger.

361.    Similarly, Defendant Hamer filed on March 10, 2021 a Form 4 which informed investors to his March 8, 2021 acquisition of 91,805 shares of Velodyne common stock, resulting from his exercise of fully-vested RSUs. According to Defendant Hamer's Form 4, he also received these RSUs in connection with the Reverse Merger. On March 15, 2021, shortly before the Class Period ended, Defendant Gopalan reported on Form 4 that, on March 11, 2015, he had sold 649,762 shares of common stock at an average per share price of $12.85, netting approximately $8.35 million in proceeds.[40] Similarly, on March 15, 2021, Defendant Hamer also reported on Form 4 that on March 11, 2015, he had sold 34,034 shares of common stock at an average per share price of $12.85, netting some $437,336.90 in proceeds.[41]

---

[40]    Gopalan's Form 4 further asserts that this transaction "represent[s] shares required to be sold by the Reporting Person to cover tax withholding obligations in connection with the previously reported vesting and settlement of restricted stock units ('RSUs'). These sales are mandated by the Issuer's election under its equity incentive plans to require the satisfaction of tax withholding obligations to be funded by a 'sell to cover' transaction and do not represent discretionary trades by the Reporting Person."

[41]    Like Gopalan, Hamer's Form 4 also asserts that this transaction "represent[s] shares required to be sold by the Reporting Person to cover tax withholding obligations in connection with the previously reported vesting and settlement of restricted stock units ('RSUs'). These sales are mandated by the Issuer's election under its equity incentive plans to require the satisfaction of tax withholding obligations to be funded by a 'sell to cover' transaction and do not represent discretionary trades by the Reporting Person."

362.    Given Defendants' knowledge of and their misleading statements about Velodyne's acquisition plans, business and prospects made contemporaneously with that knowledge, Defendants' materially false and/or misleading statements alleged herein were made willfully and caused Velodyne securities to trade at artificially inflated prices during the Class Period. Defendants Gopalan and Hamer were able to obtain valuable shares during the Class Period *via* the exercise of their RSUs, and guaranteed that their tax withholding obligations would be covered by a structured "sell to cover" transaction, rather than being forced to pay any withholding tax obligation out of their own personal pocketbook.

363.    On May 12, 2021, Berenberg Capital Markets issued a research note called "VLDR Hits the Reset Button." There, maintaining its Hold on the Company's shares, it noted that:

> Reiterating our Hold rating and reducing our price target to $12 (from $16) following VLDR rebasing expectations and taking a step back on its prior FY21 guidance (from the SPAC): Yesterday after market close, VLDR reported its Q1 earnings in which the company issued FY21 revenue guidance of $77m-94m (-10% yoy at the mid-point) and 16-24% gross margins. ***This is a big step back from the SPAC presentation targets*** of $150m (>50% yoy) and 46% gross margins. Management primarily attributes the changes to pandemic-related impacts and believes the longer-term growth outlook is intact, however we believe it is at least partly indicative of competitive challenges (as highlighted in our downgrade note). In our view, ***management now faces an uphill battle to regain investor confidence*** and will need to execute in securing high-volume contracts that can justify its high growth multiple. We also caution investors that VLDR's insider share restrictions end after tomorrow (May 12). We lower our price target to $10 on a significant cut to our estimates to reflect management's rebased financial outlook and competitive pressure in the automotive market.

364.    On May 17, 2021, Velodyne filed its Preliminary Proxy Statement relating to the Company's 2021 Annual Meeting of Stockholders ("Annual Meeting Proxy"), in which the Company provided further detail regarding its decision to remove the Halls. The Company asserted that it formed "a special committee to, among other things, evaluate and respond to the governance proposals [presented by the Halls through independent counsel on December 17, 2020], determine the advisability of each of the governance proposals and negotiate with the Halls on the Board's behalf with respect to the governance proposals (the "Special Committee")."

365.    The Halls' governance proposals purportedly sought the following: (i) "[t]he declassification of the Board and the ability of David Hall to solely appoint six of Velodyne Lidar's

eight directors (and remove them), subject to applicable Nasdaq listing rules"; (ii) "[t]he appointment of David Hall, who at the time was [Velodyne's] Executive Chairman, to [the Company's] independent Compensation Committee, and a clarification in [the Company's] governance documents that all directors are invited to attend all meetings of the Audit and Compensation Committees"; (iii) and "[t]he expansion of the Executive Chairman's role such that the Chief Executive Officer would report to the Board as well as the Executive Chairman, who would also be given the right to remove the Chief Executive Officer unilaterally without Board approval."

366.    The Annual Meeting Proxy represented that the Board of Directors formed a special committee in response to the Halls' governance proposals and further indicated that said special committee "retained outside counsel to advise it with respect to these proposals", stating in relevant part:

> As the governance proposals presented an interested party transaction for the Halls, the Board of Directors formed a special committee to, among other things, evaluate and respond to the governance proposals, determine the advisability of each of the governance proposals and negotiate with the Halls on the Board's behalf with respect to the governance proposals (the "Special Committee"). The Special Committee retained outside counsel to advise it with respect to these proposals.

367.    The Annual Meeting Proxy, however, failed to disclose that Velodyne's Audit Committee commenced its investigation of the Halls **eight days prior** to the Halls' governance proposal presentation.[42] Furthermore, according to the Annual Proxy Statement, the Special Committee responded to the Halls' governance proposals with the following: (i) "the Board should maintain its classified board structure, which the Special Committee noted was consistent with market practice for companies that have recently gone public"; (ii) "the Board should establish a Nominating

---

[42]    *See Velodyne Lidar, Inc. v. David Hall,* 21CV383938 (Cal. Sup. July 2, 2021) Declaration of Hal Michael Clyde In Opposition to Velodyne Lidar, Inc.'s Ex Parte Application for a Temporary Restraining Order at Ex. 5 "Claimant Velodyne Lidar, Inc.'s Request for Appointment of an Emergency Arbitrator and for Issuance of Provisional Injunctive Relief" ("Beginning in the fall of 2020, Mr. Hall made certain statements and acted in a way that was inappropriate with regard to Board and Velodyne procedures. Due to concerns about potential risks and harm to Velodyne stemming from the unusual statements ad conduct of Mr. Hall in board communications and at Board meetings, among other things, **on December 9, 2020, the Audit Committee of Velodyne's Board of Directors initiated an internal investigation.**")

and Governance Committee consisting of David Hall and two independent directors, which committee would" (a) "identify qualified director candidates, review and evaluate their qualifications, and recommend that the Board select such candidates to fill vacancies and be elected by stockholders and" (b) "hire a leading professional search firm to help identify qualified candidates and also consider recommendations of director candidates from any director, members of management and stockholders. In addition, under this proposal, David Hall would have the same ability as other committee members to identify candidates and participate in the committee's evaluation of such candidates, and to the extent that the committee and the Board would determine such candidates, including those identified by David Hall, to be qualified, they would be selected as director nominees (or appointed to fill a vacancy, as applicable)"; (iii) "[t]he Special Committee's support for the Halls' proposal that David Hall join the Compensation Committee (subject to the Nasdaq requirement that a Compensation Committee be fully independent one year from the date of losing controlled company status)"; (iv) "[t]hat all directors shall be invited to attend regularly scheduled Audit and Compensation Committee meetings; however, each committee would retain the right to meet solely with committee members as the committee deems appropriate, and to exclude such members or directors who may be interested parties in the topics under discussion"; and (v) "the Chief Executive Officer would continue to report to the Board (rather than to the Executive Chairman), and that Mr. Hall would, following his resignation as an employee, continue to serve as the Non-Executive Chairman with the functions of a Non-Executive Chairman."

368.    The Annual Proxy Statement represented that neither the Halls nor their attorney engaged in further discussions regarding the Special Committee's responses. Notwithstanding the Halls' governance proposals, and as reported in the Annual Proxy Statement, "[o]n January 15, 2021, the Board authorized a Nominating Committee consisting of James Graf, Marta Hall and Christopher Thomas . . . to consider and recommend candidates as Class I directors to be voted upon at the Annual Meeting." During the Nominating Committee's meeting, Mrs. Hall "identified candidates that the Halls were considering as potential nominees" (*i.e.*, Eric Singer and Deborah Hersman) and

subsequently, the Nominating Committee and other Board members agreed to and did interview those potential nominees.

369. The Annual Proxy Statement further represented that, on February 3, 2021, the Halls' attorneys "informed the attorneys for the Special Committee that, if the Board did not endorse the candidates proposed by the Halls, the Halls would nominate those candidates nonetheless." On February 12, 2021, Mr. Hall subsequently nominated Mr. Singer as a candidate to be elected as a Class I Director. Defendants did not disclose these developments during the Class Period or at any time prior to the publication of the Annual Proxy Statement. Furthermore, the Annual Proxy Statement did not disclose whether the Halls' governance proposal or nomination of Mr. Singer formed the basis for the purportedly independent Audit Committee's investigation into the Halls.

370. The Annual Proxy Statement also acknowledged that Defendants anticipated Mr. Hall's control over the Company would continue to diminish, stating in relevant part:

> Because Mr. Hall controls a majority of our outstanding voting power, we are a "controlled company" under the corporate governance rules of Nasdaq. . . . *However, in the event of additional exercises of our Public Warrants and if certain stockholders sell their shares of Common Stock, Mr. Hall could hold less than 50% of the voting power of our Common Stock. When Mr. Hall beneficially owns less than 50% of the total voting power of our Common Stock, we will no longer be a "controlled company" within the meaning of the corporate governance standards of Nasdaq.*

371. On May 26, 2021, analyst Michael Filatov of Berenberg Capital Markets commented on Mr. Hall's May 25, 2021 letter in a note called "An update on VLDR's power struggle" highlighting that:

> *Mr. Hall appears to corroborate some of the views expressed in our downgrade note that the company is experiencing a 'significant loss of market share to competitors*.' If our caution around competitive pressures weren't enough, the fact that the majority shareholder with 52.2% ownership of outstanding common stock (plus his wife's 3.1% ownership) is embroiled in a dispute with the management team and BoD should be enough reason, in our opinion, for investors to remain on the sidelines for the time being.

> The Founder and former Chairman of the Board echoes our view that VLDR has been losing share and presents other concerns. We've continued to highlight our view that VLDR is ceding share in spinning lidar to *private Chinese lidar competitor Hesai* and may be behind the curve in terms of bringing a high-performance solid-state lidar to series production (according to channel checks). In his letter, Mr. Hall expressed his

concerns about the company's declining sales and the "significant loss of market share to competitors," supporting our view. ***But Mr. Hall also highlights that VLDR has suffered from the 'departure of key R&D personnel,'*** which leaves us cautious on the company's ability to fend off new entrants like Innoviz (INVZ – Buy), Luminar (LAZR – Hold), and Ouster (OUST) with the introduction of new and competitive products.

Mr. Hall calls out management's claims that the reduced financial outlook is due to the COVID-19 pandemic. ***We've expressed our skepticism about the reduced guidance ($150m of revenue in 2021 to $86m and 47% gross margins to 20%) and believe it is heavily attributable to the competitive pressure VLDR is facing. Mr. Hall accurately highlights*** that competitors Luminar and Ouster managed to grow their Q1 revenues by 187% and 37% yoy, respectively.

372.    On July 16, 2021, Defendant Gopalan unexpectedly resigned from his role as CEO and as a Board member, effective July 30, 2021. In an updated filed with the SEC *via* Form 8-K on July 19, 2021, the Company reported that his "resignation is not a result of any disagreement with the Company on any matter relating to the Company's operations, policies or practices." Given Defendant Gopalan's abrupt resignation, Velodyne did not have a replacement CEO and rather than appoint an interim CEO, the Company "established a new 'Office of the Chief Executive Officer'" consisting of CFO Andrew Hamer, COO Jim Barnhart, Chief People Officer Kathryn McBeath, and Chief Commercial Officer Sinclair Vass.

373.    Subsequently, on August 2, 2021, Velodyne announced that Defendant Culkin was also stepping down from his position as Chairman of the Board, citing health reasons. Defendant Culkin, however, would remain a director of the Board. The Company subsequently appointed Defendant Dee to serve as Chairman of the Board. The same day, Velodyne also announced that Deborah Hersman – who had only been appointed to the Board in March 2021 - was stepping down from the Board. The Company appointed Kristin Slanina to the Board in her stead.

374.    Since the Company's shares began trading on Nasdaq on September 29, 2020, a number of directors and/or executives have either declined to stand for re-election, resigned, or been terminated. Chief among them are Velodyne's own Mr. Hall and his wife Marta Thoma Hall, both of whom built Velodyne up as a private company before its acquisition by Graf Industrial. Defendant James Graf abruptly departed the Company in mid-February 2021, shortly before the ouster of the

Halls, and shortly after news broke of his intention to form three new SPACs. And Defendant Gopalan departed the Company so immediately and unexpectedly that it left Velodyne without a CEO.

375.    On August 5, 2021, Velodyne held an earnings call in connection the announcement of its second quarter 2021 financial results. During the call, and given Gopalan's sudden exit, Defendant Hamer introduced himself as one of four members of the Company's newly formed *Office of the Chief Executive Officer*, further noting that the "*Board is undertaking a search to find a full-time CEO[.]*" Despite Defendants' repeated assurance about the Company's high quality corporate governance, and ability to function as a publicly-traded Company, internally the Company was in fact utterly dysfunctional as illustrated by the circus of resignations and terminations of the Company's highest-ranking insiders and executives as depicted in the chart below:

| BOD & EXECUTIVE OFFICER RESIGNATIONS AND TERMINATIONS | | | | |
|---|---|---|---|---|
| **INDIVIDUAL** | **POSITION** | **START DATE** | **END DATE** | **NARRATIVE** |
| David Hall | CEO | 12/2015 | 01/01/2020 | Transitions from CEO to Executive Chairman |
| | Executive Chairman | 01/01/2020 | 01/07/2021 | Transitions from employee/ executive officer to non-executive role |
| | Chairman | 01/07/2021 | 02/19/2021 | Removed as Chairman by BOD |
| | Class III Director[43] | 02/19/2021 | 03/02/2021 | Resigns from BOD as Director |
| James Graf [(†)] | Class II Director | 09/29/2020 | 02/15/2021 | Resigns from BOD as Director, replaced by Christopher Thomas |
| Marta Thoma Hall | Chief Marketing Officer | 01/2020 | 02/19/2021 | BOD votes to remove her after investigation concluded, replaced as Chief Marketing Officer by Sally Frykman |
| | Class II Director[44] | 01/2020 | Current | Remains an active director of the board |
| Christopher Thomas [(*)(†)] | Class I Director | 09/29/2020 | 02/24/2021 | Resigns Class I Director position to be appointed Class II Director to fill the empty position left by James Graf |
| | Class II Director | 02/24/2021 | Current | Fills Graf's empty position |

---

[43]    Class III Directors to be voted on in third annual meeting of stockholders (June 2023), and every three years thereafter.

[44]    Class II Directors to be voted on in in second annual meeting of stockholders (June 2022), and every three years thereafter.

| BOD & EXECUTIVE OFFICER RESIGNATIONS AND TERMINATIONS | | | | |
|---|---|---|---|---|
| **INDIVIDUAL** | **POSITION** | **START DATE** | **END DATE** | **NARRATIVE** |
| Thomas Tewell | COO | 09/2018 | 03/14/2021 | Company decides to transition him out of COO position on 03/11/21 with Jim Barnhart replacing him as COO. He resigns on 03/14/21 |
| Barbara Samardzich [*][†] | Class I Director[45] | 10/2016 | 06/11/2021 | Notifies BOD she won't stand for re-election on 01/18/2021; term ends 06/2021, replaced by Hamid Zarringhalam |
| Dr. Anand Gopalan | Class III Director, President, and CEO | 07/2019 | 07/30/2021 | Resigns as CEO and board member; will support the company in an advisory capacity. Company forms "office of Chief Executive" as it searches for replacement CEO, which is comprised of: Jim Barnhart, Drew Hamer, Kathy McBeath, and Sinclair Vass |
| Dr. Joseph B. Culkin[46] | Chairman | 02/19/2021 | 08/02/2021 | Appointed Chairman by BOD after Hall ouster; steps down as Chairman due to health reasons. Nominated Michael Dee as his replacement |
| | Class III Director | 08/02/2021 | Current | Remains active director of the board |
| Deborah Hersman | Class III Director | 03/15/2021 | 07/29/2021 | Previously identified by Halls; appointed to fill David Hall's Class III Director position. Hersman informs board on 07/28/2021 that she will be stepping down. Replaced by Kristin Slanina. |
| Michael Dee [*] | Class II Director | 09/29/2020 | 08/02/2021 | Dr. Joseph B. Culkin takes over Dee's Class II Director position after stepping down as Chairman; Dee appointed Chairman of the Board. |
| | Chairman | 08/02/2021 | Current | His appointment follows the decision of Dr. Joseph B. Culkin to step down as Chairman of the Board due to health reasons. Dr. Culkin will remain an active director of the Board. Nominated by Dr. Culkin. |

(*) Member of the Audit Committee throughout the investigation into the Halls.
(†) Member of the Compensation Committee throughout the investigation into the Halls and renegotiation of Gopalan's Employment Agreement.

---

[45]     Class I Directors to be voted on in first annual meeting of stockholders (June 2021), and every three years thereafter.

[46]     Brother-in-law to David Hall.

376.    During the same August 5, 2021 earnings call, Defendant Hamer also discussed the financial toll that the Halls' ouster and additional executive turnover was having on the Company, stating in relevant part:

> ***GAAP operating expenses included $53.2 million stock-based compensation expense and including employer taxes.*** Included in stock-based compensation expense was approximately $42 million charged against sales and marketing-related to our 2020 merger with graft [*sic*] Industrial. This compared to first quarter 2021 GAAP operating expenses, including $13.3 million of stock-based compensation expense, including employer taxes. ***Included in general and administrative expenses are $1.4 million in legal and professional expenses in connection with our Audit Committee's investigation announced in the first quarter of 2021 and to conduct by David Hall, the company's former Chairman; and Marta Hall, the company's former Chief Marketing Officer and a current Director of the company. For the first half of 2021, this figure was $3.7 million.***
>
> \*      \*      \*
>
> Now for our full year 2021 financial statement guidance. Revenue is expected to range between 77 and $94 million.
>
> \*      \*      \*
>
> On a GAAP basis, operating expenses would include approximately $87 million of stock-based compensation expense that reflects ***approximately $42 million to be charged against sales and marketing in the second quarter related to our 2020 merger with Graf Industrial and $8 million related to the recent departure of our CEO***.

377.    Defendant Hamer's statements highlighted the extent to which Defendants Dee, Graf, and Gopalan benefited from their false and misleading statements throughout the Class Period, with Graf Industrial and Defendant Gopalan securing a collective $42 million in compensation while shareholders were left holding the bag as a result of Defendants' Class Period scheme to remove Mr. Hall from Velodyne – the Company he founded and once successfully led.

378.    During the earnings call, Bank of America analyst Aileen Elizabeth Smith pressed the Company regarding its revenue in relation to signed and awarded contracts, stating in relevant part:

> Aileen Elizabeth Smith: And then I wanted to touch base a bit. I think on Slide 12 and to kind of compare it versus last quarter***, is there anything to read into the $1 billion revenue number and sign an awarded contracts, despite what is an increase, I think, of 15% to 20% in the number of those signed and awarded contracts themselves.*** I think it was 29 in May 2021 and 34 as of this quarter, yet the estimated revenue number

is similar. *Are some of the contracts that you're winning smaller in scope or revenue size? Or have there been adjustments to perhaps assumptions in the previous pipeline?*

Defendant Hamer: Yes. So this is – *it's a very important conversation because the reason why we kind of talked about 2026 activities because we aren't forecasting or providing any information on that yet, which we'll probably do starting next quarter.* But -- so the $1 billion is with these additional customers, some of the industrial contracts are slightly smaller than the MYAs. It's just the very nature of their businesses or others of the more recent MYA agreements continue to be larger and will expand in the coming years. But as you start looking out past 2025, we're seeing the potential for those numbers to continue to expand rather substantially with some automotive activity. So for right now, we're confident that these numbers become a little bit more reliable, and we're working towards ensuring they're turning into the P&L and adding additional contracts is something we anticipate as time comes to past, these numbers will continue to grow.

379.    Berenberg Capital analyst Michael R. Filatov also sought further clarification from Defendant Hamer regarding the Company's customer sales projections, stating in relevant part:

Michael R. Filatov: I guess I just want to follow-up on a question that was asked by one of my fellow analysts earlier about that last-mile delivery customer. *I believe in an earlier presentation you put out a while ago, there had been some numbers put out that said 100,000 units related to that customer for 2022 and ramping to 250,000 in 2023 and 2024. So rather important, I think that projections. So I'm just wondering, obviously, you don't have to take who the customer is, but I mean, are those volumes still in play? Is that customer still in your multiyear agreement backlog? Just any other additional comments?*

Defendant Hamer: So the customer is still in the multiyear agreement backlog. I think the -- *we're not giving any 2022 guidance as of right now*, but it's not unreasonable to suggest that the customers' priorities might change where some of the things could move in any direction. But we also believe that with some of the other activity from other projects that are coming in, if anything, move down, others could move up. So that kind of beauty of our business relationship is we're in multiple industries with multiple products with multiple customers. So as it relates to that one customer, there are so many different opportunities in there, even if that did slip, we believe that other solutions would probably fill in.

380.    Defendant Hamer's inability to provide guidance less than a year out exemplifies the extent to which Defendants overstated the Company's financial prospects in effort to lure investors into approving the Reverse Merger and investing in the combined Company's securities during the Class Period. In reality, while Defendants touted Velodyne's revenue expectations and "signed and awarded agreements[,]" the Company was facing "plunging product sales, departure of key R&D

personnel [and] significant loss of market share to competitors. . . ." None of which was disclosed by Defendants.

381.    In an article titled "The cost of Velodyne's internal drama is starting to add up" and published the following day on *TechCrunch* article, author Rebecca Bellan expounded on the high cost of the Defendants' successful scheme to remove the Halls, subsequent executive turnover, and efforts to prevent further customer loss stating in relevant part:

> Velodyne Lidar, the sensor company that went public a year ago when it merged with special purpose acquisition company Graf Industrial Corp., reported its second quarter earnings Thursday, ***results that show a company spending more to find new customers for its products while grappling with an increasingly expensive internal drama.***

> Just a few weeks ago, ***Velodyne's CEO Anand Gopalan resigned, taking $8 million in equity compensation with him***, according to the company's second-quarter report. At the time of Gopalan's resignation, the company restated its business outlook for 2021 revenue, noting that its guidance of between $77 million and $94 million remained unchanged.

> Earlier in the year, founder David Hall was removed as chairman of the board and his wife, Marta Thoma Hall, lost her role of chief marketing officer following an investigation by the board into the couple for 'inappropriate behavior.' ***The legal fees involved in this debacle set the company back $1.4 million this quarter, and $3.7 million for the first half of 2021***, according to Velodyne CFO Drew Hamer.

> The board's fight with the Halls has escalated. In a May letter, David Hall blamed the SPAC, specifically the SPAC-appointed members of the combined company's board, for its poor financial performance, and called for the resignation of Gopalan and two board members.

> During a call with investors Thursday, ***Hamer also said general and administrative expenses are expected to increase by about 35% in 2021 due to increased public company and legal expenses, meaning the struggle is not over***. From the first quarter to the second, there was already a 21% increase, from $17 million to $20.6 million.

> The 'general and administrative expenses' category falls under the company's broader operating expenses, which were $84.8 million this quarter, about double last quarter's spend.

> Rising legal costs at the company are only part of its accelerating cost profile. The company is also investing heavily in growth, namely in sales and marketing.

> A large majority of operating expenses were spent on sales and marketing. Velodyne spent $47.2 million in the second quarter, which is up massively from $7.1 million in the first quarter.

On average, companies spend about 11.3% of their total revenue on marketing budgets, according to a 2020 CMO survey, though that is a broad metric. It's important to note that the full impact of sales and marketing spend is never fully realized in the quarter in which that capital is put to work. In other words, we don't know if Velodyne's expanded Q2 sales and marketing spend has brought in more business.

The company's revenue eased between the first and second quarters, falling from $17.7 million to $13.6 million. *For a company investing so heavily in sales to see revenue decline is not encouraging, even if the bulk of results stemming from Q2 spend may not show up until the company's third-quarter earnings report.*

\*      \*      \*

Velodyne has some other existing partnerships, but it faces steep competition in the automotive space.

Luminar, for example, has deals with major OEMs like Volvo and Toyota, and it recently bought one of its chip suppliers so that it wouldn't have to be held up like everyone else in the industry, including Velodyne, by the semiconductor shortage. Hesai is also seeing some traction with customers like Lyft, Nuro, Bosch, Navya and Chinese robotaxi operators Baidu, WeRide and AutoX.

Velodyne, which has long been the dominant supplier in the industry, has lost some customers more recently.

For instance, Ford, which had originally backed Velodyne, divested its stake in the company and placed its bets on Argo AI, which is supplying the automaker with its the autonomous vehicle technology. Argo had upped its game by drastically improving its in-house lidar sensor, meaning it would no longer need to rely on Velodyne. That had a ripple effect and impacted Veoneer, which had partnered with Velodyne to produce the lidar for Ford.

382.    The article confirmed concerns raised by Mr. Hall months earlier; namely, that Velodyne's insiders were benefiting at the expense of shareholders and that the Company was losing market share and customers – including Ford – to competitors like Hesai and Argo AI while its Velarray sensor was being rejected by customers.

383.    Nevertheless, Defendants efforts to curtail Mr. Hall's participation and control of the Company were ultimately a success. On August 11, 2021, Veldoyne filed its quarterly report for the period ending June 30, 2021 with the SEC on Form 10-Q ("2Q21 10-Q"), wherein the Company reported it was no longer a "controlled company[,]" stating in relevant part:

Prior to the filing of this Quarterly Report on Form 10-Q, David Hall controlled the votes of the majority of our common stock. As a result, we were a 'controlled company'

for purposes of the Nasdaq corporate governance rules . . . We are no longer a 'controlled company' under the corporate governance rules of Nasdaq.

**David Hall will have control over key decision making because he holds voting rights with respect to a significant amount of our voting stock.** [47] David Hall, our former chairman and CEO, holds voting rights with respect to an aggregate of approximately 87.6 million shares of common stock, which represented approximately 44.9% of the voting power of our outstanding capital stock as of June 30, 2021. In addition to the approximately 59.5 million shares of common stock currently held by Mr. Hall, which represented approximately 30.5% of the voting power of our capital stock as of June 30, 2021, stockholders holding approximately 28.2 million shares of common stock, including Joseph Culkin, a member of our Board, Marta Hall, a member of our Board, and certain other family members of Mr. Hall, have entered into agreements granting Mr. Hall an irrevocable proxy to vote such stockholders' shares at Mr. Hall's discretion on all matters to be voted upon by stockholders. As a stockholder, Mr. Hall is entitled to vote his shares in his own interests, which may not always be in the interests of our stockholders generally and could adversely affect the market price of our common stock.

## X.    LOSS CAUSATION

384.    As detailed herein, during the Class Period, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Velodyne securities. This scheme operated as a fraud or deceit on Class Period purchasers of Velodyne securities by failing to disclose and misrepresenting the adverse facts detailed herein. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of Velodyne securities declined significantly as the prior artificial inflation came out of the price of Velodyne securities.

385.    By concealing the adverse facts detailed herein from investors, Defendants presented a misleading picture of Velodyne's business, prospects and operations. Defendants' false and misleading statements had the intended effect and caused Velodyne securities to trade at artificially inflated levels throughout the Class Period, with Velodyne common stock reaching its highest closing price – $30.43 per share – on September 9, 2020. Following the adverse revelations detailed herein, the price of Velodyne common stock fell to a low of just over $13 per share on March 18, 2021 – 57% below the Class Period high. As a result of their purchases of Velodyne securities at artificially inflated

---

[47] Emphasis in original.

prices during the Class Period, plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

386. When the truth about the Company was revealed to the market, the price of Velodyne securities fell significantly. The decline began to remove the inflation from the price of Velodyne securities, causing real economic loss to investors who had purchased these securities during the Class Period. The declines in the price of Velodyne securities when the corrective disclosure came to light was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price decline in Velodyne securities negate any inference that the loss suffered by plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

387. The four declines in Velodyne's common stock share price during the Class Period as alleged herein are actionable. The timing and magnitude of the Company's common stock price declines on each of those days negates any inference that the losses suffered by Plaintiffs and the Class was caused by changed market conditions, macroeconomic or industry factors or Velodyne-specific facts unrelated to Velodyne and the Individual Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and other Class members was a direct result of Velodyne and the Individual Defendants' fraudulent statements and the corresponding artificial inflation in Velodyne's securities prices and the subsequent significant decline in the value of Velodyne's common stock when Velodyne and the Individual Defendants' prior acts of misconduct were revealed.

388. At all relevant times, Velodyne and the Individual Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Plaintiffs and the putative Class. Those statements were materially false and misleading by their failure to disclose a true and accurate picture of Velodyne's operations and prospects, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not false or misleading, causing Velodyne common stock to be artificially inflated. Plaintiffs and other Class

members purchased and/or acquired Velodyne common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

### A.    January 7, 2021 Disclosure

389.    On January 7, 2021, Velodyne disclosed information correcting Defendants' prior repeated material misrepresentations and omissions concerning Velodyne's financial outlook and guidance as alleged in ¶¶ 170-336, *supra*, by announcing significantly and materially lowered guidance for the fourth quarter 2020 by at least $15.5 million and withdrew full-fiscal year 2021 guidance entirely.

390.    In response, Velodyne's share price fell precipitously from a closing price of $25.82 per share on January 7, 2021 to close at $23.94 per share on January 8, 2021—a decline of 7.28% on unusually heavy trading volume of over 13.2 million shares traded. Similarly, the value of Velodyne's stock warrants also declined from January 7, 20021 to January 8, 2021, falling from $10.75 to $9.32— a decline of $1.43, representing a 13.3% drop in value in a single day, on heavy trading volume of approximately 1.649 million warrants.

391.    The Company's securities' prices would have fallen further but for Defendants' claim that day that it "increased signed and awarded contracts to 25 and expanded its pipeline to 183 projects across multiple end-markets and use cases, up from 175 since the end of the third quarter of 2020." This maintained the artificial inflation in the Company's share price. In a "Flash Note" released on January 8, 2021, Berenberg Capital Markets highlighted that Velodyne had secured an additional signed contract and eight new projects in the pipeline, saying "we expect to see momentum continue in new multi-year agreements in 2021" and maintained its price target of $29.00.

### B.    February 12, 2021 Disclosure

392.    On February 12, 2021, information was disclosed correcting Defendants' prior misrepresentations and material omissions concerning Ford's investment in the Company as alleged in ¶¶ 170-339, *supra*. On that day, Ford, filed a Form SC 13G/A, which revealed that ***Ford had liquidated its entire position in Velodyne as of December 31, 2020***. On February 15, 2021, *Forbes*

wrote that this development meant that "the days of Velodyne sensors on the automakers [*sic*] vehicles are likely numbered."

393.    In response, Velodyne's share price fell from a closing price of $23.22 per share on February 12, 2021 to close at $21.38 per share on February 16, 2021—a decline of 7.92% on unusually heavy trading volume of over 7.9 million shares traded. As the market continued to digest the news on February 17, 2021, the value of Velodyne common stock fell an additional $0.33 per share to close at $21.05, representing a further decline of 1.54%. Velodyne's stock warrant prices similarly fell, from a closing price of $8.73 on February 12, 2021 to $7.66 on February 16, 2021—a difference of $1.07, representing a 12.26% decline on 353.6 thousand warrants traded. As the market continued to digest the news on February 17, 2021, the value of the warrants dropped another $0.56 per warrant to close at $7.10—representing a further decline of 7.31%.

**C.    February 22, 2021 Disclosure**

394.    On February 22, 2021, Velodyne disclosed that it removed Mr. Hall from his position as Chairman of the Board of Directors as alleged in ¶¶ 170-336, *supra*. The Company also revealed that Mr. Hall's wife, Marta Thoma Hall, had also been removed from her position as Chief Marketing Officer. In response, Velodyne's share price fell dramatically from a closing price of $21.11 per share on February 19, 2021 to close at $17.97 per share on February 22, 2021, or 14.87%, on unusually heaving trading volume of over 12.1 million shares traded. As the market continued to digest the news on February 23, 2021, the stock price continued to fall to $16.26 per share, an additional decline from the previous day's close of 9.52%, on heavy trading of over 9.6 million shares.

395.    Defendants further disclosed that in December 2020, the Audit Committee had hired independent legal counsel to investigate "certain statements and conduct by David Hall and Marta Thoma Hall." The investigation:

> concluded that Mr. Hall and Ms. Hall each behaved inappropriately with regard to Board and Company processes, and failed to operate with respect, honesty, integrity, and candor in their dealings with Company officers and directors. Accordingly, the Board approved remedial actions including the removal of Mr. Hall as Chairman of the Board and the termination of Ms. Hall as an employee of the Company. Mr. Hall had previously informed the Board that he was voluntarily transitioning from Executive Chairman to Chairman on January 7, 2021. The Board also formally censured both Mr.

Hall and Ms. Hall, and directed them both to receive appropriate remedial training. They will remain members of the Company's Board of Directors.

396. In a "Flash Note" published that same day, Berenberg Capital Markets found that these circumstances were "concerning" and "*likely fuel[ed] todays [sic] sell-off* . . . ."

397. On this news, the price of Velodyne stock and warrants fell 15% and 20%, respectively. However, because Defendants failed to disclose the full truth about the adverse events, trends and uncertainties negatively impacting Velodyne's business, the price of Velodyne securities remained artificially inflated. Indeed, after the Halls published their own rebuttal to Velodyne's announcement on February 24, 2021, the price of Velodyne securities fell $1.77 from February 24, 2021's closing price of $16.96 to close on February 25, 2021 at $15.19 per share. This one-day decline represented a drop of 10.44% of the stock's value, as a heavy volume of 6.854 million shares were traded. As the market continued to digest the news on February 26, 2021, the stock dropped a further $0.50 per share, representing a 3.29% decline, on heavy trading volume of 10.692 million shares traded. The value of the Velodyne warrants also fell from February 24, 2021's closing price of $5.31 per warrant to $4.67 per warrant on February 25, 2021—a decline of 12.05%.

### D. March 17, 2021 Disclosure

398. On March 17, 2021, the Company filed its 2020 annual report on Form 10-K with the SEC. The 2020 Annual Report revealed was suffering from multiple material weaknesses in its internal controls over financial reporting as alleged in ¶¶ 170-339, *supra*, including weaknesses related to: (i) Velodyne's processes and controls over tracking and reporting whistleblower complaints and litigation matters; and (ii) Velodyne's failure to adequately review revenue schedules associated with non-standard revenue arrangements, which resulted in misstatements of revenue and deferred revenue for the three months ended December 31, 2020. That same day, the *Silicon Valley Business Journal* reported that Velodyne spokesman Jim Golden, refused to provide details about the material weaknesses, saying only "[t]he company provided a pretty straightforward. . . explanation of what unfolded, so I think it's all there in the filing[.]" The Company also revealed that day that its COO, Thomas Tewell, had resigned on March 14, 2021. The *Silicon Valley Business Journal* article reported that Velodyne competitor AEye announced that it had named Tewell as COO on March 15, 2021.

399.    On this news, the price of Velodyne stock fell more than 5% overnight, from a closing price of $14.01 on March 17, 2021 to a closing price of $13.26 on March 18, 2021, on heavy trading volume. As the market continued to digest the news, the share price dropped further still to a closing price of $13.00 on March 23, a total drop of more than 7%. Similarly, the price of Velodyne warrants fell 7.75% overnight, from a closing price of $4.58 on March 17, 2021 to a closing price of $4.23 on March 18, 2021, on heavy trading volume.

400.    In a research report published March 30, 2021, Craig Hallum lowered its price tarted from $20 to $13, saying, "***we don't think this stock is going anywhere until this Board/family drama is resolved and financial visibility is restored***."

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

401.    At all relevant times, the market for Velodyne securities was an efficient market under *Basic v. Levinson*, 485 U.S. 224 (1988) for the following reasons, among others:

(a)    Velodyne securities met the requirements for listing, and were listed and actively traded on the Nasdaq, a highly efficient, national stock market;

(b)    as a regulated issuer, Velodyne filed periodic public reports with the SEC and the Nasdaq;

(c)    Velodyne regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)    Velodyne was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

402.    As a result of the foregoing, the market for Velodyne securities promptly digested current information regarding Velodyne from all publicly available sources and reflected such information in the price of Velodyne securities. Under these circumstances, all purchasers of Velodyne securities during the Class Period suffered similar injury through their purchase of these securities at artificially inflated prices and a presumption of reliance applies.

403.    A class-wide presumption of reliance is also appropriate in this action under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

404.    At all relevant times, the market for Velodyne securities was open, well-developed and efficient at all relevant times. As a result of the alleged materially false and/or misleading statements, and/or omissions of material fact alleged herein, Velodyne securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased Velodyne securities relying upon the integrity of the market price of these securities and market information relating to Velodyne, and have been damaged thereby.

405.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Velodyne securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

406.    At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Velodyne's business, competition, acquisition plans and operations. These material misstatements and omissions had the cause and effect of creating in the marketplace an unrealistically positive assessment

of Velodyne, its business, profitability, competitive risks, services and financial prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in Lead Plaintiffs and other members of the Class purchasing Velodyne securities at artificially inflated prices, thus causing the damages complained of herein.

## XII.    NO SAFE HARBOR

407.    The statutory safe harbor provided for forward-looking statements under the Private Securities Litigation Reform Act of 1995 ("PSLRA") does not apply to any of the allegedly false statements pled in this Complaint. The statements alleged to be false and misleading herein all relate to then existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not adequately identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward looking statements. Furthermore, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Velodyne who knew that the statement was false when made.

408.    The PSLRA specifically excludes from the safe harbor statements made in connection with specified types of securities offerings, including those made in connection with an offering of securities by a blank check company like Graf Industrial, and those made in connection with an initial public offering like the Reverse Merger. While the PSLRA's exclusion for "initial public offering" does not refer to any definition of "initial public offering," it does exclude from its safe harbor "initial public offerings," which includes, as here, the Reverse Merger.

1

## XIII.  CLASS ACTION ALLEGATIONS

2      409.    Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure

3  23(a) and (b)(3) on behalf of a Class consisting of all purchasers of the securities of Velodyne during

4  the Class Period. Excluded from the Class are Defendants and members of their immediate families,

5  the officers and directors of the Company, at all relevant times, and members of their immediate

6  families, the legal representatives, heirs, successors or assigns of any of the foregoing, and any entity

7  in which Defendants have or had a controlling interest.

8      410.    The members of the Class are so numerous that joinder of all members is impracticable.

9  Throughout the Class Period, Velodyne securities were actively traded on the Nasdaq. While the exact

10  number of Class members is unknown to plaintiffs at this time and can only be ascertained through

11  appropriate discovery, Plaintiffs believes that there are thousands of members in the proposed Class.

12  Record owners and other members of the Class may be identified from records maintained by

13  Velodyne or its transfer agent and may be notified of the pendency of this action by mail, using the

14  form of notice similar to that customarily used in securities class actions.

15      411.    Plaintiffs' claims are typical of the claims of the members of the Class as all members

16  of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is

17  complained of herein.

18      412.    Plaintiffs will fairly and adequately protect the interests of the members of the Class

19  and has retained counsel competent and experienced in class and securities litigation.

20      413.    Common questions of law and fact exist as to all members of the Class and predominate

21  over any questions solely affecting individual members of the Class. Among the questions of law and

22  fact common to the Class are:

23          (a)    whether the Exchange Act was violated by Defendants as alleged herein;

24          (b)    whether statements made by Defendants misrepresented material facts about
               the business, operations and management of Velodyne; and

25          (c)    to what extent the members of the Class have sustained damages and the proper
26             measure of damages.

27      414.    A class action is superior to all other available methods for the fair and efficient

28  adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XIV.    COUNT I

### For Violation of § 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against Defendants

415.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

416.    During the Class Period, Defendants named herein disseminated or approved the materially false and misleading statements and/or omissions specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

417.    These Defendants: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of Velodyne securities during the Class Period.

418.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Velodyne securities. Plaintiffs and the Class would not have purchased Velodyne securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' materially false and misleading statements and/or omissions

419.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Velodyne securities during the Class Period.

## XV.    <u>COUNT II</u>

### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) Against Defendants Graf and Dee

420.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

421.    During the Class Period, Defendants Graf and Dee violated Rules 10b-5(a) & (c) in that they employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of Velodyne publicly traded securities during the Class Period as alleged herein.

422.    Beginning July 2, 2020 and continuing through February 22, 2021, Defendants Graf and Dee perpetrated a fraudulent scheme to lure investors into approving the Reverse Merger and purchasing the Company's shares by emphasizing David Hall's importance to and involvement with Velodyne. Specifically, Defendants Graf and Dee falsely touted David Hall's continued leadership of the Company after the Merger and Reverse Merger as alleged throughout herein.

423.    During the Class Period, Defendants Graf and Dee participated in the preparation of and/or disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

424.    Defendants Graf and Dee made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. Defendants Graf and Dee, individually and together, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about the business, operations and future prospects of Velodyne as specified herein.

425.    Defendants Graf and Dee had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available

to them. Defendants' misconduct was engaged in knowingly or with reckless disregard for the truth, and for the purpose and effect of concealing their efforts to remove Mr. Hall from Velodyne and limit his control over the Company from the investing public and supporting the artificially inflated price of Velodyne's securities.

426.    Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Velodyne publicly traded securities. Plaintiffs and the Class would not have purchased Velodyne publicly traded securities at the prices they paid, or at all, had they been aware that the market prices for Velodyne's common stock had been artificially inflated by Defendants Graf and Dee materially false and misleading statements and omissions.

## XVI.    COUNT III

### For Violation of § 20(a) of the Exchange Act Against the Individual Defendants

427.    Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

428.    The Individual Defendants acted as controlling persons of Velodyne within the meaning of §20(a) of the Exchange Act.

429.    By virtue of their positions as officers and/or directors of Velodyne, and/or their beneficial ownership of Velodyne securities, the Individual Defendants had the power and authority to, and did, cause Velodyne to engage in the wrongful conduct alleged.

430.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Velodyne securities during the Class Period.

431.    By reason of such conduct, the Defendants named herein are liable pursuant to §20(a) of the Exchange Act.

## XVII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment as follows:

A.    Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Lead Counsel;

B.    Awarding Plaintiffs and other members of the Class damages together with interest

thereon;

      C.      Awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, expert fees, and other costs and disbursements; and

      D.      Awarding Plaintiffs and other members of the Class such other and further relief as the Court deems just and proper under the circumstances.

## XVIII. <u>JURY DEMAND</u>

      Plaintiffs hereby demands a trial by jury.

Dated: September 1, 2021                      Respectfully submitted,

                                              **KAHN SWICK & FOTI, LLP**

                                              By:    *s/ Ramzi Abadou*
                                              Ramzi Abadou (SBN 222567)
KAHN SWICK & FOTI, LLP
580 California Street, Suite 1600
San Francisco, California 94104
Telephone: (415) 459-6900
Facsimile: (504) 455-1498
ramzi.abadou@ksfcounsel.com

-and-

Lewis S. Kahn
(to be admitted *pro hac vice*)
Alexander L. Burns
(to be admitted *pro hac vice*)
Alayne K. Gobeille
(to be admitted *pro hac vice*)
Morgan M. Embleton
(to be admitted *pro hac vice*)
KAHN SWICK & FOTI, LLC
1100 Poydras Street, Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@ksfcounsel.com
alexander.burns@ksfcounsel.com
alayne.gobeille@ksfcounsel.com
morgan.embleton@ksfcounsel.com

*Lead Counsel and Counsel for*
*Lead Plaintiffs, Diane Smith & William P. Smith*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 1, 2021, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper *via* the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ Ramzi Abadou*
RAMZI ABADOU

## Mailing Information for a Case 3:21-cv-01486-SI Moradpour v. Velodyne Lidar, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,Ashley.Errington@ksfcounsel.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **William Zachary Brenc**
  william.brenc@wilmerhale.com,william-brenc-3258@ecf.pacerpro.com,barbara.palomo@wilmerhale.com,whdocketing@wilmerhale.com

- **Alexander Louis Burns**
  alexander.burns@ksfcounsel.com

- **Rachele R. Byrd**
  byrd@whafh.com,fileclerk@whafh.com

- **Morgan Michelle Embleton**
  Morgan.Embleton@ksfcounsel.com

- **Alayne K Gobeille**
  alayne.gobeille@ksfcounsel.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **Sarah E. Maciel**
  Sarah.Maciel@wilmerhale.com

- **Kevin Peter Muck**
  Kevin.Muck@wilmerhale.com,whdocketing@wilmerhale.com,joann.ambrosini@wilmerhale.com,lindy.patrick@wilmerhale.com

- **Susan Samuels Muck**
  susan.muck@wilmerhale.com,whdocketing@wilmerhale.com,susan-muck-3159@ecf.pacerpro.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,egoodman@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,jalieberman@pomlaw.com,asoto@pomlaw.c

- **Pavithra Rajesh**
  prajesh@glancylaw.com,pavithra-rajesh-9402@ecf.pacerpro.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Brian Jared Schall**
  brian@schallfirm.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)