# EXHIBIT F

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**SCHEDULE 14A**

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934**

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☒   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☐   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material under §240.14a-12

**GRAF INDUSTRIAL CORP.**
**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☐   No fee required.

☒   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

   (1)   Title of each class of securities to which transaction applies:

      Not Applicable

   (2)   Aggregate number of securities to which transaction applies:

      Not Applicable

   (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

      Not Applicable

   (4)   Proposed maximum aggregate value of transaction:

      $1,522,000,000[1]

   (5)   Total fee paid:

      $197,555.60[2]

☐   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   (1)   Amount Previously Paid:

   (2)   Form, Schedule or Registration Statement No.:

   (3)   Filing Party:

   (4)   Date Filed:

[1]   Represents aggregate consideration.

[2]   The amount is the product of $1,522,000,000 multiplied by the SEC's filing fee of $129.80 per $1,000,000.

**TABLE OF CONTENTS**

| | |
|---|---|
| SUMMARY TERM SHEET | 1 |
| FREQUENTLY USED TERMS | 5 |
| QUESTIONS AND ANSWERS ABOUT THE PROPOSALS FOR STOCKHOLDERS | 8 |
| SUMMARY OF THE PROXY STATEMENT | 24 |
| SELECTED HISTORICAL FINANCIAL INFORMATION OF THE COMPANY | 35 |
| SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA OF VELODYNE | 36 |
| SELECTED UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 38 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 40 |
| RISK FACTORS | 42 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 82 |
| NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 89 |
| COMPARATIVE SHARE INFORMATION | 93 |
| SPECIAL MEETING OF COMPANY STOCKHOLDERS | 95 |
| PROPOSAL NO. 1 – APPROVAL OF THE BUSINESS COMBINATION | 102 |
| PROPOSAL NO. 2 – THE NYSE STOCK ISSUANCE PROPOSAL | 145 |
| PROPOSAL NO. 3 – THE CHARTER APPROVAL PROPOSAL | 147 |
| PROPOSAL NO. 4 – APPROVAL OF CERTAIN GOVERNANCE PROVISIONS IN THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION | 150 |
| PROPOSAL NO. 5 – APPROVAL OF THE INCENTIVE PLAN | 153 |
| PROPOSAL NO. 6 – APPROVAL OF EMPLOYEE STOCK PURCHASE PLAN | 157 |
| PROPOSAL NO. 7 – THE ADJOURNMENT PROPOSAL | 161 |
| INFORMATION ABOUT THE COMPANY | 162 |
| THE COMPANY'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 173 |
| VELODYNE'S BUSINESS | 180 |
| VELODYNE'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 204 |
| EXECUTIVE COMPENSATION | 225 |
| MANAGEMENT AFTER THE BUSINESS COMBINATION | 232 |
| DESCRIPTION OF SECURITIES | 240 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 252 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 256 |
| MARKET PRICE, TICKER SYMBOL AND DIVIDEND INFORMATION | 262 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 263 |
| APPRAISAL RIGHTS | 263 |
| HOUSEHOLDING INFORMATION | 263 |
| TRANSFER AGENT AND REGISTRAR | 263 |
| SUBMISSION OF STOCKHOLDER PROPOSALS | 263 |
| FUTURE STOCKHOLDER PROPOSALS | 263 |
| WHERE YOU CAN FIND MORE INFORMATION | 264 |
| INDEX TO CONSOLIDATED FINANCIAL INFORMATION | F-1 |

ANNEX A – MERGER AGREEMENT                                                                         A-1
ANNEX B – FORM OF AMENDED AND RESTATED CERTIFICATE OF INCORPORATION                                 B-1
ANNEX C – FORM OF SUPPORT AGREEMENT                                                                 C-1
ANNEX D – FORM OF SPONSOR AGREEMENT                                                                 D-1
ANNEX E – FORM OF SUBSCRIPTION AGREEMENT                                                            E-1
ANNEX F – INCENTIVE PLAN                                                                            F-1
ANNEX G – EMPLOYEE STOCK PURCHASE PLAN                                                              G-1

ii

ANNEX A – MERGER AGREEMENT                                                                         A-1
ANNEX B – FORM OF AMENDED AND RESTATED CERTIFICATE OF INCORPORATION                                 B-1
ANNEX C – FORM OF SUPPORT AGREEMENT                                                                 C-1
ANNEX D – FORM OF SPONSOR AGREEMENT                                                                 D-1
ANNEX E – FORM OF SUBSCRIPTION AGREEMENT                                                            E-1
ANNEX F – INCENTIVE PLAN                                                                            F-1
ANNEX G – EMPLOYEE STOCK PURCHASE PLAN                                                              G-1

**SUMMARY TERM SHEET**

This summary term sheet, together with the sections entitled "*Questions and Answers About the Proposals for Stockholders*" and "*Summary of the Proxy Statement*," summarizes certain information contained in this proxy statement, but does not contain all of the information that is important to you. You should carefully read this entire proxy statement, including the attached Annexes, for a more complete understanding of the matters to be considered at the Special Meeting. In addition, for definitions used commonly throughout this proxy statement, including this summary term sheet, please see the section entitled "*Frequently Used Terms*."

- Graf Industrial Corp., a Delaware corporation, which we refer to as "we," "us," "our," "Graf" or the "Company," is a special purpose acquisition company ("*SPAC*") formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

- There are currently 17,549,365 shares of common stock, par value $0.0001 per share, of the Company, issued and outstanding, consisting of (i) 11,455,237 public shares, and (ii) 6,094,128 Founder Shares held by our Initial Stockholders. There are currently no shares of Company preferred stock issued and outstanding. In addition, we have 24,400,000 public warrants to purchase common stock (originally sold as part of the units issued in our IPO) outstanding along with 14,150,605 private placement warrants issued to our Sponsor in a private placement concurrently with our IPO (which private placement warrants will be automatically cancelled immediately prior to Closing pursuant to the Sponsor Agreement). Each warrant entitles its holder to purchase three-quarters of one share of our common stock at an exercise price of $11.50 per whole share, to be exercised only for a whole number of shares of our common stock. The warrants will become exercisable 30 days after the completion of the Business Combination, and they expire five years after the completion of the Business Combination, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation. Once the warrants become exercisable, the Company may redeem the outstanding public warrants at a price of $0.01 per warrant, if the last reported sales price of the Company's common stock equals or exceeds $18.00 per share for any 20 trading days within a 30 trading day period ending on the third trading day prior to the date on which we give notice of such redemption and provided certain other conditions are met. For more information regarding the public warrants, please see the section entitled "*Description of Securities*."

- Velodyne is the global leader in lidar technology providing real-time 3D vision for autonomous systems, which Velodyne calls smart vision. Velodyne's smart vision solutions are advancing the development of safe automated systems throughout the world, thereby empowering the autonomous revolution by allowing machines to see their surroundings. In automotive applications, Velodyne's products improve roadway safety by providing perception data for reliable object avoidance and safe path-planning. Velodyne has a vision called LIVE, Lidar In Vehicles Everywhere, which encompasses a mass-produced lower cost lidar sold for every model of car and truck. Velodyne believes safety on the roadways is for everyone. To improve roadway, bicycle, and pedestrian safety, Velodyne sells automotive solutions to the rapidly expanding ADAS market, which will incrementally address the requirements of the NHTSA 5-Star Safety Ratings System. Velodyne's lidar-based smart vision solutions are also deployed in many non-automotive applications, such as autonomous mobile robots, Unmanned Aerial Vehicles ("UAVs"), last-mile delivery, precision agriculture, advanced security systems, and smart city initiatives, among others. Velodyne's first products were commercially available in 2010. Since then, Velodyne has shipped over 40,000 units and generated cumulative sales of over $570 million. While purchases have been primarily focused on research and development ("*R&D*") projects, several of Velodyne's non-automotive customers are in commercial production with their offerings. Velodyne estimates that Velodyne is addressing a market opportunity for its technology solutions of approximately $11.9 billion in 2022, with roughly 60% attributable to automotive applications. Velodyne believes that it is approaching the inflection point of adoption of lidar solutions across multiple end markets and that Velodyne is well-positioned, with strong customer relationships and a growing government interest in urban safety, to take advantage of these opportunities. For more information about Velodyne, please see the sections entitled "*Velodyne's Business*," "*Velodyne's Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Management after the Business Combination*."

1

- Subject to the terms of the Merger Agreement and customary adjustments, at the effective time of the Business Combination, each share of Velodyne capital stock issued and outstanding immediately prior to the effective time of the Business Combination (other than shares owned by Velodyne as treasury stock or dissenting shares) will convert into a number of shares of Company common stock set forth in the Merger Agreement (the "*merger consideration*"), which aggregate amount, together with all payments made with respect to all vested Velodyne equity awards (including any equity awards that become vested prior to or in connection with the occurrence of the Business Combination), shall not exceed 148,453,811 shares of Company common stock. In addition, under the Merger Agreement, Velodyne equity holders will also be entitled to receive, in the aggregate, up to an additional 2,000,000 shares of common stock (including in the form of awards of restricted stock units settleable in shares of common stock) if the closing trading price of our common stock is greater than or equal to $15.00 for any 20 trading days within any 30 trading-day period, commencing on the date of the Merger Agreement and ending on the date that is six months after the Closing.

- The PIPE Investors, including our Sponsor, have agreed to purchase 15,000,000 shares of common stock in the aggregate, for $150,000,000 of gross proceeds. In connection with the Business Combination, the Company entered into the Subscription Agreements with the PIPE Investors, including our Sponsor, pursuant to which, among other things, the Company agreed to issue and sell to the PIPE Investors, in private placements to close immediately prior to the Closing, an aggregate of 15,000,000 shares of common stock at $10.00 per share, for an aggregate purchase price of $150,000,000. The PIPE Investors may assign their commitments under the Subscription Agreements to purchase shares of our common stock to one or more of our affiliates.

- It is anticipated that, upon completion of the Business Combination: (i) the Company's public stockholders (other than the PIPE Investors) will retain an ownership interest of approximately 6.7% in the post-combination company; (ii) the PIPE Investors will own approximately 8.7% of the post-combination company (such that public stockholders, including PIPE Investors, will own approximately 15.4% of the post-combination company); (iii) our Initial Stockholders (including our Sponsor) will own approximately 1.3% of the post-combination company; and (iv) the former Velodyne equity holders will own approximately 83.3% of the post-combination company, assuming $50,000,000 of cash is used to repurchase Velodyne shares. Upon the effective time, each outstanding and unsettled restricted stock unit in respect of shares of Velodyne common stock, option to purchase Velodyne common stock and unvested restricted share of Velodyne common stock will be rolled over into restricted stock units, options, or restricted shares, respectively, of common stock in accordance with the terms of the Merger Agreement.

- The ownership percentage with respect to the post-combination company following the Business Combination does not take into account (i) warrants to purchase common stock that will remain outstanding immediately following the Business Combination, (ii) the issuance of earn-out shares to the Velodyne equity holders or our Sponsor should the earn-out conditions in the Merger Agreement be satisfied or (iii) the issuance of any shares upon completion of the Business Combination under the Incentive Plan or the ESPP, copies of which are attached to this proxy statement as Annex F and Annex G, respectively. If the actual facts are different than these assumptions, the percentage ownership retained by the Company's existing stockholders in the post-combination company will be different. For more information, please see the sections entitled "*Summary of the Proxy Statement — Impact of the Business Combination on the Company's Public Float,*" "*Unaudited Pro Forma Condensed Combined Financial Information*" "*Proposal No. 5 — Approval of the Incentive Plan*" and "*Proposal No. 6 — Approval of the ESPP.*"

- The Sponsor Agreement provides that, immediately prior to the Closing, and conditioned and effective upon the Closing, 3,519,128 Founder Shares and all of the private placement warrants, in each case held by the Sponsor immediately prior to the Closing, will be automatically cancelled, for no consideration, and shall no longer be outstanding. As a result of such cancellation, the Sponsor will, upon the Closing, be the record owner of 2,507,000 Founder Shares, including 275,000 which will be deemed "Earnout Founder Shares". The Earnout Founder Shares will be unvested and subject to the vesting and cancellation provisions described in the section entitled "*Proposal No. 1 — Approval of the Business Combination — Related Agreements — Sponsor Agreement*". The Sponsor has agreed not to transfer any unvested Earnout Founder Shares prior to the date such securities become vested.

2

- Our management and Board considered various factors in determining whether to approve the Merger Agreement and the Business Combination. For more information about our decision-making process, see the section entitled "*Proposal No. 1 — Approval of the Business Combination — The Company's Board of Directors' Reasons for the Approval of the Business Combination.*"

- Pursuant to our current certificate of incorporation, in connection with the Business Combination, holders of our public shares may elect to have their public shares redeemed for cash at the applicable redemption price per share calculated in accordance with our current certificate of incorporation. As of June 30, 2020, the estimated per share redemption price would have been approximately $10.24. If a holder exercises its redemption rights, then such holder will be exchanging its shares of our common stock for cash and will no longer own shares of the post-combination company and will not participate in the future growth of the post-combination company, if any. Such a holder will be entitled to receive cash for its public shares only if it properly demands redemption and delivers its shares (either physically or electronically) to our Transfer Agent, Continental Stock Transfer & Trust Company, at least two business days prior to the Special Meeting. Please see the section entitled "*Special Meeting of Company Stockholders — Redemption Rights.*"

- In addition to voting on the proposal to adopt the Merger Agreement and approve the transactions contemplated thereunder, including the Business Combination, at the Special Meeting, the stockholders of the Company will be asked to vote on:

  *Proposal No. 2 — The NYSE Stock Issuance Proposal* — To approve, for purposes of complying with applicable listing rules of the NYSE, the issuance of more than 20% of the Company's outstanding common stock in connection with the Business Combination and the Subscription Agreements, including up to 15,000,000 shares of our common stock to the PIPE Investors, including our Sponsor which subscribed for 950,000 shares of common stock, and up to 148,453,811 shares of our common stock to Velodyne equity holders;

  *Proposal No. 3 — The Charter Approval Proposal* — To adopt the proposed Amended and Restated Certificate of Incorporation of the Company in the form attached hereto as Annex B;

  *Proposal No. 4 — Governance Proposal* — To approve, on a non-binding advisory basis, a separate proposal with respect to certain governance provisions in the Amended and Restated Certificate of Incorporation in accordance with SEC requirements;

  *Proposal No. 5 — Incentive Plan Proposal* — To approve the Incentive Plan, including the authorization of the initial share reserve under the Incentive Plan;

  *Proposal No. 6 — ESPP Proposal* — To approve the ESPP, including the authorization of the initial share reserve under the ESPP; and

  *Proposal No. 7 — Adjournment Proposal* — To approve, if necessary, the adjournment of the Special Meeting to a later date or dates to permit further solicitation and votes of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Approval Proposal, the Incentive Plan Proposal or the ESPP Proposal. This proposal will only be presented at the Special Meeting if there are not sufficient votes to approve the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Approval Proposal, the Incentive Plan Proposal or the ESPP Proposal.

- Please see the sections entitled "*Proposal No. 1 — Approval of the Business Combination,*" "*Proposal No. 2 — The NYSE Stock Issuance Proposal,*" "*Proposal No. 3 — The Charter Approval Proposal,*" "*Proposal No. 4 — Approval of Certain Governance Provisions in the Amended and Restated Certificate of Incorporation,*" "*Proposal No. 5 — Approval of the Incentive Plan,*" "*Proposal No. 6 — Approval of the ESPP,*" and "*Proposal No. 7 — The Adjournment Proposal.*" Proposals in this proxy statement (other than the Governance Proposal and the Adjournment Proposal) are conditioned on the approval of the Business Combination Proposal.

3

- The Merger Agreement may be terminated at any time prior to the consummation of the Business Combination upon agreement of the parties thereto, or by the Company or Velodyne in specified circumstances. For more information about the termination rights under the Merger Agreement, please see the section entitled "*Proposal No. 1 — Approval of the Business Combination — The Merger Agreement — Termination.*"

- The proposed Business Combination involves numerous risks. For more information about these risks, please see the section entitled "*Risk Factors.*"

- In considering the recommendation of our Board to vote in favor of the Business Combination, stockholders should be aware that aside from their interests as stockholders, our Sponsor and certain members of our Board and officers have interests in the Business Combination that are different from, or in addition to, those of other stockholders generally. Our Board was aware of and considered these interests, among other matters, in evaluating and negotiating the Business Combination, and in recommending to stockholders that they approve the Business Combination. Stockholders should take these interests into account in deciding whether to approve the Business Combination. These interests include, among other things:

  - the fact that our Initial Stockholders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve the Business Combination;

  - the fact that our Sponsor will retain 2,507,000 Founder Shares upon the Closing, 275,000 of which shall be Earnout Founder Shares subject to certain vesting and cancellation provisions as described in the Sponsor Agreement, which if unrestricted and freely tradable would be valued at approximately $[•] based on the closing price of our common stock on NYSE on [•], 2020 but, given the restrictions on such shares, we believe such shares have less value;

  - the fact that our Initial Stockholders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete an initial business combination by the applicable deadline;

  - if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party (other than our independent public accountants) for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

  - the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

  - the fact that James Graf will join as a board member of the post-combination company and Michael Dee will continue as a board member of the post-combination company, and each shall be entitled to receive compensation for serving on the board of directors of the post-combination company;

  - the fact that our Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the applicable deadline; and

  - that the Sponsor has entered into a Subscription Agreement with the Company, pursuant to which the Sponsor has committed to purchase 950,000 shares of common stock in the PIPE Investment for an aggregate commitment of approximately $9,500,000.

4

## SUMMARY OF THE PROXY STATEMENT

This summary highlights selected information contained in this proxy statement and does not contain all of the information that may be important to you. You should carefully read this entire proxy statement, including the Annexes and accompanying financial statements of the Company and Velodyne, to fully understand the proposed Business Combination (as described below) before voting on the proposals to be considered at the Special Meeting (as described below). Please see the section entitled "*Where You Can Find More Information*" beginning on page 264 of this proxy statement.

Unless otherwise specified, all share calculations assume: (i) no exercise of redemption rights by the Company's public stockholders; (ii) no inclusion of any shares of common stock issuable upon the exercise of the Company's warrants or any shares to be issued pursuant to the Incentive Plan or the ESPP at or following the Closing; (iii) an equity raise of approximately $150,000,000 of gross proceeds from the PIPE Investment of 15,000,000 shares of common stock at $10.00 per share; and (iv) no issuance of the earn-out shares to Velodyne equity holders upon satisfaction of the earn-out conditions.

**Parties to the Business Combination**

### The Company

The Company is a blank check company incorporated as a Delaware corporation and formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

The mailing address of the Company's principal executive office is 118 Vintage Park Blvd, Suite W-222, Houston, Texas 77070.

### Merger Sub

Merger Sub, a Delaware corporation, is a wholly-owned subsidiary of the Company, formed by the Company in June 2020, to consummate the Business Combination. In the Business Combination, Merger Sub will merge with and into Velodyne, with Velodyne continuing as the surviving corporation.

The mailing address of Merger Sub's principal executive office is 118 Vintage Park Blvd, Suite W-222, Houston, Texas 77070.

### Velodyne

Velodyne is the global leader in lidar technology providing real-time 3D vision for autonomous systems, which Velodyne calls smart vision. Velodyne's smart vision solutions are advancing the development of safe automated systems throughout the world, thereby empowering the autonomous revolution by allowing machines to see their surroundings. In automotive applications, Velodyne's products improve roadway safety by providing perception data for reliable object avoidance and safe path-planning. Velodyne has a vision called LIVE, Lidar In Vehicles Everywhere, which encompasses a mass-produced lower cost lidar sold for every model of car and truck. Velodyne believes safety on the roadways is for everyone. To improve roadway, bicycle, and pedestrian safety, Velodyne sells automotive solutions to the rapidly expanding ADAS market, which will incrementally address the requirements of the NHTSA 5-Star Safety Ratings System. Velodyne's lidar-based smart vision solutions are also deployed in many non-automotive applications, such as autonomous mobile robots, UAVs, last-mile delivery, precision agriculture, advanced security systems, and smart city initiatives, among others. Velodyne's first products were commercially available in 2010. Since then, Velodyne has shipped over 40,000 units and generated cumulative sales of over $570 million. While purchases have been primarily focused on R&D projects, several of Velodyne's non-automotive customers are in commercial production with their offerings. Velodyne estimates that Velodyne is addressing a market opportunity for its technology solutions of approximately $11.9 billion in 2022, with roughly 60% attributable to automotive applications. Velodyne believes that it is approaching the inflection point of adoption of lidar solutions across multiple end markets and that Velodyne is well-positioned, with strong customer relationships and a growing government interest in urban safety, to take advantage of these opportunities.

The mailing address of Velodyne's principal executive office is 5521 Hellyer Avenue, San Jose, CA 95138, and its telephone number is (669) 275-2251.

For more information about Velodyne, please see the sections entitled "*Velodyne's Management's Discussion and Analysis of Financial Condition and Results of Operations*," "*Velodyne's Business*" and "*Management after the Business Combination*."

**The Business Combination Proposal**

On July 2, 2020, the Company and Merger Sub entered into the Merger Agreement with Velodyne. If the Merger Agreement is adopted by Velodyne stockholders and the Merger Agreement is approved by Company stockholders at the Special Meeting, Merger Sub will merge with and into Velodyne, with Velodyne surviving the merger. For more information about the transactions contemplated by the Merger Agreement, please see the section entitled "*Proposal No. 1 — Approval of the Business Combination.*" A copy of the Merger Agreement is attached to this proxy statement as Annex A.

**Merger Consideration to the Velodyne shareholders**

Subject to the terms of the Merger Agreement and customary adjustments, at the effective time of the Business Combination, each share of Velodyne capital stock issued and outstanding immediately prior to the effective time of the Business Combination (other than shares owned by Velodyne as treasury stock or dissenting shares) will convert into a number of shares of Company common stock set forth in the Merger Agreement (the "*merger consideration*"), which aggregate amount, together with all payments made with respect to all vested Velodyne equity awards, shall not exceed 148,453,811 shares of Company common stock. The consideration to be paid to the holders of shares of Velodyne capital stock and Velodyne equity awards may be increased by a total of up to 2,000,000 shares of Company common stock in earnout consideration (including in the form of awards of RSUs settleable in Company common stock) if (i) on any date prior to the Closing, or (ii) during the period from the date of the Merger Agreement until six months following the Closing, the closing price of Company common stock equals or exceeds $15.00 for 20 trading days out of any 30 trading-day period. In addition, upon the effective time, each outstanding and unsettled restricted stock unit in respect of shares of Velodyne capital stock, option to purchase Velodyne capital stock and unvested restricted share of Velodyne capital stock will be rolled over into restricted stock units, options, or restricted shares, respectively, of Company common stock in accordance with the terms of the Merger Agreement.

**Related Agreements**

This section describes the material provisions of the Related Agreements, but does not purport to describe all of the terms thereof. The following summary is qualified in its entirety by reference to the complete text of each of the Related Agreements. The Sponsor Agreement, the Support Agreement and the Subscription Agreement are attached hereto as E, F and G, respectively. Stockholders and other interested parties are urged to read such Related Agreements in their entirety prior to voting on the proposals presented at the Special Meeting.

*Sponsor Agreement*

Pursuant to the terms of a sponsor agreement (the "*Sponsor Agreement*") entered into with the Company and Velodyne, the Sponsor has agreed to vote any Founder Shares held by the Sponsor in favor of all of the proposals set forth in this proxy statement. The Sponsor and its permitted transferees own approximately 34.3% of the Company's common stock entitled to vote thereon. The quorum and voting thresholds at the Special Meeting and the Sponsor Agreement may make it more likely that the Company will consummate the Business Combination. In addition, pursuant to the terms of the Sponsor Agreement, the Sponsor has agreed to waive their redemption rights with respect to any Founder Shares held by them in connection with the completion of the Business Combination.

The Sponsor Agreement provides that, immediately prior to the Closing, and conditioned and effective upon the Closing, 3,519,128 Founder Shares and all of the private placement warrants, in each case held by the Sponsor immediately prior to the Closing, will be automatically cancelled, for no consideration, and

shall no longer be outstanding. As a result of such cancellation, the Sponsor will, as of the Closing, be the record owner of 2,507,000 Founder Shares, including 275,000 that shall be deemed "Earnout Founder Shares". The Earnout Founder Shares shall be unvested at closing and shall be subject to the vesting and cancellation provisions described in the section entitled "*Proposal No. 1 — Approval of the Business Combination — Related Agreements — Sponsor Agreement*". The Sponsor has agreed not to transfer any unvested Earnout Founder Shares prior to the date such securities become vested.

### *Support Agreement*

Pursuant to the terms of a support agreement (the "*Support Agreement*") entered into with the Company and Merger Sub, David Hall has agreed to vote all shares of Velodyne capital stock held by Mr. Hall or with respect to which Mr. Hall has the right to vote by proxy in favor of the Business Combination and the adoption of the Merger Agreement. The Support Agreement also prohibits Mr. Hall from engaging in activities that have the effect of soliciting a competing proposal.

### *Subscription Agreements*

In connection with the Business Combination, the Company entered into the Subscription Agreements with the PIPE Investors, pursuant to which, among other things, the Company agreed to issue and sell to the PIPE Investors, in private placements to close immediately prior to the Closing, an aggregate of 15,000,000 shares of common stock at $10.00 per share, for an aggregate purchase price of $150,000,000. The obligations to consummate the subscriptions are conditioned upon, among other things, customary closing conditions and the consummation of the transactions contemplated by the Merger Agreement. The PIPE Investment will be consummated substantially concurrently with the Closing.

### Incentive Plan

Our Board approved the Incentive Plan on [•], 2020, subject to stockholder approval of the Incentive Plan at the Special Meeting. The purpose of the Incentive Plan is to promote our long-term success of the Company and the creation of stockholder value by encouraging service providers to focus on critical long-range corporate objectives, encouraging the attraction and retention of service providers with exceptional qualifications and linking service providers directly to stockholder interests through increased stock ownership. These incentives are provided through the grant of stock options, including incentive stock options, and nonqualified stock options, stock appreciation rights, restricted stock, and restricted stock units. For more information about the Incentive Plan, please see the section entitled "*Proposal No. 5 — Approval of the Incentive Plan — Summary of the Incentive Plan.*"

### Employee Stock Purchase Plan

Our Board approved the ESPP on [•], 2020, subject to stockholder approval of the ESPP at the Special Meeting. The purpose of the ESPP Proposal is to provide eligible employees with an opportunity to increase their proprietary interest in the success of the Company by purchasing common stock on favorable terms and to pay for such purchases through payroll deductions. The Company believes by providing eligible employees with an opportunity to increase their proprietary interest in the success of the Company, the ESPP will motivate participants to offer their maximum effort to the Company and help focus them on the creation of long-term value consistent with the interests of the Company's stockholders. For more information about the Incentive Plan, please see the section entitled "*Proposal No. 6 — Approval of the ESPP.*"

### Redemption Rights

Pursuant to our current certificate of incorporation, holders of public shares may elect to have their shares redeemed for cash at the applicable redemption price per share equal to the quotient obtained by dividing (i) the aggregate amount on deposit in the Trust Account as of two business days prior to the consummation of the Business Combination, including interest not previously released to the Company to pay its franchise and income taxes, by (ii) the total number of then-outstanding public shares; provided that the Company will not redeem any shares of common stock issued in the IPO to the extent that such redemption would result in the Company's failure to have net tangible assets (as determined in accordance

with Rule 3a51-1(g)(1) of the Exchange Act) in excess of $5,000,000. As of June 30, 2020, the estimated per share redemption price would have been approximately $10.24.

If a holder exercises its redemption rights, then such holder will be exchanging its shares of our common stock for cash and will no longer own shares of the post-combination company. Such a holder will be entitled to receive cash for its public shares only if it properly demands redemption and delivers its shares (either physically or electronically) to our Transfer Agent in accordance with the procedures described herein. Please see the section entitled "*Special Meeting of Company Stockholders — Redemption Rights*" for the procedures to be followed if you wish to redeem your shares for cash. Any request for redemption may be withdrawn until the deadline for submitting redemption requests and thereafter, with our consent, until the Closing.

**Impact of the Business Combination on the Company's Public Float**

It is anticipated that, upon completion of the Business Combination, assuming no redemptions: (i) the Company's public stockholders will retain an ownership interest of approximately 6.7% in the post-combination company (not including shares beneficially owned by our Sponsor); (ii) the PIPE Investors will own approximately 8.7% of the post-combination company (such that public stockholders, including PIPE Investors, will own approximately 15.4% of the post-combination company); (iii) our Initial Stockholders (including our Sponsor) will own approximately 1.3% of the post-combination company; and (iv) the former Velodyne equity holders will own approximately 83.3% of the post-combination company, assuming $50,000,000 of cash is used to repurchase Velodyne shares. The PIPE Investors have agreed to purchase 15,000,000 shares of common stock in the aggregate, for $150,000,000 of gross proceeds. The ownership percentage with respect to the post-combination company following the Business Combination does not take into account (i) warrants to purchase common stock that will remain outstanding immediately following the Business Combination, (ii) the issuance of the earn-out shares to the Velodyne equity holders or our Sponsor should the earn-out conditions in the Merger Agreement be satisfied or (iii) the issuance of any shares upon completion of the Business Combination under the Incentive Plan and the ESPP, copies of which are attached to this proxy statement as Annex F and Annex G, respectively. If the actual facts are different than these assumptions, the percentage ownership retained by the Company's existing stockholders in the post-combination company will be different. For more information, please see the sections entitled "*Summary of the Proxy Statement — Impact of the Business Combination on the Company's Public Float,*" "*Unaudited Pro Forma Condensed Combined Financial Information,*" "*Proposal No. 5 — Approval of the Incentive Plan*" and "*Proposal No. 6 — Approval of the ESPP.*"

The following table illustrates varying ownership levels in the Company, assuming no redemptions by the Company's public stockholders and the maximum redemptions by the Company's stockholders:

|  | No Redemptions | 6,572,424 shares of common stock redeemed |
| --- | --- | --- |
| The Company's public stockholders | 6.7% | 2.9% |
| PIPE Investors | 8.7% | 9.1% |
| Initial Stockholders | 1.3% | 1.4% |
| The former Velodyne equity holders[1] | 83.3% | 86.6% |
|  | 100% | 100% |

(1) Assumes $50,000,000 of cash is used to repurchase Velodyne shares.

Please see "Unaudited Pro Forma Condensed Combined Financial Information — Description of the Business Combination" on page 83.

**The Charter Approval Proposal**

Upon the Closing, our current certificate of incorporation will be amended promptly to reflect the Charter Approval Proposal to:

- change the post-combination company's name to Velodyne Lidar, Inc.;

- delete provisions relating to our status as a blank check company;

- increase the total number of authorized shares of common stock to 2,250,000,000 shares and the total number of authorized shares of preferred stock to 25,000,000 shares;

- change the stockholder vote required to 66⅔% in voting power of the stock of the post-combination company in order for stockholders to amend certain provisions of our Amended and Restated Certificate of Incorporation;

- provide that certain transactions are not "corporate opportunities"; and

- provide that the post-combination company will not be governed by Section 203 of the DGCL and, instead, include a provision in the Amended and Restated Certificate of Incorporation that is substantially similar to Section 203 of the DGCL, and to make certain related changes.

Please see the section entitled "*Proposal No. 3 — The Charter Approval Proposal*" for more information.

**Other Proposals**

In addition, the stockholders of the Company will be asked to vote on:

- a proposal to approve, for purposes of complying with applicable NYSE Listing Rules, the issuance of more than 20% of the Company's issued and outstanding common stock pursuant to the Business Combination and the PIPE Investment (Proposal No. 2);

- a separate proposal to approve, on a non-binding advisory basis, certain governance provisions in the Amended and Restated Certificate of Incorporation in accordance with SEC requirements (Proposal No. 4);

- a proposal to approve and adopt the Incentive Plan, a copy of which is attached to this proxy statement as Annex F, including the authorization of the initial share reserve under the Incentive Plan (Proposal No. 5);

- a proposal to approve and adopt the ESPP, a copy of which is attached to this proxy as Annex G, including the authorization of the initial share reserve under the ESPP (Proposal No. 6); and

- a proposal to adjourn the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Approval Proposal, the Incentive Plan Proposal or the ESPP Proposal (Proposal No.7).

Please see the section entitled "*Proposal No. 2 — The NYSE Stock Issuance Proposal*," "*Proposal No. 4 — Approval of Certain Governance Provisions in the Amended and Restated Certificate of Incorporation*," "*Proposal No. 5 — Approval of the Incentive Plan*," "*Proposal No. 6 — Approval of the ESPP*," and "*Proposal No. 7 — The Adjournment Proposal*" for more information.

**Date and Time of Special Meeting**

The Special Meeting will be held on [•], 2020 at [•] Eastern time at https://[•], or at such other date, time and place to which such meeting may be adjourned or postponed, to consider and vote upon the proposals. The Special Meeting will be conducted exclusively via live webcast and so stockholders will not be able to attend the meeting in person. Stockholders may attend the special meeting online and vote at the Special Meeting by visiting https://[•] and entering your 12-digit control number, which is either included on the proxy card you received or obtained through Continental Stock Transfer & Trust Company.

**Registering for the Special Meeting**

Any stockholder wishing to attend the virtual meeting should register for the meeting by [•], 2020 at https://[•]. To register for the Special Meeting, please follow these instructions as applicable to the nature of your ownership of our common stock:

28

- If your shares are registered in your name with Continental Stock Transfer & Trust Company and you wish to attend the online-only Special Meeting, go to https://[•], enter the 12-digit control number included on your proxy card or notice of the meeting and click on the "Click here to preregister for the online meeting" link at the top of the page. Just prior to the start of the meeting you will need to log back into the meeting site using your control number. Pre-registration is recommended but is not required in order to attend.

- Beneficial stockholders (those holding shares through a stock brokerage account or by a bank or other holder of record) who wish to attend the virtual meeting must obtain a legal proxy by contacting their account representative at the bank, broker, or other nominee that holds their shares and e-mail a copy (a legible photograph is sufficient) of their legal proxy to proxy@continentalstock.com. Beneficial stockholders who e-mail a valid legal proxy will be issued a 12-digit meeting control number that will allow them to register to attend and participate in the Special Meeting. After contacting Continental Stock Transfer & Trust Company, a beneficial holder will receive an e-mail prior to the meeting with a link and instructions for entering the virtual meeting. Beneficial stockholders should contact Continental Stock Transfer & Trust Company at least five (5) business days prior to the meeting date in order to ensure access.

**Voting Power; Record Date**

Only Company stockholders of record at the close of business on [•], 2020, the record date for the Special Meeting, will be entitled to vote at the Special Meeting. You are entitled to one vote for each share of Company common stock that you owned as of the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker, bank or other nominee to ensure that votes related to the shares you beneficially own are properly counted. On the record date, there were 17,549,365 shares of Company common stock outstanding and entitled to vote, of which 11,455,237 are public shares and 6,094,128 are Founder Shares held by our Initial Stockholders.

**Accounting Treatment**

The Business Combination will be accounted for as a reverse recapitalization in accordance with GAAP. Under this method of accounting, the Company will be treated as the "acquired" company for financial reporting purposes. Accordingly, for accounting purposes, the Business Combination will be treated as the equivalent of Velodyne issuing stock for the net assets of the Company, accompanied by a recapitalization whereby no goodwill or other intangible assets are recorded.

**Appraisal Rights**

Appraisal rights are not available to our stockholders in connection with the Business Combination.

**Proxy Solicitation**

The Company is soliciting proxies on behalf of its Board. Proxies may be solicited by mail. The Company has engaged Morrow to assist in the solicitation of proxies.

If a stockholder grants a proxy, it may still vote its shares at the Special Meeting if it revokes its proxy before the Special Meeting. A stockholder may also change its vote by submitting a later-dated proxy, as described in the section entitled "*Special Meeting of Company Stockholders — Revoking Your Proxy*."

**Interests of Certain Persons in the Business Combination**

In considering the recommendation of our Board to vote in favor of the Business Combination, stockholders should be aware that aside from their interests as stockholders, our Sponsor and certain members of our Board and officers have interests in the Business Combination that are different from, or in addition to, those of other stockholders generally. Our Board was aware of and considered these interests, among other matters, in evaluating and negotiating the Business Combination, and in recommending to stockholders that they approve the Business Combination. Stockholders should take these interests into account in deciding whether to approve the Business Combination.

These interests include, among other things:

- the fact that our Initial Stockholders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve the Business Combination;

- the fact that our Sponsor will retain 2,507,000 Founder Shares upon the Closing, 275,000 of which shall be Earnout Founder Shares subject to certain vesting and cancellation provisions as described in the Sponsor Agreement, which if unrestricted and freely tradable would be valued at approximately $[•] based on the closing price of our common stock on NYSE on [•], 2020 but, given the restrictions on such shares, we believe such shares have less value;

- the fact that our Initial Stockholders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete an initial business combination by the applicable deadline;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party (other than our independent public accountants) for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that James Graf will join as a board member of the post-combination company and Michael Dee will continue as a board member of the post-combination company, and each shall be entitled to receive compensation for serving on the board of directors of the post-combination company;

- the fact that our Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the applicable deadline; and

- that the Sponsor has entered into a Subscription Agreement with the Company, pursuant to which the Sponsor has committed to purchase 950,000 shares of common stock in the PIPE Investment for an aggregate commitment of approximately $9,500,000.

**Reasons for the Approval of the Business Combination**

We were formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses. We sought to do this by utilizing the networks and industry experience of both our Sponsor and our Board to identify, acquire and operate one or more businesses within or outside of the United States, although we were not limited to a particular industry or sector.

In particular, our Board considered the following positive factors, although not weighted or in any order of significance:

- ***Leading Industry Position with Supportive Long-Term Dynamics and Competitive Market Advantage.*** The Board considered the fact that Velodyne, with its estimated 70% market share and deep, defendable competitive moats, satisfies all of the factors contributing to sustainable competitive advantages that the Board sought in a target.

- ***Stable Free Cash Flow, Prudent Debt and Financial Visibility.*** The Board considered that Velodyne has no debt, limited capital expenditures, with a path to delivering positive cash flow in 2022, and therefore satisfies the Board's criteria of acquiring a business that has historically generated, or has the near-term potential to generate, strong and sustainable free cash flow.

- ***Clear Use of Proceeds and SPAC as Preferred Course of Action.*** The Board considered that a SPAC transaction is Velodyne's preferred course of action, as opposed to a traditional initial public offering,

30

because Velodyne can provide forward-looking guidance and talk more directly about projections for future years that are backed by existing customer contracts. As a result, Velodyne's ability to become a publicly-traded company is accelerated through a SPAC, and the proceeds raised in the Business Combination will fund Velodyne to positive cash flow and enable selective acquisitions.

- ***Committed and Capable Management Team.*** The Board considered that Velodyne has a professional management team whose interests are aligned with those of our stockholders and can clearly and confidently articulate the business plan and market opportunities to public market investors. Founder and Executive Chairman David Hall is an industry icon having invented real-time 3D lidar in 2005. Velodyne CEO Dr. Anand Gopalan has a long history with Velodyne and as former company CTO has a deep understanding of the technology, the products and the manufacturing process. CFO Andrew Hamer has public company finance experience. Additionally, Velodyne has significant management strength and depth in R&D, manufacturing, sales and marketing.

- ***Potential to Grow, including Through Further Acquisition Opportunities.*** The Board considered that Velodyne has the potential to grow organically and inorganically through additional acquisitions. In particular, Velodyne is in an industry with significant opportunities and rationale for industry consolidation, with Velodyne having completed the acquisition of mapper.ai in 2019 and identifying a number of prospective targets to pursue after the Closing.

- ***Preparedness for the Process and Public Markets.*** The Board considered that Velodyne has in place the governance, financial systems and controls required in the public markets, including that Velodyne has been planning its initial public offering for over a year and had already prepared SEC compliant financial statements and disclosure, as well as corporate governance, financial systems and controls in place to operate as a public company.

For more information about our decision-making process, please see the section entitled "*Proposal No. 1 — Approval of the Business Combination — The Company's Board of Directors' Reasons for the Approval of the Business Combination.*"

**Conditions to Closing of the Business Combination**

*Conditions to Each Party's Obligations*

The respective obligations of the Company and Velodyne to complete the Business Combination are subject to the satisfaction of the following conditions:

- the applicable waiting period(s) under the HSR Act and, if required, any other applicable antitrust law in respect of the transactions contemplated by the Merger Agreement must have expired or been terminated;

- there must not be in effect any governmental order, statute, rule or regulation enjoining or prohibiting the consummation of the transactions contemplated by the Merger Agreement;

- the redemption offer in relation to the public shares must have been completed in accordance with the terms of the Merger Agreement and this proxy statement;

- the approval by the Company stockholders of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Approval Proposal and the Incentive Plan Proposal shall have been obtained;

- the Company common stock to be issued in connection with the Business Combination (including the Company common stock to be issued pursuant to payment of the earnout consideration) must have been approved for listing on the NYSE, subject only to official notice of issuance thereof;

- the approval by the Company stockholders by the requisite vote to extend the deadline for the Company to consummate its initial business combination beyond July 31, 2020 and certain other matters presented for stockholder approval in connection with such extension, as more fully described in "*The Merger Agreement — Conditions to the Merger*" on page 119; and

- the approval of the Merger Agreement and the transactions contemplated by the Merger Agreement by the requisite vote of the Velodyne stockholders, as more fully described in "*Proposal No. 1 — Approval of the Business Combination — The Merger Agreement — Conditions to the Merger*" on page 119.

*Conditions to the Company's Obligations*

The obligation of the Company to complete the Business Combination is also subject to the satisfaction, or waiver by the Company, of the following conditions:

- the accuracy of the representations and warranties of Velodyne as of the date of the Merger Agreement and as of the Closing, subject to certain materiality and material adverse effect thresholds, as more fully described in "*Proposal No. 1 — Approval of the Business Combination — The Merger Agreement — Conditions to the Merger*" on page 119;

- each of the covenants of Velodyne to be performed or complied with as of or prior to the Closing must have been performed or complied with in all material respects;

- no material adverse effect must have occurred since the date of the Merger Agreement that is continuing;

- Velodyne must have delivered a certificate signed by an officer of Velodyne certifying that the three preceding conditions have been satisfied;

- the transactions contemplated by the Subscription Agreements must be consummated concurrently with the Closing;

- certain specified individuals must have entered into employment agreements with the Company or Velodyne on terms and conditions reasonably satisfactory to the Company (but no less favorable to such employees than their current employment arrangements);

- certain specified contracts must have been terminated;

- Velodyne must have provided evidence reasonably satisfactory to the Company that a valid exemption from the registration requirement under the Securities Act is available for the delivery of the shares of Company common stock to the Velodyne equity holders pursuant to the Merger Agreement; and

- Velodyne must have provided evidence reasonably satisfactory to the Company that each holder of Velodyne capital stock that is a party to the IRA (as defined in the Merger Agreement) is bound by a customary "lockup" restricting the transfer, sale and conveyance of the shares of Company common stock to be issued in connection with the Merger Agreement for a period of six months following the Closing, all in a form reasonably acceptable to the Company.

*Conditions to Velodyne's Obligations*

The obligation of Velodyne to complete the merger is also subject to the satisfaction, or waiver by Velodyne, of the following conditions:

- the accuracy of the representations and warranties of the Company as of the date of the Merger Agreement and as of the Closing, subject to certain materiality and material adverse effect thresholds, as more fully described in "*Proposal No. 1 — Approval of the Business Combination — The Merger Agreement — Conditions to the Merger*" on page 119;

- each of the covenants of the Company to be performed or complied with as of or prior to the Closing must have been performed or complied with in all material respects;

- the Company must have delivered a certificate signed by an officer of the Company, dated as of the Closing, certifying that, to the knowledge and belief of such officer, the two preceding conditions have been fulfilled;

- the existing charter of the Company must be amended and restated to reflect the form attached to this proxy as Annex B; and

- Graf must have delivered to Velodyne evidence that, immediately after the Closing (and for the avoidance of doubt, without deducting or taking into account any liabilities, expenses or other deductions, including the Company Redemption Amount (as defined in the Merger Agreement), any transaction expenses of Velodyne or the Company, the Warrant Restructuring (as defined in the Merger Agreement) or any other payable or deductions that is expected to occur at or after the Closing), the funds in the Trust Account, together with the funding of any amounts payable under the Subscription Agreements, will be no less than an aggregate amount of $200,000,000.

**Regulatory Matters**

Under the HSR Act and the rules that have been promulgated thereunder by the U.S. Federal Trade Commission ("*FTC*"), certain transactions may not be consummated unless information has been furnished to the Antitrust Division of the Department of Justice ("*Antitrust Division*") and the FTC and certain waiting period requirements have been satisfied. The Business Combination is subject to these requirements and may not be completed until the expiration of a 30-day waiting period following the filing of the required Notification and Report Forms with the Antitrust Division and the FTC or until early termination is granted. If the FTC or the Antitrust Division makes a request for additional information or documentary material related to the Business Combination (a "*Second Request*"), the waiting period with respect to the Business Combination will be extended for an additional period of 30 calendar days, which will begin on the date on which the Company and Velodyne each certify compliance with the Second Request. Complying with a Second Request can take a significant period of time. On [•], the Company and Velodyne filed the required forms under the HSR Act with the Antitrust Division and the FTC. The 30-day waiting period with respect to the Business Combination, which cannot expire on a Saturday, Sunday or a U.S. federal holiday, is expected to expire at 11:59 p.m. Eastern time on [•] unless the FTC and the Antitrust Division earlier terminate the waiting period or issue a Second Request.

At any time before or after consummation of the Business Combination, notwithstanding any termination of the waiting period under the HSR Act, the applicable competition authorities could take such action under applicable antitrust laws as each deems necessary or desirable in the public interest, including seeking to enjoin the consummation of the Business Combination. Private parties may also seek to take legal action under the antitrust laws under certain circumstances. We cannot assure you that the Antitrust Division, the FTC, any state attorney general, or any other government authority will not attempt to challenge the Business Combination on antitrust grounds, and, if such a challenge is made, we cannot assure you as to its result. Neither the Company nor Velodyne is aware of any material regulatory approvals or actions that are required for completion of the Business Combination other than the expiration or early termination of the waiting period under the HSR Act. It is presently contemplated that if any such additional regulatory approvals or actions are required, those approvals or actions will be sought. There can be no assurance, however, that any additional approvals or actions will be obtained.

**Quorum and Required Vote for Proposals for the Special Meeting**

A quorum of Company stockholders is necessary to hold a valid meeting. A quorum will be present at the Special Meeting if a majority of the common stock outstanding on the record date and entitled to vote at the Special Meeting is represented in person or by proxy. Abstentions will count as present for the purposes of establishing a quorum.

The approval of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Governance Proposal, which is a non-binding advisory vote, the Incentive Plan Proposal, the ESPP Proposal and the Adjournment Proposal requires the affirmative vote of a majority of the votes cast by holders of our common stock represented in person or by proxy and entitled to vote at the Special Meeting. The approval of the Charter Approval Proposal requires the affirmative vote of holders of a majority of our outstanding shares of common stock entitled to vote thereon at the Special Meeting.

A failure to vote or an abstention will have no effect on the Business Combination Proposal, the Governance Proposal, and the Adjournment Proposal. However, an abstention or failure to vote will have the same effect as a vote "**AGAINST**" the Charter Approval Proposal. In addition, for purposes of the NYSE Stock Issuance Proposal, the Incentive Plan Proposal and the ESPP Proposal, the NYSE considers an

abstention vote as a "vote cast", and therefore, an abstention will have the same effect as a vote **"AGAINST"** such proposals, while a failure to vote will have no effect on these two proposals.

The proposals in this proxy statement (other than the Governance Proposal and the Adjournment Proposal) are conditioned on the approval of the Business Combination Proposal and the NYSE Stock Issuance Proposal.

It is important for you to note that in the event that the Business Combination Proposal, the NYSE Stock Issuance Proposal or the Charter Approval Proposal do not receive the requisite vote for approval, we will not consummate the Business Combination. If we do not consummate the Business Combination and fail to complete an initial business combination by the applicable deadline, we will be required to dissolve and liquidate our Trust Account by returning the then remaining funds in such account to our public stockholders.

**Recommendation to Company Stockholders**

**Our Board believes that each of the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Approval Proposal, the Governance Proposal, the Incentive Plan Proposal, the ESPP Proposal and the Adjournment Proposal to be presented at the Special Meeting is in the best interests of the Company and our stockholders and recommends that its stockholders vote "FOR" each of the proposals.**

When you consider the recommendation of our Board in favor of approval of the Business Combination Proposal, you should keep in mind that our Sponsor and certain members of our Board and officers have interests in the Business Combination that are different from or in addition to (or which may conflict with) your interests as a stockholder. Stockholders should take these interests into account in deciding whether to approve the proposals presented at the Special Meeting, including the Business Combination Proposal. Please see "*Special Meeting of Company Stockholders — Recommendation to Company Stockholders*."

**Risk Factors**

In evaluating the Business Combination and the proposals to be considered and voted on at the Special Meeting, you should carefully review and consider the risk factors set forth under the section entitled "*Risk Factors*" beginning on page 42 of this proxy statement. The occurrence of one or more of the events or circumstances described in that section, alone or in combination with other events or circumstances, may have a material adverse effect on (i) the ability of the Company and Velodyne to complete the Business Combination, and (ii) the business, cash flows, financial condition and results of operations of Velodyne prior to the consummation of the Business Combination and the post-combination company following consummation of the Business Combination.

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This proxy statement contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, including with respect to the anticipated timing, completion and effects of the Business Combination. These statements are based on the current expectations and beliefs of management of the Company and Velodyne, and are subject to a number of factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These forward-looking statements include statements about future financial and operating results of Velodyne; benefits of the Business Combination; statements of the plans, strategies and objectives of management for future operations of Velodyne; statements regarding future economic conditions or performance; and other statements regarding the Business Combination. Forward-looking statements may contain words such as "will be," "will," "expect," "anticipate," "continue," "project," "believe," "plan," "could," "estimate," "forecast," "guidance," "intend," "may," "plan," "possible," "potential," "predict," "pursue," "should," "target" or similar expressions, and include the assumptions that underlie such statements. The following factors, among others, could cause actual results to differ materially from those described in the forward-looking statements:

**Operating Factors:**

- Velodyne's future performance, including Velodyne's projected revenue, costs of revenue, gross profit or gross margin, and operating expenses;

- the sufficiency of Velodyne's cash and cash equivalents to meet its operating requirements;

- Velodyne's ability to sell its products to new customers;

- the success of Velodyne's customers in developing and commercializing products using Velodyne's solutions, and the market acceptance of those products;

- the amount and timing of future sales;

- Velodyne's future market share;

- Competition from existing or future businesses and technologies;

- the impact of the COVID-19 pandemic on Velodyne's business and the business of its customers;

- the market for and adoption of lidar and related technology;

- Velodyne's ability to effectively manage its growth and future expenses;

- Velodyne's ability to compete in a market that is rapidly evolving and subject to technological developments;

- Velodyne's estimated total addressable market and the market for autonomous solutions;

- Velodyne's ability to maintain, protect, and enhance its intellectual property;

- Velodyne's ability to comply with modified or new laws and regulations applying to its business;

- the attraction and retention of qualified employees and key personnel;

- Velodyne's ability to introduce new products that meet its customers' requirements and to continue successfully transitioning the manufacturing of its products to third-party manufacturers;

- Velodyne's anticipated investments in and results from sales and marketing and R&D;

- the increased expenses associated with Velodyne being a public company; and

- our use of the net proceeds from the PIPE and the Trust Account.

**Transaction-Related Factors:**

- occurrence of any event, change or other circumstances that could give rise to the termination of the Merger Agreement or the failure to satisfy the closing conditions;

40

- possibility that the consummation of the Business Combination is delayed or does not occur, including the failure of the stockholders of the Company and Velodyne to approve the Business Combination Proposal, the NYSE Stock Issuance Proposal and other proposals set forth in this proxy statement;

- uncertainty as to whether the Company and Velodyne will be able to complete the Business Combination on the terms set forth in the Merger Agreement;

- outcome of any legal proceedings that have been or may be instituted against the Company, Velodyne or others following announcement of the transactions contemplated by the Merger Agreement;

- uncertainty as to the long-term value of common stock;

- the risk that the proposed Business Combination disrupts current plans and operations of Velodyne as a result of the announcement and consummation of the transactions described herein; and

- the ability to obtain or maintain the listing of common stock on the NYSE following the Business Combination.

The foregoing review of important factors should not be construed as exhaustive and should be read in conjunction with the other forward-looking statements that are included herein and elsewhere, including the risk factors set forth in this proxy statement beginning on page 42. Any forward-looking statements made in this proxy statement are qualified in their entirety by the forward-looking statements contained or referred to in this section, and there is no assurance that the actual results or developments anticipated by either the Company or Velodyne will be realized. All subsequent written and oral forward-looking statements concerning the Company, Velodyne, the post-combination company, the transactions contemplated by the Merger Agreement or other matters attributable to the Company or Velodyne or any person acting on their behalf are expressly qualified in their entirety by the forward-looking statements above. Except to the extent required by applicable law, the Company and Velodyne are under no obligation (and expressly disclaim any such obligation) to update or revise their forward-looking statements whether as a result of new information, future events, or otherwise.

41

## RISK FACTORS

You should carefully review and consider the following risk factors and the other information contained in this proxy statement, including the financial statements and notes to the financial statements included herein, in evaluating the Business Combination and the proposals to be voted on at the Special Meeting. The following risk factors apply to the business and operations of Velodyne and will also apply to the business and operations of the post-combination company following the completion of the Business Combination. The occurrence of one or more of the events or circumstances described in these risk factors, alone or in combination with other events or circumstances, may adversely affect the ability to complete or realize the anticipated benefits of the Business Combination, and may have an adverse effect on the business, cash flows, financial condition and results of operations of the post-combination company. You should also carefully consider the following risk factors in addition to the other information included in this proxy statement, including matters addressed in the section entitled "*Cautionary Note Regarding Forward-Looking Statements.*" We or Velodyne may face additional risks and uncertainties that are not presently known to us or Velodyne, or that we or Velodyne currently deem immaterial, which may also impair our or Velodyne's business or financial condition. The following discussion should be read in conjunction with the financial statements and notes to the financial statements included herein.

We have grouped the risks into three categories for ease of reading, and without any reflection on the importance of, or likelihood of, any particular category.

**Risks Related to Velodyne's Business**

*Since many of the markets in which Velodyne competes are new and rapidly evolving, it is difficult to forecast long-term end-customer adoption rates and demand for Velodyne's products.*

Velodyne is pursuing opportunities in markets that are undergoing rapid changes, including technological and regulatory changes, and it is difficult to predict the timing and size of the opportunities. For example, autonomous driving and lidar-based ADAS applications require complex technology. Because these automotive systems depend on technology from many companies, commercialization of autonomous driving or ADAS products could be delayed or impaired on account of certain technological components of Velodyne or others not being ready to be deployed in vehicles. Although some companies have released systems and vehicles using Velodyne's products, others may not be able to commercialize this technology immediately, or at all. Regulatory, safety or reliability developments, many of which are outside of Velodyne's control, could also cause delays or otherwise impair commercial adoption of these new technologies, which will adversely affect Velodyne's growth. Velodyne's future financial performance will depend on its ability to make timely investments in the correct market opportunities. If one or more of these markets experience a shift in customer or prospective customer demand, Velodyne's products may not compete as effectively, if at all, and they may not be designed into commercialized products. Given the evolving nature of the markets in which Velodyne operates, it is difficult to predict customer demand or adoption rates for its products or the future growth of the markets in which it operates. As a result, the financial projections in this proxy statement necessarily reflect various estimates and assumptions that may not prove accurate and these projections could differ materially from actual results due to the risks included in "*Risk Factors,*" among others. If demand does not develop or if Velodyne cannot accurately forecast customer demand, the size of its markets, inventory requirements or its future financial results, its business, results of operations and financial condition will be adversely affected.

*Despite the actions Velodyne is taking to defend and protect its intellectual property, Velodyne may not be able to adequately protect or enforce its intellectual property rights or prevent unauthorized parties from copying or reverse engineering its solutions. Velodyne's efforts to protect and enforce its intellectual property rights and prevent third parties from violating its rights may be costly.*

The success of Velodyne's products and its business depends in part on Velodyne's ability to obtain patents and other intellectual property rights and maintain adequate legal protection for its products in the United States and other international jurisdictions. Velodyne relies on a combination of patent, copyright, service mark, trademark and trade secret laws, as well as confidentiality procedures and contractual restrictions, to establish and protect its proprietary rights, all of which provide only limited protection.

42

Velodyne cannot assure you that any patents will be issued with respect to its currently pending patent applications or that any trademarks will be registered with respect to its currently pending applications in a manner that gives Velodyne adequate defensive protection or competitive advantages, if at all, or that any patents issued to Velodyne or any trademarks registered by it will not be challenged, invalidated or circumvented. Velodyne has filed for patents and trademarks in the United States and in certain international jurisdictions, but such protections may not be available in all countries in which it operates or in which Velodyne seeks to enforce its intellectual property rights, or may be difficult to enforce in practice. Velodyne's currently-issued patents and trademarks and any patents and trademarks that may be issued or registered, as applicable, in the future with respect to pending or future applications may not provide sufficiently broad protection or may not prove to be enforceable in actions against alleged infringers. Velodyne cannot be certain that the steps it has taken will prevent unauthorized use of its technology or the reverse engineering of its technology. Moreover, others may independently develop technologies that are competitive to Velodyne or infringe Velodyne's intellectual property.

Protecting against the unauthorized use of Velodyne's intellectual property, products and other proprietary rights is expensive and difficult, particularly internationally. Velodyne believes that its patents are foundational in the area of lidar products and intends to enforce the intellectual property portfolio it has built over the years. Unauthorized parties may attempt to copy or reverse engineer Velodyne's smart vision solutions or certain aspects of Velodyne's solutions that it considers proprietary. Litigation may be necessary in the future to enforce or defend Velodyne's intellectual property rights, to prevent unauthorized parties from copying or reverse engineering its solutions, to determine the validity and scope of the proprietary rights of others or to block the importation of infringing products into the U.S.

For example, Velodyne recently achieved a favorable result in two proceedings before the U.S. Patent Trial and Appeal Board ("*PTAB*") where the PTAB upheld the validity of Velodyne's patent claims that were being challenged as unpatentable by one of its competitors. Velodyne's competitor filed a request for rehearing that was denied by the PTAB. The matter may proceed to an appeal in the future. In addition, that same competitor initiated a lawsuit in the U.S. District Court for the Northern District of California, and while that case is stayed pending PTAB proceedings, Velodyne cannot guarantee a favorable outcome in the litigation.

Additionally, to protect its intellectual property, Velodyne filed patent infringement cases in August 2019 with the U.S. International Trade Commission ("ITC") and the U.S. District Court for the Northern District of California against Hesai Photonics Technology Co., Ltd. ("*Hesai*") and Suteng Innovation Technology Co., Ltd. ("RoboSense"). Velodyne resolved its disputes with Hesai in June 2020. If it prevails in the ITC in its action against RoboSense, Velodyne has requested an exclusion order which would block the importation of sensors made by RoboSense into the United States. If it prevails in the district court, Velodyne will request that RoboSense pay damages. However, Velodyne cannot guarantee that it will prevail, that the ITC will grant it the exclusion order, that it will be able to effectively enforce the exclusion order, or that it will obtain damages from RoboSense.

Any such litigation, whether initiated by Velodyne or a third party, could result in substantial costs and diversion of management resources, either of which could adversely affect Velodyne's business, operating results and financial condition. Even if it obtains favorable outcomes in litigation, Velodyne may not be able to obtain adequate remedies, especially in the context of unauthorized parties copying or reverse engineering its smart vision solutions. Further, many of Velodyne's current and potential competitors have the ability to dedicate substantially greater resources to defending intellectual property infringement claims and to enforcing their intellectual property rights than Velodyne has. Attempts to enforce its rights against third parties could also provoke these third parties to assert their own intellectual property or other rights against Velodyne, or result in a holding that invalidates or narrows the scope of Velodyne's rights, in whole or in part. Effective patent, trademark, service mark, copyright and trade secret protection may not be available in every country in which Velodyne's products are available and competitors based in other countries may sell infringing products in one or more markets. An inability to adequately protect and enforce Velodyne's intellectual property and other proprietary rights or an inability to prevent authorized parties from copying or reverse engineering its smart vision solutions or certain aspects of its solutions that Velodyne considers proprietary could seriously adversely affect its business, operating results, financial condition and prospects.

43

***Velodyne continues to implement strategic initiatives designed to grow its business. These initiatives may prove more costly than it currently anticipates and Velodyne may not succeed in increasing its revenue in an amount sufficient to offset the costs of these initiatives and to achieve and maintain profitability.***

Velodyne continues to make investments and implement initiatives designed to grow its business, including:

- investing in R&D;

- expanding its sales and marketing efforts to attract new customers across industries;

- investing in new applications and markets for its products;

- further enhancing its manufacturing processes and partnerships;

- pursuing litigation to protect its intellectual property; and

- investing in legal, accounting, and other administrative functions necessary to support its operations as a public company.

These initiatives may prove more expensive than it currently anticipates, and Velodyne may not succeed in increasing its revenue, if at all, in an amount sufficient to offset these higher expenses and to achieve and maintain profitability. Although Velodyne generated net income of $15.8 million for 2017, it has incurred net losses in the past, including net losses of $62.3 million for 2018 and $67.2 million for 2019 and $23.4 million for the three months ended March 31, 2020. The market opportunities Velodyne is pursuing are at an early stage of development, and it may be many years before the end markets Velodyne expects to serve generate demand for its products at scale, if at all. Velodyne's revenue may be adversely affected for a number of reasons, including the development and/or market acceptance of new technology that competes with its lidar products, if certain automotive original equipment manufacturers ("OEMs") or other market participants change their autonomous vehicle technology, failure of Velodyne's customers to commercialize autonomous systems that include its smart vision solutions, Velodyne's inability to effectively manage its inventory or manufacture products at scale, Velodyne's inability to enter new markets or help its customers adapt its products for new applications or Velodyne's failure to attract new customers or expand orders from existing customers or increasing competition. Furthermore, it is difficult to predict the size and growth rate of Velodyne's target markets, customer demand for its products, commercialization timelines, developments in autonomous sensing and related technology, the entry of competitive products, or the success of existing competitive products and services. For these reasons, Velodyne does not expect to achieve profitability over the near term. If Velodyne's revenue does not grow over the long term, its ability to achieve and maintain profitability may be adversely affected, and the value of its business may significantly decrease.

***Because Velodyne's sales have been primarily to customers making purchases for R&D projects and its orders are project-based, Velodyne expects its results of operations to fluctuate on a quarterly and annual basis, which could cause the stock price of the post-combination company to fluctuate or decline.***

Velodyne's quarterly results of operations have fluctuated in the past and may vary significantly in the future, and its revenue has declined in two consecutive years. As such, historical comparisons of its operating results may not be meaningful. In particular, because Velodyne's sales to date have primarily been to customers making purchases for R&D, sales in any given quarter can fluctuate based on the timing and success of its customers' development projects. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Velodyne's quarterly financial results may fluctuate as a result of a variety of factors, many of which are outside of its control and may not fully reflect the underlying performance of Velodyne's business. These fluctuations could adversely affect Velodyne's ability to meet its expectations or those of securities analysts or investors. If Velodyne does not meet these expectations for any period, the value of its business and its securities, or those of the post-combination company, could decline significantly. Factors that may cause these quarterly fluctuations include, without limitation, those listed below:

- The timing and magnitude of orders and shipments of Velodyne's products in any quarter.

44

- Pricing changes Velodyne may adopt to drive market adoption or in response to competitive pressure.

- Velodyne's ability to retain its existing customers and attract new customers.

- Velodyne's ability to develop, introduce, manufacture and ship in a timely manner products that meet customer requirements.

- Disruptions in Velodyne's sales channels or termination of its relationship with important channel partners.

- Delays in customers' purchasing cycles or deferments of customers' purchases in anticipation of new products or updates from Velodyne or its competitors.

- Fluctuations in demand pressures for Velodyne's products.

- The mix of products sold in any quarter.

- The duration of the global COVID-19 pandemic and the time it takes for economic recovery.

- The timing and rate of broader market adoption of autonomous systems utilizing Velodyne's smart vision solutions across the automotive and other market sectors.

- Market acceptance of lidar and further technological advancements by Velodyne's competitors and other market participants.

- The ability of Velodyne's customers to commercialize systems that incorporate its products.

- Any change in the competitive dynamics of Velodyne's markets, including consolidation of competitors, regulatory developments and new market entrants.

- Velodyne's ability to effectively manage its inventory.

- Changes in the source, cost, availability of and regulations pertaining to materials Velodyne uses.

- Adverse litigation, judgments, settlements or other litigation-related costs, or claims that may give rise to such costs.

- General economic, industry and market conditions, including trade disputes.

***Velodyne's transition to an outsourced manufacturing business model may not be successful, which could harm its ability to deliver products and recognize revenue.***

Velodyne is transitioning from a manufacturing model in which it primarily manufactured and assembled its products at its California location, to one where it relies on third-party manufacturers in Europe and Asia. Velodyne currently has agreements with Fabrinet, Nikon and Veoneer to provide contract manufacturing of certain of its products. While Velodyne believes the use of third-party manufacturers will have benefits, but in the near term, while it is beginning manufacturing with new partners, Velodyne may lose revenue, incur increased costs and harm its customer relationships.

Reliance on third-party manufacturers reduces Velodyne's control over the manufacturing process, including reduced control over quality, product costs and product supply and timing. Velodyne may experience delays in shipments or issues concerning product quality from its third-party manufacturers. If any of Velodyne's third-party manufacturers experience interruptions, delays or disruptions in supplying its products, including by natural disasters, the global COVID-19 pandemic or work stoppages or capacity constraints, Velodyne's ability to ship products to distributors and customers would be delayed. Additionally, if any of Velodyne's third-party manufacturers experience quality control problems in their manufacturing operations and Velodyne's products do not meet customer or regulatory requirements, it could be required to cover the cost of repair or replacement of any defective products. These delays or product quality issues could have an immediate and material adverse effect on Velodyne's ability to fulfill orders and could have a negative effect on its operating results. In addition, such delays or issues with product quality could adversely affect Velodyne's reputation and its relationship with its channel partners. If third-party manufacturers experience financial, operational, manufacturing capacity or other difficulties, or experience shortages in required components, or if they are otherwise unable or unwilling to continue to manufacture Velodyne's

45

products in required volumes or at all, Velodyne's supply may be disrupted, it may be required to seek alternate manufacturers and it may be required to re-design its products. It would be time-consuming, and could be costly and impracticable, to begin to use new manufacturers and designs and such changes could cause significant interruptions in supply and could have an adverse effect on Velodyne's ability to meet its scheduled product deliveries and may subsequently lead to the loss of sales. While Velodyne takes measures to protect its trade secrets, the use of third-party manufacturers may also risk disclosure of its innovative and proprietary manufacturing methodologies, which could adversely affect Velodyne's business.

In addition, Velodyne currently relies on third-party manufacturers to produce its custom application specific integrated circuits ("ASICs"). Velodyne has made considerable investments to develop its proprietary ASICs and its smart vision solutions depend on them. If third-party manufacturers of Velodyne's custom ASICs experience interruptions, delays or disruptions in supplying its ASICs or if there are work stoppages, production delays or facility closures due to the COVID-19 pandemic, Velodyne's ability to ship its smart vision solutions will be delayed and it may be unable to meet customer demand. Velodyne's ASICs may have defects or other issues if its third-party manufacturers have quality control or other problems in their operations. These defects may delay Velodyne's ability to fulfill customer orders, which would have a negative effect on its brand and operating results. If it needs to change manufacturers of its ASICs for any reason, Velodyne cannot guarantee that it will be able to find a replacement manufacturer willing to produce its custom ASICs at a price it deems appropriate, or at all.

*Adverse conditions in the automotive industry or the global economy more generally could have adverse effects on Velodyne's results of operations.*

While Velodyne makes its strategic planning decisions based on the assumption that the markets it is targeting will grow, Velodyne's business is dependent, in large part on, and directly affected by, business cycles and other factors affecting the global automobile industry and global economy generally. Automotive production and sales are highly cyclical and depend on general economic conditions and other factors, including consumer spending and preferences, changes in interest rates and credit availability, consumer confidence, fuel costs, fuel availability, environmental impact, governmental incentives and regulatory requirements, and political volatility, especially in energy-producing countries and growth markets. In addition, automotive production and sales can be affected by Velodyne's automotive OEM customers' ability to continue operating in response to challenging economic conditions and in response to labor relations issues, regulatory requirements, trade agreements and other factors. The volume of automotive production in North America, Europe and the rest of the world has fluctuated, sometimes significantly, from year to year, and Velodyne expects such fluctuations to give rise to fluctuations in the demand for its products. Any significant adverse change in any of these factors may result in a reduction in automotive sales and production by Velodyne's automotive OEM customers and could have a material adverse effect on its business, results of operations and financial condition.

*Velodyne's business could be materially and adversely affected by the current global COVID-19 pandemic.*

The recent COVID-19 pandemic could result in a material adverse impact on Velodyne's or its customers' business operations including reduction or suspension of operations in the U.S. or certain parts of the world. Velodyne has customers with international operations in varying industries. It also depends on suppliers and manufacturers worldwide. Depending upon the duration of this pandemic and the associated business interruptions, its customers, suppliers, manufacturers and partners may suspend or delay their engagement with Velodyne, which could result in a material adverse effect on its financial condition. Velodyne's response to this pandemic may prove to be inadequate and it may be unable to continue its operations in the manner it had prior to the outbreak, and may endure interruptions, reputational harm, delays in its product development and shipments, all of which could have an adverse effect on its business, operating results, and financial condition. In addition, when the pandemic subsides, Velodyne cannot assure you as to the timing of any economic recovery, which could continue to have a material adverse effect on its target markets and its business.

*Although Velodyne believes that lidar is the industry standard for autonomous vehicles and other emerging markets, market adoption of lidar is uncertain. If market adoption of lidar does not continue to develop, or develops more slowly than Velodyne expects, its business will be adversely affected.*

While Velodyne's lidar-based smart vision solutions can be applied to different use cases across end markets, approximately 44% of its revenue during 2019 was generated from automotive applications.

46

Despite the fact that the automotive industry has engaged in considerable effort to research and test lidar products for ADAS and autonomous driving applications, the automotive industry may not introduce lidar products in commercially available vehicles. Velodyne continually studies emerging and competing sensing technologies and methodologies and it may add new sensing technologies such as radar and cameras to its offering to, for example, address lidar's relative deficiencies in detecting colors and low reflectivity objects and performing in extreme weather conditions. However, lidar products remain relatively new and it is possible that other sensing modalities, or a new disruptive modality based on new or existing technology, including a combination of technology, will achieve acceptance or leadership in the ADAS and autonomous driving industries. Even if lidar products are used in initial generations of autonomous driving technology and certain ADAS products, Velodyne cannot guarantee that lidar products will be designed into or included in subsequent generations of such commercialized technology. In addition, Velodyne expects that initial generations of autonomous vehicles will be focused on limited applications, such as robo-taxis, and that mass market adoption of autonomous technology may lag behind these initial applications significantly. The speed of market growth for ADAS or autonomous vehicles is difficult if not impossible to predict, and it is more difficult to predict this market's future growth in light of the economic consequences of the COVID-19 pandemic. Although it currently believes it has the lead in lidar-based systems for the autonomous market, by the time mass market adoption of autonomous vehicle technology is achieved, Velodyne expects competition among providers of sensing technology based on lidar and other modalities to increase substantially. If commercialization of lidar products is not successful, or not as successful as Velodyne or the market expects, or if other sensing modalities gain acceptance by developers of autonomous driving systems or ADAS, automotive OEMs, regulators and safety organizations or other market participants by the time autonomous vehicle technology achieves mass market adoption, its business, results of operations and financial condition will be materially and adversely affected.

Velodyne is investing in and pursuing market opportunities outside of the automotive markets, including in UAVs, self-driving rovers, industrial and security robots, mapping applications for topography and surveying and smart city initiatives. Velodyne believes that its future revenue growth, if any, will depend in part on its ability to expand within new markets such as these and to enter new markets as they emerge. Each of these markets presents distinct risks and, in many cases, requires Velodyne to address the particular requirements of that market.

Addressing these requirements can be time-consuming and costly. The market for lidar technology outside of automotive applications is relatively new, rapidly developing and unproven in many markets or industries. Many of Velodyne's customers outside of the automotive industry are still in the testing and development phases and it cannot be certain that they will commercialize products or systems with its lidar products or at all. Velodyne cannot be certain that lidar will be sold into these markets, or any market outside of automotive market, at scale. Adoption of lidar products, including Velodyne's products, outside of the automotive industry will depend on numerous factors, including: whether the technological capabilities of lidar and lidar-based products meet users' current or anticipated needs, whether the benefits of designing lidar into larger sensing systems outweigh the costs, complexity and time needed to deploy such technology or replace or modify existing systems that may have used other modalities such as cameras and radar, whether users in other applications can move beyond the testing and development phases and proceed to commercializing systems supported by lidar technology and whether lidar developers such as Velodyne can keep pace with rapid technological change in certain developing markets and the global response to the COVID-19 pandemic and the length of any associated work stoppages. If lidar technology does not achieve commercial success outside of the automotive industry, or if the market develops at a pace slower than Velodyne expects, its business, results of operation and financial condition will be materially and adversely affected.

***Because lidar is new in the market, forecasts of market growth in this proxy statement may not be accurate.***

Market opportunity estimates and growth forecasts included in this proxy statement are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. The forecasts and estimates in this proxy statement relating to the expected size and growth of the markets for lidar-based technology and other markets in which Velodyne participates may prove to be inaccurate. Even if these markets experience the forecasted growth described in this proxy statement, Velodyne may not grow its business at similar rates, or at all. Velodyne's future growth is subject to many factors, including market

47

adoption of its products, which is subject to many risks and uncertainties. Accordingly, the forecasts and estimates of market size and growth described in this proxy statement, including Velodyne's estimates that the size of its total addressable market is expected to be approximately $11.9 billion in 2022 and that its automotive total addressable market is expected to grow from $7.3 billion in 2022 to $16.8 billion in 2026, should not be taken as indicative of Velodyne's future growth. In addition, these forecasts do not take into account the impact of the current global COVID-19 pandemic, and Velodyne cannot assure you that these forecasts will not be materially and adversely affected as a result.

***Velodyne's investments in educating its customers and potential customers about the advantages of lidar and its applications may not result in sales of Velodyne's products.***

Educating Velodyne's prospective customers, and to a lesser extent, its existing customers, about lidar, its advantages over other sensing technologies and lidar's ability to convey value in different industries and deployments is an integral part of developing new business and the lidar market generally. If prospective customers have a negative perception of, or experience with, lidar or a competitor's lidar products they may be reluctant to adopt lidar in general or specifically Velodyne's products. Adverse statements about lidar by influential market participants may also deter adoption. Some of Velodyne's competitors have significant financial or marketing resources that may allow them to engage in public marketing campaigns about their alternative technology, lidar or Velodyne's solutions. Velodyne's efforts to educate potential customers and the market generally and to counter any adverse statements made by competitors or other market participants will require significant financial and personnel resources. These educational efforts may not be successful and Velodyne may not offset the costs of such efforts with revenue from the new customers. If Velodyne is unable to acquire new customers to offset these expenses or if the market accepts such adverse statements, its financial condition will be adversely affected.

***In addition to patented technology, Velodyne relies on its unpatented proprietary technology, trade secrets, processes and know-how.***

Velodyne relies on proprietary information (such as trade secrets, know-how and confidential information) to protect intellectual property that may not be patentable or subject to copyright, trademark, trade dress or service mark protection, or that Velodyne believes is best protected by means that do not require public disclosure. Velodyne generally seeks to protect this proprietary information by entering into confidentiality agreements, or consulting, services or employment agreements that contain non-disclosure and non-use provisions with its employees, consultants, contractors and third parties. However, Velodyne may fail to enter into the necessary agreements, and even if entered into, these agreements may be breached or may otherwise fail to prevent disclosure, third-party infringement or misappropriation of its proprietary information, may be limited as to their term and may not provide an adequate remedy in the event of unauthorized disclosure or use of proprietary information. Velodyne has limited control over the protection of trade secrets used by its current or future manufacturing partners and suppliers and could lose future trade secret protection if any unauthorized disclosure of such information occurs. In addition, Velodyne's proprietary information may otherwise become known or be independently developed by its competitors or other third parties. To the extent that its employees, consultants, contractors, advisors and other third parties use intellectual property owned by others in their work for Velodyne, disputes may arise as to the rights in related or resulting know-how and inventions. Costly and time-consuming litigation could be necessary to enforce and determine the scope of Velodyne's proprietary rights, and failure to obtain or maintain protection for its proprietary information could adversely affect its competitive business position. Furthermore, laws regarding trade secret rights in certain markets where Velodyne operates may afford little or no protection to its trade secrets.

Velodyne also relies on physical and electronic security measures to protect its proprietary information, but it cannot provide assurance that these security measures will not be breached or provide adequate protection for its property. There is a risk that third parties may obtain and improperly utilize Velodyne's proprietary information to its competitive disadvantage. Velodyne may not be able to detect or prevent the unauthorized use of such information or take appropriate and timely steps to enforce its intellectual property rights.

***The markets in which Velodyne competes are characterized by rapid technological change, which requires it to continue to develop new products and product innovations, and could adversely affect market adoption of its products.***

While Velodyne intends to invest substantial resources to remain on the forefront of technological development, continuing technological changes in sensing technology, lidar and the markets for these products, including the ADAS and autonomous driving industries, could adversely affect adoption of lidar and/or Velodyne's products, either generally or for particular applications. Velodyne's future success will depend upon its ability to develop and introduce a variety of new capabilities and innovations to its existing product offerings, as well as introduce a variety of new product offerings, to address the changing needs of the markets in which Velodyne offers its products. For example, Velodyne is currently working on developing its Vella software, which is a data curation software platform, as well as several other new lidar products. Velodyne cannot guarantee that the Vella software or the new products will be released in a timely manner, or at all, or achieve market acceptance. For example, in 2019 Velodyne experienced delays in acceptance of certain of its new lidar products as it worked with its customers to identify, define and meet product requirements, and Velodyne may be unable to sell these or future products at scale until these issues are resolved. Delays in delivering new products that meet customer requirements could damage Velodyne's relationships with customers and lead them to seek alternative sources of supply. In addition, Velodyne's success to date has been based on the delivery of its smart vision solutions to R&D programs in which developers are investing substantial capital to develop new systems. Velodyne's continued success relies on the success of the R&D phase of these customers as they expand into commercialized projects. While some customers already have achieved commercialization, most of Velodyne's automotive customers are just beginning on the path to commercialization. As autonomous technology reaches the stage of large scale commercialization Velodyne will be required to develop and deliver smart vision solutions at price points that enable wider and ultimately mass- market adoption. Delays in introducing products and innovations, the failure to choose correctly among technical alternatives or the failure to offer innovative products or configurations at competitive prices may cause existing and potential customers to purchase Velodyne's competitors' products or turn to alternative sensing technology.

If Velodyne is unable to devote adequate resources to develop products or cannot otherwise successfully develop products or system configurations that meet customer requirements on a timely basis or that remain competitive with technological alternatives, its products could lose market share, its revenue will decline, it may experience operating losses and its business and prospects will be adversely affected.

***Velodyne operates in a highly competitive market and some market participants have substantially greater resources. Velodyne competes against a large number of both established competitors and new market entrants.***

The markets for sensing technology applicable to autonomous solutions across numerous industries are highly competitive. Velodyne's future success will depend on its ability to maintain its lead by continuing to develop and protect from infringement advanced lidar technology in a timely manner and to stay ahead of existing and new competitors. Velodyne's competitors are numerous and they compete with it directly by offering lidar products and indirectly by attempting to solve some of the same challenges with different technology. Velodyne faces competition from camera and radar companies, other developers of lidar products, Tier 1 suppliers and other technology and automotive supply companies, some of which have significantly greater resources than it does. Some examples of Velodyne's competitors include DENSO Corporation, Hesai, Ibeo Automotive Systems, LeddarTech, Innoviz, Luminar, Quanergy, Magna International, Valeo SA, Bosch, Continental and ZF Friedrichshafen AG. In the automotive market, Velodyne's competitors have commercialized non-lidar-based ADAS technology which has achieved market adoption, strong brand recognition and may continue to improve. Other competitors are working towards commercializing autonomous driving technology and either by themselves, or with a publicly announced partner, have substantial financial, marketing, R&D and other resources. Some of Velodyne's customers in the autonomous vehicle and ADAS markets have announced development efforts or made acquisitions directed at creating their own lidar-based or other sensing technologies, which would compete with Velodyne's smart vision solutions. Velodyne does not know how close these competitors are to commercializing autonomous driving systems or novel ADAS applications. In markets outside of the automotive industry, its competitors, like Velodyne, seek to develop new sensing applications across industries. Even in these emerging markets, Velodyne faces substantial competition from numerous competitors seeking to prove the value of their technology.

49

Additionally, increased competition may result in pricing pressure and reduced margins and may impede Velodyne's ability to increase the sales of its products or cause it to lose market share, any of which will adversely affect its business, results of operations and financial condition.

***Velodyne expects to incur substantial R&D costs and devote significant resources to identifying and commercializing new products, which could significantly reduce its profitability and may never result in revenue to Velodyne.***

Velodyne's future growth depends on penetrating new markets, adapting existing products to new applications and customer requirements, and introducing new products that achieve market acceptance. Velodyne plans to incur substantial and potentially increasing, R&D costs as part of its efforts to design, develop, manufacture and commercialize new products and enhance existing products. Velodyne's R&D expenses were $31.6 million, $52.0 million, $56.9 million and $14.5 million during 2017, 2018 and 2019 and the three months ended March 31, 2020, respectively and are likely to grow in the future. Because Velodyne accounts for R&D as an operating expense, these expenditures will adversely affect its results to operations in the future. Further, Velodyne's R&D program may not produce successful results, and its new products may not achieve market acceptance, create additional revenue or become profitable.

***As part of growing its business, Velodyne may make acquisitions. If Velodyne fails to successfully select, execute or integrate its acquisitions, then its business, results of operations and financial condition could be materially adversely affected and the stock price of the post-combination company could decline.***

From time to time, Velodyne may undertake acquisitions to add new products and technologies, acquire talent, gain new sales channels or enter into new markets or sales territories. Acquisitions involve numerous risks and challenges, including relating to the successful integration of the acquired business and its key personnel, entering into new territories or markets with which Velodyne has limited or no prior experience, establishing or maintaining business relationships with new customers, channel partners, vendors and suppliers, unexpected liabilities and potential post-closing disputes.

To date, Velodyne has limited experience with acquisitions and the integration of acquired technology and personnel. Failure to successfully identify, complete, manage and integrate acquisitions could materially and adversely affect its business, financial condition and results of operations and could cause the post-combination company's stock price to decline.

***Velodyne may need to raise additional capital in the future in order to execute its business plan, which may not be available on terms acceptable to Velodyne, or at all.***

In the future, Velodyne may require additional capital to respond to technological advancements, competitive dynamics or technologies, customer demands, business opportunities, challenges, acquisitions or unforeseen circumstances and it may determine to engage in equity or debt financings or enter into credit facilities for other reasons. In order to further business relationships with current or potential customers or partners, Velodyne may issue equity or equity-linked securities to such current or potential customers or partners. Velodyne may not be able to timely secure additional debt or equity financing on favorable terms, or at all. If Velodyne raises additional funds through the issuance of equity or convertible debt or other equity-linked securities or if it issues equity or equity-linked securities to current or potential customers to further business relationships, its existing stockholders could experience significant dilution. Any debt financing obtained by Velodyne in the future could involve restrictive covenants relating to its capital raising activities and other financial and operational matters, which may make it more difficult for Velodyne to obtain additional capital and to pursue business opportunities, including potential acquisitions. If Velodyne is unable to obtain adequate financing or financing on terms satisfactory to Velodyne, when Velodyne requires it, Velodyne's ability to continue to grow or support its business and to respond to business challenges could be significantly limited. These same risks will apply to the post-combination company following the Closing of the Business Combination.

***Changes to trade policy, tariffs and import/export regulations may have a material adverse effect on Velodyne's business, financial condition and results of operations.***

Changes in global political, regulatory and economic conditions or in laws and policies governing foreign trade, manufacturing, development and investment in the territories or countries where Velodyne

50

currently purchases its components, sells its products or conducts its business could adversely affect Velodyne's business. The U.S. has recently instituted or proposed changes in trade policies that include the negotiation or termination of trade agreements, the imposition of higher tariffs on imports into the U.S., economic sanctions on individuals, corporations or countries, and other government regulations affecting trade between the U.S. and other countries where Velodyne conducts its business. A number of other nations have proposed or instituted similar measures directed at trade with the United States in response. As a result of these developments, there may be greater restrictions and economic disincentives on international trade that could adversely affect Velodyne's business. For example, such changes could adversely affect the automotive market, Velodyne's ability to access key components or raw materials needed to manufacture its products (including, but not limited to, rare-earth metals), Velodyne's ability to sell its products to customers outside of the U.S. and the demand for its products. It may be time-consuming and expensive for Velodyne to alter its business operations to adapt to or comply with any such changes, and any failure to do so could have a material adverse effect on its business, financial condition and results of operations.

***Third-party claims that Velodyne is infringing intellectual property, whether successful or not, could subject it to costly and time-consuming litigation or expensive licenses, and its business could be adversely affected.***

Although Velodyne holds key patents related to its products, a number of companies, both within and outside of the lidar industry, hold other patents covering aspects of lidar products. In addition to these patents, participants in this industry typically also protect their technology, especially embedded software, through copyrights and trade secrets. As a result, there is frequent litigation based on allegations of infringement, misappropriation or other violations of intellectual property rights. Velodyne has received, and in the future may receive, inquiries from other intellectual property holders and may become subject to claims that it infringes their intellectual property rights, particularly as Velodyne expands its presence in the market, expands to new use cases and faces increasing competition. In addition, parties may claim that the names and branding of Velodyne's products infringe their trademark rights in certain countries or territories. If such a claim were to prevail, Velodyne may have to change the names and branding of its products in the affected territories and it could incur other costs.

Velodyne currently has a number of agreements in effect pursuant to which it has agreed to defend, indemnify and hold harmless its customers, suppliers, and channel partners and other partners from damages and costs which may arise from the infringement by Velodyne's products of third-party patents or other intellectual property rights. The scope of these indemnity obligations varies, but may, in some instances, include indemnification for damages and expenses, including attorneys' fees. Velodyne's insurance may not cover all intellectual property infringement claims. A claim that its products infringe a third party's intellectual property rights, even if untrue, could adversely affect Velodyne's relationships with its customers, may deter future customers from purchasing its products and could expose Velodyne to costly litigation and settlement expenses. Even if Velodyne is not a party to any litigation between a customer and a third party relating to infringement by its products, an adverse outcome in any such litigation could make it more difficult for Velodyne to defend its products against intellectual property infringement claims in any subsequent litigation in which it is a named party. Any of these results could adversely affect Velodyne's brand and operating results.

Velodyne's defense of intellectual property rights claims brought against it or its customers, suppliers and channel partners, with or without merit, could be time-consuming, expensive to litigate or settle, divert management resources and attention and force Velodyne to acquire intellectual property rights and licenses, which may involve substantial royalty or other payments and may not be available on acceptable terms or at all. Further, a party making such a claim, if successful, could secure a judgment that requires Velodyne to pay substantial damages or obtain an injunction. An adverse determination also could invalidate Velodyne's intellectual property rights and adversely affect its ability to offer its products to its customers and may require that Velodyne procure or develop substitute products that do not infringe, which could require significant effort and expense. Any of these events could adversely affect Velodyne's business, operating results, financial condition and prospects.

***Changes in tax laws or exposure to additional income tax liabilities could affect Velodyne's future profitability.***

Factors that could materially affect Velodyne's future effective tax rates include but are not limited to:

• Changes in tax laws or the regulatory environment.

51

- Changes in accounting and tax standards or practices.
- Changes in the composition of operating income by tax jurisdiction.
- Velodyne's operating results before taxes.

Because Velodyne does not have a long history of operating at its present scale and it has significant expansion plans, Velodyne's effective tax rate may fluctuate in the future. Future effective tax rates could be affected by operating losses in jurisdictions where no tax benefit can be recorded under U.S. GAAP, changes in the composition of earnings in countries with differing tax rates, changes in deferred tax assets and liabilities, or changes in tax laws.

On December 22, 2017, the Tax Cuts and Jobs Act of 2017, or the Tax Act, was signed into law making significant changes to the Internal Revenue Code of 1986, as amended, or the Code. In particular, sweeping changes were made to the U.S. taxation of foreign operations. Changes include, but are not limited to, a permanent reduction to the corporate income tax rate, limiting interest deductions, adopting elements of a territorial tax system, assessing a repatriation tax or "toll-charge" on undistributed earnings and profits of U.S.- owned foreign corporations, and introducing certain anti-base erosion provisions, including a new minimum tax on global intangible low-taxed income ("*GILTI*") and base erosion and anti-abuse tax ("*BEAT*"). The primary impact of the new legislation on Velodyne's 2017, 2018 and 2019 and three months ended March 31, 2020 provision for income taxes was $1.9 million, $0.2 million, zero and zero, respectively. Additionally, Velodyne made a one-time deemed repatriation tax payment of $0.1 million in 2017. The overall impact of this tax reform is uncertain, and Velodyne's business and financial condition, including with respect to its non-U.S. operations, could be adversely affected.

In addition to the impact of the Tax Act on Velodyne's federal taxes, the Tax Act may impact its taxation in other jurisdictions, including with respect to state income taxes. State legislatures have not had sufficient time to respond to the Tax Act. Accordingly, there is uncertainty as to how the laws will apply in the various state jurisdictions. Additionally, other foreign governing bodies may enact changes to their tax laws in reaction to the Tax Act that could result in changes to Velodyne's global tax position and materially adversely affect its business, results of operations and financial condition. Additionally, the IRS and several foreign tax authorities have increasingly focused attention on intercompany transfer pricing with respect to sales of products and services and the use of intangibles. Tax authorities could disagree with Velodyne's intercompany charges, cross-jurisdictional transfer pricing or other matters and assess additional taxes. If Velodyne does not prevail in any such disagreements, its profitability may be affected.

***Velodyne's ability to use its net operating loss carryforwards and certain other tax attributes may be limited.***

As of December 31, 2019, Velodyne had $107.4 million of U.S. federal and $73.4 million of state net operating loss carryforwards available to reduce future taxable income, which will be carried forward indefinitely for U.S. federal tax purposes and will expire beginning in 2028 through 2038 for state tax purposes (noting that the net operating carryforward was subsequently reduced to $78.3 million in 2020 after the carryback of losses allowed under the Coronavirus Aid Relief and Economic Security Act ("CARES Act")). It is possible that Velodyne will not generate taxable income in time to use these net operating loss carryforwards before their expiration or at all. Under legislative changes made in December 2017, U.S. federal net operating losses incurred in 2018 and in future years may be carried forward indefinitely, but the deductibility of such net operating losses is limited. It is uncertain if and to what extent various states will conform to the newly enacted federal tax law. In addition, the federal and state net operating loss carryforwards and certain tax credits may be subject to significant limitations under Section 382 and Section 383 of the Code, respectively, and similar provisions of state law. Under those sections of the Code, if a corporation undergoes an "ownership change," the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change attributes, such as research tax credits, to offset its post-change income or tax may be limited. In general, an "ownership change" will occur if there is a cumulative change in our ownership by "5-percent shareholders" that exceeds 50 percentage points over a rolling three-year period. Similar rules may apply under state tax laws. Velodyne has not yet undertaken an analysis of whether or not the Business Combination constitutes an "ownership change" for purposes of Section 382 and Section 383 of the Code.

52

*Velodyne has in the past and may become involved in legal and regulatory proceedings and commercial or contractual disputes, which could have an adverse effect on its profitability and consolidated financial position.*

Velodyne may be, from time to time, involved in litigation, regulatory proceedings and commercial or contractual disputes that may be significant. These matters may include, without limitation, disputes with Velodyne's suppliers and customers, intellectual property claims, stockholder litigation, government investigations, class action lawsuits, personal injury claims, environmental issues, customs and VAT disputes and employment and tax issues. In addition, Velodyne has in the past and could face in the future a variety of labor and employment claims against it, which could include but is not limited to general discrimination, wage and hour, privacy, ERISA or disability claims. In such matters, government agencies or private parties may seek to recover from Velodyne very large, indeterminate amounts in penalties or monetary damages (including, in some cases, treble or punitive damages) or seek to limit Velodyne's operations in some way. These types of lawsuits could require significant management time and attention or could involve substantial legal liability, adverse regulatory outcomes, and/or substantial expenses to defend. Often these cases raise complex factual and legal issues and create risks and uncertainties. No assurances can be given that any proceedings and claims will not have a material adverse impact on Velodyne's operating results and consolidated financial position or that its established reserves or its available insurance will mitigate this impact.

*Velodyne is subject to, and must remain in compliance with, numerous laws and governmental regulations concerning the manufacturing, use, distribution and sale of its products. Some of Velodyne's customers also require that it comply with their own unique requirements relating to these matters.*

Velodyne manufactures and sells products that contain electronic components, and such components may contain materials that are subject to government regulation in both the locations where Velodyne manufactures and assembles its products, as well as the locations where Velodyne sells its products. For example, certain regulations limit the use of lead in electronic components. Since Velodyne operates on a global basis, this is a complex process which requires continual monitoring of regulations and an ongoing compliance process to ensure that Velodyne and its suppliers are in compliance with all existing regulations. If there is an unanticipated new regulation that significantly impacts Velodyne's use of various components or requires more expensive components, that regulation could materially adversely affect its business, results of operations and financial condition.

Velodyne's products are also used for autonomous driving and ADAS applications, which are subject to complicated regulatory schemes that vary from jurisdiction to jurisdiction. These are rapidly evolving areas where new regulations could impose limitations on the use of lidar generally or Velodyne's products specifically. If Velodyne fails to adhere to these new regulations or fails to continually monitor the updates, it may be subject to litigation, loss of customers or negative publicity and its business, results of operations and financial condition will be adversely affected.

Concerns over environmental pollution and climate change have produced significant legislative and regulatory efforts on a global basis, and Velodyne believes this will continue both in scope and in the number of countries participating. These changes could directly increase the cost of energy, which may have an effect on the way Velodyne manufactures products or utilizes energy to produce its products. In addition, any new regulations or laws in the environmental area might increase the cost of raw materials or key components Velodyne uses in its products. Environmental regulations require Velodyne to reduce product energy usage, monitor and exclude an expanding list of restricted substances and to participate in required recovery and recycling of its products. Velodyne is unable to predict how any future changes will impact it and if such impacts will be material to its business.

*Velodyne's business may be adversely affected by changes in automotive safety regulations or concerns that drive further regulation of the automobile safety market.*

Government vehicle safety regulations are an important factor for Velodyne's business. Historically, these regulations have imposed ever-more stringent safety regulations for vehicles. These safety regulations often require, or customers demand that, vehicles have more safety features per vehicle and more advanced safety products.

53

While Velodyne believes increasing automotive safety standards will present a market opportunity for its products, government safety regulations are subject to change based on a number of factors that are not within its control, including new scientific or technological data, adverse publicity regarding the industry recalls and safety risks of autonomous driving and ADAS, accidents involving its products, domestic and foreign political developments or considerations, and litigation relating to its products and its competitors' products. Changes in government regulations, especially in the autonomous driving and ADAS industries could adversely affect Velodyne's business. If government priorities shift and Velodyne is unable to adapt to changing regulations, its business may be materially and adversely affected.

Federal and local regulators impose more stringent compliance and reporting requirements in response to product recalls and safety issues in the automotive industry. As the cars that carry Velodyne's sensors go into production, it is subject to existing stringent requirements under the National Traffic and Motor Vehicle Safety Act of 1966, or the Vehicle Safety Act, including a duty to report, subject to strict timing requirements, safety defects with its products. The Vehicle Safety Act imposes potentially significant civil penalties for violations including the failure to comply with such reporting actions. Velodyne is also subject to the existing U.S. Transportation Recall Enhancement, Accountability and Documentation Act, or TREAD, which requires equipment manufacturers, such as Velodyne, to comply with "Early Warning" requirements by reporting certain information to the NHTSA, such as information related to defects or reports of injury related to its products. TREAD imposes criminal liability for violating such requirements if a defect subsequently causes death or bodily injury. In addition, the National Traffic and Motor Vehicle Safety Act authorizes NHTSA to require a manufacturer to recall and repair vehicles that contain safety defects or fail to comply with U.S. federal motor vehicle safety standards. Sales into foreign countries may be subject to similar regulations. If Velodyne cannot rapidly address any safety concerns or defects with its products, its business, results of operations and financial condition may be adversely affected.

The U.S. Department of Transportation issued regulations in 2016 that require manufacturers of certain autonomous vehicles to provide documentation covering specific topics to regulators, such as how automated systems detect objects on the road, how information is displayed to drivers, what cybersecurity measures are in place and the methods used to test the design and validation of autonomous driving systems. As cars that carry Velodyne's sensors go into production, the obligations of complying with safety regulations could increase and it could require increased resources and adversely affect Velodyne's business.

***Failures, or perceived failures, to comply with privacy, data protection, and information security requirements in the variety of jurisdictions in which Velodyne operates may adversely impact its business, and such legal requirements are evolving, uncertain and may require improvements in, or changes to, Velodyne's policies and operations.***

Velodyne's current and potential future operations and sales subject it to laws and regulations addressing privacy and the collection, use, storage, disclosure, transfer and protection of a variety of types of data. For example, the European Commission has adopted the General Data Protection Regulation and California recently enacted the California Consumer Privacy Act of 2018, both of which provide for potentially material penalties for non-compliance. These regimes may, among other things, impose data security requirements, disclosure requirements, and restrictions on data collection, uses, and sharing that may impact Velodyne's operations and the development of its business. While, generally, Velodyne does not have access to, collect, store, process, or share information collected by its solutions unless its customers choose to proactively provide such information to us, Velodyne's products may evolve both to address potential customer requirements or to add new features and functionality. Therefore, the full impact of these privacy regimes on Velodyne's business is rapidly evolving across jurisdictions and remains uncertain at this time.

Velodyne may also be affected by cyber attacks and other means of gaining unauthorized access to its products, systems, and data. For instance, cyber criminals or insiders may target Velodyne or third-parties with which it has business relationships in an effort to obtain data, or in a manner that disrupts Velodyne's operations or compromises its products or the systems into which its products are integrated.

Velodyne is assessing the continually evolving privacy and data security regimes and measures it believes are appropriate in response. Since these data security regimes are evolving, uncertain and complex, especially for a global business like Velodyne's, it may need to update or enhance its compliance measures as its products, markets and customer demands further develop and these updates or enhancements may require

54

implementation costs. The compliance measures Velodyne does adopt may prove ineffective. Any failure, or perceived failure, by Velodyne to comply with current and future regulatory or customer-driven privacy, data protection, and information security requirements, or to prevent or mitigate security breaches, cyber attacks, or improper access to, use of, or disclosure of data, or any security issues or cyber attacks affecting Velodyne, could result in significant liability, costs (including the costs of mitigation and recovery), and a material loss of revenue resulting from the adverse impact on its reputation and brand, loss of proprietary information and data, disruption to its business and relationships, and diminished ability to retain or attract customers and business partners. Such events may result in governmental enforcement actions and prosecutions, private litigation, fines and penalties or adverse publicity, and could cause customers and business partners to lose trust in Velodyne, which could have an adverse effect on its reputation and business.

***Regulations related to conflict minerals may cause Velodyne to incur additional expenses and could limit the supply and increase the costs of certain metals used in the manufacturing of its products.***

Velodyne is subject to the requirements under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, or the Dodd-Frank Act, that will require it to determine, disclose and report whether its products contain conflict minerals. The implementation of these requirements could adversely affect the sourcing, availability and pricing of the materials used in the manufacture of components used in Velodyne's products. In addition, Velodyne will incur additional costs to comply with the disclosure requirements, including costs related to conducting diligence procedures to determine the sources of conflict minerals that may be used in or necessary to the production of its products and, if applicable, potential changes to products, processes or sources of supply as a consequence of such verification activities. It is also possible that its reputation may be adversely affected if Velodyne determines that certain of its products contain minerals not determined to be conflict-free or if Velodyne is unable to alter its products, processes or sources of supply to avoid use of such materials.

***If Velodyne fails to maintain an effective system of internal controls, its ability to produce timely and accurate financial statements or comply with applicable regulations could be adversely affected.***

After the Business Combination, the post-combination company will carry out Velodyne's business and will be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, or Exchange Act, the Sarbanes-Oxley Act and the rules and regulations of the NYSE. Velodyne expects that the requirements of these rules and regulations will continue to increase its legal, accounting and financial compliance costs, make some activities more difficult, time-consuming and costly, and place significant strain on its personnel, systems and resources.

The Sarbanes-Oxley Act requires, among other things, that Velodyne maintain effective disclosure controls and procedures and internal control over financial reporting. Velodyne is continuing to develop and refine its disclosure controls, internal control over financial reporting and other procedures that are designed to ensure that information required to be disclosed by it in the reports that it will file with the SEC is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that information required to be disclosed in reports under the Exchange Act is accumulated and communicated to Velodyne's principal executive and financial officers.

Velodyne's current controls and any new controls that it develops may become inadequate because of changes in conditions in its business. Further, weaknesses in Velodyne's internal controls may be discovered in the future. Any failure to develop or maintain effective controls, or any difficulties encountered in their implementation or improvement, could adversely affect Velodyne's operating results or cause it to fail to meet its reporting obligations and may result in a restatement of Velodyne's financial statements for prior periods. Any failure to implement and maintain effective internal controls also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of Velodyne's internal control over financial reporting that it is required to include in its periodic reports Velodyne will file with the SEC under Section 404 of the Sarbanes-Oxley Act. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in Velodyne's reported financial and other information.

In order to maintain and improve the effectiveness of its disclosure controls and procedures and internal control over financial reporting, Velodyne has expended and anticipates that it will continue to expend

55

significant resources, including accounting-related costs, and provide significant management oversight. Any failure to maintain the adequacy of its internal controls, or consequent inability to produce accurate financial statements on a timely basis, could increase Velodyne's operating costs and could materially and adversely affect its ability to operate its business. In the event that Velodyne's internal controls are perceived as inadequate or that it is unable to produce timely or accurate financial statements, investors may lose confidence in Velodyne's operating results and the stock price of the post-combination company could decline. In addition, if Velodyne is unable to continue to meet these requirements, the post-combination company may not be able to remain listed on the NYSE.

The post-combination company's independent registered public accounting firm is not required to formally attest to the effectiveness of its internal control over financial reporting until after the post-combination company is no longer an emerging growth company. At such time, the post-combination company's independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which Velodyne's controls are documented, designed or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could have a material and adverse effect on the post-combination company's business and operating results.

*Velodyne currently has and targets many customers that are large corporations with substantial negotiating power, exacting product standards and potentially competitive internal solutions. If Velodyne is unable to sell its products to these customers, its prospects and results of operations will be adversely affected.*

Many of Velodyne's customers and potential customers are large, multinational corporations with substantial negotiating power relative to it and, in some instances, may have internal solutions that are competitive to Velodyne's products. These large, multinational corporations also have significant development resources, which may allow them to acquire or develop independently, or in partnership with others, competitive technologies. Meeting the technical requirements and securing design wins with any of these companies will require a substantial investment of Velodyne's time and resources. Velodyne cannot assure you that its products will secure design wins from these or other companies or that it will generate meaningful revenue from the sales of its products to these key potential customers. If Velodyne's products are not selected by these large corporations or if these corporations develop or acquire competitive technology, it will have an adverse effect on Velodyne's business.

*If Velodyne's lidar products are not selected for inclusion in autonomous driving systems or ADAS by automotive OEMs or their suppliers, its business will be materially and adversely affected.*

Automotive OEMs and their suppliers design and develop autonomous driving and ADAS technology over several years. These automotive OEMs and suppliers undertake extensive testing or qualification processes prior to placing orders for large quantities of products because Velodyne's lidar products will function as part of a larger system or platform and must meet certain other specifications. Velodyne spends significant time and resources to have its products selected by automotive OEMs and their suppliers, which is known as a design win. In the case of autonomous driving and ADAS technology, a design win means Velodyne's lidar product has been selected for use in a particular vehicle model. If Velodyne does not achieve a design win with respect to a particular vehicle model, it may not have an opportunity to supply its products to the automotive OEM for that vehicle model for a period of many years. In many cases, this period can be as long as five to seven or more years. If Velodyne's products are not selected by an automotive OEM or its suppliers for one vehicle model or if Velodyne's products are not successful in that vehicle model, it is unlikely that its product will be deployed in other vehicle models of that OEM. If Velodyne fails to win a significant number of vehicle models from one or more of automotive OEMs or their suppliers, its business, results of operations and financial condition will be materially and adversely affected.

*The discontinuation, lack of commercial success, or loss of business with respect to a particular vehicle model or technology package for which Velodyne is a significant supplier could reduce Velodyne's sales and adversely affect its profitability.*

If Velodyne is able to secure design wins and its smart vision solutions are included in these autonomous driving and ADAS products, it expects to enter into supply agreements with the relevant customer. Market practice dictates that these supply agreements typically require Velodyne to supply a customer's requirements

56

for a particular vehicle model or autonomous driving or ADAS product, rather than supply a set number of products. These contracts can have short terms and/or can be subject to renegotiation, sometimes as frequently as annually, all of which may affect product pricing, and may be terminated by Velodyne's customers at any time. Therefore, even if Velodyne is successful in obtaining design wins and the systems into which its products are built are commercialized, the discontinuation of, the loss of business with respect to, or a lack of commercial success of a particular vehicle model or technology package for which Velodyne is a significant supplier could mean that the expected sales of Velodyne's products will not materialize, materially and adversely affecting its business.

***Continued pricing pressures, automotive OEM cost reduction initiatives and the ability of automotive OEMs to re-source or cancel vehicle or technology programs may result in lower than anticipated margins, or losses, which may adversely affect Velodyne's business.***

Cost-cutting initiatives adopted by Velodyne's customers often result in increased downward pressure on pricing. Velodyne expects that its agreements with automotive OEMs may require step-downs in pricing over the term of the agreement or, if commercialized, over the period of production. In addition, Velodyne's automotive OEM customers often reserve the right to terminate their supply contracts for convenience, which enhances their ability to obtain price reductions. Automotive OEMs also possess significant leverage over their suppliers, including Velodyne, because the automotive component supply industry is highly competitive, serves a limited number of customers and has a high fixed cost base. Accordingly, Velodyne expects to be subject to substantial continuing pressure from automotive OEMs and Tier 1 suppliers to reduce the price of its products. It is possible that pricing pressures beyond Velodyne's expectations could intensify as automotive OEMs pursue restructuring, consolidation and cost- cutting initiatives. If Velodyne is unable to generate sufficient production cost savings in the future to offset price reductions, its gross margin and profitability would be adversely affected.

***Velodyne's business could be materially and adversely affected if it lost any of its largest customers or if they were unable to pay their invoices.***

Although Velodyne has and continues to pursue a broad customer base, it is dependent on a collection of large customers with strong purchasing power. In 2017, 2018 and 2019, Velodyne's top 20 customers represented 89%, 82% and 83% of its revenue, respectively. In 2017, 2018 and 2019, three, two and two customers, respectively, accounted for more than 10% of Velodyne's revenue. The loss of business from any of Velodyne's major customers (whether by lower overall demand for its products, cancellation of existing contracts or product orders or the failure to design in its products or award Velodyne new business) could have a material adverse effect on its business. For example, one of Velodyne's customers who accounted for 26% of its revenue in 2017, made substantial purchases of its products for R&D projects in 2017, but did not repeat such purchases in 2018, which contributed to the decline in Velodyne's revenue in 2018.

To the extent autonomous vehicle and ADAS systems become accepted by major automotive OEMs, Velodyne expects that it will rely increasingly for its revenue on Tier 1 suppliers through which automotive OEMs procure components. Velodyne expects that these Tier 1 suppliers will be responsible for certain hardpoint and software configuration activities specific to each OEM, and they may not exclusively carry its smart vision solutions.

There is also a risk that one or more of its major customers could be unable to pay Velodyne's invoices as they become due or that a customer will simply refuse to make such payments if it experiences financial difficulties. If a major customer were to enter into bankruptcy proceedings or similar proceedings whereby contractual commitments are subject to stay of execution and the possibility of legal or other modification, Velodyne could be forced to record a substantial loss.

***The period of time from a design win to implementation is long and Velodyne is subject to the risks of cancellation or postponement of the contract or unsuccessful implementation.***

Prospective customers, including those in the automotive industry, generally must make significant commitments of resources to test and validate Velodyne's products and confirm that they can integrate with other technologies before including them in any particular system, product or model. The development cycles of Velodyne's products with new customers varies widely depending on the application, market,

57

customer and the complexity of the product. In the automotive market, for example, this development cycle can be five to seven or more years. The development cycle in certain other markets can be months to one or two years. These development cycles result in Velodyne investing its resources prior to realizing any revenue from the commercialization. Further, Velodyne is subject to the risk that customers cancel or postpone implementation of its technology, as well as that it will not be able to integrate its technology successfully into a larger system with other sensing modalities. Further, Velodyne's revenue could be less than forecasted if the system, product or vehicle model that includes its lidar products is unsuccessful, including for reasons unrelated to its technology. Long development cycles and product cancellations or postponements may adversely affect Velodyne's business, results of operations and financial condition.

***Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management.***

Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and he remains deeply involved in all aspects of Velodyne's business, including product development. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's R&D activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry.

Competition for highly-skilled personnel is often intense, especially in the San Francisco Bay Area where Velodyne is located, and it may incur significant costs to attract them. Velodyne may not be successful in attracting, integrating, or retaining qualified personnel to fulfill its current or future needs. Velodyne has, from time to time, experienced, and it expects to continue to experience, difficulty in hiring and retaining highly skilled employees with appropriate qualifications. In addition, job candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. If the perceived value of Velodyne's equity or equity awards declines, including those of the post-combination company after Closing, it may adversely affect Velodyne's ability to retain highly skilled employees. If Velodyne fails to attract new personnel or fails to retain and motivate its current personnel, its business and future growth prospects could be adversely affected.

***The complexity of Velodyne's products could result in unforeseen delays or expenses from undetected defects, errors or bugs in hardware or software which could reduce the market adoption of its new products, damage its reputation with current or prospective customers, expose Velodyne to product liability and other claims and adversely affect its operating costs.***

Velodyne's products are highly technical and very complex and require high standards to manufacture and have in the past and will likely in the future experience defects, errors or bugs at various stages of development. Velodyne may be unable to timely release new products, manufacture existing products, correct problems that have arisen or correct such problems to its customers' satisfaction. Additionally, undetected errors, defects or security vulnerabilities, especially as new products are introduced or as new versions are released, could result in serious injury to the end users of technology incorporating Velodyne's products, or those in the surrounding area, its customers never being able to commercialize technology incorporating our products, litigation against Velodyne, negative publicity and other consequences. These risks are particularly prevalent in the highly competitive autonomous driving and ADAS markets. Some errors or defects in Velodyne's products may only be discovered after they have been tested, commercialized and deployed by customers. If that is the case, Velodyne may incur significant additional development costs and product recall, repair or replacement costs. These problems may also result in claims against Velodyne by its customers or others. Velodyne's reputation or brand may be damaged as a result of these problems and customers may be reluctant to buy its products, which could adversely affect its ability to retain existing customers and attract new customers, and could adversely affect its financial results.

In addition, Velodyne could face material legal claims for breach of contract, product liability, tort or breach of warranty as a result of these problems. Defending a lawsuit, regardless of its merit, could be costly

and may divert management's attention and adversely affect the market's perception of Velodyne and its products. In addition, Velodyne's business liability insurance coverage could prove inadequate with respect to a claim and future coverage may be unavailable on acceptable terms or at all. These product-related issues could result in claims against Velodyne and its business could be adversely affected.

***Velodyne may be subject to product liability or warranty claims that could result in significant direct or indirect costs, which could adversely affect its business and operating results.***

Velodyne's customers use its smart vision solutions in autonomous driving, ADAS and other applications that present the risk of significant injury, including fatalities. Velodyne may be subject to claims if a product using its lidar technology is involved in an accident and persons are injured or purport to be injured. Any insurance that Velodyne carries may not be sufficient or it may not apply to all situations. Similarly, Velodyne's customers could be subjected to claims as a result of such accidents and bring legal claims against Velodyne to attempt to hold it liable. In addition, if lawmakers or governmental agencies were to determine that the use of Velodyne's products or autonomous driving or certain ADAS increased the risk of injury to all or a subset of its customers, they may pass laws or adopt regulations that limit the use of Velodyne's products or increase its liability associated with the use of its products or that regulate the use of or delay the deployment of autonomous driving and ADAS technology. Any of these events could adversely affect Velodyne's brand, relationships with customers, operating results or financial condition.

Velodyne typically provides a limited-time warranty on its products. The occurrence of any material defects in its products could make Velodyne liable for damages and warranty claims. In addition, Velodyne could incur significant costs to correct any defects, warranty claims or other problems, including costs related to product recalls. Any negative publicity related to the perceived quality of Velodyne's products could affect its brand image, partner and customer demand, and adversely affect its operating results and financial condition. Also, warranty, recall and product liability claims may result in litigation, the occurrence of which could be costly, lengthy and distracting and adversely affect Velodyne's business and operating results.

***If Velodyne does not maintain sufficient inventory or if it does not adequately manage its inventory, it could lose sales or incur higher inventory-related expenses, which could negatively affect Velodyne's operating results.***

To ensure adequate inventory supply, Velodyne must forecast inventory needs and expenses, place orders sufficiently in advance with its suppliers and manufacturing partners and manufacture products based on its estimates of future demand for particular products. Fluctuations in the adoption of lidar products may affect Velodyne's ability to forecast its future operating results, including revenue, gross margins, cash flows and profitability. Velodyne's ability to accurately forecast demand for its products could be affected by many factors, including the rapidly changing nature of the markets in which it operates, including the autonomous driving, ADAS and mapping markets, the uncertainty surrounding the market acceptance and commercialization of lidar technology, the emergence of new markets, an increase or decrease in customer demand for Velodyne's products or for products and services of its competitors, product introductions by competitors, the COVID-19 pandemic and any associated work stoppages or interruptions, unanticipated changes in general market conditions and the weakening of economic conditions or consumer confidence in future economic conditions. If its lidar products are commercialized in autonomous driving, ADAS or other applications experiencing rapid growth in demand, Velodyne may face challenges acquiring adequate supplies to manufacture its products and/or Velodyne and its manufacturing partners may not be able to manufacture its products at a rate necessary to satisfy the levels of demand, which would negatively affect Velodyne's revenue. This risk may be exacerbated by the fact that Velodyne may not carry or be able to obtain for its manufacturers a significant amount of inventory to satisfy short-term demand increases. If it fails to accurately forecast customer demand, Velodyne may experience excess inventory levels or a shortage of products available for sale.

Inventory levels in excess of customer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would adversely affect Velodyne's financial results, including its gross margin, and have a negative effect on its brand. Conversely, if Velodyne underestimates customer demand for its products, Velodyne, or its manufacturing partners, may not be able to deliver products to meet its requirements, and this could result in damage to Velodyne's brand and customer relationships and adversely affect its revenue and operating results.

59

***Velodyne relies on third-party suppliers and because some of the raw materials and key components in its products come from limited or sole sources of supply, Velodyne is susceptible to supply shortages, long lead times for components, and supply changes, any of which could disrupt its supply chain and could delay deliveries of its products to customers.***

All of the components that go into the manufacture of Velodyne's smart vision solutions are sourced from third-party suppliers. To date, Velodyne has produced its products in relatively limited quantities for use in R&D programs. Velodyne does not have any experience in managing its supply chain to manufacture and deliver its products at scale. Some of the key components used to manufacture Velodyne's products come from limited or sole sources of supply. Velodyne is therefore subject to the risk of shortages and long lead times in the supply of these components and the risk that its suppliers discontinue or modify components used in its products. Velodyne has a global supply chain and the COVID-19 pandemic may adversely affect its ability to source components in a timely or cost effective manner from its third-party suppliers due to, among other things, work stoppages or interruptions. For example, Velodyne's products depend on lasers and Velodyne currently consumes a substantial portion of the available market. Any shortage of these lasers could materially and adversely affect Velodyne's ability to manufacture its smart vision solutions. In addition, the lead times associated with certain components are lengthy and preclude rapid changes in quantities and delivery schedules. Velodyne has in the past experienced and may in the future experience component shortages and price fluctuations of certain key components and materials, and the predictability of the availability and pricing of these components may be limited. Component shortages or pricing fluctuations could be material in the future. In the event of a component shortage, supply interruption or material pricing change from suppliers of these components, Velodyne may not be able to develop alternate sources in a timely manner or at all in the case of sole or limited sources. Developing alternate sources of supply for these components may be time-consuming, difficult, and costly and Velodyne may not be able to source these components on terms that are acceptable to it, or at all, which may undermine Velodyne's ability to meet its requirements or to fill customer orders in a timely manner. Any interruption or delay in the supply of any of these parts or components, or the inability to obtain these parts or components from alternate sources at acceptable prices and within a reasonable amount of time, would adversely affect Velodyne's ability to meet its scheduled product deliveries to its customers. This could adversely affect Velodyne's relationships with its customers and channel partners and could cause delays in shipment of its products and adversely affect its operating results. In addition, increased component costs could result in lower gross margins. Even where Velodyne is able to pass increased component costs along to its customers, there may be a lapse of time before it is able to do so such that Velodyne must absorb the increased cost. If Velodyne is unable to buy these components in quantities sufficient to meet its requirements on a timely basis, it will not be able to deliver products to its customers, which may result in such customers using competitive products instead of Velodyne's.

***The average selling prices of Velodyne's products could decrease rapidly over the life of the product, which may negatively affect Velodyne's revenue and gross margin.***

In the past Velodyne has substantially reduced the price of certain of its products to accelerate market adoption and solidify its position as a market leader. Velodyne expects the average selling prices of its products generally to continue to decline as its customers seek to commercialize autonomous systems at prices low enough to achieve market acceptance. In order to sell products that have a falling average unit selling price and maintain margins at the same time, Velodyne will need to continually reduce product and manufacturing costs. To manage manufacturing costs, Velodyne must engineer the most cost-effective design for its products. In addition, Velodyne continuously drives initiatives to reduce labor cost, improve worker efficiency, reduce the cost of materials, use fewer materials and further lower overall product costs by carefully managing component prices, inventory and shipping cost. Velodyne also needs to continually introduce new products with higher sales prices and gross margin in order to maintain its overall gross margin. If Velodyne is unable to manage the cost of older products or successfully introduce new products with higher gross margin, its revenue and overall gross margin would likely decline.

***Changes in Velodyne's product mix may impact its financial performance.***

Velodyne's financial performance can be affected by the mix of products it sells during a given period. If Velodyne's sales include more of the lower gross margin products than higher gross margin products, its

60

results of operations and financial condition may be adversely affected. There can be no guarantees that Velodyne will be able to successfully alter its product mix so that it is selling more of its high gross margin products. In addition, Velodyne's earnings forecasts and guidance after the Business Combination are expected to include assumptions about product sales mixes. If actual results vary from this projected product mix of sales, its Velodyne's results of operations and financial condition could be adversely affected.

*Velodyne's management team has limited experience managing a public company.*

Most of the members of Velodyne's management team have limited experience managing a publicly-traded company, interacting with public company investors, and complying with the increasingly-complex laws pertaining to public companies. Additionally, many members of Velodyne's management team were recently hired or assumed new roles, including its chief executive officer, Dr. Anand Gopalan, who was promoted from chief technology officer in January 2020. Velodyne's management team may not successfully or efficiently manage their new roles and responsibilities, Velodyne's transition to being a public company subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents will require significant attention from Velodyne's senior management and could divert their attention away from the day-to-day management of Velodyne's business, which could adversely affect Velodyne's business, financial condition, and operating results.

*Velodyne may experience difficulties in managing its growth and expanding its operations.*

Velodyne expects to experience significant growth in the scope and nature of its operations. Velodyne's ability to manage its operations and future growth will require Velodyne to continue to improve its operational, financial and management controls, compliance programs and reporting systems. Velodyne is currently in the process of strengthening its compliance programs, including its compliance programs related to export controls, privacy and cybersecurity and anti-corruption. Velodyne may not be able to implement improvements in an efficient or timely manner and may discover deficiencies in existing controls, programs, systems and procedures, which could have an adverse effect on its business, reputation and financial results.

*Velodyne's sales and operations in international markets expose it to operational, financial and regulatory risks.*

International sales comprise a significant amount of Velodyne's overall revenue. Sales to international customers accounted for 28%, 41%, 54% and 69% of Velodyne's revenue in 2017, 2018, 2019 and the three months ended March 31, 2020, respectively. Velodyne is committed to growing its international sales, and while it has committed resources to expanding its international operations and sales channels, these efforts may not be successful. International operations are subject to a number of other risks, including:

- Exchange rate fluctuations.

- Political and economic instability, international terrorism and anti-American sentiment, particularly in emerging markets.

- Global or regional health crises, such as the COVID-19 pandemic.

- Potential for violations of anti-corruption laws and regulations, such as those related to bribery and fraud.

- Preference for locally branded products, and laws and business practices favoring local competition.

- Potential consequences of, and uncertainty related to, the "Brexit" process in the United Kingdom, which could lead to additional expense and complexity in doing business there.

- Increased difficulty in managing inventory.

- Delayed revenue recognition.

- Less effective protection of intellectual property.

- Stringent regulation of the autonomous or other systems or products using Velodyne's products and stringent consumer protection and product compliance regulations, including but not limited to

61

General Data Protection Regulation in the European Union, European competition law, the Restriction of Hazardous Substances directive, the Waste Electrical and Electronic Equipment directive and the European Ecodesign directive that are costly to comply with and may vary from country to country.

- Difficulties and costs of staffing and managing foreign operations.

- Import and export laws and the impact of tariffs.

- Changes in local tax and customs duty laws or changes in the enforcement, application or interpretation of such laws.

The occurrence of any of these risks could negatively affect Velodyne's international business and consequently its business, operating results and financial condition.

***Velodyne's business is subject to the risks of earthquakes, fire, floods and other natural catastrophic events, global pandemics, and interruptions by man-made problems, such as network security breaches, computer viruses or terrorism. Material disruptions of Velodyne's business or information systems resulting from these events could adversely affect its operating results.***

A significant natural disaster, such as an earthquake, fire, flood or significant power outage or other similar events, such as infectious disease outbreaks or pandemic events, including the COVID-19 pandemic, could have an adverse effect on Velodyne's business and operating results. The COVID-19 pandemic may have the effect of heightening many of the other risks described in this "Risk Factors" section, such as the demand for Velodyne's products, its ability to achieve or maintain profitability and its ability to raise additional capital in the future. Despite the implementation of network security measures, Velodyne's networks and lidar products also may be vulnerable to computer viruses, break-ins and similar disruptions from unauthorized tampering with its solutions. Both Velodyne's corporate headquarters and its manufacturing facility are located in the San Francisco Bay Area, a region known for seismic activity. In addition, natural disasters, acts of terrorism or war could cause disruptions in Velodyne's remaining manufacturing operations, Velodyne's or its customers' or channel partners' businesses, Velodyne's suppliers' or the economy as a whole. Velodyne also relies on information technology systems to communicate among its workforce and with third parties. Any disruption to Velodyne's communications, whether caused by a natural disaster or by manmade problems, such as power disruptions, could adversely affect its business. Velodyne does not have a formal disaster recovery plan or policy in place and does not currently require that its suppliers' partners have such plans or policies in place. To the extent that any such disruptions result in delays or cancellations of orders or impede its suppliers' ability to timely deliver product components, or the deployment of its products, Velodyne's business, operating results and financial condition would be adversely affected.

**Risks Related to the Company and the Business Combination**

***Our Initial Stockholders have agreed to vote in favor of the Business Combination and the other proposals described in this proxy statement, regardless of how our public stockholders vote.***

Unlike many other blank check companies in which the founders agree to vote their Founder Shares in accordance with the majority of the votes cast by the holders of public stock in connection with an initial business combination, our Initial Stockholders have agreed to vote any shares of common stock owned by them in favor of the Business Combination Proposal and the other proposals described in this proxy statement. As of the date hereof, our Initial Stockholders own shares equal to 34.7% of our issued and outstanding shares of common stock. Accordingly, it is more likely that the necessary stockholder approval will be received for the Business Combination than would be the case if our Initial Stockholders agreed to vote any shares of common stock owned by them in accordance with the majority of the votes cast by our public stockholders.

***Our Sponsor, certain members of our Board and our officers have interests in the Business Combination that are different from or are in addition to other stockholders in recommending that stockholders vote in favor of approval of the Business Combination Proposal and approval of the other proposals described in this proxy statement.***

When considering our Board's recommendation that our stockholders vote in favor of the approval of the Business Combination Proposal, our stockholders should be aware that the directors and officers of the

Company have interests in the Business Combination that may be different from, or in addition to, the interests of our stockholders. These interests include:

- the fact that our Initial Stockholders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve the Business Combination;

- the fact that our Sponsor will retain 2,507,000 Founder Shares upon the Closing, 275,000 of which shall be Earnout Founder Shares subject to certain vesting and cancellation provisions as described in the Sponsor Agreement, and which if unrestricted and freely tradable would be valued at approximately $[•] based on the closing price of our common stock on NYSE on [•], 2020 but, given the restrictions on such shares, we believe such shares have less value;

- the fact that our Initial Stockholders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete an initial business combination by the applicable deadline;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party (other than our independent public accountants) for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that James Graf will join as a board member of the post-combination company and Michael Dee will continue as a board member of the post-combination company, and each shall be entitled to receive compensation for serving on the board of directors of the post-combination company;

- the fact that our Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the applicable deadline; and

- that the Sponsor has entered into a Subscription Agreement with the Company, pursuant to which the Sponsor has committed to purchase 950,000 shares of common stock in the PIPE Investment for an aggregate commitment of approximately $9,500,000.

Our Initial Stockholders, including our Sponsor and our independent directors, hold a significant number of shares of our common stock. They will lose their entire investment in us if a business combination is not completed.

Our Initial Stockholders hold in the aggregate 6,094,128 Founder Shares, representing 34.7% of the total outstanding shares upon completion of our IPO. The Founder Shares will be worthless if we do not complete a business combination by the applicable deadline.

The Founder's Shares are identical to the shares of common stock included in the public units, except that: (i) the Founder Shares are subject to certain transfer restrictions; (ii) our Initial Stockholders, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed: (a) to waive their redemption rights with respect to their shares of common stock in connection with the completion of our Business Combination; (b) waive their redemption rights with respect to their shares of common stock in connection with a stockholder vote to approve an amendment to our current certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of the IPO or to provide for redemption in connection with a business combination; and (c) to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete our initial business combination by the applicable deadline (although they will be entitled to liquidating distributions from the Trust Account with respect to any public shares they hold if we fail to complete our initial business combination by the applicable deadline.

63

The personal and financial interests of our officers and directors may have influenced their motivation in identifying and selecting Velodyne, completing a business combination with Velodyne and may influence their operation of the post-combination company following the Business Combination. This risk may become more acute as the deadline of the applicable deadline for completing an initial business combination nears.

***Our Sponsor, directors or officers or their affiliates may elect to purchase shares or warrants from public stockholders, which may influence a vote on a proposed Business Combination and the other proposals described in this proxy statement and reduce the public "float" of our common stock.***

Our Sponsor, directors or officers or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our Business Combination, although they are under no obligation to do so. Such a purchase may include a contractual acknowledgement that such stockholder, although still the record holder of our shares is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that our Sponsor, directors, officers or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. The purpose of such purchases could be to vote such shares in favor of the Business Combination and thereby increase the likelihood of obtaining stockholder approval of the Business Combination or to satisfy closing conditions in the Merger Agreement regarding required amounts in the Trust Account and the proceeds from the PIPE Investment equaling or exceeding certain thresholds where it appears that such requirements would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding or to vote such warrants on any matters submitted to the warrant holders for approval in connection with our initial business combination. This may result in the completion of our Business Combination that may not otherwise have been possible. Any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements.

In addition, if such purchases are made, the public "float" of our common stock and the number of beneficial holders of our securities may be reduced, possibly making it difficult to obtain or maintain the quotation, listing or trading of our securities on the NYSE or another national securities exchange or reducing the liquidity of the trading market for our common stock.

***Our public stockholders will experience dilution as a consequence of, among other transactions, the issuance of common stock as consideration in the Business Combination and the PIPE Investment. Having a minority share position may reduce the influence that our current stockholders have on the management of the post-combination company.***

The issuance of the common stock in the Business Combination and in the PIPE Investment will dilute the equity interest of our existing stockholders and may adversely affect prevailing market prices for our public shares and/or public warrants.

It is anticipated that, upon completion of the Business Combination, assuming no redemptions: (i) the Company's public stockholders will retain an ownership interest of approximately 6.7% in the post-combination company (not including shares beneficially owned by our Sponsor); (ii) the PIPE Investors will own approximately 8.7% of the post-combination company (such that public stockholders, including PIPE Investors, will own approximately 15.4% of the post-combination company); (iii) our Initial Stockholders (including our Sponsor) will own approximately 1.3% of the post-combination company; and (iv) the former Velodyne equity holders will own approximately 83.3% of the post-combination company, assuming $50,000,000 of cash is used to repurchase Velodyne shares. The PIPE Investors have agreed to purchase in the aggregate 15,000,000 shares of common stock, for approximately $150,000,000 of gross proceeds, in the PIPE Investment. The ownership percentage with respect to the post-combination company following the Business Combination does not take into account (i) warrants to purchase common stock that will remain outstanding immediately following the Business Combination, (ii) the issuance of earn-out shares to the Velodyne equity holders or our Sponsor should the earn-out conditions in the Merger Agreement be satisfied or (iii) the issuance of any shares upon completion of the Business Combination under the Incentive Plan or the ESPP, copies of which are attached to this proxy statement as Annex F and Annex G, respectively Depending on the number of public shares redeemed, our current stockholders could own a

majority of the voting rights in the post-combination company, but would not have effective control over the post-combination company. For more information, please see the sections entitled "*Summary of the Proxy Statement — Impact of the Business Combination on the Company's Public Float,*" "*Unaudited Pro Forma Condensed Combined Financial Information*" and "*Proposal No. 5 — Approval of the Incentive Plan.*"

**The NYSE may not list our securities on its exchange, which could limit investors' ability to make transactions in our securities and subject us to additional trading restrictions.**

In connection with the Business Combination, in order to continue to maintain the listing of our securities on the NYSE, we will be required to demonstrate compliance with the NYSE's initial listing requirements, which are more rigorous than the NYSE's continued listing requirements. We will seek to have the post-combination company's securities listed on the NYSE upon consummation of the Business Combination. We cannot assure you that we will be able to meet all initial listing requirements. Even if the post-combination company's securities are listed on the NYSE, we may be unable to maintain the listing of its securities in the future.

If we fail to meet the initial listing requirements and the NYSE does not list the post-combination company's securities on its exchange, Velodyne would not be required to consummate the Business Combination. In the event that Velodyne elected to waive this condition, and the Business Combination was consummated without the post-combination company's securities being listed on the NYSE or on another national securities exchange, we could face significant material adverse consequences, including:

- a limited availability of market quotations for our securities;

- reduced liquidity for our securities;

- a determination that our common stock is a "penny stock" which will require brokers trading in our common stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our securities;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." If the post-combination company's securities were not listed on the NYSE, such securities would not qualify as covered securities and we would be subject to regulation in each state in which we offer our securities because states are not preempted from regulating the sale of securities that are not covered securities. Although the states are preempted from regulating the sale of our securities, the federal statute does allow the states to investigate companies if there is a suspicion of fraud, and, if there is a finding of fraudulent activity, then the states can regulate or bar the sale of covered securities in a particular case. While we are not aware of a state, other than the State of Idaho, having used these powers to prohibit or restrict the sale of securities issued by blank check companies, certain state securities regulators view blank check companies unfavorably and might use these powers, or threaten to use these powers, to hinder the sale of securities of blank check companies in their states.

**Resales of the shares of common stock included in the stock consideration could depress the market price of our common stock.**

We will have approximately 172.3 million shares of common stock outstanding immediately following the Business Combination, and there may be a large number of shares of common stock sold in the market following the completion of the Business Combination or shortly thereafter. The shares held by the Company's public stockholders are freely tradable, and the shares of common stock held by the PIPE Investors will be freely tradable following effectiveness of the registration statement that we have agreed to file in connection with the Business Combination covering the resales of such shares. In addition, the Company will be obligated to register the resale of shares of common stock issued as merger consideration, which shares will become available for resale following the expiration of any applicable lockup period. We also expect that Rule 144 will become available for the resale of shares of our common stock that are not registered for resale once one year has elapsed from the date that we file the Current Report on Form 8-K following the

65

Closing that includes the required Form 10 information that reflects we are no longer a shell company. Such sales of shares of common stock or the perception of such sales may depress the market price of our common stock.

***We have no operating history and are subject to a mandatory liquidation and subsequent dissolution requirement. As such, there is a risk that we will be unable to continue as a going concern if we do not consummate an initial business combination by the applicable deadline. If we are unable to effect an initial business combination by the applicable deadline, we will be forced to liquidate and our warrants will expire worthless.***

We are a blank check company, and as we have no operating history and are subject to a mandatory liquidation and subsequent dissolution requirement, there is a risk that we will be unable to continue as a going concern if we do not consummate an initial business combination by the applicable deadline. Unless we amend our current certificate of incorporation to extend the life of the Company and certain other agreements into which we have entered, if we do not complete an initial business combination by the applicable deadline, we will: (i) cease all operations except for the purpose of winding up; (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses) divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law; and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board, dissolve and liquidate, subject in each case to our obligations under the DGCL to provide for claims of creditors and the requirements of other applicable law. In the event of such distribution, it is possible that the per share value of the residual assets remaining available for distribution (including Trust Account assets) will be less than the initial public offering price per public unit in the IPO. In addition, if we fail to complete an initial business combination by the applicable deadline, there will be no redemption rights or liquidating distributions with respect to our public warrants or the private placement warrants, which will expire worthless. We expect to consummate the Business Combination and do not intend to take any action to extend the life of the Company beyond the applicable deadline if we are unable to effect an initial business combination by that date.

***Even if we consummate the Business Combination, there is no guarantee that the public warrants will ever be in the money, and they may expire worthless and the terms of our public warrants may be amended.***

The exercise price for the public warrants is $11.50 per share of common stock. There is no guarantee that the public warrants will ever be in the money prior to their expiration, and as such, the public warrants may expire worthless.

***Our ability to successfully effect the Business Combination and to be successful thereafter will be dependent upon the efforts of our key personnel, including the key personnel of Velodyne. The loss of key personnel could negatively impact the operations and profitability of our post-combination business and its financial condition could suffer as a result.***

Our ability to successfully effect our Business Combination is dependent upon the efforts of our key personnel, including the key personnel of Velodyne. Although some of our key personnel are expected to remain with the post-combination company as members of the board of directors or in advisory positions following our Business Combination, it is possible that we will lose some key personnel, the loss of which could negatively impact the operations and profitability of our post-combination business. We anticipate that the executive officers of Velodyne will serve the post-combination company in their respective roles immediately following the Closing.

Velodyne's success depends to a significant degree upon the continued contributions of senior management, certain of whom would be difficult to replace. Departure by certain of Velodyne's officers could have a material adverse effect on Velodyne's business, financial condition, or operating results. The services of such personnel may not continue to be available to the post-combination company following the Closing.

66

***The Company and Velodyne will be subject to business uncertainties and contractual restrictions while the Business Combination is pending.***

Uncertainty about the effect of the Business Combination on employees and third parties may have an adverse effect on the Company and Velodyne. These uncertainties may impair our or Velodyne's ability to retain and motivate key personnel and could cause third parties that deal with any of us or them to defer entering into contracts or making other decisions or seek to change existing business relationships. If key employees depart because of uncertainty about their future roles and the potential complexities of the Business Combination, our or Velodyne's business could be harmed.

***We may waive one or more of the conditions to the Business Combination.***

We may agree to waive, in whole or in part, one or more of the conditions to our obligations to complete the Business Combination, to the extent permitted by our current certificate of incorporation and bylaws and applicable laws. We may not waive the condition that our stockholders approve the Business Combination. Please see the section entitled "*Proposal No. 1 — Approval of the Business Combination — The Merger Agreement — Conditions to Closing of the Business Combination*" for additional information.

***The exercise of discretion by our directors and officers in agreeing to changes to the terms of or waivers of closing conditions in the Merger Agreement may result in a conflict of interest when determining whether such changes to the terms of the Merger Agreement or waivers of conditions are appropriate and in the best interests of our stockholders.***

In the period leading up to the Closing, other events may occur that, pursuant to the Merger Agreement, would require the Company to agree to amend the Merger Agreement, to consent to certain actions or to waive rights that we are entitled to under those agreements. Such events could arise because of changes in the course of Velodyne's business, a request by Velodyne to undertake actions that would otherwise be prohibited by the terms of the Merger Agreement or the occurrence of other events that would have a material adverse effect on Velodyne's business and would entitle the Company to terminate the Merger Agreement. In any of such circumstances, it would be in the discretion of the Company, acting through the Board, to grant its consent or waive its rights. The existence of the financial and personal interests of the directors described elsewhere in this proxy statement may result in a conflict of interest on the part of one or more of the directors between what he or she may believe is best for the Company and our stockholders and what he or she may believe is best for himself or herself or his or her affiliates in determining whether or not to take the requested action. As of the date of this proxy statement, we do not believe there will be any changes or waivers that our directors and officers would be likely to make after stockholder approval of the Business Combination has been obtained. While certain changes could be made without further stockholder approval, if there is a change to the terms of the Business Combination that would have a material impact on the stockholders, we will be required to circulate a new or amended proxy statement or supplement thereto and resolicit the vote of our stockholders with respect to the Business Combination Proposal.

***We and Velodyne will incur significant transaction and transition costs in connection with the Business Combination.***

We and Velodyne have both incurred and expect to incur significant, non-recurring costs in connection with consummating the Business Combination and operating as a public company following the consummation of the Business Combination. We and Velodyne may also incur additional costs to retain key employees. All expenses incurred in connection with the Merger Agreement and the transactions contemplated thereby (including the Business Combination), including all legal, accounting, consulting, investment banking and other fees, expenses and costs, will be for the account of the party incurring such fees, expenses and costs or paid by the Company following the Closing.

The aggregate transaction expenses as a result of the Business Combination are expected to be approximately $31 million. The per-share amount we will distribute to stockholders who properly exercise their redemption rights will not be reduced by the transaction expenses and after such redemptions, the per-share value of shares held by non-redeeming stockholders will reflect our obligation to pay the transaction expenses.

***If we are unable to complete an initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of the Trust Account (or less than $10.00 per share in certain circumstances where a third party brings a claim against us that our Sponsor is unable to indemnify), and our warrants will expire worthless.***

If we are unable to complete an initial business combination by the applicable deadline, our public stockholders may receive only approximately $10.00 per share on the liquidation of the Trust Account (or less than $10.00 per share in certain circumstances where a third-party brings a claim against us that our Sponsor is unable to indemnify (as described herein)) and our warrants will expire worthless.

***If third parties bring claims against us, the proceeds held in the Trust Account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share.***

Our placing of funds in the Trust Account may not protect those funds from third-party claims against us. Although we will seek to have all vendors, service providers, prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any funds held in the Trust Account for the benefit of our public stockholders, such parties may not execute such agreements, or even if they execute such agreements they may not be prevented from bringing claims against the Trust Account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against our assets, including the funds held in the Trust Account. If any third party refuses to execute an agreement waiving such claims to the funds held in the Trust Account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third-party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative.

Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the Trust Account for any reason.

Upon redemption of our public shares, if we are unable to complete our initial business combination within the prescribed timeframe, or upon the exercise of a redemption right in connection with our initial business combination, we will be required to provide for payment of claims of creditors that were not waived that may be brought against us within the ten years following redemption. Accordingly, the per-share redemption amount received by public stockholders could be less than the $10.00 per share initially held in the Trust Account, due to claims of such creditors.

Our Sponsor has agreed that it will be liable to us if and to the extent any claims by a third party for services rendered or products sold to us, or a prospective target business with which we have entered into a written letter of intent, confidentiality or similar agreement or business combination agreement, reduce the amount of funds in the Trust Account to below the lesser of (i) $10.00 per public share and (ii) the actual amount per public share held in the Trust Account as of the date of the liquidation of the Trust Account if less than $10.00 per share due to reductions in the value of the trust assets, less taxes payable, provided that such liability will not apply to any claims by a third party or prospective target business who executed a waiver of any and all rights to the monies held in the Trust Account (whether or not such waiver is enforceable) nor will it apply to any claims under our indemnity of the underwriter of our IPO against certain liabilities, including liabilities under the Securities Act. However, we have not asked our Sponsor to reserve for such indemnification obligations, nor have we independently verified whether our Sponsor has sufficient funds to satisfy its indemnity obligations and believe that our Sponsor's only assets are securities of our Company. Therefore, we cannot assure you that our Sponsor would be able to satisfy those obligations. As a result, if any such claims were successfully made against the Trust Account, the funds available for our business combination and redemptions could be reduced to less than $10.00 per public share. In such event, we may not be able to complete our business combination, and you would receive such lesser amount per share in

68

connection with any redemption of your public shares. None of our officers or directors will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

***Our directors may decide not to enforce the indemnification obligations of our Sponsor, resulting in a reduction in the amount of funds in the Trust Account available for distribution to our public stockholders.***

In the event that the proceeds in the Trust Account are reduced below the lesser of (i) $10.00 per public share and (ii) the actual amount per share held in the Trust Account as of the date of the liquidation of the Trust Account if less than $10.00 per share due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, and our Sponsor asserts that it is unable to satisfy its obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our Sponsor to enforce its indemnification obligations. While we currently expect that our independent directors would take legal action on our behalf against our Sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment and subject to their fiduciary duties may choose not to do so in any particular instance if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. If our independent directors choose not to enforce these indemnification obligations, the amount of funds in the Trust Account available for distribution to our public stockholders may be reduced below $10.00 per share.

***If, before distributing the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of our stockholders and the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.***

If, before distributing the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the Trust Account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the Trust Account, the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.

***Following the consummation of the Business Combination, our only significant asset will be our ownership interest in Velodyne and such ownership may not be sufficient to pay dividends or make distributions or loans to enable us to pay any dividends on our common stock or satisfy our other financial obligations.***

Following the consummation of the Business Combination, we will have no direct operations and no significant assets other than our ownership of Velodyne. We and certain investors, the Velodyne equity holders, and directors and officers of Velodyne and its affiliates will become stockholders of the post-combination company at that time. We will depend on Velodyne for distributions, loans and other payments to generate the funds necessary to meet our financial obligations, including our expenses as a publicly traded company and to pay any dividends with respect to our common stock. The financial condition and operating requirements of Velodyne may limit our ability to obtain cash from Velodyne. The earnings from, or other available assets of, Velodyne may not be sufficient to pay dividends or make distributions or loans to enable us to pay any dividends on our common stock or satisfy our other financial obligations.

The ability of Velodyne to make distributions, loans and other payments to us for the purposes described above and for any other purpose may be limited by credit agreements to which Velodyne is party from time to time, including the existing loan and security agreement described in "*Velodyne's Management's Discussion and Analysis of Financial Condition and Results of Operations*", and will be subject to the negative covenants set forth therein. Any loans or other extensions of credit to us from Velodyne will be permitted only to the extent there is an applicable exception to the investment covenants under these credit agreements. Similarly, any dividends, distributions or similar payments to us from Velodyne will be permitted only to the extent there is an applicable exception to the dividends and distributions covenants under these credit agreements.

69

***Subsequent to our completion of our Business Combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and our stock price, which could cause you to lose some or all of your investment.***

Although we have conducted due diligence on Velodyne, we cannot assure you that this diligence will surface all material issues that may be present in Velodyne's business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of Velodyne's business and outside of our and Velodyne's control will not later arise. As a result of these factors, we may be forced to later write down or write off assets, restructure operations, or incur impairment or other charges that could result in losses. Even if our due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may be non-cash items and not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about the post-combination company or its securities. Accordingly, any of our stockholders who choose to remain stockholders following our Business Combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***We have no operating or financial history and our results of operations and those of the post-combination company may differ significantly from the unaudited pro forma financial data included in this proxy statement.***

We are a blank check company and we have no operating history and no revenues. This proxy statement includes unaudited pro forma condensed combined financial statements for the post-combination company. The unaudited pro forma condensed combined statement of operations of the post-combination company combines the historical audited results of operations of the Company for the year ended December 31, 2019 and the unaudited results of the Company for the three months ended March 31, 2020, with the historical audited results of operations of Velodyne for the year ended December 31, 2019 and the unaudited results of Velodyne for the three months ended March 31, 2020, respectively, and gives pro forma effect to the Business Combination as if it had been consummated on January 1, 2019. The unaudited pro forma condensed combined balance sheet of the post-combination company combines the historical balance sheets of the Company as of March 31, 2020 and of Velodyne as of March 31, 2020 and gives pro forma effect to the Business Combination as if it had been consummated on March 31, 2020.

The unaudited pro forma condensed combined financial statements are presented for illustrative purposes only, are based on certain assumptions, address a hypothetical situation and reflect limited historical financial data. Therefore, the unaudited pro forma condensed combined financial statements are not necessarily indicative of the results of operations and financial position that would have been achieved had the Business Combination and the acquisitions by Velodyne been consummated on the dates indicated above, or the future consolidated results of operations or financial position of the post-combination company. Accordingly, the post-combination company's business, assets, cash flows, results of operations and financial condition may differ significantly from those indicated by the unaudited pro forma condensed combined financial statements included in this document. For more information, please see the section entitled "*Unaudited Pro Forma Condensed Combined Financial Information*."

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our financial condition and results of operations.***

We will be subject to income taxes in the United States and other jurisdictions, and our tax liabilities will be subject to the allocation of expenses in differing jurisdictions. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;

- expected timing and amount of the release of any tax valuation allowances;

- tax effects of stock-based compensation;

- costs related to intercompany restructurings;

- changes in tax laws, regulations or interpretations thereof; or

70

- lower than anticipated future earnings in jurisdictions where we have lower statutory tax rates and higher than anticipated future earnings in jurisdictions where we have higher statutory tax rates.

In addition, we may be subject to audits of our income, sales and other transaction taxes by taxing authorities. Outcomes from these audits could have an adverse effect on our financial condition and results of operations.

***A market for our securities may not continue, which would adversely affect the liquidity and price of our securities.***

Following the Business Combination, the price of our securities may fluctuate significantly due to the market's reaction to the Business Combination and general market and economic conditions. An active trading market for our securities following the Business Combination may never develop or, if developed, it may not be sustained. In addition, the price of our securities after the Business Combination can vary due to general economic conditions and forecasts, our general business condition and the release of our financial reports. Additionally, if our securities are not listed on, or become delisted from, the NYSE for any reason, and are quoted on the OTC Bulletin Board, an inter-dealer automated quotation system for equity securities that is not a national securities exchange, the liquidity and price of our securities may be more limited than if we were quoted or listed on the NYSE or another national securities exchange. You may be unable to sell your securities unless a market can be established or sustained.

***If the Business Combination's benefits do not meet the expectations of investors, stockholders or financial analysts, the market price of our securities may decline.***

If the benefits of the Business Combination do not meet the expectations of investors or securities analysts, the market price of the Company's securities prior to the Closing may decline. The market values of our securities at the time of the Business Combination may vary significantly from their prices on the date the Merger Agreement was executed, the date of this proxy statement, or the date on which our stockholders vote on the Business Combination.

In addition, following the Business Combination, fluctuations in the price of our securities could contribute to the loss of all or part of your investment. Immediately prior to the Business Combination, there has not been a public market for Velodyne's stock and trading in the shares of our common stock has not been active. Accordingly, the valuation ascribed to Velodyne and our common stock in the Business Combination may not be indicative of the price of the post-combination company that will prevail in the trading market following the Business Combination. If an active market for our securities develops and continues, the trading price of our securities following the Business Combination could be volatile and subject to wide fluctuations in response to various factors, some of which are beyond our control. Any of the factors listed below could have a material adverse effect on your investment in our securities and our securities may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of our securities may not recover and may experience a further decline.

Factors affecting the trading price of the post-combination company's securities following the Business Combination may include:

- actual or anticipated fluctuations in our quarterly financial results or the quarterly financial results of companies perceived to be similar to us;

- changes in the market's expectations about our operating results;

- the public's reaction to our press releases, our other public announcements and our filings with the SEC;

- speculation in the press or investment community;

- announcements of technological innovation, new products, acquisitions, strategic alliances, significant agreements by us or competitors;

- success of competitors;

- our operating results failing to meet the expectation of securities analysts or investors in a particular period;

- changes in financial estimates and recommendations by securities analysts concerning the post-combination company or the market in general;

- operating and stock price performance of other companies that investors deem comparable to the post-combination company;

- our ability to market new and enhanced products on a timely basis;

- changes in laws and regulations affecting our business;

- commencement of, or involvement in, litigation involving the post-combination company;

- changes in the post-combination company's capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of shares of our common stock available for public sale;

- any major change in our Board or management;

- sales of substantial amounts of common stock by our directors, officers or significant stockholders or the perception that such sales could occur;

- the expiration of the market stand-off or contractual lock-up agreements;

- the realization of any of the risk factors presented in this proxy statement;

- additions or departures of key personnel;

- failure to comply with the requirements of the NYSE;

- failure to comply with SOX or other laws or regulations;

- actual, potential or perceived control, accounting or reporting problems;

- changes in accounting principles, policies and guidelines; and

- general economic and political conditions such as recessions, interest rates, fuel prices, international currency fluctuations and acts of war or terrorism.

Broad market and industry factors may materially harm the market price of our securities irrespective of our operating performance. The stock market in general and the NYSE have experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. The trading prices and valuations of these stocks, and of our securities, may not be predictable. A loss of investor confidence in the market for the stocks of other companies which investors perceive to be similar to the post-combination company could depress our stock price regardless of our business, prospects, financial conditions or results of operations. A decline in the market price of our securities also could adversely affect our ability to issue additional securities and our ability to obtain additional financing in the future.

In the past, securities class action litigation has often been initiated against companies following periods of volatility in their stock price. This type of litigation could result in substantial costs and divert our management's attention and resources, and could also require us to make substantial payments to satisfy judgments or to settle litigation.

***Because Velodyne's sales have been primarily to customers making purchases for R&D projects and Velodyne's orders are project-based, we expect our results of operations to fluctuate on a quarterly and annual basis, which could cause our stock price to fluctuate or decline.***

Velodyne's quarterly results of operations have fluctuated in the past and may vary significantly in the future, and Velodyne's revenue has declined in two consecutive years. As such, historical comparisons of Velodyne's operating results may not be meaningful. In particular, because Velodyne's sales to date have primarily been to customers making purchases for R&D, sales in any given quarter can fluctuate based on the

72

timing and success of Velodyne's customers' development projects. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Velodyne's quarterly financial results may fluctuate as a result of a variety of factors, many of which are outside of Velodyne's control and may not fully reflect the underlying performance of Velodyne's business. These fluctuations could adversely affect our ability to meet our expectations or those of securities analysts or investors. If Velodyne does not meet these expectations for any period, the trading price of our common stock could decline significantly. Factors that may cause these quarterly fluctuations include, without limitation, those listed below:

- The timing and magnitude of orders and shipments of Velodyne's products in any quarter.

- Pricing changes Velodyne may adopt to drive market adoption or in response to competitive pressure.

- Velodyne's ability to retain Velodyne's existing customers and attract new customers.

- Velodyne's ability to develop, introduce, manufacture and ship in a timely manner products that meet customer requirements.

- Disruptions in Velodyne's sales channels or termination of Velodyne's relationship with important channel partners.

- Delays in customers' purchasing cycles or deferments of customers' purchases in anticipation of new products or updates from Velodyne or Velodyne's competitors.

- Fluctuations in demand pressures for Velodyne's products.

- The mix of products sold in any quarter.

- The duration of the global coronavirus pandemic and the time it takes for economic recovery.

- The timing and rate of broader market adoption of autonomous systems utilizing our smart vision solutions across the automotive and other market sectors.

- Market acceptance of lidar and further technological advancements by our competitors and other market participants.

- The ability of Velodyne's customers to commercialize systems that incorporate Velodyne's products.

- Any change in the competitive dynamics of Velodyne's markets, including consolidation of competitors, regulatory developments and new market entrants.

- Velodyne's ability to effectively manage Velodyne's inventory.

- Changes in the source, cost, availability of and regulations pertaining to materials Velodyne uses.

- Adverse litigation, judgments, settlements or other litigation-related costs, or claims that may give rise to such costs.

- General economic, industry and market conditions, including trade disputes.

***If, following the Business Combination, securities or industry analysts do not publish or cease publishing research or reports about the post-combination company, its business, or its market, or if they change their recommendations regarding our common stock adversely, then the price and trading volume of our common could decline.***

The trading market for our common stock will be influenced by the research and reports that industry or securities analysts may publish about us, our business, our market, or our competitors. Securities and industry analysts do not currently, and may never, publish research on the Company or the post-combination company. If no securities or industry analysts commence coverage of the post-combination company, our stock price and trading volume would likely be negatively impacted. If any of the analysts who may cover the post-combination company change their recommendation regarding our stock adversely, or provide more favorable relative recommendations about our competitors, the price of our common stock would likely decline. If any analyst who may cover the Company were to cease coverage of the post-combination company or fail to regularly publish reports on it, we could lose visibility in the financial markets, which could cause our stock price or trading volume to decline.

73

***Changes in laws, regulations or rules, or a failure to comply with any laws, regulations or rules, may adversely affect our business, investments and results of operations.***

We are subject to laws, regulations and rules enacted by national, regional and local governments and the NYSE. In particular, we are required to comply with certain SEC, NYSE and other legal or regulatory requirements. Compliance with, and monitoring of, applicable laws, regulations and rules may be difficult, time consuming and costly. Those laws, regulations or rules and their interpretation and application may also change from time to time and those changes could have a material adverse effect on our business, investments and results of operations. In addition, a failure to comply with applicable laws, regulations or rules, as interpreted and applied, could have a material adverse effect on our business and results of operations.

***We have not registered the shares of common stock issuable upon exercise of the public warrants under the Securities Act or any state securities laws at this time, and such registration may not be in place when an investor desires to exercise public warrants, thus precluding such investor from being able to exercise its public warrants except on a cashless basis and potentially causing such public warrants to expire worthless.***

We have not registered the shares of common stock issuable upon exercise of the public warrants under the Securities Act or any state securities laws at this time. However, under the terms of the warrant agreement, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement for the registration under the Securities Act of the shares of common stock issuable upon exercise of the warrants and thereafter will use our best efforts to cause the same to become effective within 60 business days following our initial business combination and to maintain a current prospectus relating to the common stock issuable upon exercise of the public warrants, until the expiration of the public warrants in accordance with the provisions of the warrant agreement. We cannot assure you that we will be able to do so if, for example, any facts or events arise which represent a fundamental change in the information set forth in the registration statement or prospectus, the financial statements contained or incorporated by reference therein are not current or correct or the SEC issues a stop order. If the shares issuable upon exercise of the public warrants are not registered under the Securities Act, we will be required to permit holders to exercise their public warrants on a cashless basis. However, no public warrant will be exercisable for cash or on a cashless basis, and we will not be obligated to issue any shares to holders seeking to exercise their public warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder or an exemption from registration is available. Notwithstanding the above, if our common stock is at the time of any exercise of a public warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their public warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, and in the event we do not so elect, we will use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. In no event will we be required to net cash settle any public warrant, or issue securities or other compensation in exchange for the public warrants in the event that we are unable to register or qualify the shares underlying the public warrants under applicable state securities laws and there is no exemption available. If the issuance of the shares upon exercise of the public warrants is not so registered or qualified or exempt from registration or qualification, the holder of such public warrant shall not be entitled to exercise such public warrant and such public warrant may have no value and expire worthless. In such event, holders who acquired their public warrants as part of a purchase of public units will have paid the full unit purchase price solely for the shares of common stock included in the public units. If and when the public warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. We will use our best efforts to register or qualify such shares of common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us in the IPO. However, there may be instances in which holders of our public warrants may be unable to exercise such public warrants but holders of our private warrants may be able to exercise such private warrants.

***The exercise price for our public warrants is higher than in many similar blank check company offerings in the past, and, accordingly, the public warrants are more likely to expire worthless.***

The exercise price of our public warrants is higher than is typical with many similar blank check companies in the past. Historically, with regard to units offered by blank check companies, the exercise

74

price of a public warrant was generally a fraction of the purchase price of the units in the initial public offering. The exercise price for our public warrants is $11.50 per share, subject to adjustment as provided herein. As a result, the public warrants are less likely to ever be in the money and more likely to expire worthless.

***We may amend the terms of the public warrants in a manner that may be adverse to holders with the approval by the holders of at least 50% of the then-outstanding public warrants. As a result, the exercise price of a holder's public warrants could be increased, the exercise period could be shortened and the number of shares of our common stock purchasable upon exercise of a public warrant could be decreased, all without the approval of that warrant holder.***

Our public warrants were issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. The warrant agreement provides that the terms of the public warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then-outstanding public warrants to make any change that adversely affects the interests of the registered holders. Accordingly, we may amend the terms of the public warrants in a manner adverse to a holder if holders of at least 50% of the then-outstanding public warrants approve of such amendment. Although our ability to amend the terms of the public warrants with the consent of at least 50% of the then-outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the public warrants, convert the warrants into cash or stock, shorten the exercise period or decrease the number of shares of common stock purchasable upon exercise of a public warrant.

***We may redeem unexpired public warrants prior to their exercise at a time that is disadvantageous to warrant holders, thereby making their public warrants worthless.***

We have the ability to redeem outstanding public warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per public warrant; provided that the last reported sales price of our common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date on which we give notice of such redemption to the warrant holders. If and when the public warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. We will use our best efforts to register or qualify such shares of common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us. Redemption of the outstanding public warrants could force the warrant holders: (i) to exercise their public warrants and pay the exercise price therefor at a time when it may be disadvantageous for them to do so; (ii) to sell their public warrants at the then-current market price when they might otherwise wish to hold their public warrants; or (iii) to accept the nominal redemption price which, at the time the outstanding public warrants are called for redemption, is likely to be substantially less than the market value of their public warrants. None of the private placement warrants will be redeemable by us so long as they are held by our Sponsor or its permitted transferees. The Sponsor Agreement provides that, immediately prior to the Closing, and conditioned and effective upon the Closing, all of the private placement warrants held by the Sponsor immediately prior to the Closing, will be automatically cancelled, for no consideration, and shall no longer be outstanding.

***Warrants will become exercisable for our common stock, which would increase the number of shares eligible for future resale in the public market and result in dilution to our stockholders.***

Our public warrants are exercisable for 18,282,384 shares of common stock as part of our IPO at $11.50 per share. We expect to issue 15,000,000 shares of our common stock to the PIPE Investors in the PIPE Investment upon consummation of the Business Combination. The shares of common stock issued in the PIPE Investment and additional shares of our common stock issued upon exercise of our warrants will result in dilution to the then existing holders of common stock of the Company and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market could adversely affect the market price of our common stock.

***Our stockholders may be held liable for claims by third parties against us to the extent of distributions received by them upon redemption of their shares.***

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of the Trust Account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete an initial business combination by the applicable deadline may be considered a liquidating distribution under Delaware law. If a corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60- day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution. However, it is our intention to redeem our public shares as soon as reasonably possible following the applicable deadline in the event we do not complete an initial business combination and, therefore, we do not intend to comply with the foregoing procedures.

Because we will not be complying with Section 280 of the DGCL, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the ten years following our dissolution. However, because we are a blank check company, rather than an operating company, and our operations are limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses. If our plan of distribution complies with Section 281(b) of the DGCL, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would likely be barred after the third anniversary of the dissolution. We cannot assure you that we will properly assess all claims that may be potentially brought against us. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend beyond the third anniversary of such date. Furthermore, if the pro rata portion of our Trust Account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete an initial business combination by the applicable deadline is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful, then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution.

***If, after we distribute the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, a bankruptcy court may seek to recover such proceeds, and we and our Board may be exposed to claims of punitive damages.***

If, after we distribute the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our stockholders. In addition, our Board may be viewed as having breached its fiduciary duty to our creditors and/or having acted in bad faith, thereby exposing itself and us to claims of punitive damages, by paying public stockholders from the Trust Account prior to addressing the claims of creditors.

***Anti-takeover provisions contained in our Amended and Restated Certificate of Incorporation and bylaws, as well as provisions of Delaware law, could impair a takeover attempt.***

Assuming the passage of Proposal Nos. 1 through 3 of this proxy statement, the post-combination company's Amended and Restated Certificate of Incorporation will contain provisions that may discourage unsolicited takeover proposals that stockholders may consider to be in their best interests. We are also

76

subject to anti-takeover provisions under Delaware law, which could delay or prevent a change of control. Together, these provisions may make more difficult the removal of management and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities. These provisions will include:

- no cumulative voting in the election of directors, which limits the ability of minority stockholders to elect director candidates;

- a classified board of directors with three-year staggered terms, which could delay the ability of stockholders to change the membership of a majority of the Board;

- the requirement that directors may only be removed from the Board for cause;

- the right of our Board to elect a director to fill a vacancy created by the expansion of our Board or the resignation, death or removal of a director in certain circumstances, which prevents stockholders from being able to fill vacancies on our Board;

- a prohibition on stockholder action by written consent, which forces stockholder action to be taken at an annual or special meeting of our stockholders;

- a prohibition on stockholders calling a special meeting and the requirement that a meeting of stockholders may only be called by a majority of the board, the chairman of the board or the chief executive officer of the post-combination company and may not be called by any other person, which may delay the ability of our stockholders to force consideration of a proposal or to take action, including the removal of directors;

- the requirement that changes or amendments to certain provisions of our Amended and Restated Certificate of Incorporation must be approved by holders of at least two-thirds of the common stock of the post-combination company;

- advance notice procedures that stockholders must comply with in order to nominate candidates to our Board or to propose matters to be acted upon at a meeting of stockholders, which may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of the Company; and

- an opt out from Section 203 of the DGCL and, instead, inclusion of a provision in the Amended and Restated Certificate of Incorporation that is substantially similar to Section 203 of the DGCL.

***The JOBS Act permits "emerging growth companies" like us to take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies.***

We currently qualify as an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the JOBS Act. As such, we take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies for as long as we continue to be an emerging growth company, including: (i) the exemption from the auditor attestation requirements with respect to internal control over financial reporting under Section 404 of SOX; (ii) the exemptions from say-on-pay, say-on-frequency and say-on-golden parachute voting requirements; and (iii) reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements. As a result, our stockholders may not have access to certain information they deem important. We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year: (a) following October 18, 2023, the fifth anniversary of our IPO; (b) in which we have total annual gross revenue of at least $1.07 billion; or (c) in which we are deemed to be a large accelerated filer, which means the market value of our common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (ii) the date on which we have issued more than $1.0 billion in non-convertible debt during the prior three-year period.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the exemption from complying with new or revised accounting standards provided in Section 7(a)(2)(B) of the Securities Act as long as we are an emerging growth company. An emerging growth company can therefore delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. The JOBS Act provides that a company can elect to opt out of the

77

extended transition period and comply with the requirements that apply to non-emerging growth companies, but any such election to opt out is irrevocable. We have elected to avail ourselves of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company that is neither an emerging growth company nor an emerging growth company that has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

We cannot predict if investors will find our common stock less attractive because we rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile.

***Velodyne's founder and executive chairman will have control over key decision making after the Business Combination because he will hold voting rights with respect to a majority of the post-combination company's voting stock.***

Velodyne's founder and executive chairman, David S. Hall, will hold voting rights with respect to an aggregate of [•] shares of common stock after the completion of the Business Combination, which will represent approximately [•]% of the voting power of the post-combination company's outstanding capital stock. In addition to the [•] shares of common stock held by Mr. Hall, which will represent approximately [•]% of the voting power of the post-combination company's outstanding capital stock following the completion of the Business Combination, stockholders holding [•] shares of common stock, including Velodyne's chief marketing officer and director, Marta Hall, and certain other family members of Mr. Hall, have entered into or are expected to enter into agreements granting Mr. Hall an irrevocable proxy to vote such stockholders' shares at Mr. Hall's discretion on all matters to be voted upon by stockholders. The shares over which Mr. Hall exercises voting rights will represent a majority of the voting power of the post-combination company's outstanding capital stock after the completion of the Business Combination. As a result, Mr. Hall will have the ability to control the outcome of matters submitted to the post-combination company's stockholders for approval, including the election of directors and any merger, consolidation, or sale of all or substantially all of our assets. In addition, Mr. Hall will have the ability to control affairs of the post-combination company as a result of his ability to control the election of the post-combination company's directors. This concentrated control will limit your ability to influence corporate matters for the foreseeable future, and, as a result, the market price of the post-combination company's common stock could be adversely affected.

As a board member, Mr. Hall will owe a fiduciary duty to the post-combination company's stockholders and must act in good faith in a manner he reasonably believes to be in the best interests of the post-combination company's stockholders. As a stockholder, even as a controlling stockholder, Mr. Hall is entitled to vote his shares in his own interests, which may not always be in the interests of the post-combination company's stockholders generally and could adversely affect the market price of the post-combination company's common stock.

***Our internal controls over financial reporting may not be effective and our independent registered public accounting firm may not be able to certify as to their effectiveness, which could have a significant and adverse effect on our business and reputation.***

As a public company, we are required to comply with the SEC's rules implementing Sections 302 and 404 of SOX, which require management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of internal control over financial reporting. To comply with the requirements of being a public company, the post-combination company will be required to provide management's assessment on internal controls commencing with the annual report for fiscal year ended December 31, 2020, and we may need to undertake various actions, such as implementing additional internal controls and procedures and hiring additional accounting or internal audit staff. The standards required for a public company under Section 404 of SOX are significantly more stringent than those required of Velodyne as a privately-held company. Further, as an emerging growth company, our independent registered public accounting firm is not required to formally attest to the

effectiveness of our internal controls over financial reporting pursuant to Section 404 until the date we are no longer an emerging growth company. At such time, our independent registered public accounting firm may issue a report that is adverse in the event that it is not satisfied with the level at which the controls of the post-combination company are documented, designed or operating.

Testing and maintaining these controls can divert our management's attention from other matters that are important to the operation of our business. If we identify material weaknesses in the internal control over financial reporting of the post-combination company or are unable to comply with the requirements of Section 404 or assert that our internal control over financial reporting is effective, or if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal controls over financial reporting when we no longer qualify as an emerging growth company, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our common stock could be negatively affected, and we could become subject to investigations by the SEC or other regulatory authorities, which could require additional financial and management resources.

***The proposed Amended and Restated Certificate of Incorporation designates the Court of Chancery of the State of Delaware and federal court within the State of Delaware as the exclusive forum for certain types of actions and proceedings that the Company's stockholders may initiate, which could limit a stockholder's ability to obtain a favorable judicial forum for disputes with the Company or its directors, officers or employees.***

The proposed Amended and Restated Certificate of Incorporation provides that, subject to limited exceptions, the Court of Chancery of the State of Delaware and federal court within the State of Delaware will be exclusive forums for any:

- derivative action or proceeding brought on the Company's behalf;

- action asserting a claim of breach of a fiduciary duty owed by any of the Company's directors, officers or other employees to the Company or its stockholders;

- action asserting a claim against the Company arising pursuant to any provision of the DGCL, the Company's Amended and Restated Certificate of Incorporation or bylaws; or

- other action asserting a claim against the Company that is governed by the internal affairs doctrine.

This choice of forum provision does not apply to actions brought to enforce a duty or liability created under the Exchange Act. The Company's proposed Amended and Restated Certificate of Incorporation also provides that the federal district courts of the United States are the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act. The Company intends for this provision to apply to any complaints asserting a cause of action under the Securities Act despite the fact that Section 22 of the Securities Act creates concurrent jurisdiction for the federal and state courts over all actions brought to enforce any duty or liability created by the Securities Act or the rules and regulations promulgated thereunder. There is uncertainty as to whether a court would enforce such a provision with respect to claims under the Securities Act, and the Company's stockholders will not be deemed to have waived the Company's compliance with the federal securities laws and the rules and regulations thereunder. Any person or entity purchasing or otherwise acquiring any interest in shares of the Company's capital stock shall be deemed to have notice of and to have consented to the provisions of the Company's Amended and Restated Certificate of Incorporation described above.

These choice of forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with the Company or its directors, officers or other employees, which may discourage such lawsuits against the Company and its directors, officers and employees. Alternatively, if a court were to find these provisions of the Company's Amended and Restated Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, the Company may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect the Company's business and financial condition.

79

**Risks Related to the Redemption**

***We do not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it possible for us to complete a Business Combination with which a substantial majority of our stockholders do not agree.***

Our current certificate of incorporation does not provide a specified maximum redemption threshold, except that we will not redeem our public shares in an amount that would cause the Company's net tangible assets to be less than $5,000,001 upon consummation of our initial business combination (such that we are not subject to the SEC's "penny stock" rules). However, the Merger Agreement provides that our obligation to consummate the Business Combination is conditioned on the amount in the Trust Account and the proceeds from the PIPE Investment equaling or exceeding $200,000,000, and the obligation of Velodyne to consummate the Business Combination is conditioned on the amount in the Trust Account and the proceeds from the PIPE Investment equaling or exceeding $200,000,000. As a result, we may be able to complete our Business Combination even though a substantial portion of our public stockholders do not agree with the transaction and have redeemed their shares or have entered into privately negotiated agreements to sell their shares to our Sponsor, directors or officers or their affiliates. Based on the amount of approximately $117.3 million in our Trust Account as of June 30, 2020, and taking into account the anticipated gross proceeds of approximately $150,000,000 from the PIPE Investment, approximately 6,572,424 shares of common stock may be redeemed and still enable us to have sufficient cash to satisfy the cash closing conditions in the Merger Agreement. As of the date of this proxy statement, no agreements with respect to the private purchase of public shares by the Company or the persons described above have been entered into with any such investor or holder. We will file a Current Report on Form 8-K with the SEC to disclose private arrangements entered into or significant private purchases made by any of the aforementioned persons that would affect the vote on the Business Combination Proposal or other proposals (as described in this proxy statement) at the Special Meeting.

In the event the aggregate cash consideration we would be required to pay for all shares of common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the Merger Agreement exceeds the aggregate amount of cash available to us, we may not complete the Business Combination or redeem any shares, all shares of common stock submitted for redemption will be returned to the holders thereof, and we instead may search for an alternate business combination.

***There is no guarantee that a stockholder's decision whether to redeem its shares for a pro rata portion of the Trust Account will put the stockholder in a better future economic position.***

We can give no assurance as to the price at which a stockholder may be able to sell its public shares in the future following the completion of the Business Combination or any alternative business combination. Certain events following the consummation of any initial business combination, including the Business Combination, may cause an increase in our share price, and may result in a lower value realized now than a stockholder of the Company might realize in the future had the stockholder not redeemed its shares. Similarly, if a stockholder does not redeem its shares, the stockholder will bear the risk of ownership of the public shares after the consummation of any initial business combination, and there can be no assurance that a stockholder can sell its shares in the future for a greater amount than the redemption price set forth in this proxy statement. A stockholder should consult the stockholder's own tax and/or financial advisor for assistance on how this may affect his, her or its individual situation.

***Stockholders of the Company who wish to redeem their shares for a pro rata portion of the Trust Account must comply with specific requirements for redemption that may make it more difficult for them to exercise their redemption rights prior to the deadline. If stockholders fail to comply with the redemption requirements specified in this proxy statement, they will not be entitled to redeem their shares of our common stock for a pro rata portion of the funds held in our Trust Account.***

Public stockholders who wish to redeem their shares for a pro rata portion of the Trust Account must, among other things (i) submit a request in writing and (ii) tender their certificates to our Transfer Agent or deliver their shares to the Transfer Agent electronically through the DWAC system at least two business days

prior to the Special Meeting. In order to obtain a physical stock certificate, a stockholder's broker and/or clearing broker, DTC and our Transfer Agent will need to act to facilitate this request. It is our understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the Transfer Agent. However, because we do not have any control over this process or over the brokers, which we refer to as "DTC," it may take significantly longer than two weeks to obtain a physical stock certificate. If it takes longer than anticipated to obtain a physical certificate, stockholders who wish to redeem their shares may be unable to obtain physical certificates by the deadline for exercising their redemption rights and thus will be unable to redeem their shares.

Stockholders electing to redeem their shares will receive their pro rata portion of the Trust Account less franchise and income taxes payable, calculated as of two business days prior to the anticipated consummation of the Business Combination. Please see the section entitled "*Special Meeting of Company Stockholders — Redemption Rights*" for additional information on how to exercise your redemption rights.

***If a stockholder fails to receive notice of our offer to redeem our public shares in connection with our Business Combination, or fails to comply with the procedures for tendering its shares, such shares may not be redeemed.***

If, despite our compliance with the proxy rules, a stockholder fails to receive our proxy materials, such stockholder may not become aware of the opportunity to redeem its shares. In addition, the proxy materials that we are furnishing to holders of our public shares in connection with our Business Combination describes the various procedures that must be complied with in order to validly redeem public shares. In the event that a stockholder fails to comply with these procedures, its shares may not be redeemed.

**UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

**Introduction**

The Company is providing the following unaudited pro forma condensed combined financial information to aid you in your analysis of the financial aspects of the Business Combination. The following unaudited pro forma condensed combined financial information has been prepared in accordance with Article 11 of Regulation S-X.

The Company is a blank check company whose purpose is to acquire, through a merger, share exchange, asset acquisition, stock purchase, reorganization or other similar Business Combination with one or more businesses. The Company was incorporated in Delaware on June 26, 2018, as Graf Industrial Corp. On October 18, 2018, the Company consummated its IPO. Upon the closing of the IPO, $225.0 million from the net proceeds thereof was placed in a Trust Account and invested in U.S. "government securities" within the meaning of Section 2(a)(16) of the Investment Company Act having a maturity of 180 days or in money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act which invest only in direct U.S. government treasury obligations. The underwriters of the IPO were granted a 45-day option to purchase up to an additional 3.4 million units to cover over-allotments. On October 25, 2018, the Company consummated the closing of the sale of 1.9 million additional units upon receiving notice of the underwriters' election to partially exercise their overallotment option. As of March 31, 2020, there was $249.6 million held in the Trust Account. The Company had 18 months from the closing of the IPO (by April 18, 2020) to complete a Business Combination. On April 16, 2020, the Company filed an amendment (the "First Extension Amendment") to the Company's current certificate of incorporation to extend the date by which the Company has to consummate a Business Combination (the "First Extension") from April 18, 2020 to July 31, 2020 (the "Combination Period"). The Company's stockholders approved the First Extension Amendment at a special meeting in lieu of the 2020 annual meeting of stockholders of the Company on April 16, 2020. Additionally, on July 8, 2020 the Company filed a definitive proxy statement that included an extension amendment proposal to extend the date by which the Company has to consummate the Business Combination from July 31, 2020 to October 31, 2020 (the "Extension Amendment Proposal").

Velodyne is the global leader in lidar technology providing real-time 3D vision for autonomous systems, which it calls smart vision. Its smart vision solutions are advancing the development of safe automated systems throughout the world, thereby empowering the autonomous revolution by allowing machines to see their surroundings. In automotive applications, Velodyne's products improve roadway safety by providing perception data for reliable object avoidance and safe path-planning. Velodyne has a vision it calls LIVE, Lidar In Vehicles Everywhere, which encompasses a mass-produced lower cost lidar sold for every model of car and truck.

The following unaudited pro forma condensed combined balance sheet as of March 31, 2020 assumes that the Business Combination occurred on March 31, 2020. The unaudited pro forma condensed combined statement of operations for the three months ended March 31, 2020 and year ended December 31, 2019 present pro forma effect to the Business Combination as if it had been completed on January 1, 2019.

The unaudited pro forma condensed combined financial statements have been presented for illustrative purposes only and do not necessarily reflect what the post-combination company's financial condition or results of operations would have been had the acquisition occurred on the dates indicated. Further, the pro forma condensed combined financial information also may not be useful in predicting the future financial condition and results of operations of the post-combination company. The actual financial position and results of operations may differ significantly from the pro forma amounts reflected herein due to a variety of factors.

The historical financial information of the Company was derived from the unaudited and audited financial statements of Graf as of and for the three months ended March 31, 2020 and for the year ended December 31, 2019, included elsewhere in this proxy statement. The historical financial information of Velodyne was derived from the unaudited and audited consolidated financial statements of Velodyne as of and for the three months ended March 31, 2020 and for the year ended December 31, 2019, included elsewhere in this proxy statement. This information should be read together with the Company's and Velodyne's unaudited and audited financial statements and related notes, the sections titled "The Company's

82

Management's Discussion and Analysis of Financial Condition and Results of Operations," and "Velodyne's Management's Discussion and Analysis of Financial Condition and Results of Operations" and other financial information included elsewhere in this proxy statement.

**Description of the Business Combination**

On July 2, 2020, the Company and its wholly owned subsidiary, VL Merger Sub Inc., entered into a Merger Agreement with Velodyne. If the Merger Agreement is adopted by Velodyne stockholders, and the Merger Agreement is approved by Company stockholders at the Special Meeting, VL Merger Sub Inc. will merge with and into Velodyne, with Velodyne surviving the merger. Upon the consummation of the Business Combination, the Company will change its name to Velodyne Lidar, Inc.

The aggregate consideration for the Business Combination will be $1,521.7 million, payable in the form of shares of common stock and repurchase of up to $50 million in common stock from Velodyne equity holders. The initial purchase price will be based on a pre-money enterprise value, which will be transferred in the form of shares of the post-combination company's common stock.

Under the Merger Agreement, Velodyne equity holders will also be entitled to receive, in the aggregate, up to an additional 2,000,000 shares of common stock (including in the form of awards of RSUs settleable in common stock) if the closing trading price of the Company's common stock is greater than or equal to $15.00 for any 20 trading days within any 30 trading-day period, commencing on the date of the Merger Agreement and ending on the date that is six months after the Closing. In addition, the Sponsor will retain 2,507,000 Founder Shares that were initially purchased by the Sponsor in a private placement prior to the Company's IPO, 275,000 of which will be deemed Earnout Founder Shares that vest at such time that the closing price of common stock is greater than or equal to $15.00 for any 20 trading days within any 30 trading-day period, commencing on the date of the Merger Agreement and ending on the date that is six months after the Closing. Any Earnout Founder Shares that do not vest on or prior to such date shall be forfeited.

The following summarizes the consideration:

| (in thousands, except for share amounts) | |
|---|---:|
| Shares transferred at Closing[1] | 148,453,811 |
| Value per share[2] | 10.25 |
| **Total Share Consideration** | $ 1,521,652 |

(1) Reflects the total share consideration transferred inclusive of up to 4,878,048 shares that are subject to repurchase from former Velodyne equity holders at $10.25. If the entire $50.0 million is used to purchase shares from former Velodyne equity holders, the shares retained by former Velodyne equity holders will be 143,575,763.

(2) Share Consideration is calculated using a $10.25 reference price. Actual total Share Consideration will be dependent on the value of common stock at closing.

The unaudited pro forma condensed combined financial information has been prepared using the assumptions below with respect to the potential redemption into cash of common stock:

- **Assuming Minimum Redemptions**:   In connection with the First Extension, an aggregate 12,921,275 shares of the Company's common stock was redeemed, and approximately $132.1 million was withdrawn out of the Trust Account to pay for such redemption (estimated per share redemption value of $10.22). After redemptions, there were 11,455,237 public shares outstanding. This presentation takes into consideration the redemptions in connection with the First Extension, but it assumes that no additional public stockholders of the Company exercise redemption rights with respect to their public shares for a pro rata share of the funds in Graf's Trust Account.

- **Assuming Maximum Redemptions:**   This presentation assumes that in addition to the 12,921,275 public shares redeemed in April 2020, stockholders holding 6,572,424 of the Company's public shares will exercise their redemption rights for their pro rata share (approximately $10.24 per share) of the funds in the Company's Trust Account. The Merger Agreement provides that Velodyne's obligation to

83

consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the Subscription Agreements, being no less than an aggregate amount of $200.0 million. This scenario gives effect to $50.0 million being retained in the Trust Account, in accordance with the Subscription Agreements with respect to the PIPE Investment, and the minimum cash requirement of $200.0 million, in accordance with the Merger Agreement. This results in public share redemptions of 6,572,424 shares for aggregate redemption payments of $67.3 million.

The following summarizes the pro forma common stock outstanding under the two redemption scenarios:

| | Assuming Minimum Redemptions (Shares) | % | Assuming Maximum Redemptions (Shares) | % |
|---|---|---|---|---|
| Velodyne Shares[1][2] | 143,575,763 | 83.3% | 143,575,763 | 86.6% |
| Common shares held by current Graf shareholders | 11,455,237 | 6.7% | 4,882,813 | 2.9% |
| Founder Shares[3][4] | 2,300,000 | 1.3% | 2,300,000 | 1.4% |
| PIPE Shares | 15,000,000 | 8.7% | 15,000,000 | 9.1% |
| **Pro Forma Common Stock at March 31, 2020** | **172,331,000** | | **165,758,576** | |

(1)  Reflects the repurchase and cancellation of approximately 4,878,048 shares of common stock from Velodyne stockholders at $10.25 per share in connection with the closing of the Business Combination.

(2)  Excludes 2,000,000 of Company common stock in earnout consideration (including in the form of awards of RSUs settleable in common stock) as the price threshold has not yet been triggered.

(3)  Excludes 275,000 of Earnout Founder Shares as the price threshold has not yet been triggered.

(4)  Includes 68,000 Founder Shares held by the Company's independent directors not subject to earnout.

The following unaudited pro forma condensed combined balance sheet as of March 31, 2020 and the unaudited pro forma condensed combined statements of operations for the three months ended March 31, 2020 and the year ended December 31, 2019 are based on the historical financial statements of the Company and Velodyne. The unaudited pro forma adjustments are based on information currently available, and assumptions and estimates underlying the unaudited pro forma adjustments are described in the accompanying notes. Actual results may differ materially from the assumptions used to present the accompanying unaudited pro forma condensed combined financial information.

84

**UNAUDITED PRO FORMA CONDENSED COMBINED BALANCE SHEET**
**AS OF MARCH 31, 2020**
**(in thousands)**

| | Velodyne (Historical) | Graf (Historical) | Reclassification Adjustments (Note 2) | Historical Equity Issuance (Note 3) | Pro Forma Adjustments | | Pro Forma Combined | Pro Forma Adjustments | | Pro Forma Combined |
|---|---|---|---|---|---|---|---|---|---|---|
| | As of March 31, 2020 | | | | Assuming Minimum Redemptions | | As of March 31, 2020 | Assuming Maximum Redemptions | | As of March 31, 2020 |
| **ASSETS** | | | | | | | | | | |
| Current assets: | | | | | | | | | | |
| Cash and cash equivalents | $ 27,405 | $ 577 | $ — | $19,919 | $ 249,561 | (A) | $233,838 | $(67,302) | (K) | $166,536 |
| | | | | | 150,000 | (B) | | | | |
| | | | | | (485) | (C) | | | | |
| | | | | | (31,040) | (D) | | | | |
| | | | | | (132,099) | (H) | | | | |
| | | | | | (50,000) | (J) | | | | |
| Accounts receivable, net | 11,358 | — | — | — | | | 11,358 | — | | 11,358 |
| Inventories, net | 16,828 | — | — | — | — | | 16,828 | — | | 16,828 |
| Prepaids and other current assets | 23,592 | 83 | — | — | (2,980) | (E) | 20,695 | — | | 20,695 |
| Total current assets | 79,183 | 660 | — | 19,919 | 182,957 | | 282,719 | (67,302) | | 215,417 |
| Non-current assets: | | | | | | | | | | |
| Cash and investments held in Trust Account | — | 249,561 | — | — | (249,561) | (A) | — | — | | — |
| Property, plant and equipment, net | 20,386 | — | — | — | — | | 20,386 | — | | 20,386 |
| Goodwill | 1,189 | — | — | — | — | | 1,189 | — | | 1,189 |
| Intangible assets, net | 887 | — | — | — | — | | 887 | — | | 887 |
| Other assets | 3,970 | — | — | — | | | 3,970 | — | | 3,970 |
| Total non-current assets | 26,432 | 249,561 | — | — | (249,561) | | 26,432 | — | | 26,432 |
| **TOTAL ASSETS** | $105,615 | $250,221 | $ — | $19,919 | $ (66,604) | | $309,151 | $(67,302) | | $241,849 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | | | | | | | | |
| Accounts payable | 11,483 | 178 | — | — | (178) | (C) | 11,483 | — | | 11,483 |
| Accrued expenses and other current liabilities | 26,444 | 142 | 50 | — | — | | 26,636 | — | | 26,636 |
| Contract liabilities | 11,900 | — | — | — | — | | 11,900 | — | | 11,900 |
| Franchise tax payable | — | 50 | (50) | — | — | | — | — | | — |
| Income tax payable | — | 307 | — | — | (307) | (C) | — | — | | — |
| Total current liabilities | 49,827 | 677 | — | — | (485) | | 50,019 | — | | 50,019 |
| Non-current liabilities: | | | | | | | | | | |
| Long-term tax liabilities | 599 | — | — | | — | | 599 | — | | 599 |
| Other long-term liabilities | 2,309 | — | — | | — | | 2,309 | — | | 2,309 |
| Total non-current liabilities | 2,908 | — | — | — | — | | 2,908 | — | | 2,908 |
| Total liabilities | 52,735 | 677 | — | — | (485) | | 52,927 | — | | 52,927 |
| Common stock subject to possible redemption | | 243,765 | — | — | (243,765) | (F) | — | — | | — |

85

| | As of March 31, 2020 | | Reclassification Adjustments (Note 2) | Historical Equity Issuance (Note 3) | Assuming Minimum Redemptions | | | Assuming Maximum Redemptions | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | As of March 31, 2020 | | | As of March 31, 2020 | |
| | Velodyne (Historical) | Graf (Historical) | | | Pro Forma Adjustments | | Pro Forma Combined | Pro Forma Adjustments | | Pro Forma Combined |
| **COMMITMENTS AND CONTINGENCIES** | | | | | | | | | | |
| Stockholders' equity (deficit): | | | | | | | | | | |
| Preferred stock | | — | — | — | — | | — | — | | — |
| Series A convertible preferred stock | 1 | — | — | — | (1) | (I) | — | — | | — |
| Common stock | 3 | 1 | — | — | 1 | (B) | 18 | (1) | (K) | 17 |
| | | | | | 2 | (F) | | | | |
| | | | | | (1) | (H) | | | | |
| | | | | | 12 | (I) | | | | |
| | | | | | — | (J) | | | | |
| Additional paid-in capital | 240,495 | 18,214 | — | 19,919 | 149,999 | (B) | 452,805 | (67,301) | (K) | 385,504 |
| | | | | | (25,040) | (D) | | | | |
| | | | | | 243,763 | (F) | | | | |
| | | | | | (12,436) | (G) | | | | |
| | | | | | (132,098) | (H) | | | | |
| | | | | | (11) | (I) | | | | |
| | | | | | (50,000) | (J) | | | | |
| Accumulated other comprehensive loss | (218) | — | — | — | — | | (218) | — | | (218) |
| Accumulated deficit | (187,401) | (12,436) | — | — | (6,000) | (D) | (196,381) | — | | (196,381) |
| | | | | | (2,980) | (E) | | | | |
| | | | | | 12,436 | (G) | | | | |
| Total stockholders' equity | 52,880 | 5,779 | — | 19,919 | 177,646 | | 256,224 | (67,302) | | 188,922 |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY (DEFICIT)** | $ 105,615 | $250,221 | $— | $19,919 | $ (66,604) | | $ 309,151 | $(67,302) | | $ 241,849 |

86

**UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS**
**FOR THE THREE MONTHS ENDED MARCH 31, 2020**
**(in thousands, except share and per share data)**

| | For the Three Months Ended March 31, 2020 | | Assuming Minimum Redemptions and Maximum Redemptions | | For the Three Months Ended March 31, 2020 |
| --- | --- | --- | --- | --- | --- |
| | Velodyne (Historical) | Graf (Historical) | Pro Forma Adjustments | | Pro Forma Combined |
| Revenue | $ 17,031 | $ — | $ — | | $ 17,031 |
| Cost of revenue | 15,429 | — | — | | 15,429 |
| Gross profit | 1,602 | — | — | | 1,602 |
| Operating expenses: | | | | | |
| Research and development | 14,527 | — | — | | 14,527 |
| Sales and marketing | 5,299 | — | — | | 5,299 |
| General and administrative | 10,733 | 410 | — | | 11,143 |
| Restructuring | 1,046 | — | — | | 1,046 |
| Total operating expenses | 31,605 | 410 | — | | 32,015 |
| Operating loss | (30,003) | (410) | — | | (30,413) |
| Interest income | 112 | — | — | | 112 |
| Interest expense | (6) | — | — | | (6) |
| Other income (expense), net | (165) | — | — | | (165) |
| Change in fair value of warrant liability | | (2,800) | 2,800 | (AA) | — |
| Investment income on Trust Account | — | 773 | (773) | (BB) | — |
| Income (loss) before income taxes | (30,062) | (2,437) | 2,027 | | (30,472) |
| Provision for (benefit from) income taxes | (6,677) | 152 | 499 | (CC) | (6,026) |
| Net loss attributable to common stockholders | $(23,385) | $(2,589) | $1,528 | | $(24,446) |

| | | | Assuming Minimum Redemptions | Assuming Maximum Redemptions |
| --- | --- | --- | --- | --- |
| Weighted-average shares used in computing net income (loss) per share attributable to common stockholders | 34,252,578 | 24,376,512 | 172,331,000 | 165,758,576 |
| Basic and diluted net income (loss) per share | $ (0.68) | $ 0.02 | $ (0.14) | $ (0.15) |

87

**UNAUDITED PRO FORMA CONDENSED COMBINED STATEMENT OF OPERATIONS FOR YEAR
ENDED DECEMBER 31, 2019
(in thousands, except share and per share data)**

| | Velodyne (Historical) | Graf (Historical) | Reclassification Adjustments (Note 2) | Pro Forma Adjustments | | Pro Forma Combined |
|---|---|---|---|---|---|---|
| | For the Year ended December 31, 2019 | | | | | Assuming Minimum Redemptions & Maximum Redemptions — For the Year ended December 31, 2019 |
| Revenue | $101,398 | $ — | | $ — | | $101,398 |
| Cost of revenue | 71,630 | — | | — | | 71,630 |
| Gross profit | 29,768 | — | | — | | 29,768 |
| Operating expenses: | | | | | | |
| Research and development | 56,850 | — | | — | | 56,850 |
| Sales and marketing | 21,873 | — | | — | | 21,873 |
| General and administrative | 20,058 | 617 | 100 | — | | 20,775 |
| Franchise tax expense | — | 100 | (100) | — | | — |
| Total operating expenses | 98,781 | 717 | — | — | | 99,498 |
| Operating loss | (69,013) | (717) | | — | | (69,730) |
| Interest income | 1,146 | — | | — | | 1,146 |
| Interest expense | (77) | — | | — | | (77) |
| Other income (expense), net | 35 | — | | — | | 35 |
| Change in fair value of warrant liability | — | (17,366) | | 17,366 | (AA) | — |
| Investment income on Trust Account | — | 5,240 | | (5,240) | (BB) | — |
| Income (loss) before income taxes | (67,909) | (12,843) | — | 12,126 | | (68,626) |
| Provision for (benefit from) income taxes | (683) | 1,079 | | 2,983 | (CC) | 3,379 |
| Net loss attributable to common stockholders | $ (67,226) | $(13,922) | $ — | $ 9,143 | | $ (72,005) |

| | | | Assuming Minimum Redemptions | Assuming Maximum Redemptions |
|---|---|---|---|---|
| Weighted-average shares used in computing net income (loss) per share attributable to common stockholders | 34,252,578 | 24,376,512 | 172,331,000 | 165,758,576 |
| Basic and diluted net income (loss) per share | $ (1.96) | $ 0.17 | $ (0.42) | $ (0.43) |

88

**NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

**1.    Basis of Presentation**

The Business Combination will be accounted for as a reverse recapitalization, with no goodwill or other intangible assets recorded, in accordance with GAAP. Under this method of accounting, the Company will be treated as the "acquired" company for financial reporting purposes. Accordingly, for accounting purposes, the Business Combination will be treated as the equivalent of Velodyne issuing stock for the net assets of the Company, accompanied by a recapitalization whereby no goodwill or other intangible assets are recorded. Operations prior to the Business Combination will be those of Velodyne.

Velodyne has been determined to be the accounting acquirer based on evaluation of the following facts and circumstances under both the minimum and maximum redemption scenarios:

• Velodyne will have the largest voting interest in the post-combination company;

• Velodyne will have the ability to nominate a majority of members of the board of directors of the post-combination company;

• Velodyne will hold executive management roles for the post-combination company and be responsible for the day-to-day operations;

• From a revenue and business operations standpoint, Velodyne is the larger entity in terms of relative size;

• The intended strategy of the post-combination entity will continue Velodyne's current strategy of being a leader in smart vision technology; and

• The post-combination company will assume Velodyne's name.

The unaudited pro forma condensed combined balance sheet as of March 31, 2020 assumes that the Business Combination occurred on March 31, 2020. The unaudited pro forma condensed combined statements of operations for the three months ended March 31, 2020 and the year ended December 31, 2019 present pro forma effect to the Business Combination as if it had been completed on January 1, 2019. These periods are presented on the basis of Velodyne as the accounting acquirer.

The unaudited pro forma condensed combined balance sheet as of March 31, 2020 has been prepared using, and should be read in conjunction with, the following:

• Graf's unaudited balance sheet as of March 31, 2020 and the related notes as of March 31, 2020, included elsewhere in this proxy statement;

• Velodyne's unaudited consolidated balance sheet as of March 31, 2020 and the related notes as of March 31, 2020, included elsewhere in this proxy statement.

The unaudited pro forma condensed combined statement of operations for the three months ended March 31, 2020 has been prepared using, and should be read in conjunction with, the following:

• Graf's unaudited statement of operations for the three months ended March 31, 2020 and the related notes, included elsewhere in this proxy statement; and

• Velodyne's unaudited statement of operations for the three months ended March 31, 2020 and the related notes, included elsewhere in this proxy statement.

The unaudited pro forma condensed combined statement of operations for the year ended December 31, 2019 has been prepared using, and should be read in conjunction with, the following:

• Graf's audited statement of operations for the year ended December 31, 2019 and the related notes, included elsewhere in this proxy statement; and

• Velodyne's audited consolidated statement of operations for the year ended December 31, 2019 and the related notes, included elsewhere in this proxy statement.

Management has made significant estimates and assumptions in its determination of the pro forma adjustments. As the unaudited pro forma condensed combined financial information has been prepared based on these preliminary estimates, the final amounts recorded may differ materially from the information presented.

The unaudited pro forma condensed combined financial information does not give effect to any anticipated synergies, operating efficiencies, tax savings, or cost savings that may be associated with the Business Combination.

The pro forma adjustments reflecting the consummation of the Business Combination are based on certain currently available information and certain assumptions and methodologies that Graf believes are reasonable under the circumstances. The unaudited condensed pro forma adjustments, which are described in the accompanying notes, may be revised as additional information becomes available and is evaluated. Therefore, it is likely that the actual adjustments will differ from the pro forma adjustments and it is possible the difference may be material. The Company believes that its assumptions and methodologies provide a reasonable basis for presenting all of the significant effects of the Business Combination based on information available to management at this time and that the pro forma adjustments give appropriate effect to those assumptions and are properly applied in the unaudited pro forma condensed combined financial information.

The unaudited pro forma condensed combined financial information is not necessarily indicative of what the actual results of operations and financial position would have been had the Business Combination taken place on the dates indicated, nor are they indicative of the future consolidated results of operations or financial position of the post-combination company. They should be read in conjunction with the historical financial statements and notes thereto of Graf and Velodyne.

**2.    Accounting Policies**

Upon consummation of the Business Combination, management will perform a comprehensive review of the two entities' accounting policies. As a result of the review, management may identify differences between the accounting policies of the two entities which, when conformed, could have a material impact on the financial statements of the post-combination company. Based on its initial analysis, management had identified differences that would have an impact on the unaudited pro forma condensed combined financial information and recorded the necessary adjustments.

**3.    Historical Equity Issuance**

On April 1, 2020, Velodyne entered into a share purchase agreement with a new investor pursuant to which Velodyne sold and issued to the investor 550,176 shares of Series B-1 Preferred Stock at a price of $36.3520 per share, and received proceeds of $19.9 million, net of equity issuance costs. As this transaction occurred subsequent to the balance sheet date and results in a change in capitalization, the equity issuance has been reflected as an adjustment to the balance sheet.

**4.    Adjustments to Unaudited Pro Forma Condensed Combined Financial Information**

The unaudited pro forma condensed combined financial information has been prepared to illustrate the effect of the Business Combination and has been prepared for informational purposes only.

The historical financial statements have been adjusted in the unaudited pro forma condensed combined financial information to give pro forma effect to events that are (1) directly attributable to the Business Combination, (2) factually supportable, and (3) with respect to the statements of operations, expected to have a continuing impact on the results of the post-combination company. Velodyne and the Company have not had any historical relationship prior to the Business Combination. Accordingly, no pro forma adjustments were required to eliminate activities between the companies.

The pro forma combined provision for income taxes does not necessarily reflect the amounts that would have resulted had the post-combination company filed consolidated income tax returns during the periods presented.

90

The pro forma basic and diluted earnings per share amounts presented in the unaudited pro forma condensed combined statements of operations are based upon the number of the post-combination company's shares outstanding, assuming the Business Combination occurred on January 1, 2019.

*Adjustments to Unaudited Pro Forma Condensed Combined Balance Sheet*

The adjustments included in the unaudited pro forma condensed combined balance sheet as of March 31, 2020 are as follows:

(A)  Reflects the reclassification of $249.6 million of cash and cash equivalents held in the Graf's Trust Account at the balance sheet date that becomes available to fund the Business Combination.

(B)  Represents the net proceeds from the private placement of 15,000,000 shares of common stock at $10.00 per share pursuant to the PIPE Investment.

(C)  Reflects the settlement of Graf's historical liabilities that will be settled at transaction close.

(D)  Represents estimated transaction costs totaling $31.0 million, consisting of approximately $25.0 million of equity issuance costs.

(E)  Reflects the write-off of $3.0 million of transaction costs previously capitalized by Velodyne as of March 31, 2020 in connection with Velodyne's previously contemplated IPO.

(F)  Reflects the reclassification of approximately $243.8 million of common stock subject to possible redemption to permanent equity.

(G)  Reflects the reclassification of Graf's historical accumulated deficit.

(H)  Reflects the 12,921,275 shares of Graf's common stock that were redeemed in April 2020 for approximately $132.1 million.

(I)  Represents recapitalization of Velodyne equity and issuance of 148,453,811 of the post-combination company's common stock to Velodyne equity holders as consideration for the reverse recapitalization.

(J)  Reflects the repurchase and cancellation of 4,878,048 shares of common stock from Velodyne equity holders for $50.0 million ($10.25 per share) in connection with the Closing.

(K)  Reflects the maximum redemption of 6,572,424 Graf public shares for aggregate redemption payments of $67.3 million allocated to common stock and additional paid-in capital using par value $0.0001 per share and at a redemption price of $10.24 per share.

*Adjustments to Unaudited Pro Forma Condensed Combined Statements of Operations*

The pro forma adjustments included in the unaudited pro forma condensed combined statements of operations for the three months ended March 31, 2020 and year ended December 31, 2019 are as follows:

(AA)  Elimination of the change in fair value of warrant liability as the Company has equity-classified warrants as part of the recapitalization, and there will be no fair value fluctuations.

(BB)  Elimination of interest income on the Trust Account.

(CC)  Reflects adjustments to income tax expense as a result of the tax impact on the pro forma adjustments at the estimated statutory tax rate of 24.6%.

**5.  Loss per Share**

Represents the net loss per share calculated using the historical weighted average shares outstanding, and the issuance of additional shares in connection with the Business Combination, assuming the shares were outstanding since January 1, 2019. As the Business Combination and related proposed equity transactions are being reflected as if they had occurred at the beginning of the periods presented, the calculation of weighted average shares outstanding for basic and diluted net income per share assumes that

91

the shares issuable relating to the Business Combination have been outstanding for the entire periods presented. If the maximum number of shares are redeemed, this calculation is retroactively adjusted to eliminate such shares for the entire periods.

The unaudited pro forma condensed combined financial information has been prepared assuming two alternative levels of redemption into cash of common stock for the three months ended March 31, 2020 and for the year ended December 31, 2019:

| | For the Three Months Ended March 31, 2020 | | For the Year ended December 31, 2019 | |
| | Assuming Minimum Redemptions | Assuming Maximum Redemptions | Assuming Minimum Redemptions | Assuming Maximum Redemptions |
|---|---|---|---|---|
| Pro forma net loss | (24,446) | (24,446) | (72,005) | (72,005) |
| Weighted average shares outstanding of common stock | 172,331,000 | 165,758,576 | 172,331,000 | 165,758,576 |
| Net loss per share (Basic and Diluted) attributable to common stockholders[1] | $ (0.14) | $ (0.15) | $ (0.42) | $ (0.43) |

(1) For the purposes of applying the if converted method for calculating diluted earnings per share, it was assumed that all outstanding warrants sold in the IPO and the private placement are exchanged to common stock. However, since this results in anti-dilution, the effect of such exchange was not included in calculation of diluted loss per share.

92

**COMPARATIVE SHARE INFORMATION**

The following table sets forth summary historical comparative share information for Graf and Velodyne and unaudited pro forma condensed combined per share information after giving effect to the Business Combination, assuming two redemption scenarios as follows:

The pro forma book value information reflects the Business Combination as if it had occurred on March 31, 2020. The weighted average shares outstanding and net earnings per share information reflect the Business Combination as if they had occurred on January 1, 2019.

This information is only a summary and should be read together with the summary historical financial information summary included elsewhere in this proxy statement, and the historical financial statements of Graf and Velodyne and related notes. The unaudited pro forma combined per share information of Graf and Velodyne is derived from, and should be read in conjunction with, the unaudited pro forma condensed combined financial statements and related notes included elsewhere in this proxy statement.

The unaudited pro forma combined earnings per share information below does not purport to represent the earnings per share which would have occurred had the companies been combined during the periods presented, nor earnings per share for any future date or period. The unaudited pro forma combined book value per share information below does not purport to represent what the value of Graf and Velodyne would have been had the companies been combined during the periods presented.

- **Assuming Minimum Redemptions**:  In connection with the First Extension, an aggregate 12,921,275 shares of Graf's common stock was redeemed, and approximately $132.1 million was withdrawn out of the Trust Account to pay for such redemption (estimated per share redemption value of $10.22). After redemptions, there were 11,455,237 public shares outstanding. This presentation takes into consideration the redemptions in connection with the First Extension, but it assumes that no additional public stockholders of Graf exercise redemption rights with respect to their public shares for a pro rata share of the funds in Graf's Trust Account.

- **Assuming Maximum Redemptions**:  This presentation assumes that in addition to the 12,921,275 public shares redeemed in April 2020, stockholders holding 6,572,424 of Graf's public shares will exercise their redemption rights for their pro rata share (approximately $10.24 per share) of the funds in Graf's Trust Account. The Merger Agreement provides that Velodyne's obligation to consummate the Business Combination is conditioned on the funds in the Trust Account, together with the funding of any amounts payable under the Subscription Agreements, being no less than an aggregate amount of $200.0 million. This scenario gives effect to $50.0 million being retained in the Trust Account, in accordance with the Subscription Agreements with respect to the PIPE Investment, and the minimum cash requirement of $200.0 million, in accordance with the Merger Agreement. This results in public share redemptions of 6,572,424 shares for aggregate redemption payments of $67.3 million.

93

| | Velodyne (Historical) | Graf (Historical) | Combined Pro Forma | |
| | | | Assuming Minimum Redemptions | Assuming Maximum Redemptions |
|---|---|---|---|---|
| **As of and for the Quarter ended March 31, 2020** | | | | |
| Book Value per share[1] | $ 1.54 | $ 0.19 | $ 1.49 | 1.14 |
| Weighted averages shares outstanding – basic and diluted | 34,252,578 | | | |
| Net loss per share – basic and diluted | $ (0.68) | | | |
| Weighted average shares outstanding of Public common stock – basic and diluted | | 24,376,512 | 172,331,000 | 165,758,576 |
| Weighted average shares outstanding of Founder common stock – basic and diluted | | 6,094,128 | | |
| Net income per share of Public common stock – basic and diluted | | $ 0.02 | | |
| Net loss per share of Founder common stock – basic and diluted | | $ (0.52) | | |
| Net loss per share of common stock – basic and diluted | | | $ (0.14) | $ (0.15) |
| **As of and for the Year ended December 31, 2019** | | | | |
| Book Value per share[1] | $ 2.23 | $ 0.16 | N/A[2] | N/A[2] |
| Weighted averages shares outstanding – basic and diluted | 34,252,578 | | | |
| Net loss per share – basic and diluted | $ (1.96) | | | |
| Weighted average shares outstanding of Public common stock – basic and diluted | | 24,376,512 | 172,331,000 | 165,758,576 |
| Weighted average shares outstanding of Founder common stock – basic and diluted | | 6,094,128 | | |
| Net income per share of Public common stock – basic and diluted | | $ 0.17 | | |
| Net loss per share of Founder common stock – basic and diluted | | $ (2.94) | | |
| Net loss per share of common stock – basic and diluted | | | $ (0.42) | $ (0.43) |

(1)  Book value per share = Total equity excluding preferred shares/shares outstanding

(2)  Pro Forma balance sheet for year ended December 31, 2019 not required and as such, no such calculation included in this table.

94

*The risk that our public shareholders would vote against the business combination proposal or exercise their redemption rights*

The Board considered the risk that some of the current public shareholders would vote against the Business Combination Proposal or decide to exercise their redemption rights, thereby reducing the amount of cash available in the Trust Account to an amount below the minimum required to consummate the business combination. The Board concluded, however, that the risk was mitigated because of the market confidence shown by the PIPE investors, which the Board considered as a strong endorsement of the quality of the Business Combination. Further, and the fact that public shareholders may vote for the Business Combination Proposal while also exercising their redemption rights mitigates incentive for a public shareholder to vote against the Business Combination Proposal, especially to the extent that they hold public warrants which would be worthless if the Business Combination is not completed.

*Graf's Management and Board may have different interests in the Business Combination than the public shareholders*

The Board considered the fact that members of our management and Board may have interests that are different from, or are in addition to, the interests of our shareholders generally, including the matters described under "— *Certain Benefits of GRAF's Directors and Officers and Others in the Business Combination*" below. However, our Board concluded that the potentially disparate interests would be mitigated because (i) these interests were disclosed in the initial public offering prospectus, (ii) these disparate interests would exist or may be even greater with respect to a business combination with any target company, (iii) the Business Combination was structured to permit public stockholders to redeem a substantial portion of our public shares and (iv) a portion of the Founder Shares (275,000 of the Founder Shares) held by the Sponsor have been deferred to an earnout structure, vesting at such time that the closing price of our common stock is greater than or equal to $15.00 for any 20 trading days within any 30 trading-day period, commencing on the date of the Merger Agreement and ending on the date that is six months after the Closing. Any Earnout Founder Shares that do not vest on or prior to such date shall be forfeited. The 68,000 Founder Shares held by the GRAF's independent directors are not subject to this earnout.

**Certain Projected Financial Information**

***Certain Velodyne Forecasts and Performance Targets***

Velodyne does not, as a matter of general practice, develop or publicly disclose long-term forecasts or internal projections of its future performance, revenues, earnings, financial condition or other results due to, among other reasons, the uncertainty of the underlying assumptions and estimates. However, Velodyne has established certain targets relating to its consolidated results of operations and its business in connection with the proposed business combination and certain financial forecasts were prepared by Velodyne Management and made available to its board of directors and to Graf.

The targets also assume the consummation of the Business Combination. Velodyne's ability to achieve the targets set out below will depend upon a number of factors outside of its control. These include significant business, economic and competitive uncertainties and contingencies, as well as actions taken by counterparties. These targets have been developed based upon assumptions with respect to future business decisions and conditions that are subject to change, including Velodyne's execution of its strategies and product development, as well as growth in the markets in which Velodyne operates. As a result, Velodyne's actual results may vary from the targets set out below, and those variations may be material. See also "Cautionary Statement Regarding Forward-Looking Statements" and the risk factors set out in "*Risk Factors — If the Business Combination's benefits do not meet the expectations of investors, stockholders or financial analysts, the market price of our securities may decline*" and "*Subsequent to the consummation of the business combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and stock price, which could cause you to lose some or all of your investment*."

Velodyne Management has identified the following targets with respect to certain financial and operating metrics:

133

***Fast Growing Business with Strong Momentum***:   Velodyne Management estimates that Velodyne's revenue will have a compound annual growth rate from 2020 to 2024 of 61% and that Velodyne will have an Adjusted EBITDA margin of more than 20% in 2024, prior to incorporating the impact of any acquisitions. Approximately 48% of projected 2024 revenues are under existing awarded multi-year contracts.

***Platform Consolidation and Synergies***:   As a result of the Business Combination, future acquisition opportunities and the synergies that could be realized from each of these, Velodyne Management estimates that Velodyne's platform has the opportunity to increase in size. Velodyne has had active dialogues with several of the key targets in its addressable market, but has now deferred such discussions until the Closing of the Business Combination.

Below is a summary of the key financial projections used as a basis to determine valuation.

| ($ in millions)<br>Year | Revenues | EBITDA | Cash Flow |
|---|---|---|---|
| 2020 | $101.7 | $(52.0) | $(85.6) |
| 2021 | $152.0 | $ (7.5) | $ (4.1) |
| 2022 | $249.4 | $ 15.5 | $  6.6 |
| 2023 | $412.1 | $ 56.7 | $ 29.9 |
| 2024 | $684.1 | $148.8 | $103.7 |

The financial projections reflect numerous estimates and assumptions with respect to industry performance, general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to Velodyne's business, all of which are difficult to predict and many of which are beyond Velodyne's control. As a result, there can be no assurance that the projected results will be realized or that actual results will not be significantly higher or lower than projected. Since the projections cover multiple years, such information by its nature becomes less predictive with each successive year. These financial projections are subjective in many respects and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and business developments. As such, these financial projections constitute forward-looking information and are subject to risks and uncertainties, including the various risks set forth in the section entitled "Risk Factors" in this proxy statement/prospectus.

The financial projections were prepared solely for internal use and not with a view toward public disclosure or toward complying with GAAP, the published guidelines of the SEC regarding projections or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. The financial projections were prepared by Velodyne. Neither Velodyne's independent registered public accounting firm, nor any other independent accountants, have compiled, examined or performed any procedures with respect to the financial projections, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and they assume no responsibility for, and disclaim any association with, the financial projections. Furthermore, the financial projections do not take into account any circumstances or events occurring after the date they were prepared. Nonetheless, a summary of the projections is provided in this proxy statement/prospectus only because the projections were made available to Graf. The inclusion of financial projections in this proxy statement/prospectus should not be regarded as an indication that Graf, the Board, or their respective affiliates, advisors or other representatives considered, or now considers, such financial projections necessarily to be predictive of actual future results or to support or fail to support your decision whether to vote for or against the Business Combination Proposal. No person has made or makes any representation or warranty to any Graf shareholder regarding the information included in these financial projections. The financial forecasts are not fact and should not be relied upon as being necessarily indicative of future results, and readers of this proxy statement/prospectus are cautioned not to place undue reliance on this information. The Projections should not be viewed as public guidance.

EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAWS, BY INCLUDING IN THIS PROXY STATEMENT/PROSPECTUS A SUMMARY OF INTERNAL FINANCIAL PROJECTIONS, GRAF UNDERTAKES NO OBLIGATIONS AND EXPRESSLY DISCLAIMS ANY RESPONSIBILITY TO UPDATE OR REVISE, OR PUBLICLY DISCLOSE ANY UPDATE OR REVISION TO, THESE FINANCIAL PROJECTIONS TO REFLECT

CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE FINANCIAL PROJECTIONS AND THEIR PRESENTATION TO THE BOARD, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE.

**Satisfaction of 80% Test**

The NYSE rules require that the Company's initial business combination must occur with one or more operating businesses or assets with a fair market value equal to at least 80% of the net assets held in the Trust Account (net of amounts disbursed to management for working capital purposes and excluding the amount of any deferred underwriting discount held in the Trust Account) at the time of the Company's signing a definitive agreement in connection with its initial business combination. As of July 2, 2020, the date of the execution of the Merger Agreement, the value of the net assets held in the Trust Account was approximately $117.3 million and 80% thereof represents approximately $93.8 million. In reaching its conclusion that the merger meets the 80% asset test, the Company's board of directors used as a fair market value the enterprise value of approximately $1.6 billion, which was implied based on the terms of the transactions agreed to by the parties in negotiating the Merger Agreement. The enterprise value consists of a implied equity value of approximately $1.8 billion. In determining whether the enterprise value described above represents the fair market value of Velodyne, the Company's board of directors considered all of the factors described in this section and the section of this proxy statement entitled "*Proposal No. 1 — Approval of the Business Combination — The Merger Agreement*" and the fact that the purchase price for Velodyne was the result of an arm's length negotiation. As a result, the Company's board of directors concluded that the fair market value of the business acquired was significantly in excess of 80% of the net assets held in the Trust Account.

**Interests of Certain Persons in the Business Combination**

In considering the recommendation of our Board to vote in favor of the Business Combination, stockholders should be aware that aside from their interests as stockholders, our Sponsor and certain members of our Board and officers have interests in the Business Combination that are different from, or in addition to, those of other stockholders generally. Our Board was aware of and considered these interests, among other matters, in evaluating and negotiating the Business Combination, and in recommending to stockholders that they approve the Business Combination. Stockholders should take these interests into account in deciding whether to approve the Business Combination.

These interests include, among other things:

- the fact that our Initial Stockholders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve the Business Combination;

- the fact that our Sponsor will retain 2,507,000 Founder Shares upon the Closing, 275,000 of which shall be Earnout Founder Shares subject to certain vesting and cancellation provisions as described in the Sponsor Agreement, which if unrestricted and freely tradable would be valued at approximately $[•] based on the closing price of our common stock on NYSE on [•], 2020 but, given the restrictions on such shares, we believe such shares have less value;

- the fact that our Initial Stockholders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete an initial business combination by the applicable deadline;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party (other than our independent public accountants) for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

135

determined under U.S. federal income tax principles) and, provided such dividend is not effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States, we will be required to withhold tax from the gross amount of the dividend at a rate of 30%, unless such Non-U.S. holder is eligible for a reduced rate of withholding tax under an applicable income tax treaty and timely provides proper certification of its eligibility for such reduced rate (usually on an IRS Form W-8BEN or W-8BEN-E). Distributions in excess of our current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the Non-U.S. holder's adjusted tax basis in the common stock redeemed. Any remaining excess will be treated as gain realized on the sale or other taxable disposition of the common stock and will be treated as described below under the section entitled "*Non-U.S. Holders — Taxation of Redemption Treated as a Sale of common stock*."

Because it may not be certain at the time a Non-U.S. holder is redeemed whether such Non-U.S. holder's redemption will be treated as a sale of shares or a distribution constituting a dividend, and because such determination will depend in part on a Non-U.S. holder's particular circumstances, we or the applicable withholding agent may not be able to determine whether (or to what extent) a Non-U.S. holder is treated as receiving a dividend for U.S. federal income tax purposes. Therefore, we or the applicable withholding agent may withhold tax at a rate of 30% (or such lower rate as may be specified by an applicable income tax treaty) on the gross amount of any consideration paid to a Non-U.S. holder in redemption of such Non-U.S. holder's common stock, unless (i) we or the applicable withholding agent have established special procedures allowing Non-U.S. holders to certify that they are exempt from such withholding tax and (ii) such Non-U.S. holders are able to certify that they meet the requirements of such exemption (e.g., because such Non-U.S. holders are not treated as receiving a dividend under the Section 302 tests described above under the section entitled "*Redemption of common stock*"). However, there can be no assurance that we or any applicable withholding agent will establish such special certification procedures. If we or an applicable withholding agent withhold excess amounts from the amount payable to a Non-U.S. holder, such Non-U.S. holder generally may obtain a refund of any such excess amounts by timely filing an appropriate claim for refund with the IRS. Non-U.S. holders should consult their own tax advisors regarding the application of the foregoing rules in light of their particular facts and circumstances and any applicable procedures or certification requirements.

The withholding tax described above does not apply to dividends paid to a Non-U.S. holder who provides an IRS Form W-8ECI, certifying that the dividends are effectively connected with the Non-U.S. holder's conduct of a trade or business within the United States. Instead, the effectively connected dividends will be subject to regular U.S. federal income tax as if the Non-U.S. holder were a U.S. resident, subject to an applicable income tax treaty providing otherwise. A Non-U.S. holder that is a corporation for U.S. federal income tax purposes and is receiving effectively connected dividends may also be subject to an additional "branch profits tax" imposed at a rate of 30% (or a lower applicable treaty rate).

*Taxation of Redemption Treated as a Sale of common stock*.    If our redemption of a Non-U.S. holder's shares of common stock is treated as a sale, as discussed above under the section entitled "*Redemption of common stock*," subject to the discussions of FATCA (as defined below) and backup withholding below, a Non-U.S. holder generally will not be subject to U.S. federal income or withholding tax in respect of gain recognized in connection with such redemption, unless:

- the gain is effectively connected with the conduct of a trade or business by the Non-U.S. holder within the United States (and, under certain income tax treaties, is attributable to a United States permanent establishment or fixed base maintained by the Non-U.S. holder); or

- we are or have been a "United States real property holding corporation" for U.S. federal income tax purposes at any time during the shorter of the five-year period ending on the date of the redemption or the period that the Non-U.S. holder held our common stock, and, in the case where shares of our common stock are regularly traded on an established securities market, the Non-U.S. holder has owned, directly or indirectly, more than 5% of our common stock at any time within the shorter of the five-year period preceding the redemption or such Non-U.S. holder's holding period for the shares of our common stock.

Unless an applicable treaty provides otherwise, gain described in the first bullet point above will be subject to tax at generally applicable U.S. federal income tax rates as if the Non-U.S. holder were a U.S.

142

resident. In the event the Non-U.S. holder is a corporation for U.S. federal income tax purposes, such gain may also be subject to an additional "branch profits tax" at a 30% rate (or a lower applicable treaty rate).If the second bullet point above applies to a Non-U.S. holder, gain recognized by such holder in connection with a redemption treated as a sale will be subject to tax at generally applicable U.S. federal income tax rates. In addition, unless our common stock is regularly traded on an established securities market, we may be required to withhold U.S. federal income tax at a rate of 15% of the amount realized upon such redemption. We believe that we are not and have not been at any time since our formation a United States real property holding company and we do not expect to be a United States real property holding company immediately after the Business Combination is completed.

*FATCA Withholding Taxes.*   Sections 1471 to 1474 of the Code (such Sections commonly referred to as the Foreign Account Tax Compliance Act, or "*FATCA*") impose a 30% withholding tax on payments of dividends (including constructive dividends received pursuant to a redemption of stock) on our common stock to "foreign financial institutions" (which is broadly defined for this purpose and in general includes investment vehicles) and certain other non-U.S. entities unless various U.S. information reporting and due diligence requirements (generally relating to ownership by U.S. persons of interests in or accounts with those entities) have been satisfied, or an exemption applies to the payee (typically certified as to by the delivery of a properly completed IRS Form W-8BEN-E). If FATCA withholding is imposed, a beneficial owner that is not a foreign financial institution generally will be able to obtain a refund of any amounts withheld by filing a U.S. federal income tax return (which may entail significant administrative burden). Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Thirty percent withholding under FATCA was scheduled to apply to payments of gross proceeds from the sale or other disposition of property that produces U.S.-source interest or dividends (such as our common stock) beginning on January 1, 2019, but on December 13, 2018, the IRS released proposed regulations that, if finalized in their proposed form, would eliminate the obligation to withhold on gross proceeds. Such proposed regulations also delayed withholding on certain other payments received from other foreign financial institutions that are allocable, as provided for under final Treasury Regulations, to payments of U.S.-source dividends, and other fixed or determinable annual or periodic income. Although these proposed Treasury Regulations are not final, taxpayers generally may rely on them until final Treasury Regulations are issued. Non-U.S. holders should consult their tax advisers regarding the effects of FATCA on a redemption of common stock.

### Information Reporting and Backup Withholding

Generally, information returns will be filed with the IRS in connection with payments resulting from our redemption of shares of common stock.

Backup withholding of tax (currently at a rate of 24%) may apply to cash payments to which a U.S. holder is entitled to in connection with our redemption of shares of common stock, unless the U.S. holder (i) is exempt from backup withholding and demonstrates this fact in a manner satisfactory to the paying agent or (ii) provides a taxpayer identification number, certifies that such number is correct and that such holder is not subject to backup withholding, and otherwise complies with the backup withholding rules. Backup withholding of tax may also apply to cash payments to which a Non-U.S. holder is entitled to in connection with our redemption of shares of common stock, unless the Non-U.S. holder submits an IRS Form W-8BEN (or other applicable IRS Form W-8), signed under penalties of perjury, attesting to such Non-U.S. holder's status as non-U.S. person.

Backup withholding is not an additional tax. The amount of any backup withholding from a payment to a U.S. holder or Non-U.S. holder will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund, provided that the required information is timely furnished to the IRS.

### Regulatory Matters

Under the HSR Act and the rules that have been promulgated thereunder by the FTC, certain transactions may not be consummated unless information has been furnished to the Antitrust Division and the FTC and certain waiting period requirements have been satisfied. The Business Combination is subject to these requirements and may not be completed until the expiration of a 30-day waiting period

143

## VELODYNE'S BUSINESS

*Unless the context otherwise requires, all references in this section to "we," "us," or "our" refer to Velodyne Lidar, Inc. and its subsidiaries prior to the consummation of the Business Combination.*

### Company Overview

Velodyne is the global leader in lidar technology providing real-time 3D vision for autonomous systems, which we call smart vision. Our smart vision solutions are advancing the development of safe automated systems throughout the world, thereby empowering the autonomous revolution by allowing machines to see their surroundings. In automotive applications, our products improve roadway safety by providing perception data for reliable object avoidance and safe path-planning. We have a vision we call LIVE, Lidar In Vehicles Everywhere, which encompasses a mass-produced lower cost lidar sold for every model of car and truck. We believe safety on the roadways is for everyone. To improve roadway, bicycle, and pedestrian safety, we sell automotive solutions to the rapidly expanding ADAS market, which will incrementally address the requirements of the NHTSA 5-Star Safety Ratings System.

Our lidar-based smart vision solutions are also deployed in many non-automotive applications, such as autonomous mobile robots, UAVs, last-mile delivery, precision agriculture, advanced security systems, and smart city initiatives, among others. Our first products were commercially available in 2010. Since then, we have shipped over 40,000 units and generated cumulative sales of over $570 million. While purchases have been primarily focused on R&D projects, several of our non-automotive customers are in commercial production with their offerings. We estimate that we are addressing a market opportunity for our technology solutions of approximately $11.9 billion in 2022, with roughly 60% attributable to automotive applications. We believe we are approaching the inflection point of adoption of lidar solutions across multiple end markets and that Velodyne is well-positioned, with strong customer relationships and a growing government interest in urban safety, to take advantage of these opportunities.

Our proprietary smart vision solutions offer several advantages over other sensor technologies for a broad range of applications. Using an array of eye-safe lasers, our lidar solutions measure distances in the environment at the speed of light. Unlike camera-based solutions, lidar solutions allow machines to see in 3D by providing precise distance measurements of surrounding objects. Lidar also performs better than cameras in low light conditions and produces fewer errors. Compared to radar, lidar provides better resolution, perceiving objects' shapes for superior object detection and classification. Lidar also performs better than cameras in darkened conditions and produces fewer errors. According to a report by AAA, current pedestrian detection systems proved relatively ineffective at protecting pedestrians and bicycles in various tests, particularly at night. Lidar systems currently being tested can detect pedestrians equally well during daytime and nighttime conditions because the systems provide self-illumination by means of laser beams. By sending an alert or applying the brakes, these lidar systems are equipped to mitigate death and injury.

These advantages of lidar, combined with lower computing power requirements, enable autonomous platforms to make fast and accurate decisions to mitigate collisions. Velodyne's proprietary lidar-based hardware and software solutions combine class-leading range, up to centimeter-level accuracy and lower power consumption with high-grade reliability.

Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles ("AVs") organized by the Defense Advanced Research Projects Agency (DARPA). In the 2007 DARPA Grand Challenge, Velodyne's lidar sensors were used by five of the top six finishers. In a historic engineering milestone, Mr. Hall invented a lidar sensor that could see and measure the vehicle's surroundings with unprecedented precision, enabling the vehicle to navigate autonomously. This revolutionary design included a solid-state mechanism with an array of lasers and detectors which offered vast improvements in performance and reliability over the legacy practice of separately interfacing hundreds of fragile parts. The success of Mr. Hall's invention has spurred significant investment and focus in autonomous development, and a wide range of applications for lidar technology has since emerged. Innovation is an important component of our design heritage, and we currently have key patents in real-time 3D vision for autonomous systems. Our smart vision technology has become the reference architecture in applications requiring precise real time 3D perception.

180

David Hall led Velodyne as it grew into the leading lidar provider, with early customers such as Google, Caterpillar, and Nokia. As the company progressed, we have built a strong team, adding leaders in sales, engineering, automotive validation, manufacturing, operations, legal and finance, bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon. Today we work together as a dynamic team, planning the company growth strategy to take advantage of market opportunities and drive sales.

Through our direct sales team as well as through distributors, we sell to both automotive customers, including top automotive OEMs, system integrators, and last-mile delivery providers, as well as to non-automotive customers providing an array of industrial, drone, and security applications, among others. In 2017, 2018, 2019 and 2020 over 300 customers, including distributors who sell our products to additional end customers, purchased smart vision solutions from us. Below is a representative list of our current customers:

| Automotive OEMs and Tier 1 Suppliers | | Auto System Integrators | Last Mile Delivery | Non-Automotive Markets |
|---|---|---|---|---|
| AID[1] | Caterpillar | Aptiv | Gatik | Caterpillar |
| General Motors | Ford Motor Company | Argo AI | Idriverplus | Google |
| Hyundai MOBIS | Honda | DiDi[2] | Marble | HERE Technologies |
| SAIC Innovation Center | PACCAR | Easymile | ThorDrive | Leica Geosystems |
| Zoox | Toyota Research Institute | Local Motors | Udelv | TomTom |
| | Volkswagen | Navya | | |
| | | Optimus Ride | | |
| | | Uber ATG | | |
| | | Voyage | | |
| | | Yandex | | |

(1)   Autonomous Intelligent Driving GmbH, an Audi subsidiary

(2)   Beijing DIDI Infinity Technology & Development Co., Ltd. (DiDi)

We have won and are further actively negotiating several multi-year contracts for both ADAS and autonomous vehicle programs. We work closely with nearly every major autonomous vehicle development program in the world today. In addition, companies across several non-automotive end markets are increasingly adopting our lidar-based smart vision solutions into their systems. Over the years, our customers have committed substantial effort and resources into developing complex algorithms and software systems around our products, which further validates and reinforces our strong leadership position across many end markets.

Since inventing the smart vision platform, we have spent over a decade continually refining our technology through real world testing and validation. We are committed to driving broad adoption of our solutions in order to save lives, reduce injury, and address a growing number of use cases for our technology. For example, we recently announced and are developing a series of products to unlock higher levels of performance for ADAS applications, such as Automatic Emergency Braking ("AEB"), Lane Keep Assist, Adaptive Cruise Control, Blind Spot Monitoring, and Traffic Jam Assist. We are continuing to invest significantly in key elements of our technology platform, strategic partnerships and manufacturing processes in order to maintain our strong leadership position.

Our technology leadership and commitment to safety have established us as a thought leader for the safe deployment of autonomous vehicles and ADAS solutions. For example, we host the annual World Safety Summit on Autonomous Technology to provide a forum where industry leaders from around the world come together to discuss developing and safely deploying automated mobility solutions. The event brings together representatives from various organizations, including the American Automobile Association, Mothers Against Drunk Driving, National Transportation Safety Board, NHTSA, Partners for Automated

Vehicle Education, and Society of Automotive Engineers ("SAE") International as well as autonomous vehicle developers, including Argo AI, Aurora Innovation, Cruise Automation, The Ford Motor Company, PACCAR, Uber Technologies, Voyage, Waymo and Zoox, among others.

We believe that smart vision can significantly reduce the number of lives lost in vehicle crashes and substantially reduce pedestrian and bicyclist fatalities. Beyond automotive applications, our technology can also help reduce injuries in factories, construction sites, mines, and ports, among other applications. Smart vision technology can also enhance public safety through security and smart city applications. For example, our technology is currently being used in systems to identify suspicious activities at malls, airports, power plants, businesses and public parks, among other locations. In addition, our smart vision solutions are being used in applications such as delivery services to enhance efficiency and cost savings.

**Competitive Strengths**

We believe the following strengths will allow us to maintain and extend our leadership position.

- *Proprietary smart vision platform with embedded software*.   Velodyne created and patented 3D real-time lidar, beginning with its 360-degree surround view architecture, which has become the reference architecture for AVs, robotics, and security applications. Our technology lead is further enhanced by sophisticated embedded signal processing software that runs proprietary algorithms to analyze the unstructured data captured by our lidar hardware and generates structured data that machines can easily process. In addition, our proprietary calibration methods allow us to maximize performance in our smart vision solutions. Beyond our surround view lidar architecture, we have a broad set of proprietary technologies that have allowed us to develop other scalable lidar product platforms to target new use cases and end markets. Our directional solid state and dome architectures will underlie new product platforms that target ADAS applications and commercial vehicle markets. Our platform approach allows us to create a broad portfolio of solutions that are designed to address mass market adoption.

- *Comprehensive intellectual property portfolio*.   Our invention and early development of smart vision technology has given us many years to innovate across our hardware, software, and manufacturing capabilities, and we believe it has created substantial advantages for us in the markets that we serve. We currently hold a number of key patents, including a lidar patent related to our surround view lidar design, which we believe is fundamental. The broad applicability of this architecture stems from its real-time high performance, accurate data collection, and long range compared to other sensing solutions. Our market leadership is the result of our many years of tried-and-tested innovation that resulted in proprietary intellectual property across our entire solution, including our embedded software and manufacturing processes. Beyond our surround view lidar architecture, we have a broad technology portfolio that facilitates the development of new product offerings that are targeted to new use cases, as evidenced by the introduction of our directional solid state and dome architectures.

- *Broad product portfolio addressing multiple high growth markets*.   With more than ten years of R&D, we have gathered valuable insights and know-how that have led to the creation of advanced architectures for our lidar solutions to address various applications across several end markets. Our continued focus on innovation has enabled us to offer a wide range of high-performance solutions with a variety of software intelligence, sizes, form factors and price points. This has allowed us to serve multiple markets beyond the automotive market. Of the more than 300 customers that purchased smart vision solutions from us and our distributors in the last three fiscal years, more than 200 are using our smart vision solutions for the non-automotive applications. In 2019, for example, we generated slightly over half of our revenue from sales to customers deploying our smart vision solutions in non-automotive applications. In addition, we are transitioning from field programmable gate arrays to application-specific integrated circuits (ASICs) in order to further improve performance of our products, lower costs and reduce reliance on any key suppliers. This transition to ASICs, as well as other innovations, positions us well for increased volumes as our end markets grow.

- *Manufacturing expertise and manufacturing partners*.   To achieve our vision of LIVE, we understand the importance of designing to scale. We have dedicated teams focused on Design For Manufacturing ("DFM") processes, such as those that include proprietary alignment and calibration techniques.

182

Our teams leverage automation steps in an effort to lower manufacturing times, improve yield and position us and our manufacturing partners to produce at increasing scale as our customers' requirements increase. Our highly innovative and proprietary DFM methodology represents a key competitive advantage that positions us to maintain our market leadership through the production of high-performance, cost-competitive products across our entire portfolio of smart vision solutions. We have made significant investments in our manufacturing infrastructure that we believe will allow us, together with our manufacturing partners, to meet increasing demand for our lidar solutions. In addition, we have formalized multi-year, contracted manufacturing partnerships with Veoneer, a leading Tier 1 — auto supplier focused on ADAS and autonomous driving applications, Nikon, a leader in manufacturing precision optical components, such as high-performance cameras and Fabrinet, a leader in precision optical, electro-mechanical and electronic manufacturing. We believe our partnerships with Veoneer, Nikon and Fabrinet further cement our first mover advantage by providing us with increased flexibility, scalability and speed to market. We will continue to investigate and pursue additional third party manufacturing relationships based on capacity expansion and new product requirements. We believe that this third-party manufacturing capacity will enable us to significantly increase production volume and lower the cost of our lidar solutions by leveraging the expertise in technology and precision manufacturing of our partners as market adoption of lidar increases.

- *Strategic partnerships and strong relationships*.   Since the DARPA Grand Challenge, we have maintained relationships with other participants in the race. This includes autonomous team leaders and engineers from Stanford, Caterpillar, Ford, GM and MIT, among others. Based on the experience from our participation in the Grand Challenge races, we developed our HDL-64 lidar solution, which we subsequently provided to the teams participating in the Urban Grand Challenge in 2007. Our HDL-64 solution served as a key enabler for the success of the race in 2007. Many of the lead engineers from the DARPA race teams were from the autonomous development programs at major OEMs, were subsequently hired into technology companies working on autonomous programs or started new mobility companies, such as Uber, Aurora Innovation, and Zoox, among others. The relationships we fostered since the initial DARPA Grand Challenges have continued over a decade, strengthened by our common goal to advance autonomous technology. Many of these relationships have evolved into being our customers and partners, adopting our high quality performance solutions. We have continuously refined our solutions based on the feedback we received from our customers and partners, who have tested our products over millions of real world miles for over a decade. In addition to our business relationship, we actively collaborate with our customers to further the advancement of safe transportation on a regular basis and at our annual World Safety Summit for Autonomous Vehicles.

  Over the years, we have built an extensive ecosystem in the markets we serve. We have distribution partners in Asia and Europe to address growing market opportunities in these regions and beyond. In North America, we sell directly to most of our customers as well as through three national distributors who are also our customers and integrators. We also sell our solutions through our technology hubs around the world, such as Germany and China, where we maintain offices and staff. We strive to continue to cultivate these partnerships and improve our brand recognition globally.

- *Autonomous ecosystem built around our smart vision technology*.   Our early introduction of commercial, 360-degree, real-time 3D lidar-based solutions has allowed us to become a critical supplier to OEMs and aftermarket customers developing autonomous vehicles. Our products are used in the R&D and co-engineering phases of a substantial number of autonomous vehicle development programs, with customers investing significant time and resources in software that integrates seamlessly with our lidar solutions, which helps us retain our customers. These efforts also enable seamless adoption of our ADAS solutions, which are based on the same architectural platform. We believe that our investments in software, validation and testing create a loyal customer base that will lead to greater revenue opportunities as more of our customers roll out ADAS features in production vehicles and eventually commercialize their autonomous vehicle programs.

  Additionally, we provide account management, product management, and technical support experts to form deep, collaborative relationships with strategic customer R&D organizations. These teams

183

focus on assisting with rapid first installations, mass production supply agreements and post-sales support. We are now supporting over 50 programs in advanced research targeting future mass production.

- ***Visionary and proven management team with deep industry experience***.   Innovation runs deep in our corporate culture. Our founder and executive chairman, David Hall, and our chief executive officer, Dr. Anand Gopalan, along with our executive management team, drive our vision and corporate strategy. We believe Mr. Hall's invention of the 3D real-time lidar has directly contributed to significant developments in autonomous technology and many other applications requiring precise 3D perception data in real time. Mr. Hall was named inventor of the year in 2018 by Intellectual Property Owners Education Foundation in recognition of his significant contributions to lidar technology. Our experienced leadership team is committed to deploying safe, autonomous systems across multiple end markets. As the company developed, Mr. and Ms. Hall built a strong team, adding leaders in sales, engineering, automotive validation manufacturing, operations, legal and finance bringing their experience from public companies such as Chrysler Group, Daimler AG, NVIDIA, Rambus, and VeriSilicon.

**Industry Background**

*Increasing adoption of automated applications*

We are in the early stages of an autonomous revolution, where there is an increasing demand for general-purpose sensors that can ensure safety, increase efficiency and enhance productivity by implementing automated systems into processes traditionally driven by human labor. For the automotive industry, SAE International has published a taxonomy with detailed definitions for six levels of driving automation, ranging from no automation to full automation. Set forth below is our summary of SAE's taxonomy.



We define the shift toward automated systems as "precision in motion." We believe that the successful adoption of lidar sensors in automotive applications will drive its adoption in other markets. Some of the key drivers of increasing adoption include:

- ***Need for safety***.   According to the NHTSA, 94% of accidents are attributable to human error. To increase road safety and respond to regulatory requirements, we see automotive manufacturers proactively adopting ADAS technology. The European Union has mandated several ADAS features, such as AEB, to be required on all new vehicles by 2022. Also, NHTSA and the Insurance Institute for Highway Safety (IIHS) announced that 20 automakers in the U.S. have voluntarily committed to making AEB standard equipment by 2022, covering 99% of all new vehicles in the U.S. In addition to the regulatory mandate, NHTSA publishes its 5-Star Safety Ratings system for consumers to make smarter safety decisions when purchasing a vehicle. NHTSA currently recommends car buyers purchase vehicles equipped with Automatic Emergency Braking for added safety, and we believe future recommendations will include more advanced safety requirements. These regulatory

requirements, coupled with growing end customer demand for higher levels of safety, support the growing adoption of advanced lidar-based systems.

- **Better security and surveillance**.   Today, security systems primarily rely on cameras to detect threats. Security threats, such as terrorist attacks and mass shootings, have demonstrated the necessity for comprehensive safety surveillance in city centers, parks, utility hubs, ports of entry, docking stations, subway stations, rail stations, airports, shopping malls, and business parks, among other public areas. With advanced 3D sensing technology, suspicious movements and objects can be detected in most environments, day or night, to alert authorities and direct them to a specific location.

- **Improve productivity**.   There is a need to supplement processes traditionally handled by human labor with autonomy in order to increase productivity by redirecting human efforts to other value-added tasks. For instance, current technology enables automated robots to provide security monitoring across a wide area with only minimal human involvement, or to perform routine maintenance tasks in retail facilities so store associates can focus on other valuable customer-facing tasks. We continue to see more cases where robotic solutions can augment human productivity.

- **Efficient transportation of goods**.   The proliferation of machine vision has raised the possibility of automated transportation, including freight and last-mile delivery. Consumer demand for fast and cost-efficient delivery solutions has put pressure on businesses to improve the delivery experience. Businesses are actively exploring the use of autonomous trucks, drones and robots to help create more efficient and less expensive delivery infrastructure to meet this consumer demand. Precision in motion will be necessary to achieve the performance necessary to achieve autonomous long-haul and last-mile delivery.

- **Better traffic organization and efficiency**.   There is continual need for precise 3D mapping information to understand the surrounding environment and movement patterns to improve transportation logistics and enhance traffic efficiency. For example, smart city initiatives for intersections and corridors are being designed and deployed to better organize traffic and prevent accidents. Richer data sets are critical to the evolution of routing optimization algorithms, which are key drivers in the next generation of transportation.

*Existing vision solutions have limited ability to achieve precision in motion*

Historically, the transition to fully autonomous solutions has been critically limited by the inability of existing solutions to perceive surroundings with the required precision to respond in real time. As 3D vision solutions continue to advance, engineers have presented several combinations of technologies that could potentially support various levels of autonomy. Many commercially available products today utilize a combination of cameras and radar. However, these have significant limitations that prevent them from delivering the precise 3D vision necessary for autonomy. Cameras and radar have trouble providing the required combination of depth perception in a high resolution image, making it difficult for systems utilizing these sensors to precisely localize the relative positions of nearby objects. Camera systems can only infer depth by using complex, computationally intensive algorithms. In addition, cameras are sensitive to light conditions and typically have limited field of view, making it difficult to map a 360-degree view of the surrounding environment and thereby making it harder to detect objects that are relevant to a moving machine. As a result of these shortcomings, we believe cameras and radar by themselves or in combination provide insufficient solutions for full autonomy.

High resolution lidar sensors are superior in delivering precise location data and object detection, and are not affected adversely by poor light conditions. We believe high resolution lidar will be a critical component of truly autonomous systems; however, high resolution lidar sensors are difficult to manufacture and, as a result, tend to be more expensive than cameras and radar systems. A key component of precision in motion is the accuracy of data provided to the computer, including minimization of false positives and false negatives. Whereas current implementations of cameras and radar can often incorrectly detect hazards, lidar's rich data enables robust hazard identification. Key advantages of lidar sensors over radar and cameras include:

- **Precision at range**.   The laser-based measurement of lidar produces an image quality at a given range that is more precise than radar. Lidar is able to achieve an accuracy of centimeter-level precision

185

at long-range, far superior to that achievable by high-resolution radar. While a camera-centric autonomous system would require multiple cameras to achieve focus at every range of perception, a single lidar sensor provides data that is always in focus.

• *Object detection and recognition, day and night*.   Lidar is the highest performing sensor when it comes to object detection in all lighting conditions within a wide field of view. Cameras are not able to adequately provide high resolution 3D images in real time and they cannot detect objects in darkness, making them dependent on headlamps and street lighting. Lidar has its own self-illumination from laser beams that makes its nighttime viewing superior to cameras and that yields nighttime object detection capabilities comparable to those in daylight. Similarly, radar has limited spatial resolution that renders it unable to distinguish between objects. In contrast, lidar creates precise 3D images compared to the abstract images produced by radar. While operating in a complex 3D scene, cameras must choose areas of interest to focus their perception, thus sacrificing object detection in other areas. This is not a problem with lidar sensors, which can detect objects simultaneously in all areas within their entire field of view.

• *Localization*.   Lidar has better spatial resolution than cameras and radar. Because lidar produces data streams that contain full sets of spatial coordinates through time, any position within the mapped environment can be chosen as a point of view to analyze the movement of objects. This enables lidar to detect the speed of cars and the pace of pedestrians more precisely in order to perform various tasks, such as providing advance collision warnings and movement planning.

• *Field of view*.   Lidar is capable of capturing a complete view of an environment, avoiding the need to stitch together data from multiple frames. Lidar is also capable of capturing vertical and horizontal fields of view in a smaller form factor than a radar solution of similar performance, while cameras have no way of capturing a 360-degree view within a contiguous data set.

• *Performance at night*.   Because lidar detects photons emitted by itself, it is not reliant on ambient light conditions. This is a notable improvement over cameras, which suffer from reduced functionality in low-light environments. As 75% of pedestrian-related accidents occur at night, lidar can detect pedestrians, bikers, and cyclists far better than even the human eye can under minimal light conditions.

• *Performance in direct sunlight*.   Lidar remains resilient when exposed to direct sunlight, whereas a camera lens can become overexposed and "blinded" by the light. This was evident in recent high-profile crashes involving vehicles operating in autonomous mode without the use of lidar technology.

• *Ability to read signs & differentiate color*.   While cameras are more efficient at detecting colors, high-end lidar solutions, such as those produced by Velodyne, have the ability to read signs and differentiate color by leveraging sophisticated algorithms to measure the relative strength of photons returning to the lidar detector when reflected off of street signs. Radar has no ability to differentiate color or identify text.

We believe multiple sensors are required to support the reliability and accuracy needed for precise environmental mapping. For instance, lidar provides high resolution spatial analysis, while cameras assist with traffic sign recognition and radar provides supplemental information for continued operation under poor weather conditions. Fields of view from various sensors will overlap, providing redundancy in the event one of them fails. We envision lidar to play a crucial role in delivering a real-time, data-rich digital map for safe mobility applications.

*Standardization of active safety requirements*

As industry participants develop active safety features, standards defining the increasing levels of sophistication in these features are required. We are working with SAE International and other major professional and standardization organizations to guide the relevant regulations that address public safety. As an example, we contributed a series of published white papers addressing some of the "Unsettled Topics Concerning Sensors for Automated Road Vehicles" captured in a SAE Edge report under this title.

Included below is a proposed rating system for Automated Emergency Braking and Steering technologies with Velodyne's proposed 5-diamond rating system below.

**Velodyne-proposed guidelines for standardized five diamond rating system for Automatic Emergency Braking and Steering**

| Vehicle System Performance Criteria | ◆ | ◆◆ | ◆◆◆ | ◆◆◆◆ | ◆◆◆◆◆ |
|---|---|---|---|---|---|
| **Max Speed** | 10 mph | 30 mph | 50 mph | 65 mph | 75 mph |
| **Detection Reliability** | Frequent false negatives or positives | Fewer false negatives or positives | Occasional false negatives or positives | Extremely rare false positives or negatives | Extremely rare false positives or negatives |
| **Pedestrian, Bicycle, Motorcycle Detection and Classification Range** | Near range detection, no classification | Mid-range detection | Mid-range detection and classification | Mid-range detection and classification | Far-range detection and classification |
| **Vehicle Detection and Classification Range** | Near range detection, no classification | Mid-range detection | Mid-range detection and classification | Far-range detection and classification | Far-range detection and classification |
| **Stationary Object Detection and Classification Range** | May not detect | May not detect | Near range detection | Mid-range detection and classification | Far-range detection and classification |
| **Peripheral Object Detection and Classification Coverage** | No perception coverage | Limited perception coverage | Limited perception coverage | Improved perception coverage | Excellent perception coverage |
| **Dynamic Driving Intervention Capability** | AEB for crash mitigation | Forward collision avoidance AEB | Forward collision avoidance with steer and brake control | Forward and side collision avoidance with steer and brake control | Forward and side collision avoidance with steer and brake control |
| **Light and Weather Performance** | Suffers in low light and inclement weather | Better in low light and inclement weather | Better in low light and inclement weather | Performs well in all light and most weather | Performs well in all light and most weather |

As strong advocates of the highest safety level materialized in the 5-diamond rating, we have also published a proposed optimal lidar sensor suite for the vehicle, illustrated in the picture below showing the field of view of lidar sensors positioned around the car for optimum performance.



*One example of possible lidar sensor coverage to achieve five diamond level ADAS performance (range not to scale).*

187

With the increased rigor placed on the evaluation of the ADAS functions through initiatives like the New Car Assessment Programme, we believe that our innovative technological contributions, along with our proposed rating system, will lead to a safer deployment of the new ADAS features and ultimately to a safe implementation of the full Level 5 autonomy as described by SAE International.

**Our Market Opportunity**

*Overall market opportunity*

Our technology enables autonomy and creates new markets. Traditionally, many autonomous and 3D vision-based sensing applications were developed by utilizing non-lidar sensors; however, as the benefits of lidar-based solutions are becoming more widely recognized, we believe there are significant market opportunities available for our technology. As autonomous and 3D vision-based applications continue to grow more complex, we believe our technologies will become increasingly adopted due to our innovation, leadership, proven scale, and commercial readiness.

We estimate that the core total addressable market, or core TAM, for our solutions will be approximately $11.9 billion in 2022. We define our core TAM as perception applications in the automotive, industrial, drones, autonomous mobile robots and 3D mapping end-markets that we are actively engaging with customers on. In addition, we believe that our market opportunity could be larger than what is currently estimated as there are early development and largely unexplored new and emerging applications, which we refer to as greenfield applications, beyond our core TAM such as traffic monitoring, pedestrian monitoring, security and natural disaster damage assessment. Furthermore, as we explore ways to monetize our software and data assets, we believe we can continue to further expand our market opportunities. See below for a discussion of the material assumptions and estimates used in the calculation of our TAM.

*Automotive market opportunity*

We expect demand in the automotive market to be driven by regulatory and customer demand for lidar solutions. Consequently, we estimate that the automotive TAM by itself will further grow from $7.2 billion in 2022 to $16.8 billion in 2026, representing a compound annual growth rate, or CAGR, of approximately 24%. This automotive TAM includes AVs, ADAS, and commercial vehicles. The material assumptions and estimates used in this calculation are provided in "— *Methodology*" below.



Note: Based on Company estimates.

(1)   Includes Autonomous Vehicles, Advanced Driver Assistance Systems and Commercial Vehicles.

(2)   Includes construction, mining, agriculture, warehouse, forklift and other off road vehicles.

188

*Methodology*

We estimate our market opportunity for a given market by estimating (i) the total number of vehicles or machines in that market (or a subset that we believe would deploy lidar) using data from various third-party sources, (ii) the number and type of lidar sensors we believe would be deployed on each vehicle or machine in that market using our internal estimates and (iii) the price of each sensor to be deployed on the vehicles or machines in that particular market using out internal estimates. We then multiply the estimates generated by clauses (ii) and (iii) of the prior sentence to determine the estimated total cost of the lidar package to be deployed on each vehicle or machine in the market. The estimated total cost of the lidar package per vehicle or machine is then multiplied by the total number of vehicles or machines in the market, or the estimated number generated by clause (i) of the first sentence of this paragraph. These estimates do not take into account the impact of the current global coronavirus pandemic, and we cannot assure you that these estimates will not be materially and adversely affected as a result.

*Automotive Market Methodology*

Based on third party data, we estimate that the total market size for vehicles deploying autonomous technology will be approximately 29.0 million vehicles by 2022 and approximately 52.8 million vehicles by 2026. These figures include vehicles with Level 1 through Level 5 autonomy in both commercial and passenger vehicles. Generally, the number of lidar sensors to be deployed on each vehicle in the market depends on the level of autonomy and the type of lidar sensors utilized, which is expected to range from one to 12 sensors in 2022 and one to 13 sensors in 2026. We believe that in most cases that more lidar sensors, or at least lidar sensors with greater functionality, will be required as the level of autonomy increases towards full autonomy. For example, we estimated that vehicles designed for Level 3 autonomy would need more lidar sensors than those with only steering or braking support as with Level 1 autonomy. We then estimated the total cost of the lidar packages to be deployed on each vehicle in the market, which again varied based on the level of autonomy from approximately $600 to $10,300 per passenger vehicle in 2022 and approximately $300 to $8,700 per passenger vehicle in 2026. We estimate that the cost of lidar packages on commercial vehicles will be more expensive than those used in passenger vehicles, and our estimates assume an average sale price erosion over time that is consistent with products that we consider similar in other industries. We estimate that our automotive total addressable market (TAM) will be up to approximately $7.2 billion in 2022 and up to approximately $16.8 billion in 2026 by multiplying the estimated total cost of the lidar package per vehicle in each of the Level 1 through Level 5 autonomy by the estimated total number of passenger and commercial vehicles with each level of autonomy.

*Overall Market Opportunity Methodology*

We estimate that our core TAM will be up to approximately $11.9 billion in 2022. We define our core TAM as perception applications in the automotive, industrial, drone, autonomous mobile robot and 3D mapping end-markets. As with our automotive TAM, we estimated the total number of machines in a given area in 2022 using data from various third-party sources. We then multiplied that figure by the estimated total cost of the lidar package to be deployed on each machine using various internal estimates, including the number of lidar sensors required and the pricing of such sensors. Our key estimates for the non-automotive applications that together form our core TAM are as follows:

| Application | Estimated Machines in 2022 (in thousands) | Estimated Cost of Lidar Package per Machine in 2022 | Approximate TAM in 2022 ($ in billions) |
|---|---|---|---|
| Global autonomous robots | 241 | $2,100 | $0.5 |
| Global 3D mapping | 60 | $5,000 | $0.3 |
| Global Drones[1] | 3,400 | $300 | $1.0 |
| Global Industrial[2] | 5,100 | $600 – $6,000 | $2.8 |
| Total | | | $4.7 |

(1)  Includes inspection, monitoring, survey and mapping and precision farming drones.

189

(2)  Includes the global markets for crawlers, dumpers and tenders, excavators, finishing equipment, graders, off-highway trucks, pavers, skid steer loaders, loaders and backhoes, trenchers, wheel loaders and dozers and forklifts.

When the aggregate TAM set forth in the table above is added to the $7.2 billion automotive TAM, we estimate that our total core TAM will be approximately $11.9 billion in 2022.

Certain monetary amounts, percentages, and other figures included elsewhere in this prospectus have been subject to rounding adjustments. Accordingly, figures shown as totals in certain tables or charts may not be the arithmetic aggregation of the figures that precede them, and figures expressed as percentages in the text may not total 100% or, as applicable, when aggregated may not be the arithmetic aggregation of the percentages that precede them.

**Our Technology Platform**

*Overview of our lidar-based smart vision solutions*

Our smart vision solutions center around our proprietary lidar sensor technology, which enables real-time, three-dimensional vision of the surroundings for autonomous applications.

*How smart vision works and why it is breakthrough technology*

True autonomy can be achieved only when machines reliably perceive the world in real time and in three dimensions as they navigate. This was not possible before the advent of lidar-based smart vision. To perceive the environment in 3D, our sensor emits a series of laser pulses, typically millions of pulses each second, that bounce off objects in the environment and return to the sensor. The device measures the time each pulse traveled and uses highly sophisticated, real-time algorithms to create digital, machine-readable maps of the surrounding environment. These maps have up to centimeter-level precision and capture rich detail all around the sensor. Since the maps are continually refreshed every few milliseconds, they can be used to perceive both static and dynamic objects. Unlike cameras that are two-dimensional and radar that is not capable of high-definition imaging, our lidar captures a precise, high definition, three-dimensional view of the environment. These characteristics make our smart vision technology the ideal sensor platform for cars, robots and other autonomous machines to perceive the world as they move through it. A sample output from one of our lidar sensors is below.



190

*Advantages of our smart vision technology*

We have over a decade of experience in designing and deploying our sensor technology into a variety of applications. Drawing from this depth of knowledge in sensing and autonomous perception, we have made strategic technology investments that we believe will enable mass deployment of our smart vision solutions across multiple markets. These technology investments have allowed us to realize smaller form factors, as well as increased reliability, better power efficiency and lower cost. Key elements of our technology include:

- ***Proprietary lidar architectures***.   We have developed multiple proprietary architectural platforms for a variety of end applications:

  - ***Surround view architecture***.   Our hybrid solid state 360-degree surround view design has become the reference architecture for the majority of autonomous vehicle programs in the world. We securely position our solid state lidar on robust, aerospace-grade ball bearings that enable the part to spin 360-degrees with high reliability. This approach allows us to target numerous applications that operate at higher levels of autonomy or require wider fields of view, such as Level 4 and Level 5 autonomous vehicles.

  - ***Directional solid state architecture***.   We have developed and are deploying our small form factor, embeddable solid state architecture that will use a proprietary, frictionless, beam steering technology to enable next generation ADAS applications. This technology will combine the high reliability and long lifetime of traditional micro electro-mechanical systems (MEMS) solutions and also provide long sensing range.

  - ***Dome architecture***.   We have recently announced and are developing our dome hybrid solid state architecture that will have an innovative optical design that provides a 180-degree, hemispherical view of the surrounding environment in an embeddable form factor to enable detection of objects in close proximity, such as pedestrians and bicyclists.

    All of our current lidar solutions use multiple lasers as opposed to one single emitter, simultaneously achieving both high resolution and high frame rate as required for precise, real time perception of the environment. This gives us a unique advantage over most competitors in the market today who predominantly offer products using a single emitter.

- ***Advanced algorithms and embedded software***.   The best-in-class performance of our technology is enabled by our innovations in software algorithms and signal processing that are embedded in the lidar sensor. The ability of the lidar sensor to detect low reflectivity objects across hundreds of meters with up to centimeter-level precision requires not only best-in-class hardware but also state-of-the-art signal processing software. Our embedded signal processing software runs proprietary algorithms to analyze the unstructured data captured by our lidar hardware and generates structured data that machines can easily process. The software embedded in our systems also allows us to maintain high accuracy across a wide range of temperatures, light and weather conditions. In addition to providing precise 3D measurements, our software can provide advanced levels of functionality, including detecting and tracking objects as well as reporting the exact location of the machine. Our customers demand this higher level of performance for safety-critical applications such as autonomous driving and security. We continue to invest in innovative software to allow our customers to achieve maximum performance and value from our smart vision solutions.

- ***Custom ASICs for smart vision***.   Currently there are no commercially available integrated circuit solutions specific to lidar. This poses a significant barrier for miniaturization and cost reduction. We have developed our own custom ASICs, which will allow us to build more power-efficient and reliable lidar systems at significantly lower cost. The use of our own ASICs will also allow unprecedented levels of integration of lidar functions into a single piece of silicon, enabling us to develop lidar in ultra-small form factors such as the Velabit. The ASICs also provide a further level of protection for our core intellectual property by embedding them in a semiconductor chip that is difficult to reverse engineer.

191

- ***Micro-lidar array technology***.   The key barrier to building high performance lidar in very large quantities is the ability to integrate a large number of complex precision optics and components into a small form factor repeatedly and reliably. In order to address this, we have developed a unique micro-optical packaging called the Micro-Lidar Array along with innovative manufacturing technologies. These manufacturing technologies allow for the production of lidar elements with alignment precision that is within one-tenth the thickness of a human hair while using a fully automated production line. This allows for high levels of miniaturization, cost optimization and reliability using highly repeatable semiconductor wafer scale manufacturing processes.



- ***Manufacturing and calibration of lidar***.   Our manufacturing expertise is critical to our ability to commercialize our technology and meet the demands of our customers at price points that can drive broad adoption. We have shared and will share this expertise with our manufacturing partners to enable their success.

  - ***Design for manufacturing***.   Our innovative and proprietary DFM methodology enables us to deliver high-performance, cost-competitive products across our entire portfolio of smart vision solutions. We strategically design each component of our lidar sensors to minimize dependency on particular suppliers. Although some of our critical components come from limited or sole sources of supply, we have established and continuously evaluate second and third sources of supply for many of our critical components, enabling an agile, scalable manufacturing process. Our leading supply chain framework is a result of the experience we have gained over a decade of designing and building 3D lidar solutions with a deep and robust global sourcing network.

  - ***Precise alignment***.   A key to our best-in-class 3D lidar is precise alignment of the optical elements inside the lidar. We employ and provide our manufacturing partners with proprietary alignment methodologies that have been developed over the last ten years in order to align our lidar sensors to extremely accurate tolerances. We employ custom in-house designs and internally developed lidar alignment procedures that enlist the use of automated systems to continually validate the alignment process throughout the manufacturing steps of our lidar.

  - ***Innovative calibration***.   We deliver peak performance from each lidar unit directly off the manufacturing assembly line by using a proprietary calibration methodology. The difference between a calibrated sensor and an uncalibrated one can be two orders of magnitude, meaning a difference of centimeter-level precision versus meter-level. A one meter deviation is unusable in many applications, while centimeter-level accuracy is a critical requirement for safety and is the reason our products are known for reliability and high precision. Our manufacturing partners have access to this innovative and proprietary calibration methodology.

  - ***Lowering lidar cost***.   With more than ten years of innovation and experience manufacturing lidar solutions, we have addressed many challenges of producing lidar-based solutions and optimized the production of our smart vision products at progressively lower costs. At our advanced manufacturing facility and those of our manufacturing partners, we are able to control the critical aspects of product development and commercialization of each of our lidar systems. This has enabled us to develop and bring to market a broad product suite. We have invested extensively in automated manufacturing steps to lower costs, as well as continually updated and enhanced product designs to meet specific cost targets as informed by our worldwide customer base, while maintaining high performance. Our partnerships, including those with Veoneer, Nikon and Fabrinet, will also help us lower cost by leveraging scaled mass production and higher volume purchasing from suppliers.

**Our Growth Strategy**

Our goal is to continue to be the leader in smart vision technology. Key elements of our growth strategy include:

- *Capitalize on increasing regulatory and end customer demands for transportation safety*.   As the NHTSA recommended Tire Pressure Monitoring Systems in 2000, which became mandatory in 2007, and rearview video systems in 2013, which were mandated in 2018, future NHTSA 5-Star Safety Ratings will likely require advanced environmental awareness. We believe lidar is both superior and complementary to existing automotive safety sensors, as it is able to provide critical perception data in a wider range of conditions and with greater precision than radar or cameras alone. We believe this will result in better active safety systems that reduce crashes and save lives. Our lidar has the ability to accurately detect and measure distance of many different kinds of objects, including people and animals, in real-time. As many OEMs are actively investing in and planning on the adoption of lidar technology to enable safety in future models, we believe we are strongly-positioned to benefit from this increased demand for safety.

  The inherent limitations of cameras and radar for ADAS applications create many opportunities. We have spent the last few years developing products specifically for the ADAS market, namely our Velarray, Veladome and Velabit. Our years of working closely with major automotive OEMs on their autonomous vehicle programs allow us to be an ideal partner for lidar-based ADAS solutions.

- *Continue to penetrate high-volume commercial and industrial markets*.   As smart vision solutions gain mainstream adoption across various end markets, being the leader in lidar technologies provides us with the unique opportunity to demonstrate the advantages of our solutions on a large scale. We believe this will further solidify our market leadership and expand our available market opportunity and facilitate lidar usage in emerging applications. Our wide portfolio of smart vision products allows us to address multiple new applications beyond the automotive industry. For example, we have already been selling lidar solutions for a wide range of non-automotive applications, such as security, drones, precision agriculture, smart city, trucking, last mile delivery, industrial vehicles, industrial robotics and gaming, among others. We expect many of these applications to grow into major markets for lidar usage.

  In the security and smart city applications there is growing demand for lidar as it is effective at detecting and tracking people and objects. This capability allows for threat detection and better traffic management in airports, city centers, retail establishments, among others. In addition, with increased concerns that facial recognition technology will be used for general surveillance, a system that utilizes lidar as the initial source of object detection data could enable a security solution that preserves trust and anonymity. This is especially important in applications involving the general public, such as retail monitoring and queue management.

  In the agricultural sector, farmers are turning to automated processes with the help of lidar to perform functions that are otherwise performed by humans. Increased automation is particularly important in this sector given labor shortages.

  In the last-mile delivery market, companies such as FedEx are building delivery robots that will change the logistics industry and enable lower-cost and quicker deliveries of everyday consumer items, including food and packages.

- *Win additional commercialization contracts*.   We are seeing more smart vision-based applications transitioning from the development stage to the commercialization stage, particularly in the automotive industry. With our decade-long relationship with automotive OEMs, we have had several developmental contracts over the years and are now well-positioned to enter into several large multi-year commercial contracts adding to the number of commercial contracts we already have in place. Given the high number of markets where lidar has a strong use case, we believe the growth will be significant as we win more contracts of smart vision-based applications.

193

- ***Expand our software offerings***,   Our lidar-based smart vision solution includes an embedded software solution that translates the information that lidar visualizes into data for machines. In most instances, our embedded software interacts with the broader software stack that is used for the specific application. For example, in automotive and mobility applications, our smart vision solution will provide software data that is used as a key input to inform the broader ADAS or autonomous driving software stack. Based on customer feedback, we are developing a broader software stack for specific use cases that can be packaged with our smart vision solutions. This fully-integrated package is key to our customers in emerging markets, such as security, smart cities, robotics, and drones. These offerings will provide additional revenue opportunities, as well as enhance our existing product portfolio by providing a fully-integrated package.

- ***Develop licensing opportunities for our lidar-enabling technology***.   We are in the process of growing our revenue through new licensing ventures. As we continue to experience increasing adoption of our smart vision solutions, we have the ability to license our technology to our manufacturing partners in order to meet the growing demand for our products. Furthermore, because our foundational smart vision technology has become the reference architecture for many lidar use cases, we have the ability to capitalize on the growing market opportunity by partnering with other lidar manufacturers through licensing agreements. These new licensing ventures will help us to continue to address the global demand for lidar-based solutions while effectively increasing our manufacturing capacity. In addition, they can provide a high-margin revenue stream that will improve our overall financial results.

- ***Expand our global customer base and channel relationships***.   We will continue to deploy a direct relationship sales model as well as engage key value-added resellers to serve and expand our global customer base. We have a direct sales and customer service organization of more than 50 people operating from key locations including San Jose, California; Detroit, Michigan; Boston, Massachusetts; Frankfurt, Germany and Beijing, China. This sales force is organized around the OEM, aftermarket and new market segments. The OEM segment includes vehicle manufacturers primarily in automotive, truck and shuttle applications. The aftermarket segment includes an array of new market entrants adding our smart vision products to existing vehicles. The new market segment includes an array of markets, from mapping, drone, robotics, security, industrial, among others.

  We have also developed a network of over 25 value-added resellers, many of which provide system integration expertise in an array of end markets, as well as local customer service. We continue to expand and optimize our direct and dealer network to ensure that we have sufficient depth of end market solutions as well as geographic coverage across both existing and new markets. We believe this will help us develop emerging applications for our smart vision technology.

- ***Pursue strategic acquisitions***.   We may pursue acquisitions as a means to complement our platform, if they represent a strategic fit and are consistent with our overall growth strategy. Such acquisitions would allow us to further accelerate the pace of our innovation and enable us to access new markets. While there is demand for our products today, we believe these acquisitions may create more expansive use cases for our products. We believe that because of our unique strengths in lidar development and manufacturing, we will be able to integrate, enhance and deploy new technologies.

- ***Expand our manufacturing partnerships***.   We expect to reduce our focus on in-house manufacturing and increasingly leverage the expertise of our current and future manufacturing partners. As we start to see the commercialization of key markets, such as AV and ADAS, it will become critical for us to maintain sufficient supply of our smart vision solutions. In addition to pursuing increasing the scope of our relationship with Veoneer and Nikon, we are selectively pursuing new partnerships to give us an opportunity to improve or expand our platform through new technological capabilities or additional manufacturing capacity. This could come in the form of additional reference design licenses or other manufacturing agreements with cooperative partners.

194

**Our Product Portfolio**

*Surround-View Hybrid Solid State Lidar*

We offer a broad lineup of surround-view lidar to support numerous end applications, including autonomous vehicles, drones, security, and mapping. When we first introduced the HDL-64E, the world's first real-time 3D lidar, we revolutionized autonomous mobility. Since then, we have introduced the HDL-32E, our 3D lidar solution with less than 2-centimeter precision. To address the growing need for smaller form factors, we created the Puck, our first solution weighing less than 1 kilogram, then the Ultra Puck and Alpha Prime which, deliver high resolution lidar at hundreds of meters in range. The Alpha Prime provides a superior combination of range, accuracy and resolution, making it ideal for high speed autonomy.



**The Original Gold Standard**

**IIDL-64E** was the world's first commercially available real-time 3D lidar, supporting 64 lasers, a 360-degree field-of-view and a 120 meter range. The HDL-64E is based on the first prototype invented by David Hall during the DARPA challenge and to date has been driven millions of miles on public roads across the United States. This groundbreaking solution became the gold standard for high-performance lidar. Designed for robust obstacle detection this sensor continues to enable safe navigation of ground vehicles, such as heavy trucks and autonomous fleets, in ports, and on marine vessels.



**Precision in a Smaller Form Factor**

**IIDL-32E** was released in response to demand for a more compact and lighter sensor and this second-generation 3D lidar solution extends the core 360-degree technology developed for the HDL-64E. The HDL-32E features 32 lasers aligned over a 40-degree vertical field-of-view, generates up to 1.39 million points per second and was the first 3D lidar technology to provide distance and intensity measurements across 100 meters with less than 2-centimeter accuracy. More compact and lighter weight than its predecessor, the HDL-32E measures 5.7 inches high by 3.4 inches wide, weighs less than 2 kilograms and is developed to meet stringent military and automotive environmental specifications.



**Small and Affordable**

**VLP-16 (Puck)** is one of the most popular sensors on the market and offers 16 lasers and a 100 meter range. Developed with mass production and affordability in mind, the Puck retains the multi-laser design of our other sensors while offering lower power consumption, lighter weight and a more compact footprint at an attractive price point, making it ideal for low speed autonomy and driver assistance applications.



**A Puck Optimized for Drones**

**VLP-16 LITE (Puck LITE)** is the world's lightest 16-laser lidar sensor at 590 grams and was designed expressly to address the exacting requirements of the UAV and aerial 3D mapping markets. Puck LITE achieves identical performance to the original Puck but reduces the sensor weight by almost 30 percent, critically enabling longer flight times. This lightweight, high-performance sensor retains 360-degree surround view to capture real-time 3D lidar data.

195



**A Higher Resolution Puck**

**VLP-16 Hi-Res (Puck Hi-Res)** is a further iteration of the original groundbreaking Puck and is designed for applications requiring high image resolution. While retaining surround view and 100 meter range, this sensor compresses the vertical field-of-view from 30 degrees to 20 degrees for a tighter laser distribution spaced at 1.33 degrees instead of 2.00 degrees. This design delivers more details in the 3D image at longer ranges and enables the host system to not only detect but also better identify objects at these greater distances. It is optimized for autonomous vehicle applications but will provide denser data and better object recognition in all its applications.



**Higher Range and Resolution in a Compact Form Factor**

**VLP-32 (Ultra Puck)**, is the third generation of the Puck family. The high-density, long-range image generated by the Ultra Puck makes it an optimal solution for robotics, mapping, security, driver assistance and autonomous navigation. VLP-32 uses 32 lasers to double the range and resolution of its predecessor at a range of up to 200 meters. Ultra Puck also introduces firing exclusion and advanced features for minimizing false positives. The compact design is small and light enough to be placed below a car's side-view mirror and greatly reduces the cost of the system required for a fully-autonomous vehicle.



**Our Highest Performance Lidar**

**VLS-128 (Alpha Prime)** is our flagship surround-view lidar and the first sensor in the world capable of 300-meter range, specifically made for autonomous driving and advanced vehicle safety at highway speeds. The lidar sensor incorporates 128 lasers and provides real-time 3D data up to 0.1-degree vertical and horizontal resolution. As the result of ten years of lidar development and learning from millions of tested road miles, the Alpha Prime provides the best combination of range, resolution and precision to enable Level 4 and Level 5 autonomous vehicles to function both at highway speeds as well as in low-speed urban environments. We were recognized with the Pace Automotive award for this product.

**Future Products Announced**

*Directional Solid State Lidar*

Our directional solid state lidar technology will combine the high reliability and long lifetime of traditional micro electro-mechanical systems (MEMS) solutions while also providing longer sensing range.



**Velarray** will combine performance, durability and convenience in a small form factor that can be seamlessly integrated behind windshields, within roof lines and on the body of the vehicle. With a 200-meter range and 120-degree horizontal and 35-degree vertical field-of-view, this solid-state lidar will offer best-in-class range and resolution for hidden and low-profile sensing and faster object identification for ADAS and autonomous applications.

196



**Velabit** will bring Velodyne's performance and design to an embedded solution that can be hidden around or inside the vehicle. Aimed at satisfying a growing set of price-sensitive applications, Velabit will retain 100 meter range and high precision while being packaged in our smallest form factor. The Velabit will be our lowest-priced sensor.

### Dome Lidar

Our dome hybrid solid state architecture has an innovative optical design that provides a 180-degree, hemispherical view of the surrounding environment in an embeddable form factor to enable detection of objects in close proximity, such as pedestrians and bicyclists.



**VelaDome** will be a category-creating sensor specifically designed for high-resolution, short-range sensing. The VelaDome will offer 180-degree by 180-degree field-of-view and the ability to detect objects as close as 0.1 meter. The VelaDome's small form factor will fit for a variety of low profile mounting and styling options along the sides of an autonomous vehicle. This sensor's near-field detection and high-density image will make it an ideal solution for a range of close-proximity automotive applications, including blind-spot monitoring.

**Software Solutions**

*Vella*

As part of our mission to drive commercial adoption, we will not only bring hardware and embedded solutions to market but are also developing a full software ADAS solution built around lidar, called Vella. We believe Vella will fill a void that exists in the current marketplace, which extensively relies on software stacks developed around cameras and radar. With lidar's ability to map the world dynamically and precisely, the Vella software solution will be able to deliver a rich set of safety and autonomy applications to any vehicle that utilizes a Velarray lidar. We believe this will provide an opportunity for us to monetize our data assets, providing us with a potential new source of revenue through a data and software services model.

These announced products are not yet available for shipment to customers, and there are risks associated with developing and producing new products. See "*Risk Factors — The markets in which we compete are characterized by rapid technological change, which requires us to continue to develop new products and product innovations, and could adversely affect market adoption of our products.*"

**Our Customers**

Since creating the first lidar solution for 3D vision in 2006, we have delivered more than 40,000 sensors to our customers and generated cumulative sales of over $570 million to date. Our customers deploy our smart vision technology in various applications across markets, including in autonomous vehicles, ADAS, UAVs, mapping, industrial automation, self-driving rovers, autonomous vessels, smart city initiatives and robotics. In 2017, 2018, 2019 and 2020, over 300 customers, including distributors who sell our products to additional end customers, purchased smart vision solutions from us. More than 200 of those customers are in non-automotive markets.

In 2017, three customers each accounted for more than 10% of our revenue, one of which accounted for 26% of the revenue. The customer who accounted for 26% of our revenue in 2017 made substantial purchases of our products for R&D projects in 2017, but did not repeat such purchases in 2018 and 2019. In both 2018 and 2019, two customers each accounted for more than 10% of our revenue.

We define the number of customers as the number of customers for which we have received an order for one or more of our products. Our count of customers does not include partners to which we have sold

197

product for their own demonstration purposes. A single organization or customer may represent multiple customers due to separate divisions, segments or subsidiaries.

The following is a representative list of our current customers as of June 30, 2020:

| Automotive OEMs and Tier 1 Suppliers | | Auto System Integrators | Last Mile Delivery | Non-Automotive Markets |
|---|---|---|---|---|
| AID[1] | Caterpillar | Aptiv | Gatik | Caterpillar |
| General Motors | Ford Motor Company | Argo AI | Idriverplus | Google |
| Hyundai MOBIS | Honda | DiDi[2] | Marble | HERE Technologies |
| SAIC Innovation Center | PACCAR | Easymile | ThorDrive | Leica Geosystems |
| Zoox | Toyota Research Institute | Local Motors | Udelv | TomTom |
| | Volkswagen | Navya | | |
| | | Optimus Ride | | |
| | | Uber ATG | | |
| | | Voyage | | |
| | | Yandex | | |

(1)   Autonomous Intelligent Driving GmbH, an Audi subsidiary

(2)   Beijing DIDI Infinity Technology & Development Co., Ltd. (DiDi)

**Our Customer and Manufacturing Partner Agreements**

We expect to reduce our focus on in-house manufacturing and increasingly leverage the experience of our current and future manufacturing partners. Currently, our two key manufacturing partners are Veoneer and Nikon Corporation. We have multi-year agreements with each of Veoneer and Nikon Corporation. A summary of those agreements is set forth below.

*Veoneer Agreement*

In January 2019, we entered into a License and Supply Agreement with a U.S. subsidiary of Veoneer. This is the only agreement we have with Veoneer. Under the agreement, Veoneer will receive certain license rights from us to enable it to manufacture and distribute certain of our lidar products for customers pre-approved by us. We also agreed to provide Veoneer with certain product development support and consulting services. Veoneer does not manufacture our lidar products for subsequent sale by us.

The License and Supply Agreement also includes exclusivity obligations restricting Veoneer's ability to sell third-party or internally developed lidar technology to a pre-approved customer in certain defined scenarios during the term of an existing purchase order with such pre-approved customer. Similarly, the exclusivity provisions in the agreement restrict our ability to sell lidar products or a license to sell such lidar products to a pre-approved customer in certain defined scenarios during the term of an existing purchase order with such pre-approved customer. In the event that either party violates these exclusivity provisions, the violating party will owe the non-violating party a fixed-rate royalty based on the sales of products sold in violation of the exclusivity provisions.

Veoneer made an initial payment under the license and will pay us a royalty based on the sales price of lidar products sold by or on behalf of Veoneer. The agreement contains certain minimum revenue targets for the calendar years 2021 through 2024. If not met and provided Veoneer has not compensated us for the shortfall or the targets have not been adjusted by agreement between the parties, we may terminate the agreement.

The agreement has a term of seven years and will continue with respect to any purchase orders awarded prior to the termination of the agreement. Twelve months after the effective date of the agreement, either party may terminate the agreement if no purchase order has been awarded and no purchase order is

198

in the process of being fulfilled or performed during any consecutive twelve month period. Neither party is currently entitled to terminate the agreement under this particular provision. Additionally, the License and Supply Agreement may be terminated by either party as the result of specific sales by Veoneer of competitive lidar products for which we had a lidar product available and did not refuse the sale, upon uncured material breach of the License and Supply Agreement by the other party or upon certain insolvency or bankruptcy proceedings involving the other party.

*Nikon Agreement*

In April 2019, we entered into a manufacturing agreement with Nikon Corporation. Under the agreement, Nikon will manufacture certain of our lidar products for us at an agreed upon price per unit manufactured, subject to certain adjustments. The agreement also provides for minimum product shipments for the first four quarters following the commencement of production. The arrangement contemplates a multi-year agreement, and the Company is so far committed to one year with the ability to extend beyond that additional commitment period upon mutual agreement with Nikon.

In addition to multi-year manufacturing agreements, we have in place various multi-year agreements with customers, including, non-automotive customers and automotive customers such as OEMs, Tier 1 suppliers and system integrators. We are actively negotiating several with our potential non-automotive and automotive customers.

*Existing Multi-Year Contracts*

We have several multi-year agreements with different types of customers, including automotive OEMs, Tier 1 suppliers and system integrators and non-automotive customers. These agreements generally provide for one-year demand forecasts, with quarterly volumes and prices for the year. After the first year, we and the customer have the ability to evaluate need and price for subsequent forecasts. These agreements provide unit discounts for both volume commitments and marketing commitments. These multi-year agreements also provide terms and conditions of sale that are negotiated based on price and volume commitment.

**Competition**

The market for perception solutions for autonomous applications is an emerging market, with many potential applications in the development stage. As a result, we face competition from a range of companies seeking to have their products incorporated into these applications that are being developed and it may take a long period of time for our primary competitors to emerge. Our competitors are also working to advance technology, reliability, and innovation in their development of new and improved solutions. Although we believe that we have market leading technology, we continue to face competition from existing competitors and new companies emerging in the lidar, camera and radar industries. It will take these new smaller companies a substantial period of time to gain the recognition and trust of top-tier automotive OEMs, as well as customers and partners in other non-automotive industries. Many of our competitors offer more limited solutions for niche applications. Some competitors are currently selling solutions that offer lower levels of performance in ADAS and new markets. In the ADAS market, a number of competitors have already achieved substantial market share using camera and radar-based perception sensing solutions. Velodyne is entering the ADAS market with a higher performance product that empowers higher performance ADAS systems, which we expect can displace current solutions and increase market share. However, the growing number of competitors will divide the markets in the meantime.

We believe our solutions and innovation continue to support our position as a leader in advancing technology in the market for perception solutions for autonomous applications. For example, our patented optomechanical design of our lidar, including the particular arrangement of our solid-state lasers and detectors to create up to a 360-degree field of view, has become the reference architecture for the use of lidar in autonomous vehicle programs. Additionally, our leading technology is enabled by our proprietary calibration methodologies, which afford our solutions the precision required for autonomous applications. Our manufacturing experience and methodologies allow us to commercialize our solutions and meet the demands of our customers at price points that can stimulate broad adoption and we believe our transition

199

to third-party manufacturers will further help us with production at scale. We continue to develop our new and existing solutions and we continue to expand our channel partner networks to maintain our wide global reach in various regions.

**Sales and Marketing**

We continue expanding our sales and marketing efforts to attract new customers and grow orders from existing customers. We have developed a global network of active direct dealers and distributors to sell, install and support our solutions. We will continue to expand and optimize our dealer network to ensure that we have sufficient geographic coverage across both existing and new markets. Our channel partner ecosystem helps develop emerging applications for our smart vision technology.

Through our marketing efforts and strategic relationships we also continue to expand our global network of customers and channel partners. We are well known to global automotive OEMs, Tier 1 suppliers and customers using 3D lidar for non-automotive use cases, including mapping applications, UAVs, robotics, smart cities and industrial applications. These relationships allow us to continue to reach additional customers and partners globally. We also leverage opportunities to present and speak at conferences, executive events, trade shows and industry events to further develop our brand and reputation. These opportunities also allow us to showcase our technology and attract additional customer and channel partner interest. Through industry events and strategic relationships, we continue to identify the evolving needs of our customers and, as a result, develop new and improved solutions. Our technology and solutions have also been covered in certain analyst research reports, naming us a key player in the 3D vision lidar industry.

**Research and Development**

We have invested a significant amount of time and expense into R&D of lidar-based technologies. Our ability to maintain our leadership position depends in part on our ongoing R&D activities. Our R&D team is responsible for the design, development, manufacturing and testing of our products. We focus our efforts on development in the areas of novel lidar architecture, advanced product design, innovative manufacturing technologies and advanced algorithms.

Additionally, our transition to ASICs will allow us to increase performance of our products, lower costs and reduce reliance on any key suppliers. This transition to ASICs, as well as other such innovations, positions us well for increased volumes associated with the growth of our end markets.

Our R&D is largely conducted at our headquarters in San Jose, California and at our offices in Alameda, California. As of June 30, 2020, we had approximately 125 full time employees engaged in our R&D activities.

**Intellectual Property**

Our ability to be at the forefront of innovation in the lidar market depends in part on our ability to obtain and maintain patents and other proprietary rights relating to our key technology, and our ability to successfully enforce these rights against third parties. Our defensible market position is the result of our many years of tried-and-tested innovation that resulted in proprietary intellectual property, including in our embedded software, manufacturing processes and calibration methodology. We believe this intellectual property is strongly protected by our registered patents as evidenced by a recent favorable ruling by the U.S. Patent Trial and Appeals Board.

We have also filed patents and trademark applications in order to further secure these rights and strengthen our ability to defend against third parties who may infringe on our rights. We also protect our proprietary rights through agreements with our customers and channel partners.

As of June 30, 2020, we had 21 issued and 4 allowed U.S. patents and 41 pending U.S. patent applications. These issued patents begin expiring in 2027. We also have in the aggregate 108 pending Patent Cooperation Treaty (PCT) applications and non-U.S. national stage applications corresponding to various U.S. patent applications described above.

200

The applications and issued patents cover a broad range of system level and component level aspects of lidar technology. We do not know whether any of our pending patent applications will result in the issuance of patents or whether the examination process will require us to narrow our claims. Even if granted, there is no assurance that these pending patent applications will provide us with protection.

**Government Regulation**

We are subject to the requirements under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 that will require us to diligence, disclose and report whether our products contain conflict minerals. The implementation of these requirements could adversely affect the sourcing, availability and pricing of the materials used in the manufacture of components used in our products.

In addition, our operations are subject to various federal, state and local laws and regulations governing the occupational health and safety of our employees and wage regulations. We are subject to the requirements of the federal Occupational Safety and Health Act, as amended, or OSHA, and comparable state laws that protect and regulate employee health and safety.

As the cars that carry our sensors go into production, we will be subject to existing stringent requirements under the National Traffic and Motor Vehicle Safety Act of 1966, or the Vehicle Safety Act, including a duty to report, subject to strict timing requirements, safety defects with our products. The Vehicle Safety Act imposes potentially significant civil penalties for violations including the failure to comply with such reporting requirements. We are also subject to the existing U.S. Transportation Recall Enhancement, Accountability and Documentation Act, or TREAD, which requires equipment manufacturers, such as us, to comply with "Early Warning" requirements by reporting certain information to the NHTSA, such as information related to defects or reports of injury related to our products. TREAD imposes criminal liability for violating such requirements if a defect subsequently causes death or bodily injury. In addition, the National Traffic and Motor Vehicle Safety Act authorizes NHTSA to require a manufacturer to recall and repair vehicles that contain safety defects or fail to comply with U.S. federal motor vehicle safety standards. Sales into foreign countries may be subject to similar regulations. As the development of federal and state regulation of autonomous machines and vehicles continues to evolve, we may be subject to additional regulatory schemes.

**Legal Proceedings**

From time to time we are involved in actions, claims, suits and other proceedings in the ordinary course of business, including assertions by third parties relating to intellectual property infringement, breaches of contract or warranties or employment-related matters.

Quanergy Litigation

In September 2016, Quanergy Systems, Inc. (Quanergy) filed a complaint against us and one of our customers in the Northern District of California (the District Court litigation), seeking a declaratory judgment of non-infringement of one of our patents, U.S. Patent No. 7,969,558 (the '558 patent) and asserting state and federal trade secret misappropriation claims against us and our customer and breach of contract and constructive fraud claims against our customer. In November 2016, Quanergy filed an amended complaint, removing its trade secret misappropriation claims against us, dropping our customer from the suit and dropping the related claims of breach and constructive fraud. The amended complaint maintained only the declaratory judgment of non-infringement action against us. In December 2016, we filed an answer generally denying the allegations and relief requested in Quanergy's amended complaint. Our answer also included counterclaims against Quanergy asserting direct, indirect, and willful infringement of the '558 patent. In January 2017, Quanergy filed an answer generally denying the allegations in our patent infringement counterclaims and requesting relief. The court held a claim construction hearing on September 13, 2017 and issued a claim construction order on October 4, 2017, which adopted the majority of our proposed constructions. In June 2018, the district court entered an order granting a joint stipulation to stay the litigation.

Quanergy filed two petitions for inter partes review with the U.S. Patent Office's Patent Trials and Appeal Board (PTAB) in November 2017, challenging all claims of the '558 patent that we asserted. We filed our Patent Owner Preliminary Response to Quanergy's petitions on March 7, 2018. The PTAB issued

201

an institution decision on May 25, 2018, instituting review of all challenged claims. We subsequently filed our Patent Owner Response and a Contingent Motion to Amend the claims. The PTAB held oral argument on February 27, 2019. On May 23, 2019, the PTAB issued a Final Written Decision upholding the validity of all the challenged claims, finding that Quanergy did not prove by a preponderance of the evidence that any of the challenged claims of the '558 patent were unpatentable, and denying our contingent motion as moot. In June 2019, Quanergy filed a request for rehearing. On May 21, 2020, the PTAB denied Quanergy's request for a rehearing. Quanergy has until July 23, 2020 to appeal the PTAB decision to the U.S. Court of Appeals for the Federal Circuit.

Hesai and RoboSense Litigation

On August 13, 2019, we filed separate complaints against Hesai Photonics Technology Co., Ltd. (Hesai) (5:19-cv-4742-EJD) and Suteng Innovation Technology Co., Ltd. (RoboSense) (5:19-cv-4746-EJD), in the United States District Court for the Northern District of California. These complaints allege infringement of the '558 patent by Hesai and RoboSense, respectively. In both cases, we are seeking, among other relief, a permanent injunction and to be determined monetary damages adequate to compensate us for the alleged infringement. Both cases have been stayed pending resolution of the ITC investigation (No. 337-TA-1173). In the Hesai case (5:19-cv-4742-EJD), the parties have been ordered to file status reports every six months to update the court on the status of the ITC investigation.

On August 15, 2019, we also filed a patent infringement complaint with the United States International Trade Commission (ITC) against Hesai and RoboSense. The complaint filed with the ITC alleges violations of Section 337 of the Tariff Act of 1930, as amended, by both Hesai and RoboSense and requests that the ITC investigate Hesai and RoboSense for unlawfully importing and selling products that infringe upon the '558 patent. On August 28, 2019, we filed a supplement with the ITC. We are asking the ITC to issue permanent limited exclusion orders and permanent cease and desist orders against Hesai and RoboSense to stop the importation and sale of the following products in the United States: (a) rotating 3-D lidar devices; (b) components thereof; and (c) sensing systems containing the same. On September 11, 2019, we received notice that the ITC instituted an investigation of Hesai and RoboSense (No. 337-TA-1173). On July 8, 2020, Velodyne and Hesai jointly moved to terminate the ITC investigation with respect to Hesai pursuant to the Litigation Settlement and Patent Cross License Agreement discussed further below. On July 13, 2020, the ALJ issued Order No. 33, granting the joint motion. Order No. 33 is an Initial Determination that terminates Hesai from the Investigation. The Initial Determination shall become the determination of the Commission unless a party files a petition for review of the Initial Determination, or the Commission orders on its own motion a review of the Initial Determination or certain issues therein.

On November 8, 2019, Velodyne Lidar Inc., Velodyne Europe GmbH, Gotting KG, and IFTAS GmbH were sued by Hesai for alleged patent infringement before the District Court of Frankfurt, Germany (Docket No. 2-6 O 461/19). The response to the complaint was originally due in May 2020. The deadline for response to the complaint was extended until July 27, 2020. This case will be dismissed pursuant to the Litigation Settlement and Patent Cross License Agreement discussed below.

On April 30, 2020, Hesai filed four cases in the Shanghai Intellectual Property Court against the us, Beijing Velodyne Laser Technology Co., Ltd (Velodyne Beijing), and Shanghai Keming Instrument Co., Ltd (Keming) (collectively, Defendants). The cases were docketed by the court on May 6, 2020. Hesai asserted that the Defendants infringed three patents registered in the People's Republic of China. Each case sought an injunction and monetary damages. Velodyne Beijing was served with the complaint and filed a response on July 1, 2020. Velodyne has not yet been served with the complaint. This case will be dismissed pursuant to the Litigation Settlement and Patent Cross License Agreement discussed below.

On June 24, 2020, we entered into a Litigation Settlement and Patent Cross-license Agreement with Hesai to resolve all of the disputes between us, as described above, and agreed on the terms of a patent cross-license and releases of liability. The parties have requested that the relevant courts dismiss all of the matters related to Hesai described above.

Our litigation with RoboSense is ongoing and was not resolved by the settlement agreement described above.

202

<u>Employment Matters</u>

On April 3, 2020, a former employee filed a class action lawsuit in the United States District Court for the Northern District of California. The complaint alleges that we violated the federal Worker Adjustment and Retraining Notification Act, or WARN Act, and California WARN Act in connection with our termination of the employment of the plaintiff and other similarly situated employees. The plaintiff seeks to certify the action as a class action and seeks various other remedies on behalf of himself and others, including unpaid wages, salaries, commissions, bonuses and other compensation and benefits that would have accrued during the following 60 days. The parties have reached an agreement to resolve the case and the plaintiff filed a voluntary dismissal of the case on June 29, 2020 in accordance with the terms of the settlement.

On June 8, 2020, a former employee filed a class action lawsuit in the Santa Clara County Superior Court of the State of California. The complaint alleges that, among other things, we failed to pay minimum and overtime wages, final wages at termination, and other claims based on meal periods and rest breaks. The plaintiff is bringing this lawsuit on behalf of herself and other similarly situated plaintiffs who have not been identified and is seeking to certify the action as a class action. The plaintiff seeks unspecified damages as well as attorneys' fees. We have not yet responded to the complaint.

**Employees**

As of June 30, 2020, we employed approximately 287 people. We also engage numerous consultants and contractors to supplement our permanent workforce. None of our employees are represented by a labor union or covered by collective bargaining agreements. We believe we have strong and positive relations with our employees.

**Facilities**

Our corporate headquarters is located in San Jose, California, consisting of approximately 205,000 square feet of office and manufacturing space. See "*Certain Velodyne Relationships and Related Party Transactions — Leases*" for a description of the leased space. We also lease offices in Alameda, California, Riisselsheim, Germany and Beijing, China. We believe that our office space is adequate for our current needs and, should we need additional space, we believe will be able to obtain additional space on commercially reasonable terms.

**VELODYNE'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion of Velodyne's results of operations and financial condition should be read in conjunction with the information set forth in Velodyne's financial statements and the notes thereto included elsewhere in this proxy statement. This discussion contains forward-looking statements based upon Velodyne's current expectations, estimates and projections that involve risks and uncertainties. Actual results could differ materially from those anticipated in these forward-looking statements due to, among other considerations, the matters discussed under "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements."Unless the context otherwise requires, all references in this subsection to the "Company," "we," "us" or "our" refer to the business of Velodyne Lidar, Inc., a Delaware corporation, and its subsidiaries prior to the consummation of the Business Combination, which will be the business of the post-combination company and its subsidiaries following the consummation of the Business Combination.*

**Overview**

Velodyne is the global leader in lidar technology providing real-time 3D vision for autonomous systems, which we call smart vision. Our smart vision solutions are advancing the development of safe automated systems throughout the world, thereby empowering the autonomous revolution by allowing machines to see their surroundings. In automotive applications, our products improve roadway safety by providing perception data for reliable object avoidance and safe path-planning. We have a vision we call LIVE, Lidar In Vehicles Everywhere, which encompasses a mass-produced lower cost lidar sold for every model of car and truck. We believe safety on the roadways is for everyone. To improve roadway, bicycle, and pedestrian safety, we sell automotive solutions to the rapidly expanding ADAS market, which will incrementally address the requirements of the NHTSA 5-Star Safety Ratings System. Our lidar-based smart vision solutions are also deployed in many non-automotive applications, such as autonomous mobile robots, UAVs, last-mile delivery, precision agriculture, advanced security systems and smart city initiatives, among others. Our first products were commercially available in 2010. Since then, we have shipped over 40,000 units and generated cumulative revenue of over $570 million. While purchases have been primarily focused on R&D projects, several of our non-automotive customers are in commercial production with their offerings.

Our proprietary smart vision solutions offer several advantages over other sensor technologies for a broad range of applications. Using an array of eye-safe lasers, our lidar solutions measure distances in the environment at the speed of light. Unlike camera-based solutions, lidar solutions allow machines to see in 3D by providing precise distance measurements of surrounding objects. Compared to radar, lidar provides better resolution for superior object detection and classification. Lidar also performs better than cameras in low light conditions and produces fewer errors. According to a report by AAA, current pedestrian detection systems proved relatively ineffective at protecting pedestrians and bicycles in various tests, particularly at night. Lidar systems currently being tested can detect pedestrians equally well during daytime and nighttime conditions because the systems provide self-illumination by means of laser beams. By sending an alert or applying the brakes, these lidar systems are equipped to mitigate death and injury. These advantages of lidar, combined with lower computing power requirements, enable autonomous platforms to make fast and accurate decisions to mitigate collisions. Velodyne's proprietary lidar-based hardware and software solutions combine class-leading range, up to centimeter-level accuracy and lower power consumption with high-grade reliability.

Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles organized by the Defense Advanced Research Projects Agency (DARPA). In a historic engineering milestone, Mr. Hall invented a lidar sensor that could see and measure the vehicle's surroundings with unprecedented precision, enabling the vehicle to navigate the course autonomously.

Since the DARPA Grand Challenge, we have rapidly developed and released a suite of lidar products and achieved many key corporate milestones.

204

Many of the markets we are pursuing with our smart vision solutions are currently in pre-commercial development phases. Selling into these markets typically involves lower unit volume, but higher per-unit prices, with customers placing fewer and less consistent orders. One of the goals during the pre-commercial development phase is to demonstrate to customers that our products can be affordably and reliably manufactured. Accordingly, in certain instances, we have strategically reduced the price of our smart vision solutions in an effort to drive market adoption in automotive and non-automotive applications. In addition, our sales have been subject to significant fluctuations. Our customers in pre-commercial development may have purchased their requirements of our products in earlier periods and are not expected to begin purchasing again in volume unless and until they reach commercial deployments. Finally, as we have introduced higher functionality products, in certain cases we have experienced delays as we work with customers to achieve the required functionality and performance which has resulted in slower than expected market adoption of these products. As a result of these factors and other investments we have made in our business, our operating results have fluctuated from period to period and our revenue has declined year over year since 2017. As a number of our target markets reach commercialization, we expect there to be a shift towards higher unit volume at lower per-unit prices, with more predictable customer demand. However, future revenue can be difficult to predict as commercial success of a product is inherently uncertain.

We have successfully sold our smart vision solutions into the highly competitive automotive market. Automotive OEMs and their suppliers are just beginning to commercialize autonomous systems that rely on lidar technology. After many years of investment, there have been significant advancements in autonomous vehicle technology and ADAS. To date, the ADAS market has depended heavily on optical and radar perception technologies. We believe that lidar-based solutions offer superior capabilities for ADAS applications, and that the ADAS market will be the first to adopt widespread commercialization of lidar. The race to fully autonomous vehicles has also pushed our customers closer to commercializing lidar-based solutions. Achieving success in the automotive market, especially in ADAS and autonomous driving applications, requires participation in competitive design cycles that can last for many years.

While the automotive market is a key focus, we have successfully sold our smart vision solutions to customers and partners developing non-automotive, next-generation solutions, including UAVs, self-driving rovers, autonomous vessels, industrial and security robots, mapping applications for topography and surveying and smart city initiatives. We also license our technology and provide development services to customers and business partners. Of the more than 300 customers that purchased smart vision solutions from us and our distributors in the last three fiscal years, more than 200 are using our smart vision solutions for non-automotive applications. In 2019, for example, we generated slightly over half of our revenue from sales to customers deploying our smart vision solutions in non-automotive applications. Most of these next-generation solutions in emerging non-automotive markets are still in the pre-commercial development stage and, as a result, our future success depends on these customers bringing these projects to commercial scale.

We have historically manufactured our products in our 203,800 square foot manufacturing facility in San Jose, California and our recently sold 46,630 square foot manufacturing facility in Morgan Hill, California. These advanced manufacturing facilities enabled us to control all critical aspects of product development and commercialization within close proximity of our engineering and development teams, most of which are located at these or other locations in the San Francisco Bay Area. Moving forward, as automotive and other applications that use our products approach more widespread commercialization, we believe mass production capabilities will be required and expect to rely on third-party manufacturing partners. To this end, we have partnered with Veoneer and Nikon and are in negotiations with other third-party manufacturers so that we can efficiently scale to meet the demand of high volume markets while simultaneously innovating at our primary research facilities.

We began developing our lidar technology in 2005 as part of Velodyne Acoustics, which was formed in 1983. In December 2015, Velodyne was incorporated as a new company and all of the assets and operations related to our lidar business were assigned to us. Since the spin-off, we have operated as a standalone, independent entity and the results of operations since that date represent the results of the lidar business.

We are currently confronting numerous operational limitations due to the global outbreak of coronavirus in early 2020. We have manufacturing locations that have been, and continue to be, severely impacted due to national and regional government declarations requiring closures, quarantines and travel restrictions. The coronavirus pandemic is also adversely affecting our customers' business operations. The extent of the impact of the coronavirus pandemic on our operational and financial performance will depend on various future developments, including the duration and spread of the outbreak and impact on our customers, suppliers, contract manufacturers and employees, all of which is uncertain at this time. We expect the coronavirus pandemic to adversely impact our revenue and results of operations, but we are unable to predict at this time the size and duration of this adverse impact. For more information on our operations and risks related to health epidemics, including the coronavirus, please see "*Risk Factors — Our business could be materially and adversely affected by the current global coronavirus pandemic.*"

**Factors Affecting Our Performance**

*Design Wins.*   We are developing our smart vision solutions as a key enabling technology for OEMs in automotive and other applications. Because our solutions must be integrated into a broader platform by the OEM, it is critical that we achieve design wins with these customers. The time necessary to achieve design wins varies based on the market and application. The design cycle in the automotive market tends to be substantially longer and more onerous than in other markets. Even within the automotive market, achieving a design win with an automotive OEM takes considerably longer than a design cycle for an aftermarket application. We consider design wins to be critical to our future success, although the revenue generated by each design win and the time necessary to achieve such a win can vary significantly making it difficult to predict our financial performance.

*Pricing, Product Cost and Margins.*   Our pricing and margins will depend on the volumes and the features of the solutions we provide to our customers. To date, most of our revenue has been generated by selling our smart vision solutions into pre-commercial development phase projects. In general, solutions incorporated into development-phase products require more complex configurations, have higher prices and higher gross margins. As our markets reach maturity and commercialization, we expect prices and margins will generally decrease. Our commercial-stage customers will require that our smart vision solutions be manufactured and sold at per-unit prices that enable mass market adoption. To meet the technological and pricing needs of customers reaching commercial scale, we are making significant investments in new solutions for both cost improvements and new features. Our ability to compete in key markets will depend on the success of these investments and our efforts to efficiently and reliably produce cost-effective smart vision solutions for our commercial-stage customers. We have customers with technologies in various stages of development. We anticipate that our prices will vary by market and application due to market-specific supply and demand dynamics and product lifecycles.

*Commercialization of Lidar-based Applications.*   While we believe that we are approaching the inflection point of adoption of lidar across applications and that Velodyne is well-positioned, with strong customer relationships and a growing government interest in urban safety, in both automotive and non-automotive markets to take advantage of this opportunity, we expect that our results of operations, including

206

revenue and gross margins, will fluctuate on a quarterly basis for the foreseeable future as our customers continue R&D projects and begin to commercialize autonomous solutions that rely on lidar technology. As more customers reach the commercialization phase and as the market for lidar solutions matures, these fluctuations in our operating results may become less pronounced. However, in the near term, our revenue may not grow as we expect until more customers commercialize their products.

*End Market Concentration.*   Historically, our revenue has been from a small number of end markets. For example, in fiscal 2019, approximately 44% of our revenue came from the automotive market, although we had more than half of our customers from non-automotive markets. We believe our entry into new markets will continue to facilitate revenue growth and customer diversification. While we will continue to expand the end markets we serve, we anticipate that sales to a limited number of end markets will continue to account for a significant portion of our total revenue for the foreseeable future. Our end market concentration may cause our financial performance to fluctuate significantly from period to period based on the success or failure of the markets in which we compete. Success in an end market, or commercialization, is uncertain and may develop differently in each case, with unique pricing, volume and cost dynamics. Additionally, as production scales in order to meet the demands of commercialization, pricing pressure increases and the amount of that pressure is expected to vary by market.

*Sales Volume*.   A typical design win can generate a wide range of sales volumes for our solutions, depending on the end market demand for our customers' products. This can depend on several factors, including the reputation of the end customer, market penetration, product capabilities, size of the end market that the product addresses and our end customers' ability to sell their products. In addition to end market demand, sales volumes also depend on whether our customer is in the development, commercialization or production phase. In certain cases, we may provide volume discounts on sales of our solutions, which may or may not be offset by lower manufacturing costs related to higher volumes.

*Continued Investment and Innovation*.   We believe that we are the industry-leading lidar provider with proven designs, extensive product offerings and advanced manufacturing capabilities. Our financial performance is significantly dependent on our ability to maintain this leading position. This is further dependent on the investments we make in R&D. It is essential that we continually identify and respond to rapidly evolving customer requirements, develop and introduce innovative new products, enhance and service existing products and generate active market demand for our products. If we fail to do this, our leading market position and revenue may be adversely affected, and our investments in that area will not be recovered.

**Components of Results of Operations**

***Revenue***

The majority of our revenue comes from the sale of our lidar sensors directly to end users and through our network of U.S. and international distributors. Product revenue is recognized when control of the products is transferred to the customer, which is generally upon shipment. For custom products that require engineering and development based on customer requirements, revenue is recognized over time using an output method based on units of product shipped to date relative to total production units under the contract. We also generate a portion of our revenue from intellectual property licensing, royalties and the sale of services related to product development, validation, extended warranty and product repair services. License revenue is recognized upon delivery of the intellectual property if there are no substantive future obligations to perform under the arrangement. Royalties are recognized at the later of the period the sales occur or the satisfaction of the performance obligation to which some or all of the royalties have been allocated. As our manufacturing partners to whom we have licensed our technology start selling to customers we expect royalty revenue to increase as a percentage of total revenue. Service revenue is recognized as the services are performed.

***Cost of Revenue***

Cost of revenue includes the manufacturing cost of our lidar sensors, which primarily consists of personnel-related costs directly associated with our manufacturing organization, and amounts paid to our third-party contract manufacturers and vendors. Our cost of revenue also includes depreciation and amortization, cost of component inventory, product testing costs, costs of providing services, an allocated

portion of overhead, facility and IT costs, warranty costs, excess and obsolete inventory and shipping costs. We expect cost of revenue to increase in absolute dollars in future periods.

### *Gross Profit and Gross Margin*

Our gross profit in future periods will depend on a variety of factors, including: market conditions that may impact our pricing; product mix changes between established products and new products and licenses; excess and obsolete inventories; our cost structure for manufacturing operations, including third-party manufacturers, relative to volume; and product support obligations. Additionally, we believe our transition to an outsourced manufacturing model will favorably impact our gross profit over time. Our gross margin varies by product. In addition, our license revenue has lower cost, and therefore it contributes to higher gross margin. We expect our gross margins to fluctuate over time, depending on the factors described above.

### *Operating Expenses*

### *Research and Development Expenses*

R&D expenses consist primarily of personnel-related costs directly associated with our R&D organization, with the remainder being prototype expenses, third-party engineering and contractor costs, an allocated portion of facility and IT costs and depreciation. Our R&D efforts are focused on enhancing and developing additional functionality for our existing products and on new product development, including new releases and upgrades to our lidar sensors. We expense R&D costs as incurred. We expect our R&D expenses to increase in absolute dollars as we increase our investment in software development to broaden the capabilities of our solutions and introduce new products and features.

### *Sales and Marketing Expenses*

Our sales and marketing expenses consist primarily of personnel-related costs directly associated with our sales and marketing activities. These include the cost of sales commissions, marketing programs, trade shows, consulting services, promotional materials, demonstration equipment, an allocated portion of facility and IT costs and depreciation. We expect that our sales and marketing expenses will increase in absolute dollars over time as we hire additional sales and marketing personnel, increase our marketing activities, grow our domestic and international operations, and build brand awareness.

### *General and Administrative Expenses*

General and administrative expenses primarily consist of personnel-related expenses associated with our general and administrative organization, professional fees for legal, accounting and other consulting services, an allocated portion of facility and IT costs and depreciation. We expect to incur additional general and administrative expenses as a result of operating as a public company, including expenses related to compliance with the rules and regulations of the SEC and stock exchange listing standards, additional insurance expenses (including directors' and officers' insurance), investor relations activities and other administrative and professional services. We also expect to increase the size of our general and administrative function to support the growth of our business.

### *Restructuring Expenses*

Restructuring expenses primarily consist of costs of employee termination benefits incurred in connection with our restructuring plan to downsize the manufacturing function and related engineering and administrative functions in our California locations in March 2020. The purposes of this plan are to align resource requirements with the company's initiatives to lower our cost structure and to increase our production capacity by outsourcing a majority of manufacturing activities. The plan included a reduction of workforce and is expected to be completed in the third quarter of 2020.

### *Stock-Based Compensation*

While our stock-based compensation charges to date have been relatively insignificant, we expect our stock-based compensation expense within cost of revenue, R&D, sales and marketing, and general and

208

administrative expenses to increase significantly, particularly in the quarter during which we complete the Business Combination. As of March 31, 2020, all compensation expense related to RSAs and RSUs remained unrecognized because the liquidity vesting condition was not probable of being satisfied (including if, as expected, such condition is deemed satisfied by the board of the post-combination company following the completion of the Business Combination). At the time the liquidity vesting condition becomes probable, which is not until such condition is satisfied, we will recognize the cumulative stock-based compensation expense for the outstanding RSAs and RSUs using the accelerated attribution method. As of March 31, 2020, 4.5 million RSAs and RSUs were outstanding, of which 2.9 million had met their service-based condition. If the liquidity vesting condition had occurred on March 31, 2020, we would have recorded $58.4 million of stock-based compensation related to the RSAs and RSUs and we would recognize additional unamortized stock-based compensation of $18.6 million over a weighted-average remaining requisite service period of 1.4 years.

*Interest Income and Expense*

Interest income consists primarily of income earned on our cash equivalents and investments in marketable securities. These amounts will vary based on our cash, cash equivalents and short-term investment balances, and also with market rates. Interest expense consists primarily of interest on our equipment capital leases and credit facility.

*Other Income (Expense), Net*

Other income (expense), net consists primarily of foreign currency transaction gains and losses related to the impact of transactions denominated in a foreign currency other than the U.S. Dollar. As we have expanded our international operations, our exposure to fluctuations in foreign currencies has increased, and we expect this to continue.

*Provision for Income Taxes*

Our provision for income taxes consists of federal, state and foreign current and deferred income taxes. As we expand the scale and scope of our international business activities, any changes in the United States and foreign taxation of such activities may increase our overall provision for income taxes in the future.

We have a full valuation allowance for net deferred tax assets, including federal and state net operating loss carryforwards and R&D credit carryforwards. We expect to maintain this valuation allowance until it becomes more likely than not that the benefit of our federal and state deferred tax assets will be realized by way of expected future taxable income.

We believe that we have adequately reserved for our uncertain tax positions, although we can provide no assurance that the final outcome of these matters will not be materially different. To the extent that the final outcome of these matters is different than the amounts recorded, such differences will affect the provision for income taxes in the period in which such determination is made and could have a material impact on our financial condition and results of operations.

**Results of Operations**

The results of operations presented below should be reviewed in conjunction with the consolidated financial statements and notes included elsewhere in this proxy statement. The following table sets forth our consolidated results of operations data for the periods presented:

| | Year Ended December 31 | | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2019 | 2020 |
| | (in thousands) | | | | |
| Revenue | $182,090 | $142,946 | $101,398 | $39,823 | $ 17,031 |
| Cost of revenue[(1)] | 101,713 | 112,066 | 71,630 | 20,838 | 15,429 |
| Gross profit | 80,377 | 30,880 | 29,768 | 18,985 | 1,602 |
| Operating expenses[(1)]: | | | | | |
| Research and development | 31,610 | 51,993 | 56,850 | 12,356 | 14,527 |
| Sales and marketing | 13,956 | 22,137 | 21,873 | 5,878 | 5,299 |
| General and administrative | 9,978 | 12,902 | 20,058 | 3,393 | 10,733 |
| Restructuring | — | — | — | — | 1,046 |
| Total operating expense | 55,544 | 87,032 | 98,781 | 21,627 | 31,605 |
| Operating income (loss) | 24,833 | (56,152) | (69,013) | (2,642) | (30,003) |
| Interest income | 489 | 630 | 1,146 | 441 | 112 |
| Interest expenses | — | (14) | (77) | (13) | (6) |
| Other income (expense), net | 249 | (136) | 35 | 59 | (165) |
| Income (loss) before income taxes | 25,571 | (55,672) | (67,909) | (2,155) | (30,062) |
| Provision for (benefit from) income taxes | 9,810 | 6,628 | (683) | 27 | (6,677) |
| Net income (loss) | $ 15,761 | $ (62,300) | $ (67,226) | $ (2,182) | $(23,385) |

The following table sets forth the components of our consolidated statements of operations data as a percentage of revenue for the periods presented:

| | Year Ended December 31, | | | Three Months Ended March 31, | |
| --- | --- | --- | --- | --- | --- |
| | 2017 | 2018 | 2019 | 2019 | 2020 |
| Revenue | 100% | 100% | 100% | 100% | 100% |
| Cost of revenue | 56 | 78 | 71 | 52 | 91 |
| Gross profit | 44 | 22 | 29 | 48 | 9 |
| Operating expenses: | | | | | |
| Research and development | 17 | 36 | 56 | 31 | 85 |
| Sales and marketing | 8 | 16 | 22 | 14 | 31 |
| General and administrative | 5 | 9 | 20 | 9 | 63 |
| Restructuring | 0 | 0 | 0 | 0 | 6 |
| Total operating expenses | 30 | 61 | 97 | 54 | 185 |
| Operating income (loss) | 14 | (39) | (68) | (6) | (176) |
| Interest income | 0 | 0 | 1 | 1 | 1 |
| Interest expense | 0 | 0 | 0 | 0 | 0 |
| Other income (expense), net | 0 | 0 | 0 | 0 | (1) |
| Income (loss) before income taxes | 14 | (39) | (67) | (5) | (176) |
| Provision for (benefit from) income taxes | 5 | 5 | (1) | 0 | (39) |
| Net income (loss) | 9% | (44)% | (66)% | (5)% | (137)% |

(1)  Includes stock-based compensation expense as follows:

210

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2019 | 2020 |
| | | | (in thousands) | | |
| Cost of revenue | $ — | $ — | $ — | $— | $— |
| Research and development | 156 | 93 | 97 | 24 | 21 |
| Sales and marketing | — | — | — | — | — |
| General and administrative | 78 | 114 | 38 | 28 | — |
| Total stock-based compensation expense | $234 | $207 | $135 | $52 | $21 |

Our stock-based compensation expense primarily related to our stock options for all periods presented. As of March 31, 2020, no compensation expense related to restricted stock awards and RSUs had been recognized because the performance vesting condition, which is (i) an initial public offering, or (ii) a Company sale event, was not probable of being met. If the performance vesting condition had occurred on March 31, 2020, we would have recorded $58.4 million of stock-based compensation expense related to the RSAs and RSUs.

**Comparison of the Three Months Ended March 31, 2019 and 2020**

*Revenue*

| | Three Months Ended March 31, | | | |
|---|---|---|---|---|
| | 2019 | 2020 | Change | Change |
| | (dollars in thousands) | | | |
| Revenue: | | | | |
| Products | $28,883 | $16,422 | $(12,461) | (43)% |
| License and services | 10,940 | 609 | (10,331) | (94) |
| Total | $39,823 | $17,031 | $(22,792) | (57) |
| Revenue by geographic location: | | | | |
| North America | $27,250 | $ 9,253 | $(17,997) | (66)% |
| Asia and Pacific | 4,943 | 5,624 | 681 | 14 |
| Europe, Middle East and Africa | 7,630 | 2,154 | (5,476) | (72) |
| Total | $39,823 | $17,031 | $(22,792) | (57) |

Total revenue decreased by $22.8 million, or 57%, to $17.0 million for the three months ended March 31, 2020, from $39.8 million for the three months ended March 31, 2019. The decrease in product revenue was primarily due to a reduction in total units sold as a result of the timing of customer orders, the mix of those sensors, and a reduction in average selling price. The timing of customer orders and our ability to fulfill orders we received was impacted by various COVID-19 related government mandates across our worldwide operations. For the three months ended March 31, 2020, we estimate those mandates unfavorably impacted revenues by around $2.0 million. Starting in 2018, we strategically reduced the price of our higher volume products to continue to drive additional adoption of our smart vision solutions in multiple end markets. The decrease in license and services revenue was primarily due to the decrease in product licensing related revenue and lower services revenue related to product validation and repair services.

The decrease in North America revenue was due to a decrease in volume in units sold to existing customers coupled with a decrease in the average selling price of units sold. The increase in revenue in Asia-Pacific was primarily due to an increase in purchasing volume from customers. The decrease in revenue in Europe, Middle East and Africa was due to a decrease in volume in units sold to existing customers coupled with a decrease in the average selling price of units sold.

211

*Cost of Revenue and Gross Margin*

| | Three Months Ended March 31 | | Change $ | Change % |
|---|---|---|---|---|
| | 2019 | 2020 | | |
| | (dollars in thousands) | | | |
| Cost of revenue | $20,838 | $15,429 | $(5,409) | (26)% |
| Gross margin | 48% | 9% | | |

Cost of revenue decreased by $5.4 million, or 26%, to $15.4 million for the three months ended March 31, 2020, from $20.8 million for the three months ended March 31, 2019. The decrease in cost of revenue was primarily due to a $3.6 million decrease in product costs resulting from the change in product mix and decreased cost of materials, and a $1.8 million decrease in personnel costs related to manufacturing labor and overhead from manufacturing process improvements.

Gross margin decreased from 48% for the three months ended March 31, 2019 to 9% for the three months ended March 31, 2020. The decrease was primarily due to a decrease in average selling price, reflecting our strategical decision to reduce the price of our higher volume products to continue to drive further adoption of our smart vision solutions. The shelter in place order limits the manufacture to product to its capacity, partially caused the decreases in sales volume, which drives a higher fixed overhead cost per unit. As a result, it adversely impacted the gross margin that we expect to continue through the third quarter of 2020. We expect to decrease manufacturing labor and overhead cost as we outsource productions with our contract manufacturing partners, which will improve the overall gross margin.

*Operating Expenses*

| | Three Months Ended March 31 | | Change $ | Change % |
|---|---|---|---|---|
| | 2019 | 2020 | | |
| | (dollars in thousands) | | | |
| Research and development | $12,356 | $14,527 | $2,171 | 18% |
| Sales and marketing | 5,878 | 5,299 | (579) | (10) |
| General and administrative | 3,393 | 10,733 | 7,340 | 216 |
| Restructuring | — | 1,046 | 1,046 | N/A |
| Total operating expenses | $21,627 | $31,605 | $9,978 | 46 |

*Research and Development*

R&D expenses increased by $2.2 million, or 18%, to $14.5 million for the three months ended March 31, 2020, from $12.4 million for the three months ended March 31, 2019. The increase was primarily attributable to an increase of $1.9 million in personnel related costs, mainly driven by an increase in employee headcount contributed primarily to the acquisition of Mapper in July 2019, an increase of $1.1 million in allocated facility and IT expenses and an increase of $0.3 million in depreciation expense, partially offset by a decrease of $0.9 million in prototype product development costs.

*Sales and Marketing*

Sales and marketing expenses decreased by $0.6 million, or 10%, to $5.3 million for the three months ended March 31, 2020 from $5.9 million for the three months ended March 31, 2019. The decrease was primarily attributable to a decrease of $0.4 million in travel and trade show expenses and a decrease of $0.2 million in allocated facility and IT expenses, partially offset by an increase of $0.2 million in personnel-related expense.

*General and Administrative*

General and administrative expenses increased by $7.3 million, or 216%, to $10.7 million for the three months ended March 31, 2020 from $3.4 million for the three months ended March 31, 2019. The

212

increase was primarily attributable to an increase of $4.4 million in legal fees related primarily to our litigations, an increase of $2.4 million in legal proceedings accrual for employment-related matters, an increase of $0.2 million in personnel-related costs and an increase of $0.2 million in bad debt expenses.

*Restructuring*

In March 2020, we initiated a restructuring plan to downsize the manufacturing function and related engineering and administrative functions in our California locations. The plan included a reduction in our workforce and is expected to be completed in the third quarter of 2020. As a result of the restructuring program, we incurred restructuring charges totaling $1.0 million for the three months ended March 31, 2020, primarily related to employee severance related costs. See Note 11 — *Restructuring* of the Notes to Consolidated Financial Statements for more details regarding our restructuring plan.

*Interest Income, Interest Expense and Other Income (Expense), Net*

| | Three Months Ended March 31 | | Change $ | Change % |
|---|---|---|---|---|
| | 2019 | 2020 | | |
| | (dollars in thousands) | | | |
| Interest income | $441 | $ 112 | $(329) | (75)% |
| Interest expense | (13) | (6) | 7 | (54) |
| Other income (expense), net | 59 | (165) | (224) | (380) |

Interest income was $0.1 million in the three months ended March 31, 2020 compared to $0.4 million in the three months ended March 31, 2019. The decrease was primarily related to a decrease in our cash, cash equivalent and short-term investment balances in the three months ended March 31, 2020.

Other income (expense), net was $(0.2) million in the three months ended March 31, 2020 compared to $0.1 million in the three months ended March 31, 2019. The change was primarily related to foreign exchange gain or loss resulting from foreign currency exchange rate fluctuations in the three months ended March 31, 2020 and 2019.

*Income Taxes*

| | Three Months Ended March 31 | | Change $ | Change % |
|---|---|---|---|---|
| | 2019 | 2020 | | |
| | (dollars in thousands) | | | |
| Loss before income taxes | $(2,155) | $(30,062) | $(27,907) | 1,295% |
| Provision for (benefit from) income taxes | 27 | (6,677) | (6,704) | (24,830)% |
| Effective tax rate | (1.3)% | 22.2% | | |

We are subject to income taxes in the United States, China and Germany. Our effective tax rate changed from (1.3)% in the three months ended March 31, 2019 to 22.2% in the three months ended March 31, 2020. This change was primarily due to the $6.6 million tax benefit related to the release of a valuation allowance associated with carrying back a portion of our 2019 net operating losses to 2017 that is allowed by the CARES Act.

Enacted on March 27, 2020, the CARES Act provides emergency assistance and health care response for businesses affected by the 2020 coronavirus pandemic. The CARES Act, among other things, permits net operating loss carryovers and carrybacks to offset 100% of taxable income for taxable years beginning before 2021. Additionally, the CARES Act allows net operating losses incurred in 2018, 2019 and 2020 to be carried back to each of the five preceding taxable years to generate a refund of previously paid income taxes. In April 2020, we filed a claim to carryback a portion of our 2019 net operating losses to 2017 and received a tax refund in May 2020.

213

**Comparison of the Years Ended December 31, 2018 and 2019**

*Revenue*

| | Year Ended December 31, | | Change | Change |
|---|---|---|---|---|
| | 2018 | 2019 | | |
| | (dollars in thousands) | | | |
| Revenue: | | | | |
| Products | $132,933 | $ 81,424 | $(51,509) | (39)% |
| License and services | 10,013 | 19,974 | 9,961 | 99 |
| Total | $142,946 | $101,398 | $(41,548) | (29) |
| Revenue by geographic location: | | | | |
| North America | $ 84,541 | $ 49,634 | $(34,907) | (41)% |
| Asia and Pacific | 39,770 | 28,791 | (10,979) | (28) |
| Europe, Middle East and Africa | 18,635 | 22,973 | 4,338 | 23 |
| Total | $142,946 | $101,398 | $(41,548) | (29) |

Total revenue decreased by $41.5 million, or 29%, to $101.4 million for 2019, from $142.9 million for 2018. The decrease in product revenue was primarily due to a change in mix of products sold and a decrease of 28% in average selling price. Starting in 2018, we strategically reduced the price of our higher volume products to continue to drive additional adoption of our smart vision solutions in multiple end markets. Our overall unit volume remained consistent in 2019 across an increased customer base. The increase in license and services revenue was primarily due to higher services revenue related to product validation and repair services, and to a lesser extent, increases in product licensing related revenue.

The decrease in North America revenue was due to a decrease in volume in units sold to existing customers coupled with a decrease in average selling price of units sold. The decrease in revenue in Asia-Pacific was primarily due to a change in mix of products sold. The increase in revenue in Europe, Middle East and Africa was due to an increase in purchasing volume from customers.

*Cost of Revenue and Gross Margin*

| | Year Ended December 31, | | Change $ | Change % |
|---|---|---|---|---|
| | 2018 | 2019 | | |
| | (dollars in thousands) | | | |
| Cost of revenue | $112,066 | $71,630 | $(40,436) | (36)% |
| Gross margin | 22% | 29% | | |

Cost of revenue decreased by $40.4 million, or 36%, to $71.6 million for 2019, from $112.1 million for 2018. The decrease in cost of revenue was primarily due to a $24.3 million decrease in product costs resulting from the change in product mix during 2019, and a $13.6 million decrease in personnel costs related to manufacturing labor and overhead from manufacturing process improvements.

Gross margin increased from 22% for 2018 to 29% for 2019. The increase was primarily due to a change in revenue mix with an increase in license and service revenue and increased resources utilization in 2019 due to the improvements we made in our manufacturing processes in 2018.

214

*Operating Expenses*

| | Year Ended December 31, | | Change $ | Change % |
|---|---|---|---|---|
| | 2018 | 2019 | | |
| | (dollars in thousands) | | | |
| Research and development | $51,993 | $56,850 | $ 4,857 | 9% |
| Sales and marketing | 22,137 | 21,873 | (264) | (1) |
| General and administrative | 12,902 | 20,058 | 7,156 | 55 |
| Total operating expenses | $87,032 | $98,781 | $11,749 | 13 |

*Research and Development*

R&D expenses increased by $4.9 million, or 9%, to $56.9 million for 2019, from $52.0 million for 2018. The increase was primarily attributable to an increase of $4.7 million in personnel related costs, mainly driven by an increase in employee headcount contributed primarily to the acquisition of Mapper in July 2019, an increase of $1.9 million in allocated facility and IT expenses, and an increase of $0.8 million in depreciation expense, partially offset by a decrease of $3.0 million in prototype product development costs and a decrease of $0.3 million in professional services.

*Sales and Marketing*

Sales and marketing expenses decreased by $0.3 million, or 1%, to $21.9 million for 2019 from $22.1 million for 2018. The decrease was primarily attributable to a reduction of $1.0 million in personnel-related costs, mainly driven by a decrease in employee headcount, a decrease of $0.2 million in professional services, partially offset by increases of $0.7 million in demonstration product expenses and $0.2 million in travel and trade show expenses.

*General and Administrative*

General and administrative expenses increased by $7.2 million, or 55%, to $20.1 million for 2019 from $12.9 million for 2018. The increase was primarily attributable to an increase of $7.8 million in legal, accounting and other professional services, partially offset by a decrease of $0.5 million in personnel-related costs, mainly driven by a decrease in employee headcount, a decrease of $0.2 million in depreciation and other allocated expenses.

*Interest Income, Interest Expense and Other Income (Expense), Net*

| | Year Ended December 31, | | Change $ | Change % |
|---|---|---|---|---|
| | 2018 | 2019 | | |
| | (dollars in thousands) | | | |
| Interest income | $ 630 | $1,146 | $516 | 82% |
| Interest expense | (14) | (77) | (63) | 450 |
| Other income (expense), net | (136) | 35 | 171 | (126) |

Interest income was $1.1 million in 2019 compared to $0.6 million in 2018. The increase was primarily related to an increase in our invested funds due to the proceeds from the Series B and B-1 preferred stock financing completed in September 2018 and October 2019, respectively.

Other income (expense), net was $35,000 in 2019 compared to $(136,000) in 2018. The change was primarily related to foreign exchange gain or loss resulting from foreign currency exchange rate fluctuations in 2019 and 2018.

215

*Income Taxes*

| | Year Ended December 31, | | Change $ | Change % |
|---|---|---|---|---|
| | 2018 | 2019 | | |
| | (dollars in thousands) | | | |
| Loss before income taxes | $(55,672) | $(67,909) | $(12,237) | 22% |
| Provision for (benefit from) income taxes | 6,628 | (683) | (7,311) | (110)% |

We are subject to income taxes in the United States, China and Germany. Our effective tax rate increased from (11.9)% in 2018 to 1.0% in 2019. This change was primarily due to taxes incurred by foreign subsidiaries and state taxes and partially offset by release of income tax reserves. Due to the change in our valuation allowance on our federal and state deferred tax assets, our provision for income taxes in 2018 includes the effect of establishing a full valuation allowance for the existing net deferred tax assets. We also continue to provide a full valuation allowance on our net deferred tax assets in 2019. There was no additional provision impact recorded during fiscal 2019 as a result of the Tax Cuts and Jobs Act of 2017, or the Tax Act.

As of December 31, 2019, we had $107.4 million of U.S. federal and $73.4 million of state net operating loss carryforwards available to reduce future taxable income, which will be carried forward indefinitely for U.S. federal tax purposes and will expire beginning in 2028 through 2038 for state tax purposes.

## Comparison of the Years Ended December 31, 2017 and 2018

*Revenue*

| | Year Ended December 31, | | Change $ | Change % |
|---|---|---|---|---|
| | 2017 | 2018 | | |
| | (dollars in thousands) | | | |
| Revenue: | | | | |
| Products | $179,928 | $132,933 | $(46,995) | (26)% |
| License and services | 2,162 | 10,013 | 7,851 | 363 |
| Total | $182,090 | $142,946 | $(39,144) | (21) |
| Revenue by geographic location: | | | | |
| North America | $139,005 | $ 84,541 | $(54,464) | (39)% |
| Asia and Pacific | 26,562 | 39,770 | 13,208 | 50 |
| Europe, Middle East and Africa | 16,523 | 18,635 | 2,112 | 13 |
| Total | $182,090 | $142,946 | $(39,144) | (21) |

Revenue decreased by $39.1 million, or 21%, to $142.9 million for 2018, from $182.1 million for 2017. The decrease in product revenue was primarily due to a change in mix of products sold and a decrease of 37% in average selling price. From the beginning of 2018, we strategically reduced the price of one of our lidar products to drive additional adoption of our smart vision solutions in multiple end markets. We had an increase in unit volume of approximately 25% in 2018 across an increased customer base. In addition, a customer who accounted for 26% of our revenue in 2017, made substantial purchases of our products for R&D projects in 2017, but did not repeat such purchases in 2018. The increase in license and services revenue was primarily due to increased license and product repair services. The decrease in North America was due to a decrease in volume in units sold to existing customers coupled with a decrease in average selling price of units sold, which was partially offset by an increase in volume of units sold to new customers. The increase in revenue in Asia-Pacific was primarily due to an increase in purchasing volume from existing customers.

216

*Cost of Revenue and Gross Margin*

| | Year Ended December 31, | | Change $ | Change % |
|---|---|---|---|---|
| | 2017 | 2018 | | |
| | (dollars in thousands) | | | |
| Cost of revenue | $101,713 | $112,066 | $10,353 | 10% |
| Gross margin | 44% | 22% | | |

Cost of revenue increased by $10.4 million, or 10%, to $112.1 million for 2018, from $101.7 million for 2017. The increase in cost of revenue was primarily due to a $5.3 million increase in product costs resulting from our higher sales volume during 2018, a $2.4 million increase in depreciation expense related to manufacturing equipment and a $2.7 million increase in repair and warranty costs.

Gross margin decreased from 44% for 2017 to 22% for 2018. The decrease was primarily due to a decrease in our average selling price and reduced utilization in 2018 as we made certain improvements in our manufacturing processes.

*Operating Expenses*

| | Year Ended December 31, | | Change $ | Change % |
|---|---|---|---|---|
| | 2017 | 2018 | | |
| | (dollars in thousands) | | | |
| Research and development | $31,610 | $51,993 | $20,383 | 64% |
| Sales and marketing | 13,956 | 22,137 | 8,181 | 59 |
| General and administrative | 9,978 | 12,902 | 2,924 | 29 |
| Total operating expenses | $55,544 | $87,032 | $31,488 | 57 |

*Research and Development*

R&D expenses increased by $20.4 million, or 64%, to $52.0 million for 2018, from $31.6 million for 2017. The increase was primarily attributable to an increase of $8.2 million in personnel related costs, mainly driven by an increase in employee headcount, an increase of $8.8 million in prototype product development costs, an increase of $1.6 million in allocated facility and IT expenses and an increase of $1.2 million in professional services and travel expenses.

*Sales and Marketing*

Sales and marketing expenses increased by $8.2 million, or 59%, to $22.1 million for 2018 from $14.0 million for 2017. The increase was primarily attributable to an increase of $3.6 million in personnel-related costs, mainly driven by an increase in employee headcount, plus increases of $1.3 million in trade show and promotion expenses, $1.0 million in demonstration equipment expenses, $1.0 million in professional services and $1.1 million in travel, advertising and other demonstration expenses.

*General and Administrative*

General and administrative expenses increased by $2.9 million, or 29%, to $12.9 million for 2018 from $10.0 million for 2017. The increase was primarily attributable to an increase of $1.3 million in personnel-related costs, mainly driven by an increase in employee headcount, and an increase of $1.8 million in legal, accounting and other professional services, partially offset by a decrease of $0.2 million in bad debt expense.

217

*Interest Income, Interest Expense and Other Income (Expense), Net*

| | Year Ended December 31, | | Change $ | Change % |
|---|---|---|---|---|
| | 2017 | 2018 | | |
| | (dollars in thousands) | | | |
| Interest income | $489 | $ 630 | $ 141 | 29% |
| Interest expense | — | (14) | (14) | N/A |
| Other income (expense), net | 249 | (136) | (385) | (155) |

Interest income was $0.6 million in 2018 compared to $0.5 million in 2017. The increase was primarily related to an increase in our invested funds due to the proceeds from the Series B preferred stock financing completed in September 2018.

Other income (expense), net was $(0.1) million in 2018 compared to $0.2 million in 2017. The change was primarily related to foreign currency loss in 2018 as a result of the overall strengthening of the U.S. dollar when compared to the currencies of the jurisdictions in which we operate.

*Income Taxes*

| | Year Ended December 31, | | Change $ | Change % |
|---|---|---|---|---|
| | 2017 | 2018 | | |
| | (dollars in thousands) | | | |
| Income (loss) before income taxes | $25,571 | $(55,672) | $(81,243) | (318)% |
| Provision for income taxes | 9,810 | 6,628 | (3,182) | (32)% |

We are subject to income taxes in the United States, China and Germany. Our effective tax rate decreased from 38.4% in 2017 to (11.9)% in 2018. The decrease in our provision for income taxes was primarily due to our change in income (loss) before income taxes. Due to the change in our valuation allowance on our federal and state deferred tax assets, our provision for income taxes in 2018 includes the effect of establishing the valuation allowance for the existing net deferred tax assets.

On December 22, 2017, the Tax Act was enacted, which contains significant changes to U.S. tax law. Among other provisions, the Tax Act reduces the U.S. corporate income tax rate to 21% and repeals the alternative minimum tax, effective as of 2018. As a result, we have re-measured our U.S. deferred tax assets and liabilities as of December 31, 2017 to reflect the lower rate expected to apply when these temporary differences reverse. The impact of the Tax Act on our 2017 and 2018 provisions for income taxes was $1.9 million and $0.2 million, respectively. Additionally, we made a one-time deemed repatriation tax payment of $0.1 million in 2017.

**Liquidity and Capital Resources**

*Sources of Liquidity*

As of March 31, 2020, we had cash and cash equivalents totaling $27.4 million, which were held for working capital purposes. Our cash equivalents are comprised primarily of money market funds. To date, our principal sources of liquidity have been payments received from sales to customers and the net proceeds we received through private placements of our convertible preferred stock. In August 2016, we received $143.3 million in net proceeds from the sale of our Series A convertible preferred stock. In September 2018 and October 2019, we received $46.7 million and $49.8 million, respectively, in net proceeds from the sale of our Series B and Series B-1 convertible preferred stock. In April 2020, we raised $20.0 million from the sale of additional shares of Series B-1 convertible preferred stock.

In January 2020, we entered into a loan and security agreement with a financial institution which provides a $25.0 million revolving line of credit (the "2020 Revolving Line") with an option to increase the credit limit up to an additional $15.0 million with the bank's approval (Incremental Revolving Line). As part of the Revolving Line, there is a letter of credit sublimit of $5.0 million. The advances under the Revolving

218

Line bear interest at a rate per annum equal to the prime rate plus an applicable margin of 1.5% for prime rate advances, or LIBOR rate plus an applicable margin of 2.5% for LIBOR advances. The unused revolving line facility fee is 0.15% per annum of the average unused portion of the Revolving Line. In addition, there is a $50,000 non-refundable commitment fee if we exercise the Incremental Revolving Line option. The revolving line of credit is secured by certain of our assets. The 2020 Revolving Line matures September 2020. There are no outstanding borrowings under the 2020 Revolving Line to date.

On April 8, 2020, we received loan proceeds of $10.0 million under the CARES Act's Paycheck Protection Program ("PPP"). The principal and accrued interest are forgivable after 24 weeks as long as the borrower uses the loan proceeds for eligible purposes, including payroll, benefits, rent and utilities, and maintains its payroll levels and that approval is received from the relevant government entity. The unforgiven portion of the PPP loan is payable over up to five years at an interest rate of 1% per annum, with a deferral of payments for the first six months.

On July 2, 2020, we sold our Morgan Hill building to a third-party and received net proceeds of $12.3 million.

We have incurred negative cash flows from operating activities and significant losses from operations in the past as reflected in our accumulated deficit of $187.4 million as of March 31, 2020. We expect to continue to incur operating losses at least for the next 12 months due to the investments that we intend to make in our business and, as a result, we may require additional capital resources to grow our business. We believe that current cash, cash equivalents, expected proceeds from the sale of Series B-1 convertible preferred stock, and available borrowing capacity under the revolving credit facility will be sufficient to fund our operations for at least the next 12 months. Our future capital requirements, however, will depend on many factors, including our lidar sales volume, the timing and extent of spending to support our R&D efforts in smart vision technology, the expansion of sales and marketing activities, and market adoption of new and enhanced products and features. We may in the future enter into arrangements to acquire or invest in complementary businesses, services, and technologies, including intellectual property rights. From time to time, we may seek to raise additional funds through equity and debt. If we are unable to raise additional capital when desired and on reasonable terms, our business, results of operations, and financial condition be adversely affected.

*Cash Flow Summary*

The following table summarizes our cash flows for the periods presented:

| | Year Ended December 31, | | | Three Months Ended March 31, | |
|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2019 | 2020 |
| | | | (in thousands) | | |
| Net cash provided by (used in): | | | | | |
| Operating activities | $(12,584) | $(30,503) | $(43,230) | $7,633 | $(33,288) |
| Investing activities | 25,757 | (19,383) | 29,544 | 1,723 | 1,371 |
| Financing activities | — | 44,158 | 49,790 | — | (659) |

*Operating Activities*

During the three months ended March 31, 2020, operating activities used $33.3 million in cash. The primary factors affecting our operating cash flows during this period were our net loss of $23.4 million, impacted by our non-cash charges of $2.5 million primarily consisting of depreciation and amortization of $2.2 million and provision for doubtful accounts of $0.3 million. The cash used in changes in our operating assets and liabilities of $17.3 million which primarily consists of a decrease of $6.2 million in contract liabilities primarily due to a reclassification of $6.1 million customer deposit to refund liabilities, a decrease of $6.2 million in accrued expenses and other liabilities due to timing of payments and a reclassification of $6.1 million from customer deposit, an increase of $4.7 million in prepaid expenses and other current assets, and an increase of $0.2 million in inventories due to decreased sales volume of certain products. These amounts were partially offset by cash provided from changes in our operating assets and liabilities of

219

$4.9 million was primarily due to an increase of $4.6 million in accounts payable due to timing of payments, a decrease of $0.2 million in accounts receivable and a decrease of $0.1 million in other noncurrent assets.

During the three months ended March 31, 2019, operating activities provided $7.6 million in cash. The primary factors affecting our operating cash flows during this period were our net loss of $2.2 million, impacted by our non-cash charges of $1.9 million primarily consisting of depreciation and amortization of $1.8 million and provision for doubtful accounts of $0.2 million. The cash provided from changes in our operating assets and liabilities of $9.3 million was primarily due to a decrease of $5.0 million in accounts receivable, an increase of $1.2 million in contract liabilities due to the timing of billings and cash received in advance of revenue and an increase of $1.3 million in inventories due to increased sales volume of certain products, an increase of $1.0 million in accounts payable due to timing of payments, a decrease of $0.6 million in prepaid expenses and other current assets, and a decrease of $0.2 million in other noncurrent assets. These amounts were partially offset by cash used in changes in our operating assets and liabilities of $1.4 million which primarily consists of an increase of $1.4 million in accrued expenses and other liabilities due to timing of payments.

During 2019, operating activities used $43.2 million in cash. The primary factors affecting our operating cash flows during this period were our net loss of $67.2 million, impacted by our non-cash charges of $5.9 million primarily consisting of depreciation and amortization of $8.0 million, partially offset by deferred income tax of $2.0 million. The cash provided from changes in our operating assets and liabilities of $24.3 million was primarily due to an increase of $13.6 million in accrued expenses and other liabilities due to timing of payments, a decrease of $9.6 million in accounts receivable and a decrease of $1.1 million in other noncurrent assets. These amounts were partially offset by cash used in changes in our operating assets and liabilities of $6.2 million which primarily consists of an increase of $3.6 million in prepaid expenses and other current assets, a decrease of $1.7 million in contract liabilities due to the timing of billings and cash received in advance of revenue and an increase of $0.9 million in inventories due to decreased sales volume of certain products.

During 2018, operating activities used $30.5 million in cash. The primary factors affecting our operating cash flows during this period were our net loss of $62.3 million, impacted by our non-cash charges of $12.9 million primarily consisting of depreciation and amortization of $6.8 million and deferred income tax of $5.8 million. The cash provided from changes in our operating assets and liabilities of $28.0 million was primarily due to a decrease in inventories of $21.3 million as we consumed previously purchased inventory, an increase in contract liabilities of $4.3 million due to the timing of billings and cash received in advance of revenue and a decrease in accounts receivable of $2.4 million. These amounts were partially offset by cash used in changes in our operating assets and liabilities of $9.0 million which primarily consists of decreases of $4.4 million in accounts payable and $2.4 million in accrued expenses and other liabilities due to timing of payments, and an increase of $1.4 million in prepaid expenses and other current assets.

During 2017, operating activities used $12.6 million in cash. The primary factors affecting our operating cash flows during the period were our net income of $15.8 million, impacted by our non-cash charges of $5.1 million primarily consisting of depreciation and amortization of $3.3 million and deferred income tax of $1.0 million. The cash used in changes in our operating assets and liabilities of $57.4 million was primarily due to an increase of inventories of $32.7 million in anticipation of future demand, an increase in accounts receivable of $15.1 million, a decrease in contract liabilities of $5.0 million due to the timing of billings and cash received in advance of revenue, and an increase in prepaid expenses and other current assets of $3.4 million. These amounts were partially offset by cash provided from changes in our operating assets and liabilities of $24.0 million which primarily consists of an increase in accrued expenses and other liabilities of $16.5 million and an increase of $7.5 million in accounts payable due to timing of payments.

*Investing Activities*

During the three months ended March 31, 2020, cash provided by investing activities was $1.4 million, which was primarily from sales and maturities of short-term investments of $2.2 million, partially offset by cash used to purchase property, plant and equipment of $0.8 million.

220

During the three months ended March 31, 2019, cash provided by investing activities was $1.7 million, which was primarily from sales and maturities of short-term investments of $11.5 million, partially offset by cash used to purchase short-term investments of $7.8 million and to purchase property, plant and equipment of $1.9 million.

During 2019, cash provided by investing activities was $29.5 million, which was primarily from sales and maturities of short-term investments of $62.6 million and proceeds from repayment of notes receivable from stockholders of $3.5 million, partially offset by cash used to purchase short-term investments of $28.8 million, purchase property, plant and equipment of $5.2 million and to acquire Mapper of $2.5 million.

During 2018, cash used in investing activities was $19.4 million, which was primarily used to purchase short-term investments of $35.3 million and purchase property, plant and equipment of $6.9 million, partially offset by sales and maturities of short-term investments of $20.8 million and proceeds from the cancellation of corporate-owned life insurance policies of $2.1 million.

During 2017, cash provided by investing activities was $25.8 million, which was primarily driven by sales and maturities of short-term investments of $46.0 million, partially offset by purchases of property, plant and equipment of $18.1 million resulting from the expansion of our product development and manufacturing activities, and purchase of corporate-owned life insurance policies of $2.1 million.

Our machinery and equipment is depreciated over a useful life of approximately five years.

*Financing Activities*

During the three months ended March 31, 2020, cash used in financing activities was $0.7 million consisting of payment of deferred offering costs. There were no financing activities during the three months ended March 31, 2019.

During 2019, cash provided by financing activities was $49.8 million consisting of net proceeds from the issuance of Series B-1 preferred stock in October 2019.

During 2018, cash provided by financing activities was $44.2 million consisting of net proceeds of $46.7 million from the issuance of Series B preferred stock in September 2018, partially offset by $2.5 million use of cash to repurchase our common stock.

There were no financing activities during 2017.

**Contractual Obligations**

The following table summarizes our non-cancellable contractual obligations as of December 31, 2019:

| | Payment Due by Period | | | | |
| | Less than 1 Year | 1 to 3 Years | 3 to 5 Years | More than 5 Years | Total |
| --- | --- | --- | --- | --- | --- |
| | | | (in thousands) | | |
| Operating leases[1] | $ 4,246 | $7,322 | $6,817 | $11,012 | $29,397 |
| Capital leases | 310 | 247 | — | — | 557 |
| Purchase obligations[2] | 41,612 | — | — | — | 41,612 |
| Total | $46,168 | $7,569 | $6,817 | $11,012 | $71,566 |

(1) Consists of future non-cancelable minimum rental payments under operating leases for our offices and manufacturing facilities.

(2) Purchase obligations represent outstanding purchase orders and commitments to purchase goods or services from our contract manufacturers and vendors that range from one month up to a year.

The contractual obligation table as of December 31, 2019 excludes tax liabilities of $1.4 million related to uncertain tax positions because we are unable to make a reasonably reliable estimate of the timing of settlement, if any, of these future payments.

221

The following table summarizes our non-cancellable contractual obligations as of March 31, 2020:

| | Payment Due by Period | | | | |
| | Less than 1 Year | 1 to 3 Years | 3 to 5 Years | More than 5 Years | Total |
|---|---|---|---|---|---|
| | | | (in thousands) | | |
| Operating leases[1] | $ 3,178 | $7,319 | $6,817 | $11,012 | $28,326 |
| Capital leases | 232 | 247 | — | — | 479 |
| Purchase obligations[2] | 41,072 | — | — | — | 41,072 |
| Total | $44,482 | $7,566 | $6,817 | $11,012 | $69,877 |

(1)  Consists of future non-cancelable minimum rental payments under operating leases for our offices and manufacturing facilities.

(2)  Purchase obligations represent outstanding purchase orders and commitments to purchase goods or services from our contract manufacturers and vendors that range from one month up to a year.

***Off-Balance Sheet Arrangements***

On March 27, 2017, we entered into an unconditional payment guaranty with regard to one of our officers' $15.0 million term loan. The loan was obtained to acquire, and was secured by, our office and manufacturing facility in San Jose, California. Under the terms of the guaranty, we agreed to unconditionally guarantee this officer's obligations under the loan. As of December 31, 2019, we no longer guarantee the loan and have no further obligations under the unconditional payment guaranty.

Other than as set forth above, we have not entered into any off-balance sheet arrangements and do not have any holdings in variable interest entities.

**Quantitative and Qualitative Disclosures About Market Risk**

We are exposed to market risks in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk exposure is primarily the result of fluctuations in interest rates and foreign currency exchange rates.

We do not believe that inflation has had a material effect on our business, results of operations or financial condition. Nonetheless, if our costs were to become subject to significant inflationary pressures, we may not be able to fully offset such higher costs. Our inability or failure to do so could harm our business, results of operations or financial condition.

***Interest Rate Risk***

As of March 31, 2020, we had cash and cash equivalents of approximately $27.4 million, which consisted primarily of institutional money market funds, which carries a degree of interest rate risk. A hypothetical 10% change in interest rates would not have a material impact on our financial condition or results of operations due to the short-term nature of our investment portfolio.

***Foreign Currency Exchange Risk***

Our results of operations and cash flows are subject to fluctuations due to changes in foreign currency exchange rates. Substantially all of our revenue is generated in U.S. dollars. Our expenses are generally denominated in the currencies of the jurisdictions in which we conduct our operations, which are primarily in the U.S. and to a lesser extent in Asia and Europe. Our results of operations and cash flows are, therefore, subject to fluctuations due to changes in foreign currency exchange rates and may be adversely affected in the future due to changes in foreign exchange rates. The effect of a hypothetical 10% change in foreign currency exchange rates applicable to our business would not have a material impact on our historical

222

consolidated financial statements. To date, we have not engaged in any hedging strategies. As our international operations grow, we will continue to reassess our approach to manage our risk relating to fluctuations in currency rates.

**Critical Accounting Policies and Estimates**

We prepare our consolidated financial statements in accordance with U.S. GAAP. The preparation of these consolidated financial statements requires us to make estimates, assumptions and judgments that can significantly impact the amounts we report as assets, liabilities, revenue, costs and expenses and the related disclosures. We base our estimates on historical experience and other assumptions that we believe are reasonable under the circumstances. Our actual results could differ significantly from these estimates under different assumptions and conditions. We believe that the accounting policies discussed below are critical to understanding our historical and future performance as these policies involve a greater degree of judgment and complexity.

*Revenue Recognition*

We early adopted the requirements of the new revenue recognition standard, known as ASC 606, effective January 1, 2018 utilizing the modified retrospective method of transition. Revenue is recognized upon transfer of control of promised products and to a small extent services to customers in an amount that reflects the consideration that we expect to receive in exchange for those products and services.

We enter into contracts that can include various combinations of products and services, which are generally capable of being distinct and accounted for as separate performance obligations; however, determining whether products or services are considered distinct performance obligations that should be accounted for separately versus together may sometimes require significant judgment.

Transaction price is allocated to each performance obligation on a relative standalone selling price (SSP) basis. Judgment is required to determine SSP for each distinct performance obligation. We use a range of amounts to estimate SSP when products and services are sold separately. In instances where SSP is not directly observable, we determine SSP using information that may include other observable inputs available to us.

Accounting for contracts recognized over time under ASC 606 involves the use of various techniques to estimate total contract revenue and costs. Due to uncertainties inherent in the estimation process, it is possible that estimates of costs to complete a performance obligation will be revised in the near-term. We review and update our contract-related estimates regularly, and record adjustments as needed. For those performance obligations for which revenue is recognized using a cost-to-cost input method, changes in total estimated costs, and related progress towards complete satisfaction of the performance obligation, are recognized on a cumulative catch-up basis in the period in which the revisions to the estimates are made.

Changes in judgments with respect to these assumptions and estimates could impact the timing or amount of revenue recognition.

*Inventory Valuation*

Inventories are stated at the lower of cost or estimated net realizable value. Costs are computed under the standard cost method, which approximates actual costs determined on the first in, first out basis. We record write-downs of inventories which are obsolete or in excess of anticipated demand. Significant judgment is used in establishing our forecasts of future demand and obsolete material exposures. We consider marketability and product life cycle stage, product development plans, component cost trends, demand forecasts, historical revenue, and assumptions about future demand and market conditions in establishing our estimates. If the actual component usage and product demand are significantly lower than forecast, which may be caused by factors within and outside of our control, or if there were a higher incidence of inventory obsolescence because of rapidly changing technology and our customer requirements, we may be required to increase our inventory writedowns. A change in our estimates could have a significant impact on the value of our inventory and our results of operations.

*Income Taxes*

Significant management judgment is required in developing our provision for income taxes, including the determination of deferred tax assets and liabilities and any valuation allowances that might be required against the deferred tax assets. We have considered projected future taxable income and ongoing prudent and feasible tax planning strategies in assessing the need for valuation allowances. If we determine that a valuation allowance is required, such adjustment to the deferred tax assets would increase our tax expense in the period in which such determination is made. Conversely, if we determine that a valuation allowance exceeds our requirement, such adjustment to the deferred tax assets would decrease tax expense in the period in which such determination is made. In evaluating the exposure associated with various tax filing positions, we accrue an income tax liability when such positions do not meet the more-likely-than-not threshold for recognition.

The calculation of our tax liabilities involves dealing with uncertainties in the application of complex tax law and regulations in a multitude of jurisdictions. We recognize potential liabilities for anticipated tax audit issues in the U.S. and other tax jurisdictions based on our estimate of whether, and the extent to which, additional taxes, interest and penalties will be due. If our estimate of income tax liabilities proves to be less than the actual amount ultimately assessed, a further charge to tax expense would be required. If the payment of these amounts ultimately proves to be unnecessary, the reversal of the accrued liabilities would result in tax benefits being recognized in the period when we determine the liabilities no longer exist.

*Stock-Based Compensation*

Stock-based compensation consists of expense for RSAs, RSUs and stock options granted to employees and nonemployees. We estimate the fair value of RSAs and RSUs based on the fair market value of our common stock on the date of grant. We grant RSAs and RSUs which vest upon the satisfaction of both a time-based condition and a liquidity condition. Upon satisfaction of the liquidity vesting condition, which is the earlier of (i) an IPO, or (ii) a Company sale event, RSAs and RSUs for which the service-based condition has been satisfied will vest immediately, and any remaining unvested RSAs and RSUs will vest over the remaining service period. The fair value of RSAs and RSUs is recognized as compensation expense over the requisite service period, using the accelerated attribution method, once the liquidity condition becomes probable of being achieved. As of March 31 2020, no compensation expense had been recognized for the RSAs and RSUs because the liquidity vesting condition was not probable of being satisfied.

We estimate the fair value of stock options granted to employees and directors using the Black-Scholes option pricing model. The fair value of stock options that are expected to vest is recognized as compensation expense on a straightline basis over the requisite service period. We recognize forfeitures as they occur. Stock-based compensation expense from stock options was $0.2 million, $0.2 million, and $0.1 million, respectively, for the years ended December 31, 2017, 2018 and 2019, and $52,000 and $21,000, respectively, for the three months ended March 31, 2019 and 2020 .

The fair value of our common stock has historically been determined by our board of directors as there was no public market for the common stock. The board of directors determines the fair value of our common stock by considering a number of objective and subjective factors, including: the valuation of comparable companies, sales of convertible preferred stock to unrelated third parties, our operating and financial performance, the lack of liquidity of common stock and general and industry specific economic outlook, amongst other factors. The valuation of our common stock involves the use of estimates, judgment, and assumptions that are highly complex and subjective, such as those regarding our expected future revenue, expenses, and future cash flows, discount rates, market multiples, the selection of comparable companies, and the probability of possible future events. Changes in any or all of these estimates and assumptions or the relationships between these assumptions impact our valuations as of each valuation date and may have a material impact on the valuation of our common stock and, in turn, on the valuation of our share-based compensation awards whose values are based on part on the value of our common stock.

**Recent Accounting Pronouncements**

See Note 1 to our consolidated financial statements included elsewhere in this proxy statement for recently adopted accounting pronouncements and recently issued accounting pronouncements not yet adopted as of the date of this proxy statement.

224

**EXECUTIVE COMPENSATION**

**Velodyne**

*2019 Summary Compensation Table*

The following table shows information regarding the compensation of Velodyne's named executive officers for services performed during the years ended December 31, 2019 and 2018.

| Name and Principal Position | Year | Salary ($) | Bonus ($) | Stock Awards[1] ($) | Option Awards ($) | Non-Equity Incentive Plan Compensation[2] ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|---|
| David Hall.................................. *Founder, Executive Chairman and Former Chief Executive Officer*[3] | 2019 | 597,692 | — | 2,130,750 | — | 240,306 | — | 2,968,748 |
| | 2018 | 500,000 | — | — | | 200,000 | — | 700,000 |
| Anand Gopalan......................... *Chief Executive Officer and Former Chief Technology Officer*[3] | 2019 | 465,600 | — | 2,146,500 | — | 281,106 | 4,500[5] | 2,897,706 |
| | 2018 | 363,480 | — | 4,269,750 | — | 218,706 | 4,500[5] | 4,856,436 |
| Andrew Hamer[4] ...................... *Chief Financial Officer* | 2019 | 175,038 | | 2,201,400 | — | 92,802 | 176,417[6] | 2,645,657 |
| | 2018 | | | | | | | |

(1)  Represents the aggregate grant date fair value of RSU awards granted to the officer, computed in accordance with FASB ASC Topic 718. See Note 7 to Velodyne's consolidated financial statements included elsewhere in this proxy statement for a discussion of the assumptions made by us in determining the grant date fair value of Velodyne's equity awards.

(2)  Represents bonuses earned under Velodyne's annual bonus plans with respect to 2018 and 2019 performance. Bonuses for 2019 remain subject to formal approval.

(3)  Effective January 1, 2020, Mr. Hall transitioned from chief executive officer to executive chairman and Dr. Gopalan assumed the role of chief executive officer.

(4)  Mr. Hamer's employment with us commenced in July 2019. Prior to his appointment as chief financial officer, Mr. Hamer served as a consultant and Velodyne's interim chief financial officer. Mr. Hamer's employment letter entitles him to an annual base salary of $370,000.

(5)  Represents $4,500 in 401(k) plan contributions made by us.

(6)  Represents $171,917 in consulting fees paid to Mr. Hamer while he served as a consultant and Velodyne's interim chief financial officer and $4,500 in 401(k) plan contributions made by us.

*Narrative Explanation of Compensation Arrangements with Velodyne's Named Executive Officers*

Velodyne entered into employment agreements with each of Messrs. Gopalan and Hamer in connection with the commencement of their employment and, as described further below, entered into a new employment agreement with Mr. Gopalan in connection with his promotion to chief executive officer, effective January 1, 2020. Velodyne does not have a written employment agreement with David Hall, Velodyne's executive chairman and former chief executive officer. Velodyne's employment agreements with Messrs. Gopalan and Hamer set forth each such named executive officer's annual base salary and target bonus opportunity. These agreements also provide Messrs. Gopalan and Hamer with severance rights, though it is expected that the severance rights in such agreements will be superseded by the severance and change in control agreement the post-combination company will enter into with Velodyne's executive offices to be effective upon the completion of the Business Combination.

The annual base salaries of named executive officers will be reviewed from time to time and adjusted when the post-combination company board of directors or compensation committee determines an

225

adjustment is appropriate. During the year ended December 31, 2019, the annual base salaries for Messrs. Hall, Gopalan and Hamer were $600,000, $468,000 and $370,000, respectively. Effective January 1, 2020, the annual base salary of Dr. Gopalan was increased to $500,000. The annual base salaries of Messrs. Hall and Hamer remain at $600,000 and $370,000, respectively.

Each of Velodyne's named executive officers is eligible to earn an incentive bonus for each of Velodyne's fiscal years they are employed by us. Except in the case of Mr. Hall, Velodyne typically sets target bonus opportunities as a percentage of Velodyne's named executive officers' annual base salaries. Mr. Hamer's target bonus opportunity is 50% of his base salary and Dr. Gopalan's target bonus opportunity was increased from 60% to 100% of his base salary effective January 1, 2020, under the terms of his new employment agreement. During 2018 and 2019, Velodyne's named executive officers earned bonuses based on the achievement of certain subjective or objective company performance targets and individual performance goals, in each case as determined by members of Velodyne's executive team. In 2019, these goals included progress on an initial public offering, the completion of other key corporate transactions and strategic initiatives, including the Series B-1 preferred stock financing, and general financial performance of the company. The company performance targets and individual performance goals vary from year to year and from executive to executive.

Effective January 1, 2020, Velodyne entered into a new employment agreement with Dr. Gopalan in connection with his promotion to chief executive officer. In addition to containing annual base salary, bonus opportunity and severance rights, the agreement provides that Velodyne will grant to Dr. Gopalan an option to purchase 150,000 shares of Velodyne's common stock ("Promotion Option") and two awards of RSUs. The first award will be 300,000 RSUs ("Promotion RSU Award" and such RSUs the "Promotion RSUs") and the second award will be for up to 375,000 RSUs, with a target award of 150,000 RSUs ("Performance RSUs").

Each of the awards promised in Dr. Gopalan's employment agreement are subject to different vesting schedules. 25% of the shares of common stock subject to the Promotion Option will vest after 12 months of continuous service following January 1, 2020, and the balance will vest in equal monthly installments over the next 36 months of Dr. Gopalan's continuous service. The Promotion RSU will be subject to the satisfaction of a time-based vesting requirement. This time-based vesting requirement will be satisfied upon the first occurrence of either of the following: (A)(i) with respect to 25% of the Promotion RSUs if Dr. Gopalan remains in continuous service through January 1, 2021 and a sale event occurs on or prior to January 1, 2021 and (ii) with respect to an additional 6.25% of the Promotion RSUs when Dr. Gopalan remains in continuous service through each of the next twelve successive three-month periods thereafter, but only if the sale event had occurred on or prior to January 1, 2021; or (B)(i) with respect to 58.33% of the Promotion RSUs if Dr. Gopalan remains in continuous service through an IPO (as defined in the employment agreement) and the IPO occurs on or prior to January 1, 2021, and (ii) with respect to 6.25% of the Promotion RSUs when Dr. Gopalan remains in continuous service through each of the next seven successive three-month periods thereafter (except that the time-based vesting requirement will only be satisfied with respect to the remaining 4.17% of the Promotion RSUs upon completion of the seventh successive three-month period), but only if the IPO had occurred on or prior to January 1, 2021. The number of Performance RSUs, up to 375,000, that will vest is determined by the amount of appreciation Velodyne's common stock experiences between January 1, 2020 and December 31, 2022. If the value of Velodyne's common stock on December 31, 2022 is between $21.78 and $29.04 per share, the reference price, then 112,500 Performance RSUs will vest. The amount of Performance RSUs that vest will scale up to 375,000 RSUs, all of which will vest if Velodyne's common stock on December 31, 2022 has a value equal to greater than $72.60, which is 250% of 29.04. If neither a sale event nor an IPO occurs on or prior to January 1, 2023, the Performance RSUs will immediately terminate for no consideration on that date. For purposes of the Promotion RSUs and the Performance RSUs granted to Dr. Gopalan, it is expected that an IPO will be deemed to have occurred by the board of the post-combination company following the completion of the Business Combination.

The Promotion Option, the Promotion RSU Award and the Performance RSUs are subject to accelerated vesting in certain circumstances. In the case of the Promotion Option and the Promotion RSU, the vesting requirements will be deemed satisfied in full on an accelerated basis if Dr. Gopalan's employment is terminated without cause by us or he resigns for good reason during the period commencing one month prior to and ending 12 months after a sale event; provided that such accelerated vesting shall not apply to the

226

Promotion RSUs if they expired or were terminated prior to such employment termination or resignation. If Velodyne is subject to a sale event while Dr. Gopalan remains in continuous service and the Promotion Option and Promotion RSUs are not assumed by the acquirer or its parent, continued by the surviving company or substituted for an equivalent award or cash payment, then the outstanding Promotion Option and Promotion RSUs, if any, will be deemed vested in full immediately prior to the sale event. In the case of the Performance RSUs, if Dr. Gopalan's employment is terminated without cause by us or he resigns for good reason during the period commencing one month prior to and ending 12 months after a sale event, the number of Performance RSUs that will become vested, up to 375,000, will be determined in relation to the gross price per share paid by the acquirer in the sale event; provided that such vesting shall not apply to the Performance RSUs if they expired or were terminated prior to such employment termination or resignation. If Velodyne is subject to a sale event while Dr. Gopalan remains in continuous service and the Performance RSUs are not assumed by the acquirer or its parent, continued by the surviving company or substituted for an equivalent award or cash payment, then the outstanding Performance RSUs, if any, will vest based on the gross price per share paid by the acquirer in the sale event.

### Employee Benefits and Perquisites

Velodyne's named executive officers are eligible to participate in Velodyne's health and welfare plans to the same extent as are other full-time employees generally. Velodyne generally does not provide Velodyne's named executive officers with perquisites or other personal benefits. However, Velodyne does reimburse Velodyne's named executive officers for their necessary and reasonable business and travel expenses incurred in connection with their services to us.

Velodyne's named executive officers are also eligible to participant in the 401(k) plan Velodyne maintains for Velodyne's employees generally. The 401(k) plan is intended to qualify under Section 401(k) of the Internal Revenue Service Code, so that contributions to the 401(k) plan by employees or by us, and the investment earnings thereon, are not taxable to the employees until withdrawn, and so that contributions made by us, if any, will be deductible by us when made. Employees may elect to reduce their current compensation by up to the statutorily prescribed annual limits and to have the amount of such reduction contributed to their 401(k) plans. The 401(k) plan permits us to make contributions up to the limits allowed by law on behalf of all eligible employees. In the year ended December 31, 2019, Velodyne made a 401(k) contribution of $4,500 for each of Dr. Gopalan and Mr. Hamer.

### Equity Compensation

Velodyne offers stock options and RSUs to Velodyne's named executive officers as the long-term incentive component of Velodyne's compensation program. Velodyne typically grants equity-based awards to new hires upon their commencing employment with us. Stock options allow employees to purchase shares of Velodyne's common stock at a price per share at least equal to the fair market value of Velodyne's common stock on the date of grant and may or may not be intended to qualify as "incentive stock options" for U.S. federal income tax purposes. In the past, Velodyne's board of directors has determined the fair market value of Velodyne's common stock based upon inputs including valuation reports prepared by third-party valuation firms. Generally, Velodyne's equity-based awards vest over four years, subject to the employee's continued employment with us on each vesting date, and in the case of RSUs, a liquidity-event vesting requirement.

In 2019, both Mr. Hall and Dr. Gopalan received RSU awards in recognition of their service to us and to further incentivize continued performance. Under the terms of his consulting agreement with us, Mr. Hamer received two awards of 5,000 RSUs, one of which is subject only to a liquidity-event vesting requirement and the other is subject to both a liquidity-event vesting requirement and a four year time-based vesting requirement. In connection with his appointment as Velodyne's full-time chief financial, Mr. Hamer received a third RSU award in 2019. The details of these awards are set forth in "Outstanding Equity Awards at 2019 Year-End."

As described in the footnotes to the "Outstanding Equity Awards at 2019 Year-End" table, certain equity awards granted to one or more of Velodyne's named executive officers are subject to accelerated

227

vesting in the event such officer's employment is terminated by us without cause or as a result of the officer's resignation for good reason during a window commencing three months prior to and ending twelve months following a change in control.

### Outstanding Equity Awards at 2019 Year-End

The following table provides information regarding outstanding equity awards held by Velodyne's named executive officers as of December 31, 2019. The number of shares subject to each award and, where applicable, the exercise price per share, reflect all changes as a result of Velodyne's capitalization adjustments.

The vesting schedule applicable to each outstanding award is described in the footnotes to the table below.

| | | Option Awards | | | | Stock Awards | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Name | Vesting Commencement Date | Number of Securities Underlying Unexercised Options (#) Vested | Number of Securities Underlying Unexercised Options (#) Unvested | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested(*) ($) |
| David Hall | 2/22/19 | (1) | | | | 75,000 | |
| Anand Gopalan | 6/27/2016[2] | 43,750 | 6,250 | 18.08 | 3/23/2027 | 6/27/2016[2] | |
| | 6/27/2016[3] | | | | | 100,000 | |
| | 6/27/2016[3] | | | | | 25,000 | |
| | 6/27/2016[3] | | | | | 75,000 | |
| | 9/29/2018[3] | | | | | 25,000 | |
| | 11/26/2018[3] | | | | | 75,000 | |
| | 2/22/19[3] | | | | | 50,000 | |
| | 7/8/19[3] | | | | | 25,000 | |
| Andrew Hamer | 4/17/19[4] | | | | | 5,000 | |
| | 4/17/19[5] | | | | | 5,000 | |
| | 4/3/19[6] | | | | | 65,000 | |

(*) As there was no public market for Velodyne's common stock on December 31, 2019, Velodyne has assumed that the fair value on such date was $[•].

(1) Represents an award of RSUs granted to Mr. Hall, which is subject to both a time-based and a liquidity-event vesting requirement, with the time-based vesting requirement satisfied in connection with Mr. Hall's continuous service over four years, with 25% of the time-based vesting requirement becoming satisfied upon completion of one year of service after the vesting commencement date and $1/16^{th}$ of the time-based vesting requirement becoming satisfied upon the completion of each three month period of service thereafter. It is expected that the liquidity-event based requirement will be waived following the completion of the Business Combination

(2) Option vests over four-year period based on Dr. Gopalan's continuous service over four years, whereby 25% of the shares subject to the option vested after completion of one year of service after the vesting commencement date, and $1/16^{th}$ of the shares vesting upon the completion of each three month period of service thereafter. The option will become vested in full on an accelerated basis if Dr. Gopalan's employment is terminated without cause by us or he resigns for good reason during the period commencing three months prior to and ending twelve months after a change in control.

(3) Represents an award of RSUs granted to Dr. Gopalan, which is subject to both a time-based and a liquidity-event vesting requirement, with the time-based vesting requirement satisfied in connection with Dr. Gopalan's continuous service over four years, with 25% of the time-based vesting requirement becoming satisfied upon completion of one year of service after the vesting commencement date and $1/16^{th}$ of the time-based vesting requirement becoming satisfied upon the completion of each three

month period of service thereafter. It is expected that the liquidity-event based requirement will be waived following the completion of the Business Combination. The time-based vesting requirement will be satisfied in full on an accelerated basis if Dr. Gopalan's employment is terminated without cause by us or he resigns for good reason during the period commencing three months prior to and ending twelve months after a change in control.

(4) Represents an award of RSUs granted to Mr. Hamer, which is subject only to a liquidity-event vesting requirement. It is expected that the liquidity-event based requirement will be waived following the completion of the Business Combination.

(5) Represents an award of RSUs granted to Mr. Hamer, which is subject to both a time-based and a liquidity-event vesting requirement, with the time-based vesting requirement satisfied in connection with Mr. Hamer's continuous service over four years, with 25% of the time-based vesting requirement becoming satisfied upon completion of one year of service after the vesting commencement date and $1/16^{th}$ of the time-based vesting requirement becoming satisfied upon the completion of each three month period of service thereafter. It is expected that the liquidity-event based requirement will be waived effective following the completion of the Business Combination

(6) Represents an award of RSUs granted to Mr. Hamer, which is subject to both a time-based and a liquidity-event vesting requirement, with the time-based vesting requirement satisfied in connection with Mr. Hamer's continuous service over four years, with 25% of the time-based vesting requirement becoming satisfied upon completion of one year of service after the vesting commencement date and $1/16^{th}$ of the time-based vesting requirement becoming satisfied upon the completion of each three month period of service thereafter. It is expected that the liquidity-event based requirement will be waived effective following the completion of the Business Combination. The time-based vesting requirement will be satisfied in full on an accelerated basis if Mr. Hamer's employment is terminated without cause by us or he resigns for good reason during the period commencing three months prior to and ending twelve months after a change in control.

### Pension Benefits

Velodyne's named executive officers did not participate in, or otherwise receive any benefits under, any pension or retirement plan sponsored by us during the year ended December 31, 2019.

### Nonqualified Deferred Compensation

Velodyne's named executive officers did not participate in, or earn any benefits under, a non-qualified deferred compensation plan sponsored by us during year ended December 31, 2019.

### Equity Plans

#### 2016 Stock Plan

*General.* Velodyne's board of directors adopted Velodyne's 2016 Plan in July 2016, and it was approved by Velodyne's stockholders in July 2016. The 2016 Plan has not been amended since its adoption in July 2016. No further awards will be made under Velodyne's 2016 Plan after the consummation of the Business Combination; however, awards outstanding under Velodyne's 2016 Plan will continue to be governed by their existing terms.

*Share Reserve.* As of December 31, 2019, Velodyne has reserved 7,763,731 shares of Velodyne's common stock for issuance under Velodyne's 2016 Plan, all of which may be issued as incentive stock options. As of December 31, 2019, there were outstanding options to purchase 53,333 shares of common stock, at exercise prices ranging from $18.08 to $20.68 per share, or a weighted-average exercise price of $18.24 per share were outstanding under Velodyne's 2016 Plan and 3,247,352 shares of common stock issuable upon the vesting and settlement of RSUs, and 4,463,045 shares of common stock remained available for future issuance. Unissued shares subject to awards that expire or are cancelled, shares reacquired by us, and shares withheld in payment of the purchase price or exercise price of an award or in satisfaction of withholding taxes will again become available for issuance under Velodyne's 2016 Plan. No further awards will be made under Velodyne's 2016 Plan after the Business Combination.

229

*2007 Incentive Stock Plan*

Velodyne's board of directors adopted Velodyne's 2007 Plan in January 2008, and it was approved by Velodyne's stockholders in January 2008. The most recent amendment of Velodyne's 2007 Plan was adopted by Velodyne's board of directors in October 2019 in order to decrease the aggregate number of shares reserved for issuance under the 2007 Plan by 2,500,000 shares. Velodyne ceased making awards under the 2007 Plan after the 2016 Plan was adopted and, as of December 31, 2019, other than 1,404,557 shares of common stock outstanding under RSAs, no outstanding awards remained under Velodyne's 2007 Plan.

*2020 Equity Incentive Plan and 2020 Employee Stock Purchase Plan*

Assuming the approval of Proposal 5 and Proposal 6, following the closing of the Business Combination, the post-combination company will have the Incentive Plan and the ESPP. For a description of these plans see "*Proposal No. 5 — Incentive Plan Proposal*" and "*Proposal No. 6 — ESPP Proposal*."

### *Limitation on Liability and Indemnification of Directors and Officers*

Upon the completion of the Business Combination, the Amended and Restated Certificate of Incorporation will contain provisions that limit the liability of its current and former executive officers and directors for monetary damages to the fullest extent permitted by Delaware law. Delaware law provides that directors of a corporation will not be personally liable for monetary damages for any breach of fiduciary duties as directors, except liability:

- for any breach of a director's duty of loyalty to the corporation or its stockholders;

- for any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

- under Section 174 of the Delaware General Corporation Law (unlawful payment of dividends or redemption of shares); or

- for any transaction from which the director derives an improper personal benefit.

Such limitation of liability does not apply to liabilities arising under federal securities laws and does not affect the availability of equitable remedies, such as injunctive relief or rescission.

The Amended and Restated Certificate of Incorporation and the bylaws of the post-combination company will provide that it is required to indemnify its executive officers and directors to the fullest extent permitted by Delaware law. The post-combination company's bylaws will also provide that, upon satisfaction of certain conditions, it shall advance expenses incurred by an executive officer and director in advance of the final disposition of any action or proceeding, and permit the post-combination company to secure insurance on behalf of any officer, director, employee, or other agent for any liability arising out of his or her actions in that capacity regardless of whether the post-combination company would otherwise be permitted to indemnify him or her under the provisions of Delaware law. The Amended and Restated Certificate of Incorporation and bylaws of the post-combination company will also provide its board of directors with discretion to indemnify its other officers, employees, and other agents when determined appropriate by the board. The post-combination company expects to enter into agreements to indemnify its directors and executive officers. With certain exceptions, these agreements provide for indemnification for related expenses, including, among other things, attorneys' fees, judgments, fines, and settlement amounts incurred by any of these individuals in any action or proceeding. It is believed that these bylaw provisions and indemnification agreements are necessary to attract and retain qualified persons as directors and officers. The post-combination company is expected to maintain customary directors' and officers' liability insurance.

The limitation of liability and indemnification provisions in the Amended and Restated Certificate of Incorporation and bylaws of the post-combination company may discourage stockholders from bringing a lawsuit against the post-combination company's directors for breach of their fiduciary duty. They may also reduce the likelihood of derivative litigation against the post-combination company directors and officers, even though an action, if successful, might benefit the post-combination company and other stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent that the post-combination company pays the costs of settlement and damage awards against directors and officers as

required by these indemnification provisions. At present, there is no pending litigation or proceeding involving any Velodyne directors, officers, or employees for which indemnification is sought, and Velodyne is not aware of any threatened litigation involving Velodyne that may result in claims for indemnification under Velodyne agreements or governing documents.

*2019 Director Compensation*

With respect to the year ended December 31, 2019, Velodyne's non-employee directors did not receive cash compensation for their service on Velodyne's board of directors and Velodyne did not have a formal non-employee director compensation program in 2019. Velodyne's board exercised its discretion to grant RSUs to certain non-employee directors serving in 2019. Mr. David Hall, Velodyne's founder and chief executive officer during fiscal year 2019, did not and does not receive any additional compensation for his service as a member of Velodyne's board. Joseph Michael Jellen, Velodyne's chief commercial officer and former president, served as a director during the year ended December 31, 2019. Mr. Jellen was compensated in his capacity as an employee and executive officer, but he did not receive compensation for his service as member of Velodyne's board during the year ended December 31, 2019.

The following table sets forth information regarding the compensation of Velodyne's non-employee directors during the year ended December 31, 2019:

| Name | Stock Awards ($)[1] | Total ($) |
|---|---|---|
| Joseph B. Culkin | — | — |
| Ken Goldman[2] | $710,250 | $710,250 |
| Jennifer Li[3] | $710,250 | $710,250 |
| Barbara Samardzich[4] | — | — |
| Christopher Thomas[5] | — | — |

(1) Represents the aggregate grant date fair value of RSUs granted to non-employee directors in 2019, computed in accordance with FASB ASC Topic 718. See Note 7 to Velodyne's consolidated financial statements included elsewhere in this proxy statement for a discussion of the assumptions made by Velodyne in determining the grant date fair value of its equity awards.

(2) As of December 31, 2019, Mr. Goldman held 4,166 RSUs that will vest only if the liquidity-event vesting requirement occurs , which is expected to be deemed to have occurred following the completion of the Business Combination, by June 27, 2021. Mr. Goldman resigned from Velodyne's board of directors in June 2019.

(3) As of December 31, 2019, Ms. Li held 25,000 RSUs that vest quarterly over four years beginning in September 2018. These RSUs are also subject to a liquidity-event vesting requirement, which is expected to be deemed to have occurred following the completion of the Business Combination.

(4) As of December 31, 2019, Ms. Samardzich held 35,000 RSUs that vest quarterly over four years beginning in October 2016. These RSUs are also subject to a liquidity-event vesting requirement, which is expected to be deemed to have occurred following the completion of the Business Combination.

(5) Mr. Thomas joined the Velodyne board in July 2020.

*Post-Business Combination Executive Compensation*

Following the consummation of the Business Combination, Velodyne intends to develop an executive compensation program that is designed to align compensation with the post-combination company's business objectives and the creation of stockholder value, while enabling the post-combination company to attract, retain, incentivize and reward individuals who contribute to the long-term success of the post-combination company. Decisions on the executive compensation program will be made by the compensation committee.

231

**MANAGEMENT AFTER THE BUSINESS COMBINATION**

**Executive Officers and Directors After the Business Combination**

Upon the consummation of the Business Combination, the business and affairs of the post-combination company will be managed by or under the direction of the board of directors of the post-combination company. The directors and executive officers of the post-combination company upon consummation of the Business Combination will include the following:

| Name | Age | Position |
|---|---|---|
| *Executive Officers* | | |
| **David S. Hall** | 68 | Executive Chairman |
| **Dr. Anand Gopalan** | 41 | President, Chief Executive Officer and Director |
| **Andrew Hamer** | 56 | Chief Financial Officer and Treasurer |
| **Marta Thoma Hall** | 68 | Chief Marketing Officer and Director |
| **Joseph Michael Jellen** | 49 | Chief Commercial Officer |
| **Thomas Tewell** | 53 | Chief Operating Officer |
| **Mathew Rekow** | 50 | Chief Technology Officer |
| **Michael Vella** | 56 | General Counsel |
| *Other Key Employees* | | |
| **Dr. Mircea Gradu** | 56 | Senior Vice President of Quality and Validation |
| *Non-Employee Directors* | | |
| **Joseph B. Culkin** | 65 | Director |
| **Barbara Samardzich** | 61 | Director |
| **Christopher Thomas** | 45 | Director |
| **James A. Graf** | 55 | Director |
| **Michael E. Dee** | 64 | Director |

(1)   Member of the audit committee, effective upon completion of the Business Combination.

(2)   Member of the compensation committee, effective upon completion of the Business Combination.

**Executive Officers**

*David S. Hall.*   Upon the consummation of the Business Combination, Mr. Hall will serve as the post-combination company's executive chairman. Mr. Hall served as chief executive officer and a member of the board of directors of Velodyne's predecessor, Velodyne Acoustics, Inc., from 1983, when he founded the company, until Velodyne was formed as an independent entity in December 2015. Mr. Hall served as the chief executive officer and a member of the board of directors of Velodyne since December 2015 and transitioned from chief executive officer to executive chairman, effective January 2020. In his role as executive chairman, Mr. Hall will remain actively involved in the post-combination company's product and technology development strategy. Since December 2015, Mr. Hall has also served as chief executive officer of Velodyne Acoustics, LLC, a currently unrelated entity holding the assets of Velodyne's former acoustics business following a spin-off transaction in August 2016. Throughout his career, Mr. Hall has been inventing and building products across diverse industries including precision machining, loudspeaker design, acoustical engineering, electronics, microprocessors, real-time systems, vision-recovery technology and robotics. His inventions include the servo-driven subwoofer, which established Velodyne Acoustics as a leading company in the home theater movement of the 1980s and 1990s. After competing as one of the original entrants in the DARPA Grand Challenge, in 2005 Mr. Hall invented 3D Lidar to give autonomous vehicles real-time 360-degree vision. Possessing substantial experience in the industry, Mr. Hall is a thought leader on matters related to lidar and its pivotal role in the autonomous revolution. In 2018, Mr. Hall was honored as the Inventor of the Year by the Intellectual Property Owners Education Foundation in recognition of his significant contributions to lidar technology. Mr. Hall holds a B.S. from Case Western Reserve University.

232

*Dr. Anand Gopalan.*    Upon the consummation of the Business Combination, Dr. Gopalan will serve as the post-combination company's chief executive officer, president and a member of the post-combination company Board. Dr. Gopalan has served as Velodyne's chief executive officer since January 2020 and as a member of Velodyne's board of directors since July 2019. Prior to becoming Velodyne's chief executive officer in January 2020, Dr. Gopalan had served as Velodyne's chief technology officer since June 2016. In his role as chief technology officer, Dr. Gopalan was responsible for all the new technology and advanced product development at Velodyne. He further worked alongside Mr. Hall on technology and business strategy, and was the technical face of Velodyne with all its major customers. Dr. Gopalan brings close to fifteen years of experience in electrical engineering, opto-electronics and semiconductors to the post-combination company. Previously, Dr. Gopalan served in various technology executive roles, most recently as vice president of engineering at Rambus Incorporated, a microchip interface and architecture company, from March 2013 until May 2016. From June 2005 to March 2013, Dr. Gopalan served in various roles, including as director of R&D and mixed-signal IP development at Kawasaki Microelectronics, Inc., a microchip company. Dr. Gopalan holds a B.E. in electronics from the University of Mumbai, an M.S. in electrical engineering and a Ph.D. in microsystems from Rochester Institute of Technology.

*Andrew Hamer.*    Upon the consummation of the Business Combination, Mr. Hamer will serve as the post-combination company's chief financial officer and treasurer. Mr. Hamer has served as Velodyne's chief financial officer and treasurer since July 2019. Mr. Hamer served as interim chief financial officer and treasurer from April 2019 to July 2019. Previously, from October 2017 to September 2018, Mr. Hamer served as chief financial officer of Anomali, Inc. From October 2016 to April 2017, he served as chief financial officer of Sungevity, Inc. From June 2010 to February 2016, Mr. Hamer served as chief financial officer of ON24 Inc. Prior to that, Mr. Hamer was chief financial officer of Keynote Systems, Inc. and he held chief financial officer and vice president of finance and administration positions at KnowNow, Inc., IQ Labs and Intraspect Software, Inc. Prior to 2000, Mr. Hamer served in various financial positions at Excite@Home and Sybase, Inc. Mr. Hamer holds a Master of Accountancy from Florida International University and a B.S. in Accounting from the State University of New York at Binghamton.

*Marta Thoma Hall.*    Upon the consummation of the Business Combination, Ms. Hall will serve as the post-combination company's chief marketing officer and a member of the post-combination company Board. Ms. Hall served as vice president of marketing of Velodyne's predecessor, Velodyne Acoustics, Inc., from 2009 to 2010 and then as president from 2010 until Velodyne was formed as an independent entity in December 2015. Ms. Hall served as Velodyne's president and chief business development officer from December 2015 to January 2020. Ms. Hall has served as Velodyne's chief marketing officer and a member of Velodyne's board of directors since January 2020. Since 2009, Ms. Hall has helped grow Velodyne through a focus on marketing, business development, and leadership. During this time, alongside David Hall, Velodyne's executive chairman, Ms. Hall led the company through the transition from primarily selling acoustics equipment to developing and selling lidar. Before joining Velodyne's predecessor in 2009, Ms. Hall operated her own business, engaging with civic entities nationwide. Ms. Hall received the Most Influential Woman in Business Award in 2019 from the San Francisco Business Times. Ms. Hall holds a Master's Degree from San Francisco State University and a Bachelor's Degree from the University of California, Berkeley.

*Joseph Michael Jellen.*    Upon the consummation of the Business Combination, Mr. Jellen will serve as the post-combination company's chief commercial officer. Mr. Jellen has served as Velodyne's chief commercial officer since January 2016. Mr. Jellen previously served as Velodyne's president from January 2016 to December 2019 and as a member of Velodyne's board of directors from August 2016 to December 2019. From November 2014 to May 2015, Mr. Jellen served as vice president of Omron Adept Technology, Inc., a robotics and vision technology company. From May 2004 to August 2014, Mr. Jellen served in various capacities with subsidiaries of Danaher Corporation including Danaher Motion LLC, and Kollmorgen Corporation, most recently as vice president and general manager of vehicles, hybrid and industrial. Prior to Danaher Corporation, Mr. Jellen worked for Motion Engineering Inc., from September 2001 to May 2004 as director of sales, from October 1998 to September 2001 as field sales engineer and sales manager, and from October 1996 to October 1998 as controls applications engineer. Mr. Jellen served from September 1993 to October 1996 as manufacturing engineer at Seagate Technology PLC. Mr. Jellen holds a B.S.E.E. in Electrical Engineering from Marquette University and an M.B.A from Boston University.

*Thomas Tewell.*    Upon the consummation of the Business Combination, Mr. Tewell will serve as the post-combination company's chief operating officer. Mr. Tewell has served as Velodyne's chief operating officer since September 2018. Mr. Tewell brings more than 30 years of embedded engineering and executive-level engineering management experience to the post-combination company, and over the last two decades, has had a specific focus on automotive electronics as well as GPU/graphics pipeline technologies. Prior to serving as Velodyne's chief operating officer, Mr. Tewell was Velodyne's senior vice president advanced manufacturing from September 2017 to June 2018 and chief manufacturing technology officer from June 2018 to September 2018. From February 2016 to September 2017, Mr. Tewell also served as chief technology officer at VeriSilicon Holdings Co., Ltd., where he was responsible for worldwide ASIC system solutions. From January 2015 to February 2016, Mr. Tewell served as senior manager at NXP Semiconductors. Previously, Mr. Tewell worked at Freescale Semiconductor from September 2013 until January 2015, most recently in worldwide software engineering for i.MX/Kinetis. Prior to that, he was execution manager for Tegra Automotive at NVIDIA and served in various roles with Fujitsu Semiconductor America, Inc., most recently as director of engineering for North and South America.

*Mathew Rekow*.    Upon the consummation of the Business Combination, Mr. Rekow will serve as the post-combination company's chief technology officer. Mr. Rekow has served as Velodyne's chief technology officer since January 2020. Prior to that, Mr. Rekow was previously Velodyne's director of optical engineering from January 2018 to January 2020 and senior principal electro-optical engineer from July 2015 to January 2018. From April 2009 to June 2015, Mr. Rekow served as applications lab manager for ESI. Mr. Rekow holds a M.S. in Materials Engineering from Colorado State University, and a B.S. in Physics from the University of Idaho.

*Michael Vella*.    Upon the consummation of the Business Combination, Mr. Vella will serve as the post-combination company's general counsel, where he will advise the company on its diverse legal and regulatory matters. Mr. Vella joined Velodyne in May 2020. From January 1, 2019 to May 2020, Mr. Vella worked as a Partner of nTheta Limited (a cross-border consulting company) and as Vice President of Business Development at Managed Discovery (an electronic discovery company). From June 2010 until December 2018, Mr. Vella worked as Partner at the international law firm of Jones Day. Previously, Mr. Vella worked as law firm Partner at Morrison & Foerster LLP, as an associate attorney in other US law firms, and as a Judicial Clerk for the United States Claims Court. Mr. Vella is a California-licensed lawyer with over 25 years of international legal experience in both the US and Asia. During his legal career, Mr. Vella has advised both tech startups and multinationals on a broad range of legal matters involving international business operations, IP challenges, litigation, and compliance matters.

### Other Key Employees

*Dr. Mircea Gradu.*    Upon the consummation of the Business Combination, Dr. Gradu will serve as the post-combination company's senior vice president of product and quality. Dr. Gradu has served as Velodyne's senior vice president of product and quality since September 2019 and has started with Velodyne in 2017 as senior vice president of quality and validation. With over 25 years of experience in the automotive and commercial vehicle industry, Dr. Gradu started his career at Daimler AG in Stuttgart, Germany, served as vice president of transmission powertrain and driveline engineering and head of virtual analysis at FCA Fiat Chrysler Automobiles from September 2007 to March 2014 and, prior to Velodyne, was executive director engineering and quality at Hyundai Motor America where he worked from April 2014 to August 2017. An SAE Fellow, Dr. Gradu has been awarded over 45 patents and has published numerous technical papers. Dr. Gradu holds a master's degree in mechanical engineering from the Polytechnic Institute of Bucharest and a doctorate in mechanical engineering from the Technical University of Stuttgart, Germany.

### Non-Employee Directors

*Joseph B. Culkin*.    Upon the consummation of the Business Combination, Mr. Culkin will serve on the post-combination company Board. Mr. Culkin has served as a member of Velodyne's board of directors since September 2016. In 1987, Mr. Culkin founded New Logic Research, Inc., a provider of high-performance membrane filtration systems, and has served in a variety of capacities including presently as chief technology officer. Mr. Culkin holds a B.S. in chemical engineering from the University of Pennsylvania, an M.A. in theoretical fluid mechanics from Johns Hopkins University, and a PhD in chemical engineering

234

from Northwestern University. We believe Mr. Culkin is qualified to serve as a member of the post-combination company Board based on his operations and strategy experience in the scientific manufacturing industry.

*Barbara Samardzich.*   Upon the consummation of the Business Combination, Ms. Samardzich will serve on the post-combination company Board. Ms. Samardzich has served as a member of Velodyne's board of directors since October 2016. Ms. Samardzich retired from Ford Motor Company in October 2016 after 26 years in various roles. From November 2005 to January 2016, Ms. Samardzich held various senior leadership positions with Ford Motor Company, including most recently as chief operating officer of Ford Europe, and prior to that, from November 2005 to October 2010, Ms. Samardzich served as the vice president of powertrain operation. Prior to joining Ford, Ms. Samardzich held various engineering positions at Westinghouse Electric Corporation. Ms. Samardzich currently serves on the board of directors of Adient plc, where she is also a member of the audit committee and is chair of the compensation committee, BRP Inc., where she is also chair of the Investment and Risk Committee, and Aktiebolaget SKF. Previously, Ms. Samardzich served on the board of directors of MTS Systems Corporation. Ms. Samardzich holds a B.S. in mechanical engineering from University of Florida, an M.S. in mechanical engineering from Carnegie Mellon University, and an M.S. in engineering management from Wayne State University. We believe that Ms. Samardzich is qualified to serve as a member of the post-combination company Board based on her experience serving as a director of numerous public and private companies and her significant international automotive industry experience.

*Christopher (Chris) Thomas.*   Upon the consummation of the Business Combination, Mr. Thomas will serve on the post-combination company Board. Mr. Thomas was most recently a partner with McKinsey & Company from January 2011 to June 2020. Mr. Thomas served as co-Managing Partner for the Firm's Global Digital Strategy service line as well as its Global IoT service line, and as the leader of its Asia Semiconductor Practice. Mr. Thomas' client and research work focused on the artificial intelligence, automotive, cloud computing, smart home, server and storage end markets; the automotive, wireless, networking, power, analog, flash memory, and CPU product segments; and the semiconductor equipment, foundry and fabless verticals. Mr. Thomas also founded the CEO Circle, a regular gathering of more than 200 Chinese CxOs and China heads of multinational companies. Prior to McKinsey, Mr. Thomas spent ten years at Intel. Mr. Thomas was the General Manager of Intel China and also held multiple executive roles at Intel's global headquarters. These included Chief of Staff to Intel's Chief Sales, Marketing and Strategy Officer. Chris began his career as a private equity investor at The Blackstone Group in New York City. Mr. Thomas is a Visiting Professor at Tsinghua University and an invited member of the US-China Track II Dialogues on the Digital Economy. Mr. Thomas received an MBA from Stanford Business School, where he was an Arjay Miller Scholar, in 2000; a Master of Arts in Political Science, from Stanford University in 2000; and a Bachelor of Science in Economics, summa cum laude, from the Wharton School in 1996. We believe that Mr. Thomas is qualified to serve as a member of the post-combination company's board of directors based on his extensive international consulting and technology experience and financial expertise.

*James A. Graf.*   Upon the consummation of the Business Combination, Mr. Graf will serve on the post-combination company Board. Mr. Graf is currently the chief executive officer of Graf and has been in this role since Graf's inception in June 2018 and was a member of our board of directors from June 2018 to October 2019. Mr. Graf was a director of Platinum Eagle Acquisition Corp., from January 2018 to March 2019. Mr. Graf served as the vice president, chief financial officer and treasurer of Double Eagle Acquisition Corp. from its inception in June 2015 through its business combination with Williams Scotsman, Inc. in November 2017. He served as vice president, chief financial officer, treasurer and secretary of Silver Eagle Acquisition Corp. from its inception in April 2013 through Silver Eagle's business combination with VDTH, and he served as vice president, chief financial officer, treasurer and secretary of GEE from its inception in February 2011 to its business combination with Row 44, Inc. and Advanced Inflight Alliance AG in January 2013. He was vice chairman of Global Entertainment AG, the German entity holding GEE's equity in AIA from 2013 to 2014 and special advisor to GEE in 2013. He served as a special advisor to VDTH from 2015 to 2016. From 2008 to 2011 Mr. Graf served as a managing director of TC Capital Ltd., an investment bank, in Singapore. From 2007 to 2008, Mr. Graf was engaged as a consultant to provide financial advisory services to Metro-Goldwyn-Mayer, Inc. In 2001, Mr. Graf founded and became chief executive officer of Praedea, an enterprise software company with operations in the United States, Malaysia

235

and Ukraine. The assets of Praedea were sold in 2006 to Mergent Inc, a wholly-owned subsidiary of Xinhua Finance Ltd., and renamed Mergent Data Technology, Inc., where Mr. Graf continued to serve as chief executive officer from 2006 to 2007. Praedea was renamed PSIC, and currently serves as an investment holding company for Mr. Graf. Mr. Graf continues to be chief executive officer of PSIC. Prior to founding Praedea, Mr. Graf was a managing director at Merrill Lynch, in Singapore from 1998 to 2000 and a consultant to Merrill Lynch in 2001. From 1996 to 1998, Mr. Graf served as a director and then managing director and president of Deutsche Bank's investment banking entity in Hong Kong, Deutsche Morgan Grenfell (Hong Kong) Ltd. From 1993 to 1996, he was a vice president at Smith Barney in Hong Kong and Los Angeles. From 1987 to 1993, Mr. Graf was an analyst and then associate at Morgan Stanley in New York, Los Angeles, Hong Kong and Singapore. Mr. Graf received a Bachelor of Arts degree from the University of Chicago in 1987. We believe Mr. Graf is qualified to serve as a member of the post-combination company Board based on his extensive leadership experience, background in corporate finance and mergers and acquisitions.

*Michael E. Dee.*   Upon the consummation of the Business Combination, Mr. Dee will serve on the post-combination company Board. Currently Mr. Dee is the President and Chief Financial Officer of Graf and has been in this role since September 2018 and also serves as a member of Graf's board of directors. Mr. Dee was a Senior Advisor to the President for Finance of the Asian Infrastructure Investment Bank in Beijing from January to July 2016 and also served as a member of its Investment Committee. From 2010 to 2015, Mr. Dee managed various private investments, including providing advice to SeaOne Maritime Corp., a startup focused on the monetization of natural gas and gas liquids and based in Texas. Mr. Dee was Senior Managing Director — International of Temasek Holdings Private Limited, Singapore's sovereign investment company, from 2008 to 2010 and also served as a senior member of its Management Committee and Investment Committee. Prior to joining Temasek, Mr. Dee worked at Morgan Stanley from 1981 to 2007 in a variety of senior positions in its capital markets, mergers and acquisitions and firm management divisions, including acting as Regional Chief Executive Officer for Southeast Asia and as Head of Morgan Stanley's Houston office. Mr. Dee served as the regional chairman of the Houston branch of Teach For America, Inc. and as a director of the Greater Houston Partnership. He was also appointed Singapore's Honorary Consul General in Houston. Mr. Dee received a Bachelor of Science degree in Economics from the Wharton School of the University of Pennsylvania in 1981. We believe Mr. Dee is qualified to serve as a member of the post-combination company Board based on his extensive experience in capital markets, corporate finance, private equity and mergers and acquisitions.

### Family Relationships

David Hall, the post-combination company's executive chairman, and Marta Thoma Hall, the post-combination company's chief marketing officer and a member of the post-combination company Board, are married. Joseph Culkin, a member of the post-combination company Board, is the brother-in-law of David Hall. Outside of the foregoing relationships, there are no other family relationships among any of our directors or executive officers.

### Board Composition

Upon the consummation of the Business Combination, the post-combination company Board will be comprised of eight directors, of which five to seven directors will be nominated by Velodyne, including the chief executive officer of the post-combination company, with such appointments to be approved by Graf and two directors will be nominated by Graf, who shall be considered "independent" for NYSE purposes, to be approved by Velodyne.

### Director Independence

Upon the consummation of the Business Combination, the post-combination company Board is expected to determine that each of the directors on the post-combination company Board other than David Hall, Anand Gopalan, Joseph Culkin and Marta Thoma Hall will qualify as independent directors, as defined under the listing rules of the NYSE. In addition, the post-combination company will be subject to the rules of the SEC and NYSE relating to the memberships, qualifications, and operations of the audit committee, as discussed below.

236

**Controlled Company**

Because Mr. Hall will control a majority of the outstanding voting power of the post-combination company upon consummation of the Business Combination, the post-combination company will be a "controlled company" under the corporate governance rules of the NYSE. Therefore, the post-combination company will not be required to have a majority of its board of directors be independent, nor will the post-combination company be required to have a compensation committee or an independent nominating function. In light of the post-combination company's status as a controlled company, the post-combination company Board is not expected to have (i) a majority of independent directors or (ii) a nominating committee of the post-combination company Board. The post-combination company's full board of directors will be directly responsible for nominating members of the post-combination company Board. The post-combination company will have an independent compensation committee as described below.

**Board Oversight of Risk**

Upon the consummation of the Business Combination, one of the key functions of the post-combination company Board will be informed oversight of the post-combination company's risk management process. The post-combination company Board does not anticipate having a standing risk management committee, but rather anticipates administering this oversight function directly through the post-combination company Board as a whole, as well as through various standing committees of the post-combination company Board that address risks inherent in their respective areas of oversight. For example, the post-combination company audit committee will be responsible for overseeing the management of risks associated with the post-combination company's financial reporting, accounting, and auditing matters; the post-combination company's compensation committee will oversee the management of risks associated with our compensation policies and programs.

**Board Committees**

Upon the consummation of the Business Combination, the post-combination company Board will establish an audit committee and a compensation committee. The post-combination company Board may establish other committees to facilitate the management of the post-combination company's business. The post-combination company Board and its committees will set schedules for meeting throughout the year and can also hold special meetings and act by written consent from time to time, as appropriate. The post-combination company Board will delegate various responsibilities and authority to its committees as generally described below. The committees will regularly report on their activities and actions to the full board of directors. Each member of each committee of the post-combination company Board is expected to qualify as an independent director in accordance with the listing standards of the NYSE. Each committee of the post-combination company Board will have a written charter approved by the post-combination company Board. Upon the consummation of the Business Combination, copies of each charter will be posted on the post-combination company's website at www.velodynelidar.com under the Investor Relations section. The inclusion of the post-combination company's website address in this proxy statement does not include or incorporate by reference the information on Velodyne's website into this proxy statement. Members will serve on these committees until their resignation or until otherwise determined by the post-combination company Board.

*Audit Committee*

Upon the consummation of the Business Combination, the members of the audit committee will be Christopher Thomas, Barbara Samardzich and Michael Dee, each of whom can read and understand fundamental financial statements. The post-combination company Board has determined that each of Mr. Thomas, Ms. Samardzich and Mr. Dee is independent under the rules and regulations of the SEC and the listing standards of the NYSE applicable to audit committee members. Mr. Thomas will be the chair of the audit committee. The post-combination company Board has determined that each of [•] and [•] qualify as an audit committee financial expert within the meaning of SEC regulations and meet the financial sophistication requirements of the NYSE. The post-combination company's audit committee will assist the post-combination company Board with its oversight of the following: the integrity of the post-combination company's financial statements; the post-combination company's compliance with legal and

237

regulatory requirements; the qualifications, independence, and performance of the independent registered public accounting firm; the design and implementation of the post-combination company's internal audit function and risk assessment and risk management. Among other things, the post-combination company's audit committee will be responsible for reviewing and discussing with our management the adequacy and effectiveness of the post-combination company's disclosure controls and procedures. The audit committee will also discuss with the post-combination company's management and independent registered public accounting firm the annual audit plan and scope of audit activities, scope and timing of the annual audit of the post-combination company's financial statements, and the results of the audit, quarterly reviews of the post-combination company's financial statements and, as appropriate, will initiate inquiries into certain aspects of the post-combination company's financial affairs. The post-combination company's audit committee will be responsible for establishing and overseeing procedures for the receipt, retention, and treatment of any complaints regarding accounting, internal accounting controls or auditing matters, as well as for the confidential and anonymous submissions by the post-combination company's employees of concerns regarding questionable accounting or auditing matters. In addition, the post-combination company's audit committee will have direct responsibility for the appointment, compensation, retention, and oversight of the work of the post-combination company's independent registered public accounting firm. The post-combination company's audit committee will have sole authority to approve the hiring and discharging of the post-combination company's independent registered public accounting firm, all audit engagement terms and fees, and all permissible non-audit engagements with the independent auditor. The post-combination company's audit committee will review and oversee all related person transactions in accordance with the post-combination company's policies and procedures.

*Compensation Committee*

Upon the consummation of the Business Combination, the members of the post-combination company's compensation committee will be [•] and [•] . [•] will be the chair of the compensation committee. Each member of the post-combination company's compensation committee is independent under the rules and regulations of the SEC and the listing standards of the NYSE applicable to compensation committee members. The post-combination company's compensation committee will assist the post-combination company Board in discharging certain of the post-combination company's responsibilities with respect to compensating the post-combination company's executive officers, and the administration and review of the post-combination company's incentive plans for employees and other service providers, including the post-combination company's equity incentive plans, and certain other matters related to the post-combination company's compensation programs.

**Code of Conduct**

Upon the consummation of the Business Combination, the post-combination company Board will adopt a Code of Conduct, or the Code. The Code will apply to all of our employees, officers, and directors, as well as all of our contractors, consultants, suppliers, and agents in connection with their work for us. Upon the consummation of the Business Combination, the full text of the post-combination company's code of conduct will be posted on the post-combination company's website at www.velodynelidar.com under the Investor Relations section. The post-combination company intends to disclose future amendments to, or waivers of, the post-combination company's Code, as and to the extent required by SEC regulations, at the same location on the post-combination company's website identified above or in public filings. Information contained on the post-combination company's website is not incorporated by reference into this proxy statement, and you should not consider information contained on the post-combination company's website to be part of this proxy statement.

**Compensation Committee Interlocks and Insider Participation**

None of the intended members of the post-combination company's compensation committee has ever been a member of the board of directors or compensation committee of any other entity that has or has had one or more executive officers serving as a member of the post-combination company Board or compensation committee.

238

**Non-Employee Director Compensation**

Prior to the Business Combination, Velodyne has generally not provided any cash compensation to non-employee directors for their service on Velodyne's board. Velodyne has had a policy of reimbursing all non-employee directors for their reasonable out-of-pocket expenses in connection with attending board of directors meetings. From time to time Velodyne has granted stock options to certain non-employee directors, typically in connection with a non-employee director's initial appointment to the board.

Upon the consummation of the Business Combination, the post-combination company Board intends to approve a non-employee director compensation program. Pursuant to this program, the post-combination company's non-employee directors will receive both cash and equity compensation for their service as directors.

**DESCRIPTION OF SECURITIES**

The following summary of the material terms of the post-combination company's securities following the Business Combination is not intended to be a complete summary of the rights and preferences of such securities. The full text of the proposed Amended and Restated Certificate of Incorporation is attached as Annex B to this proxy statement. We urge you to read our Amended and Restated Certificate of Incorporation in its entirety for a complete description of the rights and preferences of the post-combination company's securities following the Business Combination.

**Authorized and Outstanding Stock**

The Amended and Restated Certificate of Incorporation authorizes the issuance of 2,250,000,000 shares of common stock, $0.0001 par value per share and 25,000,000 shares of preferred stock, par value $0.0001 per share. The outstanding shares of our common stock are, and the shares of common stock issuable in connection with the Business Combination pursuant to the Merger Agreement and the PIPE Investment will be, duly authorized, validly issued, fully paid and non-assessable. As of the record date for the Special Meeting, there were 17,549,365 shares of common stock outstanding, held of record by approximately [•] holders of common stock, no shares of preferred stock outstanding and 38,293,138 warrants outstanding held of record by approximately [•] holders of warrants. Such numbers do not include DTC participants or beneficial owners holding shares through nominee names.

*Units*

Each unit has an offering price of $10.00 and consists of one share of common stock and one redeemable warrant. Each warrant entitles the holder thereof to purchase three-quarters of one share of our common stock at a price of $11.50 per whole share. Pursuant to the warrant agreement, a warrantholder may exercise its warrants only for a whole number of shares of common stock. No fractional shares will be issued upon exercise of the warrants. If, upon exercise of the warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round down to the nearest whole number the number of shares of common stock to be issued to the warrantholder.

*Common Stock*

The Amended and Restated Certificate of Incorporation provides that the common stock will have identical rights, powers, preferences and privileges to current common stock.

*Voting Power*

Except as otherwise required by law or as otherwise provided in any certificate of designation for any series of preferred stock, under the current certificate of incorporation and the Amended and Restated Certificate of Incorporation, the holders of common stock possess or will possess, as applicable, all voting power for the election of our directors and all other matters requiring stockholder action and are entitled or will be entitled, as applicable, to one vote per share on matters to be voted on by stockholders. The holders of common stock shall at all times vote together as one class on all matters submitted to a vote of the holders of common stock under both the current certificate of incorporation and the Amended and Restated Certificate of Incorporation.

*Dividends*

Subject to the rights, if any of the holders of any outstanding shares of preferred stock, under both the current certificate of incorporation and the Amended and Restated Certificate of Incorporation, holders of common stock will be entitled to receive such dividends and other distributions, if any, as may be declared from time to time by our Board in its discretion out of funds legally available therefor and shall share equally on a per share basis in such dividends and distributions.

*Liquidation, Dissolution and Winding Up*

In the event of the voluntary or involuntary liquidation, dissolution or winding-up of the post-combination company under both the current certificate of incorporation and the Amended and Restated

240

Certificate of Incorporation, the holders of common stock will be entitled to receive all the remaining assets of the post-combination company available for distribution to stockholders, ratably in proportion to the number of shares of common stock held by them, after the rights of the holders of the preferred stock have been satisfied.

*Preemptive or Other Rights*

Under the current certificate of incorporation, our stockholders have no preemptive or other subscription rights and there are no sinking fund or redemption provisions applicable to our common stock.

*Election of Directors*

Our Board is currently divided into three classes, Class I, Class II and Class III, with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a three-year term. The term of office of the Class I directors will expire at our first annual meeting of stockholders. The term of office of the Class II directors will expire at the second annual meeting of stockholders. The term of office of the Class III directors will expire at the third annual meeting of stockholders. However, if the Business Combination Proposal, the NYSE Stock Issuance Proposal, the Charter Approval Proposal and the Incentive Plan Proposal are approved at the Special Meeting, this structure will change.

Under the terms of the Amended and Restated Certificate of Incorporation, upon the effectiveness thereof, the term of the Class I Directors in place at such time will expire at the first annual meeting of the stockholders of the post-combination company following the effectiveness of the Amended and Restated Certificate of Incorporation; the term of the Class II Directors in place at such time will expire at the second annual meeting of the stockholders of the post-combination company following the effectiveness of the Amended and Restated Certificate of Incorporation; and the term of the Class III Directors in place at such time will expire at the third annual meeting of the stockholders of the post-combination company following the effectiveness of the Amended and Restated Certificate of Incorporation.

### Preferred Stock

Our Amended and Restated Certificate of Incorporation provides that shares of preferred stock may be issued from time to time in one or more series. Our Board is authorized to fix the voting rights, if any, designations, powers, preferences and relative, participating, optional, special and other rights, if any, and any qualifications, limitations and restrictions thereof, applicable to the shares of each series. Our Board is able, without stockholder approval, to issue preferred stock with voting and other rights that could adversely affect the voting power and other rights of the holders of the common stock and could have anti-takeover effects. The ability of our Board to issue preferred stock without stockholder approval could have the effect of delaying, deferring or preventing a change of control of us or the removal of existing management. We have no preferred stock outstanding at the date hereof. Although we do not currently intend to issue any shares of preferred stock, we cannot assure you that we will not do so in the future.

### Capital Stock Prior to the Business Combination

We are providing stockholders with the opportunity to redeem all or a portion of their public shares of common stock upon the consummation of the Business Combination at a per-share price, payable in cash, equal to the aggregate amount on deposit in the Trust Account as of two business days prior to the Closing, including interest not previously released to the Company to pay its franchise and income taxes, divided by the number of then outstanding public shares, subject to the limitations described herein. Our Initial Stockholders, directors and officers have agreed to waive their redemption rights with respect to their shares of common stock in connection with the consummation of the Business Combination. Our Initial Stockholders have also agreed to waive their right to a conversion price adjustment with respect to any shares of our common stock they may hold in connection with the consummation of the Business Combination.

We will consummate the Business Combination only if a majority of our outstanding shares of common stock entitled to vote and actually cast thereon at the Special Meeting are voted in favor of the Business Combination Proposal at the Special Meeting. However, the participation of our Sponsor, officers and directors, or their affiliates in privately negotiated transactions (as described in this proxy statement), if any, could result in the approval of the Business Combination even if a majority of the stockholders vote, or indicate their intention to vote, against the Business Combination.

Our Initial Stockholders have agreed to vote their shares of common stock in favor of the Business Combination. As of the date of filing this proxy statement, our Initial Stockholders, directors and officers do not currently hold any public shares. Public stockholders may elect to redeem their public shares whether they vote for or against the Business Combination.

Pursuant to our current certificate of incorporation, if we are unable to consummate a business combination by the applicable deadline, we will: (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses), divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject in each case to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. Our Initial Stockholders, officers and directors have agreed to waive their redemption rights with respect to the Founder Shares: (a) in connection with the consummation of a business combination; (b) if we fail to consummate our initial business combination by the applicable deadline; (c) in connection with a tender offer; and (d) otherwise upon our liquidation or in the event our Board resolves to liquidate the Trust Account and ceases to pursue the consummation of a business combination prior to the applicable deadline. Our Initial Stockholders have also agreed to waive their right to a conversion price adjustment with respect to any shares of our common stock they may hold in connection with the consummation of the Business Combination. However, if our Initial Stockholders or any of our officers, directors or affiliates acquire public shares, they will be entitled to redemption rights with respect to such public shares if we fail to consummate our initial business combination within the required time period.

In the event of a liquidation, dissolution or winding up of the Company after our initial business combination, holders of our common stock are entitled to share ratably in proportion to the number of shares of common stock in all assets remaining available for distribution to them after payment of the debts and other liabilities and after provision is made for each class of stock, if any, having preference over the common stock.

Our stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to our common stock, except that upon the consummation of our initial business combination, subject to the limitations described herein, we will provide our stockholders with the opportunity to redeem their shares of our common stock for cash equal to their pro rata share of the aggregate amount on deposit in the Trust Account as of two business days prior to the Closing, including any amounts representing interest earned on the Trust Account, less any interest released to us released to pay its franchise and income taxes.

***Founder Shares***

The Founder Shares are identical to the shares of common stock, and holders of Founder Shares have the same stockholder rights as public stockholders, except that: (i) the Founder Shares are subject to certain transfer restrictions, as described in more detail below; and (ii) our Initial Stockholders, directors and officers have entered into a letter agreement with us, pursuant to which they have agreed (a) to waive their redemption rights with respect to their shares of common stock in connection with the completion of our business combination and (b) to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete our business combination by the applicable deadline, although they will be entitled to liquidating distributions from the Trust Account with respect to any public

242

shares they hold if we fail to complete our business combination within such time period; (iii) our Initial Stockholders have to waive their right to a conversion price adjustment with respect to any shares of our common stock they may hold in connection with the consummation of the Business Combination; and (iv) are subject to registration rights. Our Initial Stockholders, officers and directors have agreed to vote their shares of common stock in favor of our Business Combination. With certain limited exceptions, the Founder Shares are not transferable, assignable or salable (except to our officers and directors and other persons or entities affiliated with our Sponsor, each of whom will be subject to the same transfer restrictions) until 180 days after the completion of our initial business combination.

**Warrants**

*Public Warrants*

Each whole public warrant entitles the registered holder to purchase three-quarters of one share of our common stock at a price of $11.50 per whole share, subject to adjustment as discussed below, at any time commencing on the later of 12 months from the closing of the IPO or 30 days after the completion of our initial business combination. For example, if a warrant holder holds one public warrant, such public warrant will be exercisable for one share of the company's common stock. Pursuant to the warrant agreement, a warrant holder may exercise its public warrants only for a whole number of shares of common stock. This means that only a whole public warrant may be exercised at any given time by a warrant holder. No fractional public warrants will be issued upon separation of the units and only whole public warrants will trade. The public warrants will expire five years after the completion of our initial business combination, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

We are not obligated to deliver any shares of common stock pursuant to the exercise of a public warrant and will have no obligation to settle such public warrant exercise unless a registration statement under the Securities Act with respect to the shares of common stock underlying the public warrants is then effective and a prospectus relating thereto is current, subject to our satisfying our obligations described below with respect to registration. No public warrant will be exercisable for cash or on a cashless basis, and we will not be obligated to issue any shares to holders seeking to exercise their public warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder, or an exemption is available. In the event that the conditions in the two immediately preceding sentences are not satisfied with respect to a public warrant, the holder of such public warrant will not be entitled to exercise such public warrant and such public warrant may have no value and expire worthless. In the event that a registration statement is not effective for the exercised public warrants, the purchaser of a unit containing such public warrant will have paid the full purchase price for the unit solely for the share of common stock underlying such unit.

We have agreed that as soon as practicable, but in no event later than 15 business days, after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement for the registration, under the Securities Act, of the shares of common stock issuable upon exercise of the public warrants. We will use our best efforts to cause the same to become effective and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the public warrants in accordance with the provisions of the warrant agreement. Notwithstanding the above, if our common stock is at the time of any exercise of a public warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their public warrants to do so a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act (or any successor rule) and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, but will use our best efforts to register the shares under applicable blue sky laws to the extent an exemption is not available.

*Redemption of Warrants for Cash.*   Once the public warrants become exercisable, we may call the public warrants for redemption:

- in whole and not in part;

- at a price of $0.01 per public warrant;

- upon not less than 30 days' prior written notice of redemption to each warrant holder; and

243

- if, and only if, the last reported sale price of common stock equals or exceeds $18.00 per share for any 20 trading days within a 30-trading day period ending on the third trading day prior to the date we send to the notice of redemption to the warrant holder.

If and when the public warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws.

We have established the last of the redemption criterion discussed above to prevent a redemption call unless there is at the time of the call a significant premium to the warrant exercise price. If the foregoing conditions are satisfied and we issue a notice of redemption of the public warrants, each warrant holder will be entitled to exercise his, her or its public warrant prior to the scheduled redemption date. However, the price of the common stock may fall below the $18.00 redemption trigger price as well as the $11.50 warrant exercise price after the redemption notice is issued.

*Redemption procedures and cashless exercise.*   If we call the public warrants for redemption as described above, our management will have the option to require any holder that wishes to exercise his, her or its public warrant to do so on a "cashless basis." In determining whether to require all holders to exercise their public warrants on a "cashless basis," our management will consider, among other factors, our cash position, the number of public warrants that are outstanding and the dilutive effect on our stockholders of issuing the maximum number of shares of common stock issuable upon the exercise of our public warrants. If our management takes advantage of this option, all holders of public warrants would pay the exercise price by surrendering their public warrants for that number of shares of common stock equal to the quotient obtained by dividing (i) the product of the number of shares of common stock underlying the public warrants, multiplied by the difference between the exercise price of the public warrants and the "fair market value" (defined below) by (ii) the fair market value. The "fair market value" shall mean the average reported last sale price of the common stock for the 10 trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of public warrants. If our management takes advantage of this option, the notice of redemption will contain the information necessary to calculate the number of shares of common stock to be received upon exercise of the public warrants, including the "fair market value" in such case. Requiring a cashless exercise in this manner will reduce the number of shares to be issued and thereby lessen the dilutive effect of a warrant redemption. We believe this feature is an attractive option to us if we do not need the cash from the exercise of the public warrants after our initial business combination. If we call our public warrants for redemption and our management does not take advantage of this option, our Sponsor and its permitted transferees would still be entitled to exercise their private placement warrants for cash or on a cashless basis using the same formula described above that other warrant holders would have been required to use had all warrant holders been required to exercise their public warrants on a cashless basis, as described in more detail below. The Sponsor Agreement provides that, immediately prior to the Closing, and conditioned and effective upon the Closing, all of the private placement warrants held by the Sponsor immediately prior to the Closing, will be automatically cancelled, for no consideration, and shall no longer be outstanding.

A holder of a public warrant may notify us in writing in the event it elects to be subject to a requirement that such holder will not have the right to exercise such public warrant, to the extent that after giving effect to such exercise, such person (together with such person's affiliates), to the warrant agent's actual knowledge, would beneficially own in excess of 9.8% (or such other amount as a holder may specify) of the shares of common stock outstanding immediately after giving effect to such exercise.

*Anti-dilution Adjustments.*   If the number of outstanding shares of common stock is increased by a stock dividend payable in shares of common stock, or by a split-up of shares of common stock or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of common stock issuable on exercise of each public warrant will be increased in proportion to such increase in the outstanding shares of common stock. A rights offering to holders of common stock entitling holders to purchase shares of common stock at a price less than the fair market value will be deemed a stock dividend of a number of shares of common stock equal to the product of (i) the number of shares of common stock actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for common stock) multiplied by (ii) one minus the

244

quotient of (a) the price per share of common stock paid in such rights offering divided by (b) the fair market value. For these purposes (1) if the rights offering is for securities convertible into or exercisable for common stock, in determining the price payable for common stock, there will be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion and (2) fair market value means the volume weighted average price of common stock as reported during the 10 trading day period ending on the trading day prior to the first date on which the shares of common stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such rights.

In addition, if we, at any time while the public warrants are outstanding and unexpired, pay a dividend or make a distribution in cash, securities or other assets to the holders of common stock on account of such shares of common stock (or other shares of our capital stock into which the public warrants are convertible), other than (i) as described above; (ii) certain ordinary cash dividends; (iii) to satisfy the redemption rights of the holders of common stock in connection with a proposed initial business combination; (iv) to satisfy the redemption rights of the holders of common stock in connection with a stockholder vote to amend the Company's current certificate of incorporation to modify the substance or timing of the Company's obligation to redeem 100% of our public shares if we do not complete a business combination within 24 months from the closing of the IPO, or (v) in connection with the redemption of our public shares upon our failure to complete our initial business combination, then the warrant exercise price will be decreased, effective immediately after the effective date of such event, by the amount of cash and/or the fair market value of any securities or other assets paid on each share of common stock in respect of such event.

If the number of outstanding shares of our common stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of common stock or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of common stock issuable on exercise of each public warrant will be decreased in proportion to such decrease in outstanding shares of common stock.

Whenever the number of shares of common stock purchasable upon the exercise of the public warrants is adjusted, as described above, the warrant exercise price will be adjusted by multiplying the warrant exercise price immediately prior to such adjustment by a fraction (x) the numerator of which will be the number of shares of common stock purchasable upon the exercise of the public warrants immediately prior to such adjustment, and (y) the denominator of which will be the number of shares of common stock so purchasable immediately thereafter.

In case of any reclassification or reorganization of the outstanding shares of common stock (other than those described above or that solely affects the par value of such shares of common stock), or in the case of any merger or consolidation of us with or into another corporation (other than a consolidation or merger in which we are the continuing corporation and that does not result in any reclassification or reorganization of our outstanding shares of common stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of us as an entirety or substantially as an entirety in connection with which we are dissolved, the holders of the public warrants will thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the public warrants and in lieu of the shares of our common stock immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the holder of the public warrants would have received if such holder had exercised their public warrants immediately prior to such event. However, if such holders were entitled to exercise a right of election as to the kind or amount of securities, cash or other assets receivable upon such consolidation or merger, then the kind and amount of securities, cash or other assets for which each public warrant will become exercisable will be deemed to be the weighted average of the kind and amount received per share by such holders in such consolidation or merger that affirmatively make such election, and if a tender, exchange or redemption offer has been made to and accepted by such holders (other than a tender, exchange or redemption offer made by the Company in connection with redemption rights held by stockholders of the Company as provided for in the Company's current certificate of incorporation or as a result of the repurchase of shares of common stock by the company if a proposed initial business combination is presented to the stockholders of the company for approval) under

245

circumstances in which, upon completion of such tender or exchange offer, the maker thereof, together with members of any group (within the meaning of Rule 13d-5(b)(1) under the Exchange Act (or any successor rule)) of which such maker is a part, and together with any affiliate or associate of such maker (within the meaning of Rule 12b-2 under the Exchange Act (or any successor rule)) and any members of any such group of which any such affiliate or associate is a part, own beneficially (within the meaning of Rule 13d-3 under the Exchange Act (or any successor rule)) more than 50% of the outstanding shares of common stock, the holder of a public warrant will be entitled to receive the highest amount of cash, securities or other property to which such holder would actually have been entitled as a stockholder if such warrant holder had exercised the public warrant prior to the expiration of such tender or exchange offer, accepted such offer and all of the common stock held by such holder had been purchased pursuant to such tender or exchange offer, subject to adjustments (from and after the consummation of such tender or exchange offer) as nearly equivalent as possible to the adjustments provided for in the warrant agreement. Additionally, if less than 70% of the consideration receivable by the holders of common stock in such a transaction is payable in the form of common stock in the successor entity that is listed for trading on a national securities exchange or is quoted in an established over-the-counter market, or is to be so listed for trading or quoted immediately following such event, and if the registered holder of the public warrant properly exercises the public warrant within 30 days following public disclosure of such transaction, the warrant exercise price will be reduced as specified in the warrant agreement based on the per share consideration minus Black-Scholes Warrant Value (as defined in the warrant agreement) of the public warrant.

The public warrants have been issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. You should review a copy of the warrant agreement, which is filed as an exhibit to the registration statement pertaining to our IPO, for a complete description of the terms and conditions applicable to the public warrants. The warrant agreement provides that the terms of the public warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants.

The public warrants may be exercised upon surrender of the warrant certificate on or prior to the expiration date at the offices of the warrant agent, with the exercise form on the reverse side of the warrant certificate completed and executed as indicated, accompanied by full payment of the exercise price (or on a cashless basis, if applicable), by certified or official bank check payable to us, for the number of public warrants being exercised. The warrant holders do not have the rights or privileges of holders of common stock and any voting rights until they exercise their public warrants and receive shares of common stock. After the issuance of shares of common stock upon exercise of the public warrants, each holder will be entitled to one vote for each share held of record on all matters to be voted on by stockholders.

Warrants may be exercised only for a whole number of shares of common stock. No fractional shares will be issued upon exercise of the public warrants. If, upon exercise of the public warrants, a holder would be entitled to receive a fractional interest in a share, we will, upon exercise, round down to the nearest whole number the number of shares of common stock to be issued to the warrant holder. As a result, warrant holders not purchasing public warrants in multiples of three warrants will not obtain value from the fractional interest that will not be issued.

### Private Placement Warrants

Our Sponsor purchased an aggregate of 13,400,000 private placement warrants at a price of $0.50 per warrant for an aggregate purchase price of $6,700,000 in a private placement. On October 25, 2018, simultaneously with the sale of the over-allotment units, we consummated a private sale of an additional 750,605 placement warrants to the Sponsor at a price of $0.50 per warrant, generating gross proceeds of approximately $375,302. The private placement warrants (including the common stock issuable upon exercise of the private placement warrants) will not be transferable, assignable or salable until 30 days after the completion of our initial business combination. Otherwise, the private placement warrants have terms and provisions that are identical to those of the warrants sold as part of the units in our IPO, including as to exercisability and exercise period.

246

The Sponsor Agreement provides that, immediately prior to the Closing, and conditioned and effective upon the Closing, all of the private placement warrants held by the Sponsor immediately prior to the Closing, will be automatically cancelled, for no consideration, and shall no longer be outstanding.

**Dividends**

We have not paid any cash dividends on our common stock to date and do not intend to pay cash dividends prior to the completion of a business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of a business combination. The payment of any cash dividends subsequent to a business combination will be within the discretion of our Board at such time. In addition, our Board is not currently contemplating and does not anticipate declaring any stock dividends in the foreseeable future. Further, if we incur any indebtedness, our ability to declare dividends may be limited by restrictive covenants we may agree to in connection therewith.

**Transfer Agent and Warrant Agent**

The Transfer Agent for our common stock and warrant agent for our warrants is Continental Stock Transfer & Trust Company. We have agreed to indemnify Continental Stock Transfer & Trust Company in its roles as transfer agent and warrant agent, its agents and each of its stockholders, directors, officers and employees against all liabilities, including judgments, costs and reasonable counsel fees that may arise out of acts performed or omitted for its activities in that capacity, except for any liability due to any gross negligence, willful misconduct or bad faith of the indemnified person or entity.

**Certain Anti-Takeover Provisions of Delaware Law, the Company's Certificate of Incorporation and Bylaws**

Provisions of the DGCL and our current certificate of incorporation and bylaws as well as provisions of the Amended and Restated Certificate of Incorporation could make it more difficult to acquire the post-combination company by means of a tender offer, a proxy contest or otherwise, or to remove incumbent officers and directors. These provisions, summarized below, are intended to discourage coercive takeover practices and inadequate takeover bids and to encourage persons seeking to acquire control of the post-combination company to first negotiate with the board of directors. We believe that the benefits of these provisions outweigh the disadvantages of discouraging certain takeover or acquisition proposals because, among other things, negotiation of these proposals could result in an improvement of their terms and enhance the ability of our Board to maximize stockholder value. However, these provisions may delay, deter or prevent a merger or acquisition of us that a stockholder might consider is in its best interest, including those attempts that might result in a premium over the prevailing market price of the common stock.

We are currently subject to the provisions of Section 203 of the DGCL, which we refer to as "*Section 203*," regulating corporate takeovers. Assuming the approval of Proposal No. 3 at the Special Meeting, we will no longer be subject to Section 203 upon the effectiveness of Proposal No. 3. Instead, we would "opt out" of Section 203 and, instead, our Amended and Restated Certificate of Incorporation would include a provision that is substantially similar to Section 203, but excludes David S. Hall and his respective successors, affiliates and associates from the definition of "interested stockholder" because such stockholders currently hold voting power of Velodyne in excess of, and immediately following the Business Combination these parties will hold voting power of the post-combination company in excess of, the 15% threshold under Section 203. Upon consummation of the Business Combination, David S. Hall and his respective successors, affiliates and associates will become "interested stockholders" within the meaning of Section 203, but will not be subject to the restrictions on business combinations set forth in Section 203, as our Board approved the Business Combination in which such stockholders became interested stockholders prior to such time they became interested stockholders. Assuming adoption of Proposal No. 3 at the Special Meeting, the provisions set forth in Proposal No. 3 with regards to Section 203 would take effect 12 months after the filing of the Amended and Restated Certificate of Incorporation with the Delaware Secretary of State.Section 203 prevents certain Delaware corporations, under certain circumstances, from engaging in a business combination with (i) a stockholder who owns fifteen percent (15%) or more of our outstanding voting stock (otherwise known as an "interested stockholder"); (ii) an affiliate of an interested stockholder;

247

or (iii) an associate of an interested stockholder, in each case, for three years following the date that such stockholder became an interested stockholder.

A business combination includes a merger or sale of more than 10% of our assets. However, the above provisions of Section 203 do not apply if:

- our Board approves the transaction that made the stockholder an "interested stockholder," prior to the date of the transaction;

- after the completion of the transaction that resulted in the stockholder becoming an interested stockholder, that stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, other than statutorily excluded shares of common stock; or

- on or subsequent to the date of the transaction, the business combination is approved by our Board and authorized at a meeting of our stockholders, and not by written consent, by an affirmative vote of at least two-thirds of the outstanding voting stock not owned by the interested stockholder.

Assuming the approval of Proposal No. 3, our Amended and Restated Certificate of Incorporation will require the approval by affirmative vote of the holders of at least two-thirds of the common stock of the post-combination company to make any amendment to key provisions of the Amended and Restated Certificate of Incorporation or of the post-combination company's bylaws.

In addition, both our current certificate of incorporation and our Amended and Restated Certificate of Incorporation provide for certain other provisions that may have an anti-takeover effect:

- There is no cumulative voting with respect to the election of directors.

- Our Board is empowered to elect a director to fill a vacancy created by the expansion of the Board or the resignation, death, or removal of a director in certain circumstances.

- Directors may only be removed from the Board for cause.

- A prohibition on stockholder action by written consent, which forces stockholder action to be taken at an annual or special meeting of our stockholders.

- A prohibition on stockholders calling a special meeting and the requirement that a meeting of stockholders may only be called by members of our Board, which may delay the ability of our stockholders to force consideration of a proposal or to take action, including the removal of directors.

- Our authorized but unissued common stock and preferred stock are available for future issuances without stockholder approval and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans. Our Board is entitled, without further stockholder approval, to designate one or more series of preferred stock and the associated voting rights, preferences and privileges of such series of preferred stock. The existence of authorized but unissued and unreserved common stock and preferred stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

**Rule 144 and Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies**

In general, Rule 144 of the Securities Act, which we refer to as "Rule 144", permits the resale of restricted securities without registration under the Securities Act if certain conditions are met. Rule 144 is not available for the resale of restricted securities initially issued by shell companies (other than business combination related shell companies) or issuers that have been at any time previously a shell company, including us. However, Rule 144 also includes an important exception to this prohibition if the following conditions are met at the time of such resale:

- the issuer of the securities that was formerly a shell company has ceased to be a shell company;

- the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act;

248

- the issuer of the securities has filed all Exchange Act reports and material required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Form 8-K reports; and

- at least one year has elapsed from the time that the issuer filed current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

We anticipate that following the consummation of the Business Combination, we will no longer be a shell company, and as long as the conditions set forth in the exceptions listed above are satisfied, Rule 144 will become available for the resale of our restricted securities.

If the above conditions have been met and Rule 144 is available, a person who has beneficially owned restricted shares of our common stock or warrants for at least one year would be entitled to sell their securities pursuant to Rule 144, *provided* that such person is not deemed to have been one of our affiliates at the time of, or at any time during the three months preceding, a sale. If such persons are our affiliates at the time of, or at any time during the three months preceding, a sale, such persons would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period only a number of securities that does not exceed the greater of:

- 1% of the total number of shares of common stock or warrants, as applicable, then outstanding; or

- the average weekly reported trading volume of the common stock or warrants, as applicable, during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale.

Sales by affiliates under Rule 144, when available, will also limited by manner of sale provisions and notice requirements.

As of the date of this proxy statement, we had 17,549,365 shares of common stock outstanding, of which 11,455,237 shares are freely tradable without restriction or further registration under the Securities Act, except for any shares purchased by one of our affiliates. All of the 6,094,128 Founder Shares owned by our Initial Stockholders are restricted securities under Rule 144, in that they were issued in private transactions not involving a public offering. If the Business Combination is approved, the shares of our common stock we issue to the PIPE Investors pursuant to the Subscription Agreements will be restricted securities for purposes of Rule 144.

As of the date of this proxy statement, there are 38,293,138 warrants of the Company outstanding, consisting of 24,376,512 public warrants originally sold as part of the units issued in the Company's IPO and 14,150,605 private placement warrants that were sold by the Company to our Sponsor in a private sale concurrently with the Company's IPO (which private placement warrants will be automatically cancelled immediately prior to Closing pursuant to the Sponsor Agreement). Each warrant is exercisable for three-quarters of one share of our common stock, in accordance with the terms of the warrant agreement governing the warrants. The public warrants and are freely tradable, except for any warrants purchased by one of our affiliates within the meaning of Rule 144 under the Securities Act. In addition, we will be obligated to file no later than 15 business days after the Closing, a registration statement under the Securities Act covering the 18,282,384 shares of our common stock that may be issued upon the exercise of the public warrants, and cause such registration statement to become effective and maintain the effectiveness of such registration statement until the expiration of the warrants.

We expect Rule 144 to be available for the resale of the above noted restricted securities as long as the conditions set forth in the exceptions listed above are satisfied following the Business Combination.

**Registration Rights**

*Graf Registration Rights*

The holders of the Founder Shares, private placement warrants (and any shares of common stock issuable upon the exercise of the private placement warrants), and securities that may be issued upon conversion of working capital loans are entitled to registration rights pursuant to a registration rights agreement signed October 15, 2018, requiring the Company to register such securities for resale. The holders

249

of the majority of these securities are entitled to make up to three demands, excluding short form demands, that the Company register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to the completion of a business combination and rights to require the Company to register for resale such securities pursuant to Rule 415 under the Securities Act. However, the registration rights agreement provides that the Company will not permit any registration statement filed under the Securities Act to become effective until termination of the applicable lock-up period. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

The Sponsor Agreement provides that, immediately prior to the Closing, and conditioned and effective upon the Closing, all of the private placement warrants held by the Sponsor immediately prior to the Closing, will be automatically cancelled, for no consideration, and shall no longer be outstanding.

### Assumed Velodyne Registration Rights

Under the terms of the Merger Agreement, the Company is assuming Velodyne's obligations under that certain Amended and Restated Investors' Rights Agreement, dated October 25, 2019, between Velodyne and the stockholders named therein (the *"IRA"*) to register shares of common stock received by holders of Velodyne capital stock in the Business Combination. After the Business Combination, the holders of [•] shares of common stock will be entitled to contractual rights to require us to register those shares under the Securities Act. David Hall, Velodyne's executive chairman, has contractual rights that require the Company to register his [•] shares of common stock and any shares of common stock subsequently issued to him under the Securities Act if the Company proposed to register any of its securities under the Securities Act. If the Company proposes to register any of its securities under the Securities Act for its own account, holders of shares having registration rights are entitled to include their shares in the Company's registration statement, provided, among other conditions, that the underwriters of any such offering have the right to limit the number of shares included in the registration.

The Company will pay all expenses relating to any demand, piggyback, or Form S-3 registration described below, other than underwriting discounts and commissions. The registration rights terminate upon the earliest to occur of: (i) the fifth anniversary of the completion of the initial offering or (ii) with respect to the registration rights of an individual holder, such earlier time after the initial offering at which the holder holds one percent or less of the Company's outstanding common stock and all shares held by the holder can be sold in any three-month period without registration in compliance with Rule 144 and without the requirement for the Company to be in compliance with the current public information required under Rule 144(c)(1).

### Demand Registration Rights

Former Velodyne equity holders that will hold approximately [•] shares of common stock after the Business Combination will be entitled to certain demand registration rights. At any time beginning on the earlier of September 4, 2023 or six months following the Closing of the Business Combination, the holders of 50% or more of the registrable securities (as defined in the IRA) then outstanding, may make a written request that the Company register all or a portion of such registrable securities (as defined in the IRA), subject to certain specified conditions and exceptions. Such request for registration must cover securities with an aggregate offering price of at least $50,000,000. The Company not obligated to effect more than two of these registrations.

### Piggyback Registration Rights

If the Company proposes to register any of its securities under the Securities Act either for its own account or for the account of other stockholders, the holders of [•] shares of common stock will, pursuant to the IRA and subject to certain exceptions, be entitled to include their shares in the Company's registration statement. These registration rights are subject to specified conditions and limitations, including, but not limited to, the right of the underwriters to limit the number of shares included in any such offering under certain circumstances, but not below 30% of the total amount of securities included in such offering.

250

*Form S-3 Registration Rights*

At any time after the Company is qualified to file a registration statement on Form S-3, and subject to limitations and conditions specified in the IRA, the holders of at least 30% of the [•] shares of common stock with Form S-3 registration rights may make a written request that the Company prepare and file a registration statement on Form S-3 under the Securities Act covering their shares, so long as the aggregate price to the public, net of any underwriters' discounts and commissions, is at least $10,000,000. The Company is not obligated to effect more than two of these Form S-3 registrations in any 12-month period.

*PIPE Subscription Agreement*

Under the terms of the Subscription Agreements, the Company agreed that, prior to the Closing, it will file with the SEC a registration statement (the "*PIPE Resale Registration Statement*") registering the resale of the shares of common stock sold to the PIPE Investors (the "PIPE Shares"). The Company must use its commercially reasonable efforts to have the PIPE Resale Registration Statement declared effective upon the Closing, but no later than 60 calendar days following the Closing, subject to adjustment to 90 calendar days after the Closing if the PIPE Resale Registration Statement is reviewed by, and receives comments from, the SEC. The Subscription Agreements require the Company to cause the PIPE Resale Registration Statement to remain effective until the earlier of (i) two years from the issuance of the PIPE Shares, (ii) the date on which all of the PIPE Shares have been sold, or (iii) with respect to each PIPE Investor, the first date on which such PIPE Investor can sell all of its PIPE Shares (or shares received in exchange therefor) under Rule 144 of the Securities Act without limitation as to the manner of sale or the amount of such securities that may be sold.

**Listing of Securities**

We intend to apply to continue the listing of the post-combination company's common stock and warrants on NYSE under the symbols "VLDR" and "VLDR WS," respectively, upon the Closing.

251

**SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT**

The following table sets forth information regarding (i) the actual beneficial ownership of the common stock as of [June 30], 2020 and (ii) expected beneficial ownership of the common stock immediately following the Closing, assuming that no public shares are redeemed, and alternatively that [•] public shares are redeemed, by:

- each person who is, or is expected to be after the Business Combination, the beneficial owner of more than 5% of issued and outstanding shares of common stock;

- each person who will become an executive officer or director of the post-combination company; and

- all executive officers and directors of the Company as a group pre-Business Combination and all executive officers and directors of the post-combination company.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and warrants that are currently exercisable or exercisable within 60 days. In computing the number of shares beneficially owned by a person or entity and the percentage ownership of that person or entity in the table below, all shares subject to options and restricted stock units held by such person or entity were deemed outstanding if such securities are currently exercisable, or exercisable or would vest based on service-based vesting conditions within 60 days of [June 30], 2020, assuming that the liquidity-event vesting conditions had been satisfied as of such date. These shares were not deemed outstanding, however, for the purpose of computing the percentage ownership of any other person or entity.

The beneficial ownership of shares of common stock pre-Business Combination is based on 17,549,365 shares of common stock (including 11,455,237 public shares and 6,094,128 Founder Shares) issued and outstanding as of June 30, 2020.

The expected beneficial ownership of shares of common stock post-Business Combination assuming none of the public shares are redeemed has been determined based upon the following: (i) that no public stockholders exercise their redemption rights (no redemptions scenario), (ii) that none of the investors set forth in the table below has purchased or purchases shares of common stock (pre- or post-Business Combination), (iii) that 15,000,000 shares of common stock are issued to the PIPE Investors, (iv) that 148,453,811 shares of common stock are issued to the former Velodyne equity holders, (v) that 4,878,048 shares of common stock are repurchased from former Velodyne equity holders and cancelled in connection with the Closing, and (vi) there will be an aggregate of 172,331,000 shares of the post-combination company's common stock issued and outstanding at Closing.

The expected beneficial ownership of shares of common stock post-Business Combination assuming the maximum number of public shares have been redeemed has been determined based on the following: (i) that holders of 6,572,424 public shares exercise their redemption rights (maximum redemption scenario), (ii) that none of the investors set forth in the table below has purchased or purchases shares of common stock (pre- or post-Business Combination), (iii) that 15,000,000 shares of common stock are issued to the PIPE Investors, (iv) that 148,453,811 shares of common stock are issued to the former Velodyne equity holders, (v) that 4,878,048 shares of common stock are repurchased from former Velodyne equity holders and cancelled in connection with the Closing, and (v) there will be an aggregate of 165,758,576 shares of the post-combination company's common stock issued and outstanding at Closing.

Unless otherwise indicated, the address of each post-combination company beneficial owner listed in the table below is c/o Velodyne Lidar, Inc., 5521 Hellyer Avenue, San Jose, CA 95138.

| Name and Address of Beneficial Owner | Before the Business Combination Number of shares of common stock | % | Assuming No Redemption Number of shares of common stock | % | After the Business Combination Assuming Maximum Redemption Number of shares of common stock | % |
|---|---|---|---|---|---|---|
| Graf Acquisition LLC[(1)(2)] | 6,026,128 | [34.3] | 2,232,000 | [•] | [•] | [•] |
| OC Opportunities Fund II, L.P.[(1)(2)(3)] | 6,026,128 | [34.3] | 2,232,000 | [•] | [•] | [•] |
| Keith W. Abell[(1)] | 25,000 | * | 25,000 | [•] | [•] | [•] |
| Julie J. Levenson[(1)] | 18,000 | * | 18,000 | [•] | [•] | [•] |
| Sabrina McKee[(1)] | 25,000 | * | 25,000 | [•] | [•] | [•] |
| Kevin Starke[(10)] | — | | — | | — | |
| Michael Dee[(17)] | 50,018 | * | [•] | [•] | [•] | [•] |
| **All Directors and Executive Officers of Graf as a Group (6 Individuals)** | [•] | [•] | [•] | [•] | [•] | [•] |
| *Five Percent Holders:* | | | | | | |
| Magnetar Financial LLC[(4)] | 2,525,000 | 14.4 | 2,525,000 | [•] | [•] | [•] |
| Omni Partners LLP[(5)] | 2,287,893 | 13.1 | 2,287,893 | [•] | [•] | [•] |
| OxFORD Asset Management LLP[(6)] | 1,810,000 | 10.3 | 1,810,000 | [•] | [•] | [•] |
| Periscope Capital, Inc.[(7)] | 1,724,200 | 9.8 | 1,724,000 | [•] | [•] | [•] |
| Lighthouse Investment Partners LLC[(8)] | 1,668,295 | 9.5 | 1,668,295 | [•] | [•] | [•] |
| Karpus Management Inc.[(9)] | 1,537,975 | 8.8 | | | | |
| *Directors and Executive Officers of the Post-Combination Company After Consummation of the Business Combination* | | | | | | |
| David S. Hall[(11)] | — | — | [•] | [•] | [•] | [•] |
| Shares subject to voting proxy[(12)] | — | — | [•] | [•] | [•] | [•] |
| Total | — | — | [•] | [•] | [•] | [•] |
| Anand Gopalan[(13)] | — | — | [•] | [•] | [•] | [•] |
| Marta Thoma Hall[(14)] | — | — | [•] | [•] | [•] | [•] |
| Andrew Hamer[(15)] | — | — | [•] | [•] | [•] | [•] |
| Joseph B. Culkin[(16)] | — | — | [•] | [•] | [•] | [•] |
| Michael Dee[(17)] | 50,018 | * | [•] | [•] | [•] | [•] |
| James A. Graf[(1)(2)] | 6,026,128 | [34.3] | [•] | [•] | [•] | [•] |
| Jennifer Li[(18)] | — | — | [•] | [•] | [•] | [•] |
| Barbara Samardzich[(19)] | — | — | [•] | [•] | [•] | [•] |
| Christopher Thomas | — | — | — | — | — | — |
| **All Directors and Executive Officers of the Post-Combination Company as a Group (14 Individuals)[(20)]** | [•] | [•] | [•] | [•] | [•] | [•] |
| *Five Percent Holders:* | | | | | | |
| Entities affiliated with Baidu Holdings Limited[(21)] | — | — | [•] | [•] | [•] | [•] |
| Ford Motor Company[(22)] | — | — | [•] | [•] | [•] | [•] |

*    Less than 1%.

253

Notes:

(1)  Interests shown consist solely of founder shares.

(2)  Represents shares held by Graf Acquisition LLC, our Sponsor. James A. Graf, our CEO, is the managing member of our Sponsor and shares voting and investment discretion with OC Opportunities Fund II, L.P. ("Owl Creek") with respect to the common stock held by our Sponsor. Each of Mr. Graf and Owl Creek may be deemed to have beneficial ownership of the common stock held directly by our Sponsor. Each of Mr. Graf and Owl Creek disclaims any beneficial ownership of the reported shares other than to the extent of any pecuniary interest he or it may have therein, directly or indirectly.

(3)  The business address of OC Opportunities Fund II, L.P. is c/o Owl Creek Advisors, LLC, 640 Fifth Avenue, 20th Floor, New York, New York 10019.

(4)  According to a Schedule 13G filed with the SEC on February 14, 2019, Magnetar Financial LLC, Magnetar Capital Partners LP, Supernova Management LLC and Alec N. Litowitz share voting and dispositive power over 2,525,000 shares of the Company's common stock. The business address of these reporting persons is 1603 Orrington Avenue, 13th Floor, Evanston, Illinois 60201.

(5)  According to a Schedule 13G/A filed with the SEC on February 24, 2020, Omni Partners LLP owns 2,287,893 shares of the Company's common stock. The business address of this reporting person is 7 Air Street, London W1B 5AD, United Kingdom.

(6)  According to a Schedule 13G filed with the SEC on February 13, 2019, OxFORD Asset Management LLP has sole voting and dispositive power over 1,810,000 shares of the Company's common stock. The business address of this reporting person is 6 George Street, Oxford, United Kingdom, OX12BW.

(7)  According to a Schedule 13G filed with the SEC on February 14, 2020, Periscope Capital, Inc., has voting and dispositive power over 1,724,200 shares of the Company's common stock. The business address of this reporting person is 333 Bay Street, Suite 1240, Toronto, Ontario, Canada M5H 2R2.

(8)  According to a Schedule 13G filed with the SEC on February 6, 2020, Lighthouse Investment Partners LLC and LHP Ireland Fund Management Limited share voting and dispositive power over 1,668,295 shares of the Company's common stock held directly by various funds for which they serve as managers. The business addresses of these reporting persons are 3801 PGA Boulevard, Suite 500, Palm Beach Gardens, Florida 33410 and 32 Molesworth Street, Dublin, D02 Y512, Ireland, respectively.

(9)  According to a Schedule 13G filed with the SEC on February 14, 2020, Karpus Management, Inc. has sole voting and dispositive power over 1,537,975 shares of the Company's common stock. The business address of this reporting person is 183 Sully's Trail, Pittsford, New York 14534.

(10) Mr. Starke is employed by Owl Creek Asset Management, L.P., which is an affiliate of Owl Creek, a member of our Sponsor. Mr. Starke does not have voting or investment power over any shares held by the sponsor, except to the extent of any direct or indirect pecuniary interest he may have therein.

(11) Consists of (i) [•] shares of the post-combination company common stock held by Mr. Hall and (ii) [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•].

(12) Consists of shares of the post-combination company common stock held by other stockholders over which, except under limited circumstances, Mr. Hall holds an irrevocable proxy, pursuant to voting agreements between Mr. Hall, Velodyne and such stockholders, including certain of the post-combination company's directors and officers, as indicated in the footnotes below. Velodyne does not believe that the parties to these voting agreements constitute a "group" under Section 13 of the Securities Exchange Act of 1934, as amended, as Mr. Hall exercises voting control over these shares.

(13) Consists of (i) [•] shares of the post-combination company common stock subject to options exercisable within 60 days of [•] and (ii) [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•].

(14) Consists of (i) [•] shares of the post-combination company common stock held by Ms. Hall and (ii) [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•]. Mr. Hall holds a proxy over all such shares.

(15) Consists of (i) [•] shares of the post-combination company common stock issuable upon vesting of an RSU subject only to a liquidity-based vesting condition and (ii) [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•].

(16) Consists of [•] shares of the post-combination company common stock held by Mr. Culkin. Mr. Hall holds a proxy over all such shares.

(17) Mr. Dee is a member of our sponsor. Mr. Dee does not have voting or investment power over any shares held by the sponsor, except to the extent of any direct or indirect pecuniary interest he may have therein.

(18) Consists of [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•].

(19) Consists of [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•].

(20) Consists of (i) [•] shares of the post-combination company common stock, (ii) [•] shares of the post-combination company common stock subject to options exercisable within 60 days of [•] and (ii) [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•]. Mr. Hall holds a voting proxy over [•] of the [•] shares of the post-combination company common stock included in subpart (i) of this footnote.

(21) Consists of (i) [•] shares of the post-combination company common stock held by Baidu (Hong Kong) Limited, and (ii) [•] shares of the post-combination company common stock held by Baidu Holdings Limited. Baidu (Hong Kong) Limited, a Hong Kong company, is a wholly-owned subsidiary of Baidu Holdings Limited, a British Virgin Islands company, which is wholly owned by Baidu, Inc., a Cayman Islands company listed on the NASDAQ Global Select Market. Baidu, Inc. may be deemed to beneficially own all of the shares held by Baidu (Hong Kong) Limited and Baidu Holdings Limited. The address for Baidu (Hong Kong) Limited is Suite 2409, Everbright Centre, 108 Gloucester Road, Wanchai, Hong Kong and for Baidu Holdings Limited is Offshore Incorporation Limited of P.O. Box 957, Offshore Incorporations Centre Road Town, Tortola, British Virgin Islands.

(22) Consists of [•] shares of the post-combination company common stock held by Ford Motor Company. The address for Ford Motor Company is 1 American Rd, Dearborn, MI 48126.

CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**The Company's Related Party Transactions**

*Founder Shares*

On June 26, 2018, we issued an aggregate of 8,625,000 Founder Shares to our Sponsor for an aggregate purchase price of $25,000, or approximately $0.003 per share. On September 13, 2018, our Sponsor returned to us, at no cost, 2,156,250 shares of common stock, which we cancelled, resulting in our Sponsor holding 6,468,750 Founder Shares. On October 9, 2018, our Sponsor transferred 25,000 Founder Shares at the same per-share price paid by our Sponsor to each of Keith Abell and Sabrina McKee, two of our directors (then-director nominees), resulting in our Sponsor holding 6,418,750 Founder Shares. In addition, on October 17, 2019, our Sponsor transferred 18,000 Founder Shares to Julie J. Levenson, one of our directors, resulting in our Sponsor holding 6,026,128 Founder Shares. The number of Founder Shares issued was determined based on the expectation that such Founder Shares would represent 20% of the outstanding shares. 374,622 Founder Shares were forfeited by our Sponsor when the underwriters' over-allotment option was not exercised in full. The Founder Shares may not, subject to certain limited exceptions, be transferred, assigned or sold by the holder.

The Initial Stockholders have agreed to (i) waive their redemption rights with respect to their Founder Shares and public shares in connection with the completion of our initial business combination, (ii) waive their redemption rights with respect to their Founder Shares and public shares in connection with a stockholder vote to approve an amendment to our current certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of the initial public offering or to provide for redemption in connection with a business combination and (iii) waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete our initial business combination within 18 months from the closing of the initial public offering, although they will be entitled to liquidating distributions from the Trust Account with respect to any public shares they hold if we fail to complete our initial business combination within the prescribed time frame.

*Private Placement Warrants*

Concurrently with the closing of the initial public offering, our Sponsor purchased an aggregate of 13,400,000 private placement warrants at a price of $0.50 per warrant for an aggregate purchase price of $6,700,000 in a private placement. On October 25, 2018, simultaneously with the sale of the over-allotment units, we consummated a private sale of an additional 750,605 placement warrants to the Sponsor at a price of $0.50 per warrant, generating gross proceeds of approximately $375,302. The private placement warrants (including the shares of common stock issuable upon exercise thereof) may not, subject to certain limited exceptions, be transferred, assigned or sold by the holder.

The Sponsor Agreement provides that, immediately prior to the Closing, and conditioned and effective upon the Closing, all of the private placement warrants held by the Sponsor immediately prior to the Closing, will be automatically cancelled, for no consideration, and shall no longer be outstanding.

*Registration Rights*

The holders of the Founder Shares, private placement warrants (and any shares of common stock issuable upon the exercise of the private placement warrants), and securities that may be issued upon conversion of working capital loans are entitled to registration rights pursuant to a registration rights agreement signed October 15, 2018, requiring the Company to register such securities for resale. The holders of the majority of these securities are entitled to make up to three demands, excluding short form demands, that the Company register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to the completion of a business combination and rights to require the Company to register for resale such securities pursuant to Rule 415 under the Securities Act. However, the registration rights agreement provides that the Company will not permit any

registration statement filed under the Securities Act to become effective until termination of the applicable lock-up period. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

The Sponsor Agreement provides that, immediately prior to the Closing, and conditioned and effective upon the Closing, all of the private placement warrants held by the Sponsor immediately prior to the Closing, will be automatically cancelled, for no consideration, and shall no longer be outstanding.

### Related Party Loans

In addition, in order to finance transaction costs in connection with an intended initial business combination, our Sponsor or an affiliate of our Sponsor or certain of our officers and directors may, but are not obligated to, loan us funds as may be required. If we complete an initial business combination, we would repay such loaned amounts. In the event that the initial business combination does not close, we may use a portion of the working capital held outside the Trust Account to repay such loaned amounts but no proceeds from our Trust Account would be used for such repayment. Up to $1,500,000 of such working capital loans may be convertible into additional warrants at a price of $0.75 per warrant at the option of the lender. Such warrants would be identical to the private placement warrants, including as to exercisability and exercise price. The terms of such working capital loans by our Sponsor or its affiliates, or our officers and directors, if any, have not been determined and no written agreements exist with respect to such loans. We do not expect to seek loans from parties other than our Sponsor or an affiliate of our Sponsor as we do not believe third parties will be willing to loan such funds and provide a waiver against any and all rights to seek access to funds in our Trust Account.

### Administrative Services Agreement

We have agreed to reimburse an affiliate of our Sponsor up to $5,000 per month for office space, utilities and secretarial and administrative support. Upon completion of our initial business combination or our liquidation, we will cease paying these monthly reimbursements.

### Related Party Policy

Prior to the consummation of our IPO, we adopted a code of ethics requiring us to avoid, wherever possible, all conflicts of interests, except under guidelines or resolutions approved by our board of directors (or the appropriate committee of our board) or as disclosed in our public filings with the SEC. Under our code of ethics, conflict of interest situations include any financial transaction, arrangement or relationship (including any indebtedness or guarantee of indebtedness) involving the Company.

In addition, our audit committee, pursuant to a written charter that we adopted prior to the consummation of our IPO, is responsible for reviewing and approving related party transactions to the extent that we enter into such transactions. An affirmative vote of a majority of the members of the audit committee present at a meeting at which a quorum is present is required in order to approve a related party transaction. A majority of the members of the entire audit committee constitutes a quorum. Without a meeting, the unanimous written consent of all of the members of the audit committee is required to approve a related party transaction. We also require each of our directors and executive officers to complete a directors' and officers' questionnaire that elicits information about related party transactions.

These procedures are intended to determine whether any such related party transaction impairs the independence of a director or presents a conflict of interest on the part of a director, employee or officer.

### Velodyne's Related Party Transactions

In addition to the compensation arrangements, including employment, termination of employment, and change in control arrangements and indemnification arrangements, discussed, when required, in the sections titled "*Management After the Business Combination*" and "*Executive Compensation*" and the registration rights described in the section titled "*Description of Securities — Registration Rights*," the following is a description of each transaction since January 1, 2017 and each currently proposed transaction in which:

257

- Velodyne has been or is to be a participant;

- the amount involved exceeded or exceeds $120,000; and

- any of Velodyne's directors, executive officers or holders of more than 5% of its capital stock prior to the Business Combination, or any immediate family member of, or person sharing the household with, any of these individuals, had or will have a direct or indirect material interest.

### Equity Financings

*Sale of Series B Preferred Stock*

In September 2018, Velodyne sold an aggregate of 1,375,440 shares of its Series B preferred stock at a purchase price of $36.3520 per share to accredited investors for an aggregate purchase price of approximately $50.0 million. Each share of Velodyne's Series B preferred stock will convert automatically into shares of common stock of the Company in connection with the completion of the Business Combination, as provided in the Merger Agreement.

The following table summarizes purchases of shares of Velodyne's Series B preferred stock by its executive officers, directors, and holders of more than 5% of its capital stock.

| Purchaser | Shares of Series B Preferred Stock | |
| --- | --- | --- |
| | Number of Shares | Aggregate Gross Consideration ($) |
| Entities affiliated with Baidu (Hong Kong) Limited[1] | 687,720 | $24,999,997 |

[1]   Jennifer Li, a member of Velodyne's board of directors, is the former chief financial officer of Baidu, Inc., an affiliate of Baidu (Hong Kong) Limited. Entities affiliated with Baidu (Hong Kong) Limited held more than 5% of Velodyne's capital stock prior to the Business Combination. The 687,720 shares are held by Baidu Holdings Limited.

### Employment Arrangements with Immediate Family Members of Velodyne's Executive Officers and Directors

Marta Thoma Hall, spouse of David Hall, Velodyne's executive chairman, has been employed by Velodyne since August 2011 and has been a member of Velodyne board of directors since January 2020. As Velodyne's chief marketing officer, Ms. Hall is responsible for marketing and business development efforts. During the years ended December 31, 2017, December 31, 2018, and December 31, 2019 Ms. Hall had total cash compensation, including base salary, bonus and other compensation, of $394,039, $545,731, $564,226 respectively.

Savannah Hall, a daughter of David Hall, has been employed by Velodyne since March 2017. Ms. Hall serves as a project coordinator. Ms. Hall's salary and bonus has not exceeded the disclosure threshold for the past three fiscal years.

James Schwandt, a son-in-law of Joseph B. Culkin, a member of Velodyne's board of directors, has been employed by Velodyne since May 2017. Mr. Schwandt serves as senior program manager. During the years ended December 31, 2017, December 31, 2018 and December 31, 2019, Mr. Schwandt had total cash compensation, including base salary, bonus and other compensation, of $111,087, $168,013, and $172,571, respectively.

David Heeren, a son-in-law of Marta Thoma Hall, Velodyne's chief marketing officer and a member of Velodyne's board of directors, has been employed by Velodyne since March 2017. Mr. Heeren serves as senior technical product marketing manager. During the years ended December 31, 2017, December 31, 2018, and December 31, 2019, Mr. Heeren had total cash compensation, including base salary, bonus and other compensation, of $103,129, $179,586, and $184,976, respectively.

Each of these individuals is expected to be employed by the post-combination company following Closing.

258

*Velodyne Acoustics Litigation Indemnity*

In August 2016, Velodyne entered into an agreement with David Hall, Velodyne's then chief executive officer, and Velodyne Acoustics, LLC, an entity that was wholly-owned and controlled by David Hall until November 2019 ("Acoustics"), pursuant to which Acoustics agreed to, among other things, indemnify, defend and hold harmless Velodyne from and against any and all liabilities relating to, arising out of or resulting from certain litigation matters ("Litigation Indemnification Agreement"). The litigation matters giving rise to the indemnification obligations involved certain employment-related claims of two former employees of Velodyne Acoustics, Inc., which was the predecessor of Acoustics. In November 2019, Velodyne elected not to seek indemnification from Acoustics for the litigation matters under the terms of the Litigation Indemnification Agreement and assumed control and financial responsibility for the litigation matters. By not seeking indemnification from Acoustics, Velodyne currently estimates that it will pay approximately $4.5 million in connection with the litigation matters that were the subject of the Litigation Indemnification Agreement, indirectly benefitting Mr. Hall, the former sole owner of Acoustics. Velodyne believes that the litigation matters covered by the Litigation Indemnification Agreement are now substantially complete and does not expect to incur significant additional expenses related to these litigation matters.

*2018 Tender Offer*

In December 2018, Velodyne commenced a tender offer to purchase an aggregate of 73,150 shares of its common stock at a price of approximately $36.3520 per share. Velodyne purchased shares of its common stock from certain stockholders, including Joseph B. Culkin, a member of Velodyne's board of directors, and Bruce Hall, a brother of David Hall. The following table summarizes purchases of shares of Velodyne common stock by Velodyne from these stockholders.

| | Shares of common stock | |
| --- | --- | --- |
| Seller | Number of Shares | Aggregate Gross Consideration ($) |
| Joseph B. Culkin | 27,704 | $1,007,096 |
| Bruce Hall | 13,100 | 476,211 |
| Total | 40,804 | $1,483,307 |

*Amended and Restated Investors' Rights Agreement*

On October 25, 2019, Velodyne entered into an amended and restated investors' rights agreement (the *"Investors' Rights Agreement"*) with certain holders of Velodyne's capital stock. These stockholders will be entitled to rights with respect to the registration of their shares of common stock following the Business Combination. Under the terms of the Merger Agreement, the post-combination company will at Closing assume Velodyne's obligations to register shares of common stock held by the former Velodyne equity holders party to the Investors' Rights Agreement. Velodyne expects that its stockholders will approve an amendment to the Investors' Rights Agreement that will terminate upon Closing the covenants in Section 3 of the Investors' Rights Agreement that do not pertain to registration rights. For a description of these registration rights, see "*Description of Securities — Registration Rights*."

*Indemnification Agreements*

The post-combination company's amended and restated certificate of incorporation, which will be effective upon the completion of the Business Combination, will contain provisions limiting the liability of directors, and the post-combination company's amended and restated bylaws, which will be effective upon the completion of the Business Combination, will provide that the post-combination company will indemnify each of its directors to the fullest extent permitted under Delaware law. The Amended and Restated Certificate of Incorporation and the post-combination company's bylaws will also provide the board of directors with discretion to indemnify officers and employees when determined appropriate by the post-combination company's board of directors.

The post-combination company intends to enter into new indemnification agreements with each of its directors and executive officers and certain other key employees. The indemnification agreements will provide

259

that the post-combination company will indemnify each of its directors, executive officers, and such other key employees against any and all expenses incurred by that director, executive officer, or other key employee because of his or her status as one of the post-combination company's directors, executive officers, or other key employees, to the fullest extent permitted by Delaware law, the Amended and Restated Certificate of Incorporation and the post-combination company's bylaws. In addition, the indemnification agreements will provide that, to the fullest extent permitted by Delaware law, the post-combination company's will advance all expenses incurred by its directors, executive officers, and other key employees in connection with a legal proceeding involving his or her status as a director, executive officer, or key employee.

### *Leases*

In January 2017, Velodyne entered into a five-year lease agreement with Hellyer-DMHall Properties, LLC, an affiliate of David Hall, Velodyne's then chief executive officer and director and current executive chairman, and Marta Thoma Hall, Velodyne's chief marketing officer, and a member of Velodyne's board of directors. In October 2019, Velodyne extended the lease for an additional five years and agreed to annual increases of 3% beginning in January 2020. Under the extended lease agreement, Velodyne leases approximately 205,000 square feet of office and manufacturing space in San Jose, California as its corporate headquarters. As of December 31, 2019, future minimum lease payments total $27.3 million related to this facility. Rent expense was $3.0 million, $3.0 million and $3.1 million for the years ended December 31, 2017, 2018 and 2019, respectively. It is expected that the post-combination company will operate out of Velodyne's headquarters.

### *Loans*

In January 2017 and December 2016, Velodyne loaned David Hall, Velodyne's then chief executive officer and director and current executive chairman, approximately $3.5 million pursuant to two unsecured promissory notes for purposes of financing the acquisition of Velodyne's headquarters facility in San Jose, California. The loan accrued interest at a rate of 3.15% per annum. As of December 31, 2019, immediately prior to repayment, the aggregate outstanding balance of the loan was approximately $3.6 million, including aggregate principal of $3.5 million and aggregate accrued and unpaid interest of $0.1 million. Mr. Hall made monthly interest-only payments to Velodyne on the loan beginning in December 2017 and repaid all outstanding principal and interest due under the two promissory notes on December 31, 2019.

In addition, in March 2017, Velodyne, Mr. Hall, and Ms. Hall each entered into an unconditional payment guaranty with regard to a $15.0 million term loan issued by First Bank, as lender, to Hellyer-DMHall Properties, LLC, as borrower, an affiliate of Mr. Hall and Ms. Hall. This term loan was obtained for and secured by a Deed of Trust for Velodyne's headquarters facility in San Jose, California. The guaranty by each of Velodyne, Mr. Hall, and Ms. Hall unconditionally guaranteed the borrower's obligations under the loan. As of December 31, 2017 and 2018, the outstanding principal balance of the term loan was $14.8 million and $14.4 million, respectively. In December 2019, Velodyne was released from the unconditional payment guaranty and has no further obligations with respect to the First Bank term loan.

### *Customer Agreements*

Velodyne sells products and services to Ford Motor Company, a holder of more than 5% of Velodyne's capital stock prior to the completion of the Business Combination, and affiliated entities. Ford Motor Company has been a Velodyne customer since 2015. Ford Motor Company has made direct payments to Velodyne of approximately $3.2 million, $0.5 million and $0.3 million, for the years ended December 31, 2017, 2018 and 2019, respectively. Velodyne has also received payments on behalf of Ford Motor Company through third party distributors.

In July 2017, Velodyne entered into a supply agreement with Baidu (Hong Kong) Limited, which, together with its affiliates (Baidu), is a holder of more than 5% of Velodyne's capital stock prior to the completion of the Business Combination. Jennifer Li, a member of Velodyne's board of directors, is the former general managing director of Baidu Capital and the former chief financial officer of Baidu Inc. Entities affiliated with Baidu have made payments to Velodyne of approximately $4.9 million, $10.3 million and $0.6 million, for the years ended December 31, 2017, 2018 and 2019, respectively. In October 2019, Velodyne agreed to refund entities affiliated with Baidu a total of $4.8 million. Velodyne issued the refund

260

to entities affiliated with Baidu in order to compensate them for unforeseen challenges associated with the use of certain new products purchased from Velodyne in 2018. The products purchased by these entities in 2018 were still under development at the time and Velodyne felt it appropriate to compensate these early purchasers for working with a new product. Entities affiliated with Baidu continue to be important customers and stockholders.

### Policies and Procedures for Related Party Transactions

The post-combination company intends to adopt a new written related party transaction policy to be effective upon the completion of the Business Combination. The policy will provide that officers, directors, holders of more than 5% of any class of the post-combination company's voting securities, and any member of the immediate family of and any entity affiliated with any of the foregoing persons, will not be permitted to enter into a related-party transaction with the post-combination company without the prior consent of the audit committee, or other independent members of the post-combination company's board of directors in the event it is inappropriate for the audit committee to review such transaction due to a conflict of interest. Any request for the post-combination company to enter into a transaction with an executive officer, director, principal stockholder, or any of their immediate family members or affiliates, in which the amount involved exceeds $120,000, must first be presented to the audit committee for review, consideration, and approval. In approving or rejecting the proposed transactions, the audit committee will take into account all of the relevant facts and circumstances available.

All of the transactions described in this section were entered into prior to the adoption of this policy.

**MARKET PRICE, TICKER SYMBOL AND DIVIDEND INFORMATION**

**The Company**

*Market Price and Ticker Symbol*

The Company's units, common stock and warrants are currently listed on the NYSE under the symbols "GRAF.U," "GRAF," and "GRAF WS," respectively.

On July 1, 2020, the trading date before the public announcement of the Business Combination, the Company's units, common stock and warrants closed at $15.00, $13.85 and $2.29, respectively. On [•], the trading date immediately prior to the date of this proxy statement, the Company's units, common stock and warrants closed at $[•], $[•] and $[•], respectively.

*Holders*

As of [•], 2020, there were [•] holders of record of our units, [•] holders of record of our common stock, and [•] holders of record of our warrants. The number of holders of record does not include a substantially greater number of "street name" holders or beneficial holders whose units, common stock and warrants are held of record by banks, brokers and other financial institutions.

*Dividend Policy*

We have not paid any cash dividends on our common stock to date and do not intend to pay cash dividends prior to the completion of the Business Combination. The payment of any cash dividends subsequent to the Business Combination will be within the discretion of the post-combination company's board of directors at such time. We currently expect that the post-combination company will retain future earnings to finance operations and grow its business, and we do not expect the post-combination company to declare or pay cash dividends for the foreseeable future.

**Velodyne**

There is no public market for shares of Velodyne capital stock.

262

**ANNEX A**

**Dated July 2, 2020**

**Agreement and Plan of Merger**

among

**Graf Industrial Corp.,**

as Acquiror

**VL Merger Sub Inc.**

as Merger Sub

and

**Velodyne LiDAR, Inc.**

as the Company

**Table of Contents**

| | Page |
|---|---|
| Article I CERTAIN DEFINITIONS | 2 |
|    Section 1.01 Definitions | 2 |
|    Section 1.02 Construction | 12 |
|    Section 1.03 Knowledge | 12 |
| | |
| Article II THE MERGER; CLOSING | 13 |
|    Section 2.01 The Merger | 13 |
|    Section 2.02 Effects of the Merger | 13 |
|    Section 2.03 Closing | 13 |
|    Section 2.04 Certificate of Incorporation and Bylaws of the Surviving Company | 13 |
|    Section 2.05 Directors and Officers of the Surviving Company | 13 |
| | |
| Article III EFFECTS OF THE MERGER | 14 |
|    Section 3.01 Effect on Capital Stock. Subject to the provisions of this Agreement: | 14 |
|    Section 3.02 Equitable Adjustments | 14 |
|    Section 3.03 Delivery of Merger Consideration | 14 |
|    Section 3.04 Lost Certificate | 15 |
|    Section 3.05 Treatment of Equity Awards | 15 |
|    Section 3.06 Earnout | 16 |
|    Section 3.07 Withholding | 16 |
|    Section 3.08 Cash in Lieu of Fractional Shares | 16 |
|    Section 3.09 Payment of Expenses | 17 |
|    Section 3.10 Dissenting Shares | 17 |
| | |
| Article IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY | 18 |
|    Section 4.01 Corporate Organization of the Company | 18 |
|    Section 4.02 Subsidiaries | 18 |
|    Section 4.03 Due Authorization | 18 |
|    Section 4.04 No Conflict | 19 |
|    Section 4.05 Governmental Authorities; Consents | 19 |
|    Section 4.06 Capitalization | 19 |
|    Section 4.07 Financial Statements | 21 |
|    Section 4.08 Undisclosed Liabilities | 21 |
|    Section 4.09 Litigation and Proceedings | 21 |
|    Section 4.10 Compliance with Laws | 21 |
|    Section 4.11 Intellectual Property | 22 |
|    Section 4.12 Contracts; No Defaults. | 24 |
|    Section 4.13 Company Benefit Plans | 25 |
|    Section 4.14 Labor Matters | 26 |
|    Section 4.15 Taxes | 27 |
|    Section 4.16 Brokers' Fees | 28 |
|    Section 4.17 Insurance | 28 |

A-i

| | Page |
|---|---|
| Section 4.18 Real Property; Assets | 29 |
| Section 4.19 Environmental Matters | 30 |
| Section 4.20 Absence of Changes | 30 |
| Section 4.21 Affiliate Agreements | 30 |
| Section 4.22 Internal Controls | 31 |
| Section 4.23 Permits | 31 |
| Section 4.24 Proxy Statement | 31 |
| Section 4.25 No Additional Representations and Warranties | 31 |
| Article V REPRESENTATIONS AND WARRANTIES OF ACQUIROR AND MERGER SUB | 31 |
| Section 5.01 Corporate Organization | 32 |
| Section 5.02 Due Authorization | 32 |
| Section 5.03 No Conflict | 33 |
| Section 5.04 Litigation and Proceedings | 33 |
| Section 5.05 Compliance with Laws | 33 |
| Section 5.06 Governmental Authorities; Consents | 34 |
| Section 5.07 Financial Ability; Trust Account | 34 |
| Section 5.08 Taxes | 34 |
| Section 5.09 Brokers' Fees | 36 |
| Section 5.10 Acquiror SEC Reports; Financial Statements; Sarbanes-Oxley Act | 36 |
| Section 5.11 Business Activities; Undisclosed Liabilities; Absence of Changes | 37 |
| Section 5.12 Proxy Statement | 37 |
| Section 5.13 No Outside Reliance | 38 |
| Section 5.14 Capitalization | 38 |
| Section 5.15 NYSE Stock Market Quotation | 39 |
| Section 5.16 Contracts; No Defaults | 39 |
| Section 5.17 Title to Property | 39 |
| Section 5.18 Investment Company Act | 39 |
| Section 5.19 Affiliate Agreements | 39 |
| Section 5.20 Subscription Agreements | 40 |
| Article VI COVENANTS OF THE COMPANY | 40 |
| Section 6.01 Conduct of Business | 40 |
| Section 6.02 Inspection | 43 |
| Section 6.03 HSR Act and Regulatory Approvals | 43 |
| Section 6.04 No Acquiror Common Stock Transactions | 44 |
| Section 6.05 No Claim Against the Trust Account | 44 |
| Section 6.06 Proxy Solicitation; Other Actions | 44 |
| Section 6.07 Non-Solicitation; Acquisition Proposals | 45 |
| Section 6.08 Section 280G | 48 |
| Section 6.09 Securities Matters | 48 |
| Article VII COVENANTS OF ACQUIROR | 49 |
| Section 7.01 HSR Act and Regulatory Approvals | 49 |

A-ii

|  | **Page** |
|---|---|
| Section 7.02 Indemnification and Insurance | 50 |
| Section 7.03 Conduct of Acquiror During the Interim Period | 51 |
| Section 7.04 Trust Account | 52 |
| Section 7.05 Inspection | 52 |
| Section 7.06 Acquiror NYSE Listing | 53 |
| Section 7.07 Acquiror Public Filings | 53 |
| Section 7.08 Financing | 53 |
| Section 7.09 Additional Insurance Matters | 53 |
| Section 7.10 Section 16 Matters | 53 |
| Section 7.11 Exclusivity | 53 |
| Section 7.12 Extension | 54 |
| Section 7.13 Bylaws | 54 |
| Section 7.14 Warrant Restructuring | 54 |
| Section 7.15 Director Appointments | 54 |
| Section 7.16 Registration Rights Following the Closing | 54 |
| Article VIII JOINT COVENANTS | 54 |
| Section 8.01 Support of Transaction | 54 |
| Section 8.02 Preparation of Proxy Statement; Special Meeting; Solicitation of Company Requisite Approval | 55 |
| Section 8.03 Tax Matters | 56 |
| Section 8.04 Confidentiality; Publicity | 57 |
| Section 8.05 Post-Closing Cooperation; Further Assurances | 57 |
| Article IX CONDITIONS TO OBLIGATIONS | 57 |
| Section 9.01 Conditions to Obligations of All Parties | 57 |
| Section 9.02 Additional Conditions to Obligations of Acquiror | 58 |
| Section 9.03 Additional Conditions to the Obligations of the Company | 59 |
| Article X TERMINATION/EFFECTIVENESS | 60 |
| Section 10.01 Termination | 60 |
| Section 10.02 Effect of Termination | 61 |
| Article XI MISCELLANEOUS | 61 |
| Section 11.01 Waiver | 61 |
| Section 11.02 Notices | 62 |
| Section 11.03 Assignment | 63 |
| Section 11.04 Rights of Third Parties | 63 |
| Section 11.05 Expenses | 63 |
| Section 11.06 Governing Law | 63 |
| Section 11.07 Captions; Counterparts | 63 |
| Section 11.08 Schedules and Exhibits | 63 |
| Section 11.09 Entire Agreement | 63 |
| Section 11.10 Amendments | 63 |

A-iii

|  | **Page** |
|---|---|
| Section 11.11 Severability | 63 |
| Section 11.12 Jurisdiction; WAIVER OF TRIAL BY JURY | 64 |
| Section 11.13 Enforcement | 64 |
| Section 11.14 Non-Recourse | 64 |
| Section 11.15 Nonsurvival of Representations, Warranties and Covenants | 64 |
| Section 11.16 Acknowledgements | 65 |
| **Exhibit A Form of Amended and Restated Certificate of Incorporation of Acquiror** | 67 |
| **Exhibit B Form of Amended and Restated Bylaws of Acquiror** | 68 |
| **Exhibit C Form of Amended and Restated Certificate of Incorporation of the Company** | 69 |
| **Exhibit D Treatment of Company Stock** | 70 |
| **Exhibit E Earnout Shares** | 71 |

A-iv

|  | **Page** |
|---|---|
| Section 11.11 Severability | 63 |
| Section 11.12 Jurisdiction; WAIVER OF TRIAL BY JURY | 64 |
| Section 11.13 Enforcement | 64 |
| Section 11.14 Non-Recourse | 64 |
| Section 11.15 Nonsurvival of Representations, Warranties and Covenants | 64 |
| Section 11.16 Acknowledgements | 65 |
| **Exhibit A Form of Amended and Restated Certificate of Incorporation of Acquiror** | 67 |
| **Exhibit B Form of Amended and Restated Bylaws of Acquiror** | 68 |
| **Exhibit C Form of Amended and Restated Certificate of Incorporation of the Company** | 69 |
| **Exhibit D Treatment of Company Stock** | 70 |
| **Exhibit E Earnout Shares** | 71 |

**AGREEMENT AND PLAN OF MERGER**

This Agreement and Plan of Merger (this "Agreement"), dated as of July 2, 2020, is entered into by and among Graf Industrial Corp., a Delaware corporation ("Acquiror"), VL Merger Sub Inc., a Delaware corporation ("Merger Sub"), and Velodyne LiDAR, Inc., a Delaware corporation (the "Company"). Except as otherwise indicated, capitalized terms used but not defined herein shall have the meanings set forth in Article I of this Agreement.

**RECITALS**

WHEREAS, Acquiror is a blank check company incorporated to acquire one or more operating businesses through a Business Combination;

WHEREAS, Merger Sub is a newly formed, wholly owned, direct subsidiary of Acquiror, and was formed for the sole purpose of the Merger;

WHEREAS, subject to the terms and conditions hereof, at the Closing, Merger Sub is to merge with and into the Company pursuant to the Merger, with the Company surviving as the Surviving Company;

WHEREAS, the respective boards of directors or similar governing bodies of each of Acquiror, Merger Sub and the Company have each approved and declared advisable the Transactions upon the terms and subject to the conditions of this Agreement and in accordance with the Delaware General Corporation Law (the "DGCL");

WHEREAS, in connection with the Transactions, Acquiror has entered into (or will enter into prior to the Closing) subscription agreements (each, as amended or modified from time to time, a "Subscription Agreement"), with the Investors providing for investments in Acquiror in an aggregate amount not to exceed $160,000,000 (the "Base Subscription Amount") and whereas the Company shall have the right hereunder to elect to approve new Subscription Agreements in amounts in excess of the Base Subscription Amount;

WHEREAS, following the date of this Agreement, the Company intends to enter into agreements to purchase and, contemporaneously with the consummation of the Transactions, subsequently to acquire and cancel Company Shares from as-yet to be specified Company Shareholders in exchange for an aggregate amount of cash not to exceed $50,000,000, (the "Company Redemption Amount") which such amount is anticipated to be funded as a result of the Transactions;

WHEREAS, contemporaneously with the execution and delivery of this Agreement, in connection with the Transactions, the Sponsor has entered into that certain Sponsor Agreement, dated as of the date hereof (the "Sponsor Agreement"), with Acquiror and the Company;

WHEREAS, contemporaneously with the execution and delivery of this Agreement, in connection with the Transactions, certain stockholders of the Company haves entered into that certain Support Agreement, dated as of the date hereof (the "Support Agreement"), with Acquiror;

WHEREAS, pursuant to the Acquiror Organizational Documents, Acquiror shall provide an opportunity to its stockholders to have their Acquiror Common Stock redeemed for the consideration, and on the terms and subject to the conditions and limitations, set forth in this Agreement, the Acquiror Organizational Documents, the Trust Agreement, and the Proxy Statement in conjunction with, inter alia, obtaining approval from the stockholders of Acquiror for the Business Combination (the "Offer");

WHEREAS, prior to the consummation of the Transactions, the Acquiror shall, subject to obtaining the Acquiror Stockholder Approval, adopt the amended and restated certificate of incorporation (the "Acquiror A&R Charter") in the form set forth on Exhibit A, to provide for, among other things, an increase to the number of Acquiror's authorized shares of Acquiror Common Stock in connection with the Transactions;

WHEREAS, prior to the consummation of the Transactions, the Acquiror shall adopt the amended and restated bylaws (the "Acquiror A&R Bylaws") in the form set forth on Exhibit B;

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES OF THE COMPANY**

Except as set forth in the Schedules to this Agreement (each of which qualifies (a) the correspondingly numbered representation, warranty or covenant if specified therein and (b) such other representations, warranties or covenants where its relevance as an exception to (or disclosure for purposes of) such other representation, warranty or covenant is reasonably apparent), the Company represents and warrants to Acquiror and Merger Sub as follows:

**Section 4.01 Corporate Organization of the Company**.

(a) The Company has been duly incorporated, is validly existing and in good standing under the Laws of the State of Delaware and has the requisite power and authority to own, lease and operate its assets and properties and to conduct its business as it is now being conducted. The certificate of incorporation and by-laws of the Company previously made available by the Company to Acquiror are true, correct and complete and are in effect as of the date of this Agreement.

(b) The Company is licensed or duly qualified and in good standing as a foreign company in each jurisdiction in which the ownership of its property or the character of its activities is such as to require it to be so licensed or qualified or in good standing, except where the failure to be so licensed or qualified has not had and would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

**Section 4.02 Subsidiaries**.

(a) The Subsidiaries of the Company as of the date hereof, together with their jurisdiction of incorporation or organization, as applicable, are set forth on Schedule 4.02, including, as of such date, a description of the capitalization of each such Subsidiary and the names of the record owners of all securities and other equity interests in each Subsidiary. Each Subsidiary of the Company has been duly formed or organized and is validly existing under the Laws of its jurisdiction of incorporation or organization and has the organizational power and authority to own, lease and operate its assets and properties and to conduct its business as it is now being conducted, in each case, except where the failure to be so licensed or qualified has not had and would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Each Subsidiary of the Company is duly licensed or qualified and in good standing as a foreign corporation (or other entity, if applicable) in each jurisdiction in which its ownership of property or the character of its activities is such as to require it to be so licensed or qualified or in good standing, as applicable, except where the failure to be so licensed or qualified would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. Complete and correct copies of the principal organizational documents of each Company Subsidiary listed on Schedule 4.02, as amended and currently in effect, have been made available to Acquiror. No Company Subsidiary is in violation of any of the provisions pursuant to its organizational documents.

(b) As of the date hereof, except for the Company's or any of its Subsidiaries' ownership interest in such Subsidiaries, neither the Company nor its Subsidiaries own any capital stock or any other equity interests in any other Person or has any right, option, warrant, conversion right, stock appreciation right, redemption right, repurchase right, agreement, arrangement or commitment of any character under which a Person is or may become obligated to issue or sell, or give any right to subscribe for or acquire, or in any way dispose of, any shares of the capital stock or other equity interests, or any securities or obligations exercisable or exchangeable for or convertible into any shares of the capital stock or other equity interests, of such Person.

**Section 4.03 Due Authorization**. The Company has all requisite corporate power and authority to execute and deliver this Agreement and each ancillary agreement to this Agreement to which it is a party and (subject to the approvals described in Section 4.05 and the adoption of this Agreement by holders of (i) a majority of the voting power of the outstanding shares of Company Stock, (ii) a majority of the voting power of the outstanding shares of Company Common Stock, and (iii) a majority of the voting power of the outstanding shares of the Company Preferred Stock (the "Company Requisite Approval") to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and

A-18

equity in the Company, none of the Company or its Subsidiaries is a party to any transaction, agreement, arrangement or understanding with any (i) present or former executive officer or director of any of the Company or its Subsidiaries, (ii) beneficial owner (within the meaning of Section 13(d) of the Exchange Act) of 5% or more of the capital stock or equity interests of any of the Company or its Subsidiaries or (iii) Affiliate, "associate" or member of the "immediate family" (as such terms are respectively defined in Rules 12b-2 and 16a-1 of the Exchange Act) of any of the foregoing (each of the foregoing, a "Company Affiliate Agreement").

**Section 4.22** **Internal Controls**. The Company maintains a system of internal accounting controls designed to provide reasonable assurance that: (a) transactions are executed in accordance with management's general or specific authorizations; (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

**Section 4.23** **Permits**. Each of the Company and its Subsidiaries has all material Permits (the "Material Permits") that are required to own, lease or operate its properties and assets and to conduct its business as currently conducted. Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, (a) each Material Permit is in full force and effect in accordance with its terms, (b) no outstanding written notice of revocation, cancellation or termination of any Material Permit has been received by the Company or its Subsidiaries, (c) to the knowledge of the Company, none of such Permits upon its termination or expiration in the ordinary due course will not be renewed or reissued in the ordinary course of business upon terms and conditions substantially similar to its existing terms and conditions, (d) there are no Actions pending or, to the knowledge of the Company, threatened, that seek the revocation, cancellation, limitation, restriction or termination of any Material Permit and (e) each of the Company and its Subsidiaries is in compliance with all Material Permits applicable to the Company or its Subsidiaries.

**Section 4.24** **Proxy Statement**. None of the information relating to the Company or its Subsidiaries supplied by the Company, or by any other Person acting on behalf of the Company, in writing specifically for inclusion or incorporation by reference in the Proxy Statement will, as of the time the Proxy Statement, as of the date it is first mailed to the Acquiror Stockholders, and at the time of the Special Meeting, contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading; provided, however, notwithstanding the foregoing provisions of this Section 4.24, no representation or warranty is made by the Company with respect to information or statements made or incorporated by reference in the Proxy Statement that were not supplied by or on behalf of the Company for use therein.

**Section 4.25** **No Additional Representations and Warranties**. Except as otherwise expressly provided in this Article IV (as modified by the Schedules), the Company expressly disclaims any representations or warranties of any kind or nature, express or implied, as to the condition, value or quality of the Company or the Company's assets, and Acquiror and Merger Sub shall rely on their own examination and investigation thereof. None of the Company's Affiliates or any of their respective directors, officers, employees, stockholders, partners, members or representatives has made, or is making, any representation or warranty whatsoever to Acquiror or its Affiliates, and no such party shall be liable in respect of the accuracy or completeness of any information provided to Acquiror or its Affiliates.

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES
OF ACQUIROR AND MERGER SUB**

Except as set forth in (a) the Schedules to this Agreement (each of which qualifies (i) the correspondingly numbered representation, warranty or covenant if specified therein and (ii) such other representations, warranties or covenants where its relevance as an exception to (or disclosure for purposes of) such other representation, warranty or covenant is reasonably apparent) or (b) the registration statements, reports, schedules, forms, statements and other documents filed or furnished with the SEC by Acquiror (excluding any disclosures in such Acquiror SEC Reports under the headings "Risk Factors," "Forward-Looking

A-31

IN WITNESS WHEREOF, Acquiror, Merger Sub and the Company have caused this Agreement to be executed and delivered as of the date first written above by their respective officers thereunto duly authorized.

**GRAF INDUSTRIAL CORP.**

By:  /s/ James A. Graf
        Name:   James A. Graf
        Title:    Chief Executive Officer

**VL MERGER SUB INC.**

By:  /s/ James A. Graf
        Name:   James A. Graf
        Title:    President

**VELODYNE LIDAR, INC.**

By:  /s/ Anand Gopalan
        Name:   Anand Gopalan
        Title:    Chief Executive Officer

A-66