Ramzi Abadou (SBN 222567)
**KAHN SWICK & FOTI, LLP**
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 459-6900
Facsimile: (504) 455-1498
ramzi.abadou@ksfcounsel.com

*Lead Counsel and Counsel for Lead Plaintiffs,*
*Diane Smith & William P. Smith*

*[Additional counsel on signature page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MEYSAM MORADPOUR, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VELODYNE LIDAR, INC., ANAND GOPALAN, ANDREW HAMER, JAMES A. GRAF, MICHAEL DEE, and JOSEPH B. CULKIN<br>Defendants. | Case No. 3:21-CV-01486-SI<br><br>**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>**CLASS ACTION**<br><br>JURY TRIAL DEMANDED<br><br>Judge: Hon. Susan Illston<br>Date: March 4, 2022<br>Time: 10:00 a.m.<br>Courtroom: 1 - 17th Floor |

OPP. TO MTN. TO DISMISS                                          CASE NO. 3:21-CV-01486-SI

# TABLE OF CONTENTS

I.  INTRODUCTION ...................................................................................................1

II.  STATEMENT OF FACTS .....................................................................................8

III.  LEGAL STANDARDS ........................................................................................13

IV.  ARGUMENT .......................................................................................................13

    A.  Defendants' Materially False and Misleading Statements Are Actionable ...........13

        1.  Defendants' Statements Regarding Hall's Continued Involvement in the Company After the Reverse Merger are Actionable ...................................14

        2.  Defendants Financial Target Statements Are Actionable ..........................20

        3.  Defendants' Statements about Ford's Continued Involvement with Velodyne Are Actionable ..........................................................................24

        4.  Defendants' Internal Controls Statements Are Actionable ........................26

    B.  Additional Indicia of Scienter .................................................................................27

V.  CONCLUSION .....................................................................................................30

**TABLE OF AUTHORITIES**

**Federal Cases**                                                                                                  **Page(s)**

*Abdo v. Fitzsimmons*,
    2018 U.S. Dist. LEXIS 241075 (N.D. Cal. 2018) ........................................................................ 18

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ................................................................................................ 2, 16

*Bodri v. GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017) ........................................................................................ 20

*Brendon v. Allegiant Travel Co.*,
    412 F. Supp. 3d 1244 (D. Nev. 2019) ......................................................................................... 29

*Bruce v. Suntech Power Holdings Co.*,
    64 F. Supp. 3d 1365 (N.D. Cal. 2014) ........................................................................................ 24

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
    2021 U.S. Dist. LEXIS 71757 (S.D. Tex. 2021) ..................................................................... 1, 26

*Commc'ns Workers of Am. Plan for Emps. Pensions & Death Bens. v. CSK Auto Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) ......................................................................................... 26

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ...................................................................................................... 30

*Fecht v. Price Co.*,
    70 F.3d 1078 (9th Cir. 1995) ........................................................................................................ 25

*Hampton v. Aqua Metals, Inc.*,
    2020 U.S. Dist. LEXIS 214010 (N.D. Cal. 2020) ...................................................................... 18

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) ........................................................................................................ 19

*Howard v. Everex Sys.*,
    228 F.3d 1057 (9th Cir. 2000) ........................................................................................................ 1

*Hunt v. Bloom Energy Corp.*,
    2021 U.S. Dist. LEXIS 187321 (N.D. Cal. 2021) ...................................................................... 27

*In re Adaptive Broadband Sec. Litig.*,
    2002 U.S. Dist. LEXIS 5887 (N.D. Cal. 2002) .......................................................................... 30

*In re Am. Apparel, Inc. S'holder Litig.*,
    855 F. Supp. 2d 1043 (C.D. Cal. 2012) ....................................................................................... 25

*In re Apple Comput., Inc.*,
  2003 U.S. Dist. LEXIS 28303 (N.D. Cal. 2003) ........................................................................ 23

*In re Apple Sec. Litig.*,
  2020 U.S. Dist. LEXIS 206298 (N.D. Cal. 2020) ............................................................. 7, 19, 26

*In re Celera Corp. Secs. Litig.*,
  2013 U.S. Dist. LEXIS 125621 (N.D. Cal. 2013) ...................................................................... 22

*In re Coinstar Inc. Secs. Litig.*,
  2011 U.S. Dist. LEXIS 115794 (W.D. Wash. 2011) .................................................................. 23

*In re Connetics Corp. Sec. Litig.*,
  542 F. Supp. 2d 996 (N.D. Cal. 2008) ...................................................................................... 13

*In re Connetics Corp. Sec. Litig.*,
  2008 U.S. Dist. LEXIS 62515 (N.D. Cal. 2008) .................................................................. 16-17

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) .................................................................................................. 21

*In re CV Therapeutics, Inc. Sec. Litig.*,
  2004 U.S. Dist. LEXIS 17419 (N.D. Cal. 2004) ...................................................................... 30

*In re CytRx Corp. Sec. Litig.*,
  2015 U.S. Dist. LEXIS 91447 (C.D. Cal. 2015) ...................................................................... 28

*In re Daou Sys.*,
  411 F.3d 1006 (9th Cir. 2005) .................................................................................................. 14

*In re Gilead Scis. Secs. Litig.*,
  2009 U.S. Dist. LEXIS 95072 (N.D. Cal. 2009) ...................................................................... 17

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) ...................................................................................... 19

*In re Impax Labs., Inc. Sec. Litig.*,
  2007 U.S. Dist. LEXIS 52356 (N.D. Cal. 2007) ...................................................................... 29

*In re Intuitive Surgical Secs. Litig.*,
  2014 U.S. Dist. LEXIS 173088 (N.D. Cal. 2014) .................................................................... 13

*In re Mattel Secs. Litig.*,
  2021 U.S. Dist. LEXIS 65480 (C.D. Cal. 2021) ............................................................. *passim*

*In re Maxwell Techs., Inc. Sec. Litig.*,
  18 F. Supp. 3d 1023 (S.D. Cal. 2014) ...................................................................................... 17

*In re Nektar Therapeutics*,
  2020 U.S. Dist. LEXIS 122715 (N.D. Cal. 2020) .................................................................... 13

*In re Nuvelo, Inc.*,
    668 F. Supp. 2d 1217 (N.D. Cal. 2009) ................................................................. 13

*In re Peregrine Sys.*,
    2005 U.S. Dist. LEXIS 59408 (S.D. Cal. 2005) .................................................... 17

*In re Quality Sys.*,
    865 F.3d 1130 (9th Cir. 2017) ...................................................... 16, 21, 23, 24

*In re Rigel Pharm., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ................................................................................ 27

*In re Rocket Fuel, Inc. Secs. Litig.*,
    2015 U.S. Dist. LEXIS 171552 (N.D. Cal. 2015) ................................................ 18

*In re Sipex Corp. Sec. Litig.*,
    2005 U.S. Dist. LEXIS 30854 (N.D. Cal. 2005) .................................................. 30

*In re Stillwater Capital Partners Inc.*,
    858 F. Supp. 2d 277 (S.D.N.Y. 2012) .................................................................. 27

*In re Textainer P'ship Sec. Litig.*,
    2005 U.S. Dist. LEXIS 40974 (N.D. Cal. 2005) .................................................. 16

*In re VeriFone Holdings, Inc. Sec. Litig.*,
    704 F.3d 694 (9th Cir. 2012) .................................................................................. 1

*In re WageWorks, Inc., Sec. Litig.*,
    2020 U.S. Dist. LEXIS 97180 (N.D. Cal. 2020) .................................................. 28

*In re Yahoo! Inc. Sec. Litig.*,
    2012 U.S. Dist. LEXIS 113036 (N.D. Cal. 2012) ................................................ 19

*In re Zynga Inc. Secs. Litig.*,
    2015 U.S. Dist. LEXIS 38722 (N.D. Cal. 2015) .................................................. 16

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
    2021 U.S. Dist. LEXIS 68415 (M.D. Tenn. 2021) ......................................... 26, 30

*Karinski v. Stamps.com, Inc.*,
    2020 U.S. Dist. LEXIS 10721 (C.D. Cal. 2020) .................................................. 19

*Kasper v. AAC Holdings, Inc.*,
    2016 U.S. Dist. LEXIS 87492 (M.D. Tenn. 2016) ............................................... 15

*Khoja v. Orexigen Therapeutics, Inc.*,
    899 F.3d 988 (9th Cir. 2018) ....................................................................... *passim*

*Kim v. Advanced Micro Devices, Inc.*,
    2019 U.S. Dist. LEXIS 87287 (N.D. Cal. 2019) .................................................. 14

*Libon v. Infineon Techs., AG*,
2006 U.S. Dist. LEXIS 76430 (E.D. Va. 2006) ........................................................................... 17

*Loritz v. Exide Techs.*,
2014 U.S. Dist. LEXIS 111491 (C.D. Cal. 2014) ....................................................................... 30

*Luna v. Marvell Tech. Grp.*,
2017 U.S. Dist. LEXIS 75262 (N.D. Cal. 2017) ........................................................................ 29

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ..................................................................................................................... 17

*Middlesex Ret. Sys. v. Quest Software Inc.*,
527 F. Supp. 2d 1164 (C.D. Cal. 2007) ....................................................................................... 7

*Miller v. PCM, Inc.*,
2018 U.S. Dist. LEXIS 148930 (C.D. Cal. 2018) ................................................................. 15-16

*Miller v. Thane Int'l, Inc.*,
519 F.3d 879 (9th Cir. 2008) ..................................................................................................... 25

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ....................................................................................... 22

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) ......................................................................................... 16

*Nguyen v. Endologix, Inc.*,
962 F.3d 405 (9th Cir. 2020) ..................................................................................................... 16

*Nieman v. Duke Energy Corp.*,
2013 U.S. Dist. LEXIS 110693 (W.D.N.C. 2013) ............................................................... *passim*

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
320 F.3d 920 (9th Cir. 2003) ..................................................................................................... 27

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
759 F.3d 1051 (9th Cir. 2014) ....................................................................................... 21, 22, 27

*PPM Am. v. Marriott Corp.*,
853 F. Supp. 860 (D. Md. 1994) ................................................................................................ 18

*Reese v. Malone*,
747 F.3d 557 (9th Cir. 2014) ..................................................................................................... 25

*Rodriguez v. Gigamon Inc.*,
325 F. Supp. 3d 1041 (N.D. Cal. 2018) ..................................................................................... 22

*Rok v. Identiv, Inc.*,
2017 U.S. Dist. LEXIS 1019 (N.D. Cal. 2017) .......................................................................... 26

*Ronconi v. Larkin*,
  253 F.3d 423 (9th Cir. 2001) ............................................................................................ 24

*Rubke v. Capitol Bancorp, Ltd.*,
  551 F.3d 1156 (9th Cir. 2009) ........................................................................................ 27

*Sakkal v. Anaplan Inc.*,
  2021 U.S. Dist. LEXIS 165128 (N.D. Cal. 2021) ......................................................... 30

*Sayce v. Forescout Techs., Inc.*,
  2021 U.S. Dist. LEXIS 57256 (N.D. Cal. 2021) ...................................................... 22, 24

*Sayce v. Forescout Techs., Inc.*,
  2021 U.S. Dist. LEXIS 193207 (N.D. Cal. 2021) ......................................................... 16

*Schueneman v. Arena Pharms., Inc.*,
  840 F.3d 698 (9th Cir. 2016) ......................................................................................... 7-8

*Sec. & Exchange Comm'n v. Steve Qi & Law Offices of Steve Qi & Assocs.*,
  2018 U.S. Dist. LEXIS 239178 (C.D. Cal. 2018) ......................................................... 13

*Shenwick v. Twitter, Inc.*,
  282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...................................................... 5, 20, 28, 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ....................................................................................................... 27

*Van Noppen v. Innerworkings, Inc.*,
  136 F. Supp. 3d 922 (N.D. Ill. 2015) ....................................................................... 15, 17

*Veal v. LendingClub Corp.*,
  423 F. Supp. 3d 785 (N.D. Cal. 2019) .......................................................................... 26

*Welgus v. TriNet Grp., Inc.*,
  2017 U.S. Dist. LEXIS 207777 (N.D. Cal. 2017) ......................................................... 26

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) .................................................................................. 21, 22

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
  655 F.3d 1039 (9th Cir. 2011) .......................................................................................... 1

*Zaghian v. Farrell*,
  675 F. App'x 718 (9th Cir. 2017) .................................................................................. 23

*Zucco Partners, L.L.C. v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ......................................................................................... 28

**Federal Statutes**

15 U.S.C. § 78u-4 ............................................................................................................. 13

15 U.S.C. § 78u-5 ............................................................................................................. 23

**Rules**

FED. R. CIV. P. 15 ............................................................................................................. 30

**STATEMENT OF ISSUES TO BE DECIDED**

1. Whether the Consolidated Class Action Complaint for Violations of the Federal Securities Laws ("Complaint") adequately pleads materially false and misleading statements and/or omissions pursuant to § 10(b) the Exchange Act of 1934 and Rule 10b-5 promulgated thereunder ("Exchange Act"). *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018); *Nieman v. Duke Energy Corp.*, 2013 U.S. Dist. LEXIS 110693 (W.D.N.C. 2013); *see also* §IV.A, *infra*.

2. Whether the Complaint adequately pleads facts pursuant to § 10(b) of the Exchange Act that give rise to a strong inference that Defendants: (i) Anand Gopalan; (ii) Andrew Hamer; (iii) James Graf; (iv) Michael Dee; and (v) Joseph B. Culkin (the "Insider Defendants") made their materially false and misleading statements and/or omissions with scienter. *See In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694 (9th Cir. 2012); *see also* §§IV.A-B, *infra*.

3. Whether the Complaint adequately pleads "control person" liability claims under § 20(a) of the Exchange Act against the Insider Defendants. *See Howard v. Everex Sys.*, 228 F.3d 1057 (9th Cir. 2000); *see also* §IV.B, *infra*.

4. Whether the Complaint adequately pleads facts pursuant to Rules 10b-5(a) and (c) to support a "scheme liability" claim arising from Defendants Graf and Dee's misleading conduct. *See WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039 (9th Cir. 2011); *see also* §IV.B, *infra*.

## I. INTRODUCTION

The Complaint tells the now familiar story of reverse merger abuses by special purpose acquisition company ("SPAC") insiders to enrich themselves at the expense of public investors. *See* ¶¶69, n.9, 98; *see also Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, 2021 U.S. Dist. LEXIS 71757, at *6 n.1 (S.D. Tex. 2021). Here, to obtain shareholder approval for Graf Industrial Corp.'s ("GIC's") September 2020 "de-SPAC" reverse merger ("Reverse Merger") with Velodyne Lidar, Inc. ("Velodyne" or the "Company") before time expired for Defendants Graf and Dee to do so (¶¶77-87), the Insider Defendants: (i) falsely assured investors that Velodyne's founder, former CEO and Executive Chairman of the Board David Hall ("Hall") would "continue to play a ***critical*** role as

executive chairman of Velodyne" and "remain deeply involved in all aspects of Velodyne's business," while simultaneously engaging in efforts to remove him from Velodyne once the Reverse Merger closed;[1] (ii) made baseless and grossly misleading revenue guidance projections for fiscal years 2020 through 2024, which they withdrew just a short time after the Reverse Merger; (iii) misrepresented that Ford Motor Company ("Ford") was expected to maintain a greater than 5% stake in the combined Company following the Reverse Merger even though they knew or were reckless in not knowing that Ford intended to sell its entire stake in Velodyne almost immediately after it closed; and (iv) misrepresented the quality of the Company's internal controls, which they admitted suffered from material weaknesses soon after the Reverse Merger. Ultimately, as cogently pled in the Complaint, Defendants gave "reasonable investor[s] the 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]'" regarding Velodyne's operations and prospects. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

Indeed, as alleged in the Complaint, none of the representations that Defendants made to lend credibility to the Reverse Merger materialized once the de-SPAC was completed: (i) Defendants pushed Hall out of his role in the Company; (ii) Defendants missed their revenue projections and withdrew future guidance; (iii) Ford divested its entire stake in Velodyne; and (iv) the internal controls that Defendants purportedly "put in place" "to be a public company" were virtually nonexistent. ¶¶15-19, 22-24, 27-30, 158. Meanwhile, Defendants reaped substantial financial benefits (*see* §IV.B, *infra*) while investors shouldered the burden of Defendants' severely reckless conduct. Indeed, during the Class Period, Velodyne's common stock closed at an artificially inflated high of $30.43 per share on September 9, 2020. Once that inflation was removed in a series of partial disclosures, the Company's share price closed at $13.00 on March 23, 2021.[2] ¶399. As of this filing, the Company's share price trades at a meager $4.23 per share.

***Hall Allegations Summary*:** In a scheme designed to persuade skeptical investors to approve

---

[1]    "¶" or ¶¶" refers to the Complaint. All emphasis added and internal citations omitted herein unless otherwise noted.

[2]    Defendants do not contest loss causation for any of the four categories of statements Plaintiffs allege are materially misleading.

the Reverse Merger, knowing Hall's deep knowledge of lidar, and cognizant that investors were keenly aware of his importance to the Company's operations and prospects, Defendants repeatedly misrepresented virtually throughout the entire July 2, 2020 through March 17, 2021 proposed class period ("Class Period") that Hall would "remain deeply involved in all aspects of Velodyne's business" and "actively involved in the post-combination company's product and technology development strategy." ¶¶173, 185-86, 188-92, 204-08, 220-23, 236-40, 252-56, 265-69, 274-76, 288-91, 316. Simultaneously, and unbeknownst to investors, Defendants were engaged in a damaging dispute with Hall for control of Velodyne since July 2020 in order to enrich themselves at Hall's (and Velodyne's investors') expense. *See, e.g.*, ¶¶108-14. Defendants later admitted that the Board's purported concerns with Hall arose "beginning in the *fall of 2020*." *See* ¶¶50, 108-09, 366-67, 367 n.42. "[E]ven as they implemented the final details of their plan [to remove Hall, however], Defendants continued to issue false and misleading prospectus materials, regulatory filings and public statements . . . that [Hall] would be [Chairman]." *See Nieman*, 2013 U.S. Dist. LEXIS 110693, at *12; *id*. at *25 ("the materiality of Johnson being retained as CEO is clearly established").

After the Reverse Merger in October 2020, Defendants continued to reassure investors that "Mr. Hall *will* serve as the post-combination company's executive chairman . . . ." ¶276. On January 7, 2021, Defendants not only again concealed their investigations in an announcement withdrawing the Company's 2021 financial guidance, but they also affirmatively misrepresented "*that there is no change in our fundamental outlook for the future.*" ¶¶18-19, 332, 334.[3] Defendants, therefore, on the one hand misleadingly assured investors that the Company's "fundamental outlook" remained unchanged as of January 7, 2021 while contemporaneously knowing they had already hired outside counsel on December 9, 2020 to remove Hall. ¶¶15, 191, 207, 222, 239, 255, 268, 276, 290, 324; *Nieman*, 2013 U.S. Dist. LEXIS 110693, at *26 (scienter pled where "Defendants worked with outside counsel on the plan to remove [CEO] Johnson."). Defendant Gopalan not only concealed the Audit

---

[3]    Notably, the same day, Defendant Gopalan also failed to disclose that that Ford—one of Velodyne's largest investors—had already divested its entire ownership stake in the Company as of December 31, 2020. *See* ¶¶27, 153-56, 331-34, 392.

Committee and outside investigations during the Class Period, but also withheld that Hall had on January 7, 2021 informed Defendants that he was, due to their efforts to marginalize him and plunder the Company, transitioning to a non-executive position. *See* ¶¶331-34. "[H]aving learned new information that diminished the weight of [their prior representations about Hall], [Velodyne] was obligated to share that information." *Khoja*, 899 F.3d at 1015. Their failure to do so is actionable. *Id.*

Of course, given Hall's detailed accusations of wrongdoing against the Insider Defendants (*see*, *e.g.*, ¶113 (Hall: Defendant Gopalan "manipulated the truth to customers and investors alike" during the Class Period)), Defendants now speciously seek to portray him as some unreliable low-level confidential witness.[4] *Compare* Mot. at 2 (arguing that Hall does not have "requisite . . . knowledge" and is not a "reliable source") *with* ¶185, 186, 189-91, 205, 207, 220, 222, 237, 239, 253, 255, 266, 268, 274, 276, 288, 290, 323-24 (representing throughout the Class Period that Hall was a "visionary" that Velodyne was "highly dependent" on). Indeed, they go so far as to use ellipses in their Motion to obscure their own Class Period representations about Hall's "[v]isionary and proven **management team** with deep industry experience."[5] *Cf.* Mot. at 17 *with* ¶190. Defendants' current efforts, however, squarely contradict their repeated Class Period representations that Hall "will continue to play a critical role as executive chairman of Velodyne" after the Reverse Merger. ¶¶14, 191, 207, 222, 239, 255, 268, 276, 290, 324. Accordingly, Defendants' authorities concerning the unreliability of confidential third-party sources have no applicability here. *Compare* Mot. at 13-14 *with In re Mattel Secs. Litig.*, 2021 U.S. Dist. LEXIS 65480, at *30 (C.D. Cal. 2021) (named director's "reliability ostensibly exceeds that of confidential sources other courts find sufficiently reputable due to his disclosed identity, elevated position, and first-hand knowledge of many pertinent events.").

***Financial Target Allegations Summary*:** In another effort to mislead investors to approve the Reverse Merger, Defendants announced, affirmed and repeatedly reaffirmed Velodyne's explosive

---

[4]    While Defendants request that the Court incorporate by reference and/or take judicial notice of 25 documents, tellingly, none involve Hall's statements against the Company or the Individual Defendants. *See* ECF 86. Nor did Defendants submit any of the analyst reports cited in the Complaint. *See id.*; *see also Khoja*, 899 F.3d at 998-99.

[5]    Defendants' ellipses obscured the highlighted language in the preceding sentence.

financial growth targets through *2024* based on "existing customer contracts" (¶¶171, 175, 179, 197, 201, 214, 228, 230-32, 248, 258, 280, 309, 311-12). Then, on January 7, 2021, Defendants unexpectedly withdrew the Company's financial guidance for *2021 through 2024*. ¶¶127-28, 331-32. During a subsequent earnings call on February 25, 2021, after Defendant Hamer had previously personally touted the Company's financial targets, he refused to answer *any* questions from analysts about the withdrawn guidance and earnings miss. *See* ¶¶130-34 (Hamer: "*Again, I can't provide guidance*."); *see also* ¶135 (Berenberg: "Some investors pushed back as to why this lack of visibility is now a problem, while the company had been providing guidance to $150m of revenue in 2021 (+50% yoy) throughout the SPAC merger process and into the new year[.]"); *see also Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) ("timing of Defendants' statements is suggestive of scienter" where "Defendants' evasive responses to questions . . . came just a few months after their aggressive user growth and engagement projections."). Hall subsequently revealed that Defendants made their projections "*knowing* the company would miss its 2020 projections." ¶164. Cognizant of their legal exposure, Defendants invoke the PSLRA's safe harbor. *See* Mot. at 18-22.

The PSLRA's safe harbor provisions, however, do not apply here. *See* ¶408. The now General Counsel of the SEC (and then-Acting Director of the Division of Corporate Finance) John Coates has publicly stated that going public *via* a de-SPAC (*i.e.*, reverse merger) has all the hallmarks of a traditional initial public offering for which the safe harbor does *not* apply. *See* ¶¶69, 407-08; *see also* n.9 ("the PSLRA excludes from its safe harbor 'initial public offerings,' and *that phrase may include de-SPAC transactions*. That possibility further calls into question any sweeping claims about liability risk being more favorable for SPACs than for conventional IPOs.").[6]

The safe harbor notwithstanding, the Complaint also alleges that, beginning with the consummation of the Merger on July 2, 2020, that Hall "express[ed] [his] concerns with [Velodyne]'s corporate governance, strategy and *financial performance* . . . ." ¶107. At that time, according to Hall,

---

[6] *See Coates*, SPACS, IPOS and Liability Risk Under the Securities Laws, https://bit.ly/3oc54Uj. The SEC would no doubt be troubled by Defendants' claim that its now General Counsel made "frivolous" public announcements interpreting the federal securities laws. Mot. at 20, n.11.

Defendants Graf and Dee had begun to recklessly "curtail[] [Mr. Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward." ¶108. Such conduct "emboldened [Defendant] Gopalan to disregard [Mr. Hall's] views" even though Hall had privately raised with Defendants his "grave concerns regarding the Company's *plunging product sales, departure of key R&D personnel, significant loss of market share to competitors*, the serious risk of theft of IP in China and the Company's overall poor financial performance." ¶¶108-09. Defendants disclosed none of these negative material developments in the lead up to the Reverse Merger even while simultaneously making aggressive statements about the Company's financial performance and prospects. Moreover, Hall's public disclosures about Defendants' material misstatements have been independently corroborated by numerous sophisticated market analysts and other such market participants. *Compare* ¶¶25 (Berenberg: "*Mr. Hall appears to corroborate some of the views expressed in our downgrade notes that the company is experiencing a 'significant loss of market share to competitors*.'"); *and* ¶¶107-09 *with* ¶¶39, 110, 130, 135-37, 142, 146, 165, 293, 332, 341, 343-44, 371, 381.

Defendants Gopalan and Hamer subsequently sought to blame the Company's grossly misrepresented Class Period financial results on "COVID-19 related disruptions," despite previously disclaiming any impacts by the Covid pandemic. *See* ¶¶331-34; *see also* ¶230 (Sept. 1, 2020: "*Despite COVID-19* impact, Velodyne maintains 2020 revenue guidance and reaffirms revenue outlook to 2024[.]"); ¶¶309-10 (Nov. 5, 2020: "For the full year 2020, we expect total revenue of approximately $101 million, as previously forecasted. . . . *Despite the continued impacts of Covid-19*, we see growing interest in lidar applications across multiple industries, as evidenced by our accelerating commercial success across all of our focused markets."); *cf.* ¶110 (Hall describing COVID-19 as "a convenient scapegoat" for undisclosed Class Period customer losses and competitive pressures); *see also* ¶¶171, 175, 179, 197, 201, 214, 228-32, 248, 258, 280, 293-94, 311-12. Indeed, as the Reverse Merger approached, Defendants suddenly announced that "Velodyne's customer agreements represent approximately *$970mm in expected revenue through 2024*, *a $130mm increase from time of initial transaction announcement on July 2, 2020*." ¶¶228, 230-32, 241, 248, 258.

When their attempts to blame the COVID-19 pandemic were met with skepticism from analysts (and Hall), Defendants finally revealed on February 25, 2021 significant lost customer contracts, including Ford, which they had also misrepresented would remain a customer after the Reverse Merger.[7] ¶135 (Berenberg: "VLDR is losing share in spinning lidar, while facing stiff competition in directional lidar. Management commentary suggests that revenue could be flat or down in 2021 versus prior guidance of +50%yoy, which we believe is *more indicative of competitive challenges than pandemic-related disruptions*."); ¶342 (Craig-Hallum: "It hasn't been a banner year for VLDR . . . . Removing 2021 sales guidance on 'lower-visibility', public info emerging on lost deals with key customers (incl. *one we think was Ford*)[.]"); *see also* ¶¶137, 141, 342-44.

*Ford Allegations Summary*: Next, the Complaint alleges that Defendants knew Ford intended to abandon Velodyne as both an investor and customer as early as July 2020 when the Merger was first announced, *see* ¶145-51, even though they maintained as late as November 2020 that "Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination." *See* ¶212; *see also* ¶¶278, 286, 306. After Ford had sold its entire stake in the Company in the fourth quarter of 2020—which Ford (not Defendants) later disclosed on February 12, 2021—Defendant Hamer later admitted during a February 25, 2021 earnings call that Ford doesn't "*like to stick around* . . . . That's not their nature. They'd rather reallocate that capital to other investment[s]." *See* ¶¶27, 156; *see also In re Apple Sec. Litig.*, 2020 U.S. Dist. LEXIS 206298, at *18 n.4, *25-28 (N.D. Cal. 2020); *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("[A] 'later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement.'"). A Ford spokesperson confirmed as much on February 15, 2021, revealing that Ford's "long term capital investment strategy" was to divest itself after the Reverse Merger. ¶¶27, 156. Defendants' public representations about Ford's intentions, which were calculated to lend an air of credibility to the Reverse Merger, created for themselves the obligation to "disclos[e] adverse

---

[7]    Velodyne's purported COVID-19 related "reduced production capabilities" occurred during the same timeframe that the Company lost customer contracts. *Compare* ¶129 *with* ¶130.

information." *See Khoja*, 899 F.3d at 1009 (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016)). They ran roughshod over the obligation.

***Internal Controls Allegations Summary*:** Finally, on March 17, 2021, after repeatedly touting the quality of the Company's internal controls, Velodyne revealed "material weaknesses in our control over financial reporting" "which resulted in ***misstatements of revenue*** and deferred revenue for the three months ended December 31, 2020." ¶¶345-47. The same day, the Company revealed in a press release filed with the SEC on Form 8-K that its Chief Operating Officer ("COO") Thomas Tewell had suddenly and unexpectedly resigned, tersely stating that: "[o]n March 14, 2021, Mr. Tewell resigned from the Company, effective immediately." ¶30. Only a short time earlier, however, Defendants Gopalan and Hamer each certified the effectiveness of Velodyne's controls pursuant to the Sarbanes Oxley-Act of 2002 ("SOX"). *See* ¶¶194, 210, 242, 260. Gopalan further trumpeted them during an investor interview on November 5, 2020. ¶320. The Complaint alleges that Velodyne's internal control deficiencies were ongoing during the Company's Reverse Merger and admittedly caused Velodyne's revenue misstatement during the fourth quarter of 2020. *See* ¶¶160-61, 327, 345-47. Hall himself has since publicly stated that he had previously informed Defendants that the Company's "***corporate governance is broken***," revealing that he had raised "concerns with [Velodyne's] corporate governance" with Defendants as early as July 2020. *See* ¶¶107-10.

For all the reasons set forth herein, Defendants' motion should be denied in its entirety.

## II.    STATEMENT OF FACTS

SPACs raise capital through initial public stock offerings for the sole purpose of acquiring a private company to take public. ¶¶8, 64-66. GIC, the SPAC formed by Defendants Graf and Dee in June 2018, raised gross proceeds of $244 million from investors. ¶75. GIC's original articles of incorporation mandated that it was required to complete a merger by April 18, 2020. ¶¶8, 70, 73, 75. Defendant Graf and Dee's failure to do so would require them to refund the more than $200 million raised. *Id.* They would also be left personally holding millions of dollars' worth of expired founders' shares and warrants which were specifically excluded from any liquidating distributions from GIC's $200+ million trust account. ¶¶8, 73-74.

On April 8, 2020, GIC announced that it was in negotiations to acquire PureCycle Technologies. ¶¶83, 85. Unable to complete that de-SPAC merger within the remaining time, on April 16, 2020 (just two days before GIC's deadline to complete a merger), GIC amended its articles of incorporation to extend its deadline to July 31, 2020. ¶84. Despite the extension, PureCycle later went public *via* a different SPAC. ¶¶84-85.[8] As a result, GIC's shareholders redeemed approximately $132.1 million, draining GIC's trust account by 53% and leaving only $117.3 million to complete an acquisition. ¶86, n.17. Having lost more than half of their working capital, Defendants Graf and Dee had strong motive to quickly (and recklessly) secure an alternate target. *Id.* They then turned their sights on Velodyne—a privately held manufacturer of lidar, which is a method to measure distances using lasers, used to make high-resolution maps or as a key feature in autonomous vehicles. *Id.*

Velodyne was founded by Hall in 2015, who also served as its CEO until 2020. Hall had founded an acoustics company in 1983, and by 2005 he had started developing lidar technology, patenting this "revolutionary" technology (per *Forbes*) the following year. ¶88. On July 2, 2020 (after purportedly conducting due diligence of, *inter alia*, Hall), Defendants Dee and Graf announced an agreement to merge with Velodyne to be funded by cash and new stock issuances which would value the combined Company at $1.8 billion. ¶94. Following the announcement, GIC *again* amended its articles of incorporation to extend the deadline to complete a merger until October 31, 2020. ¶96. Ultimately, GIC and Velodyne consummated the de-SPAC Reverse Merger on September 29, 2020.

In connection therewith, the Complaint pleads four categories of materially false and misleading Class Period statements. First, given his importance to Velodyne's future prospects, Defendants misrepresented their retention of Hall in an executive role, assuring investors that he would "remain[] deeply involved in all aspects of Velodyne's business, including product development." ¶¶191, 207, 222, 239, 255, 268, 276, 290, 324. The Company's Class Period risk disclosures even acknowledged that "[n]egative public perception of, or negative news related to Mr. Hall . . . may

---

[8]    Defendant Dee is also currently facing securities fraud allegations arising from his role as CFO of that company for enriching himself while "'hoisting . . . ridiculous financial projections onto the public markets, leaving retail investors to face the ultimate consequences.'" *See* ¶¶85 n.16, 111.

adversely affect Velodyne's brand, relationship with customers, or standing in the industry." ¶¶19, 191, 207, 222, 239, 255, 268, 276, 290, 324. According to Hall, however, starting on July 2, 2020, Defendants Graf and Dee had already begun to recklessly, given their complete lack of lidar expertise, "curtail [Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business[.]" ¶108. Meanwhile, Velodyne's Audit Committee had commenced an "investigation" into Hall, which began no later than November 2020. ¶¶6, 15, 18, 19, 101-02, 367 n.42. Investors, however, were left in the dark until February 22, 2021, when these negative material developments caused the Company's share price to plummet. ¶101. After Hall *was* finally removed, Defendants provided little more than conclusory assertions about an investigation that Hall described as a "well-played out plan" to oust him. *See, e.g.*, ¶¶15, 102, 104-08.

On January 7, 2021, in conjunction with Defendants' unexpected withdrawal of the Company's recently affirmed 2021 revenue guidance, they failed to also disclose that Hall had resigned as an employee that very day and that the Company had elevated the Audit Committee's internal investigation by previously hiring outside counsel on December 9, 2020. ¶¶331-36. To the contrary, Defendant Gopalan specifically reassured investors on January 7, 2021 that, despite the withdrawn guidance, "*there is no change in our fundamental outlook for the future*." ¶¶332-34. Similarly, Velodyne's press release filed on Form 8-K with the SEC on January 13, 2021 also failed to disclose Defendants' damaging fight for control over Velodyne with Hall, misleadingly stating instead that he had merely "*voluntarily* transitioned from serving as an employee and executive officer of the Company to a non-executive role, effective immediately." ¶¶19 n.6, 334. On February 19, 2021, in what Hall later described as an "ambush" (*see* ¶105), the Company suddenly removed him as Chairman of the Board. ¶101. On February 22, 2021, Velodyne's stock and warrants tanked by 14.87% and 9.52% on a single day's trading, on unusually heavy volume. ¶394.

Second, Defendants misrepresented that Velodyne would generate revenues of approximately $100 million in 2020, increasing to $680 million in 2024, with existing contracts driving "just under 50% of the estimated 2024 revenues." ¶117. A press release issued on August 31, 2020 not only reaffirmed the prior guidance, but highlighted a sudden $130 million *increase* in existing customer

agreements to a staggering **$970 million** in expected revenues. ¶¶118-20. On September 1, 2020, Defendants Graf, Gopalan, and Hamer reaffirmed the guidance in a "September 2020 Investor Presentation." ¶121. Notably, a Company prospectus filed on October 1, 2020 represented that the Company had already accounted for COVID-19 related delays in (re)affirming the projections. ¶122. As late as November 5, 2020, in a Form 8-K signed by Defendant Hamer, Velodyne asserted: "[f]or the full year 2020, we expect total revenue of approximately $101 million, **as previously forecasted**." ¶123; *see also* ¶¶309-12. Defendant Gopalan contemporaneously touted the Company's ability to "manage through the pandemic without really significant losses from a supplier perspective because of this ability to have multiple suppliers and diverse supply chains," assuring investors that Velodyne's "supply chain has really endured very well through this challenging Covid pandemic." ¶124.

Then, on January 7, 2021, Defendants unexpectedly withdrew Velodyne's revenue guidance for 2021 altogether (¶¶124-25) and acknowledged that they had missed revenue for 4Q2020 by 30%. ¶¶127, 331. In response, Velodyne's stock and warrants plummeted by 7.28% and 13.3%, respectively, in a single day of unusually heavy volume trading. ¶390. Defendants thereafter provided inconsistent justifications for their missed 4Q2020 revenue targets. ¶¶129-131. During a February 25, 2021 earnings call, Defendant Gopalan ultimately admitted that Velodyne had lost multiple contracts to competitors (*see* ¶130), citing one who had "made the choice to use a different technology for their next generation platform" and another that selected "an older technology for their first generation rollout." ¶341. A few weeks later on March 17, 2021, Defendants admitted their revenue projections had been baseless, acknowledging material weaknesses in internal controls had caused "**misstatements of revenue** and deferred revenue for the three months ended December 31, 2020." ¶¶345-47.

Third, further intending to misleadingly boost investor confidence in the Reverse Merger, Defendants also falsely touted Ford's continued investment in the Company by repeatedly assuring investors that "Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination." *See* ¶¶144, 146, 149, 212, 225, 245, 263, 271. Despite their public assurances, Defendants then knew or were reckless in not knowing that Ford had already planned to unload its investment in Velodyne because, by summer 2020, Ford had already finalized a financing

deal to invest $600 million in a competing lidar product. S*ee* ¶146. Ford had further negotiated a "Letter Agreement" whereby "Velodyne agreed that any shares of common stock issued to Ford Motor Company in the Business Combination will not be subject to a lock-up or market stand-off agreement." ¶145. In other words, once the Reverse Merger closed, Ford was free to sell its entire stake in Velodyne. Yet even *after* the Reverse Merger, Defendants kept touting Ford's continued investment in the Company, stating that "*Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination*." ¶¶278, 286, 306. On February 12, 2021, investors finally learned the truth from Ford—not Defendants—that it had divested its entire position in Velodyne *as of December 31, 2020*, which cratered the trading price of Velodyne securities. ¶392-93. *Forbes* predicted that Ford's divestment would "number" the days that Velodyne sensors were used in Ford automobiles. ¶¶392-93.

Defendants' final de-SPAC bait-and-switch involved misrepresenting the quality of Velodyne's internal controls during the Class Period. *See* ¶¶194, 210, 242, 260. As late as November 5, 2020, Defendant Gopalan publicly asserted that Velodyne had "put in place processes and people and methods that create the discipline that is needed to basically to be a public company to say what you're going to do then do it *predictably* [. . .]" ¶320. On November 9, 2020, Defendants Gopalan and Hamer each also executed SOX certifications accompanying Velodyne's 3Q2020 Form 10-Q attesting to the effectiveness of the Company's internal controls. ¶327. Defendants Gopalan and Hamer made such statements despite knowing that Hall had been raising his concerns with them about Velodyne's "broken" corporate governance, strategy and financial performance "since the consummation of the Merger" in July 2020. ¶¶107-08. On March 17, 2021, Velodyne's 2020 annual report on Form 10-K disclosed that its internal controls were materially ineffective, admitting that Velodyne had "fail[ed] to adequately review revenue schedules associated with nonstandard revenue arrangements, which resulted in *misstatements of revenue* and deferred revenue for the three months ended December 31, 2020." ¶¶346-47. On this news, Velodyne stock and warrants fell by 5.35% and 7.64%, respectively, on unusually heavy volume. ¶399.

## III.    LEGAL STANDARDS

Under § 10(b), a plaintiff must allege (i) a false statement or omission; (ii) of material fact; (iii) made with scienter; (iv) on which plaintiff justifiably relied; and (v) that proximately caused the alleged loss. *See In re Intuitive Surgical Secs. Litig.*, 2014 U.S. Dist. LEXIS 173088, at *8 (N.D. Cal. 2014); *see In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1000 (N.D. Cal. 2008). Defendants raise only two issues in support of dismissal—falsity and scienter. In doing so, however, they substantially ignore the Complaint's particularized allegations while improperly seeking to insert their own version of events. *See Khoja*, 899 F.3d at 999 ("If defendants are permitted to present their own version of the facts at the pleading stage—and district courts accept those facts as uncontroverted and true—it becomes near impossible for even the most aggrieved plaintiff to demonstrate a sufficiently 'plausible' claim for relief.").

## IV.    ARGUMENT

### A.    Defendants' Materially False and Misleading Statements Are Actionable

Falsity under the PSLRA is adequately alleged by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading."[9] 15 U.S.C. § 78u-4(b)(1)(B); *see In re Nuvelo, Inc.*, 668 F. Supp. 2d 1217, 1225 (N.D. Cal. 2009). The Complaint plainly identifies the "who, what, when, where, and how" for each of Defendants' false statements and omissions. *See Sec. & Exchange Comm'n v. Steve Qi & Law Offices of Steve Qi & Assocs.*, 2018 U.S. Dist. LEXIS 239178, at *8 (C.D. Cal. 2018). The Complaint identifies: (i) each statement or omission alleged to have been misleading, when it was made and who made it (¶¶40, 44, 48, 51, 53, 171, 173, 175, 177, 179, 182, 185-86, 188-92, 194, 197, 201, 204-08, 210, 212, 214, 220-23, 225, 228-32, 236-40, 242, 245, 248, 252-56, 258, 260, 262-63, 266-69, 271, 274-76, 278, 280, 286, 288-91, 293-94, 309-12, 314, 316, 320, 324, 331-32, 337); (ii) the reason or reasons why the statement or omission is misleading (¶¶172, 174, 176, 180, 183, 187, 193, 195, 198, 202, 209, 211, 213, 216, 224, 226, 234,

---

[9]    Defendants' reliance on *In re Nektar Therapeutics* is misplaced. *Compare* ¶170 ("signed by Defendant Graf"), ¶¶177-79 (statements made by Defendants Gopalan, Dee, and Hamer), *and* ¶¶40, 44, 48, 51, 53, 186 *with* 2020 U.S. Dist. LEXIS 122715, at *26 (N.D. Cal. 2020).

241, 243, 246, 249, 257, 259, 261, 264, 270, 272, 277, 279, 281, 287, 292, 295, 313, 315, 317, 321, 325, 335, 339); and (iii) all facts on which the belief is formed (¶¶5-7, 11-32, 99-116, 117-42, 143-57, 158-61). Defendants, as they should here, concede that falsity and scienter may be inferred from the same set of facts. *See* Mot. at 10; *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005) (falsity and scienter "are generally strongly inferred from the same set of facts").

**1.    Defendants' Statements Regarding Hall's Continued Involvement in the Company After the Reverse Merger are Actionable**

First, throughout the Class Period, Defendants knowingly and/or recklessly misrepresented that Hall would "remain deeply involved in all aspects of Velodyne's business" and "actively involved in the post-combination company's product and technology development strategy." ¶¶173, 185-86, 188-92, 204-08, 220-23, 236-40, 252-56, 265-69, 274-76, 288-91, 316. The Complaint alleges Defendants' simultaneous undisclosed efforts to marginalize him and ultimately remove Hall from the Company, buttressed by their contemporaneous statements and efforts to the contrary. *See* ¶¶104-10; *see also Nieman*, 2013 U.S. Dist. LEXIS 110693, at *26. Hall, for instance, has publicly asserted that "***since the consummation of the Merger***" in July 2020, he had raised his concerns about Velodyne's corporate governance, strategy, and financial performance. ¶107. Hall expressly identified Graf and Dee (despite lacking ***any*** background in the lidar industry) as having limited Hall's involvement in product development, contract negotiation, and corporate integrity during the Class Period. ¶108.[10]

In a *Reuters* interview published February 22, 2021, Hall described the Board meeting where he was ousted as Chairman as "brief," "like an ambush," giving him "no chance to defend [himself]." ¶¶104-05.[11] The Complaint also alleges detailed facts about the Audit Committee's secret

---

[10]    Here, unlike in *Kim v. Advanced Micro Devices, Inc.*, the adverse impacts to Velodyne's business that Defendants warned would occur if Hall was not involved in the business had occurred. 2019 U.S. Dist. LEXIS 87287, at *18-23 (N.D. Cal. 2019); *see* ¶¶126-30, 153-56.

[11]    Attempting to portray Hall's departure as strictly "voluntary," Defendants omit any reference to: (i) Hall's involuntary removal as Chairman of the Board on February 18, 2021; and (ii) the involuntary termination of his wife, Marta Hall, as chief marketing officer on the same date. *Cf.* Mot. at 12 *with* ¶101. Only later did Hall finally resign from the Board. ¶106.

"investigation" of Hall, including their decision to retain outside counsel on December 9, 2020.[12] *See* ¶¶6, 15, 18, 19, 101-102, 367 n.42; *see also Nieman*, 2013 U.S. Dist. LEXIS 110693, at \*26. Defendants concealed their plan to oust Hall and seize control of the Company so as not to jeopardize the rich financial rewards they'd derive from the Reverse Merger. ¶¶104-110; *Nieman*, 2013 U.S. Dist. LEXIS 110693, at \*27 ("The Complaint also alleges facts showing that Defendants were aware that they would jeopardize the merger and subject themselves to a $675 million penalty if their plan to oust Johnson was made public."); *Kasper v. AAC Holdings, Inc.*, 2016 U.S. Dist. LEXIS 87492, at \*9-13 (M.D. Tenn. 2016) (failure to disclose investigation supported findings of falsity and scienter). Defendants' claim that the Complaint does not make sufficiently particular allegations is based solely on their improper credibility attacks against Hall. *See, e.g.*, Mot. at 2 ("bare conclusions, speculation, and *wild* accusations"); *id*. at 8 ("Mr. Hall *peddled* a series of conclusory accusations and conspiracy theories"); *id*. at 30 ("*petulant* grievances of a *disgruntled* former director.").

Relatedly, Defendants also now speciously "question [Hall]'s reliability, claiming he was far removed from relevant events and likening him to an undependable confidential witness." *Mattel*, 2021 U.S. Dist. LEXIS 65480, at \*29-30; *cf.* Mot. at 13. Where, as here, Defendants repeatedly touted Hall's "critical" importance to the Company during the Class Period, his detailed revelations about Defendants' misconduct are afforded great weight. *Id.* at \*30. ("Yet Whitaker's reliability ostensibly exceeds that of *confidential* sources other courts find sufficiently reputable *due to his disclosed identity, elevated position, and first-hand knowledge* of many pertinent events."); *Van Noppen v. Innerworkings, Inc.*, 136 F. Supp. 3d 922, 945-46 (N.D. Ill. 2015) ("this Court's role at the motion to dismiss stage is not to make those kinds of factual determinations."). Defendants' purported "foundational concerns" are therefore baseless. *Id.* at 947.[13] It is indisputable that Hall had first-hand

---

[12]     Defendants' conclusory argument that outside counsel "had no reason to jeopardize its reputation by participating in a 'pretextual' inquiry'" is meritless. *See Nieman*, 2013 U.S. Dist. LEXIS 110693, at \*26. Notably, the Company later rehired that firm to pursue Hall in a separate and unrelated matter. *See* ¶15 n.5.

[13]     Defendants incorrectly suggest that the Court should apply the same standards to Hall that it would for a confidential witness. Mot. at 13, n.5, citing *Miller v. PCM, Inc.*, 2018 U.S. Dist. LEXIS

knowledge of the Company's corporate governance, strategy and financial performance during the Class Period.[14] ¶¶10, 88, 90, 107-08; *see Mattel*, 2021 U.S. Dist. LEXIS 65480, at *29-30; *Berson*, 527 F.3d at 985;[15] *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 962 (N.D. Cal. 2014). Ultimately, despite touting Hall as being "deeply involved in all aspects of Velodyne's business," Defendants now frivolously seek to cast him as an unreliable source devoid of personal knowledge who peddles in "conspiracy theories." *Compare* ¶¶173, 185-86, 188-92, 205-08, 220-23, 236-40, 252-56, 266-69, 274-76, 288-91, 316, 318-19, 323-24 *with* Mot. at 2.

Notably, Hall's stated concerns about the Company's operations had (or later did) come to fruition. *Compare* ¶109 ("We voiced our grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors . . .") *with* ¶130 ("During the accompanying earnings call announcing its February 25, 2021 4Q20 results, Defendant Gopalan stated for the first time that the Company had lost multiple contracts to its competitors[.]"); *see also Mulligan*, 36 F. Supp. 3d at 962. Hall's statements about Defendants' material Class Period misstatements are further corroborated by analysts, channel checks with Velodyne customers and Defendants' own public statements. *See, e.g.,* ¶25 (Berenberg: "***Mr. Hall appears to corroborate some of the views expressed in our downgrade notes that the company is experiencing a 'significant loss of market share to competitors***.'"); *see also* ¶¶32, 85 n.16, 109-13, 130, 135-36, 141-42, 341, 371.[16]

Defendants' arguments are therefore without merit. *See In re Connetics Corp. Sec. Litig.*, 2008 148930 (C.D. Cal. 2018) and *In re Textainer P'ship Sec. Litig.*, 2005 U.S. Dist. LEXIS 40974 (N.D. Cal. 2005). In *Miller*, plaintiffs relied upon an ***anonymous*** author of blog post on *Seeking Alpha*. 2018 U.S. Dist. LEXIS 148930, at *28 n.6. *Textainer* did not involve a founder, CEO and Board Chairman as with Hall here. 2005 U.S. Dist. LEXIS 40974, at *21-23.

[14]    Defendants claim that Hall was merely a third-party speculating about Defendants' knowledge, but Hall is nothing like the hired expert in *Sayce v. Forescout Techs., Inc.*, 2021 U.S. Dist. LEXIS 193207, at *20 (N.D. Cal. 2021).

[15]    Courts have found witnesses with far less direct access to defendants than Hall has here reliable. *See In re Quality Sys.*, 865 F.3d 1130, 1139, 1145 (9th Cir. 2017) (statements of "five lower-level [] employees" supported inference of scienter); *In re Zynga Inc. Secs. Litig.*, 2015 U.S. Dist. LEXIS 38722, at *21-22 (N.D. Cal. 2015).

[16]    *Nguyen v. Endologix, Inc.*, 962 F.3d 405 (9th Cir. 2020) is inapposite because CW1 there was not a founder, CEO and Chairman and left before the allegedly false statements were made. *Id.* at 416.

U.S. Dist. LEXIS 62515, at *14-16 (N.D. Cal. 2008) (declining to strike allegations supported by, as here, other sources while recognizing the reality that certain information is unavailable absent formal discovery); *In re Gilead Scis. Secs. Litig.*, 2009 U.S. Dist. LEXIS 95072, at *8 (N.D. Cal. 2009); *In re Maxwell Techs., Inc. Sec. Litig.*, 18 F. Supp. 3d 1023, 1033-34 (S.D. Cal. 2014). The Court should "decline[] [Defendants'] invitation to discredit [Hall's] thorough account at the pleading stage." *Mattel*, 2021 U.S. Dist. LEXIS 65480, at *31; *see Van Noppen*, 136 F. Supp. 3d at 945-46. Defendants similarly argue that concealing the investigation is not problematic, contending there was no duty to disclose it. *See* Mot. at 15. Not so. Disclosure under the federal securities laws is required when necessary to make statements made, considering the circumstances under which they were made, not misleading. *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). Once a company chooses to "tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1009; *Libon v. Infineon Techs., AG*, 2006 U.S. Dist. LEXIS 76430, at *20 (E.D. Va. 2006) (when a defendant "does make a disclosure – whether it be voluntary or required – there is a duty to make it complete and accurate."). Indeed, companies routinely disclose internal investigations prior to completion. *See, e.g., In re Peregrine Sys.*, 2005 U.S. Dist. LEXIS 59408, at *66 (S.D. Cal. 2005) (disclosing internal investigation prior to completion).

Indeed, Defendants concede that they assured investors that Hall would remain deeply involved in the Company, lauding him as "[o]ur visionary founder . . . serial inventor and successful business leader" with whom they would "work together as a dynamic team." ¶¶189, 205. Defendants further highlighted how Hall "remains deeply involved in all aspects of Velodyne's business, including product development[,]" (¶207) and "will remain actively involved in the post-combination company's product and technology development strategy." ¶¶208, 223. Defendants also repeatedly acknowledged that the "loss of Mr. Hall would adversely affect Velodyne's business." ¶¶10, 18, 191, 207, 222, 239, 255, 268, 276, 290, 324.[17] Once Defendants had primed investor expectations by

---

[17]   In a calculated move, Defendants carve out their previous positive statements about Hall in a separate section (*see* Mot. at 17-18, re: Hall's "technological and manufacturing genius"; "vision and

representing that Hall would remain actively involved in the Company, they created an obligation to promptly and transparently disclose negative developments that cut against their positive public statements. *See Khoja*, 899 F.3d at 1010 ("[O]nce Orexigen chose to tout the apparently positive 25 percent interim results, Orexigen had the obligation also to disclose that they were likely unreliable[.]"). "A corporation's ***consideration*** of a major change in corporate form can be material ***even if there is only a probability that the change will occur or if it is merely contingent upon future events.*** *PPM Am. v. Marriott Corp.*, 853 F. Supp. 860, 868-70 (D. Md. 1994); *see also Abdo v. Fitzsimmons*, 2018 U.S. Dist. LEXIS 241075, at *42-43 (N.D. Cal. 2018) ("The Supreme Court has held that, with 'respect to contingent or speculative information or events, . . . materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'").

Instead, Defendant Gopalan assured analysts "***there is no change in our fundamental outlook for the future***" (*see* ¶¶332-34) in January 2021 when he then knew that Hall would soon be ousted.[18] Additionally, Defendant Gopalan's assurance cannot be reconciled with the Company's earlier statements that any negative news regarding Hall "may adversely affect Velodyne's brand, relationship with customers, or standing in the industry." ¶¶19, 191, 207, 222, 239, 255, 268, 276, 290,

---

expertise," etc.) and attempt to argue those statements are non-actionable "puffery." This argument is meritless for two reasons. First, those statements triggered a duty to disclose Velodyne's investigation, because Hall's importance to Velodyne is established, and investors were primed to expect full and fair disclosures cutting against those previous positive statements about his retention. *See Khoja*, 899 F.3d at 1009; *see also Nieman*, 2013 U.S. Dist. LEXIS 110693, at *12; *id*. at *25 ("the materiality of Johnson being retained as CEO is clearly established"). Secondly, even statements considered puffery ***in isolation*** are nevertheless actionable when they fundamentally conceal reality. *In re Rocket Fuel, Inc. Secs. Litig*., 2015 U.S. Dist. LEXIS 171552, at *16-19 (N.D. Cal. 2015) (online posts touting technology's purported effectiveness were not "mere 'product marketing statements,'" but actionable misrepresentations).

[18]    Defendant Gopalan made this representation despite knowing that Hall had allegedly "acted in a way that was inappropriate with regard to Board and Velodyne procedures" "[b]eginning in the fall of 2020" and that the Audit Committee had initiated an investigation "due to [alleged] concerns about potential risks and harm to Velodyne stemming from the unusual statements [and] conduct of Mr. Hall ***in board communications and at Board meetings***." *See* ¶367 n.42; *Abdo*, 2018 U.S. Dist. 241075, at *45. For these reasons, Defendants' reliance on *Hampton v. Aqua Metals, Inc.*, 2020 U.S. Dist. LEXIS 214010, at *44-45 (N.D. Cal. 2020) is misplaced.

324. Similarly, when Defendants disclosed Hall's resignation as a Company employee on January 12, 2021, they failed to contemporaneously disclose the investigation **and** that it was nearly complete. ¶¶19 n.6, 334. Instead, investors were kept in the dark about that material fact until Defendants suddenly announced Hall's removal as Chairman of the Board on February 22, 2021—just **forty-six days later**. *See* ¶¶15, 18-19, 101, 316, 332. The "close temporal proximity" between Defendants' omission and the disclosure of the investigation "bolster[s] an inference of scienter[.]" *See In re Apple Sec. Litig.*, 2020 U.S. Dist. LEXIS 206298, at \*29; *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) ("[T]he fact that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."). Hence, though the mere existence of an investigation without more may not trigger a duty to disclose, positive representations to the contrary about the target of the investigation are actionable. *See Karinski v. Stamps.com, Inc.*, 2020 U.S. Dist. LEXIS 10721, at \*37-38 (C.D. Cal. 2020); *Khoja*, 899 F.3d at 1009. Defendants' earlier and repeated praise of Hall's importance to the Company combined with their assurance that he would be retained long after the Reverse Merger triggered a duty to disclose. *See Nieman*, 2013 U.S. Dist. LEXIS 110693, at \*26; *see also* ¶¶173, 185-86, 188-92, 204-08, 220-23, 236-40, 252-56, 265-69, 274-76, 288-91, 316.

Defendants' authorities do not hold otherwise as none involve an internal investigation of the **cornerstone** of a company's operations as with Hall here. Instead, they involved complex accounting matters by foreign subsidiaries and modest delays to determine that the precise nature of the underlying issues were reasonable. *See In re Yahoo! Inc. Sec. Litig.*, 2012 U.S. Dist. LEXIS 113036, at \*64-68 (N.D. Cal. 2012) (disclosing **foreign** subsidiary restructuring five weeks after notice was reasonable, given complex regulatory situation in China and "ongoing discussions" regarding terms and implications of restructuring); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 754, 760-61 (7th Cir. 2007) (reasonable delay where **Brazilian** subsidiary falsified accounting records by, *inter alia*, reporting sales prematurely, falsifying sales contracts, and failing to make appropriate bad debt reserves). Tellingly, Defendants' authorities all pre-date the Ninth Circuit's opinion in *Khoja* holding that Defendants in this Circuit have a "duty to elaborate" under such circumstances. 899 F.3d at 1012.

**2.    Defendants Financial Target Statements Are Actionable**

The Complaint next alleges that Defendants misleadingly touted Velodyne's purportedly outstanding financial performance to lure investors into approving the Reverse Merger. *See* ¶¶20-25. Defendants misrepresented that the Company was, for instance, on track "to generate revenues of approximately $100 million in 2020, increasing to approximately $680 million in 2024 with existing contracts," further emphasizing that those "[e]stimated revenues under existing customer contracts are expected to ***exceed $800 million*** from 2020 to 2024." ¶171. Defendants highlighted Velodyne's customer contracts at every opportunity as the vote to approve the Reverse Merger approached. ¶¶171, 175, 197, 201, 214, 228, 230-32, 248, 258; *see also* ¶228 ("Customer agreements now represent a total of approximately ***$970mm*** of revenue through 2024, an increase of approximately $130mm since the [initial transaction] announcement."). Defendants used these purported "signed and awarded" contracts to boost investor confidence in the Company's performance to further guarantee approval of the Reverse Merger. ¶¶179, 229; *see also* ¶¶218, 227, 233, 251. Defendant Hamer emphasized that "contracts that move to signed and awarded" gave Velodyne "***further visibility and confidence in [their] numbers***" *See* ¶179; *see also* ¶181 (Defendants Dee and Hamer had a direct hand in "confirming awarded contract status[.]"). Hall later publicly revealed that Defendants made those projections "knowing" they were false. ¶24.[19]

After the Reverse Merger closed, Velodyne's true financial condition emerged.[20] *See* ¶¶280, 293, 310-12, 331. Rather than disclose that the Company was losing customers and market share (*see* ¶107-10), Defendants sought to blame COVID-19 despite repeated earlier representations that they accounted for pandemic impacts. *See* ¶121-24, 293. On January 7, 2021, Defendants sought to blame

[19]    Relying on *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 929 (N.D. Cal. 2017), Defendants assert that Plaintiffs do not establish "why Defendants would have known the forecasts 'could not be met when issued'" but this ignores, *inter alia*, that Hall confirmed that Defendants knew "the Company would miss its 2020 stated projections" and that Velodyne admitted they lost customers in the fourth quarter of 2020 (two months after the fact). *See* ¶¶24, 130.

[20]    That only a few months passed between Defendants' misleading revenue projection representation and Velodyne's staggering earnings miss raises an inference of scienter. *See Shenwick*, 282 F. Supp. 3d 1115.

COVID-19 in announcing Velodyne's large 30% earnings miss and withdrawn guidance. *See* ¶331. Defendants' COVID-19 representations were met with skepticism by analysts which were confirmed when Hall revealed that COVID-19 was a "convenient scapegoat" for the Company's poor financial performance. *See* ¶110. Defendants would later admit as much on February 25, 2021, disclosing that earnings misses stemmed from lost customer contracts. *See* ¶130.

Defendants nevertheless continued misleadingly touting their financial projections, assuming that their material misstatements were protected by the PSLRA's safe harbor, bragging that "Velodyne *can provide forward-looking guidance and talk more directly about projections for future years*[.]" *See* ECF 85-6 at 31; *see also* Mot. at 18-21. But Defendants' view turns on an overly narrow interpretation of what constitutes an "initial public offering," under the federal securities laws. *Cf.* Mot. at 20 n.11 *with* ¶¶69, 408.[21] The SEC's now General Counsel has publicly stated that "initial public offerings" include de-SPAC transactions as with the Reverse Merger here. *See* ¶69, n.9; *see also* n.6, *supra* ("[I]t is also commonly understood that it is the de-SPAC—and not the initial offering by the SPAC—that is the transaction in which a private operating company itself 'goes public,' *i.e.*, engages in its initial public offering . . . . The information, including financial statements, relevant to evaluating the investment changes dramatically in the de-SPAC . . . ."); *see also* ¶¶98, 408. Even if the Court were to conclude otherwise, Defendants would still not be entitled to protection because "the safe harbor is not designed to protect companies and their officials when they knowingly make a materially false or misleading statement about current or past facts. Nor is the safe harbor designed to protect them when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *Quality Sys.*, 865 F.3d at 1141-42. Defendants provided their revenue targets based on Velodyne's "signed and awarded contracts" and "contracts already in hand[.]" *See* ¶179; ¶171 ("[e]stimated revenues *under existing customer contracts* . . ."); ¶179 (Defendant Gopalan touted "projected 2024 revenue to be over $680 million, of

---

[21] Defendants' authorities are inapposite as none concern traditional IPOs or de-SPAC transactions. *See Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014); *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021); *In re Cutera Sec. Litig.*, 610 F.3d 1103 (9th Cir. 2010).

which ***roughly half is contracted today***. . .”). Defendants’ statements are nothing like the “unadorned” statements at issue in *Wochos*, which merely represented that the company was “on track” to meet production goals. *See* 985 F.3d at 1192.

Such materially false and misleading mixed statements of present and future fact are not entitled to safe harbor protection. *See Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1050 (N.D. Cal. 2018) (safe harbor did not apply to defendant’s representations regarding existing ‘“large deferred service’ and ‘healthy product backlog’ . . . . include[d] facts regarding the present state of the Company, not assumptions”); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1019-20 (N.D. Cal. 2020); *Sayce v. Forescout Techs., Inc.*, 2021 U.S. Dist. LEXIS 57256, at *9 (N.D. Cal. 2021).[22] Defendants’ revenue statements are actionable because they misrepresented and omitted material present and past facts, not because their predictions proved to be wrong. *See e.g.,* ¶¶171, 175, 179, 197, 201, 214, 228, 230-32, 248, 258, 280, 309, 311-12. Even if some of Defendants’ statements were purely forward-looking, they remain actionable because they omitted material facts necessary to render them not misleading. *See In re Celera Corp. Secs. Litig.*, 2013 U.S. Dist. LEXIS 125621, at *5-6 (N.D. Cal. 2013). Defendants repeatedly emphasized, for instance, that their financial forecasts were backed by existing “signed and awarded” customer contracts and touted the Company’s pipeline while failing to disclose facts undermining those rosy projections – namely, that the Company was facing “plunging product sales” and “significant loss of market share to competitors,” such as Hesai and Argo AI. *See* ¶343 (Berenberg: “Since our launch ***we have spoken to over a dozen customers***, many of whom are planning to switch to Hesai for better performance at a lower cost.”); ¶¶171, 175, 179, 197, 201, 214, 228, 230-32, 248, 258, 309, 311-12; *see also* ¶¶24, 109-10, 130, 135-37, 142, 146, 341, 344, 371, 381.

Defendants’ projections were also not accompanied by “meaningful” cautionary language. *See Mulderrig*, 492 F. Supp. 3d at 1022. Defendants’ oral statements on July 2, 2020 and September 1,

---

[22] The statements in *Police Ret. Sys. v. Intuitive Surgical, Inc.* were “assumptions” untethered to any statements about the company’s then-existing contracts or pipeline. *See* 759 F.3d at 1058; *see also Rodriguez*, 325 F. Supp. 3d at 1050-51.

2020, for instance, were not identified as forward-looking statements or "accompanied by an ***oral statement*** that additional information concerning factors that could cause actual results to differ from those in the forward-looking statement is contained in a readily available written document." *See* 15 U.S.C. § 78u-5(c)(2); *see also In re Apple Comput., Inc.*, 2003 U.S. Dist. LEXIS 28303, at *6-7 (N.D. Cal. 2003); *In re Coinstar Inc. Secs. Litig.*, 2011 U.S. Dist. LEXIS 115794, at *23-25 (W.D. Wash. 2011). While Defendants claim that they "directed listeners to . . . written investor presentations [,]" no such statements were made during either the July 2, 2020 investor call or the September 1, 2020 webinar. *See* Mot. at 19; *see also* ECF 85-17, 85-18. Indeed, Defendant Graf ***skipped*** that disclosure slide during the July 2, 2020 investor call. *See* ECF 85-17 at 1 ("Graf: You can move- move forward to page five, please."); *see also* ECF 85-5 at 2 (forward statement disclosure). Accordingly, Defendants' oral statements during the July 2, 2020 investor call and September 1, 2020 webinar are not protected under the PSLRA's safe harbor as a matter of law. *See* ¶¶179, 231-32.[23]

Finally, when push comes to shove, Defendants had actual knowledge that they were losing customer contracts and that they would miss their revenue guidance (*see* ¶¶24, 109) because Hall raised his concerns with Defendants about Velodyne's "financial performance"[,] which included drastically declining product sales and loss of market share, with the Board "since the consummation of the Merger" on July 2, 2020. *See* ¶107; *see also Zaghian v. Farrell*, 675 F. App'x 718, 721 (9th Cir. 2017). The Complaint further alleges that: (i) Defendants later admitted product demand was down, though they misleadingly attributed it to COVID-19 and continued touting their purportedly "robust" pipeline (*see* ¶¶293, 332); (ii) customers were rejecting the Company's Velarray sensors (*see* ¶¶135-37); (iii) Velodyne's product revenues declined 35% between March 2020 and March 2021 (*see* ¶¶110, 165); (iv) the weighted average price for Velodyne products plummeted by one third during the year, impacting their ability to meet guidance (*see* ¶130); (v) analysts' channel checks and conversations with customers confirmed that Defendants were losing customers and sales, including contracts with Ford and Hyundai, and declining sales to Baidu—some of Velodyne's largest investors and/or

---

[23]    Cautionary language for Defendants' remaining mixed statements fares no better. *See Quality Sys.*, 865 F.3d at 1146-47.

customers (*see* ¶¶135-37, 142, 146, 341, 343-44, 371, 381); and (vi) Defendants admitted that they lost multiple customer contracts to its competitors during the Class Period (*see* ¶¶130, 341).[24]

### 3.   Defendants' Statements about Ford's Continued Involvement with Velodyne Are Actionable

Defendants also misleadingly represented that Ford would remain an investor in Velodyne after the Reverse Merger in an effort to build investor confidence in the Reverse Merger's legitimacy. ¶¶26, 143-47, 177. Defendants entered into a letter agreement with Ford, which exempted Ford from any lock-up agreements and permitted it to sell its entire stake in Velodyne immediately after the Reverse Merger closed. ¶¶26, 145, 148-49, 299-303. Nevertheless, and though they knew Ford intended to liquidate its position, Defendants repeatedly and misleadingly represented that Ford was "expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination." ¶¶145, 147, 149, 212, 225, 245, 263, 271. Even after the Reverse Merger was approved, and continuing to November 4, 2020, Defendants continued to assert that Ford would retain at least a 5% interest in the Company.[25] *See* ¶¶150-52, 212, 278, 286, 306; *see also Bruce v. Suntech Power Holdings Co.*, 64 F. Supp. 3d 1365, 1374 (N.D. Cal. 2014); *Cf.* ¶¶314 *with* ¶¶130, 341. ***Less than two months later, Ford unloaded all of its Velodyne holdings***. *See* ¶¶115, 150-56. Notwithstanding this material change in Velodyne's relationship with Ford, on January 7, 2021, Defendant Gopalan represented that "there is no change in our fundamental outlook for the future." *See* ¶332; *Quality Sys.*, 865 F.3d at 1144 (statement actionable where it "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].").

Investors finally learned about Ford's total divestment on February 12, 2021—***43 days after***

---

[24]   Unlike in *Sayce*, Plaintiffs' claims are supported by statements from Velodyne's own former CEO and Chairman of the Board of Directors as well as additional corroborating facts that demonstrate the information that Defendants withheld, which caused the Company's revenue miss. *See* 2021 U.S. Dist. LEXIS 57256, at *13-17. For the aforementioned reasons, Defendants' reliance on *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) is also misplaced.

[25]   Defendants contend—without any support about his state of mind—that Hall signed the October 19, 2020 Registration Statement "without any apparent reservation or objection[.]" Mot. at 3. Their effort to inject their own facts to invite a searching inquiry into Hall's credibility is inappropriate here. *See Khoja*, 899 F.3d at 900; *see also Mattel*, 2021 U.S. Dist. LEXIS 65480, at *31.

Ford had sold its entire stake. ¶27. During that same period, Ford also terminated a contract with Velodyne, and Director Samardzich (Ford Europe's former COO) informed the Board that she would not stand for re-election. ¶¶31, 91, 91 n.10, 130, 153, 375; *see Reese v. Malone*, 747 F.3d 557, 574 (9th Cir. 2014) ("Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter."); *Fecht v. Price Co.*, 70 F.3d 1078, 1083-84 (9th Cir. 1995). When Ford's share liquidation was finally revealed, it was Ford, not Defendants, who disclosed it. *See* ¶¶27, 154. Defendants now claim that Ford's plan to divest itself of its investment and their knowledge of that material development is not inconsistent with any of the Complaint's challenged statements. Mot. at 22. In doing so, Defendants ignore that, under the federal securities laws, statements "literally true on their face may nonetheless be misleading when considered in context." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). They similarly contend that their statements regarding Ford's investment in Velodyne were technically accurate because immediately after the Merger did maintain a greater than 5% interest in Velodyne. Mot. at 22. But Defendants ignore that they continued representing that "Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination" even after the transaction had been completed. *See id.*; ¶¶151-52, 212, 278, 286, 306.

Defendants' boilerplate *post hoc* justifications and hindsight arguments fare no better. The Complaint cogently alleges contemporaneous facts showing that by June 2020 Ford and Volkswagen had already finalized their transaction to split an ownership stake in a competing lidar company, with 60% of a reported $1 billion investment coming from Ford alone. *See* ¶146. The following month, Ford negotiated a letter agreement with Velodyne enabling Ford's entire 7.6% stake in the Company to be both registered for sale and exempt from a lock-up agreement. ¶26-27; *see In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1068 (C.D. Cal. 2012) ("[D]efendants cannot use the mere 'incantation of fraud-by-hindsight' to 'defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made."). Once the market finally learned that Ford had sold its entire stake in the Company, Defendant Hamer unwittingly admitted during a February 25, 2021 earnings call that Ford "***they don't like to stick around*** as a financial investor. That's not

their nature. They'd rather reallocate that capital to other investment[s]." *See* ¶¶27, 156; *see also Apple*, 2020 U.S. Dist. LEXIS 206298, at *25-28. A Ford spokesperson later confirmed, contrary to Defendants' repeated Class Period representations, that Ford's "long term capital investment strategy" was to make money off its Velodyne investment and sell the stock thereafter. ¶155.

### 4.    Defendants' Internal Controls Statements Are Actionable

Finally, throughout the Class Period, Defendants repeatedly represented that Velodyne's internal controls were designed to provide "reasonable assurance" that, *inter alia*, transactions were "executed in accordance with management's general or specific authorizations" and "recorded as necessary to permit preparation of financial statements in conformity with GAAP[.]" ¶¶194, 210, 242, 260. And though the Company was clearly ***not*** reviewing revenue and deferred revenue schedules during the 4Q2020 (undoubtedly contributing to its misstated earnings; *see* ¶¶346-47), on November 5, 2020, Defendant Gopalan touted that Velodyne's internal controls were a "disciplined approach to gathering the data . . . that that piece of it is almost muscle memory [. . .] those processes ***are working***, the data ***is coming together***, and we're able to get things together for the call . . . ."[26] ¶¶158, 320; *see Apple*, 2020 U.S. Dist. LEXIS 206298, at *29-33 ("close temporal proximity between an allegedly fraudulent statement or omission and a later disclosure" raises a strong inference of scienter); *see also Alta Mesa*, 2021 U.S. Dist. LEXIS 71757, at *36-38 (10b-5 claim survived dismissal when less than one year elapsed between de-SPAC merger and massive write-down, coupled with disclosure of material weaknesses in internal controls). Gopalan and Hamer's SOX certifications further support a finding of falsity and scienter here. *See, e.g.,* C*ommc'ns Workers of Am. Plan for Emps. Pensions & Death Bens. v. CSK Auto Corp.,* 525 F. Supp. 2d 1116, 1124 (D. Ariz. 2007); *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.,* 2021 U.S. Dist. LEXIS 68415, at *24 (M.D. Tenn. 2021).

---

[26]    In *Welgus v. TriNet Grp., Inc.*, unlike here, plaintiffs did not challenge any of statements related to defendants' controls. 2017 U.S. Dist. LEXIS 207777, at *24-25 (N.D. Cal. 2017). Further, because Plaintiffs' allege that Defendants' weaknesses in control over financial reporting are directly connected to their materially false and misleading statements regarding Velodyne's financial controls, Defendants' reliance on *Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785 (N.D. Cal. 2019) and *Rok v. Identiv, Inc.*, 2017 U.S. Dist. LEXIS 1019, at *19 (N.D. Cal. 2017) is misplaced.

## B.    Additional Indicia of Scienter

***Motive and Scheme Liability*:** Allegations establishing motive or substantial personal financial gain will "weigh heavily in favor of a scienter inference." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 325 (2007). Here, the Complaint clearly pleads facts establishing Defendants' motive and their financial incentives to complete the Reverse Merger. Failing to merge meant Graf and Dee's founder's shares would expire worthless, and they would not participate in any liquidating distribution from the trust account. ¶¶72-74. On the other hand, successfully merging with Velodyne meant that Graf and Dee alone would reap, along with their fellow founders, a 20% interest in the combined Company, then valued at $72 million. *See* ¶¶78-81. Further, GIC was in a desperate financial state because its original investors had ***already*** redeemed approximately 53% of its trust account after the original April 2020 deadline lapsed. ¶86, n.17. Defendant Graf and Dee's desire to avoid an impending liquidation—particularly following a redemption by its shareholders—provides sufficient motive to raise a strong inference of scienter. *See In re Stillwater Capital Partners Inc.*, 858 F. Supp. 2d 277, 288 (S.D.N.Y. 2012). Defendants' argument concerning a lack of stock sales (*see* Mot. at 28-29) is therefore unpersuasive. *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003).

Defendants' authorities are distinguishable as ***none*** involve the unique SPAC structure present here. *See Hunt v. Bloom Energy Corp.*, 2021 U.S. Dist. LEXIS 187321, at *56-57 (N.D. Cal. 2021); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869 (9th Cir. 2012), *Rubke v. Capitol Bancorp, Ltd.*, 551 F.3d 1156, 1166 (9th Cir. 2009); *Police Ret. Sys.*, 759 F.3d at 1062. The de-SPAC process here guaranteed that Defendants Graf and Dee would receive a substantial ownership position at an extreme discount but ***only*** if the Reverse Merger was timely completed. ¶¶71-74, 78-81. Otherwise, their founders' shares would be worthless. *Id.*; *Stillwater*, 858 F. Supp. 2d at 288.

Defendants Gopalan and Culkin also benefitted by receiving substantial payouts, compensation and incentive awards by becoming officers and directors of public Velodyne. *See* ¶¶355-56; *see also Am. W.*, 320 F.3d at 944-45. Gopalan's total compensation package rose over nine times from $2.898 million in 2019 to $26.135 million in 2020. ¶¶39, 356. And when he exited the Company

less than one year after the Reverse Merger, he departed with some $8 million in equity compensation. ¶¶42, 381. Defendant Culkin beneficially owned 13,559,196 shares of the Company's common stock after the Reverse Merger valued at approximately $335,590,101. ¶52. Defendants Graf and Dee also actively engaged in conduct supporting Plaintiffs' scheme liability claim by working to marginalize Hall behind the scenes. *See* ¶¶99-116. Defendant Dee sat on the Company's Audit Committee, which "worked with outside counsel on the plan to remove [Hall]" starting at least as early as November 2020 given that external counsel was retained on December 9, 2020. *See Nieman*, 2013 U.S. Dist. LEXIS 110693, at *26; *see* ¶¶50, 101, 340, 367 n.42, 375, 395; *In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *62-63 (C.D. Cal. 2015) (sustaining similar scheme liability allegations).

***Resignations and Ousters*:** Each of the ***ten*** total departures, resignations, and instances of reshuffling alleged here during the relevant time period were accompanied by suspicious circumstances and timing which, under *Tellabs*' holistic approach, raise an inference of scienter. *See In re WageWorks, Inc., Sec. Litig.*, 2020 U.S. Dist. LEXIS 97180, at *18 (N.D. Cal. 2020); *Shenwick*, 282 F. Supp. 3d at 1148; *see also* ¶375.[27] On January 18, 2021, Director Samardzich—who had previously served as Ford Europe's former COO and joined the Board after Ford invested in Velodyne in 2016—notified the Board of Directors that she would not stand for re-election. ¶¶91, 91 n.20, 153. By this point, Ford had already sold off its entire stake in Velodyne and terminated its contract with the Company. *See id.* Defendants withheld this material information from investors, who only learned of the divestiture after Ford filed its statement of ownership on February 12, 2021. *See id.*

On February 18, 2021, the Company announced that Defendant Graf had resigned from the Board—just four days before Velodyne announced that it had terminated Hall as Chairman of the Board for purportedly "behav[ing] inappropriately[.]" ¶¶46, 340, 375, 395. According to Hall, Defendant Graf's resignation was a calculated entrenchment move which enabled Christopher Thomas to step into Defendant Graf's former position to avoid a contested re-election against Hall's own

---

[27] Here, unlike *Zucco Partners, L.L.C. v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009), the resignations, terminations, and instances of corporate reshuffling were numerous, occurred within an 8-month period, and were accompanied by suspicious circumstances, including allegations from Hall that Defendants knowingly misled investors. *See e.g.*, ¶¶111, 113, 164.

nominee. *See* ¶108 (asserting that Velodyne's Board "manipulate[d] the Company's corporate machinery" and "that Velodyne Lidar's corporate governance is broken[.]"); ¶111; *see also Shenwick*, 282 F. Supp. 3d at 1148 ("[R]esignations or terminations constitute evidence of scienter" where "they are 'accompanied by additional evidence of [D]efendant[s'] wrongdoing[.]'"). Hall, who had been repeatedly touted as a key component of Velodyne's business, finally resigned from the Board on March 2, 2021. ¶106. His departure is suspicious by its very nature. ¶¶106-08.

Then, on March 17, 2021, Velodyne announced it had "determined to transition" the Company's COO Thomas Tewell on March 11, 2021. ¶¶30, 161. A Velodyne spokesman later stated that he "didn't know what the company meant by the phrase 'determined to transition.'" ¶161. Tewell's "transition" was brief because, on March 14, 2021, Tewell resigned effective immediately. *Id.* Notably, Tewell's resignation and transition were announced the very same day Defendants admitted material weaknesses in Velodyne's internal controls. *See* ¶¶30, 161, 346-47; *see also In re Impax Labs., Inc. Sec. Litig.*, 2007 U.S. Dist. LEXIS 52356, at *26-27 (N.D. Cal. 2007); *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1263 (D. Nev. 2019).

Though he received a ninefold increase to his total compensation package following the Merger and had served as Velodyne's CEO for less than a year, Defendant Gopalan resigned on July 16, 2021. ¶¶39, 42, 165. Defendant Gopalan, who Hall accused of "***manipulat[ing] the truth to customers and investors alike***[,]" departed so abruptly that the Company had no successor. ¶113, 165. Instead, Velodyne created a stopgap "Office of the Chief Executive[,]" which consisted of several persons (including Defendant Hamer) until a new CEO could be found. *See* ¶113, 165; *Luna v. Marvell Tech. Grp.*, 2017 U.S. Dist. LEXIS 75262, at *15 (N.D. Cal. 2017). Not two weeks later, on August 2, 2021, Velodyne simultaneously announced that Director Deborah Hersman resigned from the Board and Defendant Culkin resigned as Chairman of the Board—despite only holding their positions for four and six months, respectively. *See* ¶¶168, 375; *see also* ¶113 (Defendant Culkin "has also taken several liberties with the truth."). Defendant Dee was subsequently appointed as Chairman. *See* ¶168.

These departures were also accompanied by, *inter alia*: (i) Ford's divestment (¶¶27, 130, 153-57); (ii) Velodyne's Audit Committee investigation (¶¶6, 15, 18-19, 101-02, 367 n.42): (iii) deficient

internal controls (¶¶160-61, 346-47); and (iv) misstatements of fourth quarter revenue and deferred revenue (*id.*). Such circumstances support finding a strong inference of scienter. *See In re Sipex Corp. Sec. Litig.*, 2005 U.S. Dist. LEXIS 30854, at *3-4 (N.D. Cal. 2005) (CEO's resignation indicated scienter, noting it was accompanied by, *inter alia*: (i) an audit committee investigation; (ii) termination of certain employees; (iii) announced financial misstatements; and (iv) implementation of new internal controls); *see also In re Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887, at *42-43 (N.D. Cal. 2002); *AAC Holdings*, 2021 U.S. Dist. LEXIS 68415, at *25 ("evidence of these resignations is offered here as an indicator of scienter, not to show misconduct.").[28]

## V.    CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss should be denied in its entirety. In the event the Court grants, in whole or in part, the motion to dismiss the claims, Plaintiffs request leave to amend. *See* FED. R. CIV. P. 15(a); *Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052-53 (9th Cir. 2003).[29]

Dated: January 7, 2022                                Respectfully submitted,

                                                        **KAHN SWICK & FOTI, LLP**

                                                        By:____*s/ Ramzi Abadou*_____

[28]    *Sakkal v. Anaplan Inc.*, which merely involved allegations of sales turnover, is useless here. *Compare* ¶¶46, 111, 113, 153, 161, 165, 168, 340, 346-47, 375, 395 *with* 2021 U.S. Dist. LEXIS 165128, at *22-23 (N.D. Cal. 2021).

[29]    Control person liability against each of the Individual Defendants is adequately pled. *See Loritz v. Exide Techs.*, 2014 U.S. Dist. LEXIS 111491, at *42 (C.D. Cal. 2014) ("control person liability claims can generally only be dismissed at the pleading stage 'if a plaintiff fails to adequately plead a primary violation'"). Defendants concede that Graf served as GIC's CEO and Dee served as its President/CFO up through the Merger's closing on September 29, 2020, and further do not dispute that they acted as "control persons" at least through that date. *See* Mot. at 30; *see also* ¶¶46, 49. Defendants' contention that Plaintiffs "fail to plead facts showing their control after that time" (*see* Mot. at 30) is a inapt because Defendants Graf and Dee both served as directors of Velodyne while signing or having ultimate authority over numerous documents filed with the SEC, both before ***and after*** the Merger was completed. *See* ¶¶48-51. The same holds true for Defendants Gopalan, Hamer, and Culkin who each served as Velodyne's CEO, CFO, and company director, respectively, signing and maintaining ultimate authority over post-Merger documents and statements. *See* ¶¶39-45, 52-53; *see also In re CV Therapeutics, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 17419, at *36 (N.D. Cal. 2004) (control an "intensely factual question" that can and should rarely be decided at the motion to dismiss stage).

Ramzi Abadou (SBN 222567)
KAHN SWICK & FOTI, LLP
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 459-6900
Facsimile: (504) 455-1498
ramzi.abadou@ksfcounsel.com

-and-

Lewis S. Kahn
(to be admitted *pro hac vice*)
Alexander L. Burns
(admitted *pro hac vice*)
Alayne K. Gobeille
(admitted *pro hac vice*)
Morgan M. Embleton
(admitted *pro hac vice*)
KAHN SWICK & FOTI, LLC
1100 Poydras Street, Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@ksfcounsel.com
alexander.burns@ksfcounsel.com
alayne.gobeille@ksfcounsel.com
morgan.embleton@ksfcounsel.com

*Lead Counsel and Counsel for*
*Lead Plaintiffs, Diane Smith & William P. Smith*

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper *via* the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

_s/ Ramzi Abadou_
RAMZI ABADOU

## Mailing Information for a Case 3:21-cv-01486-SI Moradpour v. Velodyne Lidar, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,Ashley.Errington@ksfcounsel.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **William Zachary Brenc**
  william.brenc@wilmerhale.com,william-brenc-3258@ecf.pacerpro.com,barbara.palomo@wilmerhale.com,whdocketing@wilmerhale.com

- **Alexander Louis Burns**
  alexander.burns@ksfcounsel.com

- **Rachele R. Byrd**
  byrd@whafh.com,fileclerk@whafh.com

- **Morgan Michelle Embleton**
  Morgan.Embleton@ksfcounsel.com

- **Alayne K Gobeille**
  alayne.gobeille@ksfcounsel.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **Sarah E. Maciel**
  Sarah.Maciel@wilmerhale.com

- **Kevin Peter Muck**
  Kevin.Muck@wilmerhale.com,whdocketing@wilmerhale.com,joann.ambrosini@wilmerhale.com,lindy.patrick@wilmerhale.com

- **Susan Samuels Muck**
  susan.muck@wilmerhale.com,whdocketing@wilmerhale.com,susan-muck-3159@ecf.pacerpro.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,jalieberman@pomlaw.com,ahood@pomlaw.com,lobas@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,fgravenson@pomlaw.c

- **Pavithra Rajesh**
  prajesh@glancylaw.com,pavithra-rajesh-9402@ecf.pacerpro.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Brian Jared Schall**
  brian@schallfirm.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)