# EXHIBIT H

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

---

**SCHEDULE 14A**

**Proxy Statement Pursuant to Section 14(a) of the**
**Securities Exchange Act of 1934 (Amendment No. 2)**

---

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☒ Preliminary Proxy Statement

☐ **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☐ Definitive Proxy Statement

☐ Definitive Additional Materials

☐ Soliciting Material under §240.14a-12

**GRAF INDUSTRIAL CORP.**
**(Name of Registrant as Specified In Its Charter)**

**(Name of Person(s) Filing Proxy Statement, if other than the Registrant)**

Payment of Filing Fee (Check the appropriate box):

☐ No fee required.

☐ Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.

  (1) Title of each class of securities to which transaction applies:

  _____

  (2) Aggregate number of securities to which transaction applies:

  _____

  (3) Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

  _____

  (4) Proposed maximum aggregate value of transaction:

  _____

  (5) Total fee paid:

  _____

☒ Fee paid previously with preliminary materials.

☐ Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

  (1) Amount Previously Paid:

  _____

  (2) Form, Schedule or Registration Statement No.:

  _____

  (3) Filing Party:

  _____

  (4) Date Filed:

  _____

**TABLE OF CONTENTS**

| | |
|---|---|
| SUMMARY TERM SHEET | 1 |
| FREQUENTLY USED TERMS | 6 |
| QUESTIONS AND ANSWERS ABOUT THE PROPOSALS FOR STOCKHOLDERS | 10 |
| SUMMARY OF THE PROXY STATEMENT | 26 |
| SELECTED HISTORICAL FINANCIAL INFORMATION OF THE COMPANY | 38 |
| SELECTED HISTORICAL CONSOLIDATED FINANCIAL DATA OF VELODYNE | 39 |
| SELECTED UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 41 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 43 |
| RISK FACTORS | 45 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 86 |
| NOTES TO UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 96 |
| COMPARATIVE SHARE INFORMATION | 100 |
| SPECIAL MEETING OF COMPANY STOCKHOLDERS | 102 |
| PROPOSAL NO. 1 – APPROVAL OF THE BUSINESS COMBINATION | 109 |
| PROPOSAL NO. 2 – THE NASDAQ STOCK ISSUANCE PROPOSAL | 154 |
| PROPOSAL NO. 3 – THE CHARTER APPROVAL PROPOSAL | 157 |
| PROPOSAL NO. 4 – APPROVAL OF CERTAIN GOVERNANCE PROVISIONS IN THE AMENDED AND RESTATED CERTIFICATE OF INCORPORATION | 160 |
| PROPOSAL NO. 5 – APPROVAL OF THE INCENTIVE PLAN | 163 |
| PROPOSAL NO. 6 – APPROVAL OF EMPLOYEE STOCK PURCHASE PLAN | 167 |
| PROPOSAL NO. 7 – THE ADJOURNMENT PROPOSAL | 171 |
| INFORMATION ABOUT THE COMPANY | 172 |
| THE COMPANY'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 183 |
| VELODYNE'S BUSINESS | 191 |
| VELODYNE'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 215 |
| EXECUTIVE COMPENSATION | 240 |
| MANAGEMENT AFTER THE BUSINESS COMBINATION | 248 |
| DESCRIPTION OF SECURITIES | 256 |
| BENEFICIAL OWNERSHIP OF SECURITIES | 269 |
| CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS | 273 |
| MARKET PRICE, TICKER SYMBOL AND DIVIDEND INFORMATION | 280 |
| INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM | 281 |
| APPRAISAL RIGHTS | 281 |
| HOUSEHOLDING INFORMATION | 281 |
| TRANSFER AGENT AND REGISTRAR | 281 |
| SUBMISSION OF STOCKHOLDER PROPOSALS | 281 |
| FUTURE STOCKHOLDER PROPOSALS | 281 |
| WHERE YOU CAN FIND MORE INFORMATION | 283 |
| INDEX TO CONSOLIDATED FINANCIAL INFORMATION | F-1 |

| | |
|---|---|
| ANNEX A-1 – MERGER AGREEMENT | A-i |
| ANNEX A-2 – AMENDMENT TO MERGER AGREEMENT | A-2-1 |
| ANNEX A-3 – LETTER ACKNOWLEDGEMENT | A-3-1 |
| ANNEX B – FORM OF AMENDED AND RESTATED CERTIFICATE OF INCORPORATION | B-1 |
| ANNEX C – FORM OF SUPPORT AGREEMENT | C-1 |
| ANNEX D – FORM OF SPONSOR AGREEMENT | D-1 |
| ANNEX E – FORM OF SUBSCRIPTION AGREEMENT | E-1 |
| ANNEX F – INCENTIVE PLAN | F-1 |
| ANNEX G – EMPLOYEE STOCK PURCHASE PLAN | G-1 |

ii

| | |
|---|---|
| ANNEX A-1 – MERGER AGREEMENT | A-i |
| ANNEX A-2 – AMENDMENT TO MERGER AGREEMENT | A-2-1 |
| ANNEX A-3 – LETTER ACKNOWLEDGEMENT | A-3-1 |
| ANNEX B – FORM OF AMENDED AND RESTATED CERTIFICATE OF INCORPORATION | B-1 |
| ANNEX C – FORM OF SUPPORT AGREEMENT | C-1 |
| ANNEX D – FORM OF SPONSOR AGREEMENT | D-1 |
| ANNEX E – FORM OF SUBSCRIPTION AGREEMENT | E-1 |
| ANNEX F – INCENTIVE PLAN | F-1 |
| ANNEX G – EMPLOYEE STOCK PURCHASE PLAN | G-1 |

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This proxy statement contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995, including with respect to the anticipated timing, completion and effects of the Business Combination. These statements are based on the current expectations and beliefs of management of the Company and Velodyne, and are subject to a number of factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. These forward-looking statements include statements about future financial and operating results of Velodyne; benefits of the Business Combination; statements of the plans, strategies and objectives of management for future operations of Velodyne; statements regarding future economic conditions or performance; and other statements regarding the Business Combination. Forward-looking statements may contain words such as "will be," "will," "expect," "anticipate," "continue," "project," "believe," "plan," "could," "estimate," "forecast," "guidance," "intend," "may," "plan," "possible," "potential," "predict," "pursue," "should," "target" or similar expressions, and include the assumptions that underlie such statements. The following factors, among others, could cause actual results to differ materially from those described in the forward-looking statements:

**Operating Factors:**

- Velodyne's future performance, including Velodyne's projected revenue, costs of revenue, gross profit or gross margin, and operating expenses;

- the sufficiency of Velodyne's cash and cash equivalents to meet its operating requirements;

- Velodyne's ability to sell its products to new customers;

- the success of Velodyne's customers in developing and commercializing products using Velodyne's solutions, and the market acceptance of those products;

- the amount and timing of future sales;

- Velodyne's future market share;

- Competition from existing or future businesses and technologies;

- the impact of the COVID-19 pandemic on Velodyne's business and the business of its customers;

- the market for and adoption of lidar and related technology;

- Velodyne's ability to effectively manage its growth and future expenses;

- Velodyne's ability to compete in a market that is rapidly evolving and subject to technological developments;

- Velodyne's estimated total addressable market and the market for autonomous solutions;

- Velodyne's ability to maintain, protect, and enhance its intellectual property;

- Velodyne's ability to comply with modified or new laws and regulations applying to its business;

- the attraction and retention of qualified employees and key personnel;

- Velodyne's ability to introduce new products that meet its customers' requirements and to continue successfully transitioning the manufacturing of its products to third-party manufacturers;

- Velodyne's anticipated investments in and results from sales and marketing and R&D;

- the increased expenses associated with Velodyne being a public company; and

- our use of the net proceeds from the PIPE and the Trust Account.

**Business Combination-Related Factors:**

- occurrence of any event, change or other circumstances that could give rise to the termination of the Merger Agreement or the failure to satisfy the closing conditions;

43

- possibility that the consummation of the Business Combination is delayed or does not occur, including the failure of the stockholders of the Company and Velodyne to approve the Business Combination Proposal, the Nasdaq Stock Issuance Proposal and other proposals set forth in this proxy statement;

- uncertainty as to whether the Company and Velodyne will be able to complete the Business Combination on the terms set forth in the Merger Agreement;

- outcome of any legal proceedings that have been or may be instituted against the Company, Velodyne or others following announcement of the transactions contemplated by the Merger Agreement;

- uncertainty as to the long-term value of common stock;

- the risk that the proposed Business Combination disrupts current plans and operations of Velodyne as a result of the announcement and consummation of the transactions described herein; and

- the ability to obtain or maintain the listing of common stock on Nasdaq following the Business Combination.

The foregoing review of important factors should not be construed as exhaustive and should be read in conjunction with the other forward-looking statements that are included herein and elsewhere, including the risk factors set forth in this proxy statement beginning on page 45. Any forward-looking statements made in this proxy statement are qualified in their entirety by the forward-looking statements contained or referred to in this section, and there is no assurance that the actual results or developments anticipated by either the Company or Velodyne will be realized. All subsequent written and oral forward-looking statements concerning the Company, Velodyne, the post-combination company, the transactions contemplated by the Merger Agreement or other matters attributable to the Company or Velodyne or any person acting on their behalf are expressly qualified in their entirety by the forward-looking statements above. Except to the extent required by applicable law, the Company and Velodyne are under no obligation (and expressly disclaim any such obligation) to update or revise their forward-looking statements whether as a result of new information, future events, or otherwise.

44

**RISK FACTORS**

You should carefully review and consider the following risk factors and the other information contained in this proxy statement, including the financial statements and notes to the financial statements included herein, in evaluating the Business Combination and the proposals to be voted on at the Special Meeting. The following risk factors apply to the business and operations of Velodyne and will also apply to the business and operations of the post-combination company following the completion of the Business Combination. The occurrence of one or more of the events or circumstances described in these risk factors, alone or in combination with other events or circumstances, may adversely affect the ability to complete or realize the anticipated benefits of the Business Combination, and may have an adverse effect on the business, cash flows, financial condition and results of operations of the post-combination company. You should also carefully consider the following risk factors in addition to the other information included in this proxy statement, including matters addressed in the section entitled "*Cautionary Note Regarding Forward-Looking Statements*." We or Velodyne may face additional risks and uncertainties that are not presently known to us or Velodyne, or that we or Velodyne currently deem immaterial, which may also impair our or Velodyne's business or financial condition. The following discussion should be read in conjunction with the financial statements and notes to the financial statements included herein.

We have grouped the risks into three categories for ease of reading, and without any reflection on the importance of, or likelihood of, any particular category.

**Risks Related to Velodyne's Business**

***Velodyne's business could be materially and adversely affected by the current global COVID-19 pandemic.***

The recent COVID-19 pandemic has disrupted and affected Velodyne's business. For example, from March until June of 2020, due to the rapid spread of COVID-19, Velodyne's manufacturing facility in San Jose, California was operating at approximately 50% capacity. Additionally, Velodyne observed delayed customer purchases and longer sales cycles with customers that are addressing budget constraints, delayed projects or other hardships related to the COVID-19 pandemic. Velodyne has a global customer base operating in a wide range of industries that has been impacted in different ways by the pandemic. Velodyne also depends on suppliers and manufacturers worldwide. Depending upon the duration of the pandemic, the associated business interruptions and the recovery, Velodyne's customers, suppliers, manufacturers and partners may suspend or delay their engagement with Velodyne. If the pandemic worsens, if the economic recovery is delayed or if there are further business interruptions or changes in customer purchasing behavior, Velodyne's business, results of operations and ability to raise capital may be materially and adversely affected. Velodyne's response to the COVID-19 pandemic may prove to be inadequate and it may be unable to continue its operations in the manner it had prior to the outbreak, and may endure further interruptions, reputational harm, delays in its product development and shipments, all of which could have an adverse effect on its business, operating results, and financial condition. In addition, when the pandemic subsides, Velodyne cannot assure you as to the timing of any economic recovery, which could continue to have a material adverse effect on its target markets and its business.

***Since many of the markets in which Velodyne competes are new and rapidly evolving, it is difficult to forecast long-term end-customer adoption rates and demand for Velodyne's products.***

Velodyne is pursuing opportunities in markets that are undergoing rapid changes, including technological and regulatory changes, and it is difficult to predict the timing and size of the opportunities. For example, autonomous driving and lidar-based ADAS applications require complex technology. Because these automotive systems depend on technology from many companies, commercialization of autonomous driving or ADAS products could be delayed or impaired on account of certain technological components of Velodyne or others not being ready to be deployed in vehicles. Although some companies have released systems and vehicles using Velodyne's products, others may not be able to commercialize this technology immediately, or at all. Regulatory, safety or reliability developments, many of which are outside of Velodyne's control, could also cause delays or otherwise impair commercial adoption of these new technologies, which will adversely affect Velodyne's growth. Velodyne's future financial performance will depend on its ability to make timely investments in the correct market opportunities. If one or more of these markets

45

experience a shift in customer or prospective customer demand, Velodyne's products may not compete as effectively, if at all, and they may not be designed into commercialized products. Given the evolving nature of the markets in which Velodyne operates, it is difficult to predict customer demand or adoption rates for its products or the future growth of the markets in which it operates. As a result, the financial projections in this proxy statement necessarily reflect various estimates and assumptions that may not prove accurate and these projections could differ materially from actual results due to the risks included in "*Risk Factors*," among others. If demand does not develop or if Velodyne cannot accurately forecast customer demand, the size of its markets, inventory requirements or its future financial results, its business, results of operations and financial condition will be adversely affected.

***Despite the actions Velodyne is taking to defend and protect its intellectual property, Velodyne may not be able to adequately protect or enforce its intellectual property rights or prevent unauthorized parties from copying or reverse engineering its solutions. Velodyne's efforts to protect and enforce its intellectual property rights and prevent third parties from violating its rights may be costly.***

The success of Velodyne's products and its business depends in part on Velodyne's ability to obtain patents and other intellectual property rights and maintain adequate legal protection for its products in the United States and other international jurisdictions. Velodyne relies on a combination of patent, copyright, service mark, trademark and trade secret laws, as well as confidentiality procedures and contractual restrictions, to establish and protect its proprietary rights, all of which provide only limited protection. Velodyne cannot assure you that any patents will be issued with respect to its currently pending patent applications or that any trademarks will be registered with respect to its currently pending applications in a manner that gives Velodyne adequate defensive protection or competitive advantages, if at all, or that any patents issued to Velodyne or any trademarks registered by it will not be challenged, invalidated or circumvented. Velodyne has filed for patents and trademarks in the United States and in certain international jurisdictions, but such protections may not be available in all countries in which it operates or in which Velodyne seeks to enforce its intellectual property rights, or may be difficult to enforce in practice. Velodyne's currently-issued patents and trademarks and any patents and trademarks that may be issued or registered, as applicable, in the future with respect to pending or future applications may not provide sufficiently broad protection or may not prove to be enforceable in actions against alleged infringers. Velodyne cannot be certain that the steps it has taken will prevent unauthorized use of its technology or the reverse engineering of its technology. Moreover, others may independently develop technologies that are competitive to Velodyne or infringe Velodyne's intellectual property.

Protecting against the unauthorized use of Velodyne's intellectual property, products and other proprietary rights is expensive and difficult, particularly internationally. Velodyne believes that its patents are foundational in the area of lidar products and intends to enforce the intellectual property portfolio it has built over the years. Unauthorized parties may attempt to copy or reverse engineer Velodyne's smart vision solutions or certain aspects of Velodyne's solutions that it considers proprietary. Litigation may be necessary in the future to enforce or defend Velodyne's intellectual property rights, to prevent unauthorized parties from copying or reverse engineering its solutions, to determine the validity and scope of the proprietary rights of others or to block the importation of infringing products into the U.S.

For example, Velodyne recently achieved a favorable result in two proceedings before the U.S. Patent Trial and Appeal Board ("*PTAB*") where the PTAB upheld the validity of Velodyne's patent claims that were being challenged as unpatentable by one of its competitors. Velodyne's competitor filed a request for rehearing that was denied by the PTAB. The matter may proceed to an appeal in the future. In addition, that same competitor initiated a lawsuit in the U.S. District Court for the Northern District of California, and while that case is stayed pending PTAB proceedings, Velodyne cannot guarantee a favorable outcome in the litigation.

Additionally, to protect its intellectual property, Velodyne filed patent infringement cases in August 2019 with the U.S. International Trade Commission ("ITC") and the U.S. District Court for the Northern District of California against Hesai Photonics Technology Co., Ltd. ("*Hesai*") and Suteng Innovation Technology Co., Ltd. ("RoboSense"). Velodyne resolved its disputes with Hesai in June 2020. If it prevails in the ITC in its action against RoboSense, Velodyne has requested an exclusion order which would block the importation of sensors made by RoboSense into the United States. If it prevails in the district court, Velodyne will request

46

that RoboSense pay damages. However, Velodyne cannot guarantee that it will prevail, that the ITC will grant it the exclusion order, that it will be able to effectively enforce the exclusion order, or that it will obtain damages from RoboSense.

Any such litigation, whether initiated by Velodyne or a third party, could result in substantial costs and diversion of management resources, either of which could adversely affect Velodyne's business, operating results and financial condition. Even if it obtains favorable outcomes in litigation, Velodyne may not be able to obtain adequate remedies, especially in the context of unauthorized parties copying or reverse engineering its smart vision solutions. Further, many of Velodyne's current and potential competitors have the ability to dedicate substantially greater resources to defending intellectual property infringement claims and to enforcing their intellectual property rights than Velodyne has. Attempts to enforce its rights against third parties could also provoke these third parties to assert their own intellectual property or other rights against Velodyne, or result in a holding that invalidates or narrows the scope of Velodyne's rights, in whole or in part. Effective patent, trademark, service mark, copyright and trade secret protection may not be available in every country in which Velodyne's products are available and competitors based in other countries may sell infringing products in one or more markets. An inability to adequately protect and enforce Velodyne's intellectual property and other proprietary rights or an inability to prevent authorized parties from copying or reverse engineering its smart vision solutions or certain aspects of its solutions that Velodyne considers proprietary could seriously adversely affect its business, operating results, financial condition and prospects.

***Velodyne continues to implement strategic initiatives designed to grow its business. These initiatives may prove more costly than it currently anticipates and Velodyne may not succeed in increasing its revenue in an amount sufficient to offset the costs of these initiatives and to achieve and maintain profitability.***

Velodyne continues to make investments and implement initiatives designed to grow its business, including:

- investing in R&D;

- expanding its sales and marketing efforts to attract new customers across industries;

- investing in new applications and markets for its products;

- further enhancing its manufacturing processes and partnerships;

- pursuing litigation to protect its intellectual property; and

- investing in legal, accounting, and other administrative functions necessary to support its operations as a public company.

These initiatives may prove more expensive than it currently anticipates, and Velodyne may not succeed in increasing its revenue, if at all, in an amount sufficient to offset these higher expenses and to achieve and maintain profitability. Although Velodyne generated net income of $15.8 million for 2017, it has incurred net losses in the past, including net losses of $62.3 million for 2018 and $67.2 million for 2019 and $33.1 million for the six months ended June 30, 2020. The market opportunities Velodyne is pursuing are at an early stage of development, and it may be many years before the end markets Velodyne expects to serve generate demand for its products at scale, if at all. Velodyne's revenue may be adversely affected for a number of reasons, including the development and/or market acceptance of new technology that competes with its lidar products, if certain automotive original equipment manufacturers ("OEMs") or other market participants change their autonomous vehicle technology, failure of Velodyne's customers to commercialize autonomous systems that include its smart vision solutions, Velodyne's inability to effectively manage its inventory or manufacture products at scale, Velodyne's inability to enter new markets or help its customers adapt its products for new applications or Velodyne's failure to attract new customers or expand orders from existing customers or increasing competition. Furthermore, it is difficult to predict the size and growth rate of Velodyne's target markets, customer demand for its products, commercialization timelines, developments in autonomous sensing and related technology, the entry of competitive products, or the success of existing competitive products and services. For these reasons, Velodyne does not expect to achieve profitability over the near term. If Velodyne's revenue does not grow over the long term, its ability to achieve and maintain profitability may be adversely affected, and the value of its business may significantly decrease.

47

*Because Velodyne's sales have been primarily to customers making purchases for R&D projects and its orders are project-based, Velodyne expects its results of operations to fluctuate on a quarterly and annual basis, which could cause the stock price of the post-combination company to fluctuate or decline.*

Velodyne's quarterly results of operations have fluctuated in the past and may vary significantly in the future, and its revenue has declined in two consecutive years. As such, historical comparisons of its operating results may not be meaningful. In particular, because Velodyne's sales to date have primarily been to customers making purchases for R&D, sales in any given quarter can fluctuate based on the timing and success of its customers' development projects. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Velodyne's quarterly financial results may fluctuate as a result of a variety of factors, many of which are outside of its control and may not fully reflect the underlying performance of Velodyne's business. These fluctuations could adversely affect Velodyne's ability to meet its expectations or those of securities analysts or investors. If Velodyne does not meet these expectations for any period, the value of its business and its securities, or those of the post-combination company, could decline significantly. Factors that may cause these quarterly fluctuations include, without limitation, those listed below:

- The timing and magnitude of orders and shipments of Velodyne's products in any quarter.
- Pricing changes Velodyne may adopt to drive market adoption or in response to competitive pressure.
- Velodyne's ability to retain its existing customers and attract new customers.
- Velodyne's ability to develop, introduce, manufacture and ship in a timely manner products that meet customer requirements.
- Disruptions in Velodyne's sales channels or termination of its relationship with important channel partners.
- Delays in customers' purchasing cycles or deferments of customers' purchases in anticipation of new products or updates from Velodyne or its competitors.
- Fluctuations in demand pressures for Velodyne's products.
- The mix of products sold in any quarter.
- The duration of the global COVID-19 pandemic and the time it takes for economic recovery.
- The timing and rate of broader market adoption of autonomous systems utilizing Velodyne's smart vision solutions across the automotive and other market sectors.
- Market acceptance of lidar and further technological advancements by Velodyne's competitors and other market participants.
- The ability of Velodyne's customers to commercialize systems that incorporate its products.
- Any change in the competitive dynamics of Velodyne's markets, including consolidation of competitors, regulatory developments and new market entrants.
- Velodyne's ability to effectively manage its inventory.
- Changes in the source, cost, availability of and regulations pertaining to materials Velodyne uses.
- Adverse litigation, judgments, settlements or other litigation-related costs, or claims that may give rise to such costs.
- General economic, industry and market conditions, including trade disputes.

*Velodyne's transition to an outsourced manufacturing business model may not be successful, which could harm its ability to deliver products and recognize revenue.*

Velodyne is transitioning from a manufacturing model in which it primarily manufactured and assembled its products at its California location, to one where it relies on third-party manufacturers in Europe and Asia. Velodyne currently has agreements with Fabrinet, Nikon and Veoneer to provide contract

48

manufacturing of certain of its products. Velodyne believes the use of third-party manufacturers will have benefits, but in the near term, while it is beginning manufacturing with new partners, Velodyne may lose revenue, incur increased costs and harm its customer relationships.

Reliance on third-party manufacturers reduces Velodyne's control over the manufacturing process, including reduced control over quality, product costs and product supply and timing. Velodyne may experience delays in shipments or issues concerning product quality from its third-party manufacturers. If any of Velodyne's third-party manufacturers experience interruptions, delays or disruptions in supplying its products, including by natural disasters, the global COVID-19 pandemic or work stoppages or capacity constraints, Velodyne's ability to ship products to distributors and customers would be delayed. The COVID-19 pandemic has caused interruptions in Velodyne's manufacturing operations and production delays. For example, Velodyne personnel have not be able to travel to Thailand to meet with a key manufacturing partner. Additionally, if any of Velodyne's third-party manufacturers experience quality control problems in their manufacturing operations and Velodyne's products do not meet customer or regulatory requirements, it could be required to cover the cost of repair or replacement of any defective products. These delays or product quality issues could have an immediate and material adverse effect on Velodyne's ability to fulfill orders and could have a negative effect on its operating results. In addition, such delays or issues with product quality could adversely affect Velodyne's reputation and its relationship with its channel partners. If third-party manufacturers experience financial, operational, manufacturing capacity or other difficulties, or experience shortages in required components, or if they are otherwise unable or unwilling to continue to manufacture Velodyne's products in required volumes or at all, Velodyne's supply may be disrupted, it may be required to seek alternate manufacturers and it may be required to re-design its products. It would be time-consuming, and could be costly and impracticable, to begin to use new manufacturers and designs and such changes could cause significant interruptions in supply and could have an adverse effect on Velodyne's ability to meet its scheduled product deliveries and may subsequently lead to the loss of sales. While Velodyne takes measures to protect its trade secrets, the use of third-party manufacturers may also risk disclosure of its innovative and proprietary manufacturing methodologies, which could adversely affect Velodyne's business.

In addition, Velodyne currently relies on third-party manufacturers to produce its custom application specific integrated circuits ("ASICs"). Velodyne has made considerable investments to develop its proprietary ASICs and its smart vision solutions depend on them. If third-party manufacturers of Velodyne's custom ASICs experience interruptions, delays or disruptions in supplying its ASICs or if there are work stoppages, production delays or facility closures due to the COVID-19 pandemic, Velodyne's ability to ship its smart vision solutions will be delayed and it may be unable to meet customer demand. Velodyne's ASICs may have defects or other issues if its third-party manufacturers have quality control or other problems in their operations. These defects may delay Velodyne's ability to fulfill customer orders, which would have a negative effect on its brand and operating results. If it needs to change manufacturers of its ASICs for any reason, Velodyne cannot guarantee that it will be able to find a replacement manufacturer willing to produce its custom ASICs at a price it deems appropriate, or at all.

***Adverse conditions in the automotive industry or the global economy more generally could have adverse effects on Velodyne's results of operations.***

While Velodyne makes its strategic planning decisions based on the assumption that the markets it is targeting will grow, Velodyne's business is dependent, in large part on, and directly affected by, business cycles and other factors affecting the global automobile industry and global economy generally. Automotive production and sales are highly cyclical and depend on general economic conditions and other factors, including consumer spending and preferences, changes in interest rates and credit availability, consumer confidence, fuel costs, fuel availability, environmental impact, governmental incentives and regulatory requirements, and political volatility, especially in energy-producing countries and growth markets. In addition, automotive production and sales can be affected by Velodyne's automotive OEM customers' ability to continue operating in response to challenging economic conditions and in response to labor relations issues, regulatory requirements, trade agreements and other factors. The volume of automotive production in North America, Europe and the rest of the world has fluctuated, sometimes significantly, from year to year, and Velodyne expects such fluctuations to give rise to fluctuations in the demand for its products. Any significant adverse change in any of these factors may result in a reduction in automotive sales and production

49

by Velodyne's automotive OEM customers and could have a material adverse effect on its business, results of operations and financial condition.

***Although Velodyne believes that lidar is the industry standard for autonomous vehicles and other emerging markets, market adoption of lidar is uncertain. If market adoption of lidar does not continue to develop, or develops more slowly than Velodyne expects, its business will be adversely affected.***

While Velodyne's lidar-based smart vision solutions can be applied to different use cases across end markets, approximately 44% of its revenue during 2019 was generated from automotive applications. Despite the fact that the automotive industry has engaged in considerable effort to research and test lidar products for ADAS and autonomous driving applications, the automotive industry may not introduce lidar products in commercially available vehicles. Velodyne continually studies emerging and competing sensing technologies and methodologies and it may add new sensing technologies such as radar and cameras to its offering to, for example, address lidar's relative deficiencies in detecting colors and low reflectivity objects and performing in extreme weather conditions. However, lidar products remain relatively new and it is possible that other sensing modalities, or a new disruptive modality based on new or existing technology, including a combination of technology, will achieve acceptance or leadership in the ADAS and autonomous driving industries. Even if lidar products are used in initial generations of autonomous driving technology and certain ADAS products, Velodyne cannot guarantee that lidar products will be designed into or included in subsequent generations of such commercialized technology. In addition, Velodyne expects that initial generations of autonomous vehicles will be focused on limited applications, such as robo-taxis, and that mass market adoption of autonomous technology may lag behind these initial applications significantly. The speed of market growth for ADAS or autonomous vehicles is difficult if not impossible to predict, and it is more difficult to predict this market's future growth in light of the economic consequences of the COVID-19 pandemic. Although it currently believes it has the lead in lidar-based systems for the autonomous market, by the time mass market adoption of autonomous vehicle technology is achieved, Velodyne expects competition among providers of sensing technology based on lidar and other modalities to increase substantially. If commercialization of lidar products is not successful, or not as successful as Velodyne or the market expects, or if other sensing modalities gain acceptance by developers of autonomous driving systems or ADAS, automotive OEMs, regulators and safety organizations or other market participants by the time autonomous vehicle technology achieves mass market adoption, its business, results of operations and financial condition will be materially and adversely affected.

Velodyne is investing in and pursuing market opportunities outside of the automotive markets, including in UAVs, self-driving rovers, industrial and security robots, mapping applications for topography and surveying and smart city initiatives. Velodyne believes that its future revenue growth, if any, will depend in part on its ability to expand within new markets such as these and to enter new markets as they emerge. Each of these markets presents distinct risks and, in many cases, requires Velodyne to address the particular requirements of that market.

Addressing these requirements can be time-consuming and costly. The market for lidar technology outside of automotive applications is relatively new, rapidly developing and unproven in many markets or industries. Many of Velodyne's customers outside of the automotive industry are still in the testing and development phases and it cannot be certain that they will commercialize products or systems with its lidar products or at all. Velodyne cannot be certain that lidar will be sold into these markets, or any market outside of automotive market, at scale. Adoption of lidar products, including Velodyne's products, outside of the automotive industry will depend on numerous factors, including: whether the technological capabilities of lidar and lidar-based products meet users' current or anticipated needs, whether the benefits of designing lidar into larger sensing systems outweigh the costs, complexity and time needed to deploy such technology or replace or modify existing systems that may have used other modalities such as cameras and radar, whether users in other applications can move beyond the testing and development phases and proceed to commercializing systems supported by lidar technology and whether lidar developers such as Velodyne can keep pace with rapid technological change in certain developing markets and the global response to the COVID-19 pandemic and the length of any associated work stoppages. If lidar technology does not achieve commercial success outside of the automotive industry, or if the market develops at a pace slower than Velodyne expects, its business, results of operation and financial condition will be materially and adversely affected.

50

*Because lidar is new in the market, forecasts of market growth in this proxy statement may not be accurate.*

Market opportunity estimates and growth forecasts included in this proxy statement are subject to significant uncertainty and are based on assumptions and estimates that may not prove to be accurate. The forecasts and estimates in this proxy statement relating to the expected size and growth of the markets for lidar-based technology and other markets in which Velodyne participates may prove to be inaccurate. Even if these markets experience the forecasted growth described in this proxy statement, Velodyne may not grow its business at similar rates, or at all. Velodyne's future growth is subject to many factors, including market adoption of its products, which is subject to many risks and uncertainties. Accordingly, the forecasts and estimates of market size and growth described in this proxy statement, including Velodyne's estimates that the size of its total addressable market is expected to be approximately $11.9 billion in 2022 and that its automotive total addressable market is expected to grow from $7.3 billion in 2022 to $16.8 billion in 2026, should not be taken as indicative of Velodyne's future growth. In addition, these forecasts do not take into account the impact of the current global COVID-19 pandemic, and Velodyne cannot assure you that these forecasts will not be materially and adversely affected as a result.

*Velodyne's investments in educating its customers and potential customers about the advantages of lidar and its applications may not result in sales of Velodyne's products.*

Educating Velodyne's prospective customers, and to a lesser extent, its existing customers, about lidar, its advantages over other sensing technologies and lidar's ability to convey value in different industries and deployments is an integral part of developing new business and the lidar market generally. If prospective customers have a negative perception of, or experience with, lidar or a competitor's lidar products they may be reluctant to adopt lidar in general or specifically Velodyne's products. Adverse statements about lidar by influential market participants may also deter adoption. Some of Velodyne's competitors have significant financial or marketing resources that may allow them to engage in public marketing campaigns about their alternative technology, lidar or Velodyne's solutions. Velodyne's efforts to educate potential customers and the market generally and to counter any adverse statements made by competitors or other market participants will require significant financial and personnel resources. These educational efforts may not be successful and Velodyne may not offset the costs of such efforts with revenue from the new customers. If Velodyne is unable to acquire new customers to offset these expenses or if the market accepts such adverse statements, its financial condition will be adversely affected.

*In addition to patented technology, Velodyne relies on its unpatented proprietary technology, trade secrets, processes and know-how.*

Velodyne relies on proprietary information (such as trade secrets, know-how and confidential information) to protect intellectual property that may not be patentable or subject to copyright, trademark, trade dress or service mark protection, or that Velodyne believes is best protected by means that do not require public disclosure. Velodyne generally seeks to protect this proprietary information by entering into confidentiality agreements, or consulting, services or employment agreements that contain non-disclosure and non-use provisions with its employees, consultants, contractors and third parties. However, Velodyne may fail to enter into the necessary agreements, and even if entered into, these agreements may be breached or may otherwise fail to prevent disclosure, third-party infringement or misappropriation of its proprietary information, may be limited as to their term and may not provide an adequate remedy in the event of unauthorized disclosure or use of proprietary information. Velodyne has limited control over the protection of trade secrets used by its current or future manufacturing partners and suppliers and could lose future trade secret protection if any unauthorized disclosure of such information occurs. In addition, Velodyne's proprietary information may otherwise become known or be independently developed by its competitors or other third parties. To the extent that its employees, consultants, contractors, advisors and other third parties use intellectual property owned by others in their work for Velodyne, disputes may arise as to the rights in related or resulting know-how and inventions. Costly and time-consuming litigation could be necessary to enforce and determine the scope of Velodyne's proprietary rights, and failure to obtain or maintain protection for its proprietary information could adversely affect its competitive business position. Furthermore, laws regarding trade secret rights in certain markets where Velodyne operates may afford little or no protection to its trade secrets.

51

Velodyne also relies on physical and electronic security measures to protect its proprietary information, but it cannot provide assurance that these security measures will not be breached or provide adequate protection for its property. There is a risk that third parties may obtain and improperly utilize Velodyne's proprietary information to its competitive disadvantage. Velodyne may not be able to detect or prevent the unauthorized use of such information or take appropriate and timely steps to enforce its intellectual property rights.

### *The markets in which Velodyne competes are characterized by rapid technological change, which requires it to continue to develop new products and product innovations, and could adversely affect market adoption of its products.*

While Velodyne intends to invest substantial resources to remain on the forefront of technological development, continuing technological changes in sensing technology, lidar and the markets for these products, including the ADAS and autonomous driving industries, could adversely affect adoption of lidar and/or Velodyne's products, either generally or for particular applications. Velodyne's future success will depend upon its ability to develop and introduce a variety of new capabilities and innovations to its existing product offerings, as well as introduce a variety of new product offerings, to address the changing needs of the markets in which Velodyne offers its products. For example, Velodyne is currently working on developing its Vella software, which is a data curation software platform, as well as several other new lidar products. Velodyne cannot guarantee that the Vella software or the new products will be released in a timely manner, or at all, or achieve market acceptance. For example, in 2019 Velodyne experienced delays in acceptance of certain of its new lidar products as it worked with its customers to identify, define and meet product requirements, and Velodyne may be unable to sell these or future products at scale until these issues are resolved. Delays in delivering new products that meet customer requirements could damage Velodyne's relationships with customers and lead them to seek alternative sources of supply. In addition, Velodyne's success to date has been based on the delivery of its smart vision solutions to R&D programs in which developers are investing substantial capital to develop new systems. Velodyne's continued success relies on the success of the R&D phase of these customers as they expand into commercialized projects. While some customers already have achieved commercialization, most of Velodyne's automotive customers are just beginning on the path to commercialization. As autonomous technology reaches the stage of large scale commercialization Velodyne will be required to develop and deliver smart vision solutions at price points that enable wider and ultimately mass-market adoption. Delays in introducing products and innovations, the failure to choose correctly among technical alternatives or the failure to offer innovative products or configurations at competitive prices may cause existing and potential customers to purchase Velodyne's competitors' products or turn to alternative sensing technology.

If Velodyne is unable to devote adequate resources to develop products or cannot otherwise successfully develop products or system configurations that meet customer requirements on a timely basis or that remain competitive with technological alternatives, its products could lose market share, its revenue will decline, it may experience operating losses and its business and prospects will be adversely affected.

### *Velodyne operates in a highly competitive market and some market participants have substantially greater resources. Velodyne competes against a large number of both established competitors and new market entrants.*

The markets for sensing technology applicable to autonomous solutions across numerous industries are highly competitive. Velodyne's future success will depend on its ability to maintain its lead by continuing to develop and protect from infringement advanced lidar technology in a timely manner and to stay ahead of existing and new competitors. Velodyne's competitors are numerous and they compete with it directly by offering lidar products and indirectly by attempting to solve some of the same challenges with different technology. Velodyne faces competition from camera and radar companies, other developers of lidar products, Tier 1 suppliers and other technology and automotive supply companies, some of which have significantly greater resources than it does. Some examples of Velodyne's competitors include DENSO Corporation, Hesai, Ibeo Automotive Systems, LeddarTech, Innoviz, Luminar, Quanergy, Magna International, Valeo SA, Bosch, Continental and ZF Friedrichshafen AG. In the automotive market, Velodyne's competitors have commercialized non-lidar-based ADAS technology which has achieved market adoption, strong brand recognition and may continue to improve. Other competitors are working towards commercializing autonomous driving technology and either by themselves, or with a publicly announced partner, have

52

substantial financial, marketing, R&D and other resources. Some of Velodyne's customers in the autonomous vehicle and ADAS markets have announced development efforts or made acquisitions directed at creating their own lidar-based or other sensing technologies, which would compete with Velodyne's smart vision solutions. Velodyne does not know how close these competitors are to commercializing autonomous driving systems or novel ADAS applications. In markets outside of the automotive industry, its competitors, like Velodyne, seek to develop new sensing applications across industries. Even in these emerging markets, Velodyne faces substantial competition from numerous competitors seeking to prove the value of their technology. Additionally, increased competition may result in pricing pressure and reduced margins and may impede Velodyne's ability to increase the sales of its products or cause it to lose market share, any of which will adversely affect its business, results of operations and financial condition.

***Velodyne expects to incur substantial R&D costs and devote significant resources to identifying and commercializing new products, which could significantly reduce its profitability and may never result in revenue to Velodyne.***

Velodyne's future growth depends on penetrating new markets, adapting existing products to new applications and customer requirements, and introducing new products that achieve market acceptance. Velodyne plans to incur substantial and potentially increasing, R&D costs as part of its efforts to design, develop, manufacture and commercialize new products and enhance existing products. Velodyne's R&D expenses were $31.6 million, $52.0 million, $56.9 million and $29.1 million during 2017, 2018 and 2019 and the six months ended June 30, 2020, respectively and are likely to grow in the future. Because Velodyne accounts for R&D as an operating expense, these expenditures will adversely affect its results to operations in the future. Further, Velodyne's R&D program may not produce successful results, and its new products may not achieve market acceptance, create additional revenue or become profitable.

***The completion of the Business Combination does not automatically result in the satisfaction of the liquidity event vesting condition applicable to our outstanding RSUs and RSAs and it is anticipated that a liquidity event will be deemed to have occurred by the board of directors of the post-combination company following the completion of the Business Combination and at that time we will be required to record a significant stock-based compensation expense.***

Our stock-based compensation expense to date has been insignificant. We anticipate that our stock-based compensation expense will increase significantly following the closing of the Business Combination. All outstanding RSUs and RSAs vest upon the satisfaction of both a service condition and a liquidity event condition. The service condition for a majority of the RSUs is satisfied over a period of four years. As of June 30, 2020, no stock-based compensation expense had been recognized for the outstanding RSUs and RSAs because the satisfaction of the liquidity event condition was not probable. While the completion of the Business Combination does not automatically result in satisfaction of the liquidity event vesting condition, it is anticipated that a liquidity event will be deemed to have occurred by the board of directors of the post-combination company following the completion of the Business Combination, effecting a stock-based award modification. In the quarter in which the board of directors of the post-combination company deems this liquidity event condition satisfied, we will record a significant one time stock-based compensation expense, and then we will begin recording stock-based compensation expense related to our RSUs as they vest. If the Business Combination had been completed on September 7, 2020 and the stock-based award modification had also taken place, we would have recorded approximately $257.8 million of incremental stock-based compensation expense related to our RSUs and RSAs on that date, which is assuming an exchange ratio of 2.8730 (which is subject to adjustment) and a deemed fair market value of $25.78 which is based on the closing price of Graf's common stock on September 4, 2020. Following the completion of the Business Combination, the stock-based compensation expense related to RSUs and other outstanding equity awards will have a significant negative impact on our ability to achieve profitability on a GAAP basis in 2020 and 2021.

***As part of growing its business, Velodyne may make acquisitions. If Velodyne fails to successfully select, execute or integrate its acquisitions, then its business, results of operations and financial condition could be materially adversely affected and the stock price of the post-combination company could decline.***

From time to time, Velodyne may undertake acquisitions to add new products and technologies, acquire talent, gain new sales channels or enter into new markets or sales territories. Acquisitions involve

53

numerous risks and challenges, including relating to the successful integration of the acquired business and its key personnel, entering into new territories or markets with which Velodyne has limited or no prior experience, establishing or maintaining business relationships with new customers, channel partners, vendors and suppliers, unexpected liabilities and potential post-closing disputes.

To date, Velodyne has limited experience with acquisitions and the integration of acquired technology and personnel. Failure to successfully identify, complete, manage and integrate acquisitions could materially and adversely affect its business, financial condition and results of operations and could cause the post-combination company's stock price to decline.

***Velodyne may need to raise additional capital in the future in order to execute its business plan, which may not be available on terms acceptable to Velodyne, or at all.***

In the future, Velodyne may require additional capital to respond to technological advancements, competitive dynamics or technologies, customer demands, business opportunities, challenges, acquisitions or unforeseen circumstances and it may determine to engage in equity or debt financings or enter into credit facilities for other reasons. In order to further business relationships with current or potential customers or partners, Velodyne may issue equity or equity-linked securities to such current or potential customers or partners. Velodyne may not be able to timely secure additional debt or equity financing on favorable terms, or at all. If Velodyne raises additional funds through the issuance of equity or convertible debt or other equity-linked securities or if it issues equity or equity-linked securities to current or potential customers to further business relationships, its existing stockholders could experience significant dilution. Any debt financing obtained by Velodyne in the future could involve restrictive covenants relating to its capital raising activities and other financial and operational matters, which may make it more difficult for Velodyne to obtain additional capital and to pursue business opportunities, including potential acquisitions. If Velodyne is unable to obtain adequate financing or financing on terms satisfactory to Velodyne, when Velodyne requires it, Velodyne's ability to continue to grow or support its business and to respond to business challenges could be significantly limited. These same risks will apply to the post-combination company following the Closing of the Business Combination.

***Changes to trade policy, tariffs and import/export regulations may have a material adverse effect on Velodyne's business, financial condition and results of operations.***

Changes in global political, regulatory and economic conditions or in laws and policies governing foreign trade, manufacturing, development and investment in the territories or countries where Velodyne currently purchases its components, sells its products or conducts its business could adversely affect Velodyne's business. The U.S. has recently instituted or proposed changes in trade policies that include the negotiation or termination of trade agreements, the imposition of higher tariffs on imports into the U.S., economic sanctions on individuals, corporations or countries, and other government regulations affecting trade between the U.S. and other countries where Velodyne conducts its business. A number of other nations have proposed or instituted similar measures directed at trade with the United States in response. As a result of these developments, there may be greater restrictions and economic disincentives on international trade that could adversely affect Velodyne's business. For example, such changes could adversely affect the automotive market, Velodyne's ability to access key components or raw materials needed to manufacture its products (including, but not limited to, rare-earth metals), Velodyne's ability to sell its products to customers outside of the U.S. and the demand for its products. It may be time-consuming and expensive for Velodyne to alter its business operations to adapt to or comply with any such changes, and any failure to do so could have a material adverse effect on its business, financial condition and results of operations.

***Third-party claims that Velodyne is infringing intellectual property, whether successful or not, could subject it to costly and time-consuming litigation or expensive licenses, and its business could be adversely affected.***

Although Velodyne holds key patents related to its products, a number of companies, both within and outside of the lidar industry, hold other patents covering aspects of lidar products. In addition to these patents, participants in this industry typically also protect their technology, especially embedded software, through copyrights and trade secrets. As a result, there is frequent litigation based on allegations of infringement, misappropriation or other violations of intellectual property rights. Velodyne has received,

54

and in the future may receive, inquiries from other intellectual property holders and may become subject to claims that it infringes their intellectual property rights, particularly as Velodyne expands its presence in the market, expands to new use cases and faces increasing competition. In addition, parties may claim that the names and branding of Velodyne's products infringe their trademark rights in certain countries or territories. If such a claim were to prevail, Velodyne may have to change the names and branding of its products in the affected territories and it could incur other costs.

Velodyne currently has a number of agreements in effect pursuant to which it has agreed to defend, indemnify and hold harmless its customers, suppliers, and channel partners and other partners from damages and costs which may arise from the infringement by Velodyne's products of third-party patents or other intellectual property rights. The scope of these indemnity obligations varies, but may, in some instances, include indemnification for damages and expenses, including attorneys' fees. Velodyne's insurance may not cover all intellectual property infringement claims. A claim that its products infringe a third party's intellectual property rights, even if untrue, could adversely affect Velodyne's relationships with its customers, may deter future customers from purchasing its products and could expose Velodyne to costly litigation and settlement expenses. Even if Velodyne is not a party to any litigation between a customer and a third party relating to infringement by its products, an adverse outcome in any such litigation could make it more difficult for Velodyne to defend its products against intellectual property infringement claims in any subsequent litigation in which it is a named party. Any of these results could adversely affect Velodyne's brand and operating results.

Velodyne's defense of intellectual property rights claims brought against it or its customers, suppliers and channel partners, with or without merit, could be time-consuming, expensive to litigate or settle, divert management resources and attention and force Velodyne to acquire intellectual property rights and licenses, which may involve substantial royalty or other payments and may not be available on acceptable terms or at all. Further, a party making such a claim, if successful, could secure a judgment that requires Velodyne to pay substantial damages or obtain an injunction. An adverse determination also could invalidate Velodyne's intellectual property rights and adversely affect its ability to offer its products to its customers and may require that Velodyne procure or develop substitute products that do not infringe, which could require significant effort and expense. Any of these events could adversely affect Velodyne's business, operating results, financial condition and prospects.

*Changes in tax laws or exposure to additional income tax liabilities could affect Velodyne's future profitability.*

Factors that could materially affect Velodyne's future effective tax rates include but are not limited to:

- Changes in tax laws or the regulatory environment.

- Changes in accounting and tax standards or practices.

- Changes in the composition of operating income by tax jurisdiction.

- Velodyne's operating results before taxes.

Because Velodyne does not have a long history of operating at its present scale and it has significant expansion plans, Velodyne's effective tax rate may fluctuate in the future. Future effective tax rates could be affected by operating losses in jurisdictions where no tax benefit can be recorded under U.S. GAAP, changes in the composition of earnings in countries with differing tax rates, changes in deferred tax assets and liabilities, or changes in tax laws.

On December 22, 2017, the Tax Cuts and Jobs Act of 2017, or the Tax Act, was signed into law making significant changes to the Internal Revenue Code of 1986, as amended, or the Code. In particular, sweeping changes were made to the U.S. taxation of foreign operations. Changes include, but are not limited to, a permanent reduction to the corporate income tax rate, limiting interest deductions, adopting elements of a territorial tax system, assessing a repatriation tax or "toll-charge" on undistributed earnings and profits of U.S.- owned foreign corporations, and introducing certain anti-base erosion provisions, including a new minimum tax on global intangible low-taxed income ("*GILTI*") and base erosion and anti-abuse tax ("*BEAT*"). The primary impact of the new legislation on Velodyne's 2017, 2018 and 2019 and six months ended June 30, 2020 provision for income taxes was $1.9 million, $0.2 million, zero and zero, respectively. Additionally, Velodyne made a one-time deemed repatriation tax payment of $0.1 million in 2017. The overall

55

impact of this tax reform is uncertain, and Velodyne's business and financial condition, including with respect to its non-U.S. operations, could be adversely affected.

In addition to the impact of the Tax Act on Velodyne's federal taxes, the Tax Act may impact its taxation in other jurisdictions, including with respect to state income taxes. State legislatures have not had sufficient time to respond to the Tax Act. Accordingly, there is uncertainty as to how the laws will apply in the various state jurisdictions. Additionally, other foreign governing bodies may enact changes to their tax laws in reaction to the Tax Act that could result in changes to Velodyne's global tax position and materially adversely affect its business, results of operations and financial condition. Additionally, the IRS and several foreign tax authorities have increasingly focused attention on intercompany transfer pricing with respect to sales of products and services and the use of intangibles. Tax authorities could disagree with Velodyne's intercompany charges, cross-jurisdictional transfer pricing or other matters and assess additional taxes. If Velodyne does not prevail in any such disagreements, its profitability may be affected.

***Velodyne's ability to use its net operating loss carryforwards and certain other tax attributes may be limited.***

As of December 31, 2019, Velodyne had $107.4 million of U.S. federal and $73.4 million of state net operating loss carryforwards available to reduce future taxable income, which will be carried forward indefinitely for U.S. federal tax purposes and will expire beginning in 2028 through 2038 for state tax purposes (noting that the net operating carryforward was subsequently reduced to $78.3 million in 2020 after the carryback of losses allowed under the Coronavirus Aid Relief and Economic Security Act ("CARES Act")). It is possible that Velodyne will not generate taxable income in time to use these net operating loss carryforwards before their expiration or at all. Under legislative changes made in December 2017, U.S. federal net operating losses incurred in 2018 and in future years may be carried forward indefinitely, but the deductibility of such net operating losses is limited. It is uncertain if and to what extent various states will conform to the newly enacted federal tax law. In addition, the federal and state net operating loss carryforwards and certain tax credits may be subject to significant limitations under Section 382 and Section 383 of the Code, respectively, and similar provisions of state law. Under those sections of the Code, if a corporation undergoes an "ownership change," the corporation's ability to use its pre-change net operating loss carryforwards and other pre-change attributes, such as research tax credits, to offset its post-change income or tax may be limited. In general, an "ownership change" will occur if there is a cumulative change in our ownership by "5% shareholders" that exceeds 50 percentage points over a rolling three-year period. Similar rules may apply under state tax laws. Velodyne has not yet undertaken an analysis of whether or not the Business Combination constitutes an "ownership change" for purposes of Section 382 and Section 383 of the Code.

***Velodyne has in the past and may become involved in legal and regulatory proceedings and commercial or contractual disputes, which could have an adverse effect on its profitability and consolidated financial position.***

Velodyne may be, from time to time, involved in litigation, regulatory proceedings and commercial or contractual disputes that may be significant. These matters may include, without limitation, disputes with Velodyne's suppliers and customers, intellectual property claims, stockholder litigation, government investigations, class action lawsuits, personal injury claims, environmental issues, customs and VAT disputes and employment and tax issues. In addition, Velodyne has in the past and could face in the future a variety of labor and employment claims against it, which could include but is not limited to general discrimination, wage and hour, privacy, ERISA or disability claims. In such matters, government agencies or private parties may seek to recover from Velodyne very large, indeterminate amounts in penalties or monetary damages (including, in some cases, treble or punitive damages) or seek to limit Velodyne's operations in some way. These types of lawsuits could require significant management time and attention or could involve substantial legal liability, adverse regulatory outcomes, and/or substantial expenses to defend. Often these cases raise complex factual and legal issues and create risks and uncertainties. No assurances can be given that any proceedings and claims will not have a material adverse impact on Velodyne's operating results and consolidated financial position or that its established reserves or its available insurance will mitigate this impact.

56

***Velodyne is subject to, and must remain in compliance with, numerous laws and governmental regulations concerning the manufacturing, use, distribution and sale of its products. Some of Velodyne's customers also require that it comply with their own unique requirements relating to these matters.***

Velodyne manufactures and sells products that contain electronic components, and such components may contain materials that are subject to government regulation in both the locations where Velodyne manufactures and assembles its products, as well as the locations where Velodyne sells its products. For example, certain regulations limit the use of lead in electronic components. Since Velodyne operates on a global basis, this is a complex process which requires continual monitoring of regulations and an ongoing compliance process to ensure that Velodyne and its suppliers are in compliance with all existing regulations. If there is an unanticipated new regulation that significantly impacts Velodyne's use of various components or requires more expensive components, that regulation could materially adversely affect its business, results of operations and financial condition.

Velodyne's products are also used for autonomous driving and ADAS applications, which are subject to complicated regulatory schemes that vary from jurisdiction to jurisdiction. These are rapidly evolving areas where new regulations could impose limitations on the use of lidar generally or Velodyne's products specifically. If Velodyne fails to adhere to these new regulations or fails to continually monitor the updates, it may be subject to litigation, loss of customers or negative publicity and its business, results of operations and financial condition will be adversely affected.

Concerns over environmental pollution and climate change have produced significant legislative and regulatory efforts on a global basis, and Velodyne believes this will continue both in scope and in the number of countries participating. These changes could directly increase the cost of energy, which may have an effect on the way Velodyne manufactures products or utilizes energy to produce its products. In addition, any new regulations or laws in the environmental area might increase the cost of raw materials or key components Velodyne uses in its products. Environmental regulations require Velodyne to reduce product energy usage, monitor and exclude an expanding list of restricted substances and to participate in required recovery and recycling of its products. Velodyne is unable to predict how any future changes will impact it and if such impacts will be material to its business.

***Velodyne's business may be adversely affected by changes in automotive safety regulations or concerns that drive further regulation of the automobile safety market.***

Government vehicle safety regulations are an important factor for Velodyne's business. Historically, these regulations have imposed ever-more stringent safety regulations for vehicles. These safety regulations often require, or customers demand that, vehicles have more safety features per vehicle and more advanced safety products.

While Velodyne believes increasing automotive safety standards will present a market opportunity for its products, government safety regulations are subject to change based on a number of factors that are not within its control, including new scientific or technological data, adverse publicity regarding the industry recalls and safety risks of autonomous driving and ADAS, accidents involving its products, domestic and foreign political developments or considerations, and litigation relating to its products and its competitors' products. Changes in government regulations, especially in the autonomous driving and ADAS industries could adversely affect Velodyne's business. If government priorities shift and Velodyne is unable to adapt to changing regulations, its business may be materially and adversely affected.

Federal and local regulators impose more stringent compliance and reporting requirements in response to product recalls and safety issues in the automotive industry. As the cars that carry Velodyne's sensors go into production, it is subject to existing stringent requirements under the National Traffic and Motor Vehicle Safety Act of 1966, or the Vehicle Safety Act, including a duty to report, subject to strict timing requirements, safety defects with its products. The Vehicle Safety Act imposes potentially significant civil penalties for violations including the failure to comply with such reporting actions. Velodyne is also subject to the existing U.S. Transportation Recall Enhancement, Accountability and Documentation Act, or TREAD, which requires equipment manufacturers, such as Velodyne, to comply with "Early Warning" requirements by reporting certain information to the NHTSA, such as information related to defects or reports of injury related to its products. TREAD imposes criminal liability for violating such requirements if a defect

57

subsequently causes death or bodily injury. In addition, the National Traffic and Motor Vehicle Safety Act authorizes NHTSA to require a manufacturer to recall and repair vehicles that contain safety defects or fail to comply with U.S. federal motor vehicle safety standards. Sales into foreign countries may be subject to similar regulations. If Velodyne cannot rapidly address any safety concerns or defects with its products, its business, results of operations and financial condition may be adversely affected.

The U.S. Department of Transportation issued regulations in 2016 that require manufacturers of certain autonomous vehicles to provide documentation covering specific topics to regulators, such as how automated systems detect objects on the road, how information is displayed to drivers, what cybersecurity measures are in place and the methods used to test the design and validation of autonomous driving systems. As cars that carry Velodyne's sensors go into production, the obligations of complying with safety regulations could increase and it could require increased resources and adversely affect Velodyne's business.

***Failures, or perceived failures, to comply with privacy, data protection, and information security requirements in the variety of jurisdictions in which Velodyne operates may adversely impact its business, and such legal requirements are evolving, uncertain and may require improvements in, or changes to, Velodyne's policies and operations.***

Velodyne's current and potential future operations and sales subject it to laws and regulations addressing privacy and the collection, use, storage, disclosure, transfer and protection of a variety of types of data. For example, the European Commission has adopted the General Data Protection Regulation and California recently enacted the California Consumer Privacy Act of 2018, both of which provide for potentially material penalties for non-compliance. These regimes may, among other things, impose data security requirements, disclosure requirements, and restrictions on data collection, uses, and sharing that may impact Velodyne's operations and the development of its business. While, generally, Velodyne does not have access to, collect, store, process, or share information collected by its solutions unless its customers choose to proactively provide such information to us, Velodyne's products may evolve both to address potential customer requirements or to add new features and functionality. Therefore, the full impact of these privacy regimes on Velodyne's business is rapidly evolving across jurisdictions and remains uncertain at this time.

Velodyne may also be affected by cyber attacks and other means of gaining unauthorized access to its products, systems, and data. For instance, cyber criminals or insiders may target Velodyne or third-parties with which it has business relationships in an effort to obtain data, or in a manner that disrupts Velodyne's operations or compromises its products or the systems into which its products are integrated.

Velodyne is assessing the continually evolving privacy and data security regimes and measures it believes are appropriate in response. Since these data security regimes are evolving, uncertain and complex, especially for a global business like Velodyne's, it may need to update or enhance its compliance measures as its products, markets and customer demands further develop and these updates or enhancements may require implementation costs. The compliance measures Velodyne does adopt may prove ineffective. Any failure, or perceived failure, by Velodyne to comply with current and future regulatory or customer-driven privacy, data protection, and information security requirements, or to prevent or mitigate security breaches, cyber attacks, or improper access to, use of, or disclosure of data, or any security issues or cyber attacks affecting Velodyne, could result in significant liability, costs (including the costs of mitigation and recovery), and a material loss of revenue resulting from the adverse impact on its reputation and brand, loss of proprietary information and data, disruption to its business and relationships, and diminished ability to retain or attract customers and business partners. Such events may result in governmental enforcement actions and prosecutions, private litigation, fines and penalties or adverse publicity, and could cause customers and business partners to lose trust in Velodyne, which could have an adverse effect on its reputation and business.

***Regulations related to conflict minerals may cause Velodyne to incur additional expenses and could limit the supply and increase the costs of certain metals used in the manufacturing of its products.***

Velodyne is subject to the requirements under the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, or the Dodd-Frank Act, that will require it to determine, disclose and report whether its products contain conflict minerals. The implementation of these requirements could adversely affect the sourcing, availability and pricing of the materials used in the manufacture of components used in Velodyne's products. In addition, Velodyne will incur additional costs to comply with the disclosure

58

requirements, including costs related to conducting diligence procedures to determine the sources of conflict minerals that may be used in or necessary to the production of its products and, if applicable, potential changes to products, processes or sources of supply as a consequence of such verification activities. It is also possible that its reputation may be adversely affected if Velodyne determines that certain of its products contain minerals not determined to be conflict-free or if Velodyne is unable to alter its products, processes or sources of supply to avoid use of such materials.

***If Velodyne fails to maintain an effective system of internal controls, its ability to produce timely and accurate financial statements or comply with applicable regulations could be adversely affected.***

After the Business Combination, the post-combination company will carry out Velodyne's business and will be subject to the reporting requirements of the Securities Exchange Act of 1934, as amended, or Exchange Act, the Sarbanes-Oxley Act and the rules and regulations of Nasdaq. Velodyne expects that the requirements of these rules and regulations will continue to increase its legal, accounting and financial compliance costs, make some activities more difficult, time-consuming and costly, and place significant strain on its personnel, systems and resources.

The Sarbanes-Oxley Act requires, among other things, that Velodyne maintain effective disclosure controls and procedures and internal control over financial reporting. Velodyne is continuing to develop and refine its disclosure controls, internal control over financial reporting and other procedures that are designed to ensure that information required to be disclosed by it in the reports that it will file with the SEC is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that information required to be disclosed in reports under the Exchange Act is accumulated and communicated to Velodyne's principal executive and financial officers.

Velodyne's current controls and any new controls that it develops may become inadequate because of changes in conditions in its business. Further, weaknesses in Velodyne's internal controls may be discovered in the future. Any failure to develop or maintain effective controls, or any difficulties encountered in their implementation or improvement, could adversely affect Velodyne's operating results or cause it to fail to meet its reporting obligations and may result in a restatement of Velodyne's financial statements for prior periods. Any failure to implement and maintain effective internal controls also could adversely affect the results of periodic management evaluations and annual independent registered public accounting firm attestation reports regarding the effectiveness of Velodyne's internal control over financial reporting that it is required to include in its periodic reports Velodyne will file with the SEC under Section 404 of the Sarbanes-Oxley Act. Ineffective disclosure controls and procedures and internal control over financial reporting could also cause investors to lose confidence in Velodyne's reported financial and other information.

In order to maintain and improve the effectiveness of its disclosure controls and procedures and internal control over financial reporting, Velodyne has expended and anticipates that it will continue to expend significant resources, including accounting-related costs, and provide significant management oversight. Any failure to maintain the adequacy of its internal controls, or consequent inability to produce accurate financial statements on a timely basis, could increase Velodyne's operating costs and could materially and adversely affect its ability to operate its business. In the event that Velodyne's internal controls are perceived as inadequate or that it is unable to produce timely or accurate financial statements, investors may lose confidence in Velodyne's operating results and the stock price of the post-combination company could decline. In addition, if Velodyne is unable to continue to meet these requirements, the post-combination company may not be able to obtain or maintain listing on Nasdaq.

The post-combination company's independent registered public accounting firm is not required to formally attest to the effectiveness of its internal control over financial reporting until after the post-combination company is no longer an emerging growth company. At such time, the post-combination company's independent registered public accounting firm may issue a report that is adverse in the event it is not satisfied with the level at which Velodyne's controls are documented, designed or operating. Any failure to maintain effective disclosure controls and internal control over financial reporting could have a material and adverse effect on the post-combination company's business and operating results.

***Velodyne currently has and targets many customers that are large corporations with substantial negotiating power, exacting product standards and potentially competitive internal solutions. If Velodyne is unable to sell its products to these customers, its prospects and results of operations will be adversely affected.***

Many of Velodyne's customers and potential customers are large, multinational corporations with substantial negotiating power relative to it and, in some instances, may have internal solutions that are competitive to Velodyne's products. These large, multinational corporations also have significant development resources, which may allow them to acquire or develop independently, or in partnership with others, competitive technologies. Meeting the technical requirements and securing design wins with any of these companies will require a substantial investment of Velodyne's time and resources. Velodyne cannot assure you that its products will secure design wins from these or other companies or that it will generate meaningful revenue from the sales of its products to these key potential customers. If Velodyne's products are not selected by these large corporations or if these corporations develop or acquire competitive technology, it will have an adverse effect on Velodyne's business.

***If Velodyne's lidar products are not selected for inclusion in autonomous driving systems or ADAS by automotive OEMs or their suppliers, its business will be materially and adversely affected.***

Automotive OEMs and their suppliers design and develop autonomous driving and ADAS technology over several years. These automotive OEMs and suppliers undertake extensive testing or qualification processes prior to placing orders for large quantities of products because Velodyne's lidar products will function as part of a larger system or platform and must meet certain other specifications. Velodyne spends significant time and resources to have its products selected by automotive OEMs and their suppliers, which is known as a design win. In the case of autonomous driving and ADAS technology, a design win means Velodyne's lidar product has been selected for use in a particular vehicle model. If Velodyne does not achieve a design win with respect to a particular vehicle model, it may not have an opportunity to supply its products to the automotive OEM for that vehicle model for a period of many years. In many cases, this period can be as long as five to seven or more years. If Velodyne's products are not selected by an automotive OEM or its suppliers for one vehicle model or if Velodyne's products are not successful in that vehicle model, it is unlikely that its product will be deployed in other vehicle models of that OEM. If Velodyne fails to win a significant number of vehicle models from one or more of automotive OEMs or their suppliers, its business, results of operations and financial condition will be materially and adversely affected.

***The discontinuation, lack of commercial success, or loss of business with respect to a particular vehicle model or technology package for which Velodyne is a significant supplier could reduce Velodyne's sales and adversely affect its profitability.***

If Velodyne is able to secure design wins and its smart vision solutions are included in these autonomous driving and ADAS products, it expects to enter into supply agreements with the relevant customer. Market practice dictates that these supply agreements typically require Velodyne to supply a customer's requirements for a particular vehicle model or autonomous driving or ADAS product, rather than supply a set number of products. These contracts can have short terms and/or can be subject to renegotiation, sometimes as frequently as annually, all of which may affect product pricing, and may be terminated by Velodyne's customers at any time. Therefore, even if Velodyne is successful in obtaining design wins and the systems into which its products are built are commercialized, the discontinuation of, the loss of business with respect to, or a lack of commercial success of a particular vehicle model or technology package for which Velodyne is a significant supplier could mean that the expected sales of Velodyne's products will not materialize, materially and adversely affecting its business.

***Continued pricing pressures, automotive OEM cost reduction initiatives and the ability of automotive OEMs to re-source or cancel vehicle or technology programs may result in lower than anticipated margins, or losses, which may adversely affect Velodyne's business.***

Cost-cutting initiatives adopted by Velodyne's customers often result in increased downward pressure on pricing. Velodyne expects that its agreements with automotive OEMs may require step-downs in pricing over the term of the agreement or, if commercialized, over the period of production. In addition, Velodyne's automotive OEM customers often reserve the right to terminate their supply contracts for convenience,

60

which enhances their ability to obtain price reductions. Automotive OEMs also possess significant leverage over their suppliers, including Velodyne, because the automotive component supply industry is highly competitive, serves a limited number of customers and has a high fixed cost base. Accordingly, Velodyne expects to be subject to substantial continuing pressure from automotive OEMs and Tier 1 suppliers to reduce the price of its products. It is possible that pricing pressures beyond Velodyne's expectations could intensify as automotive OEMs pursue restructuring, consolidation and cost- cutting initiatives. If Velodyne is unable to generate sufficient production cost savings in the future to offset price reductions, its gross margin and profitability would be adversely affected.

***Velodyne's business could be materially and adversely affected if it lost any of its largest customers or if they were unable to pay their invoices.***

Although Velodyne has and continues to pursue a broad customer base, it is dependent on a collection of large customers with strong purchasing power. In 2017, 2018 and 2019, Velodyne's top 20 customers represented 89%, 82% and 83% of its revenue, respectively. In 2017, 2018 and 2019, three, two and two customers, respectively, accounted for more than 10% of Velodyne's revenue. The loss of business from any of Velodyne's major customers (whether by lower overall demand for its products, cancellation of existing contracts or product orders or the failure to design in its products or award Velodyne new business) could have a material adverse effect on its business. For example, one of Velodyne's customers who accounted for 26% of its revenue in 2017, made substantial purchases of its products for R&D projects in 2017, but did not repeat such purchases in 2018, which contributed to the decline in Velodyne's revenue in 2018.

To the extent autonomous vehicle and ADAS systems become accepted by major automotive OEMs, Velodyne expects that it will rely increasingly for its revenue on Tier 1 suppliers through which automotive OEMs procure components. Velodyne expects that these Tier 1 suppliers will be responsible for certain hardpoint and software configuration activities specific to each OEM, and they may not exclusively carry its smart vision solutions.

There is also a risk that one or more of its major customers could be unable to pay Velodyne's invoices as they become due or that a customer will simply refuse to make such payments if it experiences financial difficulties. If a major customer were to enter into bankruptcy proceedings or similar proceedings whereby contractual commitments are subject to stay of execution and the possibility of legal or other modification, Velodyne could be forced to record a substantial loss.

***The period of time from a design win to implementation is long and Velodyne is subject to the risks of cancellation or postponement of the contract or unsuccessful implementation.***

Prospective customers, including those in the automotive industry, generally must make significant commitments of resources to test and validate Velodyne's products and confirm that they can integrate with other technologies before including them in any particular system, product or model. The development cycles of Velodyne's products with new customers varies widely depending on the application, market, customer and the complexity of the product. In the automotive market, for example, this development cycle can be five to seven or more years. The development cycle in certain other markets can be months to one or two years. These development cycles result in Velodyne investing its resources prior to realizing any revenue from the commercialization. Further, Velodyne is subject to the risk that customers cancel or postpone implementation of its technology, as well as that it will not be able to integrate its technology successfully into a larger system with other sensing modalities. Further, Velodyne's revenue could be less than forecasted if the system, product or vehicle model that includes its lidar products is unsuccessful, including for reasons unrelated to its technology. Long development cycles and product cancellations or postponements may adversely affect Velodyne's business, results of operations and financial condition.

***Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management.***

Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and he remains deeply involved in all aspects of Velodyne's business, including product development. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage

Velodyne's R&D activities and retain existing customers or cultivate new ones. In addition, Mr. Hall is the former owner, controlling equity holder, officer and/or director of various other enterprises, including Velodyne Acoustics LLC, an entity no longer affiliated with Velodyne. Negative public perception of, or negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry.

Competition for highly-skilled personnel is often intense, especially in the San Francisco Bay Area where Velodyne is located, and it may incur significant costs to attract them. Velodyne may not be successful in attracting, integrating, or retaining qualified personnel to fulfill its current or future needs. Velodyne has, from time to time, experienced, and it expects to continue to experience, difficulty in hiring and retaining highly skilled employees with appropriate qualifications. In addition, job candidates and existing employees often consider the value of the equity awards they receive in connection with their employment. If the perceived value of Velodyne's equity or equity awards declines, including those of the post-combination company after Closing, it may adversely affect Velodyne's ability to retain highly skilled employees. If Velodyne fails to attract new personnel or fails to retain and motivate its current personnel, its business and future growth prospects could be adversely affected.

***The complexity of Velodyne's products could result in unforeseen delays or expenses from undetected defects, errors or bugs in hardware or software which could reduce the market adoption of its new products, damage its reputation with current or prospective customers, expose Velodyne to product liability and other claims and adversely affect its operating costs.***

Velodyne's products are highly technical and very complex and require high standards to manufacture and have in the past and will likely in the future experience defects, errors or bugs at various stages of development. Velodyne may be unable to timely release new products, manufacture existing products, correct problems that have arisen or correct such problems to its customers' satisfaction. Additionally, undetected errors, defects or security vulnerabilities, especially as new products are introduced or as new versions are released, could result in serious injury to the end users of technology incorporating Velodyne's products, or those in the surrounding area, its customers never being able to commercialize technology incorporating our products, litigation against Velodyne, negative publicity and other consequences. These risks are particularly prevalent in the highly competitive autonomous driving and ADAS markets. Some errors or defects in Velodyne's products may only be discovered after they have been tested, commercialized and deployed by customers. If that is the case, Velodyne may incur significant additional development costs and product recall, repair or replacement costs. These problems may also result in claims against Velodyne by its customers or others. Velodyne's reputation or brand may be damaged as a result of these problems and customers may be reluctant to buy its products, which could adversely affect its ability to retain existing customers and attract new customers, and could adversely affect its financial results.

In addition, Velodyne could face material legal claims for breach of contract, product liability, tort or breach of warranty as a result of these problems. Defending a lawsuit, regardless of its merit, could be costly and may divert management's attention and adversely affect the market's perception of Velodyne and its products. In addition, Velodyne's business liability insurance coverage could prove inadequate with respect to a claim and future coverage may be unavailable on acceptable terms or at all. These product-related issues could result in claims against Velodyne and its business could be adversely affected.

***Velodyne may be subject to product liability or warranty claims that could result in significant direct or indirect costs, which could adversely affect its business and operating results.***

Velodyne's customers use its smart vision solutions in autonomous driving, ADAS and other applications that present the risk of significant injury, including fatalities. Velodyne may be subject to claims if a product using its lidar technology is involved in an accident and persons are injured or purport to be injured. Any insurance that Velodyne carries may not be sufficient or it may not apply to all situations. Similarly, Velodyne's customers could be subjected to claims as a result of such accidents and bring legal claims against Velodyne to attempt to hold it liable. In addition, if lawmakers or governmental agencies were to determine that the use of Velodyne's products or autonomous driving or certain ADAS increased the risk of injury to all or a subset of its customers, they may pass laws or adopt regulations that limit the use

62

of Velodyne's products or increase its liability associated with the use of its products or that regulate the use of or delay the deployment of autonomous driving and ADAS technology. Any of these events could adversely affect Velodyne's brand, relationships with customers, operating results or financial condition.

Velodyne typically provides a limited-time warranty on its products. The occurrence of any material defects in its products could make Velodyne liable for damages and warranty claims. In addition, Velodyne could incur significant costs to correct any defects, warranty claims or other problems, including costs related to product recalls. Any negative publicity related to the perceived quality of Velodyne's products could affect its brand image, partner and customer demand, and adversely affect its operating results and financial condition. Also, warranty, recall and product liability claims may result in litigation, the occurrence of which could be costly, lengthy and distracting and adversely affect Velodyne's business and operating results.

### If Velodyne does not maintain sufficient inventory or if it does not adequately manage its inventory, it could lose sales or incur higher inventory-related expenses, which could negatively affect Velodyne's operating results.

To ensure adequate inventory supply, Velodyne must forecast inventory needs and expenses, place orders sufficiently in advance with its suppliers and manufacturing partners and manufacture products based on its estimates of future demand for particular products. Fluctuations in the adoption of lidar products may affect Velodyne's ability to forecast its future operating results, including revenue, gross margins, cash flows and profitability. Velodyne's ability to accurately forecast demand for its products could be affected by many factors, including the rapidly changing nature of the markets in which it operates, including the autonomous driving, ADAS and mapping markets, the uncertainty surrounding the market acceptance and commercialization of lidar technology, the emergence of new markets, an increase or decrease in customer demand for Velodyne's products or for products and services of its competitors, product introductions by competitors, the COVID-19 pandemic and any associated work stoppages or interruptions, unanticipated changes in general market conditions and the weakening of economic conditions or consumer confidence in future economic conditions. If its lidar products are commercialized in autonomous driving, ADAS or other applications experiencing rapid growth in demand, Velodyne may face challenges acquiring adequate supplies to manufacture its products and/or Velodyne and its manufacturing partners may not be able to manufacture its products at a rate necessary to satisfy the levels of demand, which would negatively affect Velodyne's revenue. This risk may be exacerbated by the fact that Velodyne may not carry or be able to obtain for its manufacturers a significant amount of inventory to satisfy short-term demand increases. If it fails to accurately forecast customer demand, Velodyne may experience excess inventory levels or a shortage of products available for sale.

Inventory levels in excess of customer demand may result in inventory write-downs or write-offs and the sale of excess inventory at discounted prices, which would adversely affect Velodyne's financial results, including its gross margin, and have a negative effect on its brand. Conversely, if Velodyne underestimates customer demand for its products, Velodyne, or its manufacturing partners, may not be able to deliver products to meet its requirements, and this could result in damage to Velodyne's brand and customer relationships and adversely affect its revenue and operating results.

### Velodyne relies on third-party suppliers and because some of the raw materials and key components in its products come from limited or sole sources of supply, Velodyne is susceptible to supply shortages, long lead times for components, and supply changes, any of which could disrupt its supply chain and could delay deliveries of its products to customers.

All of the components that go into the manufacture of Velodyne's smart vision solutions are sourced from third-party suppliers. To date, Velodyne has produced its products in relatively limited quantities for use in R&D programs. Velodyne does not have any experience in managing its supply chain to manufacture and deliver its products at scale. Some of the key components used to manufacture Velodyne's products come from limited or sole sources of supply. Velodyne is therefore subject to the risk of shortages and long lead times in the supply of these components and the risk that its suppliers discontinue or modify components used in its products. Velodyne has a global supply chain and the COVID-19 pandemic may adversely affect its ability to source components in a timely or cost effective manner from its third-party suppliers due to, among other things, work stoppages or interruptions. For example, Velodyne's products depend on lasers and Velodyne currently consumes a substantial portion of the available market. Any shortage of these lasers

63

could materially and adversely affect Velodyne's ability to manufacture its smart vision solutions. In addition, the lead times associated with certain components are lengthy and preclude rapid changes in quantities and delivery schedules. Velodyne has in the past experienced and may in the future experience component shortages and price fluctuations of certain key components and materials, and the predictability of the availability and pricing of these components may be limited. Component shortages or pricing fluctuations could be material in the future. In the event of a component shortage, supply interruption or material pricing change from suppliers of these components, Velodyne may not be able to develop alternate sources in a timely manner or at all in the case of sole or limited sources. Developing alternate sources of supply for these components may be time-consuming, difficult, and costly and Velodyne may not be able to source these components on terms that are acceptable to it, or at all, which may undermine Velodyne's ability to meet its requirements or to fill customer orders in a timely manner. Any interruption or delay in the supply of any of these parts or components, or the inability to obtain these parts or components from alternate sources at acceptable prices and within a reasonable amount of time, would adversely affect Velodyne's ability to meet its scheduled product deliveries to its customers. This could adversely affect Velodyne's relationships with its customers and channel partners and could cause delays in shipment of its products and adversely affect its operating results. In addition, increased component costs could result in lower gross margins. Even where Velodyne is able to pass increased component costs along to its customers, there may be a lapse of time before it is able to do so such that Velodyne must absorb the increased cost. If Velodyne is unable to buy these components in quantities sufficient to meet its requirements on a timely basis, it will not be able to deliver products to its customers, which may result in such customers using competitive products instead of Velodyne's.

***The average selling prices of Velodyne's products could decrease rapidly over the life of the product, which may negatively affect Velodyne's revenue and gross margin.***

In the past Velodyne has substantially reduced the price of certain of its products to accelerate market adoption and solidify its position as a market leader. Velodyne expects the average selling prices of its products generally to continue to decline as its customers seek to commercialize autonomous systems at prices low enough to achieve market acceptance. In order to sell products that have a falling average unit selling price and maintain margins at the same time, Velodyne will need to continually reduce product and manufacturing costs. To manage manufacturing costs, Velodyne must engineer the most cost-effective design for its products. In addition, Velodyne continuously drives initiatives to reduce labor cost, improve worker efficiency, reduce the cost of materials, use fewer materials and further lower overall product costs by carefully managing component prices, inventory and shipping cost. Velodyne also needs to continually introduce new products with higher sales prices and gross margin in order to maintain its overall gross margin. If Velodyne is unable to manage the cost of older products or successfully introduce new products with higher gross margin, its revenue and overall gross margin would likely decline.

***Changes in Velodyne's product mix may impact its financial performance.***

Velodyne's financial performance can be affected by the mix of products it sells during a given period. If Velodyne's sales include more of the lower gross margin products than higher gross margin products, its results of operations and financial condition may be adversely affected. There can be no guarantees that Velodyne will be able to successfully alter its product mix so that it is selling more of its high gross margin products. In addition, Velodyne's earnings forecasts and guidance after the Business Combination are expected to include assumptions about product sales mixes. If actual results vary from this projected product mix of sales, its Velodyne's results of operations and financial condition could be adversely affected.

***Velodyne's management team has limited experience managing a public company.***

Most of the members of Velodyne's management team have limited experience managing a publicly-traded company, interacting with public company investors, and complying with the increasingly-complex laws pertaining to public companies. Additionally, many members of Velodyne's management team were recently hired or assumed new roles, including its chief executive officer, Dr. Anand Gopalan, who was promoted from chief technology officer in January 2020. Velodyne's management team may not successfully or efficiently manage their new roles and responsibilities, Velodyne's transition to being a public company subject to significant regulatory oversight and reporting obligations under the federal securities laws and the

64

continuous scrutiny of securities analysts and investors. These new obligations and constituents will require significant attention from Velodyne's senior management and could divert their attention away from the day-to-day management of Velodyne's business, which could adversely affect Velodyne's business, financial condition, and operating results.

***Velodyne may experience difficulties in managing its growth and expanding its operations.***

Velodyne expects to experience significant growth in the scope and nature of its operations. Velodyne's ability to manage its operations and future growth will require Velodyne to continue to improve its operational, financial and management controls, compliance programs and reporting systems. Velodyne is currently in the process of strengthening its compliance programs, including its compliance programs related to export controls, privacy and cybersecurity and anti-corruption. Velodyne may not be able to implement improvements in an efficient or timely manner and may discover deficiencies in existing controls, programs, systems and procedures, which could have an adverse effect on its business, reputation and financial results.

***Velodyne's sales and operations in international markets expose it to operational, financial and regulatory risks.***

International sales comprise a significant amount of Velodyne's overall revenue. Sales to international customers accounted for 28%, 41%, 54% and 79% of Velodyne's revenue in 2017, 2018, 2019 and the six months ended June 30, 2020, respectively. Velodyne is committed to growing its international sales, and while it has committed resources to expanding its international operations and sales channels, these efforts may not be successful. International operations are subject to a number of other risks, including:

- Exchange rate fluctuations.

- Political and economic instability, international terrorism and anti-American sentiment, particularly in emerging markets.

- Global or regional health crises, such as the COVID-19 pandemic.

- Potential for violations of anti-corruption laws and regulations, such as those related to bribery and fraud.

- Preference for locally branded products, and laws and business practices favoring local competition.

- Potential consequences of, and uncertainty related to, the "Brexit" process in the United Kingdom, which could lead to additional expense and complexity in doing business there.

- Increased difficulty in managing inventory.

- Delayed revenue recognition.

- Less effective protection of intellectual property.

- Stringent regulation of the autonomous or other systems or products using Velodyne's products and stringent consumer protection and product compliance regulations, including but not limited to General Data Protection Regulation in the European Union, European competition law, the Restriction of Hazardous Substances directive, the Waste Electrical and Electronic Equipment directive and the European Ecodesign directive that are costly to comply with and may vary from country to country.

- Difficulties and costs of staffing and managing foreign operations.

- Import and export laws and the impact of tariffs.

- Changes in local tax and customs duty laws or changes in the enforcement, application or interpretation of such laws.

The occurrence of any of these risks could negatively affect Velodyne's international business and consequently its business, operating results and financial condition.

***Velodyne's business is subject to the risks of earthquakes, fire, floods and other natural catastrophic events, global pandemics, and interruptions by man-made problems, such as network security breaches, computer viruses or terrorism. Material disruptions of Velodyne's business or information systems resulting from these events could adversely affect its operating results.***

A significant natural disaster, such as an earthquake, fire, flood or significant power outage or other similar events, such as infectious disease outbreaks or pandemic events, including the COVID-19 pandemic, could have an adverse effect on Velodyne's business and operating results. The COVID-19 pandemic has produced meaningful operational challenges and Velodyne expects to continue to experience disruptions in its business during the second half of 2020. COVID-19 has heightened many of the other risks described herein, such as the demand for Velodyne's products, its ability to achieve or maintain profitability and its ability to raise additional capital in the future. Despite the implementation of network security measures, Velodyne's networks and lidar products also may be vulnerable to computer viruses, break-ins and similar disruptions from unauthorized tampering with its solutions. Both Velodyne's corporate headquarters and its manufacturing facility are located in the San Francisco Bay Area, a region known for seismic activity. In addition, natural disasters, acts of terrorism or war could cause disruptions in Velodyne's remaining manufacturing operations, Velodyne's or its customers' or channel partners' businesses, Velodyne's suppliers' or the economy as a whole. Velodyne also relies on information technology systems to communicate among its workforce and with third parties. Any disruption to Velodyne's communications, whether caused by a natural disaster or by manmade problems, such as power disruptions, could adversely affect its business. Velodyne does not have a formal disaster recovery plan or policy in place and does not currently require that its suppliers' partners have such plans or policies in place. To the extent that any such disruptions result in delays or cancellations of orders or impede its suppliers' ability to timely deliver product components, or the deployment of its products, Velodyne's business, operating results and financial condition would be adversely affected.

**Risks Related to the Company and the Business Combination**

***Our Initial Stockholders have agreed to vote in favor of the Business Combination and the other proposals described in this proxy statement, regardless of how our public stockholders vote.***

Unlike many other blank check companies in which the founders agree to vote their Founder Shares in accordance with the majority of the votes cast by the holders of public stock in connection with an initial business combination, our Initial Stockholders have agreed to vote any shares of common stock owned by them in favor of the Business Combination Proposal and the other proposals described in this proxy statement. As of the date hereof, our Initial Stockholders own shares equal to 34.7% of our issued and outstanding shares of common stock. Accordingly, it is more likely that the necessary stockholder approval will be received for the Business Combination than would be the case if our Initial Stockholders agreed to vote any shares of common stock owned by them in accordance with the majority of the votes cast by our public stockholders.

***Our Sponsor, certain members of our Board and our officers have interests in the Business Combination that are different from or are in addition to other stockholders in recommending that stockholders vote in favor of approval of the Business Combination Proposal and approval of the other proposals described in this proxy statement.***

When considering our Board's recommendation that our stockholders vote in favor of the approval of the Business Combination Proposal, our stockholders should be aware that the directors and officers of the Company have interests in the Business Combination that may be different from, or in addition to, the interests of our stockholders. These interests include:

- the fact that our Initial Stockholders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve the Business Combination;

- the fact that our Sponsor will retain 2,507,000 Founder Shares upon the Closing, 275,000 of which shall be Earnout Founder Shares subject to certain vesting and cancellation provisions as described in the Sponsor Agreement, and which if unrestricted and freely tradable would be valued at approximately $[•] based on the closing price of our common stock on the NYSE on [•], 2020 but, given the restrictions on such shares, we believe such shares have less value;

66

- the fact that our Initial Stockholders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete an initial business combination by the applicable deadline;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, our Sponsor has agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party (other than our independent public accountants) for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that James A. Graf will join as a board member of the post-combination company and Michael Dee will continue as a board member of the post-combination company, and each shall be entitled to receive compensation for serving on the board of directors of the post-combination company;

- the fact that our Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any out-of-pocket expenses if an initial business combination is not consummated by the applicable deadline; and

- that the Sponsor has entered into a Subscription Agreement with the Company, pursuant to which the Sponsor has committed to purchase 950,000 shares of common stock in the PIPE Investment for an aggregate commitment of approximately $9,500,000.

Our Initial Stockholders, including our Sponsor and our independent directors, hold a significant number of shares of our common stock. They will lose their entire investment in us if a business combination is not completed.

Our Initial Stockholders hold in the aggregate 6,094,128 Founder Shares, representing 34.7% of the total shares outstanding as of the date of this proxy. The Founder Shares will be worthless if we do not complete a business combination by the applicable deadline.

The Founder's Shares are identical to the shares of common stock included in the public units, except that: (i) the Founder Shares are subject to certain transfer restrictions; (ii) our Initial Stockholders, officers and directors have entered into a letter agreement with us, pursuant to which they have agreed: (a) to waive their redemption rights with respect to their shares of common stock in connection with the completion of our Business Combination; (b) waive their redemption rights with respect to their shares of common stock in connection with a stockholder vote to approve an amendment to our current certificate of incorporation to modify the substance or timing of our obligation to redeem 100% of our public shares if we do not complete our initial business combination within 18 months from the closing of the IPO or to provide for redemption in connection with a business combination; and (c) to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete our initial business combination by the applicable deadline (although they will be entitled to liquidating distributions from the Trust Account with respect to any public shares they hold if we fail to complete our initial business combination by the applicable deadline.

The personal and financial interests of our officers and directors may have influenced their motivation in identifying and selecting Velodyne, completing a business combination with Velodyne and may influence their operation of the post-combination company following the Business Combination. This risk may become more acute as the deadline of the applicable deadline for completing an initial business combination nears.

***Our Sponsor, directors or officers or their affiliates may elect to purchase shares or warrants from public stockholders, which may influence a vote on a proposed Business Combination and the other proposals described in this proxy statement and reduce the public "float" of our common stock.***

Our Sponsor, directors or officers or their affiliates may purchase shares in privately negotiated transactions or in the open market either prior to or following the completion of our Business Combination,

although they are under no obligation to do so. Such a purchase may include a contractual acknowledgement that such stockholder, although still the record holder of our shares is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights. In the event that our Sponsor, directors, officers or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. The purpose of such purchases could be to vote such shares in favor of the Business Combination and thereby increase the likelihood of obtaining stockholder approval of the Business Combination or to satisfy closing conditions in the Merger Agreement regarding required amounts in the Trust Account and the proceeds from the PIPE Investment equaling or exceeding certain thresholds where it appears that such requirements would otherwise not be met. The purpose of any such purchases of public warrants could be to reduce the number of public warrants outstanding or to vote such warrants on any matters submitted to the warrant holders for approval in connection with our initial business combination. This may result in the completion of our Business Combination that may not otherwise have been possible. Any such purchases will be reported pursuant to Section 13 and Section 16 of the Exchange Act to the extent such purchasers are subject to such reporting requirements.

In addition, if such purchases are made, the public "float" of our common stock and the number of beneficial holders of our securities may be reduced, possibly making it difficult to obtain or maintain the quotation, listing or trading of our securities on the NYSE or another national securities exchange or reducing the liquidity of the trading market for our common stock.

***Our public stockholders will experience dilution as a consequence of, among other transactions, the issuance of common stock as consideration in the Business Combination and the PIPE Investment. Having a minority share position may reduce the influence that our current stockholders have on the management of the post-combination company.***

The issuance of the common stock in the Business Combination and in the PIPE Investment will dilute the equity interest of our existing stockholders and may adversely affect prevailing market prices for our public shares and/or public warrants.

It is anticipated that, upon completion of the Business Combination, assuming no redemptions: (i) the Company's public stockholders will retain an ownership interest of approximately 6.5% in the post-combination company (not including shares beneficially owned by our Sponsor); (ii) the PIPE Investors will own approximately 8.6% of the post-combination company (such that public stockholders, including PIPE Investors, will own approximately 15.1% of the post-combination company); (iii) our Initial Stockholders (including our Sponsor) will own approximately 1.5% of the post-combination company; and (iv) the former Velodyne equity holders are expected to hold, in the aggregate, approximately 83.4% of the issued and outstanding shares of the post-combination company, assuming $50,000,000 of cash is used to repurchase Velodyne shares in connection with the Pre-Closing Velodyne Tender Offer, which is expected to be consummated prior to the Closing, or approximately 83.8% assuming no shares of Velodyne capital stock are repurchased for cash in the Pre-Closing Velodyne Tender Offer. The foregoing percentages assume the issuance of 6,222,544 shares of Company common stock that will at Closing be subject to stock options and RSUs, as further described in footnotes (2) and (3) to the pro forma capitalization table in the section entitled "*Unaudited Pro Forma Condensed Combined Financial Information — Description of the Transaction.*" The PIPE Investors have agreed to purchase in the aggregate 15,000,000 shares of common stock, for approximately $150,000,000 of gross proceeds, in the PIPE Investment. The ownership percentage with respect to the post-combination company following the Business Combination does not take into account (i) warrants to purchase common stock that will remain outstanding immediately following the Business Combination, (ii) the issuance of earn-out shares to the Velodyne equity holders or our Sponsor should the earn-out conditions in the Merger Agreement be satisfied or (iii) the issuance of any shares upon completion of the Business Combination under the Incentive Plan or the ESPP, copies of which are attached to this proxy statement as Annex F and Annex G, respectively Depending on the number of public shares redeemed, our current stockholders could own a majority of the voting rights in the post-combination company, but would not have effective control over the post-combination company. For more information, please see the sections entitled "*Summary of the Proxy Statement — Impact of the Business Combination on the Company's Public Float*," "*Unaudited Pro Forma Condensed Combined Financial Information*" and "*Proposal No. 5 — Approval of the Incentive Plan.*"

68

***Nasdaq may not list the post-combination company's securities on its exchange, which could limit investors' ability to make transactions in our securities and subject us to additional trading restrictions.***

In connection with the Business Combination, in order to obtain the listing of the post-combination company's securities on Nasdaq, we will be required to demonstrate compliance with Nasdaq's initial listing requirements, which are more rigorous than the NYSE's continued listing requirements. We will seek to have the post-combination company's securities listed on Nasdaq upon consummation of the Business Combination. We cannot assure you that we will be able to meet all initial listing requirements. Even if the post-combination company's securities are listed on Nasdaq, we may be unable to maintain the listing of its securities in the future.

If we fail to meet the initial listing requirements and Nasdaq does not list the post-combination company's securities on its exchange, Velodyne would not be required to consummate the Business Combination. In the event that Velodyne elected to waive this condition, and the Business Combination was consummated without the post-combination company's securities being listed on Nasdaq or on another national securities exchange, we could face significant material adverse consequences, including:

- a limited availability of market quotations for our securities;

- reduced liquidity for our securities;

- a determination that our common stock is a "penny stock" which will require brokers trading in our common stock to adhere to more stringent rules and possibly result in a reduced level of trading activity in the secondary trading market for our securities;

- a limited amount of news and analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

The National Securities Markets Improvement Act of 1996, which is a federal statute, prevents or preempts the states from regulating the sale of certain securities, which are referred to as "covered securities." If the post-combination company's securities were not listed on Nasdaq, such securities would not qualify as covered securities and we would be subject to regulation in each state in which we offer our securities because states are not preempted from regulating the sale of securities that are not covered securities. Although the states are preempted from regulating the sale of our securities, the federal statute does allow the states to investigate companies if there is a suspicion of fraud, and, if there is a finding of fraudulent activity, then the states can regulate or bar the sale of covered securities in a particular case. While we are not aware of a state, other than the State of Idaho, having used these powers to prohibit or restrict the sale of securities issued by blank check companies, certain state securities regulators view blank check companies unfavorably and might use these powers, or threaten to use these powers, to hinder the sale of securities of blank check companies in their states.

***Resales of the shares of common stock included in the stock consideration could depress the market price of our common stock.***

We will have approximately 174.6 million shares of common stock outstanding immediately following the Business Combination (assuming the repurchase of $50.0 million of Velodyne capital stock in the Pre-Closing Velodyne Tender Offer), and there may be a large number of shares of common stock sold in the market following the completion of the Business Combination or shortly thereafter. The shares held by the Company's public stockholders are freely tradable, and the shares of common stock held by the PIPE Investors will be freely tradable following effectiveness of the registration statement that we have agreed to file in connection with the Business Combination covering the resales of such shares. Under the terms of a letter agreement with Ford Motor Company, we are obligated to include any shares of common stock issued to Ford Motor Company in the Business Combination in the registration statement we are required to file in connection with the registration of the shares issuable upon exercise of the public warrants. Ford Motor Company will not be subject to a lockup agreement like other former holders of Velodyne capital stock. See "*Description of Securities — Registration Rights — Public Warrants.*" In addition, the Company will be obligated to register the resale of shares of common stock issued as merger consideration, which shares will become available for resale following the expiration of any applicable lockup period. We also expect that Rule 144 will become available for the resale of shares of our common stock that are not registered for

69

resale once one year has elapsed from the date that we file the Current Report on Form 8-K following the Closing that includes the required Form 10 information that reflects we are no longer a shell company. Such sales of shares of common stock or the perception of such sales may depress the market price of our common stock.

***We have no operating history and are subject to a mandatory liquidation and subsequent dissolution requirement. As such, there is a risk that we will be unable to continue as a going concern if we do not consummate an initial business combination by the applicable deadline. If we are unable to effect an initial business combination by the applicable deadline, we will be forced to liquidate and our warrants will expire worthless.***

We are a blank check company, and as we have no operating history and are subject to a mandatory liquidation and subsequent dissolution requirement, there is a risk that we will be unable to continue as a going concern if we do not consummate an initial business combination by the applicable deadline. Unless we amend our current certificate of incorporation to extend the life of the Company and certain other agreements into which we have entered, if we do not complete an initial business combination by the applicable deadline, we will: (i) cease all operations except for the purpose of winding up; (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem the public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account including interest earned on the funds held in the Trust Account and not previously released to us to pay our franchise and income taxes (less up to $100,000 of interest to pay dissolution expenses) divided by the number of then outstanding public shares, which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidating distributions, if any), subject to applicable law; and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our Board, dissolve and liquidate, subject in each case to our obligations under the DGCL to provide for claims of creditors and the requirements of other applicable law. In the event of such distribution, it is possible that the per share value of the residual assets remaining available for distribution (including Trust Account assets) will be less than the initial public offering price per public unit in the IPO. In addition, if we fail to complete an initial business combination by the applicable deadline, there will be no redemption rights or liquidating distributions with respect to our public warrants or the private placement warrants, which will expire worthless. We expect to consummate the Business Combination and do not intend to take any action to extend the life of the Company beyond the applicable deadline if we are unable to effect an initial business combination by that date.

***Even if we consummate the Business Combination, there is no guarantee that the public warrants will ever be in the money, and they may expire worthless and the terms of our public warrants may be amended.***

The exercise price for the public warrants is $11.50 per share of common stock. There is no guarantee that the public warrants will ever be in the money prior to their expiration, and as such, the public warrants may expire worthless.

***Our ability to successfully effect the Business Combination and to be successful thereafter will be dependent upon the efforts of our key personnel, including the key personnel of Velodyne. The loss of key personnel could negatively impact the operations and profitability of our post-combination business and its financial condition could suffer as a result.***

Our ability to successfully effect our Business Combination is dependent upon the efforts of our key personnel, including the key personnel of Velodyne. Although some of our key personnel are expected to remain with the post-combination company as members of the board of directors or in advisory positions following our Business Combination, it is possible that we will lose some key personnel, the loss of which could negatively impact the operations and profitability of our post-combination business. We anticipate that the executive officers of Velodyne will serve the post-combination company in their respective roles immediately following the Closing.

Velodyne's success depends to a significant degree upon the continued contributions of senior management, certain of whom would be difficult to replace. Departure by certain of Velodyne's officers could have a material adverse effect on Velodyne's business, financial condition, or operating results. The services of such personnel may not continue to be available to the post-combination company following the Closing.

70

***The Company and Velodyne will be subject to business uncertainties and contractual restrictions while the Business Combination is pending.***

Uncertainty about the effect of the Business Combination on employees and third parties may have an adverse effect on the Company and Velodyne. These uncertainties may impair our or Velodyne's ability to retain and motivate key personnel and could cause third parties that deal with any of us or them to defer entering into contracts or making other decisions or seek to change existing business relationships. If key employees depart because of uncertainty about their future roles and the potential complexities of the Business Combination, our or Velodyne's business could be harmed.

***We may waive one or more of the conditions to the Business Combination.***

We may agree to waive, in whole or in part, one or more of the conditions to our obligations to complete the Business Combination, to the extent permitted by our current certificate of incorporation and bylaws and applicable laws. We may not waive the condition that our stockholders approve the Business Combination. Please see the section entitled "*Proposal No. 1 — Approval of the Business Combination — The Merger Agreement — Conditions to Closing of the Business Combination*" for additional information.

***The exercise of discretion by our directors and officers in agreeing to changes to the terms of or waivers of closing conditions in the Merger Agreement may result in a conflict of interest when determining whether such changes to the terms of the Merger Agreement or waivers of conditions are appropriate and in the best interests of our stockholders.***

In the period leading up to the Closing, other events may occur that, pursuant to the Merger Agreement, would require the Company to agree to amend the Merger Agreement, to consent to certain actions or to waive rights that we are entitled to under those agreements. Such events could arise because of changes in the course of Velodyne's business, a request by Velodyne to undertake actions that would otherwise be prohibited by the terms of the Merger Agreement or the occurrence of other events that would have a material adverse effect on Velodyne's business and would entitle the Company to terminate the Merger Agreement. In any of such circumstances, it would be in the discretion of the Company, acting through the Board, to grant its consent or waive its rights. The existence of the financial and personal interests of the directors described elsewhere in this proxy statement may result in a conflict of interest on the part of one or more of the directors between what he or she may believe is best for the Company and our stockholders and what he or she may believe is best for himself or herself or his or her affiliates in determining whether or not to take the requested action. As of the date of this proxy statement, we do not believe there will be any changes or waivers that our directors and officers would be likely to make after stockholder approval of the Business Combination has been obtained at the Special Meeting. While certain changes could be made without further stockholder approval, if there is a change to the terms of the Business Combination that would have a material impact on the stockholders, we will be required to circulate a new or amended proxy statement relating to the Business Combination or supplement thereto and resolicit the vote of our stockholders with respect to the Business Combination Proposal thereto.

***Shareholders may not know immediately after the special meeting whether we have satisfied the closing condition that the Trust Account and the proceeds from the PIPE Investment equal or exceed $200,000,000.***

If we receive valid redemption requests from holders of public shares prior to the redemption deadline, we may, at our sole discretion, following the redemption deadline and until the date of Closing, seek and permit withdrawals by one or more of such holders of their redemption requests. We may select which holders to seek such withdrawals of redemption requests from based on any factors we may deem relevant, and the purpose of seeking such withdrawals may be to increase the funds held in the trust account, including where we otherwise would not satisfy the closing condition that the amount in the Trust Account and the proceeds from the PIPE Investment equal or exceed $200,000,000. This process could take a number of days, and there may be a period of time after the special meeting and before the Closing when stockholders do not know whether we have satisfied this closing condition.

***We and Velodyne will incur significant transaction and transition costs in connection with the Business Combination.***

We and Velodyne have both incurred and expect to incur significant, non-recurring costs in connection with consummating the Business Combination and operating as a public company following the

71

consummation of the Business Combination. We and Velodyne may also incur additional costs to retain key employees. All expenses incurred in connection with the Merger Agreement and the transactions contemplated thereby (including the Business Combination), including all legal, accounting, consulting, investment banking and other fees, expenses and costs, will be for the account of the party incurring such fees, expenses and costs or paid by the Company following the Closing.

The aggregate transaction expenses as a result of the Business Combination are expected to be approximately $31.0 million. The per-share amount we will distribute to stockholders who properly exercise their redemption rights will not be reduced by the transaction expenses and after such redemptions, the per-share value of shares held by non-redeeming stockholders will reflect our obligation to pay the transaction expenses.

***If we are unable to complete an initial business combination, our public stockholders may receive only approximately $10.00 per share on the liquidation of the Trust Account (or less than $10.00 per share in certain circumstances where a third party brings a claim against us that our Sponsor is unable to indemnify), and our warrants will expire worthless.***

If we are unable to complete an initial business combination by the applicable deadline, our public stockholders may receive only approximately $10.00 per share on the liquidation of the Trust Account (or less than $10.00 per share in certain circumstances where a third-party brings a claim against us that our Sponsor is unable to indemnify (as described herein)) and our warrants will expire worthless.

***If third parties bring claims against us, the proceeds held in the Trust Account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share.***

Our placing of funds in the Trust Account may not protect those funds from third-party claims against us. Although we will seek to have all vendors, service providers, prospective target businesses or other entities with which we do business execute agreements with us waiving any right, title, interest or claim of any kind in or to any funds held in the Trust Account for the benefit of our public stockholders, such parties may not execute such agreements, or even if they execute such agreements they may not be prevented from bringing claims against the Trust Account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against our assets, including the funds held in the Trust Account. If any third party refuses to execute an agreement waiving such claims to the funds held in the Trust Account, our management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third-party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to us than any alternative.

Examples of possible instances where we may engage a third party that refuses to execute a waiver include the engagement of a third party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with us and will not seek recourse against the Trust Account for any reason.

Upon redemption of our public shares, if we are unable to complete our initial business combination within the prescribed timeframe, or upon the exercise of a redemption right in connection with our initial business combination, we will be required to provide for payment of claims of creditors that were not waived that may be brought against us within the ten years following redemption. Accordingly, the per-share redemption amount received by public stockholders could be less than the $10.00 per share initially held in the Trust Account, due to claims of such creditors.

Our Sponsor has agreed that it will be liable to us if and to the extent any claims by a third party for services rendered or products sold to us, or a prospective target business with which we have entered into a written letter of intent, confidentiality or similar agreement or business combination agreement, reduce the amount of funds in the Trust Account to below the lesser of (i) $10.00 per public share and (ii) the actual amount per public share held in the Trust Account as of the date of the liquidation of the Trust Account if

72

less than $10.00 per share due to reductions in the value of the trust assets, less taxes payable, provided that such liability will not apply to any claims by a third party or prospective target business who executed a waiver of any and all rights to the monies held in the Trust Account (whether or not such waiver is enforceable) nor will it apply to any claims under our indemnity of the underwriter of our IPO against certain liabilities, including liabilities under the Securities Act. However, we have not asked our Sponsor to reserve for such indemnification obligations, nor have we independently verified whether our Sponsor has sufficient funds to satisfy its indemnity obligations and believe that our Sponsor's only assets are securities of our Company. Therefore, we cannot assure you that our Sponsor would be able to satisfy those obligations. As a result, if any such claims were successfully made against the Trust Account, the funds available for our business combination and redemptions could be reduced to less than $10.00 per public share. In such event, we may not be able to complete our business combination, and you would receive such lesser amount per share in connection with any redemption of your public shares. None of our officers or directors will indemnify us for claims by third parties including, without limitation, claims by vendors and prospective target businesses.

***Our directors may decide not to enforce the indemnification obligations of our Sponsor, resulting in a reduction in the amount of funds in the Trust Account available for distribution to our public stockholders.***

In the event that the proceeds in the Trust Account are reduced below the lesser of (i) $10.00 per public share and (ii) the actual amount per share held in the Trust Account as of the date of the liquidation of the Trust Account if less than $10.00 per share due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes, and our Sponsor asserts that it is unable to satisfy its obligations or that it has no indemnification obligations related to a particular claim, our independent directors would determine whether to take legal action against our Sponsor to enforce its indemnification obligations. While we currently expect that our independent directors would take legal action on our behalf against our Sponsor to enforce its indemnification obligations to us, it is possible that our independent directors in exercising their business judgment and subject to their fiduciary duties may choose not to do so in any particular instance if, for example, the cost of such legal action is deemed by the independent directors to be too high relative to the amount recoverable or if the independent directors determine that a favorable outcome is not likely. If our independent directors choose not to enforce these indemnification obligations, the amount of funds in the Trust Account available for distribution to our public stockholders may be reduced below $10.00 per share.

***If, before distributing the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of our stockholders and the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.***

If, before distributing the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, the proceeds held in the Trust Account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the Trust Account, the per-share amount that would otherwise be received by our stockholders in connection with our liquidation may be reduced.

***Following the consummation of the Business Combination, our only significant asset will be our ownership interest in Velodyne and such ownership may not be sufficient to pay dividends or make distributions or loans to enable us to pay any dividends on our common stock or satisfy our other financial obligations.***

Following the consummation of the Business Combination, we will have no direct operations and no significant assets other than our ownership of Velodyne. We and certain investors, the Velodyne equity holders, and directors and officers of Velodyne and its affiliates will become stockholders of the post-combination company at that time. We will depend on Velodyne for distributions, loans and other payments to generate the funds necessary to meet our financial obligations, including our expenses as a publicly traded company and to pay any dividends with respect to our common stock. The financial condition and operating requirements of Velodyne may limit our ability to obtain cash from Velodyne. The earnings from, or other available assets of, Velodyne may not be sufficient to pay dividends or make distributions or loans to enable us to pay any dividends on our common stock or satisfy our other financial obligations.

73

The ability of Velodyne to make distributions, loans and other payments to us for the purposes described above and for any other purpose may be limited by credit agreements to which Velodyne is party from time to time, including the existing loan and security agreement described in "*Velodyne's Management's Discussion and Analysis of Financial Condition and Results of Operations*", and will be subject to the negative covenants set forth therein. Any loans or other extensions of credit to us from Velodyne will be permitted only to the extent there is an applicable exception to the investment covenants under these credit agreements. Similarly, any dividends, distributions or similar payments to us from Velodyne will be permitted only to the extent there is an applicable exception to the dividends and distributions covenants under these credit agreements.

***Subsequent to our completion of our Business Combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and our stock price, which could cause you to lose some or all of your investment.***

Although we have conducted due diligence on Velodyne, we cannot assure you that this diligence will surface all material issues that may be present in Velodyne's business, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of Velodyne's business and outside of our and Velodyne's control will not later arise. As a result of these factors, we may be forced to later write down or write off assets, restructure operations, or incur impairment or other charges that could result in losses. Even if our due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with our preliminary risk analysis. Even though these charges may be non-cash items and not have an immediate impact on our liquidity, the fact that we report charges of this nature could contribute to negative market perceptions about the post-combination company or its securities. Accordingly, any of our stockholders who choose to remain stockholders following our Business Combination could suffer a reduction in the value of their shares. Such stockholders are unlikely to have a remedy for such reduction in value.

***We have no operating or financial history and our results of operations and those of the post-combination company may differ significantly from the unaudited pro forma financial data included in this proxy statement.***

We are a blank check company and we have no operating history and no revenues. This proxy statement includes unaudited pro forma condensed combined financial statements for the post-combination company. The unaudited pro forma condensed combined statement of operations of the post-combination company combines the historical audited results of operations of the Company for the year ended December 31, 2019 and the unaudited results of the Company for the six months ended June 30, 2020, with the historical audited results of operations of Velodyne for the year ended December 31, 2019 and the unaudited results of Velodyne for the six months ended June 30, 2020, respectively, and gives pro forma effect to the Business Combination as if it had been consummated on January 1, 2019. The unaudited pro forma condensed combined balance sheet of the post-combination company combines the historical balance sheets of the Company as of June 30, 2020 and of Velodyne as of June 30, 2020 and gives pro forma effect to the Business Combination as if it had been consummated on June 30, 2020.

The unaudited pro forma condensed combined financial statements are presented for illustrative purposes only, are based on certain assumptions, address a hypothetical situation and reflect limited historical financial data. Therefore, the unaudited pro forma condensed combined financial statements are not necessarily indicative of the results of operations and financial position that would have been achieved had the Business Combination and the acquisitions by Velodyne been consummated on the dates indicated above, or the future consolidated results of operations or financial position of the post-combination company. Accordingly, the post-combination company's business, assets, cash flows, results of operations and financial condition may differ significantly from those indicated by the unaudited pro forma condensed combined financial statements included in this document. For more information, please see the section entitled "*Unaudited Pro Forma Condensed Combined Financial Information*."

***Unanticipated changes in effective tax rates or adverse outcomes resulting from examination of our income or other tax returns could adversely affect our financial condition and results of operations.***

We will be subject to income taxes in the United States and other jurisdictions, and our tax liabilities will be subject to the allocation of expenses in differing jurisdictions. Our future effective tax rates could be subject to volatility or adversely affected by a number of factors, including:

- changes in the valuation of our deferred tax assets and liabilities;

- expected timing and amount of the release of any tax valuation allowances;

- tax effects of stock-based compensation;

- costs related to intercompany restructurings;

- changes in tax laws, regulations or interpretations thereof; or

- lower than anticipated future earnings in jurisdictions where we have lower statutory tax rates and higher than anticipated future earnings in jurisdictions where we have higher statutory tax rates.

In addition, we may be subject to audits of our income, sales and other transaction taxes by taxing authorities. Outcomes from these audits could have an adverse effect on our financial condition and results of operations.

***A market for our securities may not continue, which would adversely affect the liquidity and price of our securities.***

Following the Business Combination, the price of our securities may fluctuate significantly due to the market's reaction to the Business Combination and general market and economic conditions. An active trading market for our securities following the Business Combination may never develop or, if developed, it may not be sustained. In addition, the price of our securities after the Business Combination can vary due to general economic conditions and forecasts, our general business condition and the release of our financial reports. Additionally, if our securities become delisted from the NYSE and are quoted on the OTC Bulletin Board (an inter-dealer automated quotation system for equity securities that is not a national securities exchange) or the post-combination company's securities are not listed on Nasdaq and are quoted on the OTC Bulletin Board, the liquidity and price of our securities may be more limited than if we were quoted or listed on the NYSE, Nasdaq or another national securities exchange. You may be unable to sell your securities unless a market can be established or sustained.

***If the Business Combination's benefits do not meet the expectations of investors, stockholders or financial analysts, the market price of our securities may decline.***

If the benefits of the Business Combination do not meet the expectations of investors or securities analysts, the market price of the Company's securities prior to the Closing may decline. The market values of our securities at the time of the Business Combination may vary significantly from their prices on the date the Merger Agreement was executed, the date of this proxy statement, or the date on which our stockholders vote on the Business Combination.

In addition, following the Business Combination, fluctuations in the price of our securities could contribute to the loss of all or part of your investment. Immediately prior to the Business Combination, there has not been a public market for Velodyne's stock and trading in the shares of our common stock has not been active. Accordingly, the valuation ascribed to Velodyne and our common stock in the Business Combination may not be indicative of the price of the post-combination company that will prevail in the trading market following the Business Combination. If an active market for our securities develops and continues, the trading price of our securities following the Business Combination could be volatile and subject to wide fluctuations in response to various factors, some of which are beyond our control. Any of the factors listed below could have a material adverse effect on your investment in our securities and our securities may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of our securities may not recover and may experience a further decline.

75

Factors affecting the trading price of the post-combination company's securities following the Business Combination may include:

- actual or anticipated fluctuations in our quarterly financial results or the quarterly financial results of companies perceived to be similar to us;

- changes in the market's expectations about our operating results;

- the public's reaction to our press releases, our other public announcements and our filings with the SEC;

- speculation in the press or investment community;

- announcements of technological innovation, new products, acquisitions, strategic alliances, significant agreements by us or competitors;

- success of competitors;

- our operating results failing to meet the expectation of securities analysts or investors in a particular period;

- changes in financial estimates and recommendations by securities analysts concerning the post-combination company or the market in general;

- operating and stock price performance of other companies that investors deem comparable to the post-combination company;

- our ability to market new and enhanced products on a timely basis;

- changes in laws and regulations affecting our business;

- commencement of, or involvement in, litigation involving the post-combination company;

- changes in the post-combination company's capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of shares of our common stock available for public sale;

- any major change in our Board or management;

- sales of substantial amounts of common stock by our directors, officers or significant stockholders or the perception that such sales could occur;

- the expiration of the market stand-off or contractual lock-up agreements;

- the realization of any of the risk factors presented in this proxy statement;

- additions or departures of key personnel;

- failure to comply with the requirements of Nasdaq;

- failure to comply with SOX or other laws or regulations;

- actual, potential or perceived control, accounting or reporting problems;

- changes in accounting principles, policies and guidelines; and

- general economic and political conditions such as recessions, interest rates, fuel prices, international currency fluctuations and acts of war or terrorism.

Broad market and industry factors may materially harm the market price of our securities irrespective of our operating performance. The stock market in general and Nasdaq have experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. The trading prices and valuations of these stocks, and of our securities, may not be predictable. A loss of investor confidence in the market for the stocks of other companies which investors perceive to be similar to the post-combination company could depress our stock price regardless of our business, prospects, financial conditions or results of operations. A decline in the market price of our

76

securities also could adversely affect our ability to issue additional securities and our ability to obtain additional financing in the future.

In the past, securities class action litigation has often been initiated against companies following periods of volatility in their stock price. This type of litigation could result in substantial costs and divert our management's attention and resources, and could also require us to make substantial payments to satisfy judgments or to settle litigation.

***Because Velodyne's sales have been primarily to customers making purchases for R&D projects and Velodyne's orders are project-based, we expect our results of operations to fluctuate on a quarterly and annual basis, which could cause our stock price to fluctuate or decline.***

Velodyne's quarterly results of operations have fluctuated in the past and may vary significantly in the future, and Velodyne's revenue has declined in two consecutive years. As such, historical comparisons of Velodyne's operating results may not be meaningful. In particular, because Velodyne's sales to date have primarily been to customers making purchases for R&D, sales in any given quarter can fluctuate based on the timing and success of Velodyne's customers' development projects. Accordingly, the results of any one quarter should not be relied upon as an indication of future performance. Velodyne's quarterly financial results may fluctuate as a result of a variety of factors, many of which are outside of Velodyne's control and may not fully reflect the underlying performance of Velodyne's business. These fluctuations could adversely affect our ability to meet our expectations or those of securities analysts or investors. If Velodyne does not meet these expectations for any period, the trading price of our common stock could decline significantly. Factors that may cause these quarterly fluctuations include, without limitation, those listed below:

- The timing and magnitude of orders and shipments of Velodyne's products in any quarter.

- Pricing changes Velodyne may adopt to drive market adoption or in response to competitive pressure.

- Velodyne's ability to retain Velodyne's existing customers and attract new customers.

- Velodyne's ability to develop, introduce, manufacture and ship in a timely manner products that meet customer requirements.

- Disruptions in Velodyne's sales channels or termination of Velodyne's relationship with important channel partners.

- Delays in customers' purchasing cycles or deferments of customers' purchases in anticipation of new products or updates from Velodyne or Velodyne's competitors.

- Fluctuations in demand pressures for Velodyne's products.

- The mix of products sold in any quarter.

- The duration of the global coronavirus pandemic and the time it takes for economic recovery.

- The timing and rate of broader market adoption of autonomous systems utilizing our smart vision solutions across the automotive and other market sectors.

- Market acceptance of lidar and further technological advancements by our competitors and other market participants.

- The ability of Velodyne's customers to commercialize systems that incorporate Velodyne's products.

- Any change in the competitive dynamics of Velodyne's markets, including consolidation of competitors, regulatory developments and new market entrants.

- Velodyne's ability to effectively manage Velodyne's inventory.

- Changes in the source, cost, availability of and regulations pertaining to materials Velodyne uses.

- Adverse litigation, judgments, settlements or other litigation-related costs, or claims that may give rise to such costs.

- General economic, industry and market conditions, including trade disputes.

***If, following the Business Combination, securities or industry analysts do not publish or cease publishing research or reports about the post-combination company, its business, or its market, or if they change their recommendations regarding our common stock adversely, then the price and trading volume of our common could decline.***

The trading market for our common stock will be influenced by the research and reports that industry or securities analysts may publish about us, our business, our market, or our competitors. Securities and industry analysts do not currently, and may never, publish research on the Company or the post-combination company. If no securities or industry analysts commence coverage of the post-combination company, our stock price and trading volume would likely be negatively impacted. If any of the analysts who may cover the post-combination company change their recommendation regarding our stock adversely, or provide more favorable relative recommendations about our competitors, the price of our common stock would likely decline. If any analyst who may cover the Company were to cease coverage of the post-combination company or fail to regularly publish reports on it, we could lose visibility in the financial markets, which could cause our stock price or trading volume to decline.

***Changes in laws, regulations or rules, or a failure to comply with any laws, regulations or rules, may adversely affect our business, investments and results of operations.***

We are subject to laws, regulations and rules enacted by national, regional and local governments and Nasdaq. In particular, we are required to comply with certain SEC, Nasdaq and other legal or regulatory requirements. Compliance with, and monitoring of, applicable laws, regulations and rules may be difficult, time consuming and costly. Those laws, regulations or rules and their interpretation and application may also change from time to time and those changes could have a material adverse effect on our business, investments and results of operations. In addition, a failure to comply with applicable laws, regulations or rules, as interpreted and applied, could have a material adverse effect on our business and results of operations.

***We have not registered the shares of common stock issuable upon exercise of the public warrants under the Securities Act or any state securities laws at this time, and such registration may not be in place when an investor desires to exercise public warrants, thus precluding such investor from being able to exercise its public warrants except on a cashless basis and potentially causing such public warrants to expire worthless.***

We have not registered the shares of common stock issuable upon exercise of the public warrants under the Securities Act or any state securities laws at this time. However, under the terms of the warrant agreement, we have agreed that as soon as practicable, but in no event later than 15 business days after the closing of our initial business combination, we will use our best efforts to file with the SEC a registration statement for the registration under the Securities Act of the shares of common stock issuable upon exercise of the warrants and thereafter will use our best efforts to cause the same to become effective within 60 business days following our initial business combination and to maintain a current prospectus relating to the common stock issuable upon exercise of the public warrants, until the expiration of the public warrants in accordance with the provisions of the warrant agreement. We cannot assure you that we will be able to do so if, for example, any facts or events arise which represent a fundamental change in the information set forth in the registration statement or prospectus, the financial statements contained or incorporated by reference therein are not current or correct or the SEC issues a stop order. If the shares issuable upon exercise of the public warrants are not registered under the Securities Act, we will be required to permit holders to exercise their public warrants on a cashless basis. However, no public warrant will be exercisable for cash or on a cashless basis, and we will not be obligated to issue any shares to holders seeking to exercise their public warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder or an exemption from registration is available. Notwithstanding the above, if our common stock is at the time of any exercise of a public warrant not listed on a national securities exchange such that it satisfies the definition of a "covered security" under Section 18(b)(1) of the Securities Act, we may, at our option, require holders of public warrants who exercise their public warrants to do so on a "cashless basis" in accordance with Section 3(a)(9) of the Securities Act and, in the event we so elect, we will not be required to file or maintain in effect a registration statement, and in the event we do not so elect, we will use our best efforts to register or qualify the shares under applicable blue sky laws to the extent an exemption is not available. In no event will we be required to net cash settle any public warrant, or issue securities or other compensation in exchange for the public warrants in the event that we are unable to register

78

or qualify the shares underlying the public warrants under applicable state securities laws and there is no exemption available. If the issuance of the shares upon exercise of the public warrants is not so registered or qualified or exempt from registration or qualification, the holder of such public warrant shall not be entitled to exercise such public warrant and such public warrant may have no value and expire worthless. In such event, holders who acquired their public warrants as part of a purchase of public units will have paid the full unit purchase price solely for the shares of common stock included in the public units. If and when the public warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. We will use our best efforts to register or qualify such shares of common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us in the IPO. However, there may be instances in which holders of our public warrants may be unable to exercise such public warrants but holders of our private warrants may be able to exercise such private warrants.

***The exercise price for our public warrants is higher than in many similar blank check company offerings in the past, and, accordingly, the public warrants are more likely to expire worthless.***

The exercise price of our public warrants is higher than is typical with many similar blank check companies in the past. Historically, with regard to units offered by blank check companies, the exercise price of a public warrant was generally a fraction of the purchase price of the units in the initial public offering. The exercise price for our public warrants is $11.50 per share, subject to adjustment as provided herein. As a result, the public warrants are less likely to ever be in the money and more likely to expire worthless.

***We may amend the terms of the public warrants in a manner that may be adverse to holders with the approval by the holders of at least 50% of the then-outstanding public warrants. As a result, the exercise price of a holder's public warrants could be increased, the exercise period could be shortened and the number of shares of our common stock purchasable upon exercise of a public warrant could be decreased, all without the approval of that warrant holder.***

Our public warrants were issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and us. The warrant agreement provides that the terms of the public warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 50% of the then-outstanding public warrants to make any change that adversely affects the interests of the registered holders. Accordingly, we may amend the terms of the public warrants in a manner adverse to a holder if holders of at least 50% of the then-outstanding public warrants approve of such amendment. Although our ability to amend the terms of the public warrants with the consent of at least 50% of the then-outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the public warrants, convert the warrants into cash or stock, shorten the exercise period or decrease the number of shares of common stock purchasable upon exercise of a public warrant.

***We may redeem unexpired public warrants prior to their exercise at a time that is disadvantageous to warrant holders, thereby making their public warrants worthless.***

We have the ability to redeem outstanding public warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per public warrant; provided that the last reported sales price of our common stock equals or exceeds $18.00 per share (as adjusted for stock splits, stock dividends, reorganizations, recapitalizations and the like) for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date on which we give notice of such redemption to the warrant holders. If and when the public warrants become redeemable by us, we may exercise our redemption right even if we are unable to register or qualify the underlying securities for sale under all applicable state securities laws. We will use our best efforts to register or qualify such shares of common stock under the blue sky laws of the state of residence in those states in which the warrants were offered by us. Redemption of the outstanding public warrants could force the warrant holders: (i) to exercise their public warrants and pay the exercise price therefor at a time when it may be disadvantageous for them to do so; (ii) to sell their public warrants at the then-current market price when they might otherwise wish to hold their public warrants; or (iii) to accept the nominal redemption price which, at the time the outstanding public warrants are called for

79

redemption, is likely to be substantially less than the market value of their public warrants. None of the private placement warrants will be redeemable by us so long as they are held by our Sponsor or its permitted transferees. The Sponsor Agreement provides that, immediately prior to the Closing, and conditioned and effective upon the Closing, all of the private placement warrants held by the Sponsor immediately prior to the Closing, will be automatically cancelled, for no consideration, and shall no longer be outstanding.

***Warrants will become exercisable for our common stock, which would increase the number of shares eligible for future resale in the public market and result in dilution to our stockholders.***

Our public warrants are exercisable for 18,282,384 shares of common stock as part of our IPO at $11.50 per share. We expect to issue 15,000,000 shares of our common stock to the PIPE Investors in the PIPE Investment upon consummation of the Business Combination. The shares of common stock issued in the PIPE Investment and additional shares of our common stock issued upon exercise of our warrants will result in dilution to the then existing holders of common stock of the Company and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market could adversely affect the market price of our common stock.

***Our stockholders may be held liable for claims by third parties against us to the extent of distributions received by them upon redemption of their shares.***

Under the DGCL, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of the Trust Account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete an initial business combination by the applicable deadline may be considered a liquidating distribution under Delaware law. If a corporation complies with certain procedures set forth in Section 280 of the DGCL intended to ensure that it makes reasonable provision for all claims against it, including a 60- day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution. However, it is our intention to redeem our public shares as soon as reasonably possible following the applicable deadline in the event we do not complete an initial business combination and, therefore, we do not intend to comply with the foregoing procedures.

Because we will not be complying with Section 280 of the DGCL, Section 281(b) of the DGCL requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the ten years following our dissolution. However, because we are a blank check company, rather than an operating company, and our operations are limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses. If our plan of distribution complies with Section 281(b) of the DGCL, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would likely be barred after the third anniversary of the dissolution. We cannot assure you that we will properly assess all claims that may be potentially brought against us. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend beyond the third anniversary of such date. Furthermore, if the pro rata portion of our Trust Account distributed to our public stockholders upon the redemption of our public shares in the event we do not complete an initial business combination by the applicable deadline is not considered a liquidating distribution under Delaware law and such redemption distribution is deemed to be unlawful, then pursuant to Section 174 of the DGCL, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidating distribution.

80

***If, after we distribute the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, a bankruptcy court may seek to recover such proceeds, and we and our Board may be exposed to claims of punitive damages.***

If, after we distribute the proceeds in the Trust Account to our public stockholders, we file a bankruptcy petition or an involuntary bankruptcy petition is filed against us that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our stockholders. In addition, our Board may be viewed as having breached its fiduciary duty to our creditors and/or having acted in bad faith, thereby exposing itself and us to claims of punitive damages, by paying public stockholders from the Trust Account prior to addressing the claims of creditors.

***Anti-takeover provisions contained in our Amended and Restated Certificate of Incorporation and bylaws, as well as provisions of Delaware law, could impair a takeover attempt.***

Assuming the post-combination company's Amended and Restated Certificate of Incorporation is approved at the Special Meeting, it will contain provisions that may discourage unsolicited takeover proposals that stockholders may consider to be in their best interests. We are also subject to anti-takeover provisions under Delaware law, which could delay or prevent a change of control. Together, these provisions may make more difficult the removal of management and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for our securities. These provisions will include:

- no cumulative voting in the election of directors, which limits the ability of minority stockholders to elect director candidates;

- a classified board of directors with three-year staggered terms, which could delay the ability of stockholders to change the membership of a majority of the Board;

- the requirement that directors may only be removed from the Board for cause;

- the right of our Board to elect a director to fill a vacancy created by the expansion of our Board or the resignation, death or removal of a director in certain circumstances, which prevents stockholders from being able to fill vacancies on our Board;

- a prohibition on stockholder action by written consent, which forces stockholder action to be taken at an annual or special meeting of our stockholders;

- a prohibition on stockholders calling a special meeting and the requirement that a meeting of stockholders may only be called by a majority of the board, the chairman of the board or the chief executive officer of the post-combination company and may not be called by any other person, which may delay the ability of our stockholders to force consideration of a proposal or to take action, including the removal of directors;

- the requirement that changes or amendments to certain provisions of our Amended and Restated Certificate of Incorporation must be approved by holders of at least two-thirds of the common stock of the post-combination company;

- advance notice procedures that stockholders must comply with in order to nominate candidates to our Board or to propose matters to be acted upon at a meeting of stockholders, which may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of the Company; and

- an opt out from Section 203 of the DGCL and, instead, inclusion of a provision in the Amended and Restated Certificate of Incorporation that is substantially similar to Section 203 of the DGCL.

***The JOBS Act permits "emerging growth companies" like us to take advantage of certain exemptions from various reporting requirements applicable to other public companies that are not emerging growth companies.***

We currently qualify as an "emerging growth company" as defined in Section 2(a)(19) of the Securities Act, as modified by the JOBS Act. As such, we take advantage of certain exemptions from various reporting

81

requirements applicable to other public companies that are not emerging growth companies for as long as we continue to be an emerging growth company, including: (i) the exemption from the auditor attestation requirements with respect to internal control over financial reporting under Section 404 of SOX; (ii) the exemptions from say-on-pay, say-on-frequency and say-on-golden parachute voting requirements; and (iii) reduced disclosure obligations regarding executive compensation in our periodic reports and proxy statements. As a result, our stockholders may not have access to certain information they deem important. We will remain an emerging growth company until the earliest of (i) the last day of the fiscal year: (a) following October 18, 2023, the fifth anniversary of our IPO; (b) in which we have total annual gross revenue of at least $1.07 billion; or (c) in which we are deemed to be a large accelerated filer, which means the market value of our common stock that is held by non-affiliates exceeds $700 million as of the prior June 30th, and (ii) the date on which we have issued more than $1.0 billion in non-convertible debt during the prior three-year period.

In addition, Section 107 of the JOBS Act also provides that an emerging growth company can take advantage of the exemption from complying with new or revised accounting standards provided in Section 7(a)(2)(B) of the Securities Act as long as we are an emerging growth company. An emerging growth company can therefore delay the adoption of certain accounting standards until those standards would otherwise apply to private companies. The JOBS Act provides that a company can elect to opt out of the extended transition period and comply with the requirements that apply to non-emerging growth companies, but any such election to opt out is irrevocable. We have elected to avail ourselves of such extended transition period, which means that when a standard is issued or revised and it has different application dates for public or private companies, we, as an emerging growth company, can adopt the new or revised standard at the time private companies adopt the new or revised standard. This may make comparison of our financial statements with another public company that is neither an emerging growth company nor an emerging growth company that has opted out of using the extended transition period difficult or impossible because of the potential differences in accounting standards used.

We cannot predict if investors will find our common stock less attractive because we rely on these exemptions. If some investors find our common stock less attractive as a result, there may be a less active trading market for our common stock and our stock price may be more volatile.

***Velodyne's founder and executive chairman will have control over key decision making after the Business Combination because he will hold voting rights with respect to a majority of the post-combination company's voting stock.***

Velodyne's founder and executive chairman, David S. Hall, will hold voting rights with respect to an aggregate of [•] shares of common stock after the completion of the Business Combination, which will represent approximately [•]% of the voting power of the post-combination company's outstanding capital stock. In addition to the [•] shares of common stock held by Mr. Hall, which will represent approximately [•]% of the voting power of the post-combination company's outstanding capital stock following the completion of the Business Combination, stockholders holding [•] shares of common stock, including Velodyne's chief marketing officer and director, Marta Hall, and certain other family members of Mr. Hall, have entered into or are expected to enter into agreements granting Mr. Hall an irrevocable proxy to vote such stockholders' shares at Mr. Hall's discretion on all matters to be voted upon by stockholders. The shares over which Mr. Hall exercises voting rights will represent a majority of the voting power of the post-combination company's outstanding capital stock after the completion of the Business Combination. As a result, Mr. Hall will have the ability to control the outcome of matters submitted to the post-combination company's stockholders for approval, including the election of directors and any merger, consolidation, or sale of all or substantially all of our assets. In addition, Mr. Hall will have the ability to control affairs of the post-combination company as a result of his ability to control the election of the post-combination company's directors. This concentrated control will limit your ability to influence corporate matters for the foreseeable future, and, as a result, the market price of the post-combination company's common stock could be adversely affected.

As a board member, Mr. Hall will owe a fiduciary duty to the post-combination company's stockholders and must act in good faith in a manner he reasonably believes to be in the best interests of the post-combination company's stockholders. As a stockholder, even as a controlling stockholder, Mr. Hall is entitled

82

to vote his shares in his own interests, which may not always be in the interests of the post-combination company's stockholders generally and could adversely affect the market price of the post-combination company's common stock.

***Our internal controls over financial reporting may not be effective and our independent registered public accounting firm may not be able to certify as to their effectiveness, which could have a significant and adverse effect on our business and reputation.***

As a public company, we are required to comply with the SEC's rules implementing Sections 302 and 404 of SOX, which require management to certify financial and other information in our quarterly and annual reports and provide an annual management report on the effectiveness of internal control over financial reporting. To comply with the requirements of being a public company, the post-combination company will be required to provide management's assessment on internal controls commencing with the annual report for fiscal year ended December 31, 2020, and we may need to undertake various actions, such as implementing additional internal controls and procedures and hiring additional accounting or internal audit staff. The standards required for a public company under Section 404 of SOX are significantly more stringent than those required of Velodyne as a privately-held company. Further, as an emerging growth company, our independent registered public accounting firm is not required to formally attest to the effectiveness of our internal controls over financial reporting pursuant to Section 404 until the date we are no longer an emerging growth company. At such time, our independent registered public accounting firm may issue a report that is adverse in the event that it is not satisfied with the level at which the controls of the post-combination company are documented, designed or operating.

Testing and maintaining these controls can divert our management's attention from other matters that are important to the operation of our business. If we identify material weaknesses in the internal control over financial reporting of the post-combination company or are unable to comply with the requirements of Section 404 or assert that our internal control over financial reporting is effective, or if our independent registered public accounting firm is unable to express an opinion as to the effectiveness of our internal controls over financial reporting when we no longer qualify as an emerging growth company, investors may lose confidence in the accuracy and completeness of our financial reports and the market price of our common stock could be negatively affected, and we could become subject to investigations by the SEC or other regulatory authorities, which could require additional financial and management resources.

***The proposed Amended and Restated Certificate of Incorporation designates the Court of Chancery of the State of Delaware and federal court within the State of Delaware as the exclusive forum for certain types of actions and proceedings that the Company's stockholders may initiate, which could limit a stockholder's ability to obtain a favorable judicial forum for disputes with the Company or its directors, officers or employees.***

The proposed Amended and Restated Certificate of Incorporation provides that, subject to limited exceptions, the Court of Chancery of the State of Delaware and federal court within the State of Delaware will be exclusive forums for any:

- derivative action or proceeding brought on the Company's behalf;

- action asserting a claim of breach of a fiduciary duty owed by any of the Company's directors, officers or other employees to the Company or its stockholders;

- action asserting a claim against the Company arising pursuant to any provision of the DGCL, the Company's Amended and Restated Certificate of Incorporation or bylaws; or

- other action asserting a claim against the Company that is governed by the internal affairs doctrine.

This choice of forum provision does not apply to actions brought to enforce a duty or liability created under the Exchange Act. The Company's proposed Amended and Restated Certificate of Incorporation also provides that the federal district courts of the United States are the exclusive forum for the resolution of any complaint asserting a cause of action arising under the Securities Act. The Company intends for this provision to apply to any complaints asserting a cause of action under the Securities Act despite the fact that Section 22 of the Securities Act creates concurrent jurisdiction for the federal and state courts over all actions brought to enforce any duty or liability created by the Securities Act or the rules and regulations promulgated thereunder. There is uncertainty as to whether a court would enforce such a provision with

respect to claims under the Securities Act, and the Company's stockholders will not be deemed to have waived the Company's compliance with the federal securities laws and the rules and regulations thereunder. Any person or entity purchasing or otherwise acquiring any interest in shares of the Company's capital stock shall be deemed to have notice of and to have consented to the provisions of the Company's Amended and Restated Certificate of Incorporation described above.

These choice of forum provisions may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with the Company or its directors, officers or other employees, which may discourage such lawsuits against the Company and its directors, officers and employees. Alternatively, if a court were to find these provisions of the Company's Amended and Restated Certificate of Incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, the Company may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect the Company's business and financial condition.

**Risks Related to the Redemption**

*We do not have a specified maximum redemption threshold. The absence of such a redemption threshold may make it possible for us to complete a Business Combination with which a substantial majority of our stockholders do not agree.*

Our current certificate of incorporation does not provide a specified maximum redemption threshold, except that we will not redeem our public shares in an amount that would cause the Company's net tangible assets to be less than $5,000,001 upon consummation of our initial business combination (such that we are not subject to the SEC's "penny stock" rules). However, the Merger Agreement provides that our obligation to consummate the Business Combination is conditioned on the amount in the Trust Account and the proceeds from the PIPE Investment equaling or exceeding $200,000,000, and the obligation of Velodyne to consummate the Business Combination is conditioned on the amount in the Trust Account and the proceeds from the PIPE Investment equaling or exceeding $200,000,000. As a result, we may be able to complete our Business Combination even though a substantial portion of our public stockholders do not agree with the transaction and have redeemed their shares or have entered into privately negotiated agreements to sell their shares to our Sponsor, directors or officers or their affiliates. Based on the amount of approximately $117.3 million in our Trust Account as of June 30, 2020, and taking into account the anticipated gross proceeds of approximately $150,000,000 from the PIPE Investment, approximately 6,564,785 shares of common stock may be redeemed and still enable us to have sufficient cash to satisfy the cash closing conditions in the Merger Agreement. As of the date of this proxy statement, no agreements with respect to the private purchase of public shares by the Company or the persons described above have been entered into with any such investor or holder. We will file a Current Report on Form 8-K with the SEC to disclose private arrangements entered into or significant private purchases made by any of the aforementioned persons that would affect the vote on the Business Combination Proposal or other proposals (as described in this proxy statement) at the Special Meeting.

In the event the aggregate cash consideration we would be required to pay for all shares of common stock that are validly submitted for redemption plus any amount required to satisfy cash conditions pursuant to the terms of the Merger Agreement exceeds the aggregate amount of cash available to us, we may not complete the Business Combination or redeem any shares, all shares of common stock submitted for redemption will be returned to the holders thereof, and we instead may search for an alternate business combination.

*There is no guarantee that a stockholder's decision whether to redeem its shares for a pro rata portion of the Trust Account will put the stockholder in a better future economic position.*

We can give no assurance as to the price at which a stockholder may be able to sell its public shares in the future following the completion of the Business Combination or any alternative business combination. Certain events following the consummation of any initial business combination, including the Business Combination, may cause an increase in our share price, and may result in a lower value realized now than a stockholder of the Company might realize in the future had the stockholder not redeemed its shares. Similarly, if a stockholder does not redeem its shares, the stockholder will bear the risk of ownership of the public shares after the consummation of any initial business combination, and there can be no assurance that a stockholder can sell its shares in the future for a greater amount than the redemption price set forth in

this proxy statement. A stockholder should consult the stockholder's own tax and/or financial advisor for assistance on how this may affect his, her or its individual situation.

***Stockholders of the Company who wish to redeem their shares for a pro rata portion of the Trust Account must comply with specific requirements for redemption that may make it more difficult for them to exercise their redemption rights prior to the deadline. If stockholders fail to comply with the redemption requirements specified in this proxy statement, they will not be entitled to redeem their shares of our common stock for a pro rata portion of the funds held in our Trust Account.***

Public stockholders who wish to redeem their shares for a pro rata portion of the Trust Account must, among other things (i) submit a request in writing and (ii) tender their certificates to our Transfer Agent or deliver their shares to the Transfer Agent electronically through the DWAC system at least two business days prior to the Special Meeting. In order to obtain a physical stock certificate, a stockholder's broker and/or clearing broker, DTC and our Transfer Agent will need to act to facilitate this request. It is our understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the Transfer Agent. However, because we do not have any control over this process or over the brokers, which we refer to as "DTC," it may take significantly longer than two weeks to obtain a physical stock certificate. If it takes longer than anticipated to obtain a physical certificate, stockholders who wish to redeem their shares may be unable to obtain physical certificates by the deadline for exercising their redemption rights and thus will be unable to redeem their shares.

Stockholders electing to redeem their shares will receive their pro rata portion of the Trust Account less franchise and income taxes payable, calculated as of two business days prior to the anticipated consummation of the Business Combination. Please see the section entitled "*Special Meeting of Company Stockholders — Redemption Rights*" for additional information on how to exercise your redemption rights.

***If a stockholder fails to receive notice of our offer to redeem our public shares in connection with our Business Combination, or fails to comply with the procedures for tendering its shares, such shares may not be redeemed.***

If, despite our compliance with the proxy rules, a stockholder fails to receive our proxy materials, such stockholder may not become aware of the opportunity to redeem its shares. In addition, the proxy materials that we are furnishing to holders of our public shares in connection with our Business Combination describes the various procedures that must be complied with in order to validly redeem public shares. In the event that a stockholder fails to comply with these procedures, its shares may not be redeemed.

85

itself, including without limitation any payments or expected payments from litigation or sale of real property, shall not be taken into account in determining whether an "intervening event" has occurred.

*Excess Parachute Payments Waiver*

To the extent applicable, Velodyne has agreed to, at least five (5) days prior to the Closing, take commercially reasonable actions to (i) solicit waivers of any excess parachute payment (as described below) from each person who has or may have a right to any payments and/or benefits as a result of or in connection with the transactions contemplated by the Merger Agreement that would be deemed to constitute "excess parachute payments" (within the meaning of Section 280G of the Code), and (ii) solicit the approval of Velodyne's stockholders in a manner intended to comply with Sections 280G(b)(5)(A)(ii) and 280G(b)(5)(B) of the Code of all payments and/or benefits (including payments and benefits waived pursuant to the preceding clause) that would, as a result of, or in connection with, the transactions contemplated by the Merger Agreement, be deemed to constitute "excess parachute payments." To the extent required to comply with the provisions of the preceding sentence, Velodyne has agreed to deliver, among other items, to its equity holders entitled to vote in the stockholder approval process under Code Section 280G(b)(5)(B), a disclosure statement intended to satisfy the stockholder approval requirements of Section 280G(b)(5)(B) of the Code. The form of waiver, solicitation of stockholder approval, and disclosure materials shall be provided to Graf for review at least ten (10) days prior to closing and all such materials shall be subject to the approval of Graf, such approval not to be unreasonably withheld, conditioned or delayed.

*Securities Matters*

The shares of common stock to be issued pursuant to the Merger Agreement have not been registered under the Securities Act, and have been acquired for investment and not with a view to, or in connection with, the sale of distribution thereof. No transfer of such shares may be effected without an effective registration statement related thereto or an exemption from registration under the Securities Act. Velodyne has agreed to take all actions necessary to ensure that delivery of the shares of the common stock pursuant to the Merger Agreement (including the common stock to be issued pursuant to payment of the earnout consideration) shall be made only pursuant to a valid exemption from registration requirements under the Securities Act and shall provide documentation thereof reasonably acceptable to Graf. Velodyne has also agreed to cause each holder of Velodyne common stock or Velodyne preferred stock that is a party to the IRA (as defined in the Merger Agreement), by and among Velodyne and certain of its stockholders to be bound by a customary "lockup" restricting the transfer, sale and conveyance of the shares of common stock to be issued in connection with the Merger Agreement for a period of six (6) months following the Closing, all in a form reasonably acceptable to Graf. Ford Motor Company will not be subject to a lockup agreement following the Business Combination. See "*Certain Relationships and Related Party Transactions — Ford Letter Agreement.*"

*Graf Exclusivity*

Through the Closing or earlier valid termination of the Merger Agreement, to the extent not inconsistent with the fiduciary duties of the Graf board of directors, Graf has agreed to not take, nor permit any of its affiliates or representatives to take, whether directly or indirectly, any action to solicit, initiate, continue or engage in discussions or negotiations with, or enter into any agreement with, or encourage, respond, provide information to or commence due diligence with respect to, any person or entity (other than Velodyne, its stockholders and/or any of their affiliates or representatives), concerning, relating to or which is intended or is reasonably likely to give rise to or result in, any offer, inquiry, proposal or indication of interest, written or oral relating to any business combination other than with Velodyne, its stockholders and their respective affiliates and representatives. Graf has agreed to, and cause its affiliates and representatives to, immediately cease any and all existing discussions or negotiations with any person or entity conducted prior to the date of the Merger Agreement with respect to, or which is reasonably likely to give rise to or result in, a proposal for a business combination.

*NYSE and Nasdaq Listing*

Through the Closing, Graf has agreed to use commercially reasonable efforts to ensure Graf remains listed as a public company on, and for shares of common stock to be listed on, the NYSE. Graf has agreed

122

been deferred to an earnout structure, vesting at such time that the closing price of our common stock is greater than or equal to $15.00 for any 20 trading days within any 30 trading-day period, commencing on the date of the Merger Agreement and ending on the date that is six months after the Closing. Any Earnout Founder Shares that do not vest on or prior to such date shall be forfeited. The 68,000 Founder Shares held by the GRAF's independent directors are not subject to this earnout.

**Certain Projected Financial Information**

*Certain Velodyne Forecasts and Performance Targets*

Velodyne does not, as a matter of general practice, develop or publicly disclose long-term forecasts or internal projections of its future performance, revenues, earnings, financial condition or other results due to, among other reasons, the uncertainty of the underlying assumptions and estimates. However, Velodyne has established certain targets relating to its consolidated results of operations and its business in connection with the proposed business combination and certain financial forecasts were prepared by Velodyne Management and made available to its board of directors and to Graf.

The targets also assume the consummation of the Business Combination. Velodyne's ability to achieve the targets set out below will depend upon a number of factors outside of its control. These include significant business, economic and competitive uncertainties and contingencies, as well as actions taken by counterparties. These targets have been developed based upon assumptions with respect to future business decisions and conditions that are subject to change, including Velodyne's execution of its strategies and product development, as well as growth in the markets in which Velodyne operates. As a result, Velodyne's actual results may vary from the targets set out below, and those variations may be material. See also "Cautionary Statement Regarding Forward-Looking Statements" and the risk factors set out in "*Risk Factors — If the Business Combination's benefits do not meet the expectations of investors, stockholders or financial analysts, the market price of our securities may decline*" and "*Subsequent to the consummation of the business combination, we may be required to take write-downs or write-offs, restructuring and impairment or other charges that could have a significant negative effect on our financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.*"

Velodyne Management has identified the following targets with respect to certain financial and operating metrics:

Velodyne Management estimates that Velodyne's revenue will have a compound annual growth rate from 2020 to 2024 of 61% and that Velodyne will have an adjusted EBITDA margin of more than 20% in 2024, prior to incorporating the impact of any acquisitions. Velodyne defines adjusted EBITDA, a non-GAAP financial measure, as operating income plus depreciation and amortization and other one-time charges. Velodyne's presentation of adjusted EBITDA excludes the effects of stock-based compensation.

Velodyne's revenue forecasts are based on its management's assessment of the likelihood of future design wins and revenue after conversations with existing and potential customers about the mix, volume, and average purchase price of sensors they anticipate purchasing in the coming years. Approximately 48% of projected 2024 revenues are under existing awarded multi-year contracts. Management incorporated this same information about mix, volume, and average purchase price of sensors in developing its forecast of adjusted EBITDA margin and free cash flow, a non-GAAP financial measure we define as cash flow from operations minus capital expenditures. In addition to assessments of potential designs wins and revenue based on interactions with current and prospective customers, Velodyne's forecasts reflect anticipated reductions in production costs based on improvements in product design, manufacturing processes, and outsourcing activities. The forecast also reflects customer feedback about continued investment in research and development. While selling, general, and administrative expenses may increase in absolute dollars as the company grows, such expenses are expected to represent a smaller percentage of revenue contributing to improvements in adjusted EBITDA margin.

As a result of the Business Combination, future acquisition opportunities and the synergies that could be realized from each of these, Velodyne Management estimates that Velodyne's platform has the opportunity to increase in size. Velodyne has had active dialogues with several of the key targets in its addressable market, but has now deferred such discussions until the Closing of the Business Combination.

142

Below is a summary of the key financial projections used as a basis to determine valuation.

| ($ in millions) Year | Revenues | ADJUSTED EBITDA | Free Cash Flow |
|---|---|---|---|
| 2020 | $101.2 | $ (59.3) | $ (59.6) |
| 2021 | $152.0 | $ (7.5) | $ (4.1) |
| 2022 | $249.4 | $ 15.5 | $ 6.6 |
| 2023 | $412.1 | $ 56.7 | $ 29.9 |
| 2024 | $684.1 | $148.8 | $103.7 |

The financial projections reflect numerous estimates and assumptions with respect to industry performance, general business, economic, regulatory, market and financial conditions and other future events, as well as matters specific to Velodyne's business, all of which are difficult to predict and many of which are beyond Velodyne's control. As a result, there can be no assurance that the projected results will be realized or that actual results will not be significantly higher or lower than projected. Since the projections cover multiple years, such information by its nature becomes less predictive with each successive year. These financial projections are subjective in many respects and thus are susceptible to multiple interpretations and periodic revisions based on actual experience and business developments. As such, these financial projections constitute forward-looking information and are subject to risks and uncertainties, including the various risks set forth in the section entitled "Risk Factors" in this proxy statement/prospectus.

The financial projections were prepared solely for internal use and not with a view toward public disclosure or toward complying with GAAP, the published guidelines of the SEC regarding projections or the guidelines established by the American Institute of Certified Public Accountants for preparation and presentation of prospective financial information. The financial projections were prepared by Velodyne. Neither Velodyne's independent registered public accounting firm, nor any other independent accountants, have compiled, examined or performed any procedures with respect to the financial projections, nor have they expressed any opinion or any other form of assurance on such information or its achievability, and they assume no responsibility for, and disclaim any association with, the financial projections. Furthermore, the financial projections do not take into account any circumstances or events occurring after the date they were prepared. Nonetheless, a summary of the projections is provided in this proxy statement/prospectus only because the projections were made available to Graf. The inclusion of financial projections in this proxy statement/prospectus should not be regarded as an indication that Graf, the Board, or their respective affiliates, advisors or other representatives considered, or now considers, such financial projections necessarily to be predictive of actual future results or to support or fail to support your decision whether to vote for or against the Business Combination Proposal. No person has made or makes any representation or warranty to any Graf shareholder regarding the information included in these financial projections. The financial forecasts are not fact and should not be relied upon as being necessarily indicative of future results, and readers of this proxy statement/prospectus are cautioned not to place undue reliance on this information. The Projections should not be viewed as public guidance.

EXCEPT TO THE EXTENT REQUIRED BY APPLICABLE FEDERAL SECURITIES LAWS, BY INCLUDING IN THIS PROXY STATEMENT/PROSPECTUS A SUMMARY OF INTERNAL FINANCIAL PROJECTIONS, GRAF UNDERTAKES NO OBLIGATIONS AND EXPRESSLY DISCLAIMS ANY RESPONSIBILITY TO UPDATE OR REVISE, OR PUBLICLY DISCLOSE ANY UPDATE OR REVISION TO, THESE FINANCIAL PROJECTIONS TO REFLECT CIRCUMSTANCES OR EVENTS, INCLUDING UNANTICIPATED EVENTS, THAT MAY HAVE OCCURRED OR THAT MAY OCCUR AFTER THE PREPARATION OF THESE FINANCIAL PROJECTIONS AND THEIR PRESENTATION TO THE BOARD, EVEN IN THE EVENT THAT ANY OR ALL OF THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS ARE SHOWN TO BE IN ERROR OR CHANGE.

**Satisfaction of 80% Test**

The NYSE rules require that the Company's initial business combination must occur with one or more operating businesses or assets with a fair market value equal to at least 80% of the net assets held in the Trust

143

**PROPOSAL NO. 6 — APPROVAL OF EMPLOYEE STOCK PURCHASE PLAN**

At the Special Meeting, stockholders will be asked to approve the Velodyne Lidar, Inc. 2020 Employee Stock Purchase Plan (the "*ESPP*"). Prior to the consummation of the Business Combination, our Board of Directors is expected to approve and adopt, subject to Graf stockholder approval, the ESPP, which will become effective as of the date of the stockholder approval. If the ESPP is approved by stockholders, we will be authorized to provide eligible employees with an opportunity to request payroll deductions to purchase a number of shares of post-combination company's common stock at a discount and in an amount determined in accordance with the ESPP's terms. A copy of the ESPP is attached to this proxy statement as Annex G. Our Board of Directors is still in the process of developing, approving and implementing the ESPP and, accordingly, there can be no assurance that the ESPP will be implemented or will contain the terms described below. Graf's stockholders are being asked to approve the ESPP as presented.

**Purpose of the ESPP**

The purpose of the ESPP is to provide eligible employees with an opportunity to increase their proprietary interest in the success of the post-combination company by purchasing the post-combination company's common stock from the post-combination company on favorable terms and to pay for such purchases through payroll deductions. We believe by providing eligible employees with an opportunity to increase their proprietary interest in the success of the post-combination company, the ESPP will motivate recipients to offer their maximum effort to the post-combination company and help focus them on the creation of long-term value consistent with the interests of Graf's stockholders.

**Reasons for the Approval of the ESPP Proposal**

Stockholder approval of the ESPP is necessary in order for Graf to satisfy (1) the stockholder approval requirements of Nasdaq and (2) the requirements under Section 423 of the Code.

**Consequences if the ESPP Proposal is Not Approved**

If the ESPP Proposal is not approved by our stockholders, the ESPP will not become effective, we will not have this program available as an incentive arrangement following the Business Combination, and employees of the post-combination company will not be able to purchase the post-combination company's common stock under the ESPP. Additionally, we believe our ability to recruit, retain and incentivize top talent will be adversely affected if the ESPP Proposal is not approved.

**Summary of the ESPP's Material Terms and Features**

The following summary of the principal features of the ESPP is qualified by reference to the terms of the ESPP, a copy of which is attached to this proxy statement as Annex G. Our stockholders are being asked to approve the ESPP as presented. If the terms of the ESPP are materially amended in a manner that would require stockholder approval under the requirements of Nasdaq or under Section 423 of the Code, stockholders will be asked to approve such material amendment.

*General*

The ESPP is intended to qualify as an "employee stock purchase plan" under Code Section 423, except as explained below under the heading "— *International Participation*." During regularly scheduled "offerings" under the ESPP, participants will be able to request payroll deductions and then apply the accumulated deductions to purchase a number of shares of the post-combination company's common stock at a discount to the market value of the shares as of the purchase date and in an amount determined in accordance with the ESPP's terms.

*Shares Available for Issuance*

The ESPP will have [•] ([•])of authorized but unissued or reacquired shares of the post-combination company's common stock reserved for issuance under the ESPP, plus an additional number of shares to be reserved annually on the first day of each fiscal year for a period of not more than 20 years, beginning on

167

**VELODYNE'S MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion of Velodyne's results of operations and financial condition should be read in conjunction with the information set forth in Velodyne's financial statements and the notes thereto included elsewhere in this proxy statement. This discussion contains forward-looking statements based upon Velodyne's current expectations, estimates and projections that involve risks and uncertainties. Actual results could differ materially from those anticipated in these forward-looking statements due to, among other considerations, the matters discussed under "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements."Unless the context otherwise requires, all references in this subsection to the "Company," "we," "us" or "our" refer to the business of Velodyne Lidar, Inc., a Delaware corporation, and its subsidiaries prior to the consummation of the Business Combination, which will be the business of the post-combination company and its subsidiaries following the consummation of the Business Combination.*

**Overview**

Velodyne is the global leader in lidar technology providing real-time 3D vision for autonomous systems, which we call smart vision. Our smart vision solutions are advancing the development of safe automated systems throughout the world, thereby empowering the autonomous revolution by allowing machines to see their surroundings. In automotive applications, our products improve roadway safety by providing perception data for reliable object avoidance and safe path-planning. We have a vision we call LIVE, Lidar In Vehicles Everywhere, which encompasses a mass-produced lower cost lidar sold for every model of car and truck. We believe safety on the roadways is for everyone. To improve roadway, bicycle, and pedestrian safety, we sell automotive solutions to the rapidly expanding ADAS market, which will incrementally address the requirements of the NHTSA 5-Star Safety Ratings System. Our lidar-based smart vision solutions are also deployed in many non-automotive applications, such as autonomous mobile robots, UAVs, last-mile delivery, precision agriculture, advanced security systems and smart city initiatives, among others. Our first products were commercially available in 2010. Since then, we have shipped over 40,000 units and generated cumulative revenue of over $570 million. While purchases have been primarily focused on R&D projects, several of our non-automotive customers are in commercial production with their offerings.

Our proprietary smart vision solutions offer several advantages over other sensor technologies for a broad range of applications. Using an array of eye-safe lasers, our lidar solutions measure distances in the environment at the speed of light. Unlike camera-based solutions, lidar solutions allow machines to see in 3D by providing precise distance measurements of surrounding objects. Compared to radar, lidar provides better resolution for superior object detection and classification. Lidar also performs better than cameras in low light conditions and produces fewer errors. According to a report by AAA, current pedestrian detection systems proved relatively ineffective at protecting pedestrians and bicycles in various tests, particularly at night. Lidar systems currently being tested can detect pedestrians equally well during daytime and nighttime conditions because the systems provide self-illumination by means of laser beams. By sending an alert or applying the brakes, these lidar systems are equipped to mitigate death and injury. These advantages of lidar, combined with lower computing power requirements, enable autonomous platforms to make fast and accurate decisions to mitigate collisions. Velodyne's proprietary lidar-based hardware and software solutions combine class-leading range, up to centimeter-level accuracy and lower power consumption with high-grade reliability.

Our visionary founder and executive chairman, David Hall, is a serial inventor and successful business leader. Mr. Hall created the world's first lidar solution for the Grand Challenges for autonomous vehicles organized by the Defense Advanced Research Projects Agency (DARPA). In a historic engineering milestone, Mr. Hall invented a lidar sensor that could see and measure the vehicle's surroundings with unprecedented precision, enabling the vehicle to navigate the course autonomously.

Since the DARPA Grand Challenge, we have rapidly developed and released a suite of lidar products and achieved many key corporate milestones.

215

*Piggyback Registration Rights*

If the Company proposes to register any of its securities under the Securities Act either for its own account or for the account of other stockholders, the holders of [•] shares of common stock will, pursuant to the IRA and subject to certain exceptions, be entitled to include their shares in the Company's registration statement. These registration rights are subject to specified conditions and limitations, including, but not limited to, the right of the underwriters to limit the number of shares included in any such offering under certain circumstances, but not below 30% of the total amount of securities included in such offering.

*Form S-3 Registration Rights*

At any time after the Company is qualified to file a registration statement on Form S-3, and subject to limitations and conditions specified in the IRA, the holders of at least 30% of the [•] shares of common stock with Form S-3 registration rights may make a written request that the Company prepare and file a registration statement on Form S-3 under the Securities Act covering their shares, so long as the aggregate price to the public, net of any underwriters' discounts and commissions, is at least $10,000,000. The Company is not obligated to effect more than two of these Form S-3 registrations in any 12-month period.

*PIPE Subscription Agreement*

Under the terms of the Subscription Agreements, the Company agreed that, prior to the Closing, it will file with the SEC a registration statement (the "*PIPE Resale Registration Statement*") registering the resale of the shares of common stock sold to the PIPE Investors (the "PIPE Shares"). The Company must use its commercially reasonable efforts to have the PIPE Resale Registration Statement declared effective upon the Closing, but no later than 60 calendar days following the Closing, subject to adjustment to 90 calendar days after the Closing if the PIPE Resale Registration Statement is reviewed by, and receives comments from, the SEC. The Subscription Agreements require the Company to cause the PIPE Resale Registration Statement to remain effective until the earlier of (i) two years from the issuance of the PIPE Shares, (ii) the date on which all of the PIPE Shares have been sold, or (iii) with respect to each PIPE Investor, the first date on which such PIPE Investor can sell all of its PIPE Shares (or shares received in exchange therefor) under Rule 144 of the Securities Act without limitation as to the manner of sale or the amount of such securities that may be sold.

*Public Warrants*

Under the terms of the warrant agreement pursuant to which the public warrants were issued, the Company agreed that as soon as practicable, but in no event later than 15 business days after the closing of the Business Combination, it will use its best efforts to file with the SEC a registration statement for the registration under the Securities Act of the shares of common stock issuable upon exercise of the warrants and thereafter will use its best efforts to cause the same to become effective within 60 business days following the Business Combination and to maintain a current prospectus relating to the common stock issuable upon exercise of the public warrants, until the expiration of the public warrants in accordance with the provisions of the warrant agreement.

*Ford Letter Agreement*

The Company and Velodyne entered into a letter agreement with Ford Motor Company, a Velodyne stockholder, granting Ford the right to have any shares of common stock issued to it in the Business Combination included in the registration statement filed for purposes of registering the shares issuable upon exercise of the public warrants. In the letter agreement, the Company and Velodyne agreed that any shares of common stock issued to Ford Motor Company in the Business Combination will not be subject to a lock-up or market stand-off agreement. Ford is expected to hold greater than 5% of the Company's outstanding common stock after the Business Combination. See "*Security Ownership of Certain Beneficial Owners and Management*" for details regarding the ownership of Ford Motor Company.

*Velodyne Stockholder Resale Registration Statement*

In connection with the Business Combination, Velodyne stockholders will be issued restricted securities. Prior to the expiration of the lock-up agreement applicable to the Velodyne stockholders six months after

267

the Closing, the Company intends to file a registration statement pursuant to the Securities Act registering the resale of the shares of common stock issued to Velodyne stockholders in the Business Combination. The Company intends for this registration statement to be declared effective by the SEC on or around the expiration date of the six month lock-up applicable to Velodyne stockholders.

**Listing of Securities**

We intend to apply to list of the post-combination company's common stock and warrants on Nasdaq under the symbols "VLDR" and "VLDRW," respectively, upon the Closing.

**BENEFICIAL OWNERSHIP OF SECURITIES**

The following table sets forth information regarding (i) the actual beneficial ownership of the common stock as of August 25, 2020 and (ii) expected beneficial ownership of the common stock immediately following the Closing, assuming that no public shares are redeemed, and alternatively that 6,564,785 public shares are redeemed, by:

- each person who is, or is expected to be after the Business Combination, the beneficial owner of more than 5% of issued and outstanding shares of common stock;

- each person who will become an executive officer or director of the post-combination company; and

- all executive officers and directors of the Company as a group pre-Business Combination and all executive officers and directors of the post-combination company.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and warrants that are currently exercisable or exercisable within 60 days. In computing the number of shares beneficially owned by a person or entity and the percentage ownership of that person or entity in the table below, all shares subject to options and restricted stock units held by such person or entity were deemed outstanding if such securities are currently exercisable, or exercisable or would vest based on service-based vesting conditions within 60 days of August 25, 2020, assuming that the liquidity-event vesting conditions had been satisfied as of such date. These shares were not deemed outstanding, however, for the purpose of computing the percentage ownership of any other person or entity.

The beneficial ownership of shares of common stock pre-Business Combination is based on 17,548,260 shares of common stock (including 11,454,132 public shares and 6,094,128 Founder Shares) issued and outstanding as of August 25, 2020.

The expected beneficial ownership of shares of common stock post-Business Combination assuming none of the public shares are redeemed has been determined based upon the following: (i) that no public stockholders exercise their redemption rights (no redemptions scenario), (ii) that none of the investors set forth in the table below has purchased or purchases shares of common stock (pre- or post-Business Combination), (iii) that 15,000,000 shares of common stock are issued to the PIPE Investors, (iv) that 145,575,763 shares of common stock are issued to the former Velodyne equity holders as merger consideration, including: (1) any shares issuable in respect of vested equity awards of Velodyne, and (2) up to 2,000,000 shares of common stock earned due to the satisfaction of the Earnout Condition (except for any Earnout RSUs that may not vest and settle within 60 days), (v) that a total of $50 million of shares of Velodyne capital stock are repurchased in the Pre-Closing Velodyne Tender Offer, (vi) the Sponsor forfeits an aggregate of 3,519,128 Founder Shares pursuant to the terms of the Sponsor Agreement, and (vii) there will be an aggregate of 174,604,895 shares of the post-combination company's common stock issued and outstanding at Closing.

The expected beneficial ownership of shares of common stock post-Business Combination assuming the maximum number of public shares have been redeemed has been determined based on the following: (i) that holders of 6,564,785 public shares exercise their redemption rights (maximum redemption scenario), (ii) that none of the investors set forth in the table below has purchased or purchases shares of common stock (pre- or post-Business Combination), (iii) that 15,000,000 shares of common stock are issued to the PIPE Investors, (iv) that a total of $50 million of shares of Velodyne capital stock are repurchased in the Pre-Closing Velodyne Tender Offer, (v) that 145,575,763 shares of common stock are issued to the former Velodyne equity holders as merger consideration, including: (1) shares issuable in respect of vested equity awards of Velodyne, and (2) up to 2,000,000 shares of common stock earned due to the satisfaction of the Earnout Condition (except for any Earnout RSUs that may not vest and settle within 60 days), (vi)  the Sponsor forfeits an aggregate of 3,519,128 Founder Shares pursuant to the Sponsor Agreement and (vii) there will be an aggregate of 168,040,110 shares of the post-combination company's common stock issued and outstanding at Closing.

Unless otherwise indicated, the address of each beneficial owner listed in the table below before the Business Combination is c/o Graf Industrial Corp., 118 Vintage Park Blvd, Suite W-222, Houston, Texas

269

77070 and each post-combination company beneficial owner listed in the table below is c/o Velodyne Lidar, Inc., 5521 Hellyer Avenue, San Jose, CA 95138.

| | Before the Business Combination | | After the Business Combination Assuming No Redemption | | After the Business Combination Assuming Maximum Redemption | |
|---|---|---|---|---|---|---|
| Name and Address of Beneficial Owner | Number of shares of common stock | % | Number of shares of common stock | % | Number of shares of common stock | % |
| Graf Acquisition LLC[1][2] | 6,026,128 | 34.3 | 2,507,000 | 1.4 | 2,507,000 | 1.5 |
| James A. Graf[1][2] | 6,026,128 | 34.3 | 2,507,000 | 1.4 | 2,507,000 | 1.5 |
| OC Opportunities Fund II, L.P.[1][2][3] | 6,026,128 | 34.3 | 2,507,000 | 1.4 | 2,507,000 | 1.5 |
| Keith W. Abell[1] | 25,000 | * | 25,000 | * | 25,000 | * |
| Julie J. Levenson[1] | 18,000 | * | 18,000 | * | 18,000 | * |
| Sabrina McKee[1] | 25,000 | * | 25,000 | * | 25,000 | * |
| Kevin Starke[4] | — | — | — | — | — | — |
| Michael Dee[5] | 50,018 | * | 50,018 | * | 50,018 | * |
| **All Directors and Executive Officers of GRAF as a Group (6 Individuals)** | **6,144,146** | **35.0** | **2,625,018** | **1.5** | **2,625,018** | **1.5** |
| *Five Percent Holders:* | | | | | | |
| Magnetar Financial LLC[6] | 2,525,000 | 14.4 | 2,525,000 | 1.5 | 2,525,000 | 1.5 |
| OxFORD Asset Management LLP[7] | 1,810,000 | 10.3 | 1,810,000 | 1.0 | 1,810,000 | 1.1 |
| Lighthouse Investment Partners LLC[8] | 1,668,295 | 9.5 | 1,668,295 | * | 1,668,295 | 1.0 |
| *Directors and Executive Officers of the Post-Combination Company After Consummation of the Business Combination* | | | | | | |
| David S. Hall[9] | — | — | [•] | [•] | [•] | [•] |
| Shares subject to voting proxy[10] | — | — | [•] | [•] | [•] | [•] |
| Total | — | — | [•] | [•] | [•] | [•] |
| Anand Gopalan[11] | — | — | [•] | [•] | [•] | [•] |
| Marta Thoma Hall[12] | — | — | [•] | [•] | [•] | [•] |
| Andrew Hamer[13] | — | — | [•] | [•] | [•] | [•] |
| Joseph B. Culkin[14] | — | — | [•] | [•] | [•] | [•] |
| Michael Dee[5] | 50,018 | * | 50,018 | * | 50,018 | * |
| James A. Graf[1][2] | 6,026,128 | 34.3 | 2,507,000 | 1.4 | 2,507,000 | 1.5 |
| Jennifer Li[15] | — | — | [•] | [•] | [•] | [•] |
| Barbara Samardzich[16] | — | — | [•] | [•] | [•] | [•] |
| Christopher Thomas | — | — | — | — | — | — |
| **All Directors and Executive Officers of the Post-Combination Company as a Group (14 Individuals)[17]** | **[•]** | **[•]** | **[•]** | **[•]** | **[•]** | **[•]** |
| *Five Percent Holders:* | | | | | | |
| Entities affiliated with Baidu Holdings Limited[18] | — | — | [•] | [•] | [•] | [•] |
| Ford Motor Company[19] | — | — | [•] | [•] | [•] | [•] |

\*    Less than 1%.

Notes:

(1)  Interests shown consist solely of founder shares.

(2) Represents shares held by Graf Acquisition LLC, our Sponsor. James A. Graf, our CEO, is the managing member of our Sponsor and shares voting and investment discretion with OC Opportunities Fund II, L.P. ("Owl Creek") with respect to the common stock held by our Sponsor. Each of Mr. Graf and Owl Creek may be deemed to have beneficial ownership of the common stock held directly by our Sponsor. Each of Mr. Graf and Owl Creek disclaims any beneficial ownership of the reported shares other than to the extent of any pecuniary interest he or it may have therein, directly or indirectly.

(3) The business address of OC Opportunities Fund II, L.P. is c/o Owl Creek Advisors, LLC, 640 Fifth Avenue, 20th Floor, New York, New York 10019.

(4) Mr. Starke is employed by Owl Creek Asset Management, L.P., which is an affiliate of Owl Creek, a member of our Sponsor. Mr. Starke does not have voting or investment power over any shares held by the sponsor, except to the extent of any direct or indirect pecuniary interest he may have therein.

(5) Mr. Dee is a member of our sponsor. Mr. Dee does not have voting or investment power over any shares held by the sponsor, except to the extent of any direct or indirect pecuniary interest he may have therein.

(6) According to a Schedule 13G filed with the SEC on February 14, 2019, Magnetar Financial LLC, Magnetar Capital Partners LP, Supernova Management LLC and Alec N. Litowitz share voting and dispositive power over 2,525,000 shares of the Company's common stock. The business address of these reporting persons is 1603 Orrington Avenue, 13th Floor, Evanston, Illinois 60201.

(7) According to a Schedule 13G filed with the SEC on February 13, 2019, OxFORD Asset Management LLP has sole voting and dispositive power over 1,810,000 shares of the Company's common stock. The business address of this reporting person is 6 George Street, Oxford, United Kingdom, OX12BW.

(8) According to a Schedule 13G filed with the SEC on February 6, 2020, Lighthouse Investment Partners LLC and LHP Ireland Fund Management Limited share voting and dispositive power over 1,668,295 shares of the Company's common stock held directly by various funds for which they serve as managers. The business addresses of these reporting persons are 3801 PGA Boulevard, Suite 500, Palm Beach Gardens, Florida 33410 and 32 Molesworth Street, Dublin, D02 Y512, Ireland, respectively.

(9) Consists of (i) [•] shares of the post-combination company common stock held by Mr. Hall and (ii) [•] shares of the post-combination company common stock issuable pursuant to RSUs that will betime-based vested within 60 days of [•].

(10) Consists of shares of the post-combination company common stock held by other stockholders over which, except under limited circumstances, Mr. Hall holds an irrevocable proxy, pursuant to voting agreements between Mr. Hall, Velodyne and such stockholders, including certain of the post-combination company's directors and officers, as indicated in the footnotes below. Velodyne does not believe thatthe parties to these voting agreements constitute a "group" under Section 13 of the Securities Exchange Act of 1934, as amended, as Mr. Hall exercises voting control over these shares.

(11) Consists of (i) [•] shares of the post-combination company common stock subject to options exercisable within 60 days of [•] and (ii) [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•].

(12) Consists of (i) [•] shares of the post-combination company common stock held by Ms. Hall and (ii) [•] shares of the post-combination company common stock issuable pursuant to RSUs that will betime-based vested within 60 days of [•]. Mr. Hall holds a proxy over all such shares.

(13) Consists of (i) [•] shares of the post-combination company common stock issuable upon vesting of an RSU subject only to a liquidity-based vesting condition and (ii) [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•].

(14) Consists of [•] shares of the post-combination company common stock held by Mr. Culkin. Mr. Hall holds a proxy over all such shares.

(15) Consists of [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•].

(16) Consists of [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•].

271

(17) Consists of (i) [•] shares of the post-combination company common stock, (ii) [•] shares of the post-combination company common stock subject to options exercisable within 60 days of [•] and (ii) [•] shares of the post-combination company common stock issuable pursuant to RSUs that will be time-based vested within 60 days of [•]. Mr. Hall holds a voting proxy over [•] of the [•] shares of the post-combination company common stock included in subpart (i) of this footnote.

(18) Consists of (i) [•] shares of the post-combination company common stock held by Baidu (Hong Kong) Limited, and (ii) [•] shares of the post-combination company common stock held by Baidu Holdings Limited. Baidu (Hong Kong) Limited, a Hong Kong company, is a wholly-owned subsidiary of Baidu Holdings Limited, a British Virgin Islands company, which is wholly owned by Baidu, Inc., a Cayman Islands company listed on the Nasdaq Global Select Market. Baidu, Inc. may be deemed to beneficially own all of the shares held by Baidu (Hong Kong) Limited and Baidu Holdings Limited. The address for Baidu (Hong Kong) Limited is Suite 2409, Everbright Centre, 108 Gloucester Road, Wanchai, Hong Kong and for Baidu Holdings Limited is Offshore Incorporation Limited of P.O. Box 957, Offshore Incorporations Centre Road Town, Tortola, British Virgin Islands.

(19) Consists of [•] shares of the post-combination company common stock held by Ford Motor Company. The address for Ford Motor Company is 1 American Rd, Dearborn, MI 48126.

272