Ramzi Abadou (SBN 222567)
**KAHN SWICK & FOTI, LLP**
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 459-6900
Facsimile: (504) 455-1498
ramzi.abadou@ksfcounsel.com

*Lead Counsel and Counsel for Lead Plaintiffs,*
*Diane Smith & William P. Smith*

*[Additional counsel on signature page]*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| MEYSAM MORADPOUR,<br>Individually and On Behalf of All<br>Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>VELODYNE LIDAR, INC., ANAND<br>GOPALAN, ANDREW HAMER,<br>JAMES A. GRAF, MICHAEL DEE,<br>and JOSEPH B. CULKIN<br>Defendants. | Case No. 3:21-CV-01486-SI<br><br>**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT**<br><br>**CLASS ACTION**<br><br>JURY TRIAL DEMANDED<br><br>Judge:      Hon. Susan Illston<br>Date:       April 22, 2022<br>Time:       10:00 a.m.<br>Courtroom:  1 - 17th Floor |

OPP. TO MTN. TO DISMISS AMEND. COMPL.                                    CASE NO. 3:21-CV-01486-SI

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................1

II.   STATEMENT OF FACTS ..................................................................................5

III.  LEGAL STANDARDS .....................................................................................11

IV.   ARGUMENT ....................................................................................................12

    A.    Defendants' Materially False and Misleading Statements Are Actionable ..........12

        1.    Defendants' Hall Retention Statements are Actionable ...........................13

        2.    Defendants Financial Target Statements Are Actionable .......................19

        3.    Defendants' Ford Statements Are Actionable ........................................24

        4.    Defendants' Internal Controls Statements Are Actionable .....................27

    B.    Additional Indicia of Scienter ...........................................................................27

V.    CONCLUSION ................................................................................................30

**TABLE OF AUTHORITIES**

**Federal Cases**                                                                                                   **Page(s)**

*Abdo v. Fitzsimmons*,
    2018 U.S. Dist. LEXIS 241075 (N.D. Cal. 2018) ...................................................................... 14

*Baker v. SeaWorld Ent., Inc.*,
    423 F. Supp. 3d 878 (S.D. Cal. 2019) ...................................................................................... 13

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) ...................................................................................................... 2

*Bodri v. GoPro, Inc.*,
    252 F. Supp. 3d 912 (N.D. Cal. 2017) ...................................................................................... 20

*Bruce v. Suntech Power Holdings Co.*,
    64 F. Supp. 3d 1365 (N.D. Cal. 2014) ...................................................................................... 25

*Camelot Event Driven Fund v. Alta Mesa Res., Inc.*,
    2021 U.S. Dist. LEXIS 71757 (S.D. Tex. 2021) ................................................................ 1, 27

*Carr v. Zosano Pharma Corp.*,
    2021 U.S. Dist. LEXIS 166197 (N.D. Cal. 2021) ...................................................................... 16

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) .................................................................................................... 16

*City of Sunrise Firefighters Pens. Fund v. Oracle Corp.*,
    2019 U.S. Dist. LEXIS 216801 (N.D. Cal. 2019) .................................................................... 25

*Commc'ns Workers of Am. Plan for Emps. Pensions & Death Bens. v. CSK Auto Corp.*,
    525 F. Supp. 2d 1116 (D. Ariz. 2007) ...................................................................................... 27

*Costabile v. Natus Med., Inc.*,
    2018 U.S. Dist. LEXIS 220 (N.D. Cal. 2018) .......................................................................... 20

*Elec. Workers Pension Fund, Local 103 v. HP Inc.*,
    2021 U.S. Dist. LEXIS 175694 (N.D. Cal. 2021) .............................................................. 16, 25

*Eminence Capital, L.L.C. v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) .................................................................................................. 30

*Farrar v. Workhorse Grp.*,
    2021 U.S. Dist. LEXIS 235399 (C.D. Cal. 2021) .................................................................... 21

*Higginbotham v. Baxter Int'l, Inc.*,
    495 F.3d 753 (7th Cir. 2007) .................................................................................................... 15

*Hong v. Extreme Networks, Inc.*,
    2017 U.S. Dist. LEXIS 64297 (N.D. Cal. 2017) ...................................................................... 17

*Howard v. Everex Sys.*,
   228 F.3d 1057 (9th Cir. 2000) ....................................................................................... viii

*Hunt v. Bloom Energy Corp.*,
   2021 U.S. Dist. LEXIS 187321 (N.D. Cal. 2021) ..................................................... 28

*In re Adaptive Broadband Sec. Litig.*,
   2002 U.S. Dist. LEXIS 5887 (N.D. Cal. 2002) ......................................................... 29

*In re Am. Apparel, Inc. S'holder Litig.*,
   855 F. Supp. 2d 1043 (C.D. Cal. 2012) ..................................................................... 26

*In re Apple Comput., Inc.*,
   2003 U.S. Dist. LEXIS 28303 (N.D. Cal. 2003) ....................................................... 23

*In re Apple Sec. Litig.*,
   2020 U.S. Dist. LEXIS 206298 (N.D. Cal. 2020) ................................................ 15, 25

*In re BofI Holding, Inc. Secs. Litig.*,
   2017 U.S. Dist. LEXIS 79062 (S.D. Cal. 2017) ........................................................ 19

*In re Celera Corp. Secs. Litig.*,
   2013 U.S. Dist. LEXIS 125621 (N.D. Cal. 2013) ..................................................... 23

*In re Connetics Corp. Sec. Litig.*,
   542 F. Supp. 2d 996 (N.D. Cal. 2008) (Illston, J.) ................................................ 3, 17

*In re Connetics Corp. Sec. Litig.*,
   2008 U.S. Dist. LEXIS 62515 (N.D. Cal. 2008) ................................................... 3, 17

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) .................................................................................... 21

*In re CV Therapeutics, Inc. Sec. Litig.*,
   2004 U.S. Dist. LEXIS 17419 (N.D. Cal. 2004) ....................................................... 30

*In re Cylink Secs. Litig.*,
   178 F. Supp. 2d 1077 (N.D. Cal. 2001) ....................................................................... 4

*In re CytRx Corp. Sec. Litig.*,
   2015 U.S. Dist. LEXIS 91447 (C.D. Cal. 2015) ....................................................... 29

*In re Daou Sys.*,
   411 F.3d 1006 (9th Cir. 2005) .................................................................................... 12

*In re Fannie Mae 2008 Sec. Litig.*,
   891 F. Supp. 2d 458 (S.D.N.Y. 2012) .......................................................................... 3

*In re FirstEnergy Corp. Sec. Litig.*,
   2022 U.S. Dist. LEXIS 39308 (S.D. Ohio 2022) ............................................... 5, 19, 27

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005) ............................................................... 15

*In re Mattel Secs. Litig.*,
  2021 U.S. Dist. LEXIS 65480 (C.D. Cal. 2021) ..................................... 5, 18, 19

*In re McKesson HBOC, Inc. Secs. Litig.*
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ........................................................ 3, 12

*In re Nektar Therapeutics*,
  2020 U.S. Dist. LEXIS 122715 (N.D. Cal. 2020) .................................................. 12

*In re NVIDIA Corp. Sec. Litig.*,
  768 F. 3d 1046 (9th Cir. 2014) ......................................................................... 13

*In re Peregrine Sys.*,
  2005 U.S. Dist. LEXIS 59408 (S.D. Cal. 2005) ................................................ 13

*In re Quality Sys.*,
  865 F.3d 1130 (9th Cir. 2017)............................................................ 18, 22, 23, 25

*In re QuantumScape Secs. Class Action Litig.*,
  2022 U.S. Dist. LEXIS 7782 (N.D. Cal. 2022) ....................................... *passim*

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) ............................................................................ 28

*In re Rocket Fuel, Inc. Secs. Litig.*,
  2015 U.S. Dist. LEXIS 171552 (N.D. Cal. 2015) .............................................. 13

*In re Stillwater Capital Partners Inc.*,
  858 F. Supp. 2d 277 (S.D.N.Y. 2012) .............................................................. 28

*In re Textainer P'ship Sec. Litig.*,
  2005 U.S. Dist. LEXIS 40974 (N.D. Cal. 2005) ............................................... 18

*In re WageWorks, Inc., Sec. Litig.*,
  2020 U.S. Dist. LEXIS 97180 (N.D. Cal. 2020) .......................................... 12, 29

*In re Yahoo! Inc. Sec. Litig.*,
  2012 U.S. Dist. LEXIS 113036 (N.D. Cal. 2012) ............................................. 15

*In re Zynga Inc. Secs. Litig.*,
  2015 U.S. Dist. LEXIS 38722 (N.D. Cal. 2015) ............................................... 18

*Johns v. Bayer Corp.*,
  2010 U.S. Dist. LEXIS 62804 (S.D. Cal. 2010) ................................................. 3

*Karinski v. Stamps.com, Inc.*,
  2020 U.S. Dist. LEXIS 10721 (C.D. Cal. 2020) ............................................... 15

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ............................................................................................. *passim*

*Kim v. Advanced Micro Devices, Inc.*,
  2019 U.S. Dist. LEXIS 87287 (N.D. Cal. 2019) ........................................................................ 15

*Lee v. Amguard Ins. Co.*,
  2021 U.S. Dist. LEXIS 140051 (N.D. Cal. 2021) ........................................................................ 2

*Loritz v. Exide Techs.*,
  2014 U.S. Dist. LEXIS 111491 (C.D. Cal. 2014) ...................................................................... 30

*Luna v. Marvell Tech. Grp.*,
  2017 U.S. Dist. LEXIS 75262 (N.D. Cal. 2017) ........................................................................ 30

*Luxul Tech. Inc. v. NectarLux, LLC*,
  2015 U.S. Dist. LEXIS 104097 (N.D. Cal. 2015) ...................................................................... 17

*McCasland v. FormFactor Inc.*,
  2008 U.S. Dist. LEXIS 60544 (N.D. Cal. 2011) ........................................................................ 16

*Me. State Ret. Sys. v. Countrywide Fin. Corp.*,
  2011 U.S. Dist. LEXIS 125203 (C.D. Cal. 2011) ...................................................................... 17

*Middlesex Ret. Sys. v. Quest Software Inc.*,
  527 F. Supp. 2d 1164 (C.D. Cal. 2007) .................................................................................... 26

*Miller v. PCM, Inc.*,
  2018 U.S. Dist. LEXIS 148930 (C.D. Cal. 2018) ...................................................................... 18

*Miller v. Thane Int'l, Inc.*,
  519 F.3d 879 (9th Cir. 2008) .................................................................................................. 26

*Mulderrig v. Amyris, Inc.*,
  492 F. Supp. 3d 999 (N.D. Cal. 2020) ...................................................................................... 23

*Mulligan* v. *Impax Lab'ys, Inc.*,
  36 F. Supp. 3d 942, (N.D. Cal. 2014) ...................................................................................... 19

*Nguyen v. Endologix, Inc.*,
  962 F.3d 405 (9th Cir. 2020) .................................................................................................. 18

*Nieman v. Duke Energy Corp.*,
  2013 U.S. Dist. LEXIS 110693 (W.D.N.C. 2013) ............................................................. *passim*

*No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*,
  320 F.3d 920 (9th Cir. 2003) ............................................................................................. 12, 28

*Norfolk Cty. Ret. Sys. V. Solazyme, Inc.*,
  2016 U.S. Dist. LEXIS 179949 (N.D. Cal. 2016) .................................................................... 16

*Police Ret. Sys. v. Intuitive Surgical, Inc.*,
   759 F.3d 1051 (9th Cir. 2014) ............................................................................ 21, 23, 28

*PPM Am. v. Marriott Corp.*,
   853 F. Supp. 860 (D. Md. 1994) ...................................................................................... 14

*Reese v. Malone*,
   747 F.3d 557 (9th Cir. 2014) ........................................................................................... 26

*Robb v. Fitbit Inc.*,
   2016 F. Supp. 3d 1017 (N.D. Cal. 2016) ........................................................................ 12

*Roberts v. Zuora, Inc.*,
   2020 U.S. Dist. LEXIS 74648 (N.D. Cal. 2020) ...................................................... 13, 17

*Rodriguez v. Gigamon Inc.*,
   325 F. Supp. 3d 1041 (N.D. Cal. 2018) ..................................................................... 22, 23

*Rok v. Identiv, Inc.*,
   2017 U.S. Dist. LEXIS 1019 (N.D. Cal. 2017) ............................................................. 27

*Ronconi v. Larkin*,
   253 F.3d 423 (9th Cir. 2001) ........................................................................................... 24

*Sakkal v. Anaplan Inc.*,
   2021 U.S. Dist. LEXIS 165128 (N.D. Cal. 2021) ......................................................... 30

*Sayce v. Forescout Techs., Inc.*,
   2021 U.S. Dist. LEXIS 193207 (N.D. Cal. 2021) ......................................................... 18

*Sayce v.* Forescout *Techs., Inc.*,
   2021 U.S. Dist. LEXIS 57256 (N.D. Cal. 2021) ........................................................... 24

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ........................................................................................... 25

*Shenwick v. Twitter, Inc.*,
   282 F. Supp. 3d 1115 (N.D. Cal. 2017) .................................................................. 9, 21, 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ................................................................................................. viii, 27

*Van Noppen v. Innerworkings, Inc.*,
   136 F. Supp. 3d 922 (N.D. Ill. 2015) .............................................................................. 19

*Veal v. LendingClub Corp.*,
   423 F. Supp. 3d 785 (N.D. Cal. 2019) ...................................................................... 17, 27

*Welgus v. TriNet Grp., Inc.*,
   2017 U.S. Dist. LEXIS 207777 (N.D. Cal. 2017) ......................................................... 27

*Weston Fam. Partnership v. Twitter*,
  2022 U.S. App. LEXIS 7635 (9th Cir. 2022) ................................................................. 14

*Wochos v. Tesla, Inc.*,
  985 F.3d 1180 (9th Cir. 2021) ............................................................................... 21, 22

*WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*,
  655 F.3d 1039 (9th Cir. 2011) ................................................................................ viii

*Zucco Partners, L.L.C. v. Digimarc Corp.*,
  552 F.3d 981 (9th Cir. 2009) ..................................................................................... 29

**State Statutes**

Cal. Code Civ. Proc. § 128.7 ......................................................................................... 17

**Rules**

Fed. R. Civ. P. 11 ................................................................................... 2, 3, 4, 16

**STATEMENT OF ISSUES TO BE DECIDED**

1.      Whether the Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF 99; "Complaint") adequately pleads materially false and misleading Class Period (July 2, 2020—March 17, 2021) statements and/or omissions pursuant to § 10(b) of the Exchange Act of 1934 and Rule 10b-5 promulgated thereunder ("Exchange Act"). *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988 (9th Cir. 2018); *see also* § IV.A, *infra*.

2.      Whether the Complaint adequately pleads facts pursuant to § 10(b) of the Exchange Act that give rise to a strong inference that Defendants: (i) Anand Gopalan; (ii) Andrew Hamer; (iii) James Graf; (iv) Michael Dee; and (v) Joseph B. Culkin (the "Insider Defendants") made their materially false and misleading Class Period statements and/or omissions with scienter. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 325 (2007); *see also* §§ IV.A-B, *infra*.

3.      Whether the Complaint adequately pleads "control person" liability claims under § 20(a) of the Exchange Act against the Insider Defendants. *See Howard v. Everex Sys.*, 228 F.3d 1057 (9th Cir. 2000); *see also* § IV.B, *infra*.

4.      Whether the Complaint adequately pleads facts pursuant to SEC Rules 10b-5(a) and (c) to support a "scheme liability" claim against Defendants Graf and Dee. *See WPP Lux. Gamma Three Sarl v. Spot Runner, Inc.*, 655 F.3d 1039 (9th Cir. 2011); *see also* §§ IV.A-B, *infra*.

## I.    INTRODUCTION

The Complaint alleges four categories of material misrepresentations by special purpose acquisition company ("SPAC") insiders and others to enrich themselves at the expense of unwitting public investors. *See* ¶¶81, *id.* at n.12, 112; *In re QuantumScape Secs. Class Action Litig.*, 2022 U.S. Dist. LEXIS 7782, at *56-57 (N.D. Cal. 2022) (Orrick, J.); *Camelot Event Driven Fund v. Alta Mesa Res., Inc.*, 2021 U.S. Dist. LEXIS 71757, at *6 n.1 (S.D. Tex. 2021).

To obtain shareholder approval for Graf Industrial Corp.'s ("GIC's") harried September 2020 "de-SPAC" reverse merger ("Reverse Merger") with Velodyne Lidar, Inc. ("Velodyne" or the "Company") before time expired for Defendants Graf and Dee to do so (¶¶90-100), the Insider Defendants: **(i)** falsely assured investors that Velodyne's founder, former CEO and Executive Chairman of the Board (David Hall) would "continue to play a critical role as executive chairman of Velodyne" and "remain deeply involved in all aspects of Velodyne's business," while simultaneously taking active, undisclosed steps to recklessly remove him from Velodyne once the Reverse Merger closed;[1] **(ii)** knowingly made materially misleading revenue guidance projections for fiscal years 2020 through 2024, which they altogether withdrew just a short time after the Reverse Merger; **(iii)** misrepresented that Ford Motor Company ("Ford") was expected to maintain a greater than 5% stake in the combined Company following the Reverse Merger, while knowing or deliberately disregarding that Ford intended to sell its entire stake in Velodyne once the Reverse Merger closed; and **(iv)** misrepresented the quality of the Company's internal controls, which they admitted suffered from material weaknesses shortly after the Reverse Merger.

After Plaintiffs filed the Consolidated Complaint in September 2021 (ECF 73), Hall corroborated its allegations in a lawsuit (and press release) he filed in Alameda Superior Court on January 18, 2022 ("*Hall* Complaint"). His allegations are damning. *See, e.g.*, ¶16 ("Messrs. Graf and Dee continually misled stockholders, investors and potential investors about Original Velodyne's forecasted financial performance ***prior to the 2020 SPAC merger*** with GIC."); *id*. ("In

---

[1]    "¶" or "¶¶" refers to the Complaint. All emphasis added and internal citations omitted herein unless otherwise noted.

communications to investors, Messrs. Graf and Dee published false and misleading statements, including . . . that Ford Motor Company would continue to hold a large equity stake in the Company . . . ."); *id.* ("Messrs. Graf and Dee also purposefully misrepresented Mr. Hall's future involvement in the Company to Original Velodyne stockholders, including the Halls."); *id.* ("Messrs. Graf, Dee, Gopalan and Hamer misled stockholders about Mr. Hall's departure from the Company.").

Defendants thereby gave "reasonable investor[s] the 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]'" about Velodyne's Class Period operations and prospects. *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008). Further, none of Defendants' representations – each designed to lend credibility to the Reverse Merger – materialized after it closed in September 2020. ¶¶19-26, 29-34, 36-37, 39-42. In the process, Defendants Graf and Dee avoided personal financial liabilities and all of the Insider Defendants reaped substantial financial benefits as investors bore the brunt of Defendants' severely reckless misconduct. As a consequence of Defendants' actions, Velodyne's common stock fell from a Class Period high of $30.43 per share on September 9, 2020 to close at $13.00 on March 23, 2021. ¶¶440, 454. As of this filing, Velodyne's stock trades at less than $2.50 per share.

While Plaintiffs amended their Complaint (with Defendants' written consent) in the interest of judicial efficiency, Defendants now of course seek to twist Plaintiffs' amendment into some sort of "concession."[2] *See* ECF 102 ("Mot.") at 2. In doing so, Defendants would have this Court ignore that Plaintiffs' Consolidated Complaint was so thoroughly researched and investigated that Velodyne's *own* former founder, CEO, and Class Period Chairman of the Board (Hall) corroborated its core allegations. *See* ECF 73 at ¶2; *see also* Abadou Decl., Ex. 1. Now, straining to undermine Hall's credibility, and after having repeatedly lauded his "deep[] involve[ment] in *all* aspects of Velodyne's business" during the Class Period, Defendants try to make FED. R. CIV. P. 11 the centerpiece of their current dismissal motion. It's a desperate ploy – most notably because it was Plaintiffs' *own* prior independent investigation (*see* ECF 73 at ¶2) that *Hall's* subsequent securities fraud complaint detailed

---

[2]  Had the Consolidated Complaint been dismissed without leave, Defendants would undoubtedly have argued that Plaintiffs had delayed amendment by not including the *Hall* Complaint's facts sooner. *See Lee v. Amguard Ins. Co.*, 2021 U.S. Dist. LEXIS 140051, at *11 (N.D. Cal. 2021).

and corroborated. The facts Plaintiffs have included in the Complaint from the *Hall* Lawsuit are also fair game. *See In re Fannie Mae 2008 Sec. Litig.*, 891 F. Supp. 2d 458, 471 (S.D.N.Y. 2012) ("[I]t makes little sense to say that information from . . . a study [or investigation] – which the [complaint] could unquestionably rely on if it were mentioned in a news clipping or public testimony – is immaterial simply because it is conveyed in an unadjudicated complaint."). While Hall's accusations remain allegations and are not yet proven facts, the Court can and should consider them at this early stage. Indeed, Defendants' Rule 11 authorities bear no resemblance to the facts at issue here. In Defendants' view, for instance, Plaintiffs' references to Hall's public statements in press releases and in his state court lawsuit are off limits because Plaintiffs did not interview him.[3] That makes little sense and, regardless, is not the law. *Compare Johns v. Bayer Corp.*, 2010 U.S. Dist. LEXIS 62804, at *5-6 (S.D. Cal. 2010) (reliance on non-party pleading held proper when coupled with additional investigation) *with In re Connetics Corp. Sec. Litig.*, 542 F. Supp. 2d 996, 1005 (N.D. Cal. 2008) (striking allegations where counsel relied "***entirely*** on another complaint as the sole basis for his or her allegations") (emphasis in original) (Illston, J.).

Indeed, this Court's first *Connetics* opinion entirely ***undermines*** Defendants' Rule 11 arguments.[4] Here, as in *In re McKesson HBOC, Inc. Secs. Litig.* (which *Connetics* discusses), because the *Hall* Complaint and press releases "corroborate[] plaintiff's own investigation and provide[] detailed factual allegations, [they] can – at least in combination with plaintiff's investigative efforts – be a reasonable source of information and belief allegations." 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). Plaintiffs have provided every source for their exhaustive and independent investigation (*see* ¶2) as well as citations to the media and analyst reports and SEC filings they relied on. Hence, "[b]ecause the [Complaint] refers to the contents of the [Hall] complaint and no party challenges the

---

[3]   Plaintiffs will depose Hall once the PSLRA discovery stay is lifted were the Court to allow this matter to proceed to discovery. In the meantime, consistent with their ethical obligations, Plaintiffs' counsel participated in a lengthy two-hour in-person meeting with Hall's counsel in San Francisco to confirm the basis for his Alameda Superior Court lawsuit.

[4]   *See also In re Connetics Corp. Sec. Litig.*, 2008 U.S. Dist. LEXIS 62515, at *14-16 (N.D. Cal. 2008) (declining to strike such allegations).

[Hall] complaint's authenticity, the [C]ourt may also consider the allegations contained therein "when evaluating the sufficiency of plaintiffs' allegations under the PSLRA." *In re Cylink Secs. Litig.*, 178 F. Supp. 2d 1077, 1080 (N.D. Cal. 2001). Plaintiffs' allegations, particularly "when combined with the other transactions detailed in the [Hall] complaint, provide strong circumstantial evidence" of Defendants' scienter.[5] *Id.* at 1083.

Accordingly, the Complaint properly details Defendants' undisclosed campaign to oust Hall from the Merger in July 2020 through February 2021. *See* ¶¶10, 25-26, 115-28, 130-33. Similar allegations have been sustained under almost identical facts. *See, generally, Nieman v. Duke Energy Corp.*, 2013 U.S. Dist. LEXIS 110693 (W.D.N.C. 2013). These same allegations have now also been corroborated by Velodyne's former Class Period Vice President of Human Resources, Sheetal Patel. ¶¶2, 22, *id*. at n.7, 115, 310. Rather than confront them directly, Defendants instead seek to gaslight the Court by arguing that Hall is not a "witness." *See* Mot. at 2. Hall, however, is the ultimate Class Period whistleblower and witness in this matter. Sophisticated market analysts cited in the Complaint *also* independently corroborated Hall's revelations about the Company's materially misleading Class Period revenue projections. *Compare* ¶¶32, 124-26, 424 (Berenberg (May 26, 2021): "***Mr. Hall appears to corroborate some of the views expressed in our downgrade note that the company is experiencing a 'significant loss of market share to competitors*.'"") *with* ¶¶377, 387.

The Complaint now also details how – starting in July 2020 – Hall (in his words) "repeatedly and vehemently" warned Defendants that achieving their publicly issued revenue guidance was "impossible[.]" ¶¶33, 144-45, 161, 200, 209, 228, 233, 249, 268, 284, 295, 323, 338, 357. Rather than heed his warnings, the Complaint alleges that Defendant Graf and Dee attempted to bribe Hall to confirm that Velodyne's "wildly overstated financial guidance" was "still valid" by offering him an early release from a lock-up agreement during a November 16, 2020 meeting in San Jose. ¶¶33-34, 144-46.

"Absent literal omniscience, it is difficult to envision a securities fraud complaint [such as this]

---

[5]   Defendants tellingly do not suggest that Plaintiffs violated Rule 11 by relying on newspaper articles, analyst reports and other such third-party sources without first having interviewed the authors of those materials or all the individuals quoted therein.

that would not falter on the unrealistic expectations Defendants seek to impose as law. Th[e] Court [should] not do such a great disservice to the statutory rights of shareholders and investors to recover against those who defraud them." *In re FirstEnergy Corp. Sec. Litig.*, 2022 U.S. Dist. LEXIS 39308, at \*104 (S.D. Ohio 2022). "Plaintiffs' [192]-page Amended Complaint, supplemented by numerous extrinsic materials, provides more than 'mere' allegations with respect to these fact-intensive theories, and the [Velodyne] Defendants arguing that contrary evidence 'undercuts' these theories only highlights Plaintiffs' entitlement to discovery." *In re Mattel Secs. Litig.*, 2021 U.S. Dist. LEXIS 65480, at \*29 (C.D. Cal. 2021). Defendants' motion should therefore be denied in its entirety.

## II.      STATEMENT OF FACTS

***Background*:** SPACs raise capital through initial public stock offerings for the sole purpose of acquiring a private company to take public. ¶¶8, 76-77. GIC, the SPAC formed by Defendants Graf and Dee in June 2018, raised gross proceeds of $244 million from investors. ¶¶8, 88. GIC's original articles of incorporation mandated that it was required to complete a merger by April 18, 2020. ¶¶8-9, 90, 97. Defendant Graf and Dee's failure to do so would require them to refund more than ***$200 million***. ¶¶8, 92, 101. They would also be left personally holding millions of dollars of expired founders' shares and warrants which were specifically excluded from any liquidating distributions in GIC's $200+ million trust account. ¶¶8, 91-92, 94-95. On April 8, 2020, GIC announced that it was in negotiations to acquire PureCycle Technologies. ¶¶96, 98. Unable to complete that de-SPAC merger within the remaining time, on April 16, 2020 (just two days before GIC's deadline to complete a merger), GIC amended its articles of incorporation to extend its deadline to July 31, 2020. ¶97. As a result, GIC's shareholders redeemed approximately $132.1 million, draining GIC's trust account by 53% and leaving only $117.3 million to complete an acquisition. ¶99, n.20. Defendants Graf and Dee therefore had strong motive to attempt to quickly and recklessly secure an alternate target. ¶¶99-100.

They immediately turned their sights on Velodyne—a then privately held manufacturer of lidar, which uses lasers to measure distances for use in high-resolution maps in autonomous vehicles. *Id.* Hall founded Velodyne in 2015 and served as its CEO until 2020. ¶¶49, 102. On July 2, 2020, Defendants Dee and Graf announced an agreement to merge with Velodyne, funded by cash and new

stock issuances valuing the combined Company at $1.8 billion. ¶108. Ultimately, GIC and Velodyne consummated the Reverse Merger on September 29, 2020. ¶112. In connection therewith, the Complaint pleads the following four categories of materially false and misleading statements.

*__Hall Ouster Allegations__*: Cognizant of Hall's deep knowledge of lidar, and that investors were keenly focused on his profound importance to the Company's operations and prospects, Defendants repeatedly misrepresented virtually throughout the entire Class Period that Hall would "remain[] deeply involved in all aspects of Velodyne's business" and "actively involved in the post-combination company's product and technology development strategy." ¶¶202, 215-16, 218-22, 236-40, 254-57, 271-75, 288-92, 306-09, 316-18, 331-34, 369-70; *see Nieman*, 2013 U.S. Dist. LEXIS 110693, at *25 ("the materiality of Johnson being retained as CEO is clearly established"). Simultaneously, and unbeknownst to investors, Defendants were engaged in a damaging dispute with Hall "to [s]eize [c]orporate [c]ontrol of Velodyne" to personally enrich themselves at investors' expense. *See* ¶¶14, 113-19, 121.

According to SEC filings and letters to the Board by Hall in March 2021, starting on July 2, 2020, Defendants began disregarding Hall's concerns while Graf and Dee began to recklessly "curtail [Hall's] involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business[,]" despite their complete lack of lidar expertise. ¶¶124-25. By the latter half of September 2020, Defendant Hamer had taken further steps to ensure "that Mr. Hall would ***not*** be required to sign off on specific matters such as compensation and audits." ¶¶22, 115, 310. Indeed, Patel (the Company's then V.P. of Human Resources), who participated in a September 2020 meeting where documents memorializing those actions were distributed, "was very surprised to learn that Mr. Hall would be excluded from numerous important and fundamental management decisions after the Merger[,]" particularly "[i]n light of the many previous internal statements, public announcements, and SEC filings highlighting Mr. Hall's importance to Velodyne[.]" *Id*. Defendants later admitted that the Board's purported "concerns" with Hall arose "[b]eginning in the fall of 2020." ¶420, n.54. Such "concerns" coincided with Hall's revelation that Defendants were formally limiting his involvement in critical decisions about the operations of the

Company he founded. *See* ¶¶22, 115-19, 420, n.54.

Defendants then commenced an internal "investigation" of Hall no later than November 2020, and formally retained outside counsel on December 9, 2020, which coincided with Hall's refusal in November 2020 to validate Defendants' false revenue projections as detailed in §IV.A.2, *infra*. *See Nieman*, 2013 U.S. Dist. LEXIS 110693, at *26 (scienter pled where "Defendants worked with outside counsel on the plan to remove [CEO] Johnson."). "[E]ven as they implemented the final details of their plan [to remove Hall, however], Defendants continued to issue false and misleading prospectus materials, regulatory filings and public statements . . . that [Hall] would be [Chairman]." *See id.* at *12. For instance, even after the Reverse Merger was complete, Defendants repeated their assurances to investors in October 2020 that "Mr. Hall *will* serve as the post-combination company's executive chairman . . . ." ¶¶222, 240, 257, 275, 292, 309, 318. And despite the ongoing "investigation" into Hall, Defendants' January 7, 2021 withdrawal of Velodyne's 2021 revenue guidance affirmatively misrepresented "*that there is no change in our fundamental outlook for the future*." ¶¶16, 23, 378, 380.[6]

Defendants, therefore, on the one hand misleadingly assured investors that the Company's "fundamental outlook" remained unchanged as of January 7, 2021 while contemporaneously knowing that Hall had privately relinquished his role as Executive Chairman that same day and that they had already retained outside counsel on December 9, 2020 to remove Hall. ¶24. "[H]aving learned new information that diminished the weight of [their prior representations about Hall], [Velodyne] was obligated to share that information." *Khoja*, 899 F.3d at 1015. On February 19, 2021, in what Hall later described as an "ambush," Defendants suddenly removed him as Chairman of the Board. ¶¶118-22. Defendants, however, continued to obscure their fight for control with Hall when, on January 13, 2021, they misleadingly stated that Hall had merely "*voluntarily* transitioned . . . to a non-executive role, effective immediately." ¶24, n.8. Defendants failed to inform investors of their pretextual investigations into Hall until February 22, 2021. ¶118. The disclosure about Hall's sudden and

---

[6]    Notably, the same day, Defendant Gopalan also failed to disclose that Ford—one of Velodyne's largest investors—had already divested its entire ownership stake in the Company as of December 31, 2020. *See* ¶¶36, 105 n.23, 447-48.

unexpected ouster from Velodyne caused the price of the Company's common stock to plummet 14.87% in a single day. ¶449. Even after Hall was finally removed, Defendants have provided little more than conclusory assertions about an investigation that Hall described as a "well-played out plan" to oust him. *See, e.g.*, ¶¶19, 449-52. Notably, Hall was never interviewed by Velodyne's outside counsel during its "investigation." ¶25.

***Financial Target Allegations*:** Throughout the Class Period, Defendants announced, affirmed, and repeatedly reaffirmed Velodyne's untenable financial growth targets through 2024 based on purportedly "existing customer contracts" (¶¶134-37, 139, 199, 204, 208, 227, 232, 247, 262, 264-66, 283, 294). Beginning on July 2, 2020, for instance, Defendants misrepresented that Velodyne would generate revenues of approximately $100 million in 2020, increasing to $680 million in 2024, with existing purported "contracts" driving "just under 50% of the estimated 2024 revenues." ¶¶27, 134, 199. An August 31, 2020 press release not only reaffirmed Defendants' prior guidance, but also announced a sudden ***$130 million increase*** in existing customer agreements to a staggering $970 million in expected revenues through 2024. ¶¶28, 135-37, 139, 262-65, 283. Even as new entrants to the Company, which Hall founded and led for years, the Insider Defendants touted these baseless projections without consulting with him "regarding reasonable expectations for Velodyne's revenues for 2021 and beyond." ¶¶16, 27, 109. Hall, for his part, "repeatedly and vehemently stated to the VLDR board [which then included each of the Insider Defendants] that achieving $152MM in 2021 revenues was ***impossible***, and that the alleged contracts were ***not executed contracts but at most indications of interest*** in products still under development and with no demonstrated success *in situ*." ¶¶33, 144-45. Rather than correct their "wildly overstated financial guidance[,]" Defendants Graf and Dee instead sought to co-opt Hall by proposing and adopting a resolution during a November 16, 2020 Company board meeting that conditioned his early release from his lock-up agreement on Hall's "agreement that VLDR's existing guidance of $152MM in revenues for 2021 and other aspects of guidance are still valid." ¶¶33, 146. Hall refused. *Id*. Defendants' Audit Committee investigation of Hall started the ***same month***. *See* ¶23.

When Defendants' revenue guidance was exposed as vastly overstated in January 2021 (¶¶29,

147-49, 377-78), Defendants Gopalan and Hamer sought to blame the Company's grossly misrepresented Class Period financial results on "COVID-19 related disruptions," despite having previously disclaimed impacts by the pandemic. *See* ¶139 (Sept. 1, 2020: "[*D*]*espite COVID-19* impact, Velodyne maintains 2020 revenue guidance and reaffirms revenue outlook to 2024[.]"). Notably, the Company's October 1, 2020 Prospectus represented that the Company had *already* accounted for COVID-19 related delays in (re)affirming the projections. ¶¶141, 322. As late as November 5, 2020, in a Form 8-K signed by Defendant Hamer, Velodyne asserted: "[f]or the full year 2020, we expect total revenue of approximately $101 million, *as previously forecasted*." ¶¶142, 353. The same day, Defendant Gopalan represented that "[f]or the full year 2020, we expect total revenue of approximately $101 million, as previously forecasted. . . . *Despite the continued impacts of Covid-19* . . . ." ¶¶142, 354 *cf.* ¶127 (Hall describing COVID-19 as "a convenient scapegoat").

Then, on January 7, 2021, Defendants unexpectedly altogether withdrew Velodyne's revenue guidance, adding that they had missed revenue for 4Q2020 by 30%. ¶¶377-78. In response, Velodyne's stock and warrants plummeted by 7.28% and 13.3%, respectively, in a single day on unusually heavy trading volume. ¶379. During an earnings call on February 25, 2021, after repeatedly touting and affirming its guidance, Hamer refused to answer *any* questions from analysts about the Company's withdrawn guidance and earnings miss. *See* ¶¶154-57 (Hamer: "*Again, I can't provide guidance*."); *see also* ¶390 (Berenberg: "Some investors pushed back as to why this lack of visibility is *now* a problem, while the company had been providing guidance to $150m of revenue in 2021 (+50% yoy) throughout the SPAC merger process and into the new year."); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1148 (N.D. Cal. 2017) ("timing of Defendants' statements is suggestive of scienter" where "Defendants' evasive responses to questions . . . came just a few months after their aggressive user growth and engagement projections.").

During the same earnings call, and under withering analyst questioning, Defendant Gopalan ultimately relented that Velodyne had lost multiple contracts to competitors (*see* ¶152), citing one who had "made a choice to use a different technology for their next generation platform" and another that selected "an older technology for their first generation rollout." ¶387. A few weeks later on March 17,

2021, Defendants admitted their revenue projections had been baseless and that material weaknesses in internal controls had caused "*misstatements of revenue* and deferred revenue for the three months ended December 31, 2020." ¶¶391-93. The Complaint alleges that Defendants made their projections "*knowing* the company would miss its 2020 projections." ¶¶20, 190. The Complaint also alleges (in Hall's words) that Defendants "Graf and Dee continually misled stockholders, investors and potential investors about Original Velodyne's forecasted financial performance *prior to the 2020 SPAC merger with GIC*[.]" ¶16. During this same time, Hall had also raised with Defendants his "grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance." ¶126. Defendants, however, disclosed none of these negative material developments while they simultaneously made aggressive statements about the Company's financial performance and prospects.

*Ford Allegations*: Next, to further artificially boost investor confidence in the Reverse Merger, Defendants falsely touted Ford's continued investment in the Company by repeatedly misrepresenting that "Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination" and highlighted how "*Velodyne is partnered with leading companies like Ford*." *See* ¶¶199, 206-07, 259, 280, 302, 313, 359; *see also* ¶¶168-69, 326. Despite their public assurances, Defendants then knew or were reckless in not knowing that Ford had already planned to unload its investment in Velodyne because, by summer 2020, Ford had already finalized a financing deal to invest $600 million in a competing lidar company. S*ee* ¶¶171-72. Ford had further negotiated a "Letter Agreement" in July 2020 whereby Velodyne agreed "that any shares of common stock issued to Ford Motor Company in the Business Combination will not be subject to a lock-up or market stand-off agreement." ¶170. In other words, once the Reverse Merger closed, Ford was free to sell its entire stake in Velodyne. Yet even *after* the Reverse Merger, and as late as November 2020, Defendants kept touting Ford's continued investment in the Company, misrepresenting that "*Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination*." ¶¶320, 329, 350, 359. Hall has now separately corroborated that Defendants "misrepresented Velodyne's

business, financials and prospects, [by] claiming, *inter alia*, that . . . Ford would maintain a significant equity stake in VLDR" in urging stockholders to ratify the Reverse Merger. ¶12.

On February 12, 2021, investors finally learned the truth from Ford—not Defendants—that it had divested its entire position in Velodyne *as of December 31, 2020*, which cratered the trading price of Velodyne's securities. ¶¶36, 447-48. *Forbes* presciently predicted on February 15, 2021 that Ford's divestment would "number" the days that Velodyne sensors were used in Ford automobiles. ¶447. Only after Ford had sold its entire stake in the Company in 4Q20 did Defendant Hamer finally admit during a February 25, 2021 earnings call that Ford doesn't "***like to stick around*** . . . . That's not their nature. They'd rather reallocate that capital to other investment[s]." *See* ¶¶36, 180-82. A Ford spokesperson confirmed as much on February 15, 2021, revealing that Ford's "long term capital investment strategy" had always been to sell its entire 7.6% stake after the Reverse Merger. ¶180.

***Internal Controls Allegations*:** Defendants' final Reverse Merger bait-and-switch involved misrepresenting the quality of Velodyne's internal controls. *See* ¶¶224, 242, 277, 298. On March 17, 2021, after having repeatedly touted the quality of the Company's internal controls in SEC filings and elsewhere, Velodyne revealed "material weaknesses in [its] internal control over financial reporting" "which resulted in ***misstatements of revenue*** and deferred revenue for the three months ended December 31, 2020." ¶392. Defendants further revealed that Velodyne had "fail[ed] to adequately review revenue schedules associated with nonstandard revenue arrangements . . . ." ¶393. ***That same day***, the Company disclosed in a press release filed with the SEC on Form 8-K that its Chief Operating Officer ("COO") Thomas Tewell had unexpectedly resigned, tersely stating that: "[o]n March 14, 2021, Mr. Tewell resigned from the Company, effective immediately." ¶¶40, 187, 397. On this news, Velodyne stock and warrants fell by 5.4% and 7.8%, respectively. ¶187. Hall has publicly stated and the Complaint alleges that Defendants knew throughout the Class Period that he had raised "concerns with [Velodyne's] corporate governance" with Defendants "since the consummation of the Merger" in July 2020. ¶¶39, 122, 124.

## III.    LEGAL STANDARDS

Under § 10(b), a plaintiff must allege (i) a false statement or omission; (ii) of material fact; (iii)

made with scienter; (iv) on which plaintiff justifiably relied; and (v) that proximately caused the alleged loss. *See No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 931-32 (9th Cir. 2003). Defendants do not contest reliance or loss causation for any of the four categories of statements Plaintiffs allege are materially misleading. Defendants challenge falsity and scienter but they improperly seek to insert their own alternate version of events or ask the Court to make premature credibility determinations at this stage. *See Khoja*, 899 F.3d at 999. "Even under the Reform Act, [however,] plaintiffs are only required to plead facts, not to produce admissible evidence." *McKesson*, 126 F. Supp. 2d at 1272.

## IV.    ARGUMENT

### A.    Defendants' Materially False and Misleading Statements Are Actionable

Falsity is adequately alleged by "specify[ing] each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading." *Robb v. Fitbit Inc., 2016 F. Supp. 3d* 1017, 1025 (N.D. Cal. 2016) (Illston, J.). Falsity and scienter, as they are here, "are generally strongly inferred from the same set of facts." *In re Daou Sys.*, 411 F.3d 1006, 1015 (9th Cir. 2005). The Complaint plainly identifies the "who, what, when, where, and how" for each of Defendants' false statements and omissions. *See In re WageWorks, Inc., Sec. Litig.*, 2020 U.S. Dist. LEXIS 97180, at *11 (N.D. Cal. 2020). The Complaint also identifies:

| | |
|---|---|
| (i) Each statement or omission alleged to have been misleading, when it was made and who made it: | ¶¶6, 49-66, 198-99, 202, 204, 206-08, 212, 215-16, 218-22, 224, 227, 231-32, 236-40, 242, 245, 247, 253-57, 259, 262, 264-66, 271-75, 277, 280, 282-83, 288-92, 294, 298, 302, 305-11, 313, 316-18, 320, 322, 329, 331-34, 336-37, 349-50, 353-56, 359, 361, 366, 369-70, 373, 377-78, 383 |
| (ii) the reason or reasons why the statement or omission is misleading: | ¶¶5, 200-01, 203, 205, 209-11, 213-14, 217, 223, 225-26, 228-30, 233-35, 241, 243-44, 246, 249-51, 258, 260, 268-70, 276, 278-79, 281, 284-86, 293, 295-97, 299-300, 303, 312, 314, 319, 321, 323-24, 327-28, 330, 335, 338-39, 352, 357-58, 360, 362-63, 367-68, 371-72, 374-76, 380-82, 385 |
| (iii) all facts on which the belief is formed: | ¶¶2, 7-42, 66-197, 248, 252, 261, 263, 267, 287, 301, 304, 315, 325-26, 340-48, 351, 364-65, 379, 384, 386-455 |

Defendants' reliance on *In re Nektar Therapeutics* is therefore misplaced. *Compare* ¶198 ("signed by Defendant Graf"), ¶¶206-08, 212, 215 (statements made by Defendants Gopalan, Graf, Dee, and Hamer), *and* ¶¶50, 54, 58, 62, 65 *with* 2020 U.S. Dist. LEXIS 122715, at *26 (N.D. Cal. 2020).

### 1.    Defendants' Hall Retention Statements are Actionable

Once a company chooses to "tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1009; *In re Peregrine Sys.*, 2005 U.S. Dist. LEXIS 59408, at *66 (S.D. Cal. 2005) (disclosing internal investigation prior to completion). The Complaint alleges—and Defendants admit—that they concealed their still-to-this-day opaque investigations of Hall until February 22, 2021. ¶¶19, 118-22, 449-50; Mot. at 15-16. Defendants argue Velodyne had no duty to disclose them, and their concealment did not render any of their contemporaneous statements to the contrary misleading. *See* Mot. at 15-16. Defendants are incorrect. *See Nieman*, 2013 U.S. Dist. LEXIS 110693, at *26.

Defendants repeatedly assured investors about the Company's dependence on Hall's continued involvement in the Company in connection with the Reverse Merger. ¶¶219-20, 236-38, 254-55, 271-73, 288-90, 306-07, 316-17, 331-32. Defendants, for instance, highlighted as late as November 2020 how Hall "remains deeply involved in all aspects of Velodyne's business, including product development[,]" (¶¶5, 196, 221, 239, 256, 274, 291, 308, 318, 333, 370) and "***will remain actively involved in the post-combination company's product and technology development strategy***." ¶¶222, 240, 257, 275, 292, 309, 318, 334. Defendants also repeatedly acknowledged that the "loss of Mr. Hall would adversely affect Velodyne's business." ¶¶23-24, 221, 239, 256, 274, 291, 308, 318, 333, 370; *see Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 944 (S.D. Cal. 2019) (distinguishing *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046 (9th Cir. 2014)).[7] Binding authority now clearly holds that, once Defendants had primed investor expectations about retaining Hall in this manner, they created

---

[7]    Defendants seek to carve out their previous positive statements concerning Hall's "technological and manufacturing genius", "vision and expertise" (*see* Mot. at 17-18), arguing they are non-actionable "puffery." Such statements, however, are material because they primed investors to expect full and fair disclosures cutting against such positive statements. *See Khoja*, 899 F.3d at 1009. Even statements properly disputed as puffery in isolation remain actionable when they fundamentally conceal reality. *See In re Rocket Fuel, Inc. Secs. Litig.*, 2015 U.S. Dist. LEXIS 171552, at *16-19 (N.D. Cal. 2015) (online posts touting technology's purported effectiveness were not "mere 'product marketing statements,'" but actionable misrepresentations); *Roberts v. Zuora, Inc.*, 2020 U.S. Dist. LEXIS 74648, at *32-3 (N.D. Cal. 2020) (Illston, J.).

an obligation to disclose negative developments cutting against their positive public statements. *See Khoja*, 899 F.3d at 1010 ("[O]nce Orexigen chose to tout the apparently positive 25 percent interim results, Orexigen had the obligation also to disclose that they were likely unreliable[.]"). Indeed, "[a] corporation's **consideration** of a major change in corporate form can be material even if there is only a probability that the change will occur or if it is merely contingent upon future events." *PPM Am. v. Marriott Corp.*, 853 F. Supp. 860, 868-70 (D. Md. 1994); *see also Abdo v. Fitzsimmons*, 2018 U.S. Dist. LEXIS 241075, at *42-43 (N.D. Cal. 2018) ("with 'respect to contingent or speculative information or events, . . . materiality 'will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.'").

Then, on January 7, 2021—the same day Defendants then knew Hall had internally ceded his role as Executive Chairman—Defendant Gopalan assured analysts "***there is no change in our fundamental outlook for the future.***" *See* ¶¶23, 378, 380. He made that statement also knowing that Defendants were actively working to remove Hall, including by having retained outside counsel to achieve that goal the previous month. Gopalan's assurance about the Company's then fundamental outlook is also irreconcilable with the Company's earlier statements that any negative news regarding Hall "may adversely affect Velodyne's brand, relationship with customers, or standing in the industry." ¶¶23-24, 221, 239, 256, 274, 291, 308, 318, 333, 370; *see Nieman*, 2013 U.S. Dist. LEXIS 110693, at *12, *25.[8] And when Defendants finally did disclose Hall's partial January 7, 2021 resignation on January 13, 2021, they made no mention of the ongoing investigations.[9] ¶¶24, *id*. at n.8,

---

[8]    In *Weston Family P'ship LLLP v. Twitter*, by contrast, defendants' statements about a software product still under development were not only "qualified and vague," the panel held they were also "so imprecise and noncommittal that they [we]re incapable of objective verification." 2022 U.S. App. LEXIS 7635, at *17-18 (9th Cir. March 23, 2022) (Lee, J.). Not so with Defendants' statements here about Hall and Ford which are more like the statements at issue in *Khoja*. *Id*. at *18 (distinguishing *Khoja*); *see e.g.*, ¶¶ 218-222, 245.

[9]    Defendants' claim that Hall "voluntarily" "removed himself" as Executive Chairman omits any reference to his involuntary removal as Chairman on February 18, 2021 while conveniently ignoring that his then limited "resignation" was a direct result of their efforts to marginalize him at Velodyne. *See* ¶¶ 115-19, n.24, 121-32, 146, 190.

380. Instead, again, they concealed these negative material facts until Defendants suddenly announced Hall's ouster as Chairman of the Board just a short time later on February 22, 2021.[10] *See* ¶¶19, 118; *see also In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1022 (S.D. Cal. 2005) ("that the defendants published statements when they knew facts suggesting the statements were inaccurate or misleadingly incomplete is classic evidence of scienter."). Defendants completely ignore that material omission. *See* Mot. at 15-16.

Further, while the mere existence of an investigation considered in a vacuum may not trigger a duty to disclose, where positive representations to the contrary are made about the target of the investigation, they become actionable. *See Karinski v. Stamps.com, Inc.*, 2020 U.S. Dist. LEXIS 10721, at *37-38 (C.D. Cal. 2020); *Khoja*, 899 F.3d at 1009. Here, Defendants' earlier and repeated praise of Hall's importance to the Company combined with their assurance that he would be retained long after the Reverse Merger triggered a duty to disclose the investigations. *See Nieman*, 2013 U.S. Dist. LEXIS 110693, at *26; *see also* ¶¶202, 215-16, 218-22, 236-40, 254-57, 271-75, 288-92, 306-09, 316-18, 331-34, 361, 370, 378. Defendants' authorities are distinguishable as none involve an internal investigation of the ***cornerstone*** of a company's operations as with Hall here. Instead, they involve complex accounting matters by distant foreign subsidiaries. *See In re Yahoo! Inc. Sec. Litig.*, 2012 U.S. Dist. LEXIS 113036, at *64-68 (N.D. Cal. 2012) (noting complex Chinese regulatory provisions); *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 754, 760-61 (7th Cir. 2007) (reasonable delay where Brazilian subsidiary falsified accounting records). Defendants' authorities also all pre-date *Khoja* where this Circuit held that Defendants now have a "duty to elaborate" under such circumstances. 899 F.3d at 1012.[11] Next, during a September 2020 meeting attended by Defendant Hamer, Patel witnessed Defendants' efforts to limit Hall's role at Velodyne. ¶¶115-117.[12] When Hall

---

[10]   This "close temporal proximity" between Defendants' omission and the disclosure of the investigation "bolster[s] an inference of scienter[.]" *See In re Apple Sec. Litig.*, 2020 U.S. Dist. LEXIS 206298, at *29 (N.D. Cal. 2020).

[11]   Here, unlike in *Kim v. Advanced Micro Devices, Inc.*, the adverse impacts to Velodyne's business that Defendants warned would occur if Hall was not involved in the business had already materialized. 2019 U.S. Dist. LEXIS 87287, at *18-23 (N.D. Cal. 2019); ¶¶148-52, 178-82, 387-90.

[12]   Defendants do not contest that the September 2020 meeting occurred or that such changes were

confronted Defendant Gopalan about such efforts, Gopalan assured him that the changes "were not unfavorable" and he "could easily amend" any document given his controlling stock position. ¶116-17. But those assurances were belied during an October 2020 Board meeting when Velodyne's outside counsel admitted the efforts were specifically structured to exclude Hall in "anticipati[on] that Mr. Hall's interest would soon be diluted[.]" ¶117. A month later in November 2020, Hall rebuffed Defendant Graf and Dee's efforts to bribe him into agreeing that the Company's overstated financial guidance remained valid. ¶¶33, 146. Almost *immediately* following Hall's refusal, Velodyne formally retained outside counsel on December 9, 2020 to investigate and justify removing Hall. ¶6. Defendants can hardly claim that they lacked contemporaneous knowledge of facts that undermined their public representations that Hall was "driv[ing] . . . corporate strategy" or about his continued involvement and "in *all* aspects of Velodyne's business[.]"[13] *See* ¶16; *see also QuantumScape*, 2022 U.S. Dist. LEXIS 7782, at *56 (scienter pled where "the individual defendants personally reported facts about the company that are alleged to be completely at odds with reality."); *compare* ¶¶6, 33, 115-19 *with* ¶¶317-18, 332-33, 370. Unwilling to squarely address Plaintiffs' allegations, Defendants invoke Rule 11, asking the Court to disregard Hall's public revelations. *See* Mot. at 10-12. Defendants claim the Complaint is simply "parroting" the *Hall* Complaint by "repeating a third party's unproven averments." Mot. at 10. Defendants are wrong. The facts alleged by Hall in the *Hall* Complaint are

_____

implemented. Rather, they speciously claim such changes were innocuous and not inconsistent with any Class Period statements, while selectively omitting portions of their public statements regarding the extent of Hall's involvement in the Company. *Compare* Mot. at 14 (writing that Hall would "remain 'involved'" in "other 'aspects of Velodyne's business.'") with ¶¶5, 196, 221, 239, 256, 274, 291, 308, 311, 318, 333, 370 ("[Hall] remains *deeply* involved in *all* aspects of Velodyne's business.") [emphasis added to show Defendants' selective quotation]. Accordingly, Plaintiffs' allegations, unlike those in *Norfolk Cty. Ret. Sys. v. Solazyme, Inc.*, "establish a contradiction between the alleged materially misleading statements and reality." 2016 U.S. Dist. LEXIS 179949, at *9 (N.D. Cal. 2016).

[13]    In *McCasland v. FormFactor Inc.*, none of the confidential witnesses were alleged to have any contact with any of the defendants "or to have heard or read any statement by any defendant, that contradicted . . . on a public statement made during the class period." 2008 U.S. Dist. LEXIS 60544, at *26-27, n.17 (N.D. Cal. 2008). Defendants' other cases are similarly distinguishable. *See Elec. Workers Pension Fund, Local 103 v. HP Inc.*, 2021 U.S. Dist. LEXIS 175694 (N.D. Cal. 2021) (no CWs alleged to have had contact with individual defendants); *Carr v. Zosano Pharma Corp.,* 2021 U.S. Dist. LEXIS 166197, at *31-32, *34-35 (N.D. Cal. 2021) (no allegations from CWs or former employees); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 620 (9th Cir. 2017) (no allegations that CWs disclosed channel stuffing to Defendants).

*just one* component of Plaintiffs' counsel's investigation, which also included a detailed review of, *inter alia*: (i) Defendants' filings and publications with the SEC and elsewhere; (ii) analyst and industry reports concerning Velodyne; (iii) court filings in other proceedings; and (iv) discussions with Patel's counsel. *See also* n.3, *supra*.

Defendants' own authorities themselves acknowledge that it is only improper to "rely *entirely* on another complaint as the *sole* basis for [Plaintiffs'] allegations." *Cf. Connetics*, 542 F. Supp. 2d at 1005 (emphasis original) *with Connetics*, 2008 U.S. Dist. LEXIS 62515, at *14-16 (declining to strike where plaintiffs made good faith effort to confirm allegations with witnesses, some uncooperative, recognizing certain information may require formal discovery); *see also Veal v. LendingClub Corp.*, 423 F. Supp. 3d 785, 812 (N.D. Cal. 2019) (reliance improper "without providing any independent corroboration."); *Me. State Ret. Sys. v. Countrywide Fin. Corp.*, 2011 U.S. Dist. LEXIS 125203, at *65-66 (C.D. Cal. 2011) (same). That is not the case here.[14] *See Countrywide*, 2011 U.S. Dist. LEXIS 125203, at *65-66; ¶2; n.3, *supra. Connetics* and *Veal* are further distinguishable because they involve complaints brought by federal agencies who rarely share the sources for their actions with private plaintiffs. *See* 542 F. Supp. 2d at 1004-05; 423 F. Supp. 3d at 794. By contrast, Plaintiffs have justifiably relied on a material witness—the former CEO, former Class Period Executive Chairman, and Chairman of the Board—whose complaint and public statements bolster the Complaint. Ultimately, the *Hall* Complaint simply recounts his recollections about these events with the assistance of his counsel consistent with Cal. Code Civ. Proc. § 128.7. Under the unique (if not unprecedented) circumstances here, where a high-ranking insider like Hall has accused his former colleagues of securities fraud, Plaintiffs would have been derelict not to reference those allegations. *See Luxul Tech. Inc. v. NectarLux, LLC*, 2015 U.S. Dist. LEXIS 104097, at *19-20 (N.D. Cal. 2015) (distinguishing *Connetics*).

---

[14]    Plaintiffs allege that Patel, Velodyne's Class Period VP of HR, personally received documents from Defendant Hamer that limited Hall's role in the Company and directly contradicted Defendants' representation that Hall "remain[ed] deeply involved in *all* aspects of Velodyne's business." *See* ¶¶2, 22, *id*. at n.7, 318, 333; *see also Roberts*, 2020 U.S. Dist. LEXIS 74648, at *35-39; *cf. Hong v. Extreme Networks, Inc.*, 2017 U.S. Dist. LEXIS 64297, at *49-55 (N.D. Cal. 2017) (rejecting allegations from CWs "not privy" to integration plans given their roles).

OPP. TO MTN. TO DISMISS AMEND. COMPL.          17          CASE NO. 3:21-CV-01486-SI

Defendants now also relatedly "question [Hall]'s reliability, claiming he was far removed from relevant events and likening him to an undependable confidential witness." *Mattel*, 2021 U.S. Dist. LEXIS 65480, at *29-30 *cf. with* Mot. at 11 n.4. Where, as here, Defendants' earlier public statements repeatedly touted Hall's "critical" importance to the Company, Hall's detailed revelations about Defendants' misconduct can and should be afforded great weight. *Mattel*, 2021 U.S. Dist. LEXIS 65480, at 30. ("Yet Whitaker's reliability ostensibly exceeds that of ***confidential*** sources other courts find sufficiently reputable ***due to his disclosed identity, elevated position, and first-hand knowledge***"). Defendants' purported "foundational concerns" are therefore baseless.[15] *QuantumScape* is instructive. 2022 U.S. Dist. LEXIS 7782, at *26-30. There, Judge Orrick sustained securities fraud allegations where a plaintiff relied almost entirely on a short-seller's report, which purportedly had interviewed nine former QuantumScape employees—all unidentified and none of which plaintiffs interviewed—but concluded that the level of detail from those anonymous sources provided the "minimum indicia of reliability to make [it] past the pleadings stage." *Id*. *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 416 (9th Cir. 2020) is inapposite because CW1 there was not a founder, CEO and Chairman ***and*** left the company before the allegedly false statements were made.

Ultimately, despite touting Hall as being "deeply involved in all aspects of Velodyne's business," a "genius" and "visionary[,]" Defendants' present efforts to miscast him as an unreliable source devoid of personal knowledge who peddles in "conspiracy theories" proves too much.[16] *Compare* ¶¶5, 196, 221, 239, 256, 274, 291, 308, 318, 333, 370 *with* Mot. at 7-8, 9 n.3, 11-12. Indeed,

---

[15]    Defendants incorrectly suggest that the Court should apply the same standards to Hall that it would for a confidential witness. Mot. at 11, n.4, citing *Miller v. PCM, Inc.*, 2018 U.S. Dist. LEXIS 148930 (C.D. Cal. 2018) and *In re Textainer P'ship Sec. Litig.*, 2005 U.S. Dist. LEXIS 40974 (N.D. Cal. 2005). In *Miller*, plaintiffs relied upon an ***anonymous*** author of blog post on *Seeking Alpha*. 2018 U.S. Dist. LEXIS 148930, at *28 n.6. *Textainer* did not involve a founder, CEO and Board Chairman as with Hall here. 2005 U.S. Dist. LEXIS 40974, at *21-23. Courts have found witnesses with far less direct access to Defendants than Hall has here reliable. *See In re Quality Sys.*, 865 F.3d 1130, 1139, 1145 (9th Cir. 2017) (statements of "five lower-level [] employees" supported inference of scienter; *In re Zynga Inc. Secs. Litig.*, 2015 U.S. Dist. LEXIS 38722, at *21-22 (N.D. Cal. 2015).

[16]    Defendants liken Hall to a third-party speculating about Defendants' knowledge, but he is nothing like the hired expert in *Sayce v. Forescout Techs., Inc.*, 2021 U.S. Dist. LEXIS 193207, at *20 (N.D. Cal. 2021). Hall's revelations are further corroborated by analysts, customer channel checks and Defendants' own public statements. *See, e.g.,* ¶¶32, 157-59, 424.

Defendants overlook that Hall's stated concerns about the Company had (or later did) come to fruition. *Compare* ¶126 ("We voiced our grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors . . .") *with* ¶152 ("During the accompanying earnings call announcing its February 25, 2021 4Q20 results, Defendant Gopalan stated for the first time that the Company had lost multiple contracts to its competitors[.]"); *see also Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 962 (N.D. Cal. 2014). Accordingly, the Court should "decline[] [Defendants'] invitation to discredit [Hall's] thorough account at the pleading stage." *Mattel*, 2021 U.S. Dist. LEXIS 65480, at *31; *see Van Noppen v. Innerworkings, Inc.*, 136 F. Supp. 3d 922, 945-46 (N.D. Ill. 2015).[17]

### 2. Defendants Financial Target Statements Are Actionable

The Complaint next alleges that Defendants misleadingly touted Velodyne's financial performance and prospects during the Class Period. *See* ¶¶27-34. Defendants, for instance, misrepresented in July 2020 that Velodyne was on track "to generate revenues of approximately $100 million in 2020, increasing to approximately $680 million in 2024 with existing contracts," further emphasizing that those "[e]stimated revenues under existing customer contracts are expected to ***exceed $800 million*** from 2020 to 2024."[18] ¶¶27-28, 134; *see* ¶¶28, 135-139 ("Customer agreements now represent a total of approximately ***$970mm*** of revenue through 2024, an increase of approximately $130mm since the [initial transaction] announcement."); *see e.g.*, ¶¶227-28 (table challenging 2021

---

[17]    Defendants' insistence that Plaintiffs quote from specific documents (*see* Mot. at 2) and specify "what contracts were supposedly lost, when those losses occurred, when Ford allegedly decided to 'terminate' a contract [. . .] the dollars associated with such transactions, or how any of those deals were accounted for in the Company's forecasts" (*id.* at 20-21) is baseless at this stage. "To have knowledge of internal documents at this pre-discovery stage, Plaintiffs would need either a whistleblower or omniscience, and the pleading standards demand neither." *FirstEnergy*, 2022 U.S. Dist. LEXIS 39308, at *54-55; *see also In re BofI Holding, Inc. Secs. Litig.*, 2017 U.S. Dist. LEXIS 79062, at *37 (S.D. Cal. 2017) (PSLRA does not require plaintiffs to "prove its entire case in the complaint and without the benefit of reasonable inferences. In fact, the opposite is true.").

[18]    Contrary to Defendants' assertions, Plaintiffs challenge Defendants' representations regarding Velodyne's 2021 revenue projections and projections after November 2020. *See* ¶¶227, 229, 247, 250, 322, 324, 337, 339 ("Further, the highlighted statements and ***table*** [which projects $152 million in revenue for 2021] . . . were also materially false and misleading . . ."); *see also* ¶383.

guidance).[19] Defendants highlighted Velodyne's purported *"signed and awarded"* contracts at every opportunity as the vote to approve the Reverse Merger approached. *See* ¶¶199, 204, 208, 227, 232, 247, 262, 264-66, 283, 294. In doing so, however, Defendants recklessly failed to even consult with Hall regarding those contracts despite his years of experience commercializing Velodyne's product offerings and developing its customer relationships. *See* ¶¶16, 27-28, 109-10. Further, while Defendants now claim Hall only informed them that their financial projections were false in November 2020 (Mot. at 22), Hall publicly revealed in a press release Defendants have asked this Court to accept as true that Defendants Graf and Dee "continually misled stockholders, investors, and potential investors about Original Velodyne's forecasted financial performance *prior to the [July] 2020 SPAC merger* with GIC[,]" "including overstating revenue projections for 2021 and beyond[.]" ¶¶16, 20, 31, 190.[20] Indeed, internally during the Class Period, Hall "repeatedly and vehemently stated to the VLDR board that achieving $152MM in 2021 revenues was *impossible*, and that the alleged contracts were not executed contracts but at most indications of interest in products *still under development* and *with no demonstrated success* in situ." ¶¶33-34, 144-46. Further, the Complaint alleges that the products underlying those purportedly "signed and awarded" contracts "would require significant engineering" such that their impacts on revenue could "not be predicted with any degree of assurance." *Id*. Rather than correct their material public misstatements, Defendants opted instead to try to bribe Hall to ratify their "wildly overstated" revenue projections.[21] *See* ¶146.

When Velodyne's true financial condition began to emerge soon thereafter in January 2021,

---

[19]    The Company initially projected cumulative revenues of approximately $1.59 billion for the years spanning 2020—2024. ¶322. After badly missing its initial 2020 and 2021 revenue projections, Velodyne would need to generate *$1.44 billion* in revenues by the end of 2024 to offset the shortfall.

[20]    Relying on *Bodri v. GoPro, Inc.*, 252 F. Supp. 3d 912, 929 (N.D. Cal. 2017), Defendants assert that Plaintiffs do not establish "why Defendants would have known the forecasts 'could not be met when issued'" but this ignores, *inter alia*, that Hall repeatedly warned them meeting the revenue guidance would be "impossible[,]" Hall confirmed that Defendants knew "the Company would miss its 2020 stated projections[,]" and Defendants and that Velodyne admitted they lost customers in the fourth quarter of 2020 (only two months after the fact). *See* ¶¶16, 20, 31, 33, 144-46, 151-52, 190.

[21]    The statements at issue in *Costabile v. Natus Med. Inc.* were not mixed. 2018 U.S. Dist. LEXIS 220, at *11 (N.D. Cal. 2018).

rather than disclose that the Company was losing customers, market share or that its purported "signed and awarded" contracts could not be relied upon "with any degree of assurance[,]" (*see* ¶33, 124-27, 145), Defendants blamed COVID-19 for their withdrawn guidance and deep earnings miss.[22] *See* ¶¶29, 148, 377-78. For instance, on January 7, 2021, Defendants attributed Velodyne's large 30% earnings miss and withdrawn guidance to COVID-19 even though they had previously represented that they had already accounted for pandemic impacts. *See* ¶¶139, 141-43, 147-50, 153; 212, 264-65, 283, 322, 336, 354, 365. Analysts, however, were reluctant to credit Defendants' COVID-19 justifications and their skepticism was well-founded given that Hall later revealed that COVID-19 was a "convenient scapegoat[.]" *See* ¶¶30, 126-27, 158-59, 164-66, 189, 387-90. On February 25, 2021, Defendants admitted as much when they disclosed that earnings misses actually stemmed from lost customer contracts they previously claimed were "signed and awarded." *See* ¶¶151-52, 199, 204, 208, 227, 232, 247, 262, 264-66, 283.

Despite the foregoing, Defendants nevertheless continued making their same bogus financial projections as late as November 2020, even bragging that the Reverse Merger (unlike an IPO) purportedly enabled them to ***"talk more directly about projections for future years***[.]" *See* ¶¶82, 353-355. Defendants' position, however, turned on an overly narrow interpretation of what constitutes an "initial public offering," under the federal securities laws.[23] Under the PSLRA's plain language, "initial public offerings" can and should, as here, include de-SPAC transactions like the Reverse Merger. *See* ¶¶464-465.[24] Even if the Court were to conclude otherwise as a matter of first impression,

---

[22]    That only a few months passed between Defendants' misleading revenue projections and Velodyne's earnings miss raises an inference of scienter. *See Shenwick*, 282 F. Supp. 3d 1115.

[23]    Defendants' authorities are inapposite as none concern traditional IPOs or de-SPAC transactions. *See Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051 (9th Cir. 2014); *Wochos v. Tesla, Inc.*, 985 F.3d 1180 (9th Cir. 2021); *In re Cutera Sec. Litig.*, 610 F.3d 1103 (9th Cir. 2010); *see also Farrar v. Workhorse Grp.*, 2021 U.S. Dist. LEXIS 235399, at *14 (C.D. Cal. 2021) (distinguishing *Cutera*).

[24]    *See* John C. Coates, HARVARD LAW SCHOOL, "SPAC Law and Myths" (Feb. 11, 2022), available at https://bit.ly/SPACLawandMyths (last accessed March 22, 2022) ("[T]he PSLRA does not clearly define 'initial public offering' and because no other relevant definition appears in the securities laws then or since enacted, the statute is at least ambiguous. . . . What legislative history exists cuts against the idea that de-SPACs would be covered by the safe harbor.").

Defendants would still not be entitled to protection because the safe harbor is not designed to protect those who ***knowingly*** make a materially false or misleading statement about current or past facts. *See* ¶¶20, 31 (Hall: Defendants made projections "***knowing*** that the company would miss its 2020 projections."). Defendants had actual knowledge that they were losing customer contracts and that they would miss their revenue guidance (*see* ¶¶16, 20-21, 144-46, 190) because Hall raised his concerns with Defendants about Velodyne's "financial performance"[,] which included drastically declining product sales and loss of market share, with the Board "since the consummation of the Merger" on July 2, 2020. *See id.*; ¶124. Given Hall's stated concerns, it's no wonder that Defendants did not consult him about whether their revenue projections were reasonable. Instead, they schemed to exclude him from his longtime customers' contract negotiations with the Company. *See* ¶¶16, 27-28, 109-10, 125.  Hall also warned Defendants about their "wildly overstated revenue projections[,]" "repeatedly and vehemently" telling them that achieving them was "impossible[.]" *See* ¶¶144-46.

"Nor is the safe harbor designed to protect [Defendants] when they make a materially false or misleading statement about current or past facts, and combine that statement with a forward-looking statement." *Quality Sys.*, 865 F.3d at 1141-42. Here, Defendants provided their revenue targets based on Velodyne's purported "signed and awarded contracts" and "contracts already in hand[.]" *See* ¶¶204, 227, 232, 247, 262, 264-66, 283, 377; ¶199 ("[e]stimated revenues ***under existing customer contracts*** . . ."); ¶208 ("projected 2024 revenue to be over $680 million, of which ***roughly half is contracted today*** . . ."). Defendants cannot credibly characterize such statements as forward-looking by selectively omitting the latter half of the statements. *See* Mot. at 18; *see also Rodriguez v. Gigamon Inc.*, 325 F. Supp. 3d 1041, 1050 (N.D. Cal. 2018) (safe harbor inapplicable to representations about existing "'large deferred service' and 'healthy product backlog'"). Defendants' statements are also nothing like the "unadorned" statements in *Wochos*, which merely represented that the company was "on track" to meet production goals. *See* 985 F.3d at 1192; *cf. QuantumScape*, 2022 U.S. Dist. LEXIS 7782, at *44 ("statements about current sales and performance are not protected even when coupled with future

statements."); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1019-20 (N.D. Cal. 2020).[25]

Even if some of Defendants' statements were purely forward-looking, they remain actionable because they consciously omitted material facts necessary to render them not misleading. *See In re Celera Corp. Secs. Litig.*, 2013 U.S. Dist. LEXIS 125621, at *5-6 (N.D. Cal. 2013). Defendants repeatedly emphasized, for instance, that their financial forecasts were backed by existing "signed and awarded" contracts and touted the Company's pipeline while failing to disclose facts undermining those sunny projections – namely, that the contracts were "***at most only indications of interest*** in products still under development with no demonstrated success" and the Company was facing "plunging product sales" and "significant loss of market share to competitors," such as Hesai and Argo AI. ¶¶126, 144-45, 154-59; *see* ¶389 (Berenberg: "Since our launch ***we have spoken to over a dozen customers***, many of whom are planning to switch to Hesai for better performance at a lower cost.").

Defendants' projections were also not accompanied by "meaningful" cautionary language. *See Mulderrig*, 492 F. Supp. 3d at 1022; *Quality Sys.*, 865 F.3d at 1146-47. Defendants' oral statements on July 2, 2020 and September 1, 2020, for instance (¶¶206-208, 212, 265-66), were not identified as forward-looking or "accompanied by . . . an ***oral statement*** that additional information concerning factors that could cause actual results materially to differ [from those in the forward-looking statement] is contained in a readily available written document." *See In re Apple Comput., Inc.*, 2003 U.S. Dist. LEXIS 28303, at *6-7 (N.D. Cal. 2003). While Defendants claim that they "directed listeners to . . . written investor presentations [,]" no such statements were made during either the Company's July 2, 2020 earnings call or September 1, 2020 public webinar. *See* Mot. at 19; *see also* ECF 103-17, 103-18. Indeed, Defendant Graf ***skipped*** that disclosure slide during the July 2, 2020 investor call. *See* ECF 103-17 at 1 ("Graf: You can move- move forward to page five, please."); *see also* ECF 103-18 at 6-7/22. At no time during these presentations did Defendants orally direct investors to cautionary language in written materials, nor inform them that the signed and awarded contracts were for

---

[25]     The statements in *Police Ret. Sys.* were "assumptions" untethered to any statements about the company's then-existing contracts. 759 F.3d at 1058 *cf. Rodriguez*, 325 F. Supp. 3d at 1050-51.

undeveloped products that needed significant engineering and software development.[26] *See, generally,* ECF 103-17, 103-18. Instead, Hamer assured investors that their "visibility and confidence in these numbers" would only increase as "contracts . . . moved to signed and awarded[.]" ¶¶208, 211.

The Complaint further alleges corroborating details including, *inter alia*, that: (i) Defendants later admitted product demand was down, though they misleadingly attributed it to COVID-19 and continued touting their purportedly "robust" pipeline (¶¶336, 377-78); (ii) customers were rejecting the Company's Velarray sensors (¶¶157-59, 435-36); (iii) Velodyne's product revenues declined 35% between March 2020 and March 2021 (¶¶127, 189, 435); (iv) the weighted average price for Velodyne products plummeted by one third during the year, impacting their ability to meet guidance (*see* ¶¶132, 152); (v) analysts' channel checks and conversations with customers confirmed that Defendants were losing customers and sales, including contracts with Ford and Hyundai, and declining sales to Baidu—some of Velodyne's largest investors and/or customers (¶¶164-66, 388-90, 435-36); and (vi) Defendants later admitted that they lost multiple customer contracts to its competitors during the Class Period (¶¶151-52, 387).[27]

### 3.    Defendants' Ford Statements Are Actionable

Throughout the Class Period, Defendants also repeatedly trumpeted Ford's continued investment in the Company to lend credibility to the Reverse Merger. *See* ¶¶199, 206-07, 259, 280, 302, 313; *see also* ¶¶168-69, 326. Defendants did so even as they had contemporaneously entered into a "Letter Agreement" with Ford in July 2020, within weeks of announcing the Merger, which enabled Ford to sell its entire stake in Velodyne once the Reverse Merger closed. ¶¶35, 170, 174, 176-78. Just the month before Ford negotiated its agreement with Velodyne, Ford split an ownership stake and

---

[26]    Defendants did not direct investors to their written statements regarding "firm orders[.]" *See* ECF 103-17, 103-18. Nor did they warn investors that the contracts were for undeveloped products. *See* ¶¶144-45; *see also QuantumScape*, 2022 U.S. Dist. LEXIS 7782, at *47.

[27]    Unlike in *Sayce v. Forescout Techs., Inc.*, Plaintiffs' claims are supported by statements from Velodyne's own former CEO and Chairman of the Board of Directors as well as additional corroborating facts that demonstrate the information that Defendants withheld, which caused the Company's revenue miss. *See* 2021 U.S. Dist. LEXIS 57256, at *13-17 (N.D. Cal. 2021). For the same reasons, Defendants' reliance on *Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) is also inapt.

invested $600 million in a competing lidar company.[28] *See* ¶¶171-74. Though Ford and Hall had a longstanding business relationship predating the Merger, Defendants recklessly failed to consult with Hall regarding their representations about Ford's continued investment. *See* ¶¶37, 102. Instead, Defendants knowingly or deliberately disregarded that Ford would liquidate its position in the Company while continuing to publicly represent that Ford was "expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination." ¶¶259, 280, 302, 313. Defendants' public representations about Ford's intentions, calculated to lend credibility to the Reverse Merger, obligated them to "disclos[e] adverse information." *See Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705-06 (9th Cir. 2016). They consciously failed to do so.

Even after the Reverse Merger, when the Registration Statement permitting Ford to sell its entire stake became effective on November 4, 2020, Defendants continued representing that Ford would retain at least a 5% interest in the Company and that "Velodyne was partnered with leading companies like Ford." *See* ¶¶320, 327-329; n.6, *supra*; *see also Bruce v. Suntech Power Holdings Co.*, 64 F. Supp. 3d 1365, 1374 (N.D. Cal. 2014); *Cf.* ¶359 *with* ¶¶152, 387. Then, less than two months later on December 31, 2020, Ford unloaded its entire 7.6% stake in Velodyne. *See* ¶¶36, 132, 178-80. Notwithstanding this material change in Velodyne's relationship with Ford – one of the Company's biggest customers and investors – on January 7, 2021, Defendant Gopalan represented that "***there is no change in our fundamental outlook for the future***."[29] *See* ¶¶152, 378, 387-390; *Quality Sys.*, 865 F.3d at 1144 (statement actionable where it "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]."). Investors finally learned about Ford's sale from Ford on February 12, 2021—***43 days after*** it had already sold its Velodyne holdings,

---

[28]    These allegations, unlike those in *HP Inc.*, are inconsistent with and undermine Defendants' representations that Ford was expected to remain an investor after the business combination. *Compare* ¶¶171-74 *with* 2021 U.S. Dist. LEXIS 175694, at *14. Further, they stand in stark contrast to the statements in *City of Sunrise Firefighters Pens. Fund v. Oracle Corp.,* which warned investors that "growth was expected to slow." *See* 2019 U.S. Dist. LEXIS 216801, at *35-6 (N.D. Cal. 2019).

[29]    In the same statement, Velodyne touted that it "increased its signed and awarded contracts to 25[.]" *See* ¶377. Just over a month later, Defendants admitted that they lost multiple customers contracts, including Ford, ***during the fourth quarter of 2020***. *See* ¶¶152, 387-390; *see also Khoja*, 899 F.3d at 1009; *Apple Sec. Litig.*, 2020 U.S. Dist. LEXIS 206298, at *29.

causing the Company's share price to drop 8% in a single day. ¶¶36, 132, 178-80. During that same time period, Ford terminated a contract with Velodyne and Director Samardzich (Ford Europe's former COO) informed the Board that she would not stand for re-election. ¶¶105 n.23, 152, 178, 387-390; *see Reese v. Malone*, 747 F.3d 557, 574 (9th Cir. 2014) ("Temporal proximity of an allegedly fraudulent statement or omission and a later disclosure can be circumstantial evidence of scienter.").

Despite all of this, Defendants now claim that Ford's plan to divest itself of its investment and their knowledge of that material development is not inconsistent with their prior statements. Mot. at 25; *see also* n.6, *supra*. Defendants ignore, however, that this Circuit holds that statements "literally true on their face may nonetheless be misleading when considered in context." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 886 (9th Cir. 2008). Specifically, Defendants contend that their statements regarding Ford's investment in Velodyne were technically accurate because Ford did at various times maintain a greater than 5% interest in Velodyne. Mot. at 23. But Defendants ignore that they continued misrepresenting that "Ford is expected to hold greater than 5% of GRAF's outstanding common stock after the Business Combination" ***after*** the Reverse Merger when they knew that was false. "[D]efendants cannot use the mere 'incantation of fraud-by-hindsight' to 'defeat an allegation of misrepresentations and omissions that were misleading and false at the time they were made.'" *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1068 (C.D. Cal. 2012); *see* ¶¶12, 37.

After the market finally learned about Ford's divestment, Defendant Hamer unwittingly admitted during a February 25, 2021 earnings call, contrary to his prior statements, that "***they don't like to stick around*** as a financial investor. That's not their nature. They'd rather reallocate that capital to other investment[s]." *See* ¶¶36, 182; *see also Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007) ("[A] 'later statement may suggest that a defendant had contemporaneous knowledge of the falsity of his statement, if the later statement directly contradicts or is inconsistent with the earlier statement.'"). A Ford spokesperson later confirmed, again contrary to Defendants' repeated Class Period representations that Ford would remain an investor, that Ford's "long term capital investment strategy" was to sell its Velodyne shares. ¶180.

### 4.    Defendants' Internal Controls Statements Are Actionable

Lastly, the Complaint alleges that Defendants repeatedly misrepresented that Velodyne's internal controls were designed to provide "reasonable assurance" that, *inter alia*, transactions were "executed in accordance with management's general or specific authorizations" and "recorded as necessary to permit preparation of financial statements in conformity with GAAP[.]" ¶¶224, 242, 277, 298. Defendants Gopalan and Hamer made such statements despite knowing or recklessly disregarding the internal control deficiencies and failing to remedy or disclose a material weakness until almost a year after the problem was first identified. *See* ¶185. And though the Company was clearly ***not*** reviewing revenue and deferred revenue schedules during 4Q2020, on November 5, 2020, Defendant Gopalan touted that Velodyne's internal controls were a "disciplined approach to gathering the data . . . that that piece of it is almost muscle memory [. . .] those processes ***are working*** . . . ."[30] ¶¶184-85, 366, 377; *see Alta Mesa*, 2021 U.S. Dist. LEXIS 71757, at *36-38 (10b-5 claim sustained when less than one year elapsed between de-SPAC merger and massive write-down, coupled with disclosure of material weaknesses in internal controls). Gopalan and Hamer's sworn November 9, 2020 SOX certifications in this context further support a finding of falsity and scienter here.[31]

### B.    Additional Indicia of Scienter

***Motive and Scheme***: Motive or substantial personal financial gain can "weigh heavily in favor of a scienter inference." *Tellabs, Inc.*, 551 U.S. at 325. Here, the Complaint pleads facts clearly establishing Defendants' motive and their financial incentives to complete the Reverse Merger. "[C]ontext matters to Plaintiffs' narrative and is critical to understanding the alleged fraud. Plaintiffs emphasize that [consummating the de-SPAC] was a matter of great importance to the Company, closely monitored by its shareholders." *FirstEnergy*, 2022 U.S. Dist. LEXIS 39308, at *18. Failing to

---

[30]    In *Welgus v. TriNet Grp., Inc.*, plaintiffs did not challenge any statements related to defendants' controls. 2017 U.S. Dist. LEXIS 207777, at *24-25 (N.D. Cal. 2017). Further, because Plaintiffs allege that Defendants' weaknesses in control over financial reporting are directly connected to their materially false and misleading statements, their reliance on *Veal*, 423 F. Supp. 3d at 807 and *Rok v. Identiv, Inc.*, 2017 U.S. Dist. LEXIS 1019, at *19 (N.D. Cal. 2017) is misplaced.

[31]    *See, e.g.,* C*ommc'ns Workers of Am. Plan for Emps. Pensions & Death Bens. v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1124 (D. Ariz. 2007); ¶¶373-375.

do so within the required time period meant Graf and Dee's founder's shares would expire worthless, and they would not benefit from any liquidating distribution. ¶¶85-87, 92. By contrast, successfully completing the Reverse Merger with Velodyne meant that Graf and Dee would reap, along with their fellow founders, a 20% interest in the combined Company, then valued pre-Reverse Merger at $72 million. *See* ¶¶92-94, 100. Further, GIC was in a desperate financial state because its original investors had *already* redeemed approximately 53% of its trust account after the initial April 2020 deadline to complete the PureCycle acquisition expired. ¶¶99-101, 99 n.20, 100 n.21. Defendant Graf and Dee's desire to avoid an impending liquidation—particularly following a redemption by its shareholders after the PureCycle debacle—provides sufficient motive to raise a strong inference of scienter. *See In re Stillwater Capital Partners Inc.*, 858 F. Supp. 2d 277, 288 (S.D.N.Y. 2012); *cf. Am. W.*, 320 F.3d at 944 (stock sales not needed for scienter).

Defendants' authorities are distinguishable as *none* involve an IPO like the Reverse Merger. *See Hunt v. Bloom Energy Corp.*, 2021 U.S. Dist. LEXIS 187321, at *56-57 (N.D. Cal. 2021); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 884-85 (9th Cir. 2012); *Police Ret. Sys.*, 759 F.3d at 1062. Specifically, successfully luring investors to approve and invest in the Reverse Merger guaranteed that Defendants Graf and Dee would receive a substantial ownership position at Velodyne at an extreme discount but *only* if the Reverse Merger was timely completed. ¶¶85-7, 92-5, 100. Otherwise, their founders' shares would be rendered worthless. *Id.*; *Stillwater*, 858 F. Supp. 2d at 288. Defendants Gopalan and Culkin also benefitted by receiving substantial payouts, executive compensation and incentive awards by becoming officers and directors of public Velodyne. *See* ¶¶49, 64, 403; *see also Am. W.*, 320 F.3d at 944-45. Indeed, Gopalan's total compensation package rose over *nine* times from $2.898 million in 2019 to $26.135 million in 2020. *See* ¶¶49, 403; *see also* ¶¶52, 404-09. Defendant Culkin beneficially owned 13,559,196 shares of the Company's common stock after the Reverse Merger valued at approximately ***$335,590,101***. ¶64.

Defendants Graf and Dee's misconduct to oust Hall also supports Plaintiffs' scheme liability claim. *See* ¶¶22, 124-28, 130, 477-484. Defendant Dee also sat on the Company's Audit Committee, which "worked with outside counsel on the plan to remove [Hall]" starting at least as early as

November 2020 given that external counsel was retained on December 9, 2020. *See Nieman*, 2013 U.S. Dist. LEXIS 110693, at *26; *see* ¶¶61, 118; *In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *62-63 (C.D. Cal. 2015) (sustaining similar scheme allegations). In addition, and notably, Defendants' pretextual investigation of Hall began soon after he refused to publicly affirm Defendants' "wildly overstated financial guidance." *See* ¶¶61, 118, 146.

***Resignations*:** Each of the ***ten*** total departures, resignations, and instances of reshuffling alleged here were accompanied by suspicious circumstances and timing which, under *Tellabs*' holistic approach, also raise an inference of scienter. *See WageWorks*, 2020 U.S. Dist. LEXIS 97180, at *18; *Shenwick*, 282 F. Supp. 3d at 1148; *see also* ¶429.[32] On January 18, 2021, Director Samardzich—who previously served as Ford Europe's former COO and joined the Velodyne Board after Ford invested in 2016—notified the Board that she would not stand for re-election. ¶¶105, n.23, 178. By this time, Ford had already quietly sold off its entire stake in Velodyne and terminated its contract with the Company. *See id.* On February 18, 2021, Defendant Graf unexpectedly resigned from the Board—just four days before Velodyne announced that it had terminated Hall as Chairman. ¶¶56, 118, 386. According to Hall, Defendant Graf's resignation was a calculated entrenchment move to enable Christopher Thomas to step into Graf's former position to avoid a contested re-election against Hall's own nominee. *See* ¶125 (asserting that Velodyne's Board "manipulate[d] the Company's corporate machinery" and "that Velodyne Lidar's corporate governance is broken[.]"); ¶¶125, 128; *see also Shenwick*, 282 F. Supp. 3d at 1148 ("[R]esignations or terminations constitute evidence of scienter" where "they are 'accompanied by additional evidence of [D]efendant[s'] wrongdoing[.]'").

Then, on March 17, 2021, Velodyne announced it had "determined to transition" its COO Thomas Tewell on March 11, 2021. ¶¶186-87. Tewell's "transition" was brief because, on March 14,

---

[32]    Here, unlike *Zucco Partners, L.L.C. v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009), the resignations, terminations, and instances of corporate reshuffling were numerous, occurred within an 8-month period, and were accompanied by suspicious circumstances, including allegations from Hall that Defendants knowingly misled investors. *See e.g.*, ¶429. These departures were also accompanied by, *inter alia*: (i) deficient internal controls; and (ii) misstatements of fourth quarter revenue and deferred revenue. *See* ¶¶186-87; *see also In re Adaptive Broadband Sec. Litig.*, 2002 U.S. Dist. LEXIS 5887, at *42-43 (N.D. Cal. 2002).

2021, he resigned effective immediately. *Id*. Notably, Tewell's resignation and transition were announced the same day Defendants admitted material weaknesses in their internal controls. *See id.; see also Luna v. Marvell Tech. Grp.*, 2017 U.S. Dist. LEXIS 75262, at *15 (N.D. Cal. 2017). Next, to avoid any potential repercussions if their efforts to limit Hall's control failed, Defendant Gopalan secured an exit strategy with a lucrative payout while negotiating his employment agreement in January 2021. *See* ¶¶13, 404-09.[33]

## V.    CONCLUSION

For the foregoing reasons, Defendants' motion should be denied in its entirety. Should the Court grant, in whole or in part, the motion to dismiss, Plaintiffs request leave to amend. *See Eminence Capital, L.L.C. v. Aspeon, Inc.*, 316 F.3d 1048, 1052-53 (9th Cir. 2003).[34]

Dated: March 25, 2022

Respectfully submitted,

**KAHN SWICK & FOTI, LLP**

By:     s/ *Ramzi Abadou*
Ramzi Abadou (SBN 222567)
KAHN SWICK & FOTI, LLP
580 California Street, Suite 1200
San Francisco, California 94104
Telephone: (415) 459-6900
Facsimile: (504) 455-1498
ramzi.abadou@ksfcounsel.com

-and-

---

[33]    *Sakkal v. Anaplan Inc.*, which merely involved allegations of sales turnover, is not relevant here. *Compare* ¶¶56, 98, 128, 130, 178, 186-87, 191-95, 386, 402-409 *with* 2021 U.S. Dist. LEXIS 165128, at *22-23 (N.D. Cal. 2021).

[34]    Control person liability against each Individual Defendant is adequately pled. *See Loritz v. Exide Techs.*, 2014 U.S. Dist. LEXIS 111491, at *42 (C.D. Cal. 2014) ("control person liability claims can generally only be dismissed at the pleading stage 'if a plaintiff fails to adequately plead a primary violation'"). Defendants concede that Graf served as GIC's CEO and Dee served as its President/CFO through the Merger's closing on September 29, 2020, and also do not dispute they acted as "control persons" at least through that date. *See* Mot. at 30; *see also* ¶¶56, 61. Defendants' contention that Plaintiffs "plead no facts showing their control after that time" (*see* Mot. at 30) is inapt because Graf and Dee both served as Velodyne directors while signing or having ultimate authority over numerous documents filed with the SEC, both before ***and after*** the Merger was completed. *See* ¶¶56-62; *In re CV Therapeutics, Inc. Sec. Litig.*, 2004 U.S. Dist. LEXIS 17419, at *36 (N.D. Cal. 2004) (control an "intensely factual question" that can and should rarely be decided at the motion to dismiss stage).

Lewis S. Kahn
(to be admitted *pro hac vice*)
Alexander L. Burns
(admitted *pro hac vice*)
Alayne K. Gobeille
(admitted *pro hac vice*)
Morgan M. Embleton
(admitted *pro hac vice*)
KAHN SWICK & FOTI, LLC
1100 Poydras Street, Suite 3200
New Orleans, Louisiana 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
lewis.kahn@ksfcounsel.com
alexander.burns@ksfcounsel.com
alayne.gobeille@ksfcounsel.com
morgan.embleton@ksfcounsel.com

*Lead Counsel and Counsel for*
*Lead Plaintiffs, Diane Smith & William P. Smith*

### CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses registered, as denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper *via* the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

*s/ Ramzi Abadou*
RAMZI ABADOU

OPP. TO MTN. TO DISMISS AMEND. COMPL.        31        CASE NO. 3:21-CV-01486-SI

## Mailing Information for a Case 3:21-cv-01486-SI Moradpour v. Velodyne Lidar, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,Ashley.Errington@ksfcounsel.com

- **Adam Marc Apton**
  aapton@zlk.com,Files@zlk.com

- **William Zachary Brenc**
  william.brenc@wilmerhale.com,william-brenc-3258@ecf.pacerpro.com,barbara.palomo@wilmerhale.com,whdocketing@wilmerhale.com

- **Alexander Louis Burns**
  alexander.burns@ksfcounsel.com

- **Rachele R. Byrd**
  byrd@whafh.com,fileclerk@whafh.com

- **Morgan Michelle Embleton**
  Morgan.Embleton@ksfcounsel.com

- **Alayne K Gobeille**
  alayne.gobeille@ksfcounsel.com

- **Charles Henry Linehan**
  clinehan@glancylaw.com,charles-linehan-8383@ecf.pacerpro.com

- **Sarah E. Maciel**
  Sarah.Maciel@wilmerhale.com

- **Kevin Peter Muck**
  Kevin.Muck@wilmerhale.com,whdocketing@wilmerhale.com,joann.ambrosini@wilmerhale.com,lindy.patrick@wilmerhale.com

- **Susan Samuels Muck**
  susan.muck@wilmerhale.com,whdocketing@wilmerhale.com,susan-muck-3159@ecf.pacerpro.com

- **Jennifer Pafiti**
  jpafiti@pomlaw.com,ahood@pomlaw.com,disaacson@pomlaw.com,ashmatkova@pomlaw.com,jalieberman@pomlaw.com,lobas@pomlaw.com,abarbosa@pomlaw.com

- **Ivan Panchenko**
  ivan.panchenko@wilmerhale.com

- **Pavithra Rajesh**
  prajesh@glancylaw.com,pavithra-rajesh-9402@ecf.pacerpro.com

- **Laurence Matthew Rosen**
  lrosen@rosenlegal.com,larry.rosen@earthlink.net,lrosen@ecf.courtdrive.com

- **Brian Jared Schall**
  brian@schallfirm.com

### Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)