# EXHIBIT 1

ELECTRONICALLY FILED
Superior Court of California,
County of Alameda
01/18/2022 at 02:34:51 PM
By: Anthony Zapotoczny, Deputy Clerk

Peter Vestal (SBN 159440)
John Kelley (SBN 194073)
NIESAR & VESTAL LLP
90 New Montgomery St. 9th Floor
San Francisco, CA 94105
Telephone: (415) 882-5300
Facsimile: (415) 882-5400

Douglas N. Akay (SBN 131011)
Elsa Berry (SBN 262868)
Timothy M. Lupinek (SBN 334876)
AKAY LAW
90 New Montgomery St. 9th Floor
San Francisco, CA 94105
Telephone: (415) 764-1999
Facsimile: (415) 764-1994

Attorneys for Plaintiffs DAVID HALL and MARTA HALL

SUPERIOR COURT OF CALIFORNIA

COUNTY OF ALAMEDA, UNLIMITED JURISDICTION

| | |
|---|---|
| DAVID HALL, an individual California resident, and MARTA HALL, an individual California resident,<br><br>Plaintiffs,<br><br>vs.<br><br>JEFFREY VETTER; KEITH ABELL; MICHAEL DEE; ANAND GOPALAN; JAMES GRAF; ANDREW HAMER; JULIE LEVENSON; SABRINA MCKEE; KEVIN STARKE; MICHAEL VELLA; and DOES 1 through 30, inclusive,<br><br>Defendants. | Case No. 22CV005713<br><br>COMPLAINT FOR: (1) CONSPIRACY TO DEFRAUD; (2) BREACH OF FIDUCIARY DUTY; (3) AIDING AND ABETTING BREACH OF FIDUCIARY DUTY; (4) INTENTIONAL MISREPRESENTATION; (5) NEGLIGENT MISREPRESENTATION; AND (6) SECURITIES FRAUD |

In this action, Plaintiffs David Hall ("Mr. Hall") and Marta Hall ("Ms. Hall") (collectively, the "Halls") seek to recover damages for financial and other injuries they sustained in their individual capacities as controlling stockholders of Velodyne Lidar, Inc. ("Velodyne"), a Delaware corporation. The Halls allege the following:

1

Complaint

**PARTIES**

1.    Mr. Hall is an individual California resident who founded Velodyne and, along with his wife Marta, was its majority stockholder. In September 2020, Velodyne was merged with and into Graf Industrial Corporation ("GIC") (the "Merger"), with the resulting corporation renamed Velodyne Lidar, Inc. ("VLDR"). Mr. Hall served as a member of Velodyne's—and subsequently VLDR's—board of directors from Velodyne's formation in December 2015 until March 2021. He was each entity's executive chairman—its most senior executive officer—from January 2020 through January 2021.

2.    Ms. Hall is an individual California resident who served as a Velodyne director from January 2020 through the Merger and now serves as a VLDR director. She served as Velodyne's chief marketing officer ("CMO") from January 2020 through the Merger and continued as VLDR's CMO until February 2021.

3.    Defendant Michael Dee ("Mr. Dee") has served as chairman of VLDR's board of directors since July 2021. He became a member of VLDR's board in September 2020 upon the Merger. From August 2018 until the Merger, he served as a director, president, and chief financial officer ("CFO") of GIC.

4.    Defendant Anand Gopalan ("Mr. Gopalan") is an individual California resident who served as Velodyne's Vice President of ASICs from June 2016 until being named the company's chief technology officer ("CTO") in 2017. He became Velodyne's chief executive officer ("CEO") in January 2020, served in that role through the Merger, and continued as VLDR's CEO until July 2021. Between January 2020 and January 2021, he reported to Mr. Hall, Velodyne's—and subsequently VLDR's—executive chairman.

5.    Defendant Andrew Hamer ("Mr. Hamer") is an individual California resident who served as Velodyne's interim CFO beginning in April 2019, became its permanent CFO in July 2019, continued in that role through the Merger, and now serves as VLDR's CFO. Between January 2020 and January 2021, he reported to Mr. Hall, Velodyne's—and subsequently VLDR's—executive chairman.

6. Defendant James Graf ("Mr. Graf") served as a member of VLDR's board of directors from the September 2020 Merger through February 2021. Prior to serving on VLDR's board, he served as CEO and a director of GIC, a special purpose acquisition company ("SPAC") formed in June 2018 and based in Houston, Texas.

7. Defendant Michael Vella ("Mr. Vella") is an individual California resident who became Velodyne's general counsel in March 2020, served in that role through the Merger, and subsequently served as VLDR's general counsel until September 2021. He currently serves as a consultant to VLDR.

8. Defendant Jeffrey Vetter ("Mr. Vetter") is an individual California resident and a partner in the law firm of Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP ("Gunderson"). Gunderson served as principal outside counsel from Velodyne's December 2015 formation through the Merger and continues to serve as VLDR's principal outside counsel. In 2020, a few months prior to the Merger, Mr. Vetter replaced Trevor Knapp ("Mr. Knapp") as Velodyne's principal outside counsel.

9. Defendants Keith Abell ("Mr. Abell"), Julie Levenson ("Ms. Levenson"), Sabrina McKee ("Ms. McKee") and Kevin Starke ("Mr. Starke") served as members of GIC's board of directors at the time of the Merger.

10. Plaintiffs are unaware of the true names and capacities, whether individual, corporate, associate or otherwise, of Defendants Does 1 through 30, inclusive, whom Plaintiffs therefore sue by such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to show their true names and capacities when the same have been ascertained.

11. Plaintiffs are informed and believe and thereon allege that, at all times mentioned herein, Mr. Vetter, Mr. Abell, Mr. Dee, Mr. Gopalan, Mr. Graf, Mr. Hamer, Ms. Levenson, Ms. McKee, Mr. Starke, Mr. Vella, and Does 1 through 30 were the agents and/or employees of each other and, in doing the things hereinafter alleged, were acting within the scope of such agency and/or employment.

///

3
Complaint

## VENUE

12.    Venue is proper in this Court because Plaintiffs suffered the tort injuries alleged herein in Alameda County.

## STATEMENT OF FACTS

### Origins of VLDR and Its Merger with GIC

13.    Velodyne was the pioneer developer of lidar technology, a remote sensing method largely developed by Mr. Hall that uses light in the form of lasers to measure distances by illuminating the target with laser light and measuring the time of reflection the light takes to return to the sensor. Velodyne—and subsequently VLDR—has remained a market leader particularly by making its technology widely available and affordable for both corporate and consumer markets. Mr. Hall's 2005 work on lidar innovation revolutionized the capacity for advanced motor vehicle driver assistance systems and created technological enhancements in various industries and products including, among others, mapping, robotics, and security appliances.

14.    Velodyne incorporated upon spinning off from its predecessor, Velodyne Acoustics, Inc. ("Velodyne Acoustics"), in December 2015, when Velodyne Acoustics assigned all of its assets and operations in lidar technology to Velodyne.

15.    GIC was formed in 2018 for the sole purpose of raising capital through an initial public offering to acquire an existing private company through a merger with that entity, essentially effecting an initial public offering ("IPO") of the private company. GIC's prospectus filed on October 16, 2018 (the "October 2018 Prospectus"), states that GIC is a "blank check company." GIC's sole purpose was to complete a merger, share exchange, asset acquisition, share purchase, reorganization or similar business combination with one or more businesses within the permissible time frame—originally set at 18 months following its IPO. The initial investment into GIC was made through a private placement, resulting in "founders' shares" (defined in the October 2018 Prospectus as "shares of our common stock initially purchased by our sponsor in a private placement prior to this offering") being issued to Messrs. Graf and Dee,

4

Complaint

among others, in exchange for a relatively minor investment of $25,000.00.

16.    In October 2018, GIC completed its IPO, selling 24.4MM ownership units (including a partial over-allotment) to investors for gross proceeds of $244MM. Each unit consisted of one share of common stock and one redeemable warrant. The IPO was sponsored by Graf Acquisition, a strategic advisory firm owned and controlled by, among others, Messrs. Graf and Dee. While GIC did not identify any target companies at the time of the IPO, its IPO offering materials stated that GIC planned to pursue an acquisition focused in the diversified industrials sector. GIC's IPO offering materials claimed that GIC would "bring a unique rigor to the process of identifying and consummating an initial business combination that will be well-received in the public markets, and to create value over time for our stockholders following an initial business combination."

17.    Pursuant to its IPO prospectus, GIC was required to acquire a target business with an aggregate fair market value of at least 80% of the net assets held in trust from the IPO proceeds, and to do so within 18 months of the October 2018 IPO. Accordingly, GIC had a deadline to complete its intended acquisition by April 18, 2020. In the event GIC failed to complete an initial business combination, it would be obligated to redeem 100% of its outstanding public shares equal to the aggregate trust proceeds plus interest. The founders' shares would not be eligible to participate in any liquidating distribution. Moreover, stockholders could redeem their shares at the time of the initial business combination if they did not want to retain a continuing interest in the business after the transaction. If enough stockholders redeemed their shares, a deal would not be economically feasible, and the GIC founders would be left with worthless stock.

18.    Messrs. Graf and Dee in particular stood to lose substantial sums if GIC failed to acquire a suitable target within the allotted time frame. Investing in a SPAC IPO amounts to a bet on the sponsors, their reputation and whether a successful deal will happen within two years. Rather than researching a company's financials, as one should when investing in an individual stock, a potential investor must instead research who is behind the SPAC and what industry they

5

Complaint

may be targeting for an acquisition.

19.    Accordingly, at all pertinent times, Messrs. Graf and Dee would have been acutely aware that they either had to merge with a suitable target company before the deadline elapsed or refund over $200MM to GIC's investors.

20.    If GIC successfully completed an initial business combination within the allotted time frame, Messrs. Graf and Dee and various GIC insiders would be richly rewarded. Specifically, the GIC founders' shares issued to Graf Acquisition in connection with the IPO constituted approximately 20% of GIC's outstanding common shares after the IPO, which Graf Acquisition held for the benefit of Messrs. Graf and Dee.

21.    On April 8, 2020, with its deadline to complete an initial business combination fast approaching, GIC announced in a Form 8-K that it was in negotiations to acquire a then unnamed polypropylene recycling company. Subsequently, on April 23, 2020, GIC filed another Form 8-K stating in pertinent part, "[i]n response to media and investor inquiries, [GIC] confirms that the name of the Target referred to in the press release is PureCycle Technologies, LLC." Ultimately, the GIC/PureCycle combination failed to materialize. PureCycle later went public through a merger with a different SPAC, Roth CH Acquisition.[1]

22.    On April 16, 2020, GIC's stockholders extended its acquisition deadline from April 18, 2020, to July 31, 2020.

23.    Following this extension, Messrs. Graf and Dee were determined to effectuate any strategic alternative. In May 2020, the Velodyne investment opportunity surfaced. According to the proxy statement filed with the SEC on September 14, 2020, it was not until May 9, 2020, that GIC first heard of the potential acquisition target that it later learned to be Velodyne.

24.    In July 2020, GIC began taking steps to take Velodyne public by completing the Merger. GIC issued a press release filed with the SEC on Form 8-K on July 2, 2020, announcing that GIC had entered into a merger agreement (the "Merger Agreement") with Velodyne to be

---

[1] Mr. Dee and other individuals connected with PureCycle Technologies are named as defendants in a pending class action lawsuit for securities fraud filed earlier this year in the United States District Court for the Middle District of Florida, as well as a derivative action based upon the same alleged securities fraud.

Complaint

funded by cash and new stock issuances valuing the combined company at $1.8 billion. As a result of dilution, GIC's existing stockholders would own only an estimated 6.5% of the combined post-merger company. The Merger Agreement also included a provision requiring Velodyne to pay GIC a $58,867,000 termination fee if Velodyne terminated the Merger.

25.    To the same end, Messrs. Graf and Dee entered into an agreement (the "Support Agreement") with Mr. Hall that purportedly prevented him from disrupting the Merger by restricting his ability to vote against it. As noted in GIC's July 6, 2020 Form-8K (signed by Mr. Graf), the Support Agreement provides that "at any meeting of the Velodyne stockholders and in connection with any written consent of the Velodyne stockholders, Mr. Hall will vote all of the outstanding shares of Velodyne common stock held by Mr. Hall or with respect to which Mr. Hall has the right to vote by proxy (or will execute and deliver a written consent with respect to such shares) in favor of the Merger and the adoption of the Merger Agreement, regardless of whether the Merger is no longer recommended by the Velodyne board of directors in accordance with the Merger Agreement."  No one explained the terms of the Support Agreement to Mr. Hall, who has no recollection of executing it.

26.    GIC's July 2, 2020 press release described Velodyne as a "pioneer" in the lidar field and highlighted the continued leadership of its "founder and industry icon," Mr. Hall, as well as the large equity stake that would purportedly continue to be held by Ford Motor Company ("Ford") following the Merger. The release represented that Velodyne was experiencing tremendous growth and on track to achieve $100MM in revenues in 2020 and $680MM in revenues by 2024. Neither of the Halls was informed of this press release, nor were they consulted regarding reasonable expectations for Velodyne's revenues for 2021 and beyond.

27.    On July 23, 2020, GIC's stockholders once again extended its acquisition deadline—from July 31, 2020, to October 31, 2020—in order to provide sufficient time to consummate the Merger. SEC rules pertaining to SPAC companies prohibited GIC from seeking or obtaining any further extensions of the business combination deadline. On August 31, 2020, GIC issued a release reaffirming Velodyne's revenue trajectory, stating it would achieve

7
Complaint

$101MM in revenues in 2020 and that its long-term contracted revenues had increased by 8% since the deal was first announced. Again, neither of the Halls was consulted regarding, or even informed of, these revenue projections.

28.    On September 14, 2020, GIC issued the final definitive proxy statement for the Merger, which urged stockholders to vote in favor of the deal and contained numerous materially false and misleading statements and omissions (the "Proxy Statement"). Specifically, the misleading Proxy Statement misrepresented Velodyne's business, financials and prospects, claiming, *inter alia*, that: (i) Mr. Hall would maintain leadership of VLDR, which was critical to VLDR's success; (ii) Ford would maintain a significant equity stake in VLDR; (iii) VLDR was on "a path to delivering positive cash flow in 2022 and over $100MM in expected cash flow in 2024."

29.    Relying on the misleading Proxy Statement and other misrepresentations as described below, Velodyne's stockholders, including the Halls, voted to approve the Merger at a special stockholders meeting on September 29, 2020. Following consummation of the Merger, GIC became publicly traded VLDR.

**Misrepresentations Regarding Mr. Hall's Continuing Involvement**

30.    This action involves a covert, manipulative scheme—led by Messrs. Graf and Dee—to oust Mr. Hall from any influence over VLDR's management or the company's technological advancement post-Merger.

31.    Beginning in July 2020, Messrs. Graf and Dee repeatedly highlighted Mr. Hall's continued leadership role at Velodyne as a—if not the—primary reason to support the Merger, representing, *inter alia*, that: (i) Mr. Hall would continue to play a critical role as VLDR's executive chairman; and (ii) Mr. Hall remained deeply involved in all aspects of VLDR's business. While Messrs. Graf and Dee had already begun to marginalize Mr. Hall internally, GIC's—and later VLDR's—SEC filings repeatedly recognized Mr. Hall's fundamental importance to VLDR's operations and reputation, while assuring investors that he would continue to lead VLDR after the business combination. At the same time, however, Messrs. Graf

8

Complaint

and Dee concealed their active participation in a scheme to remove Mr. Hall from VLDR's management and technological advancement.

32.     In a February 22, 2021 Form 8-K, VLDR unexpectedly disclosed that Mr. Hall had been terminated as VLDR's chairman and Ms. Hall had been terminated as a VLDR employee, based on the fact that a previously undisclosed outside investigation by the law firm of Keker Van Nest & Peters LLP ("Keker"), commenced in December 2020, had concluded that the Halls had purportedly "failed to operate with respect, honesty, integrity, and candor in their dealings with [VLDR's] officer and directors." Keker personnel did not interview either of the Halls in the course of their investigation. To this day, VLDR's management has never provided the Halls with any details regarding the Keker investigation's findings. In response to these damaging developments, the price of VLDR stock and warrants fell 15% and 20%, respectively, in a single day, on unusually heavy trading volume.

33.     To protect his reputation and in an attempt to correct the publicly available information about VLDR, Mr. Hall has publicly stated that Messrs. Gopalan and Hamer and various members of VLDR's board, including Messrs. Graf and Dee, misled stockholders with their statements about his continued leadership role at VLDR.

34.     For example, although VLDR's audit committee had already commenced an internal investigation into Mr. Hall by the time VLDR hired Keker on December 9, 2020, Messrs. Graf, Dee, Gopalan, and Hamer failed to disclose that investigation when they pre-announced VLDR's preliminary fourth quarter and full year 2020 financial results on January 7, 2021. Rather, VLDR falsely represented that "there is no change in [VLDR's] fundamental outlook for the future," despite the fact that virtually all of VLDR's previous SEC filings informed and warned investors that the loss of Mr. Hall would adversely affect VLDR's business. Messrs. Dee, Graf, Gopalan, and Hamer also knew at all relevant times that, as stated in VLDR's November 4, 2020 Prospectus filed with the SEC, "[n]egative public perception of, or negative news related to, Mr. Hall . . . may adversely affect [VLDR]'s brand, relationship with customers or standing in the industry." Those defendants therefore on the one hand misleadingly

Complaint

reassured investors that VLDR's "fundamental outlook" remained unchanged as of January 7, 2021, while knowing that Mr. Hall was already under investigation and had, as of January 7, 2021, "informed the Board of Directors of the Company that he has voluntarily transitioned from serving as an employee and executive officer of the Company to a non-executive role, effective immediately," as stated in VLDR's Prospectus Supplement No. 3, filed with the SEC on January 13, 2021.

<strong>Misrepresentations Inducing the Halls to Vote for the Merger</strong>

35.    At no time relevant to this action did the Halls employ personal legal counsel, nor did Mr. Vella, Mr. Vetter, or any other attorney recommend that the Halls retain such personal counsel. In light of their many years of working with Gunderson as the chief outside counsel to their company, neither of the Halls had any inkling that Mr. Vetter would ignore his obligation to keep them informed of all important developments that would influence their willingness to cause Velodyne to proceed with the SPAC Merger.

36.    During the third or fourth week of September 2020, Sheetal Patel ("Ms. Patel"), Velodyne's then Vice-President of Human Resources, received an invitation from Mr. Vella to join a meeting to discuss Velodyne's post-merger amended and restated certificate of incorporation, bylaws, policies and practices, about which Velodyne's attorneys were providing legal counsel. Mr. Vella, Ms. Patel, Mr. Hamer, GIC's legal counsel from White & Case LLP, and Mr. Vetter participated in this meeting.

37.    During the meeting, participants discussed Velodyne's post-merger amended and restated certificate of incorporation and bylaws. Mr. Vella had to send execution copies of those corporate documents to the Halls to sign after the meeting. Ms. Patel observed that some of the amended documents mentioned that Mr. Hall would not be required to sign off on specific matters such as compensation and audits. In particular, she saw a proposal that the VLDR board would appoint a sub-committee consisting of the CEO, the CFO, and the Chief People Officer ("CPO") for such approvals. Messrs. Vella and Hamer and Velodyne's attorneys were also discussing adopting a new executive compensation plan and changing the vesting schedule for

10
Complaint

stock grants to quarterly vesting. Ms. Patel was not invited to attend any compensation committee meetings—which were led by Messrs. Gopalan and Hamer—even though she was the Vice President of Human Resources. Previously, Messrs. Gopalan and Hamer and Ms. Patel's team had worked with an outside compensation consultant on anything related to compensation. In light of the many previous internal statements, public announcements, and SEC filings highlighting Mr. Hall's importance to Velodyne, Ms. Patel was very surprised to learn that Mr. Hall would be excluded from numerous important and fundamental management decisions after the Merger.

38.    Following the meeting, Ms. Patel spoke with Ms. Hall to alert her to inform Mr. Hall that language in the proposed amended and restated certificate of incorporation and bylaws would remove his control on a number of important corporate issues. Thereafter, while Ms. Hall was with Ms. Patel at VLDR's San Jose headquarters, Ms. Hall called Mr. Vetter to ask him about the proposed revised corporate documents and policies that were being prepared. Mr. Vetter assured her that the proposed revised documents were "standard" "boilerplate language" that contained no terms with which the Halls would disagree. Moreover, Mr. Vetter stated that, if any changes to the corporate documents were desired, the Halls could easily amend them at any time. He assured the Halls that they should not be concerned about signing the revised documents.

39.    Following her conversation with Mr. Vetter, and in Ms. Patel's presence, Ms. Hall also called Mr. Vella and posed the same questions to him. He, too, assured Ms. Hall that she and Mr. Hall should not be concerned about signing the proposed revised corporate documents, which contained "standard" "boilerplate language" and no terms with which the Halls would disagree. He too stated that, if any changes to the corporate documents were desired, the Halls could easily amend them at any time.

40.    During this same period, Mr. Hall asked Messrs. Vella, Gopalan, and Vetter whether he needed to carefully review the proposed revised corporate documents before executing them. All three assured Mr. Hall that he need not worry about the proposed revised

corporate documents because he could change them at any time, given his ownership of a substantial majority of Velodyne's shares. In reliance on these assurances by Messrs. Vetter, Vella, and Gopalan, Mr. Hall merely repeated his earlier request that the proposed VLDR corporate documents not contain terms substantially different from the existing Velodyne corporate documents.

**The Post-Merger Corporate Documents Were Structured to Deprive the Halls of Control Over VLDR**

41.     VLDR's post-merger corporate documents were structured to deprive the Halls—VLDR's majority shareholders—of control over the company's operations and technological development. For example, VLDR's Amended and Restated Bylaws (the "Bylaws"):

a. Establish an extensive, complex, and detailed process for stockholder nominations of persons to be corporate directors. See Bylaws Section 1.10(b). To be timely, a stockholder's notice nominating someone for election as a director at an annual meeting of stockholders must be received in writing by the Secretary at VLDR's headquarters not fewer than ninety (90) nor more than one hundred and twenty (120) days before the first anniversary of the preceding year's annual meeting. In addition, exhaustive information about the proposed director must be provided. Even if all of this information is timely submitted, the annual meeting chair has the power to determine whether the requests for such information have been satisfied; if the chair determines that they have not, the individual's name is not submitted in nomination.

b. Establish similar requirements to make a stockholder proposal for consideration at an annual meeting. See Bylaws Section 1.11(b).

c. Provide for the removal of directors only as expressly provided in the Amended and Restated Certificate of Incorporation (the "Certificate"), Article Fifth, F (i.e., only with the approval of holders of 66.67% in voting power). See Bylaws Section 2.8.

    d.  Provide that a vacancy on the board resulting from increase in number, death, disability, removal, resignation, disqualification or any other cause must be filled by vote of a majority of the directors then in office, rather than by stockholders. See Bylaws Section 2.9 and Certificate Article Fifth, E.

    e.  Provide for amendment of the Bylaws in the manner expressly provided in the Certificate, Article Twelfth (i.e., by a majority of the board or the holders of 66.67% in voting power). See Bylaws Article VI.

42.    The Certificate, like the Bylaws, was structured so as to effectively eliminate the Halls' control over VLDR. For example, the Certificate:

    a.  Limits stockholders' ability to nominate directors or introduce business at a stockholder meeting by requiring that "notice… shall be given in the manner provided by the Bylaws" (i.e., Sections 10.6(b) and 1.11(b) of the Bylaws). See Certificate Article Fifth, H.

    b.  Eliminates the right of stockholders to act by written consent, meaning they cannot act to remove unacceptable directors except at a special meeting of stockholders, which meeting they do not possess the power to call. See Certificate Article Ninth.

    c.  Provides for amendment of the Certificate by majority of voting power, except that 66.67% of the voting power is required to Amend Article Fifth, Seventh, Eighth, Ninth, Tenth, Twelfth, Thirteenth, Fourteenth, and Fifteenth (and that sentence of Article Eleventh). See Certificate Article Eleventh.

    d.  Provides that the Delaware Court of Chancery (or, if the Court of Chancery does not have jurisdiction, the U.S. District Court for the District of Delaware) shall be the exclusive forum for any derivative action or proceeding, any action for breach of a fiduciary duty owed by any director, officer or other VLDR employee to VLDR or its stockholders, any action arising pursuant to any provision of the Delaware General Corporation Law ("DGCL") or the

Certificate or the Bylaws, or any action asserting a claim governed by the internal affairs doctrine. See Certificate Article Thirteenth.

e.  Provides that the federal courts will have exclusive jurisdiction over any action arising out of the Securities Act of 1933, that any person or entity purchasing or otherwise acquiring or holding any interest in VLDR shares shall be deemed to have notice of and consented to the provisions of Article Thirteenth, and that any VLDR stockholder shall be deemed to have consented to the personal jurisdiction of the Delaware state and federal courts. See Certificate Article Thirteenth.

f.  Provides for a classified board of directors which, pursuant to Delaware General Corporation Law Section 141(k)(1), requires removal of directors to be "for cause" and eliminates the majority stockholders' ability to regain control of the board in one annual meeting. See Certificate Article Fifth, D.

43.  The foregoing provisions of the Bylaws and the Certificate operated to deprive the Halls of the control over VLDR that they had previously exercised over Velodyne. Even as VLDR's majority stockholders, they could not remove directors, participate in filling of vacancies on the VLDR board, amend the Bylaws, or amend numerous significant portions of the Certificate. Nor could they readily nominate potential directors or readily propose business for consideration at an annual meeting.

**The VLDR Board's Attempt to Bribe Mr. Hall**

44.  The Halls' post-merger stock was subject to a lockup agreement (the "Lockup"). In addition, because the Halls were VLDR directors, they were subject to trading volume restrictions. In a November 16, 2020 meeting, the VLDR board considered Mr. Hall's request that 10MM of his shares be released from the Lockup and that VLDR file a registration statement allowing him to sell those shares free of the volume limitations. Because other directors made similar requests, the matter was referred to a committee of three purportedly "disinterested" directors, Messrs. Graf and Dee and Chris Thomas ("Mr. Thomas").

14
Complaint

45.    Prior to this meeting, Mr. Hamer and other VLDR representatives had made statements to the public on several occasions, giving "guidance" for 2021 VLDR revenues of $152MM and touting executed contracts with customers amounting to around $800MM in VLDR sales between 2021 and 2024. The Halls had repeatedly and vehemently stated to the VLDR board that achieving $152MM in 2021 revenues was impossible, and that the alleged contracts were not executed contracts but at most indications of interest in products still under development and with no demonstrated success *in situ*. Specifically, the Halls explained to the VLDR board and relevant VLDR officers that that the "contracts" being included in VLDR's guidance were not binding customer obligations because the products to which the contracts related were not then developed and would require significant engineering (including software) development efforts, the successful and timely results of which could not be predicted with any degree of assurance. Nevertheless, the committee of purportedly disinterested directors adopted a resolution that VLDR's filing of a registration statement permitting Mr. Hall and other directors to sell shares free from volume limitation would be conditioned on the board's "agreement that VLDR's existing guidance of $152MM in revenues for 2021 and other aspects of guidance are still valid."   Because the Halls refused to endorse the wildly overstated financial guidance, the board denied Mr. Hall's request to be relieved from the Lockup. Schedule A to the November 16, 2020 board minutes, which Mr. Vetter signed, reflects that both he and Mr. Vella discussed this matter with the VLDR board at that meeting.

### Mr. Vetter's Breach of Fiduciary Duties

46.    As noted above, Gunderson was Velodyne's principal outside counsel from its December 2015 formation through the September 2020 Merger. Once Mr. Vetter replaced Mr. Knapp in 2020 as Velodyne's principal outside counsel, the Halls reasonably expected him to act honestly, forthrightly, and in the best interests of Velodyne's stockholders as its counsel in the period leading up to the Merger.

47.    As Velodyne's principal outside counsel, Mr. Vetter had a duty to report to Mr. Hall, the company's executive chairman, as well as a duty to keep all of Velodyne's board

15
Complaint

members informed of all material matters they would need to consider in discharging their duties to Velodyne and its stockholders. One fundamental such duty was the Velodyne directors' duty to approve or reject the SPAC Merger Agreement. During the period of Velodyne's discussions with GIC regarding a potential merger, Mr. Vetter's duty was to act in the best interests of *Velodyne and its stockholders*. In this proposed merger transaction, GIC was the other side of the negotiations; i.e., adverse to Velodyne's stockholders. Thus, any action by Mr. Vetter to advance the GIC directors' and stockholders' interests to the detriment of Velodyne's directors and stockholders—in terms of the Merger Agreement and VLDR's post-merger amended and restated Certificate and Bylaws—constituted a breach of Mr. Vetter's fiduciary duties.

48.     As described above, once Velodyne and GIC agreed upon the outline of a merger transaction, the parties had to get to work drafting the Merger Agreement and the restated Certificate and Bylaws. To that end, Mr. Vetter worked with Mr. Vella as well as GIC's attorneys at White and Case LLP. As a highly experienced attorney representing numerous public companies, Mr. Vetter knew how the provision of the restated Certificate and Bylaws would prevent Mr. Hall from having any ability to influence management after the Merger.

49.     The restated Certificate and Bylaws were designed to shift control of the post-merger entity to the GIC-appointed directors and to ensure that Mr. Hall would possess virtually no ability to block Messrs. Graf and Dee—and CEO Mr. Gopalan and CFO Mr. Hamer—from exercising full control over VLDR, its management and business direction. At no time did Mr. Vetter involve Velodyne's directors in discussions of the proposed amendments reflected in the Certificate and the Bylaws. Indeed, as noted above, when Ms. Hall—a director—questioned him about the proposed amendments, Mr. Vetter assured her that the documents were "standard language" "boilerplate" that contained nothing with which the Halls would disagree. He also assured Ms. Hall that, as VLDR's majority stockholders, the Halls could easily amend the Certificate and/or the Bylaws at any time after the Merger.

50.     Mr. Vetter's actions promoting the GIC directors and stockholders' interests to the detriment of Velodyne's directors and stockholders continued after completion of the

Merger. When, during an October 2020 VLDR board meeting via Zoom, Mr. Hall asked why Mr. Vetter had structured the Bylaws to exclude Mr. Hall from control over VLDR, Mr. Vetter responded that he had done so anticipating that Mr. Hall's interest would soon be diluted, such that he would no longer possess a majority of VLDR's stock. Mr. Vetter was also present at the November 16, 2020 VLDR board meeting at which some board members pressured the Halls to agree with Messrs. Gopalan and Hamer's previous unwarranted financial projections for 2021 and beyond. Thereafter, Mr. Vetter was involved in actions that ultimately led to Mr. Hall's removal as VLDR's executive chairman, including the Keker investigation commenced in December 2020 that purportedly provided justification for Mr. Hall's removal.[2]

51.    At no time did Messrs. Vetter or Vella or any other attorney suggest to either of the Halls that they should retain personal legal counsel to represent them with respect to matters such as the amendments reflected in the Certificate and Bylaws and/or related corporate control issues.

52.    Neither did Mr. Vetter suggest that any of Velodyne's strategic stockholders (Ford, Baidu, Nikon, and Hyundai) consider whether the amended Certificate and Bylaws provisions were in their interests, notwithstanding that Velodyne director Barbara Samardzich ("Ms. Samardzich") was a former Ford career executive, and Hamid Zarringhalam ("Mr. Zarringhalam")—a Nikon corporate vice president who later joined VLDR's board—was serving as a Velodyne board observer on Nikon's behalf.

**Messrs. Gopalan and Hamer's Complicity and Misrepresentations**

53.    As noted above, Mr. Hamer became Velodyne's permanent CFO in July 2019, and Mr. Gopalan became the company's CEO in January 2020. Both reported to Mr. Hall, Velodyne's executive chairman.

54.    Once the merger discussions between Velodyne and GIC began in May 2020, Messrs. Gopalan and Hamer actively worked with Messrs. Graf, Dee, Vetter, and Vella in the

---

[2] VLDR later rehired Keker to seek a temporary restraining order against Mr. Hall for purported trade secret theft in state court. See *Velodyne Lidar, Inc. v. Hall*, No. 21CV383938 (Santa Clara Super. Ct. July 2, 2021).

construction of the Merger Agreement, the Support Agreement, and later the amended and restated Certificate and Bylaws.

55.    Messrs. Gopalan and Hamer never expressed to the Halls or Velodyne's other board members anything about the Defendants' plan to isolate Mr. Hall and ensure he had no control rights in or ability to influence management or technological development of post-merger VLDR.

56.    Messrs. Gopalan and Hamer cooperated with Messrs. Graf and Dee both before and after the Merger. In late September 2020, when Ms. Patel informed Ms. Hall that the proposed post-merger VLDR Certificate and Bylaws were designed to disfavor Mr. Hall with regard to control and management issues, Mr. Hall asked Mr. Gopalan if that were true. Mr. Gopalan responded that the proposed Certificate and Bylaws were not unfavorable to Mr. Hall and, even if they were, the Halls would control so much VLDR stock that they could easily amend those documents. On at least two occasions, at separate times, Mr. Hall asked Messrs. Gopalan and Vella whether and, if so, how the Bylaws were being changed. Both men responded that the Bylaws were generic and that Mr. Hall could change them at any time.

57.    Between January 2020 and his departure from VLDR in July 2021, Mr. Gopalan was compensated $26MM by Velodyne/VLDR, including an $8MM severance payment when he resigned from his employment with VLDR. On information and belief, Mr. Gopalan's employment agreement did not provide for severance upon his voluntary termination.

**VLDR's Decline Since January 2021**

58.    Since January 2021, VLDR's business and value have declined precipitously. In large part, these changes are the result of Mr. Hall's ouster as the company's chairman and his forced resignation as a result of the harassment campaign by the VLDR board. None of the current VLDR board members possesses any deep science and technology knowledge and experience or any substantial experience in the field of LIDAR. As a result, VLDR is now drifting, losing significantly with regard to market share, making no progress with the required

Complaint

next levels of LIDAR technology development, lacking any strategy to reverse these losses, and bleeding cash to no useful end.

59.    VLDR and its stockholders have suffered the following damages, among others:

    a.    VLDR has lost major customers and contracts due to falling behind in technology innovations because of the vacuum in scientific leadership resulting from Mr. Hall's ouster;

    b.    VLDR's status as the world's leading LIDAR company has been badly compromised;

    c.    VLDR is in danger of losing further substantial market share to competitors who spent the year 2021 catching up and, in some cases, surpassing VLDR in LIDAR technology and innovation;

    d.    because there are no new products and no announced plans for innovative new products, VLDR's reputation for shipping quality, state-of-the art products continues to erode;

    e.    VLDR's revenues from product sales have dropped in 2021 by approximately 60% and are only about 40% of the sales level predicted by Messrs. Gopalan and Hamer in late 2020 over the Halls' repeated objections;

    f.    VLDR lost considerable employee talent in 2021 due to the lack of credible leadership and the precipitous decline of the company's market valuation;

    g.    Messrs. Dee, Gopalan, and Hamer have created a culture of fear of speaking out, and employees are demoralized by the lack of technology and business leadership;

    h.    As VLDR employee morale suffers from mismanagement, there is a continued loss of top-quality employees and difficulty recruiting top-quality talent; and

    i.    VLDR's losses leave the Company with very few personnel possessing deep LIDAR technical expertise and knowledge of business strategies required of a company competing in the LIDAR sector.

19
Complaint

## FIRST CAUSE OF ACTION

### Conspiracy to Defraud

### (Against Defendants Graf, Dee, Gopalan, Hamer, Vella, and Vetter)

60.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 1-59.

61.     Defendants Graf, Dee, Gopalan, Hamer, Vella, and Vetter formed a malicious conspiracy to cause injury to Plaintiffs. As described above, those Defendants acted unlawfully and conspired to defraud Plaintiffs who, as a result of those Defendants' actions, were deprived of the economic and other benefits enjoyed by the controlling stockholder of a corporation. Each Defendant participated in the conspiracy by, among other things, working with his fellow Defendants to craft the Merger Agreement, Support Agreement, Certificate, and Bylaws in such a way as to deprive the Halls, VLDR's majority stockholders, of control of the company.

62.     As the result of the Defendants' conspiracy, the Halls have been damaged in an amount to be proven at trial, but within the jurisdiction of this Court.

63.     The Halls suffered these damages in their capacity as Velodyne's controlling stockholders; accordingly, their claims are direct and individual, not derivative.

64.     Defendants' conduct was fraudulent and malicious, thus entitling the Halls to punitive or exemplary damages in an amount sufficient to deter Defendants from such wrongful conduct in the future.

## SECOND CAUSE OF ACTION

### Breach of Fiduciary Duty

### (Against Defendant Vetter)

65.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 1-64.

66.     As Velodyne's principal outside counsel, Mr. Vetter at all relevant times owed a fiduciary duty to act in good faith and in the best interests of Velodyne and its directors and stockholders, including the Halls.

67.    Mr. Vetter had a fiduciary duty to disclose any material facts that a reasonable attorney in his position would believe the Velodyne board members should know in order to act in the best interests of Velodyne and its stockholders. During the negotiations leading to the Merger, Mr. Vetter had a fiduciary duty to act in the best interests of Velodyne and its directors and stockholders, rather than in the best interests of GIC and its directors and stockholders. By participating in structuring the Merger Agreement, Support Agreement, Certificate, and Bylaws to deny corporate control to Velodyne's directors and majority stockholders, including the Halls, Mr. Vetter violated his fiduciary duties to Velodyne and its directors and stockholders.

68.    Prior to the Merger, Mr. Vetter had a fiduciary duty to keep Mr. Hall, Velodyne's most senior corporate officer and board chairman, fully informed regarding the implications of all aspects of the Merger, including the terms set forth in the Merger Agreement, the Support Agreement, the Certificate, and the Bylaws. He violated that duty by failing to advise Mr. Hall that the documents were structured to shift control of VLDR to the designees of the minority stockholders and prevent the majority stockholders from exercising any meaningful control over VLDR's management post-Merger.

69.    Further, Mr. Vetter violated his fiduciary duties by making deliberate misrepresentations to Ms. Hall regarding the impact upon the Halls' control of VLDR of the changes incorporated into the Certificate and the Bylaws. Specifically, he misrepresented to Ms. Hall that the changes reflected in the amended Certificate and Bylaws were "standard" "boilerplate language" and contained no terms with which the Halls would disagree. He misrepresented that, if any changes to the corporate documents were desired, the Halls could easily amend them at any time after the Merger. He misrepresented that the Halls should not be concerned about signing the revised documents.

70.    Mr. Vetter pursued the course of conduct alleged herein intentionally and maliciously while unconscionably disregarding of the rights of the Halls and with a fraudulent intent and/or with reckless disregard of the likelihood of causing Plaintiffs economic damage.

71.     As Velodyne's majority stockholders, the Halls were uniquely vulnerable to damages resulting from Mr. Vetter's breach of his fiduciary duties.

72.     As a direct and proximate result of Mr. Vetter's breach of his fiduciary duties, the Halls, as individuals, have suffered injury in an amount to conform to proof at time of trial, but in no event less than the jurisdictional minimum of this Court.

73.     Mr. Vetter is guilty of oppression, malice or fraud within the meaning of Civil Code Section 3294, entitling the Halls to punitive and exemplary damages in a sum to be determined at trial.

### THIRD CAUSE OF ACTION

### Aiding and Abetting Breach of Fiduciary Duty

### (Against Defendants Vella, Gopalan, Hamer, Graf, and Dee)

74.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 1-73.

75.     Defendants Vella, Gopalan, Hamer, Graf, and Dee knew that Mr. Vetter was breaching his fiduciary duties as set forth above in paragraphs __ through __, gave substantial assistance and/or encouragement to him in his commission of such breaches, and intended to provide such assistance and/or encouragement to Mr. Vetter.

76.     Defendants Vella, Gopalan, Hamer, Graf, and Dee's conduct in aiding and abetting Mr. Vetter was a substantial factor causing harm to the Halls.

77.     As a direct and proximate result of Defendants Vella, Gopalan, Hamer, Graf, and Dee's aiding and abetting Mr. Vetter's breach of his fiduciary duty, the Halls, as individuals, have suffered injury in an amount to conform to proof at time of trial, but in no event less than the jurisdictional minimum of this Court.

78.     Defendants Vella, Gopalan, Hamer, Graf, and Dee are guilty of oppression, malice or fraud within the meaning of Civil Code Section 3294, entitling the Halls to punitive and exemplary damages in a sum to be determined at trial.

///

Complaint

## FOURTH CAUSE OF ACTION

### Intentional Misrepresentation

### (Against Defendants Vetter and Vella)

79.     Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 1-78.

80.     In September 2020, Ms. Hall called Mr. Vetter to ask him about proposed revised corporate documents and policies that were being prepared in connection with the Merger, including the amended and restated Certificate and Bylaws. Mr. Vetter assured her that the proposed revised documents were "standard" "boilerplate language" and contained no terms with which the Halls would disagree. Moreover, Mr. Vetter stated that if any changes to the corporate documents were desired, the Halls could easily amend them at any time. He indicated that the Halls should not be concerned about signing the revised documents.

81.     Following her conversation with Mr. Vetter, Ms. Hall also called Mr. Vella and posed the same questions to him. Like Mr. Vetter, he assured Ms. Hall that the proposed revised corporate documents were "standard" "boilerplate language" and contained no terms with which the Halls would disagree. Like Mr. Vetter, he stated that if any changes to the corporate documents were desired, the Halls could easily amend them at any time. Like Mr. Vetter, he indicated that the Halls should not be concerned about signing the revised documents.

82.     Messrs. Vetter and Vella made the foregoing representations knowing they were untrue statements of material fact and omitted or failed to state material facts and knowing the Halls would rely upon them. At the time they made the foregoing statements to Plaintiffs, Messrs. Vetter and Vella intended to assist Messrs. Graf, Dee, Gopalan, and Hamer in revising the Certificate and Bylaws to facilitate wresting corporate control of VLDR from the Halls. Messrs. Vetter and Vella willfully deceived the Halls to induce them to alter their positions to their injury and risk.

83.     Messrs. Vetter and Vella made the foregoing representations with the intent to induce the Halls to rely upon them.

23

Complaint

84.	The Halls were unaware of the falsity of Messrs. Vetter and Vella's representations regarding the Certificate and the Bylaws at the time such representations were made. The Halls would not have agreed to the Merger had they known that Messrs. Vetter and Vella's representations were false and omitted or failed to state material facts.

85.	The Halls acted in justifiable reliance upon the truth and completeness of Messrs. Vetter and Vella's representations.

86.	The Halls have suffered damages legally (proximately) caused by the fraudulent misrepresentations and omissions of Messrs. Vetter and Vella in in an amount to conform to proof at time of trial, but in no event less than the jurisdictional minimum of this Court.

87.	Messrs. Vetter and Vella's fraudulent misrepresentations and omissions of fact constitute despicable conduct carried on by them with a willful and conscious disregard of the Halls' rights.

88.	Messrs. Vetter and Vella are guilty of oppression, malice or fraud within the meaning of California Civil Code section 3294, entitling the Halls to punitive and exemplary damages in a sum to be determined at trial.

**FIFTH CAUSE OF ACTION**

**Negligent Misrepresentation**

**(Against Defendants Vetter and Vella)**

89.	Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 1-78.

90.	In September 2020, Ms. Hall called Mr. Vetter to ask him about proposed revised corporate documents and policies that were being prepared in connection with the Merger, including the amended and restated Certificate and Bylaws. Mr. Vetter assured her that the proposed revised documents were "standard" "boilerplate language" that contained no terms with which the Halls would disagree. Moreover, Mr. Vetter stated that if any changes to the corporate documents were desired, the Halls could easily amend them at any time. He indicated that the Halls should not be concerned about signing the revised documents.

24

Complaint

91.    Following her conversation with Mr. Vetter, Ms. Hall also called Mr. Vella and posed the same questions to him. Like Mr. Vetter, he assured Ms. Hall that the proposed revised corporate documents were "standard" "boilerplate language" that contained no terms with which the Halls would disagree. Like Mr. Vetter, he stated that if any changes to the corporate documents were desired, the Halls could easily amend them at any time. Like Mr. Vetter, he indicated that the Halls should not be concerned about signing the revised documents.

92.    At the time Messrs. Vetter and Vella made the foregoing representations, they had no reasonable grounds for believing them to be true.

93.    Messrs. Vetter and Vella made the foregoing representations with the intent to induce the Halls to rely upon them.

94.    The Halls were unaware of the falsity of Messrs. Vetter and Vella's representations regarding the Certificate and the Bylaws at the time such representations were made. The Halls would not have agreed to the Merger had they known that Messrs. Vetter and Vella's representations were false and omitted or failed to state material facts.

95.    The Halls acted in justifiable reliance upon the truth and completeness of Messrs. Vetter and Vella's representations.

96.    The Halls have suffered damages legally (proximately) caused by the negligent misrepresentations and omissions of Messrs. Vetter and Vella in an amount to conform to proof at time of trial, but in no event less than the jurisdictional minimum of this Court.

## SIXTH CAUSE OF ACTION

### Securities Fraud

### (Against All Defendants)

97.    Plaintiffs reallege and incorporate by reference each and every allegation set forth in paragraphs 1-78.

98.    The VLDR shares received by the Halls and the other Velodyne stockholders as a result of the Merger are securities under California law. Cal. Corp. Code §25019.

Complaint

99.    The Merger Agreement constituted the offer and sale of a security under applicable California law, in that it provided for the Halls and other Velodyne stockholders to accept, from GIC, VLDR securities in exchange for their Velodyne securities. Cal. Corp. Code §25017(a)–(b). The offer and sale of VLDR securities occurred in the State of California. *Id.* at §25008(a)–(b).

100.    The Merger Agreement contained untrue statements of material fact.

101.    The Merger Agreement omitted or failed to state material facts that were necessary in order to make the Merger Agreement, in light of the circumstances under which the statements therein were made, not misleading.

102.    GIC, by and through the efforts of the Defendants, and each of them, offered and sold VLDR securities to the Halls in violation of California Corporations Code section 25401.

103.    Had the Merger Agreement contained true and complete statements of material fact, and not omitted to state information necessary to make the statements therein accurate instead of misleading, the Halls would not have agreed to the terms of the Merger Agreement, nor would Mr. Hall have agreed to the terms of the Support Agreement. Likewise, had GIC, by and through the Defendants, and each of them, provided the Halls with all of the material information they should have received regarding the securities, the Halls would not have agreed to the terms of the Merger Agreement, nor would Mr. Hall have agreed to the terms of the Support Agreement.

104.    The Defendants, and each of them, materially and knowingly aided in the acts underlying the negotiation, preparation and execution of the Merger Agreement and the Support Agreement and the offer and sale of post-merger securities to the Halls.

105.    The Defendants and DOES 1 through 30 are jointly and severally liable to the Halls. Cal. Corp. Code §§25504, 25504.1.

106.    The Halls are informed and believe that the VLDR securities that they own as a result of the Merger are worth only a fraction of the value that their pre-Merger Velodyne securities were worth.

26
Complaint

107.    The Halls have suffered damages legally (proximately) caused by the material misrepresentations and omissions of the Defendants, and each of them, in an amount to conform to proof at time of trial, but in no event less than the jurisdictional minimum of this Court.

WHEREFORE, Plaintiffs pray for relief as set forth below:

**PRAYER FOR RELIEF**

On the First Cause of Action (Conspiracy to Defraud):

1.    For compensatory damages in an amount to be proven at trial;

2.    For punitive and exemplary damages;

3.    For costs of suit incurred herein; and

4.    For such other and further relief as the Court deems just and proper.

On the Second Cause of Action (Breach of Fiduciary Duty):

1.    For compensatory damages in an amount to be proven at trial;

2.    For punitive and exemplary damages;

3.    For costs of suit incurred herein; and

4.    For such other and further relief as the Court deems just and proper.

On the Third Cause of Action (Aiding and Abetting Breach of Fiduciary Duty):

5.    For compensatory damages in an amount to be proven at trial;

6.    For punitive and exemplary damages;

7.    For costs of suit incurred herein; and

8.    For such other and further relief as the Court deems just and proper.

On the Fourth Cause of Action (Intentional Misrepresentation):

1.    For compensatory damages in an amount to be proven at trial;

2.    For punitive and exemplary damages;

3.    For costs of suit incurred herein; and

4.    For such other and further relief as the Court deems just and proper.

On the Fifth Cause of Action (Negligent Misrepresentation)

1.    For compensatory damages in an amount to be proven at trial;

27
Complaint

2.    For costs of suit incurred herein; and

3.    For such other and further relief as the Court deems just and proper.

On the Sixth Cause of Action (Securities Fraud)

1.    For compensatory damages in an amount to be proven at trial;

2.    For costs of suit incurred herein; and

3.    For such other and further relief as the Court deems just and proper.

DATED:  January 18, 2022                NIESAR & VESTAL LLP

John Kelley

Attorneys for Plaintiffs DAVID HALL and MARTA HALL

Complaint