# EXHIBIT 1

2022 WL 1573821
Only the Westlaw citation is currently available.
United States Court of Appeals, Ninth Circuit.

IN RE NEKTAR THERAPEUTICS
SECURITIES LITIGATION,
Oklahoma Firefighters Pension and Retirement
System; El Paso Firemen & Policemens Pension
Fund, Lead Plaintiffs, Plaintiffs-Appellants,

v.

Nektar Therapeutics; Howard W. Robin; Stephen K.
Doberstein; Jonathan Zalevsky, Defendants-Appellees.

No. 21-15170
|
Argued and Submitted December
10, 2021 Pasadena, California
|
Filed May 19, 2022

Appeal from the United States District Court for the Northern
District of California, Haywood S. Gilliam, Jr., District Judge,
Presiding, D.C. No. 4:18-cv-06607-HSG

**Attorneys and Law Firms**

Alec T. Coquin (argued), Michael P. Canty, and Thomas
G. Hoffman Jr., Labaton Sucharow LLP, New York, New
York; James M. Wagstaffe, Wagstaffe von Loewenfeldt Busch
& Radwick LLP, San Francisco, California; for Plaintiffs-
Appellants.

Robin Wechkin (argued), Sidley Austin LLP, Issaquah,
Washington; Sara B. Brody and Zarine S. Alam, Sidley Austin
LLP, San Francisco, California; Matthew J. Dolan, Sidley
Austin LLP, Palo Alto, California; for Defendants-Appellees.

Before: Milan D. Smith, Jr., Kenneth K. Lee, and Danielle J.
Forrest, Circuit Judges.

**OPINION**

LEE, Circuit Judge:

Experimental drug candidates do not always live up to their
potential, even if initial clinical trials yield highly promising
results. But, as this case illustrates, that does not mean that a
pharmaceutical company has defrauded the investing public.

In 2017, Nektar Therapeutics touted the results from a Phase
1 clinical trial (dubbed "EXCEL") of its anti-cancer drug.
The next year, however, a different and more comprehensive
Phase 1/2 clinical trial (called "PIVOT") showed that the drug
was not as effective as the initial trial had suggested. Nektar's
share price plunged over 40 percent. Two public pensions
then sued Nektar for securities fraud, alleging that Nektar
misleadingly relied on outlier data from a single patient
during the Phase 1 EXCEL clinical trial. The district court
dismissed their operative complaint with prejudice.

We affirm for two reasons. First, Plaintiffs have not
adequately alleged falsity under section **10(b)** of the
Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and
Securities and Exchange Commission Rule 10b-5, 17 C.F.R.
§ 240.10b-5. The complaint fails to articulate why Nektar's
statements about the Phase 1 EXCEL clinical trial would
be materially misleading to investors, even assuming Nektar
relied on outlier data. Plaintiffs do not sufficiently explain
what the clinical trial would have shown without the alleged
outlier data, nor do they specify how that would have affected
the investing public's assessment of the drug. For all we know,
the clinical trial could have still shown excellent results, even
without the data from the supposed outlier patient. Without
specific allegations to connect the dots, Plaintiffs' theory fails
to plead securities fraud.

**\*2** Second, Plaintiffs have not plausibly alleged loss
causation. Nothing in the operative complaint suggests that
Nektar's disclosure of its later Phase 1/2 PIVOT clinical trial
results uncovered the "falsity" of the earlier Phase 1 EXCEL
trial, thus causing the drop in stock price. Rather, Plaintiffs'
factual allegations suggest a more mundane explanation: the
different and more robust Phase 1/2 PIVOT clinical trial
merely showed that the drug may not be as effective as
the initial—and limited—Phase 1 EXCEL clinical trial had
suggested. Further, Plaintiffs' reliance on an anonymous and
self-interested short-seller's internet musings about Nektar's
Phase 1 EXCEL clinical trial does not show loss causation.

**BACKGROUND**

**I. Nektar's NKTR-214 anti-cancer drug does not
replicate the results from the first Phase 1 EXCEL
clinical trial in its later Phase 1/2 PIVOT trial.**
Nektar researches and develops new drugs for cancer,
autoimmune disease, and chronic pain. [1] Its flagship drug

candidate is NKTR-214, a modified version of a human protein that activates the body's production of cancer-fighting cells. NKTR-214 stimulates the production of CD8+ T cells, which kill infected or malignant cells.

As part of NKTR-214's development, Nektar carried out a Phase 1 clinical trial dubbed EXCEL. During the EXCEL trial, 28 cancer patients received dosages of NKTR-214 every two or three weeks, and then tissue samples were collected, divided, and analyzed to assess the drug's effectiveness.

As the EXCEL trial progressed, Nektar reported interim results at various points. At a healthcare conference in 2017, Nektar's CEO Howard Robin presented a chart that displayed data from EXCEL showing that "cancer-fighting cells increased by an average of 30-fold in tumors of purportedly ten patients dosed with NKTR-214." This so-called "30-fold chart" undergirds this securities fraud lawsuit.

Because the 30-fold chart underpins this case, we will describe it in some detail. As alleged in the complaint, the chart first appeared under the title "Analysis of T cell Populations in Tumor":



It shows the "fold change"[2] of two types of cells: CD8+ and Tregs.[3] Thus, the x-axis displays the cell type, while the y-axis displays the fold change. The chart shows a 29.8-fold change for CD8+ cells. The chart includes information explaining that the fold change was calculated by measuring the cells "predose" and then at Week 3 of dosing. It also

explains that the chart reflects data from "N = 10 patients." In layman's language, the chart shows that cancer-fighting cells increased an average of about 30-fold among 10 patients after taking Nektar's drug. Nektar presented this 30-fold chart at many conferences.

After the promising results from the Phase 1 EXCEL trial, Nektar launched a second clinical trial called PIVOT. PIVOT evaluated the effectiveness of NKTR-214 when dosed along with another drug called Opdivo. Nektar released Phase 1/2 data from PIVOT on Saturday, June 2, 2018. The reported data showed that "the overall response rate for NKTR-214 in treating melanoma had declined from the 85% rate presented the previous November to 50%." When the markets opened on Monday, Nektar's stock price plummeted from $90.35 to $52.57, a dip of about 42%.

**II. Anonymous short-sellers accuse Nektar of relying on outlier data in its first Phase 1 EXCEL clinical trial.**

**\*3**  About four months later, anonymous short-sellers released a report, dubbed the Plainview Report, that outlined why its authors believed NKTR-214 to be less effective than Nektar claimed. The Plainview Report claimed that a different chart displayed by Nektar—"Figure 6"—demonstrated the falsity of the 30-fold chart. Figure 6 presented data on CD8+ T Cell changes in 7 of the 28 patients in the EXCEL trial.



Figure 6 showed that one patient in the EXCEL trial, Patient 14, saw an increase in CD8+ T cells of roughly 300-fold, while the other six patients saw more modest increases. The Plainview Report claimed that Patient 14 was among the 10 patients reflected in the 30-fold chart, thus skewing the data in that chart. The Plainview Report also contained a disclaimer that its authors "make no representation, express or implied, as to the accuracy, timeliness, or completeness of any such information" in the report. On the same day that the Plainview

Report was published, Nektar's stock price declined by seven percent.

### III. Two public pensions sue Nektar for securities fraud.

The Oklahoma Firefighters Pension and Retirement System, along with the El Paso Firemen & Policemen's Pension Fund (collectively, "the Pensions") sued Nektar and some of its current and former employees in October 2018. They then filed an amended complaint after being appointed lead plaintiffs. The district court, however, granted Nektar's motion to dismiss the first amended complaint without prejudice.

The Pensions then filed a second amended complaint. The complaint alleged that Nektar made materially misleading statements or omissions by touting its 30-fold chart without disclosing that Patient 14's outlier data was included in the average. To support that allegation, the complaint cited the Plainview Report and its analysis linking Figure 6 to the 30-fold chart.

The complaint also included statements by Confidential Witness #2 ("CW #2"), who worked in Clinical Development Operations at Nektar throughout the Class Period and "closely monitored the incoming data" for NKTR-214. CW #2 stated that Patient 14 was the sole outlier included in the EXCEL trial, and that the 30-fold increase would have been "nowhere near" as large without Patient 14's data. CW #2 also described how Nektar changed trial reporting deadlines for the PIVOT trial so that positive results would make their way into presentations while negative results would be left out. Further, CW #2 stated that scientists working at Nektar disagreed with these practices and with the inclusion of outlier data in presentations on trial results.

The district court again dismissed the complaint, this time with prejudice. The district court held that the Pensions failed to adequately plead falsity, **scienter**, or loss causation. The Pensions timely appealed, and we have jurisdiction to review the dismissal order under [28 U.S.C. § 1291](#).

### STANDARD OF REVIEW

We review de novo the district court's dismissal of the complaint. *Levi v. Atossa Genetics, Inc. (In re Atossa Genetics Inc. Sec. Litig.)*, 868 F.3d 784, 793 (9th Cir. 2017). The court must accept all well-pleaded allegations as true. *Lloyd v.*

*CVB Fin. Corp.*, 811 F.3d 1200, 1205 (9th Cir. 2016). We also consider the complaint as a whole. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

To survive a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

**\*4** Securities fraud complaints face heightened pleading requirements. "At the pleading stage, a complaint stating claims under section **10(b)** and Rule 10b-5 must satisfy the dual pleading requirements of Federal Rule of Civil Procedure 9(b) and the [Private Securities Litigation Reform Act (PSLRA)]." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Rule 9(b) requires that a party "state with particularity the circumstances constituting fraud or mistake." The PSLRA requires that "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." [15 U.S.C. § 78u-4(b)(1)(B)](#). "By requiring specificity, [the PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden with vague allegations of deception unaccompanied by a particularized explanation stating *why* the defendant's alleged statements or omissions are deceitful." *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

### ANALYSIS

To plead a claim under § **10(b)** and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission [falsity]; (2) **scienter**; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Nguyen*, 962 F.3d at 413 (quoting *Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 603 (9th

Cir. 2014)). Each of these elements must be independently satisfied. *See* *Or. Pub. Emps. Ret. Fund*, 774 F.3d at 607 (explaining that failure to adequately plead an element "is an independent basis" on which to affirm dismissal of the complaint).

As explained below, we hold that Plaintiffs have failed to establish falsity and loss causation under the applicable pleading standards. For that reason, we need not address the remaining elements.

### I. The Complaint Does Not Adequately Allege Why Nektar's Statements About Phase 1 EXCEL Trial Results Are False or Misleading.

To satisfy the falsity element, the Pensions point to Nektar's use of the 30-fold chart to tout the effectiveness of NKTR-214. The Pensions' arguments lack merit because they fail to specify why the chart would have deceived a reasonable investor under § **10(b)** or Rule 10b-5.

#### A. The complaint fails to explain why the alleged outlier data in the Phase 1 EXCEL clinical trial constituted a material misrepresentation.

The parties dispute whether Patient 14's outlier data was in fact included in the 30-fold chart's calculations. But even assuming it was, the complaint fails to explain why its inclusion was materially misleading. Simply put, the complaint does not allege with specificity what the Phase 1 EXCEL results would have been without outlier data. Nor does it provide context about why investors would have felt misled had they received Phase 1 EXCEL results without the outlier data.

The Pensions say that the 30-fold chart was misleading because Nektar failed to inform investors that it included outlier data. An omission is materially misleading if "there is 'a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available' for the purpose of decisionmaking by stockholders concerning their investments." *Retail Wholesale & Dep't Store Union Loc. 338 Ret. Fund v. Hewlett-Packard Co.*, 845 F.3d 1268, 1274 (9th Cir. 2017) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)); *accord Atossa*, 868 F.3d at 795 (quoting same). So, "once defendants [choose] to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1009 (9th Cir. 2018) (quoting *Schueneman v. Arena Pharm., Inc.*, 840 F.3d 698, 705–06 (9th Cir. 2016)).

**\*5** Here, the Pensions have not pleaded specific facts articulating why Nektar's 30-fold chart about the Phase 1 EXEL clinical results was materially misleading. *See Metzler*, 540 F.3d at 1061. The complaint merely alleges that outlier data drove the 30-fold change claim without providing any meaningful context or information about why an investor's assessment of Nektar would have changed if Patient 14's alleged outlier data had been excluded. [4] Put another way, we simply do not know what the results would have been without the outlier data or what those results would mean as a medical matter.

The Pensions take three stabs at what the fold change would have been without Patient 14's outlier data, but they all fall short of the heightened pleading standard imposed by Rule 9(b) and the PSLRA.

First, the Pensions rely on the Plainview Report to allege that the result "would look very different" if one calculated the fold change based on only *three* patients found in Figure 6 who were dosed every three weeks. The complaint claims that the fold change for that calculation would be "~1.8 fold." But cherry-picking data from only three patients does not plausibly show the falsity of the 30-fold claim. Indeed, the complaint never explains or justifies why it excluded the other remaining patients (at least six more in the 30-fold chart). And it is not even apparent from the complaint whether any patients from Figure 6 are in the 30-fold chart, as the latter included data from only ten out of the twenty-eight patients in the EXCEL trial.

Second, the complaint states that CW #2 contended that the results would have been "nowhere near" the 30-fold result without Patient 14's data, but it does not specify any further details. Instead, CW #2 relies on vague and hyperbolic assertions, describing the 30-fold chart as "misleading," "deceitful," and "lacking scientific integrity." But conclusory adjectives do not meet the PSLRA's heightened pleading requirements. *Metzler*, 540 F.3d at 1061. In the highly technical task of evaluating scientific studies and their impact on investment decisions, plaintiffs must provide some

specificity to anchor their contentions that investors would find one study outcome to be meaningfully different from another. The Pensions' complaint fails to do that.

Third, the Pensions rely on a statistical analysis by an expert who estimates, after making many assumptions, that the fold change experienced by the other patients in the 30-fold chart could not have topped 5.55. Yet again, we are provided no plausible justification for the assumptions underlying how this expert precisely derived that 5.55-fold estimate.[5] Plaintiffs cannot evade the PSLRA's exacting pleading standards by merely citing an expert who makes assertions about falsity based on questionable assumptions and unexplained reasoning.

**\*6** Even assuming the Pensions had adequately alleged what the fold change would have been without Patient 14's data, they have failed to explain why that difference would be material to a reasonable investor. *See* *Retail Wholesale, 845 F.3d at 1274*; *Atossa, 868 F.3d at 795*. Consider this analogy on why context matters in determining the falsity of statements based on highly technical information: Suppose a smartphone maker touts that the microchip in its newest phone is 300 times faster than its predecessor chip based on multiple technical tests. But if we take out one outlier test, it turns out that the new microchip is 200 times faster. It may well be that consumers cannot tell the difference between 200 times and 300 times faster in real-life because 200 times is blazingly fast for any conceivable task on a smartphone. And in such a scenario, the average investor may not care whether the new microchip is 200 times or 300 times faster because it makes no material difference to consumers.

Likewise, we do not know from the complaint whether a somewhat lower fold-change would have been material to investors. For example, without Patient 14's data, perhaps the number of cancer-fighting cells would have increased 15-fold. Is that an excellent result from a medical perspective? Is there any material difference between a 15-fold increase and a 30-fold increase? And how would an average investor assess such a difference? Perhaps investors would not care about such a difference if it turned out that a 30-fold increase provides little marginal benefit over a 15-fold increase for most cancer patients. We cannot answer any of these questions because the complaint has failed to plead sufficient facts to provide context that would allow us to assess the alleged falsity of Nektar's statements.

**B. The purported inclusion of patients with different dosing schedules does not render the 30-fold chart materially misleading.**

The Pensions also allege that Nektar "falsely claimed that the patients in the trial were dosed with NKTR-214 every three weeks when, in fact, two of the patients used to support the 30-fold increase claim—including the outlier patient—were dosed every two weeks." But the Pensions plead no facts suggesting why the one-week difference in dosing "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Atossa, 868 F.3d at 795* (quoting *Basic, 485 U.S. at 231–32, 108 S.Ct. 978*). It might be inferred that needing a higher frequency of dosing suggests a lower potency of the drug, but it is unclear how that relates to the viability of NKTR-214 on the market or, as a result, Nektar's attractiveness as an investment. The Pensions thus have not plausibly alleged a materially false statement about dosing frequency.

**II. The Complaint Does Not Plausibly Establish Loss Causation.**

The Pensions have also failed to allege loss causation. When considering loss causation, "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Lloyd, 811 F.3d at 1210*. The "burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through 'corrective disclosures' which 'caused the company's stock price to drop and investors to lose money.' " *Id. at 1209* (quoting *Halliburton Co. v. Erica P. John Fund, Inc., 573 U.S. 258, 264, 134 S.Ct. 2398, 189 L.Ed.2d 339 (2014)*). Plaintiffs thus must show a "causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *Mineworkers' Pension Scheme v. First Solar Inc., 881 F.3d 750, 753 (9th Cir. 2018)* (internal quotation marks and citations omitted).[6]

**A. The later Phase 1/2 PIVOT trial result was not a corrective disclosure that exposed the alleged falsity of the earlier Phase 1 EXCEL trial data.**

**\*7** As discussed above, after earlier reporting on the highly promising data from the Phase 1 EXCEL clinical trial, Nektar later revealed results from the Phase 1/2 PIVOT trial that somewhat took the shine off the initial trial data. Nektar

reported that the overall response rate in patients was 50%, down from 85% reported in data collected in the year before. The next business day on June 4, Nektar's stock dropped over 40%. The Pensions argue that the inclusion of misleading outlier data in the Phase 1 EXCEL trial inflated investor expectations, and then the results of the Phase 1/2 PIVOT trial revealed the falsity of the earlier Phase 1 EXCEL trial data.

This claim fails because only a tenuous causal connection exists between the alleged falsehoods from the Phase 1 EXCEL trial and the Phase 1/2 PIVOT trial data announcement that preceded the June 4 stock drop. The use of outlier data alleged in the complaint relates to the Phase 1 EXCEL trial, which focused only on NKTR-214. In contrast, the Phase 1/2 PIVOT trial tested patients who received both NKTR-214 and Opdivo, another anti-cancer drug. The Phase 1/2 PIVOT trial thus tested a different treatment and used a different diagnostic measure than the Phase 1 EXCEL trial (tumor shrinkage rather than biomarker data).

Of course, the two trials are related in that they both involved NKTR-214. But the inquiry is whether the Pensions have traced their losses "back to the very facts about which the defendant lied." *Mineworkers'*, 881 F.3d at 753 (quotation omitted). The Pensions' allegations focus on data from the earlier Phase 1 EXCEL trial, rather than the later Phase 1/2 PIVOT data. The announcement of the Phase 1/2 results did not suggest that the EXCEL data were improperly manipulated, or that the methodology for collecting and analyzing that data was flawed. Indeed, Nektar's announcement merely integrated newly collected data from the Phase 1/2 PIVOT trial into its reporting. It did not correct or revise previous patient data.

The Phase 1/2 PIVOT result was not a corrective disclosure that exposed the alleged falsity in the Phase 1 EXCEL trial data, causing the drop in stock price. Rather, it merely showed that results from a different and more comprehensive test were not as promising as those from the more limited Phase 1 EXCEL data. Thus, the Pensions' factual allegations most plausibly suggest that relatively disappointing test results, not any revelation of earlier falsehoods, caused Nektar's share price to plunge.

### B. The Plainview Report Does Not Establish Loss Causation.

The Pensions also argue that the Plainview Report—in which anonymous short-sellers claimed that Patient 14's outlier data from Figure 6 were incorporated into the 30-fold chart—

served as a corrective disclosure that caused Nektar's stock to drop by seven percent on October 1. That argument fails.

Our court recently analyzed when a short-seller's report can satisfy the loss causation element in *Houston Mun. Employees Pension System v. BofI Holding, Inc. (In re BofI Holding, Inc. Securities Litigation)*, 977 F.3d 781 (9th Cir. 2020). The inquiry begins with whether the court can "plausibly infer that the alleged corrective disclosure provided new information to the market that was not yet reflected in the company's stock price." *Id.* at 795. This is normally difficult with a short-seller report that uses publicly available information because a corrective disclosure "must by definition reveal new information to the market that has not yet been incorporated into the [stock] price." *Id.* at 794. But if the report "required extensive and tedious research involving the analysis of far-flung bits and pieces of data," then "[t]he time and effort it took to compile this information make it plausible that the posts provided new information to the market, even though all of the underlying data was publicly available." *Id.* at 797.

**\*8** *BofI* underscored the high bar that plaintiffs must meet in relying on self-interested and anonymous short-sellers. We acknowledged that it was "plausible" that the short-seller blog posts at issue "provided new information to the market," but "nonetheless conclude[d]" that the plaintiffs "ha[d] not plausibly alleged that these posts constituted corrective disclosures." *Id.* We explained that "it is not plausible that the market reasonably perceived these posts as revealing the falsity of [the defendant's] prior misstatements" because:

> The posts were authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors stating that they made "no representation as to the accuracy or completeness of the information set forth in this article." A reasonable investor reading these posts would likely have taken their contents with a healthy grain of salt.

*Id.*

We hold that the same reasoning applies to the Plainview Report. Perhaps the Plainview Report did provide new information to the market. Its analysis pulled together disparate sources and connected data in ways that were

not plainly obvious. For example, it compared statements made by Nektar at different conferences and it cross-checked sources provided by Nektar. Yet the Plainview Report was "authored by anonymous short-sellers who had a financial incentive to convince others to sell, and the posts included disclaimers from the authors stating that they made 'no representation as to the accuracy or completeness of the information set forth in this article.' " *BofI*, 977 F.3d at 797. As a result, it is not plausible that the market would perceive the Plainview Report as revealing false statements because the nature of the report means that investors would have taken its "contents with a healthy grain of salt." *Id.*

The Pensions attempt to distinguish *BofI* by arguing that the reports in that case had only a tangential relationship to the false statements at issue, while here the Plainview Report relates directly to the alleged false statements. It is true that information's "relationship to the alleged misstatements" was a factor considered in *BofI*. *Id.* at 795. But the central holding in the case was that the character of the report— anonymous and self-interested short-sellers who disavowed any accuracy—rendered it inadequate. Whether a report is

tangential or direct in relation to the misstatements does not change that fact.

In sum, the Plainview Report does not establish loss causation for the October 1 stock drop.

## CONCLUSION

Pharmaceutical companies often suffer setbacks in their clinical trials after earlier testing offered highly promising results. That is the nature of the industry, and—without more—it does not necessarily mean that a pharmaceutical company committed securities fraud. The Pensions' operative complaint does not provide anything "more" here under the applicable legal standards, and so the Pensions have failed to state a claim for securities fraud. As a result, we **AFFIRM** the district court's dismissal of the Second Amended Complaint.

**All Citations**

--- F.4th ----, 2022 WL 1573821

## Footnotes

1    These facts come from the second amended complaint and are accepted as true for this appeal. *See* *Nguyen v. Endologix, Inc.*, 962 F.3d 405, 408 (9th Cir. 2020).

2    Fold change measures how much a quantity changes between an initial and final measurement. It is derived by dividing the final measurement by the initial measurement.

3    Tregs are Regulatory T cells that regulate and suppress the immune system. They are not at issue in this case.

4    In their briefs, the Pensions maintained that Patient 14's outlier (positive) data should have been excluded because it skewed the results. But if so, it would also allow companies to discard outlier (negative) data claiming that it distorts the results. The Pensions presumably would consider such exclusion of negative data to be misleading.

5    The expert apparently assumes that Patient 14's starting CD8+ count was 10 cells/mm$^2$. But this is seemingly estimated from visually looking at Figure 6, which is a tiny graphic whose y-axis is marked by large increments of 500 (0, 500, 1000, etc.). The dot representing Patient 14's starting CD8+ count is near zero, but the dot itself is big enough visually relative to the compressed y-axis that one could reasonably conclude that Patient 14's actual starting count is anywhere from zero to 50. Using the same logic as the expert, choosing a starting

count somewhere between 11 and 50 would mean that the fold change experienced by the other patients in the 30-fold chart could be anywhere from ~8-fold to ~27-fold.

6      The Pensions also rely on a "zone of risk" theory to argue loss causation. *See, e.g.,* ⚑*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). Our court has never expressly adopted that theory, though other circuits have. *See* ⚑*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013). We have continued to require securities fraud plaintiffs to allege that the defendant lied about "the very facts" causing the plaintiffs' losses, and it is unclear in any event that courts employing the "zone of risk" theory require any lesser showing. *See* ⚑*id.* (quoting ⚑*McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 425, 431 (3d Cir. 2007)).

---

**End of Document**                                                                                    © 2022 Thomson Reuters. No claim to original U.S. Government Works.