# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DELAWARE COUNTY EMPLOYEES RETIREMENT SYSTEM, et al. | : : : | CIVIL ACTION |
| v. | : : | |
| ADAPTHEALTH CORP. f/k/a DFB HEALTHCARE ACQUISITIONS CORP., et al. | : : : | NO. 21-3382 |

MEMORANDUM

Bartle, J.                                                    June 9, 2022

Plaintiffs Delaware County Employees Retirement System and Bucks County Employees' Retirement System bring this putative class action against defendant AdaptHealth Corp. and its individual corporate defendants[1] pursuant to the Securities Act of 1933, 15 U.S.C. §§ 77a, et seq. ("Securities Act"), and the Securities Exchange Act of 1934, 15 U.S.C. §§ 78a, et seq. ("Exchange Act").  This action was filed on behalf of all persons who purchased or acquired AdaptHealth securities between the proposed class period of November 8, 2019 and July 16, 2021.

Before the court is the motion of defendants to dismiss the amended complaint pursuant to Rules 8, 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure as well as

---

1.   The individual defendants named in the amended complaint are Luke McGee, Stephen P. Griggs, Jason Clemens, Frank J. Mullen, Richard Barasch, Joshua Parnes, Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, and David S. Williams III.

under the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4.

I

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in the light most favorable to the plaintiffs. See Phillips v. Cty. of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008); Umland v. PLANCO Fin. Servs., Inc., 542 F.3d 59, 64 (3d Cir. 2008).

On a motion to dismiss under Rule 12(b)(6), the court may consider "allegations contained in the complaint, exhibits attached to the complaint and matters of public record." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (citing 5A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (2d ed. 1990)). The court may also consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, [and] items appearing in the record of the case." Buck v. Hampton Twp. Sch. Dist., 452 F.3d 256, 260 (3d Cir. 2006) (citing 5B Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 1357 (3d ed. 2004)).

Rule 8 requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). As the Supreme Court has explained, a complaint need not include "detailed factual allegations," but it must state "more than labels and conclusions" and must provide factual allegations "enough to raise a right to belief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). Plaintiffs must "nudge[] their claims across the line from conceivable to plausible." Id. at 570.

A plaintiff in a securities fraud action must satisfy the heightened pleading standards of the PSLRA, 15 U.S.C. § 78u-4. The plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation . . . is made on information and belief . . . state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). These provisions require particularity similar to Rule 9 of the Federal Rules of Civil Procedure for claims based on fraud or mistake. As with Rule 9, for those allegations made on information and belief, "the complaint must not only state the allegations with factual

3

particularity, but must also describe the sources of information with particularity, providing the who, what, when, where and how of the sources, as well as the who, what, when, where and how of the information those sources convey." Institutional Inv'rs Grp. v. Avaya, Inc., 564 F.3d 242, 253 (3d Cir. 2009).

To do so, the court must examine the complaint as well as any other documents incorporated by reference of which the court can take judicial notice. City of Edinburgh Council v. Pfizer, Inc., 754 F.3d 159, 166 (3d Cir. 2014).

II

For present purposes, the court accepts as true the following allegations set forth in the amended complaint. AdaptHealth is a home medical equipment business. Plaintiffs acquired AdaptHealth shares during the proposed class period of November 8, 2019 through July 16, 2021. Plaintiffs claim they acquired these shares at artificially inflated prices, including in a secondary offering in January 2021, due to the violations by defendants of federal securities laws.

Defendant Luke McGee was the Chief Executive Officer ("CEO") and later co-CEO of AdapthHealth until he was removed from office in June 2021. Defendant Stephen Griggs served as co-CEO from February 2021 through June 2021 and now serves as the sole CEO subsequent to McGee's removal. Defendant Jason Clemens has been Chief Financial Officer ("CFO") since August

4

2020.  Defendant Frank Mullen was the Chief Accounting Officer ("CAO") in December 2020.  Defendant Richard Barasch was Chairman and member of the Board of Directors in December 2020 while defendant Joshua Parnes was President and a member of the Board of Directors in December 2020.  Defendants Alan Quasha, Terence Connors, Dr. Susan Weaver, Dale Wolf, Bradley Coppens, and David S. Williams III were also Directors in 2020.

On July 8, 2019, DFB Healthcare Acquisitions Corp. ("DFB") announced that it had entered into an agreement to merge with AdaptHealth.[2]  Following its merger with DFB, AdaptHealth began publicly trading on November 8, 2019.

Prior to its merger, AdaptHealth had acquired at least fifty-nine businesses between 2012 and 2019 under the direction of defendant Luke McGee, its CEO.  In the three years prior to its merger with DFB, AdaptHealth had increased its revenue 200%, although projected revenue from organic growth was 6% to 8% each year.  Organic growth relates to revenue growth from the company's existing businesses rather than revenue gained from acquiring new businesses.

---

2.   DFB, according to the Securities Exchange Commission, is a "special purpose acquisition company" ("SPAC") to acquire a healthcare business.  SPACs do not go public through a traditional public offering but instead rely on a management team to acquire or combine with an operating company, otherwise known as an "initial business combination."  The combined company is then publicly traded.

In a press release announcing the merger, DFB highlighted AdaptHealth's impressive organic growth revenue as the key driver for the merger along with AdaptHealth's "seasoned team of industry and financial professionals, including . . . McGee" as well as the president and CFO.  The press release went on to state that AdaptHealth "believes it can add approximately $100 million of acquired revenue each year" and specifically credited McGee with building "one of the industry's leading [home medical equipment] providers" through capital deployment, customer engagement, and an effective operating model.  It also explained that following the merger, AdaptHealth would "continue to focus on increasing net revenue and profitability, both organically and via accretive acquisitions."

In addition, on its Forms 10-Q filed with the Securities Exchange Commission ("SEC") throughout 2020, AdaptHealth stated that its "ability to successfully operate our business is largely dependent upon the efforts of certain key personnel of AdaptHealth, including the key personnel of AdaptHealth who have stayed with us following the Business Combination.  The loss of such key personnel would negatively impact our operations and financial results."

Plaintiffs in their amended complaint allege two grounds for violations of federal securities law by AdaptHealth and its officers and Directors.  One is based on the undisclosed

6

fact that McGee was the subject of criminal investigations and civil lawsuits.  The other relates to how AdaptHealth reported its revenue and growth to investors.

A. McGee Investigations

At the time that AdaptHealth was merging with DFB, McGee was under investigation by the Danish authorities for a major tax scheme that defrauded Denmark and other European countries of billions of dollars.  The scheme involved pension funds that submitted fraudulent applications for tax refunds to the Danish SKAT, the equivalent of the United States Internal Revenue Service.  McGee owned North Channel Bank, a German entity, which agreed to pay a criminal fine of 110 million Danish Kroner in September 2019 for faking trades in exchange for tax reimbursements.  Earlier, in May 2019, McGee had personally agreed to a settlement with the Danish authorities to repay 1.55 billion Danish Kroner in proceeds that he and two others had received from the tax scheme.

Then on November 19, 2019, the Kingdom of Denmark filed suit in the United States District Court for the Southern District of New York against hundreds of entities including 2321 Capital Pension Plan ("2321 Capital") and Lion Advisory Inc. Pension Plan ("Lion Advisory"), both of which are owned and controlled by McGee.  This suit sought recovery of $120 million, close to $20 million of which was tied to 2321 Capital and Lion

7

Advisory.  While McGee was not personally named in this action, 2321 Capital was identified as involving a "sole participant" with a listed address in New York associated in public records with McGee.  Lion Advisory was also listed with an address in New York associated in public records with McGee.  In addition, on a Form 8-K that AdaptHealth filed with the SEC on November 14, 2019, 2321 Capital is identified as the entity through which McGee held shares of AdaptHealth.  McGee signed the Form 8-K on behalf of 2321 Capital.

Meanwhile, in December 2020, the Board of Directors of AdaptHealth agreed to acquire AeroCare, its largest acquisition yet.  On January 5, 2021, AdaptHealth conducted a secondary offering and issued 7.25 million shares to the public at $33 a share.  As part of that offering, the prospectus dated January 4, 2021 touted the management experience at the company as a "meaningful differentiator relative to our competitors."  The prospectus also announced that at the close of the AeroCare acquisition AeroCare's CEO, Stephen Griggs, a defendant here, would join McGee as co-CEO of AdaptHealth.  This acquisition was completed on February 1, 2021 after which McGee and Griggs became co-CEOs of AdaptHealth.

On April 13, 2021, AdaptHealth announced in a press release that it had put McGee on unpaid leave as co-CEO and a Director of AdaptHealth after learning that "authorities in

Denmark have formally charged Co-Chief Executive Officer Luke McGee with alleged tax fraud arising from certain past private activity." It stated that the personal conduct occurred between March 2014 and August 2015 and that this conduct "had no connection to AdaptHealth's business."

That day AdaptHealth's stock dropped 19.7%, or about $7.30 per share. Various analysts expressed concern, including Deutsche Bank which viewed the combination of McGee as CEO and Parnes as President as "one of the best parts about [AdaptHealth]." Deutsche Bank described McGee as the "face of [AdaptHealth]" and a "visionary" with Parnes as the one who "executes the vision."

On June 22, 2021, McGee sold 17% of his holdings in AdaptHealth back to the company for $21.4 million in cash. This was in addition to the 25.4% of his holdings he sold back to AdaptHealth in December 2020 for $38.5 million in cash.

B. Growth Revenue Reporting

During the class period beginning on November 8, 2019 through the fourth quarter of 2020, AdaptHealth had reported its revenue growth by distinguishing between revenue from recent acquisitions and "organic revenue growth." This organic revenue growth was tied to AdaptHealth's existing businesses and excluded revenue growth from recent acquisitions.

AdaptHealth continuously promoted its successful strategy of growing "organically and through accretive acquisitions." However, it described organic growth as the most important metric. At a presentation to investors in August 2020, McGee, speaking on behalf of AdaptHealth, credited AdaptHealth's impressive acquisition revenue but stated that "we all know that organic growth is more valuable."

AdaptHealth consistently differentiated between internal, that is organic growth, and external, that is inorganic growth from recent acquisitions, on quarterly calls to investors, including at the 2019 fourth quarter call in February 2020 and the 2020 first quarter call in July 2020. This changed for the 2020 fourth quarter earnings. In the March 4, 2021 release of its earnings report, AdaptHealth used what it called "pro forma net revenue growth." According to AdaptHealth, it measured revenue growth "as if acquired companies were owned by the Company" in the prior year. This metric incorporated revenue from newly acquired businesses rather than separating that revenue out from organic growth.

In the AdaptHealth presentation accompanying the 2020 fourth quarter call with investors, there was a slide entitled "Consistent Strength in Year-on-Year Organic Revenue Growth." Included on that slide was the "Year-on-Year Pro Forma Growth" and "2020 Pro Forma Growth by Quarter." An asterisk in small

10

print on this slide included the calculation for "pro forma" which it explained as: "current period net revenue plus current period acquisition revenue divided by prior period net revenue plus prior period acquisition revenue." AdaptHealth did not explain that this was a change from its prior revenue reporting. Instead, on the call defendant Clemens, the CFO, expressed faith in the company's organic growth, specifically that they "feel rock-solid about our organic growth" and cited statistics of that growth compared to the same quarter in 2019.

In this slide presentation on the 2020 fourth quarter call with investors, AdaptHealth retroactively also changed its prior organic revenue growth figures which resulted in increased growth for each quarter compared to what had been reported on earlier quarterly calls. AdaptHealth continued to use this new pro forma net revenue growth formula without further explanation. Investors could not verify revenue growth that was organic compared to growth that was acquired.

For instance, on the 2021 first quarter earnings call on May 6, 2021, defendant Griggs, the co-CEO, stated that "[d]espite the ongoing effects of the pandemic on certain product lines, we're very pleased with our organic growth rate of 11.5%" and that the company "feel[s] confident that the balance of 2021 will meet our organic growth expectations." The slides accompanying the call included year-on-year pro forma

11

growth and pro forma growth by quarter with a tiny asterisk noting the formula for calculating this organic growth which included acquisition revenue.

On July 19, 2021, Jehoshaphat Research released a report claiming that AdaptHealth's true organic growth was negative for the first six months of 2021 contrary to what the company had disclosed. Instead, the report claimed that AdaptHealth was experiencing double-digit organic decline. Following the report, the stock price fell another 5.93% by $1.51 per share to close the day at $23.96 a share.

On the 2021 second quarter earnings call with investors on August 5, 2021, AdaptHealth acknowledged that it has now increased its disclosures with public filings, including a Form 10-Q with the SEC in which it revealed that organic revenue growth as previously calculated was negative for the first six months of 2021 and that its increase in revenue was primarily driven by acquisition revenue. It then reverted to its previous way of reporting organic growth in its filings with the SEC. In the slides released accompanying the 2021 third quarter investor call, AdaptHealth once again broke out acquisition revenue from its overall revenue.

12

III

Plaintiffs first bring a claim under § 10(b) of the Exchange Act, 15 U.S.C. § 78j, against AdaptHealth and its officers.  That statute provides:

> It shall be unlawful for any person, directly or indirectly . . . (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

Rule 10b-5 of the SEC implements this provision by making it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5(b); see City of Edinburgh, 754 F.3d at 167.

Our Court of Appeals has explained that to state a claim for securities fraud, "plaintiffs must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation."  City of Edinburgh, 754 F.3d at 167.  As previously

13

stated, these allegations must be pleaded with particularity to satisfy the PSLRA.  See 15 U.S.C. § 78u-4.

A. McGee Investigations

Plaintiffs first claim that defendant made a material misstatement or omission by not disclosing to investors or the SEC from the time the press release announced the merger between DFB and AdaptHealth on November 8, 2019 through the press release announcing that McGee was being place on leave on April 13, 2021 that McGee was the subject of a criminal investigation by the Danish authorities and was implicated in a civil suit in the Southern District of New York relating to a multi-billion-dollar tax fraud scheme.  To hold defendants liable for this omission, defendants must have had a duty to disclose the omitted information.  "A duty to disclose under federal securities laws may arise when a statute requires disclosure, insider trading occurs, or there is an inaccurate, incomplete, or misleading prior disclosure."  City of Edinburgh, 754 F.3d at 173-74.

Section 10(b), as well as the accompanying SEC Rule 10b-5, does not create an affirmative duty to disclose all relevant information.  See id. at 174.  Defendants therefore need only disclose omitted information if necessary "to make . . . statements made, in the light of the circumstances under which they were made, not misleading."  Id. (quoting 17 C.F.R.

14

§ 240.10b-5). "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." Id. (quoting Basic Inc. v. Levinson, 485 U.S. 224, 239 n.17 (1988)).

When AdaptHealth and DFB merged, the accompanying press release specifically named McGee as one of the reasons for the merger and as part of the "seasoned team of industry and financial professionals." The press release also credited McGee with building one of the industry's leading providers. AdaptHealth consistently filed its Forms 10-Q with the SEC citing its successful operations as being "largely dependent upon the efforts of certain key personnel of AdaptHealth" and explaining that "the loss of such key personnel would negatively impact our operations and financial results."

As part of its secondary offering in January 2021, AdaptHealth cited its experienced management, led by McGee, as a "meaningful differentiator." Other references highlighted McGee as the key to the company's success. These laudatory statements about McGee triggered a duty to disclose any fact which would make them not misleading. See e.g., Teamsters Local 456 Pension Fund v. Universal Health Servs., 396 F. Supp. 3d 413, 456-58 (E.D. Pa. 2019); see also Noto v. 22nd Century Grp., Inc., __ F. 4th __, 2022 WL 1633827, at *6 (2d Cir. May 24, 2022).

McGee was under investigation by the Danish authorities as early as spring 2019 when he agreed to repay 1.55

15

billion Danish Kroner.  His company, 2321 Capital, through which he owned shares in AdaptHealth, was sued in a civil lawsuit in the Southern District of New York in November 2019.  Yet it was not until April 2021 that AdaptHealth announced McGee's involvement in these actions and investigations to investors. McGee's ties to a major tax fraud scheme and his potential criminal and civil liability made AdaptHealth's previous statements about how integral he was to the company misleading as they did not disclose that his future at the company was in jeopardy.

The omissions, to be actionable, must be material. "Materiality may be found when certain information, if disclosed, 'would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor.'"  Fan v. StoneMor Partners LP, 927 F.3d 710, 716 (3d Cir. 2019).  An omission is material if there "is a substantial likelihood that a reasonable shareholder would consider [an omitted fact] important in deciding how to proceed."  Weiner v. Quaker Oats Co., 129 F.3d 310, 316 (3d Cir. 1997).

The question of materiality typically relates to a mixed question of law and fact which makes it "peculiarly for the trier of fact."  Id. at 317.  Our Court of Appeals has cautioned that "only if the alleged misrepresentations or

16

omissions are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." Id.

This court cannot say as a matter of law that McGee's alleged criminal and civil involvement in tax fraud would be obviously unimportant to a reasonable investor. While the court acknowledges that the investigation involved McGee personally and entities which he controlled rather than AdaptHealth itself, it did involve a key officer of AdaptHealth and allegedly fraudulent conduct. The investigation and litigation are closely enough related to AdaptHealth that a jury could reasonably determine that a reasonable investor would want to know this information. The question of materiality must therefore be left to the jury as the trier of fact.

Plaintiffs must also plead facts that show defendants made a material misstatement or omission with scienter. See Institutional Inv'rs Grp., 564 F.3d at 251. "Scienter is a 'mental state embracing intent to deceive, manipulate, or defraud,' . . . and requires a knowing or reckless state of mind." Id. at 252. As noted above, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Id. at 253 (quoting 15 U.S.C. § 78u-4(b)(2)).

17

It is not enough for a corporation and its officers to have a financial interest in the transaction to raise an inference of scienter.  Globis Capital Partners, LP v. Stonepath Grp., Inc., 241 F. App'x 832, 836 (3d Cir. 2007).  Scienter, however, "may be established by showing that the defendant intended to mislead investors or that the defendant acted recklessly in the face of a danger of misleading investors." Teamsters Local 456, 396 F. Supp. 3d at 465.  In determining whether there is a strong inference of scienter, the court on a motion to dismiss is obliged to look to the totality of the circumstances and "weigh the 'plausible nonculpable explanations for the defendant's conduct' against the 'inferences favoring the plaintiff.'"  Institutional Inv'rs Grp., 564 F.3d at 267.

Plaintiffs have pleaded that McGee knew of the criminal investigation into his companies and the civil suits against him.  Plaintiffs allege McGee was personally involved in an agreement in May 2019 to pay back 1.55 billion Danish Kroner to Danish tax authorities as well as a criminal fine of 110 million Danish Kroner against his bank, North Channel Bank, in the fall of 2019.  As early as February 2020, McGee would have known of the civil suit in the Southern District of New York against his companies, 2321 Capital and Lion Advisory, when he was served with the complaint.

18

Furthermore, during this time AdaptHealth had a secondary offering in January 2021. In the prospectus for this secondary offering, it described its experienced management, led by McGee as CEO, as a "meaningful differentiator relative to [their] competitors." Thus, AdaptHealth continued to sell stock to investors touting McGee's experience without disclosing until April 2021 that he was involved in an allegedly fraudulent scheme. The complaint pleads sufficient facts to allow a jury to decide whether defendants knowingly intended to mislead investors or recklessly failed to inform investors about the claims against McGee.

Defendants do not argue that plaintiffs have failed to plead "a connection between the misrepresentation or omission and the purchase or sale of a security" or that they have failed to plead their "reliance upon the misrepresentation or omission." See City of Edinburgh Council, 754 F.3d at 167. Nor do they argue that plaintiffs have failed to plead economic loss. Id.

Defendants do assert, however, that plaintiffs have failed adequately to plead loss causation and seek dismissal of the complaint accordingly. As the Supreme Court has explained, "[a] private plaintiff who claims securities fraud must prove that the defendant's fraud caused an economic loss." Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 338 (2005). The alleged

19

misrepresentations must be the proximate cause of the economic loss.  Id. at 346.  As the PSLRA made clear, Congress intended to permit private securities fraud actions "where, but only where, plaintiffs adequately allege and prove the traditional elements of causation and loss."  Id.

Plaintiffs need not plead loss causation with particularity.  Id.  A short and plain statement showing that they are entitled to relief that will satisfy Rule 8 standards will suffice.  Id.  While the burden on plaintiffs to plead loss causation is not great, plaintiffs still must plead "some indication of the loss and the causal connection" to put defendants on notice of such loss.  Id. at 347.

Our Court of Appeals has explained that "where the claimed loss involves the purchase of a security at a price that is inflated due to an alleged misrepresentation, there is a sufficient causal nexus between the loss and the alleged misrepresentation to satisfy the loss causation requirement." Semerenko v. Cendent Corp., 223 F.3d 165, 184 (3d Cir. 2000). There must be an actual decline in the value of the security as a result of the alleged misrepresentation.  Id. at 185. "Whether the plaintiff has proven causation is usually reserved for the trier of fact."  EP Medsystems, Inc. v. EchoCath, Inc., 235 F.3d 865, 884 (3d Cir. 2000).

20

Plaintiffs plead that the day AdaptHealth issued its press release on April 13, 2021 stating that it was putting McGee on unpaid leave as co-CEO and Director of AdaptHealth due to charges brought by the Danish authorities for tax fraud the stock of AdaptHealth dropped by 19.7%, or about $7.30 per share. Plaintiffs further allege that this drop in stock price caused them substantial damage. The drop in stock price came on the same day that defendants corrected their previous omission in not disclosing McGee's involvement in the scheme. This is sufficient to aver loss causation.

Defendants in addition argue that the action should be dismissed because they are protected by the PSLRA's safe harbor provision. The PSLRA "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge or falsehood." Institutional Inv'rs Grp., 564 F.3d at 254; see also 15 U.S.C. § 78u-5(c). This cautionary language must be extensive and specific, not vague boilerplate language. Id. at 256. "Forward-looking statements" include statements projecting amounts such as revenue, income, earnings, and dividends. 15 U.S.C. § 78u-5(i)(1)(A). These statements also include "plans and objectives of management for future operations" and

statements "of future economic performance."  15 U.S.C. § 78u-5(i)(1)(B)-(C).

There is no safe harbor protection for mixed present and future statements for the portion of the statement that is about the present.  Id. at 255.  In addition, "[a] statement or omission must have been misleading when it was made."  SEB Inv. Mgmt. AB v. Endo Int'l, PLC, 351 F. Supp. 3d 874, 894 (E.D. Pa. 2018).  "[A]llegations of misrepresentation or omissions cannot be based on hindsight or subsequent events."  Id.  "However, once a company has chosen to speak on an issue, even one it had no independent obligation to discuss, it cannot omit material facts related to that issue."  Id. at 897.

Plaintiffs bring this securities fraud action based, in part, on AdaptHealth's omission that McGee was being sued and criminally investigated for a major tax fraud scheme all while touting McGee's experience and key role in the company as a reason for the company's success.  For example, AdaptHealth's statements that its success is "largely dependent upon the efforts of key personnel," that McGee built the company into an industry-leader, and that his experience is a "meaningful differentiator" from AdaptHealth's competitors are not forward-looking statements.  These statements therefore do not qualify for safe harbor protection under the PSLRA.

22

B. Growth Revenue Reporting

Plaintiffs also allege that defendants made a material misrepresentation when they changed the way it reported its growth revenue without making that change clear to investors. Prior to the fourth quarter of 2020, AdaptHealth reported its revenue from acquisitions as distinct from its "organic revenue growth." Investors, therefore, knew how much revenue was being driven by organic growth and how much revenue was based on acquisitions the company had made.

For the fourth quarter 2020 earnings which AdaptHealth released in a report and discussed on a call with investors with accompanying slides, AdaptHealth stated its "pro forma net revenue growth." In small print at the bottom of the slide presentation, AdaptHealth defined "pro forma net revenue growth" as "current period net revenue plus current period acquisition revenue divided by prior period net revenue plus prior period acquisition revenue." It did not break out the growth from acquisitions from the organic growth in the slides or report.

Plaintiffs claim that this was a material misrepresentation and omission because it misled investors on the actual organic growth trend by reporting growth in a new way without making that change clear to investors, all while organic revenue growth, that is revenue not from acquisitions, was declining. This change also provided no way for investors to

23

evaluate growth that was not based on revenue from acquisitions, since those values were no longer broken out in the report or on the slides.

As previously stated, Rule 10b-5 makes it unlawful to omit a material fact necessary to make statements not misleading. 17 C.F.R. § 240.10b-5. Plaintiffs must plead the material misstatement or omission with particularity. In addition, defendants must have a duty to disclose the omitted information which can derive from a statutory duty or from an "inaccurate, incomplete, or misleading prior disclosure." City of Edinburgh, 754 F.3d at 173-74.

Plaintiffs have extensively pleaded with particularity its allegations regarding defendants' misleading omissions and misrepresentations. Plaintiffs include quotations from officers of AdaptHealth discussing growth revenue on calls and at presentations to investors. They point to what percentage of growth was reported and how it was reported prior to the fourth quarter of 2020, what changed for the fourth quarter of 2020, and what changed again after the Jehoshaphat Report was released in mid-2021. Plaintiffs describe how this was misleading to investors and the ways it obscured evaluations of growth that was not tied to acquisitions. They have sufficiently alleged the "who, what, where and how of the sources, as well as the

24

who, what, when, where and how of the information those sources convey."  Institutional Inv'rs Grp., 564 F.3d at 253.

Plaintiffs have sufficiently pleaded that defendants made misleading disclosures when they reported growth as "pro forma net revenue growth" for the 2020 fourth quarter without breaking the growth out by organic growth as compared to acquisition growth.  They therefore had a duty to disclose the omitted information.  Defendants counter that they disclosed the calculation for "pro forma net revenue growth" on the investor presentation slides accompanying the 2020 fourth quarter earnings call.  The use of an asterisk to the growth reporting and written in small font at the bottom of the slide did not fulfill defendants' duty as a matter of law to disclose omitted information to make its disclosures not misleading.

Plaintiffs must also allege that the misrepresentations or omissions were material so that a reasonable investor would view the information as "having significantly altered the total mix of information available to that investor."  Fan, 927 F.3d at 716.  Plaintiffs assert that defendants themselves touted the strong organic growth of the country to investors.  At a presentation to investors in August 2020, McGee stated that, while AdaptHealth had impressive acquisition revenue, "we all know that organic growth is more valuable."  On the 2020 fourth quarter call with investors on

25

March 4, 2021, Clemens, the CFO, stated that he feels "rock-solid" about AdaptHealth's organic growth and compared the current organic growth to previous organic growth metrics. Clearly organic growth as distinct from acquisition revenue was an important metric to the company.

There is nothing so obviously unimportant about omissions pertaining to how the company was growing and derived its revenue that this court can determine as a matter of law that a reasonable investor would not want to know that information. See Weiner, 129 F.3d at 317. The court will therefore leave to the jury to determine whether this information was material.

Plaintiffs must also have sufficiently pleaded with particularity "facts giving rise to a strong inference that defendant acted with the required state of mind" to plead the element of scienter. See Institutional Inv'rs Grp., 564 F.3d at 253. Scienter requires either a knowing or reckless state of mind. Id. at 252.

Plaintiffs have alleged that defendants reported revenue from acquisitions as distinct from organic growth in its reports to investors and disclosures to the SEC prior to the 2020 fourth quarter. It then reported what it called "pro forma net revenue growth" which failed to break out the amount of revenue from acquisition growth as compared to non-acquisition

26

growth.  Moreover, the formula to calculate this growth, again without separating out acquisition revenue, was in small print at the bottom of the slide presentation.  Investors had no way to evaluate the company's organic growth, something McGee himself had noted was "more valuable" than growth from acquisitions.  On an earnings call for the 2020 fourth quarter, Clemens stated that the company feels "rock-solid" about its organic growth.

Meanwhile, plaintiffs plead that the company's actual organic growth was negative for the beginning of 2021.  It was not until an outsider report released in July 2021 reported that the company's organic growth had actually been declining did AdaptHealth revert to breaking out acquisition revenue in the 2021 third quarter.

In summary, plaintiffs have sufficiently pleaded with particularity facts showing that defendants either intended to mislead investors by changing how it reported its growth and only reporting it in small print in a footnote or that defendants acted recklessly by doing so in the face of danger of misleading investors.

Defendants again do not challenge the connection between this misrepresentation to the purchase of a security or plaintiffs' reliance or economic loss.  Defendants do argue that plaintiffs have failed adequately to plead loss causation.

27

Plaintiffs state in the amended complaint that on the day that the Jehoshaphat Research report was released stating that AdaptHealth's organic growth was in decline over the first six months of 2021 the stock price fell 5.93%. This reported decline was in contrast to the revenue growth that AdaptHealth had been reporting for the first two quarters of 2021 when it did not break out revenue growth from acquisitions as compared to organic growth. The disclosure of the organic growth information occurred on the same day that the stock price dropped by 5.93%. Plaintiffs have satisfied their burden to plead loss causation pursuant to Rule 8. They do not have a heightened pleading standard here. See Broudo, 544 U.S. at 346.

Defendants' statements with respect to its organic growth are also not protected by the safe harbor provision of the PSLRA because they are present, not forward-looking, statements. The statements which form the basis of plaintiffs' claim of a material misrepresentation or omission concern the reporting of revenue to investors and the SEC for the 2020 fourth quarter and first two quarters of 2021 and the way that revenue was reported. These reports were on revenue for past quarters, not projections for the future.

In support of plaintiffs' claim, they cite McGee's assertion that "we all know that organic growth is more valuable." This is not forward-looking. They also cite

28

Clemens's claim that he feels "rock-solid" about the company's organic growth that it reported as compared to previous years' organic growth. This reflects his opinion on the current state of growth as compared to past growth and is again not forward-looking. Thus, the safe harbor provision does not apply.

Plaintiffs have therefore sufficiently pleaded the elements to state a claim for securities fraud pursuant to § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b). The motion of defendants to dismiss Count I of the amended complaint will be denied.

IV

Plaintiffs bring Count II against the officer defendants under § 20(a) of the Exchange Act, 15 U.S.C. § 78t. This section provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). A "controlled person" includes a corporation. City of Edinburgh, 754 F.3d at 177. Plaintiffs in

29

a private security fraud action must first allege a predicate violation before bringing a claim for joint and several liability against individuals who exercise control over the corporation pursuant to § 20(a).  Id.  Our Court of Appeals has explained that in enacting § 20(a), "Congress intended liability to be based on something besides control.  That something is culpable participation."  Rochez Bros., Inc. v. Rhodes, 527 F.2d 880, 885 (3d Cir. 1975).

As plaintiffs have sufficiently pleaded a claim for relief under § 10(b) against AdaptHealth, and § 20(a) is a derivative claim of § 10(b), plaintiffs have sufficiently pleaded a claim for joint and several liability under § 20(a) against the officer defendants who control the corporation. Plaintiffs bring this claim against the officer defendants who managed AdaptHealth and were responsible for disseminating the company's financial information to investors but in doing so left out critical information about the change in growth formula and allegations of major tax fraud against McGee.  This is enough to plead culpable participation at this stage.  The motion of defendants to dismiss Count II will be denied.

V

Plaintiffs next bring Count III against AdaptHealth and the Director defendants for violation of § 11 of the Securities Act, 15 U.S.C. § 77k.  This statute permits a private

30

cause of action against "every person who signed the registration statement" if "any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a).  The Securities Act "protects investors by ensuring that companies issuing securities . . . make a 'full and fair disclosure of information' relevant to a public offering'" including by filing a registration statement with the SEC.  Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund, 575 U.S. 175, 178 (2015).  The Supreme Court has explained that § 11 "creates two ways to hold issuers liable for the contents of a registration statement – one focusing on what the statement says and the other on what it leaves out.  Either way, the buyer need not prove . . . that the defendant acted with any intent to deceive or defraud."  Id. at 179.

There must also be a "duty to disclose the material fact such that its omission made the statement misleading."  In re Adams Golf, Inc. Sec. Litig., 381 F.3d 267, 277 (3d Cir. 2004).  "[W]hether a statement is 'misleading' depends on the perspective of a reasonable investor:  The inquiry (like the one into materiality) is objective."  Omnicare, 575 U.S. at 186-87.  To determine whether the issuer of a security gave an opinion

31

that is misleading because it omitted facts depends on the context.  Id. at 190.  "The reasonable investor understands a statement of opinion in its full context, and § 11 creates liability only for the omission of material facts that cannot be squared with such a fair reading."  Id. at 190-91.

The Supreme Court pointed out that "Congress adopted § 11 to ensure that issuers 'tell[] the whole truth' to investors" so that they do not say one thing and hold back another.  Id. at 192.  Plaintiffs cannot simply plead that an issuer's opinion was wrong.  They must also identify particular facts that were omitted from the registration statement and that made the statement misleading or that would "call into question the issuer's basis for offering the opinion."  Id. at 194-95.

In addition, unlike an action brought under the Exchange Act, plaintiffs in an action brought pursuant to the Securities Act "do not bear the burden of proving causation." In re Adams Golf, 381 F.3d at 277.

Plaintiffs allege that the registration statement filed with the SEC in preparation for the secondary offering was misleading because it omitted material facts about McGee's involvement with both a criminal investigation and civil lawsuit regarding an alleged major tax fraud scheme.  As previously discussed, defendants omitted crucial details about the CEO of the company being under criminal investigation for a

32

multi-billion-dollar tax fraud scheme and a civil lawsuit against two companies he owns, one of which is the entity through which he owns shares in AdaptHealth.  This omission is sufficient for a jury to find that AdaptHealth made materially misleading statements touting the company's leadership and experience as crucial to its success.

Plaintiffs did not just plead that the registration was wrong.  They provided ample facts as to what the registration statement left out regarding McGee's alleged financial fraud.  They therefore have stated sufficient facts to support a claim under § 11 of the Securities Act.  The motion of defendants to dismiss Count III will be denied.

VI

Plaintiffs also bring Count IV against AdaptHealth under § 12 of the Securities Act, 15 U.S.C. § 77*l*.  This statute permits a person purchasing a security to hold liable those who offer or sell a security "by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77*l*(a)(2).  This section is similar to § 11 except that it is concerned with misstatements or omissions in the prospectus rather than registration statement.  As with actions under § 11, the

33

plaintiff need not prove causation.  In re Adams Golf, 381 F.3d at 277.

Defendants filed a prospectus along with a registration statement in preparation for its secondary offering in January 2021.  This prospectus promoted the experience of its leadership, while McGee was CEO, but failed to state that McGee was being investigated and sued for tax fraud.  Plaintiffs provide ample facts in their amended complaint as to these investigations and McGee's involvement to show not just that defendants omitted facts but what facts in particular they omitted.  Plaintiffs have sufficiently pleaded facts to support a finding that this omission in the prospectus was material and misleading under § 12.  The motion of defendants to dismiss Count IV will therefore be dismissed.

## VII

Finally, plaintiffs bring Count V against the Director defendants under § 15 of the Securities Act, 15 U.S.C. § 77o. Similar to § 20 of the Exchange Act, § 15 provides for joint and several liability for "[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under sections 77k or 77*l* of this title . . . unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts."  15 U.S.C. § 77o(a).  As the court finds that plaintiffs have sufficiently alleged

34

violations by defendants of 15 U.S.C. § 77k and 15 U.S.C. § 77*l*, plaintiffs' claim against the Director defendants who controlled the corporation may proceed.  Defendants' motion to dismiss will therefore be denied as to Count V as well.