PAGES 1 - 47

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE SUSAN ILLSTON

MEYSAM MORADPOUR,                    )
                                     )
            PLAINTIFF,               )
                                     )
  VS.                                ) NO. 21-CV-01486-SI
                                     )
VELODYNE LIDAR, INC., ET AL.         ) SAN FRANCISCO, CALIFORNIA
                                     ) FRIDAY, JUNE 10, 2022
            DEFENDANTS.              )
_____)


**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

**FOR PLAINTIFFS**          KAHN, SWICK & FOTI, LLP
                            580 CALIFORNIA STREET, SUITE 1200
                            SAN FRANCISCO, CALIFORNIA  94104
                      BY:  **RAMZI ABADOU, ESQUIRE**

                            KAHN, SWICK & FOTI
                            1100 POYDRAS STREET, SUITE 3200
                            NEW ORLEANS, LOUISIANA 70163
                      BY:  **MORGAN M. EMBLETON, ESQUIRE**

**FOR DEFENDANT**           WILMER, CUTLER, PICKERING, HALE & DORR
                            ONE FRONT STREET, SUITE 3500
                            SAN FRANCISCO, CALIFORNIA 94111
                      BY:  **KEVIN P. MUCK, ESQUIRE**
                           **WILLIAM BRENC, ESQUIRE**


*REPORTED BY:  JOAN MARIE COLUMBINI, CSR #5435, RPR*
            *PRO TEM OFFICIAL COURT REPORTER, USDC*

FRIDAY, JUNE 10, 2022                                    9:54 A.M.

                          PROCEEDINGS

          **THE CLERK:**  CALLING CASE NUMBER 21-CV-1486, MORADPOUR VERSUS VELODYNE LIDAR, INCORPORATED, ET AL.

          COUNSEL, IF YOU COULD PLEASE COME TO THE PODIUM AND STATE YOUR APPEARANCES FOR THE RECORD?

          **MR. ABADOU:**  OF COURSE.  GOOD MORNING, YOUR HONOR. RAMZI ABADOU ON BEHALF OF THE PLAINTIFFS FROM THE LAW FIRM OF KAHN, SWICK & FOTI.  AND I HAVE MORGAN EMBLETON WITH ME HERE TODAY FROM NEW ORLEANS WHO PROVIDED ABLE ASSISTANCE ON THE PAPERS.

          **THE COURT:**  THANK YOU.

          **MR. MUCK:**  GOOD MORNING, YOUR HONOR.  KEVIN MUCK OF WILMER HALE FOR THE DEFENDANTS.  MY COLLEAGUE WILLIAM BRENC FRANK IS HERE AS WELL, AS IS OUR SUMMER ASSOCIATE, SARAH GARRETT, WHO IS HELPING US WITH THIS CASE.

          **THE COURT:**  THANK YOU.  IT IS LOVELY TO SEE YOU. IT'S LOVELY TO BE IN THE SAME ROOM WITH YOU ALL.  IT'S A LONG TIME COMING.  THIS MIGHT BE OUR FIRST CIVIL MOTION IN COURT. I'M NOT SURE.  WE'VE HAD SEVERAL JURY TRIALS, AND THEY'VE GONE WELL.  THE JURIES HAVE BEEN ENTHUSIASTIC AND UNDERSTANDING. NOBODY HAS GOTTEN SICK.  SO WE ARE CERTAINLY MAKING PROGRESS. BUT IT'S VERY NICE TO SEE YOU ALL HERE.

          SO, MR. ABADOU -- NO, THIS IS YOUR MOTION, MR. MUCK. ALL RIGHT.  IT'S DEFENDANTS' MOTION TO DISMISS, SO YOU CAN

START.

MR. MUCK:  THANK YOU, YOUR HONOR.  I HAVE TO CONFESS THAT I FEEL A LITTLE OUT OF PRACTICE ACTUALLY BEING IN PERSON. I GOT USED TO -- I WAS TELLING MR. ABADOU I GOT USED TO BEING ABLE TO ARGUE MOTIONS WITH NOTES PINNED UP ON THE WALL THAT I COULD LOOK AT WITHOUT ANYBODY ACTUALLY KNOWING.

THE COURT:  AND I SEE YOU ARE FULLY DRESSED, WHICH IS NICE.  ONE NEVER KNOWS ON THOSE ZOOM CALLS.

MR. MUCK:  THAT'S TRUE, NO SWEATPANTS TODAY.

YOUR HONOR, AS YOU KNOW, WE REPRESENT THE DEFENDANTS, VELODYNE LIDAR; ANAND GOPALAN, THE FORMER CEO; ANDREW HAMER, THE FORMER CFO; AND THREE CURRENT AND FORMER DIRECTORS: JOSEPH CULKIN, MICHAEL DEE, AND JAMES GRAF.

YOUR HONOR, THE BRIEFING IS CLEAR THAT THIS CASE IS BASED ON FOUR ALLEGED CATEGORIES OF MISREPRESENTATIONS.

THE COURT:  YOU KNOW, THIS CASE, UNLIKE MOST, HAS A PRETTY POTENT CW, WOULDN'T YOU SAY?

MR. MUCK:  NO.  I ACTUALLY DON'T THINK SO, YOUR HONOR, AND --

THE COURT:  THAT'S KIND OF CENTRAL TO ME.  WHY DO YOU SAY THAT?

MR. MUCK:  SO THE REASON I SAY THAT IS BECAUSE THIS CW DOESN'T ACTUALLY CLAIM TO HAVE PERSONAL KNOWLEDGE OF ANY SPECIFIC FACT, AND THAT WAS -- THAT'S THE KEY HERE.

THE REFORM ACT REQUIRES A SOURCE TO NOT ONLY HAVE

SPECIFIED ALLEGATIONS, BUT ALSO THEY SHOULD DEMONSTRATE THAT HE HAS PERSONAL KNOWLEDGE.  SO WHEN MR. HALL SAYS, FOR EXAMPLE, THAT HE WAS THE VICTIM OF A POWER GRAB OR THE COMPANY WAS HIJACKED.

THE COURT:  OR HOW ABOUT THAT I TOLD THEM RIGHT BEFORE YOU ISSUED THE PRESS RELEASE THAT I WAS LEAVING?

MR. MUCK:  WELL, HE DIDN'T SAY THAT, YOUR HONOR.  HE DID NOT SAY THAT HE WAS LEAVING.  HE SAID THAT HE WAS STEPPING DOWN AS EXECUTIVE CHAIRMAN, BUT WAS STAYING ON AS CHAIRMAN OF THE BOARD.  SO -- AND THAT WAS PROMPTLY DISCLOSED.  THAT WAS DISCLOSED --

THE COURT:  DIDN'T HE SAY THAT ON THE SAME DAY AS YOU ISSUED A STATEMENT SAYING EVERYTHING IS PROCEEDING APACE?

MR. MUCK:  WHAT THE COMPANY SAID ON JANUARY 7TH WAS THAT OUR FUNDAMENTAL OUTLOOK REMAINS THE SAME, AND THE FACT THAT MR. HALL WAS TRANSITIONING FROM AN EXECUTIVE CHAIRMAN POSITION TO SIMPLY CHAIRMAN OF THE BOARD DOESN'T RENDER THAT STATEMENT MISLEADING IN ANY WAY, AND THE PLAINTIFFS HAVEN'T SHOWN THAT THAT RENDERS THE STATEMENT MISLEADING IN ANY WAY.

AND, REALLY, WHAT THE PLAINTIFFS ARE ARGUING IS, I THINK, SOMETHING DIFFERENT.  WHAT THE PLAINTIFFS ARE ARGUING IS THAT WHAT SHOULD HAVE BEEN DISCLOSED AT THAT TIME WASN'T THAT MR. HALL HAD MADE THE DECISION ON HIS OWN TO RESIGN FROM THE EXECUTIVE CHAIRMAN POSITION.  WHAT THEY'RE SAYING IS YOU SHOULD HAVE DISCLOSED THAT THERE WAS AN AUDIT COMMITTEE INVESTIGATION

LOOKING INTO CONDUCT BY MR. HALL AND HIS WIFE, WHO WAS THE CHIEF MARKETING OFFICER AND ALSO A DIRECTOR AT THE TIME.

THE COURT:  THAT BEGAN, WHAT, A MONTH AFTER THE MERGER?

MR. MUCK:  IT BEGAN ON DECEMBER 9TH OF 2020.

THE COURT:  WHEN DID THE BOARD MAKE THE DECISION TO HIRE KEKER VAN NEST?

MR. MUCK:  DECEMBER 9TH.  IT WAS THE AUDIT COMMITTEE, DECEMBER 9TH.  AND KEKER TOOK ABOUT TWO MONTHS TO DO ITS INVESTIGATION.  AND THERE ISN'T A SINGLE FACT ANYWHERE THAT SUGGESTS THAT THE DECISION TO REPRIMAND MR. HALL AND TO REMOVE HIM FROM HIS POSITION AS CHAIRMAN WAS MADE ANY TIME BEFORE FEBRUARY.

SO YOU'VE GOT TWO STATEMENTS, YOUR HONOR, THAT WERE ALLEGEDLY MADE -- TWO ALLEGEDLY FALSE STATEMENTS THAT WERE MADE BETWEEN THE TIME THAT THE AUDIT COMMITTEE INVESTIGATION BEGAN AND KEKER WAS HIRED AND THE TIME THAT THE RESULTS OF THAT INVESTIGATION WERE ANNOUNCED.  JANUARY 7TH, WHEN THE COMPANY SAID, OUR FUNDAMENTAL OUTLOOK REMAINS UNCHANGED, AND JANUARY 12TH WHEN ALL THE COMPANY TALKED ABOUT WAS ITS RECENTLY COMPLETED FISCAL YEAR RESULTS, WHERE REVENUES HAD BEEN $94 MILLION AND THE COMPANY HAD SIGNED A CERTAIN NUMBER OF CONTRACTS DURING THE COURSE OF THAT YEAR.

THAT'S IT.  THERE WAS ABSOLUTELY NOTHING THAT WAS SAID IN EITHER OF THOSE COMMENTS ABOUT MR. HALL, NOTHING THAT

WOULD HAVE TRIGGERED AN OBLIGATION TO DISCLOSE THE EXISTENCE OF AN INVESTIGATION.

SO I THINK THAT, TO GET BACK TO YOUR ORIGINAL QUESTION, YOUR HONOR, IS THIS THE -- IS THIS A GREAT CONFIDENTIAL WITNESS?  I THINK THE WAY THAT YOU SEE THAT HE'S NOT IS BY LOOKING AT THE SPECIFIC CLAIMS AND DRILLING DOWN AND LOOKING TO SEE WHAT IT IS THAT HE ACTUALLY CLAIMS TO HAVE KNOWLEDGE OF AND WHETHER OR NOT THOSE SUPPORT EITHER FALSITY OR SCIENTER AS TO ANY OF THE FOUR CATEGORIES IN HIS STATEMENTS.

**THE COURT:**  WELL, ONE OF THE THINGS THAT YOU SAID IN YOUR PAPERS WAS THAT PLAINTIFFS FAILED TO IDENTIFY PARTICULARIZED CONTEMPORANEOUS FACTS, AS OPPOSED TO SPECULATION LIFTED FROM SOMEONE ELSE'S UNVERIFIED COMPLAINT.

**MR. MUCK:**  THAT'S CORRECT.

**THE COURT:**  WHICH IS CERTAINLY THE STATUS RIGHT NOW.

LET'S SUPPOSE THAT THE PLAINTIFFS WERE ABLE TO GET A DECLARATION, OR DEPOSITION, OR SOME SUCH STATEMENT, FROM MR. HALL THAT SAID, ON JANUARY 2ND, I PHONED UP AND TOLD THEM THIS, THAT, AND THE OTHER THING TO GET SPECIFIC PARTICULARIZED FACTS, WHICH YOU, I KNOW, WILL NOT BELIEVE, AND I DON'T -- I DON'T KNOW WHETHER THEY'D BE TRUE, BUT IF THERE WERE SUCH A STATEMENT, WOULD THAT SATISFY YOUR CONCERNS?

**MR. MUCK:**  IF THE ALLEGATIONS THAT MR. HALL MADE WERE PARTICULARIZED, IF THEY WEREN'T THE SORTS OF VAGUE ALLEGATIONS THAT WE CURRENTLY HAVE IN THE COMPLAINT AND SIMILAR TO THE ONES

THAT YOUR HONOR DEALT WITH IN THE *FORESCOUT* CASE WHERE THE CONFIDENTIAL WITNESS ALLEGATIONS WERE JUST TOO VAGUE. THEY WERE TOO NEBULOUS TO ACTUALLY SHOW THAT A STATEMENT WAS FALSE AT THE TIME IT WAS MADE OR, EQUALLY IMPORTANTLY, THAT ANY DEFENDANT HAD KNOWLEDGE THAT THE STATEMENT WAS FALSE AT THE TIME.

RIGHT NOW, MR. HALL COULD TAKE A -- COULD SUBMIT A DECLARATION SAYING EVERYTHING IN HERE IS CORRECT, AND IT WOULDN'T MATTER, YOUR HONOR, BECAUSE EVEN IF THAT WERE SO, HE DOESN'T PROVIDE THE SPECIFIC FACTS THAT ARE NECESSARY TO SHOW EITHER A MISSTATEMENT OR SCIENTER, AND THAT REALLY IS THE MORE FUNDAMENTAL PROBLEM.

THAT'S WHY I'M SAYING, I THINK WHEN YOU LOOK AT THE SPECIFIC CATEGORIES OF MISSTATEMENTS AND YOU SEE, OKAY, WHAT IS IT THAT MR. HALL IS SAYING? LET'S JUST GIVE HIM THE BENEFIT OF THE DOUBT; LET'S JUST SAY HE COULD DEMONSTRATE HE HAS PERSONAL KNOWLEDGE OF ALL OF THIS, WHAT IS IT THAT HE'S SAYING?

WELL, WITH THE FIRST CATEGORY THAT RELATES TO PURPORTED MISSTATEMENTS REGARDING HIM AND HIS POSITION IN THE COMPANY AND WHETHER IT WAS GOING TO BE AN ONGOING POSITION, THE KEY ARGUMENT BOTH FROM MR. HALL AND FROM THE PLAINTIFFS SEEMS TO BE THAT NOBODY DISCLOSED THAT THERE WAS A SURREPTITIOUS PLAN TO REMOVE HIM. THAT'S WHAT MR. HALL SAYS. MR. HALL SAID, I WAS THE VICTIM OF A SECRET PLAN. PLAINTIFFS REPEAT THAT ALLEGATION.

THERE'S ABSOLUTELY NOTHING TO SUPPORT THAT.  THERE'S NOTHING OTHER THAN SPECULATION TO SUPPORT THAT.  WHAT WE HAVE IS THE FACT THAT IN FEBRUARY -- FIRST OF ALL -- LET ME BACK UP FOR A MINUTE.

MR. HALL WAS NEVER PUSHED OUT OF THIS COMPANY. MR. HALL CHOSE TO RESIGN, AND HE'S ACKNOWLEDGED THAT, AND THE PLAINTIFFS QUOTE HIS ACKNOWLEDGMENT TO THAT EFFECT.

PUTTING THAT ASIDE, THERE IS NOT ONE FACT TO SHOW THAT ANY MEMBER OF THE BOARD OR ANY MEMBER OF MANAGEMENT KNEW OR BELIEVED THAT MR. HALL WAS EVEN GOING TO BE ASKED TO RESIGN AS CHAIRMAN PRIOR TO FEBRUARY OF 2021, NOTHING.

**THE COURT:**  IT IS KIND OF AN INTERESTING SITUATION WHERE THE -- YOUR SPAC -- IS THAT HOW THEY SAY IT?

**MR. MUCK:**  YES.

**THE COURT:**  YOUR SPAC WAS OUT LOOKING FOR A MERGER PARTNER FOR A YEAR, AND THEY RAN OUT OF TIME, SO THEY GOT MORE TIME, AND, FINALLY, THEY SETTLED ON VELODYNE, AND THEY SAY THAT MR. HALL IS THE GURU IN THE INDUSTRY, HE'S A GENIUS ENGINEER, AND ALL OF THAT, AND GET THE MERGER COMPLETED WHEN?

**MR. MUCK:**  SEPTEMBER OF 2020.

**THE COURT:**  SEPTEMBER.  AND THEN A COUPLE OF MONTHS LATER, THEY'VE GOT AN AUDIT COMMITTEE LOOKING TO SEE WHETHER HE'S COMMITTED THE KIND OF MISCONDUCT TO BOOT HIM OUT.  THAT'S PRETTY QUICK.

**MR. MUCK:**  IT IS.  AND, TRUST ME, THEY WERE NOT HAPPY

ABOUT THAT.  NOBODY WAS HAPPY ABOUT THIS.

THIS IS NOT SOMETHING THAT, IF YOU WERE PLANNING TO COME UP WITH AN APPROACH TO A COMPANY, IT GENERALLY WOULDN'T BE TO TOUT SOMEBODY AS A VISIONARY AND THEN DECIDE YOU ARE GOING TO VERY PUBLICLY RAISE ISSUES ABOUT HIS INTEGRITY AND HIS CONDUCT WITHIN A FEW MONTHS.

NOBODY BENEFITED FROM THIS.  THE DEFENDANT CERTAINLY DIDN'T BENEFIT.  THE DEFENDANT --

**THE COURT:**  THE STOCK DIDN'T.

**MR. MUCK:**  NO.  THE DEFENDANTS -- AND THAT'S -- WHICH IS ANOTHER ISSUE.

THE PLAINTIFFS WANT TO TALK ABOUT THE POTENTIAL VALUE THAT MR. GRAF, OR MR. DEE, OR THE MEMBERS OF MANAGEMENT MIGHT HAVE HAD ON PAPER AT ONE POINT IN TIME BASED UPON THE VALUATION OF THE COMPANY.  THEY NEVER TOOK ADVANTAGE OF THAT.  THEY NEVER MADE A DOLLAR.

THE ONLY STOCK SALES THAT ANYBODY EVER HAD WERE MR. GOPALAN AND MR. HAMER WHICH WERE DONE, AS THE PLAINTIFFS CONCEDE, FOR TAX PURPOSES TO PAY WITHHOLDING.  AND YOUR HONOR HAS FOUND -- I THINK IT WAS IN THE *HP* CASE -- THAT THAT SORT OF TRANSACTION ISN'T INDICATIVE OF SCIENTER IN ANY WAY.

YES, YOUR HONOR.  IT'S AN UNFORTUNATE SITUATION. NOBODY DISPUTES THAT THIS IS NOT THE WAY IT WAS PLANNED. NOBODY IS GOING TO HOLD UP VELODYNE AS AN EXAMPLE OF HOW BOARDS AND MANAGEMENT CAN GET ALONG AND FUNCTION PERFECTLY.  THAT IS A

FAR CRY FROM SECURITIES FRAUD, AND THAT'S WHY WE'RE HERE TODAY.

IT'S SECURITIES FRAUD.  IT'S NOT BREACH OF FIDUCIARY. IT'S NOT MISMANAGEMENT.  IT'S NOT SAYING, IN RETROSPECT, THESE PEOPLE SHOULD HAVE DONE A BETTER JOB.  IT'S WHETHER OR NOT THE PLAINTIFFS AND MR. HALL -- BECAUSE THAT'S WHO THE PLAINTIFFS ARE RELYING ON -- CAN SHOW THAT THERE WERE SPECIFIC FACTS DEMONSTRATING THAT AT PARTICULAR TIMES THE STATEMENTS CHALLENGED HERE ARE MISLEADING.

SO, AGAIN, WITH MR. HALL, WHAT YOU HAVE ARE THESE VAGUE ALLEGATIONS, WHICH ARE VERY SIMILAR TO THE ALLEGATIONS THAT THE NINTH CIRCUIT RECENTLY FOUND WERE INADEQUATE IN THE *NEKTAR THERAPEUTICS* CASE, WHICH I THINK I HAVE THE LANGUAGE HERE SOMEWHERE, BUT I BELIEVE THE NINTH CIRCUIT REFERRED TO THEM AS VAGUE AND HYPERBOLIC ASSERTIONS FROM CONFIDENTIAL WITNESSES.  NO QUESTION THAT'S WHAT POWER GRAB, HIJACK, CONSPIRACY ARE.  THERE'S NO FACTS TO SUPPORT THEM.

MR. HALL DOESN'T EVER PROVIDE WHAT YOUR HONOR HAS REFERRED TO AS THE WHO, WHAT, WHEN, WHERE, AND HOW THAT'S NECESSARY IN A CASE LIKE THIS.  THAT'S THE REAL PROBLEM HERE.

PLAINTIFFS ARE ALSO RELYING ON A -- SOME THIRDHAND HEARSAY THAT MR. HALL SAID HE HEARD FROM HIS WIFE, WHO SAID SHE HEARD FROM SOMEBODY ELSE ABOUT A CONVERSATION THAT OCCURRED IN SEPTEMBER OF 2020.  THAT DOESN'T COME CLOSE TO ESTABLISHING FALSITY.  IT CERTAINLY DOESN'T COME CLOSE TO ESTABLISHING ANYBODY'S SCIENTER, BECAUSE EVEN IF THAT TRIPLE HEARSAY WERE

INDULGED, IT'S INTERESTING TO LOOK AT WHAT MR. HALL'S VERSION OF THAT STORY IS.

WHAT HE SAYS IS THAT THE HEAD OF HR IN SEPTEMBER OF 2020 WAS GIVEN PROPOSED REVISIONS TO INTERNAL CORPORATE POLICIES THAT WOULD CHANGE IN SOME UNSPECIFIED WAY MR. HALL'S SIGN OFF OVER CERTAIN ASPECTS OF COMPENSATION AND AUDITS.  IT'S NOT INCONSISTENT WITH ANYTHING THE COMPANY SAID.

BUT MAYBE MORE IMPORTANTLY, HALL ADMITS THAT THOSE WERE SENT TO HIM FOR HIS APPROVAL.  IT WASN'T LIKE SOMEBODY DID THIS OVER HIS OBJECTION OR BEHIND HIS BACK.  THEY SENT THESE THINGS TO HIM, AND THEY GOT SIGN OFF.

SO THE WHOLE NOTION THAT SOMEHOW THESE VAGUE ALLEGATIONS SUPPORT A CLAIM OF FRAUD JUST FALLS APART WHEN YOU ACTUALLY LOOK AT WHAT IT IS THAT MR. HALL SAYS.  TAKE A CAREFUL LOOK AT THAT AND TRY TO LINE IT UP WITH THE STATEMENTS THAT ARE CHALLENGED AND WHAT INDIVIDUAL DEFENDANTS KNEW.

THAT'S ANOTHER ISSUE THAT I THINK REALLY NEEDS TO BE EXPLORED, YOUR HONOR, AND I HOPE THAT WE POINTED THIS OUT ADEQUATELY IN OUR PAPERS.  BUT THERE'S A LOT OF ALLEGATIONS IN THIS COMPLAINT WHICH REFER TO DEFENDANTS AND PROJECTIONS.

NOW, PLAINTIFFS HAVE TO DO BETTER THAN THAT.  THEY HAVE TO SAY WHICH PROJECTIONS THEY'RE COMPLAINING ABOUT, WHY IT IS THAT THOSE PROJECTIONS WERE ACTIONABLE, AND WHO'S RESPONSIBLE FOR THOSE PROJECTIONS.

IN THAT REGARD -- I'M NOT GOING TO REPEAT, YOUR

HONOR, THINGS THAT WE'VE ALREADY ARGUED.  BUT, IN THAT REGARD, I THINK IT'S IMPORTANT TO NOTE THAT THE PROJECTIONS THAT ARE BEING CHALLENGED HERE -- THAT'S THE SECOND CATEGORY OF MISSTATEMENTS.  FIRST IS THINGS ABOUT MR. HALL.  SECOND IS PROJECTIONS.

WE'RE REALLY TALKING ABOUT TWO DIFFERENT PROJECTIONS, TWO DIFFERENT PROJECTIONS. ONE RELATES TO THE COMPANY'S 2020 REVENUES, WHERE THE COMPANY SAID, WE EXPECT REVENUES TO BE 100 TO 101 MILLION.  THEY ENDED UP BEING 95.3 MILLION.  PLAINTIFFS ARE SAYING THAT WAS FALSE.

THE ONLY THING THAT THEY CAN POINT TO, APART FROM HINDSIGHT, IS THAT MR. HALL SAYS AT SOME UNSPECIFIED POINT HE TOLD SOMEBODY -- HE NEVER SAYS WHO -- THAT HE DIDN'T THINK THOSE PROJECTIONS WERE APPROPRIATE.  A LITTLE DIFFICULT FOR MR. HALL TO SAY SINCE HE IS ALSO SIGNING SOME OF THE DOCUMENTS THAT THE PLAINTIFFS CLAIM CONTAIN THOSE MISLEADING PROJECTIONS.

BUT PUTTING THAT ASIDE, THERE'S NOT ONE FACT TO SHOW THAT ANYBODY ACTUALLY BELIEVED AT THE TIME THOSE PROJECTIONS WERE MADE THAT THEY WERE FALSE, THAT THEY WERE UNATTAINABLE. AND MR. HALL SAYING A YEAR AFTER THE FACT, I TOLD PEOPLE AT SOME UNSPECIFIED TIME I HAD SOME UNSPECIFIED CONCERNS ABOUT THOSE PROJECTIONS DOESN'T CUT IT.

THE 2020 --

**THE COURT:**  AGAIN, IF YOU WERE TO COME IN AND SAY, WELL, ON SEPTEMBER 27TH, WHEN THEY WERE TALKING ABOUT WHAT WE

SHOULD SAY AS OUR PROJECTION, I SAID THAT'S WILDLY IMPROBABLE, YOU COULDN'T DO THAT, WOULD THAT SATISFY YOU?

MR. MUCK: WELL, IT WOULD DEPEND ON WHAT HE SAID AND WHY HE SAID IT, BUT I MEAN, IT WOULD CERTAINLY BE A STEP IN THE RIGHT DIRECTION.

THERE IS ONE INSTANCE -- TO BE FAIR TO THE PLAINTIFFS, THERE IS ONE INSTANCE WHERE HALL SAYS, I TOLD THE COMPANY THAT I THOUGHT THE PROJECTION WAS WILDLY UNREALISTIC. HE SAYS HE SAID THAT ON NOVEMBER 16TH.  INTERESTINGLY, HE DIDN'T SAY ANYTHING ABOUT THE 2020 PROJECTION.  THE ONLY THING HE SAYS WAS WILDLY UNREALISTIC WAS 2021.

THE COMPANY NEVER AGAIN ISSUED THAT PROJECTION.  WHAT THE COMPANY DID WAS, IT'S VERY NEXT CHALLENGED STATEMENT, IT WITHDREW ITS GUIDANCE.  AND MR. HALL IS SAYING ON NOVEMBER 16TH THAT HE THOUGHT THAT THIS PROJECTION WAS WILDLY UNREALISTIC.

FIRST OF ALL, HE DOESN'T SAY WHY.  HE DOESN'T SAY WHAT IT WAS ABOUT THE PROJECTION THAT MADE HIM BELIEVE THAT. BUT IT ALSO -- IT DOESN'T SAY ANYTHING ABOUT WHAT PEOPLE KNEW AT THE TIME THE PROJECTION WAS MADE, BECAUSE THE PROJECTION HAD BEEN MADE MONTHS BEFORE THAT.  THE LAST TIME THE PROJECTION WAS MADE, ACCORDING TO THE PLAINTIFFS, WAS OCTOBER 19TH IN CONNECTION WITH A REGISTRATION STATEMENT.

MR. HALL SIGNED THAT REGISTRATION STATEMENT.  SO APPARENTLY MR. HALL SEEMED TO THINK THAT SOMETHING MUST HAVE HAPPENED BETWEEN MID OCTOBER WHEN HE, ACCORDING TO THE

PLAINTIFFS, IS SIGNING OFF ON THIS PROJECTION FOR 2021 REVENUE AND NOVEMBER 16TH WHEN HE SAYS, FOR REASONS KNOWN ONLY TO DAVID HALL, I DON'T THINK THAT THESE PROJECTIONS ARE GOOD ANY LONGER.

EVEN IF THAT'S THE CASE, EVEN IF HE -- THAT WAS A BELIEF THAT HE EXPRESSED AT THE TIME, IT DOESN'T MATTER BECAUSE THE COMPANY NEVER AGAIN PUBLISHED THOSE ESTIMATES AND, IN FACT, WITHDREW THE ESTIMATE WITHIN A MATTER OF FIVE WEEKS.

SO, AGAIN, YOUR HONOR, I DON'T WANT TO DELVE INTO TOO MUCH DETAIL HERE.  THIS IS ALL LAID OUT IN THE PAPERS.  BUT I THINK IT'S IMPORTANT TO REALLY LOOK CAREFULLY AT WHAT IT IS THAT MR. HALL SPECIFICALLY IS SAYING AND HOW IT DOES OR DOESN'T RELATE TO THE CLAIMS THAT ARE BEING ALLEGED HERE.

BEFORE I LEAVE THE PROJECTIONS POINT, YOUR HONOR, THERE'S A LOT OF BRIEFING ABOUT WHETHER OR NOT THE SAFE HARBOR APPLIES.  WE THINK IT'S CLEAR THAT IT DOES.  I THINK THOSE ISSUES HAVE BEEN ADEQUATELY BRIEFED AT THIS POINT.  I'M HAPPY TO ADDRESS ANY QUESTIONS, BUT, IF NOT, LET ME JUST MOVE ON TO THE LAST TWO -- VERY BRIEFLY, THE LAST TWO ALLEGED MISSTATEMENTS.

THE THIRD CATEGORY RELATES TO STATEMENTS ABOUT FORD MOTOR COMPANY.  THE COMPLAINT HAD TWO ISSUES THAT THEY RAISED IN THAT REGARD.  NUMBER ONE WAS YOU DIDN'T DISCLOSE THAT FORD WAS PLANNING TO CANCEL SOME UNSPECIFIED CONTRACT.  I THINK THE PLAINTIFFS HAVE ABANDONED IT.  THE OPPOSITION DOESN'T EVEN MAKE ANY ATTEMPT TO DEMONSTRATE THAT THERE ARE FACTS TO SHOW THAT

ANYBODY AT THE COMPANY KNEW THAT THIS WAS GOING TO HAPPEN, AND THE ONLY FACT THAT THE PLAINTIFFS CITE IS AN ANALYST REPORT FROM FEBRUARY THAT SAYS -- FEBRUARY OF 2021 THAT SAYS THAT FORD HAD TERMINATED SOME CONTRACT.

THERE'S NO DETAIL, NO SUGGESTION THAT WAS SOMETHING THAT ACTUALLY RENDERED A PRIOR STATEMENT MISLEADING OR THAT ANY DEFENDANT HAD KNOWLEDGE THAT THAT WAS THE CASE.

THE OTHER ISSUE WITH REGARD TO FORD, WHICH I DO BELIEVE REMAINS ALIVE, IS FORD'S INVESTMENT IN VELODYNE. THE PLAINTIFFS POINT TO THE FACT THAT ON FEBRUARY 12TH OF 2021, FORD SAID THAT IT HAD SOLD ITS INTEREST IN VELODYNE. PLAINTIFFS SAY, WELL, ALL THESE OTHER STATEMENTS WERE FALSE BECAUSE THAT WASN'T DISCLOSED. THE PROBLEM, OF COURSE, IS THEY DON'T PLEAD A SINGLE FACT TO SHOW THAT ANYBODY AT VELODYNE HAD ANY KNOWLEDGE BEFORE FORD ANNOUNCED ITS SALE THAT THAT SALE WAS HAPPENING.

EVEN MR. HALL, WHO THE PLAINTIFFS SAID HAD A WONDERFUL RELATIONSHIP WITH FORD, DOESN'T CLAIM HE HAD ANY KNOWLEDGE BEFORE FEBRUARY OF 2021 THAT THAT SALE WAS HAPPENING. SO I THINK THAT CLAIM FALLS APART VERY QUICKLY.

THE LAST CLAIM THE PLAINTIFFS MAKE RELATES TO INTERNAL CONTROLS. THIS IS A CLASSIC HINDSIGHT ARGUMENT, YOUR HONOR. THE COMPANY ANNOUNCED IN MARCH OF 2021 THAT IT IDENTIFIED TWO MATERIAL WEAKNESSES AS OF DECEMBER 31ST OF 2020. THEY RELATED TO TRACKING LITIGATION WHISTLEBLOWER ISSUES. THAT

WAS ONE.  THE SECOND RELATED TO REVENUE FOR NON-STANDARD TRANSACTIONS.

THERE'S NOT A SINGLE ALLEGATION THAT ANYBODY KNEW OF THOSE CONTROL DEFICIENCIES BEFORE MARCH OF 2021, NOR IS THERE ANY ALLEGATION THAT THOSE CONTROL DEFICIENCIES EXISTED AT ANY TIME PRIOR TO DECEMBER 31ST OF 2020.

THE COMPANY ACKNOWLEDGED THEY EXISTED AS OF THAT DATE, BUT THERE'S NOT ONE FACT TO SHOW THAT ANYBODY KNEW THAT BEFOREHAND.  AND UNDER THE CASE LAW THAT WE'VE CITED, YOUR HONOR, INCLUDING A NUMBER OF CASES IN THIS DISTRICT, THE PLAINTIFF HAS TO SHOW THAT THAT WAS KNOWN TO BE FALSE AT THE TIME THE CERTIFICATION WAS MADE, AND THEY HAVEN'T DONE THAT.

YOUR HONOR, I'M OBVIOUSLY HAPPY TO ANSWER ANY OTHER QUESTIONS THAT YOU HAVE, BUT I THINK THAT THAT AT LEAST COVERS THE ITEMS THAT I THOUGHT WERE MOST SIGNIFICANT FOR THE COURT TO CONSIDER.

**THE COURT:**  THANK YOU.

MR. ABADOU.

**MR. ABADOU:**  YES, YOUR HONOR.  GOOD MORNING.

**THE COURT:**  WHAT ABOUT ALL OF THAT?

**MR. ABADOU:**  THERE'S A LOT THERE.

YOU KNOW, SITTING BACK AND LISTENING TO YOUR DISCUSSION WITH MR. MUCK, TWO THINGS REALLY CAME TO MIND.

THE FIRST WAS MENTIONING THAT MR. HALL WAS THE FORMER CEO OF THE COMPANY, THE FOUNDER OF THE COMPANY, FORMER

EXECUTIVE CHAIRMAN OF THE BOARD THROUGH THE CLASS PERIOD, WAS A POTENT CW IS VERY DIFFERENT FROM CW BECAUSE WE KNOW HIS IDENTITY.  WE KNOW HIS ROLE.

AND WHAT DEFENDANTS ARE TRYING TO DO WITH RESPECT TO MR. HALL IS NOTABLE, YOUR HONOR.  ON THE ONE HAND, AS YOU SAID, THEY DESCRIBED HIM AS A VISIONARY, A GENIUS.  BUT THEY DID MORE THAN THAT.  THIS IS AN IMPORTANT POINT IN TERMS OF HIS KNOWLEDGE AND THE DETAIL HE PROVIDES ABOUT THE WRONGDOING WE ALLEGE IS ACTIONABLE HERE, IS THAT THEY SAY REPEATEDLY THROUGHOUT THE CLASS PERIOD THAT HE'S DEEPLY INVOLVED IN ALL ASPECTS OF THE COMPANY'S OPERATIONS.

THEY CAN'T, ON THE ONE HAND, CREDIBLY SAY HE'S DEEPLY INVOLVED IN EVERY ASPECT OF THE COMPANY'S OPERATIONS THROUGH THE CLASS PERIOD, AND THEN NOW TRY TO CHARACTERIZE HIM AS SOME CW NOBODY WHO HAD NO DETAIL AND NO KNOWLEDGE ABOUT THE COMPANY'S OPERATIONS.

WE DO PROVIDE DETAIL.  ONE EXAMPLE OF THE DETAIL THAT MR. HALL PROVIDES THAT'S CRITICALLY IMPORTANT TO THIS CASE IS HIS COMMENTARY ON THE COMPANY'S PROJECTIONS, WHICH WE ALLEGE ARE MATERIALLY FALSE AND MISLEADING.

AS AN ASIDE, THE SAFE HARBOR DOESN'T APPLY BECAUSE THE STATEMENTS WERE MIXED.  UNDER *QUALITY SYSTEMS*, NINTH CIRCUIT CASE, WHEN FUTURE STATEMENTS ARE MIXED WITH PRESENT STATEMENTS, THE SAFE HARBOR DOESN'T APPLY.  AND THAT'S THE CASE HERE.

SO AS YOU START ON JULY 2ND, 2020, THE FIRST DAY OF THE CLASS PERIOD, THESE PROJECTIONS INCREASE MIRACULOUSLY, BASELESSLY, UP TO $970 MILLION OF PROJECTIONS THROUGH 2024.

WHAT MR. HALL TELLS US, AND WHAT WE ALLEGE IN THE COMPLAINT, IS THAT HE INFORMED THE BOARD, WHICH INCLUDES EVERY DEFENDANT EXCEPT FOR MR. HAMER -- OR DEFENDANT HAMER WHO IS CFO OF THE COMPANY -- THAT ACHIEVING THOSE TARGETS WAS IMPOSSIBLE, THAT THOSE TARGETS WERE WILDLY OVERSTATED.

**THE COURT:**  WHEN DID HE SAY THAT?

**MR. ABADOU:**  STARTING AT THE BEGINNING OF THE CLASS PERIOD ON JULY 2ND IN A PRESS RELEASE THAT ACCOMPANIED HIS COMPLAINT.  HE MAKES THAT VERY, VERY POTENT ALLEGATION --

**THE COURT:**  THERE WERE PRESS RELEASES THAT ACCOMPANIED HIS COMPLAINT.

**MR. ABADOU:**  THE PRESS RELEASE THAT HE ISSUED AFTER HE FILED HIS COMPLAINT.  I FORGET PRECISELY WHAT --

**THE COURT:**  THAT'S MUCH LATER.

**MR. ABADOU:**  IT WAS A COUPLE OF DAYS AFTER HE FILED HIS COMPLAINT.

BUT WHAT HE SAYS THERE IS:  I TOLD DEFENDANTS FROM THE INCEPTION OF THE CLASS PERIOD THAT THOSE PROJECTIONS WERE BASELESS, THEY WERE WILDLY OVERSTATED.  WHY?  THROUGHOUT THE CLASS PERIOD DEFENDANTS SAY REPEATEDLY THAT THEY HAVE CONTRACTS IN HAND, THAT THESE CONTRACTS ARE EXECUTED, THEY ARE SIGNED AND AWARDED.  IN OTHER WORDS, THEY'RE GIVING INVESTORS THE

IMPRESSION THAT THESE PROJECTIONS ARE BASED ON PRESENT FACTS THAT CONTRACTS ARE EXECUTED.

WHAT MR. HALL TELLS US, AND HE SHOULD KNOW, GIVEN THAT IT'S HIS COMPANY THAT HE FOUNDED, HIS CUSTOMERS THAT HE NEGOTIATED THESE DEALS WITH, WERE THAT THESE CONTRACTS WEREN'T SIGNED AND AWARDED DONE DEALS.  THEY WERE, AT MOST, INDICATIONS OF INTEREST OF PRODUCTS THAT HADN'T BEEN DEVELOPED.  SO WHEN MR. MUCK SAYS THERE'S NO DETAIL, THERE'S TREMENDOUS DETAIL, WHICH IS MY SECOND BIG POINT HERE.

SITTING BACK AND LISTENING TO MR. -- DEFENDANT'S ARGUMENTS, IT SOUNDED LIKE A SUMMARY JUDGMENT ARGUMENT.  YOU KNOW, JUDGE WHITE IN *MCKESSON* SAID, EVEN UNDER PSLRA PLAINTIFFS ARE REQUIRED TO PLEAD FACTS, CERTAINLY DETAILED FACTS, NOT PRODUCE ADMISSIBLE EVIDENCE.

I THINK THE ARGUMENTS THAT MR. MUCK MAKING SOUND IN SUMMARY JUDGMENT, WHICH INDICATES THERE SHOULD BE DISCOVERY HERE.  WE WILL DEPOSE MR. HALL.

BUT AT THIS STAGE, YOU'RE ABSOLUTELY RIGHT THAT -- I'M NOT AWARE, AFTER BEING A SECURITIES PRACTITIONER FOR 20 YEARS, OF ANY CASE WHERE A FORMER CEO, FOUNDER, CHAIRMAN, AND EXECUTIVE CHAIRMAN DURING THE CLASS PERIOD HAS LEVIED ALLEGATIONS OF FRAUD THAT MIRRORED OUR ALLEGATIONS IN THE FIRST COMPLAINT.

SO TO STEP BACK, YOU KNOW, IN *CONNETICS II* AND IN *ZORA*, BOTH OF YOUR DECISIONS, YOUR HONOR, YOU CITE *BERSON*

*VERSUS APPLIED* FOR THE PRINCIPLE THAT DEFENDANTS CANNOT AFFIRMATIVELY GIVE INVESTORS AN IMPRESSION OF A STATE OF AFFAIRS THAT DIFFERS IN A MATERIAL WAY FROM THE ONE THAT EXISTED.

DEFENDANTS DID THAT WITH RESPECT TO ALL FOUR CATEGORIES OF STATEMENTS THAT WE ALLEGE ARE MATERIALLY FALSE AND MISLEADING.

THEY DID IT WITH RESPECT TO FORD, SAYING REPEATEDLY, REPEATEDLY -- WHICH SEEMED TO ANIMATE THIS COURT IN THOSE TWO CASES -- THEY MADE THE REPEAT STATEMENT THAT FORD WOULD REMAIN A FIVE PERCENT MINIMUM SHAREHOLDER INVESTOR IN VELODYNE.

HOW DO WE LEARN THAT FORD HAD COMPLETELY DIVESTED ITS 7.6 PERCENT STAKE IN THE COMPANY?  WE LEARNED IT FROM FORD IN FEBRUARY, NEARLY TWO MONTHS AFTER THE COMPANY HAD COMPLETELY SOLD ITS ENTIRE STAKE IN THE COMPANY.

SO THE COMPANY IS REPEATEDLY SAYING TO THE MARKET IN ORDER TO CONSUMMATE THE DE-SPAC MERGER IN SEPTEMBER 2020, FORD IS A GREAT PARTNER, FORD IS GOING TO BE HUGE INVESTOR IN THE COMPANY TO GIVE THE DE-SPAC AN AIR OF CREDIBILITY.

**THE COURT:**  HOW DO YOU KNOW THAT THEY DIDN'T BELIEVE THAT?

**MR. ABADOU:**  BECAUSE AT THE BEGINNING OF THE CLASS PERIOD IN JULY 2020, FORD -- WE ALLEGE FORD AND THE COMPANY SIGNED A LETTER AGREEMENT, WHICH ENABLED FORD, AND I THINK ONE OTHER INVESTOR INDIVIDUAL, TO UNLOAD ITS ENTIRE POSITION IN THE

COMPANY.  WE ALSO KNOW --

**THE COURT:**  THAT DOESN'T MEAN THEY'RE GOING TO.

**MR. ABADOU:**  IT DOESN'T, BUT THE COMPANY DIDN'T NEED TO SPEAK ON THIS ISSUE.  THEY DIDN'T NEED TO SAY ANYTHING ABOUT FORD.  THEY CHOSE TO.  WHEN YOU CHOOSE TO MAKE STATEMENTS LIKE THAT, UNDER THE FEDERAL SECURITIES LAWS, YOU HAVE AN OBLIGATION TO MAKE SURE THAT YOU'RE COMPLETE IN YOUR DISCLOSURES.

**THE COURT:**  WELL, THE FACT THAT FORD AND THIS OTHER INVESTOR COULD SELL DURING THE PERIOD, THAT WAS DISCLOSED, WAS IT NOT, IN THE THINGS THEY FILED WITH THE SEC?

**MR. ABADOU:**  NO.  THAT LETTER AGREEMENT WAS NOT DISCLOSED -- I MEAN, IT WAS DISCLOSED IN THE COMPANY'S SEC FILINGS ORIGINALLY.  BUT THAT, COUPLED WITH THE STATEMENT THAT FORD IS EXPECTED TO MAINTAIN ITS OWNERSHIP IN THE COMPANY, WAS CRITICAL TO GIVE THIS DEAL AN AIR OF CREDIBILITY.

THERE'S ALSO ANOTHER FACT, WHICH IS A BOARD MEMBER WHO IS ON THE AUDIT COMMITTEE -- I THINK HER NAME WAS BARBARA SAMARDZICH, NOT A DEFENDANT IN THIS CASE -- WAS THE FORD RELATIONSHIP.  SHE'S ON THE AUDIT COMMITTEE THAT'S INVESTIGATING -- WE ALLEGE THE AUDIT COMMITTEE STARTED IN NOVEMBER 2020, NOT DECEMBER 9TH.  DECEMBER 9TH IS THE DATE THAT THE COMPANY HIRES KEKER & VAN NEST TO DO THIS INVESTIGATION, WHICH IS A MONTH BEFORE THE COMPANY SAYS, NOTHING TO SEE HERE, EVERYTHING'S FINE.

BY THE TIME DEFENDANTS MAKE THAT STATEMENT THAT THERE

IS NO FUNDAMENTAL CHANGE IN OUR OUTLOOK ON JANUARY 7, 2021, WE KNOW TWO THINGS, AND DEFENDANTS KNOW TWO THINGS.  ONE, THAT MR. HALL IS UNDER INVESTIGATION; TWO, THAT FORD HAS ALREADY UNLOADED ITS ENTIRE POSITION.  THE COMPANY NEVER MAKES A DISCLOSURE ABOUT THAT.

**THE COURT:**  THE COMPANY KNEW THAT AS OF?

**MR. ABADOU:**  DECEMBER 31ST, 2020, WHEN FORD HAD COMPLETELY UNLOADED ITS 7.6 PERCENT STAKE IN THE COMPANY.  AS OF DECEMBER 31ST THERE IS NO DISPUTE THAT FORD HAD SOLD ITS ENTIRE POSITION IN VELODYNE, AND WE BELIEVE AND ALLEGE THAT THOSE SALES TOOK PLACE BETWEEN NOVEMBER AND DECEMBER.

SO DEFENDANTS EITHER KNEW ABOUT THOSE SALES, OR THEY WERE RECKLESS IN NOT KNOWING, BECAUSE WHEN THEY SAY ON JANUARY 7TH, NO CHANGE TO OUR FUNDAMENTAL OUTLOOK, BY THAT POINT FORD IS GONE.  THEY CAN'T AGAIN, LIKE MR. HALL, SAY THROUGHOUT THE CLASS PERIOD, FORD IS IMPORTANT, FORD IS EXPECTED TO MAINTAIN A FIVE PERCENT INTEREST IN THE COMPANY, THEN FIND OUT THAT FORD HAS SOLD OUT AND SAY EVERYTHING IS FINE.

**THE COURT:**  FORGIVE ME, BECAUSE I JUST DON'T KNOW HOW THESE THINGS WORK.  HOW WOULD THE COMPANY KNOW OR THE INDIVIDUAL DEFENDANTS KNOW THAT FORD HAD SOLD?

**MR. ABADOU:**  IT'S ONE OF ITS BIGGEST CUSTOMERS.

**THE COURT:**  BIGGEST CUSTOMERS?

**MR. ABADOU:**  AND INVESTORS.  IT'S A KEY RELATIONSHIP

AT THE COMPANY.

SO WHEN YOU HAVE YOUR BIGGEST, ONE OF YOUR BIGGEST CUSTOMERS AND ONE OF YOUR BIGGEST INVESTORS IN THE COMPANY AND YOU DON'T KNOW THAT THEY'VE UNLOADED THEIR ENTIRE POSITION --

**THE COURT:**  HOW WOULD YOU KNOW IS MY QUESTION?  HOW WOULD THEY FIND OUT?

**MR. ABADOU:**  THEY WOULD PRESUMABLY FIND OUT FROM A BOARD MEMBER FROM FORD WHO IS ON THE AUDIT COMMITTEE, MS. SAMARDZICH, WHICH WE ALLEGE IN THE COMPLAINT.

**THE COURT:**  PRESUMABLY, SHE WOULD TELL THEM.

**MR. ABADOU:**  SHE WOULD TELL THEM OR -- THAT'S EXACTLY RIGHT.  SHE IS ON THE AUDIT COMMITTEE.  SHE'S A BOARD MEMBER. THAT'S KIND OF A CRITICAL FACT, WE THINK.

THE NEXT CATEGORY, YOUR HONOR, BESIDES FORD IS OBVIOUSLY THE HALL STATEMENTS, THAT HALL WILL REMAIN CHAIRMAN. AND YOU'RE RIGHT, THEY START THE INVESTIGATION -- THEY FINISHED THE DE-SPAC IN SEPTEMBER, AND HE'S GONE.

WHAT WE ALLEGED, AND WHAT MR. HALL PROVIDES A TREMENDOUS AMOUNT OF DETAIL ABOUT -- AND HE DOES THIS STARTING ON MARCH 3RD IN A 13D FILING WITH THE SEC, HE SAYS STARTING IN JULY THEY HAD BEGUN TO MARGINALIZE MR. HALL INTERNALLY AND REMOVE HIM FROM, KIND OF, YOU KNOW, A KEY DECISION-MAKING PROCESSES, BUT AT THE SAME TIME ARE TOUTING HIS DEEP INVOLVEMENT IN THE COMPANY, AT THE SAME TIME TELLING INVESTORS THAT HE'S GOING TO DRIVE THE TECHNOLOGY, HE'S GOING TO DRIVE

THE ENGINEERING.

WHY DID DEFENDANTS DO THAT?  DEFENDANTS DO THAT BECAUSE THE MARKET KNOWS THAT THERE'S NO WAY VELODYNE SUCCEEDS AS A COMPANY, AS A PUBLIC COMPANY, AND THERE'S REALLY NO WAY THAT THE DE-SPAC TAKES PLACE, THE MERGER TAKES PLACE IN SEPTEMBER, IF MR. HALL ISN'T THERE.

THE MINUTE THE DE-SPAC CLOSES IS WHEN DEFENDANTS REALLY BEGIN TO TAKE ACTIVE STEPS TO FURTHER MARGINALIZE HIM AND REMOVE HIM FROM THE COMPANY.

SO THIS NOTION THAT, YOUR HONOR, THE AUDIT COMMITTEE INVESTIGATIONS START ON DECEMBER 9TH, WE DON'T THINK IS QUITE ACCURATE.  YOU DON'T JUST WAKE UP ONE MORNING AS AN AUDIT COMMITTEE, AND SAY WE'RE HIRING KEKER, WE ARE GOING TO GO HIRE JOHN, ON DECEMBER 9TH.  THAT'S NOT THE WAY IT WORKS.

THEY ADMIT -- AND THIS IS IN FOOTNOTE 54 OF THE AMENDMENT COMPLAINT -- THAT -- I BELIEVE IT'S 54, AND YOU CAN CHECK ME IF I'M WRONG -- THAT THEIR CONCERNS WITH MR. HALL -- AND THEY SAY THIS IN A PARALLEL -- IN ANOTHER PROCEEDING IN ARBITRATION.  THEY SAY THAT OUR CONCERNS WITH MR. HALL BEGAN IN THE FALL.  SO THERE'S REALLY NOT A LARGE KIND OF TIME GAP BETWEEN MR. HALL'S ALLEGATION THAT THESE ISSUES STARTED IN JULY AND THE COMPANY'S ADMISSION IN FOOTNOTE 54 OF THE COMPLAINT THAT THEY HAD CONCERNS WITH HIM STARTING IN THE FALL OF 2020.

**THE COURT:**  WELL, THE WHOLE THING IS JUST SUCH A COMPACT TIME SCALE --

**MR. ABADOU:**  IT SURE IS.

**THE COURT:**  -- FOR THINGS TO GO FROM ROSY TO, GOLLY, WE THINK THERE'S A CRIMINAL PROBLEM HERE, A KEKER VAN NEST PROBLEM.

**MR. ABADOU:**  THAT'S A REALLY IMPORTANT POINT, YOUR HONOR.

JUST BY WAY OF EXAMPLE, THE COMPANY REAFFIRMS ITS GUIDANCE IN NOVEMBER 2020, RIGHT?  THAT GUIDANCE IS WITHDRAWN ON JANUARY 7TH.  THAT TEMPORAL PROXIMITY IS ABSOLUTELY CRITICAL UNDER CASES LIKE *TWITTER* AND *FECK V. PRICE*, A NINTH CIRCUIT DECISION.

SO WITH RESPECT TO SCIENTER, OR CONSCIOUS MISBEHAVIOR OR RECKLESSNESS, THE NARROW TIMING BETWEEN THESE THINGS IS SOMETHING WE MAKE A BIG DEAL ABOUT IN THE COMPLAINT AND WE THINK IS IMPORTANT HERE.

SO NOT ONLY DO THEY REAFFIRM GUIDANCE IN NOVEMBER AND SUDDENLY WITHDRAW IT ON JANUARY 7TH, BY THE TIME THEY DO THEIR EARNINGS CONFERENCE CALL IN FEBRUARY WHAT HAPPENS?  ANALYSTS START TO QUESTION THE COMPANY:  WELL, YOU GUYS SAID PROJECTIONS WERE GOING TO BE $970 MILLION THROUGH 2024, DEFENDANTS HAVE NOW WITHDRAWN THAT.

WHAT DO THEY SAY TO ANALYSTS?  NOTHING TO ANALYSTS. THEY SAY WE CAN'T ANSWER THAT QUESTION ON THAT CONFERENCE CALL. SO THEY PROVIDE EVASIVE RESPONSES TO ANALYST QUESTIONS JUST A SHORT TIME --

**THE COURT:** THAT'S NOT AN EVASIVE RESPONSE --

**MR. ABADOU:** IT'S NO RESPONSE.  IT'S EVEN WORSE.

UNDER THE CASE LAW, YOU KNOW -- AND I THINK AGAIN IT'S *TWITTER* AND PERHAPS SOME OTHER CASES WE CITED IN OUR BRIEF -- THAT'S FURTHER INDICIA OF WRONGDOING AND SCIENTER.

MR. MUCK ARGUED -- AND I THINK I NEED TO ADDRESS THIS -- THAT DEFENDANTS DIDN'T BENEFIT AT ALL AND HAD NO MOTIVE, EFFECTIVELY.  ALL ONE NEEDS TO DO IS READ THE COMPLAINT, PARTICULARLY THE PARTY SECTION AND THE ADDITIONAL SCIENTER SECTION, BUT THIS IS ALSO IN THE OPPOSITION TO THE MOTION TO DISMISS.

IF DE-SPAC HADN'T GONE THROUGH, DEFENDANTS DEE AND GRAF WOULD HAVE HAD TO REPAY THE ORIGINAL INVESTORS SOMETHING IN THE NEIGHBORHOOD OF $150 MILLION.  MR. GOPALAN'S COMPENSATION, YOUR HONOR, FROM THE TIME OF THE -- OF WHEN HE WAS ORIGINALLY WITH THE COMPANY TO WHEN THE DE-SPAC CLOSED INCREASED NINE TIMES TO SOMETHING LIKE $26 MILLION, RIGHT?

SO TO SUGGEST THEY DIDN'T BENEFIT IN ANY WAY -- MAYBE IT'S NOT BILLIONS -- YOU KNOW, MR. MUCK IS USED TO REPRESENTING INDIVIDUAL DEFENDANTS WHO MAKE BILLIONS OF DOLLARS IN THESE TRANSACTIONS.  BUT EVEN IN THIS DAY AND AGE, YOU KNOW, FROM MY PROSPECTIVE, AND CERTAINLY FROM THE CLASS'S AND SHAREHOLDERS', THOSE ARE ENORMOUS SUMS.

JUST ON PRIVATE WARRANTS ALONE, DEFENDANTS DEE AND GRAF ENDED UP MAKING -- I GET THEM CONFUSED -- 7.6 MILLION AND

6.4.  I FORGET WHICH ONE IS WHICH, BUT, AGAIN, A LOT OF MONEY.

SO THEY DID BENEFIT.  THEY DID HAVE MOTIVE.  BECAUSE IF THIS DEAL HADN'T CLOSED, DEFENDANTS DEE AND GRAF WOULD HAVE HAD TO FORFEIT THE SOME $150 MILLION THAT REMAINED IN THE TRUST TO COMPLETE ONE OF THESE DEALS.

SO TO THE EXTENT THEY HAD ISSUES WITH MR. HALL, THEY HAD EVERY INCENTIVE, EVERY MOTIVATION TO CONCEAL THAT FROM INVESTORS UNTIL THE DEAL CLOSED AND DEAL WITH HIM AT THAT POINT ONCE THEY HAD CASHED IN AS A RESULT OF THIS DEAL.

AND SO YOU'RE ABSOLUTELY RIGHT THAT WE HAVE KIND OF, YOU KNOW, THE CRITICAL WITNESS IN THIS CASE.  THERE'S ALSO MS. PATEL THAT MR. HALL DESCRIBES A MEETING IN SAN JOSE ON SEPTEMBER 9TH, I BELIEVE IT WAS, 2020, WHERE SHE WAS SHOCKED THAT HE WOULDN'T BE REQUIRED TO SIGN OFF ON AUDITS.  THIS IS THE FOUNDER OF THE COMPANY.

THE DEFENDANTS THAT COME IN, DEE AND GRAF, THROUGH THIS S-PAC, OR SPAC, REALLY HAVE NO --

**THE COURT:**  IS THAT WHAT IT IS, S-PAC?

**MR. ABADOU:**  I'VE HEARD IT PRONOUNCED BOTH WAYS, YOUR HONOR, SPAC OR S-PAC.

WHAT THIS IS -- AND WE DESCRIBE THIS IN THE BACKGROUND SECTION OF THE COMPLAINT -- IT'S A WAY TO GET AROUND DOING AN IPO.

**THE COURT:**  I UNDERSTAND ALL THAT.  IT DOES SEEM TO ME THIS IS A SLIGHTLY DIFFERENT CASE FROM THE NORM IF IT LEAVES

THE FOLKS WHO PUT TOGETHER THE DE-SPAC VULNERABLE IF THE WHOLE THING IS STRUCTURED SUCH THAT IF THE INVESTORS DON'T -- BASICALLY, DON'T LIKE THE MERGER PARTNER THAT'S CHOSEN -- AND CORRECT ME IF I'M WRONG, IF THEY DON'T LIKE IT, THEY COULD JUST GET THEIR MONEY BACK, CORRECT?  SO IT'S A DIFFERENT ANIMAL HERE A LITTLE BIT.

**MR. ABADOU:**  THERE'S ALSO ONE OTHER THING, YOUR HONOR -- TWO LAST THINGS I WANTED TO MAKE CLEAR, AND I THINK IT'S CLEAR IN THE OPPOSITION TO MOTION TO DISMISS.  DEFENDANTS I THINK TRIED TO OBFUSCATE THIS.

THERE WAS NO ABSOLUTE DUTY TO DISCLOSE UNDER THE FEDERAL SECURITIES LAWS.  WE KNOW THIS.  THAT'S BLACK LETTER LAW, AND THE NINTH CIRCUIT HAS SAID THAT TIME AND AGAIN.

SO CERTAINLY WE ALLEGE ON OUR SCHEME COUNT, THAT THERE WAS A SCHEME TO REMOVE FROM THE OUTSET.  BUT WE ALSO KNOW THAT ONCE THE AUDIT COMMITTEE STARTED TO LOOK AT MR. HALL -- AND WE BELIEVE THAT WAS IN NOVEMBER 2020, CERTAINLY NO LATER THAN WHEN THEY HIRED OR RETAINED KEKER VAN NEST ON DECEMBER 9TH, THEY HAD REPEATEDLY TOUTED MR. HALL AS A VISIONARY, A GENIUS, AND THAT HE WILL PLAY A CRITICAL ROLE AS THE COMPANY'S EXECUTIVE CHAIRMAN OF THE BOARD.  THIS WAS IMPORTANT TO INVESTORS, AND DEFENDANTS KNEW THAT.

THE MINUTE THAT INVESTIGATION STARTS, YOUR HONOR, THEY HAVE AN OBLIGATION THAT THEY CREATED FOR THEMSELVES BY TOUTING HIM REPEATEDLY TO DISCLOSE THAT INVESTIGATION.  WHAT DO

THEY DO ON JANUARY 7TH?  THEY ISSUE AN 8-K, THAT WITHDRAWS THEIR GUIDANCE AND ALSO PROVIDES A BUSINESS OUTLOOK THAT SAYS THERE'S NO CHANGE TO OUR FUNDAMENTAL OUTLOOK.  YOU TOUCHED ON THAT EARLIER.

THERE ABSOLUTELY HAD BEEN A CHANGE TO THE COMPANY'S FUNDAMENTAL OUTLOOK AS OF JANUARY 7TH, BECAUSE DEFENDANTS KNEW AS OF THAT DATE THAT THEY HAD ALREADY COMMENCED A FORMAL OUTSIDE INVESTIGATION.

AND I THINK THAT'S REALLY IMPORTANT, AND WE CITE A COUPLE OF CASES ON THAT.  *STAMPS VERSUS KARINSKI* FROM THE CENTRAL DISTRICT IS CRITICAL ON THE INVESTIGATION AND THE DUTY PIECE, AND *DUKE ENERGY* FROM NORTH CAROLINA, WHICH IS REAL ON POINT WITH RESPECT TO MR. HALL IS ALSO CRITICAL.

BUT A CASE DEFENDANTS RELY ON FUNDAMENTALLY, WHICH IS *CBS*, IT'S A SOUTHERN DISTRICT OF NEW YORK CASE AND SAY, OH, YOU DON'T HAVE TO DISCLOSE AN INVESTIGATION.  THAT IS INCORRECT. IN THE *CBS* CASE DEFENDANTS DID THE RIGHT THING, YOUR HONOR, AND DID DISCLOSE THE INVESTIGATION.  SO WHATEVER STATEMENTS THEY MADE ABOUT SMOON/VES, RIGHT, ARE VERY DIFFERENT FROM WHAT WE HAD HERE AND WHAT WE HAVE HERE.

THE ONE LAST THING I WANTED TO MENTION, YOUR HONOR --

**THE COURT:**  BUT, YOU KNOW, I KEEP THINKING ABOUT THE SITUATION AS IT UNFOLDED.  IT CANNOT HAVE BEEN A HAPPY -- A HAPPY AUDIT COMMITTEE THAT SAID, WE BETTER INVESTIGATE THIS GUY, AFTER HE HAD BEEN BROUGHT IN WITH SUCH GUSTO THAT HE'S A

VISIONARY IN THE INDUSTRY.  I MEAN, THAT CAN'T HAVE BEEN GOOD.

BUT LET'S SAY THEY HAD REVEALED THAT RIGHT THEN, WOULDN'T THAT HAVE BEEN UNFAIR TO MR. HALL, BECAUSE THERE HAD BEEN NO RESULT AND IT WOULD CERTAINLY CAST ASPERSIONS ON HIM IN THE WAY THAT WOULD BE UNFAIR?

MR. ABADOU:  SO I THINK DISCOVERY WILL REVEAL WHO WAS UNHAPPY AND WHO WAS HAPPY.  I THINK ONCE THEY STARTED HAVING ISSUES WITH HIM -- AND WE BELIEVE AND ALLEGE, BASED ON WHAT MR. HALL TELLS US, THAT BEGAN IN JULY -- THEY HAD CASHED OUT. THEY HAD MADE THEIR MONEY AS OF SEPTEMBER 2020.  AND AT THAT POINT I THINK THEY DID WANT TO GET RID OF HIM, AND I THINK MANY OF THE DEFENDANTS WERE HAPPY.

WE KNOW THERE WERE BAD RELATIONSHIPS BETWEEN DEFENDANT GOPALAN, WHO STOOD TO BENEFIT FROM MR. HALL LEAVING. WE KNEW THAT THERE WERE NEGATIVE RELATIONSHIPS BETWEEN DEFENDANT CULKIN AND MR. HALL.  AND SO I DON'T THINK VERY MANY PEOPLE AT THE COMPANY AT THE TIME LIKED HIM, AND THEY WANTED HIM GONE, AND I THINK THEY WERE HAPPY, QUITE FRANKLY, TO SEE HIM GO, AND WERE WAITING FOR THE MINUTE TO DO THAT.  THE MINUTE THE DE-SPAC CLOSED IS WHEN THEY DID THAT.

THERE'S ONE OTHER POINT I WANTED TO MAKE ABOUT THE INTERNAL CONTROLS PIECE.  THE COMPANY TOUTED ITS INTERNAL CONTROLS REPEATEDLY DURING THE CLASS PERIOD, LIKE IT DID WITH ALL THE CATEGORIES OF STATEMENTS WE ALLEGED ARE MATERIALLY FALSE AND MISLEADING.

ONE OF THE THINGS THAT HAPPENED ON THAT MARCH 15TH DISCLOSURE OF A MATERIAL WEAKNESS IN THE COMPANY'S INTERNAL CONTROLS IS AN ADMISSION THAT THEY WEREN'T REVIEWING REVENUE SCHEDULES, RIGHT?  WHO'S RESPONSIBLE FOR THOSE REVENUE SCHEDULES?  CERTAINLY THE CFO AND THE CEO WHO ARE REQUIRED TO SIGN OFF ON THE SOFT CERTIFICATIONS.  BUT HOW COULD THEY CREDITABLY TOUT THAT THOSE REVENUES PRE DE-SPAC, BETWEEN JULY AND SEPTEMBER, AND THEN BEYOND SEPTEMBER, HOW COULD THEY CREDIBLY AND NOT RECKLESSLY TOUT THOSE REVENUES WITH THE CERTAINTY THEY DID WHEN THEY WEREN'T REVIEWING THOSE REVENUE SCHEDULES?

I THINK THAT'S AN IMPORTANT POINT THAT WASN'T NECESSARILY KIND OF ADDRESSED IN THE PAPERS, BUT ALSO IN TERMS OF THE SPECIFICITY THAT MR. MUCK SAYS IS NON-EXISTENT -- I BELIEVE IT'S IN PARAGRAPH 211 OF THE COMPLAINT, YOUR HONOR, I MAY BE MISTAKEN, BUT I THINK IT'S PARAGRAPH 211.

THROUGHOUT THE CLASS PERIOD IN PROXIES THAT WERE FILED WITH INVESTORS, DEFENDANTS ASSURED INVESTORS THAT DEFENDANTS DEE AND HAMER WERE HAVING ONE-ON-ONE DIALOGUES AND CONVERSATIONS ABOUT THESE CONTRACTS THAT PROVIDED THE FOUNDATION FOR THE PROJECTIONS THAT WE ALLEGE WERE MATERIALLY MISLEADING.

THAT IS ABSOLUTELY CRITICAL BECAUSE THAT IS AT THE SAME TIME THAT MR. HALL IS TELLING THEM THAT THOSE CONTRACTS WERE AT MOST INDICATIONS OF INTEREST, RIGHT?  A REASONABLE

INVESTOR HEARING A COMPANY SAY, HEY, WE'RE GOING TO HAVE $970 MILLION IN THESE REVENUES THROUGH 2024 -- WHICH, BY THE WAY, THE COMPANY HASN'T EVEN COME CLOSE.  I THINK THEY WOULD HAVE A 1.4 BILLION DOLLAR MAKEUP BETWEEN NOW AND 2024 TO KIND OF MEET THOSE TARGETS.

BUT DURING THAT SAME TIME, HALL HAS TOLD US HE'S TELLING THEM THOSE CONTRACTS ARE AT MOST INDICATIONS OF INTEREST.  BUT A REASONABLE INVESTOR HEARING DEFENDANTS SPEAK ON THESE ISSUES AND HERE'S SIGNED AND AWARDED CONTRACTS IN HAND, SIGNED AND EXECUTED, THINKS THIS IS GREAT, THIS IS A GREAT INVESTMENT, GIVEN THE FACT THAT THESE PROJECTIONS ARE BASED ON CURRENT EXISTING CONTRACTS.  WE KNOW THOSE CONTRACTS WERE, AT MOST, INDICATIONS OF INTEREST ON PRODUCTS THAT HADN'T EVEN BEEN DEVELOPED AND WERE BEING TESTED.

AND WHO SHOULD WE BELIEVE ON THAT?  WE SHOULD BELIEVE MR. HALL.  WHY?  BECAUSE THEY WERE HIS CUSTOMERS.  IT WAS A COMPANY HE FOUNDED.  HE KNEW ABOUT THOSE CONTRACTS BETTER THAN THESE INTERLOPERS, EFFECTIVELY, WHO CAME IN AND TOOK OVER HIS COMPANY, AND SO HE HAS SOMETHING VALUABLE TO SAY HERE.

**THE COURT:**  HOW DID THEY DISCLOSE THAT THESE CONTRACTS WERE NOT BINDING IN THE SENSE THAT THE PRODUCTS HADN'T YET BEEN DEVELOPED?

**MR. ABADOU:**  THEY DID IN ONE RESPECT, WITH RESPECT TO PIPELINE.  THAT --

**THE COURT:**  WITH RESPECT TO PIPELINE?

**MR. ABADOU:** PIPELINE, CUSTOMER PIPELINE, RIGHT?

SO IN AN EARLY -- I THINK IT'S PROXY STATEMENT -- AND DEFENDANTS ARGUED THIS IN THEIR MOTION TO DISMISS THAT THEY DISCLOSED THIS. THEY DID NOT. WHAT THEY DISCLOSED WAS VIS-A-VIS PIPELINE POSSIBILITIES THAT IT WAS UNCERTAIN.

SO LEAVING THAT ASIDE --

**THE COURT:** THE PIPELINE IS STILL WITH CONTRACTS, IS IT NOT?

**MR. ABADOU:** IT MAY OR MAY NOT BE. BUT WHAT WE KNOW IS SUBSEQUENT TO THAT, YOUR HONOR, WHETHER IT'S ON CONFERENCE CALLS, OR 8-KS, OR IN ANNUAL REPORTS, THAT SAME WARNING WASN'T ARTICULATED AT ALL. SO THEY REPEATEDLY, THROUGHOUT THE CLASS PERIOD -- AND THIS IS IN THE COMPLAINT -- TOUTED THOSE SIGNED AND EXECUTED CONTRACTS WITHOUT ANY WARNING, AND WE THINK THAT'S ABSOLUTELY CRITICAL TO OUR CASE AS WELL.

**THE COURT:** OKAY. THANK YOU.

**MR. ABADOU:** ONE LAST THING, YOUR HONOR.

ON THE FUNDAMENTAL CHANGED OUTLOOK, YOU KNOW, *QUALITY SYSTEMS* IS A GOOD CASE ON THAT. IT IS A NINTH CIRCUIT DECISION. AND I BELIEVE THE LANGUAGE IN *QUALITY SYSTEMS* IS IDENTICAL TO NO FUNDAMENTAL OUTLOOK, AND SO I THINK THAT'S KIND OF AN IMPORTANT CITE AS WELL.

**THE COURT:** I HAD ONE OTHER QUESTION --

**MR. ABADOU:** I THINK DEFENDANTS SAID IT WAS KIND OF VAGUE, AND IT'S NOT. TAKEN IN CONTEXT IT'S NOT VAGUE AT ALL.

**THE COURT:** LET ME ASK YOU THIS QUESTION: IF YOU WERE TO GET LEAVE TO AMEND, DO YOU BELIEVE YOU COULD ADD MORE FACTUAL DETAIL TO THE COMPLAINT THAN YOU HAVE?

**MR. ABADOU:** WE COULD, YOUR HONOR, MAYBE, BUT I THINK AS IT STANDS NOW, I THINK AT THE MOTION TO DISMISS STAGE WHERE OUR ALLEGATIONS SHOULD BE ACCEPTED AS TRUE, OUR POSITION IS IT'S NOT REALLY CLOSE.

DEFENDANTS MAY ULTIMATELY PREVAIL AT SUMMARY JUDGMENT. I THINK THEY'D PREFER TO HAVE SUMMARY JUDGMENT NOW. I THINK THAT'S EFFECTIVELY WHAT MR. MUCK IS DOING, TRYING TO TRANSFORM THIS INTO SUMMARY JUDGMENT PROCEEDINGS, BUT AT THIS POINT WE ARE TO ALLEGE THE FACTS. WE PLED THE WHO, WHAT, WHEN, WHERE, AND HOW, AND WHY WITH RESPECT TO ALL STATEMENTS. WE SPECIFIED WHICH DEFENDANT MADE WHICH STATEMENT WHEN. SO AT THE 12(B)(6) STAGE --

**THE COURT:** WITH RESPECT, FOR EXAMPLE, TO MR. HALL, A LARGE PART OF THE PRIOR DISCUSSION WAS THAT HE HAD SAID, WELL, YOU KNOW, THEY DIDN'T LIKE ME, AND THERE WAS A PLOT TO GET RID OF ME, AND I WAS TELLING PEOPLE ALL THE TIME WHAT WAS REALLY HAPPENING, AND THEY IGNORED ME, IF THAT WERE NOT SPECIFIC ENOUGH, ARE YOU IN A POSITION TO GET MORE SPECIFICITY?

**MR. ABADOU:** I'M NOT SURE, BUT I WOULD SAY THAT IS WHAT MR. MUCK FOCUSED ON AND DEFENDANTS FOCUSED ON. BUT IF YOU LOOK AT THE COMPLAINT CAREFULLY AND OUR BRIEFING IN THIS CASE, SURE, THERE'S SOME ADJECTIVES THERE ON BOTH SIDES ABOUT EACH

OTHER.  BUT IF YOU REALLY DRILL DOWN INTO THE FACTS HE PROVIDES, I THINK IT'S BEYOND WHAT'S NECESSARY UNDER THE PSLRA AT THIS STAGE OF THE CASE.

THE COURT:  ALL RIGHT.  THANK YOU.

MR. ABADOU:  THANK YOU, YOUR HONOR.

THE COURT:  MR. MUCK?

MR. MUCK:  YOUR HONOR, IF I MIGHT, BRIEFLY?

THE COURT:  YOU MAY.

MR. MUCK:  I HAVE TO CONFESS, AS I WAS LISTENING TO THAT, I WAS WONDERING IF I HAD THE WRONG COMPLAINT, BECAUSE IN NONE OF WHAT COUNSEL HAD TALKED ABOUT AS HAVING BEEN ALLEGED WAS I ABLE TO FIND -- AND IN A COUPLE OF INSTANCES THERE WERE A COUPLE OF THINGS HE HAS ALLEGED THAT HE DIDN'T ACKNOWLEDGE.

ON THE LAST PART ABOUT SIGNED AND AWARDED CONTRACTS, THE COMPANY SPECIFICALLY DISCLOSED IT'S IN THE COMPLAINT, THAT OUR SIGNED AND AWARDED CONTRACTS MEAN THAT WE HAVE AGREED TERMS AND CONDITIONS OF SUPPLY BUT DO NOT HAVE FIRM ORDERS UNTIL AND UNLESS PURCHASE ORDERS ARE RECEIVED.  THAT SAME DISCLOSURE WAS REPEATED THROUGHOUT.

THE COURT:  THAT WAS IN THE JULY --

MR. MUCK:  AND LATER ON AS WELL, YOUR HONOR.  WE POINT THAT OUT IN OUR REPLY PAPERS.  IT IS IN THE JULY PRESENTATION, BUT THAT SAME DISCLOSURE IS REPEATED AFTER THAT AS WELL, CONSISTENTLY.  THE COMPANY UNDER- -- MADE CLEAR THAT PEOPLE UNDERSTOOD THAT WHEN THEY HAD 16 SIGNED AND AWARDED

CONTRACTS, THAT DID NOT NECESSARILY MEAN THAT CUSTOMER X WAS GOING TO ORDER FIVE MILLION PRODUCTS IN 2022.

THE COMPANY WAS MAKING REASONABLE ESTIMATES BASED ON THAT, BUT THEY NEVER SUGGESTED THAT THESE WERE FIRM COMMITMENTS.  AND THE BEST EVIDENCE OF THAT IS THERE'S NOT ONE IOTA, NOT ONE CITATION TO ANY ANALYST SAYING, OH, MY GOODNESS, I DIDN'T REALIZE HOW VELODYNE'S CONTRACTS WORK, BECAUSE EVERYBODY UNDERSTOOD IT.  SO THE NOTION THAT SOMEHOW VELODYNE WAS NOT DISCLOSING THE NATURE OF ITS CONTRACTS IS SIMPLY PULLED FROM THIN AIR.

THERE WERE A LOT OF THINGS, AND, YOU KNOW, I DON'T SUSPECT THAT I'M GOING TO HAVE ENOUGH TIME TO GET THROUGH EVERYTHING.  LET ME JUST START WITH A FEW, YOUR HONOR.

PLAINTIFF'S COUNSEL ARE, AGAIN, OFFERING A STRONGMAN WHEN IT COMES TO MR. HALL.  WE'RE NOT SAYING MR. HALL DOESN'T HAVE KNOWLEDGE.  WE'RE NOT SAYING HE DOESN'T HAVE INTERNAL KNOWLEDGE OF THE COMPANY.  WE'RE NOT SAYING HE IS NOT A RELIABLE WITNESS.

WHAT WE'RE SAYING IS HIS ACCOUNT DOES NOT BEGIN TO SATISFY WHAT THE PSLRA REQUIRES IN A CASE OF THIS SORT, AND THAT IS SPECIFICS.  AND COUNSEL SAID THEY PROVIDED THE WHO, WHAT, WHEN, WHERE, AND HOW, THE EXAMPLE THAT MR. HALL SAID, I TOLD PEOPLE FROM JULY ON THAT THESE CONTRACTS -- OR THAT THESE PROJECTIONS WERE UNREASONABLE, COULDN'T BE MET, WHERE'S THE WHO, WHAT, WHEN, WHERE, WHY, AND HOW?  WHO DID HE TELL?  WE

DON'T KNOW. WHEN DID HE SAY IT? WE DON'T KNOW. WHAT DID HE SAY? WE DON'T KNOW. DID ANYBODY ELSE SHARE THOSE CONCERNS? WE DON'T KNOW. THOSE ARE THE SORTS OF DETAILS THAT THE STATUTE ABSOLUTELY REQUIRES, AND PLAINTIFFS HAVE NOT PROVIDED THOSE.

AND I THOUGHT, YOUR HONOR, IT WAS TELLING WHEN YOU ASKED COUNSEL IF THEY COULD PROVIDE THAT INFORMATION WITH LEAVE TO AMEND. I DIDN'T HEAR AN AFFIRMATIVE RESPONSE TO THAT, AND I THINK THAT'S TELLING.

ON THIS NOTION THAT WE ARE SOMEHOW APPLYING A SUMMARY JUDGMENT STANDARD, THAT'S OBVIOUSLY NOT ACCURATE. WHAT WE ARE SAYING IS THE PSLRA REQUIRES FACTS. AND WE'RE NOT ARGUING CONTRARY FACTS. I'M LOOKING AT WHAT THE FACTS ARE THAT HAVE BEEN ALLEGED AND EXPLAINING WHY IT IS THAT THOSE DON'T SUPPORT A CLAIM OF SECURITIES FRAUD. THAT'S THE ISSUE.

A FEW OTHER THINGS.

ON THE FORD POINT, YOUR HONOR DIDN'T GET AN ANSWER TO THE QUESTION ABOUT HOW ANYBODY WOULD HAVE KNOWN BY DECEMBER 31ST. THE ANSWER IS THEY WOULDN'T, AND THERE ISN'T A SINGLE FACT ALLEGED IN THE COMPLAINT TO SUGGEST THAT ANYBODY AT VELODYNE, NOT EVEN DAVID HALL, KNEW THAT FORD SOLD ITS STOCK BEFORE IT DID.

**THE COURT:** WHAT ABOUT MS. S?

**MR. MUCK:** MS. SAMARDZICH? SHE WAS RETIRED. SHE HADN'T WORKED AT FORD FOR YEARS. SHE WAS A FORMER FORD EXECUTIVE. AND WHAT THE PLAINTIFFS ARE -- SO THE PLAINTIFFS

KEEP, YOU KNOW, FRANKLY, OMITTING, I GUESS, CERTAIN FACTS AND MAKING A LOT OF LOGICAL LEAPS THAT JUST AREN'T WARRANTED BY THE ACTUAL FACTS CONTAINED IN THIS COMPLAINT.

**THE COURT:** SO HOW DO THE BOOKS WORK ON -- LIKE THERE'S A MAJOR INVESTOR LIKE FORD WHO OWNS FIVE PERCENT OF THE STOCK OF THE COMPANY. THE COMPANY DOESN'T KNOW WHEN THAT STOCK IS SOLD. HOW DOES THAT WORK?

**MR. MUCK:** SO MY -- BECAUSE THESE ARE REGISTERED SHARES, AND FORD CAN SELL THEM AT ANY TIME THEY WANT. THEY DON'T NEED THE COMPANY'S APPROVAL AT THAT POINT.

**THE COURT:** RIGHT. BUT ISN'T THERE SOME LEDGER SOMEWHERE THAT SAYS THESE ARE THE PEOPLE THAT OWN THE COMPANY?

**MR. MUCK:** I AM NOT AWARE OF THAT, YOUR HONOR. THERE ARE REPORTING OBLIGATIONS FOR CERTAIN SHAREHOLDERS -- I'M GOING TO GET IN TROUBLE HERE. THIS IS NOT MY AREA -- IT'S 13 -- 13D, I THINK, REQUIRES THAT WITHIN A CERTAIN PERIOD OF TIME SHAREHOLDERS ABOVE A PARTICULAR THRESHOLD HAVE TO FILE A DISCLOSURE.

SO THERE ARE REQUIREMENTS THERE. BUT, NO, FORD DOESN'T -- I'M NOT AWARE OF ANYTHING, AND THE PLAINTIFFS CERTAINLY HAVEN'T IDENTIFIED ANY SUGGESTION THAT FORD NEEDED TO TELL VELODYNE, HEY, WE'RE GOING TO SELL, AND THERE ISN'T ANY FACT THAT'S ALLEGED IN THAT REGARD.

COUNSEL SAID THAT THE COMPANY DID NOT NEED TO SPEAK ABOUT FORD. THAT'S NOT TRUE. THE COMPANY DID -- THE COMPANY

SPOKE ABOUT FORD IN CONNECTION WITH THE MERGER, BECAUSE ONE OF THE RULES UNDER PROXY RULES, YOU HAVE TO DESCRIBE POST-MERGER WHO THE MAJOR SHAREHOLDERS ARE GOING TO BE, AND THAT'S THE CONTEXT IN WHICH THE COMPANY SAID FORD WILL BE -- IS EXPECTED TO BE A FIVE PERCENT SHAREHOLDER AFTER THE TRANSACTION, BECAUSE YOU ARE REQUIRED TO SAY --

**THE COURT:**  DID THEY EVER SAY THAT AGAIN?

**MR. MUCK:**  I THINK THEY MAY HAVE SAID IT IN NOVEMBER, IN EARLY NOVEMBER, NOT ANY TIME AFTER THAT THAT I AM AWARE OF, AND NOT ANY OTHER TIME THE PLAINTIFFS HAVE ALLEGED; CERTAINLY, NOT AT ANY TIME EVEN REMOTELY PROXIMATE TO WHEN FORD ANNOUNCED FINALLY THAT IT HAD SOLD ITS POSITION.

A FEW OTHER THINGS, YOUR HONOR.

WITH RESPECT TO THE TEMPORAL PROXIMITY POINT THAT COUNSEL RAISED, THAT IS A CLASSIC FRAUD BY HINDSIGHT ARGUMENT. THE NINTH CIRCUIT HAS RECENTLY SAID, INCLUDING IN THE *WESTON FAMILY PARTNERSHIP VERSUS TWITTER* CASE THAT WE CITE IN OUR PAPERS FROM EARLIER THIS YEAR, TEMPORAL PROXIMITY IS NOT ENOUGH.  AND THAT'S ALL THAT THE PLAINTIFFS HAVE WHEN IT COMES TO THESE PROJECTIONS.

AND, AGAIN, I WANT TO GET BACK TO A POINT THAT I RAISED EARLY ON, YOUR HONOR.  THEY'VE SUED FIVE INDIVIDUALS. WHAT ARE THE FACTS THAT SHOW THAT MR. GOPALAN KNEW AT ANY POINT IN TIME, OR MR. HAMER KNEW AT ANY POINT IN TIME, LET ALONE MR. CULKIN, DAVID HALL'S BROTHER-IN-LAW WHO HAS BEEN DRAGGED

INTO THIS, WHERE ARE THE FACTS TO SHOW ANY OF THOSE PEOPLE HAD KNOWLEDGE AT THE TIME THAT A PROJECTION WAS MADE THAT THAT PROJECTION WAS FALSE?  THAT'S WHAT THEY NEED TO DO.

**THE COURT:**  WELL, HE SAID TODAY THAT MR. HALL TOLD EVERYBODY STARTING IN JULY.

**MR. MUCK:**  WELL, WE DON'T KNOW WHEN.

**THE COURT:**  STARTING IN JULY.

**MR. MUCK:**  DOES THAT MEAN EARLY JULY, MID JULY, AUGUST?  PUT ASIDE, WHO, EVERYONE.  I MEAN, THAT DOESN'T DO IT. HE TOLD EVERYONE.  DOES THAT INCLUDE MR. CULKIN, WHO WAS, BY THE WAY, NOT EVEN -- HE WAS AT OLD VELODYNE AT THE TIME.  HE WASN'T EVEN WITH GRAF INDUSTRIAL.  DOES IT MEAN MR. HAMER, THE CFO?  DOES IT MEAN THE MEMBERS OF THE SPAC, MR. GRAF AND MR. DEE?  WE DON'T KNOW.  THAT'S THE SORT OF THING THAT HAS TO BE ALLEGED.

IF THE REFORM ACT MEANS ANYTHING, THAT BASIC INFORMATION HAS TO BE ALLEGED.  OKAY, YES, I TOLD EVERYBODY, AND SPECIFICALLY I TOLD MR. DEE X, AND I TOLD MR. GRAF Y, AND I TOLD THEM ON OR AROUND THESE DATES, AND THESE WERE THE ISSUES THAT I HAD.

THAT'S ANOTHER THING, YOUR HONOR, TO SAY I HAD CONCERNS, OR I DIDN'T LIKE THESE, OR I DISAGREED, OR I THOUGHT THEY WERE IMPOSSIBLE, THAT'S ALL FINE, BUT WHAT WAS IT ABOUT THE PROJECTION THAT YOU THOUGHT WAS INAPPROPRIATE?

**THE COURT:**  THE THING THAT'S DIFFICULT TO KNOW IS

WHAT'S THE DIFFERENCE BETWEEN AN ALLEGATION THAT'S OKAY FOR PLEADING PURPOSES AND PROOF THAT'S OKAY FOR TRIAL OR SUMMARY JUDGMENT.  I TOLD EVERYBODY THAT THIS WAS RIDICULOUS, AND WE'D NEVER MAKE IT, IS ONE THING, AND, I TOLD JOE DOAKES ON APRIL 2ND, AND I TOLD THIS OTHER GUY -- YOU KNOW, WHERE DO WE DRAW THE LINE?  THIS THING, THIS COMPLAINT, IS ALREADY 200 PAGES LONG.

MR. MUCK:  IT IS, ALTHOUGH --

THE COURT:  SHORTEN PLAINTIFF'S STATEMENT.

MR. MUCK:  THAT'S ANOTHER ISSUE, YOUR HONOR.  WE DID NOT MAKE A PUZZLE PLEADING ARGUMENT.  I'VE BEEN TOLD BY SOME OF YOUR COLLEAGUES THAT THOSE ARGUMENTS ARE NOT FROWNED UPON.  BUT I THINK IF THERE WERE A CASE -- I AM NOT EVEN SURE IF THIS QUALIFIES AS A PUZZLE.  THIS IS MORE LIKE A RUBIK'S CUBE.

ONE OF THE REASONS IT'S 200 PAGES IS BECAUSE, FOR EXAMPLE, MR. HALL'S ALLEGATION OF A POWER GRAB AND CONSPIRACY AND HIJACK, BY MY COUNT WAS REPEATED 28 TIMES IN THIS COMPLAINT.

THE COURT:  PART OF THE REASON FOR THAT IS BECAUSE EVERYBODY WILL COME IN HERE AND SAY, THE PSLRA, IF IT MEANS ANYTHING, MEANS THAT WE HAVE TO DO THIS, WHO, WHAT, WHERE, WHEN, WHAT DID YOU SAY, WHEN DID YOU SAY IT, THAT'S KIND OF LIKE PROOF AT TRIAL.

MR. MUCK:  EXCEPT IT ISN'T, YOUR HONOR.  WE'RE NOT ASKING THEM TO PROVE THAT.  WHAT WE'RE SAYING IS IF YOU'RE

GOING TO RELY ON MR. HALL HAVING SAID, I TOLD PEOPLE THIS, AT THE VERY LEAST, WE NEED TO KNOW WHO YOU TOLD AND WHAT THE ISSUES WERE, BECAUSE THE FACT THAT SOMEBODY SAYS, I DISAGREE WITH THAT PROJECTION, DOESN'T MEAN THE PERSON WHO MADE THE PROJECTION AGREES OR HAD ACTUAL KNOWLEDGE OF FALSITY.  THAT'S THE ISSUE, ACTUAL KNOWLEDGE OF FALSITY.

AND I DON'T THINK, YOUR HONOR, THAT THIS IS, WITH ALL DUE RESPECT, A CLOSE CALL WHEN IT COMES TO THAT KIND OF DETAIL. WE'RE NOT ASKING FOR EVIDENTIARY PROOF.  WE'RE ASKING FOR DETAIL, AND THE REFORM ACT CLEARLY REQUIRES THAT DETAIL.

JUST A COUPLE OF OTHER POINTS, THEN I PROMISE I'LL WRAP IT UP, BECAUSE I KNOW WE'VE ALREADY --

**THE COURT:**  I'M STRUCK BY THE LAST THING YOU SAID. WHAT YOU SAID IS, WELL, I TOLD THEM THIS IS RIDICULOUS.  THAT DOESN'T MEAN NECESSARILY THEY BELIEVED IT.  YOU HAVE TO ALLEGE SOMETHING THAT SAYS AND THEY BELIEVED IT.

**MR. MUCK:**  WELL, YOU HAVE TO AT LEAST ALLEGE FACTS TO SHOW THAT THAT WAS NOT ACTUALLY BELIEVED AT THE TIME.  YOU CAN HAVE A DISAGREEMENT ABOUT A PROJECTION.  I MIGHT SAY A HUNDRED MILLION DOLLARS FOR THIS YEAR IS REASONABLE, YOU MIGHT SAY I DON'T THINK IT'S REASONABLE.  OKAY.  WELL, DOES THAT MEAN THAT IF I SAY I DISAGREE AND I'M GOING TO SAY IT'S A HUNDRED MILLION DOLLARS, THAT THAT MEANS I KNEW IT WAS FALSE?  NO.

YOU ALSO -- BY THE WAY, YOUR HONOR, ANOTHER POINT THEY KEEP GLOSSING OVER IS MR. HALL KEEPS ENDORSING THESE

PROJECTIONS.  HE KEEPS -- HE SIGNS THE REGISTRATION STATEMENT IN OCTOBER OF 2020.  WHERE IS THE EXPLANATION FOR WHY MR. HALL IS SIGNING AN SEC FILING THAT THE PLAINTIFFS THEMSELVES SAY CONTAINED FALSE PROJECTIONS?

AND CERTAINLY UNDER *TELLABS*, WHERE YOUR HONOR IS REQUIRED TO CONSIDER BOTH NEFARIOUS AND POTENTIAL NON-NEFARIOUS INFERENCES FROM FACTS THAT ARE ALLEGED, THAT'S A FAIR QUESTION FOR THE COURT TO CONSIDER UNDER THESE CIRCUMSTANCES.

COUPLE OF OTHER POINTS.

ON THE SAFE HARBOR, COUNSEL SAID THAT THESE ARE MIXED STATEMENTS AND, THEREFORE, THE SAFE HARBOR DOESN'T -- THAT'S NOT LAW, FIRST OF ALL.  IF IT'S A MIXED STATEMENT, THE PROJECTION STILL APPLIES OR IS STILL WITHIN THE SCOPE OF THE SAFE HARBOR.  IT'S ONLY THE PORTION THAT IS NOT FORWARD LOOKING.

AND HERE THE ONLY PORTION THAT THEY'RE SAYING WASN'T FORWARD LOOKING WAS THESE SIGNED AND AWARDED CONTRACTS, BUT THEY DON'T ALLEGE THAT WAS EVER FALSE, AS I -- THEY ACKNOWLEDGE IT WAS ACTUALLY DISCLOSED.  YOU CAN'T HAVE A MISSTATEMENT BASED ON FACTS THAT ARE ACTUALLY DISCLOSED.  SO WITH THE WHOLE MIXED STATEMENT ARGUMENT DOESN'T GET THEM ANYWHERE.

THE OTHER POINT I WOULD MAKE, YOUR HONOR, ON THE -- THIS JANUARY 7TH STATEMENT, NO CHANGE TO THE FUNDAMENTAL OUTLOOK, THAT IS -- THEY'RE PUTTING A LOT OF WEIGHT ON ONE VERY, VERY SPARSE STATEMENT, A STATEMENT THAT, FRANKLY, A LOT

OF CASES, I THINK, WOULD SUGGEST IS PUFFING AND ISN'T EVEN ACTIONABLE TO BEGIN WITH, AND WE MADE THAT ARGUMENT.

BUT YOU CAN'T SIMPLY TAKE A STATEMENT LIKE THAT AND THEN SAY, OH, AS A RESULT OF IT, BECAUSE YOU DIDN'T DISCLOSE COMPLETELY FACTS RELATING TO OTHER TOPICS, YOU CAN COMBINE THAT AND MAGICALLY TURN IT INTO A 10B VIOLATION.

THE NINTH CIRCUIT AND OTHER COURTS HAVE CONSISTENTLY SAID AN OMISSION IS ONLY ACTIONABLE IF IT RENDERS THAT PARTICULAR STATEMENT MATERIALLY MISLEADING.  AND I WOULD SUBMIT, YOUR HONOR, THAT THERE'S NOTHING THAT THEY'VE ALLEGED THAT WOULD BE MISLEADING BY VIRTUE OF THE FACT ON JANUARY 7TH, THE COMPANY SAID ITS FUNDAMENTAL OUTLOOK HAD CHANGED, ESPECIALLY BECAUSE THAT COMMENT WAS MADE IN THE CONTEXT OF THE COMPANY SAYING WE'RE WITHDRAWING OUR GUIDANCE GOING FORWARD.

FINALLY -- WELL, I SAID FINALLY -- IS THAT THE THIRD TIME, YOUR HONOR, I SAID "FINALLY"?  THE *CBS* CASE, I WOULD ASK YOUR HONOR TO LOOK AT.  I DON'T KNOW WHAT COUNSEL MEANS WHEN HE SAYS THE COMPANY DISCLOSED.  THE COMPANY DIDN'T DISCLOSE THE INVESTIGATION.  THE COMPANY SAID AND THE COURT SAID IT WOULD HAVE BEEN STRANGE AND IRRESPONSIBLE TO DISCLOSE AN UNRESOLVED INVESTIGATION ABOUT THE CEO.  SAME THING APPLIES HERE.

AND ON THE INTERNAL CONTROLS POINT, COUNSEL RAISES THIS REVENUE ISSUE.  WHAT COUNSEL DOESN'T SAY IS THAT BETWEEN THE TIME THAT THE COMPANY ORIGINALLY ANNOUNCED ITS REVENUE FOR Q4 OF 2020 OF 94 MILLION AND THE TIME THAT THE COMPANY REALIZED

THERE WAS THIS MATERIAL WEAKNESS WITH RESPECT TO REVENUE, THE REVENUES ENDED UP BEING HIGHER, $95.3 MILLION.  SO THIS WAS -- THERE WAS A REVENUE ISSUE.  THE EFFECT OF THE REVENUE ISSUE WAS TO UNDERSTATE REVENUE.

YOUR HONOR, I APPRECIATE VERY MUCH YOUR INDULGENCE, AND THANK YOU.

THE COURT:  YOU'RE WELCOME.  THANK YOU.

ESTHER, YOU KEEP LOOKING AT ME MEANINGFULLY.

MR. ABADOU:  I'LL TAKE ONE MINUTE, YOUR HONOR, IF YOU WILL ALLOW ME.

THE COURT:  ONE MINUTE.

MR. ABADOU:  YOUR HONOR, A COUPLE OF THINGS WITH RESPECT TO THE INVESTOR PRESENTATION THAT WE MENTIONED WHERE THERE IS THAT REALLY FINE PRINT FOOTNOTE LANGUAGE, THAT IS -- AND WE DISCLOSED IT IN CONNECTION WITH OUR COMPLAINT -- THAT IS ONLY ON JULY 2ND, NOT GOING FORWARD.  THAT'S NOT OUT OF THIN AIR.

NEXT, SPECIFICITY.  THERE WAS DISCUSSION ABOUT HE TOLD EVERYONE.  ALL YOU HAVE TO DO SI LOOK AT PARAGRAPH 33 OF THE COMPLAINT.  THE HALLS -- AND I'M QUOTING FROM PARAGRAPH 33, AND SO MR. MUCK IS, I THINK, PLAYING FAST AND LOOSE HERE AGAIN.

"THE HALLS HAVE REPEATEDLY AND VEHEMENTLY STATED TO THE VLDR BOARD --"

AND I SAID EARLIER THE VLDR BOARD INCLUDED EVERY DEFENDANT EXCEPT FOR HAMER, BUT IF YOU LOOK AT THE FIRST

SENTENCE OF THAT STATEMENT, MR. HAMER WHO'S THE CFO.  SO THAT INCLUDES ALL OF THE DEFENDANTS.  HE'S NOT SAYING EVERYONE.

NOW, WITH RESPECT TO THE SIGNED AND AWARDED CONTRACTS, SOPHISTICATED MARKET ANALYSTS, YOUR HONOR, AS WELL WERE SHOCKED WHEN THE COMPANY WITHDREW ITS GUIDANCE.  AND THIS IS IN PARAGRAPHS 162, FOR INSTANCE, AND 388, WHERE THEY SAY THERE WERE CONTRACTS.  I MEAN, THIS IS A BIG STEP BACK FROM WHAT YOU ASSURED INVESTORS ABOUT IN THE LEAD UP TO DE-SPAC AND EVEN BEYOND THE DE-SPAC MERGER IN SEPTEMBER.

SO IT'S NOT JUST REASONABLE INVESTORS WHO HAD AN EXPECTATION THAT SIGNED AND AWARDED CONTRACTS MEANT SIGNED AND AWARDED.  IT WAS ALSO SOPHISTICATED MARKET ANALYSTS WHO WERE LOOKING AT WHAT THE COMPANY ORIGINALLY SAID VERSUS WHAT THEY SAID LATER AND SAYING, THERE'S A HUGE CONTRADICTION HERE.

SO I'M GETTING -- MS. CHUNG, I THINK, IS GIVING ME THE EYE.  SO I JUST WANTED TO POINT THOSE THINGS OUT AS WELL.

**THE COURT:**  ALL RIGHT.  THANK YOU.

**MR. MUCK:**  CAN I CORRECT ONE INACCURACY?  PAGE 22 OF OUR OPENING BRIEF CITES THE OTHER TIMES IN WHICH THAT SAME DISCLOSURE --

**MR. ABADOU:**  THANK YOU, YOUR HONOR --

**MR. MUCK:**  -- THROUGH NOVEMBER.

**THE COURT:**  PAGE 22.  OKAY.

**MR. MUCK:**  THANK YOU, YOUR HONOR.

**THE COURT:**  ALL RIGHT.  THANK YOU ALL.  IT'S BEEN SO

NICE TO SEE YOU HERE. I FIND IT VERY HELPFUL TO HEAR FROM BOTH OF YOU. THE MATTER WILL BE SUBMITTED.

           **MR. MUCK:** THANK YOU, YOUR HONOR.

           **MR. ABADOU:** THANK YOU, YOUR HONOR.

           (PROCEEDINGS ADJOURNED AT 11:00 A.M.)

STATE OF CALIFORNIA      )

                         )      SS

COUNTY OF CONTRA COSTA )


        I HEREBY CERTIFY THAT THE FOREGOING IN THE

WITHIN-ENTITLED CAUSE WAS TAKEN AT THE TIME AND PLACE HEREIN

NAMED; THAT THE TRANSCRIPT IS A TRUE RECORD OF THE PROCEEDINGS

AS REPORTED BY ME, A DULY CERTIFIED SHORTHAND REPORTER AND A

DISINTERESTED PERSON, AND WAS THEREAFTER TRANSCRIBED INTO

TYPEWRITING BY COMPUTER.

        I FURTHER CERTIFY THAT I AM NOT INTERESTED IN THE

OUTCOME OF THE SAID ACTION, NOR CONNECTED WITH, NOR RELATED TO

ANY OF THE PARTIES IN SAID ACTION, NOR TO THEIR RESPECTIVE

COUNSEL.

        IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND THIS

13TH DAY OF JUNE, 2022.



_____

JOAN MARIE COLUMBINI, CSR NO. 5435

STATE OF CALIFORNIA