UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MEYSAM MORADPOUR, et al., | Case No. 21-cv-01486-SI |
| Plaintiffs, | |
| v. | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS CONSOLIDATED AMENDED COMPLAINT** |
| VELODYNE LIDAR, INC., et al., | |
| Defendants. | Re: Dkt. No. 102 |

Before the Court is defendants' motion to dismiss plaintiffs' Consolidated Amended Class Action Complaint ("CAC") alleging violations of the federal securities laws.  Dkt. No. 102 (Motion); Dkt. No. 99 (CAC).  The Court held a hearing on June 10, 2022.  Having considered the arguments raised by the parties at oral argument and in the moving papers, and having carefully reviewed the CAC and the materials properly subject to judicial notice, incorporation by reference, or 15 U.S.C § 78u–5(e), the Court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss for the reasons set forth below.

Dismissal is with leave to amend by July 15, 2022.

## BACKGROUND

This securities class action arises from a merger between Velodyne Lidar and Graf Industrial.  Through its founder, David Hall, Velodyne invented a proprietary pulsed laser sensing technology (i.e., "LiDAR") for real-time 3D vision in autonomous systems.  CAC ¶ 103.  Graf Industrial was a special purpose acquisition company ("SPAC") founded in 2018 for the "sole purpose" of raising money through an IPO to fund a merger with a private company, which would then be taken public.  *Id*. ¶ 8.  Graf Industrial acquired Velodyne through a reverse merger on

September 29, 2020.  *Id.* ¶ 94.

The class action complaint, amended on February 11, 2022, is brought on behalf of all persons who purchased Velodyne securities between July 2, 2020 and March 17, 2021.  *Id.* ¶ 3.  The complaint alleges defendants advanced four categories of false or misleading statements or omissions in order to drum up support for the merger and inflate the price of Velodyne securities.  *Id.* ¶¶ 3–6.  Defendants' conduct, the complaint alleges, caused the price of Velodyne's common stock to fall from $30.34 on September 9, 2020, to just over $13 on March 18, 2021.  *Id.* ¶ 440.

**A. The Merger Between Graf Industrial and Velodyne**

**1. Anatomy of a SPAC**

A special purpose acquisition company, or "SPAC," is formed to raise capital during an initial public offering ("IPO") with the purpose of using the capital to acquire an unspecified business or asset to be identified at a later time.  *Id.* ¶ 76.  The SPAC's registration statement will often specify a timeframe within which an acquisition must occur.  When a target company is eventually found, the SPAC will hold a mandatory shareholder vote or tender offer.  *Id.* ¶ 78.  If shareholders approve the acquisition, the SPAC and target company will combine into a publicly traded operating company.  *Id.*  Whether the acquisition is approved or not, IPO investors who are unhappy with the proposed acquisition may make the SPAC repurchase their shares after a vote is solicited.  *Id.*  The proceeds raised in the IPO are thus held in a trust account until released to fund the business combination, are used redeem shares, or are liquidated to investors in the event the SPAC fails to acquire a company within the specified timeframe.  *Id.* ¶ 76.

Not all SPAC capital comes from the public IPO.  An entity or management team that forms the SPAC (i.e., "Sponsor") may contribute working capital in exchange for "founder's shares," which are distinct from public shares in several key respects.  *Id.* ¶¶ 77, 84.  First, founder's shares may be subject to a lock-up period that bars their sale during the SPAC's search for a target and for a period after the acquisition is completed.  *Id.* ¶ 85.  Second, founder's shares may not be returned to the SPAC through the tender offer.  *Id.*  Third, and perhaps most important, founder's shares may expire worthless if an acquisition is not completed within the timeframe, whereas public shares can

be redeemed through the liquidation of the trust account.  *Id.* ¶¶ 85-86.

### 2. Graf Industrial's Inception and Search for a Target

Graf Industrial was organized as a SPAC in 2018 with the sole purpose of completing a business combination within 18 months after its IPO.  *Id.* ¶ 83 (citing October 2018 Prospectus). Graf Industrial received its initial capital through the sponsorship of Graf Acquisition LLC, which is owned by defendants James Graf and Michael Dee, along with other non-party investors.  *Id.* ¶ 84 n. 13.  (The Court will hereafter refer to James Graf simply as "Graf" to avoid confusion with the Graf entities, Graf Industrial and Graf Aquation LLC).  For its sponsorship of $25,000, Graf Acquisition LLC received over 8 million founder's shares in the SPAC entity – amounting to approximately 20% of the outstanding common shares, and thus, an eventual 20% interest in the acquired company.  *Id.* ¶¶ 84, 93.

On October 16, 2018, Graf Industrial raised $244 million in an IPO.  *Id.* ¶ 88.  The IPO prospectus required Graf Industrial to acquire, within 18 months of the IPO, a business with an aggregate fair market value of at least 80% of the net assets held in trust from the IPO proceeds.  *Id.* ¶ 90.  Should Graf Industrial fail to acquire a suitable company by April 18, 2020, it would have to redeem 100% of the public shares and the founder's shares would expire worthless.  *Id.* ¶ 91.

On April 16, 2020, with the acquisition deadline just two days away, Graf Industrial updated and amended its articles of incorporation to extend the acquisition deadline to July 31, 2020.  *Id.* ¶ 97 (changes disclosed via Form 8-K filed with the SEC).  By that time, Graf Industrial had reviewed "more than 200 acquisition opportunities and enter[ed] into discussions with more than 30 potential target businesses[,]" including drafting "no less than 18 term sheets."  *Id.*  After the extension was approved in a special shareholder meeting, "an aggregate of 12,921,275 shares of [the Company's] common stock were redeemed [by shareholders]," causing approximately $132.1 million to be "withdrawn from the Trust Account to pay for such redemptions."  *Id.* ¶ 99 n. 17 (citing Graf Industrial's July 15, 2020 Preliminary Proxy at 26).  As a result, Graf Industrial's Trust Account shrunk by nearly 50%.  *Id.*

### 3. Graf Industrial Acquires Velodyne

Velodyne Acoustics was a private audio technology company founded by David Hall in 1983. *Id*. ¶ 102. In 2005, Velodyne Acoustics began developing lidar technology, which utilizes pulse lasers for remote-range sensing in autonomous cars and robots, unmanned aerial vehicles, precision agriculture, and advanced security systems. *Id*. ¶ 102-103. Hall patented his technology in 2006 and made it commercially available in 2010, catapulting Hall "to the forefront of a technological arms race." *Id*. ¶ 102. In 2015, Velodyne Acoustics assigned all lidar-related assets and operations to a spin-off entity named Velodyne, Inc. (hereafter "Velodyne"). *Id*. ¶ 104. Hall served as Velodyne's director from December 2015 onwards. *Id*. In August 2016, Velodyne secured a $150 million investment from Ford and Baidu, Inc. (a Chinese corporation). *Id*. ¶ 105.[1] Ford's investment would eventually amount to a 5% ownership interest in Velodyne.

In early May 2020—a little less than one month after Graf Industrial's initial deadline—Velodyne's financial advisors began discussing a potential transaction with Graf Industrial. *Id*. ¶ 99. On July 2, 2020, Graf Industrial and Velodyne informed the public that they had entered into a merger agreement that valued Velodyne at $1.8 billion. *Id*. ¶ 108; Dkt. No. 103-4 (July 2, 2020 Joint Press Release filed with the SEC on Form 8-K). The July 2, 2020 Joint Press Release described David Hall as Velodyne's "founder and industry icon," and informed the public that:

> David Hall will continue to play a critical role as executive chairman of Velodyne. Chief Executive Officer Dr. Anand Gopalan and Chief Financial Officer Drew Hamer will lead and manage the business along with Mr. Hall. Chief Marketing Officer Marta Hall will continue to support and elevate the brand.
> [ ]
> Current Velodyne shareholders, including David Hall and strategic investors Ford, Baidu, Inc., Nikon Corporation and Hyundai Mobis, will retain an equity interest of more than 80% in the combined company.
> [ ]
> Estimated revenues under existing customer contracts are expected to exceed $800 million from 2020 to 2024. Velodyne is expected to generate revenues of approximately $100 million in 2020, increasing to approximately $680 million in 2024 with existing contracts expected to drive just under 50% of the estimated 2024 revenues

---

[1] Barbara Samardzich, former chief operating officer of Ford Europe, joined Velodyne's board as an independent director two months after Ford's investment in the company. *Id*. ¶ 105.

United States District Court
Northern District of California

Dkt. No. 103-4 at 2-3.

On July 23, 2020, two weeks after the merger announcement, Graf Industrial shareholders again voted to extend the acquisition deadline from July 31, 2020 to October 31, 2020 to allow more time to finalize the deal. CAC ¶ 110. On August 31, 2020, Graf Industrial issued a press release reaffirming Velodyne's revenue trajectory, predicting $101 million in revenues in 2020 and an 8% increase in long-term contracted revenues since the deal was first announced. *Id.*; Dkt. No. 103-15 (August 31, 2020 Press Release filed with the SEC on Form 8-K). The Definitive Proxy Statement was issued on September 14, 2020. CAC ¶ 111; Dkt. No. 103-9 (Schedule 14A Definite Proxy).

Shareholders voted to approve the merger on September 29, 2020. CAC ¶ 112.

**B. The Class Action**

The present shareholder class action complaint names as defendants: (i) Velodyne, Inc.; (ii) Anand Gopalan, former Velodyne CEO; (iii) Andrew Hamer, Velodyne CFO; (iv) Michael Dee, former President and CFO of Graf Industrial, and current Chairman of Velodyne's Board of Directors; (v) James Graf, former CEO of Graf Industrial and Velodyne director; and (vi) Joseph Culkin, former Velodyne Board Chairman and a current director of the Board. *Id.* ¶ 4. The complaint alleges that between July 2, 2020 and March 17, 2021, defendants engaged in a "fraudulent or deliberately reckless course of business conduct" that deceived investors into approving the merger and purchasing Velodyne securities at inflated prices. *Id.* ¶ 5.

Three counts are alleged in the complaint. Count I asserts all defendants are liable under Section 10(b) of the Exchange Act and SEC Rule 10b-5 for making misleading statements during the class period. *Id.* ¶ 471. Count II asserts defendants Graf and Dee are liable under Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) for employing "devices, schemes, and artifices to defraud" and engaging "in acts, practices, and a course of business that operated as a fraud or deceit." *Id.* ¶ 478. Count III asserts all individual defendants are derivatively liable under Section 20(a) of the Exchange Act as "controlling persons" who caused violations of the securities laws. *Id.* ¶ 487.

Counts I and II are based on alleged misstatements that fall into four categories. First, the complaint alleges that defendants falsely assured shareholders about Hall's continued role in the

company while secretly trying to oust him.  *Id.* ¶ 17.  Second, the complaint alleges defendants misrepresented Velodyne's revenue and growth trajectory in the run-up to the merger's approval and in the months that followed.  *Id.* ¶ 27.  Third, the complaint alleges defendants misled shareholders about Ford's continued involvement in Velodyne as a strategic investor and customer. *Id.* ¶ 35.  And fourth, the complaint alleges defendants misled shareholders about the quality of Velodyne's corporate governance and internal controls over financial reporting.  *Id.* ¶ 38.  The Court summarizes the substance of these four categories below.

### 1. Plan to Remove Hall

Hall was terminated as Velodyne's Chairman on February 19, 2021.  *Id.* ¶ 106.  Plaintiffs allege Hall's eventual exit was no serendipitous event.  They allege that from July 2, 2020 to February 22, 2021 (when Hall's termination was publicly announced), defendants, particularly Graf and Dee, were engaged in an "undisclosed, manipulative scheme" to oust him while leading investors to believe that that Hall would continue to play a key role in Velodyne after the merger. *Id.* ¶¶ 17, 479.

### a. Graf and Dee's "Scheme" to Oust Hall

Plaintiffs allege the "surreptitious" scheme against Hall was waged on multiple fronts.  The CAC alleges Hall was marginalized when it came to business decisions and control over Velodyne. The CAC quotes a February 24, 2021 press release that Hall wrote and published over *Business Wire* after his termination:

> Since Anand Gopalan assumed the Chief Executive Officer role early last year [2020], I have stepped back from day-to-day management and offered strategic perspectives when appropriate. I ultimately relinquished my Executive Chairman position in favor of simply serving as Chairman once it became clear this winter that Mr. Gopalan and others preferred to continuously ignore my input in favor of implementing their own agenda.

*Id.* ¶ 122.  Hall repeated these sentiments on March 4, 2021, stating: "[s]ince the consummation of the merger," the Board "disregarded" his concerns about Velodyne's corporate governance, strategy, and financial performance, "took every effort to avoid a public nomination of [his]

6

[director] nominee," and "took the highly unusual step to publicly censure" him after his termination on February 19, 2021. *Id*. ¶ 124 (quoting Form 8-K that Hall filed with the SEC).  Hall again vocalized his concerns via *Business Wire* on March 10, 2021: "Jim Graf and Michael Dee – joint founders of the SPAC – wanted to curtail my involvement in the quality and selection of products being developed, the contracts negotiated and integrity of the Company's business moving forward." *Id*. ¶ 125.  Hall's *Business Wire* letter also stated: "To be completely clear: I chose to resign from the Board because I had numerous concerns about the strategic direction and current leadership of Velodyne Lidar." *Id*.

The CAC also cites to a civil complaint Hall filed in the Superior Court of California in January 2022 (hereafter "State Court Complaint"), which describes a meeting in late September 2020 attended by Hall, defendant Hammer, Velodyne's lawyers, and Velodyne's then-VP of Human Resources, Sheetal Patel. *Id*. ¶ 22.  The result of that meeting—according to the State Court Complaint's description of Patel's later statements to Hall's wife—was to amend Velodyne's certificate of incorporation and bylaws to remove Hall's "control on a number of important corporate issues," including his sign-off authority "on specific matters such as compensation and audits." *Id*.  During an October 2020 Velodyne Board meeting, Velodyne's outside counsel stated that the amendments were adopted in "anticipati[on] that Mr. Hall's interest would soon be diluted, such that [Mr. Hall] would no longer possess a majority of VLDR's stock." *Id*. ¶ 117.

The CAC also alleges Hall was wrongfully accused of misconduct in an effort to oust him from his role, culminating in a "pretextual" investigation that led to his termination.  *Id*. ¶ 25.  Around October 1, 2020 defendant Dee began service on Velodyne's Audit Committee along with independent directors Christopher Thomas and Barbara Samardzich. *Id*. ¶ 61; Dkt. No. 103-10.  By December 9, 2020, the Audit Committee had begun an undisclosed internal investigation into Hall and retained the law firm Keker Van Nest to assist in the investigation—but the public would not learn of the existence of the investigation, or its conclusions, for another two months.  CAC ¶¶ 19, 50.  Plaintiffs allege the investigation was pretextual because it commenced only after a November 16, 2020 Board meeting in which Hall "refused to endorse the [Board's] wildly overstated financial guidance" or succumb to pressures by defendants Graf and Dee to do so.  *Id*. ¶¶ 25, 144–46.

Plaintiffs further assert defendants hid the investigation from shareholders by representing in early January 2021 that Velodyne's fundamental outlook remained unchanged.  *Id*. ¶ 6.

### b. Allegedly False or Misleading Statements

Rather than informing the public of the internal company strife involving Hall, the CAC alleges defendants told the public Hall would continue to serve a critical leadership role in the company.  The July 2, 2020 Press Release announcing the merger stated Hall would "continue to play a critical role as executive chairman of Velodyne" after the merger.  *Id*. ¶ 114; Dkt. No. 103-4.  During a conference call on that same day, defendant Gopalan told investors:

> David Hall is the Company's visionary founder, serial inventor, who has pretty much created the industry of autonomy. He's transitioned to an executive chairman role, but ***will remain very involved in the engineering and technology vision of the Company***. While he's handed over day to day operations to myself, to me and really his vision is to see lidar technology proliferate across the world in all of these different applications making autonomy safer.

*Id*. ¶ 215 (emphasis in CAC).  Similarly, defendant Dee stated on the July 2, 2020 conference call: "[Hall's] technological and manufacturing genius is really reflected in the extremely high quality of management and engineering talent that he has ***and will continue to assemble***. We are profoundly honored to be his partner in taking Velodyne to the next level as a public company."  *Id*. ¶ 215 (emphasis in CAC).

The complaint also points to statements in the July 2020 Preliminary Proxy, which described Hall's stature as an "industry icon" and his role in building "a strong" Velodyne team and driving the company's vision and strategy.  *Id*. ¶¶ 237–38; Dkt. No. 103-6 at 16, 84.  The July 2020 Preliminary Proxy also stated:

> ***Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management.***
>
> Velodyne is highly dependent on David Hall, its founder and executive chairman. Mr. Hall created Velodyne's first lidar product and he remains deeply involved in all aspects of Velodyne's business, including product development. The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market participants, manage Velodyne's R&D activities and retain existing customers or cultivate new ones. [ ]. Negative public perception of, or

negative news related to, Mr. Hall or Mr. Hall's other ventures, even if such ventures are entirely separate from Velodyne's business, may adversely affect Velodyne's brand, relationship with customers or standing in the industry.

Dkt. No. 103-6 at 38 (emphasis in original). Critically, the July 2020 Preliminary Proxy stated that Hall "will serve as the post-combination company's executive chairman [and] will remain actively involved in the post-combination company's product and technology development strategy." *Id*. at 132. These statements from the July 2020 Preliminary Proxy regarding Hall were often repeated verbatim in subsequent pre- and post-merger SEC filings.[2]

Additional statements were made in the months after the merger. In a November 5, 2020 investor conference call, defendant Gopalan told investors that defendants were "grateful for the pioneering work of our founder David Hall . . . David's vision and expertise have fueled Velodyne's commercial success, as evidenced by our shipment of 47,500 sensors today for cumulative revenue of over $615 million." CAC ¶ 361. Gopalan further emphasized Hall's significance to the company in a Podcast on that same day. *Id*. ¶ 364. A November 9, 2020 SEC Quarterly Report further praised "visionary founder and executive chairman, David Hall," and reiterated the oft-repeated statement that Hall "remains deeply involved in all aspects of Velodyne's business, including product development," and that the loss of Hall (or any negative news related to Hall) would adversely affect Velodyne. *Id*. ¶ 370.

Plaintiffs assert this history of false or misleading statements came to a head on January 7, 2021, when Velodyne issued a press released titled, "Velodyne Lidar Announces Fourth Quarter and Annual 2020 Preliminary Support" ("FY2020 Release"). *Id*. ¶ 377; Dkt. No. 103-11 (filed with the SEC on Form 8-K on January 7, 2021 and signed by defendant Hamer). The FY2020 Release quoted defendant Gopalan as stating: "Despite the impact of COVID-19 in the past few months and on our near-term visibility, there is no change in our fundamental outlook for the future." Dkt. No. 103-11 at 6. Omitted from the January 7, 2021 FY2020 Release was that *on that same day*, Hall

---

[2] The statements were repeated *verbatim* in: (1) August 21, 2020 Preliminary Proxy, Dkt. No. 103-7; (2) August 26, 2020 Registration Statement, Dkt. No. 103-24; (3) September 8, 2020 Preliminary Proxy, Dkt. No. 103-8; (4) September 14, 2020 Definitive Proxy, Dkt. No. 103-9; (5) September 22, 2020 Registration Statement, Dkt. No. 103-3; and, post-merger, (6) October 1, 2020 Prospectus, Dkt. No. 103-10; (7) October 19, 2020 Registration Statement, Dkt. No. 103-2.

had allegedly "already informed" the Velodyne Board of his decision to "voluntarily transition[] from serving as an employee and executive officer of the Company to a non-executive role, effective immediately." *Id*. ¶ 24.  In plaintiffs' view, Hall's voluntary transition from Executive Chairman to non-executive Chairman certainly changed Velodyne's "fundamental outlook for the future."

### c. Eventual Disclosures

The public was not informed of Hall's voluntary transition from Executive Chairman to Chairman until Velodyne issued a press release on January 13, 2021, five days later.  *Id*. n. 8.  And the public would not learn of the Audit Committee's internal investigation into Hall until February 22, 2021, when Velodyne issued a press release informing the public that Hall had been terminated as Chairman on February 19, 2021 for "fail[ing] to operate with respect, honesty, integrity, and candor in their dealings with Company officer and directors."  *Id*. ¶ 19.  Finally, the public would not learn about the Board room strife until Hall himself described it in his February 24, 2021 press release, his March 2021 Schedule 13D, his March 2021 *Business Wire* letter to the board, and his January 2022 State Court Complaint.

### 2. Velodyne's Financial Outlook and Guidance

Plaintiffs also allege defendants "repeatedly touted" Velodyne's financial outlook and prospects by overstating anticipated contract revenues and omitting problems that undermined their optimistic projections.  *Id*. ¶ 27.  On January 7, 2021, the company withdrew its future financial guidance and disclosed that it had missed its 2020 revenue targets.  *Id*. ¶ 29.

### a. Defendant's Optimistic Outlook

When news of the merger first went public, Velodyne and Graf Industrial's July 2, 2020 Joint Press Release stated that Velodyne's "[e]stimated revenues under existing customer contracts are expected to exceed $800 million from 2020 to 2024.  Velodyne is expected to generate revenues of approximately $100 million in 2020, increasing to approximately $680 million in 2024 with existing contracts expected to drive just under 50% of the estimated 2024 revenues."  *Id*. ¶ 199; Dkt.

No. 103-4 at 3.  Grad Industrial also prepared and filed an Investor Presentation as an exhibit to the July 2, 2020 Joint Press Release.  *Id*. ¶ 204; Dkt. No. 103-5.  The Investor Presentation stated: (1) Velodyne had more than $680 million in projected revenue through 2024, and that 50% of this projected value was "contracted" based on volume and price agreements as of June 1, 2020, and (2) Velodyne had sixteen "signed and awarded contracts" as of June 1, 2020.  *Id*.  Importantly, the Investor Presentation commented on the "50% Contracted" statistic with a footnote stating: "Contracts represent agreed upon terms and conditions but do not include final commitment purchase orders.  Actual sales may differ materially from projected values."  Dkt. No. 103-5 at 10.

Defendants orally reiterated the statements made in the July 2, 2020 Joint Press Release and Investor Presentation in a conference call discussing those documents on that same day.  *Id*. ¶¶ 206, 208.  During that call, defendant Gopalan represented Velodyne's "projected 2024 revenue to be over $680 million, of which roughly half is contracted today through 16 signed and awarded multiyear agreements."  *Id*. ¶ 208 (emphasis omitted).[3]  Defendant Graf, also on the call, reiterated these projections: "as we look out to 2024 about 50% of the 2024 revenues is from contracts already in hand.  This gives us conviction and confidence in pricing off the 2024 projections."  *Id*. (emphasis omitted).  Defendant Hamer chimed in on the call as well:

> [W]e're expecting as we go forward that contract pipeline will only continue to grow and give us greater visibility, predictability and eventually stickiness with our customers in the revenues because we're going to seek additional contracts that will lead to signed and awarded deals.
>
> Now, another part that's really important about this slide is the evolution of the signed and awarded contracts. As you can see here on this slide at the beginning of January 2019 we had 1, the beginning of January 2020 we had 3 and as of June 1st of this year we had 16. Again, significant improvement.
>
> When we're looking at these numbers you start to see this ramp go, it's becomes [*sic*] reasonable to suggest that by the end of 2021, we should have as many as 50 signed and awarded contracts. So our pipeline will continue to grow from June 1st. The number of contracts that move to signed and awarded will continue to grow as

---

[3] These statements were repeated again in a July 20, 2020 Investor Presentation.  CAC ¶ 232 ("The July Investor Presentation represented that Velodyne had more than $680 million in projected revenue through 2024, and that 50% of this projected value was "contracted" based on volume and price agreements as of June 1, 2020. The July 2, 2020 Investor Presentation also highlighted that the Company had sixteen "signed and awarded contracts[.]")

we go past June 1st.

And that will give us further visibility and confidence in these numbers as we go forward to hitting our projected revenue targets. Now, the other key thing for me when I'm looking at this, because people should be wondering, well, why should you be confident these numbers in the out years?

First of all, coming from multiple contracts in each year. So even if a contract moves in or out, there will be other new contracts that are going to be coming out of that pipeline. For example, in 2024, we have approximately $1.7 billion as of June 1st that is just the pipeline. And I'm looking to fill the void between $326 million and $684 million.

It's entirely reasonable to suggest we'd get $360 million dollars out of a $1.7 billion dollar pipeline that's as of June 1st, 2020. And then therefore our expectation is this pipeline grows and we go forward and we could anticipate that that will also gain momentum and get some more traction and we'll have lots of different contracts. So we have delevered the model or derisked it because of the very, very different customers are going be in there. So, again, this has $837 million dollars of contracts out through 2024 and what that does is it leads to us being able to take a look at our revenues and gain greater confidence.

*Id.* ¶ 208 (emphasis omitted); Dkt. No. 103-17 at 10 (transcript of call).

Defendants continued to represent an optimistic financial outlook in the Merger Agreement included as Annex A to the July 15, 2020 Preliminary Proxy Statement. *Id.* ¶ 227; Dkt. No. 103-6. As described by plaintiffs in the complaint, the Merger Agreement stated: "Velodyne had one multi-year customer contract in early 2019, three multi-year customer contracts in early 2020 and 16 multi-year customer contracts awarded or signed as of June 1, 2020. These contracts account for 71% and 48% of projected 2023 and 2024 fiscal year revenues, respectively." *Id.* These statements were again repeated in an August 21, 2020 Preliminary Proxy. *Id.* ¶ 247; Dkt. No. 103-7 (indicating "over $100 million in expected cash flow in 2024").

As the merger's consummation neared, defendant's optimism continued. Graf Industrial issued an update on the Merger Agreement via an August 31, 2020 Press Release, "reaffirming" the $101 million 2020 revenue guidance and multi-year revenue outlook through 2024. *Id.* ¶ 262; Dkt. No. 103-15 (press release filed with the SEC on a Form 8-K signed by defendant Graf). The August 31, 2020 Press Release also stated that expected revenue "under contract" through 2024 had increased by $130 million since the merger was first announced on July 2, 2020. *Id.* A September 1, 2020 Investor Presentation accompanying the August 31, 2020 Press Release reiterated the

optimistic outlook, and informed investors that the increase in projected revenue was attributable to Velodyne now having eighteen "signed and awarded contracts." *Id.* ¶ 264. Defendant Graf repeated these points during a September 2020 webinar. *Id.* ¶ 265. A September 8, 2020 Investor Presentation further reaffirmed the 2024 outlook and expected revenue, *id.* ¶ 283; Dkt. No. 103-23, as did the September 14, 2020 Definitive Proxy. *Id.* ¶¶ 288, 294; Dkt. No. 103-9.

On October 1, 2020, shortly after the merger was complete, Velodyne issued a Prospectus which stated:

> As a result of COVID-19, we experienced some production delays in the second quarter and early in the third quarter of 2020 due to travel restrictions to Thailand, the location of one of our key manufacturing partners. We were also manufacturing at approximately 50% capacity for much of the second quarter of 2020. Today, we believe those production delays have been eliminated under the current work conditions, with our internal manufacturing and production capacity back to 100%.

> We believe that demand for our products remains strong, but COVID-19 will result in some transactions we expected to occur earlier in 2020 being delayed until late 2020 or early 2021. When preparing the 2020 and 2021 projected financial information included in this prospectus, we considered these potential delays.

*Id.* ¶ 316; Dkt. No. 103-10 (filed with the SEC on Form 424B3). The Prospectus referred investors to the projections contained in the July 2, 2020 Merger Agreement. *Id.* An October 19, 2020 Registration Statement again addressed the impacts of the pandemic:

> Demand for our products in the quarter ended June 30, 2020 was less than that in the corresponding period of 2019. We believe that this decline in customer demand was, in part, the result of customers impacted by COVID-19 and delayed purchasing decisions.

> While we continue to engage with current and potential customers, we believe some customers may delay purchases from us because their development programs may also be delayed as a result of COVID-19. We believe that demand for our products remains strong, but COVID-19 will result in some transactions we expected to occur earlier in 2020 being delayed until late 2020 or early 2021. When preparing the 2020 and 2021 projected financial information included in this prospectus, we considered these potential delays.

*Id.* ¶ 336; Dkt. No. 103-2.

Third Quarter 2020 financial results (3Q2020), released on November 5, 2020, "met or exceeded" the targets set earlier that year. *Id.* ¶¶ 353, 355 (Gopalan presenting results that same

day).  According to the 3Q2020 Release, Velodyne had grown revenues 137% year-over-year to $32.1 million and continued to grow its contracted revenues, signing 6 "multiyear agreements during the quarter," which increased the total to 24 long-term contracts (up from 16 in June and 18 in October).  *Id*.  The 3Q2020 Release reaffirmed the expected revenue of approximately $101 million for 2020.  *Id*.

But Velodyne failed to meet its targets.  On January 7, 2021, Velodyne issued its FY2020 Release.  *Id*. ¶ 377; Dkt. No. 103-11.  The FY2020 Release stated Velodyne had only achieved approximately $94 million in annual 2020 revenues, 7% below the previous annual revenue guidance (of $101 million) and 30% below its fourth quarter revenue guidance.  *Id*.  The FY2020 Release also withdrew all future guidance:

> Given the uncertainty around COVID-19 worldwide and its downstream impacts, and customer implementation timelines that are outside the company's control, the company has less visibility on the timing of expected purchase orders and other projects in the pipeline. Velodyne is monitoring the situation daily to understand COVID-19's impact on signed and awarded business, and other developments in customer plans affecting the new business funnel, bookings, the company's manufacturing capacity, and ultimately, revenue. ***With this reduced visibility and out of an abundance of caution, the company withdraws any previous financial guidance for 2021 at this time.***

*Id*. ¶ 376 (emphasis in CAC); Dkt. No. 103-11.  Despite the disappointing revenue results and withdrawn guidance, the FY2020 Release also stated:

> Commenting on the business and financial update, Velodyne CEO Dr. Anand Gopalan stated, "Despite the impact of COVID-19 in the past few months and on our near-term visibility, ***there is no change in our fundamental outlook for the future***. We are encouraged by the expanding adoption of lidar across a wide variety of industries, some of which are accelerating in a post-COVID world. As a result, we believe our pipeline is the most robust in the industry and we are manufacturing and shipping more lidar units than all our competitors have reported."

*Id*. ¶ 378 (emphasis in CAC); Dkt. No. 103-11 at 6.

### b. Hall Asserts Defendants Knew their Statements Weren't Accurate

The CAC alleges defendants knew all along that Velodyne would not meet the optimistic financial forecasts presented from July 2, 2020 through the January 7, 2021 FY2020 release.

Defendants knew so, plaintiffs allege, either because Hall told them facts which would have made them aware of their unfounded optimism, or because they willfully chose to not consult Hall as to the accuracy of the projections.

Hall stated in a May 25, 2021 *Business Wire* letter that while he was at Velodyne, he voiced his "grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance." *Id.* ¶ 126. The CAC also alleges Hall "[has] now revealed" that he was not informed of the July 2, 2020 press release or the August 31, 2020 reaffirmation of the guidance contained therein, nor was Hall "consulted regarding reasonable expectations for Velodyne's revenues for 2021 and beyond." *Id.* ¶¶ 27, 28 (referring to allegations in State Court Complaint).

In his State Court Complaint, Hall also alleged that, prior to a November 16, 2020 Board meeting, he and his wife

> had repeatedly and vehemently stated to the VLDR board that achieving $152MM in 2021 revenues was impossible, and that the alleged contracts were not executed contracts but at most indications of interest in products still under development and with no demonstrated success in situ.

> Specifically, the Halls explained to the VLDR board and relevant VLDR officers that that the 'contracts' being included in VLDR's guidance were not binding customer obligations because the products to which the contracts related were not then developed and would require significant engineering (including software) development efforts, the successful and timely results of which could not be predicted with any degree of assurance.

> Nevertheless, the committee of purportedly disinterested directors adopted a resolution that VLDR's filing of a registration statement permitting Mr. Hall and other directors to sell shares free from volume limitation would be conditioned on the board's "agreement that VLDR's existing guidance of $152MM in revenues for 2021 and other aspects of guidance are still valid."

> Because the Halls refused to endorse the wildly overstated financial guidance, the board denied Mr. Hall's request to be relieved from the Lockup. Schedule A to the November 16, 2020 board minutes, which Mr. Vetter signed, reflects that both he and Mr. Vella discussed this matter with the VLDR board at that meeting.

Id. ¶¶ 33, 144.

The complaint further alleges that defendant's attempts to blame COVID-19 for the revenue

short-falls in the FY2020 Release were disingenuous because they had already used that excuse in the October 1, 2020 Prospectus and October 19, 2020 Registration Statement when stating: "[w]hen preparing the 2020 and 2021 projected financial information included in this prospectus, we considered these potential delays" caused by COVID. *Id*. ¶¶ 141, 322.

### 3. Ford's Involvement as Investor and Customer

Ford was an early investor in Velodyne, putting $150 million into the company in 2016 (alongside Baidu). *Id*. ¶ 105. By the time the merger was announced in mid-2020, Ford's stake in Velodyne was expected to exceed 5% of the outstanding common stock. *Id*. ¶ 169. Plaintiffs allege that, "to boost investor confidence" for the merger, defendants "touted Ford and other strategic investors' ownership position in the post-combination company," when, in reality, defendants knew Ford planned to terminate its contracts and liquidate its investment after the merger. *Id*. ¶ 205.

#### a. Ford's Investment and Letter Agreement

When announcing the merger on July 2, 2020, defendant Gopalan told investors on a conference call that Velodyne was "backed by industry leading strategic investors, including Ford." *Id*. ¶ 206. Defendant Dee emphasized Ford's anticipated involvement post-merger, explaining that Velodyne's strategic investors "will be rolling over all their equity into this transaction. This will be subject to a six-month lockup post-closing." *Id*. ¶ 207. However, the August 21, 2020 Preliminary Proxy Statement disclosed that Ford would not be subject to a six-month lockup after all:

> Velodyne has also agreed to cause each holder of Velodyne common stock or Velodyne preferred stock that is a party to the IRA (as defined in the Merger Agreement), by and among Velodyne and certain of its stockholders to be bound by a customary "lockup" restricting the transfer, sale and conveyance of the shares of common stock to be issued in connection with the Merger Agreement for a period of six (6) months following the Closing, all in a form reasonably acceptable to Graf. Ford Motor Company will not be subject to a lockup agreement following the Business Combination. See "Certain Relationships and Related Transactions - Ford Letter Agreement.

*Id*. ¶¶ 25, 245; Dkt. No. 103-7 at 47. The "Certain Relationships and Related Transactions" section

16

United States District Court
Northern District of California

of the August 21, 2020 Preliminary Proxy Statement also included the following disclosure:

### Ford Letter Agreement

> The Company and Velodyne entered into a letter agreement with Ford Motor Company, a Velodyne stockholder, granting Ford the right to have any shares of common stock issued to it in the Business Combination included in the registration statement filed for purposes of registering the shares issuable upon exercise of the public warrants. In the letter agreement, the Company and Velodyne agreed that any shares of common stock issued to Ford Motor Company in the Business Combination will not be subject to a lock-up or market stand-off agreement. Ford is expected to hold greater than 5% of the Company's outstanding common stock after the Business Combination.

*Id.*; Dkt. No. 103-7 at 53. Plaintiffs strongly emphasize the final sentence of the disclosure—that Ford is "expected to hold" its common stock. *Id.* ¶ 259. The September 14, 2020 Definitive Proxy Statement also predicted that "after the business combination," Ford would hold 12,602,202 shares of common stock, or 7.5% of outstanding common stock shares. *Id.* ¶ 301; Dkt. No. 103-9 at 59. The Definitive Proxy Statement also disclosed the Ford Letter Agreement. Dkt. No. 103-9 at 31, 53-54 ("Ford Motor Company will not be subject to a lockup agreement like other former holders of Velodyne capital stock."). This disclosure was repeated again in the September 22, 2020 Registration Statement, CAC ¶ 313, Dkt. No. 103-3, and twice more post-merger in the October 1, 2020 Prospectus, CAC ¶ 301; Dkt. No. 103-10, and the October 19, 2020 Registration Statement. CAC ¶ 329; Dkt. No. 103-2.

The October 19, 2020 Registration Statement also "relate[d] to the resale from time to time, upon the expiration of lock-up agreements, by the selling stockholders…of up to 13,507,192 shares." CAC ¶ 327. Dkt. No. 103-2 at 4. The Registration Statement identified the two "Selling Stockholders" as Ford and Qing Lu (a former Velodyne CFO). CAC ¶ 327. Dkt. No. 103-2 at 98. The Registration Statement indicated Ford's entire 7.6% stake was offered for sale. *Id.*[4]

The existence of the Ford Letter Agreement and Ford's listing of its 7.6% stake for sale was again disclosed in a November 4, 2020 Prospectus. CAC ¶ 349; Dkt. No. 103-25 (filed with the SEC on Form 424B2). On November 5, 2020, one day later, defendant Gopalan stated during a quarterly earnings call that "Velodyne is partnered with leading companies like Ford." CAC ¶ 359.

---

[4] On October 5, 2020, 6 days after the Reverse Merger closed, Ford filed a Form SC 13G with the SEC, revealing its 7.6% ownership position in Velodyne. CAC ¶ 326.

### b. Ford Walks Away

On January 18, 2021, Director Samardzich—a *former* Ford executive who had joined Velodyne's board as an independent director after Ford made its initial investment in 2016—informed Velodyne's Board that she would not seek re-election.  CAC. ¶ 105.  And on February 12, 2021, Ford filed a Form SC 13G/A with the SEC disclosing that it had liquidated its entire position in Velodyne as of December 31, 2020 – 43 days before filing the Form SC 13G/A that disclosed the liquidation.  *Id*. ¶ 447.  Yet, Velodyne's January 7, 2021 FY2020 Release stated: "there is no change in our fundamental outlook for the future."

When subsequently asked about Ford's liquidation in an earnings call with investors on February 25, 2021, defendant Hammer stated Ford doesn't "like to stick around as a financial investor.  That's not their nature.  They'd rather reallocate that capital to other investment."  *Id*. ¶ 37.  During that same call, defendant Gopalan shared for the first time that Velodyne "had lost multiple contracts to its competitors."  *Id*. ¶ 152.   The CAC alleges "analysts later identif[ied] Ford as likely one of those contracts." *Id*. ¶ 152, 388.  Plaintiffs allege defendants knew all along that Ford intended to liquidate its investment and terminate its contract, yet publicly touted Ford's continued partnership.

### 4. Velodyne's Internal Controls

The CAC also alleges defendants misrepresented the quality of Velodyne's internal controls.  Specifically, plaintiffs point out that, in four instances, defendants stated that Velodyne maintained a "system of internal accounting controls designed to provide reasonable assurance" that

> (a) transactions are executed in accordance with management's general or specific authorizations; (b) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (c) access to assets is permitted only in accordance with management's general or specific authorization; and (d) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

*Id*. ¶¶ 224 (July 2020 Preliminary Proxy), 242 (August 2020 Preliminary Proxy), 277 (September 2020 Preliminary Proxy), 298 (September 14, 2020 Definitive Proxy).

The complaint alleges that defendants "Gopalan and Hamer knew or recklessly disregarded that Velodyne did not have adequate internal controls, [but] failed to remedy the internal control deficiencies or disclose a material weakness until almost a year after the problem was first identified." *Id*. ¶ 185.  Rather, Gopalan "trumpeted" Velodyne's internal controls in a Podcast interview on November 5, 2020, *id*. ¶ 184, and both Gopalan and Hammer signed Sarbanes-Oxley Certifications attesting to the quality of Velodyne's internal controls.  *Id*. ¶ 373-375.

**C. Defendant's Motion to Dismiss**

On March 4, 2022 defendants moved under Fed. R. Civ. P. 9(b) and 12(b)(6) to dismiss the Consolidated Amended Complaint for failure to state a claim under Sections 10(b) and 20(a) of the Securities Exchange Act or SEC Rule 10b-5. Dkt. No. 102.  As to the Section 10(b) and SEC Rule 10b-5 claims under Counts I and II, defendants assert the Complaint fails to plead facts (1) showing that any statement was materially false or misleading when made, or (2) raising a strong inference that any statement was made with scienter.  For the Section 20(b) claim under Count III, defendants assert the complaint fails to plead a primary violation of the Exchange Act or the individual defendant's control over Velodyne, and as such, cannot state a claim for derivative liability.  The motion to dismiss has been fully briefed, and the Court held oral argument on June 10, 2022.

**LEGAL STANDARDS**

To survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  When evaluating a motion to dismiss, the Court need not accept as true conclusory allegations, unwarranted deductions of fact, or unreasonable inferences.  *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008).  Securities fraud class actions must also "meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act (PSLRA)."  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 313–14 (2007).

19

Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." The PSLRA further requires the complaint state "with particularity facts giving rise to a strong inference that the defendant acted with required state of mind" for "each act or omission." 15 U.S.C. § 78u–4(b)(2)(A). Allegations based on false or misleading statements must also "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1)(B).

To state a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5, the complaint must plausibly allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Weston Fam. P'ship LLLP v. Twitter, Inc*., 29 F.4th 611, 619 (9th Cir. 2022). To establish falsity under the first element, the statement or omission must either "directly contradict what the defendant knew at that time" (i.e., is false) or "omit[ ] material information" (i.e., is misleading). *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 1008–09 (9th Cir. 2018*)*. Not all omissions are actionable. *Khoja,* 899 F.3d at 1009. "Disclosure is required ... only when necessary 'to make ... statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 CFR § 240.10b–5(b)). The "required state of mind" for scienter covers "'intent to deceive, manipulate, or defraud,' [and] also 'deliberate recklessness.'" *Schueneman v. Arena Pharmaceuticals*, 840 F.3d 698, 705 (9th Cir. 2016) (citations omitted). To determine whether scienter has been adequately pled, the Court must determine whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 551 U.S. at 310. Plaintiffs who "seek to hold individuals and a company liable on a securities fraud theory" must "allege scienter with respect to each of the individual defendants." *Oregon Pub. Emps. Ret. Fund v. Apollo Grp. Inc*., 774 F.3d 598, 607 (9th Cir. 2014).

To state a claim under Section 20(a) of the Exchange Act, the complaint must plausibly allege "certain 'controlling' individuals [are] also liable for violations of section 10(b) and its

underlying regulations." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009), as amended (Feb. 10, 2009) (citing 15 U.S.C. § 78t(a)).  A Section 20(a) claim is derivative, requiring "a primary violation of federal securities law" and "actual power or control over the primary violator." *Id.* (citation omitted).  "Whether [the defendant] is a controlling person is an intensely factual question, involving scrutiny of the defendant's participation in the day-to-day affairs of the corporation and the defendant's power to control corporate actions." *No. 84 Emp.-Teamster Joint Council Pension Tr. Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 945 (9th Cir. 2003).  Failure to plead a primary violation of the securities laws (e.g., section 10(b)) requires dismissal of a derivative Section 20(a) claim.  *Weston Fam.*, 29 F.4th at 623.

## DISCUSSION

Based on careful review of the facts alleged in the CAC, the arguments raised by the parties, and documents incorporated by reference or facts judicially noticed, the Court concludes the CAC adequately alleges: (i) Section 10(b) and SEC Rule 10b-5(c) claims against Velodyne, Gopalan, and Dee based on Hall's ouster; and (ii) a Section 20(a) claim against Gopalan, Dee, and Graf based on Hall's ouster.  No other claims in the CAC satisfy the PSLRA's stringent pleading requirements.

### A. Hall's Ouster

The complaint adequately alleges that defendants Velodyne, Gopalan, and Dee intentionally touted Hall's continued involvement in Velodyne throughout the Class Period while taking actions that "directly contradict[ed]" the notion that Hall maintained a key leadership role.  *Khoja*, 899 F.3d at 1008.  On July 2, 2020, a joint press release issued by Velodyne and Graf Industrial represented that Hall would "continue to play a critical role as executive chairman of Velodyne" post-merger.  *Id.* ¶ 114; Dkt. No. 103-4.  Defendant Gopalan repeated these sentiments during an investor call that same day, stating Hall would "remain very involved in the engineering and technology vision of the Company."  *Id.* ¶ 215 (emphasis omitted).  Similarly, defendant Dee remarked that Hall would continue to assemble management and engineering talent at Velodyne.  *Id.* (emphasis omitted).  The July 2020 Preliminary Proxy reiterated stated Hall "will remain actively involved in the post-

United States District Court
Northern District of California

combination company's product and technology development strategy."  Dkt. No. 103-6 at 132.
The CAC adequately alleges these statements were misleading because the Velodyne Board had
disregarded Hall's input on corporate governance, strategy, and financial performance "[s]ince the
consummation of the merger."  CAC ¶ 124.  Hall had also already "stepped back from day-to-day
management" after defendant Gopalan began serving as Velodyne's President and CEO in January
2020 – seven months before the merger occurred.  *Id*. ¶¶ 122, 49.

And on November 5, 2020, defendant Gopalan averred that Hall's "vision and expertise"
were key drivers to Velodyne's success.  CAC ¶ 361.  Velodyne's 2020 SEC Quarterly Report,
released on November 9, 2020 similarly stated Hall "remains deeply involved in *all aspects* of
Velodyne's business, including product development."  *Id*. ¶ 370 (emphasis added).   These
statements were misleading because in September 2020, the Velodyne Board had removed Hall's
control over "a number of important corporate issues," including his sign-off authority "on specific
matters such as compensation and audits."  *Id*. ¶ 22.  By the time winter came around, it became
"clear" to Hall that "Mr. Gopalan and others preferred to continuously ignore [Hall's] input in favor
of implementing their own agenda." *Id*. ¶ 122.

Then on January 7, 2021, Velodyne published an FY2020 Release, quoting defendant
Gopalan as stating: "Despite the impact of COVID-19 in the past few months and on our near-term
visibility, there is *no change* in our fundamental outlook for the future."  *Id*. ¶ 24; Dkt. No. 103-11
at 6 (emphasis added).  But earlier that same day, Hall had already tendered his voluntary resignation
as Executive Chairman.  CAC ¶ 24.  The resignation of the Executive Chairman who had been
touted as Velodyne's "founder and industry icon" would qualify as a change to Velodyne's outlook.
Also telling is that—by December 9, 2020—the Audit Committee had begun an undisclosed internal
investigation into Hall with the assistance of outside counsel.  The public would not learn of the
existence of the investigation, or its conclusions, until February 2021.  *Id*. ¶¶ 19, 50.  While
Velodyne did not need to prematurely disclose the results of the Audit Committee's investigation
into Hall, *See In re Yahoo! Inc. Sec. Litig*., No. C 11-02732 CRB, 2012 WL 3282819, at *22 (N.D.
Cal. Aug. 10, 2012), aff'd, 611 F. App'x 387 (9th Cir. 2015), the existence of an investigation, along
with all the other facts and circumstances, creates a strong inference of scienter for the statements

made in the FY2020 Release.

The complaint has thus adequately alleged a violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(c) against Velodyne, Gopalan, and Dee for the statements pertaining to Hall's leadership in the company during the class period.  The complaint also adequately alleges a violation of Section 20(a) against Gopalan, Dee, and Graf as control persons of Velodyne.  However, the complaint does not adequately allege that Graf or Dee "employed a device, scheme, or artifice to defraud" under SEC Rule 10b-5(a).

### B. Velodyne's Financial Outlook

The complaint further alleges various statements made between July 2, 2020 and January 7, 2021 misled investors by overstating business growth and anticipated revenue from "existing" contracts.  CAC. ¶¶ 27-34.  The Court finds that all but two of the challenged statement were accompanied with appropriate cautionary language.  As to the two statements that were not accompanied by cautionary language, the Court finds the complaint fails to plead actual knowledge of falsity.

### 1. The Safe Harbor

The PSLRA's "safe harbor" provision "is designed to protect companies and their officials from suit when optimistic projections of growth in revenues and earnings are not borne out by events." *In re Quality Sys., Inc. Sec. Litig*., 865 F.3d 1130, 1142 (9th Cir. 2017).  The safe harbor applies only to "forward-looking statements," which include:

(A) a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items;

(B) a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer;

(C) a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission;

United States District Court
Northern District of California

(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C);

[subsections (E) and (F) omitted]

15 U.S.C. § 78u-5(i)(1).  A statement that goes "beyond the articulation of 'plans,' 'objectives,' and 'assumptions' and instead contains an express or implied 'concrete' assertion concerning a specific 'current or past fact[ ]'" falls outside of the statutory definition.  *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1191 (9th Cir. 2021) (quoting *Quality Sys.*, 865 F.3d at 1142, 1144).  "[A] concrete factual assertion about a specific present or past circumstance goes beyond the assertion of a future goal, and beyond the articulation of predicate assumptions, because it describes specific, concrete circumstances *that have already occurred*."  *Id.* at 1192.

When a statement falls within the statutory definition for "forward-looking," the safe harbor applies if *either* one of two conditions is present.  *Id.* at 1149 (reiterating that the following prongs are disjunctive).  First, a forward-looking statement accompanied by sufficient cautionary language is protected.  *Id.* at 1141.  Cautionary language is sufficient when it identifies "important factors that could cause actual results to differ materially from those in the forward-looking statement."  15 U.S.C. § 78u-5(c)(1).  Second, a forward-looking statement "made without actual knowledge that it is false or misleading" is protected.  *Quality Sys.*, 865 F.3d at 1141.

### 2. The Challenged Statements Are Forward-Looking

Plaintiffs argue the safe harbor should not apply because defendants made "materially false or misleading statement[s] about current or past facts" and combined those statements with forward-looking statements regarding future revenue and growth.  Dkt. No. 105 at 31.[5]  Plaintiffs are correct that "in the context of such 'mixed' statements, only the forward-looking aspects could be

---

[5] Plaintiffs also argue the safe harbor's exclusion for "initial public offerings" applies to the merger between Graf Industrial and Velodyne. The facts do not support plaintiff's contention. The sole point of Graf Industrial was to "rais[e] capital through an initial public offering ('IPO') to target a private company to merge with and take public." CAC ¶ 8. Graf Industrial underwent an IPO on October 16, 2018, *id.* ¶ 88, and "later become the publicly traded iteration of Velodyne" through the operation of the merger agreement. *Id.* ¶ 83. The merger itself was not an IPO.

immunized from liability." *Wochos*, 985 F.3d at 1190.  But here, the challenged statements are not mixed.  Plaintiffs do not dispute that Velodyne had in-fact been "signed and awarded" various contracts (i.e., 16 contracts in June, 18 in September, and 24 in November).  Instead, plaintiffs' position is that the statements *derived from* the existence of Velodyne's contracts were misleading because the revenue was contingent on Velodyne successfully developing products pursuant to those contracts.  Stated differently, plaintiffs target the assumptions "underlying or relating to" the revenue projection, which fall within the PLSRA's definition of a "forward-looking statements."  15 U.S.C. § 78u-5(i)(1)(D).  And even if the statements about the contract revenue could be construed as mixed statements, as discussed below, there was sufficient cautionary language.

### 3. The Written Statements

Here, all the written statements cited in the complaint were accompanied by cautionary language.  Even if the statements about Velodyne's projected revenue from "signed and awarded" contracts could be construed as "mixed" (because they contained assertions about present facts), the safe harbor still applies.  "For cautionary language accompanying a forward-looking portion of a mixed statement to be adequate under the PSLRA, that language must accurately convey appropriate, meaningful information about not only the forward-looking statement but also the non-forward-looking statement."  *In re Quality Sys.*, 865 F.3d at 1148.  The statements about Velodyne's contracts meet this burden.  *See* July 2, 2020 Investor Presentation, Dkt. No. 103-5 at 16 ("Signed and awarded contracts represent agreed terms and conditions of supply, but do not reflect firm orders unless and until purchase orders are received."); Sept. 1, 2020 Investor Presentation, Dkt. No 103-16 at 18, 20, 27 (same); Sept. 8, 2020 Investor Presentation, Dkt. No. 103-23 at 18, 20, 27 ("To date, shipments under and revenue from these signed agreements have not been material."); Nov. 5, 2020 Investor Presentation, Dkt. No. 103-21 at 12, 14 (same).  As to the written revenue projections themselves, which plaintiffs concede are purely forward-looking, the Court finds such statements

accompanied by adequate cautionary language.[6]  The safe harbor thus applies to the written financial projections.

### 4. The Oral Statements

That leaves oral statements made in a July 2, 2020 conference call, a September 1, 2020 conference call, and a November 5, 2020 quarterly earnings presentation.  CAC ¶¶ 208, 265, 353, 355.  A forward-looking oral statement may qualify for the safe harbor if it "identifies a readily available document where the cautionary statements may be found."  *Hampton v. Aqua Metals, Inc.,* No. 17-CV-07142-HSG, 2020 WL 6710096, at *5 (N.D. Cal. Nov. 16, 2020) (citing 15 U.S.C. § 78u-5(c)(2)).  The transcript of the November 5, 2020 presentation indicates the presence of cautionary statements.  Dkt. No. 103-19 at 3 ("Today's discussion includes forward-looking statements.  Please refer to our form 8-K dated October 5, 2020, filed with the Securities Exchange Commission for a discussion of factors that could cause the company's actual results to differ materially from these forward-looking statements."); Dkt. No. 103-22 (October 5, 2020 8-K).

The Court has reviewed the transcripts for the conference call on July 2, 2020 and September 1, 2020 and cannot conclude that defendants Gopalan, Graf, or Hamer made cautionary oral

---

[6] *See* July 2, 2020 Merger Press Release, Dkt. No. 103-4 at 8 (indicating the presence of forward-looking statements and describing important factors that may affect actual results or outcomes); July 2, 2020 Investor Presentation, Dkt. No. 103-5 at 3 (same); July 15, 2020 Preliminary Proxy with Annex A – Merger Agreement, Dkt. No. 103-6 at 20-21 ("Cautionary Note Regarding Forward-Looking Statements" identifying operating and transaction-related risk factors that may affect actual results); Aug. 21, 2020 Preliminary Proxy, Dkt. No. 103-7 at 5-6 (same); Aug. 31, 2020 Press Release, Dkt. No. 103-15 at 3 (indicating the presence of forward-looking statements and describing important factors that may affect the reaffirmation of prior guidance and the upward revision of revenue expectations); Sept. 1, 2020 Investor Presentation, Dkt. No 103-16 at 3 (disclaimer indicating the presence of forward-looking statements and describing important factors that may affect actual results or outcomes); Sept. 8, 2020 Investor Presentation, Dkt. No. 103-23 at 3 (same); Sept. 14, 2020 Definitive Proxy, Dkt. No. 103-9 at 5-50 ("Cautionary Note Regarding Forward-Looking Statements" identifying operating and transaction-related risk factors that may affect actual results); Oct. 1, 2020 Prospectus, Dkt. No. 103-10 at 4-5 (same); Oct. 19, 2020 Registration Statement, Dkt. No. 103-2 at 8, 13-39 (same); Nov. 5, 2020 Q2020 Press Release, Dkt. No. 103-20 at 11 (disclaimer indicating the presence of forward-looking statements and describing important factors that may affect actual results or outcomes).

United States District Court
Northern District of California

statements or referred to documents where such cautionary statements could be found.  Dkt. Nos. 103-17 (July 2, 2020 transcript); 103-18 (September 1, 2020 transcript).  However, the CAC does not present sufficient facts from which the Court could infer that defendants Gopalan, Graf, or Hamer made the statements on those calls with "actual knowledge" of their falsity at the time the statements were made.  *Hampton*, 2020 WL 6710096 at *5 (citing *In re Quality Sys.*, 865 F.3d at 1141) ("Even if the forward-looking statement is not accompanied by meaningful cautionary language, it still is non-actionable unless Plaintiff alleges sufficient facts demonstrating that the statement was made with actual knowledge that it is false or misleading.").

The Court accepts as true the allegation that, prior to a November 16, 2020 board meeting, Hall "repeatedly and vehemently stated to the VLDR board that achieving $152MM in 2021 revenues was impossible, and that the alleged contracts were not executed contracts but at most indications of interest in products still under development and with no demonstrated success in situ." *Id.* ¶¶ 33, 144.  But Hall's warning calls in November 2020 would have come after the July 2, 2020 and September 1, 2020 oral statements, and are therefore not probative of the actual knowledge possessed by defendants Gopalan, Graf, or Hamer at the time.   The Court also accepts as true that Hall "voiced [his] grave concerns regarding the Company's plunging product sales, departure of key R&D personnel, significant loss of market share to competitors, the serious risk of theft of IP in China and the Company's overall poor financial performance." *Id.* ¶ 126.  But without identifying when Hall expressed his "grave concerns," and to whom, the Court cannot draw an inference of actual knowledge against defendants Gopalan, Graf, or Hamer based on this allegation.

The Court thus finds none of the statements pertaining to Velodyne's finances and revenue outlook adequately plead a violation of Section 10(b) of the Exchange Act or SEC Rule 10b.  The complaint accordingly fails to plead a Section 20(a) violation as well.

**C. Ford's Departure**

The complaint asserts that defendants falsely represented that Ford would remain a strategic investor in Velodyne and retain a "major contract" with the company after the consummation of the merger.  *Id*. ¶¶ 205, 210.  The Court finds the complaint fails to allege falsity as to any of the statements pertaining to Ford.

**1. Ford's Stake and Sale Were Properly Disclosed**

In the July 2, 2020 merger announcement, Velodyne stated that Ford, along with other strategic investors, would be "'rolling over' its equity into the transaction" subject to a six-month lockup after the consummation of the merger.  *Id*. ¶ 207.  In the August 21, 2020 Preliminary Proxy Statement, Velodyne disclosed that pursuant to a Letter Agreement, Ford would be exempt from the lockup period.  *Id*. ¶ 245; Dkt. No. 103-7 at 47.  Plaintiffs do not claim that either of these statements was false or not adequately disclosed.  Rather, plaintiffs argue that defendants' repeated assertion that "Ford is expected to hold greater than 5%" of Velodyne post-merger was misleading in light of the Letter Agreement and Ford's *eventual* sale of its entire stake on December 31, 2020.

Defendant's statements were not false or misleading.  An *expectation* that Ford would hold on to its equity post-closing is not inconsistent with Ford having the option to sell its equity stake post-closing.  And plaintiffs do not contest that Ford in fact retained its equity post-closing.  CAC ¶ 326 (describing Ford's Oct. 6, 2020 Form SC 13G revealing its 7.6% stake in Velodyne post-merger).  Once Ford chose to exercise its rights under the Letter Agreement, defendants promptly disclosed that Ford was putting its entire 7.6% equity stake up for sale.  CAC ¶ 327; Dkt. No. 103-2 at 4 (Oct. 19, 2020 Registration Statement).  And on February 12, 2021, Ford publicly disclosed that it had fully liquidated its position as of December 31, 2020.  CAC. ¶ 447.

Plaintiff's implied suggestion is that Velodyne withheld Ford's December 31, 2020 liquidation from the public—but the CAC does not allege any facts indicating that any of the defendants *knew* that Ford liquidated its position prior to Ford's announcement on February 12, 2021.  Thus, even assuming any intervening statements could be described as false or misleading, the complaint fails to plead factual basis from which a strong inference of scienter may be drawn as

United States District Court
Northern District of California

to any defendant.  Defendant Hammer's statement on February 25, 2021 that Ford doesn't "like to stick around as a financial investor" also does not render prior statements false or misleading.  CAC ¶ 37.  Even if Ford were a noncommittal investor, the fact that it had invested in Velodyne in 2016 and stuck around through 2020 only strengthens the case for the truthfulness of the statement that Ford was "expected" to hold onto its stake post-merger—which it in fact did for a short period.

### 2. Ford's Contract

Other than the repeated and unsubstantiated assertion that Ford "planned to terminate a major contract with Velodyne" after the merger closed, e.g., CAC ¶¶ 205, 210, 229, the complaint does not contain any facts describing the putative contract, Ford's plan to terminate the contract, or defendant's knowledge of such a plan.  Plaintiff's entire theory regarding Ford's contract turns on two allegations: (1) that on February 25, 2021 defendant Gopalan told investors that Velodyne "had lost multiple contracts to its competitors," *id*. ¶ 152, and (2) that at some unspecified time after February 25, 2021, some unspecified "analysts later identif[ied] Ford as *likely* one of those contracts." *Id.* ¶¶ 152, 388 (emphasis added).  The Court declines to draw the "unwarranted deductions of fact, or unreasonable inferences" that would be required to find such allegations adequate to plead falsity or scienter. *In re Gilead Scis*, 536 F.3d at 1055.

None of the statements pertaining to Ford plead a violation of Section 10(b) of the Exchange Act or SEC Rule 10b, nor Section 20(a) of the Exchange Act, against any defendant.

### D. Velodyne's Internal Controls

Finally, plaintiffs allege defendants falsely represented the quality of Velodyne's internal controls.  However, the allegations in the CAC are simply threadbare recitals of the legal elements of the claim, and are thus insufficient.  The CAC alleges that defendant Gopalan's "hands-on management style" evinces that he intentionally made false assurances regarding Velodyne's internal controls.  CAC ¶¶ 184–85, 366.  But the complaint fails to state with particularity the alleged problems to which Gopalan turned a blind eye.  Similarly, the CAC alleges that "Gopalan and Hamer knew or recklessly disregarded that Velodyne did not have adequate internal controls, [and] failed

United States District Court
Northern District of California

to remedy the internal control deficiencies or disclose a material weakness until almost a year after the problem was first identified." *Id*. ¶ 185. Yet, the only facts offered to suggest scienter are Gopalan and Hamer's November 9, 2020 SOX Certifications. *Id*. ¶ 373. This alone is not sufficient. *See Wanca v. Super Micro Computer, Inc*., No. 5:15-CV-04049-EJD, 2018 WL 3145649, at *6 (N.D. Cal. June 27, 2018) ("to successfully plead falsity [with respect to a SOX Certification], Plaintiff must also allege facts explaining why the declarants knew the financial reporting was false at the time it was made.").

None of the statements pertaining to Velodyne's internal controls plead a violation of Section 10(b) of the Exchange Act or SEC Rule 10b, nor Section 20(a) of the Exchange Act, against any defendant.

## CONCLUSION

Based on the foregoing discussion, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss. The Court finds as follows.

### *Claims based on Hall's Ouster*

- The CAC adequately alleges defendants Velodyne, Gopalan, and Dee violated Section 10(b).
- The CAC adequately alleges defendants Gopalan, Dee, and Graf violated Section 20(a) of the Exchange Act against as control persons of Velodyne.

### *Claims based on Financial Projections*

- The CAC fails to allege a violation of Section 10(b) of the Exchange Act against any defendant based on financial projections and revenue outlook.
- The CAC accordingly fails to allege a Section 20(a) violation against any defendant based on financial projections and revenue outlook.

### *Claims based on Ford*

- The CAC fails to allege a violation of Section 10(b) of the Exchange Act  against any defendant based on Ford's investment and contracts.
- The CAC accordingly fails to allege a Section 20(a) violation against any defendant

based on Ford's investment and contracts.

***Claims based on Internal Controls***

- The CAC fails to allege a violation of Section 10(b) of the Exchange Act against any defendant based on Velodyne's internal controls.

- The CAC accordingly fails to allege a Section 20(a) violation against any defendant based on Velodyne's internal controls.

The Court thus **DENIES** the motion to dismiss as it pertains to: (i) the Section 10(b) claims against Velodyne, Gopalan, and Dee based on Hall's ouster; and (ii) the Section 20(a) claims against Gopalan, Dee, and Graf based on Hall's ouster.

The balance of the motion is **GRANTED**. "When granting a motion to dismiss, the court is generally required to grant the plaintiff leave to amend, even if no request to amend the pleading was made, unless amendment would be futile." *Cooney v. California Pub. Utilities Comm'n*, No. C 12-6466 CW, 2014 WL 3531270, at *4 (N.D. Cal. July 15, 2014) (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911 F.2d 242, 246–47 (9th Cir.1990)). The Court denies leave to amend claims against Joseph Culkin, as no actionable statements have been attributed to Culkin in the present CAC or any of the preceding complaints. The Court grants leave to amend the remaining claims.

Plaintiffs may file an amended complaint no later than July 15, 2022.

**IT IS SO ORDERED**.

Dated: July 1, 2022

SUSAN ILLSTON
United States District Judge

United States District Court
Northern District of California