# EXHIBIT A

Redacted Exhibit
(Original Filed Under Seal)

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

MEYSAM MORADPOUR, Individually )
and On Behalf of All Others    )
Similarly Situated,            )
                               )
              Plaintiffs,      )
                               )
            vs.                )Case No.
                               )3:21-CV-01486-SI
VELODYNE LIDAR, INC., ANAND    )
GOPALAN, ANDREW HAMER, JAMES   )
A. GRAF, MICHAEL DEE, and      )
JOSEPH B. CULKIN,              )
                               )
              Defendants.      )
_____)

VIDEO-RECORDED REMOTE DEPOSITION OF

DIANE SMITH

Thursday, April 20, 2023

Volume I

*** HIGHLY CONFIDENTIAL ***

Reported by:
CARLA SOARES
CSR No. 5908
Job No. 5831347
Pages 1 - 178

Page 1

HIGHLY CONFIDENTIAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

MEYSAM MORADPOUR, Individually )
and On Behalf of All Others    )
Similarly Situated,          )
                             )
        Plaintiffs,     )
                             )
        vs.        )Case No.
                   )3:21-CV-01486-SI
VELODYNE LIDAR, INC., ANAND   )
GOPALAN, ANDREW HAMER, JAMES  )
A. GRAF, MICHAEL DEE, and     )
JOSEPH B. CULKIN,          )
                           )
        Defendants.     )
_____)

VIDEO-RECORDED REMOTE DEPOSITION OF DIANE SMITH, Volume I, taken on behalf of Defendants, beginning at 9:10 a.m., and ending at 2:28 p.m., on Thursday, April 20, 2023, before CARLA SOARES, Certified Shorthand Reporter No. 5908.

Page 2

APPEARANCES VIA VIDEOCONFERENCE:

For the Plaintiffs:
    KAHN SWICK & FOTI, LLP
    BY: RAMZI ABADOU, Attorney at Law
    BY: ASHLEY ERRINGTON, Attorney at Law
    BY: ALEXANDER LOUIS BURNS, Attorney at Law
    BY: JAMES FETTER, Attorney at Law
    BY: ALEXANDRA PRATT, Attorney at Law
    580 California Street, Suite 1200
    San Francisco, California 94104
    415.459.6900
    ramzi.abadou@ksfcounsel.com
    ashley.errington@ksfcounsel.com
    alexander.burns@ksfcounsel.com
    james.fetter@ksfcounsel.com
    alexandra.pratt@ksfcounsel.com

For the Defendants:
    WILMER CUTLER PICKERING HALE AND DORR LLP
    BY: TAMAR KAPLAN-MARANS, Attorney at Law
    BY: WILLIAM BRENC, Attorney at Law
    7 World Trade Center, 250 Greenwich Street
    New York, New York 10007
    212.230.8800
    tamar.kaplan-marans@wilmerhale.com
    william.brenc@wilmerhale.com

ALSO PRESENT: Soseh Kevorkian, Video Operator

        --o0o--

Page 3

INDEX
WITNESS
DIANE SMITH                EXAMINATION
Volume I

    BY MS. KAPLAN-MARANS         10

    EXHIBITS
NUMBER         DESCRIPTION         PAGE
Exhibit 1                28
    Document headed "Certification
    Pursuant to Securities Laws"

Exhibit 2                33
    Joint Declaration of Diane and
    William P. Smith in Support of Their
    Motion for Appointment as Lead
    Plaintiff and Approval of Their
    Selection of Counsel

Exhibit 3                48
    Second Joint Declaration of Diane
    and William P. Smith

Page 4

    EXHIBITS
NUMBER         DESCRIPTION         PAGE
Exhibit 4                58
    Lead Plaintiffs' Supplemental and
    Amended Responses to Defendants'
    Interrogatories to Lead Plaintiffs,
    Set One

Exhibit 5                65
    Document headed "Retention Agreement
    for Legal Representation"

Exhibit 6                76
    Consolidated Amended Class Action
    Complaint for Violations of the
    Federal Securities Laws

Exhibit 7                81
    Lead Plaintiffs' Rule 26 Initial
    Disclosures

Exhibit 8                83
    Lead Plaintiffs' Responses and
    Objections to Defendants' Interrogatories
    to Lead Plaintiffs, Set One

Page 5

2 (Pages 2 - 5)

HIGHLY CONFIDENTIAL

EXHIBITS

NUMBER        DESCRIPTION        PAGE

Exhibit 9                            91

Document headed "Statutory Short Form Power of Attorney for Property," Bates SMITHS-VLDR-000063 - 0073

Exhibit 10                          114

Fidelity Investment Report, December 1, 2020 - December 31, 2020, Bates SMITHS-VLDR-000021 - 0030

Exhibit 11                          144

Graf Industrial Corp. Schedule 14A

Exhibit 12                          152

Document headed "Intelligize"

Exhibit 13                          164

Document headed "Velodyne Lidar Announces Fourth Quarter and Annual 2020 Preliminary Snapshot"

--o0o--

Page 6

REFERENCED EXHIBITS

EXHIBIT    PAGE

(None)

INSTRUCTIONS NOT TO ANSWER

PAGE    LINE

85        5

85        22

88        5

--o0o--

Page 7

Witness Location:  Honolulu, Hawaii

Thursday, April 20, 2023

9:10 a.m.

--o0o--

P R O C E E D I N G S

THE VIDEO OPERATOR:  Good morning.  We are on the record at 9:10 a.m. on April 20th, 2023.

Please note that this deposition is being conducted virtually.  Quality of recording depends on the quality of camera and Internet connection of participants.  What is seen from the witness and heard on screen is what will be recorded.  Audio- and video-recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Diane Smith, taken by counsel for defendant, in the matter of Meysam Moradpour, et al., versus Velodyne Lidar, Incorporated, et al., filed in the U.S. District Court, Northern District of California, Case No. 3:21-CV-01486-SI.

My name is Soseh Kevorkian, representing Veritext, and I'm the videographer.  Our court reporter is Carla Soares, also from the firm Veritext.

Page 8

At this time, would counsel and all present please state their appearances and affiliations for the record, beginning with the noticing attorney.

MS. KAPLAN-MARANS:  Hi.  This is Tamar Kaplan-Marans, from WilmerHale.  I'm joined by William Brenc, also from WilmerHale.  We represent the defendants, Velodyne Lidar, Inc., James Graf, Michael Dee, Andrew Hamer, and Anand Gopalan.

MR. ABADOU:  Good morning.  This is Ramzi Abadou, from Kahn Swick & Foti, in San Francisco, California.  I'm counsel for Diane Smith, the witness, and the putative class in this matter.  With me today are Alexander Burns, James Fetter, and Ashley Errington from my firm.

THE VIDEO OPERATOR:  Okay.  Alexandra Pratt, did we hear from her?

MS. KAPLAN-MARANS:  And Alexandra Pratt as well if she's on, yeah.

THE VIDEO OPERATOR:  Thank you.

Whenever you're ready, Carla.

DIANE SMITH, having been administered an oath, was examined and testified as follows:

///

Page 9

3 (Pages 6 - 9)

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL

EXAMINATION    11:26:41

BY MS. KAPLAN-MARANS:

Q  Hi, Ms. Smith.  Good morning.  Thank you for joining us today.

Can you provide your full name for the    11:26:43
record?  Please state and spell it.

A  Sorry?

Q  Please state and spell it.

A  Diane Smith.  D-I-A-N-E, S-M-I-T-H.

Q  What is your address?    11:26:48

A  ████████████████████████████
██████████████████

Q  Is this address your primary residence?

A  Yes.

Q  Do you have more than one residence?    11:26:53

A  No.

Q  Do you understand that you are testifying in connection with the Velodyne Lidar class action litigation in the U.S. District Court for the Northern District of California?    11:26:56

A  Yes.

Q  I'd like to go over a few rules, details about the nature of this deposition today, so that you know what's going on.

Have you ever been deposed before?    11:27:00

Page 10

A  No.    11:27:01

Q  Have you ever testified in court before?

A  No.

Q  Do you understand that you are under oath and are obligated to testify truthfully as if you were in court?    11:27:03

A  Yes.

Q  Do you have counsel representing you today?

A  Yes.    11:27:05

Q  Who is that?

A  Ramzi Abadou, of Kahn Swick & Foti.

Q  We're going to go over the nature of the questions and answering process today.

It's important that you please answer    11:27:09
verbally rather than shaking your head or nodding.  The reporter is going to be transcribing whatever you say.

As you heard earlier, this deposition is being recorded.    11:27:14

Please wait until a question is finished before you answer.  It's important that we both try not to speak over one another.

If you don't understand a question, please say so.  If you answer a question, I'm going to    11:27:18

Page 11

assume that you understand it.    11:27:20

I'm going to be showing you documents during this deposition, which I will first mark as exhibits, and then you will have it available on the platform, on the Exhibit Share platform.  I'm going    11:27:23
to ask you questions about these documents.

If it's a longer document, then I may say to you, "Please turn to page 4," or some specific page number, but you're welcome to take as much time as you need to page through the entire document or    11:27:29
look through whatever you need to do.

A  Okay.

Q  Your counsel may object to certain of my questions, but after he does so, you must still answer the question unless your counsel instructs    11:27:33
you not to answer.

If you need a break, please feel free to say so, and we will accommodate.  Before taking a break, you will need to answer the last question that I asked, so we won't break while a question is    11:27:38
pending.

A  Okay.

Q  Is anyone in the room with you today?

A  In this room, no.

Q  There are special rules for video    11:27:41

Page 12

depositions that we just wanted to flag for you.    11:27:42

The expectation is that counsel will not communicate with you during this deposition while I am on the record.  That includes communicating via text, e-mail, other electronic means.  Those    11:27:46
exchanges are not subject to the protections of attorney-client privilege, sort of like if you were passing a note in front of me if we were in the same room.

Please do not look at any documents or    11:27:51
data, either hard copies or electronic, unless you specifically identify the documents to me.

We also request all electronic devices other than those being used to participate in this remote deposition please be put on silent.    11:27:55

Are there any health or medical reasons why you cannot provide accurate testimony today?

A  No.

Q  There's one other thing I want to flag.  I have a tendency to speak quickly.  So if something    11:28:00
happens and I am speaking quickly, please just flag it, and I'll do my best to slow down.

A  Okay.

Q  What did you do to prepare for today's deposition?    11:28:05

Page 13

4 (Pages 10 - 13)

A  What did I do to prepare?    11:28:05
Well, I spoke with counsel a couple of days this week to prepare, read over some of the documents that was filed.

Q  How many times did you speak with your    11:28:09 counsel?

A  It was two times this week, Monday and Wednesday.

Q  Any times prior to that with respect to preparing for the deposition?    11:28:12

A  I'm trying to think if we met last week. I can't remember exactly.  But I know we spoke Monday and Wednesday.

Q  You mentioned that you reviewed documents in preparation for the deposition.  Which documents    11:28:16 were those?

A  Basically the documents that were filed, so it would have been several documents.

Q  Do you know which documents those were?

A  I can't recite each and every document.    11:28:20

Q  Can you please describe your educational history starting with where you attended university?

A  I went to -- I had, like, three years of college, so I went to a junior college in Chicago.

Q  Which university in Chicago, or which    11:28:25

Page 14

junior college?    11:28:26

A  Olive-Harvey College.

Q  Did you have any training after that?

A  Any training?

Q  Any professional training or professional    11:28:28 licenses?

MR. ABADOU:  Objection.  Form.  It's compound.

You can answer, Diane.

BY MS. KAPLAN-MARANS:    11:28:30

Q  Did you have any -- any training for professional licenses?

MR. ABADOU:  Objection.  Form.

BY MS. KAPLAN-MARANS:

Q  Do you have any professional licenses?    11:28:33

A  No.

Q  Have you ever been arrested?

A  No.

Q  Have you ever been convicted?

A  No.    11:28:35

Q  Have you ever been the target of an investigation by a grand jury or any other governmental agency?

A  No.

Q  We're going to turn to your employment    11:28:38

Page 15

history.    11:28:39

I understand you worked in data entry; is that right?

A  That's correct.

Q  When?    11:28:40

A  Sorry?

Q  When did you work in data entry?  What years?

A  That was the 1980s.

Q  And where was that position?    11:28:43

MR. ABADOU:  Objection.  Form.

BY MS. KAPLAN-MARANS:

Q  You can still answer.

A  Still answer it?  Okay.

It was at Continental Freezers.    11:28:45

Q  I understand that you were also a real estate agent; is that right?

A  Correct.

Q  When was that?

MR. ABADOU:  Objection.  Form.    11:28:49

BY MS. KAPLAN-MARANS:

Q  You can answer.

A  That was 1986 to about 2001.  I'm not sure exactly of the date.

Q  And where -- where did you -- where was    11:28:52

Page 16

that position as a real estate agent?    11:28:53

A  I worked for a firm.  I think it was a RE/MAX.  I can't remember exactly.  And then I started my own firm.

Q  When did you start your own firm?    11:28:57

A  That was approximately 1987.

Q  And you worked at your own firm as a real estate agent until 2001?

A  Correct.

Q  I understand that you started another    11:29:00 business selling hospital supplies.

A  Correct.  Yes.

Q  When was that?

A  That was from about 2007 -- and this is approximate -- 2007 to about -- I'm sorry -- that    11:29:03 was about 2005 all the way to 2007.

Q  And where was that position?

A  That was my own business.

Q  Was that your business -- where was your business based out of?    11:29:07

A  My home.

Q  Where was your home?

A  In Chicago.

Q  What was the name of the business?

A  I'm sorry.  I can't remember it.    11:29:10

Page 17

5 (Pages 14 - 17)

Q  From 2001 to 2005, did you have any employment during that period?

A  2001 to 2005?  I was in real estate.

Q  Okay.  You previously stated that you worked as a real estate agent in your own business through 2001; is that right?

MR. ABADOU:  Objection.  Asked and answered.

BY MS. KAPLAN-MARANS:

Q  I'm trying to understand what you did between 2001 and 2005.

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Well, I may not get all the dates right because this was many years ago.

So all I can say to you, I was a real estate broker for several years, and then I went -- I was also doing my own business selling medical supplies.

BY MS. KAPLAN-MARANS:

Q  Did you work for a company called Innovative Trader?

A  Yes.  That was the name of the real estate company.

Q  And you worked for that company between 1987 to 2001, for Innovative Trader?

Page 18

A  I can't remember the exact year that I stopped working for Innovative Trader.  That was an approximate date.  I'd have to go back and try to find out that information.

Q  Have you had other jobs that we haven't discussed yet?

A  No.

MR. ABADOU:  Objection.  Form.

BY MS. KAPLAN-MARANS:

Q  You can answer.

A  No.

Q  Are you currently involved in another litigation?

A  No.

Q  Have you ever been involved in another litigation?

A  No.

Q  How did you learn about this lawsuit?

A  I was doing research in my brokerage account, and there was a notice in the news in regards to Velodyne about a class action.  That's how I find out.

Q  Was this -- was this notice from your current counsel at Kahn Swick & Foti?

A  It was.

Page 19

Q  I'm going to refer to them as "KSF" just for efficiency.

When did you see this notice?

A  I can't remember the exact date.

Q  Approximately when?

MR. ABADOU:  Objection.  Form.  Asked and answered.

BY MS. KAPLAN-MARANS:

Q  You can answer.

A  It would have been in 2021.

Q  Were you already an investor in Velodyne when you heard about this litigation?

A  Yes.

Q  How many conversations did you have with KSF before you retained them?

A  I can't remember exact numbers, but I did speak with them.

Q  Approximately how many conversations did you have with KSF before retaining them?

MR. ABADOU:  Objection.  Form.  Asked and answered.

THE WITNESS:  It might have been two conversations, maybe three.

BY MS. KAPLAN-MARANS:

Q  What was your initial reaction to learning

Page 20

that a lawsuit had been filed against Velodyne Lidar?

A  I thought it was a justified lawsuit.

Q  When you learned about the lawsuit, what did you understand it to be about at that time?

A  A class action lawsuit.

Q  What does that mean to you?

A  There's a group of investors that had some fraudulent or misinformation, and that there was going to be a lawsuit whereas all of the members or investors could join into a lawsuit to try to recover their losses.

Q  Who is being sued in this lawsuit?

A  The defendants are Velodyne, Anand Gopalan, Andrew Hamer, Michael Dee, and James Graf.

Q  And why are these parties being sued?

MR. ABADOU:  Objection.  Form.  Calls for a legal conclusion.

THE WITNESS:  Can this be answered?

BY MS. KAPLAN-MARANS:

Q  You can answer as long as Mr. Abadou doesn't instruct you not to answer.

A  Okay.  The lawsuit is based upon securities fraud and in regards to the defendants making false statements about the prospects of

Page 21

6 (Pages 18 - 21)

Velodyne, including the role of David Hall at the    11:30:20
company.

Q   Do you know what claims are being asserted?

MR. ABADOU: Objection. Calls for a legal    11:30:23
conclusion.

THE WITNESS: What claims are being asserted?

BY MS. KAPLAN-MARANS:

Q   In this lawsuit. Yes. What claims are    11:30:25
being asserted in this lawsuit?

MR. ABADOU: Objection. Form.

THE WITNESS: I don't know what you mean by "claims."

BY MS. KAPLAN-MARANS:    11:30:28

Q   In your own words, what are the general allegations in the amended complaint?

MR. ABADOU: Objection. Asked and answered.

THE WITNESS: Well, there was fraudulent    11:30:30
information given in regards to the prospects of Velodyne.

They made it sound like the chairman and founder would stay with the company. They also had projections as far as their earnings that was false.    11:30:34

Page 22

They made it seem like Ford company, which    11:30:35
was a big one, would stay with Velodyne, and which they ended up selling all their shares of Velodyne.

So there was a lot of fraudulent information that I, as an investor, did not know    11:30:40
about. And then when I found out about it, we lost a substantial amount of money.

BY MS. KAPLAN-MARANS:

Q   Do you know what stage of the litigation the action is currently in?    11:30:43

A   It is in the class certification stage, and also fact discovery stage.

Q   Are you familiar with the requirements for bringing a suit -- a lawsuit as a class action?

MR. ABADOU: Objection. Form. Also calls    11:30:48
for a legal conclusion.

THE WITNESS: Ask the question again.

BY MS. KAPLAN-MARANS:

Q   Are you familiar with the requirements for bringing a suit as a class action?    11:30:50

A   Well, if I'm understanding you correctly, I'm acting as the lead plaintiff and class representative, and my duties would be to oversee counsel and act on behalf of the class.

Q   Do you know if there are alternatives to    11:30:54

Page 23

bringing this case as a class action?    11:30:55

MR. ABADOU: Objection. Form. Calls for speculation, legal conclusion.

THE WITNESS: No.

BY MS. KAPLAN-MARANS:    11:30:58

Q   Do you know what the alleged class period is?

A   The class period is from July 2nd, 2020, to March 17th, 2021.

Q   What is your understanding of what a class    11:31:01
period is?

A   It's the period in which the fraudulent information -- within that time frame, the fraudulent statements were made and investors lost their money.    11:31:05

Q   Did you have any role in selecting that period?

A   No.

Q   Can you describe the class of people that you, as the proposed class representative, are    11:31:07
seeking to represent?

MR. ABADOU: Objection. Asked and answered.

THE WITNESS: What was the question again?

///    11:31:10

Page 24

BY MS. KAPLAN-MARANS:    11:31:10

Q   Can you describe the class of people that you, as a proposed class representative, are seeking to represent?

MR. ABADOU: Same objection.    11:31:13

THE WITNESS: The class of people? I would be the fiduciary for this class. These are investors that lost money.

BY MS. KAPLAN-MARANS:

Q   Approximately how many people are in that    11:31:16
class?

A   I do not know.

Q   What are your goals in seeking to be class representative?

A   My goals is to recover our losses as well    11:31:19
as the losses for the class members as their fiduciary.

Q   What do you mean when you say "our losses"?

A   My husband and I.    11:31:23

Q   As you understand it, what are the goals of the class as a whole?

MR. ABADOU: Objection. Form, compound.

THE WITNESS: The goals is to recover my losses as well as the losses of the members of the    11:31:27

Page 25

7 (Pages 22 - 25)

HIGHLY CONFIDENTIAL

class as their fiduciary.                                11:31:27

BY MS. KAPLAN-MARANS:

Q   What relief is being sought in this lawsuit?

MR. ABADOU:  Objection.  Form.  Calls for   11:31:29 a legal conclusion.

THE WITNESS:  What relief?  I won't know the answer to that until, you know, the case proceeds.

BY MS. KAPLAN-MARANS:                          11:31:33

Q   Do you know the identity of any of the other class members?

A   No.

Q   Have you had any communications with any of the other class members?               11:31:36

A   No.

Q   Do you understand that as lead plaintiff, you have a continued role in this litigation beyond today's deposition?

A   Yes.                                        11:31:39

Q   What do you understand that role to be?

A   To sit at a deposition, like we're doing today; to also oversee counsel; and to read any documents before they are filed.  Also, any type of settlement talks, I would be able to okay whatever   11:31:44

Page 26

decisions are made there.                        11:31:45

Those are just some of the things.

Q   How much time to date have you spent on this litigation?

A   Many hours.                                 11:31:49

Q   How have you spent this time?

MR. ABADOU:  Objection.  Form.  Vague.

THE WITNESS:  How have I spent this time? Reading over the different files that have been sent to the court.                                     11:31:53

BY MS. KAPLAN-MARANS:

Q   How much time has your husband, Mr. William Smith, spent on this litigation?

A   Well, because of his injury and because of -- you know, I'm his power of attorney, I have   11:31:56 done most of the reading and anything involved.  But I do discuss it with him, but I've done most of it.

Q   Will you commit to testifying at trial if called to do so?

A   Yes.                                        11:32:00

Q   Will your husband commit to testifying at trial if called to do so?

A   No.

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Because my husband is not   11:32:03

Page 27

seeking to be class representative.               11:32:04

MS. KAPLAN-MARANS:  Okay.  We're going to turn to the documents.

We're going to start with Tab 2.  Pull that up.                                         11:32:06

THE WITNESS:  I don't know exactly how to pull it up.  I'll probably not be able to see you if I pull this up.  I'm just pulling it up.

MR. ABADOU:  So where is 2?  I don't see it.  I see 1 still.                                11:32:11

MS. KAPLAN-MARANS:  It's coming.

MR. ABADOU:  Okay.  Yeah, you did say 30 seconds.

MS. KAPLAN-MARANS:  I'm going to refer to the documents by tab numbers.  Those are our   11:32:14 internal tab numbers.  It will not match with the exhibit number.

(Exhibit 1 was marked for identification and is attached hereto.)

BY MS. KAPLAN-MARANS:                          11:32:16

Q   It should be up.

A   I'm not seeing anything yet.

MR. ABADOU:  All you need to do, Diane, is refresh.

THE WITNESS:  Okay.  I have it.            11:32:19

Page 28

BY MS. KAPLAN-MARANS:                          11:32:20

Q   Ms. Smith, can you see the document?

A   I can.

Q   Okay.  Great.

Do you recognize this document?          11:32:21

A   I do.

Q   What is it?

A   It's "Certification Pursuant to Securities Laws."

Q   Do you see that on the first line, it   11:32:24 says, "Diane and William P. Smith ('Movant')"?

A   Yes, I do.

Q   What do you think that means?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  We are party to this   11:32:28 lawsuit.

BY MS. KAPLAN-MARANS:

Q   Does "movant" describe both you and your husband?

MR. ABADOU:  Objection.  Form.         11:32:30

THE WITNESS:  It does in this document.

BY MS. KAPLAN-MARANS:

Q   Okay.  If you could please read paragraph 3.

A   Okay.                                       11:32:32

Page 29

8 (Pages 26 - 29)

**Page 30**

Q  Do you see where it says (as read), "Movant is willing to serve as a representative on behalf of a class, including providing testimony at deposition and trial, if necessary"?

A  I do.

MR. ABADOU:  Objection.  Form.  Mischaracterizes the document.  You left out a word.

BY MS. KAPLAN-MARANS:

Q  I'm happy to read it again.

"Movant is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary."

A  Yes.

Q  Is that statement accurate?

A  That statement was accurate.

Q  Is this statement no longer accurate?

A  My husband, based upon his injury, cannot sit for a deposition.

I was the one who made all decisions regarding the purchase of Velodyne.  And I discussed

**Page 31**

it with him, but I made all the decisions.  I purchased the stock.  He's not seeking to be class representative.  I am.

So we would like to have his name removed as lead plaintiff, and so he would not be able to testify at deposition or trial.

Q  I'm sorry to hear about ▮▮▮▮▮▮▮.

Do you see on this document at the bottom that it's dated May 3rd, 2021; is that right?

A  That's correct.

Q  Has something changed with respect to Mr. Smith's condition since May 3rd, 2021?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Well, he has the same condition, but there have been things. ▮▮▮▮▮▮▮▮▮▮▮▮ His voice -- you can barely understand him in speaking.  And it would not be good medically for him to sit for a deposition or a trial.

BY MS. KAPLAN-MARANS:

Q  Has his condition changed since May 3rd, 2021?

MR. ABADOU:  Objection.  Asked and answered.

**Page 32**

BY MS. KAPLAN-MARANS:

Q  Has his condition deteriorated since May 3rd, 2021?

MR. ABADOU:  Objection.  Asked and answered.

THE WITNESS:  Well, his condition is about the same, but he has had hospitalizations, which made things even worse.

BY MS. KAPLAN-MARANS:

Q  Is his condition about the same as it was on May 3rd, 2021?

MR. ABADOU:  Objection.  Asked and answered.  And now you're getting close to badgering the witness about this.

MS. KAPLAN-MARANS:  Well, Mr. Abadou, she just said two conflicting things.  She said that --

MR. ABADOU:  She didn't say anything conflicting.  You're reading it as conflicting because you want to.

MS. KAPLAN-MARANS:  Please don't interrupt me.

I will ask the question again, and she can provide an answer, and then we'll clarify it.

Q  Has Mr. Smith's condition deteriorated or changed since May 3rd, 2021?

**Page 33**

A  Yes.

MR. ABADOU:  Same objection.  Form.  Compound.

BY MS. KAPLAN-MARANS:

Q  Ms. Smith, do you see the sentence right on top of the date where it says, "I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct"?

A  I do.

Q  What does that sentence mean to you?

A  That we have to tell the truth.

Q  Who are the signatories on this certification of May 3rd, 2021?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Myself, and I signed as power of attorney.

MS. KAPLAN-MARANS:  We're going to Tab 1.  Pull that up, please.

(Exhibit 2 was marked for identification and is attached hereto.)

BY MS. KAPLAN-MARANS:

Q  Ms. Smith, let us know when you see Exhibit 2 pop up on your screen.

A  Okay.  I see Tab 2.  Exhibit 1, Tab 2.

9 (Pages 30 - 33)

THE REPORTER: You need to refresh, 11:33:47 Ms. Smith, and then the next exhibit should pop up.

THE WITNESS: Okay. You want Exhibit 2?

BY MS. KAPLAN-MARANS:

Q Yes. 11:33:50

A Okay. Okay.

Q Do you recognize this document?

A I do.

Q What is this document?

A It's "Joint Declaration of Diane and 11:33:52 William P. Smith in Support of Their Motion for Appointment as Lead Plaintiff and Approval of Their Selection of Counsel."

Q Who made this declaration?

MR. ABADOU: Objection. Form. 11:33:56

THE WITNESS: We did.

BY MS. KAPLAN-MARANS:

Q Who is "we"?

A My husband and I.

Q In paragraph 1 that starts at line 2, do 11:33:59 you see this is referred to as a "joint declaration"?

A Yes, but I signed it as power of attorney for him.

Q What does it mean that the declaration is 11:34:03

Page 34

joint? 11:34:04

MR. ABADOU: Objection. Form.

THE WITNESS: Two people.

BY MS. KAPLAN-MARANS:

Q Okay. If you look at paragraph 5 starting 11:34:05 on line 11, it says, "We have been investing in the stock market together since the late 1990s," right?

MR. ABADOU: Objection. Form.

THE WITNESS: Okay. Number 5? Yes.

BY MS. KAPLAN-MARANS: 11:34:11

Q What does the "we" in paragraph 5 -- who is that referring to?

A Me and my husband.

Q Sorry. There was static there. Can you say it one more time? 11:34:14

A My husband and I. That was well before his injury.

Q Why did you start trading in the late '90s?

A It was an interest of ours in the stock 11:34:18 market.

Q What did you trade in?

MR. ABADOU: Objection. Form. Vague.

THE WITNESS: Stocks and options.

/// 11:34:20

Page 35

BY MS. KAPLAN-MARANS: 11:34:20

Q Whose decision was it to begin trading in the stock market in the late 1990s?

MR. ABADOU: Objection. Form.

THE WITNESS: Both of us. 11:34:23

BY MS. KAPLAN-MARANS:

Q At that point in time in the late '90s, did you use a financial advisor before trading? Did you consult with a financial advisor before trading?

A No. 11:34:27

MR. ABADOU: Objection. Objection. Form. Compound.

BY MS. KAPLAN-MARANS:

Q Did you rely on any experts before trading? 11:34:29

MR. ABADOU: Objection. Form.

THE WITNESS: No.

BY MS. KAPLAN-MARANS:

Q When -- what is your decision-making process like when determining whether to invest in a 11:34:31 specific stock?

MR. ABADOU: Hold on. Objection. Form. Horribly vague.

THE WITNESS: Can you ask the question again? 11:34:35

Page 36

BY MS. KAPLAN-MARANS: 11:34:35

Q What does your decision-making process look like when determining whether to invest in a specific stock?

MR. ABADOU: Same objection. 11:34:38

THE WITNESS: We read up on the company and see how their stock has performed. We look at charts, news.

BY MS. KAPLAN-MARANS:

Q And who is the "we" in that sentence? 11:34:41

A My husband and I.

Q Do you both participate in that decision-making process?

MR. ABADOU: Objection. Form.

THE WITNESS: I do most of it now because 11:34:45 he does not have the use of his hands. And so I do the work now.

BY MS. KAPLAN-MARANS:

Q And what does the work -- when you say you read up about a company, what materials are you 11:34:48 reading?

MR. ABADOU: Objection. Mischaracterizes her testimony and form.

THE WITNESS: Ask the question again. I'm sorry. 11:34:51

Page 37

10 (Pages 34 - 37)

HIGHLY CONFIDENTIAL

BY MS. KAPLAN-MARANS:

Q When you -- when you read up on a company, as you said, before deciding whether to trade in it, what materials do you read?

MR. ABADOU: Objection. Form. Vague, compound.

THE WITNESS: It's mainly looking at, through our brokerage account, whatever news that's basically on the Internet, and the brokerage news on that particular company.

BY MS. KAPLAN-MARANS:

Q You mentioned that Mr. Smith does not have use of his hands. How does that impact on his cognitive abilities?

MR. ABADOU: Objection. Form.

THE WITNESS: On his cognitive abilities? I'm not sure what you mean.

BY MS. KAPLAN-MARANS:

Q Is Mr. Smith able to read the articles that you're referencing that you look at online?

MR. ABADOU: Objection. Form.

THE WITNESS: He's able to, but I read them.

BY MS. KAPLAN-MARANS:

Q So Mr. Smith, when you're making a

Page 38

decision to invest, since his injury, he does not -- he does not read the documents that you're talking about that you look at before investing in something?

MR. ABADOU: Objection. Form.

THE WITNESS: He can read, and he might have read some of the documents. I could put it before him.

But ultimately, I'm making the decisions on purchasing because he does not have the use of his hands, and he's put that into my ability to do. But we do discuss stocks.

BY MS. KAPLAN-MARANS:

Q Does he provide you with his opinion -- does he provide you with his opinion before you decide on behalf of you and him to purchase a stock?

MR. ABADOU: Objection. Form.

THE WITNESS: He has.

BY MS. KAPLAN-MARANS:

Q Okay. We're going to turn to paragraph 7 in the same document, which starts on line 15.

Can you see where it says, towards the middle of -- toward the end of line 15, "we made the decision to invest in Velodyne securities"?

A I'm not seeing what line you're speaking

Page 39

of.

Q If you read paragraph 7 in this document, it's lines 15 to 17.

A The document that I'm looking at only goes to 12.

Q It's paragraph 7. You need to scroll down a little bit.

A I'm not sure if I have the correct document.

Q Are you looking at Exhibit -- Exhibit 2?

A Exhibit 2, yes.

Q Okay. If you look at the page that's labeled at the bottom "page 1" --

A Page 1.

Q -- there's an item numbered 7.

A Okay. Um-hum.

Q That's the paragraph I'm referring to.

If you could please read that, where it says "we made the decision to invest in Velodyne securities."

A What I'm reading on line 7 says, "I am attorney-in-fact for our joint investment account."

Q That's the right paragraph. I'm just reading from the middle of the paragraph.

A Oh, "and we made the decision to invest in

Page 40

Velodyne securities."

Q Do you see where it says "we made the decision"?

A Yes.

Q The "we" means you and William, correct?

A I made the ultimate decision. I discussed it with him, but I was the one who made the ultimate decision to buy the stock and to invest in it. But yes, we did discuss it together.

Q What does "we made the decision" mean here, then?

MR. ABADOU: Objection. Form, and asked and answered.

THE WITNESS: We discussed it, and I ultimately made the decision to invest.

BY MS. KAPLAN-MARANS:

Q Can you turn to the next page, page 2?

A Okay.

Q Do you see right in the second-to-last line, line 14, it says, "We declare under penalty of perjury that the foregoing is true and correct"?

A Yes.

Q What does that mean to you?

MR. ABADOU: Objection. Asked and answered.

Page 41

11 (Pages 38 - 41)

HIGHLY CONFIDENTIAL

THE WITNESS: That we will tell the truth  11:36:10 on -- we will tell the truth.

BY MS. KAPLAN-MARANS:

Q   Based on the paragraph 7 that we read, is it fair to say that both you and William had an  11:36:13 equal say in your investment decisions?

MR. ABADOU: Objection. Asked and answered.

THE WITNESS: We discussed it, and I ultimately made the trade.  11:36:16

BY MS. KAPLAN-MARANS:

Q   So you ultimately made the decision?

MR. ABADOU: Objection. Asked and answered twice.

THE WITNESS: We discussed the Velodyne  11:36:19 purchase, but I ultimately made the decision to go through with the purchase.

BY MS. KAPLAN-MARANS:

Q   How did you first learn about Velodyne?

A   I'm not sure exactly.  11:36:22

Q   Did you learn about Velodyne first or did William learn about it first?

MR. ABADOU: Objection. Form. Compound.

THE WITNESS: Well, I'm the one that looks up different stocks and news and charts and things  11:36:26

Page 42

of that nature, so I would say that I would have  11:36:27 been the one because he doesn't have the use of his hands to go to the computer and -- and look up stocks.

BY MS. KAPLAN-MARANS:  11:36:31

Q   How do you and Mr. Smith communicate?

MR. ABADOU: Objection. Form.

THE WITNESS: Verbally.

BY MS. KAPLAN-MARANS:

Q   Is Mr. Smith able to speak?  11:36:33

A   He's able to speak, but it's hard to understand him.

Q   Did you and Mr. Smith ultimately agree on the decision to invest in Velodyne?

MR. ABADOU: Objection. Asked and  11:36:37 answered.

THE WITNESS: We discussed Velodyne together, and I ultimately made the decision to purchase Velodyne stock.

BY MS. KAPLAN-MARANS:  11:36:39

Q   Was he aware that you were going to be purchasing Velodyne stock?

A   He was aware.

Q   And he agreed with that decision?

MR. ABADOU: Objection. Asked and  11:36:42

Page 43

answered.  11:36:42

THE WITNESS: He gave me the okay to do what I wanted to do with it.

BY MS. KAPLAN-MARANS:

Q   Did anyone else participate in these  11:36:44 discussions between you and Mr. Smith concerning investing in Velodyne stock?

A   No.

Q   Okay. If you could please look at paragraph 8 in the same document on line 18. Do you  11:36:47 see where it says, "We believe the securities classes action against Velodyne is meritorious"?

A   Yes.

Q   Do you still believe -- do you still believe this statement to be accurate?  11:36:52

A   Yes.

Q   Why is this case meritorious?

A   As I stated, because of the fraudulent -- the securities fraud and the fraudulent statements of the defendants regarding Velodyne's prospects and  11:36:55 the role of David Hall in the company.

Q   Can you turn to paragraph 10 starting at line 24? If you could read that paragraph. You can read it to yourself.

A   "We understand and appreciate that any  11:36:59

Page 44

Lead Plaintiff's objection under the PSLRA is to act  11:37:00 as a fiduciary for the class, and that an important decision in this role is the selection of Lead Counsel."

Is that what you're speaking of?  11:37:04

Q   Yes. If you could read the whole paragraph.

A   "We have fulfilled this responsibility by selecting and retaining Lead Counsel with a proven history of handling this type of complex litigation.  11:37:07 We have selected Kahn Swick & Foti to serve as Lead Counsel based on the firm's experience in achieving substantial recoveries in securities class actions. As part of our due diligence process, prior to our selection of KSF, we assessed the firm's  11:37:13 qualifications and discussed this action with the Firm."

Q   Was KSF the first firm that you looked at?

MR. ABADOU: Objection. Form.

THE WITNESS: I had seen a couple of other  11:37:17 firms that had news out on the class action of Velodyne. I looked at those and ultimately decided -- after speaking with Kahn Swick & Foti -- decided to retain them because of their experience.

///  11:37:23

Page 45

12 (Pages 42 - 45)

HIGHLY CONFIDENTIAL

BY MS. KAPLAN-MARANS:   11:37:23

Q  Can you recall the other firms that you -- that you looked at?

A  No.

Q  What did you do -- sorry.   11:37:25

In line 2 at the top of page 2, the declaration says, "we assessed the firm's qualifications."

What did you do to assess KSF's qualifications?   11:37:29

A  I spoke with Lewis Kahn --

MR. ABADOU:  Hold on a second, Diane.  I'm just going to remind you not to disclose your conversations with counsel.  Those conversations are privileged.   11:37:34

THE WITNESS:  Okay.

MR. ABADOU:  You can talk about -- you can answer the question without disclosing any confidential privileged communications between you and Mr. Kahn or any lawyers at the firm.   11:37:36

THE WITNESS:  Okay.  I also did a little research on the company.  I looked at their website and seen they were very successful at getting large settlements for their clients.  And I looked at their experience, and they had extensive experience   11:37:41

Page 46

with complicated cases.   11:37:42

And so this is the reason I chose this firm.

BY MS. KAPLAN-MARANS:

Q  If you look at the next paragraph,   11:37:44 paragraph 11, on line 5, do you see where it says, "We will supervise Lead Counsel and actively oversee the prosecution of this action"?

A  Yes.

Q  Who is lead counsel in this action?   11:37:48

A  Ramzi Abadou of Kahn Swick & Foti.

Q  What have you done to supervise lead counsel?

A  I've spoken with lead counsel several times.  I've looked over the filings before they   11:37:52 were filed.  And we basically have discussed the case.  We've also -- you know, we oversee what the counsel is doing.

Q  How often do you speak with lead counsel?

A  I'm not sure how often it's been.  It's   11:37:57 been on and off.  I'm not sure how many times.

MS. KAPLAN-MARANS:  Can we turn to Tab 27, please?

MR. ABADOU:  Tamar, just to ask Diane, Diane, are you doing okay with a break?  I know --   11:38:01

Page 47

(Interruption due to technical issues.)   11:38:02

THE VIDEO OPERATOR:  We're going off the record at 10:02 a.m.

(Recess, 10:02 a.m. - 10:15 a.m.)

THE VIDEO OPERATOR:  We are on the record   11:38:04 at 10:15 a.m., and this is the beginning of Media 2 in the deposition of Diane Smith.

MS. KAPLAN-MARANS:  Mr. Abadou, before we restart the questioning, we're going to ask that when you object, you refrain from providing the   11:38:08 basis for your objection.  We understand that that's not in line with practice with the Northern District of California.

Mr. Abadou, can you hear me?

MR. ABADOU:  I can.  I heard you.  I heard   11:38:12 you.

MS. KAPLAN-MARANS:  We're going to pull up another document.  It's going to be Exhibit 3.

(Exhibit 3 was marked for identification and is attached hereto.)   11:38:15

BY MS. KAPLAN-MARANS:

Q  Ms. Smith, let me know when you can see it.

A  I can see it.

Q  Do you recognize this document?   11:38:17

Page 48

A  I do.   11:38:17

Q  What is this document?

A  It's the "Second Joint Declaration of Diane and William P. Smith."

Q  I'm going to point you to paragraph 5,   11:38:20 starting on line 11.  I'm actually going to start in the middle of line 12.

Do you see where it says, "That is why I alone signed both the PSLRA Certification and the Joint Declaration on my husband William's behalf as   11:38:25 his 'POA' or Power of Attorney"?

A  Yes.

Q  Is it accurate that you alone signed the PSLRA certification?

A  Yes.   11:38:29

Q  Is it accurate that you alone signed the joint declaration?

A  Yes.

Q  I'm going to go to paragraph 6 starting on line 15.   11:38:32

Do you see where it says, "We are requesting William's withdrawal as lead plaintiff due to his quadriplegia, which renders an oral deposition deeply burdensome and potentially harmful"?   11:38:36

Page 49

13 (Pages 46 - 49)

A   Yes.                    11:38:37

Q   Is it accurate that an oral deposition would be potentially harmful to your husband?

A   Yes.

Q   Why is that?                    11:38:39

A   Well, he has difficulty, you know, speaking and breathing.  If he has to sit for a long deposition, you know, ████████████████████ ████████████

And then just, you know, sitting for a    11:38:44 long period of time in a deposition just would not be good for him physically.  As far as speaking for that amount of time, it just wouldn't be good.

Q   What if Mr. Smith were to sit for 20 minutes at a time?  Would he be able to do that?    11:38:49

MR. ABADOU:  Objection.  Form.  Compound.

MS. KAPLAN-MARANS:  Again, Mr. Ramzi [sic], we're going to ask that you not provide the basis for your objections because it is effectively coaching the witness.    11:38:54

MR. ABADOU:  I'm not coaching the witness.

MS. KAPLAN-MARANS:  Okay.  Well, we reserve all our rights with respect to the way that you're framing your objections.

MR. ABADOU:  Well, I don't appreciate the    11:38:57

Page 50

accusation.                    11:38:58

But go ahead.  Ask your questions about his quadriplegia.

THE WITNESS:  It would be burdensome on him because -- you know, because of his injury.    11:39:00

For instance, today, we would have had to cancel this appointment because -- I won't get into the details, but we had to speak to his doctor, and she said ███████████████████ ████████████                    11:39:06

So he is not in a good state to sit for a deposition.  From day to day, this injury brings new things.  It's not a stable situation.  You never know, you know, how he's going to do from day to day.                    11:39:10

BY MS. KAPLAN-MARANS:

Q   Can Mr. Smith sit for approximately 15 to 20 minutes at a time?

MR. ABADOU:  Objection.  Asked and answered.                    11:39:13

THE WITNESS:  He can sit, but as I stated, you know, there's many medical issues involved.

BY MS. KAPLAN-MARANS:

Q   Could you point to some medical issues that are recent that are different than when -- that    11:39:15

Page 51

are different right now than two years ago?    11:39:16

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Well, as I stated, ████████ ███████████████████████████████ ████ ████████████████████████ ████████████████████████████████ ██████████████████████████████████ ██████████████████████████████ ██████████████

You know, when we were living in the other    11:39:25 state, his breathing was better.  But lately, his voice has really gotten even weaker than before.  So it would be difficult to understand him.  The voice has gotten weaker.

You know, sometimes -- the voice will come    11:39:30 back sometimes, but it has been pretty consistently weak from, you know, what it was.  It was weak before, but it has definitely been weaker, and on a more consistent basis, unfortunately.

BY MS. KAPLAN-MARANS:                    11:39:35

Q   Can you turn back to Tab 1, please, Exhibit 2?  Can you open that up?

A   Okay.

Q   Can you read to me -- sorry.

Do you see in paragraph 2 where it says,    11:39:38

Page 52

"We are residents of Scottsdale, Arizona"?    11:39:39

A   Yes.

Q   Okay.  Then I'm going to flip back to the document we were just looking at, Exhibit 3, where it says -- let me know when you have Exhibit 3 in    11:39:43 front of you.

A   Okay.  I do.

Q   Do you see where it says, "We are currently residents of Honolulu, Hawaii"?

A   Yes.                    11:39:47

Q   When did you move from Scottsdale to Honolulu?

A   We moved to Honolulu September 30th of 2022.

Q   So approximately six months ago?    11:39:50

A   Correct.  Five, six months.  However many months it is.

Q   How did you travel from Scottsdale, Arizona, to Honolulu, Hawaii?

A   It was by plane.                    11:39:53

Q   How many hours was that plane ride?

A   Was it -- I think it was five or six hours.

Q   And was Mr. Smith able to make that trip?

A   He was.  It was uncomfortable, but he was.    11:39:57

Page 53

14 (Pages 50 - 53)

Q  So he was able to just sit for approximately five to six hours consecutively to make that trip?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  He was able to make that trip.

BY MS. KAPLAN-MARANS:

Q  Looking still at Exhibit -- Exhibit 3, also paragraph 6, if you look at line 17, towards the middle of the sentence, do you see where it says, "Deposing William is also duplicative given that I, Diane Smith, have already agreed to sit for a deposition"?

A  Yes.

Q  Why would it be duplicative for William to also sit for a deposition?

A  Well, I mean, I have all of the knowledge of, you know, the transaction, so it would be the same thing.  And he probably -- you know, we discussed it, but I ultimately made the decisions on it.  So it would be basically the same, if not being able to answer some of your questions.

Q  But did Mr. Smith participate in the process to purchase the Velodyne securities?

MR. ABADOU:  Objection.  Form.  Asked and

Page 54

answered.

THE WITNESS:  We discussed Velodyne stock, and I ultimately made the decision to purchase.

BY MS. KAPLAN-MARANS:

Q  Can you look at paragraph 8 on line 24, please?

Do you see where it says, "The ultimate decision to purchase Velodyne common stock during the Class Period was mine"?

A  Yes.

Q  Can you explain to me what "ultimate decision" means in that sentence?

A  The decision to purchase or not.  I ultimately made the decision, you know, whether to purchase or not.

Q  And that's because Mr. Smith is unable to make decisions?

MR. ABADOU:  Objection.  Leading.  Form.

THE WITNESS:  No, that's not the case.  But he gave me authority to make the decision.

BY MS. KAPLAN-MARANS:

Q  If Mr. Smith had asked that you not purchase Velodyne and he didn't provide his agreement, would you still have purchased it?

MR. ABADOU:  Objection.  Form.

Page 55

THE WITNESS:  I don't know.  We probably would have discussed it more.

BY MS. KAPLAN-MARANS:

Q  Do you ever purchase stocks without his agreement?

A  Yes.

Q  But this time when you purchased Velodyne, he provided his agreement?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  We discussed it, but I made the decision.

BY MS. KAPLAN-MARANS:

Q  Did Mr. Smith say, "I agree that you" -- did Mr. Smith say the equivalent of "I agree that you can purchase Velodyne securities"?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  No, he didn't say that.

BY MS. KAPLAN-MARANS:

Q  What did he say?

MR. ABADOU:  I'm going to object regarding the marital communications privilege here.  You're getting really close to confidential communications between spouses, which is inappropriate.

I've let this go on for a while.  Now you're asking about their conversations

Page 56

specifically.

MS. KAPLAN-MARANS:  Well, we can't depose him, so we're trying to get to what he was thinking in this process, which you're saying is duplicative, which this declaration --

MR. ABADOU:  I've made my objection.

MS. KAPLAN-MARANS:  Are you instructing Ms. Smith not to answer the question?

MR. ABADOU:  I'm getting close.

MS. KAPLAN-MARANS:  Is that a yes or a no?

MR. ABADOU:  That's my answer.

BY MS. KAPLAN-MARANS:

Q  Okay.  Ms. Smith, Mr. Abadou hasn't said "Don't answer the question," so I think we should go ahead and presume that you can answer the question.

I can only respond to what Mr. Abadou says, and he's not telling me -- he's not telling you that you can't answer the question.

A  What was the question?  I'm sorry.

MS. KAPLAN-MARANS:  Can the reporter -- Carla, can you read back the question, please?

(Record read as follows:

"Question:  Did Mr. Smith say, 'I agree that you' -- did Mr. Smith say the equivalent of 'I agree that you can purchase Velodyne

Page 57

15 (Pages 54 - 57)

HIGHLY CONFIDENTIAL

securities"? 11:40:49

"Mr. Abadou: Objection. Form.

"Answer: No, he didn't say that.

"Question: What did he say?")

MR. ABADOU: You can answer that, Diane. 11:41:14

THE WITNESS: He didn't say anything in particular. You know, he gives me the authority. I discuss stocks with him, and, you know, he didn't say purchase or not purchase.

BY MS. KAPLAN-MARANS: 11:41:18

Q Mr. Smith gave you full authority to do whatever you wanted to do with respect to Velodyne securities?

A Yes.

MR. ABADOU: Objection. Form. 11:41:20

BY MS. KAPLAN-MARANS:

Q Turn to Tab -- Exhibit 1.

You know what? I apologize. Let's turn to the supplemental interrogatories.

(Exhibit 4 was marked for identification 11:41:23 and is attached hereto.)

BY MS. KAPLAN-MARANS:

Q Ms. Smith, can you please let us know when you see Exhibit 4 pop up?

A I refreshed the page. I don't see 11:41:25

Page 58

Exhibit 4. 11:41:26

MR. ABADOU: Neither do I.

MS. KAPLAN-MARANS: Let's give it a second.

I see it, so you guys probably have it as 11:41:27 well.

THE WITNESS: Okay.

BY MS. KAPLAN-MARANS:

Q Ms. Smith, do you recognize this document?

A I do. 11:41:30

Q What is it?

A "Lead Plaintiffs' Supplemental and Amended Responses to Defendants' Interrogatories to Lead Plaintiffs, Set One."

Q Great. 11:41:34

Can you turn to page 6, please?

Do you see that you --

MR. ABADOU: Please hold on. I'm not there yet, Counsel.

Okay. Thank you. 11:41:37

BY MS. KAPLAN-MARANS:

Q Do you see the two charts on page 6?

A Yes.

Q Do you know what these two charts are?

A Yes. 11:41:39

Page 59

Q What are they? 11:41:40

A Those are the trades that we made in Velodyne, the buy and the sell.

Q I'm going to look at the second chart.

Do you see where it says, "In the Lead 11:41:43 Plaintiffs' Fidelity account"?

A Yes.

Q Are these the trades that you and Mr. Smith executed in your Fidelity account in purchasing Velodyne securities? 11:41:46

A Yes.

Q On the first slide, do you see where it says, "Trade date: December 9th, 2020"?

A Yes.

Q And do you see where it says the quantity 11:41:49 of shares purchased was 375,678 shares?

A Yes.

Q And do you see where it says the price was $19.50 per share?

A Yes. 11:41:54

Q Approximately how -- just that trade alone, approximately how much money was that trade worth?

MR. ABADOU: Objection. Form.

THE WITNESS: I am not sure. I would have 11:41:57

Page 60

to multiply that. 11:41:58

BY MS. KAPLAN-MARANS:

Q I will state for the record that $19.50 times 375,678 shares is approximately $7,325,321.

Does that sound about right? 11:42:02

A It does.

Q So going back to what we were asking before, Mr. Smith did not tell you either way, yes or no, on purchasing over $7 million worth of Velodyne stock? 11:42:06

MR. ABADOU: Objection. Form. Compound.

THE WITNESS: Correct.

BY MS. KAPLAN-MARANS:

Q So you made the decision to purchase $7 million of shares in Velodyne without Mr. Smith's 11:42:09 agreement either way?

MR. ABADOU: Objection. Form.

Do you understand the question, Diane?

THE WITNESS: Yes.

MR. ABADOU: Okay. 11:42:12

THE WITNESS: I think she's saying that I made the decision.

And yes, I made the decision to purchase.

BY MS. KAPLAN-MARANS:

Q Did you make the decision to purchase over 11:42:15

Page 61

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL

$7 million worth of stock in Velodyne on that date, 11:42:16 December 9th, without Mr. Smith's saying either way, yes, he was okay with it, or no, he was not okay with it?

MR. ABADOU: Objection. Form. 11:42:20

THE WITNESS: We discussed the stock itself, and I made the decision to purchase.

BY MS. KAPLAN-MARANS:

Q So Mr. Smith did not say to you, "Yes, Diane, you can go ahead and purchase over $7 million 11:42:23 worth of stock in Velodyne"?

MR. ABADOU: Objection. Form.

THE WITNESS: He did not state that, no.

BY MS. KAPLAN-MARANS:

Q He didn't tell you not to purchase -- 11:42:27

MR. ABADOU: Objection. Form.

THE REPORTER: I'm sorry. Counsel, I didn't hear your whole question because of the objection. Can you please repeat it?

BY MS. KAPLAN-MARANS: 11:42:29

Q Did Mr. Smith tell you not to purchase over $7 million worth of stock of Velodyne on that day?

A He did not.

MR. ABADOU: Objection. Sorry. 11:42:31

Page 62

Objection. Form. 11:42:32

BY MS. KAPLAN-MARANS:

Q Did you have -- in your investing history since the late '90s, did you ever make a trade that was as large as that without Mr. Smith's agreement? 11:42:34

MR. ABADOU: Objection. Form.

THE WITNESS: As large as that, no.

BY MS. KAPLAN-MARANS:

Q If Mr. Smith had said to you, "I don't want you to purchase $7 million worth of Velodyne 11:42:38 stock," would you still have purchased it?

MR. ABADOU: Objection. Form. Calls for speculation.

THE WITNESS: We would have discussed it further. 11:42:42

BY MS. KAPLAN-MARANS:

Q And if he had ultimately said, "No, I don't want you to do it," would you still have done it?

MR. ABADOU: Objection. Same objection. 11:42:45

THE WITNESS: I am not sure.

BY MS. KAPLAN-MARANS:

Q Can we go back, please, to Exhibit 3? I think we may be on Exhibit 3.

MR. ABADOU: This is 4. 11:42:48

Page 63

BY MS. KAPLAN-MARANS: 11:42:48

Q Sorry. Go back to Exhibit 3, please.

Ms. Smith, do you have the exhibit in front of you?

A I do. 11:42:51

Q Okay. Great. Can you go to page 2 on this document?

A Okay.

Q Do you see the sentence right above -- the sentence on line 3 where it says, "I declare under 11:42:54 penalty of perjury that the foregoing is true and correct"?

Do you see that?

A Yes, I do.

Q What do you understand that to mean? 11:42:57

MR. ABADOU: Objection. Form. Asked and answered.

MS. KAPLAN-MARANS: Again, Mr. Abadou, please refrain from making these objections.

THE WITNESS: It's -- 11:43:01

MS. KAPLAN-MARANS: You can make your objections, but please refrain from stating the basis for the objection.

THE WITNESS: It's just stating that the information is true and correct. 11:43:04

Page 64

BY MS. KAPLAN-MARANS: 11:43:05

Q Ms. Smith, do you have an engagement agreement with lead counsel in connection with this litigation?

A An engagement agreement? What is that 11:43:07 exactly?

Page 65

17 (Pages 62 - 65)

HIGHLY CONFIDENTIAL



Page 66

Page 68

11:44:09

Page 67

Q  Okay.  Understood.  Thank you.

Have you or your husband received any    11:44:17
benefits, either financial or otherwise, from KSF in
connection with this retention?

A  No.

Q  Are you aware that you have filed a motion
to be appointed as a class representative?    11:44:20

A  Yes.

Q  Are you aware that your husband,
Mr. Smith, did not join your motion to serve as a
class representative?

A  Yes.    11:44:23

Q  Are you aware that you and your husband
filed a motion requesting to withdraw Mr. Smith as
lead plaintiff?

A  Yes.

Q  Why did you file that motion?    11:44:26

Page 69

18 (Pages 66 - 69)

A  Because I was seeking to be class representative and not him.  And he could not sit for a deposition.  It would be too burdensome on him.  So that was the reason that we filed to have him removed as lead plaintiff.

Q  When you initially filed this -- the amended complaint on February 11th, 2022, as the lead plaintiff, did you anticipate that Mr. Smith would be a lead plaintiff going forward?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  At the time he was lead plaintiff, but we never intended for him to be a class representative.

BY MS. KAPLAN-MARANS:

Q  What did you understand a lead plaintiff's duties to be at the time when the amended complaint was filed?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  As I stated before, kind of oversee the account, oversee the filings, oversee the counsel.  Just kind of oversee the case in itself and make sure that -- that the class members are represented properly.

BY MS. KAPLAN-MARANS:

Q  What did you understand your duties to be

Page 70

as the class representative?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Well, my duties as class representative would be to serve as lead plaintiff and class representative and to oversee counsel.

BY MS. KAPLAN-MARANS:

Q  And at the time -- at the time when the action was filed, did you intend for Mr. Smith to serve as class representative?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  We did not intend for him to be class representative.

BY MS. KAPLAN-MARANS:

Q  You never intended for Mr. Smith to be class representative?

MR. ABADOU:  Objection.  Form.

MS. KAPLAN-MARANS:  Again, why don't you take a pause to just make sure that I'm done with my question so that the court reporter can get -- can get everything on the record.

MR. ABADOU:  Sorry.  You keep asking the same question, so I think you're done.  But I'll try and do my best.

MS. KAPLAN-MARANS:  I don't think I'm asking the same question.

Page 71

MR. ABADOU:  Okay.

MS. KAPLAN-MARANS:  Carla, can you read back the last question, please?

(Record read as follows:

"Question:  You never intended for Mr. Smith to be class representative?")

THE WITNESS:  We never intended for Mr. Smith to be a class representative.

BY MS. KAPLAN-MARANS:

Q  You never intended him to be a class representative at any point in the litigation?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Well, we know that he cannot sit for a deposition, and so...

BY MS. KAPLAN-MARANS:

Q  So because you felt he could not sit for a deposition, you never intended for him to be a class representative in this matter, right?

MR. ABADOU:  Same objection.  Same objection.  Asked and answered numerous times.

THE WITNESS:  No, we did not intend for him to be class representative.

BY MS. KAPLAN-MARANS:

Q  Can we go back to Exhibit 1, please?

A  Sorry.  I just clicked out of that.

Page 72

Q  No problem.

A  I'll have to get back in somehow.

MR. ABADOU:  Take your time, Diane.

THE WITNESS:  Okay.  Okay.  Got right back in.  Good.  Okay.

Exhibit 1, you said?

BY MS. KAPLAN-MARANS:

Q  Yes, Exhibit 1, please.

A  Okay.

Q  Great.

Can you look at paragraph 3?  Do you see where it says, "Movant is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary"?

A  Yes.

Q  What does "movant" mean there?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  It does state me and my husband, William.

BY MS. KAPLAN-MARANS:

Q  So on the date that this certification was filed, which is May 3rd, 2021, did you intend for Mr. Smith to serve as a class representative?

MR. ABADOU:  Objection.  Form.

Page 73

19 (Pages 70 - 73)

THE WITNESS: I didn't expect him to sit as a class representative, but -- as lead plaintiff, but not as a class representative. And we're withdrawing him from lead plaintiff, to my understanding of what it is, because he can't sit for a deposition.

BY MS. KAPLAN-MARANS:

Q   What is your understanding of "Movant is willing to serve as a representative party on behalf of a class"? What does that mean to you?

A   Well, it's about him sitting for a deposition. That was something that he could not do.

Q   Does this sentence, "Movant is willing to serve as a representative party on behalf of a class," mean that William was willing to serve as a class representative?

MR. ABADOU: Objection. Form.

THE WITNESS: He wasn't willing to sit as a class representative but more as a lead plaintiff.

MR. ABADOU: Excuse me one second.

Tamar, if you would, just out of respect and courtesy, don't call him "William." Please call him "Mr. Smith."

MS. KAPLAN-MARANS: Sure. I apologize for

Page 74

that. Thank you for flagging that.

MR. ABADOU: Sure.

MS. KAPLAN-MARANS: Carla, can you read back the last question, please?

(Record read as follows:

"Question: Does this sentence, 'Movant is willing to serve as a representative party on behalf of a class,' mean that William was willing to serve as a class representative?")

MR. ABADOU: Can you also read back the answer, if there was one to that?

(Record read as follows:

"Answer: He wasn't willing to sit as a class representative but more as a lead plaintiff.")

MR. ABADOU: Thank you.

BY MS. KAPLAN-MARANS:

Q   What does it mean to you that Mr. Smith was willing to serve as a representative party on behalf of a class?

MR. ABADOU: Objection. Form.

THE WITNESS: Well, I thought I could be class representative because I have power of attorney, and so -- and I made all the decisions regarding our Velodyne stock purchase, and I was

Page 75

seeking to be class representative.

BY MS. KAPLAN-MARANS:

Q   Ms. Smith, when you signed this certification, did you understand the contents of it?

A   Yes.

Q   At the time, did you understand what it meant to serve as a class representative?

MR. ABADOU: Objection. Form.

THE WITNESS: Well, I did not know that he would have to sit for a deposition, because I was power of attorney. I signed all the documents. And I was seeking to be class representative.

MS. KAPLAN-MARANS: Okay. Can we please turn to Tab 4.

MR. ABADOU: I'm sorry. Which tab?

MS. KAPLAN-MARANS: We're going to put up Exhibit 5.

THE REPORTER: I think next is Exhibit 6.

MR. ABADOU: The next one should be Exhibit 6. It's not 5, 5 is already up.

MS. KAPLAN-MARANS: Yes, it's Exhibit 6.

(Exhibit 6 was marked for identification and is attached hereto.)

///

Page 76

BY MS. KAPLAN-MARANS:

Q   Let us know when you can access it.

A   I do have it.

MR. ABADOU: Hold on one second.

All good. Thank you.

BY MS. KAPLAN-MARANS:

Q   Ms. Smith, do you recognize this document?

A   I do.

Q   What is it?

A   "Consolidated Amended Class Action Complaint for Violations of the Federal Securities Laws."

Q   Have you read this document?

A   Yes.

Q   Do you understand that this is an amended complaint which amended the allegations in the original complaint?

A   Yes.

Q   Did you read the original complaint?

A   Yes.

Q   Are you aware of the differences between the amended complaint and the original complaint?

MR. ABADOU: Objection. Form.

THE WITNESS: Mostly, yes.

///

Page 77

20 (Pages 74 - 77)

HIGHLY CONFIDENTIAL

BY MS. KAPLAN-MARANS:                          11:46:34

Q   What are those differences?

A   To my understanding, counsel had a chance to speak with David Hall, who was the founder and chairman of Velodyne, and he received additional information, and that information was put into this amended class action complaint.

Q   What information did your counsel discuss with Mr. Hall?

MR. ABADOU: Objection. Form.                  11:46:40

And again, Diane, please be careful not to disclose my conversations with you that are privileged about the complaint or anything else that Ms. Kaplan-Marans is apparently trying to get to. Thank you.                                          11:46:45

THE WITNESS: Okay. I can't say that I remember everything that was put into -- everything that was changed or added or amended.

BY MS. KAPLAN-MARANS:

Q   Did you review the amended complaint        11:46:48
before it was filed?

MR. ABADOU: Objection. Form.

THE WITNESS: I did review the complaint, or the consolidated amended.

///                                            11:46:51

Page 78

BY MS. KAPLAN-MARANS:                          11:46:52

Q   Did you disagree with anything in amended complaint?

MR. ABADOU: I'm sorry. Can you say that again? I didn't hear.                             11:46:53

BY MS. KAPLAN-MARANS:

Q   Did you disagree with anything in the amended complaint?

MR. ABADOU: Objection. Form.

THE WITNESS: Did I disagree with           11:46:56
anything? No.

BY MS. KAPLAN-MARANS:

Q   Do you think that certain allegations in the amended complaint do not apply to you?

MR. ABADOU: Objection. Form. Calls for       11:46:59
a legal conclusion.

THE WITNESS: I don't know.

BY MS. KAPLAN-MARANS:

Q   So your understanding is that everything that's contained in the amended complaint applies to    11:47:02
you?

MR. ABADOU: Same objection.

THE WITNESS: Well, I'm not a legal person, so --

///                                            11:47:04

Page 79

BY MS. KAPLAN-MARANS:                          11:47:04

Q   What's your understanding --

A   That's what I have an attorney for.

Q   What's your understanding as a layperson?

MR. ABADOU: Objection. Form.                  11:47:06

Can you just explain, understanding of what? That would be helpful.

BY MS. KAPLAN-MARANS:

Q   Does everything contained in the complaint apply to you, Ms. Smith?                          11:47:09

MR. ABADOU: Objection. Form.

THE WITNESS: I have not -- that's why we have counsel, is to do legal filings here. I read it over, but it's up to them to write the complaint or amend the complaint.                            11:47:14

BY MS. KAPLAN-MARANS:

Q   We've been going for about 45 minutes. Are you okay to keep going?

A   Yes, I am.

MR. ABADOU: Thank you. I appreciate you       11:47:17
asking.

BY MS. KAPLAN-MARANS:

Q   It seems like you're struggling to hear me. I just want to make sure you can hear me okay.

A   I can.                                      11:47:20

Page 80

MS. KAPLAN-MARANS: Okay. Everyone else       11:47:21
on the line can hear me as well?

MR. ABADOU: Yes.

MS. KAPLAN-MARANS: We're going to pull up another document and mark it as Exhibit 7.           11:47:23

(Exhibit 7 was marked for identification and is attached hereto.)

BY MS. KAPLAN-MARANS:

Q   Ms. Smith, let us know when you have the document accessible.                               11:47:25

A   I do have it.

Q   What is this document?

A   "Lead Plaintiffs' Rule 26 Initial Disclosures."

Q   Have you seen this document before?       11:47:28

A   Let's see here.

I'm not sure. I might have. I'm not sure. I believe, you know --

Q   I'm sorry, Ms. Smith. Can you say that again?                                              11:47:32

A   I was trying to read through it and see.

Q   Oh.

A   I am not sure. I've seen many documents. I'm not sure.

Q   Can you please turn to page 1, labeled    11:47:35

Page 81

21 (Pages 78 - 81)

HIGHLY CONFIDENTIAL

"page 1" at the bottom of the page?        11:47:36

A   Um-hum.

Q   Do you see -- around line 16, do you see where it says, "Lead Plaintiffs are likely to have discoverable information relating to their        11:47:39 investment in Velodyne securities"?

A   I do see that.

Q   What does this sentence mean?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Well, I believe that means        11:47:42 our trade confirmations and our trade statements.

BY MS. KAPLAN-MARANS:

Q   "Lead plaintiffs" referred to you and your husband, correct?

A   At that time, yes.        11:47:45

Q   Is it accurate that both you and Mr. Smith are -- is it accurate that you and Mr. Smith both have discoverable information relating to your investments in Velodyne?

A   Well, he gave me the authority to        11:47:49 purchase, so we both have the discoverable information.  It's a joint account.  But I sign for everything, and I made the purchase.

MS. KAPLAN-MARANS:  We're going to pull up another document.  We can go through one more        11:47:54

Page 82

document, and then take a break if that works for        11:47:55 you.

THE WITNESS:  Okay.

(Exhibit 8 was marked for identification and is attached hereto.)        11:47:56

BY MS. KAPLAN-MARANS:

Q   It should be on its way, and I see it as Exhibit 8.

A   I do have that.

Q   What is this document?        11:47:59

A   It's "Lead Plaintiffs' Responses and Objections to Defendants' Interrogatories to Lead Plaintiffs, Set One."

Q   Have you seen this document before?

A   I have.        11:48:03

Q   Can you turn to page 14, please?

A   Okay.  I have it.

Q   Great.

Did you sign this document?

A   Yes, electronically.        11:48:06

Q   And did you sign this on behalf of Mr. Smith as his power of attorney?

A   It was signed by me.

Q   Did you sign on behalf of Mr. Smith as well as his power of attorney?        11:48:10

Page 83

A   Yes.        11:48:11

Q   Did Mr. Smith review this document?

A   I go over the documents with him.

Q   Can you explain to me what it means that you go over it with him?        11:48:14

A   Just kind of read through the document.

Q   And when you read this document to Mr. Smith, did he understand it?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I assume he did.  I'm not        11:48:17 sure.  I believe he did.  I signed on his behalf.

BY MS. KAPLAN-MARANS:

Q   Is Mr. Smith able to speak?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Yes, he is.        11:48:21

BY MS. KAPLAN-MARANS:

Q   Did you ask him if he understood this document before you signed on his behalf as power of attorney?

MR. ABADOU:  Objection.  Form.        11:48:24

THE WITNESS:  I read him the information, and I signed it.

BY MS. KAPLAN-MARANS:

Q   But Mr. Smith did not convey to you that he understood this document?        11:48:27

Page 84

MR. ABADOU:  Objection.  Form.        11:48:27

And again, this is getting close to marital communication privilege which I'm going to invoke.

And I'm going to instruct you not to        11:48:30 answer here, Diane.

BY MS. KAPLAN-MARANS:

Q   Did Mr. Smith have any questions about this document?

MR. ABADOU:  Same objection, Diane.        11:48:32

MS. KAPLAN-MARANS:  Can you state the objection?

MR. ABADOU:  The marital communication privilege.  Communications, as you know, between spouses that are intended to be confidential are        11:48:35 protected.  And I've given you a lot of leeway, but now you're getting, I think, a little -- going a little too far.  So that's the objection.

BY MS. KAPLAN-MARANS:

Q   Did you and Mr. Smith have the same view        11:48:40 of this document?

MR. ABADOU:  Same objection and instruction.

BY MS. KAPLAN-MARANS:

Q   Ms. Smith, if you could please turn to        11:48:42

Page 85

22 (Pages 82 - 85)

page 7, please.                                    11:48:43

A   Okay.

Q   I'm actually going to have you -- actually, if you look at -- on page 7, on line 10, Interrogatory No. 4, do you see where it says,            11:48:46 "Describe" --

MR. ABADOU:  Hold on.  I'm not there yet. Page 7, what line, Counsel?

MS. KAPLAN-MARANS:  Line 11.

MR. ABADOU:  Okay.  Thanks.            11:48:50

MS. KAPLAN-MARANS:  Interrogatory No. 4.

MR. ABADOU:  Thank you.

BY MS. KAPLAN-MARANS:

Q   Ms. Smith, do you see where it says, "Describe in full all communications between Lead            11:48:52 Plaintiffs (or any Person representing or acting on Lead Plaintiffs' behalf) and any Person regarding or relating to any of the allegations in the Complaint, including the name of such Person, the last known contact information for such Person, date of such            11:48:57 communications, the people who participated in such communications, the medium of communication (for example, e-mail, telephone, in person), and the contents of such communications"?

A   Yes.                                    11:49:02

Page 86

Q   Do you see -- if you scroll to the next            11:49:02 page, page 8, in the response to Interrogatory No. 4, if you look at lines 2 and 3, do you see where it says, "Lead Plaintiffs have not had communications with any Persons, besides each other            11:49:06 and their counsel, regarding or relating to any of the allegations in the Complaint"?

A   Yes.

Q   Is this accurate?

A   It is.                                    11:49:09

Q   What communications have you had with your husband regarding the allegations in the complaint?

MR. ABADOU:  Objection.  Form. Can you just -- can you hold on a second, Diane?                                    11:49:13

And can you repeat the question, Carla?

(Record read as follows:

"Question:  What communications have you had with your husband regarding the allegations in the complaint?")            11:49:14

MR. ABADOU:  Okay.  You can answer that if you can, Diane.

THE WITNESS:  Okay.  Well, we discussed everything I've stated to you, the allegations in the complaint.                                    11:49:17

Page 87

BY MS. KAPLAN-MARANS:                                    11:49:18

Q   Did Mr. Smith agree with the allegations in the complaint?

MR. ABADOU:  Objection.  Form.

And again, same objection with respect to            11:49:19 marital communications privilege.  Same instruction.

MS. KAPLAN-MARANS:  Are you instructing the witness not to answer?

MR. ABADOU:  I sure am.

BY MS. KAPLAN-MARANS:                                    11:49:22

Q   How many times have you and Mr. Smith discussed the allegations in the complaint?

A   I don't know the number of times.

Q   Can you give an approximate amount of times that you and your husband, Mr. Smith, have            11:49:25 discussed the allegations in the complaint?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  It's been many times because it's a lot of things to read through.  So we discussed it many times.                                    11:49:30

BY MS. KAPLAN-MARANS:

Q   Have you discussed the allegations in the complaint with anyone else besides your husband?

A   No.  Besides counsel, no.

Q   Do you know if KSF, your counsel, spoke            11:49:33

Page 88

with anyone else about this case?                                    11:49:34

MR. ABADOU:  Objection.  Form.

That's so -- I'm sorry.  That's so broad that -- could you ask it a different way so you can get an answer to your question without asking            11:49:37 something that's so broad?

MS. KAPLAN-MARANS:  I don't think it's broad.  I'm happy to restate the question.

MR. ABADOU:  Okay.

BY MS. KAPLAN-MARANS:                                    11:49:41

Q   Do you know if KSF spoke with anyone else about this case?

MR. ABADOU:  Objection.  Form.

And again, Diane, to the extent this -- the answer to this question would involve our            11:49:43 communications, which are privileged, I instruct you not to answer.  To the extent they're not privileged and you have knowledge, feel free.

MS. KAPLAN-MARANS:  Mr. Abadou, I just want to say for the record that speaking objections            11:49:47 are not proper in the Northern District of California.

Unless you're instructing the witness not to answer on a privileged ground, please limit your objections and refrain from coaching the witness.            11:49:51

Page 89

23 (Pages 86 - 89)

HIGHLY CONFIDENTIAL



MR. ABADOU: I'm not coaching the witness. 11:49:52

MS. KAPLAN-MARANS: Again, speaking objections are not proper.

MR. ABADOU: I heard you, Counsel.

THE WITNESS: I'm not sure of the answer 11:49:54 to that question. I would believe that he communicates with several people.

BY MS. KAPLAN-MARANS:

Q Who do you believe those several people to be? 11:49:57

MR. ABADOU: Objection. Form.

THE WITNESS: Witnesses that he may call. I'm not sure.

BY MS. KAPLAN-MARANS:

Q Are you keeping track of what your 11:49:59 attorneys are doing in this case?

MR. ABADOU: Objection. Form.

THE WITNESS: Yes, I am.

MS. KAPLAN-MARANS: We're okay to take a break now, if that works for everybody. 11:50:02

MR. ABADOU: Does that work for you, Diane? How much time would you like?

THE WITNESS: Another ten minutes would be fine.

MS. KAPLAN-MARANS: Let's take -- is 15 11:50:06

Page 90

minutes okay? 11:50:06

THE WITNESS: Yes.

MR. ABADOU: I was asking Tamar. Is that all right?

MS. KAPLAN-MARANS: That's fine with us as 11:50:08 well.

THE VIDEO OPERATOR: Okay. We're going off record at 11:13 a.m.

(Recess, 11:13 a.m. - 11:28 a.m.)

THE VIDEO OPERATOR: We are on the record 11:50:11 at 11:28 a.m., and this is the beginning of Media 3 in the deposition of Diane Smith.

MS. KAPLAN-MARANS: Ms. Smith, we're going to pull up another exhibit.

Page 91

Q Why did you choose to become Mr. Smith's 11:50:40 power of attorney?

MR. ABADOU: Objection. Form.

THE WITNESS: Because he cannot sign for himself.

BY MS. KAPLAN-MARANS: 11:50:43

Q We understand that your husband's injuries caused him to be paralyzed; is that correct?

A Correct.

Q Did his injuries impair his cognitive abilities? 11:50:46

MR. ABADOU: Objection. Form.

THE WITNESS: If you mean by -- his mind, no, it did not.

BY MS. KAPLAN-MARANS:

Q Does Mr. Smith read on a regular basis? 11:50:49

MR. ABADOU: Objection. Form.

THE WITNESS: I mean, he reads on and off.

BY MS. KAPLAN-MARANS:

Q When was Mr. Smith injured?

A It was January 2nd, 2008. 11:50:52

Page 93

24 (Pages 90 - 93)

HIGHLY CONFIDENTIAL

Q   Was that before you two invested in     11:50:53
Velodyne?

A   Yes, it was.

MR. ABADOU: I'm sorry. Objection to form to that last question.     11:50:56

BY MS. KAPLAN-MARANS:

Q   Could you please walk me through what it looks like when you sign a document on behalf of -- when you sign a document as power of attorney for Mr. Smith?     11:50:59

Does he -- do you ask for his consent before you do that?

MR. ABADOU: Objection. Form. Compound.

THE WITNESS: Yes, he knows. We discuss whatever the document is. We discuss every document together, and I sign for him.     11:51:02

BY MS. KAPLAN-MARANS:

Q   So before you sign something, a document on his behalf, does he read the document?

MR. ABADOU: Objection. Form.     11:51:06

THE WITNESS: I don't know if every document. I would say most.

BY MS. KAPLAN-MARANS:

Q   Before -- before you sign something on his behalf, do you ask his permission?     11:51:08

Page 94

---

MR. ABADOU: Objection. Form.     11:51:09

THE WITNESS: He would definitely be aware of what I'm signing.

BY MS. KAPLAN-MARANS:

Q   Do you ask Mr. Smith's permission before you make an investment?     11:51:11

MR. ABADOU: Objection. Form.

THE WITNESS: His permission? We've discussed -- you know, he gives me authority to make purchases in the stock market.     11:51:14

BY MS. KAPLAN-MARANS:

Q   Do you ask his permission before you make an investment?

MR. ABADOU: Objection. Form.

THE WITNESS: Not all the time.     11:51:16

BY MS. KAPLAN-MARANS:

Q   Do you make all of your investments out of your joint accounts?

A   Yes.

Q   Do you make any investments out of your own personal account, meaning not a joint account?     11:51:19

MR. ABADOU: Objection. Form. Foundation.

THE WITNESS: No.

///     11:51:22

Page 95

---

BY MS. KAPLAN-MARANS:     11:51:23

Q   When Mr. Smith speaks, are you able to understand him?

A   Sometimes I have to, you know, ask him to repeat himself.     11:51:25

Q   But generally, are you able to understand him?

MR. ABADOU: Objection. Form.

THE WITNESS: Not all the time.

BY MS. KAPLAN-MARANS:     11:51:27

Q   Does Mr. Smith use a computer?

A   He does not have use of his hands, so I would have to use the computer for him.

Q   Does Mr. Smith read articles online?

A   He has.     11:51:31

Q   How does he do that?

A   I'd have to go to the article and look it up for him and page through the article.

Q   Is Mr. Smith able to communicate verbally with his doctors?     11:51:35

MR. ABADOU: Objection. Form. And this is getting into, you know, HIPAA privacy issues.

So you can answer this question, but I'm not going to let this go much further. Go ahead.

MS. KAPLAN-MARANS: I'm not asking about     11:51:39

Page 96

---

the substance of the communications. I'm just asking if he's able to communicate verbally with his doctors.     11:51:39

MR. ABADOU: Well, you could ask if he's able to communicate verbally with somebody at the supermarket. I don't know why you're talking about his doctors.     11:51:42

But you can answer the question, Diane.

THE WITNESS: Yes.

MS. KAPLAN-MARANS: Again, Mr. Abadou, I would just like to remind you that speaking objections are not proper in the Northern District of California.     11:51:46

Unless you're instructing the witness not to answer on privilege grounds, please limit your objections and refrain from coaching the witness.     11:51:50

MR. ABADOU: I'm not coaching the witness.

BY MS. KAPLAN-MARANS:

Q   Ms. Smith, do you -- are you aware that there was a motion to dismiss filed in this action by the defendants?     11:51:53

A   Yes.

Q   Are you aware of the outcome of that motion to dismiss?

MR. ABADOU: Objection. Form.     11:51:56

Page 97

---

25 (Pages 94 - 97)

THE WITNESS: Yes.    11:51:57

BY MS. KAPLAN-MARANS:

Q At the time of the outcome of the motion to dismiss when the Court made a decision, from that time to now, has Mr. Smith's physical condition    11:51:59
changed?

MR. ABADOU: Objection. Form.

THE WITNESS: He's had more health challenges. I don't remember the date of that, but he has recently had more health challenges.    11:52:02

BY MS. KAPLAN-MARANS:

Q Did those challenges set him back permanently?

MR. ABADOU: Objection. Form.

THE WITNESS: I don't know.    11:52:05

BY MS. KAPLAN-MARANS:

Q Ms. Smith, do you manage your own investments?

MR. ABADOU: Objection. Form.

THE WITNESS: Yes.    11:52:06

BY MS. KAPLAN-MARANS:

Q How much time do you spend per week managing your investments?

A I'm not sure how many hours I spend per week. I'm not sure.    11:52:09

Page 98

Q Can you give me an approximate amount of    11:52:10
hours you spend managing your investments on a weekly basis?

A "Managing," what are you speaking of?

Q However you interpret that. The process    11:52:13
of managing your investments.

MR. ABADOU: Objection. Form.

THE WITNESS: "Managing"? Well, I spend several hours a week looking up different information on companies.    11:52:17

BY MS. KAPLAN-MARANS:

Q Do you continue to invest in the stock market on a regular basis?

MR. ABADOU: Objection. Form.

THE WITNESS: We invest on and off.    11:52:20

BY MS. KAPLAN-MARANS:

Q Can you explain to me what "on and off" means?

A Sometimes it may be off because, you know, we're doing something else and may not want to    11:52:23
invest in the stock market. It may be that my husband's hospitalized, and we don't invest in the stock market.

So it can be -- sometimes we do, sometimes we don't.    11:52:27

Page 99

Q Do you consider yourself to be    11:52:27
knowledgeable regarding financial matters?

A Yes.

Q What factors do you consider to be important in making investment decisions?    11:52:30

A Well, I mean, what the company is stating their projections are for their earnings, the company's management team, their board, what the stock has performed like in the past, news on the company.    11:52:34

Q How do you check what the company is saying about their earnings?

MR. ABADOU: Objection. Form.

THE WITNESS: It's stated in a lot of news articles, through analysts, through news.    11:52:37

BY MS. KAPLAN-MARANS:

Q How do you find those articles?

A I have brokerage accounts in which I go to find those articles. I look up the ticker symbol of the company and see what news articles have come out    11:52:41
about that particular company.

Q I'm sorry. I'm not sure I understand.

You say you access the news articles via your brokerage account. Can you explain that to me a little bit more?    11:52:46

Page 100

A Yes. A part of the -- what the brokerage    11:52:46
company offers on their website, it's news on that particular company.

So you plug in their ticker symbol, and it will give you news -- you know, however often the    11:52:50
news comes out, it will give you news on that particular company.

Q How do you select the particular company that you're looking up?

MR. ABADOU: Objection. Form.    11:52:54

THE WITNESS: It may be because of the performance of the stock itself. As I stated, the company itself, you know, how the company is run, you know, the statements that the company has made.

BY MS. KAPLAN-MARANS:    11:52:59

Q How did you hear about -- sorry. Apologies.

A The analysts' reviews on the company.

Q How do you identify those companies in the first place?    11:53:02

MR. ABADOU: Objection. Form.

THE WITNESS: Well, I just look up different companies. It may be a company that's performing pretty good in the market, and then I go do research on that particular company.    11:53:05

Page 101

26 (Pages 98 - 101)

HIGHLY CONFIDENTIAL

BY MS. KAPLAN-MARANS:

Q  Does a financial consultant advise you on how to identify those companies?

A  No.

Q  Does a financial consultant -- do you have a financial consultant providing you with advice over your investment decisions?

A  No.

Q  Do you watch any shows regarding investments and the stock market generally?

MR. ABADOU:  Objection.  Compound.

THE WITNESS:  We've watched CNBC.

BY MS. KAPLAN-MARANS:

Q  Are there specific shows on CNBC that you watch?

A  No, not in particular.

Q  Do you ever discuss your purchases of securities with a broker?

A  No.

Q  Do you rely on an accountant?

A  No.

Q  Do you have an accountant?

A  No.

Q  Do you have an investment club membership?

A  No.

Page 102

Q  Do you have an accountant advising you when you prepare your tax statements?

A  No.

Q  Do you discuss investment strategies with William?

MR. ABADOU:  Mr. Smith, please.

MS. KAPLAN-MARANS:  Mr. Smith.

MR. ABADOU:  You're not his friend.

THE WITNESS:  Yes.

BY MS. KAPLAN-MARANS:

Q  How often?

A  Well, as often as we feel that we want to trade a stock, and so we're doing research -- I'm doing the research on it.  And then I come to him and we discuss it.

Q  Before Mr. Smith's injury, would he participate in that process of researching companies with you?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Back then, I cannot remember.  I don't know.

BY MS. KAPLAN-MARANS:

Q  Does Mr. Smith ever recommend to you which stocks to buy?

A  He has companies that -- you know, that he

Page 103

likes.

Q  How does Mr. Smith identify those companies?

A  Just by what they do, you know.

Q  How does he learn about those companies?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  We've been, you know, at this for a while, so he knows different companies.

So what's the question?

BY MS. KAPLAN-MARANS:

Q  How does Mr. Smith learn about those companies?

MR. ABADOU:  Same objection.

THE WITNESS:  A lot of times it's a company that he knows, or, you know, I may bring something to him in regards to different companies.

BY MS. KAPLAN-MARANS:

Q  So when you don't bring it to him, how does he know about it?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Well, if -- you know, I bring most of the information to him now that he cannot do it himself.

But, you know, he may ask me how a certain stock is doing or something, but for the most part,

Page 104

I do the research on it.

BY MS. KAPLAN-MARANS:

Q  Does Mr. Smith ever, on his own, bring up a company to you that you have not mentioned to him?

A  He may.  He may ask me just how a company is doing, you know.

Q  What kind of companies is Mr. Smith interested in?  Are they in a certain sector?

MR. ABADOU:  Objection.  Form.  Compound.

THE WITNESS:  No, not in a certain -- not a certain industry or anything.

BY MS. KAPLAN-MARANS:

Q  Does Mr. Smith ever buy stocks without consulting with you?

A  No --

MR. ABADOU:  Objection -- I'm sorry.

Objection.  Form.

THE WITNESS:  No, because he cannot make the trade himself.

BY MS. KAPLAN-MARANS:

Q  Would you say that the decision to purchase a stock is made when you press the button on the screen making the trade happen?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Well, we normally discuss

Page 105

27 (Pages 102 - 105)

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL

it, and then we make the trade.                    11:54:12

BY MS. KAPLAN-MARANS:

Q   What do you consider to be the point in time where a decision is made?

MR. ABADOU:  Objection.  Form.        11:54:14

THE WITNESS:  The point in time?  What does that mean?

BY MS. KAPLAN-MARANS:

Q   Is the decision made when you make the purchase?                    11:54:17

MR. ABADOU:  Objection.  Form.

THE WITNESS:  It's normally made before we make the purchase.

BY MS. KAPLAN-MARANS:

Q   Do you or Mr. Smith talk to other people        11:54:19 about investing, such as your family or friends?

MR. ABADOU:  Objection.  Form.  Compound.

THE WITNESS:  No.

BY MS. KAPLAN-MARANS:

Q   Do you read any financial or business        11:54:22 publications on a regular basis?

A   Other than what's on the Internet, no, not a certain newspaper or anything of that nature.  Just the Internet.

Q   How do you find the articles you want to        11:54:27

Page 106

read?                    11:54:28

MR. ABADOU:  Objection.  Form.

THE WITNESS:  As I stated, through brokerage accounts, on the Internet.

BY MS. KAPLAN-MARANS:                    11:54:30

Q   You mentioned that you will review statements by the company when making an investment decision.

How do you access those statements?

MR. ABADOU:  Objection.  Form.        11:54:33

THE WITNESS:  A lot of times, it's either through the company itself or through an analyst or, you know, analysts' projections.  Mainly through news about the company.

BY MS. KAPLAN-MARANS:                    11:54:37

Q   Do you listen to any podcasts about investing?

A   No, I haven't listened to podcasts.

Q   Does Mr. Smith listen to podcasts about investing?                    11:54:40

A   No.

Q   Do you watch Mad Money with Jim Cramer?

A   We have.

Q   What do you mean by "we"?

A   We watch television together, my husband        11:54:43

Page 107

and I.  Yes.                    11:54:45

Q   You and Mr. Smith have watched Mad Money together?

A   We have.

Q   Do you watch Mad Money on a regular basis?        11:54:47

A   No.

Q   Are there sources that -- are there any sources that you always try to look at before investing in a company?

A   Just from the brokerage accounts, the news        11:54:51 and charts and things like that.

Q   Ms. Smith, I just want to make sure that you can hear me okay because I see that you're leaning forward.  So I just want to make sure you can hear me.                    11:54:56

A   Yes, I can.

Q   I don't mind if you lean forward.  I just want to make sure you can actually hear.

A   Um-hum.

Q   Okay.  Great.                    11:54:59

What types of securities do you invest in?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  It's different companies.  There's no specific type.

///                    11:55:02

Page 108

BY MS. KAPLAN-MARANS:                    11:55:02

Q   Do you invest in mutual funds?

A   No, we do not.

Q   Do you invest in bonds?

A   No.                    11:55:04

Q   Do you invest in individual securities?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Yes, we have.

BY MS. KAPLAN-MARANS:

Q   How frequently do you trade individual        11:55:07 securities?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I don't know how many times exactly.  Like I said, it's kind of on and off.  Sometimes we trade often.  Sometimes we do not.        11:55:09

BY MS. KAPLAN-MARANS:

Q   There's a little bit of a noise in the background.

A   Hold on one second.  Let me close the door.  Just a moment.                    11:55:13

Okay.  Sorry.

Q   Thank you.  I appreciate that.

Is there -- for you personally, is there one segment of the economy or industry that you're particularly interested in when investing?        11:55:17

Page 109

28 (Pages 106 - 109)

HIGHLY CONFIDENTIAL

MR. ABADOU: Objection. Form. Compound.    11:55:18

THE WITNESS: Not in particular.

BY MS. KAPLAN-MARANS:

Q    Other than Velodyne Lidar, can you recall other individual securities that you purchased?    11:55:20

A    There's other securities. You know, I may not remember every company that we purchased. There's been several companies that we purchased.

Q    Can you name them?

MR. ABADOU: Objection. Form.    11:55:24

THE WITNESS: There's many, many companies. We purchased Tesla. We purchased Apple. We purchased Google. We purchased -- Google, which is Alphabet now. We purchased many stocks.

BY MS. KAPLAN-MARANS:    11:55:29

Q    The companies that you just mentioned, when did you make those purchases?

MR. ABADOU: Objection. Form.

THE WITNESS: I would not know the dates. Sorry.    11:55:31

BY MS. KAPLAN-MARANS:

Q    Can you provide me with the year?

A    I don't know. I would be in the 2000s. I know that. But the exact year? I'm not sure of the exact dates.    11:55:38

Page 110

Q    To the best of your knowledge, were those purchased in the last two years?    11:55:42

MR. ABADOU: I'm sorry, Counsel. Just to be clear, when you say "those purchases," are you referring to -- I think it was Apple, Tesla, and Google? Is that what you're referring to? You're not sure?    11:55:57

Can you read the record back?

THE REPORTER: Sure. Do you want the --

MR. ABADOU: I'd just like to know what companies Mrs. Smith mentioned so that we have an idea of what question counsel just asked her. It appears to be a form issue.    11:56:05

(Record read as follows:

"Answer: There's many, many companies.    11:56:05
We purchased Tesla. We purchased Apple. We purchased Google. We purchased -- Google, which is Alphabet now. We purchased many stocks.")

THE WITNESS: Well, that would be hard to say because we also do options, which is a right to buy the stock. So Tesla might have been last year as far as an option. It might have been a year or two ago for Alphabet.    11:56:42

It's just many stocks and options that we    11:57:13

Page 111

purchased, so, you know, sometimes we buy stocks and options, sometimes, like I said, we -- we don't.    11:57:15

BY MS. KAPLAN-MARANS:

Q    Do you monitor the companies that you've invested in?    11:57:28

A    Yes, we monitor what's going on with the company.

Q    How do you do that?

A    Reading those articles.

Q    Do you check the stock price?    11:57:41

A    We check the stock price.

Q    How often do you check the stock price?

A    Pretty often when we're invested in that particular stock.

Q    What does "pretty often" means?    11:57:57

A    Probably every day, or, you know, very often.

Page 112



Page 113

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL



MS. KAPLAN-MARANS:  We're going to pull up another document.  It will be Exhibit 10 once it        12:00:55
pops up.

Page 114

Page 115

Page 116

Q   Can we go back to Exhibit 1, please?

Do you have the document, Ms. Smith?

A   I do have it.

Q   Okay.  Great.                    12:05:29

If you could just turn to the second page of the document, do you see the two charts, "Account No. 1" and "Account No. 2"?

A   Yes.

Q   Can you confirm that Account 1 is your        12:05:41
Fidelity account?

A   That's correct.

Q   And Account 2 is your E*Trade account?

A   Yes, it is.

Q   If you look at the account activity in        12:05:52
Account No. 1, it refers to the trading activity in Account No. 2.  And you see that the trades in Account No. 1 are much larger in size, right?

A   Correct.

Q   And why is that?                    12:06:10

Page 117

30 (Pages 114 - 117)

HIGHLY CONFIDENTIAL

MR. ABADOU: Objection. Form.    12:06:12

THE WITNESS: Because they were giving a better interest rate on that account, so that's the account that we had most of the money in.

BY MS. KAPLAN-MARANS:    12:06:42

Q  Can we go to Exhibit 4, please?

A  Okay.

Q  Can you please turn to page 6?

A  Okay.  I have it.

Q  Do you see -- we looked at this earlier.    12:07:16

Do you see the two charts?

A  Yes.

Q  Just to confirm, the first chart represents your trade in Velodyne securities in your E*Trade account, right?    12:07:30

A  Correct.

Q  And the second chart represents your trades in your Fidelity account, right?

A  Correct.

Q  Is this information still accurate?    12:07:40

MR. ABADOU: Objection.  Form.

BY MS. KAPLAN-MARANS:

Q  Is the information contained in these charts still accurate?

MR. ABADOU: Same objection.    12:07:54

Page 118

THE WITNESS: It looks correct.    12:07:56

BY MS. KAPLAN-MARANS:

Q  Have you made any subsequent purchases or sales of Velodyne stock since March 9th, 2021?

A  No, I have not.    12:08:04

Q  Do you see at the top of the first chart where it says, "December 9th, 2020, Bought 5,226 shares"?

A  Yes.

Q  And do you see in the second chart, the    12:08:25 first -- the second line where it says on December 9th, 2020, you bought 375,678 shares of Velodyne?

A  Yes.

Q  On December 9th, 2020, when you made those    12:08:37 two purchases, what percentage of your investment portfolio did that account for?

A  It probably accounted for most of it.  I'm not sure.  But it was -- it was a good amount of it.

Q  Why did you choose to purchase stock on    12:09:07 Velodyne Lidar on December 9th?

A  We thought the technology was a good technology.

Q  What was the technology?

A  Lidar.    12:09:23

Page 119

Q  And what is that?    12:09:24

A  It's something that they're putting in autonomous vehicles now.  It's kind of -- I don't know how to explain it exactly, but it's a beam sensor, and it detects different movement and things    12:09:36 of that nature.

We thought it was a good technology and futuristic, so...

Q  What information did you rely on when you chose to purchase Velodyne on December 9th?    12:09:57

A  We did, as I stated, look up the company itself and any news articles that had come out on the company.  We looked at a chart on the company.  Those type of things.

MS. KAPLAN-MARANS: I apologize.  There's    12:10:18 a very loud sound in the background that sounds like a fire alarm.  Can we take a break for five minutes so I can just -- oh, it just stopped.

MR. ABADOU: I could use a break, though, since you raised it, if that's okay.    12:10:31

MS. KAPLAN-MARANS: Okay.  Yeah.

MR. ABADOU: Five minutes is great.  You guys can actually stay on the record if you want, if you promise not to ask any questions.

MS. KAPLAN-MARANS: We can wait for you.    12:10:39

Page 120

THE VIDEO OPERATOR: We're going off the    12:10:42 record at 12:10 p.m.

(Recess, 12:10 p.m. - 12:42 p.m.)

THE VIDEO OPERATOR: We're on the record at 12:42 p.m., and this is the beginning of Media 4    12:42:15 in the deposition of Diane Smith.

MS. KAPLAN-MARANS: Carla, can you please read back the last question and answer?

(Record read as follows:

"Question:  What information did you rely    12:42:47 on when you chose to purchase Velodyne on December 9th?

"Answer:  We did, as I stated, look up the company itself and any news articles that had come out on the company.  We looked at a    12:42:48 chart on the company.  Those type of things.")

MS. KAPLAN-MARANS: Thank you.  I appreciate that.

Q  Ms. Smith, when you referenced a "chart," what does that mean?  What kind of chart was it?    12:42:54

MR. ABADOU: Objection.  Form.

THE WITNESS: It's a chart that tells what the stock has done over a period of time, whether that's one day, 30 days, one year, two years.

///    12:43:09

Page 121

31 (Pages 118 - 121)

HIGHLY CONFIDENTIAL

BY MS. KAPLAN-MARANS:                    12:43:13

Q  On December 9th when you purchased your shares in your two accounts of Velodyne securities, who made the decision to purchase stock that day?

MR. ABADOU:  Objection.  Form.          12:43:28

THE WITNESS:  We discussed it, and I made the decision to purchase.

BY MS. KAPLAN-MARANS:

Q  Is the "we" you and Mr. Smith?

A  Correct.                             12:43:37

Q  Did you tell Mr. Smith that you were going to purchase these shares on December 9th?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I believe I did.

BY MS. KAPLAN-MARANS:                    12:43:48

Q  When you purchased Velodyne stock on December 9th, what did you think of the stock price at that time?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  At that time, what I recall   12:44:11 is that the stock was moving in an upward direction.

BY MS. KAPLAN-MARANS:

Q  Why did you purchase Velodyne stock that day?

MR. ABADOU:  Objection.  Form.          12:44:22

Page 122

THE WITNESS:  Because the company itself   12:44:27 seemed like a very good technology, so it was something we thought may be a long-term investment for us.  So, you know, we did our research on the company and decided to purchase.        12:44:40

BY MS. KAPLAN-MARANS:

Q  Prior to December 9th, did you ever own Velodyne securities before that?

A  No.

Q  When did you first learn of Velodyne?       12:44:55

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I'm not sure what date.

BY MS. KAPLAN-MARANS:

Q  On December 9th, 2020, you bought $7,325,321 worth of Velodyne stock in your Fidelity   12:45:11 account, and $101,907 in your E*Trade account, right?

A  That sounds about right.

Q  Can you please look at Exhibit 4?

A  Exhibit 4?  Okay.  I'm looking at        12:45:39 Exhibit 4.

Q  Okay.  So if you turn to page 6, you'll see the two charts that we talked about earlier.

Do you see those?

A  Yes.                                12:45:49

Page 123

MR. ABADOU:  I'm not there yet.  Please   12:45:49 hold on.

What page?

MS. KAPLAN-MARANS:  Page 6.

MR. ABADOU:  Okay.                     12:46:04

BY MS. KAPLAN-MARANS:

Q  Now that you have those two charts in front of you, I'll ask that question again.

On December 9th, you bought $7,325,321 worth of Velodyne stock in your Fidelity account,   12:46:15 and $101,907 in your E*Trade account, right?

A  It sounds about right, but I'd have to do the math to make sure those amounts are correct.

Q  Okay.  Understood.

But does that sound approximately about   12:46:33 right?

A  Approximately, yes.

Q  Why did you buy that amount on that day?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  As I stated, we read up on   12:46:45 the technology and we thought it was a good technology.  So we, at that point, was wanting to do a long-term investment, and so we thought this would be a good company for that.

///                                   12:47:00

Page 124

BY MS. KAPLAN-MARANS:                    12:47:04

Q  Do you consider a seven and a half million dollar investment to be a significant investment?

A  Yes.

Q  Did you feel that when you made that    12:47:15 purchase, you had done sufficient diligence on the stock before investing that money?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Yes.

BY MS. KAPLAN-MARANS:                    12:47:32

Q  Can you see on line 14 and 15 on page 6, on December 17th, 2020, you sold 375,678 shares of Velodyne stock at a price of $20.60?

A  Yes.

Q  Yes?                                12:47:56

A  Yes.

Q  Does it sound about right to you that that was approximately $7.7 million worth of Velodyne stock that you sold on that date?

A  Yes.                                12:48:09

Q  Did something change from the time that you purchased -- made the purchase on December 9th to the time you sold the shares on December 17th?

A  No, nothing changed.

Q  What was the reason that you sold your   12:48:34

Page 125

32 (Pages 122 - 125)

HIGHLY CONFIDENTIAL

stock on December 17th?    12:48:36

A  Initially, it was just something that we wanted to -- just more of a trade.  But then after investigating a little further, we thought it may be long term for us.  So we got back into Velodyne.    12:48:52

Q  But I'm just talking about, on December 17th, why did you sell almost everything that you bought?

A  Basically at that point, to just take a profit.    12:49:07

Q  And who made the decision on December 17th to sell all of your shares in Velodyne from your Fidelity account?

A  We probably discussed it.  I can't remember that particular day and all the ins and outs of our discussion.    12:49:34

But, you know, I -- like I say, I was the one that was doing the trading, so, you know, I would discuss it with my husband and make the trade.

Q  Did you confer with Mr. Smith before you sold $7.7 million worth of shares in Velodyne?    12:49:55

A  To my recollection, I believe I did.

Q  Do you regularly trade in millions of dollars without consulting with your husband?

MR. ABADOU:  Objection.  Form.    12:50:17

Page 126

THE WITNESS:  We normally talk about it.    12:50:19

BY MS. KAPLAN-MARANS:

Q  Do you expect that you would have asked him for his authorization before trading $7.7 million from your joint account, before selling $7.7 million worth of shares in your joint account?    12:50:28

MR. ABADOU:  Objection.  Form.

THE WITNESS:  We discussed it, and it was something that he was leaving up to me to -- you know, to make the decision and the trade.  But it was something that we discussed.    12:50:41

BY MS. KAPLAN-MARANS:

Q  If Mr. Smith had told you on that day not to sell your Velodyne shares in your Fidelity account, would you have sold them?    12:50:55

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I can't say what I would have done back then.  There would have been more of a discussion on it.    12:51:09

BY MS. KAPLAN-MARANS:

Q  When you sold those shares in your Fidelity account on December 17th, you did not sell your shares in your E*Trade account; is that right?

A  Not on that same date.    12:51:30

Page 127

Q  Why is that?    12:51:31

A  I don't recall.

Q  Why did you then sell the shares that you held in your E*Trade account on December 21st, four days later?    12:51:47

A  To take the profit from it.

Q  Did you discuss that with Mr. Smith?

A  We normally discuss the stocks, and he leaves it up to me to make the trade and the decision to sell or buy.  But we discuss it.    12:52:08

Q  Do you see, on December 22nd, 2020, you bought 290,938 shares in Velodyne at $26.60?

A  Yes.

Q  In the Fidelity account?

A  Yes.    12:52:39

Q  That was a day after you sold your E*Trade accounts.  Why did you then buy those shares in your Fidelity account?

A  As I was stating, we were looking more towards a long-term investment, you know, rather than, you know, trading in and out.  So we wanted to, you know, find a stock that would be -- that had a good potential to go up, and something that we could hang on to for a while.  So we wanted to do Velodyne because of its technology as a long-term    12:52:55    12:53:17

Page 128

investment.    12:53:20

Q  Did something change between December 21st and December 22nd to make you jump from selling to buying?

A  Just to have it as a long-term investment at that point.  We felt it was a stock that was going to continue to go up.    12:53:37

Q  Did something change between December 17th when you sold over 375,000 shares in your Fidelity account to December 22nd when you re-bought 290,000 shares in your Fidelity account?    12:53:52

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I don't know of anything that changed.  Our mindset at that point was to hang on to Velodyne.    12:54:08

BY MS. KAPLAN-MARANS:

Q  And why is that?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  We thought it would be a good long-term investment.    12:54:18

BY MS. KAPLAN-MARANS:

Q  Did you think it would be a good long-term investment when you sold over 375,000 shares on December 17th?

MR. ABADOU:  Objection.  Form.    12:54:28

Page 129

33 (Pages 126 - 129)

HIGHLY CONFIDENTIAL

THE WITNESS: I don't remember exactly what I thought at that time.

BY MS. KAPLAN-MARANS:

Q Was there any information that you saw when you bought the 290,938 shares on December 22nd that made you effectuate that purchase?

A Well, we thought it was a good technology. The stock, I believe, at that time, was going up, and so we thought it may be a good long-term investment.

Q But again, you sold, only a few days earlier, $7.7 million in Velodyne. So what changed that made you go back and re-buy the majority of those shares?

MR. ABADOU: Objection. Form. Asked and answered, argumentative.

THE WITNESS: Our thought was, at that time, the stock was going up. It's a good technology. And our mindset was to have a stock for a long-term investment, and this was the stock that we chose.

BY MS. KAPLAN-MARANS:

Q Can you please look -- in the top chart, do you see, on December 23rd, in your E*Trade account, you sold 4,000 shares at $26.70?

Page 130

A Um-hum. Yes.

Q Is this a day after you bought 290,938 shares in your Fidelity account?

A Yes, it is.

Q Why did you sell the shares in your E*Trade account after you bought the shares in the Fidelity account?

A I'm not sure what our thought pattern was right then. We might have felt that we had enough, you know, shares invested in Velodyne.

Q Why did you sell 4,170 shares on January 27th, 2023?

A Well, there was news starting to come out about the fraudulent activity of the defendant. So the stock was starting to go down, so we decided to sell a portion.

Q What percentage of your overall holdings in Velodyne was that portion that you sold on January 27th?

MR. ABADOU: Objection. Form.

THE WITNESS: I don't know what percentage.

BY MS. KAPLAN-MARANS:

Q Was it a small percentage? Large percentage?

Page 131

MR. ABADOU: Objection. Compound.

THE WITNESS: It was a smaller percentage of the amount that we owned.

BY MS. KAPLAN-MARANS:

Q What information did you rely on when you sold those 4,170 shares on January 27th?

MR. ABADOU: Objection. Form.

THE WITNESS: I believe it was because there was news coming out regarding activity with this company. They might have removed their guidance, or something happened. And the stock was starting to go down, so we decided to get out of a small portion. Even though we still wanted to believe in the company, decided to get out of a small portion.

BY MS. KAPLAN-MARANS:

Q And do you see -- in the second chart in your Fidelity account, do you see the sales that you made, multiple sales that you made on March 9th, 2021?

A Correct.

Q Why did you sell these shares on March 9th, 2021?

A Well, as you can see, the stock price was going down substantially because of news that had

Page 132

come out, especially about -- I believe it was about the chairman and, you know, the founder, as well as Ford. We had lost already 3.5 million. We wanted to make a wise decision to get out of that stock. It was no longer a good investment, good long-term investment.

Q You referenced the news about the chairman and founder. What was that news?

A I believe he might have been ousted from the company, or...

Q What do you mean by he was "ousted from the company"?

A He was removed from the company.

Q Who removed him?

A I'm not sure. I don't have all the details.

Page 133

34 (Pages 130 - 133)



Page 134

on, Counsel?                                    13:03:07

MS. KAPLAN-MARANS:  Yes.  Just scroll one page, please.

MR. ABADOU:  Gotcha.  Thank you.

BY MS. KAPLAN-MARANS:                           13:03:12

Q  Ms. Smith, do you see, on line 3, where it says, "Further supplementing and amending the foregoing, Lead Plaintiffs reviewed online information about the Company but did not retain copies of the material they reviewed"?           13:03:28

A  Correct.

Q  What online material did you review?

A  As I stated before, it's mainly going to brokerage accounts and looking at, you know, the news from there.                              13:03:48

Q  When you reviewed this online information, did you print it?

A  I did not print it.

Q  Do you typically print news articles off of the Internet?                              13:04:00

A  No, I don't.

Q  Do you typically save or bookmark material you reviewed online related to investments?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I don't save them, no.          13:04:14

Page 136

BY MS. KAPLAN-MARANS:                           13:01:42

Q  Please turn to page 7 in Exhibit 4.

MR. ABADOU:  Is this Exhibit 4 that we're     13:03:06

Page 135

BY MS. KAPLAN-MARANS:                           13:04:15

Q  What do you know about Jim Cramer from Mad Money?

A  He's one of the hosts of shows on CNBC.

Q  When did you first learn of him?          13:04:43

A  Probably many years ago.

Q  You referenced earlier that you watched his show; is that right?

A  I have.  We have.

Q  And your husband watches that show with  13:04:58 you?

A  Um-hum.  Sometimes.

Q  Have you ever read articles about the show?

A  Read articles?  No.                       13:05:08

Q  How often do you rely on Mr. Cramer's advice?

A  I've never --

MR. ABADOU:  Hold on.

Objection.  Form.  Foundation.               13:05:21

You can answer.

THE WITNESS:  I don't rely on Jim Cramer's advice.

BY MS. KAPLAN-MARANS:

Q  Did you watch Mad Money around the time    13:05:37

Page 137

35 (Pages 134 - 137)

HIGHLY CONFIDENTIAL

you invested in Velodyne Lidar?                    13:05:39

A   I don't remember.

Q   Over the last few months, have you watched Mad Money at all?

MR. ABADOU: Objection. Form.                    13:06:00

THE WITNESS: I don't think so. We don't really watch that channel anymore. We burnt out our TV screen, so we don't really watch it too much anymore.

BY MS. KAPLAN-MARANS:                    13:06:22

Q   Who is David Hall?

A   He's the founder -- he was the founder, and he was the chairman of Velodyne.

Q   Who is Marta Hall?

A   That's his wife.                    13:06:50

Q   Was she involved in Velodyne?

A   I believe so, yes.

Q   In what capacity?

A   I can't remember her capacity.

Q   Who is Anand Gopalan?                    13:07:06

MR. ABADOU: Objection. Form.

THE WITNESS: He's the former CEO of Velodyne.

BY MS. KAPLAN-MARANS:

Q   Who is Andrew Hamer?                    13:07:20

Page 138

A   He's the former CFO of Velodyne.                    13:07:22

Q   Who is James Graf?

A   James Graf is the former CEO of Graf Industrials.

Q   Who is Michael Dee?                    13:07:37

A   Michael Dee is the former president and CFO of Graf Industrials.

Q   What is your understanding of Velodyne Lidar's business?

A   It was the technology that was going to                    13:08:01 be -- that could be put in autonomous vehicles, and it was a technology that was -- it was a technology that was kind of futuristic. And it's something autonomous vehicles -- electric vehicles are going to be probably more prominent in the future, so                    13:08:23 their Lidar technology was a good technology.

Q   Are you familiar with any other companies in this industry?

MR. ABADOU: Objection to form.

THE WITNESS: I don't know about another                    13:08:42 company. Yes, there are other companies out there that's in that business, yes.

BY MS. KAPLAN-MARANS:

Q   Why did you specifically choose Velodyne over the other companies when you made your                    13:08:54

Page 139

investment?                    13:08:56

MR. ABADOU: Objection. Form, foundation.

THE WITNESS: Mainly because of what I was reading on the company itself. I believe at that time I went to their website and read up on the                    13:09:08 company and read any kind of news that was out, and I thought the founder was a brilliant person. So that's why we decided to purchase.

BY MS. KAPLAN-MARANS:

Q   What did you find about him that was                    13:09:29 brilliant?

A   I mean, just discovering this technology itself was a pretty good -- a pretty good thing.

Q   When do you understand that Mr. Hall discovered Lidar technology?                    13:09:48

A   I don't remember. I don't remember.

Q   Are you familiar with what a special purpose acquisition company is?

A   I've heard of it.

Q   What is your understanding of what a                    13:10:05 special purpose acquisition company is?

A   I couldn't tell you exactly, but I think it's a company that kind of doesn't go through the same channels as an IPO as far as getting people to invest.                    13:10:29

Page 140

Q   Are you familiar with Graf Industrial                    13:10:35 Corporation?

A   Yes, through my readings.

Q   What is it?

A   I'm familiar with it. I believe that --                    13:10:45 I'm not sure. I believe that they were a part of -- becoming a part of Velodyne, invested in Velodyne.

Q   How did you learn about GIC? How did you learn about Graf Industrial Corporation?

MR. ABADOU: Objection. Form.                    13:11:11 Foundation.

THE WITNESS: I'm sorry. I don't recall.

BY MS. KAPLAN-MARANS:

Q   Had you ever invested in Graf Industrial Corporation?                    13:11:21

A   Have I invested in -- sorry.

Q   In Graf Industrial Corporation.

A   No.

Q   Are you aware that Graf Industrial Corporation was a SPAC, a special purpose                    13:11:30 acquisition company?

A   I found that out, yes.

Q   How did you learn that?

A   I don't remember exactly, but I know it now.                    13:11:49

Page 141

36 (Pages 138 - 141)

Q  Do you recall when you learned it?    13:11:57

A  I don't know.  I don't know whether it was through the filings here or -- I don't remember exactly when I found that out.

Q  Are you aware that Velodyne Lidar went    13:12:08 public by merging with a SPAC called Graf Industrial?

A  Yes, I do know that.

Q  Are you aware that after this merger, Graf Industrial changed its name to Velodyne?    13:12:21

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I knew that it was Velodyne.

BY MS. KAPLAN-MARANS:

Q  Have you previously invested in any other companies that were -- that became public through a    13:12:38 de-SPAC merger?

A  I might have.  I'm not sure.

Q  At the time that you purchased stock in Velodyne Lidar, were you aware of the Velodyne Lidar/Graf Industrial merger?    13:13:06

MR. ABADOU:  I'm sorry, Tamar.  Can you repeat that again?

MS. KAPLAN-MARANS:  Sure.

Q  At the time that you purchased stock in Velodyne Lidar, were you aware of the Velodyne    13:13:15

Page 142

Lidar/Graf Industrial merger?    13:13:20

A  I'm not sure if I knew back then.  I'm not sure.

Q  Do you know when Velodyne merged with Graf Industrial?    13:13:29

A  I believe it was the date of this class.  I believe it was July 2nd, 2020.

Q  Before you purchased shares in Velodyne, did you review any of Velodyne's public disclosures?

MR. ABADOU:  Objection.  Form.    13:14:01

THE WITNESS:  I'm not sure.

BY MS. KAPLAN-MARANS:

Q  To the best of your knowledge, did you rely on any of the company's public disclosures prior to your decision to invest in it?    13:14:21

A  I did rely on that, yes.

Q  So you relied on the disclosures, but you are not sure if you reviewed them?

A  Okay.  I must have misunderstood your question.  But I did rely on their disclosures.    13:14:38

Q  Okay.  So before you purchased shares in Velodyne, did you review Velodyne's public disclosures?

A  Yes, through news.

MS. KAPLAN-MARANS:  We're going to pull up    13:15:00

Page 143

another document as an exhibit.  It will be    13:15:01 Exhibit 11, please.

(Exhibit 11 was marked for identification and is attached hereto.)

BY MS. KAPLAN-MARANS:    13:15:13

Q  Do you see the document, Ms. Smith?

A  I do.

Q  Okay.  Great.

Do you recognize this document?

A  Not exactly.    13:15:51

Q  Do you know what this document is?

A  Not exactly, no.

Q  Can you please turn to page 4?  You'll see in the bottom right corner, it has the page number.

MR. ABADOU:  I'm sorry, Tamar.  Is it    13:16:21 page 4 of the actual -- of the -- what is this?  Is it a proxy?  Or is it page 4 of the -- I guess there's only one page number.  So it's just page 4 of the document itself?

MS. KAPLAN-MARANS:  Yes.    13:16:38

MR. ABADOU:  Okay.  Thank you.

THE WITNESS:  Okay.  I have it.

BY MS. KAPLAN-MARANS:

Q  Do you see where it says, "About Velodyne" at the top?    13:16:53

Page 144

A  Yes.  Yes.    13:16:54

Q  One, two, three, four -- four paragraphs down, the second-to-the-last sentence, do you see where it says, "Velodyne is expected to generate revenues of approximately 100 million in 2020,    13:17:07 increasing to approximately 680 million in 2024, with existing contracts expected to drive just under 50 percent of the estimated 2024 revenues"?

A  Yes.

Q  Who made this statement?    13:17:26

A  I believe the people from Graf -- the people from Graf Industrials.

Q  Did this statement factor into your decision to invest in Velodyne stock?

A  I believe at that time I had news that    13:17:45 their projections were -- that they were going to be making money, and yes.

Q  Do you believe this statement is inaccurate?

A  It became to be inaccurate.    13:18:03

Q  When did it become inaccurate?

A  In 2021, I believe it was.

Q  Approximately when in 2021?

A  What I do know is that the -- I'm not sure of which person at the company -- withdrew their    13:18:28

Page 145

37 (Pages 142 - 145)

HIGHLY CONFIDENTIAL

guidance, I believe, in January.    13:18:36

Q  On the date that this statement was made, was this statement inaccurate?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  It became inaccurate.    13:19:23  That's why it's a fraud.

BY MS. KAPLAN-MARANS:

Q  It became inaccurate in March of 2021; is that right?

MR. ABADOU:  Objection.  Form.    13:19:32

THE WITNESS:  I'm not sure of the dates.

BY MS. KAPLAN-MARANS:

Q  But you said it became inaccurate at some point in 2021, right?

A  Um-hum.    13:19:42

Q  So at the time that this statement was made, was it inaccurate?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Well, obviously it was inaccurate because that was not accurate.    13:19:56

BY MS. KAPLAN-MARANS:

Q  You used the word -- you used the phrase "it became inaccurate."

What does that mean?

MR. ABADOU:  Objection.  Form.    13:20:10

Page 146

THE WITNESS:  They stated something that    13:20:15  later was not true.

BY MS. KAPLAN-MARANS:

Q  So it became not true in 2021?

MR. ABADOU:  Objection.  Form.    13:20:24

THE WITNESS:  I'm not sure of the date, but I believe it was when they withdrew the guidance.

BY MS. KAPLAN-MARANS:

Q  Was this statement inaccurate on the date    13:20:39  that it was made?

MR. ABADOU:  Objection.  Form.  Asked and answered.

THE WITNESS:  It became inaccurate.  It was fraudulent.    13:20:53

BY MS. KAPLAN-MARANS:

Q  I'm sorry, Ms. Smith.  It's a yes-or-no statement.  Was this question inaccurate on the date that it was made?

MR. ABADOU:  Objection.  Form.    13:21:00

BY MS. KAPLAN-MARANS:

Q  Yes or no?

MR. ABADOU:  Argumentative.

MS. KAPLAN-MARANS:  It's not argumentative.  It's just a yes-or-no question.    13:21:04

Page 147

MR. ABADOU:  You don't need to respond to    13:21:06  me.  It's argumentative.

THE WITNESS:  Yes, it was inaccurate because later they came out with the correct numbers.    13:21:23

BY MS. KAPLAN-MARANS:

Q  Mr. Smith, do you see the sentence immediately before that, the one we just read, where it says, "Estimated revenues under existing customer contracts are expected to exceed 800 million from    13:21:44  2020 to 2024"?

A  Um-hum.

Q  Were you aware that this statement was made?

MR. ABADOU:  Objection.  Form.    13:21:58

THE WITNESS:  I believe through my readings.

BY MS. KAPLAN-MARANS:

Q  Do you believe this statement was inaccurate on the date that it was made?    13:22:08

A  Yes.

Q  Why?

A  Because later they came out with something different.

Q  If you could turn back one page to page 3.    13:22:37

Page 148

A  Um-hum.    13:22:49

Q  Look at the last paragraph, the second-to-last sentence.

Do you see where it says, "Current Velodyne shareholders, including David Hall, and    13:22:55  strategic investors Ford, Baidu, Inc., Nikon Corporation and Hyundai Mobis, will retain an equity interest of more than 80 percent in the combined company"?

A  No, I'm sorry.  I'm not reading the same    13:23:09  thing you're reading.

Q  Oh, okay.  What page are you on?

A  You said page 3?

Q  Page 3.

A  Okay.    13:23:20

Q  It's the last paragraph.

A  Okay.

Q  The second-to-last sentence starting with "Current Velodyne shareholders."

A  I am not seeing that.    13:23:45

The paragraph that starts with "David Hall"?  What are we speaking of?

Q  Are you looking at -- at the top of the page, it says, "Velodyne Lidar and Graf Industrial Corp. Announce Business Combination"?    13:24:03

Page 149

38 (Pages 146 - 149)

HIGHLY CONFIDENTIAL

A Yes. 13:24:04

Q Okay. So you see where it says at the bottom, "Houston, Texas"?

A Oh, okay.

Q So the second-to-last sentence in that paragraph. 13:24:10

A Okay. I'm not sure where that starts, but you said starting at "Current"?

Q Yes. And if you want to take the time to read the whole paragraph, take your time to do that, please. 13:24:24

A Okay.

Q So you see the sentence starting with "Current Velodyne shareholders"?

A Yes. 13:24:55

Q Okay. Great.

Were you aware -- were you aware that Graf Industrial made this statement?

MR. ABADOU: Objection. Form.

THE WITNESS: I'm not sure. 13:25:16

BY MS. KAPLAN-MARANS:

Q As far as you know, did this statement factor into your decision to invest in Velodyne?

A Well, I know I was reading information that Ford had invested in Velodyne, which was 13:25:27

Page 150

another reason that I purchased. So yes, I did rely on this. 13:25:33

Q Do you believe this statement is inaccurate?

MR. ABADOU: Objection. Form. 13:25:46

THE WITNESS: I guess it's accurate.

BY MS. KAPLAN-MARANS:

Q Okay. Just scoot up a little bit. Right above this paragraph that we just looked at, do you see the very last bullet starting with "David Hall"? 13:26:07

A Yes.

Q Do you see where it says, "David Hall will continue to play a critical role as executive chairman of Velodyne"?

A Yes. 13:26:20

Q Were you aware that Graf Industrial made this statement?

A I was aware of that.

Q Did this statement factor into your decision to invest in Velodyne? 13:26:32

A Yes, it did.

Q Do you believe this statement is inaccurate?

A It is not accurate, yes.

MR. ABADOU: Objection. Form, to the last 13:26:48

Page 151

question. I didn't get it in. 13:26:50

THE REPORTER: I was going to ask her to repeat that.

Did you say, "It is not accurate"?

THE WITNESS: Correct. It's not accurate. 13:27:01

BY MS. KAPLAN-MARANS:

Q Why not?

A Because he was thrown out of the company the next year.

Q Was this statement accurate at the time it was made? 13:27:13

MR. ABADOU: Objection. Form.

THE WITNESS: That's what's making this so fraudulent. They didn't tell the truth.

BY MS. KAPLAN-MARANS: 13:27:26

Q Was this statement accurate at the time it was made?

MR. ABADOU: Objection. Form.

THE WITNESS: I don't believe it was accurate. 13:27:36

MS. KAPLAN-MARANS: We're going to pull up another document. It's going to be Exhibit 12.

(Exhibit 12 was marked for identification and is attached hereto.)

/// 13:28:26

Page 152

BY MS. KAPLAN-MARANS: 13:28:26

Q I don't see it yet. It may be taking a while. Oh, I see it now.

Ms. Smith, can you see it, Exhibit 12?

A Yes. 13:28:35

Q Okay. Great.

Do you recognize this document?

A It does not look familiar.

Q Do you know what this document is?

A "Intelligize." No, I do not. 13:28:53

Q Please turn to page 31. It's PDF page 41, but in the document at the bottom, it's labeled page 31.

MR. ABADOU: Say that again, Counsel. Is it 31 of the document or -- 13:29:17

MS. KAPLAN-MARANS: Page 31 in the document, but page 41 in the PDF.

MR. ABADOU: Is your version of this as small as mine is? I don't know what -- I don't know what this "Intelligize" is. But is the writing on your end as small as it is on mine? 13:29:33

THE WITNESS: It is small.

BY MS. KAPLAN-MARANS:

Q Can you see it, Ms. Smith?

A I mean, it is small. 13:29:52

Page 153

39 (Pages 150 - 153)

HIGHLY CONFIDENTIAL

Q  Can you zoom in?                13:29:53

MR. ABADOU:  There you go.

THE WITNESS:  Let me see if I can zoom in.
I'm trying to get to -- you said page 41?

BY MS. KAPLAN-MARANS:                13:30:00

Q  Yeah.  It's page 31 on the bottom of the document, how it's labeled, but in the PDF, it's page 41.

A  I think I have the correct page.

Q  It starts in the middle of a sentence at        13:30:32
the very top.  It says, "because Velodyne can provide forward-looking guidance."

A  Obviously I don't have the correct page.
So you're saying it's not page 41.  Is it 31 or --

Q  It's page 31.                13:30:47

A  31.  Okay.  Okay.  I have page 31.

Q  Okay.  Do you see the first bullet where it says, "Committed and Capable Management Team"?

A  Um-hum.  Yes.

Q  Okay.  Do you see where it says, "The        13:31:22
Board considered that Velodyne has a professional management team whose interests are aligned with those of our stockholders and can clearly and confidently articulate the business plan and market opportunities to public market investors"?        13:31:35

Page 154

A  Yes, I see that.                13:31:40

Q  Are you aware that Graf Industrial made this statement?

A  I don't know if I get that.

Q  Did this statement factor into your        13:32:05
decision to invest in Velodyne?

A  More so that they were going to be keeping the chairman on.  I don't remember, you know.  I might have read it.

Q  Do you believe that this statement was        13:32:27
inaccurate at the time it was made?

A  Well, based upon what happened the next year, I don't believe it's accurate.

Q  Was it accurate at the time it was made?

MR. ABADOU:  Objection.  Form.        13:32:57

THE WITNESS:  No, it wasn't accurate.

BY MS. KAPLAN-MARANS:

Q  Okay.  Could you please turn to page 58?
That will be page 68 in the PDF.

A  Up here it says, "PDF," but you're        13:33:21
saying -- it says, "Exhibit 12 Tab 12.PDF."

Q  Just look at the page number on the bottom of the document, and look for page 58.  Then you'll find it.

A  58?  Okay.                13:33:39

Page 155

Q  Okay.  Is this the --                13:33:44

A  I don't have it yet.  I'm sorry.

MR. ABADOU:  I don't have it, either.

THE WITNESS:  I believe I have the correct page now.                13:34:10

BY MS. KAPLAN-MARANS:

Q  It starts at the top, "customer and the complexity of the product"?

A  Yes.

Q  If you go to the second paragraph, which        13:34:18
is bolded, do you see where it says, "Velodyne is highly dependent on David Hall, its founder and executive chairman, and its ability to attract and retain highly skilled personnel and senior management"?                13:34:35

A  Yes.

Q  Okay.  Then do you see the next few lines, "Velodyne is highly dependent on David Hall, its founder and executive chairman.  Mr. Hall created Velodyne's first lidar product and he remains deeply        13:34:46
involved in all aspect of Velodyne's business, including product development.  The loss of Mr. Hall would adversely affect Velodyne's business because his loss could make it more difficult to, among other things, compete with other market        13:34:58

Page 156

participants, manage Velodyne's R&D activities and        13:35:00
retain existing customers or cultivate new ones"?

Do you see that?

A  I do.

Q  Were you aware that Graf Industrial made        13:35:11
this statement?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I believe I did know that.
Yes.

BY MS. KAPLAN-MARANS:                13:35:23

Q  Did this statement factor into your decision to invest in Velodyne stock?

A  Yes.  The chairman and founder is a very important individual.

Q  Do you believe that this statement was        13:35:35
inaccurate when made?

A  Yes.

Q  What do you understand from this sentence stating that the loss of Mr. Hall would adversely affect Velodyne's business?                13:35:55

A  Well, I mean, David Hall probably had a great relationship with his customers.  He created the technology.  So the loss of him is just like losing the company itself.  He's a very important part of the company.                13:36:17

Page 157

40 (Pages 154 - 157)

HIGHLY CONFIDENTIAL

Q  Okay.  If you could please turn to page 232.   13:36:23

MR. ABADOU:  Is there a faster way to scroll through these big documents, do you know?

MS. KAPLAN-MARANS:  I don't know.  But   13:36:44 what if you were to put the PDF number on top?  It's PDF 242.

MR. ABADOU:  I'm sorry.  What page was this again?

MS. KAPLAN-MARANS:  232.   13:37:07

Q  Ms. Smith, can you see page 232?

A  I am still scrolling.

Q  Take your time.

A  Okay.  232.

Q  Okay.  Great.  Thank you for your patience   13:38:46 on that.

Do you see the heading where it says, "Executive Officers"?

A  Yes.

Q  Do you see where it says, "David S. Hall.   13:38:58 Upon the consummation of the Business Combination, Mr. Hall will serve as the post-combination company's executive chairman."  And I'm going to skip a few lines.  "In his role as executive chairman, Mr. Hall will remain actively involved in   13:39:13

Page 158

the post-combination company's product and   13:39:16 technology development strategy."

Were you aware that Graf Industrial made this statement?

A  I don't know if I'm reading the correct   13:39:28 thing here.  Where are you starting?  I'm sorry.

Q  Do you see where it says, "Executive Officers" towards the bottom of the page?

A  Oh, okay.  I was reading the one at the top.   13:39:41

Q  If you just read the -- read the first few lines of that paragraph.

A  Okay.

Q  Were you aware that Graf Industrial made this statement?   13:40:15

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I don't recall if I read this or not.

BY MS. KAPLAN-MARANS:

Q  Did this statement factor into your   13:40:29 decision to invest in Velodyne stock?

MR. ABADOU:  Objection.  Form. Foundation.  She just testified she's not sure if -- sorry.

THE WITNESS:  I don't recall if I read it.   13:40:42

Page 159

BY MS. KAPLAN-MARANS:   13:40:46

Q  Do you believe this statement is inaccurate?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Well, they removed him from   13:40:59 the company, so it must have been inaccurate.

BY MS. KAPLAN-MARANS:

Q  Was this statement inaccurate at the time it was made?

MR. ABADOU:  Objection.  Form.   13:41:09

THE WITNESS:  I'm not sure if it was correct.  I'm not sure.

BY MS. KAPLAN-MARANS:

Q  I'm sorry.  Do you understand that this statement was inaccurate at the time it was made?   13:41:34

MR. ABADOU:  Objection.  Form.

THE WITNESS:  It says here that he would serve as post-combination company's executive chairman, but that didn't happen.

BY MS. KAPLAN-MARANS:   13:41:58

Q  So do you believe this statement was inaccurate at the time it was made?

A  I believe there was a lot of inaccurate information.

Q  Did the company know it was inaccurate at   13:42:08

Page 160

the time that this statement was made?   13:42:10

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I believe they did.

BY MS. KAPLAN-MARANS:

Q  Okay.  I have one more question in this   13:42:29 document, but I need you to please scroll to -- it's A-31.  It's further along in the document.  It's PDF page 387.

A  Okay.

MR. ABADOU:  Is it F-31 or A-31?   13:43:10

MS. KAPLAN-MARANS:  A-31, A as in "apple."

MR. ABADOU:  Oh, I see.

Diane, the A's are going to come after the F, just so you don't get confused.

THE WITNESS:  After?  Okay.  Thank you.   13:43:23

I'm still on the F's here.  Goodness.

Okay.  I have it.

BY MS. KAPLAN-MARANS:

Q  Okay.  Great.

Do you see the Section 4.22, "Internal   13:44:59 Controls"?

A  Yes.

Q  Do you see where it says, "The Company maintains a system of internal accounting control designed to provide reasonable assurance that,"   13:45:10

Page 161

41 (Pages 158 - 161)

HIGHLY CONFIDENTIAL

et cetera?    13:45:15

Do you want to read that paragraph?

MR. ABADOU: Would you like her to read the paragraph?

MS. KAPLAN-MARANS: I'm sorry. She can read it to herself.    13:45:23

THE WITNESS: Okay. I've read it.

BY MS. KAPLAN-MARANS:

Q What do you understand this paragraph to be about?    13:46:16

A I'm not sure.

Q Were you aware that Graf Industrial made this statement?

A I don't believe I was.

Q Did this statement factor into your decision to invest in Velodyne stock?    13:46:29

A I don't recall reading this.

Q As far as you can understand, does this statement relate to the company's internal accounting controls?    13:46:46

MR. ABADOU: Objection. Form.

THE WITNESS: That's what it says here, but I don't understand the paragraph.

BY MS. KAPLAN-MARANS:

Q Do you believe this statement is    13:47:01

Page 162

inaccurate?    13:47:02

MR. ABADOU: Objection. Form.

THE WITNESS: I have no clue whether it's inaccurate or accurate.

MS. KAPLAN-MARANS: We have about probably an hour to go. Do you want to take a break now, or do you want to keep going?    13:47:16

THE WITNESS: I'm going to have to take a break.

MR. ABADOU: How long do you want, Diane?    13:47:30

THE WITNESS: Ten minutes.

MR. ABADOU: Okay. How about we take 15? Is that okay you with you, Tamar?

MS. KAPLAN-MARANS: Yeah, I was going to suggest that. That sounds great.    13:47:41

MR. ABADOU: Okay.

THE VIDEO OPERATOR: We're going off the record at 1:47 p.m.

(Recess, 1:47 p.m. - 2:07 p.m.)    13:47:46

THE VIDEO OPERATOR: We are on the record at 2:07 p.m., and this is the beginning of Media 5 in the deposition of Diane Smith.

MS. KAPLAN-MARANS: Ms. Smith, we're going to pull up another document. It's going to be    14:07:50

Page 163

Exhibit 13.    14:07:53

(Exhibit 13 was marked for identification and is attached hereto.)

THE WITNESS: Okay. I have it.

BY MS. KAPLAN-MARANS:    14:08:38

Q Okay. Great.

Do you recognize this document?

A No, I don't.

Q Do you know what this document is?

A It says it's "Fourth Quarter and Annual    14:08:52 2020 Preliminary Snapshot."

Q Okay. Do you see -- do you see on page -- do you see page 1?

A Yes.

Q Okay. Do you see the last paragraph that    14:09:17 says, "Largely as a result of these COVID-19 related disruptions, management now estimates fourth quarter revenue 2020 in a range of 15.5 million to 16 million and full-year 2020 revenue of approximately 94 million versus 101 million as    14:09:35 previously provided as guidance for the full year"?

A Um-hum.

Q And do you see the next sentence, "Without these unexpected end-of-year disruptions, Velodyne believes it would have met prior revenue guidance    14:09:53

Page 164

for 2020"?    14:09:56

A Yes.

Q Were you aware that Velodyne made this statement?

MR. ABADOU: Objection. Form.    14:10:05

THE WITNESS: I believe I might have read something to this effect.

BY MS. KAPLAN-MARANS:

Q I'm sorry. Can you state that one more time?    14:10:48

A I believe I might have read this. I'm not sure.

Q To the best of your knowledge, did this statement factor into your decision to invest in Velodyne stock?    14:10:59

MR. ABADOU: Objection. Form. Foundation.

THE WITNESS: I do remember reading something about the revenues, so it probably did at that time.    14:11:32

BY MS. KAPLAN-MARANS:

Q Was the statement inaccurate at the time it was made?

MR. ABADOU: Objection. Form.

THE WITNESS: Well, based upon the actual    14:11:51

Page 165

42 (Pages 162 - 165)

HIGHLY CONFIDENTIAL

revenues, it must have been inaccurate.                    14:12:00

BY MS. KAPLAN-MARANS:

Q   Do you believe it was inaccurate at the time it was made?

MR. ABADOU:  Objection.  Form.                    14:12:09

THE WITNESS:  Evidently it was inaccurate because they -- they knew or should have known.

BY MS. KAPLAN-MARANS:

Q   Next page, please.  Page 2.

Do you see -- one, two, three -- four full               14:12:35 paragraphs down, the paragraph starting with "Commenting on the business and financial update"?

A   Yes.

Q   Do you see where it says, "Velodyne CEO Dr. Anand Gopalan stated, 'Despite the impact of          14:12:49 COVID-19 in the past few months and on our near-term visibility, there is no change in our fundamental outlook for the future'"?

A   Yes.

Q   Were you aware that Velodyne made this              14:13:07 statement?

A   Yes.

Q   Did this statement factor into your decision to invest in Velodyne stock?

A   Yes.                                        14:13:17

Page 166

Q   Why?                                        14:13:18

A   Well, everyone was having problems in COVID.  So when they said, "for our near-term visibility, there is no change," that made it sound like the company was stable.                     14:13:36

Q   Did you understand that the company's -- what the company was flagging was related to issues related to COVID?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  Yes, that's what it states         14:13:53 here.

BY MS. KAPLAN-MARANS:

Q   Do you believe that this statement was inaccurate at the time it was made?

MR. ABADOU:  Objection.  Form.                    14:14:04

THE WITNESS:  Yes.

BY MS. KAPLAN-MARANS:

Q   What was inaccurate about this statement?

A   They knew all the inner workings at the company, and they knew that the fundamental outlook      14:14:18 had changed.  So it's inaccurate.

Q   What do you understand that to mean, that the fundamental outlook had changed?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  The outlook that they put          14:14:37

Page 167

out previously was not changing any, even though           14:14:39 COVID-19 was hitting many companies in negative manners.  But they made it sound like there was no change with their outlook.

BY MS. KAPLAN-MARANS:                                14:14:58

Q   So did you understand that the change in the outlook is the result of COVID-19 disruptions?

MR. ABADOU:  Objection.  Sorry. Objection.  Form.

THE WITNESS:  Yes.                                14:15:12

BY MS. KAPLAN-MARANS:

Q   Did you understand that the company knew, at the time that it made this statement, that it was inaccurate?

MR. ABADOU:  Objection.  Form.                    14:15:38

THE WITNESS:  Yes.

BY MS. KAPLAN-MARANS:

Q   Did you rely on any other sources of information not previously discussed when you chose to invest in Velodyne?                              14:16:32

MR. ABADOU:  I don't remember.

THE WITNESS:  I'm not sure.

BY MS. KAPLAN-MARANS:

Q   To the best of your knowledge, what you can recall, if you relied on anything else, please      14:16:46

Page 168

let us know.                                    14:16:50

MR. ABADOU:  Same objection.

THE WITNESS:  This covers a lot of it, if not all of it.  I'm not sure if I relied on anything else.                                        14:17:04

BY MS. KAPLAN-MARANS:

Q   Do you have any documents relevant to this case that you have not yet produced?

MR. ABADOU:  Objection.  Form.

THE WITNESS:  I don't have any documents.         14:17:28

BY MS. KAPLAN-MARANS:

Q   To the extent you have documents relating to this litigation, have you already provided them to your counsel?

A   I'm sorry.  I didn't understand the          14:17:42 question.

Q   Any documents that you have in your possession that relate to this litigation, have those already been provided to your counsel?

A   The brokerage statements, those were the      14:17:57 documents I had.

Q   Do you know who Shetal Patel is?

A   No.

Q   Have you spoken to David Hall?

A   No.                                        14:18:25

Page 169

43 (Pages 166 - 169)

Q  Have you spoken to Marta Hall?          14:18:30

A  No.

Q  Has your counsel spoken to David Hall?

A  I don't know.  I think it's possible.  I'm not sure.          14:18:41

Q  Has your counsel spoken to Marta Hall?

A  I'm not sure.

Q  Did David Hall provide your counsel with any documents?

MR. ABADOU:  Objection as to form.          14:19:00

THE WITNESS:  I don't know.

MS. KAPLAN-MARANS:  We think that's all we have on our end.  We're going to just take five minutes.

MR. ABADOU:  Sure.  Did you want to go off          14:19:43 the record?

MS. KAPLAN-MARANS:  Yes.

THE VIDEO OPERATOR:  We're going off the record at 2:19 p.m.

(Recess, 2:19 p.m. - 2:26 p.m.)          14:19:52

THE VIDEO OPERATOR:  We are on the record at 2:26 p.m., and this is the beginning of Media 5 in the deposition of Diane Smith.  Sorry.  Media 6.

MS. KAPLAN-MARANS:  Ms. Smith, thank you very much for participating today.  We understand          14:26:41

Page 170

that we had to -- we had to discuss a number of          14:26:45 topics, and we really appreciate your patience as we worked through them.  So thank you very much.

At this time, we have no further questions.          14:26:58

MR. ABADOU:  I would like to, on the record, thank defense counsel for scheduling this deposition at a time that was most convenient for the Smiths in Hawaii.  I know it's late in New York.

We're going to designate, pursuant to the          14:27:12 protective order entered by the Honorable Susan Illston, the transcript as "Highly Confidential," given some of the questions about Mr. Smith's health and physical disability, as well as questions about marriage.          14:27:30

And that's all I have.  Thank you, everyone.

MS. KAPLAN-MARANS:  Just in response to that, Ramzi, we're going to plan to challenge that designation.  We took a look at the -- we took a          14:27:39 look at the language in the protective order defining "Highly Confidential," and it's defined as "Designating party may designate as 'Highly Confidential - Attorneys' Eyes Only' any extremely sensitive, confidential information, the disclosure          14:27:54

Page 171

of which to another party or non-party would create          14:27:58 a risk of serious harm to the designated party that could not be avoided by less restrictive means."

And it's our view that the testimony today did not rise to that level and that almost all --          14:28:10 almost all, if not all, of the information discussed today is already in the public realm via your filings.

MR. ABADOU:  Okay.  Thanks for your speech.          14:28:23

THE REPORTER:  Ramzi, this is Carla.  Do you want a copy of the transcript?

MR. ABADOU:  Yes.  We'll take a rough.  I think Ashley had mentioned everything that we wanted in response to one of the e-mails.  But, yeah, we'll          14:28:34 take the video, the rough, and obviously when it's ready, the final.

THE REPORTER:  Thank you.

THE VIDEO OPERATOR:  Do you get the video synched with the transcript?          14:28:45

MS. ERRINGTON:  Yes, please.

THE VIDEO OPERATOR:  Are we ready to go off?

MR. ABADOU:  Yes.

MS. KAPLAN-MARANS:  Yes.          14:28:53

Page 172

MR. ABADOU:  Thank you.          14:28:54

THE VIDEO OPERATOR:  We're going off the record at 2:28 p.m., and this concludes today's testimony given by Diane Smith.  The total number of media units used was six and will be retained by          14:29:00 Veritext.

(TIME NOTED:  2:28 p.m.)

--o0o--

Page 173

44 (Pages 170 - 173)

HIGHLY CONFIDENTIAL

I, DIANE SMITH, do hereby declare under penalty of perjury that I have read the foregoing transcript; that I have made any corrections as appear noted, in ink, initialed by me, or attached hereto; that my testimony as contained herein, as corrected, is true and correct.

EXECUTED this _____ day of _____, 2023, at _____, _____.

(City)          (State)

_____

DIANE SMITH

Page 174

---

I, the undersigned, a Certified Shorthand Reporter of the State of California, do hereby certify:

That the foregoing proceedings were taken before me at the time and place herein set forth; that any witnesses in the foregoing proceedings, prior to testifying, were administered an oath; that a record of the proceedings was made by me using machine shorthand which was thereafter transcribed under my direction; that the foregoing transcript is a true record of the testimony given.

Further, that if the foregoing pertains to the original transcript of a deposition in a Federal Case, before completion of the proceedings, review of the transcript [ ] was [X] was not requested.

I further certify I am neither financially interested in the action nor a relative or employee of any attorney or any party to this action.

IN WITNESS WHEREOF, I have this date subscribed my name.

Dated: 2/2

_Carla Soares_

CARLA SOARES
CSR No. 5908

Page 175

---

TAMAR KAPLAN-MARANS, ESQ.

tamar.kaplan-marans@wilmerhale.com

April 24, 2023

RE: MEYSAM MORADPOUR VS. VELODYNE LIDAR, INC.

APRIL 20, 2023, DIANE SMITH, JOB NO. 5831347

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived – Reading & Signature was waived at the time of the deposition.

Page 176

---

__ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

_X_ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 177

45 (Pages 174 - 177)

HIGHLY CONFIDENTIAL

RE: MEYSAM MORADPOUR VS. VELODYNE LIDAR, INC.
DIANE SMITH, JOB NO. 5831347

E R R A T A  S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____  _____

WITNESS                 Date

Page 178

Veritext Legal Solutions
866 299-5127

**[& - 22nd]**

| & |
| --- |
| **&**  3:4 9:11 11:12 19:24 45:11,23 47:11 176:23 177:9 |

| 0 |
| --- |
| **000021**  6:11 |
| **000063**  6:6 |
| **0030**  6:11 |
| **0073**  6:6 |
| **01486**  1:8 2:8 8:21 |

| 1 |
| --- |
| **1**  1:25 4:9 6:10 8:16 28:10,18 33:18,25 34:20 40:13,14 52:21 58:17 72:24 73:6,8 81:25 82:1 117:7,13 117:15,21,23 164:13 177:1 |
| **10**  4:5 6:8 44:22 86:4 114:10,12 |
| **100**  145:5 |
| **1000**  10:11 |
| **10007**  3:16 |
| **101**  164:20 |
| **101,907**  123:16 124:11 |
| **10:02**  48:3,4 |
| **10:15**  48:4,6 |

**11**  6:13 35:6 47:6 49:6 86:9 144:2,3
**114**  6:8
**11:13**  91:8,9
**11:28**  91:9,11
**11th**  70:7
**12**  6:16 40:5 49:7 152:22,23 153:4 155:21
**12.pdf.**  155:21
**1200**  3:7
**12:10**  121:2,3
**12:42**  121:3,5
**13**  6:19 164:1,2
**14**  41:20 83:16 125:11
**144**  6:13
**14a**  6:14
**15**  39:21,23 40:3 49:20 51:17 90:25 125:11 163:13
**15.5**  164:18
**152**  6:16
**16**  82:3 164:19
**164**  6:19
**17**  40:3 54:9
**178**  1:25
**17th**  24:9 125:12,23 126:1,7,11 127:23 129:8 129:24

**18**  44:10
**19**  164:16 166:16 168:2,7
**19.50**  60:19 61:3
**1980s**  16:9
**1986**  16:23
**1987**  17:6 18:25
**1990s**  35:7 36:3
**1:47**  163:19,20

| 2 |
| --- |
| **2**  4:13 28:4,9 33:20,24,25,25 34:3,20 40:10 40:11 41:17 46:6,6 48:6 52:22,25 64:6 87:3 117:13,18 117:22 166:9 |
| **2/24/23**  175:22 |
| **20**  1:18 2:19 8:2 50:14 51:18 176:5 |
| **20.60**  125:13 |
| **2000s**  110:23 |
| **2001**  16:23 17:8 18:1,3,6 18:11,25 |
| **2005**  17:16 18:1,3,11 |
| **2007**  17:14,15 17:16 |
| **2008**  93:25 |

**2013**  93:4
**2020**  6:10,10,22 24:8 60:13 119:7,12,15 123:14 125:12 128:11 143:7 145:5 148:11 164:11,18,19 165:1
**2021**  20:10 24:9 31:10,13 31:23 32:3,11 32:25 33:14 73:23 119:4 132:20,23 145:22,23 146:8,14 147:4
**2022**  53:14 70:7
**2023**  1:18 2:19 8:2,8 131:12 174:15 176:3,5
**2024**  145:6,8 148:11
**2025.520**  176:9 176:12
**20th**  8:8
**212.230.8800**  3:16
**21st**  128:4 129:2
**22**  7:9
**22nd**  128:11 129:3,10 130:5

Page 1

HIGHLY CONFIDENTIAL

**[232 - 90s]**

**232**  158:2,10,11
  158:14
**23rd**  130:24
**24**  44:23 55:5
  176:3
**242**  158:7
**250**  3:15
**26**  5:19 81:13
**26.60**  128:12
**26.70**  130:25
**27**  47:22
**27th**  131:12,19
  132:6
**28**  4:9 66:11,16
  66:22 67:12,17
  68:7,16,19
  69:4,6
**290,000**  129:10
**290,938**  128:12
  130:5 131:2
**2:07**  163:20,22
**2:19**  170:19,20
**2:26**  170:20,22
**2:28**  2:18 173:3
  173:7
**2nd**  24:8 93:25
  143:7

**3**

**3**  4:20 29:24
  48:18,19 53:4
  53:5 54:8
  63:23,24 64:2
  64:10 73:11
  87:3 91:11
  136:6 148:25

149:13,14
**3.5**  133:3,18
  134:13 135:7
  135:11
**3.5.**  134:9
**30**  28:12
  121:24 177:1
**30th**  53:13
**31**  6:10 153:11
  153:13,15,16
  154:6,14,15,16
  154:16 161:7
  161:10,10,11
**33**  4:13
**3302**  10:11
**375,000**  129:9
  129:23
**375,678**  60:16
  61:4 119:12
  125:12
**387**  161:8
**3:21**  1:8 2:8
  8:21
**3rd**  31:10,13,22
  32:3,11,25
  33:14 73:23

**4**

**4**  5:3 12:8
  58:20,24 59:1
  63:25 76:15
  86:5,11 87:3
  118:6 121:5
  123:19,20,21
  135:10,24,25
  144:13,16,17

144:18
**4,000**  130:25
**4,170**  131:11
  132:6
**4.22**  161:20
**400,000**  113:6
  135:3,8,11
**41**  153:11,17
  154:4,8,14
**415.459.6900**
  3:8
**45**  80:17
**48**  4:20

**5**

**5**  5:9 7:8,10
  35:5,9,11 47:6
  49:5 65:8,9
  76:18,21,21
  163:22 170:22
**5,226**  119:7
**50**  145:8
**500**  113:6
**58**  5:3 155:18
  155:23,25
**580**  3:7
**5831347**  1:24
  176:5 178:2
**5908**  1:23 2:20
  175:25

**6**

**6**  5:13 49:19
  54:9 59:16,22
  76:19,21,22,23
  118:8 123:22

124:4 125:11
  170:23
**65**  5:9
**68**  155:19
**680**  145:6

**7**

**7**  3:15 5:18
  39:20 40:2,6
  40:15,21 42:4
  61:9,15 62:1
  62:10,22 63:10
  81:5,6 86:1,4,8
  135:24
**7,325,321**  61:4
  123:15 124:9
**7.7**  125:18
  126:21 127:5,6
  130:12
**7529**  175:24
**76**  5:13

**8**

**8**  5:22 44:10
  55:5 83:4,8
  87:2
**80**  149:8
**800**  148:10
**81**  5:18
**83**  5:22
**85**  7:8,9
**88**  7:10

**9**

**9**  6:3 91:15,16
**90s**  35:19 36:7
  63:4

**[91 - abadou]**

| | | | |
|---|---|---|---|
| **91**  6:3 | 38:5,15,21 | 85:13,22 86:7 | 129:18,25 |
| **94**   164:20 | 39:5,17 41:12 | 86:10,12 87:13 | 130:15 131:20 |
| **94104**  3:7 | 41:24 42:7,13 | 87:21 88:4,9 | 132:1,7 133:21 |
| **96814**   10:12 | 42:23 43:7,15 | 88:17 89:2,9 | 134:3,8,15,20 |
| **9:10**   2:18 8:3,8 | 43:25 45:19 | 89:13,19 90:1 | 135:13,19,25 |
| **9th**   60:13 62:2 | 46:12,17 47:11 | 90:4,11,17,21 | 136:4,24 |
| 93:4 119:4,7 | 47:24 48:8,14 | 91:3 92:15,20 | 137:19 138:5 |
| 119:12,15,21 | 48:15 50:16,21 | 93:7,16,21 | 138:21 139:19 |
| 120:10 121:12 | 50:25 51:19 | 94:4,13,20 | 140:2 141:10 |
| 122:2,12,17 | 52:2 54:4,25 | 95:1,7,14,22 | 142:11,21 |
| 123:7,14 124:9 | 55:18,25 56:9 | 96:8,21 97:4 | 143:10 144:15 |
| 125:22 132:19 | 56:16,20 57:6 | 97:10,17,25 | 144:21 146:4 |
| 132:23 | 57:9,11,13,16 | 98:7,14,19 | 146:10,18,25 |
| | 58:2,5,15 59:2 | 99:7,14 100:13 | 147:5,12,20,23 |
| **a** | 59:18 60:24 | 101:10,21 | 148:1,15 |
| **a.m.**   2:18 8:3,8 | 61:11,17,20 | 102:11 103:6,8 | 150:19 151:5 |
| 48:3,4,4,6 91:8 | 62:5,12,16,25 | 103:19 104:6 | 151:25 152:12 |
| 91:9,9,11 | 63:6,12,20,25 | 104:13,20 | 152:18 153:14 |
| **abadou**   3:4 | 64:16,18 66:9 | 105:9,16,24 | 153:18 154:2 |
| 9:10,11 11:12 | 66:18,24 67:4 | 106:5,11,17 | 155:15 156:3 |
| 15:7,13 16:11 | 67:10,19,23,25 | 107:2,10 | 157:7 158:3,8 |
| 16:20 18:7,12 | 68:10,14,20,25 | 108:22 109:7 | 159:16,22 |
| 19:8 20:6,20 | 70:10,18 71:2 | 109:12 110:1 | 160:4,10,16 |
| 21:17,21 22:5 | 71:10,16,21 | 110:10,18 | 161:2,10,12 |
| 22:12,18 23:15 | 72:1,12,19 | 111:3,10 | 162:3,21 163:2 |
| 24:2,22 25:5 | 73:3,18,25 | 113:14 114:3 | 163:10,13,17 |
| 25:23 26:5 | 74:18,21 75:2 | 115:21 116:15 | 165:5,16,24 |
| 27:7,24 28:9 | 75:10,16,21 | 118:1,21,25 | 166:5 167:9,15 |
| 28:12,23 29:14 | 76:9,16,20 | 120:19,22 | 167:24 168:8 |
| 29:20 30:6 | 77:4,23 78:10 | 121:21 122:5 | 168:15,21 |
| 31:14,24 32:4 | 78:22 79:4,9 | 122:13,19,25 | 169:2,9 170:10 |
| 32:12,15,17 | 79:15,22 80:5 | 123:11 124:1,5 | 170:15 171:6 |
| 33:2,15 34:15 | 80:11,20 81:3 | 124:19 125:8 | 172:9,13,24 |
| 35:2,8,23 36:4 | 82:9 84:9,14 | 126:25 127:8 | 173:1 |
| 36:11,16,22 | 84:20 85:1,10 | 127:17 129:12 | |
| 37:5,14,22 | | | |

Veritext Legal Solutions
866 299-5127

**[abilities - alarm]**

**abilities**  38:14 38:16 93:15
**ability**  39:11 67:22 156:13
**able**  26:25 28:7 31:5 38:19,22 43:10,11 50:15 53:24 54:1,5 54:22 84:13 96:2,6,19 97:2 97:5 113:4,22
**above**  64:9 151:9 176:6
**access**  77:2 100:23 107:9 115:19
**accessible** 81:10
**accommodate** 12:18
**account**  19:20 38:8 40:22 60:6,9 70:20 82:22 95:21,21 100:24 115:1 115:11,11,14 116:8,12,13,21 116:25 117:3 117:12,13,15 117:16,18,18 117:20,21,22 117:23 118:3,4 118:15,18 119:17 123:16 123:16 124:10

124:11 126:13 127:5,7,16,23 127:24 128:4 128:14,18 129:10,11 130:25 131:3,6 131:7 132:18
**accountant** 102:20,22 103:1
**accounted** 119:18
**accounting** 161:24 162:20
**accounts**  95:18 100:18 107:4 108:10 116:10 116:11,14,22 117:5 122:3 128:17 135:6 136:14
**accurate**  13:17 30:15,16,17 44:15 49:13,16 50:2 82:16,17 87:9 118:20,24 146:20 151:6 151:24 152:4,5 152:10,16,20 155:13,14,16 163:4
**accusation**  51:1
**achieving** 45:12

**acquisition** 140:18,21 141:21
**act**  23:24 45:1
**acting**  23:22 86:16
**action**  5:14 10:18 19:21 21:6 23:10,14 23:20 24:1 44:12 45:16,21 47:8,10 71:8 77:10 78:7 97:20 175:17 175:18
**actions**  45:13
**actively**  47:7 158:25
**activities**  157:1
**activity**  115:20 115:25 117:20 117:21 131:14 132:9
**actual**  144:16 165:25
**actually**  49:6 86:3,4 108:18 120:23
**added**  78:18
**additional**  78:5
**address**  10:10 10:13
**administered** 9:23 175:7

**adversely** 156:23 157:19
**advice**  102:6 115:12,17 137:17,23
**advise**  102:2
**advising**  103:1
**advisor**  36:8,9
**affect**  156:23 157:20
**affiliations**  9:3
**agency**  15:23
**agent**  16:17 17:1,8 18:5
**ago**  18:14 31:17 52:1,4,5 53:15 111:24 137:6
**agree**  8:15 43:13 56:13,14 57:23,25 88:2
**agreed**  43:24 54:12 67:1 68:3,11
**agreement**  5:10 55:24 56:5,8 61:16 63:5 65:3,5,16,22,25 66:2
**ahead**  51:2 57:15 62:10 96:24
**al**  8:19,19
**alarm**  120:17

Page 4

[alexander - arizona]

| | | | |
|---|---|---|---|
| **alexander** 3:5 9:14 | 119:19 124:18 132:3 134:10 | 121:8,13 137:21 | **applies** 79:20 **apply** 79:14 |
| **alexander.bur...** 3:9 | **amounts** 124:13 | **answered** 18:8 20:7,21 21:19 | 80:10 **appointed** |
| **alexandra** 3:6 9:16,18 | **analyst** 107:12 **analysts** 100:15 | 22:19 24:23 31:25 32:5,13 | 69:15 **appointment** |
| **alexandra.pratt** 3:10 | 101:18 107:13 **anand** 1:9 2:9 | 41:13,25 42:8 42:14 43:16 | 4:16 34:12 51:7 |
| **aligned** 154:22 **allegations** | 9:9 21:14 138:20 166:15 | 44:1 51:20 55:1 64:17 | **appreciate** 44:25 50:25 |
| 22:17 77:16 79:13 86:18 | **andrew** 1:9 2:9 9:9 21:15 | 72:20 130:16 147:13 | 80:20 109:22 121:18 171:2 |
| 87:7,12,20,24 88:2,12,16,22 | 138:25 **announce** | **answering** 11:14 | **approval** 4:17 34:12 |
| **alleged** 24:6 **alphabet** | 149:25 **announces** 6:21 | **anticipate** 70:8 **anymore** 138:7 | **approximate** 17:15 19:3 |
| 110:14 111:18 111:24 | **annual** 6:21 164:10 | 138:9 **apartment** | 88:14 99:1 113:12,16 |
| **alternatives** 23:25 | **answer** 7:6 11:15,22,25 | 10:11 **apologies** | **approximately** 17:6 20:5,18 |
| **amend** 80:15 **amended** 5:5 | 12:15,16,19 15:9 16:13,14 | 101:17 **apologize** 58:18 | 25:10 51:17 53:15 54:2 |
| 5:14 22:17 59:12 70:7,16 | 16:22 19:10 20:9 21:21,22 | 74:25 120:15 **apparently** | 60:21,22 61:4 113:9 124:15 |
| 77:10,15,16,22 78:7,18,20,24 | 26:8 32:23 46:18 54:22 | 78:14 **appear** 174:11 | 124:17 125:18 134:6 135:3,4 |
| 79:2,8,14,20 **amending** | 57:8,11,14,15 57:18 58:3,5 | **appearances** 3:1 9:2 | 145:5,6,23 164:20 |
| 136:7 **america** 33:8 | 67:16,20,21,21 75:11,13 85:6 | **appearing** 176:18 177:7 | **april** 1:18 2:19 8:2,8 176:3,5 |
| **ameritrade** 116:13 | 87:21 88:8 89:5,15,17,24 | **appears** 111:13 **apple** 110:12 | **argumentative** 130:16 147:23 |
| **amount** 23:7 50:13 88:14 | 90:5 96:23 97:8,15 111:15 | 111:5,16 161:11 | 147:25 148:2 **arizona** 53:1,19 |
| 99:1 113:16,19 | 113:3,4,5 | | |

Veritext Legal Solutions
866 299-5127

[arrested - behalf]

arrested  15:17
article  96:17,18
articles  38:19
  96:14 100:15
  100:17,19,20
  100:23 106:25
  112:9 120:12
  121:14 136:19
  137:13,15
articulate
  154:24
ashley  3:5 9:15
  172:14
ashley.erringt...
  3:9
asked  12:20
  18:7 20:6,20
  22:18 24:22
  31:24 32:4,12
  41:12,24 42:7
  42:13 43:15,25
  51:19 54:25
  55:22 64:16
  72:20 111:12
  127:3 130:15
  147:12
asking  56:25
  61:7 68:1
  71:21,25 80:21
  89:5 91:3
  96:25 97:2
aspect  156:21
asserted  22:4,8
  22:11

assess  46:9
assessed  45:15
  46:7
assigned  117:2
assigns  115:10
assume  12:1
  84:10
assurance
  161:25
attached  28:19
  33:21 48:20
  58:21 65:10
  76:24 81:7
  83:5 91:17
  114:13 144:4
  152:24 164:3
  174:11
attended  14:22
attorney  3:4,5
  3:5,6,6,14,15
  6:5 9:4 13:7
  27:15 33:17
  34:23 40:22
  49:11 75:24
  76:12 80:3
  83:22,25 84:19
  91:21,23 92:2
  92:7,14,22,25
  93:2,6 94:9
  175:18
attorneys  90:16
  171:24
attract  156:13
auahi  10:11

audio  8:13
authority  55:20
  58:7,11 82:20
  95:9
authorization
  127:4
autonomous
  120:3 139:11
  139:14
available  12:4
avoided  172:3
aware  43:21,23
  69:14,17,21
  77:21 95:2
  97:19,23
  115:24 141:19
  142:5,9,19,25
  148:13 150:17
  150:17 151:16
  151:18 155:2
  157:5 159:3,14
  162:12 165:3
  166:20

**b**

b  1:10 2:10
  177:1
back  19:3 52:8
  52:9,16,21
  53:3 57:21
  61:7 63:23
  64:2 72:3,24
  73:2,4 75:4,10
  98:12 103:20
  111:8 117:7
  121:8 126:5

127:19 130:13
  134:23 143:2
  148:25
background
  109:18 120:16
badgering
  32:13
baidu  149:6
barely  31:18
based  17:20
  21:23 30:18
  42:4 45:12
  155:12 165:25
basically  14:17
  38:9 47:16
  54:21 126:9
basis  48:11
  50:19 52:19
  64:23 93:20
  99:3,13 106:21
  108:5
bates  6:6,11
beam  120:4
becoming
  141:7
beginning  2:18
  9:3 48:6 91:11
  121:5 163:22
  170:22
behalf  1:5 2:5
  2:17 23:24
  30:3,11 39:16
  49:10 73:13
  74:9,15 75:8
  75:20 83:21,24

**[behalf - case]**

84:11,18 86:17 92:3,19 94:8 94:19,25
**believe** 44:11 44:14,15 66:15 68:13 81:18 82:10 84:11 90:6,9 122:14 126:22 130:8 132:8,14 133:1 133:9 134:17 135:14 138:17 140:4 141:5,6 143:6,7 145:11 145:15,18,22 146:1 147:7 148:16,19 151:3,22 152:19 155:10 155:13 156:4 157:8,15 160:2 160:21,23 161:3 162:14 162:25 165:6 165:11 166:3 167:13
**believes** 164:25
**benefits** 69:11
**best** 13:22 67:22 71:23 111:1 113:4 134:12 143:13 165:13 168:24
**better** 52:11 118:3

**beyond** 26:18
**big** 23:2 158:4
**bit** 40:7 100:25 109:17 151:8
**board** 100:8 154:21
**bolded** 156:11
**bonds** 109:4
**bookmark** 136:22
**bottom** 31:9 40:13 82:1 144:14 150:3 153:12 154:6 155:22 159:8
**bought** 119:7 119:12 123:14 124:9 126:8 128:12 129:10 130:5 131:2,6
**break** 12:17,19 12:20 47:25 83:1 90:20 120:17,19 163:6,9
**breaks** 50:9
**breathing** 50:7 52:11
**brenc** 3:15 9:7
**brilliant** 140:7 140:11
**bring** 104:15 104:18,22 105:3

**bringing** 23:14 23:20 24:1
**brings** 51:12
**broad** 89:3,6,8
**broker** 18:16 102:18
**brokerage** 19:19 38:8,9 100:18,24 101:1 107:4 108:10 136:14 169:20
**bullet** 151:10 154:17
**burdensome** 49:24 51:4 70:3
**burns** 3:5 9:14
**burnt** 138:7
**business** 17:11 17:18,19,20,24 18:5,17 106:20 139:9,22 149:25 154:24 156:21,23 157:20 158:21 166:12
**button** 105:22
**buy** 41:8 60:3 103:24 105:13 111:22 112:1 124:18 128:10 128:17 130:13
**buying** 129:4

**c**

**c** 8:6
**ca** 176:9,12,20
**california** 1:2 2:2 3:7,7 8:21 9:12 10:20 48:13 89:22 97:13 175:2
**call** 74:23,23 90:12
**called** 18:20 27:19,22 142:6
**calls** 21:17 22:5 23:15 24:2 26:5 63:12 79:15
**camera** 8:11
**cancel** 51:7
**capable** 154:18
**capacity** 138:18,19
**careful** 78:11
**carla** 1:22 2:19 8:24 9:21 57:21 72:2 75:3 87:16 121:7 172:11 175:24
**case** 1:8 2:8 8:21 24:1 26:8 44:17 47:17 55:19 66:15 70:21 89:1,12 90:16 169:8 175:14

Page 7

**[cases - commenting]**

| | | | |
|---|---|---|---|
| **cases** 47:1 | 178:4,7,10,13 | **civil** 68:1 | **clients** 46:24 |
| **caused** 93:12 | 178:16,19 | 176:19,20 | **close** 32:13 |
| **ccp** 176:9,12 | **changed** 31:12 | **claims** 22:3,7 | 56:22 57:9 |
| **center** 3:15 | 31:22 32:25 | 22:10,14 | 85:2 109:19 |
| **ceo** 138:22 | 78:18 98:6 | **clarify** 32:23 | **club** 102:24 |
| 139:3 166:14 | 125:24 129:14 | **clarity** 68:6 | **clue** 163:3 |
| **certain** 12:13 | 130:12 142:10 | **class** 5:14 9:13 | **cnbc** 102:12,14 |
| 79:13 104:24 | 167:21,23 | 10:18 19:21 | 137:4 |
| 105:8,10,11 | **changing** 168:1 | 21:6 23:11,14 | **coaching** 50:20 |
| 106:23 | **channel** 138:7 | 23:20,22,24 | 50:21 67:24,25 |
| **certification** | **channels** | 24:1,6,8,10,19 | 89:25 90:1 |
| 4:10 23:11 | 140:24 | 24:20 25:2,3,6 | 97:16,17 |
| 29:8 33:14 | **chart** 60:4 | 25:7,11,13,16 | **code** 176:9,12 |
| 49:9,14 73:22 | 118:13,17 | 25:22 26:1,12 | 176:19,20 |
| 76:4 | 119:6,10 | 26:15 28:1 | **cognitive** 38:14 |
| **certified** 2:20 | 120:13 121:16 | 30:3,11 31:2 | 38:16 93:14 |
| 175:1 | 121:19,20,22 | 45:2,13,21 | **college** 14:24 |
| **certify** 175:3,16 | 130:23 132:17 | 55:9 69:2,3,15 | 14:24 15:1,2 |
| **cetera** 162:1 | **charts** 37:8 | 69:19 70:1,13 | **combination** |
| **cfo** 139:1,7 | 42:25 59:22,24 | 70:22 71:1,3,5 | 149:25 158:21 |
| **chairman** | 108:11 117:12 | 71:9,12,15 | 158:22 159:1 |
| 22:23 78:5 | 118:11,24 | 72:6,8,10,17,22 | 160:18 |
| 133:2,7 138:13 | 123:23 124:7 | 73:13,24 74:2 | **combined** |
| 151:14 155:8 | **check** 100:11 | 74:3,10,16,17 | 149:8 |
| 156:13,19 | 112:10,11,12 | 74:20 75:8,9 | **come** 52:9,15 |
| 157:13 158:23 | 113:19 | 75:14,20,23 | 100:20 103:14 |
| 158:25 160:19 | **chicago** 14:24 | 76:1,8,13 | 120:12 121:15 |
| **challenge** | 14:25 17:23 | 77:10 78:7 | 131:13 133:1 |
| 171:19 | **choose** 93:5 | 143:6 | 161:13 |
| **challenges** 98:9 | 119:20 139:24 | **classes** 44:12 | **comes** 101:6 |
| 98:10,12 | **chose** 47:2 | **clear** 111:4 | **coming** 28:11 |
| **chance** 78:3 | 120:10 121:11 | **clearly** 154:23 | 52:8 132:9 |
| **change** 125:21 | 130:21 168:19 | **clicked** 72:25 | **commenting** |
| 129:2,8 166:17 | **city** 174:16 | **client** 13:7 | 166:12 |
| 167:4 168:4,6 | | | |

Veritext Legal Solutions
866 299-5127

**[commit - consider]**

| | | | |
|---|---|---|---|
| **commit** 27:18 | 22:24 23:1 | 77:11,16,17,19 | 26:6 79:16 |
| 27:21 | 37:6,20 38:2 | 77:22,22 78:7 | **condition** 31:13 |
| **committed** | 38:10 44:21 | 78:13,20,23 | 31:16,22 32:2 |
| 154:18 | 46:22 69:2 | 79:3,8,14,20 | 32:6,10,24 |
| **common** 55:8 | 100:6,10,11,20 | 80:9,14,15 | 98:5 |
| **communicate** | 100:21 101:2,3 | 86:18 87:7,12 | **conditions** |
| 13:3 43:6 | 101:7,8,13,13 | 87:20,25 88:3 | 65:24 |
| 96:19 97:2,5 | 101:14,18,23 | 88:12,16,23 | **conducted** 8:10 |
| **communicates** | 101:25 104:15 | **complete** 92:5 | **confer** 126:20 |
| 90:7 | 105:4,5 107:7 | **completed** | **confidential** |
| **communicating** | 107:12,14 | 176:7,17 177:6 | 1:20 46:19 |
| 13:4 | 108:9 110:7 | **completion** | 56:22 85:15 |
| **communication** | 112:7 120:11 | 175:14 177:10 | 171:12,22,24 |
| 85:3,13 86:22 | 120:13,13 | **complex** 45:10 | 171:25 |
| **communicati...** | 121:14,15,16 | **complexity** | **confidently** |
| 26:14 46:19 | 123:1,5 124:24 | 156:8 | 154:24 |
| 56:21,22 85:14 | 132:10,14 | **complicated** | **confirm** 117:15 |
| 86:15,21,22,24 | 133:10,12,13 | 47:1 | 118:13 |
| 87:5,11,18 | 134:23 136:9 | **compound** 15:8 | **confirmations** |
| 88:6 89:16 | 139:21 140:4,6 | 25:23 33:3 | 82:11 114:19 |
| 97:1 | 140:18,21,23 | 36:12 38:6 | 114:21 |
| **companies** | 141:21 145:25 | 42:23 50:16 | **conflicting** |
| 99:10 101:19 | 149:9 152:8 | 61:11 94:13 | 32:16,18,18 |
| 101:23 102:3 | 157:24,25 | 102:11 105:9 | **confused** |
| 103:17,25 | 160:6,25 | 106:17 110:1 | 161:14 |
| 104:3,5,8,12,16 | 161:23 167:5,7 | 132:1 | **connection** |
| 105:7 108:23 | 167:20 168:12 | **computer** 43:3 | 8:11 10:18 |
| 110:8,12,16 | **company's** | 96:11,13 | 65:3 69:12 |
| 111:11,15 | 100:8 143:14 | **concerning** | **consecutively** |
| 112:4 134:19 | 158:23 159:1 | 44:6 | 54:2 |
| 134:22,24 | 160:18 162:19 | **concludes** | **consent** 94:11 |
| 139:17,21,25 | 167:6 | 173:3 | **consider** 67:3,9 |
| 142:15 168:2 | **compete** 156:25 | **conclusion** | 68:7 100:1,4 |
| **company** 18:20 | **complaint** 5:15 | 21:18 22:6 | 106:3 125:2 |
| 18:23,24 22:2 | 22:17 70:7,16 | 23:16 24:3 | |

Page 9

**[considered - cv]**

| | | | |
|---|---|---|---|
| **considered** 154:21 | **control** 92:5 161:24 | 152:5 154:9,13 156:4 159:5 | 71:19 98:4 |
| **consistent** 52:19 | **controls** 161:21 162:20 | 160:12 174:13 | **courtesy** 74:23 |
| **consistently** 52:16 | **convenient** 171:8 | **corrected** 174:13 | **covered** 92:22 |
| **consolidated** 5:14 77:10 78:24 | **conversations** 20:14,18,23 46:14,14 56:25 78:12 | **corrections** 174:10 176:14 176:15 177:3,4 | **covers** 116:18 169:3 |
| **consult** 36:9 | **convey** 84:24 | **correctly** 23:21 | **covid** 164:16 166:16 167:3,8 168:2,7 |
| **consultant** 102:2,5,6 115:4 117:2 | **convicted** 15:19 | **counsel** 4:18 8:17 9:1,12 11:8 12:13,15 13:2 14:2,6 19:24 23:24 26:23 34:13 45:4,9,12 46:14 47:7,10 47:13,14,18,19 59:19 62:17 65:3 70:21 71:5 78:3,8 80:13 86:8 87:6 88:24,25 90:4 111:3,12 136:1 153:14 169:14,19 170:3,6,8 171:7 176:18 176:21 177:7 | **cramer** 107:22 137:2 |
| **consulting** 105:14 126:24 | **copies** 13:11 136:10 | | **cramer's** 137:16,22 |
| **consummation** 158:21 | **copy** 172:12 | | **create** 172:1 |
| **contact** 30:21 86:20 176:9 | **corner** 144:14 | | **created** 156:19 157:22 |
| **contained** 79:20 80:9 118:23 174:12 | **corp** 6:14 149:25 | | **critical** 151:13 |
| | **corporation** 141:2,9,15,17 141:20 149:7 | | **csr** 1:23 175:25 |
| **contents** 76:4 86:24 | **correct** 16:4,18 17:9,12 31:11 33:9 40:8 41:5 41:21 53:16 61:12 64:12,25 82:14 91:25 93:12,13 115:1 115:2 117:17 117:24 118:16 118:19 119:1 122:10 124:13 132:21 135:4 136:11 148:4 | | **culkin** 1:10 2:10 |
| **continental** 16:15 | | | **cultivate** 157:2 |
| **contingent** 66:13,14,14 | | | **current** 19:24 112:18 113:2 149:4,19 150:8 150:14 |
| **continue** 8:14 99:12 129:7 151:13 | | | **currently** 19:12 23:10 53:9 |
| **continued** 26:18 | | **counsel's** 66:8 | **customer** 148:9 156:7 |
| **contracts** 145:7 148:10 | | **couple** 14:2 45:20 52:4 | **customers** 157:2,22 |
| | | **court** 1:1 2:1 8:20,23 10:19 11:2,6 27:10 | **cutler** 3:14 |
| | | | **cv** 1:8 2:8 8:21 |

HIGHLY CONFIDENTIAL

**[d - depositions]**

| d | | | |
|---|---|---|---|
| **d**  8:6 10:9 | 174:14 | 105:21 106:4,9 | 97:21 |
| **data**  13:11 16:2 | **days**  14:3 | 107:8 122:4,7 | **defense**  171:7 |
| 16:7 | 121:24 128:5 | 126:11 127:11 | **defined**  171:22 |
| **date**  16:24 19:3 | 130:11 | 128:10 133:4 | **defining**  171:22 |
| 20:4 27:3 33:6 | **de**  142:16 | 143:15 145:14 | **definitely**  52:18 |
| 60:13 62:1 | **december**  6:10 | 150:23 151:20 | 95:2 |
| 73:22 86:20 | 6:10 60:13 | 155:6 157:12 | **delta**  135:7,10 |
| 98:9 123:12 | 62:2 119:7,12 | 159:21 162:16 | **dependent** |
| 125:19 127:25 | 119:15,21 | 165:14 166:24 | 156:12,18 |
| 135:3 143:6 | 120:10 121:12 | **decisions**  27:1 | **depends**  8:10 |
| 146:2 147:6,10 | 122:2,12,17 | 30:24 31:1 | 116:16 |
| 147:18 148:20 | 123:7,14 124:9 | 39:9 42:6 | **depose**  57:2 |
| 175:19 176:16 | 125:12,22,23 | 54:20 55:17 | **deposed**  10:25 |
| 177:5 178:24 | 126:1,7,11 | 75:24 100:5 | **deposing**  54:11 |
| **dated**  31:10 | 127:23 128:4 | 102:7 | **deposition**  1:16 |
| 175:22 | 128:11 129:2,3 | **declaration** | 2:16 8:9,17 |
| **dates**  18:14 | 129:8,10,24 | 4:14,21 34:10 | 10:23 11:19 |
| 110:19,25 | 130:5,24 | 34:14,22,25 | 12:3 13:3,15 |
| 146:11 | **decide**  39:16 | 46:7 49:3,10 | 13:25 14:10,15 |
| **david**  22:1 | **decided**  45:23 | 49:17 57:5 | 26:19,22 30:4 |
| 44:21 78:4 | 45:24 123:5 | **declare**  33:6 | 30:12,19 31:6 |
| 138:11 149:5 | 131:15 132:12 | 41:20 64:10 | 31:20 48:7 |
| 149:21 151:10 | 132:14 140:8 | 174:8 | 49:24 50:2,8 |
| 151:12 156:12 | **deciding**  38:3 | **dee**  1:10 2:10 | 50:11 51:12 |
| 156:18 157:21 | **decision**  36:2 | 9:9 21:15 | 54:13,16 70:3 |
| 158:20 169:24 | 36:19 37:2,13 | 139:5,6 | 72:14,17 73:14 |
| 170:3,8 | 39:1,24 40:19 | **deeply**  49:24 | 74:6,12 76:11 |
| **day**  51:12,12 | 40:25 41:3,6,8 | 156:20 | 91:12 121:6 |
| 51:14,15 62:23 | 41:10,15 42:12 | **defendant**  8:18 | 163:23 170:23 |
| 112:16 113:20 | 42:16 43:14,18 | 131:14 | 171:8 175:13 |
| 121:24 122:4 | 43:24 45:3 | **defendants** | 176:19,22,24 |
| 122:24 124:18 | 55:3,8,12,13,14 | 1:11 2:11,17 | 177:8,10 |
| 126:15 127:14 | 55:20 56:11 | 3:13 5:5,24 9:8 | **depositions** |
| 128:16 131:2 | 61:14,22,23,25 | 21:14,24 44:20 | 13:1 |
| | 62:7 93:1 98:4 | 59:13 83:12 | |

Veritext Legal Solutions
866 299-5127

[describe - document]

| | | | |
|---|---|---|---|
| **describe** 14:21 24:19 25:2 29:18 86:6,15 | 48:7 49:4 54:12 58:5 61:18 62:10 | **disclosing** 46:18 | 172:6 |
| **description** 4:8 5:2 6:2 | 73:3 78:11 85:6,10 87:15 | **disclosure** 171:25 | **discussion** 126:16 127:20 |
| **designate** 171:10,23 | 87:22 89:14 90:22 91:12 | **disclosures** 5:20 81:14 | **discussions** 44:6 |
| **designated** 172:2 | 97:8 121:6 161:13 163:10 | 143:9,14,17,20 143:23 | **dismiss** 97:20 97:24 98:4 |
| **designating** 171:23 | 163:23 170:23 173:4 174:8,20 | **discoverable** 82:5,18,21 | **disruptions** 164:17,24 168:7 |
| **designation** 171:20 | 176:5 178:2 | **discovered** 140:15 | **district** 1:1,2 2:1,2 8:20,20 |
| **designed** 161:25 | **differences** 77:21 78:2 | **discovering** 140:12 | 10:19,20 48:12 89:21 97:12 |
| **despite** 166:15 | **different** 27:9 42:25 51:25 | **discovery** 23:12 | **division** 1:3 2:3 |
| **details** 10:22 51:8 133:16 | 52:1 65:24 89:4 92:8 99:9 | **discuss** 27:17 39:12 41:9 | **doctor** 30:22 51:8 52:5 |
| **detects** 120:5 | 101:23 104:8 104:16 108:23 | 58:8 78:8 94:14,15 | **doctors** 96:20 97:3,7 |
| **deteriorated** 32:2,24 | 116:14 120:5 148:24 | 102:17 103:4 103:15 105:25 | **document** 4:10 5:10 6:4,17,20 |
| **determined** 176:18,22 177:7 | **difficult** 52:13 156:24 | 126:19 128:7,8 128:10 171:1 | 12:7,10 14:20 29:2,5,21 30:7 |
| **determining** 36:20 37:3 | **difficulty** 50:6 | **discussed** 19:6 30:25 41:6,14 | 31:9 34:7,9 39:21 40:2,4,9 |
| **development** 156:22 159:2 | **diligence** 45:14 125:6 | 42:9,15 43:17 45:16 47:16 | 44:10 48:18,25 49:2 53:4 59:9 |
| **devices** 13:13 | **direction** 122:21 175:10 | 54:20 55:2 56:2,10 62:6 | 64:7 65:8,13 65:19 77:7,13 |
| **diane** 1:17 2:16 4:3,14,21 8:17 | **disability** 171:14 | 63:14 87:23 88:12,16,20,22 | 81:5,10,12,15 82:25 83:1,10 |
| 9:12,22 10:9 15:9 28:23 | **disagree** 79:2,7 79:10 | 95:9 122:6 126:14 127:9 | 83:14,19 84:2 84:6,7,18,25 |
| 29:11 34:10 46:12 47:24,25 | **disclose** 46:13 78:12 | 127:12 168:19 | 85:9,21 91:20 92:6 93:3 94:8 |

Veritext Legal Solutions
866 299-5127

[document - executive]

| | | | |
|---|---|---|---|
| 94:9,15,15,18 94:19,22 114:10,16 117:8,12 144:1 144:6,9,11,19 152:22 153:7,9 153:12,15,17 154:7 155:23 161:6,7 163:25 164:7,9 | duplicative 54:11,15 57:4 | 156:3 | estimate 113:22 |
| | duties 23:23 70:16,25 71:3 | electric 139:14 | estimated 145:8 148:9 |
| | | electronic 13:5 13:11,13 | estimates 164:17 |
| | **e** | electronically 83:20 | et 8:19,19 162:1 |
| | e 8:6,6 10:9 13:5 86:23 116:12,24 117:3,5,18 118:15 123:16 124:11 127:24 128:4,16 130:24 131:6 172:15 176:9 176:12 177:1 178:3,3,3 | emergency 30:21 31:7 51:10 | everybody 90:20 |
| **documents** 12:2,6 13:10 13:12 14:4,14 14:15,17,18,19 26:24 28:3,15 39:2,7 76:12 81:23 84:3 92:4 158:4 169:7,10,12,17 169:21 170:9 | | employee 175:17 | evidently 166:6 |
| | | employment 15:25 18:2 112:22 | exact 19:1 20:4 20:16 110:24 110:25 134:10 |
| | | ended 23:3 | exactly 14:12 16:24 17:3 28:6 42:20 65:6 109:14 120:4 130:1 140:22 141:24 142:4 144:10 144:12 |
| | earlier 11:19 118:10 123:23 130:12 133:17 135:2 137:7 | engagement 65:2,5 | |
| | | entered 171:11 | |
| **doing** 18:17 19:19 26:22 47:18,25 90:16 99:20 103:13 103:14 104:25 105:6 126:18 | | entire 12:10 | |
| | earnings 22:25 100:7,12 | entry 16:2,7 | |
| | | equal 42:6 | examination 4:3 10:1 |
| | economy 109:24 | equity 149:7 | examined 9:23 |
| | | equivalent 56:14 57:24 | example 86:23 |
| **dollar** 125:3 | educational 14:21 | | exceed 148:10 |
| **dollars** 126:24 | | errata 176:14 176:16 177:3,5 | excellent 69:3 |
| **door** 109:20 | effect 165:7 | | exchanges 13:6 |
| **dorr** 3:14 | effectively 50:20 | errington 3:5 9:15 172:21 | excuse 74:21 |
| **dr** 166:15 | effectuate 130:6 | especially 133:1 134:23 | executed 60:9 174:14 |
| **drive** 145:7 | | esq 176:1 | |
| **driver** 112:24 | efficiency 20:2 | estate 16:17 17:1,8 18:3,5 18:16,22 114:2 114:4 | executive 151:13 156:13 156:19 158:18 |
| **due** 45:14 48:1 49:23 | either 13:11 61:8,16 62:2 69:11 107:11 | | |

Veritext Legal Solutions
866 299-5127

**[executive - firm]**

| | | | |
|---|---|---|---|
| 158:23,24 | **expectation** | **familiar** 23:13 | **fiduciary** 25:7 |
| 159:7 160:18 | 13:2 | 23:19 139:17 | 25:17 26:1 |
| **exhibit** 4:9,13 | **expected** 145:4 | 140:17 141:1,5 | 45:2 |
| 4:20 5:3,9,13 | 145:7 148:10 | 153:8 | **file** 69:25 |
| 5:18,22 6:3,8 | **experience** | **family** 106:16 | **filed** 8:20 14:4 |
| 6:13,16,19 7:2 | 45:12,24 46:25 | **far** 22:25 50:12 | 14:17 21:1 |
| 12:5 28:17,18 | 46:25 67:6,9 | 85:18 111:23 | 26:24 47:16 |
| 33:20,24,25 | **experienced** | 140:24 150:22 | 69:14,22 70:4 |
| 34:2,3 40:10 | 69:2 | 162:18 | 70:6,17 71:8 |
| 40:10,11 48:18 | **experts** 36:14 | **faster** 158:3 | 73:23 78:21 |
| 48:19 52:22 | **explain** 55:11 | **february** 70:7 | 97:20 |
| 53:4,5 54:8,8 | 80:6 84:4 | **federal** 5:16 | **files** 27:9 |
| 58:17,20,24 | 99:17 100:24 | 77:11 175:13 | **filings** 47:15 |
| 59:1 63:23,24 | 120:4 | 177:1,8,9 | 70:20 80:13 |
| 64:2,3 65:8,9 | **express** 116:2 | **fee** 66:13,17,23 | 142:3 172:8 |
| 72:24 73:6,8 | **extensive** 46:25 | 66:25 67:18 | **final** 172:17 |
| 76:18,19,21,22 | **extent** 89:14,17 | 68:3,3,3,7,8,13 | **financial** 36:8,9 |
| 76:23 81:5,6 | 169:12 | 68:19,19 69:4 | 69:11 100:2 |
| 83:4,8 91:14 | **extremely** | 69:6 | 102:2,5,6 |
| 91:15,16 | 171:24 | **feel** 12:17 89:18 | 106:20 115:4 |
| 114:10,12 | **eyes** 171:24 | 103:12 125:5 | 117:2 166:12 |
| 117:7 118:6 | **f** | **fees** 66:8,10 | **financially** |
| 123:19,20,21 | | **felt** 72:16 129:6 | 175:16 |
| 135:24,25 | **f** 161:10,14 | 131:9 | **find** 19:4,22 |
| 144:1,2,3 | **f's** 161:16 | **fetter** 3:6 9:14 | 100:17,19 |
| 152:22,23 | **fact** 23:12 | **fidelity** 6:9 | 106:25 128:22 |
| 153:4 155:21 | 30:20 40:22 | 60:6,9 114:25 | 140:10 155:24 |
| 164:1,2 | **factor** 145:13 | 115:10 116:8 | **fine** 90:24 91:5 |
| **exhibits** 4:7 5:1 | 150:23 151:19 | 116:20 117:16 | 114:23 |
| 6:1 7:1 12:4 | 155:5 157:11 | 118:18 123:15 | **finish** 68:23 |
| **existing** 145:7 | 159:20 162:15 | 124:10 126:13 | **finished** 11:21 |
| 148:9 157:2 | 165:14 166:23 | 127:15,23 | **fire** 120:17 |
| **expect** 74:1 | **factors** 100:4 | 128:14,18 | **firm** 8:24 9:15 |
| 127:3 | **fair** 42:5 | 129:9,11 131:3 | 17:2,4,5,7 |
| | **false** 21:25 | 131:7 132:18 | 45:17,18 46:20 |
| | 22:25 | | |

**[firm - four]**

| | | | |
|---|---|---|---|
| 47:3 65:23 | 20:6,20 21:17 | 93:16,21 94:4 | 148:15 150:19 |
| 67:5,8 | 22:12 23:15 | 94:13,20 95:1 | 151:5,25 |
| **firm's** 45:12,15 | 24:2 25:23 | 95:7,14,22 | 152:12,18 |
| 46:7 | 26:5 27:7,24 | 96:8,21 97:25 | 155:15 157:7 |
| **firms** 45:21 | 29:14,20 30:6 | 98:7,14,19 | 159:16,22 |
| 46:2 | 31:14 33:2,15 | 99:7,14 100:13 | 160:4,10,16 |
| **first** 12:3 29:10 | 34:15 35:2,8 | 101:10,21 | 161:2 162:21 |
| 42:19,21,22 | 35:23 36:4,11 | 103:19 104:6 | 163:2 165:5,16 |
| 45:18 60:12 | 36:16,22 37:14 | 104:20 105:9 | 165:24 166:5 |
| 101:20 115:3 | 37:23 38:5,15 | 105:17,24 | 167:9,15,24 |
| 118:13 119:6 | 38:21 39:5,17 | 106:5,11,17 | 168:9,15 169:9 |
| 119:11 123:10 | 41:12 42:23 | 107:2,10 | 170:10 |
| 137:5 154:17 | 43:7 45:19 | 108:22 109:7 | **former** 138:22 |
| 156:20 159:11 | 50:16 52:2 | 109:12 110:1 | 139:1,3,6 |
| **five** 53:16,22 | 54:4,25 55:18 | 110:10,18 | **forth** 175:5 |
| 54:2 120:17,22 | 55:25 56:9,16 | 111:13 113:14 | **forward** 70:9 |
| 170:13 | 58:2,15 60:24 | 114:3 115:21 | 108:14,17 |
| **flag** 13:1,19,21 | 61:11,17 62:5 | 116:15 118:1 | 154:12 |
| **flagging** 75:1 | 62:12,16 63:1 | 118:21 121:21 | **foti** 3:4 9:11 |
| 167:7 | 63:6,12 64:16 | 122:5,13,19,25 | 11:12 19:24 |
| **flip** 53:3 | 66:9,18,24 | 123:11 124:19 | 45:11,23 47:11 |
| **follows** 9:24 | 67:4,10,19 | 125:8 126:25 | **found** 23:6 |
| 57:22 72:4 | 68:10,14 70:10 | 127:8,17 | 141:22 142:4 |
| 75:5,12 87:17 | 70:18 71:2,10 | 129:12,18,25 | **foundation** |
| 111:14 121:9 | 71:16 72:12 | 130:15 131:20 | 95:23 137:20 |
| 176:8 | 73:18,25 74:18 | 132:7 133:21 | 140:2 141:11 |
| **ford** 23:1 133:3 | 75:21 76:9 | 134:3,8,15,20 | 159:23 165:17 |
| 149:6 150:25 | 77:23 78:10,22 | 135:13,19 | **founder** 22:24 |
| **foregoing** 33:8 | 79:9,15 80:5 | 136:24 137:20 | 78:4 133:2,8 |
| 41:21 64:11 | 80:11 82:9 | 138:5,21 | 138:12,12 |
| 136:8 174:9 | 84:9,14,20 | 139:19 140:2 | 140:7 156:12 |
| 175:4,6,10,12 | 85:1 87:13 | 141:10 142:11 | 156:19 157:13 |
| **form** 6:5 15:7 | 88:4,17 89:2 | 143:10 146:4 | **four** 128:4 |
| 15:13 16:11,20 | 89:13 90:11,17 | 146:10,18,25 | 145:2,2 166:10 |
| 18:12 19:8 | 92:15,20 93:7 | 147:5,12,20 | |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL

**[fourth - gotten]**

**fourth** 6:21 164:10,17
**frame** 24:13
**framing** 50:24
**francisco** 1:3 2:3 3:7 9:11
**fraud** 21:24 44:19 146:6
**fraudulent** 21:9 22:20 23:4 24:12,14 44:18,19 131:14 147:15 152:14
**frcp** 177:1
**free** 12:17 89:18
**freezers** 16:15
**frequently** 109:10
**friend** 103:8
**friends** 106:16
**front** 13:8 53:6 64:4 124:8
**fulfilled** 45:8
**full** 10:5 58:11 86:15 164:19 164:21 166:10
**fundamental** 166:17 167:20 167:23
**funds** 109:2 116:19
**further** 63:15 96:24 126:4

136:7 161:7 171:4 175:12 175:16
**future** 139:15 166:18
**futuristic** 120:8 139:13

**g**

**g** 8:6
**general** 22:16
**generally** 96:6 102:10
**generate** 145:4
**getting** 32:13 46:23 56:22 57:9 85:2,17 96:22 140:24
**gic** 141:8
**give** 59:3 88:14 99:1 101:5,6 115:12,17 134:22 163:11
**given** 22:21 54:11 85:16 171:13 173:4 175:11
**gives** 58:7 95:9 116:20
**giving** 118:2
**go** 8:15 10:22 11:13 19:3 42:16 43:3 49:19 51:2,9 56:24 57:14 62:10 63:23

64:2,6 72:24 82:25 84:3,5 96:17,24,24 100:18 101:24 117:7 118:6 128:23 129:7 130:13 131:15 132:12 135:5 140:23 154:2 156:10 163:6 170:15 172:22
**goals** 25:13,15 25:21,24
**goes** 40:4
**going** 10:24 11:13,17,25 12:2,5 15:25 20:1 21:10 28:2,4,14 33:18 39:20 43:21 46:13 48:2,9,17,18 49:5,6,19 50:18 51:14 53:3 56:20 60:4 61:7 65:7 65:8 67:15 70:9 76:17 80:17,18 81:4 82:24 85:3,5 85:17 86:3 91:7,13,14 96:24 112:6 114:9 121:1 122:11 129:7

130:8,18 132:25 136:13 139:10,14 143:25 145:16 152:2,21,22 155:7 158:23 161:13 163:7,8 163:15,18,24 163:25 170:13 170:18 171:10 171:19 173:2
**good** 8:7 9:10 10:3 31:19 50:12,13 51:11 73:5 77:5 101:24 116:20 119:19,22 120:7 123:2 124:21,24 128:23 129:20 129:22 130:7,9 130:18 133:5,5 139:16 140:13 140:13
**goodness** 161:16
**google** 110:13 110:13 111:6 111:17,17
**gopalan** 1:9 2:9 9:9 21:15 138:20 166:15
**gotcha** 136:4
**gotten** 52:12,14

**[governmental - hours]**

| | | | |
|---|---|---|---|
| **governmental** 15:23 | **guys** 59:5 120:23 | **hard** 13:11 43:11 52:8 111:20 | **hi** 9:5 10:3 |
| **graf** 1:10 2:10 6:14 9:8 21:15 139:2,3,3,7 141:1,9,14,17 141:19 142:6,9 142:20 143:1,4 145:11,12 149:24 150:17 151:16 155:2 157:5 159:3,14 162:12 | **h** | **harm** 172:2 | **highly** 1:20 156:12,14,18 171:12,22,23 |
| | **h** 10:9 178:3 | **harmful** 49:25 50:3 | **hipaa** 96:22 |
| | **hale** 3:14 | **harvey** 15:2 | **history** 14:22 16:1 45:10 63:3 |
| | **half** 125:2 | **hawaii** 8:1 10:12 53:9,19 171:9 | **hitting** 168:2 |
| | **hall** 22:1 44:21 78:4,9 138:11 138:14 140:14 149:5,22 151:10,12 156:12,18,19 156:22 157:19 157:21 158:20 158:22,25 169:24 170:1,3 170:6,8 | **head** 11:16 | **hold** 36:22 46:12 59:18 77:4 86:7 87:14 109:19 124:2 137:19 |
| **grand** 15:22 | | **headed** 4:10 5:10 6:4,17,20 | **holdings** 131:17 |
| **great** 29:4 59:15 64:6 73:10 83:18 108:20 113:5 117:10 120:22 144:8 150:16 153:6 157:22 158:15 161:19 163:16 164:6 | | **heading** 158:17 | **home** 17:21,22 114:7 |
| | | **health** 13:16 98:8,10 171:13 | **honolulu** 8:1 10:12 53:9,12 53:13,19 114:7 |
| | **hamer** 1:9 2:9 9:9 21:15 138:25 | **hear** 9:17 31:7 48:14 62:18 79:5 80:23,24 81:2 101:16 108:13,15,18 | **honorable** 171:11 |
| | **handled** 176:8 | **heard** 8:13 11:19 20:12 48:15,15 90:4 140:19 | **horribly** 36:23 |
| **greater** 66:19 67:12 68:15 | **handling** 45:10 | | **hospital** 17:11 31:17 52:4 |
| | **hands** 37:16 38:13 39:11 43:3 96:12 | **held** 128:4 | **hospitalizatio...** 32:7 |
| **greenwich** 3:15 | **hang** 128:24 129:14 | **helpful** 80:7 | **hospitalized** 99:22 |
| **ground** 89:24 | | **hereto** 28:19 33:21 48:20 58:21 65:10 76:24 81:7 83:5 91:17 114:13 144:4 152:24 164:3 174:12 | |
| **grounds** 97:15 | **happen** 105:23 160:19 | | **hosts** 137:4 |
| **group** 21:8 | **happened** 132:11 155:12 | | **hour** 163:6 |
| **guess** 144:17 151:6 | **happens** 13:21 | | **hours** 27:5 53:21,23 54:2 98:24 99:2,9 |
| **guidance** 132:11 146:1 147:8 154:12 164:21,25 | **happy** 30:9 89:8 | | |

Veritext Legal Solutions
866 299-5127

[houston - insurance]

| | | | |
|---|---|---|---|
| **houston** 150:3 | 104:2 | **income** 112:18 | 130:4 132:5 |
| **hum** 40:16 82:2 | **identity** 26:11 | 112:25 113:1 | 136:9,16 |
| 108:19 131:1 | **illston** 171:12 | **incorporated** | 150:24 160:24 |
| 137:12 146:15 | **immediately** | 8:19 | 168:19 171:25 |
| 148:12 149:1 | 148:8 | **increasing** | 172:6 |
| 154:19 164:22 | **impact** 38:13 | 145:6 | **initial** 5:19 |
| **husband** 25:20 | 166:15 | **index** 4:1 | 20:25 81:13 |
| 27:12,21,25 | **impair** 93:14 | **individual** | **initialed** 174:11 |
| 29:19 30:18 | **important** | 109:6,10 110:5 | **initially** 70:6 |
| 34:19 35:13,16 | 11:15,22 45:2 | 135:17 157:14 | 126:2 |
| 37:11 49:10 | 100:5 157:14 | **individually** | **injured** 93:24 |
| 50:3 69:10,17 | 157:24 | 1:5 2:5 | **injuries** 93:11 |
| 69:21 73:20 | **inaccurate** | **industrial** 6:14 | 93:14 |
| 82:14 87:12,19 | 145:19,20,21 | 141:1,9,14,17 | **injury** 27:14 |
| 88:15,23 91:22 | 146:3,5,8,13,17 | 141:19 142:7 | 30:18 35:17 |
| 91:24 92:2 | 146:20,23 | 142:10,20 | 39:1 51:5,12 |
| 107:25 112:19 | 147:10,14,18 | 143:1,5 149:24 | 103:16 |
| 126:19,24 | 148:3,20 151:4 | 150:18 151:16 | **ink** 174:11 |
| 137:10 163:12 | 151:23 155:11 | 155:2 157:5 | **inner** 167:19 |
| **husband's** | 157:16 160:3,6 | 159:3,14 | **innovative** |
| 93:11 99:22 | 160:8,15,22,23 | 162:12 | 18:21,25 19:2 |
| **hyundai** 149:7 | 160:25 163:1,4 | **industrials** | **ins** 126:15 |
| **i** | 165:22 166:1,3 | 139:4,7 145:12 | **instance** 51:6 |
| | 166:6 167:14 | **industry** | **instruct** 21:22 |
| **idea** 92:24 | 167:18,21 | 105:11 109:24 | 85:5 89:16 |
| 111:12 | 168:14 | 139:18 | **instructing** |
| **identification** | **inappropriate** | **information** | 57:7 88:7 |
| 28:18 33:20 | 56:23 | 19:4 22:21 | 89:23 97:14 |
| 48:19 58:20 | **included** | 23:5 24:13 | **instruction** |
| 65:9 76:23 | 176:14 177:3 | 64:25 78:6,6,8 | 85:23 88:6 |
| 81:6 83:4 | **includes** 13:4 | 82:5,18,22 | **instructions** |
| 91:16 114:12 | **including** 22:1 | 84:21 86:20 | 7:6 |
| 144:3 152:23 | 30:3,12 73:13 | 99:10 104:22 | **instructs** 12:15 |
| 164:2 | 86:19 149:5 | 118:20,23 | **insurance** |
| **identify** 13:12 | 156:22 | 120:9 121:10 | 116:17 |
| 101:19 102:3 | | | |

[intelligize - kaplan]

| | | | |
|---|---|---|---|
| **intelligize** 6:17 153:10,20 | 41:15 43:14 99:12,15,21,22 | 129:1,5,20,23 130:10,20 | 131:19 132:6 146:1 |
| **intend** 71:8,11 72:21 73:23 | 108:21 109:2,4 109:6 134:2,19 | 133:5,6 140:1 | **jim** 107:22 137:2,22 |
| **intended** 70:12 71:14 72:5,7 72:10,17 85:15 | 134:22 140:25 143:15 145:14 150:23 151:20 | **investments** 82:19 95:17,20 98:18,23 99:2 99:6 102:10 | **job** 1:24 69:3 176:5 178:2 **jobs** 19:5 |
| **interest** 35:20 116:21 118:3 149:8 | 155:6 157:12 159:21 162:16 165:14 166:24 | 113:20 136:23 **investor** 20:11 23:5 | **join** 21:11 69:18 **joined** 9:6 |
| **interested** 105:8 109:25 175:17 | 168:20 **invested** 94:1 112:5,13 | **investors** 21:8 21:11 24:14 25:8 149:6 | **joining** 10:4 **joint** 4:14,21 34:10,21 35:1 |
| **interests** 154:22 | 113:10,12,17 113:23 131:10 | 154:25 **invoke** 85:4 | 40:22 49:3,10 49:17 82:22 |
| **internal** 28:16 161:20,24 162:19 | 138:1 141:7,14 141:16 142:14 150:25 | **involve** 89:15 **involved** 19:12 19:15 27:16 | 95:18,21 127:5 127:6 **joseph** 1:10 |
| **internet** 8:11 38:9 106:22,24 107:4 136:20 | **investigating** 126:4 **investigation** | 51:22 116:24 138:16 156:21 158:25 | 2:10 **july** 24:8 143:7 **jump** 129:3 |
| **interpret** 99:5 **interrogatories** | 15:22 **investing** 35:6 | **ipo** 140:24 **issue** 111:13 | **junior** 14:24 15:1 |
| 5:6,24 58:19 59:13 83:12 | 39:3 44:7 63:3 106:16 107:17 | **issues** 48:1 51:22,24 96:22 | **jury** 15:22 **justified** 21:3 |
| **interrogatory** 86:5,11 87:2 | 107:20 108:9 109:25 125:7 | 167:7 **item** 40:15 | **k** |
| **interrupt** 32:20 **interruption** | **investment** 6:9 40:22 42:6 | **j** | **kahn** 3:4 9:11 11:12 19:24 |
| 48:1 **introduce** | 82:6 95:6,13 100:5 102:7,24 | **james** 1:9 2:9 3:6 9:8,14 | 45:11,23 46:11 46:20 47:11 |
| 117:6 **invest** 36:20 | 103:4 107:7 115:17 119:16 | 21:15 139:2,3 **james.fetter** | **kaplan** 3:14 4:5 9:5,6,18 10:2 |
| 37:3 39:1,24 40:19,25 41:8 | 123:3 124:23 125:3,3 128:20 | 3:10 **january** 93:4 93:25 131:12 | 15:10,14 16:12 16:21 18:9,19 19:9 20:8,24 |

Veritext Legal Solutions
866 299-5127

**[kaplan - know]**

21:20 22:9,15
23:8,18 24:5
25:1,9 26:2,10
27:11 28:2,11
28:14,20 29:1
29:17,22 30:8
31:21 32:1,9
32:15,20 33:4
33:18,22 34:4
34:17 35:4,10
36:1,6,13,18
37:1,9,18 38:1
38:11,18,24
39:13,19 41:16
42:3,11,18
43:5,9,20 44:4
46:1 47:4,22
48:8,17,21
50:17,22 51:16
51:23 52:20
54:7 55:4,21
56:3,12,18
57:2,7,10,12,20
58:10,16,22
59:3,8,21 61:2
61:13,24 62:8
62:14,20 63:2
63:8,16,22
64:1,18,21
65:1,7,12
66:12,21 67:2
67:7,14,23
68:5,12,17,21
69:5 70:14,24
71:6,13,17,24

72:2,9,15,23
73:7,21 74:7
74:25 75:3,17
76:2,14,17,22
77:1,6 78:1,14
78:19 79:1,6
79:12,18 80:1
80:8,16,22
81:1,4,8 82:12
82:24 83:6
84:12,16,23
85:7,11,19,24
86:9,11,13
88:1,7,10,21
89:7,10,19
90:2,8,14,19,25
91:5,13,19
92:17,23 93:10
93:19,23 94:6
94:17,23 95:4
95:11,16 96:1
96:10,25 97:10
97:18 98:2,11
98:16,21 99:11
99:16 100:16
101:15 102:1
102:13 103:7
103:10,22
104:10,17
105:2,12,20
106:2,8,14,19
107:5,15 109:1
109:9,16 110:3
110:15,21
112:3 113:18

114:6,9,15
115:23 116:23
118:5,22 119:2
120:15,21,25
121:7,17 122:1
122:8,15,22
123:6,13 124:4
124:6 125:1,10
127:2,13,21
129:16,21
130:3,22
131:23 132:4
132:16 134:1,5
134:11,18
135:1,16,23
136:2,5 137:1
137:24 138:10
138:24 139:23
140:9 141:13
142:13,23
143:12,25
144:5,20,23
146:7,12,21
147:3,9,16,21
147:24 148:6
148:18 150:21
151:7 152:6,15
152:21 153:1
153:16,23
154:5 155:17
156:6 157:10
158:5,10
159:19 160:1,7
160:13,20
161:4,11,18

162:5,8,24
163:5,15,24
164:5 165:8,21
166:2,8 167:12
167:17 168:5
168:11,17,23
169:6,11
170:12,17,24
171:18 172:25
176:1
**keep**  71:21
80:18 116:22
163:7
**keeping**  90:15
155:7
**kevorkian**  3:20
8:22
**kind**  70:19,21
84:6 105:7
109:14 115:12
116:18 120:3
121:20 134:19
139:13 140:6
140:23
**knew**  142:12
143:2 166:7
167:19,20
168:12
**know**  10:24
14:12,19 22:3
22:13 23:5,9
23:25 24:6
25:12 26:7,8
26:11 27:15
28:6 33:23

Veritext Legal Solutions
866 299-5127

**[know - lidar]**

47:17,25 48:22
50:6,8,10 51:5
51:14,14,22
52:6,7,10,15,17
53:5 54:18,19
55:14 56:1
58:7,8,18,23
59:24 65:23
68:2 72:13
76:10 77:2
79:17 81:9,18
85:14 88:13,25
89:11 92:3,5,5
92:8 94:21
95:9 96:4,22
97:6 98:15
99:19 101:5,13
101:14 103:21
103:25 104:4,7
104:15,19,21
104:24 105:6
107:13 109:13
110:6,19,23,24
111:10 112:1
112:16 116:1
116:20 120:4
123:4 126:17
126:18 127:11
128:20,21,22
129:13 131:10
131:21 133:2
134:6,24 135:5
135:5 136:14
137:2 139:20
141:24 142:2,2

142:8 143:4
144:11 145:24
150:22,24
153:9,19,19
155:4,8 157:8
158:4,5 159:5
160:25 164:9
169:1,22 170:4
170:11 171:9
**knowledge**
54:17 89:18
92:21 111:1
134:12 143:13
165:13 168:24
**knowledgeable**
100:2
**known** 86:19
166:7
**knows** 94:14
104:8,15
**ksf** 20:1,15,19
45:15,18 69:11
88:25 89:11
**ksf's** 46:9
**ksfcounsel.c...**
3:8,9,9,10,10

**l**

**labeled** 40:13
81:25 153:12
154:7
**language**
171:21
**large** 46:23
63:5,7 131:24

**largely** 164:16
**larger** 117:23
**late** 35:7,18
36:3,7 63:4
171:9
**lately** 52:11
**law** 3:4,5,5,6,6
3:14,15
**laws** 4:11 5:16
29:9 33:7
77:12
**lawsuit** 19:18
21:1,3,4,6,10
21:11,13,23
22:10,11 23:14
26:4 29:16
**lawyers** 46:20
**layperson** 80:4
**lead** 4:16 5:4,6
5:19,23,25
23:22 26:17
31:5 34:12
45:1,3,9,11
47:7,10,12,14
47:19 49:22
59:12,13 60:5
65:3 69:23
70:5,8,9,11,15
71:4 74:2,4,20
75:14 81:13
82:4,13 83:11
83:12 86:15,17
87:4 136:8
**leading** 55:18

**lean** 108:17
**leaning** 108:14
**learn** 19:18
42:19,21,22
104:5,11
123:10 137:5
141:8,9,23
**learned** 21:4
142:1
**learning** 20:25
**leaves** 128:9
**leaving** 127:10
**leeway** 85:16
**left** 30:7 115:3
**legal** 5:11
21:18 22:5
23:16 24:3
26:6 65:16
79:16,23 80:13
176:7
**level** 172:5
**lewis** 46:11
**licenses** 15:6,12
15:15
**lidar** 1:9 2:9
6:20 8:19 9:8
10:18 21:2
110:4 119:21
119:25 138:1
139:16 140:15
142:5,19,20,25
143:1 149:24
156:20 176:4
178:1

Veritext Legal Solutions
866 299-5127

**[lidar's - made]**

**lidar's** 139:9
**likely** 82:4
**likes** 104:1
**limit** 89:24
  97:15
**limits** 92:10,13
  92:16,18
**line** 7:7 29:10
  34:20 35:6
  39:21,23,25
  40:21 41:20,20
  44:10,23 46:6
  47:6 48:12
  49:6,7,20 54:9
  55:5 64:10
  81:2 82:3 86:4
  86:8,9 119:11
  125:11 136:6
  176:15 177:4
  178:4,7,10,13
  178:16,19
**lines** 40:3 87:3
  156:17 158:24
  159:12
**listen** 107:16
  107:19
**listened** 107:18
**litigation** 10:19
  19:13,16 20:12
  23:9 26:18
  27:4,13 45:10
  65:4 72:11
  169:13,18
**little** 40:7 46:21
  85:17,18

100:25 109:17
  126:4 134:9
  151:8
**living** 52:10
**llp** 3:4,14
**location** 8:1
**locked** 176:12
  177:1
**long** 21:21 50:7
  50:11 123:3
  124:23 126:5
  128:20,25
  129:5,20,22
  130:9,20 133:5
  163:10
**longer** 12:7
  30:17 133:5
**look** 12:11
  13:10 35:5
  37:3,7 38:20
  39:3 40:12
  43:3 44:9 47:5
  54:9 55:5 60:4
  73:11 86:4
  87:3 93:3
  96:17 100:19
  101:22 108:8
  114:22 117:20
  120:11 121:13
  123:19 130:23
  149:2 153:8
  155:22,23
  171:20,21
**looked** 45:18
  45:22 46:3,22

46:24 47:15
  118:10 120:13
  121:15 151:9
**looking** 38:7
  40:4,10 53:4
  54:8 99:9
  101:9 123:20
  128:19 136:14
  149:23 154:12
**looks** 42:24
  94:8 114:19,20
  119:1
**losing** 157:24
**loss** 156:22,24
  157:19,23
**losses** 21:12
  25:15,16,19,25
  25:25 135:17
**lost** 23:6 24:14
  25:8 133:3,18
  135:8,12
**lot** 23:4 85:16
  88:19 100:14
  104:14 107:11
  160:23 169:3
**loud** 120:16
**louis** 3:5

**m**

**m** 10:9
**machine** 175:9
**mad** 107:22
  108:2,5 137:2
  137:25 138:4
**made** 22:23
  23:1 24:14

27:1 30:24
  31:1 32:8
  34:14 39:23
  40:19,25 41:2
  41:6,7,10,15
  42:10,12,16
  43:18 54:20
  55:3,14 56:10
  57:6 60:2
  61:14,22,23
  62:7 75:24
  82:23 98:4
  101:14 105:22
  106:4,9,12
  119:3,15 122:4
  122:6 125:5,22
  126:11 130:6
  130:13 132:19
  132:19 139:25
  145:10 146:2
  146:17 147:11
  147:19 148:14
  148:20 150:18
  151:16 152:11
  152:17 155:2
  155:11,14
  157:5,16 159:3
  159:14 160:9
  160:15,22
  161:1 162:12
  165:3,23 166:4
  166:20 167:4
  167:14 168:3
  168:13 174:10
  175:8

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL

**[mahoney - marans]**

| | | | |
|---|---|---|---|
| **mahoney** 115:7 115:9,15,24 116:24 | **management** 100:8 154:18 154:22 156:15 164:17 | 56:3,12,18 57:2,7,10,12,20 58:10,16,22 59:3,8,21 61:2 | 96:10,25 97:10 97:18 98:2,11 98:16,21 99:11 99:16 100:16 |
| **mail** 13:5 86:23 117:5 | **managing** 98:23 99:2,4,6 99:8 | 61:13,24 62:8 62:14,20 63:2 63:8,16,22 | 101:15 102:1 102:13 103:7 103:10,22 |
| **mails** 172:15 | **manners** 168:3 | 64:1,18,21 | 104:10,17 |
| **main** 116:21 | **marans** 3:14,17 | 65:1,7,12 | 105:2,12,20 |
| **maintains** 161:24 | 4:5 9:5,6,18 | 66:12,21 67:2 | 106:2,8,14,19 |
| **majority** 130:13 | 10:2 15:10,14 | 67:7,14,23 | 107:5,15 109:1 |
| **make** 53:24 | 16:12,21 18:9 | 68:5,12,17,21 | 109:9,16 110:3 |
| 54:3,5 55:17 | 18:19 19:9 | 69:5 70:14,24 | 110:15,21 |
| 55:20 61:25 | 20:8,24 21:20 | 71:6,13,17,24 | 112:3 113:18 |
| 63:4 64:21 | 22:9,15 23:8 | 72:2,9,15,23 | 114:6,9,15 |
| 70:22 71:18 | 23:18 24:5 | 73:7,21 74:7 | 115:23 116:23 |
| 80:24 95:6,9 | 25:1,9 26:2,10 | 74:25 75:3,17 | 118:5,22 119:2 |
| 95:12,17,20 | 27:11 28:2,11 | 76:2,14,17,22 | 120:15,21,25 |
| 105:18 106:1,9 | 28:14,20 29:1 | 77:1,6 78:1,14 | 121:7,17 122:1 |
| 106:13 108:12 | 29:17,22 30:8 | 78:19 79:1,6 | 122:8,15,22 |
| 108:14,18 | 31:21 32:1,9 | 79:12,18 80:1 | 123:6,13 124:4 |
| 110:17 124:13 | 32:15,20 33:4 | 80:8,16,22 | 124:6 125:1,10 |
| 126:19 127:11 | 33:18,22 34:4 | 81:1,4,8 82:12 | 127:2,13,21 |
| 128:9 129:3 | 34:17 35:4,10 | 82:24 83:6 | 129:16,21 |
| 133:4 156:24 | 36:1,6,13,18 | 84:12,16,23 | 130:3,22 |
| 176:14 177:3 | 37:1,9,18 38:1 | 85:7,11,19,24 | 131:23 132:4 |
| **making** 21:25 | 38:11,18,24 | 86:9,11,13 | 132:16 134:1,5 |
| 36:19 37:2,13 | 39:13,19 41:16 | 88:1,7,10,21 | 134:11,18 |
| 38:25 39:9 | 42:3,11,18 | 89:7,10,19 | 135:1,16,23 |
| 64:19 66:5 | 43:5,9,20 44:4 | 90:2,8,14,19,25 | 136:2,5 137:1 |
| 100:5 105:23 | 46:1 47:4,22 | 91:5,13,19 | 137:24 138:10 |
| 107:7 145:17 | 48:8,17,21 | 92:17,23 93:10 | 138:24 139:23 |
| 152:13 | 50:17,22 51:16 | 93:19,23 94:6 | 140:9 141:13 |
| **manage** 98:17 | 51:23 52:20 | 94:17,23 95:4 | 142:13,23 |
| 157:1 | 54:7 55:4,21 | 95:11,16 96:1 | 143:12,25 |

Veritext Legal Solutions
866 299-5127

**[marans - mindset]**

144:5,20,23
146:7,12,21
147:3,9,16,21
147:24 148:6
148:18 150:21
151:7 152:6,15
152:21 153:1
153:16,23
154:5 155:17
156:6 157:10
158:5,10
159:19 160:1,7
160:13,20
161:4,11,18
162:5,8,24
163:5,15,24
164:5 165:8,21
166:2,8 167:12
167:17 168:5
168:11,17,23
169:6,11
170:12,17,24
171:18 172:25
176:1,2
**march** 24:9
119:4 132:19
132:23 146:8
**marital** 56:21
85:3,13 88:6
**mark** 12:3 81:5
**marked** 28:18
33:20 48:19
58:20 65:9
76:23 81:6
83:4 91:16

114:12 144:3
152:23 164:2
**market** 35:7,21
36:3 95:10
99:13,21,23
101:24 102:10
113:10,13,17
113:24 134:2
134:14 135:8
135:12 154:24
154:25 156:25
**marriage**
171:15
**marta** 138:14
170:1,6
**match** 28:16
**material**
136:10,12,22
**materials** 37:20
38:4
**math** 124:13
**matter** 8:18
9:13 30:20
72:18
**matters** 100:2
**max** 17:3
**mean** 21:7
22:13 25:18
31:16 33:11
34:25 38:17
41:10,23 54:17
64:15 73:17
74:10,16 75:8
75:18 82:8
93:17,22 100:6

106:7 107:24
115:12 121:20
133:11 140:12
146:24 153:25
157:21 167:22
**meaning** 95:21
**means** 13:5
29:13 41:5
55:12 66:20
67:12 68:16
82:10 84:4
92:2 99:18
112:15 172:3
**meant** 76:8
**media** 8:16
48:6 91:11
121:5 163:22
170:22,23
173:5
**medical** 13:16
18:17 30:20
51:22,24
**medically**
31:19
**medication**
163:12
**medium** 86:22
**members** 21:10
25:16,25 26:12
26:15 70:22
**membership**
102:24
**mentioned**
14:14 38:12
105:4 107:6

110:16 111:11
172:14
**merged** 143:4
**merger** 142:9
142:16,20
143:1
**merging** 142:6
**meritorious**
44:12,17
**met** 14:11
164:25
**meysam** 1:5 2:5
8:18 176:4
178:1
**michael** 1:10
2:10 9:9 21:15
139:5,6
**middle** 39:23
40:24 49:7
54:10 154:10
**million** 61:9,15
62:1,10,22
63:10 125:2,18
126:21 127:5,6
130:12 133:3
133:18 134:13
135:7,11 145:5
145:6 148:10
164:18,19,20
164:20
**millions** 126:23
**mind** 93:17
108:17
**mindset** 129:14
130:19

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL

[mine - numerous]

mine  55:9
  153:19,21
minute  114:22
minutes  50:15
  51:18 80:17
  90:23 91:1
  120:17,22
  163:11 170:14
mischaracteri...
  30:7 37:22
  134:16
misinformation
  21:9
misunderstood
  143:19
mobis  149:7
moment  109:20
monday  14:7
  14:13
monetary
  66:17
money  23:7
  24:15 25:8
  60:22 107:22
  108:2,5 116:22
  118:4 125:7
  133:20,23,24
  134:6 137:3,25
  138:4 145:17
monies  116:17
monitor  112:4
  112:6
months  31:17
  52:4,5 53:15
  53:16,17 138:3

166:16
moradpour  1:5
  2:5 8:18 176:4
  178:1
morning  8:7
  9:10 10:3
motion  4:16
  34:11 69:14,18
  69:22,25 97:20
  97:24 98:3
movant  29:11
  29:18 30:2,10
  73:12,17 74:8
  74:14 75:6
move  53:11
moved  53:13
movement
  120:5
moving  122:21
multiple
  132:19
multiply  61:1
mutual  109:2

n

n  8:6 10:9
name  8:22 10:5
  17:24 18:22
  31:4 86:19
  110:9 142:10
  175:20
nature  10:23
  11:13 43:1
  106:23 120:6
near  166:16
  167:3

necessary  30:4
  30:13 73:15
  176:14 177:3
need  12:10,11
  12:17,19 28:23
  34:1 40:6
  148:1 161:6
needs  50:9
negative  168:2
negotiate  65:25
neither  59:2
  175:16
net  113:2,7,23
  114:1 135:2
never  51:13
  70:12 71:14
  72:5,7,10,17
  137:18
new  3:16,16
  51:12 157:2
  171:9
news  19:20
  37:8 38:8,9
  42:25 45:21
  100:9,14,15,20
  100:23 101:2,5
  101:6,6 107:14
  108:10 120:12
  121:14 131:13
  132:9,25 133:7
  133:8 136:15
  136:19 140:6
  143:24 145:15
newspaper
  106:23

night  30:21
  31:8
nikon  149:6
nodding  11:16
noise  109:17
non  172:1
normally
  105:25 106:12
  127:1 128:8
northern  1:2
  2:2 8:20 10:20
  48:12 89:21
  97:12
notating
  176:15 177:4
note  8:9 13:8
noted  173:7
  174:11
notice  19:20,23
  20:3
noticing  9:4
number  4:8 5:2
  6:2 12:9 28:17
  35:9 88:13
  144:14,18
  155:22 158:6
  171:1 173:4
  176:15 177:4
numbered
  40:15
numbers  20:16
  28:15,16 148:5
numerous
  72:20

Veritext Legal Solutions
866 299-5127

**[o - okay]**

| **o** | |
|---|---|
| **o**  8:6 | |

**o**  8:6
**o0o**  3:22 6:24 7:12 8:5 173:8
**oath**  9:23 11:4 175:7
**object**  12:13 48:10 56:20 68:20,24
**objection**  15:7 15:13 16:11,20 18:7,12 19:8 20:6,20 21:17 22:5,12,18 23:15 24:2,22 25:5,23 26:5 27:7,24 29:14 29:20 30:6 31:14,24 32:4 32:12 33:2,15 34:15 35:2,8 35:23 36:4,11 36:11,16,22 37:5,14,22 38:5,15,21 39:5,17 41:12 41:24 42:7,13 42:23 43:7,15 43:25 45:1,19 48:11 50:16 51:19 52:2 54:4,25 55:18 55:25 56:9,16 57:6 58:2,15 60:24 61:11,17 62:5,12,16,19 62:25 63:1,6 63:12,20,20 64:16,23 66:9 66:18,24 67:4 67:10,19 68:10 68:14,25 70:10 70:18 71:2,10 71:16 72:12,19 72:20 73:18,25 74:18 75:21 76:9 77:23 78:10,22 79:9 79:15,22 80:5 80:11 82:9 84:9,14,20 85:1,10,12,18 85:22 87:13 88:4,5,17 89:2 89:13 90:11,17 92:15,20 93:7 93:16,21 94:4 94:13,20 95:1 95:7,14,22 96:8,21 97:25 98:7,14,19 99:7,14 100:13 101:10,21 102:11 103:19 104:6,13,20 105:9,16,17,24 106:5,11,17 107:2,10 108:22 109:7 109:12 110:1 110:10,18 113:14 114:3 115:21 116:15 118:1,21,25 121:21 122:5 122:13,19,25 123:11 124:19 125:8 126:25 127:8,17 129:12,18,25 130:15 131:20 132:1,7 133:21 134:3,8,15,20 135:13,19 136:24 137:20 138:5,21 139:19 140:2 141:10 142:11 143:10 146:4 146:10,18,25 147:5,12,20 148:15 150:19 151:5,25 152:12,18 155:15 157:7 159:16,22 160:4,10,16 161:2 162:21 163:2 165:5,16 165:24 166:5 167:9,15,24 168:8,9,15 169:2,9 170:10
**objections**  5:24 50:19,24 64:19 64:22 83:12 89:20,25 90:3 97:12,16
**obligated**  11:5
**obviously**  146:19 154:13 172:16
**offers**  101:2
**office**  176:11
**officers**  158:18 159:8
**oh**  40:25 81:22 120:18 149:12 150:4 153:3 159:9 161:12
**okay**  9:16 12:12,22 13:23 16:14 18:4 21:23 26:25 28:2,12,25 29:4,23,25 33:25 34:3,6,6 35:5,9 39:20 40:12,16 41:18 44:2,9 46:16 46:21 47:25 50:22 51:9 52:23 53:3,7 57:13 59:7,20 61:20 62:3,3 64:6,8 65:11 69:4,9 72:1 73:4,4,5,9 76:14 78:16 80:18,24 81:1

Page 26

**[okay - paralyzed]**

83:3,17 86:2
86:10 87:21,23
89:9 90:19
91:1,7,20
108:13,20
109:21 114:14
117:10 118:7,9
120:20,21
123:20,22
124:5,14
143:19,21
144:8,21,22
149:12,15,17
150:2,4,7,12,16
151:8 153:6
154:16,16,17
154:20 155:18
155:25 156:1
156:17 158:1
158:14,15
159:9,13 161:5
161:9,15,17,19
162:7 163:13
163:14,17
164:4,6,12,15
172:9
**olive** 15:2
**once** 114:10
**ones** 157:2
**online** 38:20
96:14 136:8,12
136:16,23
**open** 52:22
115:11

**operator** 3:20
8:7 9:16,20
48:2,5 91:7,10
121:1,4 163:18
163:21 170:18
170:21 172:19
172:22 173:2
**opinion** 39:14
39:15 116:2,4
**opportunities**
154:25
**option** 111:23
**options** 35:24
111:21,25
112:2 135:21
**oral** 49:23 50:2
**order** 171:11
171:21
**original** 77:17
77:19,22
175:13 176:10
176:21
**ousted** 133:9
133:11
**outcome** 97:23
98:3
**outlook** 166:18
167:20,23,25
168:4,7
**outs** 126:16
**overall** 131:17
**oversee** 23:23
26:23 47:7,17
70:20,20,20,21
71:5

**own** 17:4,5,7
17:18 18:5,17
22:16 95:21
98:17 105:3
114:7 123:7
**owned** 132:3

**p**

**p** 4:15,22 8:6
29:11 34:11
49:4
**p.m.** 2:18 121:2
121:3,3,5
163:19,20,20
163:22 170:19
170:20,20,22
173:3,7
**page** 4:8 5:2
6:2 7:2,7 12:8
12:9,10 40:12
40:13,14 41:17
41:17 46:6
58:25 59:16,22
64:6 81:25
82:1,1 83:16
86:1,4,8 87:2,2
96:18 115:3
117:11 118:8
123:22 124:3,4
125:11 135:24
136:3 144:13
144:14,16,17
144:18,18
148:25,25
149:12,13,14
149:24 153:11

153:11,13,16
153:17 154:4,6
154:8,9,13,14
154:15,16
155:18,19,22
155:23 156:5
158:2,8,11
159:8 161:8
164:12,13
166:9,9 176:15
177:4 178:4,7
178:10,13,16
178:19
**pages** 1:25
176:14,17,17
177:3,6,6
**paragraph**
29:24 34:20
35:5,11 39:20
40:2,6,17,23,24
42:4 44:10,22
44:23 45:7
47:5,6 49:5,19
52:25 54:9
55:5 73:11
149:2,16,21
150:6,10 151:9
156:10 159:12
162:2,4,9,23
164:15 166:11
**paragraphs**
145:2 166:11
**paralyzed**
93:12

Veritext Legal Solutions
866 299-5127

**[part - please]**

| | | | |
|---|---|---|---|
| **part** 45:14 101:1 104:25 141:6,7 157:25 | **patience** 158:15 171:2 | **performed** 37:7 100:9 | **pickering** 3:14 |
| **participants** 8:12 157:1 | **pattern** 131:8 | **performing** 101:24 | **place** 8:14 101:20 175:5 |
| **participate** 13:14 37:12 44:5 54:23 103:17 | **pause** 71:18 | **period** 18:2 24:6,8,11,12,17 50:11 55:9 121:23 176:18 177:7 | **plaintiff** 4:17 23:22 26:17 31:5 34:12 49:22 69:23 70:5,8,9,12 71:4 74:2,4,20 75:15 |
| **participated** 86:21 | **pdf** 153:11,17 154:7 155:19 155:20 158:6,7 161:7 176:12 177:1 | | |
| **participating** 170:25 | **penalty** 33:7 41:20 64:11 174:9 176:16 177:5 | **perjury** 33:7 41:21 64:11 174:9 176:17 177:6 | **plaintiff's** 45:1 70:15 |
| **particular** 38:10 58:7 67:5,8 100:21 101:3,7,8,25 102:16 110:2 112:14 126:15 134:23 | **pending** 12:21 **pension** 112:20 112:21 | **permanently** 98:13 **permission** 94:25 95:5,8 95:12 | **plaintiffs** 1:7 2:7 3:3 5:4,6 5:19,23,25 59:12,14 60:6 81:13 82:4,13 83:11,13 86:16 86:17 87:4 136:8 |
| **particularly** 109:25 | **people** 24:19 25:2,6,10 35:3 86:21 90:7,9 106:15 115:10 140:24 145:11 145:12 | **person** 79:24 86:16,17,19,20 86:23 140:7 145:25 | **plan** 154:24 171:19 |
| **parties** 8:15 21:16 | **percent** 66:11 66:16,22 67:12 67:17 68:7,16 68:19 69:4,6 145:8 149:8 | **personal** 95:21 **personally** 109:23 | **plane** 53:20,21 **platform** 12:5,5 **play** 151:13 |
| **party** 29:15 30:11 73:13 74:9,15 75:7 75:19 171:23 172:1,1,2 175:18 | **percentage** 113:9,11,12,16 113:23 114:1 119:16 131:17 131:22,24,25 132:2 | **personnel** 156:14 **persons** 87:5 **pertains** 175:12 **phlegm** 50:8 **phrase** 146:22 **physical** 98:5 171:14 | **please** 8:9 9:2 10:6,8 11:15 11:21,24 12:8 12:17 13:10,15 13:21 14:21 29:23 32:20 33:19 40:18 44:9 47:23 52:21 55:6 57:21 58:23 |
| **passing** 13:8 **past** 100:9 112:22 166:16 **patel** 169:22 | **performance** 101:12 | **physically** 50:12 | |

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL

**[please - proper]**

59:16,18 62:19
63:23 64:2,19
64:22 68:23
72:3,24 73:8
74:23 75:4
76:14 78:11
81:25 83:16
85:25 86:1
89:24 91:15
94:7 97:15
103:6 117:7
118:6,8 121:7
123:19 124:1
130:23 135:24
136:3 144:2,13
150:11 153:11
155:18 158:1
161:6 166:9
168:25 172:21
**plug**   101:4
**pneumonia**
   31:17 52:5,7
**poa**   49:11
**podcasts**
   107:16,18,19
**point**   36:7 49:5
   51:24 72:11
   106:3,6 124:22
   126:9 129:6,14
   146:14
**pop**   33:24 34:2
   58:24
**pops**   114:11
**portfolio**
   119:17

**portion**   131:16
   131:18 132:13
   132:15
**position**   16:10
   17:1,17
**possession**
   169:18
**possible**   170:4
**possibly**   114:20
**post**   158:22
   159:1 160:18
**potential**
   128:23
**potentially**
   49:24 50:3
**power**   6:5
   27:15 33:17
   34:23 49:11
   75:23 76:12
   83:22,25 84:18
   91:21,23 92:2
   92:7,10,13,14
   92:22,24 93:2
   93:6 94:9
**practice**   48:12
**pratt**   3:6 9:17
   9:18
**preliminary**
   6:22 164:11
**preparation**
   14:15
**prepare**   13:24
   14:1,3 103:2
**preparing**
   14:10

**present**   3:20
   9:2
**president**   139:6
**press**   105:22
**pressure**   50:9
**presume**   57:15
**pretty**   52:16
   66:5 101:24
   112:13,15
   140:13,13
**previously**   18:4
   142:14 164:21
   168:1,19
**price**   60:18
   112:10,11,12
   122:17 125:13
   132:24
**primary**   10:13
**print**   136:17,18
   136:19
**prior**   14:9
   45:14 123:7
   143:15 164:25
   175:7
**privacy**   96:22
**privilege**   13:7
   56:21 85:3,14
   88:6 97:15
**privileged**
   46:15,19 78:13
   89:16,17,24
**probably**   28:7
   54:19 56:1
   59:5 66:4
   112:16 119:18

126:14 134:4
   137:6 139:15
   157:21 163:5
   165:19
**problem**   73:1
**problems**   167:2
**procedure**
   176:19,20
**proceedings**
   175:4,6,8,14
**proceeds**   26:9
**process**   11:14
   36:20 37:2,13
   45:14 54:24
   57:4 99:5
   103:17
**produced**
   169:8
**product**   156:8
   156:20,22
   159:1
**professional**
   15:5,5,12,15
   154:21
**profit**   126:10
   128:6
**projections**
   22:25 100:7
   107:13 145:16
**prominent**
   139:15
**promise**   120:24
**proper**   89:21
   90:3 97:12

Veritext Legal Solutions
866 299-5127

## [properly - ramzi]

**properly** 70:23
**property** 6:5
**proposed** 24:20
  25:3
**prosecution**
  47:8
**prospects**
  21:25 22:21
  44:20
**protected**
  85:16
**protections**
  13:6
**protective**
  171:11,21
**proven** 45:9
**provide** 10:5
  13:17 32:23
  39:14,15 50:19
  55:23 110:22
  113:5,22
  154:12 161:25
  170:8
**provided** 56:8
  164:21 169:13
  169:19 176:19
  177:8
**providing** 30:3
  30:12 48:10
  73:14 102:6
**provisions** 66:8
**proxy** 144:17
**pslra** 45:1 49:9
  49:14

**public** 142:6,15
  143:9,14,22
  154:25 172:7
**publications**
  106:21
**pull** 28:4,7,8
  33:19 48:17
  65:7 81:4
  82:24 91:14
  114:9 143:25
  152:21 163:25
**pulling** 28:8
**purchase** 30:25
  39:16 42:16,17
  43:19 54:24
  55:3,8,13,15,23
  56:4,15 57:25
  58:9,9 61:14
  61:23,25 62:7
  62:10,15,21
  63:10 75:25
  82:21,23
  105:22 106:10
  106:13 119:20
  120:10 121:11
  122:4,7,12,23
  123:5 125:6,22
  130:6 140:8
**purchased** 31:2
  55:24 56:7
  60:16 63:11
  110:5,7,8,12,12
  110:13,13,14
  111:2,16,16,17
  111:17,18

112:1 122:2,16
  125:22 142:18
  142:24 143:8
  143:21 151:1
**purchases**
  95:10 102:17
  110:17 111:4
  119:3,16
**purchasing**
  39:10 43:22
  60:10 61:9
**purpose** 140:18
  140:21 141:20
**pursuant** 4:11
  29:8 171:10
**put** 13:15 39:7
  39:11 76:17
  78:6,17 139:11
  158:6 167:25
**putative** 9:13
**putting** 120:2

### q

**quadriplegia**
  49:23 51:3
**qualifications**
  45:16 46:8,10
**quality** 8:10,11
**quantity** 60:15
**quarter** 6:21
  164:10,17
**question** 11:21
  11:24,25 12:15
  12:19,20 23:17
  24:24 32:22
  36:24 37:24

46:18 57:8,14
  57:15,18,19,21
  57:23 58:4
  61:18 62:18
  67:16,20 68:9
  68:18,23 71:19
  71:22,25 72:3
  72:5 75:4,6
  87:16,18 89:5
  89:8,15 90:6
  94:5 96:23
  97:8 104:9
  111:12 121:8
  121:10 124:8
  143:20 147:18
  147:25 152:1
  161:5 169:16
**questioning**
  48:9
**questions** 11:14
  12:6,14 51:2
  54:22 85:8
  115:14 120:24
  171:5,13,14
**quickly** 13:20
  13:21

### r

**r** 8:6 178:3,3
**r&d** 157:1
**r&s** 177:1,9
**raised** 120:20
**ramzi** 3:4 9:10
  11:12 47:11
  50:18 171:19
  172:11

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL

**[ramzi.abadou - regarding]**

| | | | |
|---|---|---|---|
| **ramzi.abadou** 3:8 | 40:21,24 112:9 140:4 149:10 149:11 150:24 159:5,9 162:17 165:18 176:23 177:9 | **received** 69:10 78:5 | **recorded** 1:16 2:16 8:13,16 11:20 |
| **range** 164:18 | | **receives** 112:19 | **recording** 8:10 8:14 |
| **rate** 118:3 | | **receiving** 69:3 | |
| **rates** 116:21 | | **recent** 51:25 | **recover** 21:12 25:15,24 |
| **rather** 11:16 128:20 | **readings** 141:3 148:17 | **recently** 98:10 | **recoveries** 45:13 |
| **reaction** 20:25 | **reads** 93:22 | **recess** 48:4 91:9 121:3 163:20 170:20 | |
| **read** 14:3 26:23 29:23 30:1,9 37:6,20 38:2,4 38:19,22 39:2 39:6,7 40:2,18 42:4 44:23,24 45:6 52:24 57:21,22 66:4 66:5 72:2,4 75:3,5,10,12 77:13,19 80:13 81:21 84:6,7 84:21 87:17 88:19 93:20 94:19 96:14 106:20 107:1 111:8,14 121:8 121:9 124:20 137:13,15 140:5,6 148:8 150:10 155:9 159:11,11,17 159:25 162:2,3 162:6,7 165:6 165:11 174:9 | **ready** 9:21 172:17,22 | **recite** 14:20 | **recovery** 66:11 66:17 |
| | **real** 16:16 17:1 17:7 18:3,5,15 18:22 114:2,4 | **recognize** 29:5 34:7 48:25 59:9 65:13 77:7 114:16 144:9 153:7 164:7 | **refer** 20:1 28:14 |
| | **really** 52:6,12 56:22 138:7,8 171:2 | | **referenced** 7:1 121:19 133:7 133:17,17 135:2 137:7 176:6 |
| | **realm** 172:7 | **recollection** 126:22 | |
| | **reason** 47:2 70:4 125:25 151:1 178:6,9 178:12,15,18 178:21 | **recommend** 103:23 | **referencing** 38:20 |
| | | **record** 8:8,15 9:3 10:6 13:4 48:3,5 57:22 61:3 68:6 71:20 72:4 75:5,12 87:17 89:20 91:8,10 111:8,14 120:23 121:2,4 121:9 163:19 163:21 170:16 170:19,21 171:7 173:3 175:8,11 | **referred** 34:21 82:13 |
| | **reasonable** 66:17,23 67:3 67:9,18 68:8 68:13,19 69:7 161:25 | | **referring** 35:12 40:17 111:5,6 |
| | | | **refers** 117:21 |
| | | | **refrain** 48:10 64:19,22 89:25 97:16 |
| | **reasons** 13:16 | | |
| | **recall** 46:2 110:4 122:20 128:2 141:12 142:1 159:17 159:25 162:17 168:25 | | **refresh** 28:24 34:1 |
| | | | **refreshed** 58:25 |
| **reading** 27:9,16 32:18 37:21 | | | **regarding** 30:25 44:20 56:20 66:7,8 |

Veritext Legal Solutions
866 299-5127

**[regarding - retained]**

| | | | |
|---|---|---|---|
| 75:25 86:17 | **remain** 158:25 | 62:17 71:19 | **research** 19:19 |
| 87:6,12,19 | **remainder** | 76:19 111:9 | 46:22 101:25 |
| 100:2 102:9 | 133:19 | 152:2 172:11 | 103:13,14 |
| 132:9 | **remaining** | 172:18 175:2 | 105:1 123:4 |
| **regards** 19:21 | 133:20,23,24 | **represent** 9:7 | **researching** |
| 21:24 22:21 | **remains** 156:20 | 24:21 25:4 | 103:17 |
| 104:16 115:14 | **remember** | **representation** | **reserve** 50:23 |
| **regular** 93:20 | 14:12 17:3,25 | 5:11 65:17 | **residence** 10:13 |
| 99:13 106:21 | 19:1 20:4,16 | **representative** | 10:15 |
| 108:5 | 66:4 78:17 | 23:23 24:20 | **residents** 53:1 |
| **regularly** | 98:9 103:21 | 25:3,14 28:1 | 53:9 |
| 126:23 | 110:7 126:15 | 30:2,11 31:3 | **respect** 14:9 |
| **reinvested** | 130:1 134:10 | 69:15,19 70:2 | 31:12 50:23 |
| 134:13 | 138:2,19 | 70:13 71:1,4,5 | 58:12 74:22 |
| **relate** 162:19 | 140:16,16 | 71:9,12,15 | 88:5 |
| 169:18 | 141:24 142:3 | 72:6,8,11,18,22 | **respond** 57:16 |
| **related** 136:23 | 155:8 165:18 | 73:13,24 74:2 | 148:1 |
| 164:16 167:7,8 | 168:21 | 74:3,9,15,17,20 | **response** 87:2 |
| **relating** 82:5 | **remind** 46:13 | 75:7,9,14,19,23 | 171:18 172:15 |
| 82:18 86:18 | 97:11 | 76:1,8,13 | **responses** 5:5 |
| 87:6 169:12 | **remote** 1:16 | **represented** | 5:23 59:13 |
| **relationship** | 2:16 13:15 | 70:23 | 83:11 |
| 157:22 | **removed** 31:4 | **representing** | **responsibility** |
| **relative** 175:17 | 70:5 132:10 | 8:22 11:8 | 45:8 |
| **released** 176:21 | 133:13,14 | 86:16 | **restart** 48:9 |
| **relevant** 169:7 | 160:5 | **represents** | **restate** 89:8 |
| **relied** 143:17 | **renders** 49:23 | 118:14,17 | **restrictive** |
| 168:25 169:4 | **repeat** 62:19 | **request** 13:13 | 172:3 |
| **relief** 26:3,7 | 87:16 96:5 | **requested** | **result** 164:16 |
| **rely** 36:14 | 142:22 152:3 | 175:15 177:1,9 | 168:7 |
| 102:20 120:9 | **report** 6:9 | 177:10 | **retain** 45:24 |
| 121:10 132:5 | **reported** 1:22 | **requesting** | 136:9 149:7 |
| 137:16,22 | **reporter** 2:20 | 49:22 69:22 | 156:14 157:2 |
| 143:14,16,20 | 8:24 11:17 | **requirements** | **retained** 20:15 |
| 151:1 168:18 | 34:1 57:20 | 23:13,19 | 173:5 |

Veritext Legal Solutions
866 299-5127

**[retaining - see]**

| | | | |
|---|---|---|---|
| **retaining** 20:19 45:9 | 131:9 135:3 137:8 144:14 146:9,14 151:8 | 39:22 40:19,21 41:2,20 44:11 46:7 47:6 49:8 | **scrolling** 158:12 |
| **retention** 5:10 65:16 69:12 | **rights** 50:23 | 49:21 52:25 53:5,8 54:11 | **second** 4:21 41:19 46:12 |
| **return** 176:17 177:6 | **rise** 172:5 | 55:7 57:17 60:5,13,15,18 | 49:3 59:4 60:4 74:21 77:4 |
| **revenue** 164:18 164:19,25 | **risk** 172:2 | 64:10 66:19 73:12 82:4 | 87:14 109:19 117:11 118:17 |
| **revenues** 145:5 145:8 148:9 | **role** 22:1 24:16 26:18,21 44:21 45:3 151:13 | 86:5,14 87:4 115:4,5,7 | 119:10,11 132:17 145:3 |
| 165:19 166:1 | 158:24 | 119:7,11 136:7 144:24 145:4 | 149:3,18 150:5 156:10 |
| **review** 66:2 78:20,23 84:2 | **room** 12:23,24 13:9 51:10 | 148:9 149:4,24 150:2 151:12 | **seconds** 28:13 |
| 107:6 136:12 143:9,22 | **rough** 172:13 172:16 | 154:11,18,20 155:20,21 | **section** 161:20 |
| 175:14 176:8 176:10,13 | **rule** 5:19 81:13 | 156:11 158:17 158:20 159:7 | **sector** 105:8 |
| 177:2 | **rules** 10:22 12:25 177:8 | 160:17 161:23 162:22 164:10 | **securities** 4:11 5:16 21:24 |
| **reviewed** 14:14 136:8,10,16,23 | **run** 101:13 | 164:16 166:14 | 29:8 39:24 40:20 41:1 |
| 143:18 | **ryan** 115:7,9 | **schedule** 6:14 176:10 | 44:11,19 45:13 54:24 56:15 |
| **reviews** 101:18 | **s** | **scheduling** 171:7 | 58:1,13 60:10 77:11 82:6 |
| **ride** 53:21 | **s** 8:6 10:9 158:20 178:3 | **scoot** 151:8 | 102:18 108:21 109:6,11 110:5 |
| **right** 16:3,17 18:6,14 31:10 | **sake** 68:6 | **scottsdale** 53:1 53:11,18 | 110:6 118:14 122:3 123:8 |
| 33:5 35:7 40:23 41:19 | **sales** 119:4 132:18,19 | **screen** 8:13 33:24 105:23 | 135:18,22 |
| 52:1 61:5 64:9 72:18 73:4 | **san** 1:3 2:3 3:7 9:11 | 138:8 | **security** 112:19 |
| 91:4 111:21 114:5 117:23 | **save** 136:22,25 | **scroll** 40:6 87:1 136:2 158:4 | **see** 20:3 28:7,9 28:10 29:2,10 |
| 118:15,18 123:17,18 | **saw** 130:4 | 161:6 | 30:1 31:9 33:5 33:23,25 34:21 |
| 124:11,12,16 125:17 127:24 | **saying** 57:4 61:21 62:2 100:12 154:14 155:21 | | 37:7 39:22 41:2,19 44:11 |
| | **says** 29:11 30:1 33:6 35:6 | | |

Veritext Legal Solutions
866 299-5127

**[see - signatories]**

| | | | |
|---|---|---|---|
| 47:6 48:22,24 | **seeing** 28:22 | **sent** 27:9 | **shareholders** |
| 49:8,21 52:25 | 39:25 149:20 | **sentence** 33:5 | 149:5,19 |
| 53:8 54:10 | **seeking** 24:21 | 33:11 37:10 | 150:14 |
| 55:7 58:24,25 | 25:3,13 28:1 | 54:10 55:12 | **shares** 23:3 |
| 59:5,17,22 | 31:2 70:1 76:1 | 64:9,10 74:14 | 60:16,16 61:4 |
| 60:5,12,15,18 | 76:13 | 75:6 82:8 | 61:15 119:8,12 |
| 64:9,13 73:11 | **seem** 23:1 | 145:3 148:7 | 122:3,12 |
| 81:16,21 82:3 | **seemed** 123:2 | 149:3,18 150:5 | 125:12,23 |
| 82:3,7 83:7 | **seems** 80:23 | 150:13 154:10 | 126:12,21 |
| 86:5,14 87:1,3 | **seen** 8:12 45:20 | 157:18 164:23 | 127:6,15,22,24 |
| 100:20 108:13 | 46:23 81:15,23 | **september** | 128:3,12,17 |
| 113:20 115:5,7 | 83:14 | 53:13 | 129:9,11,23 |
| 117:12,22 | **segment** 109:24 | **serious** 172:2 | 130:5,14,25 |
| 118:10,11 | **select** 101:8 | **serve** 30:2,10 | 131:3,5,6,10,11 |
| 119:6,10 | **selected** 45:11 | 45:11 69:18 | 132:6,22 |
| 123:23,24 | **selecting** 24:16 | 71:4,9 73:12 | 133:19 143:8 |
| 125:11 128:11 | 45:9 | 73:24 74:9,15 | 143:21 |
| 130:24 132:17 | **selection** 4:18 | 74:16 75:7,9 | **shetal** 169:22 |
| 132:18,24 | 34:13 45:3,15 | 75:19 76:8 | **short** 6:4 |
| 135:6 136:6 | **sell** 60:3 126:7 | 158:22 160:18 | **shorthand** 2:20 |
| 144:6,13,24 | 126:12 127:15 | **set** 5:7,25 59:14 | 175:1,9 |
| 145:3 148:7 | 127:23 128:3 | 83:13 98:12 | **show** 137:8,10 |
| 149:4 150:2,13 | 128:10 131:5 | 175:5 | 137:14 |
| 151:10,12 | 131:11,16 | **settlement** | **showing** 12:2 |
| 153:2,3,4,24 | 132:22 | 26:25 69:4 | **shows** 102:9,14 |
| 154:3,17,20 | **selling** 17:11 | **settlements** | 137:4 |
| 155:1 156:11 | 18:17 23:3 | 46:24 | **si** 1:8 2:8 8:21 |
| 156:17 157:3 | 127:6 129:3 | **seven** 125:2 | **sic** 50:18 |
| 158:11,17,20 | **send** 117:5 | **several** 14:18 | **sign** 82:22 |
| 159:7 161:12 | **senior** 156:14 | 18:16 47:14 | 83:19,21,24 |
| 161:20,23 | **sense** 66:14 | 90:7,9 99:9 | 92:3,4,9 93:8 |
| 164:12,12,13 | **sensitive** | 110:8 | 94:8,9,16,18,24 |
| 164:15,23 | 171:25 | **shaking** 11:16 | 176:16 177:5 |
| 166:10,14 | **sensor** 120:5 | **share** 12:5 | **signatories** |
| | | 60:19 | 33:13 |

Veritext Legal Solutions
866 299-5127

**[signature - sound]**

| | | | |
|---|---|---|---|
| **signature** 66:6 | 132:15 153:19 | 96:14,19 97:19 | 126:21 127:16 |
| 175:24 176:21 | 153:21,22,25 | 98:17 103:6,7 | 127:22 128:16 |
| 176:23,23 | **smaller** 132:2 | 103:23 104:2 | 129:9,23 |
| 177:9 | **smith** 1:17 2:17 | 104:11 105:3,7 | 130:11,25 |
| **signed** 33:16 | 4:3,15,22 8:17 | 105:13 106:15 | 131:18 132:6 |
| 34:23 49:9,13 | 9:12,22 10:3,9 | 107:19 108:2 | 133:18 |
| 49:16 76:3,12 | 27:13 29:2,11 | 108:12 111:11 | **solutions** 176:7 |
| 83:23 84:11,18 | 33:5,23 34:2 | 117:8 121:6,19 | **somebody** 97:5 |
| 84:22 | 34:11 38:12,19 | 122:9,11 | **sorry** 10:7 16:6 |
| **significant** | 38:25 43:6,10 | 126:20 127:14 | 17:15,25 31:7 |
| 125:3 | 43:13 44:6 | 128:7 136:6 | 35:14 37:25 |
| **signing** 95:3 | 48:7,22 49:4 | 144:6 147:17 | 46:5 52:24 |
| **silent** 13:15 | 50:14 51:17 | 148:7 153:4,24 | 57:19 62:17,25 |
| **similarly** 1:6 | 53:24 54:12,23 | 158:11 163:23 | 64:2 67:19 |
| 2:6 | 55:16,22 56:13 | 163:24 170:23 | 71:21 72:25 |
| **sit** 26:22 30:19 | 56:14 57:8,13 | 170:24 173:4 | 76:16 79:4 |
| 31:20 50:7,14 | 57:23,24 58:11 | 174:8,20 176:5 | 81:19 89:3 |
| 51:11,17,21 | 58:23 59:9 | 178:2 | 92:12 94:4 |
| 54:1,12,16 | 60:9 61:8 62:9 | **smith's** 31:13 | 100:22 101:16 |
| 70:2 72:14,16 | 62:21 63:9 | 32:24 61:15 | 105:16 109:21 |
| 74:1,5,19 | 64:3 65:2 | 62:2 63:5 | 110:20 111:3 |
| 75:13 76:11 | 67:15 69:18,22 | 92:19 93:5 | 141:12,16 |
| **sitting** 50:10 | 70:8 71:8,14 | 95:5 98:5 | 142:21 144:15 |
| 74:11 | 72:6,8 73:24 | 103:16 112:21 | 147:17 149:10 |
| **situated** 1:6 2:6 | 74:24 75:18 | 171:13 | 156:2 158:8 |
| **situation** 51:13 | 76:3 77:7 | **smiths** 6:6,11 | 159:6,24 |
| **six** 53:15,16,22 | 80:10 81:9,19 | 171:9 | 160:14 162:5 |
| 54:2 173:5 | 82:16,17 83:22 | **snapshot** 6:22 | 165:9 168:8 |
| **size** 117:23 | 83:24 84:2,8 | 164:11 | 169:15 170:23 |
| **skilled** 156:14 | 84:13,24 85:8 | **soares** 1:22 | **sort** 13:7 |
| **skip** 158:24 | 85:20,25 86:14 | 2:19 8:24 | **soseh** 3:20 8:22 |
| **slide** 60:12 | 88:2,11,15 | 175:24 | **sought** 26:3 |
| **slow** 13:22 | 91:12,13,24 | **social** 112:19 | **sound** 22:23 |
| **small** 113:16,19 | 92:25 93:20,24 | **sold** 125:12,19 | 61:5 120:16 |
| 131:24 132:13 | 94:10 96:2,11 | 125:23,25 | 124:15 125:17 |

Veritext Legal Solutions
866 299-5127

**[sound - stock]**

167:4 168:3
**sounds**  120:16
  123:18 124:12
  163:16
**sources**  108:7,8
  112:18,25
  113:1 168:18
**spac**  141:20
  142:6,16
**speak**  11:23
  13:20 14:5
  20:17 43:10,11
  47:19 51:8
  78:4 84:13
**speaking**  13:21
  31:19 39:25
  45:5,23 50:7
  50:12 89:20
  90:2 97:11
  99:4 149:22
**speaks**  96:2
**special**  12:25
  140:17,21
  141:20
**specific**  12:8
  36:21 37:4
  102:14 108:24
**specifically**
  13:12 57:1
  139:24
**speculation**
  24:3 63:13
**speech**  172:10
**spell**  10:6,8

**spelling**  65:22
**spend**  98:22,24
  99:2,8
**spent**  27:3,6,8
  27:13
**spit**  50:8
**spoke**  14:2,12
  46:11 88:25
  89:11
**spoken**  47:14
  115:15,16
  169:24 170:1,3
  170:6
**spouses**  56:23
  85:15
**spread**  116:18
  116:22
**stable**  51:13
  167:5
**stage**  23:9,11
  23:12
**start**  17:5 28:4
  35:18 49:6
**started**  17:4,10
**starting**  14:22
  35:5 44:22
  49:6,19 131:13
  131:15 132:12
  149:18 150:8
  150:13 151:10
  159:6 166:11
**starts**  34:20
  39:21 149:21
  150:7 154:10
  156:7

**state**  9:2 10:6,8
  51:11 52:11
  61:3 62:13
  73:19 85:11
  165:9 174:16
  175:2 176:9,12
**stated**  18:4
  44:18 51:21
  52:3,5 70:19
  87:24 100:14
  101:12 107:3
  120:11 121:13
  124:20 134:21
  136:13 147:1
  166:15
**statement**
  30:15,16,17
  44:15 114:20
  114:21,24
  145:10,13,18
  146:2,3,16
  147:10,18
  148:13,19
  150:18,22
  151:3,17,19,22
  152:10,16
  155:3,5,10
  157:6,11,15
  159:4,15,20
  160:2,8,15,21
  161:1 162:13
  162:15,19,25
  165:4,14,22
  166:21,23
  167:13,18

168:13
**statements**
  21:25 24:14
  44:19 82:11
  101:14 103:2
  107:7,9 169:20
**states**  1:1 2:1
  33:8 65:23
  67:11 92:7
  167:10
**static**  35:14
**stating**  64:22
  64:24 100:6
  128:19 157:19
**statutory**  6:4
**stay**  22:24 23:2
  120:23
**stipulation**
  176:20
**stock**  31:2 35:7
  35:20 36:3,21
  37:4,7 39:16
  41:8 43:19,22
  44:7 55:2,8
  61:10 62:1,6
  62:11,22 63:11
  75:25 95:10
  99:12,21,23
  100:9 101:12
  102:10 103:13
  104:25 105:22
  111:22 112:10
  112:11,12,14
  113:10,13,17
  119:4,20

Veritext Legal Solutions
866 299-5127

HIGHLY CONFIDENTIAL

**[stock - tamar.kaplan]**

121:23 122:4
122:16,17,21
122:23 123:15
124:10 125:7
125:13,19
126:1 128:22
129:6 130:8,18
130:19,20
131:15 132:11
132:24 133:4
134:2,14 135:8
135:12 142:18
142:24 145:14
157:12 159:21
162:16 165:15
166:24
**stockholders**
154:23
**stocks** 35:24
39:12 42:25
43:4 56:4 58:8
103:24 105:13
110:14 111:19
111:25 112:1
114:25 128:8
**stopped** 19:2
120:18
**strategic** 149:6
**strategies**
103:4
**strategy** 159:2
**street** 3:7,15
10:11
**struggling**
80:23

**subject** 13:6
30:22
**subscribed**
175:20
**subsequent**
119:3
**substance** 97:1
**substantial**
23:7 45:13
**substantially**
132:25
**substantively**
65:19
**successful**
46:23
**sued** 21:13,16
**sufficient** 125:6
**suggest** 163:16
**suit** 23:14,20
**suite** 3:7
**supermarket**
97:6
**supervise** 47:7
47:12
**supplemental**
5:4 58:19
59:12
**supplementing**
136:7
**supplies** 17:11
18:18
**support** 4:15
34:11
**sure** 16:23
38:17 40:8

42:20 47:20,21
60:25 63:21
66:3,3,5 68:25
70:22 71:18
74:25 75:2
80:24 81:17,18
81:23,24 84:11
88:9 90:5,13
98:24,25
100:22 108:12
108:14,18
110:24 111:7,9
113:3,6,11,15
115:22,22
119:19 123:12
124:13 131:8
133:15,23
135:5,6 141:6
142:17,23
143:2,3,11,18
145:24 146:11
147:6 150:7,20
159:23 160:11
160:12 162:11
165:12 168:22
169:4 170:5,7
170:15
**susan** 171:11
**swick** 3:4 9:11
11:12 19:24
45:11,23 47:11
**symbol** 100:19
101:4
**synched** 172:20

**system** 161:24

**t**

**t** 10:9 178:3,3
**tab** 28:4,15,16
33:18,25,25
47:22 52:21
58:17 76:15,16
155:21
**take** 8:14 12:9
52:8 71:18
73:3 83:1
90:19,25
114:22 120:17
126:9 128:6
150:9,10
158:13 163:6,8
163:13 170:13
172:13,16
**taken** 2:17 8:17
175:4
**talk** 46:17
106:15 127:1
**talked** 66:3
123:23
**talking** 39:2
97:6 126:6
**talks** 26:25
**tamar** 3:14 9:5
47:24 74:22
91:3 142:21
144:15 163:14
176:1
**tamar.kaplan**
3:17 176:2

**[target - today]**

| | | | |
|---|---|---|---|
| **target**  15:21 | 166:16 167:3 | 88:19 92:22 | 35:15 36:7 |
| **tax**  103:2 | **tesla**  110:12 | 108:11 120:5 | 50:11,13,15 |
| **td**  116:13 | 111:5,16,22 | 120:14 121:16 | 51:18 52:8 |
| **team**  100:8 | **testified**  9:24 | 156:25 | 56:7 70:11,16 |
| 154:18,22 | 11:2 159:23 | **think**  14:11 | 71:7,7 73:3 |
| **technical**  48:1 | **testify**  11:5 | 17:2 29:13 | 76:7 82:15 |
| **technology** | 31:6 | 53:22 57:14 | 90:22 95:15 |
| 119:22,23,24 | **testifying**  10:17 | 61:21 63:24 | 96:9 98:3,5,22 |
| 120:7 123:2 | 27:18,21 175:7 | 66:16 71:22,24 | 106:4,6 115:11 |
| 124:21,22 | **testimony** | 76:19 79:13 | 121:23 122:18 |
| 128:25 130:7 | 13:17 30:3,12 | 85:17 89:7 | 122:20 125:21 |
| 130:19 139:10 | 37:23 73:14 | 111:5 117:4 | 125:23 130:2,8 |
| 139:12,12,16 | 134:16 172:4 | 122:17 129:22 | 130:18 137:25 |
| 139:16 140:12 | 173:4 174:12 | 138:6 140:22 | 140:5 142:18 |
| 140:15 157:23 | 175:11 | 154:9 170:4,12 | 142:24 145:15 |
| 159:2 | **texas**  150:3 | 172:14 | 146:16 150:9 |
| **telephone** | **text**  13:5 | **thinking**  57:3 | 150:10 152:10 |
| 86:23 | **thank**  9:20 10:3 | **thought**  21:3 | 152:16 155:11 |
| **television** | 59:20 69:9 | 75:22 119:22 | 155:14 158:13 |
| 107:25 | 75:1,16 77:5 | 120:7 123:3 | 160:8,15,22 |
| **tell**  33:12 42:1 | 78:15 80:20 | 124:21,23 | 161:1 165:10 |
| 42:2 61:8 | 86:12 109:22 | 126:4 129:19 | 165:20,22 |
| 62:15,21 | 121:17 136:4 | 130:2,7,9,17 | 166:4 167:14 |
| 122:11 140:22 | 144:21 158:15 | 131:8 140:7 | 168:13 171:4,8 |
| 152:14 | 161:15 170:24 | **three**  14:23 | 173:7 175:5 |
| **telling**  57:17,17 | 171:3,7,16 | 20:23 52:4 | 176:10,18,24 |
| **tells**  121:22 | 172:18 173:1 | 145:2 166:10 | 177:7 |
| **ten**  90:23 | **thanks**  86:10 | **thrown**  152:8 | **times**  14:5,7,9 |
| 163:11 | 172:9 | **thursday**  1:18 | 47:15,21 61:4 |
| **tendency**  13:20 | **thing**  13:19 | 2:19 8:2 | 72:20 88:11,13 |
| **term**  123:3 | 54:19 140:13 | **ticker**  100:19 | 88:15,18,20 |
| 124:23 126:5 | 149:11 159:6 | 101:4 | 104:14 107:11 |
| 128:20,25 | **things**  27:2 | **time**  9:1 12:9 | 109:13 |
| 129:5,20,22 | 31:16 32:8,16 | 21:5 24:13 | **today**  9:14 10:4 |
| 130:9,20 133:5 | 42:25 51:13 | 27:3,6,8,12 | 10:23 11:9,14 |

**[today - uncomfortable]**

12:23 13:17
26:23 51:6
170:25 172:4,7
**today's**  13:24
26:19 173:3
**together**  35:7
41:9 43:18
94:16 107:25
108:3
**told**  127:14
**took**  134:13
171:20,20
**top**  33:6 46:6
119:6 130:23
144:25 149:23
154:11 156:7
158:6 159:10
**topics**  171:2
**total**  66:11,16
113:7 173:4
**tough**  52:7
**toward**  39:23
**towards**  39:22
54:9 128:20
159:8
**track**  90:15
**trade**  3:15
35:22 38:3
42:10 60:13,21
60:22 63:4
82:11,11
103:13 105:19
105:23 106:1
109:10,15
114:19,20,25

116:12,14,24
117:3,18
118:14,15
123:16 124:11
126:3,19,23
127:11,24
128:4,9,16
130:24 131:6
**trader**  18:21,25
19:2
**trades**  60:2,8
117:22 118:18
**trading**  35:18
36:2,8,9,15
115:19,24
116:7,11
117:21 126:18
127:4 128:21
**training**  15:3,4
15:5,11
**transaction**
54:18
**transactions**
92:8
**transcribed**
175:9
**transcribing**
11:17
**transcript**
171:12 172:12
172:20 174:10
175:10,13,15
176:6,8,10,13
176:13,21
177:2,2

**travel**  53:18
**trial**  27:18,22
30:4,13 31:6
31:20 73:14
**trip**  53:24 54:3
54:6
**truck**  112:24
**true**  33:8 41:21
64:11,25 147:2
147:4 174:13
175:11
**truth**  33:12
42:1,2 152:14
**truthfully**  11:5
**try**  11:22 19:3
21:11 71:22
108:8
**trying**  14:11
18:10 57:3
78:14 81:21
154:4
**turn**  12:8 15:25
28:3 39:20
41:17 44:22
47:22 52:21
58:17,18 59:16
76:15 81:25
83:16 85:25
117:11 118:8
123:22 135:24
144:13 148:25
153:11 155:18
158:1
**tv**  138:8

**twice**  42:14
**two**  14:7 20:22
32:16 35:3
52:1,4 59:22
59:24 94:1
111:2,24
117:12 118:11
119:16 121:24
122:3 123:23
124:7 145:2
166:10
**type**  26:24
45:10 108:24
116:16 120:14
121:16
**types**  108:21
**typically**
136:19,22

**u**

**u.s.**  8:20 10:19
**ultimate**  41:6,7
55:7,11
**ultimately**  39:9
41:15 42:10,12
42:16 43:13,18
45:22 54:20
55:3,14 63:17
**um**  40:16 82:2
108:19 131:1
137:12 146:15
148:12 149:1
154:19 164:22
**unable**  55:16
**uncomfortable**
53:25

Veritext Legal Solutions
866 299-5127

**[under - videographer]**

**under** 11:4
33:6,7 41:20
45:1 64:10
145:7 148:9
174:8 175:10
**undersigned**
175:1
**understand**
10:17 11:4,24
12:1 16:2,16
17:10 18:10
21:5 25:21
26:17,21 31:18
43:12 44:25
48:11 52:13
61:18 64:15
70:15,25 76:4
76:7 77:15
84:8 93:11
96:3,6 100:22
140:14 157:18
160:14 162:9
162:18,23
167:6,22 168:6
168:12 169:15
170:25
**understanding**
23:21 24:10
65:18,21 66:7
74:5,8 78:3
79:19 80:2,4,6
92:1 139:8
140:20
**understood**
69:9 84:17,25

124:14
**unexpected**
164:24
**unfortunately**
52:19
**unit** 8:16
**united** 1:1 2:1
33:7
**units** 173:5
**university**
14:22,25
**update** 166:12
**upward** 122:21
**use** 36:8 37:16
38:13 39:10
43:2 96:11,12
96:13 120:19
**used** 13:14
146:22,22
173:5
**using** 175:8

**v**

**vague** 27:7
35:23 36:23
38:5
**vehicles** 120:3
139:11,14,14
**velodyne** 1:9
2:9 6:20 8:19
9:8 10:18
19:21 20:11
21:1,14 22:1
22:22 23:2,3
30:25 39:24
40:19 41:1

42:15,19,21
43:14,17,19,22
44:7,12 45:22
54:24 55:2,8
55:23 56:7,15
57:25 58:12
60:3,10 61:10
61:15 62:1,11
62:22 63:10
75:25 78:5
82:6,19 94:2
110:4 115:25
118:14 119:4
119:13,21
120:10 121:11
122:3,16,23
123:8,10,15
124:10 125:13
125:18 126:5
126:12,21
127:15 128:12
128:25 129:15
130:12 131:10
131:18 138:1
138:13,16,23
139:1,8,24
141:7,7 142:5
142:10,12,19
142:19,25,25
143:4,8,22
144:24 145:4
145:14 149:5
149:19,24
150:14,23,25
151:14,20

154:11,21
155:6 156:11
156:18 157:12
159:21 162:16
164:24 165:3
165:15 166:14
166:20,24
168:20 176:4
178:1
**velodyne's**
44:20 143:9,22
156:20,21,23
157:1,20
**verbally** 11:16
43:8 96:19
97:2,5
**veritext** 8:23,25
173:6 176:7,9
176:11
**version** 153:18
**versus** 8:19
164:20
**video** 1:16 2:16
3:20 8:7,14,16
9:16,20 12:25
48:2,5 91:7,10
121:1,4 163:18
163:21 170:18
170:21 172:16
172:19,19,22
173:2
**videoconfere...**
3:1
**videographer**
8:23

Page 40

[view - witness]

| | | | |
|---|---|---|---|
| **view** 85:20 172:4 | 128:24 132:13 133:3 172:14 | **william** 3:15 4:15,22 9:7 | 22:20 23:17 24:4,24 25:6 |
| **violations** 5:15 77:11 | **wanting** 124:22 | 27:13 29:11 34:11 41:5 | 25:24 26:7 27:8,25 28:6 |
| **virtually** 8:10 | **watch** 102:9,15 107:22,25 | 42:5,22 49:4 54:11,15 66:2 | 28:25 29:15,21 31:15 32:6,14 |
| **visibility** 166:17 167:4 | 108:5 137:25 138:7,8 | 73:20 74:16,23 75:8 103:5 | 33:16 34:3,16 35:3,9,24 36:5 |
| **vldr** 6:6,11 | **watched** 102:12 108:2 | **william's** 49:10 49:22 | 36:17,24 37:6 37:15,24 38:7 |
| **voice** 31:18 52:12,13,15 | 137:7 138:3 | **william.brenc** 3:17 | 38:16,22 39:6 39:18 41:14 |
| **volume** 1:19 2:17 4:3 | **watches** 137:10 **way** 17:16 | **willing** 30:2,10 73:12 74:9,14 | 42:1,9,15,24 43:8,17 44:2 |
| **vs** 1:8 2:8 176:4 178:1 | 50:23 61:8,16 62:2 83:7 89:4 | 74:16,19 75:7 75:9,13,19 | 45:20 46:16,21 50:20,21 51:4 |
| **w** | 158:3 | **wilmer** 3:14 | 51:21 52:3 |
| **wait** 11:21 120:25 | **we've** 47:17 80:17 95:8 | **wilmerhale** 9:6 9:7 | 54:5 55:2,19 56:1,10,17 |
| **waived** 176:23 176:23 | 102:12 104:7 | **wilmerhale.c...** 3:17,17 176:2 | 58:6 59:7 60:25 61:12,19 |
| **waiving** 176:20 | **weak** 52:17,17 **weaker** 52:12 | **winning** 66:15 | 61:21 62:6,13 63:7,14,21 |
| **walk** 94:7 | 52:14,18 | **wise** 133:4 | 64:20,24 65:11 |
| **want** 13:19 32:19 34:3 | **website** 46:22 101:2 140:5 | **withdraw** 69:22 | 66:10,19,25 67:5,11,24,25 |
| 63:10,18 80:24 89:20 99:20 | **wednesday** 14:8,13 | **withdrawal** 49:22 | 68:2,11,15 69:1 70:11,19 |
| 103:12 106:25 108:12,14,18 | **week** 14:3,7,11 98:22,25 99:9 | **withdrawing** 74:4 | 71:3,11 72:7 72:13,21 73:4 |
| 111:9 114:22 116:18 120:23 | **weekly** 99:3 | **withdrew** 145:25 147:7 | 73:19 74:1,19 75:22 76:10 |
| 150:9 162:2 163:6,7,10 | **welcome** 12:9 **went** 14:23,24 | **witness** 4:2 8:1 8:12 9:13 | 77:24 78:16,23 79:10,17,23 |
| 170:15 172:12 | 18:16 140:5 142:5 | 18:13 20:22 21:19 22:7,13 | 80:12 82:10 |
| **wanted** 13:1 44:3 58:12 126:3 128:21 | **whereof** 175:19 **wife** 138:15 | | |

Veritext Legal Solutions
866 299-5127

**[witness - zoom]**

| | | | |
|---|---|---|---|
| 83:3 84:10,15 | 133:22 134:4,9 | **work**  16:7 | 121:24 152:9 |
| 84:21 87:23 | 134:17,21 | 18:20 37:17,19 | 155:13 164:19 |
| 88:8,18 89:23 | 135:14,20 | 69:1 90:21 | 164:21,24 |
| 89:25 90:1,5 | 136:25 137:22 | **worked**  16:2 | **years**  14:23 |
| 90:12,18,23 | 138:6,22 | 17:2,7 18:5,24 | 16:8 18:14,16 |
| 91:2,18 92:16 | 139:20 140:3 | 112:24 171:3 | 52:1 111:2 |
| 92:21 93:8,17 | 141:12 142:12 | **working**  19:2 | 121:24 137:6 |
| 93:22 94:14,21 | 143:11 144:22 | **workings** | **york**  3:16,16 |
| 95:2,8,15,24 | 146:5,11,19 | 167:19 | 171:9 |
| 96:9 97:9,14 | 147:1,6,14 | **works**  83:1 | |

**z**

**zoom**  154:1,3

| | | |
|---|---|---|
| 97:16,17 98:1 | 148:3,16 | 90:20 |
| 98:8,15,20 | 150:20 151:6 | **world**  3:15 |
| 99:8,15 100:14 | 152:5,13,19 | **worse**  32:8 |
| 101:11,22 | 153:22 154:3 | 51:9 |
| 102:12 103:9 | 155:16 156:4 | **worth**  60:23 |
| 103:20 104:7 | 157:8 159:17 | 61:9 62:1,11 |
| 104:14,21 | 159:25 160:5 | 62:22 63:10 |
| 105:10,18,25 | 160:11,17 | 113:2,7,23 |
| 106:6,12,18 | 161:3,15 162:7 | 114:1 123:15 |
| 107:3,11 | 162:22 163:3,8 | 124:10 125:18 |
| 108:23 109:8 | 163:11 164:4 | 126:21 127:6 |
| 109:13 110:2 | 165:6,18,25 | 135:2 |
| 110:11,19 | 166:6 167:10 | **write**  80:14 |
| 111:20 113:15 | 167:16,25 | **writing**  153:20 |
| 114:4,14 | 168:10,16,22 | |

**x**

**x**   175:15 177:9

| | | |
|---|---|---|
| 115:22 116:16 | 169:3,10 | |
| 118:2 119:1 | 170:11 175:19 | |

**y**

| | | |
|---|---|---|
| 121:22 122:6 | 176:13,16 | |
| 122:14,20 | 177:2,5 178:24 | **yeah**  9:19 |
| 123:1,12 | **witnesses**  90:12 | 28:12 114:24 |
| 124:20 125:9 | 175:6 | 120:21 154:6 |
| 127:1,9,18 | **word**  30:7 | 163:15 172:15 |
| 129:13,19 | 146:22 | **year**  19:1 |
| 130:1,17 | **words**  22:16 | 110:22,24 |
| 131:21 132:2,8 | | 111:22,23 |

Veritext Legal Solutions
866 299-5127

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.